UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

K.C., a minor child by her parents and next
friends Nathaniel and Beth Clawson;
NATHANIEL and BETH CLAWSON;
M.W., a minor child by his parents and next
friends Ryan and Lisa Welch;
RYAN and LISA WELCH;
A.M., a minor child by her mother and next
friend Emily Morris;
EMILY MORRIS;
M.R., a minor child by his parent and next
friend, Maria Rivera;
MARIA RIVERA;
CATHERINE BAST, M.D.;
MOSAIC HEALTH AND HEALING ARTS,
INC.;
all plaintiffs on their own behalf and on behalf
of classes and sub-classes similarly
situated,

Plaintiffs,

v.                                                          No. 1:23-CV-595

THE INDIVIDUAL MEMBERS OF THE
MEDICAL LICENSING BOARD OF
INDIANA, in their official capacities;
EXECUTIVE DIRECTOR, INDIANA
PROFESSIONAL LICENSING AGENCY,
in her official capacity;
ATTORNEY GENERAL OF THE
STATE OF INDIANA, in his official capacity;
SECRETARY, INDIANA FAMILY AND
SOCIAL SERVICES ADMINISTRATION, in
her official capacity;
INDIANA FAMILY AND SOCIAL SERVICES
ADMINISTRATION,

[1]

Defendants.

**Class Action Complaint for Declaratory and Injunctive Relief / Notice of Challenge to Constitutionality of Indiana Statute**

**Introduction**

1.      Over the sustained objection and concern of medical professionals, Indiana passed Indiana Senate Enrolled Act 480 ("S.E.A. 480"), effective July 1, 2023, which prohibits transgender minors from receiving what the law labels as "gender transition procedures." These prohibited interventions are evidence-based and medically necessary medical care essential to the health and well-being of transgender minors who are suffering from gender dysphoria, a serious condition that can lead to depression, anxiety and other serious health consequences when untreated. By denying this medically necessary treatment to minors, the State of Indiana has displaced the judgment of parents, doctors, and adolescents with that of the government. In so doing, the State has intruded on the fundamental rights of parents to care for their minor children by consenting to their receipt of doctor-recommended and necessary care and treatment. This violates due process. Additionally, by singling out for prohibition the care related to "gender transition," the law creates a facial classification based on sex and transgender status, violating the equal protection rights of transgender adolescents. It also violates their bodily integrity and is fundamentally irrational, which violates due process. And, to the extent that it prohibits the provision of essential services that would otherwise be

authorized and reimbursed by Medicaid, the law violates the federal requirements of the Medicaid Act and the Affordable Care Act. It also intrudes on the First Amendment rights of doctors and other practitioners.

2.       This law takes away critical health care from a group of Hoosiers, leaving them and their parents in dire circumstances. It is vast government overreach into the decision-making of parents and will cause untold harms to the individuals affected and the practice of medicine in Indiana. It is also unlawful and unconstitutional and should be enjoined both as to plaintiffs and the classes they seek to represent.

**Jurisdiction, venue, and cause of action**

3.       This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

4.       Venue is proper in this district pursuant to 28 U.S.C. § 1391.

5.       Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil Procedure and by 28 U.S.C. §§ 2201, 2202.

6.       This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States and is also brought pursuant to the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116(a).

**Parties**

7.       K.C. is a minor child who resides in Monroe County. She brings this action by her parents and next friends, Nathaniel and Beth Clawson.

[3]

8.     Nathaniel and Beth Clawson, the parents and legal guardians of K.C., are adult residents of Monroe County.

9.     M.W. is a minor child who resides in Marion County. He brings this action by his parents and next friends, Ryan and Lisa Welch.

10.    Ryan and Lisa Welch, the parents and legal guardians of M.W., are adult residents of Marion County.

11.    A.M. is a minor child who resides in Marion County. She brings this action by her mother and next friend, Emily Morris.

12.    Emily Morris, the parent and legal guardian of A.M, is an adult resident of Marion County.

13.    M.R. is a minor child who resides in Elkhart County. He brings this action by his mother and next friend, Maria Rivera.

14.    Maria Rivera, the parent and legal guardian of M.R., is an adult resident of Elkhart County.

15.    Dr. Catherine Bast is a physician practicing medicine in Elkhart County who is licensed to practice medicine in the State of Indiana and who is a co-founder of Mosaic Health and Healing Arts, Inc., where she practices medicine.

16.    Mosaic Health & Healing Arts, Inc., is a family medicine practice that provides necessary medical care to many transgender persons, including minors with gender dysphoria. It is located in Elkhart County.

[4]

17.     The Individual Members of the Medical Licensing Board of Indiana are the duly appointed members of the agency that is empowered to grant and revoke the licenses of medical practitioners in Indiana and otherwise impose discipline upon them. *See* Ind. Code §§ 25-1-9-1; 25-1-9-4(a)(3); 25-1-9-9.

18.     The Executive Director, Indiana Professional Licensing Agency, is the director of the agency that performs certain administrative functions and duties and has certain responsibilities for numerous agencies in Indiana that regulate "practitioners" as defined by S.E.A. 480. Ind. Code §§ 25-0.5-3; 25-1-6-3. One of these agencies is the Medical Licensing Board of Indiana.

19.     The Attorney General of the State of Indiana is empowered to investigate consumer complaints alleging a violation of state law, Ind. Code § 25-1-7-2, and can, and regularly does, bring actions seeking to discipline persons holding professional licenses.

20.     The Secretary of the Indiana Family and Social Services Administration is the director of the Indiana agency that is responsible for the administration of the Indiana Medicaid Program. Ind. Code § 12-15-1-1.

21.     The Indiana Family and Social Services Administration is a recipient of federal Medicaid funds and is therefore a "health program or activity that receives federal funds" subject to Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116.

**Class action allegations**

*Class 1*

[5]

22.     Plaintiffs K.C., M.W., A.M., and M.R. bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

23.     The class is defined as:

> all minors in the State of Indiana who are, or will be, diagnosed with gender dysphoria, and are receiving, or would receive but for Senate Enrolled Act 480, care that falls within the statute's definition of "gender transition procedures."

