UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

K.C., *et al.*,                                     )
                                                    )
       Plaintiffs,                             )
                                                    )
          v.                                 )          No. 1:23-cv-00595-JPH-KMB
                                                    )
THE INDIVIDUAL MEMBERS OF THE                       )
MEDICAL LICENSING BOARD OF                          )
INDIANA, *et al.*,                                  )
                                                    )
       Defendants.                             )

**Memorandum in Support of Motion for Preliminary Injunction**

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 4602
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org


Chase Strangio
*Pro Hac Vice*
Harper Seldin
*Pro Hac Vice*
ACLU
125 Broad Street
New York, NY 10004
212/549-2500
cstrangio@aclu.org
hseldin@aclu.org


Attorneys for Plaintiffs and the
Putative Classes and Subclass

# Table of Contents

Table of Authorities.................................................................................................. i

Statement of the Issues ......................................................................................... 1

The Challenged Statute .......................................................................................... 1

Statement of Facts ................................................................................................. 4

    I.     Medical protocols for the treatment of transgender minors with gender dysphoria.................................................................................................. 4

    II.    The safety and efficacy of the gender-affirming care prohibited by S.E.A. 480................................................................................................................ 8

    III.   The plaintiffs and the profoundly deleterious consequences they will suffer if S.E.A. 480 is allowed to take effect ................................................... 10

        A.    The minor plaintiffs and their plaintiff-parents...................................... 10

        B.    The provider plaintiffs........................................................................... 13

The preliminary injunction standard .................................................................. 16

Argument ……………….. ................................................................................. 16

    I.     The plaintiffs are likely to prevail on the merits of their claims ......................... 16

        A.    S.E.A. 480 violates the equal protection rights of the plaintiff youth... 16

            1.    S.E.A. 480 discriminates against transgender youth because of their sex and the discrimination cannot be justified by the State ............................................................................................ 17

            2.    S.E.A. 480 is unconstitutional because it discriminates based on transgender status and fails the required heightened scrutiny................................................................................... 20

            3.    S.E.A. 480 fails any level of equal-protection review................ 22

        B.    S.E.A. 480 denies the parent plaintiffs their fundamental right to dictate the care, custody, and control of their children........................... 23

        C.    S.E.A. 480's prohibition on the provision of gender-affirming care to minors violates federal Medicaid law ...................................................... 26

            1.    Federal Medicaid law requires that participating states, including

Indiana, ensure the provision of medically necessary care that falls within specified categories of covered services without regard to a patient's condition or diagnosis ................................ 26

2.   Indiana's prohibition on gender-affirming care violates the Availability Provision of federal Medicaid law .......................... 28

   a.   The gender-affirming care prohibited by S.E.A. 480 falls within several service categories that Indiana has agreed to cover through Medicaid .................................. 28

   b.   S.E.A. 480 prohibits the provision of medically necessary care within covered service categories and therefore violates the Availability Provision of federal Medicaid law ........................................................................................ 30

3.   Indiana's prohibition on gender-affirming care violates the Comparability Provision of federal Medicaid law ...................... 33

D.   S.E.A. 480 violates the Affordable Care Act ............................................ 36

1.   The FSSA is bound by Section 1557 of the Affordable Care Act ................................................................................................ 36

2.   To the extent that S.E.A. 480 prevents Medicaid-recipient youth from receiving gender-affirming care, it violates the ACA ....... 36

3.   S.E.A. 480 is conflict preempted by the ACA and cannot be enforced ........................................................................................ 38

F.   S.E.A. 480 violates the First Amendment rights of Dr. Bast and Mosaic ....................................................................................................... 39

II.   The other requirements for the grant of a preliminary injunction are met ........ 42

A.   The plaintiffs are faced with irreparable harm for which there is no adequate remedy at law ............................................................................ 42

B.   The balance of harms favors the plaintiffs ................................................ 44

C.   The public interest will not be disserved by a preliminary injunction ... 44

D.   The injunction should issue without bond ................................................ 44

Conclusion ............................................................................................................................ 44

## Table of Authorities

**Cases**

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ........................................21

*A.M.T. v. Gargano*, 781 F. Supp. 2d 798 (S.D. Ind. 2011) ......................................29

*Arizona v. United States*, 567 U.S. 387 (2012).........................................................38

*Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667 (7th Cir. 1987).....................16

*Bigelow v. Virginia,* 421 U.S. 809 (1975)................................................................42

*Blessing v. Freestone*, 520 U.S. 329 (1997).............................................................28

*Bontrager v. Ind. Family & Soc. Servs. Admin.*, 697 F.3d 604 (7th Cir. 2012) .................27, 28, 30

*Bostock v. Clayton Cnty.*, –U.S.–, 140 S. Ct. 1731 (2020) ....................................18, 19, 37

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018) ......................................31

*Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021), *aff'd on other grounds*, 47 F.4th 661 (8th Cir. 2022).....................................................................................*passim*

*Brandt v. Rutledge,* 47 F.4th 661 (8th Cir. 2022).................................. 19, 20, 21, 43

*C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541 (7th Cir. 2020).............................38

*Citizens United v.* FEC, 558 U.S. 310 (2010)...........................................................40

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ..........................23

*Cohen v. California*, 403 U.S. 15 (1971)...................................................................40

*Collins v. Hamilton*, 349 F.3d 371 (7th Cir. 2003) .....................................27, 29, 31

*Cruz v. Zucker*, 195 F. Supp. 3d 554 (S.D.N.Y.), *on reconsideration*, 218 F. Supp. 3d 246 (S.D.N.Y. 2016) ........................................................................................................32, 33

*Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016)..............................................................35

*Dobbs v. Jackson Women's Health Org.*, –U.S.–, 142 S. Ct. 2228 (2022) ...............17, 24

*Eisenstadt v. Baird*, 405 U.S. 438 (1972).................................................................23

*Ekloff v. Rogers*, 443 F. Supp. 2d 1173 (D. Ariz. 2006) ...................................................................29

*Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022..............................................20, 25, 44

*Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017) ..................................................21

*Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 741 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) ...........................................................................................44

*F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018) ..................................................................21

*Fain v. Crouch*, –F. Supp. 3d–, 2022 WL 3051015 (S.D.W. Va. Aug. 2, 2022), *appeal pending*, No. 22-1927 (4th Cir.) ...............................................................................34, 36, 38

*Flack v. Wisconsin Department of Health Services*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019) .... 31, 32, 34, 36

*Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992).......................................................37

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984).......................................16

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002)................................................................28

*Grimm v. Gloucester Co. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ..................................................21, 22

*Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453 (7th Cir. 2010)........................................44

*Hall v. Tawney*, 621 F.2d 607 (2d Cir. 1980)..............................................................26

*Health and Hospital Corporation of Marion County v. Talevski*, No. 21-806 (U.S.) ...........................28

*Hill v. Colorado*, 530 U.S. 703 (2000) ..................................................................40

*Iglesias v. Fed. Bureau of Prisons*, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021)................................ . 30

*Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020)............................................18

*Jacobus v. Dep't of PATH*, 857 A.2d 785 (Vt. 2004) ........................................................35

*June Medical Services L.L.C. v. Russo*, –U.S.–, 140 S. Ct. 2103 (2020) ..........................................17

*Kadel v. Folwell*, 2022 WL 17415050 (M.D.N.C. Dec. 5, 2022), *app. pending*, No. 22-1721 (4th Cir.)....37

*Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396 (6th Cir. 2019)..............................24

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ........................................................21

*Martin v. Taft*, 222 F. Supp. 2d 940 (S.D. Ohio 2002).....................................................28

*Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307 (1976) ...................................................................21

*Memisovski ex rel. Memisovski v. Maram*, 2004 WL 1878332 (N.D. Ill. Aug. 23, 2004) ............28

*Meyer v. Nebraska*, 262 U.S. 390 (1923)......................................................................................24

*Miller ex rel. Morrish v. Olszewski*, 2009 WL 5201792 (E.D. Mich. Dec. 21, 2009 ...................33

*Monroe v. Meeks,* 584 F. Supp. 3d 643 (S.D. Ill. 2022) ...............................................................30

*Moore ex rel. Moore v. Reese*, 637 F.3d 1220 (11th Cir. 2011) ...................................................31

*N.B. v. Hamos*, 26 F. Supp. 3d 756 (N.D. Ill. 2014)....................................................................30

*Nat'l Inst. of Family & Life Advocates v. Becerra*, –U.S.–, 138 S. Ct. 2361 (2018).....................40

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ................................................................37

*Orr v. Shicker*, 953 F.3d 490 (7th Cir. 2020) ..............................................................................43

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2002). .....................43

*Parham v. J.R.,* 442 U.S. 584 (1979) ............................................................................................24

*Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Servs.*, 293 F.3d 472 (8th Cir. 2002) ...................28

*Peltier v. Charter Day Sch., Inc.*, 37 F. 4th 104 (4th Cir. 2022) *cert. filed*, No. 22-238 (2022);.......................37

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)...............................................................................24

*Planned Parenthood of Ind., Inc. v. Commissioner of Ind. State Dep't of Health*, 699 F.3d 962
    (7th Cir. 2012)........................................................................................................................27

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) ................................................................40

*Quilloin v. Walcott*, 434 U.S. 246 (1978) ....................................................................................24

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ............................................................. 25, 40

*Reno v. Flores*, 507 U.S. 292 (1993).......................................................................................25, 26

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ..........................................................23

*Romer v. Evans*, 517 U.S. 620 (1996) ...................................................................................22, 23

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ........................................40

iii

*Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980) ............................................................ 31, 35

*Salazar v. District of Columbia*, 729 F. Supp. 2d 257 (D.D.C. 2010) ................................ 28

*Santosky v. Kramer,* 455 U.S. 745 (1982) .......................................................................... 24

*Simpson v. Wilson*, 480 F. Supp. 97 (D. Vt. 1979) ............................................................ 35

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ............................................................... 40

*Stanley v. Ill.*, 404 U.S. 645 (1972) ................................................................................... 24

*Thompson v. Western States Med. Ctr.*, 535 U.S. 357 (2002) ............................................ 41

*Thoreson v. Palmer*, 1997 WL 33558625 (N.D. Iowa Apr. 25, 1997) ................................ 28

*Tinker v. Des Moines Indep. City. Sch. Dist.*, 393 U.S. 503 (1969) ................................... 40

*Troxel v. Granville*, 530 U.S. 57 (2000) ....................................................................... 24, 26

*Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015) ................................................ 16

*United States v. O'Brien*, 391 U.S. 367 (1968) ................................................................. 40

*United States v. Virginia*, 518 U.S. 515 (1996) ................................................................. 19

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000) ............................................................. 24

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .............................................................. 26

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034
    (7th Cir. 2017) ..........................................................................................................*passim*

*White v. Beal*, 555 F.2d 1146 (3d Cir. 1977) ...................................................................... 35

*Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990) ................................................................ 27

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) .............. 22

*Wisc. v. Yoder*, 406 U.S. 205 (1972) ................................................................................... 24

*Xu Feng v. Univ. of Delaware*, 785 Fed Appx. 53 (3d Cir. 2019) ...................................... 40

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2nd Cir. 1994) ............................................................ 37

**Statutes**

*United States*

42 U.S.C. § 1396 ................................................................................................................27

42 U.S.C. § 1396a(a)(10)(A) .................................................................................27, 28, 30

42 U.S.C. § 1396a(a)(10)(B) ............................................................................................28

42 U.S.C. § 1396a(a)(10)(B)(i) .........................................................................................28

42 U.S.C. § 1396d(a)(4)(B) ..............................................................................................28

42 U.S.C. § 1396d(a)(5)(A) ..............................................................................................29

42 U.S.C. § 1396d(a)(6) ...................................................................................................29

42 U.S.C. § 1396d(a)(9) ...................................................................................................30

42 U.S.C. § 1396d(a)(12) .................................................................................................29

42 U.S.C. § 1396d(a)(13) .................................................................................................30

42 U.S.C. § 1396a(a)(43) .......................................................................................28, 29, 32

42 U.S.C. § 1396d(r)(1) ....................................................................................................29

42 U.S.C. § 1396d(r)(5) ..............................................................................................29, 33

42 U.S.C. § 1396r-8(d)(1)(B)(i) .......................................................................................32

42 U.S.C. § 1396r-8(k)(3) ................................................................................................33

42 U.S.C. § 1396r-8(k)(6) ................................................................................................32

42 U.S.C. § 1983 ..............................................................................................................28

42 U.S.C. § 18116(a) ..................................................................................................36, 38

*Indiana*

Ind. Code § 12-15-1-1 ................................................................................................27, 37

Ind. Code § 25-1-7-2 .........................................................................................................3

Ind. Code § 25-1-9-1 ..................................................................................................3

Ind. Code § 25-1-9-4(a)(3) .........................................................................................4

Ind. Code § 25-1-9-9 ..................................................................................................3

Ind. Code § 25-1-22-3 ..............................................................................................17

Ind. Code § 25-1-22-4 ................................................................................................2

Ind. Code § 25-1-22-5(a) .........................................................................................29

Ind. Code § 25-1-22-5(b) ...............................................................................3, 18, 33

Ind. Code § 25-1-22-10 ..............................................................................................3

