UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| K.C., *et al.*,<br><br>          Plaintiffs,<br><br>v.<br><br>THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, *et al.*,<br><br>          Defendants. | No. 1:23-cv-00595-JPH-KMB |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**INTRODUCTION TO THE CLASSES AND SUBCLASSES**

On April 5, 2023, the Governor signed into law Senate Enrolled Act 480 ("S.E.A. 480"), which prohibits physicians and other medical practitioners in Indiana from providing certain gender-affirming care to minors, or aiding or abetting the provision of such care. *See* Ind. Code § 25-1-22-13(a), (b) (eff. July 1, 2023) (defining and prohibiting "gender transition procedures"). If allowed to take effect, the statute will have a devastating, life-threatening effect on minors' ability to obtain healthcare that is widely recognized as safe, effective, and medically necessary to treat patients' gender dysphoria. The plaintiffs in this case are four minors who have been diagnosed with gender dysphoria and who receive (or, in the case of K.C., will begin receiving within days), and wish to continue receiving, gender-affirming care that falls within the statutory definition of "gender transition procedures"; their parents, who have watched their children benefit profoundly from their receipt of gender-affirming care and who wish to ensure their children's ability to continue receiving the only evidence-based care capable of alleviating the devastating symptoms of their gender dysphoria; and a physician and health clinic that provide gender-affirming care and wish to continue doing so.

Insofar as this case arises as a challenge to a generally applicable statute that will affect

1

hundreds if not thousands of young Hoosiers and their parents, as well as at least forty (and likely many more) medical practitioners, this case is paradigmatically appropriate for class treatment under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. After all, "civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of cases where certification under Rule 23(b)(2) is appropriate. *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 441 (7th Cir. 2015) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Given the different legal claims asserted by the plaintiffs, they are seeking certification of three classes and two subclasses that are generally (and appropriately) limited to persons who may raise each particular legal claim. The proposed class definitions are as follows:

- Class 1 ("the Minor Patient Class"), which is represented by K.C., M.W., A.M., and M.R., is defined as "all minors in the State of Indiana who are, or will be, diagnosed with gender dysphoria, and are receiving, or would receive but for Senate Enrolled Act 480, care that falls within the statute's definition of 'gender transition procedures.'"

- Subclass 1-A ("the Medicaid Patient Subclass"), which is a subclass of the Minor Patient Class and is represented by A.M., is defined as "all members of Class 1 who are, or will be, Medicaid recipients."

- Class 2 ("the Parent Class"), which is represented by Nathaniel and Beth Clawson, Ryan and Lisa Welch, Emily Morris, and Maria Rivera, is defined as "all parents of minors in the State of Indiana who are, or will be, diagnosed with gender dysphoria, and are receiving, or would receive but for Senate Enrolled Act 480, care that falls within the statute's definition of 'gender transition procedures.'"

- Class 3 ("the Provider Class"), which is represented by Dr. Catherine Bast and Mosaic Health and Healing Arts, Inc. ("Mosaic"), is defined as "all current physicians and practitioners in Indiana, as those terms are defined in Senate Enrolled Act 480, who are providing care that falls within the statute's definition of 'gender transition procedures' or who, but for that act, would provide that care."

- And subclass 3-A ("the Medicaid Provider Subclass"), which is also represented by Dr. Bast and Mosaic, is defined as "all members of Class 3 who are Medicaid providers and who are currently providing care, reimbursed by Medicaid, which falls within the definition in Senate Enrolled Act 480 of 'gender transition procedures' and those providers in the future who would provide such care but for Senate Enrolled Act 480."

As defined, each of the classes and subclasses meets all requirements of Federal Rule 23(a) and (b)(2)

and they should therefore be certified. Additionally, the plaintiffs' attorneys are skilled and experienced both in class-action litigation and in civil-rights litigation, and they should therefore be appointed class counsel pursuant to Federal Rule 23(g).[1]

## STANDARD FOR CLASS CERTIFICATION

The requirements for certification of a class under the Federal Rules of Civil Procedure are clear. In order for an individual or individuals to sue on behalf of a class, four requirements must be met:

(1) The class must be so numerous that joinder of the members is impracticable;

(2) There must be questions of law or fact common to the class;

(3) The claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

(4) The representative parties must fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, a class must meet the requirements of Federal Rule 23(b)(1), (2), or (3). Here, the plaintiffs seek certification pursuant to Rule 23(b)(2). This portion of the Rule is met if the defendants have acted or refused to act on grounds generally applicable to the class. *See* Fed. R. Civ. P. 23(b)(2).

