# EXHIBIT 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| K.C., *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   No. 1:23-cv-00595-JPH-KMB |
| | ) |
| THE INDIVIDUAL MEMBERS | ) |
| OF THE MEDICAL LICENSING | ) |
| BOARD OF INDIANA, in their | ) |
| official capacities, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**DECLARATION OF JAMIE REED**

I, Jamie Reed, declare as follows:

1. I am an adult, I am under no mental incapacity or disability, and I know that the following facts set forth are true because I have personal knowledge of them.

2. I hold a Bachelor of Arts in Cultural Anthropology from the University of Missouri St. Louis and a Master of Science in Clinical Research Management from Washington University. I have worked at Washington University for seven years. I initially worked with HIV-positive patients, caring for many transgender individuals. From 2018 until November 2022, I worked as a case manager at the Washington University Pediatric Transgender Center ("the Center") at St. Louis Children's Hospital. My duties included meeting with patients two to three days a week and completing the screening triage intake of patients referred to the Center.

3. I have experience and expertise working with transgender individuals and pediatric populations. I accepted the job at the Center because I firmly believed I could provide quality care for children there. Instead, I personally witnessed children experience shocking injuries from puberty

1

blockers and cross-sex hormones, which often were prescribed to them without complete informed parental consent or an accurate assessment of the child's needs. To my knowledge, the Center did not track patients' adverse outcomes post-discharge. I left the Center in November 2022 after having raised concerns internally for years.

4. During my time at the Center, I was required to schedule patients to the Endocrinology or Adolescent Medicine practice based on their age and stage of puberty. Generally, Psychology was primarily only available to write patients' letter of support for medical transition treatments instead of ongoing therapy. Psychiatry was limited to patients "not too severe" to avoid the already overburdened emergency room for patients suffering suicidal ideations and self-harm or requiring inpatient eating disorder treatment.

5. On my own initiative, I tracked certain patients on a case-by-case basis. I was concerned that Center doctors were prescribing cross-sex hormones and puberty blockers to children who were not good candidates. I created a "red flag" list of children where other staff and I had concerns. Ultimately, Center doctors sent these children to our in-house therapists, and those therapists inevitably provided letters to the doctors. Center doctors told me I had to stop raising these concerns, and I was no longer allowed to maintain the red flag list. I also wanted to track the number of our patients who detransitioned, attempted suicide, or committed suicide. The Center would not make these tracking systems a priority.

6. From 2020 to 2022, the Center initiated medical transition for more than 600 children and adolescents. Approximately 74% of these patients were assigned female at birth. One biologically female patient on cross-sex hormones called the Center after having sexual intercourse and experiencing severe vaginal lacerations as a result. Patient bled through a pad, pants, and a

2

towel wrapped around their waist. Ultimately, Patient required surgical treatment in St. Louis Children's Hospital emergency room. I have heard from minor patients given testosterone that their clitorises have grown so large that they now constantly chafe against their pants, causing them pain when they walk.

    7.    Nearly all children and adolescents who came to the Center presented with severe comorbidities, including autism, ADHD, depression, anxiety, PTSD, trauma histories, OCD, and eating disorders. Many were prescribed puberty blockers or cross-sex hormones. For example:

    a.    Patient came to the Center identifying as a "communist, attack helicopter, human, female, maybe nonbinary." Patient was in poor mental health and reported early on that they had no idea of their gender identity. The Center prescribed Patient cross-sex hormones. Patient subsequently reported that their mental health worsened.

    b.    Patient was in a residential sex offender treatment facility in state custody. Patient had previously sexually abused animals and had stated that they would do so again when released. There were questions about the consistency of gender history. The Center prescribed Patient cross-sex hormones.

    c.    Patient had severe Obsessive Compulsive Disorder and threatened to self-harm their genitals. Patient did not have a trans or other incongruent gender identity. The Center prescribed Patient cross-sex hormones to reduce libido and sexual arousal chemically.

    d.    Patient had a history of sexual abuse and notified the psychologist of this. Documented in the letter of support were Patient's concerns about the changes that testosterone would cause to their genitals. The Center prescribed Patient testosterone.

    e.    Patient had severe mental health concerns and was prescribed psychiatric

medications. Patient failed to take these prescriptions. The Center nonetheless prescribed Patient cross-sex hormones.

f. Patient had significant autism with unrealistic expectations, struggled to answer questions, and wanted questions provided ahead of time. The Center prescribed Patient feminizing hormones.

g. Patient had a mental health history that included violent tendencies. Parent forced Patient to cross-dress. The Center prescribed Patient feminizing hormones.

