UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| K.C., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:23-cv-00595-JPH-KMB |
| THE INDIVIDUAL MEMBERS OF THE | ) | |
| MEDICAL LICENSING BOARD OF | ) | |
| INDIANA, in their official capacities, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

THEODORE E. ROKITA
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

JAMES A. BARTA
Deputy Solicitor General

CORRINE YOUNGS
Policy Director and Legislative Counsel

MELINDA R. HOLMES
RAZI S. LANE
Deputy Attorneys General

Office of the Attorney General
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

STATEMENT OF ISSUES ........................................................................................ iv

TABLE OF AUTHORITIES ...................................................................................... v

INTRODUCTION ......................................................................................................1

BACKGROUND ........................................................................................................2

I.      Sex, Gender Identity, and Gender Discordance...........................................2

II.     Gender Dysphoria .........................................................................................3

        A.      Diagnosis of gender dysphoria...........................................................3

        B.      The recent spike in gender dysphoria .................................................4

        C.      Persistence of gender dysphoria into adulthood .................................5

III.    Interventions for Gender Dysphoria .............................................................6

        A.      Psychological interventions ................................................................6

        B.      Medical interventions..........................................................................7

IV.     Protocols for Medical Interventions..............................................................9

        A.      The "Dutch protocol".........................................................................9

        B.      WPATH & Endocrine Society.............................................................10

V.      Detransition and Regret ................................................................................13

VI.     International Responses .................................................................................14

VII.    Indiana Responds with S.E.A. 480 ...............................................................16

VIII.   The Lawsuit ...................................................................................................17

STANDARD OF REVIEW ........................................................................................19

i

PLAINTIFFS DO NOT HAVE A STRONG LIKELIHOOD OF SUCCESS ..............................19

I.      Plaintiffs Lack Standing to Challenge S.E.A. 480's Surgical Restrictions ......................19

II.     Substantive Due Process Does Not Protect a Right to Gender-Transition Procedures .....19

        A.      No right to gender-transition procedures exists .....................................................19

        B.      S.E.A. 480's restrictions on subjecting vulnerable minors to unproven,
                harmful, and irreversible procedures satisfies any level of scrutiny.....................22

III.    The Equal-Protection Claims Lack Merit ........................................................................29

        A.      S.E.A. 480 classifies based on age, procedure, and condition—not sex or
                transgender status..................................................................................................29

        B.      S.E.A. 480 does not engage in impermissible sex stereotyping ...........................31

        C.      *Bostock* and *Whitaker* do not support plaintiffs.....................................................32

        D.      Transgender status is not a protected characteristic.............................................33

        E.      S.E.A. 480 survives any level of scrutiny............................................................35

        F.      Mosaic and Bast lack standing to assert others' claims.........................................35

IV.     Medicaid Does Not Safeguard a Right to Any Medical Procedure .................................36

        A.      Medicaid does not provide a cause of action  ......................................................36

        B.      S.E.A. 480 does not violate any Medicaid requirements......................................36

        C.      Gender-transition procedures are not necessary health care.................................36

        D.      S.E.A. 480 does not violate the comparability regulation ....................................37

V.      There Is No Affordable Care Act Violation or Preemption...............................................38

        A.      S.E.A. 480 does not affect payments ...................................................................38

        B.      The ACA does not conflict preempt S.E.A. 480...................................................38

        C.      S.E.A. 480 does not require discrimination on the basis of sex............................39

VI.     The First Amendment Does Not Protect Illegal Conduct....................................................41

PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM................................42

PUBLIC POLICY AND THE BALANCE OF EQUITIES PRECLUDE RELIEF.....................44

SCOPE OF RELIEF ............................................................................................................44

CONCLUSION....................................................................................................................45

## STATEMENT OF ISSUES

Senate Enrolled Act 480 prohibits gender-transition procedures for minors, including GnRH analogues (puberty blockers), hormones, and surgeries. Plaintiffs' motion to preliminarily enjoin enforcement of S.E.A. 480 presents the following issues:

1.      Whether substantive due process confers a right on minors to obtain GnRH analogues, hormones, and surgeries for the purpose of gender transition, or a right on their parents to obtain them for their children.

2.      Whether S.E.A. 480 violates equal protection by using age, condition, and procedure to determine permissible medical uses of GnRH analogues, hormones, and surgeries.

3.      Whether S.E.A. 480's restrictions on which procedures physicians may perform violates Medicaid's claims payment requirements even though they do not affect claims payment, and if so, whether the Indiana legislature has made a reasonable judgment that unproven and risky gender-transition procedures are not "necessary" medical care.

4.      Whether S.E.A. 480 violates, or is preempted by, the Affordable Care Act's prohibition on "sex" discrimination in Medicaid by using age, condition, and procedure to determine permissible medical uses of GnRH analogues, hormones, and surgeries.

5.      Whether S.E.A. 480's prohibition on aiding or abetting gender-transition procedures for minors by conduct or other means violates the First Amendment.

6.      Whether plaintiffs have met all the requirements for a preliminary injunction, including irreparable harm, the balance of the equities, and public interest.

7.      Whether any preliminary injunction must be limited to the parties to the litigation when this case has not been certified as a class action.

# TABLE OF AUTHORITIES

**CASES**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
    495 F.3d 695 (D.C. Cir. 2007) ..........................................................................21, 22

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022) ...............................................30, 32, 33, 40

*Barsky v. Bd. of Regents of Univ.*,
    347 U.S. 442 (1954)........................................................................................27

*Beal v. Doe*,
    432 U.S. 438 (1977)........................................................................................38

*Bigelow v. Virginia*,
    421 U.S. 809 (1975)........................................................................................41

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)...............................................................................32, 40

*Bowen v. Gilliard*,
    483 U.S. 587 (1987)...................................................................................33, 34

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993)...................................................................................30, 31

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)...............................................................................32, 33, 34

*Collins v. Hamilton*,
    349 F.3d 371 (7th Cir. 2003) ........................................................................36

*Craig v. Boren*,
    429 U.S. 190 (1976)........................................................................................33

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020)......................................................................................45

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022)............................................................... *passim*

*Doe v. City of Lafayette*,
    377 F.3d 757 (7th Cir. 2004) ........................................................................20

*Doe ex rel. Doe v. Pub. Health Tr. of Dade Cnty.*,
    696 F.2d 901 (11th Cir. 1983) ......................................................................21

Cases [cont'd]

*Doe v. Rokita*,
    54 F.4th 518 (7th Cir. 2022) ........................................................................44, 45

*Druley v. Patton*,
    601 F. App'x 632 (10th Cir. 2015) ............................................................33

*Elk Grove Unified Sch. Dist. v. Newdow*,
    542 U.S. 1 (2004)........................................................................................35

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)................................................................................29, 34

*Geduldig v. Aiello*,
    417 U.S. 484 (1974)........................................................................29, 30, 35

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)....................................................................................41

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)....................................................................................22

*Hanson v. Dane Cnty.*,
    608 F.3d 335 (7th Cir. 2010) .....................................................................20

*Hoohuli v. Ariyoshi*,
    631 F. Supp. 1153 (D. Haw. 1986)............................................................30

*Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*,
    438 F.3d 195 (2d Cir. 2006)........................................................................30

*Kane v. De Blasio*,
    19 F.4th 152 (2d Cir. 2021) ........................................................................45

*Khan v. Gallitano*,
    180 F.3d 829 (7th Cir. 1999) .....................................................................20

*Kimel v. Fla. Bd. of Regents*,
    528 U.S. 62 (2000)......................................................................................35

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004), (2) .............................................................................35

*Linder v. United States*,
    268 U.S. 5 (1925)........................................................................................39

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................................19

CASES [CONT'D]

*Lyng v. Castillo*,
  477 U.S. 635 (1986) ............................................................................................33

*Maryland v. King*,
  567 U.S. 1301 (2012) ..........................................................................................44

*Mass. Bd. of Retirement v. Murgia*,
  427 U.S. 307 (1976) ............................................................................................33

*Mathews v. Lucas*,
  427 U.S. 495 (1976) ............................................................................................33

*Merck Sharp & Dohme Corp. v. Albrecht*,
  139 S. Ct. 1668 (2019) ........................................................................................39

*Morrissey v. United States*,
  871 F.3d 1260 (11th Cir. 2017) .....................................................................21, 22

*Mulholland v. Marion Cnty. Election Bd.*,
  746 F.3d 811 (7th Cir. 2014) ..............................................................................45

*New York v. Ferber*,
  458 U.S. 747 (1982) ............................................................................................22

*Nguyen v. INS*,
  533 U.S. 53 (2001) .........................................................................30, 31, 33, 40

*Ohralik v. Ohio State Bar Ass'n*,
  436 U.S. 447 (1978) ............................................................................................41

*Otto v. City of Boca Raton, Fla.*,
  981 F.3d 854 (11th Cir. 2020) ............................................................................42

*Parham v. J.R.*,
  442 U.S. 584 (1979) .......................................................................................20, 25

*Patriotic Veterans, Inc. v. Indiana*,
  736 F.3d 1041 (7th Cir. 2013) ............................................................................39

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) ...........................................................................................37, 40

*Raich v. Gonzales*,
  500 F.3d 850 (9th Cir. 2007) ..............................................................................21

*Reed v. Reed*,
  404 U.S. 71, 75 (1971) ........................................................................................29

CASES [CONT'D]

*Rice v. Paladin Enterprises, Inc.*,
   128 F.3d 233 (4th Cir. 1997) ............................................... 41

*Romer v. Evans*,
   517 U.S. 620 (1996) .............................................................. 33

*Rush v. Parham*,
   625 F.2d 1150 (5th Cir. 1980) ......................................... 37, 38

*Rutherford v. United States*,
   616 F.2d 455 (10th Cir. 1980) ............................................. 22

*Sable Commc'ns of Cal. v. F.C.C.*,
   492 U.S. 115 (1989) .............................................................. 42

*Schall v. Martin*,
   467 U.S. 253 (1984) .............................................................. 20

*Talevski v. Health & Hosp. Corp. of Marion Cnty.*,
   No. 21-806 (U.S.) ................................................................. 36

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) .......................................................... 19

*Ulane v. E. Airlines, Inc.*,
   742 F.2d 1081 (7th Cir. 1984) ............................................. 40

*United States v. Doremus*,
   249 U.S. 86 (1919) ................................................................ 39

*United States v. Salerno*,
   481 U.S. 739 (1987) .............................................................. 45

*United States v. Virginia*,
   518 U.S. 515 (1996) ............................................. 29, 30, 32, 35

*Virginia v. Hicks*,
   539 U.S. 113 (2003) .............................................................. 41

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ......................................................... 20, 21

*Whalen v. Roe*,
   429 U.S. 589 (1977) ......................................................... 21, 27

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ....................................... 33, 39, 40

CASES [CONT'D]

*Whole Woman's Health v. Jackson*,
    142 S. Ct. 522 (2021) ................................................................45

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ................................................................19

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ................................................................38

STATUTES

20 U.S.C. § 1681, *et seq* ................................................................38

42 U.S.C. § 1396a(a)(10)(A) ................................................................36

42 U.S.C. § 1396a(a)(43) ................................................................37

42 U.S.C. § 1396d(a) ................................................................36

42 U.S.C. § 18116(a) ................................................................38, 40

42 U.S.C. § 1983 ................................................................36

Ind. Code § 25-1-22-5(a) ................................................................17

Ind. Code § 25-1-22-5(a)(1)–(2) ................................................................29

Ind. Code § 25-1-22-5(b) ................................................................17, 22

Ind. Code § 25-1-22-7 ................................................................38

Ind. Code § 25-1-22-12 ................................................................17

Ind. Code § 25-1-22-13 ................................................................38

Ind. Code § 25-1-22-13(a)–(b) ................................................................17

Ind. Code § 25-1-22-13(b) ................................................................41

Ind. Code § 25-1-22-13(c) ................................................................17

Ind. Code § 25-1-22-13(d) ................................................................17

Ind. Code § 25-1-22-14 ................................................................17

Ind. Code § 25-1-22-15 ................................................................41

**STATUTES [CONT'D]**

Ind. Code § 25-1-22-16 ...................................................................................................17

Ind. Code § 25-1-22-16 to -18 ........................................................................................17

**EXECUTIVE MATERIALS**

42 C.F.R. § 444.200 ........................................................................................................37

42 C.F.R. § 444.210 ........................................................................................................37

42 C.F.R. § 440.230(c) ....................................................................................................37

45 C.F.R. § 164.524(a)(1) ...............................................................................................42

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021)........................................34

Exec. Order No. 14,020, 86 Fed. Reg. 13,797 (Mar. 8, 2021).......................................34

Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021).......................................34

**OTHER AUTHORITIES**

*Transgender Resources*, ABA,
    https://www.americanbar.org/groups/diversity/sexual_
    orientation/resources/transgenderrights/ .................................................................35

## INTRODUCTION

Even as gender dysphoria seems to be sweeping developed countries, new peer-reviewed systematic reviews of scientific literature reveal that the evidence supporting use of puberty blockers, cross-sex hormones, and gender transition surgery is exceedingly poor. Other evidence shows the tremendous risks of irreversible negative medical consequences for those who undertake these interventions, particularly children. Blockers stunt growth, weaken bones, and affect brain development; hormones increase cancer and stroke risk and can cause permanent sterility. Girls who take testosterone are stuck with low voices and facial hair, even if they detransition. And anyone who undergoes surgery permanently loses genitals, breasts, or both, with sexual dysfunction often accompanying physical disfigurement.

