UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| K.C., *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:23-CV-595 |
| THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, *et al.*, | |
| Defendants. | |

**EXPERT REBUTTAL DECLARATION OF DAN H. KARASIC, M.D.**

I, DAN H. KARASIC, M.D., hereby declare and state as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3.      I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4.      I incorporate as part of this rebuttal declaration my opinions and qualifications set forth in the expert declaration I filed in this matter dated April 17, 2023 and filed on April 21, 2023. Since then, I have testified as an expert at trial in: *Dekker et al., v. Weida et al.*, No. 4:22-cv-325 (N.D. Fla.).

5.      As with my April 21, 2023 expert declaration, my opinions contained in this rebuttal declaration are based on: my thirty years of clinical experience as a psychiatrist treating thousands of patients with gender dysphoria, including adolescents and young adults; my knowledge of the peer-reviewed research, regarding the treatment of gender dysphoria, which

reflects advancements in the field of transgender health; my knowledge of the clinical practice guidelines for the treatment of gender dysphoria, including my work as a contributing author of the eighth edition of the World Professional Association for Transgender Health ("WPATH") *Standards of Care for the Health of Transgender and Gender Diverse People* (SOC 8); and my review of any of the materials cited herein.

6.      I submit this rebuttal declaration to respond to the expert declarations of Drs. James Cantor, Paul Hruz, Kristopher Kaliebe, Dianna Kenny, and Daniel Weiss.[1]

7.      In this rebuttal, I respond to some of the central points made in those declarations. I do not address each and every assertion made in those reports that I believe are baseless, misleading, or mischaracterizations of the evidence, as there are many. Instead, my aim is to provide an explanation of the erroneous premises upon which their conclusions are based.

## SUMMARY OF OPINIONS

8.      The State's expert witnesses' description of gender-affirming care for adolescents with gender dysphoria bears no resemblance to the prevailing treatment protocols.

9.      The State's expert witnesses offer no alternative effective treatment for adolescents with gender dysphoria.

10.     The State's expert witnesses draw inappropriate conclusions from the numbers and sex-ratios of gender clinic referrals.

11.     Some of the State's expert witnesses quarrel with the field of psychiatry and their opinions reflect their lack of experience in the field generally or with minors with gender dysphoria specifically.

---

[1] I have cited to the State's expert witnesses' respective declarations by last name and paragraph number, and to their respective deposition transcripts, where appropriate, by page and line.

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

12.     The State's expert witnesses' attempts to discredit WPATH, the WPATH Standards of Care and all of the professional groups that accept them are baseless.

13.     Gender-affirming medical care can have long-term benefits to patients.

**THE STATE'S EXPERT WITNESSES' DESCRIPTION OF GENDER-AFFIRMING CARE FOR ADOLESCENTS WITH GENDER DYSPHORIA BEARS NO RESEMBLANCE TO THE PREVAILING TREATMENT PROTOCOLS**

14.     The State's expert witnesses offer descriptions of medical care for adolescents with gender dysphoria that bear no resemblance to the widely accepted protocols for treatment articulated in WPATH Standards of Care 8 ("WPATH SOC 8"), or its predecessor WPATH Standards of Care 7 ("WPATH SOC 7"), and the Endocrine Society Guideline. Throughout their declarations, the State's experts claim that doctors who provide medical interventions to treat gender dysphoria or who evaluate adolescents in advance thereof "actively encourage" or "push" patients to be transgender, rush to provide or recommend medical interventions without sufficient psychiatric assessments, disregard other mental health and family issues that could be causing the patient distress, oppose psychotherapy, and fail to inform patients and their families of the risks associated with treatments.  (*See, e.g.*, Kaliebe, ¶ 154 (claiming that therapists "advise a patient to change a gender identity"); Weiss, ¶¶ 27, 33, 148 (claiming that clinicians "without question 'affirm' the child's self-diagnosis," "fail to address psychiatric comorbidities," provide an "assembly line" or "one size fits all" protocol, and use a "perfunctory" informed consent process)). None of that is accurate.

15.     The State's experts call this "affirmative care" (Kaliebe, ¶ 22; Kenny, ¶ 158), implying that it is an accepted mode of treatment, but the model they describe is completely at odds with the WPATH SOC 7, WPATH SOC 8, and the Endocrine Society Guideline:

3

a. Under the WPATH SOC 7, WPATH SOC 8, and Endocrine Society Guideline, care for transgender youth that is described as "affirming" or "gender affirming" does not mean steering them in any particular direction, but rather supporting them through their period of exploration of gender expression and increasing self-awareness of their identity. (Coleman, et al., 2012, at 18; Ehrensaft, 2017).

b. The protocols provide that before any medical or surgical interventions are provided to adolescents, a careful mental health assessment should be conducted to ascertain whether the diagnostic criteria for Gender Dysphoria in Adolescents and Adults are met and the appropriateness of such care for the patient. (Coleman, et al., 2022, at S50; Hembree, et al., 2017, at 3877).

c. The protocols provide that clinicians should ensure that any psychiatric conditions are appropriately addressed and that it is important that mental health care is available to patients before, during, and sometimes after transitioning. (Coleman, et al., 2022 at S256-7; Hembree, et al., 2017, at 3876, 3879).

d. The protocols provide for a rigorous informed consent process that includes informing the patient and their parents of side effects of treatment, including the potential loss of fertility. For hormone therapy, in addition to requiring the parents' informed consent, the adolescent must have "sufficient mental capacity . . . to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent." (Hembree, et al., 2017, at 3878).