24.     As defined, the class meets all the requirements of Rule 23(a). Specifically:

    a.     The class is so numerous that joinder of all members is impracticable.

    b.     There are questions of law or fact common to the class.

    c.     The claims of the representative parties are typical of those of the class.

    d.     The named plaintiffs are adequate representatives of the class.

25.     The further requirements of Rule 23(b)(2) are met in that at all times defendants The Individual Members of the Medical Licensing Board of Indiana, the Executive Director of the Indiana Professional Licensing Agency, and the Attorney General of Indiana have acted and have failed to act on grounds generally applicable to the class.

> *Subclass 1-A*

26.     Plaintiff A.M. also brings this action on her own behalf, and on behalf of a subclass of those similarly situated, pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

27.     The subclass is defined as:

all members of Class 1 who are, or will be, Medicaid recipients.

28.    As defined, the subclass meets all the requirements of Rule 23(a). Specifically:

      a.      The class is so numerous that joinder of all members is impracticable.

      b.      There are questions of law or fact common to the class.

      c.      The claims of the representative parties are typical of those of the class.

      d.      The named plaintiffs are adequate representatives of the class.

29.    The further requirements of Rule 23(b)(2) are met in that at all times defendant Secretary, Indiana Family and Social Services Administration and the Indiana Family and Social Services Administration have acted and has failed to act on grounds generally applicable to the class.

*Class 2*

30.    Plaintiffs Nathaniel and Beth Clawson, Ryan and Lisa Welch, Emily Morris, and Maria Rivera bring this action on their own behalf and on behalf of a class of those similarly situated.

31.    The class is defined as:

all parents or legal guardians of minors in the State of Indiana who are, or will be, diagnosed with gender dysphoria, and are receiving, or would receive but for Senate Enrolled Act 480, care that falls within the statute's definition of "gender transition procedures."

32.    As defined, the class meets all the requirements of Rule 23(a). Specifically:

      a.      The class is so numerous that joinder of all members is impracticable.

      b.      There are questions of law or fact common to the class.

      c.      The claims of the representative parties are typical of those of the class.

      d.      The named plaintiffs are adequate representatives of the class.

33.      The further requirements of Rule 23(b)(2) are met in that at all times defendants The Individual Members of the Medical License Board, Executive Director of the Indiana Professional Licensing Agency, and the Attorney General of Indiana have acted and have failed to act on grounds generally applicable to the class.

      *Class 3*

34.      Dr. Catherine Bast and Mosaic Health and Healing Arts, Inc. bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

35.      The class is defined as:

    all current physicians and practitioners in Indiana, as those terms are defined in Senate Enrolled Act 480, who are providing care that falls within the statute's definition of "gender transition procedures" or who, but for that act, would provide that care.

36.      As defined, the class meets all the requirements of Rule 23(a). Specifically:

      a.      The class is so numerous that joinder of all members is impracticable.

      b.      There are questions of law or fact common to the class.

      c.      The claims of the representative party are typical of those of the class.

      d.      The named plaintiffs are adequate representatives of the class.

37.      The further requirements of Rule 23(b)(2) are met in that at all times defendants The Individual Members of the Medical Licensing Board, Executive Director of the

Indiana Professional Licensing Agency, and the Attorney General of Indiana have acted and have failed to act on grounds generally applicable to the class.

*Subclass 3-A*

38.     Dr. Catherine Bast and Mosaic Health and Healing Arts, Inc., bring this action on their own behalf and on behalf of a subclass of those similarly situated.

39.     The subclass is defined as:

> all members of Class 3 who are Medicaid providers and who are currently providing care, reimbursed by Medicaid, which falls within the definition in Senate Enrolled Act 480 of "gender transition procedures" and those providers in the future who would provide such care but for Senate Enrolled Act 480.

40.     As defined, the subclass meets all the requirements of Rule 23(a). Specifically:

    a.     The class is so numerous that joinder of all members is impracticable.

    b.     There are questions of law or fact common to the subclass.

    c.     The claims of the representative parties are typical of those of the class.

    d.     The named plaintiffs are adequate representatives of the subclass.

41.     The further requirements of Rule 23(b)(2) are met in that at all times the Family and Social Services Administration has acted and has failed to act on grounds generally applicable to the class.

42.     Undersigned counsel are appropriate to be appointed counsel for all classes and subclasses and should be appointed pursuant to Federal Rule of Civil Procedure 23(g).

**The statute**

43.    S.E.A. 480 defines "gender transition" as the "process in which an individual shifts from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex, and may involve social, legal, or physical changes." Ind. Code 25-1-22-3 (eff. July 1, 2023).

44.    The statute defines "gender transition procedures" to mean:

> any medical or surgical service, including physician's services, practitioner's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition, that seeks to:
>
> (1)    alter or remove physical or anatomical characteristics or features that are typical for the individual's sex; or
>
> (2)    instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex, including medical services that provide puberty blocking drugs, gender transition hormone therapy, or genital gender reassignment surgery or nongenital gender reassignment surgery knowingly performed for the purpose of assisting an individual with a gender transition.

Ind. Code § 25-1-22-5(a) (eff. July 1, 2023).

45.    The statute defines "gender transition hormone therapy" as testosterone, estrogen, or progesterone, that is "given to an individual in an amount greater than would normally be produced endogenously in a healthy individual of that individual's age and sex." Ind. Code § 25-1-22-4 (eff. July 1, 2023).

46.    "Puberty blocking drugs" are defined as

> "(1)    gonadotropin releasing hormone analogues or other synthetic drugs used to stop luteinizing hormone and follicle stimulating hormone secretion; or

(2)      synthetic antiandrogen drugs used to block the androgen receptor;

when used for the purpose of assisting an individual with a gender transition."

Ind. Code § 25-1-22-11 (eff. July 1, 2023).

47.     However, the term "gender transition procedures" does not include:

(1)      Medical or surgical services to an individual born with a medically verifiable disorder of sex development, including an individual with:

(A) external sex characteristics that are irresolvably ambiguous;
(B) forty-six (46) XX chromosomes with virilization;
(C) forty-six (46) XY chromosomes with undervirilization; or
(D) both ovarian and testicular tissue.

(2)      Medical or surgical services provided when a physician or practitioner has diagnosed a disorder or condition of sexual development that the physician or practitioner has determined through genetic or biochemical testing that the individual does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action.

(3) The treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of gender transition procedures.