Ind. Code § 25-1-22-11 ..............................................................................................2

Ind. Code § 25-1-22-12 ...................................................................................1, 16, 21

Ind. Code § 25-1-22-13(a) ..........................................................................................1

Ind. Code § 25-1-22-13(b) .............................................................................3, 34, 39

Ind. Code § 25-1-22-13(c) ..................................................................................3, 33

Ind. Code § 25-1-22-13(d) .........................................................................................3

Ind. Code § 25-1-22-15 ............................................................................................39

Ind. Code § 25-1-22-16 ..............................................................................................4

Ind. Code § 25-1-22-17 ..............................................................................................4

Ind. Code § 25-1-22-18 ..............................................................................................4

Ind. Code § 25-22-5-9 ................................................................................................2

Ind. Code § 25-22-5-10 ..............................................................................................2

**Regulations**

*United States*

42 C.F.R. § 440.210(a)(1) .........................................................................................34

42 C.F.R. § 440.230(c) ...............................................................................................28, 34, 36

42 C.F.R. § 440.50(a) ..................................................................................................................34

42 C.F.R. §§ 440.40(b)................................................................................................................34

    *Indiana*

844 Ind. Admin. Code § 5-2-7 ....................................................................................................39

**Other Authorities**

Rafferty J, AAP Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents, Pediatrics, 2018 Volume 142 No. 4 https://pediatrics.aappublications.org/content/pediatrics/142/4/e2018 2162.full.pdf; AACAP Statement Responding to Efforts to Ban Evidence Based Care for Transgender and Gender Diverse Youth, American Academy of Child and Adolescent Psychiatry, https:// www.aacap.org/AACAP/Latest_News/AACAP_Statement_Responding_to_Effortsto_ban_Evi dence-Based_Care_for_Transgender_and_Gender_Diverse.aspx. ....................................................6

World Professional Association for Transgender Health, Standards of Care for the Health of Trangender and Gender Diverse People (8th Version) (2022), https://www.wpath.org/ publications/soc ........................................................................................................................6

Wylie C. Hembree et al., "Endocrine Treatment of Gender Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," The Journal of Clinical Endocrinology & Metabolism, Volume 102, Issue 11, 1 November 2017, Pages 3869-3903, https://doi.org/10.1210/jc.2017-01658.....................................................................................6

**Statement of the Issues**

Indiana Senate Enrolled Act 480 ("S.E.A. 480" or "the Act") prohibits transgender youth in Indiana from receiving medications designed to treat their gender dysphoria, an extremely serious medical condition, although the same medications are allowed by the Act for treatment of youth who do not suffer from gender dysphoria. The Act prohibits medically necessary and potentially lifesaving care for transgender Hoosier youth and leaves them without any evidence-based treatment for their gender dysphoria. The case presents the following issues:

1.    Does the Act violate the equal protection rights of transgender youth because it discriminates against them based on both their sex and their transgender status and is therefore subject to, and fails, the requisite elevated scrutiny? Regardless, does it fail any level of scrutiny insofar as it targets a particular group for unequal treatment without any rational reason for the discrimination?

2.    Does the Act violate the fundamental due process rights of parents to provide for the care of their children, including necessary medical care, without State interference?

3.    Does the Act violate federal Medicaid law insofar as it denies Medicaid recipients the ability to receive medically necessary care?

4.    Does the Act violate the Affordable Care Act by mandating discrimination on the grounds of sex?

5.    Does the Act violate the First Amendment insofar as it subjects physicians and practitioners to punishment for speech they make to assist in the medical care of their patients?

6.    Are the other requirements for the grant of a preliminary injunction met?

**The Challenged Statute**

With limited exceptions for patients with conditions other than gender dysphoria, S.E.A. 480 prohibits a physician or other practitioner from "knowingly provid[ing] gender transition procedures

to a minor." Ind. Code § 25-1-22-13(a) (eff. July 1, 2023). "[G]ender transition procedures" are defined as medical or surgical services, including drugs, which are designed to "alter or remove physical or anatomical characteristics or features that are typical for the individual's sex[1]" or that are designed to "instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex." Ind. Code § 25-1-22-5(a) (eff. July 1, 2023). These include "puberty blocking drugs, gender transition hormone therapy, or genital gender reassignment surgery or nongenital gender reassignment surgery knowingly performed for the purpose of assisting an individual with a gender transition." [2] *Id.*

However, under the act, "gender transition procedures" do not include:

1)      Medical or surgical services to an individual born with a medically verifiable disorder of sex development, including an individual with:

      (A) external sex characteristics that are irresolvably ambiguous;
      (B) forty-six (46) XX chromosomes with virilization;
      (C) forty-six (46) XY chromosomes with undervirilization;
      or
      (D) both ovarian and testicular tissue.

(2)      Medical or surgical services provided when a physician or practitioner[3] has diagnosed a disorder or condition of sexual development that the physician or practitioner has determined through genetic or biochemical testing that the individual does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action.

---

[1]      "Sex" is defined as "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." Ind. Code § 25-1-22-12 (eff. July 1, 2023).

[2]      "Puberty blocking drugs" are defined as "(1) gonadotropin releasing hormone analogues or other synthetic drugs used to stop luteinizing hormone and follicle stimulating hormone secretion; or (2) synthetic antiandrogen drugs used to block the androgen receptor," when the drugs are "used for the purpose of assisting an individual with a gender transition." Ind. Code § 25-1-22-11 (eff. July 1, 2023).

      "Gender transition hormone therapy" is defined as giving an individual testosterone, estrogen, or progesterone "in an amount greater than would normally be produced endogenously in a healthy individual of that individual's age and sex." Ind. Code § 25-1-22-4 (eff. July 1, 2023).

[3]      The statute defines "physician" as an individual licensed under Indiana Code § 25-22-5, and a "practitioner" as an individual who is licensed and provides health services. Ind. Code § 25-22-5-9, 10 (eff. July 1, 2023).

(3) The treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of gender transition procedures.

(4) Any medical or surgical service undertaken because the individual suffers from a physical disorder, physical injury, or physical illness that would, as certified by a physician or practitioner, place the individual in imminent danger of death or impairment of major bodily function unless the medical or surgical service is performed.

(5) Mental health or social services other than gender transition procedures as defined in subsection (a).

(6) Services for a disorder or condition of sexual development that is unrelated to a diagnosis of gender dysphoria or gender identity disorder.

Ind. Code § 25-1-22-5(b) (eff. July 1, 2023).

S.E.A. 480 not only prohibits physicians or other practitioners from knowingly providing gender transition procedures to a minor, but also prohibits them from "aid[ing] or abet[ting] another physician or practitioner in the provision of gender transition procedures to a minor." Ind. Code § 25-1-22-13(b) (eff. July 1, 2023). Doing so violates the standard of practice established by Indiana law and subjects the physician or practitioner to discipline by the board that regulates them. Ind. Code § 25-1-22-15 (eff. July 1, 2023). However, the statute does not prohibit the provision of services noted in Indiana Code § 25-1-22-5(b)(1)-(4) (eff. July 1, 2023), *i.e.* services to youth for purposes other than gender-affirming care to transgender youth. Ind. Code § 25-1-22-13(c) (eff. July 1, 2023). Although the statute becomes effective on July 1, 2023, it provides that if an individual is taking hormones after being prescribed "gender transition hormone therapy" as part of a "gender transition procedure" prior to July 1, 2023, the hormone therapy may continue until December 31, 2023. Ind. Code § 25-1-22-13(d) (eff. July 1, 2023). There is no similar exception for those receiving puberty blocking drugs ("puberty blockers") or other gender-affirming care as of July 1, 2023.

Although not mentioned in S.E.A. 480, any individual holding a license issued by a regulatory board is subject to discipline if they "knowingly violate[] any state statute . . . regulating the profession

[3]

in question." Ind. Code § 25-1-9-4(a)(3).[4] Additionally, S.E.A. 480 provides that an individual who has received gender transition procedures in violation of the statute, or their parent or guardian, may bring an action to obtain damages, injunctive or declaratory relief, or any other appropriate relief. Ind. Code § 25-1-22-16-18 (eff. July 1, 2023).

**Statement of Facts**[5]

**I.     Medical protocols for the treatment of transgender minors with gender dysphoria**

"Gender identity" refers to a person's internal sense of belonging to a particular gender. (Dkt. 26-1, Declaration of Dr. Dan H. Karasic ["Karasic"] ¶¶ 26-29; Dkt. 26-2, Declaration of Dr. Daniel Shumer ["Shumer"] ¶¶ 26-29).[6] Everyone has a gender identity, and a person's gender identity cannot

---

[4]      Defendants Individual Members of the Medical Licensing Board comprise the agency that has the power to discipline physicians in Indiana. See Ind. Code §§ 25-1-9-1; 25-1-9-4(a)(3); 25-1-9-9. The Medical Licensing Board is a sub-agency within the defendant Indiana Professional Licensing Agency, the director of which has administrative functions, duties, and responsibilities for overseeing numerous sub-agencies that also regulate other healthcare practitioners as that term is defined by S.E.A. 480, Ind. Code § 25-1-22-10 (eff. July 1, 2023). And the Attorney General of the State of Indiana is empowered to investigate and prosecute consumer complaints that allege a violation of state law. Ind. Code § 25-1-7-2. All defendants are referred together as "the State"

[5]      Discovery has not yet occurred in this case and plaintiffs therefore reserve the right to present supplemental facts to the Court at or prior to any preliminary injunction hearing in this matter.

[6]      Dr. Dan Karasic is a Professor Emeritus at the University of California – San Francisco School of Medicine and has been on the faculty at UCSF since 1991. He received his M.D. from the Yale Medical School, and, among other qualifications, has worked with thousands of patients diagnosed with gender dysphoria for over thirty years; chairs the American Psychiatric Association Workgroup on Gender Dysphoria; authored the chapter on transgender care in the American Psychiatric Press's Clinical Manual of Cultural Psychiatry; co-authored the *WPATH Standards of Care* (Version 8), which are the internationally accepted guidelines designed to promote the health and welfare of transgender persons; has developed specialty certification programs for health providers serving transgender patients; and has undertaken numerous clinical and consulting positions regarding the care of people diagnosed with gender dysphoria. (*See* Karasic ¶¶ 12-21 & Exhibit A (CV)).

Dr. Daniel Shumer is a pediatric endocrinologist, Associate Professor of Pediatrics, the Clinical Director of the Child and Adolescent Gender Clinic at Mott Children's Hospital at Michigan Medicine, and Medical Director of the Comprehensive Gender Services Program at Michigan Medicine, University of Michigan. He received his M.D. from Northwestern University and his M.P.H. from Harvard's T.H. Chan School of Public Health. Among other qualifications, Dr. Shumer has treated hundreds of patients with gender dysphoria since 2015; published extensively on the topic of gender identity in pediatrics and the treatment of gender dysphoria; trained medical students in pediatric endocrinology and the treatment of patients with gender dysphoria; established the Child and Adolescent Gender Services Clinic in Ann Arbor; and has authored numerous peer-reviewed articles and medical textbook chapters. (*See* Shumer ¶¶ 3-16 & Exhibit A (CV)).

[4]

be altered through medical intervention. (Karasic ¶ 28; Shumer ¶¶ 27-28; Dkt. 26-3, Declaration of Dr. Jack Turban ["Turban"] ¶ 20).[7] People who have a gender identity that aligns with the sex they were assigned at birth are cisgender (or non-transgender), while people who have a gender identity that does not align with their sex assigned at birth are transgender. (Karasic ¶ 29; Shumer ¶ 27). The lack of alignment between one's gender identity and sex assigned at birth can cause significant distress. (Karasic ¶ 30; Shumer ¶¶ 30-31). In Indiana, approximately 4,100 persons aged 13 to 17 are transgender and approximately 25,800 adults aged 18 or older are transgender. (Karasic ¶ 29).

"Gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and their sex assigned at birth. (Karasic ¶¶ 30-32; Shumer ¶ 31). Under the criteria set forth in the Diagnostic & Statistical Manual of Mental Disorders, 5th ed., to be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, school, or occupational, or other important areas, of functioning. (Karasic ¶¶ 31-32; Shumer ¶ 31). Being transgender is not itself a medical condition to be treated or cured. (Karasic ¶ 33). Gender dysphoria, however, is a serious medical condition that, if left untreated, can result in severe anxiety and depression, posttraumatic stress disorder, eating disorders, substance abuse, self-harm, and suicidality. (Karasic ¶ 57; Shumer ¶ 35; Turban ¶ 22).

Indiana medical providers use well-established guidelines to diagnose and treat minors with

---

[7]      Dr. Jack Turban is an Assistant Professor of Child & Adolescent Psychiatry at the UCSF School of Medicine, where he is also Affiliate Faculty at the Philip R. Lee Institute for Health Policy Studies and serves as the director of the Gender Psychiatry Program in the Division of Child & Adolescent Psychiatry. He received his M.D. and Master of Health Science degrees from the Yale University School of Medicine. Among other qualifications, he is a board-certified psychiatrist; has received awards for his research on the mental health of transgender youth and youth experiencing gender dysphoria; lectures at medical schools and grand rounds around the country; publishes extensively in peer-reviewed journals on the topic of transgender youth; co-edited the textbook *Pediatric Gender Identity: Gender-Affirming Care for Transgender and Gender Diverse Youth*; and served as lead author for multiple textbook chapters on the mental health of transgender youth. (*See* Turban ¶¶ 4-10. & Exhibit A (CV)).