Moreover, hearsay and similar evidence that would be inadmissible at trial may be relied upon to determine the propriety of class certification. *See, e.g.*, *Smith v. City of Chicago*, 340 F.R.D. 262, 273 n.2 (N.D. Ill. 2021) (noting that, while the Seventh Circuit had yet to resolve the issue, "other circuits . . . allow[] hearsay and other inadmissible evidence to be considered for class certification purposes") (citations omitted).

---

[1] Discovery in this case has not yet been conducted, and the plaintiffs therefore reserve their right to introduce additional facts or evidence in conjunction with their reply brief. Specifically, they are in the process of seeking discovery from the Indiana Family and Social Services Administration, which administers the Medicaid program in Indiana, that may further elucidate the size of the proposed classes.

**ARGUMENT**

I.   **The requirements of Federal Rule 23(a) are met here**

   A.   **Each of the classes and subclasses is sufficiently numerous to render the joinder of all members impracticable**

The first requirement for certification of a class action is that the class must be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020) (quoting *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017)); *see also, e.g.*, *Gentry v. Floyd Cnty.*, 2016 WL 4088748, at *4 (S.D. Ind. July 25, 2016) ("Although there is not a numerical threshold to establish numerosity, 40 is generally considered sufficiently large to satisfy Rule 23(a).") (citing *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 & n.9 (7th Cir. 1969)). Moreover, the Court may rely on "common sense assumptions or reasonable inferences in determining numerosity." *Jenkins v. Mercantile Mortg. Co.*, 231 F. Supp. 2d 737, 744 (N.D. Ill. 2002) (citation omitted).

Here, the size of each of the classes and subclasses is easily sufficient to raise a presumption that joinder is impracticable:

> ➢ The Minor Patient Class and the Parent Class easily contain hundreds of current members and almost certainly contain thousands of members. Approximately 4,100 transgender minors between the ages of 13 and 17 reside in Indiana. (Dkt. 26-1, Decl. of Dr. Dan. H. Karasic ¶ 29). By virtue of S.E.A. 480, none of these transgender minors will be able to receive gender-affirming care when it is medically indicated. Even a conservative estimate places the size of the Minor Patient Class (and by extension the Parent Class) in the thousands. Indeed, Mosaic alone—a single provider located in Goshen, Indiana—currently provides this care to 72 minor patients. (Dkt. 26-8, Decl. of Michelle Marquis ["Marquis"] ¶ 15). This alone satisfies numerosity, although it is worth noting that Mosaic's size pales in comparison to the size of the Gender Health Program at Riley Children's Hospital, which provides to-be-prohibited care to hundreds of minor patients at any one time (including three of the four named minor plaintiffs and four additional affiants). (*Id.* ¶¶ 24-25; Dkt. 26-4, Decl. of Nathaniel Clawson and Beth Clawson ¶¶ 10-13; Dkt. 26-5, Decl. of Lisa Welch and Ryan Welch ¶¶ 5-8; Dkt. 26-6, Decl. of Emily Morris ¶¶ 9-10; Dkt. 26-10, Decl. of LaRisha Hanks ¶¶ 3-4; Dkt. 26-12, Decl. of Julia Kathary ¶¶ 2-3; Dkt. 26-13, Decl. of Patrick Rhodes ¶¶ 4-5; Dkt. 26-14, Decl. of Michael Rabinowitch and Lindsey Rabinowitch ¶¶ 3-4; *see also* Dkt. 26-11, Decl. of Jamie

4

> Harris ¶¶ 2-12 [Kentucky resident referred to, but not yet receiving care from, the Gender Health Program]). Indeed, several nonprofit organizations that offer assistance and support to transgender youth and their families have attested to the numerous minors they serve who receive, or wish to receive, gender-affirming care banned by S.E.A. 480. (*See* Dkt. 26-15, Decl. of Krisztina Inskeep ¶¶ 6-8 [Gender Expansive Kids & Co. boasts membership of approximately two hundred fully vetted persons, with members "uniformly" seeking information and advice regarding the use of puberty blockers and hormones]; Dkt. 26-16, Decl. of Indiana Youth Group ¶ 6 [Indiana Youth Group providing support to at least ten transgender minors currently receiving puberty blockers or hormones and to an additional 35 minors in the process of accessing this gender-affirming care]; Dkt. 26-18, Decl. of Emma Vosicky ¶ 7 [GenderNexus Inc. has provided services since September 2022 to at least 137 transgender minors, a significant portion of whom were or are considering or receiving puberty blockers or hormones]).