h. Patient was on cross-sex hormones and had decompensating mental health, outlandish name changes, and a self-diagnosis of multiple personalities. The Center continued prescribing Patient cross-sex hormones.

i. Patient believed that their prescribed testosterone was poisoning them and stopped for a period. Patient had significant serious mental health issues. The Center continued prescribing Patient testosterone.

j. A 17-year-old Patient arrived at the Center with non-relative man who had been living with Patient. One year later, the Center prescribed Patient hormones. Patient's mental health deteriorated. Patient visited the Emergency Department and disclosed that the non-relative man that had brought them to the clinic had been sexually and physically abusing them. The Center continued Patient's medical transition treatment.

k. Patient was in residential facility, in foster care. The Center convinced the facility staff to allow Patient to start testosterone. Patient ran away numerous times from the facility and began having unprotected intercourse while on testosterone. The Center continued prescribing Patient testosterone.

l. Patient admitted that their parent encouraged them to start taking testosterone

at 11- years-old because they were moving to a state that the parent believed would restrictPatient's care in the future. Patient had desisted in male identity to a vague nonbinary. Patient changed their name numerous times and struggled with thoughts about desistence, even saying they wanted breast development. The Center continued prescribing Patient testosterone.

    m.  Patient on cross-sex hormones was evaluated for OCD and a somatization disorder with "seizure" activity. The Center continued prescribing Patient cross-sex hormones.

    n.  Patient on cross-sex hormones stopped taking their schizophrenia medications without consulting a doctor. The Center continued prescribing Patient cross-sex hormones.

8.    I witnessed puberty blockers worsen patients' mental health. Several children that had never contemplated suicide attempted suicide after taking puberty blockers. Similarly, many patients with depression and anxiety symptoms became more severe after starting cross-sex hormones. The Center did not require children to continue with mental health care after they prescribed cross-sex hormones or puberty blockers. The Center continued treatment despite patients reporting worsening mental health.

9.    The Center had four basic requirements to place a child on puberty blockers or cross-sex hormones: age or puberty stage, therapist letter, parental consent, and a clinical visit. In practice, every patient who met these minimum criteria was prescribed cross-sex hormones or puberty blockers.

10.    First, the Center required that the child be at a certain age or stage of puberty. Puberty stages were measured according to the Tanner Stage system. When I was at the clinic, the World Professional Association for Transgender Health ("WPATH") Standard of Care Version 7

recommended that children be at least 16 years old before starting cross-sex hormones. The Center routinely prescribed cross-sex hormones to children as young as 13.

11. Second, the Center required the child to have a therapist referral letter authorizing medical treatment. Supposedly, this requirement ensured that two independent professional clinicians agreed that medical transition was appropriate before giving the child medication. The Center would recommend therapists it knew would offer children a letter supporting medical transition. If the child did not receive a letter from an outside therapist authorizing puberty blockers or cross-sex hormones, we would send the patient to the Center's in-house therapists. I was instructed to draft and send language to the therapists for them to use for letters supporting medical transition. Most therapists had a template letter drafted by the Center. Many therapists on the Center's list would return letters supporting medical transition after 1-2 hours with a patient.

12. Third, the Center required parental consent. But parents routinely said they felt they were pressured to consent. I was present during visits where Center doctors obtained consent by telling the parent of a child assigned female at birth, "You can either have a living son or a dead daughter," or parents of a child assigned male at birth, "You can either have a living daughter or dead son."

13. The Center did not inform parents or children of all known side effects before placing children on cross-sex hormones or puberty blockers. Center doctors knew that many of its former patients had stopped taking cross-sex hormones and were detransitioning. Doctors did not share this information with parents or children. The Center nurse and I expressed concerns about one patient's intellectual function and ability to provide informed consent. Patient attended a school district for special education needs, could not identify where they lived, and could not

explain what kind of legal documents or identification they possessed. The provider dismissed our concerns and prescribed hormones. In a follow-up appointment, Patient stated that they were possibly interested in having biological children. Patient never saw the fertility department and the Center never discussed fertility questions with Patient.

14. Fourth, the Center required that the child attend a consultation with the Endocrinology or Adolescent Medicine practices. On several occasions, I witnessed Center doctors mention that they did not have time in the meeting to discuss everything they would have liked to.

15. During my four years working at the clinic, I witnessed only two instances where doctors chose not to prescribe cross-sex hormones or puberty blockers for a child who met the four basic criteria. Both cases involved patients with severe developmental delays. In one of those cases, the doctors did not prescribe cross-sex hormones or puberty blockers, despite recommending the medications, solely because the parents would not agree to monitor the child's medication administration.