All of this damage occurs to address a disorder that cannot be verified with objective data. It depends entirely on a child's self-assessment of "feeling" like a girl or boy and preferring the social stereotypes of the opposite sex: "girls" toys and clothing or "boys" activities and haircuts. Even worse, children who participate in this grand gender-transition experiment often have serious, unresolved psychological co-morbidities: depression, anxiety, ADHD, Autism Spectrum Disorder, Post Traumatic Stress Disorder (perhaps resulting from physical or even sexual abuse), schizophrenia, and more. For those children and their families, blockers, hormones, and surgeries may seem like magic solutions that can cause their symptoms to disappear. But no evidence establishes that they do—or proves their long-term efficacy or safety.

The Indiana legislature has decided that troubled children should not be put in a position where their own psychological self-assessment leads to a life of permanent medicalization, profound physical transformation, infertility, and other known (and unknown) risks to mind and body. That decision is reasonable, and no federal constitutional or statutory principle impedes it.

# BACKGROUND

## I.    Sex, Gender Identity, and Gender Discordance

All humans have a sex—male or female. *See* Dkt. 48-4 at 5 (Weiss Decl. ¶ 18); Dkt. 48-2 at 10 (Hruz Decl. ¶ 16). "Sex is an objective biological trait . . . permanently determined . . . at conception." Dkt. 48-2 at 9 (Hruz Decl. ¶ 14); *see* Dkt. 48-4 at 5–6 (Weiss Decl. ¶¶ 18–20); Dkt. 48-1 at 52–54 (Cantor Decl. ¶¶ 104–06). Sex is genetically encoded into every cell: "Males have XY chromosomes in their cells"; "females have XX chromosomes." Dkt. 48-4 at 5 (Weiss Decl. ¶ 19); *see* Dkt. 48-2 at 9, 32, 41 (Hruz Decl. ¶¶ 14, 57, 71). That encoding affects humans through "over 6,500" sex-differentially expressed genes. Dkt. 48-2 at 27, 41 (Hruz Decl. ¶¶ 48, 71).

One of sex's most significant impacts is on reproductive role. Dkt. 48-2 at 9, 41 (Hruz Decl. ¶¶ 14, 71). Males produce sperm in testes and deliver it to females; females receive the sperm and join it with maternal genetic information contained in an ovum produced by ovaries. *Id.* (¶ 14); *see* Dkt. 48-4 at 5 (Weiss Decl. ¶ 20). "[N]o procedure can enable an individual to perform the reproductive role of the opposite sex." Dkt. 48-4 at 5 (Weiss Decl. (¶ 21); *see* Dkt. 48-2 at 32–33 (Hruz Decl. ¶ 57). Although rare genetic disorders can affect external genitalia, sex can be correctly identified from them in "nearly 99.98% of cases." Dkt. 48-2 at 9–12 (Hruz Decl. ¶¶ 15–19).

Gender and gender identity are distinct from sex. Gender has varied meanings, traditionally having only grammatical significance, but nowadays often referring to "psychological and cultural characteristics." Dkt. 48-2 at 12–13 (Hruz Decl. ¶ 20). As even plaintiffs' Dr. Turban admits, whereas sex refers to an *objective*, *biological* concept, gender identity refers to a *subjective*, *psychological* sense. *See* Dkt. 48-11 at 7 (Turban Dep. 19: 3–12); Dkt. 48-1 at 52 (Cantor Decl. ¶ 104); Dkt. 48-2 at 9, 12–13 (Hruz Decl. ¶¶ 14, 20). Plaintiffs' experts describe gender identity as an "internal sense of belonging," Dkt. 26-2 at 6 (Shumer Decl. ¶ 27), which can be male, female, a

blend, or something else, Dkt. 26-1 at 7 (Karasic Decl. ¶ 28). The term "transgender" is often used for persons whose gender identity and sex do not align. Dkt. 26-2 at 6 (Shumer Decl. ¶ 27).

Although plaintiffs' experts theorize that biology—in addition to social and cultural factors—"can contribute" to gender identity, Dkt. 48-10 at 18–19 (Shumer Dep. 64:17–66:16), they admit no genetic determinant has been identified, Dkt. 48-11 at 9 (Turban Dep. 26:10–16); *see* Dkt. 48-1 at 79–80 (Cantor Decl. ¶ 162) (no brain structures identified). Plaintiffs' own witnesses concede no test for gender identity exists. Dkt. 48-10 at 9, 11 (Shumer Dep. 27:1–5, 33:14–15); Dkt. 48-11 at 8 (Turban Dep. 24:1–6); Dkt. 48-8 at 15 (Mosaic Dep. 51:5–6); *see* Dkt. 48-1 at 52 (Cantor Decl. ¶ 104). The only identifier is to ask a person to "tell [them]." Dkt. 48-8 at 15 (Mosaic Dep. 51:3–4); *see* Dkt. 48-10 at 9 (Shumer Dep. 28:13–16); Dkt. 48-9 at 8 (Karasic Dep. 24:15–21); Dkt. 48-11 at 7–8 (Turban Dep. 19:13–21, 21:6–22:20). As plaintiffs' witnesses admit, "gender identity may evolve over time," Dkt. 26-2 at 6–7 (Shumer Decl. ¶ 28); *see* Dkt. 48-8 at 13–14 (Mosaic Dep. 44:13–15, 46:14–25) (agreeing that "gender identity change[s] over time").

## II.    Gender Dysphoria

### A.    Diagnosis of gender dysphoria

Gender dysphoria is a psychiatric (not medical) diagnosis defined by the American Psychiatric Association's DSM-5. *See* Dkt. 48-1 at 55 (Cantor Decl. ¶ 108). The prior manual, DSM-4, called the diagnosis "gender identity disorder." *Id.* at 119–20 (¶ 266). A diagnosis of gender dysphoria requires (among other things) "clinically significant distress" with one's sex. *Id.* at 55 (¶ 108); *see* Dkt. 48-3 at 99–100 (Kenny Decl. ¶¶ 188–89). Not all transgender youth experience dysphoria. Dkt. 48-10 at 13 (Shumer Dep. 42:5–8); Dkt. 48-11 at 10 (Turban Dep. 31:4–10).

Gender dysphoria in children (prepubertal minors) is marked by a "strong desire" or "instance" that "one is the other gender" and at least five other criteria, all lasting at least six months,

such as "a strong preference for wearing only typical masculine clothing," "for the toys, games or activities stereotypically used or engaged in by the other gender," and "for playmates of the other gender." Dkt. 49-4 at 7–8 (DSM-5 TR 3–4). Gender dysphoria in adolescents (minors who have reached puberty) is marked by two criteria lasting at least six months, such as a "strong desire to be rid of one's primary and/or secondary sex characteristics" or "a strong conviction that one has the typical feelings and reactions of the other gender." *Id.*

As plaintiffs' experts concede, no other test exists to verify a diagnosis or to calculate an error rate. *See* Dkt. 48-11 at 10 (Turban Dep. 31:11–19); Dkt. 48-10 at 13 (Shumer Dep. 41:15–16). A diagnosis depends on self-reported feelings. Other conditions and experiences, such as post-traumatic stress disorder, schizophrenia, autism, borderline personality disorder, and incipient ho-mosexuality, can cloud a gender dysphoria diagnosis. Dkt. 48-5 at 62–69 (Kaliebe Decl. ¶¶ 171–89); Dkt. 48-3 at 121–26 (Kenny Decl. ¶¶ 237–46); Dkt. 48-11 at 15 (Turban Dep. 49:1–5).

### B.    The recent spike in gender dysphoria

Historically, gender dysphoria in minors was "rare." Dkt. 48-5 at 10, 12 (Kaliebe Decl. ¶¶ 19, 28). And most cases of gender dysphoria were reported in prepubertal children born male, with ratios of boys to girls being as high as 33 to 1. Dkt. 48-3 at 43–45 (Kenny Decl. ¶¶ 87, 89); *see* Dkt. 48-1 at 57 (Cantor Decl. ¶ 112). In recent years, however, numbers have skyrocketed. "The UK has reported a 4,000 percent increase . . . over the past 10 years" and "Sweden . . . a 1,500 percent increase." Dkt. 48-3 at 35 (Kenny Decl. ¶ 71). "Similar increases have been reported across much of the economically advanced countries in the world, many showing an over 1000% rise in gender dysphoria over the last decade." Dkt. 48-5 at 12 (Kaliebe Decl. ¶ 29); *see* Dkt. 48-3 at 43–51 (Kenny Decl. ¶¶ 87–101). "Never before have there been large cohorts of individuals seeking . . . to alter their secondary sex characteristics." Dkt. 48-5 at 12 (Kaliebe Decl. ¶ 30).

4

With the skyrocketing numbers has come an equally dramatic shift in presentation. Whereas formerly most minors with gender dysphoria were young boys, most minors today are adolescent girls with no history of cross-gender behavior. Dkt. 48-1 at 66–67 (Cantor Decl. ¶ 135); Dkt. 48-5 at 11–12 (Kaliebe Decl. ¶¶ 28, 30). Data from the U.K. and Sweden illustrate the dramatic shift. *Id.* (¶¶ 28–30); *see* Dkt. 48-3 at 43–45 (Kenny Decl. ¶¶ 87–89) (discussing other data).

The upsurge in gender dysphoria among teen girls is largely unstudied, Dkt. 48-1 at 66–67 (Cantor Decl. ¶ 135)—as a U.K. review observed, "[a]t present we have the least information for the largest group of patients," Dkt. 48-5 at 17 (Kaliebe Decl. ¶ 45) (citation omitted); *see* Dkt. 49-7 at 59 (Cass Report 58). But "[c]ases commonly appear to occur within clusters of peers in association with increased social media use, and among people with autism or other mental health issues." Dkt. 48-1 at 66–67 (Cantor Decl. ¶ 135). Approximately "70% of children with gender dysphoria have had recent trauma, history of abuse, autism spectrum disorder, homosexual orientation, depression, anxiety, or bullying." Dkt. 48-4 at 14 (Weiss Decl. ¶ 58).

Social and online contagion could be "major contributors" to the "remarkable rise in gender dysphoria among adolescents." Dkt. 48-5 at 10 (Kaliebe Decl. ¶ 33). A 2018 paper showed 86.7% of parents reporting "that, along with the sudden or rapid onset of gender dysphoria, their child either had an increase in their social media/internet use, belonged to a friend group in which one or multiple friends" identified as transgender "during a similar time-frame, or both." *Id.* at 13 (¶ 42) (citation omitted). A 2023 paper showed similar results. Dkt. 48-1 at 66–67 (Cantor Decl. ¶ 135).

Those findings are consistent with broader research showing that peers exert "powerful" influence on minors, especially on adolescent girls. Dkt. 48-3 at 17–18, 39 (Kenny Decl. ¶¶ 32–33, 78). Minors who do not fit within peers' perception of a binary gender role are frequently ostracized and, to gain acceptance, may "declar[e] themselves transgender," an identity "valorized

by a politically powerful transactivist lobby." *Id.* at 37–38 (¶ 76); *see id.* at 41–42 (¶ 84).

The findings are also consistent with research showing the internet and social media powerfully affect minors, as illustrated by their role in spreading suicide contagion, self-harm contagion, anorexia, tic disorders, and psychosomatic illnesses. Dkt. 48-5 at 15 (Kaliebe ¶¶ 39–41); *see* Dkt. 48-3 at 40–41 (Kenny Decl. ¶¶ 82–83). When polled, 82% of attendees at a national conference of psychiatrists reported that social media "somewhat often" or "very often" influences teens regarding "their sexual and/or gender identity." Dkt. 48-5 at 21 (Kaliebe Decl. ¶ 53).

### C.     Persistence of gender dysphoria into adulthood

Although long-term data on the recent rise of adolescent teen girls identifying as transgender is lacking, existing research indicates that gender dysphoria can resolve on its own, *i.e.*, without social or medical intervention. All studies of children found that a "majority cease to want to be the other gender over the course of puberty—ranging from 61–88% desistance." Dkt. 48-1 at 59 (Cantor Decl. ¶ 115). Currently, however, there is no "reliable procedure for discerning which children who present with gender dysphoria will persist." *Id.* at 61–62 (¶ 122.)

## III.   Interventions for Gender Dysphoria

There is ongoing debate about the appropriate treatment for gender dysphoria. Generally, however, the approaches use psychological interventions, medical interventions, or both.

### A.     Psychological interventions

Psychological interventions include "[p]sychosocial support[] and psychotherapy" for gender dysphoric patients, a population who "typically" have "comorbid mental health disorders." Dkt. 48-5 at 57–58 (Kaliebe Decl. ¶ 150). "Quality psychotherapy includes the process of exploring patient life history, emotions, coping style, and thought patterns. This includes validating how patients feel, but it also includes teaching patients to not be guided solely by their feelings." *Id.*

6

(¶ 151). "Psychiatrists," for example, "do not 'affirm' hopelessness in depression, delusions in schizophrenia, or distorted body image in anorexia or body dysmorphic disorder." *Id.* (¶ 152.)