4

16.     In sum, the State's experts create a straw man by providing a false description of care under the prevailing protocols and then attacking it. None of the State's expert witnesses point to any examples of this happening, or even citations to literature, but rather rely on their own deliberate misreading of existing protocols and Internet sources. Indeed, Dr. Kaliebe admitted in his deposition that his example of a rush to affirmation in the face of acute traumatic events was just a hypothetical, not based on any real case or patient. (*Compare* Kaliebe, ¶ 153 ("Is it, for example, sensible, compassionate, or good medical practice to, for instance, soon after a sexual assault, automatically agree with a teen's new self-assigned gender label?") *with* Kaliebe Dep. 179:11 – 180:3 ("Well, that is, that particular vignette would be a hypothetical.")). The State's expert witnesses' either misunderstand the prevailing protocols or assume, without basis, that all or most gender clinics or clinicians providing care to minors with gender dysphoria disregard them.

17.     As a clinician who, unlike the State's experts, actively works and consults with clinicians providing care to transgender youth and adults on a regular basis, I know firsthand that their characterization of treatment is wholly inconsistent with the prevailing practice in the United States. If there are individual doctors who deviate from the accepted protocols and inappropriately provide care that is harmful to patients, medical licensing boards can address that without denying care to those who have been appropriately assessed and determined to need it. The reality, in my experience, is that the majority of adolescents and young adults with gender dysphoria experience significant barriers to diagnosis and treatment—the opposite of the problem the State's expert witnesses suggest.

18.     The WPATH SOC 8 explicitly recommends psychotherapy for the treatment of adolescents with gender dysphoria stating: "We recommend health care professionals working

with gender diverse adolescents facilitate the exploration and expression of gender openly and respectfully so that no one particular identity is favored." (Coleman, et al 2022).

19.     Unlike the State's experts, I have regularly seen transgender adolescents in psychotherapy over the course of decades. The false accusations regarding my views on psychotherapy and my practice of psychotherapy bear no resemblance to reality.

20.     It would be unethical for any clinician to "push" a patient to assume an identity – either a cisgender or a transgender identity. Clinicians have ethical obligations to provide appropriate medical care, and every incentive not to mis-diagnose patients with gender dysphoria if, in fact, they have a different condition. It is clear from some of the State's experts' declarations that their concern is not about the alleged lack of thorough mental health assessments or access to psychotherapy for patients; it is about categorical opposition to treatment in all cases. (*See, e.g.*, Kenny ¶¶ 141, 186 (objecting to "transgendering children and young people" and a parental failure to enforce "boundaries" around "fantasies" and describing those young people as "totally ruined as social human beings")).

## THE STATE'S EXPERT WITNESSES OFFER NO ALTERNATIVE EFFECTIVE TREATMENT FOR ADOLESCENTS WITH GENDER DYSPHORIA

21.     The State's expert witnesses disapprove of existing protocols for treating gender dysphoria in adolescents. But the alternative treatments they propose are not supported by the rigorous evidentiary standards they hold existing protocols to and in fact lack any evidence of effectiveness at all.

22.     Dr. Kaliebe claims psychotherapy can sometimes enable a return to a gender identity that matches sex assigned at birth, but offers nothing but an untested hypothesis based on the effectiveness of cognitive behavioral therapy for other, unrelated conditions. (*See* Kaliebe, ¶¶

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

167, 184). Dr. Kaliebe also asserts, without any evidence, that an alternative to gender-affirming medical care is to encourage mindfulness meditation or trauma-focused yoga. (*See* Kaliebe, ¶¶ 150, 167).

23.     Dr. Kaliebe appears to support conversion therapy while admitting that there is no evidence to support its use. (*See* Kaliebe, ¶¶ 160-161). He tries to rename it or redefine it, but mostly creates a strawman fantasy of the practice of others, and compares it to the "quality" therapy he provides. And yet, when he recommends cognitive behavioral therapy as a substitute for medical interventions for those who need them, he is without any evidence that such intervention effectively treats gender dysphoria. Cognitive behavioral therapy, as well as psychoanalytic psychotherapy, were used for decades in attempts to treat the dysphoria of gender diverse youth as part of efforts to try to make them more gender conforming. Ultimately, these practices over decades resulted in no evidence of such interventions being effective. And those of us who have treated transgender youth and adults have heard many reports from patients about both its lack of efficacy and its harms. That's why treatment with the goal of changing a person's gender identity is no longer considered ethical. (Coleman, et al., 2012, at 16; American Psychological Association, 2021). The comparison of such efforts to a purported "longstanding tradition" of mental health practitioners "get[ting] patients to accept and live comfortably with their bodies" (Kaliebe, ¶ 161) reflects a profound misunderstanding of gender dysphoria as a condition and its treatment. As a clinician who has treated transgender patients for decades, I have worked with many people who attempted conversion therapy, or who were sent to treatment designed to "cure" them of their transgender identity. These efforts were universally unsuccessful and harmful to my patients.