(4) Any medical or surgical service undertaken because the individual suffers from a physical disorder, physical injury, or physical illness that would, as certified by a physician or practitioner, place the individual in imminent danger of death or impairment of major bodily function unless the medical or surgical service is performed.

(5) Mental health or social services other than gender transition procedures as defined in subsection (a).

(6) Services for a disorder or condition of sexual development that is unrelated to a diagnosis of gender dysphoria or gender identity disorder.

Ind. Code § 25-2-22-5(b) (eff. July 1, 2023).

48.     The statute prohibits physicians and practitioners, defined as any individual who is licensed by a regulatory board, from knowingly providing gender transition procedures to a minor or aiding or abetting another physician or practitioner in providing such procedures to a minor. Ind. Code § 25-2-22-10, 13(b) (eff. July 1, 2023).

49.     This prohibition does not apply to services provided to a minor for the reasons noted in Ind. Code § 25-2-22-5(b)(1)-(4). Ind. Code § 25-2-22-13(a), (c) (eff. July 1, 2023).

50.     Additionally, the statute provides that if a physician or practitioner has prescribed gender transition hormone therapy to a minor as of June 30, 2023 as part of a gender transition procedures, the hormones may continue until December 31, 2023. Ind. Code § 25-2-22-13(a), (d) (eff. July 1, 2023). There is no similar provision concerning extending the continuation date for those who have been prescribed puberty blockers as of June 30, 2023.

51.     A physician or practitioner who takes any action to aid or abet another physician or practitioner to provide gender transition procedures for a minor violates the standard of practice under Indiana Code 25-1-9 and is subject to discipline. Ind. Code § 25-2-22-15 (eff. July 1, 2023).

52.     The statute also provides for a damages action by an individual who has received prohibited gender transition procedures or by the individual's parent or guardian. Ind. Code § 25-2-22-16-18 (eff. July 1, 2023).

**Factual allegations**

*Background as to transgender persons, gender dysphoria, and the medically necessary treatment of gender dysphoria*

53.     Gender identity refers to a person's core sense of belonging to a particular gender.

54.     Although the precise origin of gender identity is unknown, a person's gender identity is a fundamental aspect of human development. There is a general medical consensus that gender identity has a significant biological component.

55.     Every person has a gender identity; it is not a personal decision, preference, or belief. A person's gender identity cannot be altered through medical intervention.

56.     A person's gender identity usually matches, or is congruent with, the sex they were designated at birth based on their external genitalia.

57.     Most boys are designated male at birth based on their external genital anatomy, and most girls are designated female at birth based on their external genital anatomy. Persons whose gender identities are congruent with the sex they were assigned at birth are referred to as "cisgender."

58.     Transgender persons have gender identities that are not congruent with their sex as assigned at birth. For example, a transgender boy is someone who was assigned a female sex at birth but persistently, consistently, and insistently identifies as male. A transgender girl is someone who was assigned a male sex at birth but persistently, consistently, and insistently identifies as female.

59.     Just like cisgender boys and girls cannot (and are not expected or asked to) simply

turn off their gender identities like a switch, so too are transgender boys and girls unable to "turn off" their gender identity—which, again, is innate.

60.    For transgender people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress and discomfort.

61.    "Gender dysphoria," codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V) at 302.6 (for children) and 302.85 (for post-pubertal adolescents and adults), is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth. To be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

62.    Studies indicate that up to 0.6% of adolescent and adult persons in Indiana identify as transgender.

63.    Being transgender itself is not a medical condition to be cured. As the American Psychiatric Association explained in promulgating the DSM-V, "[t]he presence of gender variance is not the pathology but dysphoria is from the distress caused by the body and mind not aligning and/or societal marginalization of gender-variant people."

64.    Untreated, gender dysphoria results in significant lifelong distress, clinically significant anxiety and depression, self-harming behaviors, substance misuse, and

suicidality.

65.     In fact, research consistently demonstrates that up to 51% of transgender and gender nonbinary young persons have attempted suicide at least once, compared to 14% of adolescents without gender dysphoria.

66.     Gender dysphoria can be diagnosed very early in a child's life, sometime as early as three years of age.

67.     The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published widely accepted and evidence-based standards of care for the assessment, diagnosis, and treatment of gender dysphoria. These clinical practice guidelines are recognized by leading mental health and medical organizations in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association.

68.     The WPATH Standards of Care set out a regimen of care designed to address and alleviate the clinically significant distress caused by the incongruence between a transgender individual's gender identity and their birth-assigned sex. The distress may be extremely debilitating and dangerous and is alleviated by helping a transgender person live in alignment with their gender identity. This treatment is sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care." These clinical practice guidelines are widely accepted as best practices guidelines for the treatment of adolescents and adults diagnosed with gender dysphoria and have been

recognized as authoritative by leading medical organizations, such as the American
Academy of Pediatrics, which agrees that this care is safe, effective, and for many youth
diagnosed with gender dysphoria, medically necessary.

69.     Medical necessity is properly defined as:

> Health care services that a physician and/or health care professional,
> exercising prudent clinical judgment, would provide to a patient for the
> purpose of preventing, evaluating, diagnosing or treating an illness, injury,
> disease or its symptoms, and that are: (a) in accordance with generally
> accepted standards of medical practice; (b) clinically appropriate in terms
> of type, frequency, extent, site and duration, and considered effective for
> the patient's illness, injury, or disease; and (c) not primarily for the
> convenience of the patient, physician, or other health care provider, and not
> more costly than an alternative service or sequence of services at least as
> likely to produce equivalent therapeutic or diagnostic results as to the
> diagnosis or treatment of that patient's illness or disease.

WPATH Standards of Care for the Health of Transgender and Gender Diverse People,
Version 8, Statement 2.1.

70.     The precise treatment for gender dysphoria depends upon each person's
individualized needs, and the guidelines for medical treatment differ depending on
whether the treatment is for an adolescent or an adult.

71.     For pre-pubertal children, interventions are directed at supporting the child with
family, peers, and at school, as well as supportive individual psychotherapy for the child
as needed. Some pre-pubertal children may also explore their gender identity by
adopting a different name or pronoun and/or wearing clothes and hairstyles that match
an affirmed gender as part of what is referred to as "social transition."