[5]

gender dysphoria. The Endocrine Society[8] and the World Professional Association for Transgender Health ("WPATH")[9] have published widely accepted medical protocols for treating gender dysphoria. (Karasic ¶¶ 34-37; Shumer ¶¶ 32, 40-48). Medical treatment for gender dysphoria seeks to eliminate or avoid clinically significant distress by helping a transgender person live in alignment with their gender identity. (Karasic ¶¶ 33, 57; Shumer ¶ 34). This treatment, sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care," is recognized by the American Academy of Pediatrics and the American Academy of Child and Adolescent Psychiatry as safe, effective, and medically necessary treatment for the health and well-being of adolescents suffering from gender dysphoria.[10] (Karasic ¶¶ 36, 56, 60; Shumer ¶¶ 46-47; Turban ¶¶ 13, 32). Treatment for gender dysphoria differs depending on whether the patient is a pre-pubertal child, an adolescent, or an adult. Before puberty, gender transition does not include any pharmaceutical or surgical intervention; interventions are instead directed at supporting the child with family, peers, and at school, through supportive psychotherapy as needed, and by allowing the child to live and be socially recognized in accordance with their gender identity. (Karasic ¶ 39; Shumer ¶ 50; Turban ¶ 25). Medical interventions may become medically necessary and appropriate after transgender patients reach puberty. (Karasic ¶¶ 40-41; Shumer ¶¶ 39, 51-52; Turban ¶ 23). In providing medical treatments to

---

[8]     Wylie C. Hembree et al., "Endocrine Treatment of Gender Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," The Journal of Clinical Endocrinology & Metabolism, Volume 102, Issue 11, 1 November 2017, Pages 3869-3903, https://doi.org/10.1210/jc.2017-01658 ("Endocrine Society Guideline").

[9]     World Professional Association for Transgender Health, Standards of Care for the Health of Transgender and Gender Diverse People (8th Version) (2022), https://www.wpath.org/publications/soc ("WPATH Standards of Care").

[10]    Rafferty J, AAP Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents, Pediatrics, 2018 Volume 142 No. 4 https://pediatrics.aappublications.org/content/pediatrics/142/4/e2018 2162.full.pdf; AACAP Statement Responding to Efforts to Ban Evidence Based Care for Transgender and Gender Diverse Youth, American Academy of Child and Adolescent Psychiatry, https:// www.aacap.org/AACAP/Latest_News/AACAP_Statement_Responding_to_Effortsto_ban_Evidence-Based_Care_for_Transgender_and_Gender_Diverse.aspx.

adolescents, clinicians are guided by mental health assessments and/or work in close consultation with qualified providers who are experienced in diagnosing and treating gender dysphoria. (Karasic ¶¶ 7, 43, 45, 50; Shumer ¶ 37). For adolescents, parental consent is required before the initiation of any medical interventions. (Karasic ¶ 42; Shumer ¶¶ 57, 63).

For many transgender adolescents, going through puberty in accordance with their sex assigned at birth can cause significant distress. (Karasic ¶¶ 40, 59; Shumer ¶¶ 57-58, 73). To relieve this distress and pause the development of the potentially permanent physical changes that come with puberty, healthcare providers may prescribe puberty-delaying medication to these patients. (Karasic ¶¶ 40-41; Shumer ¶¶ 50-58). Under the WPATH Standards of Care, puberty-delaying treatment may be medically indicated if, among other criteria, the patient's gender incongruence is marked and sustained over time, and they meet the diagnostic criteria for gender dysphoria. (Karasic ¶ 41). Puberty-delaying treatment is reversible, and if an adolescent discontinues the treatment, endogenous puberty will resume. (Shumer ¶¶ 55-56).

For some adolescents, their healthcare provider may determine it is medically necessary and appropriate to treat them with gender-affirming hormone therapy (i.e., testosterone for transgender boys and testosterone suppression and estrogen for transgender girls). (Karasic ¶¶ 8, 43, 60; Shumer ¶¶ 61-63, 76; Turban ¶ 32). This treatment is prescribed either after a period of puberty-delaying treatment or for adolescents who are later into puberty at the time of assessment. Both the Endocrine Society Guideline and the WPATH Standards of Care require rigorous assessment prior to the initiation of gender-affirming hormone therapy in adolescents. (Karasic ¶¶ 41-45).

Transgender adolescents who receive gender-affirming hormones after puberty-delaying treatment never go through puberty in accordance with the sex assigned to them at birth, and, instead, go through hormonal puberty that matches their gender identity. (Shumer ¶¶ 54, 57-58, 61-62). These treatments not only reduce distress at the time of treatment, but also minimize dysphoria later in life

[7]

and reduce or eliminate the need for later surgical interventions. (Shumer ¶¶ 53-54, 57-58). Adolescents who receive gender-affirming hormones will undergo physiological changes consistent with their gender identity: transgender adolescent boys prescribed testosterone will develop a lower voice and facial and body hair, while transgender adolescent girls prescribed estrogen will experience breast growth, female fat distribution, and softer skin. (Shumer ¶ 62).

## II. The safety and efficacy of the gender-affirming care prohibited by S.E.A. 480

Without gender-affirming medical treatment, many transgender adolescents with gender dysphoria suffer extreme distress and elevated rates of anxiety, depression, and suicidal ideation. (Karasic ¶¶ 57-59; Shumer ¶¶ 35, 80-85; Turban ¶¶ 14-16, 18, 22). These severe symptoms of gender dysphoria are alleviated when adolescents are treated with puberty-delaying treatments and hormone therapy, which prevents them from going through endogenous puberty and allows them to go through hormonal puberty consistent with their gender identity. (Karasic ¶¶ 47-49; Shumer ¶¶ 36, 73, 76-77; Turban ¶ 12).

Puberty blockers and hormone therapy are safe and effective treatments. (Karasic ¶¶ 8, 47-49; Shumer ¶¶ 59, 66, 72, 77). The best available evidence developed through decades of clinical experience and a body of research has demonstrated the safety and efficacy of these treatments for adolescents with gender dysphoria. (Karasic ¶ 56; Shumer ¶ 79). Cross-sectional and longitudinal studies have shown that both puberty delaying treatment and gender-affirming hormone therapy prevent the worsening of severe symptoms of gender dysphoria in adolescents and improve overall patient health. (Turban ¶¶ 14-15, 32). Based on this body of research and the experience of clinical providers at research institutions across the country, the major medical associations in the United States, including the American Medical Association, the American Psychiatric Association, the American College of Physicians, the American Academy of Family Physicians, the Endocrine Society, WPATH, and the United States Professional Association for Transgender Health, along with the

medical professional associations responsible for the care of youth, including the American Academy of Pediatrics, the Academy of Child and Adolescent Psychiatry, and the Pediatric Endocrine Society, oppose denying this appropriate care for transgender youth with gender dysphoria. (Karasic ¶ 60; Turban ¶¶ 13, 32). Other than the gender-affirming medical care banned by S.E.A. 480, there are no evidence-based treatments for adolescents with gender dysphoria. (Karasic ¶ 10; Turban ¶¶ 19, 32).

Withholding or withdrawing gender-affirming care from adolescents with gender dysphoria is harmful. Adolescents with gender dysphoria who received gender-affirming care demonstrate improved health and well-being. (Karasic ¶¶ 47-50; Shumer ¶¶ 73, 76; Turban ¶¶ 14-15). Lack of access to gender-affirming care directly contributes to poorer mental health outcomes. (Karasic ¶ 58; Turban ¶ 32; Shumer ¶¶ 80, 82). Delayed or denied care frequently results in increased depression, anxiety, suicidal ideation and self-harm, increased substance use, and a deterioration in school performance. (Karasic ¶ 59; Shumer ¶ 80-81; Turban ¶ 32). Discontinuing puberty blockers causes the onset of puberty, a significant source of distress for patients with gender dysphoria. (Shumer ¶ 81). Discontinuing gender-affirming hormone therapy causes adolescents to experience physiological changes inconsistent with their gender identity, regardless of whether that therapy is withdrawn abruptly or titrated down. (*Id.*).

There is nothing uniquely risky about the care provided to transgender minors to treat gender dysphoria when compared to any other type of healthcare. The endocrine treatments prohibited by S.E.A. 480—pubertal suppression, testosterone, estrogen, and testosterone suppression—are used to treat other conditions such as precocious puberty, delayed puberty, hypogonadism, Turner Syndrome, Klinefelter Syndrome, agonism, premature ovarian failure, and disorders of sex development, and carry comparable risks and side effects regardless of the indication for which they are prescribed. (Shumer ¶¶ 55, 59-60, 66-68, 74-75, 77; Turban ¶ 18). Indeed, the evidence supporting the safety and efficacy of the care prohibited by S.E.A. 480 is comparable to the evidence supporting treatment of

[9]

other conditions. (Karasic ¶ 35; Shumer ¶ 40). Nor do the endocrine treatments used to treat gender dysphoria in adolescents create a unique risk to fertility: puberty blockers on their own do does not affect fertility, and many patients treated with hormone therapy are able to biologically conceive children. (Shumer ¶¶ 56, 59, 70). Moreover, gender-affirming care is not the only type of medical care that can affect fertility, but it is the only care banned by S.E.A. 480. (Shumer ¶ 71).

### III.   The plaintiffs and the profoundly deleterious consequences they will suffer if S.E.A. 480 is allowed to take effect

#### A.   The minor plaintiffs and their plaintiff-parents

K.C. is a 10-year-old transgender girl. (Dkt. 26-4, Declaration of Nathaniel and Beth Clawson ["Clawson"] ¶ 3). Although her birth-assigned sex was male, she has lived as a girl since before she was four years old, using a typical girl's name and wearing girls' clothing. (*Id.* ¶¶ 4, 7). Before she was four, she showed distress about her physical body not aligning with her gender identity. (*Id.* ¶ 5). She was diagnosed with gender dysphoria shortly after she turned four and has been in therapy periodically since that time. (*Id.* ¶¶ 6, 9). The dysphoria has triggered severe anxiety and depression. (*Id.* ¶ 9). She is a patient at the Riley Gender Health Program ("Riley") in Indianapolis and is treated by an endocrinologist. (*Id.*). K.C. has recently entered the first stages of puberty and her doctor has prescribed a puberty blocker to prevent her from being affected by testosterone. (*Id.* 11). She has an appointment later this month for subcutaneous insertion of a device that will deliver a puberty blocker. (*Id.*). She also hopes to receive gender-affirming hormonal therapy as soon as it is medically appropriate and necessary. (*Id.* ¶ 19). With the onset of puberty, her dysphoria, and its attendant anxiety and depression, is increasing. (*Id.* ¶ 14). Any sign of her "maleness," for instance the increase in body odor from her underarms or other signs of maturation, makes her extremely upset. (*Id.* ¶ 15).

M.W. is a 16-year-old transgender boy who socially transitioned at 14 and consistently uses a typical boy's first name and dresses and appears as a boy. (Dkt. 26-5, Declaration of Lisa and Ryan Welch ["Welch"] ¶¶ 3-4). He has been diagnosed with gender dysphoria and suffers from anxiety and

depression because of the incongruence between his gender identity and gender assigned at birth. (*Id.* ¶¶ 5-6). He has received care at Riley since 2022. (*Id.* ¶ 5). For approximately a year  his gender dysphoria has been treated with testosterone by professionals at Riley. (*Id.* ¶ 8). He also separately receives mental health therapy to assist him in managing the manifestations of his gender dysphoria. (*Id.* ¶ 10). Even before he first visited Riley, he began to wear a chest binder to minimize the distress that his developing body was causing him and the medical professionals at Riley have also given him further instruction on wearing the chest binder. (*Id.* ¶ 7). The testosterone has caused the development of male characteristics, including the deepening of M.W.'s voice, the growth of facial hair, and changes in his musculature. (*Id.* ¶ 11). These male characteristics have greatly ameliorated the symptoms of his gender dysphoria. (*Id.* ¶¶ 12-14). His depression and anxiety have decreased, and he now has made friends who treat him as the boy that he is. (*Id.* ¶ 13).

A.M. is an 11-year-old transgender girl who informed her family before she was four that she was a girl and was having thoughts of mutilating her penis to get rid of it. (Dkt. 26-6, Declaration of Emily Morris ["Morris"] ¶¶ 12-13). Since that time, she has lived as a girl, consistently using her preferred female first name and dressing and appearing as a girl, and she is known to the world only as a girl. (*Id.* ¶ 4). She has been diagnosed with gender dysphoria, which causes anxiety and depression, and has been in mental health counseling since she was six. (*Id.* ¶¶ 7-8). She is a recipient of Medicaid due to her family's income level, and Medicaid funds pay for her gender-affirming care at Riley. (*Id.* ¶ 19). She has been prescribed a puberty blocker and has been taking it by injection at Riley since August of 2021. (*Id.* ¶ 10). As a result, she is not experiencing any of the physiological changes that increased testosterone levels would cause in a pubescent boy, and when medically appropriate, she will be prescribed estrogen and testosterone suppression in the future that will cause her to develop many of the physiological characteristics caused by female puberty. (*Id.* ¶ 23). The blocking of puberty and the ability to live as a girl have caused the symptoms of A.M.'s gender dysphoria to markedly decrease.