> The Medicaid Patient Subclass also numbers at least in the hundreds and likely in the thousands. According to the U.S. Census Bureau, in 2021 nearly 36% of children were enrolled in Medicaid or CHIP (a program providing medical insurance for families whose income is too high to qualify for Medicaid but too low to afford private insurance). *See* Laryssa Mykyta, et al., *More Children Were Covered by Medicaid and CHIP in 2021*, Sept. 13, 2022, *at* https://www.census.gov/library/stories/2022/09/uninsured-rate-of-children-declines.html (last visited Apr. 17, 2023). Data from the Centers for Medicare and Medicaid Services shows that more than twelve times as many persons are enrolled in Medicaid as are enrolled in CHIP. *See* Ctrs. for Medicare & Medicaid Servs., *December 2022 Medicaid and CHIP Enrollment Data Highlights*, *at* https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights/index.html (last visited Apr. 17, 2023) (85 million Medicaid enrollees compared to 7 million CHIP enrollees). The subclass therefore consists of more than 1,300 persons: 4,100 transgender youth in Indiana that will not have access to gender-affirming care if S.E.A. 480 takes effect times 0.36 (the percentage of these persons enrolled in Medicaid or CHIP) times 0.92 (the percentage of these persons enrolled in Medicaid rather than CHIP). This experience is, again, borne out by Mosaic—a single provider—which currently provides would-be prohibited "gender transition procedures" to 31 minors on Medicaid. (Marquis ¶ 15).

> The Provider Class contains numbers at least in the high two digits and may contain more than one hundred persons. Mosaic alone employs three persons (Dr. Bast and two nurse practitioners) that fall within the class definition. (*Id.* ¶¶ 9, 13). It is also aware of 38 other physicians and nurse practitioners who provide gender-affirming care in Indiana—a number that does not includes nurses other than nurse practitioners, who are also "practitioners" as defined by S.E.A. 480 and therefore members of the putative class. (*Id.* ¶ 24). And there are doubtless other providers, unknown to Mosaic, that provide gender-affirming care to Hoosier youth.

> And the Medicaid Provider Subclass is nearly as large. A 2017 report found that, nationwide, "[a]bout 70% of all office-based physicians accept new Medicaid patients, including two-thirds of primary care physicians and close to three-quarters (72%) of specialists." *See* Julia Paradise, *Data Note: A Large Majority of Physicians Participate in Medicaid*, May 10, 2017, *at* https://www.kff.org/medicaid/issue-brief/data-note-a-large-majority-of-physicians-participate-in-

5

medicaid (last visited Apr. 17, 2023). While this report did not provide an Indiana-specific number, it did note that the percentage of Indiana physicians enrolled in the Medicaid program is "[s]ignificantly higher than [the] national average." *See id.* But it is not necessary to rely on statistics to demonstrate numerosity here: in addition to Mosaic's three providers accepting Medicaid, Medicaid is also accepted by Riley Children's Hospital (and thus by the many practitioners providing care through that institution), *see* Riley Children's Health, *Most Commonly Accepted Insurance(s)*, *at* https://www.rileychildrens.org/pay-a-bill/most-commonly-accepted-insurance (last visited Apr. 19, 2023), as well as by the hospital and other facilities operated by Eskenazi Health (and thus by the practitioners providing care through those institutions), *see* Eskenazi Health, *Financial Counseling*, *at* https://www.eskenazihealth.edu/programs/financial-counseling (last visited Apr. 20, 2023). And this does not take into consideration any other provider.

Each of the proposed classes and subclasses is sufficiently large to render a presumption that numerosity exists, and it is therefore unnecessary to determine whether other factors also support the impracticability of joinder.