16. Toward the end of my time at the Center, I saw a large increase in children seeking transition treatment. When I started in 2018, the Center received between five and ten calls a month. When I left, the Center had received more than 40 calls a month. Many children reported that they learned of their gender identities from TikTok.

17. Center doctors would prescribe puberty blockers or cross-sex hormones even if the child had severe comorbidities or was influenced by social media.

18. Children had come into the clinic using pronouns of inanimate objects like "mushroom," "rock," or "helicopter;" asking for hormones because they do not want to be gay; changing their identities on a day-to-day basis; and under clear pressure by a parent to identify in a way inconsistent with the child's actual identity.

19. In hundreds of other cases, Center doctors regularly issued puberty blockers or cross-sex hormones despite concerns raised by the child's individual circumstances. For example:

   a. Patient's gender identity shifted day-to-day. Patient changed preferred name and at one point changed to non-binary identity. Center doctors continued prescribing Patient cross-sex hormones.

   b. 19-year-old Patient, initially seen as a minor, had a mastectomy at St. Louis Children's Hospital. Three months after the surgery, Patient contacted the surgeon and asked for their breasts to be "put back on."

   c. Doctors placed a biologically female patient on cross-sex hormones. Later, I discovered that Patient desired cross-sex hormones only to avoid becoming pregnant.

   d. I witnessed a call between an outside psychiatrist and the Center's endocrinologist. Psychiatrist recommended that Patient not start cross-sex hormones due to the child's serious mental health issues. Patient had threatened to commit suicide by jumping off a roof. The Center's endocrinologist yelled at the psychiatrist and spoke down to this provider.

   e. At intake, Patient identified as "blind," even though vision tests revealed that the child could see. Patient also identified as transgender. The Center dismissed the child's blindness claim as a somatization disorder but accepted Patient's statement about gender. The Center prescribed that child drugs for medical transition without confirming the length or persistence of the condition. The Center provided no concurrent mental health.

20. I have personally witnessed staff say they were uncomfortable with how the Center

requested that they code bills sent to publicly funded insurance programs. I witnessed staff ask providers for clarification on billing questions and have providers dismiss the concerns and prioritize patients' coverage. I personally witnessed staff report that they were aware that patients had been coded incorrectly, coding for precocious puberty for a puberty blocker prescription when the child did not have the condition.

21. Washington University School of Medicine's Pediatric Transgender Center at St. Louis Children's Hospital is not an outlier in its practices. I know this personally to be true for the following reasons:

a. Our clinical co-director was trained in gender care by Dr. Steven Rosenthal, the Medical Director of the Children and Adolescent Gender Center at the University of California San Francisco at Benioff Children's Hospital. UCSF is known as a leading institution in pediatric gender care. UCSF recently hosted the 2023 National Transgender Health Summit. Our clinical co-director, Dr. Chris Lewis continued to seek out Dr. Rosenthal's clinical expertise on a regular basis through my tenure at the center and would state that he wanted to discuss cases with his mentor. Even after those discussions clinical decisions like I described above were made.

b. Our center multidisciplinary team attended numerous national conferences. We attended as a group the Philadelphia Trans Wellness Conference at the Mazzoni Center. We also attended as a group the Gender Odyssey Conference in San Diego. In these conference sessions, we were never challenged with any information or clinical practices that demonstrated that our clinical practices were outside of the norm. If anything, we were presented with information that demonstrated that our clinical care was potentially more conservative than the prevailing norms at the coastal centers. For example, the conference in San Diego

9

had an entire session on the use of the cancer drug bicalutamide and our provider, Dr Chris Lewis, was using this drug on a regular basis. This drug was not found in any WPATH or Endocrine Society formal 'guidelines' and yet was clearly being used by other gender centers treating children around the country.

c. Our Center's multidisciplinary team was active in an online email national group that linked together pediatric gender care providers. Although I never completed the steps to join that group, in part because I already had enough email to manage, I heard from the providers comments that our practices were actually more conservative than what they were seeing on the group chats. Casey Lofquest, our Center's nurse practitioner, even commented once to me about this chat saying that if I think our Center is going too far and not following the 'guidelines' that I would be appalled at some of the other clinical practices who do not even know that 'guidelines' even exist.

d. We had patients who transferred their care to our Center from centers in other states. Upon reviewing the records from other centers, I found that other centers did not even attempt to determine who the legal guardians are for children in their care. I found that other centers did not even request a letter of support at all before starting children on cross sex hormone treatment. I also found in one case that a child transferred to our center who was started on testosterone at the age of 11. It was apparent that other centers, within the United States, were operating well outside of any standard of care.

22. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on June 1, 2023.

/s/ *Jamie Reed*
Jamie Reed

10