"Time-tested and widely effective psychotherapy approaches include supportive therapy or cognitive behavioral therapy." Dkt. 48-5 at 61–62 (Kaliebe Decl. ¶ 167). "Cognitive behavioral therapy has proven effective for virtually every mental health condition researched, including the full range of anxiety disorders, depressive and mood disorders, disturbed anger, sleep disturbance and trauma reactions"—conditions present at "high levels" in patients with gender dysphoria. *Id.* (¶ 167). The goal with psychotherapy is "to help individuals gain a deeper understanding of themselves, develop coping skills, and provide a neutral, unbiased process." *Id.* (¶ 168).

### B.      Medical interventions

Medical interventions for gender dysphoria are riskier and more invasive. They include GnRH analogues (puberty blockers), cross-sex hormones, and gender-transition surgeries.

1.      GnRH analogues are drugs that the FDA approved to treat central precocious puberty, a rare disorder in which children undergo puberty too early. Dkt. 48-2 at 20–22, 24 (Hruz Decl. ¶¶ 36–37, 39, 43); *see* Dkt. 48-4 at 19 (Weiss Decl. ¶ 86). When used for treating precocious puberty, the goal is to allow a child to enter puberty at a normal age, lest early puberty stunt their ultimate bone growth. Dkt. 48-2 at 21, 25 (Hruz Decl. ¶¶ 37, 45). Puberty, however, is not further delayed due to the risk of "adverse effects, including reduced bone marrow density." *Id.* (¶ 45); *see* Dkt. 48-4 at 20 (Weiss Decl. ¶ 92).

GnRH analogues are not FDA approved for treating gender dysphoria in minors. Dkt. 48-4 at 19 (Weiss Decl. ¶ 86); Dkt. 48-2 at 33 (Hruz Decl. ¶ 58). When GnRH analogues are used to treat gender dysphoria in minors, the objective is to delay natural puberty and to prevent the development of secondary sex characteristics (*e.g.*, facial hair in natal males and breasts in natal

7

females). Dkt. 48-2 at 14–15, 33–34 (Hruz Decl. ¶¶ 25, 59); *see* Dkt. 26-2 at 13–15 (Shumer Decl. ¶¶ 54, 57–58) (similar). Various medical and psychiatric conditions can render patients with gender dysphoria ineligible for GnRH analogues. Dkt. 48-11 at 18 (Turban Dep. 62:14–63:6).

2.     Cross-sex hormones are another medical intervention. Males and females naturally have different primary sex hormones: The principal sex hormone for males is testosterone while the principal female sex hormone is estrogen. Dkt. 48-2 at 27–30, 42 (Hruz Decl. ¶¶ 49, 53, 73); Dkt. 48-4 at 23 (Weiss Decl. ¶¶ 107–08). "There are major and highly significant differences between male and female responses to sex hormones." Dkt. 48-2 at 27 (Hruz Decl. ¶ 48). For example, testosterone can be used to restore health in males by raising low testosterone due to damaged testes or by treating delayed male puberty with "low doses of testosterone for 3–4 months." *Id.* at 27–28 (¶¶ 49–50). By contrast, testosterone is "not an indicated treatment" for disorders affecting "a female child or adolescent." *Id.* at 29 (¶ 52). Giving testosterone to a female would yield "serious adverse effects," including "impaired fertility, alopecia (hair loss), disfiguring acne, and metabolic changes that increase risk of heart disease and diabetes." *Id.* (¶ 52). Instead, females are given estrogen to "to treat the same conditions testosterone treats in males." *Id.* at 28–29 (¶ 53).

Cross-sex hormone treatment for gender dysphoria involves giving females doses of testosterone 20–40 times higher than their normal levels to induce typical male characteristics, such as lower voice and facial hair, and giving males doses estrogen about 5 times higher than their normal levels to induce typical female characteristics, such as breasts, female fat distribution, and softer skin. Dkt. 48-2 at 39–40 (Hruz Decl. ¶ 68); Dkt. 48-4 at 23 (Weiss Decl. ¶¶ 107–08). Patients may take hormones for "the rest of their lives." Dkt. 48-8 at 20 (Mosaic Dep. 69:22–23). Certain conditions, including suicidality, can render patients better suited for psychotherapy than hormones. Dkt. 48-9 at 22 (Karasic Dep. 77:25–79:16); Dkt. 48-11 at 12 (Turban Dep. 37:24–39:9).

3.      Surgeries are the most invasive intervention. Surgeries considered for natal females include "masculinizing chest surgery" (often called "top surgery") and "phalloplasty" (often called "bottom surgery" or genital surgery). Dkt. 48-11 at 47 (Turban Dep. 180:10–16). Chest surgery means removing both breasts and recontouring the chest. *See* Dkt. 48-11 at 48 (Turban Dep. 182:4–18). Its "end goal" differs from a mastectomy's, which is usually done to "remove breast cancer." Dkt. 48-10 at 7–8 (Shumer Dep. 20:15–21:1). A phalloplasty involves "taking a piece of tissue from somewhere else in the body and fashioning a phallus from it," attaching it to the genital area, and repositioning and extending the urethra. Dkt. 48-11 at 48 (Turban Dep. 181:21–182:3).

Surgeries for natal males include vaginoplasties. Dkt. 48-11 at 47 (Turban Dep. 180:10–16). That surgery involves "removal of the testes" and penis, creating a "space between the rectum and the bladder," creating a vaginal-like structure with skin from the penis, and "reposition[ing] the urethra where the urine flows." Dkt. 48-9 at 26 (Karasic Dep. 96:7–23); Dkt. 48-11 at 48 (Turban Dep. 181:9–16). Genital surgeries are "fairly big invasive surgeries that carry substantial medical involvement and are difficult to reverse." Dkt. 48-11 at 47 (Turban Dep. 180:19–21).

## IV.   Protocols for Medical Interventions

### A.      The "Dutch protocol"

The history of medical interventions for gender dysphoria is a short one, beginning at a clinic in the Netherlands during the 1990s. Dkt. 48-1 at 110 (Cantor Decl. ¶¶ 238–39); Dkt. 48-2 at 32 (Hruz Decl. ¶ 58). The influential protocol that clinic developed, known as the "Dutch protocol," is more conservative than the standards used by many practitioners but still quickly proceeds to medical interventions. Dkt. 48-1 at 83, 110 (Cantor Decl. ¶¶ 170, 238–39).

Under the Dutch protocol, "no social transition"—*i.e.*, "social affirmation" of a child's declared gender, such as by calling a natal female by a boy's name—is permitted before age 12.

Dkt. 48-1 at 110–11 (Cantor Decl. ¶¶ 240, 244). Rather, "watchful waiting" is prescribed. *Id.* "Watchful waiting does not mean do nothing but passively observe the child." *Id.* (¶ 244). It instead involves "actively treating" other "issues which may be exacerbating psychological stress or dysphoria" through therapy and mental-health interventions. *Id.* The Dutch insistence on watchful waiting reflects "the long-established and repeated observation" that gender dysphoria will resolve in most children without intervention and the reality that "social transition" itself "contribute[s] to the likelihood of persistence." *Id.* at 61, 110 (¶¶ 121, 239) (citation omitted).

After age 12, the Dutch protocol permits social transition and treatment with GnRH analogues, but only after mental health issues are resolved. Dkt. 48-1 at 110 (Cantor Decl. ¶ 240). It "emphasize[s] the need for extensive mental health assessment, including clinical interviews, formal psychological testing with validated psychometric instruments, and multiple sessions with the child and the child's parents." *Id.* at 111 (¶ 243). And the Dutch protocol calls for ongoing mental-health support. *Id.* (¶ 244). After age 16, the Dutch protocol permits cross-sex hormones, but again only if mental issues have been resolved and with ongoing support. *Id.* at 110–11 (¶¶ 240, 243). In selecting age thresholds, the Dutch did not identify "any research" showing them to be more appropriate than alternatives. *Id.* (¶ 242); *see id.* at 111–12 (¶ 245). The thresholds were selected because they happened to correspond to the age of informed consent under Dutch law. *Id.*

## B.    WPATH & Endocrine Society

More recently, many practitioners have departed from the Dutch protocol to take an even riskier approach—which plaintiffs prefer. Plaintiffs point to guidelines developed by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society as describing this approach. *See* Mem. 6. There is, however, growing evidence that some practitioners and clinics take even more lax approaches. Dkt. 49-17 at 5–6, 9–10 (Reed Decl. ¶¶ 10–11, 21).

WPATH released version 8 of its guidelines in 2022 (SOC-8). Dkt. 48-5 at 42 (Kaliebe

Decl. ¶ 113). Under SOC-8, social transition is permitted *at any age*. Dkt. 48-1 at 52, 112 (Cantor Decl. ¶¶ 101, 248). Plaintiffs' Dr. Turban considers three-year-olds able to declare themselves transgender and to begin social transition. Dkt. 48-11 at 12 (Turban Dep. 40:17–21). And while the SOC-8 initially had age recommendations for medical interventions, WPATH abruptly dropped those recommendations soon after initial publication without citing any research. Dkt. 48-1 at 52, 112–113 (Cantor Decl. ¶¶ 101, 248). The current guidelines permit treatment with GnRH analogues and cross-sex hormones as soon as a child exhibits the first physical signs of puberty (Tanner Stage 2). Dkt. 49-3 at 115–116 (WPATH SOC-8 at S12.1, S12.5). Under SOC-8, there is no requirement that transgender persons receive any psychotherapy before transitioning.

In creating SOC-8, WPATH did not conduct a "systematic review" of the evidence "for children." Dkt. 48-9 at 23 (Karasic Dep. 81:4–6). It did commission a general review on efficacy of GnRH analogues and cross-sex hormones but not their safety. Dkt. 48-1 at 48–49 (Cantor ¶¶ 92–93). The review did not separately evaluate adolescents. *Id.* at 50 (¶ 97). It considered only three studies on adolescents, excluding three others due to "high risks of bias," and then lumped the selected studies together with adult studies. *Id.* at 49 (¶ 94). Even so, the review found only "low" evidence that hormones improved quality of life, depression, and anxiety, and "insufficient" evidence that hormone therapy reduced suicide. *Id.* at 50 (¶ 97). No studies "follow[ed] youth into adulthood." *Id.* at 51–52 (¶ 100). Despite research gaps, SOC-8 made recommendations on "consensus-based expert opinion." *Id.* at 50–51, 85 (¶¶ 98, 175) (quoting SOC-8 at S8); *see* Dkt. 48-5 at 43–45 (Kaliebe Decl. ¶¶ 115–21) (observing SOC-8 used a process similar to the prior version, which "scored poorly on editorial independence, applicability, and rigor of development").

Like WPATH, the Endocrine Society recommends "temporary suppression of pubertal development of children with GnRH agonists followed by hormonal treatments." Dkt. 48-2 at 48–49

(Hruz Decl. ¶¶ 82–83). Those recommendations were created by a committee of ten members—nine of whom are "also WPATH leaders or authors"—and were never submitted to the full membership for approval or for an external review. Dkt. 48-5 at 47–48 (Kaliebe Decl. ¶ 128); *see* Dkt. 48-2 at 50–51 (Hruz Decl. ¶ 86). According to the guidelines themselves, the quality of evidence for the recommendations is "low or very[ ]low" under the GRADE system. Dkt. 48-2 at 48–49 (Hruz Decl. ¶ 83). Under "the GRADE system, low recommendations indicate that '[f]urther research is very likely to have an important impact on our confidence in the estimate of effect and is likely to change the estimate.' Very low recommendations mean that 'any estimate of effect is very uncertain.'" *Id.* at 47 (¶ 82). The guidelines nevertheless made "strong recommendations" based on "weak evidence"—a practice "discouraged" in other contexts. *Id.* at 49 (¶ 84).

In creating the guidelines, the Endocrine Society commissioned a review on how sex steroid use affects "lipids and cardiovascular outcomes" and on how it affects "bone health." Dkt. 48-1 at 47–48 (Cantor Decl. ¶ 88) (citation omitted). It did not "look at the effect of the interventions on gender dysphoria itself, arguably 'the most important outcome.'" Dkt. 48-2 at 49 (Hruz Decl. ¶ 84) (citation omitted). Despite the narrow scope, the reviews did not "identify any study of adolescents" on lipids and cardiovascular outcomes, and identified "only one small," short-term study on bone health. Dkt. 48-1 at 47–48 (Cantor Decl. ¶ 88). "The Endocrine Society does not claim to have conducted or consulted any systematic review of the efficacy of puberty blockers or cross-sex hormones to reduce gender dysphoria or increase mental health or well-being." *Id.* at 48 (¶ 89). "Nor does it claim to have conducted or consulted any systematic review of safety" with respect to "brain development, future fertility, [or] actual reversibility." *Id.*

Many medical advocacy organizations have nonetheless issued supporting statements. Dkt. 48-3 at 76 (Kenny Decl. ¶ 144). Some of those statements, such as the American Academy of

Pediatrics, are the work of "a single author" who never did a systematic review. Dkt. 48-1 at 52 (Cantor Decl. ¶ 103). Others were developed by committees staffed with advocates of medical interventions for transgender youth. Dkt. 48-5 at 32–33 (Kaliebe Decl. ¶¶ 85–87). The organizations' leadership have suppressed efforts to have discussions about quality of evidence and alternative treatments. *Id.* at 33–58 (¶¶ 89–150); Dkt. 48- 3 at 74–75, 81–85 (Kenny Decl. ¶¶ 142–43, 155–60). WPATH's U.S. affiliate even censured WPATH's first transgender president for criticizing physicians who fail to follow its guidelines. Dkt. 48-5 at 47 (Kaliebe Decl. ¶ 125).