24.     Dr. Kenny also suggests that, as an alternative to medical interventions, health care providers can address gender dysphoria by helping patients understand that they are "pregay

children" and have "incipient fantasies, desires, and gender role performances that are not consonant with gender social roles for their natal sex." (Kenny, ¶ 241). This represents a misunderstanding of gender dysphoria and its diagnoses and treatment, as well as a conflation of gender identity and sexual orientation. If a patient's distress relates only to a sense of limitation on behaviors related to gender and they do not have a strong understanding of themselves as a different gender than that assigned to them at birth, they would not meet the criteria for diagnosis and medical treatment of gender dysphoria.

25.     Dr. Weiss—an adult endocrinologist who has never treated a minor with gender dysphoria—claims that psychotherapy can "lead to…desistance" in patients with gender dysphoria. (Weiss, ¶ 26).  Psychotherapy generally is certainly appropriate and is an aspect of care for children and adolescents with gender dysphoria.  But those types of interventions do not resolve the dysphoria and are not alternatives to medical interventions for adolescents who need them. My initial declaration discusses the harms that can result from the denial of medically indicated gender-affirming medical care. (*See* Expert Declaration of Dan. K. Karasic, MD, filed at ECF 26-1, ¶¶ 57-60).

26.     The State's experts point to "watchful waiting" as an alternative treatment approach to the existing treatment paradigms outlined in the WPATH SOC 7, WPATH SOC 8, and the Endocrine Society Guideline.  (*See* Kaliebe, ¶ 89; Kenny, ¶ 197).  While "watchful waiting" is an approach for prepubertal children followed by some clinicians, it is not an accepted approach used with adolescents. That is because, while there are studies finding that many prepubertal children diagnosed with Gender Identity Disorder (a precursor diagnosis to Gender Dysphoria in Children) identified with their sex assigned at birth at a later follow up, there is no evidence that gender

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

dysphoria that continues into adolescence is likely to desist. (DeVries, et al., 2011, Wiepjies, et al. 2018, Brik, et al., 2020).[2]

27.    There is likewise no basis for suggesting that providing gender-affirming medical care will *cause* youth with gender dysphoria who would otherwise desist to, instead, persist. This claim erroneously relies on the assertion that social transition in prepubertal children can cause their gender dysphoria to persist into adolescence. First, the fact that there is a correlation between social transition prior to puberty and persistence does not establish that social transition causes persistence of gender dysphoria. The intensity of gender dysphoria prior to puberty predicted persistence, and children with more intense dysphoria were more likely to socially transition. (Steensma, 2013). Rae, et al. (2019) found that "stronger cross-sex identification and preferences expressed by gender-nonconforming children at initial testing predicted whether they later socially transitioned." Further, whatever conclusions can be drawn from these desistance studies about the impact of gender affirmation on the persistence rates in prepubertal children, this research does not apply to adolescents with gender dysphoria, for whom desistance is rare, and the treatments banned by SEA 480 are not indicated until adolescence.

28.    The suggestion that adolescents can just wait until they are 18 years old to get care ignores the harm of not providing the care. Allowing endogenous puberty to advance is not a neutral decision. For many adolescents, the development of secondary sex characteristics that do

---

[2] Although the work of Kenneth Zucker is often cited in support of "watchful waiting," Dr. Zucker recognized the need for medical interventions for gender dysphoria in adolescence and treated adolescent patients with persistent gender dysphoria with the medical interventions now banned by Indiana. (Zucker, et al., 2010). Similarly, the Dutch researchers who coined the term "watchful waiting" for prepubertal children did the seminal research on medical interventions for those patients whose gender dysphoria persists until adolescence. (de Vries, 2011; Steensma, 2011; de Vries, 2014).

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

not match their gender identity can have a severe negative impact on their mental health and can exacerbate lifelong dysphoria because some of those characteristics are impossible to change later through surgeries. In addition, youth may suffer needlessly from untreated gender dysphoria while waiting to turn 18.

## THE STATE'S EXPERTS DRAW INAPPROPRIATE CONCLUSIONS FROM THE NUMBERS AND SEX RATIOS OF GENDER CLINIC REFERRALS

29.    The State's experts devote many pages to the increase in the numbers of referrals to gender clinics, and changes in sex ratios of patients. (*See, e.g.*, Kaliebe, ¶¶ 25-55; Kenny, ¶¶ 86-109). As an initial matter, in their caricature of doctors pushing medical transition, the State's experts say the field is ignoring and avoiding exploration of these developments. That is not the case. Indeed, the chapter on adolescents in WPATH SOC 8 specifically discusses the increase in referrals to gender clinics and the sex ratios of these young patients. (*See* WPATH SOC 8 at Chapter 6). But the State's experts draw unsupported conclusions about the rise in number of referrals and changes in sex ratios observed in some clinics. They claim this means adolescents are adopting a transgender identity due to "social contagion," leading them to undergo irreversible medical treatments they later regret. (*See, e.g.*, Kenny, ¶¶ 71-85). This conclusion is baseless.