72.    No medical interventions beyond mental health counseling are recommended or provided to any person before the onset of puberty. In other words, gender transition does not include any pharmaceutical or surgical intervention before puberty.

73.    Under the WPATH Standards of Care and Endocrine Society Clinical Guidelines, medical interventions may become medically necessary and appropriate after a transgender young person reaches puberty. In providing medical treatments to adolescents, qualified medical providers may work in close consultation with mental health professionals experienced in diagnosing and treating gender dysphoria.

74.    After the earliest sign of the beginning of puberty, the standard of care for transgender adolescents is to consider providing puberty-delaying medical treatment through medications, generically known as puberty blockers. A puberty blocker interrupts the sequence of hormonal signals of the pituitary gland that control puberty. This means that the testicles or ovaries remain at a prepubertal stage that are incapable of production of testosterone (for a child born with testicles) or estradiol (for a child born with ovaries) that control the many bodily changes associated with puberty. Puberty will resume when puberty blockers are stopped.

75.    For many transgender youth, puberty blockers are a medical necessity as they mitigate the significant anxiety and extreme distress experienced by adolescents as the physical changes of endogenous puberty begin and they start experiencing potentially permanent physical changes in their bodies that are incongruent with their gender

identity. Puberty-delaying medication allows transgender adolescents to avoid this, therefore minimizing and potentially preventing the heightened gender dysphoria and these permanent physical changes that endogenous puberty would cause.

76.    This treatment will be provided only when the youth's transgender status is marked and sustained over time and only after discussing the matter with the youth and their parent(s) or legal guardian(s) and obtaining informed consent.

77.    Under the Endocrine Society Clinical Guidelines, transgender adolescents who have reached the onset of puberty may be eligible for puberty-delaying treatment if:

- A qualified mental health professional has confirmed that:

  o The adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed);

  o Gender dysphoria worsened with the onset of puberty;

  o Any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment;

  o The adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment;

- And the adolescent:

- o Has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility;

- o Has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process;

- And a pediatric endocrinologist, or other clinician experienced in pubertal assessment:

    - o Agrees with the indication for gonadotropin-releasing hormone ("GnRH") agonist treatment;

    - o Has confirmed that puberty has started in the adolescent;

    - o Has confirmed that there are no medical contraindications to GnRH agonist treatment.

78.     Puberty-delaying treatment is reversible. If an adolescent discontinues the medication, puberty consistent with their assigned sex at birth will resume. Puberty-delaying treatment does not cause infertility.

79.     Without the support of puberty blockers, the stresses and anxieties that are common among pubertal youth are markedly increased, often to the point of clinically significant social isolation, depression, self-harm, and suicidal ideation.

80.     Transgender youth who are denied this treatment are at a greatly increased risk of experiencing or continuing clinically significant distress, suicidal behavior, self-harm, and other serious and lifelong psychological harm as compared to their cisgender peers.

81.     For some young people, it may be medically necessary and appropriate to initiate hormonal puberty consistent with the young person's gender identity through gender-affirming hormone therapy (e.g., testosterone for transgender boys, and estrogen and testosterone suppression for transgender girls).

82.     Under Endocrine Society Clinical Guidelines, transgender adolescents may be eligible for gender-affirming hormone therapy if:

- A qualified mental health professional has confirmed:

    o   The persistence of gender dysphoria;

    o   Any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment;

- o The adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment;

- And the adolescent:

  - o Has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);

  - o Has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process;

- And a pediatric endocrinologist, or other clinician experienced in pubertal induction:

  - o Agrees with the indication for sex hormone treatment;

  - o Has confirmed that there are no medical contraindications to sex hormone treatment.

83.    These guidelines represent the best practices of care based on the best available evidence, as determined by WPATH and the Endocrine Society. As with all medical care,

the care provided to transgender young people with gender dysphoria is tailored to the unique needs of each patient based on their individual experiences, proximity to specialists, and general health, as well as the clinical experience of practitioners.

84.     Many individuals treated with hormone therapy can still conceive children while undergoing treatment or after discontinuing.

85.     As with all medications that could impact fertility, transgender young persons and their parents or guardians are counseled on the potential risks of the medical intervention, and treatment is only initiated where parents and adolescents are properly informed, the adolescent's parents consent to the care, and the adolescent assents to the care.

86.     Gender-affirming hormones will be prescribed when it is a medical necessity to do so after thorough mental health and medical evaluations.

87.     Transgender boys treated with puberty-delaying medication and then gender-affirming hormones will receive the same amount of testosterone during puberty that non-transgender boys generate with their gonads or testes. They will develop the phenotypic features of non-transgender boys such as muscle mass, fat distribution, facial and body hair, and lower vocal pitch. Likewise, transgender girls treated with puberty-delaying medication and then gender-affirming hormones will receive the same amount of estrogen during puberty that non-transgender girls generate endogenously. They will develop the same muscle mass, fat distribution, skin and female hair patterns, and breasts

typically associated with non-transgender girls.

88.     Adolescents who first receive treatment later in puberty and are only treated with gender-affirming hormone therapy (and not puberty-delaying treatment) also go through a hormonal puberty consistent with their gender identity. However, they will have undergone physical changes associated with their endogenous puberty that may not be wholly reversed by hormone therapy or even surgery later in life.

89.     Gender-affirming hormone therapy will be prescribed for minor persons when it is deemed a medical necessity to ameliorate the potentially severe symptoms of gender dysphoria and when it is medically safe and consistent with the youth's gender identity.

90.     This treatment will be provided only when the youth's transgender status is marked and sustained over time and only after discussing the matter with the youth and their parent(s) or legal guardian(s) and obtaining informed consent before any treatments are prescribed.

*The plaintiffs*

91.     K.C. is 10-year-old transgender girl.

92.     Although her birth-assigned sex was male, she has lived as a girl since before she was four. She uses a first name that is typical of girls and wears girls' clothing.

93.     She  was diagnosed with gender dysphoria shortly after she turned four.

94.     Before she was four, she grabbed a pair of scissors when she left her bath and asked if she could cut off her penis.

95.     Her gender dysphoria has triggered severe anxiety and depression.

96.     She has been in therapy periodically since she was very young. She is a patient at the Riley Gender Health Program in Indianapolis where she is followed by a pediatric endocrinologist.