[11]

(*Id.* ¶ 16 ). Terminating A.M.'s puberty blockers, causing her to develop male characteristics, would be devastating to her. (*Id.* ¶¶ 16-17).

M.R. is a 15-year-old transgender boy. (Dkt. 26-7, Declaration of Maria Rivera ["Rivera"] ¶¶ 3-4). He suffers from gender dysphoria that has caused him depression and anxiety and that has caused him to engage in self-harming behavior, which resulted in hospitalization. (*Id.* ¶ 6). Approximately 18 months ago he began to transition as a boy and began to receive mental health care to deal with his gender dysphoria. (*Id.* ¶ 8). He began to receive testosterone early in 2023. (*Id.* ¶ 9). As soon as he began to receive the testosterone his mental health greatly improved; his depression and anxiety substantially decreased. (*Id.* ¶ 11). Before receiving testosterone, he did not want to leave the house and he had an enormous amount of anxiety that he would be misgendered. (*Id.* ¶ 12). This anxiety led him to engage in self-harming behavior. (*Id.*). Now, after receiving testosterone for only a short period of time, he has become more outgoing and comfortable with his peers. (*Id.* ¶ 14). He is now developing male physical characteristics and is recognized by others as male. (*Id.* ¶ 13). His mother believes that the terrible symptoms of his gender dysphoria will continue to decrease as he continues receiving testosterone as part of his gender-affirming therapy. (*Id.* ¶ 15).

All the plaintiff youth were prescribed gender-affirming care only after the risks and benefits were fully explained to them and to their parents, and only after these parents provided informed consent. (Clawson ¶ 13 ; Welch ¶ 9; Morris ¶ 14; Rivera ¶ 10). The plaintiff parents have all watched their children suffer greatly from gender dysphoria and have made the parental choice to ensure that their children are provided with the gender-affirming care that they believe, and their healthcare providers confirm, is medically necessary for these children. (Clawson ¶ 20 ; Welch ¶¶ 16-17; Morris ¶¶ 20-22; Rivera ¶ 5-6, 12, 17). They recognize that denying this care would be extremely harmful to their children as it would have a cascade of negative consequences: it would undo the physical progress their children have already made and cause the development of the physiological characteristics

inconsistent with their children's gender identity, thereby causing severe symptoms of gender dysphoria to return, injuring their mental health with potentially extremely serious consequence; it would be devastating for the children. (Clawson ¶¶ 16-18; Welch ¶¶ 15-16; Morris ¶¶ 17-18; Rivera ¶ 16). The parents have all made the parental choice to obtain what their doctors have recommended and what they believe is necessary and essential medical care for their children, and they believe that they have the right as parents to ensure that their children receive appropriate medical treatment. (Clawson ¶¶ 21-22 ; Welch ¶¶ 18-19; Morris ¶¶ 22-25; Rivera ¶ 18).

> **B.** **The provider plaintiffs**

Mosaic Health and Healing Arts, Inc. ("Mosaic") is a family medicine practice in Goshen, Indiana, which, in addition to plaintiff Dr. Catherine Bast, employs other licensed healthcare practitioners: two family nurse practitioners and a licensed mental health counselor. (Dkt. 26-8, Declaration of Michelle Marquis ["Marquis"] ¶ 9). It is an Indiana Medicaid provider and receives Medicaid reimbursement for care for its minor patients, including reimbursement for patient visits, which includes visits with the physician where puberty blocker and gender-affirming hormones are administered in its offices either through injection or implantation, as well as visits with other medical staff operating under the supervision of a physician. (*Id.* ¶ 13). Medicaid will also pay for the puberty blockers and hormones by directly paying the pharmacies that issue the medication. (*Id.*). Medicaid will also pay for the laboratory tests and costs that are required under the standard of care to monitor the efficacy and results of the medication that have been administered. (*Id.*). Medicaid has consistently approved and provided reimbursement for the above-described gender-affirming services since Mosaic opened in 2016. (*Id.* ¶ 14). At the current times it provides puberty blockers and gender-affirming hormones to approximately 72 persons under the age of 18, 31 of whom are Medicaid recipients. (*Id.* ¶ 15). Mosaic receives Medicaid reimbursement for services provided to these youth. (*Id.* ¶ 15). It desires to continue to provide this necessary care for its patients and to receive Medicaid

reimbursement. (*Id.* ¶ 26).

Dr. Bast is a board-certified family care physician and is one of the co-founders of Mosaic, where she provides an array of medical services to her patients, including wellness visits, annual physicals, chronic disease management, and acute care. (Dkt. 26-9, Declaration of Dr. Catherine Bast ["Bast"] ¶¶ 2-4). She provides gender-affirming care to minor patients with gender dysphoria to ameliorate these patients' symptoms of gender dysphoria, and this includes the provision of puberty blockers and gender-affirming hormones. (*Id.* ¶¶ 10-12). Mosaic has more than 1,200 patients who are transgender. (Marquis ¶ 10). Dr. Bast is the physician who supervises the medical care of all of Mosaic's patients, including the approximately 72 minor transgender persons who are receiving either puberty blockers or hormones as part of their gender-affirming care. (Bast ¶¶ 8, 10). She prescribes hormones and puberty blockers to her minor transgender patients with gender dysphoria only where the medications are medically necessary, the patients and their parents are informed of the benefits and side effects of the treatments, and informed consent is obtained. (*Id.* ¶¶ 12, 15). In providing services to her patients, including puberty blocking drugs and gender-affirming hormone therapy, she utilizes and relies upon the WPATH Standards of Care of the Health of Transgender and Gender Diverse People (SOC 8). (*Id.* ¶ 14). Dr. Bast and the other licensed practitioners at Mosaic will also assist in providing transgender persons, including minors, with devices to aid them in their social transition, including chest binders for transgender boys. (*Id.* ¶ 16).

Dr. Bast is a Medicaid provider, separate from Mosaic, although Mosaic bills for her services, which includes reimbursement for services that are provided to her minor transgender patients who are Medicaid recipients and for whom she prescribes puberty blockers and gender-affirming hormones. (*Id.* ¶ 17).

Dr. Bast believes that as a physician she has an ethical and legal obligation to alleviate her patients' suffering by continuing to provide puberty blockers and hormones, as well as related care, to

[14]

her minor transgender patients as part of their gender-affirming care, receiving Medicaid reimbursement where appropriate, but she will be precluded from providing that care reimbursement if S.E.A. 480 goes into effect. (*Id.* ¶¶ 19-21). Dr. Bast is extremely concerned about the harm that will befall her minor transgender patients if she is not able to prescribe them puberty blockers and gender-affirming care. (*Id.* ¶¶ 27-28). Their gender dysphoria will necessarily increase leading to depression, anxiety, and suicidality. (*Id.* ¶ 28).

Dr. Bast and Mosaic provide referrals of their patients to other physicians and clinics where they can receive care for various matters, including gender-affirming hormones and puberty blockers, if, for instance, those practitioners are more conveniently located for the patients. (Bast ¶ 22; Marquis ¶ 18). If S.E.A. 480 takes effect, Dr. Bast will want—and indeed considers it part of her ethical obligation as a physician—to provide referrals for her patients to out-of-state practitioners so that her patients can continue to receive puberty blockers and gender-affirming hormones; and Mosaic will also wish to make these referrals. (Bast ¶ 23; Marquis ¶ 19). And Dr. Bast will want, and is ethically obligated, to cooperate with those out-of-state practitioners by talking to them about her former patients at their request, so that her patients receive continuity of care, and Mosaic will want to similarly cooperate (Bast ¶ 24; Marquis ¶ 20). However, if S.E.A. 480 takes effect Dr. Bast and Mosaic understands that making these referrals, or cooperating with physicians who contact Dr. Bast or Mosaic's other practitioners concerning the patients, is prohibited by the "aiding or abetting" provisions of the statute. (Bast ¶ 25; Marquis ¶ 21).

Neither Mosaic nor Dr. Bast wish to discriminate against their transgender patients who are minors by denying them medically necessary gender-affirming care, which is what would be required if S.E.A. 480 becomes effective. ( Bast ¶ 29; Marquis ¶ 26).

[15]

## The Preliminary Injunction Standard

A court must weigh several factors in the preliminary injunction determination:

(1)   whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2)   whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3)   whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

(4)   whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g.*, *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984). Thus, "the more likely [the preliminary injunction movant] is to win, the less the balance of harms must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

## Argument

## I.   The plaintiffs are likely to prevail on the merits of their claims

### A.   S.E.A. 480 violates the equal protection rights of the plaintiff youth

S.E.A. 480 prohibits procedures designed to effect a "gender transition," which the statute defines as the process whereby a person "shifts from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex," with "sex" defined as "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." Ind. Code §§ 25-1-22-3, 12 (eff. July 1, 2023). Given that the Act facially prohibits treatment related to "gender transition"—something that

[16]

only transgender people undergo—and ties the prohibition to a person's sex, it discriminates on the basis of both sex and transgender status. The Act does not prohibit all youth from receiving puberty blockers, testosterone, estrogen, progesterone, or even surgery; it only prohibits transgender youth from receiving those medications and treatments as part of gender-affirming care. (*Supra* at 9-10). The differential treatment meted out by S.E.A. 480 offends equal protection in multiple ways.[11]

> **1.   S.E.A. 480 discriminates against transgender youth because of their sex and the discrimination cannot be justified by the State**

Where the government restricts the ability of people to live in accordance with their gender identity, both the Seventh Circuit and the Supreme Court have recognized that such action is sex discrimination.

In *Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education,* 858 F.3d

---

[11]    The plaintiff youth, K.C., M.W., A.M., and M.R., raise these claims on their own behalf and on behalf of a putative class of similarly situated transgender youth. Dr. Bast and Mosaic also raise these claims on behalf of the almost 100 transgender youth to whom they provide gender-affirming care that will be prohibited if S.E.A. 480 goes into effect, as well as the additional patients that they will doubtless treat in the future. The Supreme Court has recognized on numerous occasions in the abortion context that healthcare providers have standing to raise the interests of their patients, given that the provider and the patient have such a close relationship "that the former is fully, or very nearly, as effective a proponent of the right as the latter," and that there are "genuine obstacle[s]" that make it difficult for the patient to assert their own rights. *Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976); *see also June Medical Services L.L.C. v. Russo*, –U.S.–, 140 S. Ct. 2103, 2118 (2020) (citing cases), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, –U.S.–, 142 S. Ct. 2228 (2022). In *June Medical* the Court noted that "we have generally permitted plaintiffs to assert third-party rights in cases where the enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." 140 S. Ct. at 2118-19 (internal quotation and citations omitted) (emphasis by the Court). Here, Dr. Bast and Mosaic are directly injured by the Act, which will prevent them from providing medically necessary gender-affirming care (and will subject Dr. Bast to professional consequences if she does so). *See* Section I(D), *infra*. They have close relationships with their patients and are therefore effective proponents of their patients' rights. And given the fact that the youth are under eighteen, that they are unlikely to step forward on their own in light of the politically charged nature of the provision of gender-affirming care to transgender youth, and that there are intense privacy interests at stake, it is clear that the youth have genuine obstacles in their path to bringing litigation on their own. It is therefore not surprising that the district court in *Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021), *aff'd on other grounds*, 47 F.4th 661 (8th Cir. 2022), in granting a preliminary injunction against an Arkansas statute similar to S.E.A. 480, found that the physician plaintiffs had standing not only to challenge the statute as to them but also to raise the claims of their minor patients. *Id.* at 888. The same is true here. Dr. Bast and Mosaic have standing to raise the equal protection violations imposed on their patients.

[17]

1034 (7th Cir. 2017), *abrogation on other grounds recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020), the court entered a preliminary injunction after finding, among other things, that the minor plaintiff was likely to succeed in demonstrating that the school's policy denying him the ability to use restrooms consistent with his gender identity violated equal protection as unlawful sex discrimination. *Id.* at 1051. While cisgender boys were able to use the male restrooms, the plaintiff, a transgender boy, was not. The plaintiff's sex was the determinative factor, and the court concluded that where "the School District's policy cannot be stated without referencing sex," the policy creates a sex-based classification for purposes of equal protection. *Id.* Subsequent to *Whitaker,* the Supreme Court, in a Title VII case reached the same essential conclusion, holding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, –U.S.–, 140 S. Ct. 1731, 1741 (2020).