Were it necessary to looked beyond the sheer size of the classes, however, "[t]he general rule encouraging liberal construction of civil rights class actions applies with equal force to the numerosity requirement of Rule 23(a)(1)," *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975), and "the court may look to other factors when determining whether joinder is impracticable," *Gentry*, 313 F.R.D. at 77 (citation omitted). Here, there are no fewer than four additional factors that support numerosity.

First, each of the classes and subclasses includes future members. As this Court has observed, "the joinder of [future class members], regardless of the number, is inherently impracticable." *Lindh v. Warden*, 2014 WL 7334745, at *3 (S.D. Ind. Dec. 19, 2014) (citing *Rosario v. Cook Cnty.*, 101 F.R.D. 659, 661 (N.D. Ill. 1983), *class decertified on other grounds*, 2015 WL 5009244 (S.D. Ind. Aug. 20, 2015)). Other courts have likewise observed that the inclusion of future class members weighs in favor of numerosity. *See, e.g.*, *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000) ("We have found the inclusion of future members in the class definition a factor to consider in determining if joinder is impracticable."); *Valenti v. Hartford City*, 2016 WL 5662097, at *4 (N.D. Ind. Oct. 3, 2016) ("The relief sought, declaratory and injunctive relief, would impact future class members, and '[s]uch future members make joinder inherently impracticable because there is no way to know who they will

6

be.'") (quoting *Olson v. Brown*, 284 F.R.D. 398, 408 (N.D. Ind. 2012)); *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 442 (W.D. Tex. 1999) ("These unknown future members should be properly considered and included as a part of the class and joinder of such persons is inherently impracticable.") (internal quotation and citation omitted). And, the transitory nature of membership in the non-provider classes, as young Hoosiers age in and out of the Minor Patient Class, has similarly been deemed an appropriate consideration in determining the impracticability of joinder. *See, e.g.*, *Olson*, 284 F.R.D. at 409 n.5.

Second, joinder is particularly impracticable where potential plaintiffs are likely to be reluctant to initiate individual lawsuits due to a fear of retaliation. *See, e.g.*, *Hutt v. Greenix Pest Control, LLC*, 2023 WL 2726357, at *4 (S.D. Ohio Mar. 31, 2023) (citations omitted); *Zelaya v. Hammer*, 342 F.R.D. 426, 433 (E.D. Tenn. 2022) (citations omitted). Just as employees might be reluctant to initiate a legal action against their employer, *see, e.g.*, *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir. 1999), transgender individuals' reasonable fear of harassment or violence renders it likely that many class members will be unwilling to sue individually. *See, e.g.*, Human Rights Watch, *United States: Transgender People at Risk of Violence*, Nov. 18, 2021, *at* https://www.hrw.org/news/2021/11/18/united-states-transgender-people-risk-violence (last visited Apr. 17, 2023) (detailing the "significant risk of violence and harassment" that transgender persons face, and describing the bias as potentially "stoke[d]" by discriminatory state laws). And the reluctance to initiate individual actions almost certainly extends to the Provider Class (and the Medicaid Provider Subclass), where members frequently rely on governmental funding, support, or licensure. This factor weighs strongly in favor of a finding that numerosity exists.

Third, members of each of the classes and subclasses are spread throughout Indiana. The "geographic dispersion" of class members dictates in favor of certification. *See, e.g.*, *Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 399 (N.D. Ill. 1987) (citation omitted). Although this factor is most often

7

employed when certification of a nationwide class is sought, on multiple occasions this Court has concluded that the statewide nature of a proposed class weighed in favor of certification. *See Ind. Civil Liberties Union Found., Inc. v. Superintendent*, 336 F.R.D. 165, 173 (S.D. Ind. 2020) (class of persons engaged in panhandling that "span[ned] the entire state"); *Hubler Chevrolet, Inc. v. Gen. Motors Corp.*, 193 F.R.D. 574, 577 (S.D. Ind. 2000) (class of automobile dealers located throughout Indiana). So too here.