## V.      Detransition and Regret

Accompanying the rise of medical interventions are heartbreaking stories of how hormones and surgeries have destroyed lives. Corinna Cohn, a self-described "feminized man," likens transitioning to "asking the survivor of a tornado whether he regrets choosing to live in a house that was destroyed." Dkt. 49-13 at 6–7 (Cohn Decl. ¶ 22). Xandra Robertson, a detransitioned woman, attempted suicide because "[t]he pursuit of transition had pushed away her family, destroyed her marriage, and made meaningful relationships nearly impossible." Dkt. 49-14 at 6–7 (Robertson Decl. ¶¶ 14–15). Chloe Cole began testosterone at age 13 and received a double mastectomy at age 15, and now at age 18 "griev[es] for her breasts and her girlhood that was cut short." Dkt. 49-12 at 2, 4 (Cole Decl. ¶¶ 2, 13). Zoe Hawes started testosterone at 16 and desperately wanted a hysterectomy and mastectomy—only insufficient finances preserved her ability to become a mother able to breastfeed her son. Dkt. 49-16 at 4–5 (Hawes Decl. ¶¶ 15–16). Yaacov Sheinfeld's daughter experienced so much depression and pain from using testosterone for ten years that she took fentanyl, fatally overdosing. Dkt. 49-15 at 3 (Sheinfeld Decl. ¶¶ 11–13). This despair reflects detransitioners' realization they "could never really become the opposite sex" and were patients for life. Dkt. 49-14 at 5 (Robertson Decl. ¶ 12); Dkt. 49-13 at 6 (Cohn Decl. ¶¶ 18, 21).

Such stories do not stand alone. Evidence of detransition and regret among those who undergo gender-transition procedures as minors is "increasing." Dkt. 48-4 at 27 (Weiss Decl. ¶ 137); *see* Dkt. 48-1 at 20–21 (Cantor Decl. ¶ 29); Dkt. 48-3 at 69–70 (Kenny Decl. ¶ 132). The issue has not been exhaustively studied. But an evaluation of 952 adolescents observed that 26% of those who started hormonal interventions before age 18 discontinued them, including 36% of natal females. Dkt. 48-4 at 27–28 (Weiss Decl. ¶ 139). And that paper almost certainly undercounts. Years may elapse between receipt of hormones and detransition, and a high proportion—76%—"do not inform their physician about their detransition." *Id.* (¶¶ 138–39). Dr. Weiss estimates about 70% of the 100 gender dysphoria patients he treated discontinued hormones. *Id.* at 28 (¶ 140).

## VI.    International Responses

Although WPATH and the Endocrine Society are fulfilling the wishes of adolescents clamoring for medical interventions despite the weak evidence base and increasing evidence of regret, international medical bodies are studying the evidence and charting a different path.

In 2020, the U.K.'s National Health Service commissioned an independent report by prominent pediatrician Dr. Hilary Cass on the use of puberty blockers and cross-sex hormones. Dkt. 48-1 at 12–13, 15–16 (Cantor Decl. ¶¶ 12, 19). The U.K.'s National Institute for Health Care Excellence (NICE) surveyed the literature on efficacy and safety. *Id.* at 42 (¶ 77). It concluded that, under GRADE, evidence for those interventions was "very low" quality. Dkt. 49-5 at 41–42 (NICE GnRH Review 40–41); Dkt. 49-6 at 15, 48 (NICE Hormone Review 14, 47). It also observed that children taking puberty blockers lacked normal bone density. Dkt. 48-4 at 22 (Weiss Decl. ¶ 101). Dr. Cass reported that the evidence was "not strong enough" to recommend a policy. Dkt. 49-7 at 36 (Cass Report 35). The National Health Service has since restricted medical interventions for gender-dysphoric minors to research, stating that "[l]ittle is known about the long-term side effects

14

of hormone or puberty blockers." Dkt. 48-1 at 16, 44 (Cantor Decl. ¶¶ 20, 82) (citation omitted).

In 2019, Finland "commissioned a systematic review of the effectiveness and safety of medicalized transition." Dkt. 48-1 at 16–17 (Cantor Decl. ¶ 22). It observed that "the youth who were functioning well after transition were those who were already functioning well before transition, and those who were functioning poorly before transition continued to function poorly after transition." *Id.* at 17 (¶ 22). "Medical gender reassignment is not enough to improve functioning and relieve psychiatric comorbidities among adolescents with gender dysphoria." *Id.* In 2020, Finland's "health care service ended the surgical transition of minors." *Id.* (¶ 24). Its governing body also stated that puberty blockers and cross-sex hormones could be considered "only if" a minor's transgender identity is "of a permanent nature," it "causes severe dysphoria," "other psychiatric symptoms have ceased," and "adolescent development is progressing normally," Dkt. 49-9 at 10–11 (COHERE Recommendation 9–10). Ethical considerations counseled that "no decisions should be made that can permanently alter a still-maturing minor's mental and physical development." *Id.* at 8 (COHERE Recommendation 7).

In 2019, Sweden initiated its own systematic review. Dkt. 48-1 at 18–19 (Cantor Decl. ¶ 26). Released as a peer-reviewed article in 2023, the review concluded that "long-term effects of hormone therapy on psychosocial and somatic health are unknown, except that GnRHa treatment seems to delay bone maturation and gain in bone mineral density." Dkt. 49-10 at 13 (Ludvigsson 12). According to the review, the "absence of long-term studies is worrying because many individuals start treatment as minors (<18 years) and [cross-sex hormone therapy] is lifelong." *Id.* at 11 (Ludvigsson 10). The review further observed that there were "[n]o randomized controlled trials" regarding safety and efficacy, and that existing observational studies were "limited by methodological weaknesses." *Id.* at 10–11 (Ludvigsson 9–10). After the review, Sweden adopted a

policy document deeming evidence of efficacy "insufficient and inconclusive for all reported out-comes." Dkt. 48-1 at 19–20 (Cantor Decl. ¶ 28) (citation omitted). It concluded the "risks" of medical interventions "currently outweigh the possible benefits." *Id.* (citation omitted).

In 2022, the French Académie Nationale de Médecine changed its own stance on medical interventions, saying the "greatest reserve is required" for hormones. Dkt. 48-1 at 20 (Cantor Decl. ¶ 29) (citation omitted). "[G]reat medical caution," the Académie observed, "must be taken in children and adolescents, given the vulnerability, particularly psychological, of this population and the many undesirable effects, and even serious complications, that some of the available therapies can cause." Dkt. 49-11 at 2 (Académie 1). The Académie attributed a "very important part" of the growing numbers of minors with gender dysphoria to the "addictive character of excessive con-sultation of social networks," *i.e.*, social media and peers. *Id.* at 3 (Académie 2). It advised provid-ers "to extend as much as possible the psychological support phase" of treatment. *Id.*

In 2022, Norway undertook a review as well. Dkt. 48-1 at 21 (Cantor Decl. ¶ 30). The report, released this year, deemed medical interventions for minors "experimental." *Id.* (citation omitted). It observed an 8-fold increase in the number of minors seeking treatment for gender dysphoria, particularly among young natal females. *Id.* at 22 (¶ 33). And it concluded that the "knowledge base, especially research-based knowledge for gender-affirming treatment (hormonal and surgical), is insufficient and the long-term effects are little known." *Id.* (¶ 31) (citation omit-ted). "This applies particularly to the teenage population, which accounts for a large part of the increase in referrals to the specialist health service in the last decade." *Id.* (citation omitted).

## VII.   Indiana Responds with S.E.A. 480

Consistent with growing international calls for caution, Indiana enacted S.E.A 480 in April 2023. S.E.A. 480 generally prohibits licensed medical practitioners from "knowingly provid[ing],"

or aiding and abetting another practitioner in providing, "gender transition procedures to a minor." Ind. Code § 25-1-22-13(a)–(b). "Gender transition procedures" are procedures that seek to "(1) alter or remove physical or anatomical characteristics or features that are typical for the individual's sex" or "(2) instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex," including "puberty blocking drugs, gender-transition hormone[s]," and gender-reassignment surgeries. *Id.* § 25-1-22-5(a). The term does not encompass (1) services for "a disorder or condition of sex development"; (2) services for a "physical disorder, physical injury, or physical illness" or other ailments caused by gender-transition procedures, and (3) "[m]ental health or social services." *Id.* §§ 25-1-22-5(b), 25-1-22-13(c). In S.E.A. 480, "sex" refers to "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." *Id.* § 25-1-22-12.

Separately, S.E.A. 480 prohibits state, county, and municipal health-care facilities and employees from providing gender-transition procedures. Ind. Code § 25-1-22-14. And S.E.A. 480 provides that any minor who receives gender-transition procedures in violation of the law may bring a private cause of action for compensatory damages and prospective relief. *Id.* § 25-1-22-16; *see id.* §§ 25-1-22-16 to -18. S.E.A. 480 is set to take effect on July 1, 2023, but provides a 6-month grace period for practitioners to titrate down hormones. *Id.* § 25-1-22-13(d).

## VIII.   The Lawsuit

Within hours of S.E.A. 480's signing, plaintiffs filed this lawsuit. Dkt. 1. The complaint alleges that S.E.A. 480 violates an unenumerated parental right, equal protection, a Medicaid provision and regulation, and the Affordable Care Act (ACA)'s prohibition on "sex" discrimination. *Id.* at 42–45 (¶¶ 212–23). Plaintiffs include four transgender minors and their parents; Catherine

17

Bast, a physician who provides puberty blockers and cross-sex hormones to minors; and her medical practice, Mosaic Health and Healing Arts. *Id.* at 3–4 (¶¶ 7–16).

Each minor suffers from multiple co-morbidities. K.C., a 10-year-old natal male, started claiming to be a girl "between 18 and 36 months" of age. Dkt. 48-13 at 8, 12 (N. Clawson Dep. 21:24; 37:1, 15–18). After K.C. socially transitioned before age four, K.C. was diagnosed with "TIDM, celiac disease, depression, anxiety, ADHD, dyspraxia." Dkt. 48-3 at 105 (Kenny Decl. ¶ 200). A.M., an 11-year-old male who identifies as a girl, a "dragon," and a "witch," has experienced "multiple, prolonged, severely adverse childhood events since infancy." *Id.* at 107, 110, 111 (¶¶ 204, 213, 216–17). A.M. first wanted to cut off A.M.'s penis at age 4—the age "A.M.'s father physically and sexually abused A.M. and specifically his penis"—and started puberty blockers at age 9. *Id.* at 108 (¶¶ 207–08). M.W., a 16-year-old female, socially transitioned as a boy at age 14 and takes testosterone. Dkt. 26-05 at 1, 2 (Welch Decl. ¶¶ 2, 4, 7–8). M.W. has ADD and "longstanding . . . mood disorders (depression, anxiety – both unspecified)." Dkt. 48-3 at 114–115 (Kenny Decl. ¶ 225). M.R., a 15-year-old female who identifies as male, has "a history of self-harm, isolation, depression, and poor school performance." Dkt. 48-4 at 7 (Weiss Decl. ¶ 32); *see* Dkt. 48-3 at 112 (Kenny Decl. ¶¶ 220–21). M.R. recently started taking testosterone and stopped taking anti-depressants. Dkt. 48-17 at 18, 23 (M. Rivera Dep. 61:18–23; 81:5–19).

Plaintiffs seek a preliminary injunction against enforcement of S.E.A. 480. Dkt. 27. They have submitted declarations from psychiatrists Jack Turban and Dan Karasic and pediatric endocrinologist Daniel Shumer. The State's opposition is supported by testimony from five experts: Dianna Kenny, a psychologist; James Cantor, a psychologist and neuroscientist; Kristopher Kaliebe, a psychologist; Daniel Weiss, an endocrinologist; and Paul Hruz, a pediatric endocrinologist.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking [one] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

## PLAINTIFFS DO NOT HAVE A STRONG LIKELIHOOD OF SUCCESS

### I.     Plaintiffs Lack Standing to Challenge S.E.A. 480's Surgical Restrictions

Plaintiffs lack standing to challenge S.E.A. 480's restrictions on surgeries for minors. Standing requires an "injury in fact" that is "fairly traceable to the challenged action" and "likely to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). It must be demonstrated for "each form of relief" sought. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Here, however, no plaintiff has "concrete plans" for surgery before age 18. *Lujan*, 504 U.S. at 564; *see* Dkt. 48-13 at 19 (N. Clawson Dep. 66:20–24); Dkt. 48-14 at 14 (Morris Dep. 47:23–48:8); Dkt. 48-17 at 21 (M. Rivera Dep. 75:23–76:7); Dkt. 48-15 at 22 (R. Welch Dep. 80:4–10); Dkt. 48-16 at 26 (L. Welch Dep. 95:19–96:2). And no one in Indiana provides, or plans to provide, surgeries to minors. Dkt. 51 at 4 (Stip. of Facts ¶ 14); Dkt. 48-8 at 26 (Mosaic Dep. 93:8–10, 94:6–8); Dkt. 48-7 at 10, 13 (Eskenazi Dep. 32:2–4, 42:21–43:6); Dkt. 48-6 at 12 (Riley Dep. 38:23–24). No redressable injury is traceable to S.E.A. 480.