30.    The rise in numbers of referrals is hardly surprising given the greater awareness on the part of youth and their parents of what gender dysphoria is and that care is available, as well as the significant increase in the number of clinics available to provide care. In addition, the stigma associated with being transgender, while still significant, has lessened in recent years. Coming out to parents and seeking care are options that did not exist for many youth until recently, so an increase in numbers of referrals to gender clinics is not surprising. While there is a documented

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

increase in clinic referrals, the State's experts exaggerate the increase by making inappropriate comparisons.

31.     Until the past decade, little data on the number of people identifying as transgender was available. From 2007 to 2009, a question asking whether the respondent identified as transgender was added to a large population-based health survey conducted in Massachusetts, and 0.5% of study participants identified as transgender. (Conron, et al., 2012). Since then, this question was added to large health surveys in other states, and analyses of surveys done in 2014 found that, nationally, 0.5-0.6% of adults identified as transgender, and 0.7% of youth ages 13 to 17 identified as transgender. (Crissman, et al., 2017; Flores, et al., 2016; Herman, et al., 2017).

32.     While increases in numbers and changes in sex ratios of patients referred to some gender clinics have been reported, since the number of patients referred to gender clinics reflect only a small fraction of the people identifying as transgender, these changes may reflect changes in referral patterns to clinics rather than changes in the number of people identifying as transgender.

33.     Sex ratios of patients vary from clinic to clinic and over time. When I was the psychiatrist for the Dimensions Clinic for transgender youth in San Francisco from 2003 to 2020, a consistent majority of my patients were assigned female at birth. Other clinics have had more assigned male at birth patients. The rise in numbers and percentage of patients assigned female at birth observed at some clinics in recent years is not surprising given the historical development of the study of gender dysphoria in youth. The first large American study of gender non-conforming youth was the Feminine Boy Study at UCLA. There was significant societal discomfort with and rejection of boys who departed from sex stereotypes—the director of the study referred to them as "sissy boys" in the book resulting from the study—and these boys often experienced bullying from

11

peers. In this context, boys who were perceived to be effeminate were the population brought in to psychiatrists by their parents and were the population that was initially studied by researchers. (Green, 1987). Parents were not as concerned about gender non-conforming girls as they were more socially accepted. There was also less awareness among the general public of the existence of transgender males and that transitioning was an option for individuals assigned female at birth who were experiencing gender dysphoria. The increase in awareness in recent decades made it possible for individuals who ultimately came to identify as transgender men to come out and seek care.

34.     Ultimately, the diagnostic criteria for gender dysphoria are rigorous: if there were individuals claiming a transgender identity to fit into a peer group, they would not meet the criteria for a gender dysphoria diagnosis, let alone be deemed to need medical interventions.

**SOME OF THE STATE'S EXPERT WITNESSES QUARREL WITH THE FIELD OF PSYCHIATRY AND THEIR OPINIONS REFLECT THEIR LACK OF EXPERIENCE IN THE FIELD GENERALLY OR WITH MINORS WITH GENDER DYSPHORIA SPECIFICALLY**

35.     Gender dysphoria is a psychiatric diagnosis. Some of the State's expert witnesses critique the diagnosis of gender dysphoria for being based on self-reports from patients. (*See, e.g.*, Cantor, ¶ 107 (critiquing gender identity as lacking scientific meaning because it is not "objectively measurable"); Kenny, ¶ 187 & fn. 30 (criticizing the DSM-5 based on "the absence of diagnostic tests for many of the conditions, which is unlike almost any other field of medicine, and nowhere more problematic than in the area of gender dysphoria, that overly relies on patients' subjective reports and reconstructed memories…")). But clinical interviews with patients are typically used to diagnose other DSM diagnoses and determine treatment. This widely used assessment tool is not unique to gender dysphoria.

36.    Based on their declarations and curriculum vitae, Drs. Kaliebe, Kenny, and Weiss do not appear to have a sufficient clinical basis for offering expert opinions regarding the diagnosis and treatment of gender dysphoria in children and adolescents, or the assessment and informed consent process when treating adolescents with gender dysphoria and gender affirming care. Notwithstanding their lack of qualifications, these witnesses did not hesitate to offer opinions about psychiatric care for minors diagnoses with gender dysphoria. Overall, their declarations in this regard appear to be based on a series of hypothetical assumptions about how other mental health practitioners are diagnosing minors with gender dysphoria and recommending treatment— with minimal (if any) experience doing so themselves, and without any apparent knowledge of how care is provided by others.

37.    Dr. Kaliebe has only treated approximately 13 minors with gender dysphoria. (*See* Kaliebe Dep. 35:7 – 36:11). He speculates about how other mental health practitioners are diagnosing minors with gender dysphoria and recommending treatment, again without any apparent knowledge about how care is actually provided by others. (*See, e.g.*, Kaliebe, ¶¶ 150-155 (speculating about the lack of interest in supportive psychotherapy among clinicians treating adolescents with gender dysphoria), ¶¶ 171-185 (hypothesizing about clinicians' alleged failure to consider autism, trauma, and borderline personality disorder as comorbid conditions), ¶¶ 186-189 (guessing that clinicians reduce adolescents with gender dysphoria to their gender identity to the exclusion of other aspects of self)).