97.     She recently entered the first stages of puberty and her physician has recommended that she receive a puberty blocker to prevent her from being affected by testosterone.

98.     With the beginning of the onset of puberty, her anxiety, depression, and other symptoms of gender dysphoria are increasing.

99.     Any sign of her "maleness," for instance the increase in body odor from her armpits, makes her extremely upset.

100.    The puberty blocker was prescribed after she and her parents spoke to staff at Riley Gender Health Program and were fully informed of the risks and benefits of the treatment.

101.    The puberty blocker is medically necessary as going through male puberty would significantly increase the symptoms of her gender dysphoria and the anxiety and other serious problems that it has caused.

102.    K.C. desires to receive puberty blockers and to receive gender-affirming hormonal therapy as soon as it is possible and medically appropriate and necessary.

103.    Many of the changes she would undergo from endogenous puberty will be life-long and potentially impossible to reverse.

104.    Denying her the ability to receive puberty blockers and to receive gender-affirming hormone therapy in the future would be extremely harmful to her as it will deny her the ability to live her gender identity and will cause her enormous emotional and potentially physical harm.

105.    S.E.A. 480 will prevent her from receiving necessary gender-affirming care and will cause her serious harm.

106.    Nathaniel and Beth Clawson have been fully informed of the treatment provided to their daughter and have given their informed consent to it.

107.    As parents, Nathaniel and Beth Clawson have watched their child suffer and have consulted with medical experts for years. Understanding all the risks and benefits of treatment, they have made the parental decision to have their child provided with gender- affirming care because they believe that it is essential treatment for her.

108.    They are aware that preventing her from receiving gender-affirming care, including puberty blockers and eventually hormones, would be devastating to her.

109.    Nathaniel and Beth Clawson believe that as parents they must have the right to assure that their child receives necessary medical treatment and the gender-affirming care that she is receiving is such treatment.

110.    M.W. is a 16-year-old transgender boy.

111.    M.W. socially transitioned at 14 and consistently uses a typical boys' first name and dresses and appears as male.

112.    M.W. receives care at the Riley Gender Health Program and has since 2022.

113.    M.W. has been diagnosed with gender dysphoria and has suffered from anxiety and depression because of the incongruence between his gender identity and gender assigned at birth.

114.    To minimize the distress caused by the way his body developed during puberty, M.W. began to wear a chest binder even before he was seen at the Riley Gender Health Program.

115.    The medical professionals at the Riley Gender Health Program have also given him further instruction on wearing the chest binder.

116.    M.W. receives gender-affirming hormone therapy—testosterone—from professionals at the Riley Gender Health Program. He also separately receives mental health therapy to assist him in dealing with the manifestations of his gender dysphoria.

117.    M.W. has received testosterone for approximately a year.

118.    The gender-affirming hormone therapy was prescribed only after its benefits and side effects were fully explained to M.W. and his parents.

119.    Gender-affirming hormone therapy is a medical necessity for M.W.

120.    Since M.W. has received testosterone, he has developed male characteristics, including facial hair and changes in his musculature. His voice has also deepened.

121.    Being able to gain these male characteristics has resulted in an enormous decrease in the symptoms of his gender dysphoria. His depression and anxiety have decreased, and he has made friends who treat him as the boy that he is.

122.    If S.E.A. 480 is allowed to go into effect, he will no longer be able to receive gender-affirming care and will cease to receive this critical treatment.

123.    If the hormones were to be discontinued, the development of his male physical characteristics would cease, and he would experience the continued development of typically female physiological characteristics.

124.    This would be extremely damaging to his mental health and would cause his gender dysphoria to markedly increase with potentially devastating consequences. It would cause him severe harm.

125.    Ryan and Lisa Welch have been fully informed of the treatment provided for their son and have given their informed consent to it.

126.    As parents Ryan and Lisa Welch have worked closely with medical professionals and based on the needs of their child, have consented to the provision of gender-affirming care because they believe that it is essential treatment for him, and they have seen its continuing positive effects.

127.    They are aware that ceasing his gender-affirming care would be devastating to him.

128.    Ryan and Lisa Welch believe that as parents they must have the right to assure that their child receives necessary medical treatment and the gender-affirming care that he is receiving is such treatment.

129.    A.M. is an 11-year-old transgender girl.

130.    Although her birth-assigned sex was male, she informed her family before she was 4 years old that she is a girl and that she was having thoughts about mutilating her penis to get rid of it.

131.    Since that time, she has been living as a girl. She has consistently used her preferred female first name and has dressed and appeared as a girl.

132.    The world accepts her for who she is: a girl.

133.    A.M. has been diagnosed with gender dysphoria.

134.    She suffers from anxiety and depression and has been in mental health counseling since she was 6.

135.    Her depression and anxiety stem from the disconnect between her sex assigned at birth and her gender identity.

136.    A.M. receives care through the Riley Gender Health Program in Indianapolis.

137.    A.M. is a recipient of Medicaid and Medicaid funds pay for her gender affirming care at the Riley Gender Health Program.

138.    A.M. has been prescribed a puberty blocker and has been taking it by injection since August of 2021 after clinical documentation of the initial signs of puberty.

139.    As a result, she is not experiencing any of the physiological changes that increased testosterone levels would cause in a pubescent boy.

140.    She was prescribed this treatment only after it was fully explained to her and to her mother, Emily Morris.

141.    If medically appropriate and necessary in the future, A.M. will be prescribed estrogen and testosterone suppression that will cause her to develop many of the physiological changes associated with puberty in females.

142.    The blocking of puberty and being able to live as a girl have caused the symptoms associated with A.M.'s gender dysphoria to markedly decrease and she is accepted by the world as a girl.

143.    Terminating her puberty blocker would cause her to develop male characteristics. This would cause the debilitating symptoms of her gender dysphoria to dramatically increase and would be devastating to her. It would also lead to potentially irreversible physical changes in her body that could increase lifelong dysphoria.

144.    Moreover, denying her gender-affirming care, and the physiological changes that would occur as the result of the cessation of the care, would inform the world that she is a transgender girl. This would amplify her gender dysphoria with potentially serious consequences.

145.    S.E.A. 480 will prevent her from receiving gender-affirming care and will cause her harm.

146.    Emily Morris has been fully informed of the treatment provided to her daughter and has given her informed consent to it.