In *Whitaker* the Court highlighted the fact that sex discrimination was present because of discrimination based on sex stereotyping as, "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker*, 858 F.3d at 1048. S.E.A. 480 explicitly enforces sex stereotypes and gender conformity by targeting health care for exclusion if it would "alter or remove physical or anatomical characteristics or features that are *typical* for the individual's sex" or that is designed to "instill or create physiological or anatomical characteristics that resemble a sex *different* from the individual's sex." Ind. Code § 25-1-22-5(a) (eff. July 1, 2023) (emphasis added). By contrast, S.E.A. 480 permits the exact same medical treatments when sought to align a person's characteristics with their sex assigned at birth. *See* Ind. Code § 25-1-22-5(b) (eff. July 1, 2023). As such, the Act constitutes a "form of sex stereotyping where an individual is required effectively to maintain [their] natal sex characteristics." *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018).

Given *Whitaker* and *Bostock* the outcome here is clear. S.E.A. 480 defines an individual's "sex"

[18]

based on assignment at birth, and then allows or prohibits medical treatment based exclusively on that sex and the patient's relationship to it. It is impossible to determine the application of the statute without reference to sex, and as in *Whitaker* and *Bostock*, this is discrimination based on sex.

The Eighth Circuit reached this exact conclusion in *Brandt v. Rutledge,* 47 F.4th 661 (8th Cir. 2022), affirming a preliminary injunction against an Arkansas statute that would have prohibited healthcare personnel from providing "gender transition procedures." *Id.* at 668. "The biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not." *Id.* at 670

All sex-based classifications are subject to "demanding" scrutiny, requiring the State to demonstrate "an exceedingly persuasive justification" for its differential treatment. *United States v. Virginia*, 518 U.S. 515, 533 (1996). The State bears the burden of demonstrating that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 524. "It is not sufficient to provide a hypothesized or post hoc justification created in response to litigation. Nor may the justification be based upon overbroad generalizations about sex. Instead, the justification must be genuine." *Whitaker*, 858 F.3d at 150 (internal citations omitted).

Indiana cannot meet this demanding burden because the Act does not further any important governmental interests. The Act does not further any interest in protecting children; to the contrary, it harms children by denying them access to medically necessary care that is proven to alleviate the symptoms of their gender dysphoria. By categorically prohibiting this treatment, Indiana has cut off the only evidence-based treatment for the serious medical condition of gender dysphoria. Decades of clinical experience, bolstered by published, peer-reviewed, cross-sectional and longitudinal studies, demonstrate that this care improves health outcomes for adolescent patients. (Karasic ¶¶ 47-49; Shumer ¶¶ 36, 73, 76-79; Turban ¶¶ 12, 14-15, 32). And the personal experiences of the minor

[19]

plaintiffs and their parents show how this treatment positively transforms the lives of the adolescents who need it. Far from harming these youth, this treatment allows them to feel better (Welch ¶ 16; Morris ¶ 16; Rivera ¶¶ 13-14).

Although the State has not yet articulated a justification for the Act, other courts have rejected the argument that banning gender-affirming medical treatment furthers any important governmental interest in protecting the medical profession or children. *See Brandt*, 47 F.4th at 671 (rejecting same argument by Arkansas); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1145 (M.D. Ala. 2022) (rejecting same argument by Alabama). Gender-affirming care is safe, effective, and medically necessary treatment for the health and well-being of adolescents suffering from gender dysphoria. (Karasic ¶¶ 36-37, 56, 60-61; Shumer ¶¶ 42-47; Turban ¶¶ 13, 32). Rather than harm children, this care greatly improves the mental health outcomes of adolescents with gender dysphoria. For this reason, every major medical association in the United States opposes denying this appropriate care for transgender youth with gender dysphoria and recognizes the prohibited treatments as safe and effective. (Karasic ¶ 60; Turban ¶ 13).

> **2.      S.E.A. 480 is unconstitutional because it discriminates based on transgender status and fails the required heightened scrutiny**

The Act expressly classifies patients for differential treatment based on transgender status. A transgender person, by definition, is someone whose sex assigned at birth is different from their gender identity. By prohibiting medical treatments based on whether they enable a person to live in accordance with a gender identity inconsistent with their sex assigned at birth—that is, to undergo gender transition—S.E.A. 480 expressly and exclusively targets transgender people based on their transgender status. It is true that S.E.A. 480 "does not specifically refer to transgender individuals. It does, however, refer to gender transition which is only sought by transgender individuals" thereby discriminating based on transgender status. *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022); *see also Eknes-Tucker,* 603 F. Supp. 3d at 1147 (explaining that

[20]

Alabama's ban on gender-affirming care for minors "places a special burden on transgender minors because their gender identity does not match their birth sex."). Moreover, the discrimination is highlighted by the Act's definition of "sex" that writes transgender adolescents out of that term. *See* Ind. Code § 25-1-22-12 (eff. July 1, 2023) (defining sex to exclude those whose gender identity differs from their sex designated at birth).

The Supreme Court has noted that heightened scrutiny applies to assess the constitutionality of discrimination against "quasi-suspect classes," or groups that have "experienced a history of purposeful unequal treatment…or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (internal quotation and citation omitted). Appropriate considerations include whether the group has been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process," *id.* (internal quotation and citation omitted), and whether the group "exhibit[s] obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

Although the Supreme Court has not answered this question, numerous courts, applying the factors established by the Supreme Court, have held that transgender persons are members of a quasi-suspect class, discrimination against whom is subject to elevated scrutiny. *See Grimm v. Gloucester Co. Sch. Bd.*, 972 F.3d 586, 613 (4th Cir. 2020); *Karnoski v. Trump,* 926 F.3d 1180, 1200-02 (9th Cir. 2019); *Brandt*, 551 F. Supp. 3d at 889[12]; *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 289 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F.

---

[12]     In affirming the district court's preliminary injunction against a statute similar to S.E.A. 480, the Eighth Circuit held that the district court had not erred in concluding that the plaintiffs were likely to succeed in their claim that the statute represented unlawful sex discrimination. *Brandt*, 47 F. 4th at 669-71. The court noted that "[t]he district court also concluded that heightened scrutiny was appropriate because the Act facially discriminates against transgender people, who constitute a quasi-suspect class. We discern no clear error in the district court's factual findings underlying this legal conclusion, but we need not rely on it to apply heightened scrutiny because the Act also discriminates on the basis of sex." *Id.* at 6 70 n.4.

Supp. 3d 134, 139 (S.D.N.Y. 2015). Indeed, transgender persons (1) have historically been subject to discrimination; (2) have a defining characteristic that bears no relation to their ability to contribute to society; (3) may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) are a minority group lacking political power. *See Grimm*, 972 F.3d at 610-13 (applying the test synthesized from Supreme Court jurisprudence in *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013)).

In order to justify the discrimination against the youth based on their transgender status, the State must satisfy the same standard as for the sex-based classification described above—it must demonstrate that the discrimination is substantially related to an important governmental interest. *Grimm*, 972 F.3d at 613. As noted above, given the clear efficacy and medical necessity of gender-affirming care and the fact that the same care is available to cisgender youth, the State cannot satisfy the required elevated scrutiny.

### 3.      S.E.A. 480 fails any level of equal-protection review

Without addressing whether gay and lesbian persons were part of a suspect or quasi-suspect class, the Supreme Court in *Romer v. Evans*, 517 U.S. 620 (1996), concluded that "[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Id.* at 633. A law targeting a group in this way "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.* at 634. Where a law "further[s no] proper legislative end" but to make a group "unequal to everyone else" it does not "bear a rational relationship to a legitimate governmental purpose," and is unconstitutional under any standard of review. *Id.* at 635.

Much like the challenged amendment in *Romer*, S.E.A. 480 "identifies persons by a single trait and then denies them protection across the board"—in this case, access to the medical care that all

other youth and adults in Indiana may receive. *Id.* at 633. The bottom line is that the transgender youth are denied safe and necessary medical care that is available to others, solely because they are transgender. The Act "is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Id.* at 635.

Even without a finding of animus, what the law does is "so far removed from [the asserted] justifications that . . . it [is] impossible to credit them." *Id.* There is no rational basis to conclude that allowing adolescents with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten legitimate interests of [Indiana] in a way that" allowing other types of care "would not." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (health risks of birth control pills not a basis for banning access for unmarried people while allowing access for married people where risks are the same). In this regard, S.E.A. 480 is "so woefully underinclusive" with respect to any purported interest in protecting the health and safety of minors "as to render belief in that purpose a challenge to the credulous" under any standard of review. *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002). Regardless of the level of scrutiny applied, S.E.A. 480 violates the equal protection rights of transgender youth.[13]

**B.**   **S.E.A. 480 denies the parent plaintiffs their fundamental right to dictate the care, custody, and control of their children**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects not only rights that are explicit in the Constitution but also those that are "deeply rooted in

---

[13]   Even without reference to *Romer*, S.E.A. 480 fails the minimal rationality that equal protection demands. Under this low-level scrutiny "state action is presumed to be lawful and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest." *Whitaker*, 858 F.3d at 1050. There is nothing rational about denying medically necessary, evidence-based, standard-of-care treatment to youth, particularly where the care is available to all others. However, given the holdings of *Whitaker* and *Romer*, there is no need for this Court to address this issue.

[our] history and tradition" and that are "essential to our Nation's scheme of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, –U.S.–, 142 S. Ct. 2228, 2246 (2022) (internal quotations and citation omitted) (alteration by the Court). For the past century, the Supreme Court has recognized that the "liberty" protected by due process includes the right to "establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Since then, the Court has decided an unbroken chain of cases recognizing that "the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing *Santosky v. Kramer,* 455 U.S. 745, 753 (1982); *Parham v. J.R.,* 442 U.S. 584, 602 (1979); *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978); *Wisc. v. Yoder*, 406 U.S. 205, 232 (1972); *Stanley v. Ill.*, 404 U.S. 645, 651 (1972); *Prince v. Mass.*, 321 U.S. 158, 166 (1944); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925)).

This fundamental right "includes the rights of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (further citation omitted), *see also, e.g., Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) ("Parents, therefore, "possess a fundamental right to direct the medical care of their children."). They "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604. When the parent's and child's liberty interests in pursuing a course of medical care align, the strength of those interests is at its apex against state interference. *Cf. Santosky v. Kramer*, 455 at 760 (referring to the "vital interest" of the parent and child in preserving their relationship "coincide[ing]").

S.E.A. 480 impinges upon the fundamental right of parents, in conjunction with medical practitioners, to make decisions concerning the care of their children, and in the context of this medical care, usurps that right in its entirety. The plaintiff-parents want their children to receive what

[24]

the statute characterizes as "gender transition procedures," including puberty blockers and hormones. The youths' medical providers wish to deliver this treatment. S.E.A. 480 would absolutely prohibit it.

When a fundamental liberty interest is involved, it may not be infringed "unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citations omitted). Again, this is the State's burden to establish. *See, e.g., Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015) (referring to strict scrutiny in the First Amendment context). The State cannot meet its burden. As noted, puberty blockers, hormone therapy, and related care are not only medically necessary for youth suffering from gender dysphoria, but also there is no other evidence-based treatment available. (*Supra* at 9). This is not "experimental treatment." Puberty blockers have been used for decades to treat conditions such as precocious puberty, and hormone therapy is common for patients whose natural hormone levels are below normal. (Shumer ¶ 55, *see also supra* at 9-10). S.E.A. 480 denies necessary treatment to transgender youth, and there is no justification, let alone a narrowly tailored one, to deny parents the right to obtain this treatment for their children where it has been prescribed by their children's medical practitioners.

Here, S.EA. 480 deprives the minor Plaintiffs and their parents of the right to seek what every major medical association has recognized is safe, effective, and necessary care, and in so doing endangers children against their wishes and the wishes of their parents. "Parents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether [gender-affirming] medications are in a child's best interest on a case-by-case basis." *Eknes-Tucker*, 603 F. Supp. 3d at 1146. In *Eknes-Tucker*, the court issued a preliminary injunction against an Alabama statute that prohibited hormone therapy and puberty blockers for transgender youth. Among other things, the court concluded that "Parent Plaintiffs are substantially likely to show that they have a fundamental right to treat their children with transitioning medications subject to medically accepted standards and that the Act infringes on that right." *Id.* at 1144. The court rejected the State's asserted interests in

[25]

interfering with this form of treatment, noting that "at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors." *Id.* at 1145. *See also, Brandt*, 551 F. Supp. 3d at 893 (noting that the challenged statute, like S.E.A. 480, "allows the same treatment for cisgender minors that are banned for transgender minors . . . Based on these findings, the State could not withstand either heightened scrutiny or rational basis review.").

The Court was clear in *Troxel* that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." 530 U.S. at 68-69. Yet this is precisely what S.E.A. 480 does, and it violates the parents' fundamental rights to dictate "the care, custody, and control of their children." *Id.* at 65.[14]

**C.    S.E.A. 480's prohibition on the provision of gender-affirming care to minors violates federal Medicaid law**

Insofar as it denies Medicaid recipients such as A.M. the ability to receive medically necessary puberty blockers, hormones, and other gender-affirming care, S.E.A. 480 violates federal Medicaid law as well.