And fourth, for the Medicaid Patient Subclass in particular, insofar as all class members meet the financial-eligibility requirements to receive Medicaid, membership is restricted to persons of limited means. In determining the practicability of joinder, this Court may consider "the financial resources of the class members." *Strunk v. LaGrange Cnty. Sheriff*, 2011 WL 839662, at *3 (N.D. Ind. Mar. 7, 2011). Where class membership is defined in terms of persons' enrollment in the Medicaid program, "[t]he medical and economic vulnerability of the putative class members makes joinder even more impracticable and further supports the [conclusion] that numerosity exists." *A.M.T. v. Gargano*, 2010 WL 4860119, at *4 (S.D. Ind. Nov. 22, 2010) (class of disabled minors enrolled in the Medicaid program).

\*     \*     \*

The size of the putative classes and subclasses is alone sufficient to render the joinder of all members impracticable. These four additional factors merely drive the point home. Numerosity is present with respect to each of the classes and subclasses.

**B. The commonality, typicality, and adequacy requirements are met with respect to each of the classes and subclasses**

The remaining requirements of Rule 23(a)—commonality, typicality, and adequacy— frequently overlap and are all met here.

1.   Commonality: First, there are questions of law or fact common to each of the classes and subclasses. *See* Fed. R. Civ. P. 23(a)(2). The named plaintiffs and the members of each putative

8

class and subclass are, of course, all subject to S.E.A. 480's ban on "gender transition procedures" (or in aiding or abetting those procedures). As noted at the outset, the classes and subclasses are defined in terms of the legal claims that they are pursuing:

- ➤ The Minor Patient Class challenges S.E.A. 480 as violative of the Fourteenth Amendment's Equal Protection and Due Process Clauses. (*See* Dkt. 1 at 42-43 [¶¶ 212-14]).

- ➤ The Medicaid Patient Subclass challenges S.E.A. 480 as violative of federal Medicaid law and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. (*See* Dkt. 1 at 45 [¶¶ 220-23]).

- ➤ The Parent Class challenges S.E.A. 480 as violative of the Due Process Clause. (*See* Dkt. 1 at 43-44 [¶¶ 215-16]).

- ➤ The Provider Class challenges S.E.A. 480 on its members' own behalf as violative of the First Amendment and on behalf of its members' patients as violative of the Equal Protection and Due Process Clauses. (*See* Dkt. 1 at 44-45 [¶¶ 217-19]).

- ➤ And the Medicaid Provider Subclass, like the Medicaid Patient Subclass, challenges S.E.A. 480 as violative of the Affordable Care Act. (*See* Dkt. 1 at 45 [¶¶ 220-21]).

In other words, each class and subclass is united by the common question of whether S.E.A. 480 runs afoul of these constitutional and statutory provisions.

While commonality requires that plaintiffs "do more than show that they suffered a violation of the same provision of law," it is met where they assert a "common injury that is 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Lacy v. Cook Cnty.*, 897 F.3d 847, 865 (7th Cir. 2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2008)) (additional quotation and citation omitted). That is, "the key to commonality is not the raising of common 'questions' but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. The critical point is the need for *conduct* common to members of the class." *Id.* (emphasis in original) (internal quotations, citations, and alterations omitted).

This requirement is plainly met here. Come July 1st, Indiana (through the various boards, agencies, and individuals named as defendants) will enforce S.E.A. 480 uniformly against all members

9

of the classes and subclasses. The statute's constitutionality and legality present common issues with respect to each class and subclass that clearly will "drive the resolution of this litigation." The minor plaintiffs, and members of the class and subclass they seek to represent, will all lose access to healthcare that is medically necessary and critical to their health and wellbeing. The parent plaintiffs, and the members of the class they seek to represent, will all be stripped of their parental authority to direct their children's upbringing and to make medical decisions for them in accordance with the recommendations of medical professionals. The provider plaintiffs, and the class and subclass they seek to represent, will all be forced to stop providing the evidence-based care they currently provide to their patients with gender dysphoria, and be unable to assist their patients in finding appropriate care elsewhere. Commonality exists.

  2. <u>Typicality</u>: Second, Federal Rule 23(a)(3) requires that the claims of the representative parties be typical of those of the classes and subclasses that they wish to represent. As the Supreme Court has noted, this requirement is intertwined with the commonality requirement:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so inter-related that the interests of the class-members will be fairly and adequately protected in their absence.