### II.     Substantive Due Process Does Not Protect a Right to Gender-Transition Procedures

#### A.     No right to gender-transition procedures exists

Plaintiffs' claims fail on the merits as well. Substantive due process does not confer on anyone a fundamental right to obtain gender-transition procedures or subject children to risky illegal procedures. To determine whether the Fourteenth Amendment confers an unwritten right, a court must "careful[ly] describ[e]" the right and ask whether "objectiv[e]" evidence shows it to be

19

so "deeply rooted in this Nation's history and tradition" such that "neither liberty nor justice would exist" without it. *Washington v. Glucksberg*, 521 U.S. 702, 703, 720–21 (1997) (citation omitted). That careful, objective analysis is essential to "guard against the natural human tendency to confuse what the Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2247 (2022).

Plaintiffs offer no evidence that parents have a historical right to obtain for minors puberty blockers, cross-sex hormones, and gender-transition surgeries. Plaintiffs instead invoke a generic "right of parents . . . to make decisions concerning the care of their children." Mem. 24. In describing a putative right, however, courts must "avoid[] sweeping abstractions and generalities." *Doe v. City of Lafayette*, 377 F.3d 757, 769 (7th Cir. 2004) (en banc); *see Hanson v. Dane Cnty.*, 608 F.3d 335, 338–39 (7th Cir. 2010); *Khan v. Gallitano*, 180 F.3d 829, 833–34 (7th Cir. 1999). The question here is not whether parents have a right to choose among otherwise lawful treatment options but whether they have a right to override legislative judgments that the specific gender-transition procedures sought are too risky, unproven, and invasive to be offered to any minor.

Plaintiffs offer no objective, historical evidence of such a potent right. The decisions they cite (Mem. 24) are "very, very far afield," addressing parents' rights to "send children to religious school," parents' rights "to have children receive German language instruction," or the procedural process due a juvenile before voluntary commitment to a mental-health institution. *Dobbs*, 142 S. Ct. at 2268. None holds that parents can demand access to treatments that physicians may not lawfully provide to minors. As even plaintiffs' own authority recognizes, "[p]arents . . . in no sense have an absolute right" to demand whatever treatments they wish. *Parham v. J.R.*, 442 U.S. 584, 603–604 (1979). Because children lack "capacity to take care of themselves," *Schall v. Martin*, 467 U.S. 253, 265 (1984), parents may choose among otherwise *lawful* options for them.

At bottom, a parent's right "to make decisions for his daughter [is] no greater than his rights to make medical decisions for himself." *Doe ex rel. Doe v. Pub. Health Tr. of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983); *cf. Whalen v. Roe*, 429 U.S. 589, 603–04 (1977) (explaining a "doctor['s] claim" to prescribe drugs "is derivative from, and therefore no stronger than, the patients'" claim to "acquire and to use" drugs). That makes sense: Parents otherwise could demand for their children all sorts of "treatments" that they could not demand for themselves—unapproved vaccines, experimental therapies, medical marijuana, abortions, etc. Children, however, do not have greater rights than adults. Plaintiffs thus cannot show that parents have a right to access gender-transitioning procedures for minors without showing that adults have a right to access them.

Again, plaintiffs fail to make that showing. Only in a footnote do plaintiffs contend that adults have a "right to be free of state intrusions into . . . bodily security." Mem. 26 n.14 (citation omitted). But a right to *refuse* unwanted medical care is different from a right to "affirmative *access*." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 711 n.19 (D.C. Cir. 2007) (en banc); *see Dobbs*, 142 S. Ct. at 2257–58 (distinguishing between a right to abortion and a "right in certain circumstances not to undergo involuntary surgery, forced administration of drugs, or other substantially similar procedures"); *Glucksberg*, 521 U.S. at 723 (distinguishing between a "right to refuse lifesaving hydration and nutrition" and a "right to commit suicide" with physician "assistance") (citation omitted)). And the interventions plaintiffs seek are "decidedly modern." *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017).

Courts have rejected a litany of claims that persons have a right to obtain drugs and procedures even where those interventions are purportedly necessary "to preserve bodily integrity, avoid intolerable pain, and preserve life." *Raich v. Gonzales*, 500 F.3d 850, 864–66 (9th Cir. 2007) (no right to medical marijuana); *see Dobbs*, 142 S. Ct. at 2242–43 (no right to abortion); *Glucksberg*,

521 U.S. at 722–36 (no right to physician-assisted suicide); *Morrissey*, 871 F.3d at 1269 (11th Cir.

2017) (no right "to procreate via an IVF process" involving an "unrelated third-party egg donor");

*Abigail All.*, 495 F.3d at 711 (no "right to procure and use experimental drugs"); *Rutherford v.*

*United States*, 616 F.2d 455, 456 (10th Cir. 1980) (no right for "terminally ill cancer patients" to

"take whatever treatment they wished regardless of whether the FDA regarded the medication as

'effective' or 'safe'"). Mere physician belief that a procedure is necessary—be it abortion or gen-

der-transition procedures—does not make it a right. *See Dobbs*, 142 S. Ct. at 2267.

**B.    S.E.A. 480's restrictions on subjecting vulnerable minors to unproven, harm-
ful, and irreversible procedures satisfies any level of scrutiny**

In the absence of a fundamental right to gender-transitioning procedures, "rational-basis

review is the appropriate standard." *Dobbs*, 142 S. Ct. at 2283. S.E.A. 480, "like other health and

welfare laws, is entitled to a 'strong presumption of validity.'" *Id.* at 2284 (citation omitted). "It

must be sustained if there is a rational basis on which the legislature could have thought that it

would serve legitimate state interests." *Id.* Even if heightened scrutiny were applied, however,

"compelling" state interests in "safeguarding the physical and psychological wellbeing of a mi-

nor," *New York v. Ferber*, 458 U.S. 747, 756–57 (1982), and "regulating the medical profession"

would justify S.E.A. 480's restrictions on unproven procedures, *Gonzales v. Carhart*, 550 U.S.

124, 157 (2007). The "normal rule [is] that courts defer to the judgments of legislatures 'in areas

fraught with medical and scientific uncertainties.'" *Dobbs*, 142 S. Ct. at 2268 (citation omitted).

1.    Contrary to plaintiffs' claims, gender-transition procedures are not "safe." Mem.

20, 23, 25. Even when properly administered to prevent *premature* puberty, GnRH analogues carry

risks. They "may cause hot flashes, weight gain, fatigue," "mood alterations," and increased brain

pressure capable of causing "headache[s] and loss of eyesight." Dkt. 48-4 at 20 (Weiss Decl. ¶¶

90-93); *see* Dkt. 48-2 at 25, 36 (Hruz Decl. ¶¶ 43, 61). Psychiatric effects, including suicidality,

are possible too. Dkt. 48-1 at 103 (Cantor Decl. ¶ 220). And administering GnRH analogues to prevent *normal* puberty is a different use of unproven safety. Dkt. 48-2 at 46–47 (Hruz Decl. ¶ 80). To date, "no controlled trials . . . prove the safety" of using GnRH analogues to treat gender dysphoria in minors with normal puberty. Dkt. 48-4 at 20 (Weiss Decl. ¶ 89). Risks to interrupting normal puberty include depressed stature, lower bone density, inability to orgasm, increased risk of cardiovascular disease, and detrimental impact on brain maturation. Dkt. 48-2 at 35–38 (Hruz Decl. ¶¶ 61–66); Dkt. 48-1 at 99–103 (Cantor Decl. ¶¶ 207–213, 215–21). And even if a minor stops puberty blockers, the minor will be developmentally behind—and suffer repercussions. Dkt. 48-1 at 106–109 (Cantor Decl. ¶¶ 230–236); Dkt. 48-2 at 37 (Hruz Decl. ¶ 63).

Exposing minors to cross-sex hormones multiplies the risks. As plaintiffs' Dr. Turban admits, continued exposure causes "more permanent" changes. Dkt. 48-11 at 18 (Turban Dep. 61:6–15). No one knows whether adolescents will be fertile if "immature gonads" are exposed to cross-sex hormones. Dkt. 48-2 at 44 (Hruz Decl. ¶ 77); *see id.* at 38–39, 44–45 (¶¶ 67, 78). Even "advocates of transgender hormone therapy" recognize "that hormonal treatment impairs fertility, which may be irreversible." *Id.* at 44 (¶ 77). Those effects set the stage for profound regret for minors who later detransition. *See* pp. 13–14, *supra*. "Other potential adverse effects include disfiguring acne, high blood pressure, weight gain, abnormal glucose tolerance, breast cancer, liver disease, thrombosis," "cardiovascular disease," "lower bone density," and "thromboembolic stroke." Dkt. 48-2 at 45–46 (Hruz Decl. ¶ 79); *see* Dkt. 48-4 at 23–25 (Weiss Decl. ¶¶ 109–25). When natal females take testosterone, "breast cancer onset is 20 years earlier than expected," the risk of heart attacks is 3.5 times greater, and the risk of strokes is doubled. Dkt. 48-4 at 24 (Weiss Decl. ¶¶ 115, 117–18). Natal males taking estrogen experience a "22-fold increase in the rate of breast cancer" and a "36-fold higher risk of strokes." *Id.* at 24–25 (¶¶ 119–23).

The risks associated with gender-transition surgeries are greater still. Operations in which surgeons castrate young boys and cut out ovaries in girls cause permanent loss of fertility and the ability to orgasm, among other risks. Dkt. 48-1 at 99, 101 (Cantor Decl. ¶¶ 207, 214). Should a minor later detransition, the psychological impact can be devastating. *See* pp. 13–14, *supra*. Similar risks accompany breast removal, which permanently prevents the breastfeeding of babies. Dkt. 48-1 at 98–99 (Cantor Decl. ¶ 206). Additionally, "[b]etween 15–38% of children who undergo mastectomies require additional surgeries." Dkt. 48-4 at 25 (Weiss Decl. ¶ 128). "Up to a third have post-operative complications," including "excessive scarring, pain and swelling from blood or fluid buildup, wound dehiscence (opening up where the surgical incisions were sewn together), and nipple necrosis (death of the nipple tissue)." *Id.* Among adults who have had sex reassignment surgery, the "overall mortality" rate is "three times higher" than the general population and the suicide rate is "19 times higher." Dkt. 48-3 at 72 (Kenny Decl. ¶ 137). Indeed, Riley already enforces a rigid policy forbidding gender-transition surgery on minors and forbidding its physicians from conducting such surgeries even in other facilities. Dkt. 48-6 at 12–13 (Riley Dep. 39:8–11, 42:20–24). Riley has "looked many places across the country" and "the sort of accepted standard is that children" must be "the age of consent for surgical intervention." *Id.* at 13 (44:2–7).

The need to protect minors from risky procedures with irreversible effects is particularly compelling considering their vulnerability. Minors with gender dysphoria "typically also have a mix of anxiety, depression, self-harm, personality disorders, neurodevelopmental disorders, and trauma-related symptoms." Dkt. 48-5 at 69 (Kaliebe Decl. ¶ 190). A child's gender expression can be a product of trauma or comorbidities "rather than an intrinsic identity." *Id.* at 62 (¶ 171). Increasingly, peers and social media appear to be prompting vulnerable teens to identity as transgender. *See* pp. 4–6, *supra*. Compounding the problem, minors do not have the "maturity,

24

experience, or capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602; *see* Dkt. 48-5 at 40 (Kaliebe Decl. ¶¶ 107–08) (observing brains develop through age 20). Young children cannot understand what it means to permanently give up fertility, breastfeeding, or normal sexual development. Dkt. 48-1 at 98-99, 108 (Cantor Decl. ¶¶ 206, 234). S.E.A. 480 undoubtedly serves to protect minors from risky, irreversible procedures.

2.      With no test for gender dysphoria and no reliable way to know whether it will resolve without lifechanging medical interventions, the State has no less restrictive means to advance its interests. There is "no means of either falsifying or verifying" gender identity. Dkt. 48-1 at 52 (Cantor Decl. ¶ 104); *see* Dkt. 48-10 at 9, 11 (Shumer Dep. 27:1–5, 33:14–15); Dkt. 48-11 at 8 (Turban Dep. 24:1–6); Dkt. 48-8 at 15 (Mosaic Dep. 51:5–6). And plaintiffs' own witnesses admit that "gender identity may evolve over time," Dkt. 26-2 at 6-7 (Shumer Decl. ¶ 28); *see* Dkt. 48-8 at 13 (Mosaic Dep. 44:13–15, 46:14–25) (agreeing that "gender identity change[s] over time"). Indeed, while no studies examine adolescent onset gender dysphoria, research consistently finds that up to 88% of gender dysphoric children will desist. Dkt. 48-1 at 59 (Cantor Decl. ¶ 115). There is, however, no "reliable procedure for discerning which children . . . will persist." *Id.* at 61 (¶ 122); *see id.* at 62–63, 118–22 (¶¶ 123–24, 265–71). As the Endocrine Society admits, "we cannot predict the psychosexual outcome for any specific child." Dkt. 49-1 at 9 (Hembree 3876).