38.    Rather than the picture of care the Defendants' experts paint, in my over thirty years of clinical experience working with thousands of adolescents and young adults with gender dysphoria, psychotherapy has been a central part of treating minors with gender dysphoria, as it is with many conditions; and diagnosing and treating gender dysphoria involves careful assessment,

differential diagnosis and management of comorbid conditions. Though psychotherapy can be a critical part of managing a patient's well-being, it does not treat a patient's underlying dysphoria, which stems from the incongruence between a patient's physiological sex-based characteristic and gender identity.

39.     Dr. Kenny admits that she practices "exploratory psychotherapy"—which has no evidence base—with a small population of families who reject their children's gender dysphoria diagnoses or transgender identities. (*See* Kenny, ¶ 9; Kenny Dep. 30:24 – 33:17, 34:23 – 35:10). Professor Kenny also appears to dispute gender dysphoria as a legitimate diagnosis, apparently disagreeing with the DSM-5-TR's de-pathologizing of transgender identity. (*See* Kenny, ¶ 187 ("Because the DSM-5 contends that "being transgender" is not a pathological condition, it has accordingly revised the diagnostic criteria (and name) of gender identity disorder to GD to "recognize" the clinical distress as the focus of the treatment, not the patient's transgender status per se.")).

40.     To the contrary, gender dysphoria is a legitimate diagnosis. Though being transgender is not a pathology, this change ultimately has no bearing on the diagnostic criteria for gender dysphoria outlined in the DSM. Dr. Kenny seems to offer the view that pushing people to be cisgender should be the prevailing paradigm of treatment, but as discussed above, this is neither effective nor ethical.

41.     Dr. Weiss is an adult endocrinologist and has not treated any minors with gender dysphoria. (*See* Weiss, ¶¶ 1-4, 8; Weiss Dep. 10:4-6, 112:22-113:6, 201:24-202:4). Nonetheless, Dr. Weiss did not hesitate to offer opinions about psychiatric care. (*See, e.g.*, Weiss, ¶¶ 24-26 (hypothesizing that a gender dysphoria diagnosis may be influenced by gender stereotypes or peer or social media influence and claiming that psychotherapy can "lead to…desistance" in patients

14

with gender dysphoria), ¶ 35 (claiming "With gender identity issues, open, exploratory psychotherapy or talk therapy is too often dispensed with entirely.")).

42.     Dr. Weiss reports that most of his patients with gender dysphoria stopped treatment with gender affirming hormones. He measured this claim by the fact that his patients did not continue appointments with him. But there are many reasons a patient might discontinue treatment with a provider or stop accessing hormone therapy that are unrelated to either regret or detransition. For example, there have been many barriers, including lack of insurance reimbursement, to patients following up in care. Dr. Weiss states in his deposition that many of his patients were Medicaid recipients. (*See* Weiss Dep. 72:23 – 73:2). Ohio historically excluded gender affirming care from Medicaid coverage. Even after there were some federal and state moves to expand Medicaid coverage, in 2015 the state of Ohio enacted an exclusion of gender affirming care from Ohio Medicaid.[3] Exclusions for gender affirming care also were present in many private insurance policies as well during the period Dr. Weiss provided gender-affirming care. The patients that Dr. Weiss no longer saw also had other treatment options in Ohio: Dr. Weiss reports referring patients to MetroHealth (*see* Weiss Dep. 49:15-23, 117:1-21, 118:5 – 119:8), which for over 15 years has provided a welcoming environment for gender affirming care in northern Ohio, despite Medicaid and private healthcare exclusions.[4]

---

[3] *See, e.g.*, Christy Mallory & William Tentindo, *Medicaid Coverage for Gender-Affirming Care* (Oct. 2019), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/Medicaid-Gender-Care-Oct-2019.pdf.

[4] *See* MetroHealth, Adult Transgender & Non-Binary Care, https://www.metrohealth.org/lgbtqi-pride-network/adult-transgender-non-binary-care (last visited June 5, 2023).

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

43.     Dr. Weiss states that, in addition to patients not returning to him to receive gender-affirming care, he saw two adult patients who regretted having orchiectomies, one because of sexual dysfunction.[5] The fact that some patients may regret surgical interventions in adulthood is certainly no reason to ban all treatment for adolescents. Regret for orchiectomy is rare: 0.6% over a 43 year period in the Netherlands. (Wiepjes et al, 2018).  But in any event, Dr. Weiss knows that any treatment comes with the potential for negative effects. For example, Dr. Weiss works for Eli Lilly promoting the use of Mounjaro. In Lilly's report of the data supporting the approval of Mounjaro for weight loss, over 80% of trial participants had adverse effects, 111 participants stopped Mounjaro due to adverse effects, and 7 study participants died after taking Mounjaro.[6]

**THE STATE'S EXPERT WITNESSES' ATTEMPTS TO DISCREDIT THE WPATH STANDARDS OF CARE AND ALL OF THE PROFESSIONAL GROUPS THAT ACCEPT THEM ARE BASELESS**

44.     The State's expert witnesses characterize WPATH as an ideological, non-scientific, advocacy organization, open to transgender activists outside of the health field. (*See* Kaliebe, ¶¶ 122-126; Kenny, ¶¶ 98, 147; Weiss, ¶ 40).  Many WPATH members are academics who publish in peer-reviewed journals. Many are academic leaders in endocrinology, internal medicine, plastic surgery, urology, psychiatry, psychology, and other disciplines of the health sciences. WPATH restricts its full membership to those with professional credentials and most members are licensed