147.    As a mother, Emily Morris has watched her child suffer from severe distress and has consulted with medical professionals who are expert in the condition that her daughter suffers from. Following medical advice and understanding the benefits and risks of treatment, she has chosen to have her child provided with gender-affirming care because she believes that it is essential treatment for her and she has seen its continuing positive effects.

148.    She is aware that ceasing gender-affirming care would be devastating to her daughter.

149.    Emily Morris believes that as a parent, she must have the right to ensure that her child receives necessary medical treatment and the gender-affirming care that she is receiving is such treatment.

150.    M.R. is a 15-year-old transgender boy.

151.    He suffers from gender dysphoria that has caused him depression, anxiety, and has caused him in the past to engage in self-harming behavior.

152.    He receives counseling and began to socially transition in 2020.

153.    He began to receive testosterone in January of 2023.

154.    Since that time his depression and anxiety has markedly decreased, and he has become more outgoing and comfortable with his peers.

155.    He is living his life as a boy and this makes him comfortable with himself.

156.    He and his mother believe that the symptoms of his gender dysphoria will continue to lessen as he continues to receive testosterone and his body continues to develop male characteristics.

157.    If S.E.A. 480 is allowed to go into effect, he will no longer be able to receive gender-affirming care.

158.    If his hormones were discontinued, he would not develop male characteristics and his body would develop into that of a female.

159.    He is not a female and to have this happen would be devastating to his mental health and would cause him to lose all the progress he has made in lessening the serious consequences of his gender dysphoria. This would be extremely harmful to him.

160.    Maria Rivera has been fully informed of the treatment that M.R. is receiving and has given her informed consent to it.

161.    Maria Rivera recognizes that the gender-affirming care that M.R. is receiving is necessary and essential for his physical and mental health.

162.    Maria Rivera is aware that ending this care would be the worst thing that could happen to her son.

163.    Maria Rivera believes that as a parent she has the right and obligation to make sure that M.R. receives necessary medical treatment and the gender-affirming care that he is receiving is such treatment.

164.    Dr. Catherine Bast is a board-certified family care physician who is a co-founder of Mosaic Health and Healing Arts, Inc., in Goshen, Indiana, where she practices medicine.

165.    Dr. Bast is licensed to practice medicine by the State of Indiana.

166.    Dr. Bast provides a whole host of services to her patients, including well visits, annual physicals, chronic disease management, and acute care as needed.

167.    Dr. Bast provides hormone treatment to transgender adults and minors to ameliorate the symptoms of gender dysphoria, including the treatments that would be banned if S.E.A. 480 were to go into effect.

168.    She has minor transgender patients who are prescribed puberty blockers and/or hormones as part of the gender-affirming care that she provides.

169.    Hormones and puberty blockers are prescribed for her minor patients only after informed consent is obtained from a minor's parents or legal guardians and after the minor assents to treatment.

170.    Dr. Bast is a Medicaid provider, and for patients (including minors) enrolled in the Medicaid program, the gender-affirming hormone therapy and other gender-affirming care that she provides is reimbursed by Medicaid.

171.    Dr. Bast also will assist in providing transgender persons, including minors, with devices to aid them, such as chest binders for transgender males.

172.    The gender-affirming care that Dr. Bast provides to minor persons is medically necessary.

173.    She desires to continue to provide gender-affirming care to her minor patients as it is her duty as a physician to treat her patients and not to abandon them.

174.    However, S.E.A. 480 will prevent her from providing gender-affirming care because if she violates the law, not only is she subject to civil litigation under the statute, but she may be subject to discipline by the Medical Licensing Board and she may be subject to an enforcement action brought by the Indiana Attorney General.

175.    If S.E.A. 480 becomes law, she will want to provide advice to her minor patients to assist them in receiving gender-affirming care in other states and will, at her patients' requests, want to cooperate with the health providers in that state in terms of sharing information concerning her minor patients. This is also part of her duty as a physician to not abandon patients when she is unable to continue their care.

176.    At the current time she provides referrals for her patients to other physicians and clinics where they can receive gender-affirming care.

177.    As a physician she also refers patients to providers for many other conditions. But if S.E.A. 480 were to go into effect she would only be prohibited from advising about and referring patients for treatment for gender-affirming care.

178.    However, S.E.A. 480 prohibits her from doing anything that aids or abets another physician or practitioner in providing gender transition procedures for a minor and she

will therefore not even be able to discuss with her patients the availability of these services in another state.

179.    Dr. Bast wishes to continue to receive reimbursement for the Medicaid services she provides to her minor transgender patients and does not want to discriminate against them by denying them medical necessary gender-affirming care as would be required if S.E.A. 480 went into effect.

180.    Mosaic Health and Healing Arts, Inc., is a family medicine practice that believes in inclusive and whole person care. It is dedicated to creating both medical care and educational opportunities that bring healing and understanding to its community.

181.    In addition to Dr. Bast, Mosaic Health and Healing Arts, Inc., employs a number of licensed practitioners, including two family nurse practitioners and a licensed mental health counselor.

182.    It is committed to providing medically necessary care for its patients, including its more than 1,200 patients who are transgender, which includes at least 100 persons under the age of 18.

183.    This medically necessary care includes gender-affirming hormone therapy and other gender-affirming care for many of the minor patients.

184.    It desires to continue to provide this medically necessary care and believes it is obligated to do so because of its mission as described above.

185.    It also provides referrals to other physicians and practitioners for some of its minor patients who wish to receive gender-affirming care in other locations.

186.    Mosaic Health and Healing Arts, Inc., is a Medicaid provider and receives reimbursement for services provided to its minor patients, including gender-affirming hormone therapy and other gender-affirming care.

187.    Mosaic wishes to continue to receive reimbursement for the Medicaid services it provides to its Medicaid-enrolled patients who are minors and does not want to discriminate against its transgender patients who are minors by denying them medically necessary gender-affirming care as would be required if S.E.A. 480 went into effect.

*The effect of S.E.A. 480*

188.    If S.E.A. 480 goes into effect, physicians and practitioners in Indiana will cease providing what the statute characterizes as "gender transition procedures" to minor patients because in addition to the risk of litigation authorized by the statute, a physician or practitioner who provides these "procedures" will be subject to the loss of their licenses that have been granted to them through agencies regulated by the Indiana Professional Licensing Agency and its subagencies including, as noted above, the Medical Licensing Board of Indiana.