**1.    Federal Medicaid law requires that participating states, including Indiana, ensure the provision of medically necessary care that falls within specified categories of covered services without regard to a patient's condition or diagnosis**

Medicaid "is a cooperative federal-state program through which the Federal Government

---

[14]    The Supreme Court has recognized that the "liberty" in the Due Process Clause includes the right "to bodily integrity." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). This is a "fundamental right." *Id.* Thus, "the right to be free of state intrusions into . . . bodily security" is "an attributed of the ordered liberty that is the concern of substantive due process." *Hall v. Tawney*, 621 F.2d 607, 613 (2d Cir. 1980). As noted, a fundamental right can be impinged upon only if the impingement is narrowly tailored to serve a compelling governmental interest. *Flores*, 507 U.S. at 302. Therefore, if Indiana passed a statute identical to S.E.A. 480, but applied it to adults, it would violate this right to bodily integrity for the same reason that the Act violates the due process rights of parents to direct their children's upbringing.

provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990); *see generally* 42 U.S.C. § 1396, *et seq*. While "[a] state's participation in the Medicaid program is completely voluntary . . . once a state elects to participate, it must abide by all federal requirements and standards as set forth in the Act." *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003) (citation omitted). To ensure compliance with these requirements, "participating states must submit proposed Medicaid plans and any subsequent amendments to the Centers for Medicare and Medicaid Services for approval." *Planned Parenthood of Ind., Inc. v. Commissioner of Ind. State Dep't of Health*, 699 F.3d 962, 969 (7th Cir. 2012) (internal parenthetical, footnote, and citation omitted). Indiana participates in the Medicaid program and must therefore comply with all federally imposed requirements. *See id.*; *Bontrager v. Ind. Family & Soc. Servs. Admin.*, 697 F.3d 604, 606 (7th Cir. 2012); *Collins*, 349 F.3d at 374; *see also* Ind. Code § 12-15-1-1, *et seq*.

One such requirement (termed the "Availability Provision") is the obligation to make "medical assistance"—a term defined in great detail by 42 U.S.C. § 1396d(a)—"available . . . to all [eligible] individuals." 42 U.S.C. § 1396a(a)(10)(A); *see also Bontrager*, 697 F.3d at 606. The "medical assistance" provided by a state's Medicaid program *must* include coverage of ten specific service categories, *see* 42 U.S.C. § 1396a(a)(10)(A); *Collins*, 349 F.3d at 374 (addressing mandatory coverage category of "early and periodic screening, diagnostic, and treatment service[s]"), and *may* include coverage of twenty-one additional "optional" service categories, *see* 42 U.S.C. § 1396a(a)(10)(A); *Bontrager*, 697 F.3d at 606, 608 (addressing optional coverage category of "dental services"). However, even for optional service categories, a participating state "is required to provide Medicaid coverage for medically necessary treatments in those service areas that [it covers]." *Bontrager*, 697 F.3d at 608.

A separate requirement of federal Medicaid law, termed the "Comparability Provision," is the obligation to ensure that the "medical assistance" made available to an eligible Medicaid recipient not "be less in amount duration or scope than the medical assistance made available to any other such

[27]

individual." 42 U.S.C. § 1396a(a)(10)(B)(i). Among other things, this provision mandates that a state "may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).[15]

### 2. Indiana's prohibition on gender-affirming care violates the Availability Provision of federal Medicaid law

#### a. The gender-affirming care prohibited by S.E.A. 480 falls within several service categories that Indiana has agreed to cover through Medicaid

The gender-affirming care banned by S.E.A. 480 is a covered service and, in fact, Indiana's Medicaid agency has for years been covering this care for A.M. and other minors.

Most notably, gender-affirming care for minors qualifies as an "early and periodic screening, diagnostic, and treatment [or EPSDT] service[] for individuals . . . under the age of 21," which must be covered by all states participating in the Medicaid program. *See* 42 U.S.C. § 1396d(a)(4)(B); *see also* 42 U.S.C. § 1396a(a)(43). EPSDT services include any "necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses

---

[15]      Where a plaintiff seeks to enforce a federal statute through 42 U.S.C. § 1983, courts are frequently required to address, as a preliminary matter, whether that statute satisfies the three-prong test of *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997), such that it may be enforced through § 1983. *See also Gonzaga Univ. v. Doe*, 536 U.S. 273, 279-91 (2002). That is not a difficult inquiry here, for the Seventh Circuit in *Bontrager* explicitly held that one of the statutory subsections at issue—42 U.S.C. § 1396a(a)(10)(A)—is enforceable by Medicaid recipients. *See* 697 F.3d at 606-07. While *Bontrager* by its terms addressed only subsection (A) of § 1396a(a)(10), its holding is equally applicable both to subsection (B) and to 42 U.S.C. § 1396a(a)(43). Other courts have reached these conclusions explicitly. *See, e.g., Davis v. Shah*, 821 F.3d 231, 255 n.12 (2d Cir. 2016) (§ 1396a(a)(10)(B)); *Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Servs.*, 293 F.3d 472, 477-79 (8th Cir. 2002) (§ 1396a(a)(43)); *Salazar v. District of Columbia*, 729 F. Supp. 2d 257, 268-72 (D.D.C. 2010) (§ 1396a(a)(43); *Gaines v. Hadi*, 2006 WL 6035742, at *24-25 (S.D. Fla. Jan. 30, 2006) (§ 1396a(a)(10)(B)); *Memisovski ex rel. Memisovski v. Maram*, 2004 WL 1878332, at *9-11 (N.D. Ill. Aug. 23, 2004) (§ 1396a(a)(43)); *Martin v. Taft*, 222 F. Supp. 2d 940, 977-78 (S.D. Ohio 2002) (§ 1396a(a)(10)(B)); *Thoreson v. Palmer*, 1997 WL 33558625, at *6-7 (N.D. Iowa Apr. 25, 1997) (§ 1396a(a)(10)(B)).

The plaintiffs acknowledge that the U.S. Supreme Court has granted certiorari and heard argument in *Health and Hospital Corporation of Marion County v. Talevski*, No. 21-806, which raises issues concerning the circumstances under which spending-clause legislation may be enforced through § 1983. Nonetheless, unless and until the Supreme Court says otherwise, *Bontrager* remains good law in this circuit.

and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5); *see also* 42 U.S.C. § 1396d(r)(1) (describing the covered screening services as services "to determine the existence of certain physical or mental illnesses or conditions"). Treatment serves to "correct or ameliorate" a patient's condition when it makes that condition "better or more tolerable." *A.M.T. v. Gargano*, 781 F. Supp. 2d 798, 806 (S.D. Ind. 2011). Gender-affirming care is necessary to ameliorate the symptoms of patients' gender dysphoria. This being the case, for minors there is no such thing as an "optional" service category. *See, e.g.*, *Ekloff v. Rogers*, 443 F. Supp. 2d 1173, 1179 (D. Ariz. 2006) ("Every Circuit which has examined the scope of the EPSDT program has recognized that states must cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable under § 1396d(a).") (citing, *inter alia*, *Collins*, 349 F.3d at 376 n.8).

But even in the absence of the EPSDT provision, gender-affirming care qualifies as a covered service under Indiana's Medicaid program. Puberty blockers and hormones constitute "prescribed drugs" under 42 U.S.C. § 1396d(a)(12), which are covered by Indiana's State Medicaid Plan. The gender-affirming care prohibited by S.E.A. 480 also includes, at the very least, "physicians' services furnished by a physician" under § 1396d(a)(5)(A), and may also include, under appropriate circumstances, "medical care . . . furnished by licensed practitioners within the scope of their practice" under § 1396d(a)(6), "clinic services furnished by or under the direction of a physician" under § 1396d(a)(9), or even preventive or rehabilitative services under § 1396d(a)(13). Nowhere is this more obvious than in the language of SEA 480 itself, which defines so-called "gender transition procedures" to include "physician's services, practitioner's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition." Ind. Code § 25-1-22-5(a) (eff. July 1, 2023).

Of the various service categories enumerated in federal Medicaid law, in addition to EPSDT services "physicians' services" must be covered by a state Medicaid program, *see* 42 U.S.C. §

[29]

1396a(a)(10)(A), whereas Indiana has chosen to provide coverage for the other, optional, categories.[16]

> b. S.E.A. 480 prohibits the provision of medically necessary care within covered service categories and therefore violates the Availability Provision of federal Medicaid law

Given that the treatment banned by S.E.A. 480 falls within numerous service categories covered by Indiana's Medicaid program—some mandatory and others optional—Indiana "is required to provide Medicaid coverage for medically necessary treatments." *Bontrager*, 697 F.3d at 608.

The medical necessity of gender-affirming care for patients with gender dysphoria, including care prohibited by S.E.A. 480, is supported by the American Medical Association, the Endocrine Society, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association, and is detailed in standards of care established by the World Professional Association for Transgender Health ("WPATH"), which have been repeatedly described by courts in this circuit as establishing the guidelines that practitioners should follow.[17] Unsurprisingly, given that broad medical consensus, Indiana itself has been approving Medicaid coverage for interventions prohibited by S.E.A. 480 for years, and has been doing so pursuant to a federally approved state plan that limits coverage to medically necessary services. (Bast ¶¶ 17-18; Marquis ¶¶ 13-14).[18]

---

[16]    The plaintiffs have submitted with their evidentiary materials, as Exhibit 26-17, relevant excerpts from Indiana's State Medicaid Plan establishing Indiana's agreement to cover these optional service categories and the various limitations imposed for each service category. The complete State Medicaid Plan is available at https://provider.indianamedicaid. com/ihcp/stateplan/state_plan.asp (last visited Apr. 12, 2023). For ease of reference, citations in this brief to the State Medicaid Plan are made to the page number assigned by this Court's electronic filing system.

[17]    *See, e.g.*, *Monroe v. Meeks*, 584 F. Supp. 3d 643, 646 n.2 (S.D. Ill. 2022) (the standards "are the benchmark for appropriate care of individuals with [gender dysphoria]"); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 987 (W.D. Wis. 2018) (the standards "are widely recognized guidelines for the management of transgender individuals with gender dysphoria"); *cf. Iglesias v. Fed. Bureau of Prisons*, 2021 WL 6112790, at *2 (S.D. Ill. Dec. 27, 2021) (describing ten professional organizations that "endorse all the protocols in accordance with WPATH's Standards of Care").

[18]    Some courts have held that, under the EPSDT provision, once a prescribing physician determines a service to be "medically necessary," a state may only review that determination for evidence of fraud, abuse, or similar misconduct. *See, e.g.*, *N.B. v. Hamos*, 26 F. Supp. 3d 756, 765 (N.D. Ill. 2014). Other courts have held that a state retains discretion to review a physician's medical-necessity determination. *See, e.g.*, *Moore ex rel. Moore*

Recent cases have consistently held that treatments for gender dysphoria are medically necessary and certainly not experimental. In *Flack v. Wisconsin Department of Health Services*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019), the court addressed the legality of a state Medicaid agency's refusal to cover hormone therapies deemed by a provider to be medically necessary to treat patients' gender dysphoria, at least when those therapies were "associated with [gender-affirming] surgeries." *Id.* at 1009-10. While acknowledging that the Fifth Circuit in *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980), had upheld a restriction on gender-affirming surgeries under a coverage exclusion for "experimental" treatments, the court concluded that the state's "assertion that 'transsexual surgery' and the associated hormone treatments are not medically necessary is no longer reasonable." *Flack*, 395 F. Supp. 3d at 1015. This was so because, since 1980, the medical profession had reached a "formal consensus as to the safety and efficacy of surgical treatments for severe gender dysphoria." *Id.* at 1015-16; *see also id.* at 1018 ("[A]ny attempt by defendants or their experts to contend that gender-confirming care—including surgery—is inappropriate, unsafe, and ineffective is unreasonable, in the face of the existing medical consensus.").

To be sure, the prohibition on the coverage of gender-affirming care in *Flack* applied only to adults. But this was because Wisconsin, even in severely restricting coverage for adults, recognized its duty under the EPSDT provision to provide the same care to minors. *See id.* at 1010 ("For younger beneficiaries, [Wisconsin] considers requests for coverage under the [EPSDT] provisions. When reviewing an HMO denial of a request for gender confirming surgery for a beneficiary who was under 21 years old in July 2018, Wisconsin Medicaid's then-medical director . . . concluded that the requested

---

*v. Reese*, 637 F.3d 1220, 1257 (11th Cir. 2011). The Seventh Circuit in *Collins* appears to have concluded that states lack this discretion. *See* 349 F.3d at 376 n.8 ("[I]n the context of individuals under the age of twenty-one subject to EPSDT services, a state's discretion to exclude services deemed 'medically necessary' by an EPSDT provider has been circumscribed by the express mandate of the statute.") (internal citation omitted). Nonetheless, given the weight of medical evidence supporting the necessity of gender-affirming care for youth with gender dysphoria, it is unnecessary for this Court to address whether or not the State even has the authority to second guess a provider's medical-necessity determination.

surgery was medically necessary, recommending approval for coverage.").

On cross-motions for summary judgment, the district court in *Cruz v. Zucker*, 195 F. Supp. 3d 554 (S.D.N.Y.), *on reconsideration*, 218 F. Supp. 3d 246 (S.D.N.Y. 2016), squarely addressed a state's duty under the EPSDT provision to provide Medicaid coverage for hormone therapies to minors. The district court concluded that this provision required the coverage of both hormone therapies and pubertal suppressants when "medically necessary for minors with gender dysphoria." *Id.* at 581-82. Although it initially found this issue to revolve around a factual dispute not amenable to resolution on summary judgment, *id.*, four months after its summary-judgment decision the district court concluded that a proposed rule that would allow for coverage of medically necessary therapies to treat minors' gender dysphoria served as a concession "that plaintiffs' view of the remaining factual issues is correct," *see* 218 F. Supp. 3d at 247-49. The court therefore directed final judgment in the plaintiffs' favor. *See id.* at 248-49.