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). In order for typicality to be present, there need not be identity of interest between named plaintiffs and the class that they seek to represent; rather, there need only be "sufficient homogeneity of interests." *Sosna v. Iowa*, 419 U.S. 393, 403 n.13 (1975). In other words, "[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Lacy*, 897 F.3d at 886 (internal quotation, citation, and alteration omitted).

  Again, that is not a difficult inquiry here. S.E.A. 480, when and if it takes effect, will affect all members of the classes and subclasses uniformly: so-called "gender-transition procedures" will be

10

banned. "Here, the named plaintiffs allege the same injurious conduct" (that is, the enforcement of S.E.A. 480), are pursuing the "same legal theor[ies]" (described immediately above) and request[] the same [relief]" (that is, an injunction against the enforcement of S.E.A. 480) "as the class at large." *Id.* They are typical of the various classes and subclasses that they seek to represent.

  3. <u>Adequacy</u>: And third, Federal Rule 23(a)(4) requires that the class representatives' interests be such that they can and will vigorously pursue the class's interests as well as their own. *See, e.g.*, *Hohman v. Packard Instrument Co.*, 399 F.2d 711 (7th Cir. 1968). The relief that the plaintiffs seek "is not inconsistent in any way with the interests of the members of the class[es]." *Jones v. Blinziner*, 536 F. Supp. 1181, 1190 (N.D. Ind. 1982). Much to the contrary, they seek an injunction that will inure to the benefit of all members of the classes and subclasses. Likewise, they clearly have a substantial stake in these proceedings that will "insure diligent and thorough prosecution of the litigation." *Rodriguez v. Swank*, 318 F. Supp. 289, 294 (N.D. Ill. 1970), *aff'd*, 496 F.2d 1110 (7th Cir. 1974). The minor plaintiffs, like the members of the class and subclass they seek to represent, all are receiving or wish to receive (as medically indicated) the only evidence-based treatment for their gender dysphoria, in consultation with their doctors and with their parents' consent. The parent plaintiffs, like the members of the class they seek to represent, wish to remain the decisionmakers for their children's health and wellbeing, and not to have that authority stripped from them. And the provider plaintiffs, like the members of the class and subclass they seek to represent, wish to continue practicing evidence-based medicine and to uphold their ethical obligations to their patients and their families with respect to continuity of care.

  The named plaintiffs are all adequate class representatives.

**II.** **The requirement of Federal Rule 23(b)(2) is met here**

  In addition to the requirements of Federal Rule 23(a), a plaintiff seeking class certification must demonstrate that one of the requirements of Federal Rule 23(b) is met. The plaintiffs here seek

certification pursuant to Rule 23(b)(2), which requires that the party opposing certification have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole." This provision "is the appropriate rule to enlist when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant[s] to do or not do something that would benefit the whole class." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 441 (7th Cir. 2015).

Rule 23(b)(2) is readily satisfied in a case such as this one, where the plaintiffs challenge a duly enacted statute of general applicability. After all, "Rule 23(b)(2) was drafted specifically to facilitate relief in civil rights suits. Most class actions in the constitutional and civil rights areas seek primarily declaratory and injunctive relief on behalf of the class and therefore readily satisfy Rule 23(b)(2) class action criteria." *Tyson v. Grant Cnty. Sheriff*, 2007 WL 1395563, *5 (N.D. Ind. May 9, 2007) (quoting A. Conte & H. Newberg, 8 Newberg on Class Actions, § 25.20 (4th ed. 2002)); *see also Chicago Teachers Union*, 797 F.3d at 441 ("'[C]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of Rule 23(b)(2) classes.") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Consequently, "[t]he requirements of the rule are . . . given a liberal construction in civil rights suits." *John Does 1-100 v. Boyd*, 613 F. Supp. 1514, 1528 (D. Minn. 1985) (citing *Coley v. Clinton,* 635 F.2d 1364, 1379 (8th Cir. 1980)).

Here, if it takes effect, S.E.A. 480 will immediately and detrimentally affect the named plaintiffs as well as the members of the putative classes and subclasses. The plaintiffs seek to prevent this injury by enjoining the statute. The state agency and the various state officials named as defendants, who are charged with enforcing S.E.A. 480, have therefore all acted or refused to act on grounds generally applicable to the classes. The requirements of Rule 23(b)(2) are met.