Nor does reliable evidence show that gender-transition procedures will benefit *any* minor. No randomized controlled trials—the "gold standard" for medical research—have examined those procedures. Dkt. 48-1 at 28, 30 (Cantor Decl. ¶¶ 44, 52). The only studies available cannot establish that puberty blockers and hormones—as opposed to uncontrolled variables, such as psychotherapy, counseling, or simple maturity—cause any improvements. *Id.* (¶¶ 44, 52); Dkt. 49-10 at 11 (Ludvigsson 10); *see* Dkt. 48-11 at 34 (Turban Dep. 126:3–7) (admitting "[n]o single study can

draw causal inferences"). Available studies are so methodologically weak that they cannot support subjecting minors to procedures "fraught with extensive and irreversible consequences." Dkt. 48-1 at 19 (Cantor Decl. ¶ 27) (citation omitted); *see id.* at 14–23, 38–46 (¶¶ 16–36, 74–86).

The methodological weaknesses in the individual studies cited by plaintiffs' experts are documented in the European reviews, the expert declarations, and the depositions. Dkt. 48-1 at 14–23, 38–46, 115–31 (¶¶ 16–36, 74–86, 257–99); Dkt. 48-5 at 67–68 (Kaliebe Decl. ¶¶ 184–85); Dkt. 48-11 at 18–53 (Turban Dep. 64:7–203:21); Dkt. 49-5 at 46–47 (NICE GnRH Review 45–46); Dkt. 49-6 at 48–51 (NICE Hormone Review 47–50); Dkt. 49-10 at 11 (Ludvigsson 10); Dkt. 49-8 (COHERE Summary). Several features deserve particular attention.

First, the first study on puberty blockers dates from 2011 and the first study on cross-sex hormones dates from 2014—both of which examined patients under the Dutch protocol, not the newer, riskier approach plaintiffs endorse. Dkt. 48-1 at 39, 90 (Cantor Decl. ¶¶ 76, 186–87). No papers examine genital surgery for adolescents. Dkt. 48-11 at 50 (Turban Dep. 189:10–24). And the literature on chest surgeries is "at the level of more case series qualitative data," *e.g.*, interviews with select patients. *Id.* at 49 (188:14–22).

Second, study participants do not reflect a random sample of gender dysphoric youth but a carefully selected population. Dkt. 48-1 at 36 (Cantor Decl. ¶ 68); *see* Dkt. 48-11 at 23, 27 (Turban Dep. 83:1–2, 84:4–9, 99:14–18). That creates a "substantial risk of selection bias." Dkt. 49-10 at 5 (Ludvigsson 4); *see* Dkt. 48-1 at 36 (Cantor Decl. ¶ 68). No study focuses on adolescent onset gender dysphoria—the largest population today. Dkt. 48-1 at 21, 67 (Cantor Decl. ¶¶ 31, 136).

Third, all minors in the longitudinal studies received psychotherapy while receiving puberty blockers or hormones, which makes it impossible to attribute any improvements to gender-transition procedures instead of psychotherapy. *Id.* at 87 (¶ 178); Dkt. 49-10 at 5, 10 (Ludvigsson

4, 9). Turban's cross-sectional studies—based on biased survey data—did not control for professional mental-health interventions either. Dkt. 48-11 at 25, 43 (Turban Dep. 91:5–18, 163:4–13).

Fourth, results even with those favorable conditions are mixed. Several studies have found very little to no improvement. Dkt. 48-1 at 88–90, 92–94 (Cantor Decl. ¶¶ 182–85, 194–96); *see* Dkt. 48-11 at 25 (Turban Dep. 92:5–11) (admitting his study did "not detect a difference in the odds of lifetime or past year suicide attempts"); Dkt. 48-11 at 43 (Turban Dep. 162:2–163:3) (admitting his study detected no improvement for several categories). Indeed, one study "found *increases* in suicidal ideation (from 25% to 38%), attempts (from 2% to 5%), and non-suicidal self-injury (10% to 17%)." Dkt. 48-1 at 73 (Cantor Decl. ¶ 150). Turban's study reported *increased* binge drinking and substance abuse. Dkt. 48-11 at 43 (Turban Dep. 162:2–163:3). And yet another proposed to examine suicidality but then did not report data after 2 of 315 participants—a "shockingly high rate"—committed suicide. Dkt. 48-1 at 72, 94–95 (Cantor Decl. ¶¶ 147, 197–98).

Fifth, no studies examine long-term outcomes for puberty blockers and cross-sex hormones. Dkt. 48-1 at 21, 46 (Cantor Decl. ¶¶ 31, 86). That omission is "worrying" due to the irreversible, "lifelong" impacts of gender-transition procedures. Dkt. 49-10 at 11 (Ludvigsson 10).

3.     Plaintiffs cite the views of "major medical associations," arguing that parents and physicians should make all decisions on whether to provide gender-transition procedures. Mem. 25–26. But "the American Medical Association" does not have the final word on what the Constitution protects. *Dobbs*, 142 S. Ct. at 2267 (citation omitted). "It is elemental that a state has broad power" to regulate "all professions concerned with health," *Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 449 (1954); *see Whalen*, 429 U.S. at 603 n.30, especially where there are "medical and scientific uncertainties," *Dobbs*, 142 S. Ct. at 2268 (citation omitted). States are not required to defer to the views of medical advocacy groups. History illustrates the need for States to make their

own evidence-based assessments. The "medical establishment" supported eugenic sterilization, lobotomies, removal of the clitoris to treat "hysteria," and mass prescription of antidepressants, minimizing or "ignoring contrary evidence." Dkt. 48-5 at 26, 27–29 (Kaliebe Decl. ¶¶ 71, 73–76). More recently, physicians "ushered in" the "American opioid epidemic." *Id.* at 30 (¶ 79).

Yet again the signs of interest group capture are apparent. Plaintiffs do not claim all the medical groups they tout undertook systematic reviews of the available literature, submitted their analysis to peer review, or put recommendations to the full membership for a vote. In fact, the opposite occurred. Some of those statements purport to be the work of "a single author," who formulated it without conducting a review. Dkt. 48-1 at 52 (Cantor Decl. ¶ 103). Others were developed by committees filled with advocates of medical interventions for transgender youth. Dkt. 48-5 at 32–33 (Kaliebe Decl. ¶¶ 85–87). And WPATH and other groups have consistently suppressed questions about puberty blockers and cross-sex hormones, even refusing to host panels on the growing European concerns regarding those procedures. *Id.* at 33–58 (¶¶ 89–150); Dkt. 48-3 at 74–75, 81–85 (Kenny Decl. ¶¶ 142–43, 155–60).

What matters is not how many interested medical organizations support a procedure but whether Indiana made a reasonable judgment in an area "fraught with medical and scientific uncertainties." *Dobbs*, 142 S. Ct. at 2268 (citation omitted). It did. As the European reviews attest, suppressing normal puberty in vulnerable minors and pumping them full of hormones to cause irreversible effects is an unproven, "experimental" treatment. Dkt. 48-1 at 21, 82–83, 117 (Cantor Decl. ¶¶ 30, 167–70, 261). Tellingly, plaintiff's own experts, when afforded the opportunity to do so, repeatedly refused to say the Europeans reviews reached "unreasonable" conclusions. Dkt. 48-10 at 43–69, (Shumer Dep. 259:11–259:18, 163:17–265:9); Dkt. 48-11 at 57 (Turban Dep. 218:8–219:13). And both Riley hospital and plaintiffs' expert Dr. Karasic reject gender-transition surgery

for those under 18 given (1) the lack of capacity of children and adolescents to consent, and (2) the permanence of surgery. Dkt. 48-6 at 9 (Riley Dep. 28:14–21); Dkt. 48-9 at 26 (Karasic Dep. 95:2–10). It is perfectly reasonable for Indiana to extend that same assessment to providing minors puberty blockers and hormones, which also have significant, even permanent, consequences.

### III.   The Equal-Protection Claims Lack Merit

#### A.   S.E.A. 480's classifications are based on age, procedure, and condition—not sex or transgender status

Plaintiffs' claims that S.E.A. 480 discriminates based on sex and transgender status lack merit. S.E.A. 480 classifies based solely on age, procedure, and condition—not sex or transgender status. A sex-based classification is one that provides for "different treatment . . . on the basis of their sex." *Frontiero v. Richardson*, 411 U.S. 677, 682–83 (1973) (quoting *Reed v. Reed*, 404 U.S. 71, 75 (1971)); *see United States v. Virginia*, 518 U.S. 515, 532 (1996). S.E.A. 480, however, does not differentiate based on sex or transgender status. Under S.E.A. 480, a physician cannot perform "any medical or surgical service" on a minor that "seeks to" "alter or remove physical or anatomical characteristics or features that are typical for the individual's sex" or "instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex." Ind. Code § 25-1-22-5(a)(1)–(2). But S.E.A. 480 does not provide different rules for males and females or for transgender patients and cisgender patients. S.E.A. 480's exemptions are instead based on age, procedure, and medical condition (*e.g.*, "disorder of sex development," "physical injury," etc.). *Id.* § 25-1-22-5(b). They encompass both sexes and all gender identities.

*Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974), confirms that condition-based classifications are not sex-based even where one group contains "only" one sex and the other contains "both sexes." It upheld a benefits statute that excluded pregnancy, a condition that "only" affects

women. *Id.*; *see Dobbs*, 142 S. Ct. at 2245–46 (applying the same reasoning to abortion, a "proce-dure that only one sex can undergo"); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) (similar). *Geduldig*'s holding applies with greater force here. S.E.A. 480 does not even create a group that exclusively consists of male, female, cisgender, or transgender minors: *No minors can obtain gender-transition procedures regardless of sex or gender identities*, subject to exceptions equally applicable to all. Plaintiffs concede that "S.E.A. 480 'does not specifically refer to transgender individuals,'" yet protest that gender-transition procedures are "only sought by transgender individuals." Mem. 30 (citation omitted). That may or may not be true, but it does not distinguish *Dobbs* or *Geduldig*, where abortion and disability benefits for pregnancy, respectively, were sought only by women.

Plaintiffs' other complaint is that S.E.A. 480 defines "sex" based on biology. Mem. 30–31. But adopting a biological definition of sex does not mean S.E.A. 480 classifies based on transgender status because both sexes "inherently contain transgender" individuals. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc). Nor is S.E.A. 480's biological definition of "sex" discriminatory. Plaintiffs' own experts agree that sex is a "bi-ological concept" distinct from gender identity. Dkt. 48-11 at 7 (Turban Dep. 19:3–18); *see* Dkt. 26-02 at 6 (Shumer Decl. ¶¶ 26–27); Dkt. 48-2 at 9 (Hruz Decl. ¶ 14); Dkt. 48-4 at 5 (Weiss Decl. ¶¶ 18–20); Dkt. 48-1 at 52–54 (Cantor Decl. ¶¶ 104–06). Similarly, Supreme Court precedent de-scribes "sex" as a "biological" characteristic. *Nguyen v. INS*, 533 U.S. 53, 73–74 (2001); *see Vir-ginia*, 518 U.S. at 533. It cannot be that simply using an accepted definition of "sex" triggers heightened scrutiny—after all, *some* definition must be used. *Cf. Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006) (applying rational-basis review to "the contours" of race); *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, 1159 (D. Haw. 1986) (similar).

**B.      S.E.A. 480 does not engage in impermissible sex stereotyping**

Plaintiffs also contend S.E.A. 480 engages in impermissible sex stereotyping by forbidding procedures that seek to "instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex" yet allowing the "exact same medical treatments" when they would instill characteristics consistent with a minor's sex. Mem. 28 (citation omitted). But repairing injured genitalia to restore health is not the same as destroying properly functioning genitalia for cosmetic reasons. Giving puberty blockers for central precocious puberty, an objectively verifiable disorder that can lead to stunted growth, to ensure puberty happens at the normal age is not the same as disrupting a properly functioning endocrine system to prevent normal puberty. Dkt. 48-2 at 20–24, 34–36 (Hruz Decl. ¶¶ 37–45, 61–63). And giving low doses of hormones for a few months to induce delayed puberty resulting from improperly functioning endocrine system is not the same as giving high hormone doses indefinitely to suppress a properly functioning system. *Id.* at 27–29, 38–42 (¶¶ 50–53, 68–75). The intent, effect, and method of treatment all differ.

Where, as here, medical procedures take account of basic, immutable biological differences between male and females, any differences do not prompt "heightened constitutional scrutiny." *Dobbs*, 142 S. Ct. at 2245–46; *see Bray*, 506 U.S. at 273–74. Nor can "our most basic biological differences"—such different healthy male-female genitalia and different healthy male-female responses to testosterone—be derided as "stereotypes." *Nguyen*, 533 U.S. at 73.

Indeed, *gender identity* is based on stereotypes. According to plaintiffs' experts, gender identity is an unverifiable subjective "deeply felt sense of being male, female, or another gender." Dkt. 48-9 at 9 (Karasic Dep. 25:6–9). Such feelings are developed through "interact[ions]" with "other person[s]" and "society." Dkt. 48-10 at 19 (Shumer Dep. 65:13–66:5). Stereotypes permeate gender dysphoria as well. Diagnostic questions include whether a child prefers "typical masculine

31

clothing," "games or activities stereotypically used or engaged in by the other gender," and "play-
mates of the other gender." Dkt. 49-4 at 7 (DSM-5 TR 3). The premise of plaintiffs' argument is
that a male who does not feel like other males must be the wrong sex, which denies the possibility
that males can have a wider variety of feelings and experiences than is stereotypical.