---

[5] These anecdotes are not representative of the broader literature around this surgical intervention. A review of 6793 patients seen in the Dutch gender clinic over 43 years found that only 0.6% regretted having an orchiectomy  (Wiepjes et al, 2018).  Wiepjes CM, Nota NM, de Blok CJM, Klaver M, de Vries ALC, Wensing-Kruger SA, de Jongh RT, Bouman MB, Steensma TD, Cohen-Kettenis P, Gooren LJG, Kreukels BPC, den Heijer M. The Amsterdam Cohort of Gender Dysphoria Study (1972-2015): Trends in Prevalence, Treatment, and Regrets. J Sex Med. 2018 Apr;15(4):582-590. doi: 10.1016/j.jsxm.2018.01.016. Epub 2018 Feb 17. PMID: 29463477.

[6] *See* Jastreboff, A.M., et al. (2022). Tirzepatide Once Weekly for the Treatment of Obesity. N Engl J Med 2022; 387:205-216. https://www.nejm.org/doi/full/10.1056/NEJMoa2206038.

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

clinicians. The fact that WPATH engages in advocacy on behalf of its patient population for access to beneficial care is typical of medical associations. For example, the American Psychiatric Association advocates for a wide range of public policy changes to improve access to mental health care, e.g., for migrants and for incarcerated people.[7]

45.     I have been involved with WPATH for many years and have 35 years of experience treating people with mental illnesses. And there are many others like me in WPATH. Mental health providers make up the largest percentage of WPATH's membership. These mental health professionals are licensed and regulated by state licensing boards, and most provide care to both cisgender and transgender clients—including those with serious mental illness.

46.     Having been actively involved for over three decades as a UCSF professor in the training of psychiatry residents, internal medicine residents and fellows, and medical students, as well as of mental health and medical professionals at conferences around the nation, by my observation, the mainstream views of health professionals on transgender care include widespread acceptance of the WPATH Standards of Care

47.     The State's expert witnesses also argue that dissenting views are not tolerated in WPATH. (*See, e.g.*, Kaliebe, ¶¶ 123-126). I have attended several WPATH conferences since 2001, and have been a member of the Scientific Committees that have reviewed abstract

---

[7] *See* American Psychiatric Association. (2019). Position Statement on the Care of Medically Vulnerable Migrants in the United States. Available at https://www.psychiatry.org/File%20Library/About-APA/OrganizationDocuments-Policies/Policies/Position-Care-of-Medically-Vulnerable-Migrants-in-the-US.pdf; American Psychiatric Association. (2016). Position Statement on Treatment of Substance Use Disorders in the Criminal Justice System. Available at https://www.psychiatry.org/File%20Library/About-APA/Organization-DocumentsPolicies/Policies/Position-2016-Substance-Use-Disorders-in-the-Criminal-Justice-System.pdf; *see generally* American Psychiatric Association Policy Finder, available at https://www.psychiatry.org/home/policy-finder.

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

submissions for the conferences, and the diversity of views presented and discussed has always been notable. For example, as chair of the Scientific Committee for the 2017 USPATH conference, I helped organize a panel of therapists and trainees who had themselves detransitioned, and the presentations and discussion were well-received by attendees.

48.     According to the State's experts, it is not just WPATH and USPATH, but also the American Medical Association, the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, the American Psychological Association, the American Psychiatric Association, the American College of Physicians, the American Academy of Family Physicians, the Endocrine Society, and the Pediatric Endocrine Society, that act based on political ideology rather than evidence-based scientific methodologies. (*See* Kaliebe, ¶¶ 89-130; Kenny, ¶¶ 144-145; Weiss, ¶ 70).

49.     These unsupported claims that all of these major medical groups are sacrificing adolescents' health to promote a particular ideology is staggering. Nonetheless, the State's expert witnesses claim the existence of a "transactivist lobby," "transgender marketing machine," "transgender medical industry," and "transgender agenda." (*See, e.g.*, Kenny, ¶¶ 30, 115, 146, 149). Health professionals across disciplines providing medically necessary care for their gender dysphoric patients, as they do for their other patients, do not constitute a conspiracy. The suggestion that health care providers across specialties and around the world are somehow influenced by a shadow lobby of transgender activists is without basis.

**GENDER-AFFIRMING MEDICAL CARE HAS LONG-TERM BENEFITS**

50.     I have treated people ranging from adolescents to the elderly. And many of my patients have remained with me for decades, e.g., where a patient is on medications that need to

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

be monitored, and their medical transition was a positive health care decision not just in the short term but for the course of their lives.

51.     The State's expert witnesses' anecdotes and assertions regarding the incidence of regret and "detransition" are inconsistent with the data and my clinical experience. (*See* Kaliebe, ¶¶ 173, 175; Kenny, ¶¶ 125-137; Weiss, ¶¶ 136-140). A study of everyone receiving gender-affirming surgery in Sweden over 50 years (1960 to 2010) found a regret rate of 2.2.%, declining over the years. There were ten cases of regret from 1960 to 1980, and only five cases of regret total in the last 30 years that were reviewed, from 1981-2010. (Dhejne, et al., 2014). A meta-analysis of 27 studies which reported regret after gender-affirming surgery found that of 7928 people having gender-affirming surgery, the regret rate was 1%. (Bustos, et al., 2021). These experts' assertions are also at odds with my clinical experience over decades. I have had some patients who halted their transition due to challenging personal circumstances—e.g., fear of losing family support— but they still had gender dysphoria. And some came back years later to resume their transition. I have also had patients discontinue medical treatment for other reasons, including being happy with the existing changes and continuing to live and identify as transgender. But in 30 years, I have never seen a patient who had undergone hormone therapy and surgery and later came to identify with their sex assigned at birth and regret the treatment they had received.