189.    These licensing actions may be pursued by the Indiana Attorney General.

190.    S.E.A. 480 will result in the denial of medically necessary care to transgender persons under the age of 18, including care that would otherwise be reimbursed by Medicaid.

191.    The treatment prohibited by S.E.A. 480 is necessary to correct or ameliorate defects and physical and mental illnesses and conditions—that is, the gender dysphoria—of transgender youth.

192.    S.E.A. 480 will result in parents of transgender children being unable to obtain necessary medical treatment for their children.

193.    S.E.A. 480 will prevent physicians and other practitioners from referring their patients to physicians or practitioners outside the State of Indiana to obtain what the statute characterizes as "gender transition procedures" and will prevent Indiana physicians and practitioners from sharing information with those out-of-state providers, to the detriment of their patients.

194.    Withholding medical treatment from adolescents with gender dysphoria when it is medically indicated puts them at risk of extreme harm to their health and well-being.

195.    When adolescents are able to access puberty-delaying drugs and hormone therapy, which prevents them from going through endogenous puberty and allows them to go through hormonal puberty consistent with their gender identity, their distress recedes, and their mental health improves. Both clinical experience and multiple medical and scientific studies confirm that for many young people, this treatment is not only safe

and effective, but also prevents significant harms of untreated gender dysphoria. Indeed, transgender youth able to access this essential and well-established medical care often go from painful suffering to become thriving young persons.

196.    Conversely, for adolescents with gender dysphoria with a clinical need for hormone therapy, withholding or denying this treatment contributes clinically significant distress and places the youth at ongoing increased risk of suicide, self-harm, and other serious and lifelong psychological harms as opposed to their transgender peers.

197.    If a healthcare provider is forced to stop puberty-delaying drugs or hormone therapy due to S.E.A. 480, it will cause patients to resume their endogenous puberty. There may be reversal of some of the physical changes that have occurred during hormone therapy. Involuntary withdrawal of gender-affirming hormones will likely be associated with a marked increase in the debilitating experience of gender dysphoria associated with significant anxiety, depression, self-harm, and suicidality.

198.    This could result in extreme distress for patients who have been relying on medical treatments to prevent bodily changes that come with their endogenous puberty. For a girl who is transgender, this could mean that she would start experiencing genital growth, body hair growth, deepening of her voice, and development of a more pronounced Adam's apple. For a boy who is transgender, this could mean the initiation of a menstrual cycle and breast growth. These changes can be extremely distressing for a transgender

young person experiencing gender dysphoria that had been relieved by medical treatment.

199.    Additionally, the effects of underdoing one's endogenous puberty may not be reversible even with subsequent hormone therapy and surgery in adulthood, thus exacerbating lifelong gender dysphoria in patients who have this essential and necessary treatment withheld or cut off.  Bodily changes from puberty as to stature, genital growth, voice, and breast development can be impossible or more difficult to counteract.

200.    For patients who are currently undergoing treatment with gender-affirming hormones like estrogen or testosterone, withdrawing care can result in a range of serious physiological and mental health consequences. The body takes about six weeks to ramp up endogenous hormones, so if a healthcare provider is forced to stop treatment, a patient will be without sufficient circulating hormones at all.  This can result in depressed mood, hot flashes, and headaches. For patients on spironolactone—a testosterone suppressant—terminating treatment can cause a patient's blood pressure to spike, increasing a young person's risk of heart attack or stroke. The withdrawal of treatment also results in predictable and negative mental health consequences, including heightened anxiety and depression.

201.    What is more, the enactment of laws like S.E.A. 480 gravely and directly threatens the mental health and wellbeing of transgender youth in Indiana.  Studies have shown that experiencing discrimination in health care settings poses a unique risk factor for

heightened suicidality among transgender individuals. And the 2022 National Survey on LGBTQ Youth Mental Health found that LGBTQ youth who had experienced discrimination based on sexual orientation or gender identity had attempted suicide in the past year at nearly three times the rate as those who had not (19% vs. 7%). The same survey revealed that 93% of transgender and nonbinary youth have worried about transgender people being denied access to gender-affirming medical care due to state or local laws, while a different survey found for 86% of transgender and nonbinary youth, the debates about bills like S.E.A. 480 had negatively impacted their mental health.

202.    Gender-affirming medical care can be lifesaving treatment for transgender minors experiencing gender dysphoria. The major medical and mental health associations support the provision of such care and recognize that the mental and physical health benefits to receiving this care outweigh the risks. These groups include the American Academy of Pediatrics, American Medical Association, the Endocrine Society, the Pediatric Endocrine Society, the American Psychological Association, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the National Association of Social Workers, and WPATH.

203.    The failure to provide the appropriate medically necessary treatment, or the withdrawal of such medically necessary care, to a transgender youth will cause immediate, serious, and potentially life-threatening and life-long harm.

        *The lack of legitimate justifications for S.E.A. 480*

204.    S.E.A. 480 establishes a complete ban on well-established, evidenced-based, and medically necessary medical treatments for minors when, and only when, they are provided to transgender youth as part of "gender transition procedures."

205.    While S.E.A. 480 prohibits the use of well-established, medically necessary treatments for gender dysphoria in transgender adolescents—including puberty-delaying drugs, hormone therapy (testosterone for transgender boys, and estrogen and testosterone suppressants for transgender girls), and chest surgery—because these treatments are provided for the purpose of assisting "gender transition," it nonetheless permits the use of these treatments for any other purpose.

206.    The puberty-delaying drugs prohibited by S.E.A. 480 for the treatment of gender dysphoria are the same drugs that are commonly used to treat central precocious puberty, which is the premature initiation of puberty (before eight years of age in people assigned female at birth and before nine years of age in people assigned male) by the central nervous system. S.E.A. 480 permits puberty-delaying treatment for central precocious puberty because it is not provided for purposes of assisting with "gender transition"; that is, it is not prescribed to affirm a person's gender identity different from their sex assigned at birth.