Of course, particularly in light of Indiana's years-long coverage of gender-affirming care for minors, at the present juncture the plaintiffs are in the dark as to whether the State suddenly believes this care to be medically unnecessary. Any such contention, however, is against the great weight of medical evidence establishing the medical necessity of this care.[19]

---

[19]    The plaintiffs acknowledge that, at least for adults, federal Medicaid law allows states to exclude or restrict coverage of a "covered outpatient drug" if the prescribed use is not for a "medically accepted indication," a defined term that refers generally to the use of a drug that has been approved by the Food and Drug Administration or that is supported by a citation in one of three specific "compendia." *See* 42 U.S.C. §§ 1396r-8(d)(1)(B)(i), 1396r-8(k)(6). The plaintiffs are presently uncertain as to whether the use of hormones and puberty blockers to treat patients' gender dysphoria is supported by a citation in one of these compendia. Nonetheless, this provision is not relevant to the plaintiffs' claims under federal Medicaid law for four independent reasons.

First, § 1396r-8(d)(1)(B)(i) gives states authority to, but does not require that they, restrict coverage of outpatient drugs. However, the EPSDT provision *requires* that participating states provide medically necessary care to minors "whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5); *see also* 42 U.S.C. § 1396a(a)(43)(C). As with any other optional service category, the State's ability to restrict coverage for minors is sharply circumscribed, even if they might be able to restrict similar coverage for adults. *See Cruz*, 195 F. Supp. 3d at 581 ("[T]he coverage carveout offered by the Compendia Requirement does not lessen a state's burden under the EPSDT Provision to provide all medically necessary care.").

[32]

    **3.**    **Indiana's prohibition on gender-affirming care violates the Comparability Provision of federal Medicaid law**

Finally, federal Medicaid law prohibits denying services based solely on an enrollee's diagnosis, but S.E.A. 480 does just that: minors' ability to receive services depends directly and exclusively on whether they have been diagnosed with gender dysphoria or not, because the statute only bans care when the treatments are provided to transgender minors to treat that condition.

S.E.A. 480 does not ban *all* physicians' visits for minors, nor does it prohibit the provision of hormone therapies, puberty blockers, or even gender-confirmation surgeries to *all* minors. Rather, young Hoosiers may still receive these services if they have "a medically verifiable disorder of sex development," if they have abnormal "sex chromosome structure, sex steroid hormone production, or sex steroid hormone action," or if they otherwise require these services "for a disorder or condition of sexual development that is unrelated to a diagnosis of gender dysphoria or gender identity disorder." Ind. Code § 25-1-22-5(b) (eff. July 1, 2023); *see also* Ind. Code § 25-1-22-13(c) (eff. July 1, 2023)

---

Second, even for adults, Indiana has not exercised its authority under § 1396r-8(d)(1)(B)(i) to restrict its coverage of prescribed drugs in this manner. "States, like [Indiana], participate in the Medicaid program through state plans and amendments to those plans," which must be approved by the federal government. *See, e.g.*, *Miller ex rel. Morrish v. Olszewski*, 2009 WL 5201792, at *2 (E.D. Mich. Dec. 21, 2009). But Indiana's State Medicaid Plan continues to provide for the coverage of drugs without regard to whether they are for a "medically accepted indication." (Ex. 26-17, State Medicaid Plan at 47, 69-70). The State cannot escape this binding commitment.

Third, the authority under federal Medicaid law to restrict medically necessary drugs does not apply to any drug "provided as part of, or as incident to and in the same setting as . . . [p]hysicians' services." 42 U.S.C. § 1396r-8(k)(3). A.M., a Medicaid recipient, receives the injection of her puberty blocker from medical professionals in their offices. (Morris ¶ 10). While the district court in *Cruz* concluded that this fact has no bearing on whether gender-affirming care includes "covered outpatient drugs" within the meaning of § 1396r-8(k)(3), *see* 195 F. Supp. 3d at 572-73, to do so it relied upon different (and clearly ambiguous) language in the statute while also reading a portion of the statute out of existence entirely—that is, the "as part of, or as incident to and in the same setting as" language. That analysis does not obtain here.

And fourth, all of this aside, a state's ability to restrict or exclude Medicaid coverage of certain "covered outpatient drugs," of course, only applies to coverage of the drugs themselves. S.E.A. 480, on the other hand, is not so limited: it prohibits the provision not only of puberty blockers and hormones but also of certain surgeries, physicians' visits, and related gender-affirming care. No matter what, the duty of Indiana to provide Medicaid coverage of these services is clearly unaffected by its right to restrict the provision of certain "covered outpatient drugs."

[33]

(exempting from the statute the provision of services to, *inter alia*, persons with certain developmental disorders unrelated to gender dysphoria).

Restricting young Hoosiers' ability to receive services based on their diagnosis violates federal Medicaid law. As indicated, the Comparability Provision prohibits a state from "arbitrarily deny[ing] or reduc[ing] the amount, duration, or scope of a required service under [42 C.F.R.] §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). Again, these "required service[s]" include both EPSDT services and physicians' services. *See* 42 C.F.R. § 440.210(a)(1) (identifying, *inter alia*, "services defined in §§ 440.10 through 440.50"); *see also* 42 C.F.R. §§ 440.40(b) (EPSDT services), 440.50(a) (physicians' services). Through its enactment of S.E.A. 480, Indiana has done exactly what the Comparability Provision does not allow it to do: make a Medicaid enrollee's entitlement to a covered service entirely dependent on the enrollee's "diagnosis, type of illness, or condition."

Other courts have held unequivocally that such restrictions violate federal Medicaid law. The district court in *Flack*, in addressing the prohibition on the coverage of gender-affirming care for adults, applied the Comparability Provision to invalidate Wisconsin's "exclu[sion] from coverage certain medical procedures . . . that are deemed medically necessary . . . to treat gender dysphoria, even though those same procedures are covered when deemed medically necessary to treat other provisions." 395 F. Supp. 3d at 1009. The court concluded unequivocally:

> Here, there is no dispute that the Challenged Exclusion prevents Wisconsin Medicaid from covering the medical treatment needs of those suffering from gender dysphoria . . . . Nor is there any dispute that these treatments *are* covered when used to treat other medical conditions. Accordingly, the Challenged Exclusion both fails to make covered treatments available in sufficient "amount, duration, and scope" *and* discriminates on the basis of diagnosis.

*Id.* at 1019 (emphasis in original). The district court in *Fain v. Crouch*, –F. Supp. 3d–, 2022 WL 3051015 (S.D.W. Va. Aug. 2, 2022), *appeal pending*, No. 22-1927 (4th Cir.), reached the same conclusion with respect to surgical interventions (such as mastectomies) that were not authorized for persons with

[34]

gender dysphoria even though they were allowed for patients suffering from other conditions. *Id.*, 2022 WL 3051015, at *13-14. Indeed, even 43 years ago, when the Fifth Circuit upheld a denial of gender-affirming surgery because at the time it deemed the procedure experimental (on a record developed in the mid-1970s), the court cautioned that if coverage were denied not because the procedure was experimental but rather "because it was transsexual surgery," then the state would "be required to pay for the operation" due to the Comparability Provision. *Rush*, 625 F.2d at 1156 n.12.

In other contexts, courts have consistently applied the Comparability Provision to invalidate restrictions where Medicaid coverage depended on a patient's diagnosis. *See Davis v. Shah*, 821 F.3d 231, 258-59 (2d Cir. 2016) (invalidating decision to cover orthopedic footwear or compression stockings only for certain conditions); *White v. Beal*, 555 F.2d 1146, 1149-52 (3d Cir. 1977) (invalidating decision to cover eyeglasses for those suffering from eye disease but not for those with non-pathological eye problems); *Simpson v. Wilson*, 480 F. Supp. 97, 101 (D. Vt. 1979) (invalidating decision to cover eye care for persons suffering from disease but not merely from refractive error); *Jacobus v. Dep't of PATH*, 857 A.2d 785, 791 (Vt. 2004) (invalidating decision to cover orthodontic treatment depending in part of a patient's condition).

So too here. S.E.A. 480 continues to allow Medicaid coverage of medically necessary puberty blockers or hormones, and of other gender-affirming care, for a wide array of conditions—such as precocious central puberty, delayed puberty, hypogonadism, Turner Syndrome, Klinefelter Syndrome, agonism, premature ovarian failure, or other disorders of sex development—but does not allow Medicaid patients to receive these same therapies when they have been diagnosed with gender dysphoria. More generally, Indiana still allows Medicaid coverage for "physicians' services" for virtually every condition under the sun, at least when medically necessary, but under S.E.A. 480 no longer permits these services for gender dysphoria. Quite plainly, under S.E.A. 480 Medicaid coverage

[35]

depends on a patient's "diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). This violates

the Comparability Provision and therefore federal Medicaid law.

### D. S.E.A. 480 violates the Affordable Care Act

#### 1. The FSSA is bound by Section 1557 of the Affordable Care Act

Section 1557 of the Patient Protection and Affordable Care Act ("ACA") provides, in relevant

part, that

> an individual shall not, on the ground prohibited under title VI of the Civil Rights Act
> of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20
> U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq,), or
> section 794 of title 29, be excluded from participation in, be denied the benefits of, or
> be subjected to discrimination under, any health program or activity, and any part of
> which is receiving Federal financial assistance . . . . The enforcement mechanisms
> provided for and available under such title VI, title IX, section 794, or such Age
> Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a). Medicaid is a "health program or activity" that receives "Federal financial

assistance." *See, e.g., Fain*, 2022 WL 3051015, at *11 (West Virginia's denial of Medicaid reimbursement

for gender-affirming surgical care violates the ACA); *Flack*, 328 F. Supp. 3d at 947 ("there is no dispute

that Wisconsin Medicaid is 'a health program or activity' that 'receive[es] Federal financial assistance'")

(alteration by the court) (internal citation omitted). The Indiana Family and Social Services

Administration, the administrator of Indiana's Medicaid program, Ind. Code § 12-15-1-1, is therefore

a health program or activity within Section 1557.

#### 2. To the extent that S.E.A. 480 prevents Medicaid-recipient youth from receiving gender-affirming care, it violates the ACA

Medicaid currently pays for A.M.'s gender-affirming care, including her puberty blockers.

However, this Medicaid-covered care will cease if S.E.A. 480 goes into effect. As noted, the ACA

prohibits discrimination that would violate Title IX, which in turn provides that no person "shall, on

the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any educational program or activity receiving Federal financial assistance." 20

[36]

U.S.C. § 1681(a). In *Whitaker*, the court concluded that prohibiting the plaintiff, a transgender male, from being able to use male restrooms in his school violated not only the Equal Protection Clause, but also Title IX's prohibition on sex discrimination. The court held that "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth" and that "requir[ing] an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." 858 F.3d at 1048-49. The Seventh Circuit is therefore clear: discrimination against a transgender person is sex discrimination prohibited by Title IX.

"[C]ourts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2nd Cir. 1994) (citations omitted).[20] Additionally, "[c]ases under Title VI are governed by the same framework as those under other federal civil rights laws such as Title VII." *Xu Feng v. Univ. of Delaware*, 785 Fed. Appx. 53, 55 (3d Cir. 2019). Given that the ACA explicitly incorporates Title IX and Title VI, and Title VII cases are used to interpret both Title IX and Title VI, "[t]he test announced in *Bostock* [a Title VII case] is therefore the appropriate test to determine whether a policy discriminates in violation of the ACA." *Kadel v. Folwell*, 2022 WL 17415050, at *1 (M.D.N.C. Dec. 5, 2022), *app. pending*, No. 22-1721 (4th Cir.). And, of course, the Supreme Court held in *Bostock* that, under Title VII, discrimination against a transgender employee is sex discrimination. 140 S. Ct. at 1742.

Discrimination against transgender persons is sex discrimination under both Title VI and Title IX, and those prohibitions are incorporated in the ACA's anti-discrimination provision. S.E.A. 480's

---

[20]     Courts have routinely "used precedent interpreting the antidiscrimination provisions of Title VII in [their] analysis of comparable provisions in Title IX." *Peltier v. Charter Day Schs., Inc.*, 37 F. 4th 104, 130 n.22 (4th Cir. 2022) (en banc) (citing cases), *cert. filed* No. 22-238 (2022); *see also, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX.") (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)); *Whitaker*, 858 F.3d at 1047 ("this court has looked to Title VII when construing Title IX") (citation omitted).

discrimination against transgender adolescents, based on their sex and transgender status, necessarily violates the ACA as applied to A.M. and the other youth receiving Medicaid. As the Court held in a challenge to a state Medicaid agency's decision not to cover medically necessary surgeries for gender-affirming care, "because this Court finds that Defendants are a 'health program or activity' under the ACA, and that Plaintiffs have been subjected to discrimination on the basis of sex, Defendants have violated ACA section 1557." *Fain*, 2022 WL 3051015, at *12 (internal citation omitted).