**III.   The plaintiffs' attorneys are appropriate class counsel and should be appointed pursuant to Federal Rule 23(g)**

Finally, Federal Rule 23(g) requires that this Court consider various factors related to attorneys'

skill and experience and appoint counsel to represent the class. "Absent a basis for questioning the competence of counsel, the named plaintiffs' choice of counsel [should] not be disturbed." *Mateo v. M/S KISO*, 805 F. Supp. 761, 771 (N.D. Cal. 1991). Nonetheless, the plaintiffs' attorneys are all experienced in this type of litigation and should be appointed pursuant to Rule 23(g).

This Court is familiar with the attorneys from the ACLU of Indiana and both that office and the ACLU of Indiana's national counterpart possess substantial expertise litigating constitutional and civil-rights challenges to governmental action. The attorneys involved in this litigation have specific experience representing transgender plaintiffs in particular. *See, e.g.*, *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (Strangio); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) (Seldin); *A.M. ex rel. E.M. v. Indianapolis Pub. Schs.*, __ F. Supp. 3d __, 2022 WL 2951430 (S.D. Ind. July 26, 2022) (Falk, Rose, and Pactor), *appeal dismissed*, 2023 WL 371646 (7th Cir. Jan. 19, 2023); *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725 (S.D. Ind. 2022) (Falk and Pactor), *appeal pending*, No. 22-2318 (7th Cir.); *Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020) (Strangio), *aff'd*, 2023 WL 1097255 (9th Cir. Jan. 30, 2023); *Stone v. Trump*, 400 F. Supp. 3d 317 (D. Md. 2019) (Strangio); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833 (S.D. Ind. June 7, 2019) (Falk, Rose, and Pactor). Two of the plaintiffs' attorneys also have experience litigating the complexities of federal Medicaid law at issue in this case. *See, e.g.*, *Planned Parenthood of Ind., Inc. v. Comm'r*, 699 F.3d 962 (7th Cir. 2012) (Falk and Rose); *B.N. ex rel. A.N. v. Murphy*, 2011 WL 5838976 (N.D. Ind. Nov. 16, 2011) (Rose); *Bontrager v. Ind. Family & Soc. Servs. Admin.*, 829 F. Supp. 2d 688 (N.D. Ind. 2011) (Rose), *aff'd*, 697 F.3d 604 (7th Cir. 2012); *A.M.T. v. Gargano*, 781 F. Supp. 2d 798 (S.D. Ind. Feb. 10, 2011) (Falk and Rose).

Given this experience, both this Court and the Northern District have not hesitated to appoint counsel to represent plaintiff classes in civil-rights litigation. *See, e.g.*, *Ind. Civil Liberties Union Found., Inc. v. Superintendent*, 336 F.R.D. 165, 177 (S.D. Ind. 2020) ("The Court . . . designates Kenneth Falk,

Gavin Rose, and Stevie Pactor as class counsel pursuant to Fed. R. Civ. P. 23(g).") (emphasis omitted); *Olson v. Brown*, 284 F.R.D. 398, 415 (N.D. Ind. July 25, 2012) ("Mr. Rose and Mr. Falk have extensively reviewed and investigated the potential claims in this case, have much experience in handling class action litigation, have knowledge of the law relative to the claims asserted, and have the resources that are necessary to represent the class. Therefore, in compliance with Rule 23(g)(1), Mr. Rose and Mr. Falk will be appointed class counsel."). The plaintiffs' attorneys are adequate class counsel and should be so appointed pursuant to Rule 23(g).

## Conclusion

This case is paradigmatically appropriate for class treatment. Although the various legal claims advanced by the plaintiffs necessitate the certification of multiple classes and subclasses, at bottom the plaintiffs are challenging a generally applicable statute that will be enforced against hundreds if not thousands of persons. All requirements of Federal Rule 23(a) and (b)(2) are met in this case and the classes and subclasses should be certified, with the plaintiffs' counsel appointed to represent the class pursuant to Federal Rule 23(g).

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 4602
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Chase Strangio, *Pro Hac Vice*
Harper Seldin, *Pro Hac Vice*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
212/549-2500
cstrangio@aclu.org
hseldin@aclu.org

*Attorneys for Plaintiffs and the Putative Classes and Subclasses*