### C. *Bostock* and *Whitaker* do not support plaintiffs' argument

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), nowhere suggests equal protection
requires physicians to blind themselves to a patient's sex. That decision addressed Title VII, not
the Equal Protection Clause. It held that "discrimination based on homosexuality or transgender
status necessarily entails discrimination based on sex." *Id.* at 1747. But it did not consider what it
means to discriminate based on sex, or whether discrimination based on "sex necessarily entails
discrimination based on transgender status." *Adams*, 57 F.4th at 808–09. *Bostock*, moreover, made
clear that discrimination requires "treating [an] individual worse than others who are *similarly
situated*." 140 S. Ct. at 1740 (emphasis added). It expressly declined to hold that it would violate
Title VII to consider sex, sexual orientation, or transgender status in contexts where those charac-
teristics are relevant, such as "bathrooms, locker rooms, and dress codes." *Id.* at 1753.

That limitation is critical here. The Equal Protection Clause "is essentially a direction that
all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432, 439 (1985). It, however, does not require the sexes to be treated as "fungible" with-
out regard to "enduring" "[p]hysical differences." *Virginia*, 518 U.S. at 533 (citation omitted).
When it comes to medical procedures that involve sexual organs and sex hormones, males cannot
be compared to females because their cellular structure, anatomy, and hormone levels differ. Even
plaintiffs' treatment models recognize males and females respond differently to different sex hor-
mones. *See* Dkt. 49-3 at 118–19 (WPATH SOC-8 at S12.6); Dkt. 49-1 at 18 (Hembree 3885).

*Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), is inapposite as well. That case addressed a school bathroom policy, which placed students in separate classes "based upon the sex listed on the student's birth certificate." *Id.* at 1051. S.E.A. 480, however, does not create different categories based on sex. Moreover, in *Whitaker*, the challenged policy allegedly rested on "stereotypes" about what a teacher and other students consider culturally appropriate levels of privacy. *Id.* at 1052–53. Here, S.E.A. 480 deals with biological facts affecting sexual development and sex-differentiated responses to hormones. And in *Whitaker* the court relied heavily on the school's "arbitrary" decision to make bathroom assignments based on whatever gender is listed on a birth certificate, which may or may not reflect biology. *Id.* at 1053–54. Here, S.E.A. 480 defines sex in biological terms. *Whitaker* cannot apply without running headlong into the Supreme Court's admonition against equating "basic biological differences" with "stereotypes." *Nguyen*, 533 U.S. at 73.

### D.    Transgender status is not a protected characteristic

Showing that S.E.A. 480 classifies based on transgender status would not matter anyway. Transgender persons do not constitute a quasi-suspect class. *See Adams*, 57 F.4th at 803 n.5 ("grave doubt" that transgender constitutes a quasi-suspect class); *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (noting transgender status has never been recognized as a protected class). The Supreme Court has recognized only sex, *Craig v. Boren*, 429 U.S. 190, 197 (1976), and illegitimacy, *Mathews v. Lucas*, 427 U.S. 495, 505–06 (1976), as quasi-suspect classes. It has declined to recognize others. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 640 n.1 (1996) (sexual orientation); *Bowen v. Gilliard*, 483 U.S. 587, 601–2 (1987) (family units); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (close relatives); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441–42 (1985) (mental disability); *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312–3 (1976) (age).

Transgender status does not meet the criteria for a new protected class. It is not an obvious, "immutable characteristic determined solely by the accident of birth." *Frontiero*, 411 U.S. at 686. According to plaintiffs' experts, transgender status depends on a "person's internal sense of belonging." Dkt. 26-02 at 6 (Shumer Decl. ¶ 27). That sense of belonging cannot be objectively measured. Dkt. 48-1 at 52 (Cantor Decl. ¶ 104); Dkt. 48-10 at 9, 11 (Shumer Dep. 27:1–5, 33:14–15); Dkt. 48-11 at 8 (Turban Dep. 24:1–6). The only way to determine it is to ask a person to "tell [you]." Dkt. 48-8 at 15 (Mosaic Dep. 51:3–4); *see* Dkt. 48-10 at 9 (Shumer Dep. 28:4–16); Dkt. 48-9 at 8 (Karasic Dep. 24:15–21); Dkt. 48-11 at 7, 8 (Turban Dep. 19:13–21, 21:6–22:20). Gender identity, moreover, can—and frequently does—"evolve." Dkt. 26-02 at 6--7 (Shumer Decl. ¶ 28). Up to 88% of children with gender dysphoria eventually grow out of it. Dkt. 48-1 at 59 (Cantor Decl. ¶ 115).

Transgender minors have not been "historical[ly]" subjected to medical discrimination for no legitimate reason. *Bowen*, 483 U.S. at 602; *see City of Cleburne*, 473 U.S. at 440–41. Many medical organizations support transgender persons—and have since at least 1979. Dkt. 26-01 at 9, 17–18 (Karasic Decl. ¶¶ 34, 60). And while Indiana now restricts unproven gender-transition procedures for minors, that measure reflects genuine concern for their wellbeing and a conviction that minors should make decisions with lifelong impacts once they have obtained maturity. Progressive European countries share that same conviction. Indiana does not prevent transgender minors from accessing less risky, more beneficial treatments, such as psychotherapy.

Relatedly, transgender persons are not a politically powerless minority with "no ability to attract the attention of lawmakers." *City of Cleburne*, 473 U.S. at 445. President Biden has issued various executive orders intended to advance transgender rights. *See, e.g.*, Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021); Exec. Order No. 14,020, 86 Fed. Reg. 13,797 (Mar. 8, 2021);

Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021). An abundance of advocacy groups support transgender persons as well. *See, e.g.*, *Transgender Resources*, ABA, https://www.americanbar.org/groups/diversity/sexual_orientation/resources/transgenderrights/.

### E.   S.E.A. 480 survives any level of scrutiny

For classifications based on age, condition, and procedure, rational-basis review is proper. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83–84 (2000); *Geduldig*, 417 U.S. at 496 & n.20. Even under heightened scrutiny, S.E.A. 480 survives; its restrictions on risky, unproven, irreversible procedures for minors are "substantially related" to compelling interests in the wellbeing of minors and the medical profession. *Virginia*, 518 U.S. at 533–34; *see* pp. 22–29, *supra*.

### F.   Mosaic and Bast lack standing to assert others' claims

Mosaic and Bast lack standing to assert equal-protection claims on behalf of current and "future" patients. Mem. 27 n.11. Litigants may assert others' rights only in "limited" situations where (1) the plaintiff has a "close" relationship to the rightsholder, *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004), (2) the rightsholder faces a "hindrance" to protecting his right, *id.*, and (3) the plaintiff's interests are not "potentially in conflict" with the rightsholder's, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004).

Mosaic and Bast cannot meet those requirements. With respect to future patients, their relationship is not "close." *Kowalski*, 543 U.S. at 130–31. As the participation of three current patients in this lawsuit demonstrates, there is no genuine hindrance to patients asserting their own claims. *See id.* at 131–32. And as persons who profit from providing the gender-transition procedures that threaten patients with severe, lifelong harms, there is undoubtedly a "potential[]" conflict of interest that precludes third-party standing. *Elk Grove*, 542 U.S. at 15.

IV.     **Medicaid Does Not Safeguard a Right to Any Medical Procedure**

A.     **Medicaid does not provide a cause of action**

Plaintiffs do not have an express cause of action to enforce Medicaid but rely on § 1983. Mem. 38 n.15. Currently, the Supreme Court is considering whether any Medicaid provision is privately enforceable via § 1983 without an express cause of action. *See Talevski v. Health & Hosp. Corp. of Marion Cnty.*, No. 21-806 (U.S.) (argued Nov. 8, 2022). A ruling that an express cause of action is required would preclude plaintiffs from prevailing on their Medicaid claim.

B.     **S.E.A. 480 does not violate any Medicaid requirements**

Plaintiffs argue that S.E.A. 480 violates Medicaid by preventing them from "receiv[ing] medically necessary puberty blockers" and "hormones" for gender transitions. Mem. 36. Under Medicaid, a state plan "for medical assistance must . . . provide for making medical assistance available . . . to all [qualified] individuals." 42 U.S.C. § 1396a(a)(10)(A). Here, the term "medical assistance" means "*payment* of part or all of the cost of [certain] care and services." *Id.* § 1396d(a) (emphasis added). That definition limits a State's Medicaid obligation to "fund[ing] the cost" of eligible services. *Collins v. Hamilton*, 349 F.3d 371, 372 (7th Cir. 2003).

Plaintiffs assume that FSSA would not pay claims for GnRH analogues, testosterone, or estrogen if physicians cannot "legal[ly]" provide gender-transition procedures. Dkt. 48-8 at 39 (Mosaic Dep. 148:4–14). But S.E.A. 480 itself does not prohibit payment of claims. Nor does FSSA review diagnoses in paying claims for GnRH analogues, testosterone, and estrogen. Dkt. 51 at 13–14 (Stip. of Facts ¶¶ 96–100). Thus, nothing prevents a provider who performs gender-transition procedures from receiving Medicaid reimbursement.

C.     **Gender-transition procedures are not necessary health care**

Medicaid does not require coverage of gender-transition procedures in any event. Plaintiffs

rely (Mem. 38) on the requirement that state plans "provide for" the coverage of "early and periodic screening, diagnostic, and treatment services." 42 U.S.C. § 1396a(a)(43). Those services include "[s]uch other necessary health care, diagnostic necessary health care, diagnostic services, treatment, and other measures described in subsection (a) to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." *Id.* § 1396d(r)(5). That language imposes at least two requirements relevant here: (1) the care must be "necessary health care" and (2) it must "correct or ameliorate" a "physical" or "mental illness[]" or "condition." As discussed above, however, gender-transition procedures are risky, likely to cause irreversible damage, and have not been proven with reliable evidence to provide any benefits. *See* pp. 22–29, *supra*. That precludes them from qualifying either as "necessary health care" or care that "correct[s] or ameliorate[s] defects"

The absence of reliable evidence is particularly important in this context. Medicaid's requirements must be "unambiguous[]" to be enforceable. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Reasonable minds can disagree about whether gender-transition procedures are necessary and beneficial, so there is no statutory obligation to provide them. *See Rush v. Parham*, 625 F.2d 1150, 1157–58 (5th Cir. 1980) (permitting denial of Medicaid claim for "transsexual surgery" where it was "reasonable" to deem the surgery experimental).

### D.     S.E.A. 480 does not violate the comparability regulation

Plaintiffs argue S.E.A. 480 runs afoul of a "comparability" regulation as well. Mem. 43–46. That regulation provides: "The Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under [42 C.F.R.] §§ 444.210 and 444.200 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). There is no violation here. First, the regulation is directed to the "Medicaid agency."

It is another "payment" requirement. *Rush*, 625 F.2d at 1156 n.12. FSSA, however, has not denied or reduced any payments. Second, the regulation is triggered only if an agency denies a claim "solely because of the diagnosis, type of illness, or condition." FSSA, however, does not review diagnoses or conditions in paying claims for puberty blockers and hormones. It is in full compliance. Nor does S.E.A. 480 itself restrict gender-transition procedures based "solely" on condition; the statute relies on condition *plu*s age. *See* Ind. Code §§ 25-1-22-7, -13. Third, the regulation prohibits only "arbitrary" denials. Prohibiting risky procedures that have no proven benefits is hardly arbitrary. *See Rush*, 625 F.2d at 1158; *see also Beal v. Doe*, 432 U.S. 438, 444 (1977) (observing States have "broad discretion" to determine what assistance is "reasonable").

## V.     There Is No Affordable Care Act Violation or Preemption

### A.     S.E.A. 480 does not affect payments

The Affordable Care Act (ACA) provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Plaintiffs argue that FSSA will violate that provision if it stops "pay[ing] for A.M.'s gender-affirming care, including her puberty blockers." Mem. 36. As discussed above, however, S.E.A. 480 does not pose an obstacle to FSSA paying claims. *See* p. 36, *supra*.

### B.     The ACA does not conflict preempt S.E.A. 480

Plaintiffs alternatively argue that S.E.A. 480 conflicts with, and is preempted by, the ACA as to Mosaic and Bast. Mem. 38–39. The Court must "start with the assumption" that state police power remains intact. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). Conflict preemption requires a showing that "applying the state law would do 'major damage' to clear and

substantial federal interests." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046, 1050 (7th Cir. 2013). Impossibility preemption requires showing it is "impossible" to comply with both state and federal law. *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1678 (2019). "The possibility of impossibility [is] not enough." *Id.* Here, plaintiffs' preemption argument can apply at most to persons in Medicaid because the relevant "program or activity" is "Indiana's Medicaid program." Mem. 36. Since S.E.A. 480 does not affect payment of Medicaid benefits, however, plaintiffs cannot show that any conflict exists. It would be odd for S.E.A. 480 to apply differently to Medicaid and non-Medicaid patients. And nothing prevents providers from turning down Medicaid patients, making it possible to comply with both state and federal law.