52.     The State's expert witnesses point to elevated rates of mental health problems and substance use in the transgender community, suggesting that being transgender is the cause of these negative outcomes and, thus, something doctors should try to prevent. (*See* Cantor, ¶ 55; Kaliebe, ¶¶ 186-189; Kenny, ¶ 137; Weiss, ¶ 58). As discussed above, being transgender is not something doctors can prevent. And these comments disregard the significant stigma transgender

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

people continue to face, and stigma is a well-documented risk factor for mental health and substance use issues.

53.     Apparently in support of the unattainable goal of trying to deter people from being transgender or receiving any gender affirming medical care, the State's expert witnesses' claim that: gender affirming care comes at the expense of "not developing functional aspects [of identity], such as educational excellence, productive work skills, well-rounded leisure pursuits, and purpose and meaning through supportive communities," (Kaliebe, ¶ 189); that the "longer-term outlook for transgender adults appears bleak," (Kenny, ¶ 137); and that transgender young people who receive gender affirming care are "totally ruined as social human beings." (Kenny, ¶ 141). That may be their own views of transgender people, but it is not at all consistent with clinical experience, including my own. Many transgender people, when appropriately treated, lead fulfilling lives, forming romantic relationships and having families, and having close relationships with friends and extended family.

**RESPONSE TO CRITICISMS IN THE EXPERT DECLARATION OF JAMES CANTOR**

54.     I have reviewed the declaration from James Cantor, specifically his critique of my declaration.  (*See* Cantor, ¶¶ 272-283).  I note briefly that, contrary to Dr. Cantor's assertions, my declaration includes extensive citation to relevant research literature.  (*Compare* Cantor, ¶ 273 *with* ECF 26-1 (Exhibit B – Dan Karasic Bibliography)).  Contrary to Dr. Cantor's general critiques of the WPATH SOC 7 and SOC 8, those standards of care are based upon a rigorous and methodological approach to outline treatment recommendations, informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options, as well as expert consensus.  The rigor of that approach is confirmed, not contradicted, by the changes across

20

SOC 6, 7, and 8, as clinicians and researchers steeped in this area of medicine continually endeavor to refine the treatment recommendations based on the best currently available evidence.

55.     After lengthy criticism of literature supporting gender affirming care, which Dr. Cantor distorts through cherry-picking, Dr. Cantor uses Diaz and Bailey (2023) to draw the conclusion that the body of research supporting gender-affirming care cannot be applied to current transgender youth. Diaz and Bailey's paper has received extensive criticism, including that its first author is anonymous and did not seek the human subjects review that is a standard requirement, and that the data was obtained from parents of trans people visiting a site that is named after the phenomenon the paper purports to examine—a site that opposes gender affirming care. The second author, Dr. Bailey, is listed as an editorial board member of the journal that published the paper, despite the fact that Bailey's institutional review board at Northwestern University refused to approve the research protocol. Ultimately, Springer Nature, publisher of the journal, retracted the article, reportedly due to ethical concerns, including lack of informed consent.[8]

56.     Dr. Cantor refers to systematic reviews of the literature of gender affirming care for minors. It is important to put GRADE scores of systematic reviews in context. Only a small percentage of systematic reviews of medical interventions have a high GRADE score; for a majority of systematic reviews of medical interventions, GRADE scores are low or very low. (Fleming et al., 2016, Howick, et al., 2020). For complex interventions, for which gender affirming care certainly qualifies, no high GRADE scores were found for systematic reviews of any complex

---

[8] *See, e.g.*, Ellie Kincaid, *After backlash, publisher to retract article that surveyed parents of children with gender dysphoria, says co-author*, (May 24, 2023), https://retractionwatch.com/2023/05/24/after-backlash-publisher-to-retract-article-that-surveyed-parents-of-children-with-gender-dysphoria-says-co-author.

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.

intervention. (Movsisyan, et al., 2016). If only medical interventions with high GRADE scores were permitted by law, most medical interventions and all complex interventions would be banned.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6th day of June, 2023.

Dan H. Karasic, M.D.

22

## EXHIBIT A – DAN KARASIC BIBLIOGRAPHY

American Psychological Association. (2021). APA Resolution on Gender Identity Change Efforts. Available at https://www.apa.org/about/policy/resolution-gender-identity-changeefforts.pdf.

Bakker A., van Kesteren P. J. M., Gooren L. J. G., et al. (1993). The prevalence of transsexualism in the Netherlands. Acta Psychiatr Scand, 87(4), 237-238.