207.    S.E.A. 480 prohibits hormone therapy when the treatment is used to treat gender dysphoria, but the same hormone therapy is permitted when prescribed to non-transgender patients to help bring their bodies into alignment with their gender. For

[40]

example, non-transgender boys with delayed puberty may be prescribed testosterone if they have not begun puberty by fourteen years of age. Without testosterone, for most of these patients, puberty would eventually initiate naturally. However, testosterone is prescribed to avoid some of the social stigma that comes from undergoing puberty later than one's peers and failing to develop the secondary sex characteristics consistent with their gender at the same time as their peers. Likewise, non-transgender girls with primary ovarian insufficiency, hypogonadotropic hypogonadism (delayed puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), or Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop) may be treated with estrogen. And non-transgender girls with polycystic ovarian syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair) may be treated with testosterone suppressants. The same treatments that are permitted for non-transgender minors are thus banned if provided to transgender minors for the same reason.

208.    S.E.A. 480 prohibits chest surgery on transgender young men to treat gender dysphoria, but minors are permitted to undergo comparable surgeries. For example, non-transgender adolescent boys can have surgery to treat gynecomastia—the proliferation of ductal or glandular breast tissue, as opposed to adipose tissue, in individuals assigned male at birth. And non-transgender adolescent girls can have breast reconstruction surgery, including to address conditions such as breast hypoplasia: a lack of breast

development in people assigned female at birth.  These kinds of surgeries are commonly performed to reduce psychosocial distress, often related to the incongruence with one's gender. Therefore, under S.E.A. 480, a transgender boy cannot receive chest-masculinizing surgery to affirm his gender identity, but a non-transgender boy can. Likewise, a transgender girl cannot receive chest-feminizing surgery to affirm her gender identity, but a non-transgender girl can.

*Concluding allegations*

209.    The State of Indiana receives federal funds for its participation in the Medicaid program and these funds are administered through the Family and Social Services Administration.

210.    Plaintiffs are being threatened with irreparable harm for which there is no adequate remedy at law.

211.    At all times defendants have acted under the color of state law.

**Claims for relief**

*Claims with regard to Class 1*

212.    Senate Enrolled Act 480 violates the equal protection rights of K.C., M.W., A.M., and M.R., and the class they seek to represent, as guaranteed by the Fourteenth Amendment to the United States Constitution, in that:

a.      It discriminates on the basis of sex.

b.    It discriminates on the basis of transgender status. Transgender people have a long history of being discriminated against and continue to suffer such discrimination to this day. They are a discrete and insular group and lack the political power to protect their rights through the legislative process and have largely been unable to secure state and federal protections again discrimination. Moreover, a person's transgender status bears no relation to their ability to contribute to society and being transgender is a core, defining trait that is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

c.    It imposes a broad and undifferentiated disability on transgender youth without justification.

213.    Inasmuch as Senate Enrolled Act 480 improperly and inappropriately invades bodily autonomy and prohibits the delivery of medically necessary health care, it violates the rights of K.C., M.W., A.M., and M.R., and the class they seek to represent to due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

214.    These claims are brought against The Individual Members of the Medical Licensing Board of Indiana, the Executive Director of the Indiana Professional Licensing Agency, and the Attorney General of Indiana.

*Claim with regard to Class 2*

[43]

215.    To the extent that Senate Enrolled Act 480 prohibits Nathaniel and Beth Clawson, Ryan and Lisa Welch, Emily Morris, and Maria Rivera, and the class they seek to represent, from obtaining medically necessary medical care for their children, it violates fundamental rights protected by due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

216.    These claims are brought against The Individual Members of the Medical Licensing Board of Indiana, the Executive Director of the Indiana Professional Licensing Agency, and the Attorney General of Indiana.

*Claim with regard to Class 3*

217.    Inasmuch as Senate Enrolled Act 480 prohibits Dr. Bast and Mosaic Health and Healing Arts, Inc., and the class they seek to represent, from engaging in communications that are designed to allow another physician or practitioner to provide "gender transition procedures" as described in the statute, the statute prohibits speech in violation of the First Amendment to the United States Constitution.

218.    Inasmuch as Senate Enrolled Act 480 prohibits Dr. Bast and Mosaic Health and Healing Arts, Inc. from providing necessary medical care to their minor patients, it violates their patients' due process and equal protection rights as set out in more detail in paragraphs 195 and 196, above.

219.    These claims are brought against The Individual Members of the Medical Licensing Board of Indiana, the Executive Director of the Indiana Professional Licensing Agency, and the Attorney General of Indiana.

*Claim with regard to Subclasses 1-A and 3-A*

220.    Inasmuch as Senate Enrolled Act 480 excludes A.M., Dr. Bast, and Mosaic Healing Arts and the subclasses they seek to represent, from the benefits of Medicaid, a health program or activity that receives Federal financial assistance, because of sex, it is unlawful and is preempted by Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116.

221.    This claim is brought against the Indiana Family and Social Services Administration.

*Additional claim with regard to Subclass 1-A*

222.    Inasmuch as Senate Enrolled Act 480 violates the binding requirements, imposed on Indiana as a condition of participating in the Medicaid program, which require the provision to eligible recipients of "medical assistance" as that term is defined by 42 U.S.C. § 1396d(a) and separately require the provision of early and periodic screening, diagnostic, and treatment services, it violates the rights of A.M. and the subclass she seeks to represent.

223.    This claim is brought against the Secretary of the Indiana Family and Social Services Administration.

**Request for relief**

WHEREFORE, plaintiffs request that this Court:

1.      Accept jurisdiction of this case and set it for hearing at the earliest opportunity.

2.      Certify this case as a class action with the classes and subclasses defined as noted above.

3.      Declare that Senate Enrolled Act 480 is unconstitutional and unlawful for the reasons specified above.

4.      Enter a preliminary injunction, later to be made permanent, enjoining defendants from enforcing Senate Enrolled Act 480 and allowing plaintiffs and the class and subclass to proceed as if the law was not in effect.

5.      Award plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 18116(a).

6.      Award all other proper relief.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 4602
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org


Chase Strangio*
Harper Seldin*
ACLU
125 Broad Street
New York, NY 10004
212/549-2500
cstrangio@aclu.org
hseldin@aclu.org

*Motions for admission pro hac vice forthcoming.

Attorneys for Plaintiffs and the
Putative Classes and Subclass