### 3.      S.E.A. 480 is conflict preempted by the ACA and cannot be enforced

S.E.A. 480 directly conflicts with the anti-discrimination provision of the ACA. "[S]tate laws are preempted when they conflict with federal law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "In order to show conflict preemption, a plaintiff must show either that it would be impossible to comply with both state and federal law or that state law constitutes an obstacle to satisfying the purposes and objectives of Congress." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (cleaned up) (quotations and citations omitted).

As Medicaid providers, both Dr. Bast and Mosaic are subject to the ACA as they are themselves a "health program or activity" receiving federal financial assistance within the meaning of 42 U.S.C. § 18116(a). S.E.A. 480 presents them with a Hobson's Choice. They can obey the prohibition in S.E.A. 480 and deny their patients gender-affirming care and thereby violate the ACA. Or they can obey the anti-discrimination mandate of the ACA—as Dr. Bast and Mosaic certainly wish to do—and risk the loss of their professional licenses as well as other penalties due to their violation of S.E.A. 480. It is clearly "impossible to comply with both state and federal law" and S.E.A. 480 is therefore preempted. *C.Y. Wholesale, Inc.*, 965 F.3d at 547.

Moreover, in enacting the anti-discrimination provision of the ACA, 42 U.S.C. § 18116(a), Congress explicitly intended that discrimination that would be unlawful under Titles VI and IX, as well as the Rehabilitation and Age Discrimination Acts, would also be unlawful in the provision of

[38]

care by health programs or activities. S.E.A. 480, which demands that Dr. Bast and others engage in sex discrimination, constitutes an insurmountable obstacle to achieving this goal. Conflict preemption applies for this reason as well.

**F.      S.E.A. 480 violates the First Amendment rights of Dr. Bast and Mosaic**

If S.E.A. 480 becomes effective, Dr. Mast and Mosaic's nearly 100 transgender youth patients will have to seek care out of state. The State's prohibition against transgender youth receiving treatment does not mean that they will cease to suffer from gender dysphoria and cease to need medically necessary care. When those minor patients or their parents ask Dr. Bast or the other medical practitioners employed at Mosaic for a referral to an out-of-state practitioner who can provide gender-affirming care and they provide the referral, Dr. Bast and Mosaic's practitioners will be in violation of the Act insofar as a physician or other practitioner may not "aid or abet another physician or practitioner or other in the provision of gender transition procedures to a minor." Ind. Code § 25-1-22-13(b) (eff. July 1, 2023).[21] The same is true if they respond to inquiries from these out-of-state providers who wish to discuss the patient, or even seek their medical records. Any such "aiding or abetting" is deemed to "violate the standards of practice under IC 25-1-9 and is subject to discipline by the board regulating the physician or practitioner." Ind. Code § 25-1-22-15 (eff. July 1, 2023).

The "aiding and abetting" represented by the referral described above is pure speech: practitioners talking to their patients or other practitioners to impart information. While it is certainly possible that the general terms "aiding or abetting" could also be applied to non-expressive conduct as well, the fact that it will prohibit pure speech means that it is subject to the most exacting First Amendment scrutiny. Here, regardless of the conduct to which the prohibition in S.E.A. 480 could

---

[21]      The Indiana Standards of Professional Conduct that apply to physicians also require physicians to refer a patient to another practitioner "in any case where the referring practitioner does not consider himself/herself qualified to treat the patient." 844 Ind. Admin. Code § 5-2-7. Of course, here, physicians are legally disqualified from providing treatment, and therefore must provide such a referral.

be applied, as applied to Dr. Bast and Mosaic's desire to speak to patients and other providers, the Act applies to speech, not conduct.[22]

The First Amendment protects "the right of every citizen to reach the minds of willing listeners." *Hill v. Colorado*, 530 U.S. 703, 728 (2000) (internal quotation and citation omitted). "An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568-69 (2011); *see also, e.g., Tinker v. Des Moines Indep. City. Sch. Dist.*, 393 U.S. 503, 505-06 (1969) ("'[P]ure speech . . . is entitled to comprehensive protection under the First Amendment.'") (citing cases). And, of course, "it is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)).

S.E.A. 480 is a content-based regulation of speech, as the prohibition is only on speech connected with "gender transition procedures." Moreover, it is also content based as it only targets particular speakers: those who wish to discuss "gender transition procedures." Restrictions that target particular speakers are content based. *Citizens United v.* FEC, 558 U.S. 310, 340 (2010). As a content-based restriction on speech, the Act is presumptively unconstitutional and is subject to strict scrutiny. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015). The State cannot satisfy strict scrutiny.

---

[22] In limited circumstances, a regulation of information disseminated by a professional, though technically speech, may be deemed "professional conduct" and therefore subject only to the intermediate scrutiny of *Cohen v. California*, 403 U.S. 15 (1971). *See Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), –U.S.–, 138 S. Ct. 2361, 2373-74 (2018). In *NIFLA*, in which a state sought to mandate the dissemination of information about the availability of certain family-planning services, the Supreme Court appeared to limit this type of "professional conduct" to informed-consent or similar requirements (which S.E.A. 480 clearly is not), and certainly did not extend "professional conduct" to include a professional's referral to a different provider. Regardless, this issue only affects the level of scrutiny to which S.E.A. 480 is subject, for even a regulation of professional conduct must still advance "an important or substantial governmental interest . . . unrelated to the suppression of free expression" and any "incidental restriction on alleged First Amendment freedoms [must be] no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). As set forth below, there is no governmental interest in restricting the dissemination of truthful information about vital medical interventions, and so the statute fails under any level of scrutiny.

The State has no interest whatsoever, let alone a compelling one, in denying medically necessary gender-affirming care to the youth who will suffer severe harm without it, and it certainly has no interest in whether out-of-state physicians lawfully provide that care. Even if Indiana were allowed to prohibit this care within its borders, it has no interest in banning the delivery of truthful information about the availability of lawful out-of-state treatment options—or in preventing Indiana providers from cooperating with their out-of-state counterparts, such as by providing medical records or other information, once a patient finds a provider allowed to provide necessary care.

So held the district court in *Brandt*, where the challenged statute prohibited "a physician or other healthcare provider from providing or referring any individual under the age of 18 for 'gender transition procedures.'" 551 F. Supp. 3d at 887 (internal citation omitted). Arkansas' enjoined law attempted to prevent parents from making what the state deemed to be the wrong decision of agreeing to gender-affirming care for their children. But, as the district court in *Brandt* explained, the Supreme Court has held that the "fear that people would make bad decisions if given truthful information" cannot justify prohibiting the dissemination of that truthful information. *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 374 (2002) (cited by *Brandt*, 551 F. Supp. 3d at 93). Even if gender-affirming care is made unlawful in Indiana, the First Amendment precludes the State's attempt to prohibit a medical professional from informing a patient about the availability of care elsewhere. *See Bigelow v. Virginia,* 421 U.S. 809, 829 (1975) (holding that a Virginia law prohibiting encouraging the procuring of an abortion violated the First Amendment when applied to a Virginia newspaper advertising the availability of abortions in New York). Indiana's desire to suppress information about the availability of gender-affirming care not only fails to represent a compelling governmental interest, but it is also not even rational. *Brandt*, 551 F. Supp. 3d at 894. In addition to its other constitutional infirmities, S.E.A. 480 violates the First Amendment.

[41]

## II.     The other requirements for the grant of a preliminary injunction are met

### A.     The plaintiffs are faced with irreparable harm for which there is no adequate remedy at law

The minor plaintiffs will face devastating harm if S.E.A. 480 goes into effect. All of the youth have been diagnosed with gender dysphoria, "an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity." *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019). The gender-affirming care the plaintiff youth currently receive has greatly ameliorated the serious effects of their dysphoria. Preventing K.C. and A.M. from receiving puberty blockers will cause them to experience endogenous puberty and increase their anxiety, depression, and other serious mental health issues, "putting them at high risk of gender dysphoria and lifelong physical and emotional pain," as well as high risk of self-harm and suicidality. *Brandt*, 551 F. Supp. 3d at 892. (*See also* Karasic ¶¶ 58-61; Shumer ¶¶ 81-85; Turban ¶¶ 22, 32). M.W. and M.R., both of whom are receiving hormones, will have them gradually reduced to total discontinuance under the six-month window permitted by the law for adolescents' treatment to be terminated. Cutting off or providing non-therapeutic doses of this necessary treatment will cause these youth immediate and severe distress. (Shumer ¶ 81). There are no medically accepted, evidence-based alternative treatments for their gender dysphoria: they will be forced to suffer and have their mental health deteriorate with the increased risk of self-harm and suicide. (Karasic ¶¶ 10, 58; Turban ¶¶ 19, 32). That harm will result whether care is abruptly halted, as would be the case for K.C. and A.M.'s puberty blockers, or even if it is titrated down, as S.E.A. 480 would require for M.W. and M.R.'s hormone therapy (Shumer ¶ 81). This is obvious and irreparable harm. *See, e.g.*, *Whitaker*, 58 F.3d at 1045 (finding that the district court did not err in concluding that the plaintiff's significant and negative impacts represented irreparable harm); *Brandt*, 47 F.4th at 671 (agreeing with the district court's conclusion that the minor plaintiffs would suffer irreparable harm if they were denied gender-affirming care as they would be forced to "undergo endogenous puberty—a process that cannot be reversed—and suffer heightened gender dysphoria").

[42]

Without an injunction, the parents will have to helplessly watch their children suffer or be forced to move their families outside of Indiana. Parents will watch their children be denied the very care that has ameliorated their mental distress from gender dysphoria and in some cases, reduced or eliminated other self-harming behavior. All the while, they will know precisely what treatment helps their children, and that cisgender children in Indiana, and transgender children outside of Indiana, can receive this necessary medical care. Having to helplessly watch one's child endure unnecessary pain and suffering is one of the most profoundly disturbing things that can ever happen to a parent. "Parent plaintiffs will face the irreparable harm of having to watch their children experience physical and emotional pain or of uprooting their families to move to another state where their children can receive medical necessary treatment." *Brandt*, 551 F. Supp. 3d at 892. And Dr. Bast and Mosaic will "face the irreparable harm of choosing between breaking the law and providing appropriate guidance and interventions for their transgender patients." *Id.*

In addition to the obvious irreparable harms outlined above, allowing S.E.A. 480 to go into effect would violate plaintiffs' constitutional rights. "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Irreparable harm is "defined as harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (internal quotation and citation omitted). There is no amount of money that could compensate the plaintiffs for the harms that S.E.A. 480 will cause, not only in terms of the irreversible changes the minor plaintiffs will undergo through the commencement or continuation of endogenous hormonal puberty and their suffering from untreated gender dysphoria, but also the infringement on the plaintiff parents and providers' constitutional and statutory rights. The plaintiffs are facing irreparable harm for which there

[43]

is no adequate remedy at law.

### B.    The balance of harms favors the plaintiffs

The harms that the plaintiffs face in this case are severe, palpable, and certain. The State's potential harms are nonexistent or hypothetical. A preliminary injunction will maintain the status quo, allowing the safe and effective treatment that is the standard of care for gender dysphoria to continue in Indiana. Therefore "the imminent threat of harm to Parent Plaintiffs and Minor Plaintiffs—i.e., severe physical and/or psychological harm—outweighs the harm the State will suffer from the injunction." *Eknes-Tucker*, 603 F. Supp.3d at 1151. In any event, as the district court noted in *Brandt*, "[t]he State has no interest in enforcing laws that are unconstitutional." 551 F. Supp. 3d at 892 (internal quotation and citation omitted).

### C.    The public interest will not be disserved by a preliminary injunction

"The public interest is served when constitutional rights are vindicated." *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 741 (S.D. Ind. 2016) (citations omitted), *aff'd*, 838 F.3d 902 (7th Cir. 2016). Moreover, the public interest will be served by preventing the State from intruding on parental rights and by preventing certain injury to Indiana's youth.

### D.    The injunction should issue without bond

The issuance of a preliminary injunction will not impose any monetary injuries on the State. In the absence of such injuries, no bond should be required. *See, e.g.*, *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (citing authority for waiver of the bond when there is no danger that a defendant will incur any damages if the injunction is granted as "[t]here is no reason to require a bond in such a case").

### Conclusion

Without a preliminary injunction, the plaintiff youth face certain and dire harm from being denied the medically necessary care that is the only evidence-based and widely accepted treatment for

[44]

their gender dysphoria. Their parents, Dr. Bast, and Mosaic also face severe harm. S.E.A. 480 is destructive, cruel, and unlawful. All the requirements for the grant of a preliminary injunction are met and the Act should be enjoined, preventing it from going into effect on July 1, 2023.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 4602
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org


Chase Strangio
*Pro Hac Vice*
Harper Seldin
*Pro Hac Vice*
ACLU
125 Broad Street
New York, NY 10004
212/549-2500
cstrangio@aclu.org
hseldin@aclu.org

Attorneys for Plaintiffs and the
Putative Classes and Subclass