Accepting plaintiffs' argument would permit private parties to acquire an exemption from state health and safety laws by accepting federal dollars. But treating grant conditions applicable to private parties who accept federal dollars as "law" capable of displacing state police power would create significant constitutional problems by radically expanding the spending power. It would allow the federal government to induce physicians to violate state law with impunity, even though "direct control of medical practice in the states is beyond the power of the federal government." *Linder v. United States*, 268 U.S. 5, 18 (1925); *see United States v. Doremus*, 249 U.S. 86, 93-95 (1919) (invalidating federal regulation of physicians under taxing power).

### C.     S.E.A. 480 does not require discrimination on the basis of sex

Plaintiffs' ACA claim fails on the merits as well. Citing *Whitaker*, plaintiffs argue that S.E.A. 480 discriminates based on "sex" by stereotyping transgender minors. Mem. 36–37. But that argument fails for much the same reason as plaintiffs' equal-protection argument based on *Whitaker*. First, S.E.A. 480 classifies based on age, condition, and procedure—not sex or

transgender status. *See* pp. 29–30, *supra*. Second, "transgender" discrimination cannot be conflated with "sex" discrimination. The ACA incorporates Title IX's understanding of sex. *See* 42 U.S.C. § 18116(a). When Title IX was enacted in 1972, "sex" carried a "narrow, traditional interpretation." *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085–86 (7th Cir. 1984). "[D]ictionaries defin[ed] 'sex' on the basis of biology and reproductive function," not gender identity. *Adams*, 57 F.4th at 812–13. Third, recognizing "basic biological differences" is not sex "stereotype[ing]." *Nguyen*, 533 U.S. at 73. S.E.A. 480 merely recognizes objective, biological differences between the sexes that affect medical practice. That distinguishes this case sharply from *Whitaker*, which addressed privacy expectations and birth certificates that did not necessarily correspond to sex. *See* pp. 31–33, *supra*.

Since *Whitaker*, moreover, the Supreme Court has made clear that "discrimination" requires "treating [an] individual worse than others who are *similarly situated*." *Bostock*, 140 S. Ct. at 1740 (emphasis added). When it comes to medicine affecting sexual development, hormones, and organs, however, males and females are not the same. *See* pp. 2, 7–8, 22–29, 31, *supra*. A requirement that physicians blind themselves to sex would make safely and effectively treating a variety of medical conditions, including delayed puberty, impossible. And given that plaintiffs rely on Spending Clause legislation, even a reasonable alternative construction is sufficient to defeat their theory. *See Pennhurst*, 451 U.S. at 17. *Whitaker* should not be extended to medicine. Finally, plaintiffs' own theory traffics in stereotypes when it tells minors who do not like names, clothes, toys, activities, and haircuts stereotypical of their sex that they must really be the opposite sex and must take drugs to induce physical features more "typical" of that sex.  *See* p. 32, *supra*.

## VI.     The First Amendment Does Not Protect Illegal Conduct

S.E.A. 480 prohibits an Indiana "physician or other practitioner" from knowingly "aid[ing] or abet[ting] another physician or practitioner in the provision of gender-transition procedures to a minor," Ind. Code § 25-1-22-13(b), by "tak[ing] *any action* that aids or abets another physician or practitioner," *id.* § 25-1-22-15. Bast and Mosaic argue that provision violates the First Amendment by preventing them from (1) "refer[ing]" minors out of state for gender-transition procedures and (2) "respond[ing] to inquiries" from out-of-state practitioners. Mem. 39. S.E.A. 480, however, regulates conduct and impacts speech only incidentally.

S.E.A. 480 prohibits any conduct that aids or abets a gender-transition procedure, such as driving a minor to another physician's office for one or assisting with a surgery. S.E.A. 480 impacts speech only to the extent it plays "an integral part of conduct in violation of a valid . . . statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). Under the Constitution, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 691; *see Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (collecting cases). The First Amendment "does not necessarily pose a bar to liability for aiding and abetting a crime, even when such aiding and abetting takes the form of the spoken or written word." *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 244 (4th Cir. 1997); *see Virginia v. Hicks*, 539 U.S. 113, 124 (2003) (an overbreadth challenge "[r]arely, if ever, will . . . succeed against a law . . . not specifically addressed to speech"). And here, the stakes are even lower because S.E.A. 480 is a civil statute.

S.E.A. 480 bears no resemblance to the restriction on advertisements in *Bigelow v. Virginia*, 421 U.S. 809, 811 (1975). It applies not to advertisements but *specific* actions, whether

taking the form of speech or conduct. Not everything prohibited is speech, so the law does not target speech. *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 865 (11th Cir. 2020).

Indiana's "compelling interest in protecting the physical and psychological well-being of minors" justifies S.E.A. 480 regardless. *Sable Commc'ns of Cal. v. F.C.C.*, 492 U.S. 115, 126 (1989). Allowing physicians to knowingly assist minors with obtaining harmful gender-transition procedures would undermine the law's protections. And no lesser restriction would suffice. The policies of Riley Hospital for Children confirm this point. Riley not only prohibits its own staff from performing gender-transition surgeries but prohibits them from referring patients to other providers for such surgery to protect the integrity of its policy. Dkt. 48-6 at 15–16 (Riley Dep. 52:14–24, 53:5–8). S.E.A. 480 is no different.[1]

## PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

In arguing irreparable harm, Mem. 42–43, plaintiffs focus on purported—and unproven—benefits while ignoring substantial risks that accompany puberty blockers and cross-sex hormones. They prioritize short-term experience with those drugs over long-term risks for cancer, stroke, and many other conditions. And they neglect the possibility that immature youth will later regret permanent changes to their voices or reproductive capacity, among other long-term consequences.

Plaintiffs fear that "*untreated* adolescent gender dysphoria" will harm minors. Dkt. 26-3 at 11 (Turban Decl. ¶ 22) (emphasis added); *see* Mem. 42. But no one proposes doing nothing for troubled youth. Psychosocial support and psychotherapy have been used in treating gender dysphoric patients for years, especially by the Dutch, with articles reporting beneficial results. Dkt. 48-1 at 87–88, 90-94 (Cantor Decl. ¶¶ 178–79, 188–96); *see* Dkt. 48-4 at 7 (Weiss Decl. ¶ 26);

---

[1] Under HIPAA regulations, "an individual has a right of access to inspect and obtain a copy of protected health information about the individual." 45 C.F.R. § 164.524(a)(1). S.E.A. 480 does not interfere with that right of access.

Dkt. 48-5 at 57–58, 70 (Kaliebe Decl. ¶¶ 150, 195). Several European authorities "now endorse psychotherapy as the treatment of choice for minors." Dkt. 48-1 at 14 (Cantor Decl. ¶ 16). Additionally, psychotherapy is a "[t]ime-tested" and "effective" approach for treating co-morbidities frequently occurring in minors with gender dysphoria —such as the minors in this case—"including the full range of anxiety disorders, depressive and mood disorders, disturbed anger, sleep disturbance and trauma reactions," Dkt. 48-5 at 57–58 (Kaliebe Decl. ¶ 150); *see id.* at 67 (¶ 184).

Even plaintiffs' experts agree that "psychotherapy" is "very valuable for a lot of people" with gender dysphoria. Dkt. 48-9 at 22 (Karasic Dep. 76:18–24); *see* Dkt. 48-11 at 59–60 (Turban Dep. 228:16–229:1) (admitting psychotherapy "helped" patients with co-morbidities). Plaintiffs' experts denigrate not professional psychotherapy but nebulously defined "conversion efforts" or "conversion therapy." Dkt. 48-5 at 59, 60 (Kaliebe Decl. ¶¶ 155, 160); *see* Dkt. 48-11 at 60, 62–63 (Turban Dep. 229:2–7, 238:8–241:22). And they admit those efforts have not been proven to "caus[e]" *worse* mental health. Dkt. 48-11 at 62 (Turban Dep. 237:21–238:2). So, "no empirical basis" justifies a rush to "prioritiz[e] hazardous medical treatment" over psychotherapy, which may also lead to other problems going "untreated." Dkt. 48-5 at 67–68 (Kaliebe Decl. ¶ 185).

Plaintiffs' records illustrate the need for caution. Plaintiffs' Dr. Turban estimated that diagnosing a "simple case" of gender dysphoria would involve "maybe five or six sessions over a few months. Very complicated cases . . . go for a year or longer." Dkt. 48-11 at 13 (Turban Dep. 41:13–20). Diagnoses here were made far more quickly. *See, e.g.*, Dkt. 48-17 at 12 (M. Rivera Dep. 38:1–6; 40:8) (M.R. diagnosed after "ten, 11 days")); Dkt. 48-15 at 13 (R. Welch Dep. 43:6–13) (M.W. diagnosed "at the first appointment"). And the minors' cases are anything but "simple." "All" have "multiple comorbidities including anxiety, depression, and self-harm behavior." Dkt. 48-4 at 8 (Weiss Decl. ¶ 28). One "had been physically and sexually abused by the biologic father."

43

*Id.* (¶ 29); Dkt. 48-3 at 107–108 (Kenny Decl. ¶ 205). At least two are still trying to figure out their sexual orientation. Dkt. 48-3 at 112–113 (Kenny Decl. ¶ 221–22). Yet M.R.'s mother decided even "before the appointment" that "we wanted to start [hormone therapy]"—and Bast obliged. Dkt. 48-17 at 15, 18 (M. Rivera Dep. at 51:22–23; 61:18–19). And then Bast permitted M.R. to reject further treatment for depression. *Id.* at 21–22 (76:21–25; 77:1–14).

Plaintiffs raise the specter of suicidality, but Dr. Karasic conceded he would "recommend psychotherapy" before medical intervention for patients with "suicidal ideation." Dkt. 48-9 at 22 (Karasic Dep. at 78:23–25, 79:1–16). And one study correlates cross-sex hormones with *increased* risk of suicide among gender dysphoric youth. *See* Dkt. 48-1 at 72–73 (Cantor Decl. ¶¶ 146–150).

## PUBLIC POLICY AND THE BALANCE OF EQUITIES PRECLUDE RELIEF

The equities and public interest militate against a preliminary injunction. Enjoining the State from "effectuating statutes enacted by representatives of its people" would "irreparabl[ly] injur[e]" it. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Although young people and their parents might sincerely believe blockers and hormones are the answer for extensive mental-health problems, science provides no evidence of long-term benefit and ample evidence of risk. *See* pp. 22–29, *supra*. As detransition stories illustrate, these minors may come to regret profoundly irreversible changes to their still-maturing bodies. *See* pp. 13–14, *supra*.

## SCOPE OF RELIEF[2]

To the extent that the Court determines the requirements for injunctive relief are met, any relief must be "no greater than necessary to protect the rights of the prevailing litigants." *Doe v. Rokita*, 54 F.4th 518, 519 (7th Cir. 2022). Where a "case has not been certified as a class action,"

---

[2] When the Court ordered plaintiffs to show cause as to why class-certification briefing should not be stayed, it recognized scope of relief would be addressed in the "ongoing briefing" on the preliminary-injunction motion. Dtk. 41 at 3. It did not "address the appropriate scope of preliminary injunctive relief." *Id.*; *see* Dkt. 42 at 2 (recognizing that defendants may still argue "facial relief is inappropriate"). This is defendants' first opportunity to address the issue.

courts are limited to granting relief to the named plaintiffs. *Id.*; *see Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) ("no court may . . . purport to enjoin the challenged 'laws themselves'") (citation omitted)). Enjoining a statute's application to "strangers to the suit" would "raise serious questions" under equity and Article III. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in grant of stay); *see Doe*, 54 F.4th at 519. And it would create an "end run around the rules governing class certification." *Kane v. De Blasio*, 19 F.4th 152, 173–74 (2d Cir. 2021). So while *Mulholland v. Marion County Election Board*, 746 F.3d 811 (7th Cir. 2014), stated that a *final declaratory judgment* of facial invalidity means a statute would be unconstitutional "as to all," it reaffirmed that the *injunction* there reached "only *the parties before*" the court. *Id.* at 819 (emphasis added). And a facial declaration will require plaintiffs to "establish that no set of circumstances exists under which [S.E.A. 480] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Yet even under plaintiffs' standard of care, blockers, cross-sex hormones, and surgeries are not always appropriate. Dkt. 48-9 at 22 (Karasic Dep. 77:25–79:16); Dkt. 48-11 at 12, 18, 48 (Turban Dep. 37:24–39:9, 62:21–63:6, 183:1–25). Accordingly, S.E.A. 480 is valid at least *sometimes*.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

Office of the Indiana Attorney General                    Respectfully submitted,
IGC-South, Fifth Floor
302 West Washington Street                                Theodore E. Rokita
Indianapolis, Indiana 46204-2770                          Indiana Attorney General
Telephone: (317) 232-6255
Fax: (317) 232-7979                              By:      Thomas M. Fisher
Email: Tom.Fisher@atg.in.gov                              Solicitor General

                                                          James A. Barta
                                                          Deputy Solicitor General

                                                          Corrine Youngs
                                                          Policy Director and Legislative Counsel

                                                          Melinda R. Holmes
                                                          Razi S. Lane
                                                          Deputy Attorneys General

                                                          *Counsel for Defendants*