Bustos, V. P., Bustos, S. S., Mascaro, A., Del Corral, G., Forte, A. J., Ciudad, P., Kim, E. A., Langstein, H. N., & Manrique, O. J. (2021). Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence. Plastic and reconstructive surgery-Global open, 9(3), e3477, available at https://doi.org/10.1097/GOX.0000000000003477.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlberg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. International Journal of Transgender Health, 23(Suppl 1), S1–S259.

Coleman, E., Bockting, W., Botzer, M., et al. (2012). Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (7th Version). The World Professional Association for Transgender Health. Available at https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=16 13669341.

Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: results from a household probability sample of adults. Am. J. Public Health, 102(1), 118-122, available at https://doi.org/10.2105/AJPH.2011.300315.

Crissman, H. P., Berger, M. B., Graham, L. F., & Dalton, V. K. (2017). Transgender Demographics: A Household Probability Sample of US Adults, 2014. American Journal of Public Health, 107(2), 213-215, available at https://doi.org/10.2105/AJPH.2016.303571.

de Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. The journal of sexual medicine, 8(8), 2276-2283, available at https://doi.org/10.1111/j.1743-6109.2010.01943.x.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment. Pediatrics, 134(4), 696-704, available at https://doi.org/10.1542/peds.2013-2958.

Dhejne, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960-2010: prevalence, incidence, and regrets. Archives of Sexual Behavior, 43(8), 1535-1545, available at https://doi.org/10.1007/s10508-014-0300-8.

Ehrensaft, D. (2017). Gender nonconforming youth: current perspectives. Adolescent Health, Medicine and Therapeutics, 8, 57–67, available at https://doi.org/10.2147/AHMT.S110859.

Fleming PS, Koletsi D, Ioannidis JP, Pandis N. High quality of the evidence for medical and other health-related interventions was uncommon in Cochrane systematic reviews. J Clin Epidemiol. 2016 Oct;78:34-42. doi: 10.1016/j.jclinepi.2016.03.012. Epub 2016 Mar 29. PMID: 27032875.

Flores, A. R., Herman, J. L., Gates, G. J., & Brown, T. N. T. (2016). How Many Adults Identify as Transgender in the United States? The Williams Institute, available at https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/.

Green, R. (1987). The "Sissy Boy Syndrome" and the Development of Homosexuality. New Haven, CT: Yale University Press.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S., Meyer, W. J., Murad, M. H., … T'Sjoen, G. G. (2017). Endocrine treatment of genderdysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. The Journal of Clinical Endocrinology & Metabolism, 102(11), 3869-3903, available at https://doi.org/10.1210/jc.2017-01658.

Herman, J. L., Flores, A. R., Brown, T. N. T., Wilson, B. D. M., & Conron, K. J. (2017). Age of Individuals Who Identify as Transgender in the United States. The Williams Institute, available at http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf.

Howick J, Koletsi D, Pandis N, Fleming PS, Loef M, Walach H, Schmidt S, Ioannidis JPA. The quality of evidence for medical interventions does not improve or worsen: a metaepidemiological study of Cochrane reviews. J Clin Epidemiol. 2020 Oct;126:154-159. doi: 10.1016/j.jclinepi.2020.08.005. Epub 2020 Sep 2. PMID: 32890636.

Johns, M. M., Lowry, R., Andrzejewski, J., Barrios, L. C., Demissie, Z., McManus, T., Rasberry, C. N., Robin, L., & Underwood, J. M. (2019). Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students - 19 states and large urban school districts, 2017. Morbidity and Mortality Weekly Report, 68(3), 67-71, available at https://doi.org/10.15585/mmwr.mm6803a3.

Movsisyan A, Melendez-Torres GJ, Montgomery P. Outcomes in systematic reviews of complex interventions never reached "high" GRADE ratings when compared with those of simple interventions. J Clin Epidemiol. 2016 Oct;78:22-33. doi: 10.1016/j.jclinepi.2016.03.014. Epub 2016 Mar 30. PMID: 27038850.

Rae, J. R., Gülgöz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. Psychological Science, 30(5), 669–681. https://doi.org/10.1177/0956797619830649.

Rider, G. N., McMorris, B. J., Gower, A. L., Coleman, E., & Eisenberg, M. E. (2018). Health and care utilization of transgender and gender nonconforming youth: A population-based study. Pediatrics, 141(3) e20171683, available at https://doi.org/10.1542/peds.2017-1683.

Steensma T. D., Biemond R., de Boer F., & Cohen-Kettenis P. T. (2011). Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study. Clinical Child Psychology and Psychiatry, 16(4), 499-516.

Steensma, T. D., et al. (2013). Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study. Journal of the American Academy of Child & Adolescent Psychiatry, 52(6), 582-590.

Wiepjes, C. M., Nota, N. M., de Blok, C. J., Klaver, M., de Vries, A.L., Wensing-Kruger, S.A., ... & Gooren, L.J. (2018). The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets. The Journal of Sexual Medicine, 15(4), 582-590, available at https://doi.org/10.1016/j.jsxm.2018.01.016.

Zucker, K., et al. (2010). Puberty-Blocking Hormonal Therapy for Adolescents with Gender Identity Disorder: A Descriptive Clinical Study. Journal of Gay & Lesbian Mental Health, 15:1, 58-82, available at http://dx.doi.org/10.1080/19359705.2011.530574.

EXPERT REBUTTAL DECLARATION OF DR. DAN H. KARASIC, M.D.