UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | |
|---|---|
| K.C., et al, ) | |
| ) | |
| Plaintiffs, ) | Case No. |
| ) | 1:23-cv-00595-JHP-KMB |
| -vs- ) | |
| ) | |
| THE INDIVIDUAL MEMBERS OF THE ) | |
| MEDICAL LICENSING BOARD OF ) | |
| INDIANA, in their official ) | |
| capacities, et al., ) | |
| ) | |
| Defendants. ) | |


DEPOSITION OF KRISTOPHER KALIEBE, M.D.


The deposition upon oral examination of
KRISTOPHER KALIEBE, M.D., a witness produced and
sworn before Wendi Kramer Sulkoske, Notary Public in
and for the County of Boone, State of Indiana, taken
on behalf of the Plaintiff via videoconference in
Tampa, Hillsborough County, Florida on June 1, 2023,
pursuant to the Federal Rules of Civil Procedure.


CIRCLE CITY REPORTING
135 North Pennsylvania Street, Suite 1720
INDIANAPOLIS, INDIANA 46204
(317) 635-7857

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

---

**Page 2**

APPEARANCES

(Via Video Conference)

FOR PLAINTIFFS:

AMERICAN CIVIL LIBERTIES UNION
Harper Seldin
Chase Strangio
125 Broad Street
New York, New York  10004
hseldin@aclu.org
cstrangio@aclu.org

ACLU OF INDIANA
Gavin Rose
Stevie Pactor
1031 East Washington Street
Indianapolis, Indiana  46202
spactor@aclu-in.org
grose@aclu-in.org

FOR THE DEFENDANTS:

COOPER & KIRK
Peter A. Patterson
1523 New Hampshire Avenue, NW
Washington, D.C.  20036
ppatterson@cooperkirk.com

ALSO PRESENT:  Zoom Moderator, Joel Scherer
              Bailey Steinhauer, Andrew Shaw
              Charles Ferguson

EXAMINATION INDEX

|                                | Page |
|--------------------------------|------|
| EXAMINATION QUESTIONS BY MR. SELDIN | 4 |

---

**Page 3**

EXHIBIT INDEX

| Exhibit | Description | Page |
|---------|-------------|------|
| Exhibit 1 | Dr. Kaliebe Declaration | 6 |
| Exhibit 3 | Dr. Kaliebe Expert Report | 7 |
| Exhibit 4 | Dr. Kaliebe Expert Report | 8 |
| Exhibit 5 | Dr. Kaliebe Deposition | 10 |
| Exhibit 6 | Plaintiff Memorandum of Law in Support of Motion to Exclude Expert Testimony of Dr. Kaliebe | 15 |
| Exhibit 7 | Dr. Kaliebe Decker Testimony | 13 |
| Exhibit 8 | Zero To Three Article | 212 |
| Exhibit 11 | Do No Harm About Us | 167 |
| Exhibit 14 | Standards of Care for the Health of Transgender and Gender Diverse People Version 8 | 155 |
| Exhibit 15 | Oasis Conference Link | 203 |
| Exhibit 16 | Dr. Kaliebe Twitter Pages | 205 |
| Exhibit 17 | Oasis Conference Link | 209 |

---

**Page 4**

1      KRISTOPHER KALIEBE, M.D.
2  the witness herein, having been first duly sworn to
3  tell the truth, the whole truth, and nothing but the
4  truth, was examined and testified as follows:
5  EXAMINATION,
6      QUESTIONS BY MR. SELDIN:
7  Q  Dr. Kaliebe, good morning.
8  A  Good morning.
9  Q  My name is Harper Seldin.  I'm an attorney with
10    the ACLU for the plaintiffs in this case.
11    Joining me is Stevie Pactor, along with Gavin
12    Rose, along with some interns as well as an intern
13    from the national office.
14      How are you this morning?
15  A  I'm good.
16  Q  So just to do a little bit of table setting and
17    some housekeeping and then we will get right to
18    it.
19      MR. SELDIN: Mr. Patterson, I don't know
20    if you want to enter an appearance for the
21    record?
22      MR. PATTERSON: I'm appearing on behalf of
23    the defendants and to defend this deposition.
24  Q  Dr. Kaliebe, have you had your deposition taken
25    before?

---

**Page 5**

1  A  Yes.
2  Q  About how many times?
3  A  Fifteen.
4  Q  Okay.  So this will all be familiar to you, but I
5    will say it again.
6  A  Yes.
7  Q  I'm sure fourteen times you have heard lawyers say
8    you know this, but we will go over it anyway.
9      First, are you on any medications today that
10    would prevent you from hearing and understanding
11    me and providing truthful responses?
12  A  No.
13  Q  Any other reason today that you could not testify
14    truthfully or understand what I'm asking you?
15  A  No.
16  Q  Great.  So today we will be having a discussion.
17    I just ask that with the Zoom lag that we let each
18    other finish.  Please let me finish my question
19    even if you think you know where I'm going.  I
20    will endeavor to let you finish your answer.
21      If you answer my question I will assume that
22    means you understood it.  Is that fair?
23  A  Yes.
24  Q  Great.  And your responses need to be verbal.
25    Uh-huh and huh-uh look pretty much the same on the

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 6

1    record. We ask that you verbalize your response.
2    If at any time you need a break, let me know. I
3    will try to break us around the hour mark. I ask
4    if there is a question pending that you answer the
5    question before you take a break.
6         Does that sound like a good plan?
7    A  Yes.
8    Q  Great. Then, Doctor, do you have any notes with
9    you today or anything on your desk?
10   A  I only have a blank piece of paper and a pen, so,
11   no, I have no notes or anything like that.
12   Q  Okay. Great. So the first thing that I would
13   like to show you is an exhibit that has been
14   marked Exhibit 1.
15        I think Joel will pull that up for us.
16   A  Okay.
17   Q  My question when we see Exhibit 1 is just going to
18   be do you recognize this document?
19   A  Yes, I recognize that document.
20   Q  And is this the declaration that you submitted in
21   this case?
22   A  It does appear to be so.
23   Q  Does this contain all of the opinions that you
24   intend to offer in this case?
25   A  Yes. Unless I'm asked about other matters.

Page 7

1    Q  As of this moment it contains all of the opinions
2    that you intend to offer?
3    A  Yes.
4         MR. SELDIN: Joel, could you scroll us
5    down toward the end.
6    Q  Dr. Kaliebe, I don't believe there was a C.V.
7    attached to this declaration. I just want to go
8    to the end. I believe it just includes a list of
9    publications. I just want you to confirm that
10   that is the case.
11   A  Correct.
12   Q  Okay.
13        MR. SELDIN: Joel, can you pull up
14   Exhibit 3 for us.
15   Q  My question, Dr. Kaliebe, is just going to be do
16   you recognize this document?
17   A  Yes.
18   Q  What is this?
19   A  This is another report, expert report for the
20   state of Alabama.
21   Q  And I believe there was a C.V. attached to the end
22   of this.
23        MR. SELDIN: Joel, if you can scroll down
24   for us, please. I believe it starts at about
25   Page 87 of the PDF.

Page 8

1    Q  Is this a copy of your C.V?
2    A  It does appear to be so.
3    Q  Were there any changes from when you submitted
4    this report and when you submitted the declaration
5    in this case?
6    A  Nothing major. I'm not sure the C.V. has my
7    promotion to full professor on it. That occurred
8    as of a couple months ago.
9    Q  Other than your promotion to full professor,
10   congratulations, would there be any material
11   changes?
12   A  If they are, they are quite minor.
13   Q  Dr. Kaliebe, do you still hold the opinions that
14   you provided in the report that you submitted in
15   Boe v. Marshall?
16   A  Yes.
17   Q  Were you aware that the state of Indiana provided
18   this report to plaintiffs as an example of a
19   report that you might offer in this case?
20   A  Yes.
21        MR. SELDIN: Joel, if you can pull up
22   Exhibit 4 for us.
23   Q  Dr. Kaliebe, do you recognize this document?
24   A  Yes.
25   Q  What is it?

Page 9

1    A  It's a report for the state of Florida.
2    Q  The case caption is Decker v. Weida, is that
3    correct?
4    A  Yes.
5    Q  Do you still hold the opinions contained in this
6    report?
7    A  Yes, I think perhaps some minor opinions have
8    evolved somewhat. But I would say for the most
9    part, yes.
10   Q  How would they have evolved?
11   A  You have to be specific. I have continued to --
12   the report was filed, you know, months ago.
13   Q  Looking at the date at the top of this -- you were
14   fading out.
15   A  No. I just continue to read. I continue to amass
16   more information. So, you know, opinions that I
17   had a couple months ago may be more nuanced if I
18   have additional data to substantiate or slightly
19   alter opinions.
20        I don't have any direct, I don't have any
21   particular things that I know of in the report
22   that I feel differently on. Although, I'm
23   guessing there are probably some things that have
24   slightly changed.
25   Q  Just to make sure I understand, the report in

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 4 of 84 PageID #: 3542

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 10

1     Decker was filed on April 7, correct?
2 A  Correct. Yes.
3 Q  So it's your belief that in less than the two
4    months that have elapsed between this report and
5    today your opinions may have been refined or
6    evolved, but are materially the same?
7 A  Correct.
8      MR. SELDIN: Joel, can you pull up
9    Exhibit 5?
10 Q  Dr. Kaliebe, I'm showing you what we marked as
11    Exhibit 5.
12     Do you recall being deposed in the Decker
13    matter we were just discussing?
14 A  Yes, I do.
15 Q  Does this appear to be a copy of your deposition
16    in that case?
17 A  Yes, it is.
18 Q  Were you truthful in that deposition?
19 A  Yes. Although, as I read the deposition
20    transcript, I feel like there are a couple times
21    where the answer that I gave, as I read it, seemed
22    to be somewhat -- the question asked seemed to be
23    somewhat different than as I understood it at the
24    time.
25     So I was truthful, however, now that I look

Page 11

1    at some of the answers I might have answered them
2    with some different nuance.
3 Q  Is there a particular question you have in mind
4    when you are explaining that to me?
5 A  Well, yes. There were some questions about
6    treatment of gender dysphoria that were framed in
7    a manner that seemed to me as I read them that
8    were sort of, that indicated that it must be
9    treated. Where I believe at the time the
10    questioner was, you know, is this a valid thing to
11    treat? Would this be a good thing to treat? You
12    know, just a slight nuance there.
13     I also noted that the questioner asked, they
14    had a comment that I had to ask my wife, who is an
15    endocrinologist, about the endocrinological
16    patients. I didn't note it at the time that that
17    was how the questioner framed it.
18     Of course, I know plenty about those things
19    and have done my own research. I just thought it
20    was nice to add on top of that, you know, she is a
21    board certified endocrinologist.
22     As I read it, there are some minor things
23    like that that I think were in the moment I didn't
24    hear the question the way reflected as I read it.
25    I would refine my answer.

Page 12

1 Q  Did you have an opportunity to review your
2    deposition transcript in Decker to submit an
3    errata?
4 A  Yes.
5 Q  Did you submit any errata?
6 A  Yes.
7 Q  Did your errata address your different
8    understanding of those questions or --
9 A  My errata contained what I thought were misquotes
10    of myself. I didn't see the errata as a time to
11    change my answer on things. I just saw it as a
12    time to correct any errors in the transcript. So
13    that is what is in the errata.
14 Q  When did it become apparent to you that perhaps
15    you would have changed some of your answers in
16    this deposition if you had understood the question
17    differently?
18 A  When I read the transcript.
19 Q  Okay. So is it fair to say -- so you read the
20    transcript for errata. You changed what you
21    believed were misquotes, but you did not seek to
22    address to change your answers when you had a new
23    understanding of the questions?
24 A  Correct.
25 Q  Okay. So for purposes of this deposition let's

Page 13

1    just make sure that you understand my questions
2    and so if there is any ambiguity we sort that out.
3    How about that?
4 A  Yes.
5 Q  Okay.
6     MR. SELDIN: Joel, could you pull up
7    Exhibit 7.
8 Q  Dr. Kaliebe, in the Decker matter do you recall
9    testifying at trial?
10 A  Yes.
11 Q  That was very recently, is that right?
12 A  May 18.
13 Q  And is this, you will see this is a transcript of
14    the fifth day of the trial in Decker.
15     MR. SELDIN: Joel, can you take us to
16    Page 1058.
17     MR. PATTERSON: It looks like it is
18    Page 95 if I'm doing that math correctly.
19     MR. SELDIN: Mr. Patterson is much braver
20    than I to do math in the middle of a deposition.
21     MR. PATTERSON: I was off by one page.
22 Q  Dr. Kaliebe, you will see on Page 1058 --
23     MR. SELDIN: Joel, if you can scroll down
24    one more.
25 Q  It starts afternoon session. I might have the

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 14

1  wrong page on this one.  Give me a second.
2  A  I was the second witness in the afternoon.
3  Q  Let me find the right page.  I apologize.
4      MR. SELDIN: Joel, I think it's 1095 or
5  try Page 133.
6  Q  Dr. Kaliebe, do you see where it says Direct
7  Examination and then --
8  A  Yes.
9  Q  Is this a copy of your trial testimony in Decker?
10 A  Yes.
11 Q  Were you truthful during that testimony?
12 A  Yes.
13 Q  Did you do your best to answer honestly?
14 A  Yes.
15 Q  Was that true when the state of Florida was asking
16 you questions?
17 A  Yes.
18 Q  Was that also true when plaintiffs in that case
19 were asking you questions?
20 A  Yes.
21 Q  I believe that the court in that case also asked
22 you some questions while you were on the stand.
23      Do you recall that?
24 A  Yes.
25 Q  Did you do your best to be truthful when answering

Page 15

1  the judge in that case?
2  A  Yes.
3      MR. SELDIN: Joel, can you pull up
4  Exhibit 6 for us.
5  Q  Dr. Kaliebe, have you ever seen this document
6  before?
7  A  Yes.
8  Q  What is this document?
9  A  It's a Plaintiff's Memorandum of Law in Support of
10 Motion to Exclude Expert Testimony of
11 Dr. Kristopher Kaliebe.
12 Q  Is it your understanding then that the plaintiffs
13 in Decker tried to exclude your testimony in that
14 case?
15 A  Yeah.  I just found that out the other day.
16 Q  I'm sorry.  You said --
17 A  Yes.  I guess so.  I just found out.
18 Q  Do you know whether the court has resolved this
19 motion yet?
20 A  No.
21 Q  Were you aware prior to testifying for Decker that
22 this motion had been filed?
23 A  No.
24 Q  Thank you so much.
25      MR. SELDIN: Joel, we can take that down

Page 16

1  for now.  Thank you.
2  Q  Dr. Kaliebe, I will ask you some questions about
3  how you prepared for today's deposition.
4      Just to head trouble off at the pass, I'm not
5  asking you what you talked about with your
6  lawyers.  I'm asking you questions about the where
7  and who, but not the what.
8      I'm sure Mr. Patterson will cut you off if
9  you try.  I just want to be clear about that ahead
10 of time.
11      So my question is just going to be how did
12 you prepare for today's deposition?
13 A  Well, I did have a meeting, I think it was Sunday,
14 with the lawyer for about forty-five minutes.  So
15 I had one meeting with the lawyer.  The other prep
16 was I read my report.  I read the deposition that
17 I gave.  I read my trial testimony.
18 Q  When you say you read the deposition that you
19 gave, are you referring to the deposition in
20 Decker that we were just talking about?
21 A  Yes.
22 Q  When you say your trial testimony, are you
23 referring to the trial testimony in Decker that we
24 were just discussing?
25 A  Correct.

Page 17

1  Q  Do you recall which lawyer you met with for about
2  forty-five minutes this past Sunday?
3  A  Yeah.  I hate to -- I do not remember Brian's last
4  name.  There has been a lot of switching of the
5  lawyers.
6  Q  Any part of their name will do.
7  A  Brian.
8  Q  Did you say Brian?
9  A  Yes.
10 Q  Is that Brian Barnes with Cooper and Kirk?
11 A  I believe it is.
12 Q  Any other attorneys that you spoke with?
13 A  No.
14 Q  Okay.  Any other meetings other than that
15 forty-five minute meeting?
16 A  No.
17 Q  Did you speak with anyone else at all in
18 preparation for today's deposition?
19 A  No.
20 Q  Okay.  Other than your report or your declaration
21 in this case, your deposition testimony in Decker,
22 and your trial testimony in Decker, did you review
23 any other documents to prepare for today's
24 deposition?
25 A  Well, I continually am educating myself and

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 6 of 84 PageID #: 3544

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 18

1 reading more reports, articles, and such. None of
2 them were in preparation for this deposition
3 though.
4 Q  Did you review the expert declarations from
5 Dr. Shumer, Dr. Karasic, or Dr. Turban?
6 A  I did.
7 Q  Did you review the transcription of their
8 depositions?
9 A  I did.
10 Q  Did you review any of the declarations submitted
11 by Indiana's other experts?
12 A  No, I did not.
13 Q  I'm sorry?
14 A  No.  I don't believe so.  Just those three.
15 Q  In the process of preparing for today's
16 deposition, did you review any of the medical
17 records of the plaintiffs in this case?
18 A  I reviewed medical records, but not regarding, you
19 know, it was a while back.  It was not regarding
20 this deposition.
21 Q  So did you review the plaintiffs' medical records
22 in your declaration?
23 A  I did review them.  But I decided, it was decided
24 to not, you know, include anything regarding those
25 records in my report.

Page 19

1 So if that answers your question, I reviewed
2 the records.  I did not, you know, formulate
3 opinions or, you know, add anything into my report
4 related to that.  So I did review them, but I
5 didn't comment on them.
6 Q  Have you spoken to Diana Kenny, who is one of the
7 experts in this case that Indiana has proffered?
8 A  No.
9 Q  Have you spoken with Daniel Weiss, who is another
10 of the Indiana experts in this case?
11 A  No.
12 Q  Have you spoken with Paul Hruz?
13 A  No.
14 Q  Have you spoken with James Cantor?
15 A  No.
16 Q  When we were talking earlier about your deposition
17 in Decker you referred to part of the transcript
18 where you discussed speaking with your wife,
19 Dr. Olga Kaliebe, who is a board certified
20 endocrinologist, is that correct?
21 A  Yes.
22 Q  Have you spoken with your wife, Dr. Kaliebe, about
23 this case?
24 A  No.
25 Q  Did she assist in any way in your declaration in

Page 20

1 this case?
2 A  No.
3 Q  Thank you, Dr. Kaliebe.
4 Anything else that you did to prepare for
5 today's deposition that we have not covered?
6 A  No.
7 Q  Then Dr. Kaliebe, I want to talk a little about
8 your background.  You are board certified in
9 psychiatry, is that correct?
10 A  Yes.
11 Q  You are also board certified in child and
12 adolescent psychiatry, is that correct?
13 A  Yes.
14 Q  And forensic psychiatry as well?
15 A  Correct.
16 Q  Do you have any other board certifications?
17 A  No.
18 Q  Do you have any formal training in sociology?
19 A  Well, I believe during medical school and
20 residency, yeah, training in the broad range of
21 the field, which sociology is somewhat included
22 within psychiatry.  So psychiatry has some
23 sociology included.
24 Q  Was there a specific course in sociology that you
25 took as part of your medical training?

Page 21

1 A  Well, since psychiatry deals with biopsychosocial
2 phenomenon in people, sociology is a component of
3 how you are trained.  So the social part is quite
4 important.
5 As I said, what people think about how you
6 approach the patient is biopsychosocial.  So
7 social is a major component.  In psychiatry we
8 frame our approach to patients as biopsychosocial.
9 So social matters are essential and a large part
10 of psychiatry.  So there's a lot of psychiatric
11 training and medical school training.
12 So, yes, it is quite important to be up on
13 social matters and understand social interactions.
14 That is a large component of our training.
15 Q  And how are you defining sociology?
16 A  Well, how am I defining sociology?  In psychiatry
17 social matters are very important.  Social
18 interactions are the basis of sociology is my
19 understanding.  So that is how I was applying
20 them.
21 Q  Fair to say that in psychiatry you are treating
22 individual patients, correct?
23 A  Well, you do.  You treat families.  You treat them
24 within a context.  You are also asked for input
25 regarding matters that are more broad.  So, you

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 22

1  know, it depends. Yes. Typically our model is
2  individual patients or families.
3      COURT REPORTER: Doctor, I'm sorry. you
4  are cutting out and I am having a hard time
5  hearing you.
6      MR. SELDIN: Let's go off the record.
7      (OFF RECORD AT 10:00 A.M.)
8      (AT THIS TIME A SHORT RECESS WAS HELD OFF
9  THE RECORD AFTER WHICH THE FOLLOWING PROCEEDINGS
10  WERE HAD:)
11      (ON RECORD AT 10:01 A.M.)
12  BY MR. SELDIN:
13  Q  Thank you, Dr. Kaliebe. Do you treat families in
14    your psychiatry practice currently?
15  A  When you practice child psychiatry you typically
16    do see the family. Right? You have to see the
17    family. So you are doing family work.
18  Q  I'm not asking typically. I'm asking do you
19    specifically treat families currently in your
20    psychiatry practice?
21  A  Yes. I mean, when you work in child psychiatry
22    you work with the family, yes.
23  Q  And when you say you work with the family, you
24    mean providing psychiatric treatment to the family
25    and consulting with the family about the child?

Page 23

1  A  Well, neither of those is the right way to frame
2    it. You work with a child and family together.
3    The child may be the assigned patient, but you are
4    working with the entire family.
5  Q  Do you prescribe medication as part of your
6    psychiatry practice?
7  A  Yes.
8  Q  Are you prescribing medication to any of the
9    parents or the family members of your child
10    patients as part of your practice?
11  A  No.
12  Q  Do you provide psychotherapy as part of your
13    psychiatric practice?
14  A  You would provide parent training. So, yes, you
15    are providing -- it's not, it's family work so you
16    do some family therapy. Even when you are in a
17    room with a parent and the child together that is
18    a therapeutic interaction with both members.
19  Q  Then other than the training in sociology that you
20    talked about as part of your medical training, do
21    you have any other training in group dynamics or
22    organizational dynamics?
23  A  We receive some of that training as, you know, in
24    medical school and during your residency and
25    because I was the program director and was

Page 24

1  involved in training when I was at LSU you do
2  learn about a lot of organizational stuff because
3  you do the trainings that the universities do to
4  help understand how to run a residency and work
5  with trainees.
6      There is some organizational work, some
7  organizational training that I received as part of
8  that. Each medical school has a medical education
9  department. They do trainings about other work
10  systems.
11  Q  Anything other than that?
12  A  Not that I recall.
13  Q  And then in your declaration you said that gender
14    dysphoria and its treatment were part of your
15    professional training.
16      Do you recall that part of your declaration?
17  A  Yes.
18  Q  Okay. And what professional training did you
19    receive on gender dysphoria or its treatment?
20  A  Well, at the time it would have been called gender
21    identity disorder. I use the modern term. But
22    when you are doing a general psychiatry residency
23    your section of the training in medical school
24    includes a section of training or learning that
25    includes those disorders.

Page 25

1      In child psychiatry residency, you have
2    training that includes those disorders. So at
3    every level of training you get some education
4    regarding, you know, at that point it was gender
5    identity disorder, but now it's called gender
6    dysphoria.
7  Q  Did you take any specialized or targeted classes
8    that dealt with gender identity disorder or
9    gender dysphoria as part of your medical school
10    training?
11  A  No.
12  Q  Okay. Have you done any continuing education on
13    gender identity disorder or as it was previously
14    called or gender dysphoria?
15  A  Yes.
16  Q  What continuing education have you done?
17  A  Okay. So I attend meetings at the American
18    Academy of Child and Adolescent Psychiatry, they
19    have CME meetings at every annual meeting. And I
20    attended in the last four years, five years, I
21    would guess about half a dozen, maybe more, of the
22    presentations, or I bought the, you know, you get
23    the audio package later.
24      With COVID it kind of got messed up so it was
25    not the usual conference. We were doing online

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 8 of 84 PageID #: 3546

K.C., et al. VS                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                            June 1, 2023

Page 26

1   not real time so you could watch later.  Because
2   of that I would not say that all of the ones I
3   watched every single minute of, you know, during
4   that online period.
5       When you are in person you know that you sit
6   there through the whole presentation.  So I would
7   estimate at least six presentations which are CME
8   presentations from the American Academy of Child
9   and Adolescent through the annual meeting.
10      Most of them were at the time of the annual
11  meeting, but some of them were later because I get
12  the package where you can watch them later so if
13  you miss something you can go back and watch.
14      I was at the American Psychiatric Association
15  meeting last year and attended a CME meeting
16  related to gender dysphoria and adolescents.  And
17  I downloaded, or I also participated in one of the
18  American Psychiatric Association trainings related
19  to gender dysphoria this year.
20  Q   So it sounds like those first six CME credits that
21      you were talking about, were those all related to
22      gender dysphoria or its treatment?
23  A   Yes.
24  Q   Okay.  So the past four or five years about how
25      many hours of CME training do you think you have

Page 27

1   had on gender dysphoria or its treatment?
2   A   About ten.
3   Q   Okay.  And so six years ago and later about how
4       many hours of CME credit do you think you had
5       related specifically to gender dysphoria or gender
6       identity disorder?
7   A   Only to the degree it was included in larger
8       programs.  So at that point I had not sought out
9       any.  So one answer to that question is none.
10      Or only as it was included in course reviews
11  or other classes.  Because when you do, when you
12  go to the annual conference there's a performance
13  and practice feedback that you do, which is asking
14  and answering questions about different topics in
15  child psychiatry.  That includes topics related to
16  gender dysphoria.
17      Then also when you do board review there are
18  sections of board review that are also related to
19  gender dysphoria and gender dysphoria treatments.
20  That is a general review of all topics, but it
21  includes those.
22      So I did retake my boards, I'm guessing in
23  2005.  Then in 2015 would have been my redo for my
24  child psychiatry boards.  So I would have to
25  study.  But you do get CME for taking the board.

Page 28

1   That is considered continued medical education,
2   taking the board review.
3   Q   Doctors have a better deal than lawyers when it
4       comes to CLEs.
5   A   It's expensive.
6   Q   Other than the ten hours we talked about and the
7       education that you would have gotten in the
8       ordinary course as part of your board
9       certifications and continuing training, anything
10      else since 2005?
11  A   I do not believe anything else that was CME.
12  Q   Okay.  How did you come to be an expert in this
13      case?
14          MR. PATTERSON: I will object to the
15      extent it calls for attorney/client privilege
16      communication.
17  Q   Let me break it down a little more in smaller
18      chunks to see if we can avoid the problem.  This
19      is a yes or no question.
20          Did the state of Indiana reach out to you
21      about becoming an expert in this case?
22  A   Yes.
23  Q   So you did not affirmatively reach out to them, is
24      that correct?
25  A   Correct.

Page 29

1   Q   When was the first case -- excuse me.
2       Prior to Decker, were you an expert in any
3   case involving gender dysphoria or its treatment?
4   A   No.
5   Q   Other than Decker and Boe v. Marshall, have you
6       been involved in any case involving gender
7       dysphoria or its treatment?
8   A   No.
9   Q   In your C.V. and in Boe and in your declaration
10      you listed your prior expert engagements.
11      Fair to say other than Decker, Boe, and this
12  matter, none of the rest would pertain to gender
13  dysphoria or its treatment?
14  A   Correct.
15  Q   In which case did you become an expert first,
16      Decker or Boe?
17  A   Decker.
18  Q   Okay.  In the Decker matter in Florida, did the
19      state of Florida reach out to you about becoming
20      an expert?
21  A   Yes.
22  Q   Were any third parties involved in making that
23      connection between you and the state of Florida?
24  A   I actually don't know.
25  Q   Prior to Decker had you ever held yourself out as

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 30

1 an expert in gender dysphoria or its treatment?
2 A No.
3 Q Have you ever lobbied before a state legislature?
4 A No.
5 Q Have you ever testified before a state
6 legislature?
7 A No.
8 Q The same question at the federal level, have you
9 ever lobbied for federal legislature?
10 A No.
11 Q Have you ever testified before Congress?
12 A No.
13 Q You are aware this case involves Senate Enrolled
14 Act 480 in Indiana, correct?
15 A Correct.
16 Q Have you made any public statements for or against
17 Senate Enrolled Act 480?
18 A No.
19 Q Have you ever made any public statements for or
20 against any other laws pertaining to the treatment
21 of gender dysphoria in minors in other states?
22 A No.
23 Q No op eds or letters to the editor? Nothing like
24 that?
25 A Correct.

Page 31

1 Q Dr. Kaliebe, I will ask you some questions about
2 your background. They come from the portions of
3 your declaration and when we talk about it if you
4 would like to refer to those, let me know and we
5 will pull up Exhibit 1.
6 My questions will be what were the
7 circumstances of starting or stopping various
8 jobs. I'm not trying to trick you. If you want
9 to refer to that for dates, just let me know.
10 According to your declaration you stopped
11 being the assistant professor at LSU Health
12 Science Center in 2016, is that correct?
13 A Yes.
14 Q What prompted the end of your employment there?
15 A I moved to Tampa, Florida. It did not totally end
16 my employment with LSU. I'm not exactly sure how
17 long I remained with some contracts in Louisiana.
18 I retained my medical license in Louisiana and
19 still had an LSU collaborative care contract when
20 I moved to Florida. I can't exactly say that it
21 ended.
22 I mostly became a University of South Florida
23 employee and had moved to Tampa. I had a
24 collaborative care contract, I believe it was for
25 one more year at LSU, you know, doing psychiatry

Page 32

1 and collaborative care back to Louisiana. But I
2 mostly moved from Louisiana to Florida, thereby
3 changing my work from mostly LSU to mostly the
4 University of South Florida.
5 Q Did your role at LSU involve clinical treatment?
6 A Yes.
7 Q Did it involve clinical supervision?
8 A Yes.
9 Q Did you teach?
10 A Yes.
11 Q Did you perform research?
12 A Yes.
13 Q Okay. Did you have any administrative
14 responsibilities?
15 A Yes.
16 Q Here is the tough question, what percentage of
17 your job do you think was clinical treatment
18 versus the other things we just talked about?
19 A So when I was at LSU my job involved, it changed
20 over time. That is not a question that I can
21 answer easily because there were different times
22 with different roles.
23 Mostly I would do clinical work. So, you
24 know, I was mostly a clinician. But I would say I
25 was heavily a clinician educator. So I was always

Page 33

1 very involved with the training programs and
2 teaching. So I always had a large teaching role.
3 In my clinical sites I would have students or
4 residents come with me where I was working a lot
5 of the time and people would, you know, sit in
6 with me. So I had a clinical role, which included
7 some resident supervision. Then if you want me to
8 breakdown the numbers --
9 Q I think that is a good answer. Thank you.
10 A Okay.
11 Q In your current role at USF do you have roughly
12 the same mix of responsibilities in terms of being
13 a clinician and teaching?
14 A Well, yes and no. When I moved to Florida I was
15 offered a number of contracts in corrections which
16 was actually a little bit more time in juvenile
17 corrections than I was spending in Louisiana. So
18 I do more correctional work in Florida than I was
19 doing in Louisiana hours-wise.
20 Recently I'm doing more forensic cases so I'm
21 doing more forensic work. My clinical role in
22 Florida was significantly decreased in terms of,
23 like, having an individual patient clinic. Right?
24 So I have two resident clinics right now.
25 But that is, you know, a lot less sort of

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 34

1 direct patient care and, you know, very little
2 independent patient care compared to what I was
3 doing in Louisiana.
4 Q Dr. Kaliebe, how long have you been practicing
5 psychiatry?
6 A Well, I finished my first residency in, which
7 would be the general psychiatry residency as I
8 transferred into child psychiatry, that would be
9 in 2004.
10 At that point, because I was already
11 moonlighting, which was an independent practice,
12 you know, I would say my first independent
13 practice was 2001 or 2002. So during your
14 residency sometimes you are also independent
15 practicing. So I would have to say 2001 would
16 probably be my first year of independent practice.
17 I graduated medical school in 1999.
18 I know during your first year of residency no
19 one does any independent practice. That is one
20 way to answer the question.
21 Another way to answer is when I finished all
22 my fellowships and residencies, that would be
23 July 2005 because I did general psychiatry. Then
24 I did child and adolescent psychiatry.
25 So general for three years. Child psychiatry

Page 35

1 for three years. Forensic psychiatry for one
2 year. And finished in July of 2005.
3 Q Fair to say then you have seen patients in some
4 capacity for about twenty-two years?
5 A Correct. You could say my residency started on
6 July 1 of 1999.
7 Q Round numbers, is it fair to say you have treated
8 thousands of patients in that twenty plus year
9 period?
10 A Correct.
11 Q Of those thousands of patients how many of them
12 have you treated that have had gender dysphoria or
13 gender identity disorder?
14 A As you have probably seen in my deposition, there
15 is a -- it is probably around sixteen or seventeen
16 patients right now.
17 Q I believe you had a colloquy with the court in
18 Decker that led you to that number about sixteen
19 or seventeen.
20 Do you recall that part of your testimony?
21 A Yes.
22 Q Okay. Of those sixteen or seventeen patients with
23 gender identity disorder or gender dysphoria, how
24 many of them were under eighteen?
25 A I would guess twelve or thirteen of them.

Page 36

1 Q So twelve to thirteen were under eighteen? Then
2 we will call it --
3 A I'm not sure how you count the people that you saw
4 and they were below eighteen and now they are over
5 eighteen in that question.
6 Q When you started seeing those people under
7 eighteen, if we use that definition, does the
8 twelve to thirteen still stand?
9 A We will make it thirteen if it's when I started to
10 see them. You know, that is my, I'm, that is the
11 best estimate that I can give you.
12 Q I will spot you the one. We will call it
13 thirteen.
14 Of those thirteen did you diagnose any of
15 them with gender dysphoria?
16 A Yes.
17 Q How many of them did you diagnose with gender
18 dysphoria?
19 A There are different ways to answer that question.
20 All of them are diagnosed with gender dysphoria
21 and had come to me with that diagnosis or some
22 question regarding that diagnosis.
23 Now, are you asking am I the first person to
24 diagnose gender dysphoria for that patient? Or
25 are you asking me did I continue a diagnosis of

Page 37

1 gender dysphoria?
2 Q We will break it down into small chunks to get
3 exactly at that question. Of those thirteen
4 patients how many of them when they arrived in
5 your office already had a diagnosis of gender
6 dysphoria?
7 A I would guess maybe ten.
8 Q Okay. Of those ten who arrived in your office
9 already with a diagnosis of gender dysphoria, how
10 many of those did you also diagnose with gender
11 dysphoria?
12 A I'm trying to think back if there was any. I
13 believe there was a continuation of a diagnosis in
14 all patients.
15 Q So of those ten who showed up with a diagnosis of
16 gender dysphoria, in none of them you said, I
17 don't think that is correct. You don't have
18 gender dysphoria.
19 A Well, you are asking me questions about when they
20 present for treatment. You know, you see people
21 over time. So it may be a different answer at the
22 end of the day did they always leave the practice
23 also with a gender dysphoria diagnosis, you know,
24 that is a slightly different question.
25 I believe there was continuation of the

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 38

1  incoming diagnosis in all ten.
2  Q  When the ten, when those ten who showed up with a
3     diagnosis of gender dysphoria at least at the
4     beginning you thought all ten of these have, I
5     agree with that diagnosis of gender dysphoria.  Is
6     that fair to say then?
7  A  Yes.
8  Q  At the end of treatment for those ten, were there
9     any of them where you did not continue the
10    diagnosis of gender dysphoria?
11 A  I would say no.  That is a difficult question
12    sometimes because you get people for, you know, at
13    the clinics for a certain amount of time.  Then
14    they roll off of your clinic or they leave and you
15    often don't know what happens next with them.
16       But I don't remember taking away that
17    diagnosis in any particular patient.
18 Q  We talked about the ten of the thirteen who showed
19    up with a diagnosis of gender dysphoria.
20       Of the three additional folks who were minors
21    when you began seeing them, did you diagnosis all
22    three of those people with gender dysphoria?
23 A  Yes.
24 Q  Were you using the DSM-5-TR criteria to make that
25    diagnosis?

Page 39

1  A  Yes.
2  Q  I believe that leaves four adults who you have
3     seen or treated who had gender dysphoria.
4        The same set of questions.  When they showed
5     up in your office did all of those four adults
6     already have a diagnosis of gender dysphoria?
7  A  Yes.
8  Q  Did you continue the diagnosis for all four
9     adults?
10 A  Yes.
11 Q  I'm sort of zooming out to the sixteen or
12    seventeen people who you have seen with gender
13    dysphoria.
14       Did any of them have a gender identity
15    disorder diagnosis, or were they all post DSM-5?
16 A  Post DSM-5, correct.
17 Q  Did you recommend or prescribe any treatment for
18    the gender dysphoria that you diagnosed in these
19    individuals?
20 A  Yes.
21 Q  What treatment did you prescribe?
22 A  Well, I recommend when a child presents with
23    gender dysphoria that they enter psychotherapy.
24 Q  Anything other than psychotherapy?
25 A  No.  I mean, if you are talking about treating --

Page 40

1  people come in with co-morbidities.  So there's
2  treatment for matters other than gender dysphoria,
3  which could include medications or other
4  therapies.
5     Let me qualify, also, that I have a practice
6  of always recommending certain things for patients
7  when they show up in my clinic.  It includes a
8  number of matters that all patients get.  So I
9  would recommend these things also for a patient
10 who presents with gender dysphoria.  So I don't
11 just recommend people for psychotherapy and leave
12 it at that.
13    Would you like me to tell you about what I
14 recommend for all of the patients that I interact
15 with?
16 Q  Well, so I want to ask a clarifying question.  Of
17 the general suite of things that you recommend to
18 all of your patients, is that fair to say that is
19 part of general wellness?  It is not specific to
20 any diagnosis?
21 A  I don't think wellness is the correct word.  I am
22 talking about things that do promote wellness, but
23 they also have an impact on mental health.
24    So, you know, when I am, when I have someone
25 present to me with a mental health condition, the

Page 41

1  fact that I want them to get involved with
2  physical activity, exercise, you know, perhaps
3  sports.  Perhaps, you know, yoga.  Perhaps, you
4  know, time in nature.  Perhaps taking walks.  I
5  mean, all that physical activity and movement
6  stuff has very good evidence base and is
7  important.  I emphasize it with all my patients.
8  So it is true with a patient with gender
9  dysphoria.
10    I would talk about changing how people eat,
11 food related issues.  Once again, that is pretty
12 strong evidence base, great risk and benefit
13 profile.  It does treat and help with mental
14 disorders.
15    Then the other component is managing what I
16 call honoring silence.  That is a general frame
17 for having some mediative or calming practice that
18 you do all of the time.
19    And then, also, mindfully managing your
20 exposure, especially for children these days, to
21 electronics.  When I say honor silence, that
22 includes, you know, turning, coming to some
23 conclusion as a family about, you know, what is
24 the relationship that this person is going to have
25 with electronics?  Where do they go?  How much

Page 42

1　time do they spend on the different devices? What
2　other activities, you know, might be better than
3　the extra time online? Are there any things that
4　are good or positive they are doing online? Those
5　could be increased or the important part of it.
6　　　But that is advice that I do think is
7　pertinent and I give to all patients. So that
8　would include, you know, that would include
9　patients with gender dysphoria. They would get
10　the advice to, you know, basically eat food to
11　improve their diet. Move their body, physical
12　activity. Mixed in with mindfulness. Hopefully a
13　mindful practice of moving their body and properly
14　managing, because today's kids are so heavily
15　involved in electronics and it's so much of their
16　social world. So managing those things.
17　　　That is not everything that I tell people,
18　but that is a standard, you know, speech that I
19　give or discussion that I have with every single
20　patient. It would be applicable in this case in
21　addition to my referral for, you know,
22　psychotherapy.
23　Q　And is it fair to say that you didn't say to any
24　of those patients that I think if you do more yoga
25　or are more mindful you will no longer have gender

Page 43

1　dysphoria?
2　　　It was just part of your general suite of all
3　your patients you see, you think that is a good
4　plan for everyone to do yoga and limit screen
5　time and be --
6　A　No. I would not say it like that. I would say
7　there is a significant possibility that people can
8　help with their distress about their body through
9　the practices that I'm recommending and by
10　managing, you know, what is coming into their
11　brain through, you know, media.
12　　　So, yes, I do think particularly in these
13　cases this would be a part of the treatment plan.
14　I think it is something that is important to
15　communicate to the patients.
16　Q　Are there any randomized controlled trials,
17　studies, regarding yoga as a treatment for gender
18　dysphoria?
19　A　No.
20　Q　In your declaration you said that you were
21　consulted about providing a second opinion and
22　coordinating care regarding a patient with gender
23　dysphoria in the Louisiana Juvenile Correctional
24　System.
25　　　Do you recall that part of your declaration?

Page 44

1　A　Correct.
2　Q　Is that patient included in your sixteen or
3　seventeen, or is that a separate person?
4　A　Actually it was not included.
5　Q　Who asked you for a second opinion?
6　A　Well, at the time when I moved to Florida I still
7　had a relationship with the clinic in the
8　correctional system in Louisiana. If you remember
9　what I said, I moved here. I kept the Louisiana
10　license. I was still doing work in Louisiana.
11　　　As the most senior clinician within the
12　company that has all of the contracts for the
13　juvenile justice in Louisiana, whenever they have
14　challenging cases I was likely to get consulted.
15　　　That was a patient who was moving facilities
16　and so they asked my opinion. They asked, you
17　know, basically what approach should they have.
18　So that was actually working for the company at
19　that time and they consulted me.
20　Q　I take it that was because it was a juvenile
21　correctional system that that person was under
22　eighteen?
23　A　That person -- well, I don't want to speak too
24　much about individual patients because, you know,
25　especially when we get into specifics about where

Page 45

1　they are and how they move.
2　Q　Well, we can designate this portion of your
3　deposition transcript as confidential.
4　A　Can we?
5　Q　Yes.
6　　　MR. SELDIN: Mr. Patterson, I don't know
7　if you are aware of the confidentiality order that
8　we have in this case. We have been using that to
9　designate portions in other expert testimony
10　pertaining to the plaintiffs.
11　　　If it's appropriate here, we can designate
12　this portion as confidential so I can inquire into
13　his expertise.
14　　　MR. PATTERSON: Yes. We can designate it
15　confidential, but I would say to the extent he is
16　under any obligations not to disclose any
17　information even in a confidential setting he has
18　to abide by those. I'm okay with this being made
19　confidential.
20　　　MR. SELDIN: Great.
21　Q　The particular individual about whom you provided
22　a second opinion, was that person a minor?
23　A　They, since this is not -- I mean, I don't believe
24　that in this context that this would be too, that
25　I'm revealing too much. I do want to not speak

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 46

1 too specifically because, obviously, we are, when
2 you talk about individual patients, any of this
3 could be trackable. I do not want to say anything
4 that would reveal anything about any patient that
5 I'm treating. Right?
6      So I'm trying to keep it as general as
7 possible. Redacted
8 Redacted
9 Q Redacted
10 Redacted
11      Redacted
12 Redacted
13 A Redacted
14 Redacted
15 Redacted
16 Redacted
17 Redacted
18 Redacted
19 Redacted
20 Q Redacted
21 Redacted
22 Redacted
23 Redacted
24 A Redacted
25 Redacted

Page 47

1 Redacted
2 Redacted
3 Q Redacted
4 Redacted
5 Redacted
6 A Redacted
7 Redacted
8 Redacted
9 Redacted
10 Redacted
11 Q Also, in your declaration you said that you
12 provided an opinion about whether a pediatric
13 patient was competent to assent to the
14 administration of puberty blockers.
15      Doctor, do you recall that part of your
16 declaration?
17 A Yes.
18 Q In what capacity were you consulted on that? I
19 guess which contract was that a part of?
20 A It was within the USF, you know, child psychiatry
21 realm.
22 Q Okay. When you provided that opinion, was that to
23 someone you were supervising or a lateral
24 colleague?
25 A Lateral colleague.

Page 48

1 Q What was your opinion on their competence to
2 assent?
3 A Well, my opinion was that at the age they were
4 that it seems unlikely that they would have full
5 knowledge or capacity to fully assent, you know,
6 or if you want to say consent to the procedure.
7      It seemed -- the particular wording of the
8 question was not can they assent or not. It was
9 more do they have the, you know, capacity to fully
10 understand what they are agreeing to.
11 Q Do you recall how old that person was?
12 A I don't, I don't remember for sure. But I do
13 think it was twelve or thirteen.
14 Q And were you asked to provide an opinion on that
15 child's parents' ability to consent to the
16 treatment?
17 A No.
18 Q Did you have any concerns based on what you heard
19 in that consultation about the parents' ability to
20 consent?
21 A No.
22 Q You also said that you have been consulted
23 regarding psychotherapeutic approaches to young
24 adult patients who detransition.
25      Do you recall that part of your declaration?

Page 49

1 A Correct.
2 Q When you say young adult, I take it you mean those
3 people were over eighteen?
4 A Correct.
5 Q You also said you collaborate in the care of
6 patients with gender dysphoria as part of your
7 work with the Florida Medicaid psychiatric
8 hotline.
9      Do you recall that part?
10 A Yes.
11 Q And about how many patients have you collaborated
12 in the care with for those hotline calls?
13 A That also had gender dysphoria?
14 Q Yes.
15 A I'm trying to think if it was two or one. Only
16 one that I remember. So one time.
17 Q Did your involvement in that care go beyond that
18 phone call?
19 A No.
20 Q How many patients have you consulted about in
21 connection with your work on the Florida Medicaid
22 psychiatric hotline?
23 A Good question. Twenty. Thirty.
24 Q Dr. Kaliebe, have you conducted any research about
25 gender dysphoria?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 50

1   A   No.
2   Q   Any research on gender identity generally?
3   A   No.
4   Q   Any research focusing on the treatment of
5       transgender people?
6   A   No.
7   Q   Have you published any papers on those topics?
8   A   No.
9   Q   Have you supervised any research on those
10      topics?
11  A   No.
12  Q   Have you ever had to retract a research paper?
13  A   No.
14  Q   Or issue a correction to a research paper?
15  A   No.
16  Q   Have you ever been sued for medical malpractice?
17  A   No.
18  Q   Have you ever been the subject of professional
19      discipline?
20  A   No.
21  Q   Have you ever been sanctioned by a licensing
22      board?
23  A   No.
24  Q   Have you ever had a professional complaint filed
25      against you?

Page 51

1   A   No.
2   Q   Have you ever been the subject of a Title Nine
3       complaint?
4   A   Not that I know of.
5   Q   Have you ever been arrested or charged with a
6       crime?
7   A   No.
8   Q   Are you on social media?
9   A   Yes.
10  Q   What social media do you use?
11  A   Use would probably be a strong word because I'm on
12      social media, but I do not use social media
13      generally.  I have a Facebook account.  I believe
14      I have an Instagram account that links to my
15      Facebook.  I never actually go on Instagram.  So
16      it's very rare that I'm on Facebook.  That would
17      be the only social media that I'm on.
18          I will, I occasionally have gone on Twitter.
19      I don't make it a practice to go on Twitter.  But
20      I have gone on Twitter.  I don't have a presence.
21      I don't post.  I don't do any of those things.
22      Sometimes to access things I'm occasionally linked
23      to Twitter.  I would not say I really have a
24      Twitter account, but I've gone on Twitter.
25  Q   I think the youth call people like us lurkers.

Page 52

1       That is the technical term.  I don't know if you
2       have encountered that in the practice with your
3       youth?
4   A   Yes, I have used that term.
5   Q   Fair to say you fall more on that side of the
6       continuum?
7   A   That is fair to say, yes.
8   Q   Have you given any interviews in either
9       traditional media or elsewhere on the topic of
10      gender dysphoria?
11  A   Given any interviews?  Yes.
12  Q   What interviews have you given on the topic of
13      gender dysphoria?
14  A   Well, I haven't, I was contacted by someone to do
15      an interview.  I talked briefly with the person.
16      I don't have their name in front of me.  This was
17      quite recently.  So I was contacted by someone to
18      do an interview regarding some of the stuff I
19      guess that has gone on, you know, in this case or
20      with professional organizations.
21  Q   Do you recall the name of who --
22  A   I don't.  I don't.
23  Q   Do you recall what publication they were with?
24  A   I don't.
25  Q   Do you recall --

Page 53

1   A   I can tell you it was not a publication or place
2       that I had heard of.  So, hence, maybe that is
3       part of why I don't remember actually who they
4       are.  Yeah.
5   Q   I take it you said no?
6   A   We briefly spoke.  I said yes.
7   Q   I'm sorry.  What did you speak about?
8   A   Well, they asked about things that are going on
9       with the professional organizations that I have
10      written about in my report.
11          So they asked for details regarding those
12      things and what is going on and I said that I
13      would talk a little bit about it, but not, you
14      know, not at length.
15          I said that it is accurate what I wrote in my
16      reports that we have attempted to submit proposals
17      that seem to have been squashed based on
18      ideological grounds.  I said that that is, you
19      know, accurate.  And basically, you know, I left
20      it at that.
21          I was, I had mixed emotions, of course, about
22      getting myself involved.  I've not previously and
23      I'm trying to not be involved with press related
24      stuff.  So I didn't want to talk at length.  Yeah.
25  Q   Was this on background with this person, or do you

Page 54

1 anticipate there will be an article?
2 A I don't know if there will be an article or not.
3 I asked to, you know, to not be named or, you
4 know, so, yeah.
5 Q When you said your reports, were you talking about
6 your reports in Decker and Boe?
7 A Yes. You know, I guess those are public. I don't
8 know what is publicly available and what is not.
9 I have already made statements in these cases
10 regarding my opinion regarding what is going on
11 within the academia and our professional
12 organizations.
13 Q Fair to say, did you speak specifically about this
14 case in that interview?
15 A No.
16 Q How did that person get in touch with you?
17 A I got an email.
18 Q Did you keep that email?
19 A Yes.
20 Q Why do you try not to get involved with press
21 around this?
22 A Well, I guess there are a number of things. For
23 one, it seems like if you are an honest broker of
24 information and try to work for more cautious care
25 and for people to be careful about transitioning

Page 55

1 minors, then you get painted as a right wing
2 extremist and hateful and transphobic. I would
3 prefer myself and my family not to go through
4 that.
5 So I'm trying to, you know, be honest with
6 the courts. I was asked for an opinion so I feel
7 like I have to give my honest opinion. I feel
8 like the safeguarding of children is very
9 important. I feel like I have a duty to my
10 patients to testify.
11 Yet, you know, as I wrote in my report, there
12 are a lot of thought levels and tribalism in our
13 society. People are using this issue to attack
14 other people. And I don't want to be involved
15 with attacking other people.
16 I also would prefer for, I would prefer to
17 remain within respectful academic-type dialogue.
18 That is hard to get to happen in these things, as
19 I've written in my report. But I feel like the
20 dialogue of ideas would go best through medical
21 either journals and professional organizations and
22 that is a, you know, the more ideal way to work
23 these things out rather than going through, you
24 know, the media.
25 Although, I do think that, you know, once

Page 56

1 again, considering the stakes that I'm getting
2 asked, I mean, it's a tough discussion. But, yes,
3 those are some of the factors that I thought
4 about.
5 Q In your answer you said you thought you had a duty
6 to your patients in this regard.
7 Were you referring to the sixteen or
8 seventeen patients with gender dysphoria that you
9 have treated?
10 A Yes. And to all patients, yes.
11 Q And of the sixteen or seventeen patients with
12 gender dysphoria, you believed as a psychiatrist
13 that they all, in fact, had gender dysphoria,
14 correct?
15 A Yes, that they had that diagnosis. Correct.
16 Q You said you thought there, that you wanted to
17 participate in more academic dialogue about this
18 topic.
19 Do you believe that Senate Enrolled Act 480
20 furthers academic dialogue on this topic?
21 A I think just, like anything else in life, there
22 are trade offs. So it might. It might not. I
23 guess we would have to see what the results of it
24 are.
25 Q You said trade offs. Do you believe that the

Page 57

1 trade off of banning medical treatment for gender
2 dysphoria in minors in Indiana is an acceptable
3 trade off to possibly further academic dialogue on
4 this topic?
5 MR. PATTERSON: Object. This is outside
6 of the scope of his testimony.
7 You can answer.
8 A Well, I don't think, I think that is only one of
9 the implications of the law. So, no, that is not
10 the primary implication of the law. It is an
11 implication of it.
12 Q I'm sorry. What is not a primary implication of
13 the law?
14 A The law's effect on the academic or scholarly or
15 public dialogue is a secondary effect and not a
16 primary effect.
17 Q Do you agree with the primary -- I take it then
18 that you are supportive, however, of the primary
19 effect of Senate Enrolled Act 480, which is to
20 prohibit gender-affirming care for minors in the
21 state of Indiana?
22 MR. PATTERSON: Object. The law speaks
23 for itself.
24 You can answer the question if you
25 understand it.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 58

1  A  I will answer in that I was asked to give my
2     opinion about matters related to the treatment of
3     gender dysphoria, what is going on in professional
4     organizations, what is going on in the academia.
5     That is where my realm, you know, is that I'm
6     providing expertise.
7         So the effects of the laws, both good and
8     bad, is not something that I've given, that is
9     sort of a secondary effect.
10        But, yes, I'm, I do believe that in all it's
11    better to stop these gender-affirming treatments
12    which in total I believe cause more harm than they
13    ameliorate.
14  Q  When you say in total cause more harm than they
15    ameliorate, do you mean at the individual level or
16    population level?
17  A  Both.
18  Q  Do you believe there are any individual patients
19    for whom gender-affirming care as a minor is a net
20    positive?
21  A  I'm not sure.
22  Q  Of the thirteen patients who you have seen with
23    gender dysphoria, were any of them receiving care
24    that would otherwise be banned by the state of
25    Indiana?

Page 59

1  A  If we are going to ask me about my patients I
2     would like to go off the record again.
3         MR. PATTERSON: You mean confidential?
4  A  Confidential, yes.
5  Q  I think the way we have been doing this is that
6     when we remember during the deposition we say it
7     and then when we get the transcripts we mark it.
8  A  Okay. So you would like me to answer?  As long as
9     its confidential then I will answer.  Redacted
10  Q  Redacted
11    Redacted
12    Redacted
13  A  Redacted
14  Q  Redacted
15  A  Redacted
16    Redacted
17    Redacted
18  Q  Redacted
19    Redacted
20    Redacted
21  A  Redacted
22  Q  Of the thirteen, how many of those patients were
23    receiving care that would otherwise be banned by
24    the state of Indiana?
25  A  Well, I mean, one at one time would have been.

Page 60

1  Q  Redacted
2     Redacted
3  A  Redacted
4  Q  Redacted
5     Redacted
6  A  Redacted
7     Redacted
8     Redacted
9       Redacted
10    Redacted
11  Q  Redacted
12    Redacted
13  A  Redacted
14    Redacted
15    Redacted
16    Redacted
17    Redacted
18    Redacted
19  Q  Dr. Kaliebe, you are testifying on behalf of the
20    state of Indiana, right?
21  A  Yes.
22  Q  They are defending a law that bans
23    gender-affirming care for minors.
24        Part of your expertise is predicated in your
25    representation to the court that you have treated

Page 61

1  some number of patients with gender dysphoria.
2  A  Correct.
3  Q  You told me that you believe that at the
4     individual level the provision of the kind of care
5     that is banned by Indiana now for minors is more
6     harmful than it is beneficial.
7         So I'm trying to ask so the court, when it
8     sees the transcript, can assess what is it that
9     you have observed as a clinician that makes you
10    think this care is more harmful than it is
11    beneficial?
12        So it would be helpful then to know -- let me
13    ask you small questions to see how far we get.
14        Were these long-term risks you were concerned
15    about or short-term?
16  A  Once, again, I would prefer not to talk about
17    individual patients.
18  Q  Let's talk generally.  What are the general risks
19    you believe outweigh the benefits for this kind of
20    treatment?
21  A  Well, so first off, there are risks related to
22    mental health that are, especially long-term
23    mental health, that seem apparent based on
24    long-term data.  And especially would be apparent
25    in someone who has not gone through a proper

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 62

1  process of actually developing as an individual
2  before they moved on to consider such things.
3      And in such cases, they should have a period
4  of time where they are able to interact with
5  mental health professionals and explore their
6  identity, explore how they got to the place where
7  they are, explore what possibly might be other
8  things that could be involved that would lead
9  them, you know, to have this gender dysphoria.
10     So that should all be worked up prior to
11 initiation of these treatments. And as someone
12 who is a growing, developing adolescent, they
13 should finish their development or very close to
14 finishing it before they make permanent changes in
15 their bodies. Those are some of the
16 psychological.
17     The physical risks is risk of surgery,
18 hormones, cancers. Any kind of medical problems
19 that could come.
20 Q  Do you believe that there are any patients at the
21 end of this process that you propose, that the
22 provision of gender-affirming care, the benefits
23 will outweigh the risks?
24 A  Yes. Could I qualify since we have not gone on
25 yet? I think you are asking me to opine on an

Page 63

1  unknown that I would not say that I have a -- I'm
2  saying yes based on that I think those who have
3  gone through, you know, a proper process and are
4  adults, you know, I think that that is a, that
5  it's unknown, it's unknown still overall about the
6  risks and benefits of these transitions. I think
7  we do need more evidence on it. But that is my
8  qualified answer. Go ahead.
9  Q  Would you support a ban on this kind of care for
10 adults?
11 A  You would have to tell me what you mean by ban.
12 Q  Well, you are familiar with Senate Enrolled Act
13 480, which we are talking about in this case as
14 pertains to minors.
15 A  Yes.
16 Q  Would you support a law like Senate Enrolled Act
17 480 if it applied to adults?
18 A  You are saying starting at what age?
19 Q  Let's start with for anybody of any age, would you
20 support a ban on this kind of care?
21 A  I mean, I think you can reasonably say there must
22 be some, there could be an age limit. There could
23 be a process that people have to go through.
24     Yes. I mean, it may be in the current
25 climate that you need some legislative safeguards

Page 64

1  in order to ensure that there is a proper process.
2  Q  I am asking two questions then.
3      The first question is so you believe that
4  after some kind of proper evaluation process the
5  provision of this care may be appropriate in
6  adults, correct?
7  A  Correct.
8  Q  Setting aside what that process is, do you believe
9  that there is any age limit that should exist for
10 folks who are even eligible to go through that
11 process to then receive this kind of care?
12 A  Well, I don't have a formulated opinion on what
13 would be the pluses and minuses of a particular
14 age limit.
15     But I do think, in general, we understand
16 that people are growing and developing and, you
17 know, in other circumstances people are often, oh,
18 the brain develops until twenty-five or until
19 twenty-one.
20     You know, there is an active debate about the
21 age where someone sort of becomes, you know, a
22 fully developed complete person and, you know,
23 when their identity of any type, you know, would
24 have solidified.
25     I think you can have -- I don't think we have

Page 65

1  had enough quality discussion and debate in the
2  literature regarding those things to give me a
3  sense of what would be a, you know, how to
4  approach that.
5  Q  In the interim while this debate is continuing or
6  not, do you believe that there should be a ban on
7  this kind of care for folks who are over
8  eighteen?
9  A  A blanket ban for over eighteen? Well, as I was
10 saying, I just think my belief would be with some
11 process and with some age bar which might be more
12 than eighteen could be appropriate.
13 Q  Okay. Well, I guess, earlier when we were talking
14 about how you think that there is not sufficient
15 research or there has not been sufficient debate
16 with respect to folks under eighteen so you
17 support a ban in the interim.
18     I am asking the same question for over
19 eighteen. Do you think there should be an age ban
20 above eighteen in the interim?
21 A  I have not given it -- I think that it could be
22 reasonable to have an age ban over eighteen,
23 correct.
24     I don't know what exactly, I've not given it
25 a lot of thought, nor have I seen in the

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 18 of 84 PageID #: 3556

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 66

1 literature what would be a proper way to approach
2 this. What process would people have to go
3 through. I mean, whenever you make an age limit
4 like sixteen for driving, or twenty-one for
5 drinking, there are always problems with those
6 strict age limits. There are those trade offs.
7 There is a lot of complex calculation that would
8 go into any such trade off.
9        And so I've not really seen any analysis of
10 exactly what would be the best trade off in these
11 situations.
12        MR. SELDIN: We have been going for a
13 little bit at this point. How would a five minute
14 break sound?
15        (OFF RECORD AT 11:09 A.M.)
16    (AT THIS TIME A SHORT RECESS WAS HELD OFF
17 THE RECORD AFTER WHICH THE FOLLOWING PROCEEDINGS
18 WERE HAD:)
19        (ON RECORD AT 11:15 A.M.)
20 BY MR. SELDIN:
21 Q  Dr. Kaliebe, welcome back.
22        MR. SELDIN: Joel, will you pull up
23 Exhibit 1 for us?
24 Q  Dr. Kaliebe, I would like to talk a little about
25 your declaration.

Page 67

1 A  Okay.
2 Q  Dr. Kaliebe, in your declaration in Paragraph 25
3 you say, "Current discussions regarding
4 transgender care take place in the context of an
5 unexplained and remarkable rise in minor patients
6 reporting gender dysphoria."
7        Do you see where you wrote that?
8 A  Yes.
9 Q  Would you agree that gender dysphoria is a real
10 condition that requires treatment?
11 A  Well, that is one of the things I was talking
12 about before in my preamble about things I was
13 asked before.
14        So is it a real disorder? Correct. But
15 the "requires treatment" part is a complicated
16 matter. So I would say, no. Even though before I
17 sort of automatically said yes, that sounds
18 reasonable. Lots of times in our business there
19 are problems people have that they mostly work
20 through on their own and do not get treatment for.
21        So that is the standard, you know, mental
22 health, most of the things that people have that
23 might meet criteria for a disorder or a problem do
24 not usually get solved by therapy or the medical
25 community.

Page 68

1        So, no. I would not say that I would agree
2 with that statement in that it does not, it seems
3 to reflect a it must be treated part. So I can't
4 agree with that.
5        MR. SELDIN: Joel, will you pull up
6 Exhibit 7? We will be at Page 157 of the PDF.
7 Q  Dr. Kaliebe, earlier I showed you Exhibit 7, which
8 was your testimony at trial in Decker.
9        Do you recall us talking about that?
10 A  Yes.
11 Q  Okay. You will see on this Page 1119 of the
12 transcript starting at Line 11 you are asked
13 questions.
14        "Q. Dr. Kaliebe, you would agree that gender
15 dysphoria is a real condition that requires
16 treatment?
17        A. Correct."
18        Do you see that?
19 A  Yes, I do.
20 Q  Was the testimony that you provided at trial in
21 Decker that I just read truthful?
22 A  Yes. In that I -- if you remember at the
23 beginning when you asked about did I make any
24 changes, as I looked at it and saw the wording of
25 this in both my previous, you know, as I was

Page 69

1 questioned, this is exactly what I was talking
2 about that now that I see how that was worded,
3 that I, in some ways, misunderstood about
4 "requires treatment" because you can talk about
5 that in different ways.
6        Is it, do we normally -- would we like to
7 treatment something? Is it good if something is
8 treated? Sometimes that is what you mean by
9 requires treatment.
10        I just want to clarify there are lots of
11 disorders and problems that do not require
12 treatment that for most people most of the time
13 they solve their problems without medical or
14 psychiatric treatment.
15        Now that I have had time to think about it
16 and looked at it in print, that is what I was
17 mentioning that I think I was, you know, I believe
18 that "requires" is a word that I was misreading.
19        And now I can see that if that is the, if
20 that is how you are asking it, "must be treated",
21 no, I don't, I want to add some nuance to that
22 question.
23 Q  So, Dr. Kaliebe, earlier you were talking about
24 your deposition in Decker, which was like this,
25 just lawyers, no court.

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 19 of 84 PageID #: 3557

K.C., et al. VS                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                          June 1, 2023

Page 70

1    We talked about how you reviewed your
2  transcript for errata.  In that case you pointed
3  out misquotes, but not sot of substantive changes
4  that you were thinking about after reflecting upon
5  the testimony.
6    What we just read was testimony that you
7  provided live in court from Decker a few weeks
8  ago.  Are you saying the testimony I just read
9  that you provided to the court in Florida is, in
10  fact, not true?
11 A  I'm saying that I would add nuance to it because
12  the word "requires" can be seen in different ways.
13  I don't want to be boxed into a corner of saying
14  something that I didn't.
15    Now that I read it, as I said about the
16  deposition, I am now reflecting an opinion that
17  the word "requires" can mean different things in
18  different contexts.  So I'm just clarifying.
19 Q  Do you feel like given what you have just told me
20  you will need to correct your testimony in Decker?
21 A  I don't know what you mean by correct my
22  testimony.
23 Q  Well, in Decker you said in court in front of a
24  judge, just like the judge that we have in our
25  case in Indiana, you were asked "You would agree

Page 71

1  that gender dysphoria is a real condition that
2  requires treatment?"
3    You said, "Correct."
4    Then you moved on being questioned.  So the
5  judge in that case heard you say that it's
6  correct.
7    Do you think that judge needs to know that,
8  in fact, you want to add nuance to that because
9  it's not the answer that you wanted to give?
10    MR. PATTERSON: Objection.
11    You can answer.
12 A  I think the judge is plenty intelligent to siphon
13  out these things himself.  He saw the rest of my
14  testimony.  I'm pretty sure that he was capable of
15  coming to conclusions about what I felt and how I
16  approached treatment.
17    So I think, I don't think it's necessary for
18  me to go and, you know, try to have something
19  amended.  I don't see it as a matter that would
20  reach that level of importance.
21    But, once again, since I noticed it and I
22  have evolved or became more mindful of exactly how
23  the words are asked to me to, you know, and could
24  be perhaps used to twist or change what my opinion
25  is, I wanted to make sure here I'm on the record

Page 72

1  accurately with what my opinion is.
2 Q  So you believe that your views have evolved since
3  May 18 when you provided this testimony?
4    MR. PATTERSON: Objection.
5  Mischaracterizes his testimony.
6    You can answer.
7 A  I don't think, I think, you know, my views have
8  not changed on it.  I just, the word "requires" is
9  an overly strong word that now I'm realizing I had
10  agreed to and now would be, I would add nuance.  I
11  should have at that time added the nuance to my
12  answer.
13 Q  All right.  Further down on this page, you know,
14  right after this question I will read you part of
15  this testimony.
16    On Line 14 you were asked the question, "You
17  provided some testimony just earlier about the
18  number of people presenting for care.  Do you
19  recall that?"
20    You said, "Correct."
21    Then you were asked, "You previously
22  testified that the fact that more people have been
23  showing up in clinics could be, could be explained
24  by, (a), that the care is more available; and,
25  (b), that more people feel comfortable seeking

Page 73

1  care; is that correct?"
2    And you said, "Yes."
3 A  Correct.
4 Q  Do you have any nuance that you want to add to
5  that testimony?
6 A  Well, I would assume if you have specific
7  questions, you could ask me.  So I think that that
8  speaks for itself.
9 Q  So when I asked you correct -- when we were
10  talking earlier you said you had some nuance to
11  add to your answer in Line 16 of "Correct."
12    So I'm asking the same question here, which
13  is, did you understand the question then and
14  answer truthfully, I guess?  Then, is there
15  anything that you need to change now to make that
16  the case?
17 A  No.  I mean, I think that those are factors which
18  are involved.  So I still would believe -- I
19  believed at the time and I still believe the --
20  no, that's -- I will stick with that.
21 Q  In your report or your declaration you talk about
22  how you had not seen any patients for gender
23  dysphoria between 2005 and 2016.
24    Do you recall that?
25 A  Yes.

Page 74

1  Q   Okay.  And you are aware that there was at least
2      one clinic in the United States as early as 2007,
3      correct?
4  A   Yes.
5  Q   Is there a particular reason you didn't include
6      that fact in this declaration?
7  A   I don't understand the question.
8  Q   Okay.
9          MR. SELDIN: Joel, will you pull up
10     Exhibit 4?
11 Q   Look at Paragraph 102.  We were earlier talking
12     about the report that you provided in Decker.
13     This was filed with the court on April 7.
14         In Paragraph 102 if you read maybe two-thirds
15     of the way down the paragraph you said, "The first
16     gender clinic in the United States just opened in
17     2007."
18         Do you see that?
19 A   Correct.
20 Q   So is there a particular reason that you did not
21     include that fact in your declaration in this
22     matter?
23 A   No.
24 Q   Earlier we talked about how Decker was the first
25     case you had been an expert in that involved

Page 75

1      gender dysphoria, correct?
2  A   Yes.
3  Q   You said you had not held yourself out as having
4      any particular expertise in gender dysphoria prior
5      thereto, correct?
6  A   Well, other than I have obviously testified on, in
7      many cases being a forensic psychiatrist.  I have
8      repeatedly held myself out as an expert in
9      psychiatry and in child psychiatry.
10         So my expertise is as a psychiatrist and as a
11     child psychiatrist.
12 Q   But you did not specifically hold yourself out as
13     having an expertise in gender dysphoria, is that
14     correct?
15 A   Correct.
16 Q   Okay.  So turning back to Exhibit 1, Paragraph 26,
17     you will see in Paragraph 26 that you talk about
18     how from 2005 to 2016, that eleven year period,
19     none of the medical students or residents you
20     supervised presented you with cases involving
21     gender dysphoria.
22         Do you see where you wrote that?
23 A   Yes.
24 Q   It would not be surprising if no one came to
25     specifically ask you about gender dysphoria if you

Page 76

1      were not holding yourself out as having a
2      particular expertise on that topic, right?
3  A   No.  Because I work with residents and medical
4      students and primary care doctors on all sorts of
5      patients.  So if we were seeing those patients
6      they would have brought them to me because I was
7      working with them as a supervisor under many
8      circumstances.
9          So, no, it would not have to be that I was an
10     expert.  I was the expert as the attending
11     clinician or the person who ran the clinic or the
12     person doing the consultative service.
13         So I would disagree with that
14     characterization.
15 Q   You would agree then that from 2005 to 2016 just
16     because you were not encountering patients with
17     gender dysphoria, that does not mean that no one
18     was encountering patients with gender dysphoria,
19     right?
20 A   Well, I think I was very clear that it was just
21     nobody in my sphere that I worked in at all and my
22     personal interaction.
23         So I didn't ever claim that no one anywhere
24     ever saw a patient with gender dysphoria.
25 Q   Okay.

Page 77

1          MR. SELDIN: Then, Joel, take to us
2      Paragraph 30, please.
3  Q   You wrote, "Never before have there been large
4      cohorts of individuals seeking medical services to
5      alter their secondary sex characteristics."
6          Do you see that?
7  A   Yes.
8  Q   What do you base that statement on?
9  A   Well, we are looking right at a graph of the
10     increases.  I know that is Sweden.  We could make
11     a similar graph in other places.
12         You know, as I mentioned in my report also,
13     you know, the base rate of gender dysphoria was
14     seen as very low even by the DSM-5, which I
15     believe is a pretty reputable source, two to
16     fourteen per 100,000.
17         So, you know, clearly there was not large
18     amounts of patients seeking services until
19     recently.
20 Q   The question that I have is in that sentence you
21     say just seeking medical services to alter
22     secondary sex characteristics.
23         You are referring to a chart about gender
24     dysphoria children, adolescents in Sweden.  I
25     guess what I'm asking is when you make that broad

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 78

1  statement, are you considering the history of
2  cosmetic surgery and plastic surgery globally
3  which does often, in fact, alter secondary sex
4  characteristics?
5  A  Okay.  Yeah.  I mean, I think point taken.  People
6  do have voluntary surgeries for those things and
7  that has existed for a while.  Yes.
8  Q  So would it be fair to say that there have been
9  large cohorts of individuals seeking medical
10  services to alter their secondary sex
11  characteristics.
12      They just may not have had gender dysphoria
13  for that, correct?
14  A  Well, you know, this report is related to gender
15  dysphoria.  So I assume, you know, and these
16  charts are related to children.
17      So I would assume that it was understood that
18  we were talking about children presenting to
19  change their secondary sex characteristics to the
20  other gender, which is accurate.
21      You are correctly pointing out that there are
22  other circumstances where people have sought out
23  surgeries to change their sex characteristics.
24  Q  In Paragraph 28 you talk about referrals to
25  certain gender clinics in England and elsewhere.

Page 79

1      Do you see that?
2  A  Yes.
3  Q  Would you agree that there is a difference between
4  having gender dysphoria and being referred to a
5  gender clinic?
6  A  Yes.
7  Q  Okay.  So it's -- the base rate of gender
8  dysphoria and referrals to clinics is not apples
9  to apples, right?
10  A  Well, you know, very likely they are related.
11  Q  Very likely, but you were not certain?
12  A  No.
13      MR. SELDIN:  Joel, would you take us to
14  Paragraph 33.
15  Q  In your third line of Paragraph 33 you say, "Yet
16  multiple lines of evidence point to direct social
17  influences and online and social media contagion
18  as major contributors to the remarkable rise in
19  gender dysphoria in adolescents."
20      Do you see where you wrote that?
21  A  Yes.
22  Q  What multiple lines of evidence are you referring
23  to here?
24  A  Well, I go on in the report to talk about the
25  increase in presentations to child psychiatrists

Page 80

1  of other disorders or problems that are seemingly
2  acquired online or contributed to online which we
3  have, it has been shown that there is a
4  relationship between online viewing and
5  suicidality, self-harm, multiple personality
6  disorder, tic disorders.
7      So we have a significant literature that does
8  show the influence of online habits and
9  presentations to child psychiatrists for problems.
10  That whole idea of culture and disorders and how
11  the medical system's theories and naming of
12  disorders and treatments influence patient
13  presentations has gone back a long time.
14  I referenced the Shorter book which goes back
15  to the Victorian era.  So we have known for a long
16  time that the way the medical establishment or
17  clinics see problems can bleed out into the
18  community and affect it.
19      In addition, there are currents in our
20  society that are, you know, reflect viewpoints or
21  ideologies that often are flowing through the
22  media.  And those seem to, you know, have
23  influence on how people see themselves.  That
24  could be any number of ways.  And I don't think
25  that gender identity or gender dysphoria would be

Page 81

1  immune to any of those influences.
2  Q  So the multiple lines of evidence you are
3  referring to then is by inference or analogy that
4  you would think that also applies to gender
5  dysphoria?
6  A  Well, it would be a pretty incredible coincidence
7  that right at the same time that social media came
8  on the scene and became widely adopted by children
9  and adolescents and that the popularity of
10  influencer and ideology related to transgender and
11  gender dysphoria sort of came on the scene, that
12  that was right at the same time that we had this
13  large rise in presentations to gender clinics.
14      So it seems that there is very likely an
15  interaction between the two.  Certainly we should
16  be skeptical and cautious when, you know, there is
17  such a change so quickly.
18  Q  You would agree that is correlation and not
19  causation at this point?
20  A  Correct.
21  Q  When you say influencers, who were you referring
22  to.
23  A  Well, I don't have specific names of people
24  online.  Although over time we have heard many
25  names.  There are TV shows.  There are people that

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 22 of 84 PageID #: 3560

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

---

Page 82

1    are online.  There's a number of individuals who
2    are transgender who are well-known personalities.
3         There are also subgroups.  You know,
4    influencers might be a strong word for this, but
5    there are a lot of people who are active on the
6    online communities, Reddit, and these type of
7    places where adolescents and children can be
8    influenced by what they encounter online.
9  Q   Do you believe that a celebrity who is on social
10    media merely existing as openly transgender is a
11    source of social contagion?
12  A   Well, they may be or may be not.  I don't, I would
13    not say merely existing.  Definitely it would
14    depend on how they present themselves and how they
15    are talking about themselves.
16         It could be -- no, not by merely existing.
17  Q   When you say it would depend on what they said and
18    how they are presenting, what do you mean?
19  A   Well, I think that we would have to be cautious
20    about the presentation of individuals who may have
21    a large influence over children and adolescents
22    who may take celebratory views regarding
23    transition.
24         That may have a large influence on minors.
25    And so I think that there's a potential for those

---

Page 83

1    who are celebratory to have an influence in a way
2    that, you know, can especially for minors who
3    already have mental health problems or are very
4    easily influenced, could lead them to believe or
5    develop a belief that transition is a solution to
6    the problems that they have, or that their gender
7    dysphoria, the solution to that would help them,
8    could contribute to the development of gender
9    dysphoria or contribute to the belief that a
10    transition would be, you know, a good source for
11    them.
12  Q   Do you believe that to be the case even if there
13    is no mention by that particular celebrity about
14    any other co-morbid conditions?
15         You said celebratory.  If someone really
16    celebrates the fact that they have medically
17    transitioned, do you believe that that is
18    sufficient to cause social contagion in youth such
19    that they will then believe that they also have
20    gender dysphoria?
21  A   Well, I don't know that is sufficient.  It could
22    be a contributor.
23  Q   Is it possible that a celebrity who is celebratory
24    about their medical transition really creates a
25    more welcoming environment for people who already

---

Page 84

1    have gender dysphoria to be more open about it?
2  A   Yes, it's possible.
3         MR. SELDIN: Joel, please take us to
4    Paragraph 52.
5  Q   You wrote, "Yet most child and adolescent
6    psychiatrists I speak with admit to me that they
7    will not speak publicly on this subject due to how
8    sensitive the topic is, expressing fears of
9    hostilities from activists along with condemnation
10    and retributions from others with their
11    universities and organizations."
12         Do you see that?
13  A   Yes.
14  Q   Can you tell me which child and adolescent
15    psychiatrists have said this to you?
16  A   Are you asking me to out the people who said they
17    do not want to speak publicly?
18  Q   You represented to the court here that most of the
19    people you talk with have said this to you.  I
20    would like to know who said this to you.
21         MR. PATTERSON: I object.  There could be
22    First Amendment issues here.
23         At a minimum, we should go confidential on
24    this part of the transcript.
25         MR. SELDIN: I think it is presumptively

---

Page 85

1    confidential for two days so we can work it out.
2  Q   Dr. Kaliebe, who said this to you?
3  A   So this is confidential?  Is that what you are
4    saying?
5  Q   Yes.  We can designate this portion as
6    confidential.
7         MR. PATTERSON: You will not object to
8    maintaining confidentiality of this portion,
9    correct?
10         MR. SELDIN: No, I won't.
11  Q   Redacted
12  A   Redacted
13    Redacted
14    Redacted
15    Redacted
16       Redacted
17    Redacted
18    Redacted
19    Redacted
20    Redacted
21    Redacted
22    Redacted
23    Redacted
24       Redacted                            ,
25    Redacted

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 86

1    Redacted
2    Redacted
3    Redacted
4    Redacted
5    Redacted
6  Q  Let's start with the folks you just named.  You
7     first named, I think, you counted five or six
8     people.
9        Is that most of the psychiatrists that you
10    have talked to?  I'm trying to understand how you
11    are coming to this conclusion of "most"?
12 A  I talk to many more.  I talk to many, many more
13    psychiatrists.  When I go to the child psychiatry
14    meetings I'm trying to talk to people about these
15    issues so that we can come up with more.
16       I just have not prepared a list to provide to
17    out people who do not want to be outed during my
18    deposition due to their fears of recrimination and
19    hostility.
20       That was not something I thought I would be
21    asked to reveal.  If you want me to make a list
22    and give it to you later, you know, but like I
23    said, as I am representing in my report, that it's
24    many people.
25 Q  You were talking just a minute ago about a talk

Page 87

1     you gave in Puerto Rico.  When was that?
2  A  May 2 or May 3 I would guess.
3  Q  What was the conference you were presenting at?
4  A  It was the Oasis Child Psychiatry Conference.
5  Q  What is the Oasis Child Psychiatry Conference?
6  A  A continuing medical education conference that is
7     presented in different places.  Basically people
8     pay a fee and they travel to wherever it is.  This
9     one was in Puerto Rico.
10       People like me who are experts provide talks
11    on different things.  I gave three talks at the
12    Child Psychiatry Conference.
13       You didn't ask me about presenting CMEs.  I
14    did present this CME talk on child, on gender
15    dysphoria.  So if you want to add that to my
16    expertise, you can.  But this was at the Oasis
17    Child Psychiatry Conference.
18 Q  Who organizes that conference?
19 A  It's a larger, it's under the umbrella of a large
20    organization that does many different, they have a
21    psychiatry conference.  They have a child
22    psychiatry conference.
23       They have many other things.  I don't
24    remember the name of the company.  I don't
25    remember the company of that organization.

Page 88

1  Q  So it's, are they affiliated with a medical
2     institution or association, or is this like a CME
3     company?
4  A  It's like a board review CME company.
5  Q  Right.  Was the topic of the conference you
6     presented at specific to gender dysphoria?
7  A  No.  The topic of the conference was specific to
8     child psychiatry.  I presented three topics.
9     Gender dysphoria was one of the three topics.
10 Q  What were the other two?
11 A  Traumatic brain injury and social media.
12 Q  Had you presented any version of this presentation
13    on gender dysphoria before?
14 A  No.
15 Q  Have you presented it again since May 2 or 3?
16 A  No.
17 Q  Have you presented other CMEs on gender dysphoria
18    prior to May 2 or May 3?
19 A  No.
20 Q  Okay.
21 A  The date might be a little off.  I'm not sure.  It
22    was May.  It was early May.
23 Q  Okay.  How many people attended your session on
24    gender dysphoria?
25 A  There were probably sixty to eighty in the room.

Page 89

1  Q  Okay.  And about how many people attended the
2     conference?
3  A  I would assume somewhere around that same number.
4     It's also online.
5  Q  The entire conference you think was under one
6     hundred practitioners?
7  A  Yeah.  On site I would guess so.  Yeah.  I'm
8     not -- it's a guess.
9  Q  Did you reach out to Oasis about this presentation
10    or did they reach out to you?
11 A  I have spoken for them before.  This was the third
12    time that I have spoken for them.  I spoke some at
13    the adult psychiatry one contiguous with it.
14       I have done it twice before for them for
15    child.  They have an adult and then a child
16    conference.  I spoke a little at the adult and
17    then also the child conference this time.  They
18    request me as a speaker.  They reached out to me.
19 Q  Did you discuss your involvement as an expert
20    during your presentation?
21 A  No.
22 Q  I would assume when you say most of the
23    psychiatrists that you speak with, and this may
24    seem like a silly question, but you don't speak
25    with most psychiatrists in the U.S.  I take it,

Page 90

1   right?
2 A  Correct.
3 Q  You have stated you believe that it is
4   controversial to take the position that you take
5   regarding gender dysphoria, correct?
6 A  Not controversial among psychiatrists or
7   physicians, yet controversial in the public
8   sphere.  Yes.
9 Q  So would it surprise you then that once you
10   express some receptiveness to this view of gender
11   dysphoria, would it surprise you then that what
12   appears to be an unusually large number of folks
13   would come to you expressing the same one?
14 A  Well, mostly these are regular private
15   conversations from people that I know.  It's not
16   like I was approached by the names that I gave you
17   or the people that I'm speaking about when I say
18   that child psychiatrists are afraid to talk about
19   this, but feel supportive of my approach.
20 Q  Dr. Weiss, let's go to Paragraph 53 of your
21   declaration.  We will scroll down a little bit.
22       MR. PATTERSON:  Did you say Dr. Weiss?
23 Q  Sorry.  My mind is still in last week.
24       Dr. Kaliebe, you will see in this paragraph
25   you talk about social media as an influence

Page 91

1   regarding teenagers.
2       Do you think that heterosexuality is a sexual
3   identity?
4 A  Could you repeat the question?
5 Q  Is heterosexuality a sexual identity?
6 A  Yes.
7 Q  Do you believe that social media has an influence
8   in how teenagers who are heterosexual express
9   their identity?
10 A  Identity, no.
11 Q  You believe that teenagers who use social media
12   who are heterosexual or straight, the way they
13   express being straight is not influenced by social
14   media?
15 A  It could be.  It could be.
16 Q  Are you familiar with the movie genre of the teen
17   rom com?
18 A  Is that romantic comedy?
19 Q  Right.  You are generally familiar with the fact
20   that a decent amount of media television or movies
21   revolve around teenagers in high school who date.
22       Is that a fair description of a certain part
23   of American media?
24 A  Yes.
25 Q  Do you think that those movies and TV shows when

Page 92

1   they show straight teenagers dating, do you think
2   that that has an influence on how American
3   teenagers date or their expectations of dating as
4   straight teenagers?
5 A  It could, yes.
6 Q  All right.  For teenagers who are not straight,
7   who have a different sexual identity, do you think
8   that media influences their expression more or
9   less than heterosexual teenagers?
10 A  I would not have an opinion more or less.  I'm not
11   sure.
12 Q  Okay.  And then do you think everyone has a gender
13   identity?
14 A  I think that is an open scientific question.  I'm
15   not, I would not say that that is a settled
16   question.  That has been an assumption that most
17   people are going on.
18       That seems to be a common assumption.  I'm
19   not sure that it is a settled scientific question.
20 Q  Do you think that most people have an internal
21   sense of whether they are male or female or
22   something else?
23 A  I think we are getting into nuance about internal,
24   what we mean by internal sense.  Most people can
25   identify themselves as either male or female.  So

Page 93

1   I would say that is correct because that does
2   exist in their brain.  Yes.
3 Q  When you say sense of themselves you mean as male
4   or female?  We will start there.
5 A  Correct.
6 Q  Okay.  Do you think that -- okay.  In Paragraph 54
7   of your declaration you talk about the -- I'm
8   sorry.  I lost my place here.
9       Yes.  In Paragraph 53 you talk about
10   Dr. Weigle's publication in the Psychiatric
11   Times.
12       Do you see that about three lines up from the
13   end of Paragraph 53?
14 A  Yes.
15 Q  Is the Psychiatric Times a peer reviewed journal?
16 A  No.
17 Q  Dr. Kaliebe, in Paragraph 54 you say -- in
18   Paragraph 55 you say in my opinion --
19       MR. SELDIN:  Joel, can you scroll down to
20   Paragraph 55, please.
21 Q  You say, "In my opinion, technological,
22   ideological, and social factors underlie much of
23   the recent increase in gender dysphoria in
24   adolescents."
25       Do you see that?

K.C., et al. VS
The Individual Members of the Medical Licensing Board
KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 94

1 A  Yes.
2 Q  We will take a look at your report in Decker.
3      MR. SELDIN: Joel, will you pull that up?
4  That is Exhibit 4, Paragraph 44.  You say there,
5  "It is plausible and probable that ideological and
6  social factors underlie the increase in gender
7  dysphoria."
8      Do you see that?
9 A  Yes.
10 Q  My question is in this earlier report in Decker
11  you said it's plausible and probable that
12  ideological and social factors underlie the
13  increase.
14      Then in your declaration here you say, "In my
15  opinion technological, ideological, and social
16  factors underlie much of the recent increase in
17  gender dysphoria in adolescents."
18      My question is, is this two ways of saying
19  the same thing?  Or are you holding this opinion
20  to a different degree of certainty from April to
21  now?
22 A  I guess it was just the -- it seems to me that I'm
23  pretty much saying the same thing on both
24  occasions.  I'm just perhaps fine tuning it.  I
25  don't know that it really adds more or less

Page 95

1  certainty, the change.
2 Q  All right.  In the Decker report you said it is
3  plausible and probable that ideological and social
4  factors underlie the increase in gender dysphoria.
5      Is it fair to say then that you are not sure,
6  but this could be true?
7 A  Well, I'm saying it is probable.  So, yeah, I
8  mean, I think in either case, you know, if it's my
9  opinion, I think the -- I mentioned it is
10  plausible because of it's so, you have had such
11  panic in the academic community when there has
12  been talk of social contagion that it's, you know,
13  it has been really remarkable how people have
14  fought against the idea that there possibly are
15  social or online influences driving these things
16  or having a large influence.
17      That is why I put in the word plausible there
18  because there are academics who are saying that
19  it's not plausible.  But I think it is an
20  extraneous word, so I did not use it in the next
21  report.
22 Q  As a general matter, would you expect teens who
23  had something in common to find each other online?
24 A  Yeah, they could.  Yes.
25 Q  And would you generally expect that small

Page 96

1  populations that tend to otherwise be isolated
2  would find each other online?
3 A  Yes.
4      MR. SELDIN: Joel, will you take us to
5  Paragraph 57, please.
6      I'm sorry.  Can you take us back to
7  Exhibit 1 and then go to that Paragraph 57.  I
8  apologize.
9 Q  Dr. Kaliebe, in Paragraph 57 you provide what you
10  call, "A prescription for open exchange and
11  deliberate consideration regarding gender
12  dysphoria treatments..."
13      Do you see that?
14 A  Yes.
15 Q  Where does that prescription come from?
16 A  Well, I don't know exactly where it comes from.  I
17  feel like it's an amalgam of thoughts that come
18  from John Haidt, who I cited just below.  He is a
19  public intellectual who has commented about group
20  think, the squashing of opinions within academia.
21  He is a social scientist.  That is in part from
22  him.
23      It is in part from Jonathan Rauch, who
24  wrought a book called The Constitution of Ideas,
25  which is a quite thoughtful recent book that lays

Page 97

1  out, I think, even a list of something similar.
2  This could come from Jonathan Rauch.
3  Steven Pinker has written extensively on this same
4  topic and the importance of rationality and the
5  importance of a dialogue of ideas.
6      You could take this as far back as
7  John Stuart Mill, who was originally one of the
8  originals who sort of brought forth a lot of our
9  ideas that underpin what some people call liberal
10  science or scientific exchange today.
11      So this list is a time tested list and it's
12  reflecting of much of the underpinning of how we
13  have achieved, you know, science and moved
14  knowledge forward.
15      As Jonathan Rauch talked about in his book,
16  there is no one person who has a monopoly on the
17  truth.  We get to the truth by exchange, which is
18  conflict, and we need that in order to understand
19  both our opinions better and the opinions of
20  others.  And each of us, hopefully, with this
21  conflict will help us all get closer to the
22  truth.
23      So I know that was a long answer for where
24  that list comes from.  I'm pretty sure if I looked
25  in those sources I could find a list that is

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 98

1    similar.  I don't know exactly where it comes
2    from.
3  Q  Have you evaluated any other areas of medicine
4    that you believe have a credible evidence base to
5    assess whether this prescription was followed?
6  A  Well, I believe in a lot of medicine these things
7    are broadly followed.  So, yes, I believe in many
8    places we have a rigorous scientific exchange on
9    multiple matters within medicine.  Yes.
10  Q  I guess, have you personally examined any
11    particular treatment in the field of medicine to
12    say I wonder if they follow this prescription and
13    have done this analysis?
14  A  Yes.  I think that the best example -- there are
15    many examples, but I think the scholarly exchange
16    regarding antidepressant medications is really a
17    prime example of how we have a robust exchange of
18    ideas.
19  Q  At the end of that robust exchange of ideas that
20    you believe took place with antidepressants, did
21    any state ban the use of antidepressants in
22    minors?
23  A  No.
24  Q  Okay.  Do you think they should have?
25  A  No.

Page 99

1  Q  Is that an area with what we know now about
2    antidepressants where you think individual
3    clinicians have sufficient guidance to make
4    decisions about their particular patients?
5  A  I think that we still are affected by some
6    distortions of that scholarly dialogue in the
7    past.
8    It's in my report regarding undue influence
9    of pharmaceutical companies which have swayed
10    people in a different direction.  Thankfully,
11    there was enough rigor and enough people took
12    interest, although, it took outside pressure
13    because it was the lawsuit asking for a release of
14    full information that helped lead to that.
15    But, yes, at this point those who are looking
16    can find a rigorous dialogue of ideas and make
17    decisions for themselves.
18  Q  Do you think that that evolution would have
19    benefited from a ban on the use of antidepressants
20    in any population while it took place?
21  A  No.
22  Q  In Paragraph 58 you say, referring to this
23    prescription, "This framework would depersonalize
24    the search for truth and esteemed empirical
25    dialogue, which has been in short supply on

Page 100

1    numerous topics within academia."
2    Do you see that?
3  A  Yes.
4  Q  What are the other numerous topics you are
5    referring to here?
6  A  I think in general many of our academic
7    institutions and professional organizations
8    included have gotten behind ideas of social
9    justice.
10    I think social justice ideas at some point,
11    you know, may or may not reflect the truth.  So if
12    your goal is social justice, it can bump up
13    against rigorous science.
14    So I would say that in general that would be
15    the one good example.
16  Q  Which social justice topics do you think are
17    bumping up against empirical science?
18  A  Well, it could be any number of them.  I think
19    this is a case in point.  So I think this is part
20    of why it's in my report.
21    Rather than being seen as a dialogue related
22    to what is the science and ensuring a rigorous
23    scientific dialogue, it has been treated as if
24    it's a social justice issue rather than an issue
25    of what is good medical practice.

Page 101

1    But I think, you know, the issues related to
2    hot button topics, race would be one.
3  Q  In what way?
4  A  Well, I think that when -- I think that after
5    George Floyd's murder and other events that there
6    has been, but that in particular, there was a call
7    for a special influence on matters of race.  Which
8    is a great thing for people to be more attune to
9    and to have scholarly dialogue.
10    But they asked for a certain viewpoint.  I
11    think a good example is Ibram Kendi's, you know,
12    antiracism sort of viewpoint on it to be put
13    forward as the way that we are supposed to handle
14    it.
15    So a lot of our journals, in fact, the Child
16    Psychiatry Journal, they declared itself an
17    antiracist journal, which is joining an ideology
18    on how to approach race, rather than calling for
19    more open and rigorous dialogue about race, which
20    would have been the more appropriate viewpoint for
21    a medical journal.
22  Q  I think you just described antiracism as a
23    particular ideology about race.
24    What are the other ideologies about race that
25    you believe exist?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 102

1  A   Well, like I said, I don't have a countervailing
2      ideology of it.  Like I said, the journal in our,
3      in child psychiatry declared itself to be an
4      antiracist journal, which is an affiliation with
5      that ideology.
6          I'm actually against affiliations with
7      ideology.  I don't know that there is a
8      counter-ideology.  We prefer it to just be a
9      rigorous scientific dialogue about important
10     issues.  That is what we would be aiming for if
11     you follow the prescription that I've laid out
12     here.
13 Q   Are there any particular principles in antiracism
14     as an ideology that you think are antithetical to
15     the search for the truth or scholarly dialogue
16     that you think that journal should have
17     undertaken?
18 A   Well, I didn't, you know, I'm not prepared to go
19     into a, you know, in depth into that.  I would say
20     there's a, there are some broad narratives about
21     the world included in that, which is that certain
22     groups are oppressors and other groups are
23     oppressed.
24         That would be a primary narrative that is,
25     can be accurate.  But yet we would have to be

Page 103

1      nuanced about how we approached those things and
2      that we should be very careful to make
3      generalizations especially in the realm of
4      science.
5          The more broad your generalization, the more
6      likely that you are over inclusive and
7      overgeneralizing.  And so that would be the
8      oppressor versus oppressed narrative, that would
9      be a good example.
10         Another example of that would be the whole
11     idea of race being codified into a more important
12     marker of people's identity.  Whereas, it's not
13     actually a very scientific idea.  It is a really
14     complex idea.
15         People come from different backgrounds and
16     origins.  You know, where do you draw the line?
17     How do we sort of determine this?  And what do you
18     do about mixed race couples?  What do you do about
19     people who look like they are one race, but they
20     are the other?  I mean, it's very complex.
21         So the broader narratives embraced are
22     problematic when you come to, when you come to
23     science.  Then, also, it's a call for, I mean,
24     when editors call for a certain viewpoint, once
25     again, I just think that that is not what any job

Page 104

1      of an editor or a journal would be.
2          They can call for more viewpoints and
3      discussions which would be great, but not to call
4      out or prefer a certain viewpoint.
5  Q   Do you think there are any viewpoints about race
6      that journals should not seek to include?
7  A   Well, I think that there, I think that certainly
8      you are not going to, you know, considering where
9      the dialogue is and who would be writing to
10     psychiatry journals, you are only going to have
11     thoughtful academics writing in and trying to talk
12     about a nuance.
13         So not within the, not that I, not that a
14     psychiatrist would write into a journal.  I find
15     it would be highly unusual that there would be any
16     idea written in or someone who would submit for an
17     article that would be outside of the bounds of
18     what would be acceptable dialogue.
19         I would say maybe, you know, in theory there
20     could be.  In practice, there is not.
21 Q   Do you believe that there is, as a normative
22     matter, a view on race that a psychiatrist could
23     seek to present to a journal that without
24     hampering the search for truth the journal could
25     say that is actually outside of the bounds of

Page 105

1      discussion?
2  A   Well, if they were overgeneralizing, which is
3      exactly what I'm talking about.  Yes, so.  I'm
4      against people overgeneralizing.
5          So a journal editor should knock down any
6      article that overgeneralizes.
7  Q   Dr. Kaliebe, in the middle of Paragraph 62 in your
8      declaration you say, "Supporters of
9      gender-affirming treatment want to believe they
10     have found an ethical and evidence based
11     solution."
12         Do you see where you wrote that?
13 A   Yes.
14 Q   What do you think is unethical about
15     gender-affirming treatment?
16 A   Well, gender-affirming treatment as an actual
17     clinical treatment can do harm.  So I think it is
18     unethical to do harm.
19 Q   What harm do you think it does?
20 A   Well, when you are asked to evaluate a child or an
21     adolescent, they need to be seen in the context of
22     a total individual and their total environment.
23         You would have a biopsychosocial formulation.
24     They are in the process of identity development.
25     So to see someone through just the lens of

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 106

1  affirming can be harmful and can turn the
2  discussion just towards gender identity or gender
3  dysphoria rather than away from the traditional
4  way that you would approach a patient.
5      So it's trying to, it is, I believe it's poor
6  medical care to move to affirming automatically
7  patients who present with gender identity issues
8  or gender dysphoria.
9  Q  So is the harm from the diagnosis of gender
10  dysphoria, or from the possibility that the
11  evaluation process does not discover other
12  co-morbid conditions?
13  A  There is not a problem with the diagnosis of the
14  gender dysphoria. But there is a problem with an
15  overemphasis on one component of people's identity
16  and a turning away from the typical therapeutic
17  approach which we have always used which does not
18  jump towards affirmation, but lets a person
19  develop in their own way and would be broadly
20  based and notice what is the context, what other
21  disorders, what else is going on, what traumas
22  have occurred, you know. What other family issues
23  are going on?
24      So, yes, I feel like that when this is
25  proposed as a way to approach these patients, that

Page 107

1  it distorts care away from what would be a proper
2  and traditional psychiatric approach.
3  Q  Do you think that the care can be ethical if all
4  of the traditional psychiatric or
5  psychotherapeutic approaches that you are
6  referencing had already happened or are happening
7  concurrently?
8      Could then treatment that is gender-affirming
9  be ethical?
10  A  Well, if you are -- yes, it could be. It could be
11  if they have had a proper workup and have, you
12  know, that is the approach that the clinician
13  has decided after working with the patient for a
14  long period of time.
15      But I'm talking about a psychotherapy
16  approach. I assume that is what you are talking
17  about, too. When you say gender-affirming care
18  that can include medicalized care.
19      I want to be clear. I'm not talking about
20  medicalized care. I think we are talking about
21  therapy and therapeutic approaches.
22  Q  I think we will talk about both. For
23  psychotherapeutic approaches you believe it is
24  possible to provide gender-affirming
25  psychotherapeutic approaches to minors who are

Page 108

1  experiencing gender dysphoria, is that fair?
2  A  Well, you could get to it after providing
3  appropriate care, you know. Would there be a
4  place down the road where you could decide that,
5  you know, and I'm not quite sure what exactly you
6  are meaning by affirmative care, but I assume you
7  mean for, like, going along with the patient's
8  conceptualization of what is going on, which would
9  not be what we usually do in mental health.
10      We usually remain neutral about what is going
11  on rather than joining a patient's
12  conceptualization.
13      If at the end of the day, you know, would
14  that mean is it okay for a clinician to use the
15  pronouns that are requested by a patient, then I'm
16  saying, yes. You know, that is perfectly
17  reasonable and under certain circumstances, you
18  know, yes.
19      But is it appropriate to ever completely go
20  along with the patients' narratives or views of
21  the world so that is, you know, a clinical
22  decision that maybe you could get to.
23      MR. SELDIN: We have been going for
24  another hour. I think most of the folks here are
25  on East Coast time.

Page 109

1      Do we want to take a short break now and
2  then go for an hour and then do lunch? How are
3  folks feeling?
4      Dr. Kaliebe, will you be okay with a five
5  minute break and then another hour?
6  A  I will do whatever the group wants.
7      MR. SELDIN: Let's do that. We will come
8  back at 12:27 Eastern.
9      (OFF RECORD AT 12:21 P.M.)
10      (AT THIS TIME A SHORT RECESS WAS HELD OFF
11  THE RECORD AFTER WHICH THE FOLLOWING PROCEEDINGS
12  WERE HAD:)
13      (ON RECORD AT 12:27 P.M.)
14  BY MR. SELDIN:
15  Q  Dr. Kaliebe, welcome back after that short break.
16      In Paragraph 65 you describe a dynamic, "In
17  fact, sophisticated language skills enable
18  virtuosity in creating and promoting false
19  narratives."
20      Then you go on to say, "These dynamics have
21  arisen before in medicine, and it is my assessment
22  this has occurred again with regards to medical
23  interventions to treat gender dysphoria in
24  minors."
25      Do you see that?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 110

1  A  Yes.
2  Q  What is your methodology for assessing that that
3     has happened here?
4  A  Well, I think if you look at a lot of the journal
5     articles, the press releases from national
6     organizations, the sort of what I would call
7     cheerleading for affirmative care, that it seems
8     to be that it's like a, more of a tribal dynamic
9     than an actual usual discussion, a very complex
10    nuanced evidence based and a new treatment
11    population.
12        Within that environment clearly there is some
13    who are, I believe, very caught up in a group
14    think regarding these issues.  So I can give you
15    more details.  But basically, the things that I
16    put in my report sort of speak for themselves.
17        The way the professional organizations are
18    framing their arguments, the way the people write
19    the guidelines all speak to a moralized type of
20    environment rather than the usual dialogue
21    regarding medical evidence.
22  Q  Is your primary concern the consensus or the
23     enthusiasm?
24  A  Well, the false consensus is definitely a problem
25     because they are, without really undergoing the

Page 111

1     standard academic debate, they are sort of
2     pretending like there is a consensus and this is
3     all settled science.
4         Then the level of enthusiasm is also very
5     problematic because the level of enthusiasm should
6     be proportional to your confidence in your
7     argument and the safety of your argument.
8         So when people are coming out very
9     enthusiastic for something that, you know, is not
10    settled and unclear clinically, that then,
11    those -- so I would believe those are both
12    problems.
13  Q  Then you say that these dynamics have arisen
14     before in medicine.
15        When have they arisen before?
16  A  Well, when for a time lobotomies were popular and
17    were sort of celebrated as curing a very difficult
18    patient population with serious problems.
19        The person, you know, won the Nobel Prize for
20    lobotomy.  In retrospect it sounds horrible, but
21    that is an example.
22        I think your, I mean, I think whenever you
23    have intermixing of moralized environments -- on
24    the flip side you could also say, like,
25    pronunciations against, you know, making

Page 112

1     heterosexuality a disorder in the DSM would rise
2     from moralized environments where people took what
3     should be a scientific or medical issue and turned
4     it into a disorder based on social or cultural
5     elements.
6  Q  So with your homosexuality example, do you think
7     the moralizing environment led to its inclusion in
8     the DSM or its removal from the DSM?
9  A  Inclusion in the DSM.
10  Q  Do you agree with its removal from the DSM?
11  A  Yes.
12  Q  Okay.  In Paragraph 66 you talk about emotional
13     reasoning.  In the last sentence you say that it
14     "helps explain opinion cascades, partisanship, and
15     group think."
16        Do you see that?
17  A  Yes.
18  Q  Those are terms that come from sociology, is that
19     correct?
20  A  I mean, there's a, they -- I'm not sure exactly.
21    They jump from field to field.  So you can get
22    those terms in a number of different fields.
23        Behavioral economics is a field that uses
24    those terms.  You know, we do talk about them some
25    in medicine, too.  Yes, I believe sociology and

Page 113

1     behavioral economics would be the, would be where
2     I found them.
3  Q  Is it fair to say these are not conditions that
4     you diagnose as a psychiatrist?
5  A  Behavioral economics was sort of founded by a
6     psychologist.  The only psychologist who won the
7     Noble Prize, Daniel Kahneman, so it's within the
8     realm of people who are experts in how the mind
9     works and how we make decisions.
10        Is it directly psychiatric?  I think it's
11     important for you to size up the person in front
12     of you and where they get their information and if
13     they have cognitive distortions related to groups,
14     you know, and the information that comes to them
15     in groups they affiliate with.
16        I think modern psychiatrists should
17     understand and know these things.
18  Q  Do you think you have expertise beyond that of a
19     well-trained psychiatrist to assess whether
20     opinion cascades, partisanship, and group think
21     are occurring?
22  A  Well, I think I was mentioning that I would hope
23     that all psychiatrists should understand these
24     phenomenon and be able to see when they may apply.
25  Q  Do you, yourself, believe above that level that

K.C., et al. VS
The Individual Members of the Medical Licensing Board
KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 114

1  any psychiatrist should have, do you believe you
2  have particular expertise in identifying when
3  these things are happening?
4  A  Well, I put in a lot of work.  As I mentioned in
5  my report, I did present on misinformation at the
6  child psychiatry conference.  If you look at some
7  of my articles, like my article on child obesity,
8  I bring in a lot of the ideas related to
9  behavioral economics and how to approach the world
10  and how we, how human beings tend to fool
11  themselves.
12      Yes, I probably put in more work than other
13  psychiatrists on these matters.
14  Q  Okay.
15  A  I will say I read a lot.  So, you know, I probably
16  read a lot more than almost any psychiatrist that
17  you will talk to.
18      So, yes.  I do pull from lots of different
19  things, but I think that what I'm pulling from
20  here is important and most psychiatrists
21  understand these dynamics.
22  Q  Doctor, look at Paragraph 79.  Dr. Kaliebe, in
23  this paragraph you are talking about the opioid
24  epidemic.
25      On the bottom of Page 27 there is a sentence

Page 115

1  that starts, "While a small number of patients may
2  have achieved better pain control as a result, it
3  came at the cost of creating legions of addicts."
4      Do you see where you wrote that?
5  A  Yes.
6  Q  And so is it fair to say that you have identified
7  opioid prescription as an area in which providers
8  were practicing either outside of the guidelines
9  or recklessly?
10  A  Well, what I was saying was, in fact, the
11  guidelines were pushing them towards, they were
12  exerting pressures on them to prescribe
13  inappropriately.
14      So, no, you know, this was my whole point.
15  You get, you get ideas that come from, you know, a
16  small group, yet then can get taken up and become
17  popular.  Especially when you have the idea of you
18  are being more compassionate so this is the right
19  thing to do.  You are a bad person to ignore
20  someone's pain without realizing at the end of the
21  day these are complex matters and you can do harm
22  by opioid prescribing.
23      I believe that was pretty clear in what I
24  wrote.
25  Q  Do you believe that the treatment of gender

Page 116

1  dysphoria like the treatment of pain is a complex
2  area?
3  A  Yes.
4  Q  Okay.  And in response to the opioid epidemic, the
5  states have implemented greater controls, is that
6  fair to say?
7  A  Yes.
8  Q  But they have not banned them entirely?
9  A  Correct.
10  Q  Dr. Kaliebe, before the break we sort of talked
11  about, we touched on this and I want to dig a
12  little deeper.
13      So you say in Paragraph 83, you talk about
14  "affirmative treatment."  You put that in quotes.
15      What is affirmative treatment?
16  A  Well, I believe it has two major components.  I
17  mean, one would be the idea that when someone
18  presents with -- well, specifically we are talking
19  children and adolescents here.
20      If a child presents and declares a gender
21  identity that the clinician should agree with that
22  identity.  That is one component.
23      And then the other part of affirmative
24  treatment is medicalized treatment such as puberty
25  blockers, hormones, and surgeries.

Page 117

1  Q  Where do you get that definition from?
2  A  Of affirmative treatment?
3  Q  Yes.
4  A  I mean, I have seen much more complex descriptions
5  of affirmative treatment.  I think that is what it
6  boils down to.
7  Q  You say in Paragraph 83 there is a push for
8  affirmative treatment.
9      How do you think the groups that you list in
10  this paragraph are pushing the treatment?
11  A  Well, if you look at the guidelines from WPATH, I
12  think those are clear.  The Endocrine Society and
13  the American Academy of Pediatrics came out with
14  guidelines that specifically advocate for them.
15      American Psychiatric Association has, I
16  believe, they didn't come out with treatment
17  guidelines, but they have come out in support of
18  it in multiple ways, press releases, stuff on the
19  website, publicity things and in their journals.
20      So there's, you know, the way that they
21  selected articles and the articles that they
22  publish all, they all seem to reflect an idea that
23  those are the, that this is the approach that they
24  favor as institutions.
25  Q  When you say push for affirmative treatment, do

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 118

1  you mean just the organizational support around
2  the existing guidelines?
3      Or do you mean push for affirmative treatment
4  at the individual level?
5  A  Well, it seems clear to me that they want us to
6  adopt this as treatment.
7  Q  And what is your basis for saying that this kind
8  of care is politicized?
9  A  Well, I think, for one, if you look at a survey,
10  opinions about these matters tend to clump in
11  lines that go along political affiliation.
12      So for one, it's just a fact that is based on
13  the surveys.  There has been a number of surveys.
14  It tends to be that people who are in, you know,
15  in one political party have certain feelings about
16  this and people in another political party have
17  certain feelings about this.
18      So I cited a Regenerist article that did
19  questions after people came out of polls.  That
20  was sort of a direct peer view published line of
21  that evidence.  There have also been a number of
22  opinions polls.
23      The political parties, you know, have, I
24  don't know that the, I don't know if the, to what
25  degree the Republican party has come out, you

Page 119

1  know, with strong statements or push for these
2  things.  But if my memory serves me correctly,
3  their administrative, I mean, political parties,
4  whoever is in political power has some control
5  over administrative issues.
6      So, I mean, I think that some aspects of the
7  general idea or rights for transgender individuals
8  is a politicized idea.  So I think that that is
9  where I say that.  I would also say that if you
10  look at the organizations -- I put some data in
11  there.
12      These organizations, particularly the
13  psychiatric ones, and the American Academy of
14  Pediatrics, I could say that for sure, too, tend
15  to be a left-leaning organization.  They tend to
16  support politics that are, you know, to the left
17  of the center.
18      And also it's true if you will look at just
19  even polls of who in what medical specialty aligns
20  with what political party.  One of the polls I saw
21  had psychiatry was second to the most left-leaning
22  of all of the specialities with only public health
23  being more left-leaned.
24      So not surprising that the professional
25  organizations follow the politics of the members

Page 120

1  that tend to lean in one direction.  That is -- I
2  put examples in my report.
3  Q  Based on that definition of certain kinds of care
4  being politicized, do you think that as a
5  clinician that is a reason to provide or not
6  provide certain kinds of care?
7  A  Well, I think that it is not a reason you should
8  be providing care based on what is good care.  But
9  it could make you more skeptical of these
10  professional organizations' support for certain
11  care because you know that they come out and
12  support things that happen to lean in their
13  political or within their, you know, thought
14  level.  They are very accepting of things that
15  are, in that case, left-leaning.
16      Therefore, they are susceptible to
17  confirmation bias, group think, group dynamics
18  that would lead them to move away from a
19  scientific, more clinical approach towards an
20  ideological approach.
21      Unfortunately, I put in my report that is
22  what I feel has occurred.
23  Q  Are there other areas of psychiatry where you
24  think the political alignment of psychiatrists or
25  their organizing groups has negatively influenced

Page 121

1  care?
2  A  Yes and no.  I mean, there are different
3  priorities that the organizations have.  I mean,
4  my priority and what I was trying to push for
5  within the American Academy of Child and
6  Adolescent Psychiatry and the American Psychiatric
7  Association with some of the articles that I wrote
8  and, you know, supporting in meetings, was a
9  collaborative care, particularly working in
10  federally qualified health centers.
11      So what I would love to see is for them to
12  put an emphasis on getting primary care support to
13  deal with mental health issues.  Getting an
14  emphasis on us growing more federally qualified
15  health centers which are primary care clinics that
16  provide like WIC and dental and, you know, mental
17  health care to communities.  You can only open an
18  FQHC if you are an underserved or disadvantaged
19  community.
20      So that is what I was pushing for us to do.
21  We do that some as an organization, push for
22  that.  I just feel like that would be a much
23  better priority for an organization.  So
24  unfortunately, you know, they seem to be more at
25  times interested in other things rather than what

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 122

1    I think would be the most helpful approach.
2        It seems that sometimes the other things that
3    they are interested in are things that are hot
4    button political items rather than the actual, a
5    great thing you can do like supporting primary
6    care in disadvantaged neighborhoods.
7  Q   So relative ranking of priorities aside, is there
8    any individual kind of care in psychiatry that you
9    think is being provided and should not be because
10   of the political alignment of psychiatrists or the
11   organized medical groups?
12 A   No.  I think gender medicine has been the first
13   time that this type of ideological care has
14   actually come into and affected, you know, patient
15   care on a wide level.  Yeah.  I have never seen
16   that before.
17 Q   In Paragraph 84 you say in the third sentence, "I
18   have directly observed over the last decade, but
19   particularly the last 5 years, that these
20   organizations have prioritized a politicized,
21   narrow vision of social justice advocacy."
22       Do you see where you wrote that?
23 A   It is kind of cut off at the bottom.  Yes.  I
24   remember writing it.
25 Q   Other than what you just called gender medicine,

Page 123

1    what else have you directly observed in the last
2    five years that falls into this category?
3  A   Well, I think we talked about race, so I think
4    that is an issue that, you know, while an
5    important issue and I'm glad that they want to
6    emphasize it, the way that they have emphasized
7    that has also has been very, it has been
8    politicized.  And the sort of policing of, or the
9    curation of what goes in the journal, at least of
10   the psychiatric organizations, does seem to be
11   very narrow.
12       But that would be the other main thing that I
13   can think of.  There are probably more.  That is
14   what I can think of right now.
15 Q   When you referenced just now narrow curation, are
16   you talking about articles regarding the treatment
17   of gender dysphoria or something else?
18 A   Something else.  I'm saying I do believe they do
19   that.  But since I was asked about what else is
20   sort of politicized and the social justice, we
21   spoke before about how they have come out with
22   becoming antiracist journals rather than just
23   saying we would like to focus more on race.  Race
24   is a really important topic.  It is an important
25   component of what goes on in society.

Page 124

1  Q   Let's look at Paragraph 85 and 86 together.
2    Dr. Kaliebe, you talk about your time
3    co-chairing -- is AACAP the way you say that?
4  A   Yes.  People say AACAP.
5  Q   When you co-chaired AACAP's media committee, it
6    seemed like in Paragraph 86 you characterize that
7    as a committee of content experts, is that fair?
8  A   Yes.  Yes.
9  Q   And then in Paragraph 85 you are talking on the
10   second line about special interest groups.  You
11   put that in quotes.
12       Do you see where you wrote that?
13 A   Correct.
14 Q   Is there a difference between special interest
15   groups and content committee and content?
16 A   Well, I was trying to differentiate that there are
17   groups of people that do, that are attracted
18   towards certain approaches.  And so they could be
19   a group of people that are not officially a
20   committee.
21       So you could self-select in more ways than
22   one.  The committees are vehicles within the
23   professional organizations.
24 Q   What I'm trying to get at, your concerns about
25   group think and opinion cascades, do you think

Page 125

1    that was in affect when you were co-chairing the
2    AACAP committee on media?
3  A   Yes and no.  I think in the media committee we
4    were always mindful to bring in diverse opinions
5    of people.  So we didn't want -- there are a lot
6    of people who are generally negative about the
7    media.  They would want to present or talk about
8    media in negative ways.
9        We were very conscious that humans seem to
10   have a negativity bias and negative stuff gets
11   noticed more.  There are also positives with
12   media.  We are trying to cultivate in our
13   presentations and in our output a balanced look.
14       So, you know, I don't think by any estimation
15   anyone would think that our committee became
16   one-sided or too, you know, too negative.  But
17   once again, you deal with clinical issues.  So
18   there is always some bias towards negative.  That
19   is something that we were cognizant about.
20 Q   Are there other committees in AACAP that you feel
21   didn't do as good a job providing that kind of
22   balanced view other than the ones dealing with
23   treatment of gender dysphoria?
24 A   Well, I think I had mentioned previously that at
25   one point those who wrote -- or had in my

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 126

1  report -- that those who wrote the pharmacology
2  guidelines were overly enthusiastic, influenced,
3  or excited or however you want to say it,
4  regarding psychopharm.
5      So I think at times any of these committees
6  can be somewhat overconfident or have opinions
7  that lean towards interventionalism towards
8  whatever intervention that the committee is about.
9      So I think that, yes, you know, the
10  psychopharmacology committee would tend to be too
11  much focused on psychopharmacology from the
12  perspective of a regular psychiatric practitioner
13  that has to take the different patients and use
14  all sorts of different modalities and not just
15  pharmacology.
16      The group dynamics have some affect on the
17  other committees. I mean, I would probably guess
18  that, or it is possible that there is some other
19  committees that they also may interact with. I
20  have not been to the, I think it's, like, I will
21  probably mess up the name. I think there is,
22  like, a race and diversity committee.
23      Is it possible that they would be, you know,
24  could that committee be overly politicized? It is
25  possible.

Page 127

1      Other than the gender committee I have never
2  seen it affect clinical care in this way.
3  Q  Dr. Kaliebe, at the end of Paragraph 87 you
4  characterize the group that works in the area of
5  gender dysphoria as "a well-intentioned but
6  homogenous group of supporters."
7      What do you mean by homogenous?
8  A  I am talking about at the beginning of the
9  paragraph, they have self-selected into providing
10  this type of care and are enthusiastic about it.
11      And so when you have a group of like-minded
12  individuals that support it without really a --
13  more skeptical people end up not being on that
14  committee. So that is my impression.
15  Q  Just to describe a similar dynamic, the
16  psychopharmacology committee, that they would have
17  bias toward intervention using certain kinds of
18  medication, is that also what you mean by -- would
19  homogenous be a way to describe that as well?
20  A  Yes.
21  Q  Okay. Would you generally agree that a group of
22  people that have a special interest in a topic
23  is -- I guess, what I'm trying to ask you is when
24  you were the chair of AACAP's media committee, did
25  that committee benefit from the fact that its

Page 128

1  members had a special interest in media issues?
2      MR. PATTERSON: Objection. Assumes facts
3  not in evidence.
4      You can answer.
5  A  Yes.
6  Q  Generally speaking, in your evaluation of group
7  dynamics, if you have a small committee you would
8  prefer folks who were interested in the topics
9  rather than disinterested, correct?
10  A  Well, no. I would give some nuance to that. I
11  mean, I would really love to see -- I actually
12  thought that it probably would be really quite
13  helpful for -- let's go back to the
14  psychopharmacology committee -- for there to be
15  some, like, regular bread and butter practitioners
16  on that committee so that the committee would be
17  mindful of what is happening in the real world and
18  how, you know, their proclamations on, you know,
19  medications play out.
20      You know, especially as I've served in
21  disadvantaged and underserved communities, you
22  know, the idea that there is a medication solution
23  for people's problems, you know, the guidelines
24  were very heavy into pharmacologic, you know,
25  solutions. And it just is not, it's just

Page 129

1  unrealistic on a massive level.
2      No, I think it would be best if there was a
3  way to make sure that there is broad inclusion of
4  people. But in reality, that is not how
5  committees are formed. It is people that tend to
6  be enthusiasts.
7      So I think there is some advantage to people
8  being enthusiasts, but I think there are
9  disadvantages, too. You know, as I mentioned the
10  psychopharmacology example, you know, it would be
11  nice for there to be a counterbalance of people in
12  the field who are not so enthusiastic.
13  Q  Do you think that is true for every field?
14  A  Yes.
15  Q  Dr. Kaliebe, in Paragraph 89 you talk about
16  watchful waiting.
17      What do you -- is watchful waiting the
18  approach that you prefer for treating minors with
19  gender dysphoria?
20  A  Well, I think a component of the approach,
21  regarding certainly medicalization-wise I would
22  say yes. I think that would make the most sense
23  to let people grow up and then once they, you
24  know, are adults to make decisions about hormones
25  and surgeries when they are fully developed

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 130

1 humans.
2 So medicalization-wise, yes. But I think as
3 I mentioned before, I believe that it is ideal for
4 people to get other types of, you know, to have a
5 well-rounded approach to life which would include
6 a number of things and potentially psychotherapy.
7 Q And so you, in this paragraph you say that the
8 policy statement at issue from the AAP contained
9 citation errors, overstatements, and
10 mischaracterizations of the -- sorry -- you say it
11 mischaracterized the long-standing and
12 well-regarding clinical approach of watchful
13 waiting.
14 How do you think they mischaracterized it?
15 A Well, they say it right there. "Watchful waiting
16 is based on binary notions of gender."
17 I mean, to translate, that sounds like saying
18 well, those people who do watchful waiting, they
19 are just those old rubes who don't know any
20 better.
21 We're the sophisticated new people that want
22 to do this intervention. We are going to get rid
23 of that approach is what we want to do because we
24 know better now.
25 And I think that that right there kind of

Page 131

1 shows that they are failing to appreciate the
2 nuance and difficult realities of when you have a
3 developing situation and you don't know where it's
4 going to go, it's often better to not intervene
5 than to intervene and potentially do harm.
6 Q Do you agree that there are instances where not
7 intervening can actually also cause harm?
8 A Are we talking about with gender dysphoria or just
9 in general?
10 Q First, we will start in general. Do you agree
11 there are situations where the choice not to
12 intervene can also cause harm?
13 A Correct. Yes.
14 Q Do you think that there are instances in the
15 treatment of gender dysphoria in minors where
16 declining to intervene can cause harm?
17 A I would not frame it as causing harm. So I would
18 not use those words.
19 Q What words would you use?
20 A Well, I would say that the not intervening would
21 allow a patient to grow and develop. And then
22 once they have a sort of fully developed self,
23 then they can make decisions about medicalization
24 of their body.
25 So I don't, I just, I think you have got --

Page 132

1 that would be a better way to say it.
2 Q So are you aware that some of the original
3 proponents of the watchful waiting approach were
4 the Dutch and Ken Zucker in Toronto?
5 A I mean, I would step back and just say, you know,
6 watchful waiting is a term that we use in medicine
7 all of the time. It was used for decades before
8 it was adopted by gender medicine.
9 So I would say this is an old term that has
10 lots of uses in medicines. So, yes, I would, I am
11 aware that both Ken Zucker and those in the
12 Netherlands have used that approach.
13 Q Both the Amsterdam Clinic and Zucker's Toronto
14 clinic both treated adolescents with blockers
15 and hormones once they reached puberty, is that
16 right?
17 A Yeah. I mean, I don't have data about Zucker's
18 treatment protocol or what was going on there. I
19 can't speak to what treatment they were getting in
20 the clinic. The Dutch clinic has published a lot
21 of articles so we are familiar with that.
22 Q So in that respect, watchful waiting would apply
23 to prepuberty at those clinics?
24 A Correct.
25 Q And so even those proponents of watchful waiting,

Page 133

1 they still recommended medical interventions when
2 the incongruence of distress persisted into
3 puberty?
4 A Yes, I know the Dutch did. I don't know that
5 Zucker's protocol, I have not seen exactly how it
6 was treated or what his approach was.
7 Q Do you oppose social transition for minors with
8 gender dysphoria?
9 A Well, I think it's a complex subject. I think,
10 yes, in that children with gender dysphoria it
11 seems would be wise for them to be thought of as
12 children with gender dysphoria, not transgender
13 children.
14 We don't know what their, in the end
15 development is going to be, so why not, I think
16 it's most wise to keep them developing within
17 their biological sex, be honest that they are a
18 person with gender identity issues with gender
19 dysphoria.
20 They may grow up to be a transgender
21 individual as an adult. They may also grow up to
22 be not transgender as an adult. Since we don't
23 really know, why don't we more conservatively
24 approach this and not socially transition them
25 when they are young. That would be my

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 134

1  recommendation.
2      That being said, you know, families can
3  decide to do whatever they want to do and, you
4  know, I don't know that there could not be some
5  exceptions to that recommendation.  But that would
6  be my recommendation.
7  Q  It sounds like you would agree that individual
8  families might decide that for their particular
9  child the appropriate way to address their gender
10  dysphoria would be to allow them to socially
11  transition?
12  A  Well, they do decide that.  Yes.  I mean, like I
13  said, I don't think that is a wise decision.  But
14  once again, that is a family decision.  Whatever a
15  psychiatrist says cannot change what a family
16  does.
17  Q  Would you support a ban on social transition among
18  minors?
19  A  Well, I do think that the society has always used
20  biological sex as the main marker of what a minor,
21  you know, how a minor is classified.
22      So I don't see a compelling reason to stop
23  using biological sex as the marker which we --
24  especially considering these are children with
25  gender dysphoria.  They are not transgender

Page 135

1  children.  Right?  We don't know what the end of
2  their trajectory will be so why are we going
3  through this at this point?
4      Like I said, through human history the marker
5  of biological sex has some, it has trade offs, but
6  it has generally worked well for us.  I would say
7  that is the most sensible approach right now.
8  Q  So my question was, I guess, do you think that
9  there should be a ban on parents taking the
10  approach of allowing their children to socially
11  transition prepuberty?
12  A  I don't know that I have an answer to that
13  question because I've not thought about a ban.  I
14  have a clinical impression or what I would
15  recommend.  But I've not gone through the
16  implications of that.
17  Q  You said that some of the children who have gender
18  dysphoria you believe may grow up to be
19  transgender and some may not be transgender, is
20  that right?
21  A  Correct.
22  Q  For the children who do grow up and are
23  transgender, do you think they will have been
24  harmed by not being allowed to socially transition
25  while they were children?

Page 136

1  A  My guess is that we, since we never know about
2  what will happen with any one child we can't
3  really say if any individual would have been
4  better or would have been worse.
5      I would not frame it in terms of harm.
6  Children have been growing up all through human
7  history.  We have generally not been socially
8  transitioning them and it has not been a major, I
9  think in general societies they have decided that
10  not transitioning is the better trade off.
11      So continuing with that approach seems wise
12  until we know better.
13  Q  What do you base that statement on, that
14  assessment of the trade off?
15  A  Well, for one, through all of human history we
16  have used biological sex as a main marker where
17  we, how we divide children.
18      Children with gender dysphoria do have a
19  harder time and are going to have significant
20  problems.  I think it's one of those issues of,
21  like we often have in medicine where there is
22  only difficult choices.  There is no easy choice
23  and no, like, clear that this is going to lead to
24  some great solution.
25      However, since we know so many of these kids

Page 137

1  will grow up to be -- like I said, I consider them
2  children with gender dysphoria.  I do not consider
3  their identity to be fixed.  I would like everyone
4  to have the opportunity to grow up and then become
5  an adult and then decide about what their identity
6  is.
7  Q  What do you base that statement on that most of
8  the children with gender dysphoria do not grow up
9  to be transgender?
10  A  That has been traditionally the data, that most
11  childhood onset gender dysphoria children grow up
12  and are typically, more likely the adult outcome
13  is being a same sex attracted adult.
14  Q  Is that a particular study you are thinking of
15  when you say that?
16  A  I have seen it referenced many times.
17      MR. SELDIN:  Joel, will you take to us
18  Paragraph 91.
19  Q  Dr. Kaliebe, in this paragraph you talk about
20  political activisms around laws pertaining to
21  gender-affirming care.
22      Do you see that?
23  A  Yes.
24  Q  You characterize it as political activisms.
25      Do you think it's political advocacy for

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 138

1  endocrinologists who treat diabetes to take a
2  position on the affordability of insulin?
3  A  No.
4  Q  Why not?
5  A  Well, that is not an issue that aligns with any
6  particular politics. I have not seen any data
7  that makes me think that Republican
8  endocrinologists and Democrat endocrinologists see
9  that differently. So, once again, it would not be
10  a political issue because that seems to be a
11  general medical care issue.
12  Q  And so when you say political, do you mean
13  measurable difference in opinion by a political
14  party?
15  A  Yes. Well, I don't -- I'm saying political saying
16  these organizations seem very willing to get
17  involved with political activism from a certain
18  viewpoint. There could be any number of things
19  where they -- you would think at least once maybe
20  they would get, have some issue that is not from
21  that same viewpoint, but it does not seem very --
22  they seem very willing to make things more
23  political than they really are.
24      I believe that questions about
25  gender-affirming care are clinical questions. And

Page 139

1  so I don't think that these organizations should
2  be condemning people who see the evidence
3  differently or want to be cautious.
4      But it seems like that is in the press
5  releases where they would want to approach it. So
6  I can't think it's anything other than political
7  because they usually, let's say, the American
8  Academy of Pediatrics would be respectful of
9  people who want a cautious approach or parents
10  that do not agree with this approach.
11      So, yes, I believe the way that they are
12  approaching seems that it must be political.
13  Q  Earlier you were talking about how you wish some
14  medical organizations prioritized things like
15  access to primary care through federally funded
16  health centers.
17      Do you remember when we were talking about
18  that?
19  A  Yes.
20  Q  Do you believe that that is a political issue?
21  A  Not so much because it has bipartisan support. So
22  I believe that would be an issue that would not be
23  politicized because I think individuals on both,
24  on both on the left and the right could get behind
25  those things. So it's a less politicized issue.

Page 140

1  Q  Do you think an endocrinologist who testifies
2  before a legislative body about a particular bill
3  is engaged in political advocacy?
4      For example, if there were a bill to make
5  insulin free and an endocrinologist testified in
6  favor of that bill, do you think that
7  endocrinologist is engaging in political advocacy?
8  A  It would depend on how they testified and in what
9  way and exactly what the bill was. I could not
10  say. I would not make a blanket statement that it
11  was or wasn't.
12  Q  So you think that the content of the opinion
13  determines whether it is political advocacy or
14  not?
15  A  That is one component of how I would decide, yes.
16  Q  What other components would help you decide
17  whether that was political advocacy?
18  A  Well, depending on the issue. Right? The issue
19  at hand here is an issue that does have clumpings
20  of political support in different parties and
21  different sides.
22      So clearly, whenever you are talking about an
23  issue that does have clear political implications,
24  then that would make you at least be skeptical or
25  consider that there is something political going

Page 141

1  on.
2  Q  Do you think clinicians who provide legislative
3  testimony about bills like Senate Enrolled Act 480
4  are engaged in political advocacy?
5  A  It would depend on the testimony they are giving.
6  So possibly or possibly not.
7  Q  What would make their testimony political
8  advocacy?
9  A  Well, I don't know if you are asking me about are
10  they providing, you know, references to studies?
11  Are they talking about -- you know, I'm not sure
12  what they are bringing up.
13      If they are trying to portray evidence as
14  more than it really is or kind of, you know, if
15  they use political language. I mean there are any
16  number of ways that someone can reveal that they
17  are more interested in advocating for a certain,
18  you know, tribal political viewpoint than an
19  actual sober discussion of what is the situation
20  at hand.
21      I think most clinicians who would get up and
22  testify should be able to remain respectful about
23  the other side of the opinion and realize the
24  trade offs and difficulties and nuances.
25      So if that is what they are doing and getting

K.C., et al. VS
The Individual Members of the Medical Licensing Board
KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 142

1  up and admitting all those things, then I would,
2  you know, lean towards it not being so political.
3        If that is not what they are doing, then I'm
4  leaning in towards it being more political.
5  Q  In Paragraph 91 you are talking about this press
6  release.  You say, "Yet the press release frames
7  these limits as discrimination based on gender
8  identity, a moralized characterization of
9  restrictions on care."
10       Why do you think that is a moralizing
11  statement?
12  A  Well, if I accuse you of discriminating I think
13  that is a morale accusation.  Right?
14       Whereas, normally when you are talking about
15  medical care you would be talking about what is
16  the evidence base for this medical care.  Or let
17  me show you this study that strongly supports my
18  opinion.
19       That is what I would think that a medical
20  organization would be doing, rather than claiming
21  that this is discrimination.
22  Q  So back to my example of an endocrinologist and
23  insulin.  If I am an endocrinologist and I testify
24  before a legislative body, I treat a lot of people
25  with diabetes.  They need insulin.  The cost of

Page 143

1  insulin means some of them don't get it.  That is
2  a negative outcome.  I think this bill should pass
3  because it will make insulin free.
4        Do you think any of that is political and
5  moralizing?
6  A  No.  Because they are talking about a clear-cut
7  medical, you know, situation that seems
8  apolitical.
9  Q  What if they then say, And I think it's
10  discrimination against people with diabetes not to
11  make insulin free?  What then?
12  A  I mean, they could say that.  I think that that
13  would be a, I mean, they would be trying to
14  moralize the argument.  I don't think it would be
15  a compelling argument.
16       I'm guessing that people who are deciding
17  about what could be paid for and not paid for are
18  mostly working on economic arguments and not on
19  discrimination arguments.
20       MR. SELDIN:  Joel, in Paragraph 92 about
21  two-thirds of the way down, if you could show us
22  Paragraph 92.  Thank you.
23  Q  You are critical of the American Academy of
24  Pediatrics.  You say, "As such, a more appropriate
25  perspective from a medical organization would be a

Page 144

1  call for reasoned dialogue to evaluate the moral
2  claims on each side and examine the logic and data
3  behind these moral frameworks and treatments."
4        Do you see where you wrote that?
5  A  Yes.
6  Q  Is your issue that, I guess, do you think the
7  competing moral frameworks in this particular
8  instance are equally worth debating?
9  A  Well, I think there are multiple moral frameworks
10  so you would have autonomy of patients.  You would
11  have parental decision rights.  You would have
12  whether an analysis of an evidence base is a moral
13  one or a discriminatory one.
14       So there's multiple moral issues at play.
15  There would be the moral issue of can someone
16  consent or not consent?  Is it moral to allow
17  those things?
18       So there are just a number of ethical and
19  moral issues that could be wrapped into any
20  discussion.
21  Q  So in the realm of pediatrics generally you have
22  issues of assent and consent, is that fair to say?
23  A  Yes.
24  Q  So in that respect, every decision about pediatric
25  medicine involves the moral issue of assent and

Page 145

1  consent, right?
2  A  Yeah.  I mean, you know, I would not quite -- I
3  would say there's almost no moral issue for many
4  or most regular pediatric treatment issues.
5  Whether to get an antibiotic or whether to brace
6  an arm after it's broken, you know, this is what
7  most medical decisions are.
8       Most of them do not have difficult competing
9  moral frameworks like permanent treatments to
10  minors with gender dysphoria.  That is a lot more
11  complex.
12  Q  Let's talk about some other medical interventions
13  in pediatrics.
14       Are you familiar with Cochlear implants?
15  A  Somewhat.
16  Q  Do you think that there is any moral valiance to a
17  decision about whether to provide those to a
18  child?
19  A  Well, not being my area of expertise, I don't know
20  what the statistics are and how successful they
21  are and how established they are.
22       There may or may not be on different
23  treatments depending on all those things.  If it's
24  a well established treatment and they have a great
25  evidence base on, then the amount of the moral

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 146

1    dilemma is small.
2        When you have unknowns in a treatment or it's
3    an experimental treatment, that is much more of a
4    moral dilemma.  I don't know Cochlear implants
5    enough to tell you where I fall on that.
6  Q  Do you believe then that the level of moral
7    dilemma is inverse to the evidence base?
8  A  Well, the less evidence base and the more
9    potential harm would raise the moral implications.
10   Yes.
11 Q  Okay.  So then in any area of medicine where there
12   is an uncertainty about the evidence base or
13   outcomes you believe there is a moral issue?
14 A  Well, specifically, I mean, yes.  Especially when
15   we are talking about lifelong changing of
16   characteristics of a developing adolescent.
17       So, yes.  I mean, yes.  But there is, you
18   know, we are talking about something quite
19   significant.
20 Q  Well, are you familiar with ear pinning as a
21   medical intervention in children?
22 A  I mean, not very.
23 Q  Well, I will represent to you that for children
24   whose ears stick out there is a surgical
25   intervention where you can pin their ears back so

Page 147

1    they stick out less.
2        Are you familiar with that?
3  A  Okay.  Yes.
4  Q  Okay.  Have you heard of such a thing?
5  A  I have heard of it.  Yes.
6  Q  Okay.  Do you think that that has moral
7    implications?
8  A  Not -- I don't know.  But it sounds like that is a
9    low risk surgery.  So to me, I'm guessing that
10   it's a low risk procedure which, you know, seems
11   to be well received or work out the way that
12   individuals who have gotten in the past want.  I
13   don't know how long it has been around for.
14       So it could be a significant moral issue if
15   it's the first patient that it's ever been done on
16   and there are some potential downfield negative
17   effects that could be serious.
18       If it's a standard procedure that is done all
19   of the time without much problem, then that makes
20   it less of a moral issue.
21 Q  Even though it permanently alters the appearance
22   of the child you don't believe that that by itself
23   raises a moral issue?
24 A  Well, is the outcome -- you know, if this is an
25   established procedure that has a known good

Page 148

1    outcome, then it reduces the moral or ethical
2    dilemma.
3  Q  You don't believe that all interventions that
4    alter the bodies of minors involve moral dilemmas?
5  A  I just said there are degrees.  There would be a
6    degree.
7  Q  In terms of what should inform moral
8    considerations around the provision of treatment
9    to minors, we have talked about evidence based.
10   We have talked about assent and consent.
11       Are there any other things that you think
12   should factor into that moral calculus?
13 A  Evidence base.  Assent and consent.  Family and
14   parental viewpoints.  There are any number of
15   possible other inputs.
16 Q  What do you mean by family?
17 A  I think if a family -- in a family there may or
18   may not be agreement with procedures.  I think
19   that is something to take into account.
20 Q  Would that fall under assent and consent?
21 A  I guess it could.  Yeah.
22 Q  In Paragraph 93 --
23 A  I could say there is some -- you are asking about
24   what moral dilemmas possibly you would have.  I
25   think, you know, we talked about the evidence

Page 149

1    base.  But, also, you know, we don't really have
2    an evidence base about a, you know, human
3    developing identity, which is also something that
4    we are treating.  I just want to throw that out
5    there.  We are sort of fiddling with something
6    which that is important and fundamental in human
7    beings.
8        I just think that also raises caution beyond
9    what a typical discussion of evidence base would
10   be.
11 Q  Are you offering an opinion in this case about the
12   evidence base?
13 A  Regarding gender-affirming care?
14 Q  Yes.
15 A  Well, I mean, yes.  I've put, I did not
16   concentrate on that in my report, but I think I
17   make it clear in my report my assessment of the
18   evidence base.
19       MR. SELDIN:  Joel, can you pull up
20   Exhibit 4.  Take us to Paragraph 4, please.  I'm
21   sorry.  Can you scroll up to the first page so we
22   can see the caption.
23 Q  Dr. Kaliebe, this was your report in the Decker
24   case that we were talking about.
25       Do you see the case caption?

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 39 of 84 PageID #: 3577

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 150

1  A  Yes.
2  Q  Then Paragraph 4 (b) and (c), Dr. Kaliebe, in your
3     Decker report you offered the opinion at 4 (b),
4     "There is no consensus in the field regarding the
5     treatment of gender dysphoria, nor is there an
6     evidence base sufficient to lead to any confident
7     recommendations."
8        Do you see where you wrote that in your
9     Decker report?
10 A  I don't.  Okay.  Yes.  Yes, I do.
11 Q  Then in 4 (c) you said, "Multiple reviews of the
12    evidence base regarding treatment of gender
13    dysphoria indicate that the evidence for
14    affirmative treatment is low quality."
15       Do you see where you wrote that in the Decker
16    report?
17 A  Correct.  Yes.
18 Q  There do not appear to be corresponding opinions
19    of this nature in your declaration in this case.
20       That is why I'm asking, are you offering
21    these opinions in this case here?
22 A  Well, yeah.  I'm not sure how to answer that in
23    that I believe there are other experts in this
24    case that are reviewing the evidence base.
25       Those are my opinions.  But my -- in terms of

Page 151

1     this case, I wrote in my report the things that I
2     was emphasizing.
3  Q  So is it fair to say that you, Dr. Kaliebe, the
4     individual, hold these views, but you,
5     Dr. Kaliebe, Indiana's expert in this case, are
6     not offering yourself as an expert on these two
7     points?
8  A  I would not commit to that.  Since I have put this
9     in my report even though it's not exactly these
10    same statements, I have mentioned the low quality
11    evidence base.
12       Since I have mentioned that in my report and
13    I am already speaking as an expert and I've gone
14    on the record, I think I am affirming that this is
15    my opinion and this opinion is in my report.
16       MR. SELDIN: I wonder if now is a good
17    time to take a little longer break for lunch.
18       Dr. Kaliebe, Mr. Patterson, would that work
19    for you?
20       MR. PATTERSON: Fine with me.
21 A  Fine with me.
22       (OFF RECORD AT 1:31 P.M.)
23    (AT THIS TIME A SHORT RECESS WAS HELD OFF THE
24    RECORD AFTER WHICH THE FOLLOWING PROCEEDINGS WERE
25    HAD:)

Page 152

1        (ON RECORD AT 2:15 P.M.)
2  BY MR. SELDIN:
3  Q  Dr. Kaliebe, welcome back.
4        MR. SELDIN: Joel, could you pull
5     Exhibit 1 back up for us.
6  Q  This is your declaration that we have been talking
7     about in this case.
8        MR. SELDIN: Joel, can you take us to
9     Paragraph 121.
10 Q  Dr. Kaliebe, in Paragraph 121 of your declaration
11    you have some criticisms of SOC-8.  I take it that
12    is WPATH's Standards of Care 8?
13 A  Correct.
14 Q  And in Subsection A you say, "SOC-8 makes no
15    analysis for why it prioritizes affirmation of
16    gender identity over affirmation and acceptance of
17    the physical sexed body."
18       Do you see where you said that?
19 A  Yes.
20 Q  What is affirmation and acceptance of the physical
21    sex body?
22 A  Well, it would be the concept that it is important
23    for people to come to accept and work with the
24    body that they have, which is a time tested
25    approach, you know, in individuals who have

Page 153

1     challenges and disorders, distress related to
2     their body.
3  Q  When you say time tested, what do you mean?
4  A  Well, I mean in many other psychiatric disorders
5     we have patients that are uncomfortable or
6     distressed by the body that they have.
7        Someone with anorexia will starve themselves
8     in order to, you know, not go into development or
9     because they don't want to, because they have a
10    distorted view of themselves, a body dysmorphic
11    disorder.
12       During development, of course, many people
13    are uncomfortable or distressed by the body that
14    they have.
15 Q  In prior declarations you refer to this as body
16    affirmation.
17       Is affirmation acceptance of the physical sex
18    body the same as body affirmation?
19 A  Yeah.  I mean, I think they are part of the same
20    concept, yes.
21 Q  Did you come up with this distinction between body
22    affirmation and gender affirmation?
23 A  Did I come up with it?  Well, I think that this is
24    a noticeable discrepancy by the way that we are
25    asked to approach gender dysphoria compared to

Page 154

1 other disorders like I was, like I was mentioning
2 previously.
3 So, yes. I don't have a clear source from
4 where that comes from. It's just that I've noted
5 that this is a very different approach to affirm
6 and emphasize, you know, a psychological concept
7 about self over the physical body.
8 Q Is there any literature where researchers
9 discussed this distinction between gender
10 affirmation and body affirmation?
11 A There probably is. You know, since we are in such
12 a new field right now, you know, I don't think
13 that there has been much on this regarding
14 particularly this issue.
15 But I think there is significant literature
16 in other disorders regarding patients, healthy
17 patients, learning to come to peace with or love
18 the body that they have or reducing their distress
19 about the body that they have.
20 Q So it sounds like you are not aware of any studies
21 on body affirmation versus gender affirmation as
22 it pertains to gender dysphoria, is that correct?
23 A Correct.
24 Q In Paragraph 121, Subsection (d) another one of
25 your criticisms is that, "SOC-8 downplays concerns

Page 155

1 related to detransitioning."
2 Do you see where you wrote that?
3 A Correct.
4 MR. SELDIN: Joel, can you please pull up
5 Exhibit 14.
6 Q Dr. Kaliebe, have you seen this document before?
7 A Yes. It's the Standards of Care for the Health of
8 Transgender and Gender Diverse People, Version 8.
9 I was referring to that in my report as the
10 SOC-8.
11 MR. SELDIN: Joel, can you take us to
12 Page 43 of the PDF, please.
13 Q Dr. Kaliebe, do you see where it says
14 Statement 5.7?
15 A Yes.
16 Q Do you see, "We recommend health care
17 professionals assessing adults who wish to
18 detransition and seek general-related hormone
19 intervention, surgical intervention, or both,
20 utilize a comprehensive multidisciplinary
21 assessment that will include additional viewpoints
22 from experienced health care professionals in
23 transgender health and that considers, together
24 with the individual, the role of social transition
25 as part of the assessment process."

Page 156

1 Do you see that?
2 A Yes.
3 Q There is a whole section of SOC-8 that talks about
4 detransition, correct?
5 A Correct. I think if you look at the amount of
6 pages devoted to it, and I do see 260 pages on the
7 document, that is why I was saying underemphasized
8 the component.
9 Q What would be an appropriate emphasis in the SOC-8
10 for detransition?
11 A Well, I think a more realistic approach in
12 regarding the new patient population, which has
13 recently emerged. And we do not know what the
14 rates of detransition will be in this new
15 different patient population.
16 And so I think while it generally downplays
17 it, reporting it to be rare, which I think, you
18 know, once again, we are not totally clear on, the
19 data is not so clear on how rare it really is.
20 But, secondly, it's especially pertinent
21 considering the large rise in these treatments
22 among minors and minors that are very different
23 than the minors that were in the Dutch protocol or
24 other early interventions.
25 MR. SELDIN: Can you take us back to

Page 157

1 Exhibit 1, please.
2 Q In Paragraph 122, Doctor, in Paragraph 122 you
3 say, "There have been several other episodes I
4 have learned about that have caused me to conclude
5 that I do not feel comfortable relying on WPATH or
6 its U.S. affiliate, USPATH, to guide my care of
7 gender dysphoric patients."
8 A Yes.
9 Q What do you rely on to treat your gender dysphoria
10 patients?
11 A My experience as a child psychiatrist. And I
12 think patients are all human beings. They all
13 share a lot of qualities. We have a wealth of
14 clinical and other research data, which gives us a
15 general approach on how to approach patients.
16 And so when a new population and a new
17 treatment model comes in and asks you to do
18 something a different way and you see that it has
19 flaws and it's not, it has not, it does not have
20 the evidence base that it claims to have, then you
21 have to use your, you have to use what you know
22 about other treatments, which are, of course, you
23 know, which are generalizable in order to approach
24 that patient population.
25 Q Earlier we talked about how in total you have

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 158

1  treated maybe sixteen or seventeen patients with
2  gender dysphoria.
3      How many of those are you currently treating?
4  A  I would guess half that number.
5  Q  Are they aware you are not using USPATH or WPATH
6  standards of care in their treatment?
7  A  I don't know that patients are ever aware of what
8  guidelines or treatments or what approaches that
9  you use as a clinician.
10     That would be no regarding any of my patients
11  with any of my approaches.
12  Q  Do you think a patient would want to know if you
13  were intentionally not using consensus guidelines
14  to treat their condition?
15  A  Well, I don't believe these to really be consensus
16  guidelines. So, you know, there is no reason to
17  inform patients exactly where you are getting your
18  clinical approach from.
19     You take it from all sorts of places. So I'm
20  not -- no, I don't think it's necessary. I never
21  inform my patients in other circumstances what
22  guidelines I use or don't use. I don't think
23  these patients are really any different.
24  Q  Are any of the patients you are currently treating
25  for gender dysphoria minors?

Page 159

1  A  Yes.
2  Q  Do you think their parents would want to know that
3  you were not using WPATH and USPATH guidelines to
4  treat them?
5  A  Once again, parents have never ever in the past
6  asked me about what guidelines I use for my
7  treatment. So I think that it would be a
8  discussion to have perhaps if there is a
9  discussion about medicalization. So in those
10  situations I'm more than happy to tell them what
11  my perspective is.
12     But, once again, you know, you really don't
13  usually go into treatment guidelines when you are
14  discussing matters with parents or with patients.
15  Q  Are you treating these particular patients with
16  what you call body affirmation?
17  A  Well, as I mentioned before, I think whenever you
18  are referring people for things like physical
19  activity, exercise, mindfulness approaches, those
20  all have some elements of coming to peace with and
21  using the body, appreciating the body that you
22  have.
23     I think that approach is known because those
24  are things that I talk about. I think it would
25  be, I don't think I talk about my philosophy of

Page 160

1  treatment with any of my patients. I just provide
2  recommendations and treatment.
3  Q  Is it fair -- have you ever had a conversation
4  with these patients or their parents in which you
5  have explained what you explain here, that there
6  is gender affirmation and there is body
7  affirmation and you are going to prioritize body
8  affirmation?
9  A  I have, in a manner, yes. I think that as I have
10  spoken with parents they have -- I have
11  communicated to them what my approach is. I don't
12  use those words. I will tell parents what I
13  emphasize and don't emphasize in my treatment.
14     Once again, these are not the conversations,
15  I mean, this is not usual -- you know, out in the
16  community as a treater or in the clinics that I
17  work in, I mean, this is not the level of
18  conversation that you are typically having.
19     So I am not usually talking about which
20  guidelines I use or what approach I use with
21  patients. This is quite unusual.
22  Q  Doctor, you have not told them there is no
23  research about body affirmation versus gender
24  affirmation?
25  A  Well, hold on. Because you are claiming that

Page 161

1  there is some research, which is not accurate.
2  There is research in all sorts of things. You are
3  just saying in the exact specific condition of
4  gender dysphoria, which we have almost no research
5  on anything in regard to any kind of therapy with
6  gender dysphoria.
7      It's such a new condition with this
8  population with this large amount that we only now
9  are starting to be able to roll out studies.
10     Once again, you are mischaracterizing what is
11  going on. But, yeah. So, no, I don't have
12  exactly that conversation because that is not an
13  appropriate framing of it.
14  Q  Well, have you had the conversation with parents
15  or patients where you have said there is not any
16  specific research on the use of body affirmation
17  to treat your condition, gender dysphoria, but
18  there is research for other conditions?
19     So what I will recommend in the absence of
20  that research on your specific condition is that
21  we use body affirmation instead of gender
22  affirmation.
23     Have you had any kind of conversation like
24  that with your patients?
25  A  Well, you know, once again, I think we are talking

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 162

1     about these large, you know, concepts rather than
2        talking about specifics.
3            I mean, you know, you could still be
4     affirmative, meaning use the pronouns the person
5     was working with, and be affirmative in that you
6     are supporting them.  But, also, want to work with
7     them in coming to peace with the body that they
8     have.
9  Q  Is that your general practice with your minor
10     patients that have gender dysphoria, to use the
11     pronouns that they want to be known by?
12 A  Yes.
13 Q  Earlier you were talking about how you treat
14     patients given your desire not to use WPATH or
15     USPATH guidelines.
16         Is it fair to say then that you consider your
17     clinical practice sufficient to sort of establish
18     guidelines for yourself?
19 A  Well, I think when you are a child psychiatrist
20     and you treat all of the different conditions that
21     could come in, people come in with autism.  People
22     come in with psychosis.  People come in with
23     bipolar disorder.  They come in with PTSD.  They
24     come in with all number of different problems.
25         And then they have problems in development.

Page 163

1         They have problems of identity that are not
2     related to gender.  They have problems
3     academically.  They have neurocognitive problems.
4     They have problems related to school.  They have
5     problems relating to getting into fights.  They
6     have family conflict.
7         So when you approach a patient clinically,
8     you are putting together a treatment plan and an
9     assessment that speaks to them specifically.  So
10     I'm using what, you know, is the, I would say,
11     mainstream psychiatric approach with all these
12     patients, including the patients with gender
13     dysphoria.
14 Q  So your description then of your clinical
15     experience, that is sufficient you think to
16     establish good clinical practices?
17 A  I don't think that patients with gender dysphoria
18     are that different than other patients that I
19     should throw out all my training for everything
20     else I do and do something that WPATH has
21     determined to be the right approach even though my
22     assessment of the evidence is that it's not the
23     right approach.  So, correct.
24         MR. SELDIN: Joel, will you take us to
25     Paragraph 129, please.

Page 164

1  Q  Dr. Kaliebe, in Paragraph 129 you are discussing
2     Dr. Shumer.
3         Do you recall writing this paragraph?
4  A  Yes.
5  Q  In this paragraph at the very end you say, "This
6     virtuous sense of self must at least raise
7     concerns as to whether Dr. Shumer and other
8     advocates engage in sober reviews of the
9     evidence."
10         Do you see where you wrote that?
11 A  Yes.
12 Q  Would you generally agree that patients should
13     receive competent and compassionate care, medical
14     care?
15 A  Yes.
16 Q  Do you generally agree that transgender people are
17     emerging and demanding specific kinds of care?
18 A  Emerging and demanding specific types of care?
19         Yeah.  I mean, this is, I think some of the
20     questions that we have is a child, you know, a
21     transgender person, or are they a child with
22     gender dysphoria?  Or is this a teenager with
23     gender dysphoria or a transgender person?
24         So I think, you know, as your identity is
25     still developing I think it's important for us to

Page 165

1     step back and look that we are not necessarily
2     dealing with someone who at the end of the day
3     should be best conceptualized as a certain person.
4         And that the fact that someone, that there
5     are some demands for care, once again, is detailed
6     elsewhere in my report.  Yes, people should be
7     compassionate and we should be competent.
8         But often the type of care that patients
9     request is often not the best type of care for
10     them.  So, you know, I am somewhat agreeing with
11     your characterization.  But I think there is some
12     nuance there.
13 Q  We talked about this a little bit earlier.  I
14     wanted to clarify.
15         You said you prefer to treat, to consider
16     children with gender dysphoria as children with
17     gender dysphoria and not as what you called
18     transgender children, is that accurate?
19 A  Correct.
20 Q  You would agree, though, that some, that at least
21     some children with gender dysphoria are, in fact,
22     transgender, right?
23 A  No.  Because we don't know what their identity
24     really is or what it will be at the end.  I don't
25     think we are, I mean, putting a label on a child

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 166

1    that is still developing, I mean, that's not, I
2    don't think it's a wise practice.
3        So I would not call them transgender as I
4    have stated.  I would call them a child with
5    gender dysphoria.
6    Q   And would you agree that some children with
7    gender dysphoria come to identify as transgender
8    adults?
9    A   Yes.
10   Q   Earlier we were talking about your concerns about
11   some of the moralizing language that you think
12   exists in discussions about the treatment of
13   gender dysphoria.
14       Do you remember us talking about that earlier
15   today?
16   A   Correct.
17   Q   And it seems like based on Paragraph 129 that you
18   have some concerns about folks who use what you
19   term, folks who use what you characterize as
20   moralizing language that they can't soberly review
21   the evidence.
22       Is that fair to say?
23   A   Well, they may or may not be able to.  It would
24   raise, it would raise a level of skepticism.
25       MR. SELDIN: Joel, will you pull up

Page 167

1    Exhibit 11.
2    Q   Dr. Kaliebe, this is a printout of a website for
3    an organization called Do No Harm.
4        Have you heard of Do No Harm before?
5    A   I have heard the name.  I'm not familiar with it,
6    no.
7    Q   You will see in the "About Us" section it says,
8    "We are a diverse group of physicians, health care
9    professionals, medical students, patients, and
10   policymakers united by a moral mission:  Protect
11   health care from a radical, divisive, and
12   discriminatory ideology."
13       Do you see where I read that?
14   A   Yes.
15   Q   Do you consider this the kind of moralizing
16   language that gives you pause about an ability to
17   soberly review the evidence?
18   A   Well, I think they are using language similar to
19   Turban and Karasic and Shumer.  Yeah.  I would
20   think that those who look at any sort of group
21   that has a mission, you know, you would have to
22   be, you have to be skeptical and understand that
23   they are potentially a part of a group.
24       MR. SELDIN: Joel, scroll down, please, to
25   Page 6 of the PDF.

Page 168

1    Q   Dr. Kaliebe, you will see at the bottom there is a
2    photo of Dr. Daniel Weiss, Senior Fellow.
3        Do you see that?
4    A   Yes.
5    Q   And I think we were talking earlier today, are you
6    aware that Dr. Weiss is one of Indiana's experts
7    in this case?
8    A   I am now that you are asking me that question.
9    Q   Would his membership in this group give you some
10   pause about his ability to soberly review the
11   evidence?
12   A   No.  I mean, I think that your, you know, the fact
13   that someone has joined a group which is calling
14   for cautious care under the circumstances would
15   not necessarily, you know, give me pause.
16       So, no, I think, I mean, yes, is it possible
17   that this could also have some group think or
18   group identity issues, you know, distorting their
19   viewpoint, it's possible.
20       I, you know, as I said before, it just means
21   that you should look at what the person says and
22   examine the evidence and the idea about ideas
23   competing with each other.
24       Rather than personally attacking the person,
25   you should identify the idea and evaluate the

Page 169

1    quality of the evidence or the idea.
2    Q   And so for clinicians like Dr. Shumer, do you
3    think the same applies, that rather than simply
4    judging him by his participation or any kind of
5    group or gender clinic you should look at his
6    ideas and evaluate them on the merits?
7    A   Correct.
8    Q   Okay.
9        MR. SELDIN: Joel, will you take us back
10   to Exhibit 1, please.
11   Q   Look at Paragraph 130.  Dr. Kaliebe, in
12   Paragraph 130 you talk about what you perceive to
13   be a chilling effect on scholarly dialogue.
14       Do you see where you wrote that?
15   A   In 130?  I don't use those words there.
16   Q   Sorry.
17   A   It's not in Paragraph 130.
18       MR. SELDIN: Joel, are you on Exhibit 1?
19       JOEL SCHERER: Yes, this is Exhibit 1.
20       MR. SELDIN: Okay.  I have something wrong
21   with my pagination.
22   Q   You do recall that there is some scholarly
23   dialogue missing, right?
24   A   Yes.
25   Q   What specific articles do you think should have

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 44 of 84 PageID #: 3582

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 170

1    been published that have not been?
2  A  Well, I think I say in the report there are many
3    articles that should be published and many issues
4    to be explored.  We are in the infancy of medical
5    and hormonal treatments for young people and we
6    don't really have good long-term outcome data.  We
7    don't have any control data.
8       So, you know, we should be still debating
9    what is the right approach considering the actual
10   level of the evidence.  We should be careful about
11   promoting one type of care or the other and,
12   obviously, be talking about what evidence base
13   supports it.
14       I think specifically in the, in the arena of
15   gender-affirming care what we should talk about,
16   we should have articles in major medical journals
17   about informed consent in relation to that.  We
18   should have articles regarding psychotherapy.  We
19   should have articles regarding special populations
20   like traumatized individuals, personality
21   disorders, autism.
22       I mean, we have so much to explore.  There is
23   so much more we don't know than what we do know.
24   To, you know, to only sort of allow one type of an
25   article or one perspective on this seems quite

Page 171

1    misguided.
2  Q  Just to make sure we are talking about the same
3    thing, in your declaration you list some specific
4    instances of some specific articles that you
5    believe should have been published that were not.
6       Just in your answer now you are talking more
7    broadly about kinds of papers you wish you had
8    seen.
9       Were you referring to anything specific?
10 A  I don't know exactly what has been submitted that
11   has not been published.  So it is impossible for
12   us to know what articles were rejected.  I'm not
13   quite understanding the question.
14 Q  Well, fair to say you don't know if these, you are
15   not sure if maybe these articles don't exist at
16   all or they are being submitted and just not being
17   published?
18 A  Correct.  Other than my letters to the editor
19   which I know were rejected.
20 Q  Do you know the rejection rate for letters to the
21   editor?
22 A  No.
23       MR. SELDIN:  Joel, can you take us to
24   Paragraph 142, please.
25 Q  Dr. Kaliebe, in Paragraph 142 you talk about, "A

Page 172

1    colleague told me about a difficult experience
2    with editors of the American Academy of Psychiatry
3    and the Law Newsletter."
4       Do you see that?
5  A  Correct.
6  Q  Who is the colleague that --
7  A  Josh Sanderson.
8  Q  Okay.  Do you know if he tried to get this article
9    published anywhere else?
10 A  It got published.  He just, they just asked him to
11   remove the actual behavior of the transgender
12   individuals on the inpatient unit.
13       So the whole, you know, part of the article
14   was to communicate that these are difficult
15   situations that we are having on the inpatient
16   unit with individuals who identify as transgender.
17       They forced him to take out the part about
18   what was actually happening on the inpatient unit,
19   thereby, stopping clinical exchange of information
20   related to caring for individuals on inpatient
21   units.
22 Q  Did this colleague try to get his unedited article
23   published somewhere else?
24 A  I'm not aware.
25 Q  In Paragraph 144 at the end you say, "Former sex

Page 173

1    researchers have left the field due to the
2    harassment and intellectual bullying they
3    received."
4       Do you see where you wrote that?
5  A  Yes.
6  Q  Who has left the field?
7  A  I gave the one example of Debra Soh.  I don't
8    have a list in front of me.  She is not the only
9    one.
10 Q  Who else do you think has left the field?
11 A  I don't have that in front of me.  I think you
12   could read Debra Soh's book and it would provide a
13   lot of detail about the harassment and
14   anti-scientific atmosphere in which she endured.
15 Q  Other than Soh, there is no one you can
16   specifically remember?
17 A  There are examples in her book.  And if I could
18   add on, I mean, it's not just about leaving the
19   field.  It's about staying away from areas of
20   scholarly exploration, which there are plenty of
21   examples.  Right?
22       So, for one, it's difficult to get grants or
23   to then be able to study things that are
24   controversial in universities, especially
25   controversial and related to gender dysphoria or

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 174

1  transgender care.
2      So, unfortunately, that is, you know, we are
3  reducing the amount of information flow due to
4  these things.
5      MR. SELDIN: Joel, will you take us to
6  Paragraph 145, please.
7  Q  Dr. Kaliebe, in Paragraph 145 you talk about your
8  personal interactions with psychiatrists.
9      Do you recall writing this paragraph?
10 A  Yes.
11 Q  Would you agree that your personal interactions
12 with psychiatrists is a form of anecdotal
13 evidence, right?
14 A  Correct.
15 Q  In Paragraph 145 you use the term automatic
16 affirmation.
17 A  Yes.
18 Q  What is automatic affirmation?
19 A  As I mentioned earlier, when a patient comes to
20 you and has a certain perspective on something, it
21 is not typical within mental health for you to
22 automatically agree with their perspective.
23     So that is not what we do in any other
24 situation, but for whatever reason with gender
25 dysphoria we have been asked to, or there seems to

Page 175

1  be pressures that if someone says that they have a
2  certain gender identity that we are obligated to
3  agree with that.  That is just a departure from
4  typical mental health care.
5  Q  Where does the term automatic affirmation come
6  from?
7  A  Well, that seems to be the approach which is being
8  pushed.  I don't know that term, I'm
9  characterizing the affirmative approach as
10 automatic or some component of it.  I'm sure that
11 there are people who consider themselves
12 affirmative who do not automatically affirm or do
13 not consider their affirmation automatic, yet it
14 seems that there is some pressure to automatically
15 affirm.  So that is why I put that in there.
16     It seems very unusual that you would
17 necessarily agree with a patient when in mental
18 health care we don't affirm or agree with patients
19 in general.
20 Q  So automatic is your descriptive modifier based on
21 your experience --
22 A  Well, yes.  It is one of the fundamental problems
23 with gender-affirming care.  So it's an
24 underlying, you know, unstable base that
25 gender-affirming care has in my assessment.

Page 176

1  Q  Earlier in one of your answers you said clinicians
2  were obliged to accept gender identity.
3      What did you mean by obliged?
4  A  Well, as I have said before, we typically in
5  mental health -- let's say you are working with an
6  adult client and they come in and say I want to
7  have a divorce.
8      You know, you are usually not going to be, I
9  mean, any reputable therapist would be, like,
10 let's sit down.  Let's talk about it.  Let's see
11 what is going on.  Let's understand your history
12 and your current situation.  Let's, I mean, let me
13 hear more about this.
14     You don't, you know, a mental health provider
15 would not be yes, you should get a divorce, or no,
16 you should not.  Right?  I mean, that would be
17 inappropriate.  Certainly we would not offer
18 anything like suggestions in matters of, you know,
19 major life choices like a divorce.
20     At some point by getting to know a person you
21 may get a sense of whether that would be a wise
22 course for them or not.  I'm just bringing that up
23 as an example of what normally, how normally you
24 would approach a patient in mental health when
25 they say I have this situation.

Page 177

1      So you don't, you would not necessarily say
2  yes, do something, or no, don't do something.
3  Q  Are you aware of any clinicians who are not asking
4  follow-up questions when patients present
5  themselves saying I think I have gender dysphoria
6  or I might be transgender?
7  A  Yeah.  If you look at the Hannah Barnes book, Time
8  To Think, or you look at the whistleblower
9  report, you can see that there is sufficient,
10 significant evidence that within gender clinics
11 there are a lot of pressures to automatically, and
12 there are people in the community who say the
13 first thing that you should do is immediately
14 affirm.  You have to go with it.  This can never
15 be challenged.
16     So, yes, I feel that clinicians, therapists,
17 have a lot of pressure, especially if they are,
18 if, especially probably in places like gender
19 clinics to automatically affirm.
20 Q  Based on your secondhand review of the literature
21 you believe this is happening?
22 A  Well, based on what I read in WPATH guidelines,
23 and based on what I have read in Hannah Barnes'
24 book, and based on my experience talking with
25 other psychiatrists, and based on my experience

Page 178

1 going to meetings and listening to child
2 psychiatrists who are presenting on gender
3 dysphoria, yes, I believe this is what is
4 happening.
5 Q   If a patient presents themselves and says, you
6 know, I think I have gender dysphoria or I think
7 I'm transgender and I want you to use male
8 pronouns for me, do you think it is automatic
9 affirmation to begin using male pronouns for that
10 person?
11 A   It may or may not be.  It depends on the
12 circumstance.
13 Q   In what circumstance would it not be automatic
14 affirmation?
15 A   Well, if you are, if their request to use male
16 pronouns is in a situation where you, you know,
17 there has been a long history of gender dysphoria
18 or issues related to it and this is a well thought
19 out process that emerges in therapy, or someone
20 has already done a bunch of therapy work, if they
21 are older, I mean, there are all sorts of factors
22 that you may consider whether to go with that.
23      Or the next question might be why do you feel
24 that way?  What's going on?  Tell me about that.
25      Usually in therapy you are asking questions

Page 179

1 regarding what is the experience of the patient
2 and why they feel a certain way.
3 Q   Would you agree that it's possible to do both?  To
4 say great, thank you, I will use male pronouns.
5 Can you tell me a little more about that?
6 A   That would be one choice, yes.
7 Q   Would you consider that automatic affirmation?
8 A   It could be.  Yeah.  If you are going to go with
9 it, right, at the first request of a patient I
10 would consider that automatic affirmation.
11 Q   What do you think you should do instead?
12 A   Once again, it depends on the clinical situation.
13 I mean, I have written that in the report.
14 Someone, you know, if someone comes up and they
15 were just sexually assaulted and now they say, I
16 want to, I want to use male pronouns.  I'm going
17 to change to this male name.
18      I would be, like, hold on.  What's going on?
19 You know, let me hear more about this.  Let me
20 hear what's behind your decision.
21      Yes, we want to talk about it because we want
22 to know, and I would want to explore what exactly
23 is happening.
24 Q   That example that you just referred to about a
25 patient recently being sexually assaulted, is that

Page 180

1 based on a specific patient or a hypothetical?
2 A   Well, that is, that particular vignette would be a
3 hypothetical.
4 Q   So you are aware of that happening.  That is an
5 example that you came up with --
6 A   There is evidence there is increased gender
7 dysphoria after sexual assault.  That is in my
8 report.  This is part of the concern that after a
9 sexual assault there is evidence that there is
10 more likely to be gender dysphoria.
11 Q   That is a vignette that you came up with based on
12 your reading of data, not a specific patient?
13 A   Correct.
14 Q   Okay.  In Paragraph 145 you talk about some
15 psychiatrists who are, many psychiatrists are
16 "willing to use affirmative approaches
17 selectively."
18      Do you see where you wrote that?
19 A   Yes.
20 Q   Is that what we talked about just now where you
21 said depending on the therapeutic history it might
22 be warranted to affirm someone by using their
23 pronouns?
24 A   Yes.
25 Q   Do you think in a patient that had that kind of

Page 181

1 long therapeutic history it would be warranted to
2 provide them with gender-affirming care, medical
3 care in the form of puberty blocks or hormones?
4 A   I think that we have already discussed this.  I
5 mean, if they are fully grown into adulthood that
6 that would be worth considering.
7      Yes, if they are done developing and they are
8 still not in a process of identity development
9 that could make sense.
10 Q   Do you think there are seventeen year olds who are
11 sufficiently developed in their identity and have
12 a long enough history that gender-affirming care
13 in the form of hormones would be appropriate?
14 A   I don't think that we have enough data about if
15 seventeen year olds will maintain their identity
16 that they have in order to justify that.
17 Q   Can you imagine any circumstance in which it would
18 be appropriate to provide hormones to a seventeen
19 year old?
20 A   I don't think it is a good clinical decision.  So,
21 no, I don't.  In my opinion, it would not be wise.
22      MR. SELDIN:  Joel, will you take us to
23 Page 53, please.  Can you scroll down a little
24 bit.  Go to Page 53.  Thank you.
25 Q   Paragraph 131 appears out of order.  It is on the

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 182

1    bottom of Page 53.
2        Do you see where you are discussing here
3    Levine's list of assumptions misrepresented as
4    facts.
5        Do you see that?
6  A  Yes.
7  Q  Then the third bullet down says, "All gender
8    identity variations are biologically determined
9    and inherently healthy."
10        Do you see that?
11  A  Yes.
12  Q  Do you believe that there are some gender identity
13    variations that are inherently unhealthy?
14  A  Do I believe there are some -- well, yeah.  I
15    mean, I think we have an open scientific question
16    if some patient's gender identities are unhealthy
17    for them, correct.
18  Q  What do you mean by unhealthy for them?
19  A  Well, we could go back to the data related to
20    trauma and increased gender dysphoria.  I mean, is
21    the, you know, is this really an avoidance
22    strategy to shield someone, you know,
23    psychologically from the trauma that they had.
24    Right?
25        So if someone develops a transgender identity

Page 183

1    or gender dysphoria after a sexual assault, it
2    could be an unhealthy response to that.  And that
3    could end up being a, you know, you know,
4    nonproductive, nonfunctional way for them to cope
5    or react to that.
6  Q  Do you think having a transgender gender identity
7    is inherently unhealthy?
8  A  No, not across the board.  So I think that, you
9    know, in an adult with an established transgender
10    identity, the -- you would have a, a transgender
11    identity -- everything in life is -- you know, so
12    first of all, there are people that seem to just
13    feel this very strongly.  And it comes, and it has
14    come from not a place of another disorder or
15    trauma and it has been persistent for a long
16    period of time.
17        So I think that is the group of patients
18    where we are saying that that does not seem so
19    much like this is an unhealthy or problematic
20    identity.
21  Q  So you would agree then that there are at least
22    some transgender adults for whom there is no
23    traumatic etiology for their transgender
24    identities?  It is just the way they are, correct?
25  A  Correct.

Page 184

1  Q  Do you feel that way about any minors?
2  A  What I would prefer to conceptualize this as is
3    that a minor is a developing individual with
4    gender dysphoria.  So I don't think clinically it
5    is the right approach to consider them a fixed
6    transgender individual.
7        And only time will tell if they end up being
8    an adult who, you know, does have that fixed
9    identity of a stable transgender identity.  So,
10    you know, for any one individual teenager or
11    child, I mean, we don't know what their life will
12    bring them or how they will develop.
13  Q  If you could predict with a hundred percent
14    certainty which children with gender dysphoria
15    would grow up to become transgender adults, would
16    you have the same objections to provision of
17    gender-affirming care, medical care to minors?
18  A  If you could predict with a hundred percent
19    certainty?
20        Well, I guess I would have a number of
21    caveats with that.  We are saying someone without
22    co-morbidities or other problems that possibly
23    could be a contributing factor to something else.
24        So I think, yes, I think you are -- then we
25    would, you know, everyone would feel much more

Page 185

1    comfortable if we knew for sure or we knew what
2    the person's individual development trajectory
3    would be.
4        So, you know, I have never thought of that
5    question before exactly like that.  But, yeah,
6    perhaps if we knew, if we knew a hundred percent.
7  Q  Is there any other medical condition for which you
8    think we should have a hundred percent certainty
9    as to outcome before we provide it?
10  A  You know, well, not that I know of.  I do think
11    this is an exceptional case because of the
12    permanent changing of a person's, you know,
13    trajectory with a, you know, low quality evidence
14    base.
15        So that is the challenge here, is that we
16    don't really know who is going to have what type
17    of identity as an adult.  We don't know the
18    long-term outcomes.  Yes, other situations where
19    we were talking about things that do not have this
20    risk level, sure, we don't demand such a high
21    certainty.
22        I'm not saying that I'm demanding a hundred
23    percent certainty.  I'm saying I am demanding a
24    lot more certainty than we have with the current
25    patient population that we have.

Page 186

1 Q Would you support studies that would bring us
2   closer to certainty about the, about what you
3   believe would be --
4 A Yes. Yes.
5 Q You are aware that Senate Enrolled Act 480 does
6   not include any carve outs for research?
7 A Yes.
8 Q Do you think that that is a mistake?
9 A I don't know all of the factors that go into
10   making the bill. I would say, in general, I wish
11   we would be studying things more. Especially if
12   we were studying one pool of patients with
13   psychotherapy and psychosocial treatments.
14      As long as we are actually studying
15   alternatives, then I think studies are great. If
16   all you are going to study is medicalized
17   treatments, then we are going to be in the same
18   boat down the road because we are not going to
19   really know what treatments are better.
20 Q If I understand, you have opinions about study
21   design.
22      Generally speaking, you would support
23   studies?
24 A Correct.
25 Q Okay.

Page 187

1      MR. SELDIN: Joel, will you take us to
2   Page 55, please.
3 Q Dr. Kaliebe, you will see in Paragraph 151 you
4   talk about in the third sentence, "Psychotherapy
5   involves getting patients to recognize their own
6   thought patterns, disturbed emotions, and, when
7   appropriate, includes challenging irrational,
8   self-defeating, and harmful beliefs."
9      Do you see that?
10 A Yes.
11 Q Do you think gender dysphoria is an irrational,
12   self-defeating or harmful belief?
13 A I believe that what I have seen in many patients
14   with gender dysphoria is that it includes those
15   types of beliefs, yes.
16    So when you have a patient who is saying, you
17   know, who is so fearful of puberty, and they are
18   saying this will be the worst thing. This will be
19   so horrible. They are predicting a future that
20   they don't know. They are assuming the worst.
21   Right?
22      That is a classic assuming the worst
23   cognitive distortion. Right? They don't know
24   what will happen, but they feel it's bad. They
25   have thoughts related to that.

Page 188

1      A lot of patterns in gender dysphoria are
2   classic patterns that you have in all psychiatric
3   disorders. If they seem quite amenable to
4   treatment and if you can get patients to engage in
5   such treatment, then they could be less disturbed.
6   Yes.
7 Q So so you were talking about the dreaded puberty as a
8   potentially irrational self-defeating or harmful
9   belief?
10 A Yes.
11 Q But you believe there are some children with
12   gender dysphoria who do grow up to be transgender
13   adults, right?
14 A Correct.
15 Q So for those youth, their fear of puberty is not
16   irrational, right?
17 A Well, it may be irrational because it may be out
18   of proportion. So just because a possible outcome
19   is that puberty will be bad, I mean, you know,
20   puberty may be good.
21      That person does not know until they
22   experience it. So they are assuming the worst and
23   making themselves suffer more. This is a lot of
24   what you do in therapy, is help people to have
25   realistic and flexible thought patterns and accept

Page 189

1   what they have to accept and not making things
2   worse for themselves.
3      You don't want people catastrophizing the
4   worst and focusing on negatives. That is amenable
5   to therapy. I think those could be quite helpful
6   in patients with gender dysphoria.
7 Q You might disagree with the amplitude of their
8   distress, but it would not be irrational to be
9   worried about going through puberty that didn't
10   match your gender identity, right?
11 A It is not all about rational. That is one
12   component of it. An overfocus on negative things
13   makes people more upset and causes them to do
14   worse.
15    So there are many different components of how
16   your thought patterns contribute to suffering. So
17   we want to minimize suffering from people having
18   flexible thoughts, alternative seeking, remaining
19   realistic.
20      And so just the overfocus itself, even if it
21   is rational, can be a harmful approach.
22 Q You talk about minimizing suffering as a generally
23   good goal. We talked about, you know, children
24   with gender dysphoria, minors with gender
25   dysphoria who grow up to be transgender adults.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 190

1     Would you agree that it's good to minimize
2  their suffering of going through puberty that does
3  not match their identity?
4  A  I don't know that we know enough right now to say
5  whether that is -- even for the ones who end up
6  being adults, I don't know that we know that it's
7  not a better path, even if it's difficult, to go
8  through puberty, become an adult, have a
9  solidified identity and then make a choice to
10  transition when you have gone through that even if
11  it was painful or difficult or there was suffering
12  involved.
13     So while, yes, we want to minimize suffering,
14  I don't know that in your hypothetical that we
15  would be.  I think that is one of the many
16  unknowns.
17     MR. SELDIN: Joel, will you take us to
18  Paragraph 154 on the next page, please.
19  Q  Five lines down you say, "Yet, the false binary of
20  affirmative psychotherapy versus conversion for
21  gender dysphoria is being used to push therapists
22  away from consideration that acceptance of one's
23  biological sex or resolution of gender dysphoria
24  is a positive event."
25     Do you see where you wrote that?

Page 191

1  A  Yes.
2  Q  This false binary, what do you base that on?
3  A  Well, a lot, there have been many attempts to call
4  different types of therapy for gender dysphoria or
5  approaches to people who are transgender as
6  conversion therapy.
7     Conversion therapy usually was thought of as
8  attempts to force changes in sexual orientation.
9  Those are not any -- I mean, in the distant past
10  those occurred.  They were rejected by the mental
11  health community a long time ago.  They may exist
12  in certain religious sects or in other parts of
13  society.
14     But to then associate regular, you know,
15  psychotherapy with conversion I think has done a
16  lot of damage in that people don't want to engage
17  in deep regular therapy with patients because for
18  fear of this.
19     And because patients hear that therapy is not
20  the solution to their problems.  That they really
21  just need to be affirmed and get medical
22  treatments.  So that can also interfere with the
23  patient's willingness to do therapy when therapies
24  are called conversion therapy.
25  Q  So I'm trying to understand the distinction

Page 192

1  between this regular psychotherapy that you are
2  talking about and affirmative therapy.
3     Earlier you said it would not necessarily be
4  affirming for a therapist or psychiatrist to say,
5  Great, I'll use those pronouns.  Can you tell me
6  more about that?
7     I mean, what is the difference between
8  regular psychotherapy and affirmative therapy in
9  that instance?
10  A  Well, that would be fine.  It's fine to choose
11  that approach.  But as long as we are getting to
12  the, Can you tell me more about that, and we are
13  really truly going down that road it seems like
14  many proponents of medicalized transitions for
15  youth are not emphasizing how important it is for
16  there to be a true process of actual exploration
17  and a completion of identity development before
18  medicalized treatment.
19     And I just think that, you know, the, calling
20  therapies for gender identity or addressing
21  elements of gender identity conversion therapy is
22  an inappropriate attempt to, it's, it makes
23  therapy a pejorative and it argues against therapy
24  for kids who really could benefit from therapy.
25     MR. SELDIN: Joel, will you take us to

Page 193

1  Paragraph 168.
2  Q  Dr. Kaliebe, in Paragraph 168 you say in the
3  second sentence, "Beyond standard psychotherapies,
4  more specific and nuanced approaches for gender
5  dysphoria exist, such as Exploratory Therapy."
6  Then you include the URL for
7  genderexploratory.com.
8     Do you see that?
9  A  Yes.
10  Q  Have you studied Gender Exploratory Therapy?
11  A  I don't know what you mean by "studied."  But I've
12  looked at the site and the approach, yes.
13  Q  What is the evidence base for this approach?
14  A  Well, it's based on long-standing principles of
15  psychotherapy.  And as I note in other parts of my
16  report, the evidence base in general for
17  psychotherapy is quite good.
18     So since we are using lots of the techniques
19  from standard therapy, my guess is that it would
20  generalize and be quite good.  Just like
21  everything else, there are very few studies as we
22  have a very new patient population.
23  Q  You have a hypothesis that can work, but there is
24  not an evidence base specifically for gender
25  dysphoria?

Page 194

1 A There is a huge evidence base for psychotherapy.
2 I don't see any reason that patients with gender
3 dysphoria would be so different from all of the
4 other patients. So we can look at the massive
5 evidence base that there is for psychotherapy and
6 assume that all human beings with struggles and
7 problems and distress could benefit from talking.
8 People have been fine tuning and honing
9 therapy for quite a while and there are lots of
10 really well proven techniques. I have cited
11 cognitive therapy in my report.
12 I mean, there is a really strong substantial
13 base for this being a very effective tool. So I
14 don't see any reason why it would not work in
15 gender dysphoria.
16 Q You think you have a really good hypothesis, but
17 there is not a study showing that --
18 A Yes. Yes. There is no study showing it does not
19 work, right. There are a lot of studies that show
20 it works for everything else. But, no, we do not
21 have a specific study in this.
22 Q Right. Would you agree that gender dysphoria is
23 distress based on the existence of psychological
24 characteristics that don't align with their gender
25 identity?

Page 195

1 A That is a complex question. I'm not sure that
2 that is the primary driver for most of or --
3 Q Doctor, I don't mean to cut you off. I think
4 maybe you misunderstood my question. I'm not
5 talking about etiology. I'm just talking about
6 what it describes.
7 As a descriptive matter, gender dysphoria as
8 a distress because of having psychological
9 characteristics that don't align with your gender
10 identity, is that fair to say that is a
11 descriptive matter?
12 A I'm not sure. I mean, I think those are elements
13 of what is going on. But, in totality, we are not
14 really sure what the children and teens, what
15 factors are causing them to have the, you know,
16 thoughts and feelings that they have.
17 But, yes, I mean, I would agree to that, you
18 know, that part of the criteria is that there is
19 distress about their physical characteristics.
20 So I think that there are some qualifications
21 and that we really sort of have not fully
22 developed theories and knowledge about what is
23 driving gender dysphoria.
24 But, yes, I would agree that just by the
25 criteria, you are talking about someone who has

Page 196

1 distress related to their secondary sex
2 characteristics and physiology.
3 Q And even though you have talked about evidence for
4 things like cognitive behavorial therapy as a
5 treatment for other conditions, you are not aware
6 of any studies regarding the effectiveness of CBT
7 for the treatment of gender dysphoria, is that
8 correct?
9 A Yeah. I'm not aware of any studies that don't say
10 it treats it. But I'm not aware of any studies
11 that say it does treat it.
12 There are lots of studies that say it works
13 for a lot of things. It just has not been
14 studied, correct.
15 MR. SELDIN: Joel, will you take us back
16 to Page 56, please.
17 Q Dr. Kaliebe, in Paragraph 154 you say, "It is
18 surely reasonable and compassionate for a
19 psychotherapist to prefer a patient no longer to
20 suffer with gender dysphoria."
21 Do you see where you wrote that?
22 A Yes.
23 Q It's your belief that gender dysphoria can
24 resolve? Or it's your belief that gender
25 dysphoria can possibly be resolved by a person

Page 197

1 accepting their biological sex, is that fair?
2 A I believe that a component of resolution of gender
3 dysphoria could be in many cases, and maybe in all
4 cases, that acceptance. So yes, that could be one
5 component of it.
6 Q Would you agree that gender dysphoria can also be
7 resolved by treatments that bring a person's body
8 in line with their gender identity?
9 A I'm not so -- I think when you talk about the
10 patient population of adolescents that we are
11 treating, I'm not, I don't think that the evidence
12 is overwhelming that that does resolve their
13 gender dysphoria.
14 There's mixed evidence on that. So I would
15 not say that that is a uniform response to gender
16 affirming treatment. I would agree it does seem
17 there is evidence in some cases it resolves gender
18 dysphoria.
19 Q So I guess my question is if it's -- and we can
20 disagree about the frequency. But if it's
21 sometimes resolution through accepting their
22 biological sex, or through changing physical
23 characteristics to match gender identity, is it
24 ethical to totally ban one of those two?
25 A Well, I would add there is a third that sometimes

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 198

1 these would just resolve on their own.
2 So, yes, I think that we also have to
3 understand and consider that gender dysphoria
4 could just resolve without treatment. So we don't
5 necessarily have to do a medicalized treatment for
6 all individuals with gender dysphoria.
7 So would it appropriate? Well, I think in
8 the case of developing minors, I think it is
9 proper to argue that they should wait until
10 complete development, and then have sufficient
11 psychotherapy and other supports that would help
12 them get to a place as an adult and with enough
13 time that they have stayed gender dysphoric before
14 moving on to medicalized treatments.
15 MR. SELDIN: Joel, will you pull up
16 Exhibit 7. Take us to Page 1130, which is
17 Page 168 of the PDF.
18 Q And so, Dr. Kaliebe, we were talking earlier about
19 your testimony in the Decker trial that took place
20 recently.
21 Do you remember we were talking about that?
22 A Yes.
23 Q This is going to be a long portion of me reading.
24 My question at the end will be did I read that
25 correctly.

Page 199

1 A Okay.
2 Q So you know where we are going. So on Page 1130
3 of this transcript at Line 11 the Court said -- or
4 rather we will start at Line 9.
5 "THE WITNESS: Yes, I do not believe that we
6 should be doing hormones and surgeries for
7 developing adolescents."
8 "THE COURT: My question was therapy. And I
9 think I take it from your answers that you don't
10 think therapy that would make an adolescent
11 comfortable with gender identity different from
12 the sex assigned at birth is ever appropriate.
13 Did I misunderstood it?"
14 "THE WITNESS: I would say a little bit. I
15 think that we wouldn't have a goal of trying to
16 change someone's gender identity in therapy. I'm
17 not trying to get to one particular result. It's
18 more you want to -- so if that's the end result
19 that they have a, you know, a gender identity
20 opposite from their natal sex, I am fine with
21 that. I'm not opposed to that.
22 "I do think that you would have a leaning
23 towards or it is sort of a better outcome for most
24 kids most of the times, considering the
25 co-morbidities and everything going on, that they

Page 200

1 come to peace with their natal sex because then
2 they don't have all the problems that come from
3 not having that, and the distress from not having
4 that. But I'm okay with -- obviously, there are
5 going to be people that are going to go on and be
6 transgender and not be comfortable with their
7 natal sex, so you could support that."
8 Did I read that correctly?
9 A Yes.
10 Q Do you still agree with that testimony that you
11 provided in Decker?
12 A Yes, I think that was very similar to the
13 conversation that we just had.
14 Q Earlier we talked about a situation in which you
15 were comfortable with the certainty of the
16 prediction.
17 For those children, for minors with gender
18 dysphoria who go on to be transgender adults there
19 may be a role for medical gender-affirming care
20 for those people, would you agree?
21 MR. PATTERSON: Objection. It has been
22 asked and answered several times.
23 You can answer again.
24 A You are saying as adults?
25 Q Yes. We will start with as adults.

Page 201

1 A Repeat the question then before I answer it.
2 Q So we talked about before those minors with gender
3 dysphoria who go on to be transgender adults.
4 Do you believe that there is a role for
5 gender-affirming medical care in the form of
6 hormones for those individuals?
7 A Yes.
8 Q Is it your belief it is ever appropriate to
9 provide that kind of medical care to someone who
10 is under eighteen?
11 MR. PATTERSON: Objection. Objection
12 asked and answered.
13 You can answer.
14 A My belief is that there is no evidence base to
15 support that practice.
16 MR. SELDIN: Joel, will you take us back
17 to Exhibit 1.
18 Q Dr. Kaliebe, we were talking earlier and you were
19 talking about conversion therapy in the context of
20 sexual orientation.
21 Do you remember that?
22 A Yes.
23 Q You said it was rare. Do you recall saying that?
24 A Yes. I qualified that conversion therapy was, if
25 it is carried out these days, it's typically

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 52 of 84 PageID #: 3590

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 202

1    carried out within parts of our society that are
2    not related to mental health care or medical care.
3  Q  What do you base that statement on?
4  A  That in all of my experience I've not encountered
5    medical or mental health professionals who would
6    attempt to change anyone's sexual orientation.
7    Nor have I ever seen any compelling evidence of it
8    in any of our medical journals.
9  Q  Any evidence of it happening, you mean?
10  A  Correct. Within the medical community or mental
11    health community, correct.
12  Q  We will look at Page 59.
13      Dr. Kaliebe, earlier you had mentioned that
14    you thought trauma might have a role in gender
15    dysphoria in some minors.
16  A  Correct.
17  Q  For minors who have no history of trauma this
18    hypothesis would not be applicable, right?
19  A  Correct.
20  Q  And would you agree, or rather, do you think that
21    there are people who have gender dysphoria who
22    separate and unrelated have had some kind of
23    trauma in their life?
24  A  Correct. You can see if something occurred before
25    the development of the gender dysphoria or at the

Page 203

1    same time as the development of the gender
2    dysphoria.
3      We would call that a co-occurring disorder if
4    it occurred at the same time or around the same
5    time, but after the trauma.
6  Q  Would you agree then that -- once someone's trauma
7    has been adequately addressed it is possible that
8    that person could still have gender dysphoria?
9  A  Yes.
10  Q  Okay.
11      MR. SELDIN: We have been going a little
12    over an hour. Is now a good time for a five
13    minute break for folks? Let's come back at 3:37
14    Eastern.
15      (OFF RECORD AT 3:31 P.M.)
16    (AT THIS TIME A SHORT RECESS WAS HELD OFF
17  THE RECORD AFTER WHICH THE FOLLOWING PROCEEDINGS
18    WERE HAD:)
19      (ON RECORD AT 3:37 P.M.)
20  BY MR. SELDIN:
21  Q  Let's look at paragraph -- sorry.
22      MR. SELDIN: Joel, will you bring up
23    Exhibit 15. Click us through to that link.
24  Q  You recall earlier you mentioned this conference
25    you spoke about. Oasis.

Page 204

1  A  Yes.
2      MR. SELDIN: Joel, will you scroll down.
3    Keep going.
4  Q  I believe this is -- does this look like the
5    agenda from the conference that you were talking
6    about?
7  A  Okay. Hold on. This is the adult conference.
8  Q  Okay. The adult conference. Okay. There was a
9    separate child conference?
10  A  Correct.
11  Q  Well, let's stay here for a moment. So,
12    Dr. Kaliebe, you said that you provided three
13    different CME lectures at this weekend in
14    Puerto Rico, is that right?
15  A  Of the child. Two for adult and three for child.
16  Q  Okay. So are these the two for the adult that you
17    were talking about?
18  A  Correct. Yes.
19  Q  So the agenda would be listed separately for the
20    child conference?
21  A  Yes.
22  Q  I'm asking because I only saw two of the three. I
23    was not sure where the third had gone. We will
24    take a look at that in a second.
25      MR. SELDIN: Joel, will you pull up

Page 205

1    Exhibit 16.
2  Q  Earlier you said you had a Twitter account. Is
3    that your handle?
4  A  It must be ancient. Maybe I just joined to read
5    some things. I don't know that I have a handle.
6    I don't ever tweet anything. Maybe when I logged
7    in it connected to me through Google or some other
8    way. Like I said, I have gone on to read things.
9  Q  Is that photo there --
10  A  That is me in the photo.
11  Q  Is that a New Orleans Saints jersey?
12  A  It is a Saint's jersey, yes.
13  Q  So that is you. The bio says "psychiatrist and
14    sceptic."
15      Does that sound like something you would
16    write?
17  A  It is. I don't remember -- anyway. Yeah. I
18    would write that. I don't remember.
19  Q  Okay. You don't have any reason to believe this
20    is a different Kristopher --
21  A  That is me.
22  Q  Okay. All right. And then we will scroll down.
23    You said you used Twitter to read some things.
24      It looks like that this profile liked this
25    tweet by Dr. Jordan B. Peterson that says, "Why

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 206

1   can't we tell the truth about Lia Thomas?"
2        It links to an article on spiked-online.com.
3        Do you see that?
4   A  Yes.
5   Q  Do you recall liking this tweet?
6   A  I believe that is accurate that I probably did.
7   Q  Do you recall reading this article?
8   A  I don't know that I ever read the article, no.
9   Q  Okay.
10  A  I may have.  I may not have.
11       MR. SELDIN: Joel, scroll down.
12  Q  You liked another tweet on March 28, 2022.  This
13  was posted by communik8e to Jordan Peterson.  It
14  says, "The Party told you to reject the evidence
15  of your eyes and ears.  It was their final, most
16  essential command."
17       That is a George Orwell quote from 1984
18  superimposed on a photo of Lia Thomas.
19       Do you recall liking this tweet?
20  A  No.  I don't doubt that I did if it showed up in
21  my profile.
22  Q  What do you think this graphic means?
23  A  What does the graphic mean?  Well, I think there
24  is, the graphic means that there seems to be a
25  problem with inclusion of biological males in

Page 207

1   women's sports and that we, you know, that this is
2   an issue that seems, I think, important and that
3   we should have an honest proper discussion about
4   it.
5        And my opinion is that it's important to keep
6   women's sports to those who are biologically
7   female with whatever, you know, definition that
8   you have.  Yes, I would agree that is the main
9   part.
10       The bigger part, though, is the, you know,
11  there is an Orwell quote.  As I was mentioning
12  regarding, regarding, you know, silencing of
13  debate, it seems like that we have not had any
14  sort of proper dialogue, especially in the medical
15  journals and within medical societies about how we
16  are going to handle these complex issues.
17       So, you know, therefore, the George Orwell
18  quote I think is, you know, part of why I tweeted
19  it.  Or why I liked it.  I have never tweeted
20  anything as far as I know.
21       MR. SELDIN: Joel, scroll down to the last
22  page.
23  Q  You will see you liked a tweet from Andre MCato on
24  March 28, 2022.  The tweet that you are liking
25  says, "Who has the courage to interview Thomas and

Page 208

1   ask him how he justifies winning among women?  In
2   a free society, that interview would have already
3   happened."
4        Do you see that?
5   A  Okay.  Yes.
6   Q  Do you recall why you liked that tweet?
7   A  No.  I think it speaks for itself.
8   Q  What do you mean?
9   A  Well, I think that we should have a close look at
10  what is going on.  And, you know, to me this is a
11  problematic issue when someone swims as a
12  biological male for three years in college and
13  then transitions and then swims as a female.
14       So, once again, this is something that I
15  think is challenging, but there is a clear answer
16  that most people would support.  And I support
17  that biological sex when it comes to sports is
18  very important.
19       It is quite unfair for female participants if
20  someone who is a biological male and gone through
21  biological puberty is then allowed to compete with
22  biological females.
23  Q  You would agree that Senate Enrolled Act 480 has
24  nothing to do with sports?
25  A  Correct.

Page 209

1   Q  Okay.  And you will see that this tweet uses male
2   pronouns to refer to Lia Thomas.
3        Do you think that is appropriate?
4   A  You know, once again, I don't think it's a big
5   deal.  I don't know that I noticed whether it used
6   male pronouns or not.  I mostly was liking things
7   that brought up this issue of fairness and, you
8   know, basically allowing women to compete fairly
9   in women's sports, which I think is an important
10  issue.
11       MR. SELDIN: Joel, I'm dropping into the
12  chat a link which I will call Exhibit 17 for
13  purposes of this exercise.  If you can take us
14  there.
15  Q  Is Exhibit 17 the agenda for the child portion of
16  the Oasis conference?
17  A  Yes.  You would have to scroll down to see the
18  rest.
19  Q  You will see -- Dr. Kaliebe, do you see there are
20  two CMEs listed with your name next to them?
21  A  Yes.
22  Q  "Social Media and Cyberbullying:  Prevention."
23  A  Yes.
24  Q  The second one is, "Cannabinoid:  New Forms and
25  New Problems."

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

---

Page 210

1  A  Yes.
2  Q  I guess my question is earlier you talked about
3     presenting on gender dysphoria specifically at the
4     child portion of this conference.
5        I'm just wondering why it's not listed here?
6  A  Yeah.  Well, that's a good question.  I've not
7     accessed this before.  This is also garbled
8     because the presenters do not match up.  I did not
9     represent on cannabinoids.  I did present on the
10    social media.  Some of this is messed up.
11 Q  Okay.  Did you present one or two CMEs?
12 A  Three.  I presented three.
13 Q  Are the three that you did listed here?
14 A  No.  So only one is listed here.  I presented the
15    social media one.  I'm not sure if the other ones
16    are wrong or what is wrong on this.  I presented
17    on the three.  It was Social Media and Cyber
18    Bullying.  It was Traumatic Brain Injury and
19    Gender Dysphoria.  What is listed there is
20    incorrect.
21 Q  Do you recall what the title of that CME would
22    have been on gender dysphoria?
23 A  I know gender dysphoria.  It was Reviewing the
24    Evidence or something like that.
25        MR. SELDIN:  Joel, will you please bring

---

Page 211

1     up Exhibit 3.
2  Q  Earlier today we talked about this as the C.V.
3     that you attached to your report in Boe v.
4     Marshall.
5  A  Yes.
6  Q  Look at Page 107 of this PDF.  You will see,
7     Dr. Kaliebe, on Page 21 it says at the top that
8     you were a member of Zero To Three from 2017 to
9     2021.
10       Do you see that?
11 A  Yes.
12 Q  What is Zero To Three?
13 A  Zero to Three is an organization devoted to young
14    children.  So this is, there's a field, sometimes
15    people call it infant psychiatry or infant mental
16    health.
17       The first few years of life are incredibly
18    important.  This is an organization devoted
19    towards supporting children, infants, young babies
20    and also their caregivers, especially their
21    mothers.
22       So Zero To Three is a professional
23    organization of those devoted to trying to promote
24    support for moms and babies.
25 Q  Why did you stop being a member after 2021?

---

Page 212

1  A  I had presented a couple times at their
2     conference.  I do a lot of different things.  So
3     that was not totally, or, you know, I didn't feel
4     like it was -- I just do so many things.  I had to
5     give some things up.  It's a great organization.
6     I would be happy to join or contribute again in
7     the future.
8  Q  And then we will look at Exhibit 8 next.  This is
9     an article on the Zero To Three website dated
10    December 15, 2021.
11       It says, "Embracing Diversity:  Developing a
12    Gender Identity."
13       Do you see this article?
14 A  Yes.
15 Q  Have you seen this article before?
16 A  No.
17       MR. SELDIN:  Joel, scroll down to
18    "Supporting Healthy Development."
19 Q  I will read something.  My question will be did I
20    read that correctly.
21    Under Supporting Healthy Development it says,
22    "Make sure your child knows they have your
23    support.  Gender identity is a central part of a
24    child's identity and well-being.  Parents don't
25    make their children cisgender or transgender.

---

Page 213

1     This is also not a choice children make - it is
2     simply who they are.  To grow up healthy, every
3     child needs to know that they are fully accepted,
4     loved, and supported."
5        Did I read that correctly?
6  A  Yes.
7  Q  Do you agree with that?
8  A  Yeah.
9  Q  Dr. Kaliebe it says, "Read stories that feature
10    all kinds of families, as well as stories that
11    include transgender, non-binary, and gender
12    expansive characters.  Shared reading is a
13    powerful way for all families to nurture an
14    inclusive worldview and challenge stereotypes from
15    the start."
16       Then it links to some suggested titles.
17       Did I read that correctly?
18 A  Yes.
19 Q  Do you generally agree with that advice?
20 A  You know, I don't, I'm not sure that if we are
21    talking about Zero To Three, you know, which is
22    really like, you know, very, very young children.
23    I think, you know, it's debatable what positive
24    influence you would have in a very, very young
25    child introducing these different characters.

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 214

1    I don't think, you know, I'm not necessarily
2  opposed to it.  But I'm also not thinking that
3  this is a, you know, that this is necessarily
4  important.
5    I mean, yeah, I mean, once again, I think I
6  would honestly, I personally would have a somewhat
7  different emphasis.  I don't think there is
8  anything wrong with reading stories that include
9  transgender or nonbinary, or gender expansive
10  characters.
11 Q  Dr. Kaliebe, further down there is a section that
12  says, "Build an inclusive community."
13    It says, "This is important for all kids, and
14  it's especially important for kids who may later
15  identify as LGBTQ.  In the past, one of the
16  toughest things for kids discovering that their
17  sexual orientation or gender identity was
18  different than those around them was a feeling of
19  being alone.  Actors, politicians, teachers,
20  sports stars, family, and friends who are upfront
21  about their identities help make the world more
22  comfortable for questioning kids.  Make it clear
23  that all people are welcome in your community and
24  in your household.  Living your values in this way
25  shows your child that they will be loved however

Page 215

1  they show up and whoever they become."
2    Did I read that correctly?
3  A  Yes.
4  Q  Do you agree with that?
5  A  Yes.  It is important for us to have broad roles,
6  or a broad range of how what, of how children can
7  act.  I do think it is important that we accept
8  boyish girls and girlish boys and don't try to
9  pigeonhole kids into my particular gender
10  expression.
11    So I would definitely agree that allowing a
12  wide range of gender expression is important.
13 Q  Do you think that extends to people who are
14  transgender?
15 A  Well, I think we have had this conversation
16  already.  Children with gender dysphoria I would
17  not categorize as transgender.  I would say they
18  are a child with gender dysphoria because I don't
19  think it is appropriate to place an identity on a
20  child.
21    So within their life we should make room for
22  children to express themselves in any way,
23  including gender nonconforming ways.
24    So, yes, we are in agreement that we need to
25  make space for all children, including gender

Page 216

1  nonconforming children.  And that it is important
2  for society to create space for gender
3  nonconforming children.
4    Where I think we are not on the same page or
5  there is some difference of viewpoint is that I
6  think it's important to emphasize that what we are
7  talking about in, you know, we are saying gender
8  nonconforming could be fine and not gender
9  dysphoria.
10    But if we are talking about a gender
11  dysphoria child, I'm not for labeling that child a
12  transgender child.  I think that we can label them
13  a child with gender dysphoria.
14 Q  In the middle of this paragraph it says, "Actors,
15  politicians, teachers, sports stars, family, and
16  friends who are upfront about their identities
17  help make the world more comfortable for
18  questioning kids."
19    Do you see that?
20 A  Yes.
21 Q  Earlier today we were talking about whether
22  celebrities who are openly transgender are a
23  source of social contagion.  You thought they
24  might be.
25    Do you remember us talking about that?

Page 217

1  A  Yes.
2  Q  Do you think these two, this sentence and that
3  belief are in tension with each other?
4  A  Well, I think there's a lot of nuance.  As I said,
5  I think we have to be careful about anything that
6  may encourage children to want to change their
7  body prior to them fully developing as
8  individuals.
9    So I think that there is a challenge there in
10  wanting to accept a child as they are whether that
11  is gender nonconforming or not.  So making space
12  for all children, but not having children feel
13  pressured that they would need to change their
14  body prior to them fully developing.
15 Q  But per this paragraph just about people being
16  upfront about their identities, do you think just
17  being upfront about identity as a transgender
18  adult, that that is a source of social contagion?
19 A  No, that is fine.
20    MR. SELDIN: Dr. Kaliebe, Mr. Patterson,
21  it may be that I'm able to wrap up soon.  I think
22  another break might help me determine that.
23    Would you be opposed to a longer break,
24  about ten minutes until 4:13?
25    MR. PATTERSON: Fine.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

Page 218

1        (OFF RECORD AT 4:02 P.M.)
2        (AT THIS TIME A SHORT RECESS WAS HELD OFF
3    THE RECORD AFTER WHICH THE FOLLOWING PROCEEDINGS
4    WERE HAD:)
5        (ON RECORD AT 4:09 P.M.)
6        MR. SELDIN: Dr. Kaliebe, thank you for
7    the conversation today.  Unless Mr. Patterson has
8    questions that I want to follow up, I think we are
9    at an end.
10        MR. PATTERSON: I don't have any
11    questions.  I think we are done.
12
13
14    AND FURTHER DEPONENT SAITH NOT
15
16
     _____
17    KRISTOPHER KALIEBE, M.D.
18
19
20
21
22
23
24
25

Page 219

1    STATE OF INDIANA   )
                     ) SS:
2    COUNTY OF BOONE   )
3
4        I, Wendi Kramer Sulkoske, Notary Public in and
5    for said county and state, do hereby certify that
6    KRISTOPHER KALIEBE, M.D., the deponent herein was
7    by me first duly sworn to tell the truth in the
8    aforementioned matter;
9        That the foregoing deposition was taken on
10    behalf of the Plaintiffs at the time and place
11    heretofore mentioned with counsel present as
12    noted.
13        That the deposition was taken down in
14    Stenograph notes, reduced to typewriting under
15    my direction, is a true record of the testimony
16    given by said deponent, and was thereafter
17    presented to the deponent for signature.
18        That this certificate does not purport to
19    acknowledge or verify the signature hereto of
20    the deponent.
21        I do further certify that I am a
22    disinterested person in this cause of action;
23    that I am not a relative or attorney of any of
24    the parties or otherwise interested in the event
25    of this action, and am not in the employ of the

Page 220

1    attorneys for the respective parties.
2        IN WITNESS WHEREOF, I have hereunto set my
3    hand and affixed my notarial seal this _____
4    day of _____ 2023.
5
6        _Wendi K. Sulkoske_
7
     _____
8    Wendi Kramer Sulkoske, Notary Public
9
10    Commission Number  NP0661030
11    My commission expires December 1, 2030.
     My County of residence is Boone.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

AMERICAN CIVIL LIBERTIES UNION
Harper Seldin
125 Broad Street
New York, New York  10004

NOTICE OF FILING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

K.C., et al,                      )
                                  )
              Plaintiffs,  ) Case No.
                                  ) 1:23-cv-00595-JHP-KMB
        -vs-                      )
                                  )
THE INDIVIDUAL MEMBERS OF THE     )
MEDICAL LICENSING BOARD OF        )
INDIANA, in their official        )
capacities, et al.,               )
                                  )
              Defendants.  )

        In compliance with the Indiana Rules of
Procedure, Rules of the Industrial Board or Federal
Rules of Procedure, pursuant to Indiana Supreme Court
Order dated 10/1/86, you are notified that the signed
original deposition of KRISTOPHER KALIEBE, M.D.,
taken on behalf of the Plaintiffs on June 1, 2023 has
been sealed and submitted to the originating party,
along with the attached Errata Sheet(s), if
applicable.

        (Date Received by Circle City Reporting)

CIRCLE CITY REPORTING
135 North Pennsylvania, Suite 1720
Indianapolis, Indiana  46204

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 57 of 84 PageID #: 3595

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

## A

**AACAP (4)**
124:3,4;125:2,20
**AACAP's (2)**
124:5;127:24
**AAP (1)**
130:8
**abide (1)**
45:18
**ability (4)**
48:15,19;167:16;
168:10
**able (7)**
62:4;113:24;
141:22;161:9;
166:23;173:23;
217:21
**above (2)**
65:20;113:25
**absence (1)**
161:19
**academia (4)**
54:11;58:4;96:20;
100:1
**academic (7)**
56:17,20;57:3,14;
95:11;100:6;111:1
**academically (1)**
163:3
**academics (2)**
95:18;104:11
**academic-type (1)**
55:17
**Academy (8)**
25:18;26:8;117:13;
119:13;121:5;139:8;
143:23;172:2
**accept (6)**
152:23;176:2;
188:25;189:1;215:7;
217:10
**acceptable (1)**
57:2;104:18
**acceptance (5)**
152:16,20;153:17;
190:22;197:4
**accepted (1)**
213:3
**accepting (3)**
120:14;197:1,21
**access (2)**
51:22;139:15
**accessed (1)**
210:7
**According (1)**
31:10
**account (5)**
51:13,14,24;
148:19;205:2
**accurate (7)**
53:15,19;78:20;

102:25;161:1;
165:18;206:6
**accurately (1)**
72:1
**accusation (1)**
142:13
**accuse (1)**
142:12
**achieved (2)**
97:13;115:2
**acknowledge (1)**
219:19
**ACLU (1)**
4:10
**acquired (1)**
80:2
**across (1)**
183:8
**Act (10)**
30:14,17;56:19;
57:19;63:12,16;
141:3;186:5;208:23;
215:7
**action (2)**
219:22,25
**active (2)**
64:20;82:5
**activism (1)**
138:17
**activisms (2)**
137:20,24
**activists (1)**
84:9
**activities (1)**
42:2
**activity (4)**
41:2,5;42:12;
159:19
**Actors (2)**
214:19;216:14
**actual (7)**
105:16;110:9;
122:4;141:19;170:9;
172:11;192:16
**actually (15)**
29:24;33:16;44:4,
18;51:15;53:3;62:1;
102:6;103:13;
104:25;122:14;
128:11;131:7;
172:18;186:14
**add (11)**
11:20;19:3;69:21;
70:11;71:8;72:10;
73:4,11;87:15;
173:18;197:25
**added (1)**
72:11
**addicts (1)**
115:3
**addition (2)**
42:21;80:19
**additional (3)**

9:18;38:20;155:21
**address (3)**
12:7,22;134:9
**addressed (1)**
203:7
**addressing (1)**
192:20
**adds (1)**
94:25
**adequately (1)**
203:7
**administration (1)**
47:14
**administrative (3)**
32:13;119:3,5
**admit (1)**
84:6
**admitting (1)**
142:1
**adolescent (11)**
20:12;25:18;26:9;
34:24;62:12;84:5,14;
105:21;121:6;
146:16;199:10
**adolescents (12)**
26:16;77:24;79:19;
81:9;82:7,21;93:24;
94:17;116:19;
132:14;197:10;199:7
**adopt (1)**
118:6
**adopted (2)**
81:8;132:8
**adult (21)**
48:24;49:2;89:13,
15,16;133:21,22;
137:5,12,13;176:6;
183:9;184:8;185:17;
190:8;198:12;204:7,
8,15,16;217:18
**adulthood (1)**
181:5
**adults (19)**
39:2,5,9;63:4,10,
17;64:6;129:24;
155:17;166:8;
183:22;184:15;
188:13;189:25;
190:6;200:18,24,25;
201:3
**advantage (1)**
129:7
**advice (3)**
42:6,10;213:19
**advocacy (8)**
122:21;137:25;
140:3,7,13,17;141:4,
8
**advocate (1)**
117:14
**advocates (1)**
164:8
**advocating (1)**

141:17
**affect (4)**
80:18;125:1;
126:16;127:2
**affected (2)**
99:5;122:14
**affiliate (2)**
113:15;157:6
**affiliated (1)**
88:1
**affiliation (2)**
102:4;118:11
**affiliations (1)**
102:6
**affirm (7)**
154:5;175:12,15,
18;177:14,19;180:22
**affirmation (30)**
106:18;152:15,16,
20;153:16,17,18,22,
22;154:10,10,21,21;
159:16;160:6,7,8,23,
24;161:16,21,22;
174:16,18;175:5,13;
178:9,14;179:7,10
**affirmative (19)**
108:6;110:7;
116:14,15,23;117:2,
5,8,25;118:3;150:14;
162:4,5;175:9,12;
180:16;190:20;
192:2,8
**affirmatively (1)**
28:23
**affirmed (1)**
191:21
**affirming (5)**
106:1,6;151:14;
192:4;197:16
**affixed (1)**
220:3
**affordability (1)**
138:2
**aforementioned (1)**
219:8
**afraid (2)**
86:4;90:18
**afternoon (2)**
13:25;14:2
**afterwards (1)**
85:20
**again (26)**
5:5;41:11;56:1;
59:2;60:13;61:16;
71:21;88:15;103:25;
109:22;125:17;
134:14;138:9;
156:18;159:5,12;
160:14;161:10,25;
165:5;179:12;
200:23;208:14;
209:4;212:6;214:5
**against (11)**

30:16,20;50:25;
95:14;100:13,17;
102:6;105:4;111:25;
143:10;192:23
**age (12)**
48:3;63:18,19,22;
64:9,14,21;65:11,19,
22;66:3,6
**aged (1)**
46:8
**agenda (3)**
204:5,19;209:15
**ago (8)**
8:8;9:12,17;27:3;
70:8;85:25;86:25;
191:11
**agree (44)**
38:5;57:17;67:9;
68:1,4,14;70:25;
76:15;79:3;81:18;
112:10;116:21;
127:21;131:6,10;
134:7;139:10;
164:12,16;165:20;
166:6;174:11,22;
175:3,17,18;179:3;
183:21;190:1;
194:22;195:17,24;
197:6,16;200:10,20;
202:20;203:6;207:8;
208:23;213:7,19;
215:4,11
**agreed (1)**
72:10
**agreeing (2)**
48:10;165:10
**agreement (2)**
148:18;215:24
**ahead (2)**
16:9;63:8
**aiming (1)**
102:10
**Alabama (1)**
7:20
**align (2)**
194:24;195:9
**alignment (2)**
120:24;122:10
**aligns (2)**
119:19;138:5
**allow (4)**
131:21;134:10;
144:16;170:24
**allowed (2)**
135:24;208:21
**allowing (3)**
135:10;209:8;
215:11
**almost (3)**
114:16;145:3;
161:4
**alone (1)**
214:19

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 58 of 84 PageID #: 3596

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

**along (6)**
4:11,12;84:9;
108:7,20;118:11
**alter (6)**
9:19;77:5,21;78:3,
10;148:4
**alternative (1)**
189:18
**alternatives (1)**
186:15
**alters (1)**
147:21
**Although (5)**
9:22;10:19;55:25;
81:24;99:12
**always (9)**
32:25;33:2;37:22;
40:6;66:5;106:17;
125:4,18;134:19
**amalgam (1)**
96:17
**amass (1)**
9:15
**ambiguity (1)**
13:2
**ameliorate (2)**
58:13,15
**amenable (2)**
188:3;189:4
**amended (1)**
71:19
**Amendment (1)**
84:22
**American (14)**
25:17;26:8,14,18;
91:23;92:2;117:13,
15;119:13;121:5,6;
139:7;143:23;172:2
**among (4)**
90:6;134:17;
156:22;208:1
**amount (6)**
38:13;91:20;
145:25;156:5;161:8;
174:3
**amounts (1)**
77:18
**amplitude (1)**
189:7
**Amsterdam (1)**
132:13
**analogy (1)**
81:3
**analysis (4)**
66:9;98:13;144:12;
152:15
**ancient (1)**
205:4
**and/or (1)**
46:14
**Andre (1)**
207:23
**anecdotal (1)**

174:12
**annual (4)**
25:19;26:9,10;
27:12
**anorexia (1)**
153:7
**answered (3)**
11:1;200:22;
201:12
**antibiotic (1)**
145:5
**anticipate (1)**
54:1
**antidepressant (1)**
98:16
**antidepressants (4)**
98:20,21;99:2,19
**antiracism (3)**
101:12,22;102:13
**antiracist (3)**
101:17;102:4;
123:22
**anti-scientific (1)**
173:14
**antithetical (1)**
102:14
**apolitical (1)**
143:8
**apologize (2)**
14:3;96:8
**apparent (3)**
12:14;61:23,24
**appear (4)**
6:22;8:2;10:15;
150:18
**appearance (2)**
4:20;147:21
**appearing (1)**
4:22
**appears (2)**
90:12;181:25
**apples (2)**
79:8,9
**applicable (2)**
42:20;202:18
**applied (1)**
63:17
**applies (2)**
81:4;169:3
**apply (2)**
113:24;132:22
**applying (1)**
21:19
**appreciate (2)**
85:21;131:1
**appreciating (1)**
159:21
**approach (58)**
21:6,8;44:17;60:6;
65:4;66:1;90:19;
101:18;106:4,17,25;
107:2,12,16;114:9;
117:23;120:19,20;

122:1;129:18,20;
130:5,12,23;132:3,
12;133:6,24;135:7,
10;136:11;139:5,9,
10;152:25;153:25;
154:5;156:11;
157:15,15,23;158:18;
159:23;160:11,20;
163:7,11,21,23;
170:9;175:7,9;
176:24;184:5;
189:21;192:11;
193:12,13
**approached (3)**
71:16;90:16;103:1
**approaches (12)**
48:23;107:5,21,23,
25;124:18;158:8,11;
159:19;180:16;
191:5;193:4
**approaching (1)**
139:12
**appropriate (18)**
45:11;64:5;65:12;
101:20;108:3,19;
134:9;143:24;156:9;
161:13;181:13,18;
187:7;198:7;199:12;
201:8;209:3;215:19
**April (3)**
10:1;74:13;94:20
**area (6)**
99:1;115:7;116:2;
127:4;145:19;146:11
**areas (3)**
98:3;120:23;
173:19
**arena (1)**
170:14
**argue (1)**
198:9
**argues (1)**
192:23
**argument (4)**
111:7,7;143:14,15
**arguments (3)**
110:18;143:18,19
**arisen (3)**
109:21;111:13,15
**arm (1)**
145:6
**around (11)**
6:3;35:15;54:21;
89:3;91:21;118:1;
137:20;147:13;
148:8;203:4;214:18
**arrested (1)**
51:5
**arrived (2)**
37:4,8
**article (16)**
54:1,2;104:17;
105:6;114:7;118:18;

170:25;172:8,13,22;
206:2,7,8;212:9,13,
15
**articles (16)**
18:1;110:5;114:7;
117:21,21;121:7;
123:16;132:21;
169:25;170:3,16,18,
19;171:4,12,15
**aside (2)**
64:8;122:7
**aspects (1)**
119:6
**assault (3)**
180:7,9;183:1
**assaulted (2)**
179:15,25
**assent (8)**
47:13;48:2,5,8;
144:22,25;148:10,13,
20
**assess (3)**
61:8;98:5;113:19
**assessing (2)**
110:2;155:17
**assessment (8)**
109:21;136:14;
149:17;155:21,25;
163:9,22;175:25
**assigned (2)**
23:3;199:12
**assist (1)**
19:25
**assistant (1)**
31:11
**associate (1)**
191:14
**Association (5)**
26:14,18;88:2;
117:15;121:7
**assume (9)**
5:21;73:6;78:15,
17;89:3,22;107:16;
108:6;194:6
**Assumes (1)**
128:2
**assuming (3)**
187:20,22;188:22
**assumption (2)**
92:16,18
**assumptions (1)**
182:3
**atmosphere (1)**
173:14
**attached (3)**
7:7,21;211:3
**attack (1)**
55:13
**attacking (2)**
55:15;168:24
**attempt (2)**
192:22;202:6
**attempted (1)**

53:16
**attempts (2)**
191:3,8
**attend (1)**
25:17
**attended (4)**
25:20;26:15;88:23;
89:1
**attending (1)**
76:10
**attorney (2)**
4:9;219:23
**attorney/client (1)**
28:15
**attorneys (2)**
17:12;220:1
**attracted (2)**
124:17;137:13
**attune (1)**
101:8
**audio (1)**
25:23
**autism (2)**
162:21;170:21
**automatic (10)**
174:15,18;175:5,
10,13,20;178:8,13;
179:7,10
**automatically (7)**
67:17;106:6;
174:22;175:12,14;
177:11,19
**autonomy (1)**
144:10
**available (2)**
54:8;72:24
**avoid (1)**
28:18
**avoidance (1)**
182:21
**aware (18)**
8:17;15:21;30:13;
45:7;74:1;132:2,11;
154:20;158:5,7;
168:6;172:24;177:3;
180:4;186:5;196:5,9,
10
**away (7)**
38:16;106:3,16;
107:1;120:18;
173:19;190:22

**B**

**babies (2)**
211:19,24
**back (25)**
18:19;26:13;32:1;
37:12;66:21;75:16;
80:13,14;96:6;97:6;
109:8,15;128:13;
132:5;142:22;
146:25;152:3,5;

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 59 of 84 PageID #: 3597

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

156:25;165:1;169:9;
182:19;196:15;
201:16;203:13
**background (3)**
20:8;31:2;53:25
**backgrounds (1)**
103:15
**bad (4)**
58:8;115:19;
187:24;188:19
**balanced (2)**
125:13,22
**ban (14)**
63:9,11,20;65:6,9,
17,19,22;98:21;
99:19;134:17;135:9,
13;197:24
**banned (4)**
58:24;59:23;61:5;
116:8
**banning (1)**
57:1
**bans (1)**
60:22
**bar (1)**
65:11
**Barnes (2)**
17:10;177:7
**Barnes' (1)**
177:23
**base (37)**
41:6,12;77:8,13;
79:7;98:4;136:13;
137:7;142:16;
144:12;145:25;
146:7,8,12;148:13;
149:1,2,9,12,18;
150:6,12,24;151:11;
157:20;170:12;
175:24;185:14;
191:2;193:13,16,24;
194:1,5,13;201:14;
202:3
**based (25)**
48:18;53:17;61:23;
63:2;105:10;106:20;
110:10;112:4;
118:12;120:3,8;
130:16;142:7;148:9;
166:17;175:20;
177:20,22,23,24,25;
180:1,11;193:14;
194:23
**basically (6)**
42:10;44:17;53:19;
87:7;110:15;209:8
**basis (2)**
21:18;118:7
**became (4)**
31:22;71:22;81:8;
125:15
**become (7)**
12:14;29:15;

115:16;137:4;
184:15;190:8;215:1
**becomes (1)**
64:21
**becoming (3)**
28:21;29:19;
123:22
**began (1)**
38:21
**begin (1)**
178:9
**beginning (3)**
38:4;68:23;127:8
**behalf (3)**
4:22;60:19;219:10
**behavior (1)**
172:11
**Behavioral (4)**
112:23;113:1,5;
114:9
**behavorial (1)**
196:4
**behind (4)**
100:8;139:24;
144:3;179:20
**beings (4)**
114:10;149:7;
157:12;194:6
**belief (11)**
10:3;65:10;83:5,9;
187:12;188:9;
196:23,24;201:8,14;
217:3
**beliefs (2)**
187:8,15
**below (2)**
36:4;96:18
**beneficial (2)**
61:6,11
**benefit (4)**
41:12;127:25;
192:24;194:7
**benefited (1)**
99:19
**benefiting (1)**
59:10
**benefits (7)**
60:8,8,10,12;
61:19;62:22;63:6
**best (10)**
14:13,25;36:11;
47:7;55:20;66:10;
98:14;129:2;165:3,9
**better (16)**
28:3;42:2;58:11;
97:19;115:2;121:23;
130:20,24;131:4;
132:1;136:4,10,12;
186:19;190:7;199:23
**beyond (4)**
49:17;113:18;
149:8;193:3
**bias (4)**

120:17;125:10,18;
127:17
**big (1)**
209:4
**bigger (1)**
207:10
**bill (6)**
140:2,4,6,9;143:2;
186:10
**bills (1)**
141:3
**binary (3)**
130:16;190:19;
191:2
**bio (1)**
205:13
**biological (14)**
133:17;134:20,23;
135:5;136:16;
190:23;197:1,22;
206:25;208:12,17,20,
21,22
**biologically (2)**
182:8;207:6
**biopsychosocial (4)**
21:1,6,8;105:23
**bipartisan (1)**
139:21
**bipolar (1)**
162:23
**birth (1)**
199:12
**bit (8)**
4:16;33:16;53:13;
66:13;90:21;165:13;
181:24;199:14
**blank (1)**
6:10
**blanket (2)**
65:9;140:10
**bleed (1)**
80:17
**blockers (4)**
47:14;60:1;116:25;
132:14
**blocks (1)**
181:3
**board (13)**
11:21;19:19;20:8,
11,16;27:17,18,25;
28:2,8;50:22;88:4;
183:8
**boards (2)**
27:22,24
**boat (1)**
186:18
**bodies (2)**
62:15;148:4
**body (34)**
42:11,13;43:8;
131:24;140:2;
142:24;152:17,21,24;
153:2,6,10,13,15,18,

18,21;154:7,10,18,
19,21;159:16,21,21;
160:6,7,23;161:16,
21;162:7;197:7;
217:7,14
**Boe (7)**
8:15;29:5,9,11,16;
54:6;211:3
**boils (1)**
117:6
**book (8)**
80:14;96:24,25;
97:15;173:12,17;
177:7,24
**BOONE (2)**
219:2;220:11.5
**both (15)**
23:18;58:7,17;
68:25;94:23;97:19;
107:22;111:11;
132:11,13,14;139:23,
24;155:19;179:3
**bottom (4)**
114:25;122:23;
168:1;182:1
**bought (1)**
25:22
**bounds (2)**
104:17,25
**boxed (1)**
70:13
**boyish (1)**
215:8
**boys (1)**
215:8
**brace (1)**
145:5
**brain (5)**
43:11;64:18;88:11;
93:2;210:18
**braver (1)**
13:19
**bread (1)**
128:15
**break (14)**
6:2,3,5;28:17;37:2;
66:14;109:1,5,15;
116:10;151:17;
203:13;217:22,23
**breakdown (1)**
33:8
**Brian (3)**
17:7,8,10
**Brian's (1)**
17:3
**briefly (2)**
52:15;53:6
**bring (7)**
114:8;125:4;
184:12;186:1;197:7;
203:22;210:25
**bringing (2)**
141:12;176:22

**broad (8)**
20:20;21:25;77:25;
102:20;103:5;129:3;
215:5,6
**broader (1)**
103:21
**broadly (3)**
98:7;106:19;171:7
**broken (1)**
145:6
**broker (1)**
54:23
**brought (3)**
76:6;97:8;209:7
**Build (1)**
214:12
**bullet (1)**
182:7
**bullying (2)**
173:2;210:18
**bump (1)**
100:12
**bumping (1)**
100:17
**bunch (1)**
178:20
**business (1)**
67:18
**butter (1)**
128:15
**button (2)**
101:2;122:4

## C

**calculation (1)**
66:7
**calculus (1)**
148:12
**call (21)**
36:2,12;41:16;
49:18;51:25;96:10;
97:9;101:6;103:23,
24;104:2,3;110:6;
144:1;159:16;166:3,
4;191:3;203:3;
209:12;211:15
**called (8)**
24:20;25:5,14;
96:24;122:25;
165:17;167:3;191:24
**calling (3)**
101:18;168:13;
192:19
**calls (2)**
28:15;49:12
**calming (1)**
41:17
**came (10)**
75:24;81:7,11;
85:20,25;115:3;
117:13;118:19;
180:5,11

Case 1:23-cv-00595-JPH-KMB Document 58-7 Filed 06/12/23 Page 60 of 84 PageID #: 3598

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

**can (105)**
7:13,23;8:21;10:8;
13:15,23;15:3,25;
26:12,13;28:18;
32:20;36:11;43:7;
45:2,4,11,12,14;47:2;
48:8;53:1;57:7,24;
60:14;61:8;63:21;
64:25;69:4,19;70:12,
17;71:11;72:6;80:17;
82:7;83:2;84:14;
85:1,5,13;86:5,15;
87:16;92:24;93:19;
96:6;99:16;100:12;
102:25;104:2;
105:17;106:1,1;
107:3,18;110:14;
112:21;115:16,21;
121:17;122:5;
123:13,14;126:6;
128:4;131:7,12,16,
23;134:2;141:16;
144:15;146:25;
149:19,21,22;152:8;
155:4,11;156:25;
171:23;173:15;
177:9,14;179:5;
181:17,23;188:4;
189:21;191:22;
192:5,12;193:23;
194:4;196:23,25;
197:6,19;200:23;
201:13;202:24;
209:13;215:6;216:12

**cancers (1)**
62:18

**Cannabinoid (1)**
209:24

**cannabinoids (1)**
210:9

**Cantor (1)**
19:14

**capable (1)**
71:14

**capacity (4)**
35:4;47:18;48:5,9

**caption (3)**
9:2;149:22,25

**care (104)**
31:19,24;32:1;
34:1,2;43:22;46:9,10,
11,13,18;47:4;49:5,
12,17;54:24;57:20;
58:19,23;59:11,19,
23;60:4,23;61:4,10;
62:22;63:9,20;64:5,
11;65:7;67:4;72:18,
24;73:1;76:4;106:6;
107:1,3,17,18,20;
108:3,6,110:7;118:8;
120:3,6,8,8,11;121:1,
9,12,15,17;122:6,8,
13,15;127:2,10;

137:21;138:11,25;
139:15;142:9,15,16;
149:13;152:12;
155:7,16,22;157:6;
158:6;164:13,14,17,
18;165:5,8,9;167:8,
11;168:14;170:11,
15;174:1;175:4,18,
23,25;181:2,3,12;
184:17,17;200:19;
201:5,9;202:2,2

**careful (4)**
54:25;103:2;
170:10;217:5

**caregivers (1)**
211:20

**caring (1)**
172:20

**carried (2)**
201:25;202:1

**carve (1)**
186:6

**cascades (3)**
112:14;113:20;
124:25

**case (51)**
6:21,24;7:10;8:5,
19;9:2;10:16;14:18,
21;15:1,14;17:21;
18:17;19:7,10,23;
20:1;28:13,21;29:1,3,
6,15;30:13;42:20;
45:8;52:19;54:14;
59:17;63:13;70:2,25;
71:5;73:16;74:25;
83:12;95:8;100:19;
120:15;149:11,24,25;
150:19,21,24;151:1,
5;152:7;168:7;
185:11;198:8

**cases (10)**
33:20;43:13;44:14;
54:9;62:3;75:7,20;
197:3,4,17

**catastrophizing (1)**
189:3

**categorize (1)**
215:17

**category (1)**
123:2

**caught (1)**
110:13

**causation (1)**
81:19

**cause (7)**
58:12,14;83:18;
131:7,12,16;219:22

**caused (1)**
157:4

**causes (1)**
189:13

**causing (2)**
131:17;195:15

**caution (1)**
149:8

**cautious (6)**
54:24;81:16;82:19;
139:3,9;168:14

**caveats (1)**
184:21

**CBT (1)**
196:6

**celebrated (1)**
111:17

**celebrates (1)**
83:16

**celebratory (4)**
82:22;83:1,15,23

**celebrities (1)**
216:22

**celebrity (3)**
82:9;83:13,23

**Center (2)**
31:12;119:17

**centers (3)**
121:10,15;139:16

**central (1)**
212:23

**certain (24)**
38:13;40:6;78:25;
79:11;91:22;101:10;
102:21;103:24;
104:4;108:17;
118:15,17;120:3,6,
10;124:18;127:17;
138:17;141:17;
165:3;174:20;175:2;
179:2;191:12

**Certainly (4)**
81:15;104:7;
129:21;176:17

**certainty (10)**
94:20;95:1;184:14,
19;185:8,21,23,24;
186:2;200:15

**certificate (1)**
219:18

**certifications (2)**
20:16;28:9

**certified (4)**
11:21;19:19;20:8,
11

**certify (2)**
219:5,21

**chair (1)**
127:24

**challenge (3)**
185:15;213:14;
217:9

**challenged (1)**
177:15

**challenges (1)**
153:1

**challenging (3)**
44:14;187:7;
208:15

**change (14)**
12:11,22;71:24;
73:15;78:19,23;
81:17;95:1;134:15;
179:17;199:16;
202:6;217:6,13

**changed (5)**
9:24;12:15,20;
32:19;72:8

**changes (6)**
8:3,11;62:14;
68:24;70:3;191:8

**changing (5)**
32:3;41:10;146:15;
185:12;197:22

**characteristics (12)**
77:5,22;78:4,11,19,
23;146:16;194:24;
195:9,19;196:2;
197:23

**characterization (3)**
76:14;142:8;
165:11

**characterize (4)**
124:6;127:4;
137:24;166:19

**characterizing (1)**
175:9

**characters (3)**
213:12,25;214:10

**charged (1)**
51:5

**chart (1)**
77:23

**charts (1)**
78:16

**chat (1)**
209:12

**cheerleading (1)**
110:7

**child (73)**
20:11;22:15,21,25;
23:2,3,9,17;25:1,18;
26:8;27:15,24;34:8,
24,25;39:22;47:20;
75:9,11;79:25;80:9;
84:5,14;85:16;86:13;
87:4,5,12,14,17,21;
88:8;89:15,15,17;
90:18;101:15;102:3;
105:20;114:6,7;
116:20;121:5;134:9;
136:2;145:18;
147:22;157:11;
162:19;164:20,21;
165:25;166:4;178:1;
184:11;204:9,15,15,
20;209:15;210:4;
212:22;213:3,25;
214:25;215:18,20;
216:11,11,12,13;
217:10

**childhood (1)**

137:11

**children (50)**
41:20;55:8;77:24;
78:16,18;81:8;82:7,
21;116:19;133:10,12,
13;134:24;135:1,10,
17,22,25;136:6,17,
18;137:2,8,11;
146:21,23;165:16,16,
18,21;166:6;184:14;
188:11;189:23;
195:14;200:17;
211:14,19;212:25;
213:1,22;215:6,16,
22,25;216:1,3;217:6,
12,12

**child's (2)**
48:15;212:24

**chilling (1)**
169:13

**choice (5)**
131:11;136:22;
179:6;190:9;213:1

**choices (2)**
136:22;176:19

**choose (1)**
192:10

**chunks (2)**
28:18;37:2

**circumstance (3)**
178:12,13;181:17

**circumstances (7)**
31:7;64:17;76:8;
78:22;108:17;
158:21;168:14

**cisgender (1)**
212:25

**citation (1)**
130:9

**cited (3)**
96:18;118:18;
194:10

**claim (1)**
76:23

**claiming (2)**
142:20;160:25

**claims (2)**
144:2;157:20

**clarify (2)**
69:10;165:14

**clarifying (2)**
40:16;70:18

**classes (2)**
25:7;27:11

**classic (2)**
187:22;188:2

**classified (1)**
134:21

**clear (14)**
16:9;76:20;107:19;
115:23;117:12;
118:5;136:23;
140:23;149:17;

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 61 of 84 PageID #: 3599

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

154:3;156:18,19;
208:15;214:22
**clear-cut (1)**
143:6
**clearly (3)**
77:17;110:12;
140:22
**CLEs (1)**
28:4
**Click (1)**
203:23
**client (1)**
176:6
**climate (1)**
63:25
**clinic (13)**
33:23;38:14;40:7;
44:7;74:2,16;76:11;
79:5;132:13,14,20,
20;169:5
**clinical (23)**
32:5,7,17,23;33:3,
6,21;105:17;108:21;
120:19;125:17;
127:2;130:12;
135:14;138:25;
157:14;158:18;
162:17;163:14,16;
172:19;179:12;
181:20
**clinically (3)**
111:10;163:7;
184:4
**clinician (11)**
32:24,25;33:13;
44:11;61:9;76:11;
107:12;108:14;
116:21;120:5;158:9
**clinicians (7)**
99:3;141:2,21;
169:2;176:1;177:3,
16
**clinics (12)**
33:24;38:13;72:23;
78:25;79:8;80:17;
81:13;121:15;
132:23;160:16;
177:10,19
**close (2)**
62:13;208:9
**closer (2)**
97:21;186:2
**clump (1)**
118:10
**clumpings (1)**
140:19
**CME (13)**
25:19;26:7,15,20,
25;27:4,25;28:11;
87:14;88:2,4;204:13;
210:21
**CMEs (4)**
87:13;88:17;

209:20;210:11
**Coast (1)**
108:25
**co-chaired (1)**
124:5
**co-chairing (2)**
124:3;125:1
**Cochlear (2)**
145:14;146:4
**codified (1)**
103:11
**cognitive (4)**
113:13;187:23;
194:11;196:4
**cognizant (1)**
125:19
**cohorts (2)**
77:4;78:9
**coincidence (1)**
81:6
**collaborate (1)**
49:5
**collaborated (1)**
49:11
**collaborative (4)**
31:19,24;32:1;
121:9
**colleague (5)**
47:24,25;172:1,6,
22
**college (1)**
208:12
**colloquy (1)**
35:17
**com (1)**
91:17
**comedy (1)**
91:18
**comfortable (8)**
72:25;157:5;185:1;
199:11;200:6,15;
214:22;216:17
**coming (7)**
41:22;43:10;71:15;
86:11;111:8;159:20;
162:7
**command (1)**
206:16
**comment (2)**
11:14;19:5
**commented (1)**
96:19
**Commission (2)**
220:10,11
**commit (1)**
151:8
**committee (20)**
124:5,7,15,20;
125:2,3,15;126:8,10,
22,24;127:1,14,16,
24,25;128:7,14,16,16
**committees (6)**
124:22;125:20;

126:5,17,19;129:5
**common (2)**
92:18;95:23
**communicate (2)**
43:15;172:14
**communicated (1)**
160:11
**communication (1)**
28:16
**communik8e (1)**
206:13
**communities (3)**
82:6;121:17;
128:21
**community (11)**
67:25;80:18;95:11;
121:19;160:16;
177:12;191:11;
202:10,11;214:12,23
**co-morbid (2)**
83:14;106:12
**co-morbidities (3)**
40:1;184:22;
199:25
**companies (1)**
99:9
**company (6)**
44:12,18;87:24,25;
88:3,4
**compared (2)**
34:2;153:25
**compassionate (4)**
115:18;164:13;
165:7;196:18
**compelling (3)**
134:22;143:15;
202:7
**compete (2)**
208:21;209:8
**competence (1)**
48:1
**competent (3)**
47:13;164:13;
165:7
**competing (3)**
144:7;145:8;
168:23
**complaint (2)**
50:24;51:3
**complete (2)**
64:22;198:10
**completely (1)**
108:19
**completion (1)**
192:17
**complex (11)**
66:7;103:14,20;
110:9;115:21;116:1;
117:4;133:9;145:11;
195:1;207:16
**complicated (1)**
67:15
**component (14)**

21:2,7,14;41:15;
106:15;116:22;
123:25;129:20;
140:15;156:8;
175:10;189:12;
197:2,5
**components (3)**
116:16;140:16;
189:15
**comprehensive (1)**
155:20
**concentrate (1)**
149:16
**concept (3)**
152:22;153:20;
154:6
**concepts (1)**
162:1
**conceptualization (2)**
108:8,12
**conceptualize (1)**
184:2
**conceptualized (1)**
165:3
**concern (2)**
110:22;180:8
**concerned (1)**
61:14
**concerns (6)**
48:18;124:24;
154:25;164:7;
166:10,18
**conclude (1)**
157:4
**conclusion (2)**
41:23;86:11
**conclusions (1)**
71:15
**concurrently (1)**
107:7
**condemnation (1)**
84:9
**condemning (1)**
139:2
**condition (10)**
40:25;67:10;68:15;
71:1;158:14;161:3,7,
17,20;185:7
**conditions (7)**
46:21;83:14;
106:12;113:3;
161:18;162:20;196:5
**conducted (1)**
49:24
**conference (28)**
25:25;27:12;85:17;
87:3,4,5,6,12,17,18,
21,22;88:5,7;89:2,5,
16,17;114:6;203:24;
204:5,7,8,9,20;
209:16;210:4;212:2
**confidence (1)**
111:6

**confident (1)**
150:6
**confidential (13)**
45:3,12,15,17,19;
59:3,4,9;60:15;
84:23;85:1,3,6
**confidentiality (4)**
45:7;60:14,18;85:8
**confined (1)**
46:22
**confinement (1)**
46:21
**confirm (1)**
7:9
**confirmation (1)**
120:17
**conflict (2)**
97:18,21;163:6
**congratulations (1)**
8:10
**Congress (1)**
30:11
**connected (1)**
205:7
**connection (2)**
29:23;49:21
**conscious (1)**
125:9
**consensus (6)**
110:22,24;111:2;
150:4;158:13,15
**consent (11)**
48:6,15,20;144:16,
16,22;145:1;148:10,
13,20;170:17
**conservatively (1)**
133:23
**consider (14)**
62:2;137:1,2;
140:25;162:16;
165:15;167:15;
175:11,13;178:22;
179:7,10;184:5;
198:3
**consideration (2)**
96:11;190:22
**considerations (1)**
148:8
**considered (1)**
28:1
**considering (8)**
56:1;78:1;104:8;
134:24;156:21;
170:9;181:6;199:24
**considers (1)**
155:23
**Constitution (1)**
96:24
**consultation (1)**
48:19
**consultative (1)**
76:12
**consulted (6)**

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 62 of 84 PageID #: 3600

K.C., et al. VS                                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                                            June 1, 2023

43:21;44:14,19;
47:18;48:22;49:20
**consulting (1)**
22:25
**contacted (2)**
52:14,17
**contagion (6)**
79:17;82:11;83:18;
95:12;216:23;217:18
**contain (1)**
6:23
**contained (3)**
9:5;12:9;130:8
**contains (1)**
7:1
**content (4)**
124:7,15,15;
140:12
**context (6)**
21:24;45:24;67:4;
105:21;106:20;
201:19
**contexts (1)**
70:18
**contiguous (1)**
89:13
**continually (1)**
17:25
**continuation (2)**
37:13,25
**continue (5)**
9:15,15;36:25;
38:9;39:8
**continued (2)**
9:11;28:1
**continuing (6)**
25:12,16;28:9;
65:5;87:6;136:11
**continuum (1)**
52:6
**contract (3)**
31:19,24;47:19
**contracts (3)**
31:17;33:15;44:12
**contribute (4)**
83:8,9;189:16;
212:6
**contributed (1)**
80:2
**contributing (1)**
184:23
**contributor (1)**
83:22
**contributors (1)**
79:18
**control (3)**
115:2;119:4;170:7
**controlled (1)**
43:16
**controls (1)**
116:5
**controversial (5)**
90:4,6,7;173:24,25

**conversation (8)**
160:3,18;161:12,
14,23;200:13;
215:15;218:7
**conversations (2)**
90:15;160:14
**conversion (8)**
190:20;191:6,7,15,
24;192:21;201:19,24
**co-occurring (1)**
203:3
**Cooper (1)**
17:10
**coordinate (1)**
46:9
**coordinating (2)**
43:22;46:10
**cope (1)**
183:4
**copy (3)**
8:1;10:15;14:9
**corner (1)**
70:13
**correction (1)**
50:14
**correctional (4)**
33:18;43:23;44:8,
21
**corrections (2)**
33:15,17
**correctly (9)**
13:18;78:21;119:2;
198:25;200:8;
212:20;213:5,17;
215:2
**correlation (1)**
81:18
**corresponding (1)**
150:18
**cosmetic (1)**
78:2
**cost (2)**
115:3;142:25
**counsel (1)**
219:11
**count (1)**
36:3
**counted (1)**
86:7
**counterbalance (1)**
129:11
**counter-ideology (1)**
102:8
**countervailing (1)**
102:1
**COUNTY (3)**
219:2,5;220:11,5
**couple (4)**
8:8;9:17;10:20;
212:1
**couples (1)**
103:18
**courage (1)**

207:25
**course (8)**
11:18;20:24;27:10;
28:8;53:21;153:12;
157:22;176:22
**court (14)**
14:21;15:18;22:3;
35:17;60:25;61:7;
69:25;70:7,9,23;
74:13;84:18;199:3,8
**courts (1)**
55:6
**covered (1)**
20:5
**COVID (1)**
25:24
**crazy (1)**
85:22
**create (1)**
216:2
**creates (1)**
83:24
**creating (2)**
109:18;115:3
**credible (1)**
98:4
**credit (1)**
27:4
**credits (1)**
26:20
**crime (1)**
51:6
**criteria (4)**
38:24;67:23;
195:18,25
**critical (1)**
143:23
**criticisms (2)**
152:11;154:25
**cultivate (1)**
125:12
**cultural (1)**
112:4
**culture (1)**
80:10
**curation (2)**
123:9,15
**curing (1)**
111:17
**current (5)**
33:11;63:24;67:3;
176:12;185:24
**currently (4)**
22:14,19;158:3,24
**currents (1)**
80:19
**cut (3)**
16:8;122:23;195:3
**cutting (1)**
22:4
**CV (6)**
7:6,21;8:1,6;29:9;
211:2

**Cyber (1)**
210:17
**Cyberbullying (1)**
209:22

**D**

**damage (1)**
191:16
**Daniel (3)**
19:9;113:7;168:2
**data (14)**
9:18;61:24;119:10;
132:17;137:10;
138:6;144:2;156:19;
157:14;170:6,7;
180:12;181:14;
182:19
**date (4)**
9:13;88:21;91:21;
92:3
**dated (1)**
212:9
**dates (1)**
31:9
**dating (2)**
92:1,3
**day (7)**
13:14;15:15;37:22;
108:13;115:21;
165:2;220:4
**days (3)**
41:20;85:1;201:25
**deal (4)**
28:3;121:13;
125:17;209:5
**dealing (2)**
125:22;165:2
**deals (1)**
21:1
**dealt (1)**
25:8
**debatable (1)**
213:23
**debate (6)**
64:20;65:1,5,15;
111:1;207:13
**debating (2)**
144:8;170:8
**Debra (2)**
173:7,12
**decade (1)**
122:18
**decades (1)**
132:7
**December (2)**
212:10;220:11
**decent (1)**
91:20
**decide (7)**
108:4;134:3,8,12;
137:5;140:15,16
**decided (4)**

18:23,23;107:13;
136:9
**deciding (1)**
143:16
**decision (8)**
108:22;134:13,14;
144:11,24;145:17;
179:20;181:20
**decisions (9)**
46:25,25;59:16;
99:4,17;113:9;
129:24;131:23;145:7
**Decker (40)**
9:2;10:1,12;12:2;
13:8,14;14:9;15:13,
21;16:20,23;17:21,
22;19:17;29:2,5,11,
16,17,18,25;35:18;
54:6;68:8,21;69:24;
70:7,20,23;74:12,24;
94:2,10;95:2;149:23;
150:3,9,15;198:19;
200:11
**declaration (29)**
6:20;7:7;8:4;
17:20;18:22;19:25;
24:13,16;29:9;31:3,
10;43:20,25;47:11,
16;48:25;66:25;67:2;
73:21;74:6,21;90:21;
93:7;94:14;105:8;
150:19;152:6,10;
171:3
**declarations (3)**
18:4,10;153:15
**declared (2)**
101:16;102:3
**declares (1)**
116:20
**declining (1)**
131:16
**decreased (1)**
33:22
**deep (1)**
191:17
**deeper (1)**
116:12
**defend (1)**
4:23
**defendants (1)**
4:23
**defending (1)**
60:22
**defining (2)**
21:15,16
**Definitely (3)**
82:13;110:24;
215:11
**definition (4)**
36:7;117:1;120:3;
207:7
**degree (4)**
27:7;94:20;118:25;

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 63 of 84 PageID #: 3601
K.C., et al. VS                                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                                           June 1, 2023

148:6

**degrees (1)**
148:5

**deliberate (1)**
96:11

**demand (1)**
185:20

**demanding (4)**
164:17,18;185:22,
23

**demands (1)**
165:5

**Democrat (1)**
138:8

**dental (1)**
121:16

**department (1)**
24:9

**departure (1)**
175:3

**depend (4)**
82:14,17;140:8;
141:5

**depending (3)**
140:18;145:23;
180:21

**depends (3)**
22:1;178:11;
179:12

**depersonalize (1)**
99:23

**DEPONENT (5)**
218:14;219:6,16,
17,20

**deposed (1)**
10:12

**deposition (30)**
4:23,24;10:15,18,
19;12:2,16,25;13:20;
16:3,12,16,18,19;
17:18,21,24;18:2,16,
20;19:16;20:5;35:14;
45:3;59:6;69:24;
70:16;86:18;219:9,
13

**depositions (1)**
18:8

**depth (1)**
102:19

**describe (3)**
109:16;127:15,19

**described (1)**
101:22

**describes (1)**
195:6

**description (2)**
91:22;163:14

**descriptions (1)**
117:4

**descriptive (3)**
175:20;195:7,11

**design (1)**
186:21

**designate (5)**
45:2,9,11,14;85:5

**desire (1)**
162:14

**desk (1)**
6:9

**detail (1)**
173:13

**detailed (1)**
165:5

**details (3)**
53:11;60:16;
110:15

**determine (2)**
103:17;217:22

**determined (2)**
163:21;182:8

**determines (1)**
140:13

**detransition (5)**
48:24;155:18;
156:4,10,14

**detransitioning (1)**
155:1

**develop (4)**
83:5;106:19;
131:21;184:12

**developed (5)**
64:22;129:25;
131:22;181:11;
195:22

**developing (17)**
62:1,12;64:16;
131:3;133:16;
146:16;149:3;
164:25;166:1;181:7;
184:3,23;198:8;
199:7;212:11;217:7,
14

**development (15)**
62:13;83:8;105:24;
133:15;153:8,12;
162:25;181:8;185:2;
192:17;198:10;
202:25;203:1;
212:18,21

**develops (2)**
64:18;182:25

**devices (1)**
42:1

**devoted (4)**
156:6;211:13,18,
23

**diabetes (3)**
138:1;142:25;
143:10

**diagnose (5)**
36:14,17,24;37:10;
113:4

**diagnosed (2)**
36:20;39:18

**diagnosis (23)**
36:21,22,25;37:5,9,
13,15,23;38:1,3,5,10,
17,19,21,21,25;39:6,8,
15;40:20;56:15;
106:9,13

**dialogue (23)**
55:17,20;56:17,20;
57:3,15;97:5;99:6,16,
25;100:21,23;101:9,
19;102:9,15;104:9,
18;110:20;144:1;
169:13,23;207:14

**Diana (1)**
19:6

**diet (1)**
42:11

**difference (5)**
79:3;124:14;
138:13;192:7;216:5

**different (47)**
10:23;11:2;12:7;
27:14;32:21,22;
36:19;37:21,24;42:1;
69:5;70:12,17,18;
87:7,11,20;92:7;
94:20;99:10;103:15;
112:22;114:18;
121:2;126:13,14;
140:20,21;145:22;
154:5;156:15,22;
157:18;158:23;
162:20,24;163:18;
189:15;191:4;194:3;
199:11;204:13;
205:20;212:2;
213:25;214:7,18

**differentiate (1)**
124:16

**differently (4)**
9:22;12:17;138:9;
139:3

**difficult (10)**
38:11;111:17;
131:2;136:22;145:8;
172:1,14;173:22;
190:7,11

**difficulties (1)**
141:24

**dig (1)**
116:11

**dilemma (4)**
146:1,4,7;148:2

**dilemmas (2)**
148:4,24

**direct (5)**
9:20;14:6;34:1;
79:16;118:20

**direction (3)**
99:10;120:1;
219:15

**directly (5)**
46:15;47:9;113:10;
122:18;123:1

**director (1)**

23:25

**disadvantaged (3)**
121:18;122:6;
128:21

**disadvantages (1)**
129:9

**disagree (3)**
76:13;189:7;
197:20

**discipline (1)**
50:19

**disclose (1)**
45:16

**discover (1)**
106:11

**discovering (1)**
214:16

**discrepancy (1)**
153:24

**discriminating (1)**
142:12

**discrimination (4)**
142:7,21;143:10,
19

**discriminatory (2)**
144:13;167:12

**discuss (1)**
89:19

**discussed (3)**
19:18;154:9;181:4

**discussing (5)**
10:13;16:24;
159:14;164:1;182:2

**discussion (13)**
5:16;42:19;56:2;
65:1;105:1;106:2;
110:9;141:19;
144:20;149:9;159:8,
9;207:3

**discussions (3)**
67:3;104:3;166:12

**disinterested (2)**
128:9;219:22

**disorder (17)**
24:21;25:5,8,13;
27:6;35:13,23;39:15;
67:14,23;80:6;112:1,
4;153:11;162:23;
183:14;203:3

**disorders (15)**
24:25;25:2;41:14;
69:11;80:1,6,10,12;
106:21;153:1,4;
154:1,16;170:21;
188:3

**distant (1)**
191:9

**distinction (3)**
153:21;154:9;
191:25

**distorted (1)**
153:10

**distorting (1)**

168:18

**distortion (1)**
187:23

**distortions (2)**
99:6;113:13

**distorts (1)**
107:1

**distress (11)**
43:8;133:2;153:1;
154:18;189:8;194:7,
23;195:8,19;196:1;
200:3

**distressed (2)**
153:6,13

**disturbed (2)**
187:6;188:5

**diverse (3)**
125:4;155:8;167:8

**diversity (1)**
126:22;212:11

**divide (1)**
136:17

**divisive (1)**
167:11

**divorce (3)**
176:7,15,19

**Doctor (7)**
6:8;22:3;47:15;
114:22;157:2;
160:22;195:3

**Doctors (2)**
28:3;76:4

**document (8)**
6:18,19;7:16;8:23;
15:5,8;155:6;156:7

**documents (1)**
17:23

**done (12)**
11:19;25:12,16;
47:2;89:14;98:13;
147:15,18;178:20;
181:7;191:15;218:11

**doubt (1)**
206:20

**down (29)**
7:5,23;13:23;
15:25;28:17;37:2;
72:13;74:15;90:21;
93:19;105:5;108:4;
117:6;143:21;
167:24;176:10;
181:23;182:7;
186:18;190:19;
192:13;204:2;
205:22;206:11;
207:21;209:17;
212:17;214:11;
219:13

**downfield (1)**
147:16

**downloaded (1)**
26:17

**downplays (2)**

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 64 of 84 PageID #: 3602

K.C., et al. VS                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                              June 1, 2023

154:25;156:16
**dozen (1)**
　25:21
**dozens (3)**
　85:18,20,24
**Dr (82)**
　4:7,24;7:6,15;8:13,
　23;10:10;13:8,22;
　14:6;15:5,11;16:2;
　18:5,5,5;19:19,22;
　20:3,7;22:13;31:1;
　34:4;49:24;60:19;
　66:21,24;67:2;68:7,
　14;69:23;85:2,11;
　90:20,22,24;93:10,
　17;96:9;105:7;109:4,
　15;114:22;116:10;
　124:2;127:3;129:15;
　137:19;149:23;
　150:2;151:3,5,18;
　152:3,10;155:6,13;
　164:1,2,7;167:2;
　168:1,2,6;169:2,11;
　171:25;174:7;187:3;
　193:2;196:17;
　198:18;201:18;
　202:13;204:12;
　205:25;209:19;
　211:7;213:9;214:11;
　217:20;218:6
**draw (1)**
　103:16
**dreaded (1)**
　188:7
**Drell (1)**
　85:14
**drinking (1)**
　66:5
**driver (1)**
　195:2
**driving (3)**
　66:4;95:15;195:23
**dropping (1)**
　209:11
**DSM (5)**
　112:1,8,8,9,10
**DSM-5 (3)**
　39:15,16;77:14
**DSM-5-TR (1)**
　38:24
**due (4)**
　84:7;86:18;173:1;
　174:3
**duly (2)**
　4:2;219:7
**during (10)**
　14:11;20:19;23:24;
　26:3;34:13,18;59:6;
　86:17;89:20;153:12
**Dutch (4)**
　132:4,20;133:4;
　156:23
**duty (2)**

55:9;56:5
**dynamic (3)**
　109:16;110:8;
　127:15
**dynamics (8)**
　23:21,22;109:20;
　111:13;114:21;
　120:17;126:16;128:7
**dysmorphic (1)**
　153:10
**dysphoria (206)**
　11:6;24:14,19;
　25:6,9,14;26:16,19,
　22;27:1,5,16,19,19;
　29:3,7,13;30:1,21;
　35:12,23;36:15,18,
　20,24;37:1,6,9,11,16,
　18,23;38:3,5,10,19,
　22;39:3,6,13,18,23;
　40:2,10;41:9;42:9;
　43:1,18,23;47:5,10;
　49:6,13,25;52:10,13;
　56:8,12,13;57:2;58:3,
　23;61:1;62:9;67:6,9;
　68:15;71:1;73:23;
　75:1,4,13,21,25;
　76:17,18,24;77:13,
　24;78:12,15;79:4,8,
　19;80:25;81:5,11;
　83:7,9,20;84:1;
　85:19;87:15;88:6,9,
　13,17,24;90:5,11;
　93:23;94:7,17;95:4;
　96:12;106:3,8,10,14;
　108:1;109:23;116:1;
　123:17;125:23;
　127:5;129:19;131:8,
　15;133:8,10,12,19;
　134:10,25;135:18;
　136:18;137:2,8,11;
　145:10;150:5,13;
　153:25;154:22;
　157:9;158:2,25;
　161:4,6,17;162:10;
　163:13,17;164:22,23;
　165:16,17,21;166:5,
　7,13;173:25;174:25;
　177:5;178:3,6,17;
　180:7,10;182:20;
　183:1;184:4,14;
　187:11,14;188:1,12;
　189:6,24,25;190:21,
　23;191:4;193:5,25;
　194:3,15,22;195:7,
　23;196:7,20,23,25;
　197:3,6,13,18;198:3,
　6;200:18;201:3;
　202:15,21,25;203:2,
　8;210:3,19,22,23;
　215:16,18;216:9,11,
　13
**dysphoric (2)**
　157:7;198:13

**E**

**ear (1)**
　146:20
**earlier (28)**
　19:16;65:13;68:7;
　69:23;72:17;73:10;
　74:11,24;94:10;
　139:13;157:25;
　162:13;165:13;
　166:10,14;168:5;
　174:19;176:1;192:3;
　198:18;200:14;
　201:18;202:13;
　203:24;205:2;210:2;
　211:2;216:21
**early (3)**
　74:2;88:22;156:24
**ears (3)**
　146:24,25;206:15
**easily (2)**
　32:21;83:4
**East (1)**
　108:25
**Eastern (2)**
　109:8;203:14
**easy (1)**
　136:22
**eat (2)**
　41:10;42:10
**economic (1)**
　143:18
**economics (4)**
　112:23;113:1,5;
　114:9
**editor (5)**
　30:23;104:1;105:5;
　171:18,21
**editors (2)**
　103:24;172:2
**eds (1)**
　30:23
**educating (1)**
　17:25
**education (7)**
　24:8;25:3,12,16;
　28:1,7;87:6
**educator (1)**
　32:25
**effect (6)**
　57:14,15,16,19;
　58:9;169:13
**effective (1)**
　194:13
**effectiveness (1)**
　196:6
**effects (2)**
　58:7;147:17
**eighteen (15)**
　35:24;36:1,4,5,7;
　44:22;49:3;65:8,12,
　16,19,20,22;201:10

**eighty (1)**
　88:25
**either (5)**
　52:8;55:21;92:25;
　95:8;115:8
**elapsed (1)**
　10:4
**electronics (3)**
　41:21,25;42:15
**elements (4)**
　112:5;159:20;
　192:21;195:12
**eleven (1)**
　75:18
**eligible (1)**
　64:10
**else (21)**
　17:17;20:4;28:10,
　11;46:12,23;47:5;
　56:21;86:2;92:22;
　106:21;123:1,17,18,
　19;163:20;172:9,23;
　173:10;193:21;
　194:20
**elsewhere (3)**
　52:9;78:25;165:6
**email (2)**
　54:17,18
**embraced (1)**
　103:21
**Embracing (1)**
　212:11
**emerged (1)**
　156:13
**emerges (1)**
　178:19
**emerging (2)**
　164:17,18
**emotional (1)**
　112:12
**emotions (2)**
　53:21;187:6
**emphasis (4)**
　121:12,14;156:9;
　214:7
**emphasize (6)**
　41:7;123:6;154:6;
　160:13,13;216:6
**emphasized (1)**
　123:6
**emphasizing (2)**
　151:2;192:15
**empirical (2)**
　99:24;100:17
**employ (1)**
　219:25
**employee (1)**
　31:23
**employment (2)**
　31:14,16
**enable (1)**
　109:17
**encounter (1)**

82:8
**encountered (2)**
　52:2;202:4
**encountering (2)**
　76:16,18
**encourage (1)**
　217:6
**end (26)**
　7:5,8,21;31:14,15;
　37:22;38:8;62:21;
　93:13;98:19;108:13;
　115:20;127:3,13;
　133:14;135:1;164:5;
　165:2,24;172:25;
　183:3;184:7;190:5;
　198:24;199:18;218:9
**endeavor (1)**
　5:20
**ended (1)**
　31:21
**Endocrine (1)**
　117:12
**endocrinological (1)**
　11:15
**endocrinologist (8)**
　11:15,21;19:20;
　140:1,5,7;142:22,23
**endocrinologists (3)**
　138:1,8,8
**endured (1)**
　173:14
**engage (3)**
　164:8;188:4;
　191:16
**engaged (2)**
　140:3;141:4
**engagements (1)**
　29:10
**engaging (1)**
　140:7
**England (1)**
　78:25
**enough (8)**
　65:1;99:11,11;
　146:5;181:12,14;
　190:4;198:12
**Enrolled (9)**
　30:13,17;56:19;
　57:19;63:12,16;
　141:3;186:5;208:23
**ensure (1)**
　64:1
**ensuring (1)**
　100:22
**enter (2)**
　4:20;39:23
**enthusiasm (3)**
　110:23;111:4,5
**enthusiastic (4)**
　111:9;126:2;
　127:10;129:12
**enthusiasts (1)**
　129:6,8

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 65 of 84 PageID #: 3603

K.C., et al. VS                                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                                          June 1, 2023

entire (2)
23:4;89:5
entirely (1)
116:8
environment (5)
83:25;105:22;
110:12,20;112:7
environments (2)
111:23;112:2
epidemic (2)
114:24;116:4
episodes (1)
157:3
equally (1)
144:8
era (1)
80:15
errata (8)
12:3,5,7,9,10,13,
20;70:2
errors (2)
12:12;130:9
especially (18)
41:20;44:25;61:22,
24;83:2;103:3;
115:17;128:20;
134:24;146:14;
156:20;173:24;
177:17,18;186:11;
207:14;211:20;
214:14
essential (2)
21:9;206:16
establish (2)
162:17;163:16
established (4)
145:21,24;147:25;
183:9
establishment (1)
80:16
esteemed (1)
99:24
estimate (2)
26:7;36:11
estimation (1)
125:14
ethical (6)
105:10;107:3,9;
144:18;148:1;197:24
etiology (2)
183:23;195:5
evaluate (4)
105:20;144:1;
168:25;169:6
evaluated (1)
98:3
evaluation (3)
64:4;106:11;128:6
even (18)
5:19;23:16;45:17;
64:10;67:16;77:14;
83:12;97:1;119:19;
132:25;147:21;

151:9;163:21;
189:20;190:5,7,10;
196:3
event (2)
190:24;219:24
events (1)
101:5
everyone (4)
43:4;92:12;137:3;
184:25
evidence (61)
41:6,12;63:7;
79:16,22;81:2;98:4;
105:10;110:10,21;
118:21;128:3;139:2;
141:13;142:16;
144:12;145:25;
146:7,8,12;148:9,13,
25;149:2,9,12,18;
150:6,12,13,24;
151:11;157:20;
163:22;164:9;
166:21;167:17;
168:11,22;169:1;
170:10,12;174:13;
177:10;180:6,9;
185:13;193:13,16,24;
194:1,5;196:3;
197:11,14,17;201:14;
202:7,9;206:14;
210:24
evolution (1)
99:18
evolved (5)
9:8,10,10:6;71:22;
72:2
exact (1)
161:3
exactly (20)
31:16,20;37:3;
65:24;66:10;69:1;
71:22;96:16;98:1;
105:3;108:5;112:20;
133:5;140:9;151:9;
158:17;161:12;
171:10;179:22;185:5
EXAMINATION (2)
4:5;14:7
examine (2)
144:2;168:22
examined (2)
4:4;98:10
example (16)
8:18;98:14,17;
100:15;101:11;
103:9,10;111:21;
112:6;129:10;140:4;
142:22;173:7;
176:23;179:24;180:5
examples (4)
98:15;120:2;
173:17,21
exceptional (1)

185:11
exceptions (1)
134:5
exchange (8)
96:10;97:10,17;
98:8,15,17,19;172:19
excited (1)
126:3
Exclude (2)
15:10,13
excuse (3)
29:1
exercise (3)
41:2;159:19;
209:13
exerting (1)
115:12
exhibit (33)
6:13,14,17;7:14;
8:22;10:9,11;13:7;
15:4;31:5;66:23;
68:6,7;74:10;75:16;
94:4;96:7;149:20;
152:5;155:5;157:1;
167:1;169:10,18,19;
198:16;201:17;
203:23;205:1;
209:12,15;211:1;
212:8
exist (6)
64:9;93:2;101:25;
171:15;191:11;193:5
existed (1)
78:7
existence (1)
194:23
existing (4)
82:10,13,16;118:2
exists (1)
166:12
expansive (2)
213:12;214:9
expect (2)
95:22,25
expectations (1)
92:3
expensive (1)
28:5
experience (9)
157:11;163:15;
172:1;175:21;
177:24,25;179:1;
188:22;202:4
experienced (1)
155:22
experiencing (1)
108:1
experimental (1)
146:3
expert (19)
7:19;15:10;18:4;
28:12,21;29:2,10,15,
20;30:1;45:9;74:25;

75:8;76:10,10;89:19;
151:5,6,13
expertise (11)
45:13;58:6;60:24;
75:4,10,13;76:2;
87:16;113:18;114:2;
145:19
experts (8)
18:11;19:7,10;
87:10;113:8;124:7;
150:23;168:6
expires (1)
220:11
explain (2)
112:14;160:5
explained (2)
72:23;160:5
explaining (1)
11:4
exploration (2)
173:20;192:16
Exploratory (2)
193:5,10
explore (5)
62:5,6,7;170:22;
179:22
explored (1)
170:4
exposure (1)
41:20
express (4)
90:10;91:8,13;
215:22
expressing (2)
84:8;90:13
expression (3)
92:8;215:10,12
extends (1)
215:13
extensively (1)
97:3
extent (2)
28:15;45:15
extra (1)
42:3
extraneous (1)
95:20
extremist (1)
55:2
eyes (1)
206:15

**F**

Facebook (3)
51:13,15,16
facilities (1)
44:15
facility (4)
46:17,19,20,22
fact (15)
41:1;56:13;70:10;
71:8;72:22;74:6,21;

78:3;83:16;91:19;
101:15;109:17;
115:10;118:12;
127:25;165:4,21;
168:12
factor (2)
148:12;184:23
factors (10)
56:3;73:17;93:22;
94:6,12,16;95:4;
178:21;186:9;195:15
facts (2)
128:2;182:4
fading (1)
9:14
failing (1)
131:1
fair (28)
5:22;12:19;21:21;
29:11;35:3,7;38:6;
40:18;42:23;52:5,7;
54:13;78:8;91:22;
95:5;108:1;113:3;
115:6;116:6;124:7;
144:22;151:3;160:3;
162:16;166:22;
171:14;195:10;197:1
fairly (1)
209:8
fairness (1)
209:7
fall (3)
52:5;146:5;148:20
falls (1)
123:2
false (4)
109:18;110:24;
190:19;191:2
familiar (9)
5:4;63:12;91:16,
19;132:21;145:14;
146:20;147:2;167:5
families (8)
21:23;22:2,13,19;
134:2,8;213:10,13
family (24)
22:16,17,17,22,23,
24,25;23:2,4,9,15,16;
41:23;55:3;106:22;
134:14,15;148:13,16,
17,17;163:6;214:20;
216:15
far (3)
61:13;97:6;207:20
favor (2)
117:24;140:6
fear (2)
188:15;191:18
fearful (1)
187:17
fears (2)
84:8;86:18
feature (1)

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 66 of 84 PageID #: 3604

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

213:9
**federal (2)**
    30:8,9
**federally (3)**
    121:10,14;139:15
**fee (1)**
    87:8
**feedback (1)**
    27:13
**feel (24)**
    9:22;10:20;55:6,7,
    9,19;70:19;72:25;
    90:19;96:17;106:24;
    120:22;121:22;
    125:20;157:5;
    177:16;178:23;
    179:2;183:13;184:1,
    25;187:24;212:3;
    217:12
**feeling (2)**
    109:3;214:18
**feelings (3)**
    118:15,17;195:16
**Fellow (1)**
    168:2
**fellowships (1)**
    34:22
**felt (1)**
    71:15
**female (6)**
    92:21,25;93:4;
    207:7;208:13,19
**females (1)**
    208:22
**few (4)**
    70:7;85:25;193:21;
    211:17
**fiddling (1)**
    149:5
**field (14)**
    20:21;98:11;
    112:21,21,23;129:12,
    13;150:4;154:12;
    173:1,6,10,19;211:14
**fields (1)**
    112:22
**Fifteen (1)**
    5:3
**fifth (1)**
    13:14
**fights (1)**
    163:5
**filed (5)**
    9:12;10:1;15:22;
    50:24;74:13
**final (1)**
    206:15
**find (6)**
    14:3;95:23;96:2;
    97:25;99:16;104:14
**fine (10)**
    94:24;151:20,21;
    192:10,10;194:8;

199:20;216:8;
    217:19,25
**finish (4)**
    5:18,18,20;62:13
**finished (3)**
    34:6,21;35:2
**finishing (1)**
    62:14
**first (26)**
    4:2;5:9;6:12;
    26:20;29:1,15;34:6,
    12,16,18;36:23;
    61:21;64:3;74:15,24;
    84:22;86:7;122:12;
    131:10;147:15;
    149:21;177:13;
    179:9;183:12;
    211:17;219:7
**five (8)**
    25:20;26:24;66:13;
    86:7;109:4;123:2;
    190:19;203:12
**fixed (3)**
    137:3;184:5,8
**flaws (1)**
    157:19
**flexible (2)**
    188:25;189:18
**flip (1)**
    111:24
**Florida (17)**
    9:1;14:15;29:18,
    19,23;31:15,20,22;
    32:2,4;33:14,18,22;
    44:6;49:7,21;70:9
**flow (1)**
    174:3
**flowing (1)**
    80:21
**Floyd's (1)**
    101:5
**focus (1)**
    123:23
**focused (1)**
    126:11
**focusing (2)**
    50:4;189:4
**folks (12)**
    38:20;64:10;65:7,
    16;86:6;90:12;
    108:24;109:3;128:8;
    166:18,19;203:13
**follow (4)**
    98:12;102:11;
    119:25;218:8
**followed (2)**
    98:5,7
**FOLLOWING (6)**
    22:9;66:17;109:11;
    151:24;203:17;218:3
**follows (1)**
    4:4
**follow-up (1)**

177:4
**food (2)**
    41:11;42:10
**fool (1)**
    114:10
**force (1)**
    191:8
**forced (1)**
    172:17
**foregoing (1)**
    219:9
**forensic (5)**
    20:14;33:20,21;
    35:1;75:7
**form (4)**
    174:12;181:3,13;
    201:5
**formal (1)**
    20:18
**formed (1)**
    129:5
**Former (1)**
    172:25
**Forms (1)**
    209:24
**formulate (1)**
    19:2
**formulated (1)**
    64:12
**formulation (1)**
    105:23
**forth (1)**
    97:8
**forty-five (3)**
    16:14;17:2,15
**forward (2)**
    97:14;101:13
**fought (1)**
    95:14
**found (4)**
    15:15,17;105:10;
    113:2
**founded (1)**
    113:5
**four (5)**
    25:20;26:24;39:2,
    5,8
**fourteen (2)**
    5:7;77:16
**FQHC (1)**
    121:18
**frame (6)**
    21:8;23:1;41:16;
    60:6;131:17;136:5
**framed (2)**
    11:6,17
**frames (1)**
    142:6
**framework (1)**
    99:23
**frameworks (4)**
    144:3,7,9;145:9
**framing (2)**

110:18;161:13
**free (4)**
    140:5;143:3,11;
    208:2
**frequency (1)**
    197:20
**friends (2)**
    214:20;216:16
**front (5)**
    52:16;70:23;
    113:11;173:8,11
**full (4)**
    8:7,9;48:4;99:14
**fully (10)**
    48:5,9;64:22;
    129:25;131:22;
    181:5;195:21;213:3;
    217:7,14
**fundamental (2)**
    149:6;175:22
**funded (1)**
    139:15
**further (5)**
    57:3;72:13;214:11;
    218:14;219:21
**furthers (1)**
    56:20
**future (2)**
    187:19;212:7

**G**

**garbled (1)**
    210:7
**gave (8)**
    10:21;16:17,19;
    85:19;87:1,11;90:16;
    173:7
**Gavin (1)**
    4:11
**gender (276)**
    11:6;24:13,19,20;
    25:4,5,8,9,13,14;
    26:16,19,22;27:1,5,5,
    16,19,19;29:3,6,12;
    30:1,21;35:12,13,23,
    23;36:15,17,20,24;
    37:1,5,9,10,16,18,23;
    38:3,5,10,19,22;39:3,
    6,12,14,18,23;40:2,
    10;41:8;42:9,25;
    43:17,22;47:4,10;
    49:6,13,25;50:2;
    52:10,13;56:8,12,13;
    57:1;58:3,23;61:1;
    62:9;67:6,9;68:14;
    71:1;73:22;74:16;
    75:1,4,13,21,25;
    76:17,18,24;77:13,
    23;78:12,14,20,25;
    79:4,5,7,19;80:25;
    81:4,11,13;83:6,8,20;
    84:1;85:19;87:14;

88:6,9,13,17,24;90:5,
    10;92:12;93:23;94:6,
    17;95:4;96:11;106:2,
    2,7,8,9,14;108:1;
    109:23;115:25;
    116:20;122:12,25;
    123:17;125:23;
    127:1,5;129:19;
    130:16;131:8,15;
    132:8;133:8,10,12,
    18,18;134:9,25;
    135:17;136:18;
    137:2,8,11;142:7;
    145:10;150:5,12;
    152:16;153:22,25;
    154:9,21,22;155:8;
    157:7,9;158:2,25;
    160:6,23;161:4,6,17,
    21;162:10;163:2,12,
    17;164:22,23;165:16,
    17,21;166:5,7,13;
    169:5;173:25;
    174:24;175:2;176:2;
    177:5,10,18;178:2,6,
    17;180:6,10;182:7,
    12,16,20;183:1,6;
    184:4,14;187:11,14;
    188:1,12;189:6,10,
    24,24;190:21,23;
    191:4;192:20,21;
    193:4,10,24;194:2,
    15,22,24;195:7,9,23;
    196:7,20,23,24;
    197:2,6,8,13,15,17,
    23;198:3,6,13;
    199:11,16,19;200:17;
    201:2;202:14,21,25;
    203:1,8;210:3,19,22,
    213:11;214:9,17;
    215:9,12,16,18,23,
    25;216:2,7,8,10,13;
    217:11
**gender-affirming (24)**
    57:20;58:11,19;
    59:11,19;60:23;
    62:22;105:9,15,16;
    107:8,17,24;137:21;
    138:25;149:13;
    170:15;175:23,25;
    181:2,12;184:17;
    200:19;201:5
**genderexploratorycom (1)**
    193:7
**general (26)**
    24:22;27:20;34:7,
    23,25;40:17,19;
    41:16;43:2;46:6;
    47:6;61:18;64:15;
    95:22;100:6,14;
    119:7;131:9,10;
    136:9;138:11;
    157:15;162:9;

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 67 of 84 PageID #: 3605

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

175:19;186:10;
193:16
**generalizable (1)**
157:23
**generalization (1)**
103:5
**generalizations (1)**
103:3
**generalize (1)**
193:20
**generally (17)**
50:2;51:13;61:18;
91:19;95:25;125:6;
127:21;128:6;135:6;
136:7;144:21;
156:16;164:12,16;
186:22;189:22;
213:19
**general-related (1)**
155:18
**genre (1)**
91:16
**George (3)**
101:5;206:17;
207:17
**gets (1)**
125:10
**girlish (1)**
215:8
**girls (1)**
215:8
**given (9)**
52:8,11,12;58:8;
65:21,24;70:19;
162:14;219:16
**gives (2)**
157:14;167:16
**giving (2)**
46:9;141:5
**glad (1)**
123:5
**globally (1)**
78:2
**goal (3)**
100:12;189:23;
199:15
**goes (3)**
80:14;123:9,25
**good (32)**
4:7,8,15;6:6;11:11;
33:9;41:6;42:4;43:3;
49:23;58:7;69:7;
83:10;100:15,25;
101:11;103:9;120:8;
125:21;147:25;
151:16;163:16;
170:6;181:20;
188:20;189:23;
190:1;193:17,20;
194:16;203:12;210:6
**Google (1)**
205:7
**graduated (1)**

34:17
**grants (1)**
173:22
**graph (2)**
77:9,11
**graphic (3)**
206:22,23,24
**Great (15)**
5:16,24;6:8,12;
41:12;45:20;101:8;
104:3;122:5;136:24;
145:24;179:4;
186:15;192:5;212:5
**greater (1)**
116:5
**grounds (1)**
53:18
**group (26)**
23:21;96:19;109:6;
110:13;112:15;
113:20;115:16;
120:17,17;124:19,25;
126:16;127:4,6,11,
21;128:6;167:8,20,
23;168:9,13,17,18;
169:5;183:17
**groups (10)**
102:22,22;113:13,
15;117:9;120:25;
122:11;124:10,15,17
**grow (14)**
129:23;131:21;
133:20,21;135:18,22;
137:1,4,8,11;184:15;
188:12;189:25;213:2
**growing (4)**
62:12;64:16;
121:14;136:6
**grown (1)**
181:5
**guess (28)**
15:17;25:21;35:25;
37:7;47:19;52:19;
54:7,22;56:23;65:13;
73:14;77:25;87:2;
89:7,8;94:22;98:10;
126:17;127:23;
135:8;136:1;144:6;
148:21;158:4;
184:20;193:19;
197:19;210:2
**guessing (4)**
9:23;27:22;143:16;
147:9
**guidance (1)**
99:3
**guide (1)**
157:6
**guidelines (20)**
110:19;115:8,11;
117:11,14,17;118:2;
126:2;128:23;158:8,
13,16,22;159:3,6,13;

160:20;162:15,18;
177:22

---

## H

**habits (1)**
80:8
**Haidt (1)**
96:18
**half (2)**
25:21;158:4
**hampering (1)**
104:24
**hand (4)**
47:2;140:19;
141:20;220:3
**handle (4)**
101:13;205:3,5;
207:16
**Hannah (2)**
177:7,23
**happen (4)**
55:18;120:12;
136:2;187:24
**happened (3)**
107:6;110:3;208:3
**happening (9)**
107:6;114:3;
128:17;172:18;
177:21;178:4;
179:23;180:4;202:9
**happens (1)**
38:15
**happy (2)**
159:10;212:6
**harassment (2)**
173:2,13
**hard (2)**
22:4;55:18
**harder (1)**
136:19
**harm (16)**
58:12,14;105:17,
18,19;106:9;115:21;
131:5,7,12,16,17;
136:5;146:9;167:3,4
**harmed (2)**
59:19;135:24
**harmful (7)**
61:6,10;106:1;
187:8,12;188:8;
189:21
**harming (1)**
60:5
**Harper (1)**
4:9
**hate (1)**
17:3
**hateful (1)**
55:2
**head (1)**
16:4
**Health (32)**

31:11;40:23,25;
61:22,23;62:5;67:22;
83:3;108:9;119:22;
121:10,13,15,17;
139:16;155:7,16,22,
23;167:8,11;174:21;
175:4,18;176:5,14,
24;191:11;202:2,5,
11;211:16
**healthy (5)**
154:16;182:9;
212:18,21;213:2
**hear (5)**
11:24;176:13;
179:19,20;191:19
**heard (9)**
5:7;48:18;53:2;
71:5;81:24;147:4,5;
167:4,5
**hearing (2)**
5:10;22:5
**heavily (2)**
32:25;42:14
**heavy (1)**
128:24
**HELD (9)**
22:8;29:25;66:16;
75:3,8;109:10;
151:23;203:16;218:2
**help (11)**
24:4;41:13;43:8;
83:7;97:21;140:16;
188:24;198:11;
214:21;216:17;
217:22
**helped (1)**
99:14
**helpful (4)**
61:12;122:1;
128:13;189:5
**helps (1)**
112:14
**hence (1)**
53:2
**hereby (1)**
219:5
**herein (2)**
4:2;219:6
**hereto (1)**
219:19
**heretofore (1)**
219:11
**hereunto (1)**
220:2
**heterosexual (3)**
91:8,12;92:9
**heterosexuality (3)**
91:2,5;112:1
**high (2)**
91:21;185:20
**highly (1)**
104:15
**himself (1)**

71:13
**history (10)**
78:1;135:4;136:7,
15;176:11;178:17;
180:21;181:1,12;
202:17
**hold (7)**
8:13;9:5;75:12;
151:4;160:25;
179:18;204:7
**holding (2)**
76:1;94:19
**homogenous (3)**
127:6,7,19
**homosexuality (1)**
112:6
**honest (5)**
54:23;55:5,7;
133:17;207:3
**honestly (1)**
14:13;214:6
**honing (1)**
194:8
**honor (1)**
41:21
**honoring (1)**
41:16
**hope (1)**
113:22
**Hopefully (2)**
42:12;97:20
**hormonal (1)**
170:5
**hormone (1)**
155:18
**hormones (12)**
60:1,3,5;62:18;
116:25;129:24;
132:15;181:3,13,18;
199:6;201:6
**horrible (2)**
111:20;187:19
**hostilities (1)**
84:9
**hostility (1)**
86:19
**hot (2)**
101:2;122:3
**hotline (1)**
49:8,12,22
**hour (5)**
6:3;108:24;109:2,
5;203:12
**hours (3)**
26:25;27:4;28:6
**hours-wise (1)**
33:19
**household (1)**
214:24
**housekeeping (1)**
4:17
**Hruz (1)**
19:12

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 68 of 84 PageID #: 3606

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

**huge (1)**
194:1
**huh-uh (1)**
5:25
**human (8)**
114:10;135:4;
136:6,15;149:2,6;
157:12;194:6
**humans (2)**
125:9;130:1
**hundred (6)**
89:6;184:13,18;
185:6,8,22
**hypothesis (3)**
193:23;194:16;
202:18
**hypothetical (3)**
180:1,3;190:14

**I**

**Ibram (1)**
101:11
**idea (15)**
80:10;95:14;
103:11,13,14;104:16;
115:17;116:17;
117:22;119:7,8;
128:22;168:22,25;
169:1
**ideal (2)**
55:22;130:3
**ideas (13)**
55:20;96:24;97:5,
9;98:18,19;99:16;
100:8,10;114:8;
115:15;168:22;169:6
**identified (1)**
115:6
**identify (5)**
92:25;166:7;
168:25;172:16;
214:15
**identifying (1)**
114:2
**identities (5)**
182:16;183:24;
214:21;216:16;
217:16
**identity (69)**
24:21;25:5,8,13;
27:6;35:13,23;39:14;
50:2;62:6;64:23;
80:25;91:3,5,9,10;
92:7,13;103:12;
105:24;106:2,7,15;
116:21,22;133:18;
137:3,5;142:8;149:3;
152:16;163:1;
164:24;165:23;
168:18;175:2;176:2;
181:8,11,15;182:8,
12,25;183:6,10,11,

20;184:9,9;185:17;
189:10;190:3,9;
192:17,20,21;194:25;
195:10;197:8,23;
199:11,16,19;212:12,
23,24;214:17;
215:19;217:17
**ideological (8)**
53:18;93:22;94:5,
12,15;95:3;120:20;
122:13
**ideologies (2)**
80:21;101:24
**ideology (8)**
81:10;101:17,23;
102:2,5,7,14;167:12
**ignore (1)**
115:19
**imagine (1)**
181:17
**immediately (1)**
177:13
**immune (1)**
81:1
**impact (1)**
40:23
**implants (2)**
145:14;146:4
**implemented (1)**
116:5
**implication (1)**
57:10,11,12
**implications (5)**
57:9;135:16;
140:23;146:9;147:7
**importance (3)**
71:20;97:4,5
**important (31)**
21:4,12,17;41:7;
42:5;43:14;55:9;
102:9;103:11;
113:11;114:20;
123:5,24,24;149:6;
152:22;164:25;
192:15;207:2,5;
208:18;209:9;
211:18;214:4,13,14;
215:5,7,12;216:1,6
**impossible (1)**
171:11
**impression (2)**
127:14;135:14
**improve (1)**
42:11
**inappropriate (2)**
176:17;192:22
**inappropriately (1)**
115:13
**include (14)**
18:24;40:3;42:8,8;
74:5,21;104:6;
107:18;130:5;
155:21;186:6;193:6;

213:11;214:8
**included (11)**
20:21,23;27:7,10;
33:6;44:2,4;46:13,
14;100:8;102:21
**includes (10)**
7:8;24:24,25;25:2;
27:15,21;40:7;41:22;
187:7,14
**including (4)**
46:24;163:12;
215:23,25
**inclusion (4)**
112:7,9;129:3;
206:25
**inclusive (3)**
103:6;213:14;
214:12
**incoming (1)**
38:1
**incongruence (1)**
133:2
**incorrect (1)**
210:20
**increase (6)**
79:25;93:23;94:6,
13,16;95:4
**increased (3)**
42:5;180:6;182:20
**increases (1)**
77:10
**incredible (1)**
81:6
**incredibly (1)**
211:17
**independent (6)**
34:2,11,12,14,16,
19
**Indiana (13)**
8:17;19:7,10;
28:20;30:14;57:2,21;
58:25;59:24;60:20;
61:5;70:25;219:1
**Indiana's (3)**
18:11;151:5;168:6
**indicate (1)**
150:13
**indicated (1)**
11:8
**individual (24)**
21:22;22:2;33:23;
44:24;45:21;46:2;
58:15,18;61:4,17;
62:1;99:2;105:22;
118:4;122:8;133:21;
134:7;136:3;151:4;
155:24;184:3,6,10;
185:2
**individuals (17)**
39:19;77:4;78:9;
82:1,20;119:7;
127:12;139:23;
147:12;152:25;

170:20;172:12,16,20;
198:6;201:6;217:8
**infancy (1)**
170:4
**infant (2)**
211:15,15
**infants (1)**
211:19
**inference (1)**
81:3
**influence (13)**
80:8,12,23;82:21,
24;83:1;90:25;91:7;
92:2;95:16;99:8;
101:7;213:24
**influenced (5)**
82:8;83:4;91:13;
120:25;126:2
**influencer (1)**
81:10
**influencers (2)**
81:21;82:4
**influences (4)**
79:17;81:1;92:8;
95:15
**inform (3)**
148:7;158:17,21
**information (8)**
9:16;45:17;54:24;
99:14;113:12,14;
172:19;174:3
**informed (1)**
170:17
**inherently (3)**
182:9,13;183:7
**initiation (1)**
62:11
**injury (2)**
88:11;210:18
**inpatient (4)**
172:12,15,18,20
**input (1)**
21:24
**inputs (1)**
148:15
**inquire (1)**
45:12
**Instagram (2)**
51:14,15
**instance (2)**
144:8;192:9
**instances (3)**
131:6,14;171:4
**instead (2)**
161:21;179:11
**institution (1)**
88:2
**institutions (2)**
100:7;117:24
**insulin (7)**
138:2;140:5;
142:23,25;143:1,3,11
**intellectual (2)**

96:19;173:2
**intelligent (1)**
71:12
**intend (2)**
6:24;7:2
**intentionally (1)**
158:13
**interact (3)**
40:14;62:4;126:19
**interaction (3)**
23:18;76:22;81:15
**interactions (4)**
21:13,18;174:8,11
**interest (5)**
99:12;124:10,14;
127:22;128:1
**interested (5)**
121:25;122:3;
128:8;141:17;219:24
**interfere (1)**
191:22
**interim (3)**
65:5,17,20
**intermixing (1)**
111:23
**intern (1)**
4:12
**internal (3)**
92:20,23,24
**interns (1)**
4:12
**intervene (4)**
131:4,5,12,16
**intervening (2)**
131:7,20
**intervention (7)**
126:8;127:17;
130:22;146:21,25;
155:19,19
**interventionalism (1)**
126:7
**interventions (5)**
109:23;133:1;
145:12;148:3;156:24
**interview (5)**
52:15,18;54:14;
207:25;208:2
**interviews (3)**
52:8,11,12
**into (30)**
19:3;34:8;37:2;
43:10;44:25;45:12;
60:16;66:8;70:13;
80:17;92:23;102:19,
19;103:11;104:14;
112:4;123:2;127:9;
128:24;133:2;
144:19;148:12,19;
153:8;159:13;163:5;
181:5;186:9;209:11;
215:9
**introducing (1)**
213:25

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 69 of 84 PageID #: 3607
K.C., et al. VS
The Individual Members of the Medical Licensing Board
KRISTOPHER KALIEBE, M.D.
June 1, 2023

**inverse (1)**
146:7
**involve (1)**
32:5,7;148:4
**involved (17)**
24:1;29:6,22;
32:19;33:1;41:1;
42:15;46:16;53:22,
23;54:20;55:14;62:8;
73:18;74:25;138:17;
190:12
**involvement (2)**
49:17;89:19
**involves (3)**
30:13;144:25;
187:5
**involving (3)**
29:3,6;75:20
**irrational (6)**
187:7,11;188:8,16,
17;189:8
**isolated (1)**
96:1
**issue (32)**
50:14;55:13;
100:24,24;112:3;
123:4,5;130:8;138:5,
10,11,20;139:20,22,
25;140:18,18,19,23;
144:6,15,25;145:3;
146:13;147:14,20,23;
154:14;207:2;
208:11;209:7,10
**issues (22)**
41:11;84:22;86:15;
101:1;102:10;106:7,
22;110:14;119:5;
121:13;125:17;
128:1;133:18;
136:20;144:14,19,22;
145:4;168:18;170:3;
178:18;207:16
**items (1)**
122:4

## J

**James (1)**
19:14
**jersey (2)**
205:11,12
**job (4)**
32:17,19;103:25;
125:21
**jobs (1)**
31:8
**Joel (51)**
6:15;7:4,13,23;
8:21;10:8;13:6,15,
23;14:4;15:3,25;
66:22;68:5;74:9;
77:1;79:13;84:3;
93:19;94:3;96:4;

137:17;143:20;
149:19;152:4,8;
155:4,11;163:24;
166:25;167:24;
169:9,18,19;171:23;
174:5;181:22;187:1;
190:17;192:25;
196:15;198:15;
201:16;203:22;
204:2,25;206:11;
207:21;209:11;
210:25;212:17
**John (2)**
96:18;97:7
**join (1)**
212:6
**joined (2)**
168:13;205:4
**Joining (3)**
4:11;101:17;
108:11
**Jonathan (3)**
96:23;97:2,15
**Jordan (2)**
205:25;206:13
**Josh (2)**
85:15;172:7
**journal (14)**
93:15;101:16,17,
21;102:2,4,16;104:1,
14,23,24;105:5;
110:4;123:9
**journals (9)**
55:21;101:15;
104:6,10;117:19;
123:22;170:16;
202:8;207:15
**judge (6)**
15:1;70:24,24;
71:5,7,12
**judging (1)**
169:4
**July (3)**
34:23;35:2,6
**jump (2)**
106:18;112:21
**justice (8)**
44:13;100:9,10,12,
16,24;122:21;123:20
**justifies (1)**
208:1
**justify (1)**
181:16
**juvenile (4)**
33:16;43:23;44:13,
20

## K

**Kahneman (1)**
113:7
**KALIEBE (73)**
4:1,7,24;7:6,15;

8:13,23;10:10;13:8,
22;14:6;15:5,11;
16:2;19:19,22;20:3,
7;22:13;31:1;34:4;
49:24;60:19;66:21,
24;67:2;68:7,14;
69:23;85:2,11;90:24;
93:17;96:9;105:7;
109:4,15;114:22;
116:10;124:2;127:3;
129:15;137:19;
149:23;150:2;151:3,
5,18;152:3,10;155:6,
13;164:1;167:2;
168:1;169:11;
171:25;174:7;187:3;
193:2;196:17;
198:18;201:18;
202:13;204:12;
209:19;211:7;213:9;
214:11;217:20;
218:6,17;219:6
**Karasic (2)**
18:5;167:19
**keep (5)**
46:6;54:18;133:16;
204:3;207:5
**Ken (2)**
132:4,11
**Kendi's (1)**
101:11
**Kenny (1)**
19:6
**kept (1)**
44:9
**kids (10)**
42:14;136:25;
192:24;199:24;
214:13,14,16,22;
215:9;216:18
**kind (22)**
25:24;61:4,19;
62:18;63:9,20;64:4,
11;65:7;118:7;122:8,
23;125:21;130:25;
141:14;161:5,23;
167:15;169:4;
180:25;201:9;202:22
**kinds (6)**
120:3,6;127:17;
164:17;171:7;213:10
**Kirk (1)**
17:10
**knew (4)**
185:1,1,6,6
**knock (1)**
105:5
**knowledge (3)**
48:5;97:14;195:22
**known (4)**
80:15;147:25;
159:23;162:11
**knows (1)**

212:22
**Kramer (2)**
219:4;220:7.5
**KRISTOPHER (5)**
4:1;15:11;205:20;
218:17;219:6

## L

**label (2)**
165:25;216:12
**labeling (1)**
216:11
**lag (1)**
5:17
**laid (1)**
102:11
**language (6)**
109:17;141:15;
166:11,20;167:16,18
**large (15)**
21:9,14;33:2;77:3,
17;78:9;81:13;82:21,
24;87:19;90:12;
95:16;156:21;161:8;
162:1
**larger (2)**
27:7;87:19
**last (9)**
17:3;25:20;26:15;
90:23;112:13;
122:18,19;123:1;
207:21
**later (7)**
25:23;26:1,11,12;
27:3;86:22;214:14
**lateral (2)**
47:23,25
**Law (8)**
15:9;57:9,10,13,
22;60:22;63:16;
172:3
**laws (3)**
30:20;58:7;137:20
**law's (1)**
57:14
**lawsuit (1)**
99:13
**lawyer (3)**
16:14,15;17:1
**lawyers (5)**
5:7;16:6;17:5;
28:3;69:25
**lays (1)**
96:25
**lead (6)**
62:8;83:4;99:14;
120:18;136:23;150:6
**lean (4)**
120:1,12;126:7;
142:2
**leaning (2)**
142:4;199:22

**learn (1)**
24:2
**learned (1)**
157:4
**learning (2)**
24:24;154:17
**least (9)**
26:7;38:3;74:1;
123:9;138:19;
140:24;164:6;
165:20;183:21
**leave (3)**
37:22;38:14;40:11
**leaves (1)**
39:2
**leaving (1)**
173:18
**lectures (1)**
204:13
**led (2)**
35:18;112:7
**left (6)**
53:19;119:16;
139:24;173:1,6,10
**left-leaned (1)**
119:23
**left-leaning (3)**
119:15,21;120:15
**legions (1)**
115:3
**legislative (4)**
63:25;140:2;141:2;
142:24
**legislature (3)**
30:3,6,9
**length (2)**
53:14,24
**lens (1)**
105:25
**less (11)**
10:3;33:25;47:8;
92:9,10;94:25;
139:25;146:8;147:1,
20;188:5
**lets (1)**
106:18
**letters (3)**
30:23;171:18,20
**level (18)**
25:3;30:8;58:15,
16;61:4;71:20;111:4,
5;113:25;118:4;
120:14;122:15;
129:1;146:6;160:17;
166:24;170:10;
185:20
**levels (1)**
55:12
**Levine's (1)**
182:3
**LGBTQ (1)**
214:15
**Lia (3)**

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 70 of 84 PageID #: 3608

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

206:1,18;209:2
**liberal (1)**
97:9
**license (2)**
31:18;44:10
**licensing (1)**
50:21
**life (8)**
56:21;130:5;
176:19;183:11;
184:11;202:23;
211:17;215:21
**lifelong (1)**
146:15
**liked (5)**
205:24;206:12;
207:19,23;208:6
**likely (7)**
44:14;79:10,11;
81:14;103:6;137:12;
180:10
**like-minded (1)**
127:11
**liking (4)**
206:5,19;207:24;
209:6
**limit (5)**
43:4;63:22;64:9,
14;66:3
**limits (3)**
60:17;66:6;142:7
**Line (10)**
68:12;72:16;73:11;
79:15;103:16;
118:20;124:10;
197:8;199:3,4
**lines (6)**
79:16,22;81:2;
93:12;118:11;190:19
**link (2)**
203:23;209:12
**linked (1)**
51:22
**links (3)**
51:14;206:2;
213:16
**list (12)**
7:8;86:16,21;97:1,
11,11,24,25;117:9;
171:3;173:8;182:3
**listed (7)**
29:10;204:19;
209:20;210:5,13,14,
19
**listening (1)**
178:1
**literally (3)**
85:18,19,24
**literature (6)**
65:2;66:1;80:7;
154:8,15;177:20
**little (18)**
4:16;20:7;28:17;

33:16;34:1;53:13;
66:13,24;88:21;
89:16;90:21;116:12;
151:17;165:13;
179:5;181:23;
199:14;203:11
**live (1)**
70:7
**Living (1)**
214:24
**lobbied (2)**
30:3,9
**lobotomies (1)**
111:16
**lobotomy (1)**
111:20
**logged (1)**
205:6
**logic (1)**
144:2
**long (16)**
31:17;34:4;59:8;
80:13,15;97:23;
107:14;147:13;
178:17;181:1,12;
183:15;186:14;
191:11;192:11;
198:23
**longer (4)**
42:25;151:17;
196:19;217:23
**long-standing (2)**
130:11;193:14
**long-term (5)**
61:14,22,24;170:6;
185:18
**look (30)**
5:25;10:25;74:11;
94:2;103:19;110:4;
114:6,22;117:11;
118:9;119:10,18;
124:1;125:13;156:5;
165:1;167:20;
168:21;169:5,11;
177:7,8;194:4;
202:12;203:21;
204:4,24;208:9;
211:6;212:8
**looked (4)**
68:24;69:16;97:24;
193:12
**Looking (3)**
9:13;77:9;99:15
**looks (2)**
13:17;205:24
**lost (1)**
93:8
**lot (34)**
17:4;21:10;24:2;
33:4,25;55:12;65:25;
66:7;82:5;97:8;98:6;
101:15;110:4;114:4,
8,15,16;125:5;

132:20;142:24;
145:10;157:13;
173:13;177:11,17;
185:24;188:1,23;
191:3,16;194:19;
196:13;212:2;217:4
**Lots (7)**
67:18;69:10;
114:18;132:10;
193:18;194:9;196:12
**Louisiana (12)**
31:17,18;32:1,2;
33:17,19;34:3;43:23;
44:8,9,10,13
**love (3)**
121:11;128:11;
154:17
**loved (2)**
213:4;214:25
**low (6)**
77:14;147:9,10;
150:14;151:10;
185:13
**LSU (8)**
24:1;31:11,16,19,
25;32:3,5,19
**lunch (2)**
109:2;151:17
**lurkers (1)**
51:25

## M

**main (4)**
123:12;134:20;
136:16;207:8
**mainstream (1)**
163:11
**maintain (1)**
181:15
**maintaining (1)**
85:8
**major (7)**
8:6;21:7;79:18;
116:16;136:8;
170:16;176:19
**makes (6)**
61:9;138:7;147:19;
152:14;189:13;
192:22
**making (6)**
29:22;111:25;
186:10;188:23;
189:1;217:11
**Malaty (1)**
85:15
**male (13)**
92:21,25;93:3;
178:7,9,15;179:4,16,
17;208:12,20;209:1,6
**males (1)**
206:25
**malpractice (1)**

50:16
**manage (3)**
46:14,17;47:7
**managing (5)**
41:15,19;42:14,16;
43:10
**manner (3)**
11:7;47:7;160:9
**many (41)**
5:2;26:25;27:4;
35:11,24;36:17;37:4,
10;49:11,20;59:22;
75:7;76:7;81:24;
86:12,12,12,24;
87:20,23;88:23;89:1;
98:7,15;100:6;
136:25;137:16;
145:3;153:4,12;
158:3;170:2,3;
180:15;187:13;
189:15;190:15;
191:3;192:14;197:3;
212:4
**March (2)**
206:12;207:24
**mark (2)**
6:3;59:7
**marked (2)**
6:14;10:10
**marker (5)**
103:12;134:20,23;
135:4;136:16
**Marshall (3)**
8:15;29:5;211:4
**Martin (1)**
85:14
**massive (2)**
129:1;194:4
**match (4)**
189:10;190:3;
197:23;210:8
**material (1)**
8:10
**materially (1)**
10:6
**math (2)**
13:18,20
**matter (13)**
4:10;10:13;13:8;
29:12,18;67:16;
71:19;74:22;95:22;
104:22;195:7,11;
219:8
**matters (15)**
6:25;21:9,13,17,
25;40:2,8;58:2;98:9;
101:7;114:13;
115:21;118:10;
159:14;176:18
**may (51)**
9:17;10:5;13:12;
23:3;37:21;63:24;
64:5;72:3;78:12;

82:12,12,20,22,24;
87:2,2;88:15,18,18,
22,22;89:23;100:11,
11;113:24;115:1;
126:19;133:20,21;
135:18,19;145:22,22;
148:17,18;166:23,23;
176:21;178:11,11,22;
188:17,17,20;191:11;
200:19;206:10,10;
214:14;217:6,21
**maybe (13)**
25:21;37:7;53:2;
74:14;104:19;
108:22;138:19;
158:1;171:15;195:4;
197:3;205:4,6
**MCato (1)**
207:23
**MD (3)**
4:1;218:17;219:6
**mean (95)**
22:21,24;39:25;
41:5;45:23;46:20;
49:2;56:2;58:15;
59:3,25;63:11,21,24;
66:3;69:8;70:17,21;
73:17;76:17;78:5;
82:18;85:12;92:24;
93:3;95:8;103:20,23;
108:7,14;111:22;
112:20;116:17;
117:4;118:1,3;119:3,
6;121:2,3;126:17;
127:7,18;128:11;
130:17;132:5,17;
134:12;138:12;
141:15;143:12,13;
145:2;146:14,17,22;
148:16;149:15;
153:3,4,19;160:15,
17;162:3;164:19;
165:25;166:1;
168:12,16;170:22;
173:18;176:3,9,12,
16;178:21;179:13;
181:5;182:15,18,20;
184:11;188:19;
191:9;192:7;193:11;
194:12;195:3,12,17;
202:9;206:23;208:8;
214:5,5
**meaning (2)**
108:6;162:4
**means (5)**
5:22;143:1;168:20;
206:22,24
**measurable (1)**
138:13
**media (32)**
43:11;51:8,10,12,
12,17;52:9;55:24;
79:17;80:22;81:7;

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 71 of 84 PageID #: 3609
K.C., et al. VS
The Individual Members of the Medical Licensing Board
KRISTOPHER KALIEBE, M.D.
June 1, 2023

82:10;88:11;90:25;
91:7,11,14,20,23;
92:8;124:5;125:2,3,7,
8,12;127:24;128:1;
209:22;210:10,15,17
mediative (1)
41:17
Medicaid (2)
49:7,21
medical (67)
18:16,18,21;20:19,
25;21:11;23:20,24;
24:8,8,23;25:9;28:1;
31:18;34:17;50:16;
55:20;57:1;62:18;
67:24;69:13;75:19;
76:3;77:4,21;78:9;
80:11,16;83:24;87:6;
88:1;100:25;101:21;
106:6;109:22;
110:21;112:3;
119:19;122:11;
133:1;138:11;
139:14;142:15,16,19;
143:7,25;145:7,12;
146:21;164:13;
167:9;170:4,16;
181:2;184:17;185:7;
191:21;200:19;
201:5,9;202:2,5,8,10;
207:14,15
medicalization (2)
131:23;159:9
medicalization-wise (2)
129:21;130:2
medicalized (8)
107:18,20;116:24;
186:16;192:14,18;
198:5,14
medically (1)
83:16
medication (4)
23:5,8;127:18;
128:22
medications (4)
5:9;40:3;98:16;
128:19
medicine (14)
98:3,6,9,11;
109:21;111:14;
112:25;122:12,25;
132:6,8;136:21;
144:25;146:11
medicines (1)
132:10
meet (1)
67:23
meeting (8)
16:13,15;17:15;
25:19;26:9,11,15,15
meetings (6)
17:14;25:17,19;
86:14;121:8;178:1

member (2)
211:8,25
members (4)
23:9,18;119:25;
128:1
membership (1)
168:9
Memorandum (1)
15:9
memory (1)
119:2
men's (1)
46:22
mental (22)
40:23,25;41:13;
61:22,23;62:5;67:21;
83:3;108:9;121:13,
16;174:21;175:4,17;
176:5,14,24;191:10;
202:2,5,10;211:15
mention (1)
83:13
mentioned (13)
77:12;95:9;114:4;
125:24;129:9;130:3;
151:10,12;159:17;
174:19;202:13;
203:24;219:11
mentioning (4)
69:17;113:22;
154:1;207:11
merely (3)
82:10,13,16
merits (1)
169:6
mess (1)
126:21
messed (2)
25:24;210:10
met (1)
17:1
methodology (1)
110:2
middle (3)
13:20;105:7;
216:14
might (19)
8:19;11:1;13:25;
42:2;56:22,22;62:7;
65:11;67:23;82:4;
88:21;134:8;177:6;
178:23;180:21;
189:7;202:14;
216:24;217:22
Mill (1)
97:7
mind (3)
11:3;90:23;113:8
mindful (5)
42:13,25;71:22;
125:4;128:17
mindfully (1)
41:19

mindfulness (2)
42:12;159:19
minimally (1)
46:15
minimize (3)
189:17;190:1,13
minimizing (1)
189:22
minimum (1)
84:23
minor (12)
8:12;9:7;11:22;
45:22;46:7,8;58:19;
67:5;134:20,21;
162:9;184:3
minors (3)
30:21;38:20;55:1;
57:2,20;59:20;60:23;
61:5;63:14;82:24;
83:2;98:22;107:25;
109:24;129:18;
131:15;133:7;
134:18;145:10;
148:4,9;156:22,22,
23;158:25;184:1,17;
189:24;198:8;
200:17;201:2;
202:15,17
minuses (1)
64:13
minute (6)
17:15;26:3;66:13;
86:25;109:5;203:13
minutes (3)
16:14;17:2;217:24
mischaracterizations (1)
130:10
mischaracterized (2)
130:11,14
Mischaracterizes (1)
72:5
mischaracterizing (1)
161:10
misguided (1)
171:1
misinformation (1)
114:5
misquotes (3)
12:9,21;70:3
misreading (1)
69:18
misrepresented (1)
182:3
miss (1)
26:13
missing (1)
169:23
mission (2)
167:10,21
mistake (1)
186:8
misunderstood (3)
69:3;195:4;199:13

mix (1)
33:12
Mixed (4)
42:12;53:21;
103:18;197:14
modalities (1)
126:14
model (2)
22:1;157:17
modern (2)
24:21;113:16
modifier (1)
175:20
moment (3)
7:1;11:23;204:11
moms (1)
211:24
monopoly (1)
97:16
months (4)
8:8;9:12,17;10:4
moonlighting (1)
34:11
morale (1)
142:13
moralize (1)
143:14
moralized (4)
110:19;111:23;
112:2;142:8
moralizing (6)
112:7;142:10;
143:5;166:11,20;
167:15
more (91)
9:16,17;13:24;
18:1;21:25;25:21;
28:17;31:25;33:16,
18,20,21;42:24,25;
46:16;47:6;48:9;
52:5;54:24;55:22;
56:17;58:12,14;61:5,
10;63:7;65:11;71:22;
72:22,24,25;83:25;
84:1;86:12,12,15;
92:8,10;94:25;101:8,
19,20;103:5,5,11;
104:2;110:8,15;
114:12,16;115:18;
117:4;119:23;120:9,
19;121:14,24;123:13,
23;124:21;125:11;
127:13;133:23;
137:12;138:22;
141:14,17;142:4;
143:24;145:10;

146:3,8;156:11;
159:10;170:23;
171:6;176:13;179:5,
19;180:10;184:25;
185:24;186:11;
188:23;189:13;
192:6,12;193:4;
199:18;214:21;
216:17
morning (3)
4:7,8,14
most (33)
9:8;26:10;44:11;
67:22;69:12,12;84:5,
18;86:9,11;89:22,25;
92:16,20,24;108:24;
114:20;119:21;
122:1;129:22;
133:16;135:7;137:7,
10;141:21;145:4,7,8;
195:2;199:23,24;
206:15;208:16
mostly (10)
31:22;32:2,3,3,23,
24;67:19;90:14;
143:18;209:6
mothers (1)
211:21
Motion (3)
15:10,19,22
Move (3)
42:11;45:1;106:6;
120:18
moved (10)
31:15,20,23;32:2;
33:14;44:6,9;62:2;
71:4;97:13
movement (1)
41:5
movie (1)
91:16
movies (2)
91:20,25
moving (3)
42:13;44:15;
198:14
much (23)
5:25;13:19;15:24;
41:25;42:15;44:24;
45:25;60:14;93:22;
94:16,23;97:12;
117:4;121:22;
126:11;139:21;
146:3;147:19;
154:13;170:22,23;
183:19;184:25
multidisciplinary (1)
155:20
multiple (9)
79:16,22;80:5;
81:2;98:9;117:18;
144:9;14;150:11
murder (1)

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 72 of 84 PageID #: 3610

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

101:5
**must (7)**
11:8;63:21;68:3;
69:20;139:12;164:6;
205:4
**myself (5)**
12:10;17:25;53:22;
55:3;75:8

**N**

**name (10)**
4:9;17:4,6;52:16,
21;87:24;126:21;
167:5;179:17;209:20
**named (3)**
54:3;86:6,7
**names (3)**
81:23,25;90:16
**naming (1)**
80:11
**narrative (2)**
102:24;103:8
**narratives (4)**
102:20;103:21;
108:20;109:19
**narrow (3)**
122:21;123:11,15
**natal (3)**
199:20;200:1,7
**national (2)**
4:13;110:5
**nature (2)**
41:4;150:19
**necessarily (8)**
165:1;168:15;
175:17;177:1;192:3;
198:5;214:1,3
**necessary (2)**
71:17;158:20
**need (12)**
5:24;6:2;63:7,25;
70:20;73:15;97:18;
105:21;142:25;
191:21;215:24;
217:13
**needs (3)**
71:7;85:21;213:3
**negative (8)**
125:6,8,10,16,18;
143:2;147:16;189:12
**negatively (1)**
120:25
**negatives (1)**
189:4
**negativity (1)**
125:10
**neighborhoods (1)**
122:6
**neither (1)**
23:1
**net (1)**
58:19

**Netherlands (1)**
132:12
**neurocognitive (1)**
163:3
**neutral (1)**
108:10
**new (13)**
12:22;110:10;
130:21;154:12;
156:12,14;157:16,16;
161:7;193:22;
205:11;209:24,25
**Newsletter (1)**
172:3
**next (6)**
38:15;95:20;
178:23;190:18;
209:20;212:8
**nice (2)**
11:20;129:11
**Nine (1)**
51:2
**Nobel (1)**
111:19
**Noble (1)**
113:7
**nobody (1)**
76:21
**nonbinary (1)**
214:9
**non-binary (1)**
213:11
**nonconforming (5)**
215:23;216:1,3,8;
217:11
**None (5)**
18:1;27:9;29:12;
37:16;75:19
**nonfunctional (1)**
183:4
**nonproductive (1)**
183:4
**nor (3)**
65:25;150:5;202:7
**normally (4)**
69:6;142:14;
176:23,23
**normative (1)**
104:21
**notarial (1)**
220:3
**Notary (2)**
219:4;220:7.5
**note (2)**
11:16;193:15
**noted (3)**
11:13;154:4;
219:12
**notes (3)**
6:8,11;219:14
**notice (1)**
106:20
**noticeable (1)**

153:24
**noticed (3)**
71:21;125:11;
209:5
**notions (1)**
130:16
**NP0661030 (1)**
220:10
**nuance (15)**
11:2,12;69:21;
70:11;71:8;72:10,11;
73:4,10;92:23;
104:12;128:10;
131:2;165:12;217:4
**nuanced (4)**
9:17;103:1;110:10;
193:4
**nuances (1)**
141:24
**number (25)**
33:15;35:18;40:8;
54:22;61:1;72:18;
80:24;82:1;86:3;
89:3;90:12;100:18;
112:22;115:1;
118:13,21;130:6;
138:18;141:16;
144:18;148:14;
158:4;162:24;
184:20;220:10
**numbers (2)**
33:8;35:7
**numerous (2)**
100:1,4
**nurture (1)**
213:13

**O**

**Oasis (7)**
85:17;87:4,5,16;
89:9;203:25;209:16
**obesity (1)**
114:7
**object (5)**
28:14;57:5,22;
84:21;85:7
**Objection (6)**
71:10;72:4;128:2;
200:21;201:11,11
**objections (1)**
184:16
**obligated (1)**
175:2
**obligations (1)**
45:16
**obliged (2)**
176:2,3
**observed (3)**
61:9;122:18;123:1
**obviously (4)**
46:1;75:6;170:12;
200:4

**occasionally (2)**
51:18,22
**occasions (1)**
94:24
**occurred (7)**
8:7;106:22;109:22;
120:22;191:10;
202:24;203:4
**occurring (1)**
113:21
**off (28)**
13:21;16:4,8;22:6,
7,8;38:14;57:1,3;
59:2;61:21;66:8,10,
15,16;88:21;109:9,
10;122:23;136:10,
14;151:22,23;195:3;
203:15,16;218:1,2
**offer (4)**
6:24;7:2;8:19;
176:17
**offered (2)**
33:15;150:3
**offering (3)**
149:11;150:20;
151:6
**office (4)**
4:13;37:5,8;39:5
**officially (1)**
124:19
**offs (5)**
56:22,25;66:6;
135:5;141:24
**often (8)**
38:15;64:17;78:3;
80:21;131:4;136:21;
165:8,9
**old (4)**
48:11;130:19;
132:9;181:19
**older (1)**
178:21
**olds (2)**
181:10,15
**Olga (1)**
19:19
**Once (26)**
41:11;55:25;60:13;
61:16;71:21;90:9;
103:24;125:17;
129:23;131:22;
132:15;134:14;
138:9,19;156:18;
159:5,12;160:14;
161:10,25;165:5;
179:12;203:6;
208:14;209:4;214:5
**one (78)**
13:21,24;14:1;
16:15;19:6;26:17;
27:9;31:25;34:19,19;
35:1;36:12;46:24;
49:15,16,16;54:23;

57:8;59:21,25,25;
60:12;67:11;74:2;
75:24;76:17,23;
85:22;87:9;88:9;
89:5,13;90:13;97:7,
16;100:15;101:2;
103:19;106:15;
116:17,22;118:9,12,
15;119:20;120:1;
124:22;125:25;
136:2,15,20;140:15;
144:13,13;154:24;
168:6;170:11,24,25;
173:7,9,15,22;
175:22;176:1;179:6;
184:10;186:12;
189:11;190:15;
197:4,24;199:17;
209:24;210:11,14,15;
214:15
**ones (5)**
26:2;119:13;
125:22;190:5;210:15
**one's (1)**
190:22
**one-sided (1)**
125:16
**online (18)**
25:25;26:4;42:3,4;
79:17;80:2,2,4,8;
81:24;82:1,6,8;86:2;
89:4;95:15,23;96:2
**only (18)**
6:10;27:7,10;
49:15;51:17;57:8;
60:13;104:10;113:6;
119:22;121:17;
136:22;161:8;
170:24;173:8;184:7;
204:22;210:14
**onset (1)**
137:11
**op (1)**
30:23
**open (6)**
84:1;92:14;96:10;
101:19;121:17;
182:15
**opened (1)**
74:16
**openly (2)**
82:10;216:22
**opine (1)**
62:25
**opinion (40)**
43:21;44:5,16;
45:22;46:10,18;47:3,
12,22;48:1,3,14;
54:10;55:5,6,7;58:2;
60:9;64:12;70:16;
71:24;72:1;92:10;
93:18,21;94:15,19;
95:9;112:14;113:20;

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 73 of 84 PageID #: 3611

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

124:25;138:13;
140:12;141:23;
142:18;149:11;
150:3;151:15,15;
181:21;207:5
**opinions (20)**
6:23;7:1;8:13;9:5,
7,16,19;10:5;19:3;
96:20;97:19,19;
118:10,22;125:4;
126:6;150:18,21,25;
186:20
**opioid (4)**
114:23;115:7,22;
116:4
**opportunity (2)**
12:1;137:4
**oppose (1)**
133:7
**opposed (3)**
199:21;214:2;
217:23
**opposite (1)**
199:20
**oppressed (2)**
102:23;103:8
**oppressor (1)**
103:8
**oppressors (1)**
102:22
**order (7)**
45:7;64:1;97:18;
153:8;157:23;
181:16,25
**ordinary (1)**
28:8
**organization (12)**
87:20,25;119:15;
121:21,23;142:20;
143:25;167:3;
211:13,18,23;212:5
**organizational (5)**
23:22;24:2,6,7;
118:1
**organizations (19)**
52:20;53:9;54:12;
55:21;58:4;84:11;
100:7;110:6,17;
119:10,12,25;121:3;
122:20;123:10;
124:23;138:16;
139:1,14
**organizations' (1)**
120:10
**organized (1)**
122:11
**organizes (1)**
87:18
**organizing (1)**
120:25
**orientation (4)**
191:8;201:20;
202:6;214:17

**original (1)**
132:2
**originally (1)**
97:7
**originals (1)**
97:8
**origins (1)**
103:16
**Orleans (1)**
205:11
**Orwell (3)**
206:17;207:11,17
**others (2)**
84:10;97:20
**otherwise (4)**
58:24;59:23;96:1;
219:24
**out (54)**
9:14;13:2;15:15,
17;22:4;27:8;28:20,
23;29:19,25;39:11;
46:8;55:23;70:3;
71:13;75:3,8,12;
76:1;78:21,22;80:17;
84:16;85:1;86:3,17;
89:9,10,18;97:1;
102:11;104:4;111:8;
117:13,16,17;118:19,
25;120:11;123:21;
128:19;146:24;
147:1,11;149:4;
160:15;161:9;
163:19;172:17;
178:19;181:25;
188:17;201:25;202:1
**outcome (8)**
137:12;143:2;
147:24;148:1;170:6;
185:9;188:18;199:23
**outcomes (2)**
146:13;185:18
**outed (1)**
86:17
**output (1)**
125:13
**outs (1)**
186:6
**outside (5)**
57:5;99:12;104:17,
25;115:8
**outweigh (3)**
60:8;61:19;62:23
**outweighed (2)**
60:10,11
**over (17)**
5:8;32:20;36:4;
37:21;49:3;65:7,9,18,
22;81:24;82:21;
103:6;119:5;122:18;
152:16;154:7;203:12
**overall (1)**
63:5
**overconfident (1)**

126:6
**overemphasis (1)**
106:15
**overfocus (2)**
189:12,20
**overgeneralizes (1)**
105:6
**overgeneralizing (3)**
103:7;105:2,4
**overly (3)**
72:9;126:2,24
**overstatements (1)**
130:9
**overwhelming (1)**
197:12
**own (5)**
11:19;67:20;
106:19;187:5;198:1

**P**

**package (2)**
25:23;26:12
**Pactor (1)**
4:11
**Page (29)**
7:25;13:16,18,21,
22;14:1,3,5;68:6,11;
72:13;114:25;
149:21;155:12;
167:25;181:23,24;
182:1;187:2;190:18;
196:16;198:16,17;
199:2;202:12;
207:22;211:6,7;
216:4
**pages (2)**
156:6,6
**pagination (1)**
169:21
**paid (2)**
143:17,17
**pain (3)**
115:2,20;116:1
**painful (1)**
190:11
**painted (1)**
55:1
**panic (1)**
95:11
**paper (3)**
6:10;50:12,14
**papers (2)**
50:7;171:7
**Paragraph (78)**
67:2;74:11,14,15;
75:16,17;77:2;78:24;
79:14,15;84:4;90:20,
24;93:6,9,13,17,18,
20;94:4;96:5,7,9;
99:22;105:7;109:16;
112:12;114:22,23;
116:13;117:7,10;

122:17;124:1,6,9;
127:3,9;129:15;
130:7;137:18,19;
142:5;143:20,22;
148:22;149:20;
150:2;152:9,10;
154:24;157:2,2;
163:25;164:1,3,5;
166:17;169:11,12,17;
171:24,25;172:25;
174:6,7,9,15;180:14;
181:25;187:3;
190:18;193:1,2;
196:17;203:21;
216:14;217:15
**parent (2)**
23:14,17
**parental (2)**
144:11;148:14
**parents (11)**
23:9;135:9;139:9;
159:2,5,14;160:4,10,
12;161:14;212:24
**parents' (2)**
48:15,19
**part (48)**
9:9;17:6;19:17;
20:25;21:3,9;23:5,10,
12,20;24:7,14,16;
25:9;28:8;35:20;
40:19;42:5;43:2,13,
25;47:15,19;48:25;
49:6,9;53:3;60:24;
67:15;68:3;72:14;
84:24;91:22;96:21,
23;100:19;116:23;
153:19;155:25;
167:23;172:13,17;
180:8;195:18;207:9,
10,18;212:23
**participants (1)**
208:19
**participate (1)**
56:17
**participated (1)**
26:17
**participation (1)**
169:4
**particular (28)**
9:21;11:3;38:17;
45:21;47:7,8;48:7;
64:13;74:5,20;75:4;
76:2;83:13;98:11;
99:4;101:6,23;
102:13;114:2;134:8;
137:14;138:6;140:2;
144:7;159:15;180:2;
199:17;215:9
**particularly (5)**
43:12;119:12;
121:9;122:19;154:14
**parties (6)**
29:22;118:23;

119:3;140:20;
219:24;220:1
**partisanship (2)**
112:14;113:20
**parts (3)**
191:12;193:15;
202:1
**party (7)**
118:15,16,25;
119:20;138:14;
206:14
**pass (2)**
16:4;143:2
**past (7)**
17:2;26:24;99:7;
147:12;159:5;191:9;
214:15
**path (1)**
190:7
**patient (49)**
21:6;23:3;33:23;
34:1,2;36:24;38:17;
40:9;41:8;42:20;
43:22;44:2,15;46:4,
7;47:8,13;59:21;
60:12,16;76:24;
80:12;106:4;107:13;
108:15;111:18;
122:14;131:21;
147:15;156:12,15;
157:24;158:12;
163:7;174:19;
175:17;176:24;
178:5;179:1,9,25;
180:1,12,25;185:25;
187:16;193:22;
196:19;197:10
**patients (96)**
11:16;21:8,22;
22:2;23:10;35:3,8,11,
16,22;37:4,14;40:6,8,
14,18;41:7;42:7,9,24;
43:3,15;44:24;46:2;
48:24;49:6,11,20;
55:10;56:6,8,10,11;
58:18,22;59:1,18,22;
61:1,17;62:20;67:5;
73:22;76:5,5,16,18;
77:18;99:4;106:7,25;
115:1;126:13;
144:10;153:5;
154:16,17;157:7,10,
12,15;158:1,7,10,17,
21,23,24;159:14,15;
160:1,4,21;161:15,
24;162:10,14;163:12,
12,17,18;164:12;
165:8;167:9;175:18;
177:4;183:17;
186:12;187:5,13;
188:4;189:6;191:17,
19;194:2,4
**patients' (1)**

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 74 of 84 PageID #: 3612

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

108:20
**patient's (4)**
   108:7,11;182:16;
   191:23
**patterns (5)**
   187:6;188:1,2,25;
   189:16
**Patterson (26)**
   4:19,22;13:17,19,
   21;16:8;28:14;45:6,
   14;57:5,22;59:3;
   71:10;72:4;84:21;
   85:7;90:22;128:2;
   151:18,20;200:21;
   201:11;217:20,25;
   218:7,10
**Paul (2)**
   19:12;85:14
**pause (3)**
   167:16;168:10,15
**pay (1)**
   87:8
**PDF (6)**
   7:25;68:6;155:12;
   167:25;198:17;211:6
**peace (4)**
   154:17;159:20;
   162:7;200:1
**pediatric (3)**
   47:12;144:24;
   145:4
**Pediatrics (6)**
   117:13;119:14;
   139:8;143:24;
   144:21;145:13
**peer (2)**
   93:15;118:20
**pejorative (1)**
   192:23
**pen (1)**
   6:10
**pending (1)**
   6:4
**people (119)**
   21:2,5;33:5;36:3,6;
   37:20;38:12,22;
   39:12;40:1,11;41:10;
   42:17;43:7;49:3;
   50:5;51:25;54:25;
   55:13,14,15;63:23;
   64:16,17;66:2;67:19,
   22;69:12;72:18,22,
   25;78:5,22;80:23;
   81:23,25;82:5;83:25;
   84:16,19;85:18,20,
   24;86:8,14,17,24;
   87:7,10;88:23;89:1;
   90:15,17;92:17,20,
   24;95:13;97:9;99:10,
   11;101:8;103:15,19;
   105:4;110:18;111:8;
   112:2;113:8;118:14,
   16,19;124:4,17,19;

125:5,6;127:13,22;
   129:4,5,7,11,23;
   130:4,18,21;139:2,9;
   142:24;143:10,16;
   152:23;153:12;
   155:8;159:18;
   162:21,21,22;164:16;
   165:6;170:5;175:11;
   177:12;183:12;
   188:24;189:3,13,17;
   191:5,16;194:8;
   200:5,20;202:21;
   208:16;211:15;
   214:23;215:13;
   217:15
**people's (3)**
   103:12;106:15;
   128:23
**per (2)**
   77:16;217:15
**perceive (1)**
   169:12
**percent (5)**
   184:13,18;185:6,8,
   23
**percentage (1)**
   32:16
**perfectly (1)**
   108:16
**perform (1)**
   32:11
**performance (1)**
   27:12
**perhaps (10)**
   9:7;12:14;41:2,3,3,
   4;71:24;94:24;159:8;
   185:6
**period (6)**
   26:4;35:9;62:3;
   75:18;107:14;183:16
**permanent (3)**
   62:14;145:9;
   185:12
**permanently (1)**
   147:21
**persisted (1)**
   133:2
**persistent (1)**
   183:15
**person (32)**
   26:5;36:23;41:24;
   44:3,21,23;45:22;
   48:11;52:15;53:25;
   54:16;64:22;76:11,
   12;97:16;106:18;
   111:19;113:11;
   115:19;133:18;
   162:4;164:21,23;
   165:3;168:21,24;
   176:20;178:10;
   188:21;196:25;
   203:8;219:22
**personal (3)**

76:22;174:8,11
**personalities (1)**
   82:2
**personality (2)**
   80:5;170:20
**personally (3)**
   98:10;168:24;
   214:6
**person's (3)**
   185:2,12;197:7
**perspective (3)**
   126:12;143:25;
   159:11;170:25;
   174:20,22
**pertain (1)**
   29:12
**pertaining (3)**
   30:20;45:10;
   137:20
**pertains (2)**
   63:14;154:22
**pertinent (2)**
   42:7;156:20
**Peterson (2)**
   205:25;206:13
**pharmaceutical (1)**
   99:9
**pharmacologic (1)**
   128:24
**pharmacology (2)**
   126:1,15
**phenomenon (2)**
   21:2;113:24
**philosophy (1)**
   159:25
**phone (1)**
   49:18
**photo (4)**
   168:2;205:9,10;
   206:18
**physical (11)**
   41:2,5;42:11;
   62:17;152:17,20;
   153:17;154:7;
   159:18;195:19;
   197:22
**physicians (2)**
   90:7;167:8
**physiology (1)**
   196:2
**piece (1)**
   6:10
**pigeonhole (1)**
   215:9
**pin (1)**
   146:25
**Pinker (1)**
   97:3
**pinning (1)**
   146:20
**place (12)**
   53:1;62:6;67:4;
   93:8;98:20;99:20;

108:4;183:14;
   198:12,19;215:19;
   219:10
**places (6)**
   77:11;82:7;87:7;
   98:8;158:19;177:18
**plaintiffs (7)**
   4:10;8:18;14:18;
   15:12;18:17;45:10;
   219:10
**plaintiffs' (1)**
   18:21
**Plaintiff's (1)**
   15:9
**plan (4)**
   6:6;43:4,13;163:8
**plastic (1)**
   78:2
**plausible (6)**
   94:5,11;95:3,10,17,
   19
**play (2)**
   128:19;144:14
**Please (20)**
   5:18;7:24;77:2;
   84:3;93:20;96:5;
   149:20;155:4,12;
   157:1;163:25;
   167:24;169:10;
   171:24;174:6;
   181:23;187:2;
   190:18;196:16;
   210:25
**plenty (3)**
   11:18;71:12;
   173:20
**plus (1)**
   35:8
**pluses (1)**
   64:13
**PM (8)**
   109:9,13;151:22;
   152:1;203:15,19;
   218:1,5
**point (14)**
   25:4;27:8;34:10;
   66:13;78:5;79:16;
   81:19;99:15;100:10,
   19;115:14;125:25;
   135:3;176:20
**pointed (1)**
   70:2
**pointing (1)**
   78:21
**points (1)**
   151:7
**policing (1)**
   123:8
**policy (1)**
   130:8
**policymakers (1)**
   167:10
**political (37)**

118:11,15,16,23;
   119:3,4,20;120:13,
   24;122:4,10;137:20,
   24,25;138:10,12,13,
   15,17,23;139:6,12,
   20;140:3,7,13,17,20,
   23,25;141:4,7,15,18;
   142:2,4;143:4
**politicians (2)**
   214:19;216:15
**politicized (9)**
   118:8;119:8;120:4;
   122:20;123:8,20;
   126:24;139:23,25
**politics (3)**
   119:16,25;138:6
**polls (4)**
   118:19,22;119:19,
   20
**pool (1)**
   186:12
**poor (1)**
   106:5
**popular (2)**
   111:16;115:17
**popularity (1)**
   81:9
**population (12)**
   58:16;99:20;
   110:11;111:18;
   156:12,15;157:16,24;
   161:8;185:25;
   193:22;197:10
**populations (2)**
   96:1;170:19
**portion (7)**
   45:2,12;85:5,8;
   198:23;209:15;210:4
**portions (2)**
   31:2;45:9
**portray (1)**
   141:13
**position (2)**
   90:4;138:2
**positive (4)**
   42:4;58:20;190:24;
   213:23
**positives (1)**
   125:11
**possibility (2)**
   43:7;106:10
**possible (13)**
   46:7;83:23;84:2;
   107:24;126:18,23,25;
   148:15;168:16,19;
   179:3;188:18;203:7
**possibly (8)**
   57:3;62:7;95:14;
   141:6,6;148:24;
   184:22;196:25
**post (3)**
   39:15,16;51:21
**posted (1)**

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 75 of 84 PageID #: 3613

K.C., et al. VS                                                                KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                          June 1, 2023

206:13
**potential (3)**
  82:25;146:9;
  147:16
**potentially (4)**
  130:6;131:5;
  167:23;188:8
**power (1)**
  119:4
**powerful (1)**
  213:13
**practice (23)**
  22:14,15,20;23:6,
  10,13;27:13;34:11,
  13,16,19;37:22;40:5;
  41:17;42:13;51:19;
  52:2;100:25;104:20;
  162:9,17;166:2;
  201:15
**practices (2)**
  43:9;163:16
**practicing (3)**
  34:4,15;115:8
**practitioner (1)**
  126:12
**practitioners (2)**
  89:6;128:15
**preamble (1)**
  67:12
**predicated (1)**
  60:24
**predict (2)**
  184:13,18
**predicting (1)**
  187:19
**prediction (1)**
  200:16
**prefer (11)**
  55:3,16,16;61:16;
  102:8;104:4;128:8;
  129:18;165:15;
  184:2;196:19
**prep (1)**
  16:15
**preparation (2)**
  17:18;18:2
**prepare (3)**
  16:12;17:23;20:4
**prepared (3)**
  16:3;86:16;102:18
**preparing (1)**
  18:15
**prepuberty (2)**
  132:23;135:11
**prescribe (4)**
  23:5;39:17,21;
  115:12
**prescribing (2)**
  23:8;115:22
**prescription (7)**
  96:10,15;98:5,12;
  99:23;102:11;115:7
**presence (1)**

51:20
**present (12)**
  37:20;40:25;82:14;
  87:14;104:23;106:7;
  114:5;125:7;177:4;
  210:9,11;219:11
**presentation (5)**
  26:6;82:20;88:12;
  89:9,20
**presentations (8)**
  25:22;26:7,8;
  79:25;80:9,13;81:13;
  125:13
**presented (14)**
  75:20;85:16,18;
  87:7;88:6,8,12,15,17;
  210:12,14,16;212:1;
  219:17
**presenters (1)**
  210:8
**presenting (7)**
  72:18;78:18;82:18;
  87:3,13;178:2;210:3
**presents (5)**
  39:22;40:10;
  116:18,20;178:5
**press (7)**
  53:23;54:20;110:5;
  117:18;139:4;142:5,
  6
**pressure (3)**
  99:12;175:14;
  177:17
**pressured (1)**
  217:13
**pressures (3)**
  115:12;175:1;
  177:11
**presumptively (1)**
  84:25
**pretending (1)**
  111:2
**pretty (8)**
  5:25;41:11;71:14;
  77:15;81:6;94:23;
  97:24;115:23
**prevent (1)**
  5:10
**Prevention (1)**
  209:22
**previous (1)**
  68:25
**previously (5)**
  25:13;53:22;72:21;
  125:24;154:2
**primary (13)**
  57:10,12,16,17,18;
  76:4;102:24;110:22;
  121:12,15;122:5;
  139:15;195:2
**prime (1)**
  98:17
**principles (2)**

102:13;193:14
**print (1)**
  69:16
**printout (1)**
  167:2
**prior (10)**
  15:21;29:2,10,25;
  62:10;75:4;88:18;
  153:15;217:7,14
**priorities (2)**
  121:3;122:7
**prioritize (1)**
  160:7
**prioritized (2)**
  122:20;139:14
**prioritizes (1)**
  152:15
**priority (2)**
  121:4,23
**private (1)**
  90:14
**privilege (1)**
  28:15
**Prize (2)**
  111:19;113:7
**probable (4)**
  94:5,11;95:3,7
**probably (15)**
  9:23;34:16;35:14,
  15;51:11;88:25;
  114:12,15;123:13;
  126:17,21;128:12;
  154:11;177:18;206:6
**problem (7)**
  28:18;67:23;
  106:13,14;110:24;
  147:19;206:25
**problematic (4)**
  103:22;111:5;
  183:19;208:11
**problems (27)**
  62:18;66:5;67:19;
  69:11,13;80:1,9,17;
  83:3,6;111:12,18;
  128:23;136:20;
  162:24,25;163:1,2,3,
  4,5;175:22;184:22;
  191:20;194:7;200:2;
  209:25
**procedure (4)**
  48:6;147:10,18,25
**procedures (1)**
  148:18
**PROCEEDINGS (6)**
  22:9;66:17;109:11;
  151:24;203:17;218:3
**process (17)**
  18:15;62:1,21;
  63:3,23;64:1,4,8,11;
  65:11;66:2;105:24;
  106:11;155:25;
  178:19;181:8;192:16
**proclamations (1)**

128:18
**professional (15)**
  24:15,18;50:18,24;
  52:20;53:9;54:11;
  55:21;58:3;100:7;
  110:17;119:24;
  120:10;124:23;
  211:22
**professionals (5)**
  62:5;155:17,22;
  167:9;202:5
**professor (1)**
  8:7,9;31:11
**proffered (1)**
  19:7
**profile (3)**
  41:13;205:24;
  206:21
**program (1)**
  23:25
**programs (2)**
  27:8;33:1
**prohibit (1)**
  57:20
**promote (2)**
  40:22;211:23
**promoting (2)**
  109:18;170:11
**promotion (2)**
  8:7,9
**prompted (1)**
  31:14
**pronouns (12)**
  108:15;162:4,11;
  178:8,9,16;179:4,16;
  180:23;192:5;209:2,
  6
**pronunciations (1)**
  111:25
**proper (10)**
  61:25;63:3;64:1,4;
  66:1;107:1,11;198:9;
  207:3,14
**properly (1)**
  42:13
**proponents (3)**
  132:3,25;192:14
**proportion (1)**
  188:18
**proportional (1)**
  111:6
**proposals (1)**
  53:16
**propose (1)**
  62:21
**proposed (1)**
  106:25
**Protect (1)**
  167:10
**protocol (3)**
  132:18;133:5;
  156:23
**proven (1)**

194:10
**provide (18)**
  23:12,14;48:14;
  86:16;87:10;96:9;
  107:24;120:5,6;
  121:16;141:2;
  145:17;160:1;
  173:12;181:2,18;
  185:9;201:9
**provided (14)**
  8:14,17;45:21;
  47:12,22;68:20;70:7,
  9;72:3,17;74:12;
  122:9;200:11;204:12
**provider (1)**
  176:14
**providers (1)**
  115:7
**providing (11)**
  5:11;22:24;23:15;
  43:21;47:3;58:6;
  108:2;120:8;125:21;
  127:9;141:10
**provision (5)**
  61:4;62:22;64:5;
  148:8;184:16
**psychiatric (23)**
  21:10;22:24;23:13;
  26:14,18;46:11,13;
  49:7,22;69:14;93:10,
  15;107:2,4;113:10;
  117:15;119:13;
  121:6;123:10;
  126:12;153:4;
  163:11;188:2
**psychiatrist (15)**
  56:12;75:7,10,11;
  104:14,22;113:4,19;
  114:1,16;134:15;
  157:11;162:19;
  192:4;205:13
**psychiatrists (22)**
  79:25;80:9;84:6,
  15;86:9,13;89:23,25;
  90:6,18;113:16,23;
  114:13,20;120:24;
  122:10;174:8,12;
  177:25;178:2;
  180:15,15
**psychiatrist's (1)**
  46:18
**psychiatry (51)**
  20:9,12,14,22,22;
  21:1,7,10,16,21;
  22:14,15,20,21;23:6;
  24:22;25:1,18;27:15,
  24;31:25;34:5,7,8,23,
  24,25;35:1;47:20;
  75:9,9;85:16;86:13;
  87:4,5,12,17,21,22;
  88:8;89:13;101:16;
  102:3;104:10;114:6;
  119:21;120:23;

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 76 of 84 PageID #: 3614

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

121:6;122:8;172:2;
211:15
**psychological (4)**
62:16;154:6;
194:23;195:8
**psychologically (1)**
182:23
**psychologist (2)**
113:6,6
**psychopharm (1)**
126:4
**psychopharmacology (5)**
126:10,11;127:16;
128:14;129:10
**psychosis (1)**
162:22
**psychosocial (1)**
186:13
**psychotherapeutic (5)**
46:12;48:23;107:5,
23,25
**psychotherapies (1)**
193:3
**psychotherapist (1)**
196:19
**psychotherapy (21)**
23:12;39:23,24;
40:11;42:22;46:13,
16;107:15;130:6;
170:18;186:13;
187:4;190:20;
191:15;192:1,8;
193:15,17;194:1,5;
198:11
**PTSD (1)**
162:23
**puberty (14)**
47:14;116:24;
132:15;133:3;181:3;
187:17;188:7,15,19,
20;189:9;190:2,8;
208:21
**public (9)**
30:16,19;54:7;
57:15;90:7;96:19;
119:22;219:4;
220:7.5
**publication (3)**
52:23;53:1;93:10
**publications (1)**
7:9
**publicity (1)**
117:19
**publicly (3)**
54:8;84:7,17
**publish (1)**
117:22
**published (11)**
50:7;118:20;
132:20;170:1,3;
171:5,11,17;172:9,
10,23
**Puerto (4)**

85:17;87:1,9;
204:14
**pull (18)**
6:15;7:13;8:21;
10:8;13:6;15:3;31:5;
66:22;68:5;74:9;
94:3;114:18;149:19;
152:4;155:4;166:25;
198:15;204:25
**pulling (1)**
114:19
**purport (1)**
219:18
**purposes (2)**
12:25;209:13
**push (7)**
117:7,25;118:3;
119:1;121:4,21;
190:21
**pushed (1)**
175:8
**pushing (3)**
115:11;117:10;
121:20
**put (14)**
95:17;101:12;
110:16;114:4,12;
116:14;119:10;
120:2,21;121:12;
124:11;149:15;
151:8;175:15
**putting (2)**
163:8;165:25

**Q**

**qualifications (1)**
195:20
**qualified (4)**
63:8;121:10,14;
201:24
**qualify (2)**
40:5;62:24
**qualities (1)**
157:13
**quality (5)**
65:1;150:14;
151:10;169:1;185:13
**questioner (3)**
11:10,13,17
**quickly (1)**
81:17
**quite (18)**
8:12;21:3,12;
52:17;96:25;108:5;
128:12;145:2;
146:18;160:21;
170:25;171:13;
188:3;189:5;193:17,
20;194:9;208:19
**quote (3)**
206:17;207:11,18
**quotes (2)**

116:14;124:11

**R**

**race (15)**
101:2,7,18,19,23,
24;103:11,18,19;
104:5,22;123:3,23,
23;126:22
**radical (1)**
167:11
**Raga (1)**
85:15
**raise (4)**
146:9;164:6;
166:24,24
**raises (2)**
147:23;149:8
**ran (1)**
76:11
**randomized (1)**
43:16
**range (3)**
20:20;215:6,12
**ranking (1)**
122:7
**rare (4)**
51:16;156:17,19;
201:23
**rate (3)**
77:13;79:7;171:20
**rates (1)**
156:14
**rather (18)**
55:23;60:16;
100:21,24;101:18;
106:3;108:11;
110:20;121:25;
122:4;123:22;128:9;
142:20;162:1;
168:24;169:3;199:4;
202:20
**rational (2)**
189:11,21
**rationality (1)**
97:4
**Rauch (3)**
96:23;97:2,15
**reach (6)**
28:20,23;29:19;
71:20;89:9,10
**reached (2)**
89:18;132:15
**react (1)**
183:5
**read (36)**
9:15;10:19,21;
11:7,22,24;12:18,19;
16:16,16,17,18;
68:21;70:6,8,15;
72:14;74:14;114:15,
16;167:13;173:12;
177:22,23;198:24;

200:8;205:4,8,23;
206:8;212:19,20;
213:5,9,17;215:2
**reading (6)**
18:1;180:12;
198:23;206:7;
213:12;214:8
**real (6)**
26:1;67:9,14;
68:15;71:1;128:17
**realistic (3)**
156:11;188:25;
189:19
**realities (1)**
131:2
**reality (1)**
129:4
**realize (1)**
141:23
**realizing (2)**
72:9;115:20
**really (36)**
51:23;66:9;83:15,
24;94:25;95:13;
98:16;103:13;
110:25;123:24;
127:12;128:11,12;
133:23;136:3;
138:23;141:14;
149:1;156:19;
158:15,23;159:12;
165:24;170:6;
182:21;185:16;
186:19;191:20;
192:13,24;194:10,12,
16;195:14,21;213:22
**realm (5)**
47:21;58:5;103:3;
113:8;144:21
**reason (11)**
5:13;74:5,20;
120:5,7;134:22;
158:16;174:24;
194:2,14;205:19
**reasonable (4)**
65:22;67:18;
108:17;196:18
**reasonably (1)**
63:21
**reasoned (1)**
144:1
**reasoning (1)**
112:13
**recall (28)**
10:12;13:8;14:23;
17:1;24:12,16;35:20;
43:25;47:15;48:11,
25;49:9;52:21,23,25;
68:9;72:19;73:24;
164:3;169:22;174:9;
201:23;203:24;
206:5,7,19;208:6;
210:21

**receipt (1)**
60:5
**receive (6)**
23:23;24:19;64:11;
164:13
**received (3)**
24:7;147:11;173:3
**receiving (4)**
58:23;59:12,20,23
**recent (3)**
93:23;94:16;96:25
**recently (7)**
13:11;33:20;52:17;
77:19;156:13;
179:25;198:20
**receptiveness (1)**
90:10
**RECESS (3)**
22:8;66:16;109:10;
151:23;203:16;218:2
**recklessly (1)**
115:9
**recognize (5)**
6:18,19;7:16;8:23;
187:5
**recommend (10)**
39:17,22;40:9,11,
14,17;59:14;135:15;
155:16;161:19
**recommendation (3)**
134:1,5,6
**recommendations (2)**
150:7;160:2
**recommended (1)**
133:1
**recommending (2)**
40:6;43:9
**record (25)**
4:21;6:1;22:6,7,9,
11;59:2;66:15,17,19;
71:25;109:9,11,13;
151:14,22,24;152:1;
203:15,17,19;218:1,
3,5;219:15
**records (5)**
18:17,18,21,25;
19:2
**recrimination (1)**
86:18
**Reddit (1)**
82:6
**redo (1)**
27:23
**reduced (1)**
219:14
**reduces (1)**
148:1
**reducing (2)**
154:18;174:3
**refer (4)**
31:4,9;153:15;
209:2
**referenced (3)**

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 77 of 84 PageID #: 3615

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

80:14;123:15;
137:16
**references (1)**
141:10
**referencing (1)**
107:6
**referral (1)**
42:21
**referrals (2)**
78:24;79:8
**referred (3)**
19:17;79:4;179:24
**referring (12)**
16:19,23;56:7;
77:23;79:22;81:3,21;
99:22;100:5;155:9;
159:18;171:9
**refine (1)**
11:25
**refined (1)**
10:5
**reflect (4)**
68:3;80:20;100:11;
117:22
**reflected (1)**
11:24
**reflecting (3)**
70:4,16;97:12
**regard (2)**
56:6;161:5
**regarding (43)**
18:18,19,24;21:25;
25:4;36:22;43:17,22;
46:18;47:2,9;48:23;
52:18;53:11;54:10,
10;60:14;65:2;67:3;
82:22;90:5;91:1;
96:11;98:16;99:8;
110:14,21;123:16;
126:4;129:21;
149:13;150:4,12;
154:13,16;156:12;
158:10;170:18,19;
179:1;196:6;207:12,
12
**regards (1)**
109:22
**Regenerist (1)**
118:18
**regular (8)**
90:14;126:12;
128:15;145:4;
191:14,17;192:1,8
**reject (1)**
206:14
**rejected (3)**
171:12,19;191:10
**rejection (1)**
171:20
**related (30)**
19:4;26:16,18,21;
27:5,15,18;41:11;
53:23;58:2;61:21;

78:14,16;79:10;
81:10;100:21;101:1;
113:13;114:8;153:1;
155:1;163:2,4;
172:20;173:25;
178:18;182:19;
187:25;196:1;202:2
**relating (1)**
163:5
**relation (1)**
170:17
**relationship (3)**
41:24;44:7;80:4
**relative (2)**
122:7;219:23
**release (3)**
99:13;142:6,6
**releases (3)**
110:5;117:18;
139:5
**religious (1)**
191:12
**rely (1)**
157:9
**relying (1)**
157:5
**remain (3)**
55:17;108:10;
141:22
**remained (1)**
31:17
**remaining (1)**
189:18
**remarkable (3)**
67:5;79:18;95:13
**remember (19)**
17:3;38:16;44:8;
48:12;49:16;53:3;
59:6;68:22;87:24,25;
122:24;139:17;
166:14;173:16;
198:21;201:21;
205:17,18;216:25
**removal (2)**
112:8,10
**remove (1)**
172:11
**repeat (2)**
91:4;201:1
**repeatedly (1)**
75:8
**report (55)**
7:19,19;8:4,14,18,
19;9:1,6,12,21,25;
10:4;16:16;17:20;
18:25;19:3;53:10;
55:11,19;73:21;
74:12;77:12;78:14;
79:24;86:23;94:2,10;
95:2,21;99:8;100:20;
110:16;114:5;120:2,
21;126:1;149:16,17,
23;150:3,9,16;151:1,

9,12,15;155:9;165:6;
170:2;177:9;179:13;
180:8;193:16;
194:11;211:3
**REPORTER (1)**
22:3
**reporting (2)**
67:6;156:17
**reports (4)**
18:1;53:16;54:5,6
**represent (2)**
146:23;210:9
**representation (1)**
60:25
**represented (1)**
84:18
**representing (1)**
86:23
**Republican (2)**
118:25;138:7
**reputable (2)**
77:15;176:9
**request (2)**
89:18;165:9;
178:15;179:9
**requested (1)**
108:15
**require (1)**
69:11
**requires (10)**
67:10,15;68:15;
69:4,9,18;70:12,17;
71:2;72:8
**research (18)**
11:19;32:11;49:24;
50:2,4,9,12,14;65:15;
157:14;160:23;
161:1,2,4,16,18,20;
186:6
**researchers (2)**
154:8;173:1
**residence (1)**
220:11.5
**residencies (1)**
34:22
**residency (10)**
20:20;23:24;24:4,
22;25:1;34:6,7,14,18;
35:5
**resident (2)**
33:7,24
**residents (5)**
33:4;75:19;76:3;
86:3,4
**resolution (3)**
190:23;197:2,21
**resolve (4)**
196:24;197:12;
198:1,4
**resolved (3)**
15:18;196:25;
197:7
**resolves (1)**

197:17
**respect (3)**
65:16;132:22;
144:24
**respectful (3)**
55:17;139:8;
141:22
**respective (1)**
220:1
**response (4)**
6:1;116:4;183:2;
197:15
**responses (2)**
5:11,24
**responsibilities (2)**
32:14;33:12
**rest (3)**
29:12;71:13;
209:18
**restrictions (1)**
142:9
**result (3)**
115:2;199:17,18
**results (1)**
56:23
**retained (1)**
31:18
**retake (1)**
27:22
**retract (1)**
50:12
**retributions (1)**
84:10
**retrospect (1)**
111:20
**reveal (3)**
46:4;86:21;141:16
**revealing (1)**
45:25
**review (18)**
12:1;17:22;18:4,7,
10,16,21,23;19:4;
27:17,18,20;28:2;
88:4;166:20;167:17;
168:10;177:20
**reviewed (4)**
18:18;19:1;70:1;
93:15
**reviewing (2)**
150:24;210:23
**reviews (3)**
27:10;150:11;
164:8
**revolve (1)**
91:21
**Rico (3)**
85:17;87:1,9;
204:14
**rid (1)**
130:22
**right (59)**
4:17;13:11;14:3;
22:16;23:1;33:23,24;

35:16;46:5;55:1;
60:20;72:13,14;76:2,
19;77:9;79:9;81:7,
12;88:5;90:1;91:19;
92:6;95:2;115:18;
123:14;130:15,25;
132:16;135:1,7,20;
139:24;140:18;
142:13;145:1;
154:12;163:21,23;
165:22;169:23;
170:9;173:21;
174:13;176:16;
179:9;182:24;184:5;
187:21,23;188:13,16;
189:10;190:4;
194:19,22;202:18;
204:14;205:22
**rights (2)**
119:7;144:11
**rigor (1)**
99:11
**rigorous (6)**
98:8;99:16;100:13,
22;101:19;102:9
**rise (5)**
67:5;79:18;81:13;
112:1;156:21
**risk (5)**
41:12;62:17;147:9,
10;185:20
**risks (9)**
60:8,10,11;61:14,
18,21;62:17,23;63:6
**road (3)**
108:4;186:18;
192:13
**robust (2)**
98:17,19
**role (9)**
32:5;33:2,6,11,21;
155:24;200:19;
201:4;202:14
**roles (2)**
32:22;215:5
**roll (2)**
38:14;161:9
**rom (1)**
91:17
**romantic (1)**
91:18
**room (3)**
23:17;88:25;
215:21
**Rose (1)**
4:12
**roughly (1)**
33:11
**Round (1)**
35:7
**rubes (1)**
130:19
**run (1)**

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 78 of 84 PageID #: 3616

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

24:4

**S**

**safeguarding (1)**
55:8
**safeguards (1)**
63:25
**safety (1)**
111:7
**Saints (1)**
205:11
**Saint's (1)**
205:12
**SAITH (1)**
218:14
**same (27)**
5:25;10:6;30:8;
33:12;39:4;65:18;
73:12;81:7,12;89:3;
90:13;94:19,23;97:3;
137:13;138:21;
151:10;153:18,19;
169:3;171:2;184:16;
186:17;203:1,4,4;
216:4
**sanctioned (1)**
50:21
**Sanderson (2)**
85:15;172:7
**Saudra (1)**
85:13
**saw (7)**
12:11;36:3;68:24;
71:13;76:24;119:20;
204:22
**saying (31)**
63:2,18;65:10;
70:8,11,13;85:4;
94:18,23;95:7,18;
108:16;115:10;
118:7;123:18,23;
130:17;138:15,15;
156:7;161:3;177:5;
183:18;184:21;
185:22,23;187:16,18;
200:24;201:23;216:7
**scene (2)**
81:8,11
**sceptic (1)**
205:14
**SCHERER (1)**
169:19
**scholarly (8)**
57:14;98:15;99:6;
101:9;102:15;
169:13,22;173:20
**school (9)**
20:19;21:11;23:24;
24:8,23;25:9;34:17;
91:21;163:4
**Science (9)**
31:12;97:10,13;

100:13,17,22;103:4,
23;111:3
**scientific (10)**
92:14,19;97:10;
98:8;100:23;102:9;
103:13;112:3;
120:19;182:15
**scientist (1)**
96:21
**scope (1)**
57:6
**screen (1)**
43:4
**scroll (14)**
7:4,23;13:23;
90:21;93:19;149:21;
167:24;181:23;
204:2;205:22;
206:11;207:21;
209:17;212:17
**seal (1)**
220:3
**search (3)**
99:24;102:15;
104:24
**second (11)**
14:1,2;43:21;44:5;
45:22;46:10;119:21;
124:10;193:3;
204:24;209:24
**secondary (8)**
57:15;58:9;77:5,
22;78:3,10,19;196:1
**secondhand (1)**
177:20
**secondly (1)**
156:20
**section (5)**
24:23,24;156:3;
167:7;214:11
**sections (1)**
27:18
**sects (1)**
191:12
**seeing (3)**
36:6;38:21;76:5
**seek (4)**
12:21;104:6,23;
155:18
**seeking (6)**
72:25;77:4,18,21;
78:9;189:18
**seem (15)**
53:17;61:23;80:22;
89:24;117:22;
121:24;123:10;
125:9;138:16,21,22;
183:12,18;188:3;
197:16
**seemed (5)**
10:21,22;11:7;
48:7;124:6
**seemingly (1)**

80:1
**seems (26)**
48:4;54:23;68:2;
81:14;92:18;94:22;
110:7;118:5;122:2;
133:11;136:11;
138:10;139:4,12;
143:7;147:10;
166:17;170:25;
174:25;175:7,14,16;
192:13;206:24;
207:2,13
**sees (1)**
61:8
**SELDIN (72)**
4:6,9,19;7:4,13,23;
8:21;10:8;13:6,15,19,
23;14:4;15:3,25;
22:6,12;45:6,20;
66:12,20,22;68:5;
74:9;77:1;79:13;
84:3,25;85:10;93:19;
94:3;96:4;108:23;
109:7,14;137:17;
143:20;149:19;
151:16;152:2,4,8;
155:4,11;156:25;
163:24;166:25;
167:24;169:9,18,20;
171:23;174:5;
181:22;187:1;
190:17;192:25;
196:15;198:15;
201:16;203:11,20,22;
204:2,25;206:11;
207:21;209:11;
210:25;212:17;
217:20;218:6
**selected (1)**
117:21
**selectively (1)**
180:17
**self (3)**
131:22;154:7;
164:6
**self-defeating (3)**
187:8,12;188:8
**self-harm (1)**
80:5
**self-select (1)**
124:21
**self-selected (1)**
127:9
**Senate (9)**
30:13,17;56:19;
57:19;63:12,16;
141:3;186:5;208:23
**senior (2)**
44:11;168:2
**sense (8)**
65:3;92:21,24;
93:3;129:22;164:6;
176:21;181:9

**sensible (1)**
135:7
**sensitive (1)**
84:8
**sentence (7)**
77:20;112:13;
114:25;122:17;
187:4;193:3;217:2
**separate (3)**
44:3;202:22;204:9
**separately (1)**
204:19
**serious (2)**
111:18;147:17
**served (1)**
128:20
**serves (1)**
119:2
**service (1)**
76:12
**services (4)**
77:4,18,21;78:10
**session (3)**
13:25;88:23
**set (2)**
39:4;220:2
**setting (4)**
4:16;45:17;47:8;
64:8
**settled (4)**
92:15,19;111:3,10
**seventeen (11)**
35:15,19,22;39:12;
44:3;56:8,11;158:1;
181:10,15,18
**several (2)**
157:3;200:22
**sex (24)**
77:5,22;78:3,10,19,
23;133:17;134:20,
23;135:5;136:16;
137:13;152:21;
153:17;172:25;
190:23;196:1;197:1,
22;199:12,20;200:1,
7;208:17
**sexed (1)**
152:17
**sexual (10)**
91:2,5;92:7;180:7,
9;183:1;191:8;
201:20;202:6;214:17
**sexually (2)**
179:15,25
**share (1)**
157:13
**Shared (1)**
213:12
**shield (1)**
182:22
**SHORT (9)**
22:8;66:16;99:25;
109:1,10,15;151:23;

203:16;218:2
**Shorter (1)**
80:14
**short-term (1)**
61:15
**show (8)**
6:13;40:7;80:8;
92:1;142:17;143:21;
194:19;215:1
**showed (6)**
37:15;38:2,18;
39:4;68:7;206:20
**showing (4)**
10:10;72:23;
194:17,18
**shown (1)**
80:3
**shows (4)**
81:25;91:25;131:1;
214:25
**Shumer (5)**
18:5;164:2,7;
167:19;169:2
**side (4)**
52:5;111:24;
141:23;144:2
**sides (1)**
140:21
**signature (2)**
219:17,19
**significant (7)**
43:7;80:7;136:19;
146:19;147:14;
154:15;177:10
**significantly (1)**
33:22
**silence (2)**
41:16,21
**silencing (1)**
207:12
**silly (1)**
89:24
**similar (6)**
77:11;97:1;98:1;
127:15;167:18;
200:12
**simply (2)**
169:3;213:2
**single (2)**
26:3;42:19
**siphon (1)**
71:12
**sit (3)**
26:5;33:5;176:10
**site (2)**
89:7;193:12
**sites (1)**
33:3
**situation (12)**
46:17;47:2;59:16;
131:3;141:19;143:7;
174:24;176:12,25;
178:16;179:12;

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 79 of 84 PageID #: 3617
K.C., et al. VS
The Individual Members of the Medical Licensing Board
KRISTOPHER KALIEBE, M.D.
June 1, 2023

200:14
**situations (5)**
66:11;131:11;
159:10;172:15;
185:18
**six (4)**
26:7,20;27:3;86:7
**sixteen (9)**
35:15,18,22;39:11;
44:2;56:7,11;66:4;
158:1
**sixty (1)**
88:25
**size (1)**
113:11
**skeptical (5)**
81:16;120:9;
127:13;140:24;
167:22
**skepticism (1)**
166:24
**skills (1)**
109:17
**slight (1)**
11:12
**slightly (3)**
9:18,24;37:24
**small (7)**
37:2;61:13;95:25;
115:1,16;128:7;
146:1
**smaller (1)**
28:17
**sober (2)**
141:19;164:8
**soberly (3)**
166:20;167:17;
168:10
**SOC-8 (6)**
152:11,14;154:25;
155:10;156:3,9
**social (49)**
21:3,7,9,13,13,17,
17;42:16;51:8,10,12,
12,17;79:16,17;81:7;
82:9,11;83:18;88:11;
90:25;91:7,11,13;
93:22;94:6,12,15;
95:3,12,15;96:21;
100:8,10,12,16,24;
112:4;122:21;
123:20;133:7;
134:17;155:24;
209:22;210:10,15,17;
216:23;217:18
**socially (6)**
133:24;134:10;
135:10,24;136:7
**societies (2)**
136:9;207:15
**society (9)**
55:13;80:20;
117:12;123:25;

134:19;191:13;
202:1;208:2;216:2
**sociology (11)**
20:18,21,23,24;
21:2,15,16,18;23:19;
112:18,25
**Soh (2)**
173:7,15
**Soh's (1)**
173:12
**solidified (2)**
64:24;190:9
**solution (6)**
83:5,7;105:11;
128:22;136:24;
191:20
**solutions (1)**
128:25
**solve (1)**
69:13
**solved (1)**
67:24
**someone (30)**
40:24;47:23;52:14,
17;61:25;62:11;
64:21;83:15;85:21;
104:16;105:25;
116:17;141:16;
144:15;153:7;165:2,
4;168:13;175:1;
178:19;179:14,14;
180:22;182:22,25;
184:21;195:25;
201:9;208:11,20
**someone's (3)**
115:20;199:16;
203:6
**sometimes (8)**
34:14;38:12;51:22;
69:8;122:2;197:21,
25;211:14
**somewhat (8)**
9:8;10:22,23;
20:21;126:6;145:15;
165:10;214:6
**somewhere (2)**
89:3;172:23
**soon (1)**
217:21
**sophisticated (2)**
109:17;130:21
**sorry (12)**
15:16;18:13;22:3;
53:7;57:12;90:23;
93:8;96:6;130:10;
149:21;169:16;
203:21
**sort (28)**
11:8;13:2;33:25;
39:11;58:9;64:21;
67:17;81:11;97:8;
101:12;103:17;
110:6,16;111:1,17;

113:5;116:10;
118:20;123:8,20;
131:22;149:5;
162:17;167:20;
170:24;195:21;
199:23;207:14
**sorts (5)**
76:4;126:14;
158:19;161:2;178:21
**sot (1)**
70:3
**sought (2)**
27:8;78:22
**sound (3)**
6:6;66:14;205:15
**sounds (7)**
26:20;67:17;
111:20;130:17;
134:7;147:8;154:20
**source (6)**
77:15;82:11;83:10;
154:3;216:23;217:18
**sources (1)**
97:25
**South (2)**
31:22;32:4
**space (3)**
215:25;216:2;
217:11
**speak (13)**
17:17;44:23;45:25;
53:7;54:13;84:6,7,
17;89:23,24;110:16,
19;132:19
**speaker (1)**
89:18
**speaking (5)**
19:18;90:17;128:6;
151:13;186:22
**speaks (4)**
57:22;73:8;163:9;
208:7
**special (6)**
101:7;124:10,14;
127:22;128:1;170:19
**specialities (1)**
119:22
**specialized (1)**
25:7
**specialty (1)**
119:19
**specific (20)**
9:11;20:24;40:19;
73:6;81:23;88:6,7;
161:3,16,20;164:17,
18;169:25;171:3,4,9;
180:1,12;193:4;
194:21
**specifically (15)**
22:19;27:5;46:1;
47:4;54:13;75:12,25;
116:18;117:14;
146:14;163:9;

170:14;173:16;
193:24;210:3
**specifics (2)**
44:25;162:2
**speech (1)**
42:18
**spend (1)**
42:1
**spending (1)**
33:17
**sphere (2)**
76:21;90:8
**spiked-onlinecom (1)**
206:2
**spoke (6)**
17:12;53:6;89:12,
16;123:21;203:25
**spoken (8)**
19:6,9,12,14,22;
89:11,12;160:10
**sports (8)**
41:3;207:1,6;
208:17,24;209:9;
214:20;216:15
**spot (1)**
36:12
**squashed (1)**
53:17
**squashing (1)**
96:20
**SS (1)**
219:1.5
**stable (1)**
184:9
**stakes (1)**
56:1
**stand (2)**
14:22;36:8
**standard (6)**
42:18;67:21;111:1;
147:18;193:3,19
**Standards (3)**
152:12;155:7;
158:6
**stars (2)**
214:20;216:15
**start (7)**
63:19;86:6;93:4;
131:10;199:4;
200:25;213:15
**started (3)**
35:5;36:6,9
**starting (4)**
31:7;63:18;68:12;
161:9
**starts (3)**
7:24;13:25;115:1
**starve (1)**
153:7
**state (16)**
7:20;8:17;9:1;
14:15;28:20;29:19,
23;30:3,5;57:21;

58:24;59:24;60:20;
98:21;219:1,5
**stated (2)**
90:3;166:4
**statement (10)**
68:2;77:8;78:1;
130:8;136:13;137:7;
140:10;142:11;
155:14;202:3
**statements (5)**
30:16,19;54:9;
119:1;151:10
**states (4)**
30:21;74:2,16;
116:5
**statistics (1)**
145:20
**stay (1)**
204:11
**stayed (1)**
198:13
**staying (1)**
173:19
**Stenograph (1)**
219:14
**step (2)**
132:5;165:1
**stereotypes (1)**
213:14
**Steven (1)**
97:3
**Stevie (1)**
4:11
**stick (3)**
73:20;146:24;
147:1
**still (19)**
8:13;9:5;31:19;
36:8;44:6,10;63:5;
73:18,19;90:23;99:5;
133:1;162:3;164:25;
166:1;170:8;181:8;
200:10;203:8
**Stock (1)**
85:13
**stop (4)**
58:11;59:14;
134:22;211:25
**stopped (1)**
31:10
**stopping (2)**
31:7;172:19
**stories (3)**
213:9,10;214:8
**straight (5)**
91:12,13;92:1,4,6
**strategy (1)**
182:22
**strict (1)**
66:6
**strong (6)**
41:12;51:11;72:9;
82:4;119:1;194:12

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 80 of 84 PageID #: 3618
K.C., et al. VS                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                        June 1, 2023

**strongly (2)**
142:17;183:13
**struggles (1)**
194:6
**Stuart (1)**
97:7
**students (4)**
33:3;75:19;76:4;
167:9
**studied (3)**
193:10,11;196:14
**studies (13)**
43:17;141:10;
154:20;161:9;186:1,
15,23;193:21;
194:19;196:6,9,10,12
**study (9)**
27:25;137:14;
142:17;173:23;
186:16,20;194:17,18,
21
**studying (3)**
186:11,12,14
**stuff (6)**
24:2;41:6;52:18;
53:24;117:18;125:10
**subgroups (1)**
82:3
**subject (4)**
50:18;51:2;84:7;
133:9
**submit (4)**
12:2,5;53:16;
104:16
**submitted (7)**
6:20;8:3,4,14;
18:10;171:10,16
**Subsection (2)**
152:14;154:24
**substantial (1)**
194:12
**substantiate (1)**
9:18
**substantive (1)**
70:3
**successful (1)**
145:20
**sued (1)**
50:16
**suffer (2)**
188:23;196:20
**suffering (6)**
189:16,17,22;
190:2,11,13
**sufficient (10)**
65:14,15;83:18,21;
99:3;150:6;162:17;
163:15;177:9;198:10
**sufficiently (1)**
181:11
**suggested (1)**
213:16
**suggestions (1)**

176:18
**suicidality (1)**
80:5
**suite (2)**
40:17;43:2
**Sulkoske (2)**
219:4;220:7.5
**Sunday (2)**
16:13;17:2
**superimposed (1)**
206:18
**supervised (2)**
50:9;75:20
**supervising (1)**
47:23
**supervision (2)**
32:7;33:7
**supervisor (1)**
76:7
**supply (1)**
99:25
**Support (23)**
15:9;63:9,16,20;
65:17;117:17;118:1;
119:16;120:10,12;
121:12;127:12;
134:17;139:21;
140:20;186:1,22;
200:7;201:15;
208:16,16;211:24;
212:23
**supported (1)**
213:4
**Supporters (2)**
105:8;127:6
**supporting (6)**
121:8;122:5;162:6;
211:19;212:18,21
**supportive (2)**
57:18;90:19
**supports (3)**
142:17;170:13;
198:11
**supposed (1)**
101:13
**sure (34)**
5:7;8:6;9:25;13:1;
16:8;31:16;36:3;
48:12;58:21;71:14,
25;88:21;92:11,19;
95:5;97:24;108:5;
112:20;119:14;
129:3;141:11;
150:22;171:2,15;
175:10;185:1,20;
195:1,12,14;204:23;
210:15;212:22;
213:20
**surely (1)**
196:18
**surgeries (5)**
78:6,23;116:25;
129:25;199:6

**surgery (4)**
62:17;78:2,2;147:9
**surgical (2)**
146:24;155:19
**surprise (2)**
90:9,11
**surprising (2)**
75:24;119:24
**survey (1)**
118:9
**surveys (2)**
118:13,13
**susceptible (1)**
120:16
**swayed (1)**
99:9
**Sweden (2)**
77:10,24
**swims (2)**
208:11,13
**switching (1)**
17:4
**sworn (2)**
4:2;219:7
**System (3)**
43:24;44:8,21
**systems (1)**
24:10
**system's (1)**
80:11

---

**T**

**table (1)**
4:16
**talk (55)**
20:7;31:3;41:10;
46:2;53:13,24;61:16,
18;66:24;69:4;73:21;
75:17;78:24;79:24;
84:19;85:13,13,14,
19,22,24;86:4,12,12,
14,25;87:14;90:18,
25;93:7,9;95:12;
104:11;107:22;
112:12,24;114:17;
116:13;124:2;125:7;
129:15;137:19;
145:12;159:24,25;
169:12;170:15;
171:25;174:7;
176:10;179:21;
180:14;187:4;
189:22;197:9
**talked (24)**
16:5;23:20;28:6;
32:18;38:18;52:15;
70:1;74:24;86:10;
97:15;116:10;123:3;
148:9,10,25;157:25;
165:13;180:20;
189:23;196:3;
200:14;201:2;210:2;

211:2
**talking (71)**
16:20;19:16;26:21;
39:25;40:22;54:5;
59:21;63:13;65:13;
67:11;68:9;69:1,23;
73:10;74:11;78:18;
82:15;85:22;86:25;
105:3;107:15,16,19,
20;114:23;116:18;
123:16;124:9;127:8;
131:8;139:13,17;
140:22;141:11;
142:5,14,15;143:6;
146:15,18;149:24;
152:6;160:19;
161:25;162:2,13;
166:10,14;168:5;
170:12;171:2,6;
177:24;185:19;
188:7;192:2;194:7;
195:5,5,25;198:18,
21;201:18,19;204:5,
17;213:21;216:7,10,
21,25
**talks (3)**
87:10,11;156:3
**Tampa (2)**
31:15,23
**targeted (1)**
25:7
**teach (1)**
32:9
**teachers (2)**
214:19;216:15
**teaching (3)**
33:2,2,13
**team (2)**
59:18;60:4
**teams (1)**
59:15
**technical (1)**
52:1
**techniques (2)**
193:18;194:10
**technological (2)**
93:21;94:15
**teen (1)**
91:16
**teenager (2)**
164:22;184:10
**teenagers (9)**
91:1,8,11,21;92:1,
3,4,6,9
**teens (2)**
95:22;195:14
**television (1)**
91:20
**ten (12)**
27:2;28:6;37:7,8,
15;38:1,2,2,4,8,18;
217:24
**tend (8)**

96:1;114:10;
118:10;119:14,15;
120:1;126:10;129:5
**tends (1)**
118:14
**tension (1)**
217:3
**term (9)**
24:21;52:1,4;
132:6,9;166:19;
174:15;175:5,8
**terms (8)**
33:12,22;112:18,
22,24;136:5;148:7;
150:25
**tested (3)**
97:11;152:24;
153:3
**testified (7)**
4:4;30:5,11;72:22;
75:6;140:5,8
**testifies (1)**
140:1
**testify (4)**
5:13;55:10;141:22;
142:23
**testifying (3)**
13:9;15:21;60:19
**testimony (31)**
14:9,11;15:10,13;
16:17,22,23;17:21,
22;35:20;45:9;57:6;
68:8,20;70:5,6,8,20,
22;71:14;72:3,5,15,
17;73:5;141:3,5,7;
198:19;200:10;
219:15
**Thankfully (1)**
99:10
**theories (2)**
80:11;195:22
**theory (2)**
60:15;104:19
**therapeutic (5)**
23:18;106:16;
107:21;180:21;181:1
**therapies (3)**
40:4;191:23;
192:20
**therapist (2)**
176:9;192:4
**therapists (2)**
177:16;190:21
**therapy (33)**
23:16;67:24;
107:21;161:5;
178:19,20,25;188:24;
189:5;191:4,6,7,17,
19,23,24;192:2,8,21,
23,23,24;193:5,10,
19;194:9,11;196:4;
199:8,10,16;201:19,
24

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 81 of 84 PageID #: 3619
K.C., et al. VS
The Individual Members of the Medical Licensing Board
KRISTOPHER KALIEBE, M.D.
June 1, 2023

**thereafter (1)**
219:16
**thereby (2)**
32:2;172:19
**Therefore (2)**
120:16;207:17
**thereto (1)**
75:5
**thinking (3)**
70:4;137:14;214:2
**third (8)**
29:22;79:15;89:11;
122:17;182:7;187:4;
197:25;204:23
**thirteen (11)**
35:25;36:1,8,9,13,
14;37:3;38:18;48:13;
58:22;59:22
**Thirty (1)**
49:23
**Thomas (4)**
206:1,18;207:25;
209:2
**though (8)**
18:3;67:16;147:21;
151:9;163:21;
165:20;196:3;207:10
**thought (21)**
11:19;12:9;38:4;
55:12;56:3,5,16;
65:25;86:20;120:13;
128:12;133:11;
135:13;178:18;
185:4;187:6;188:25;
189:16;191:7;
202:14;216:23
**thoughtful (2)**
96:25;104:11
**thoughts (4)**
96:17;187:25;
189:18;195:16
**thousands (2)**
35:8,11
**three (23)**
18:14;34:25;35:1;
38:20,22;87:11;88:8,
9;93:12;204:12,15,
22;208:12;210:12,12,
13,17;211:8,12,13,
22;212:9;213:21
**throw (2)**
149:4;163:19
**tic (1)**
80:6
**times (13)**
5:2,7;10:20;32:21;
67:18;93:11,15;
121:25;126:5;
137:16;199:24;
200:22;212:1
**Title (2)**
51:2;210:21
**titles (1)**

213:16
**today (11)**
5:9,13,16;6:9;10:5;
97:10;166:15;168:5;
211:2;216:21;218:7
**today's (7)**
16:3;12;17:18,23;
18:15;20:5;42:14
**together (5)**
23:2,17;124:1;
155:23;163:8
**told (5)**
61:3;70:19;160:22;
172:1;206:14
**took (7)**
20:25;98:20;99:11,
12,20;112:2;198:19
**tool (1)**
194:13
**top (3)**
9:13;11:20;211:7
**topic (12)**
52:9,12;56:18,20;
57:4;76:2;84:8;88:5,
7;97:4;123:24;
127:22
**topics (12)**
27:14,15,20;50:7,
10;88:8,9;100:1,4,16;
101:2;128:8
**Toronto (2)**
132:4,13
**total (5)**
58:12,14;105:22,
22;157:25
**totality (1)**
195:13
**totally (4)**
31:15;156:18;
197:24;212:3
**touch (1)**
54:16
**touched (1)**
116:11
**tough (2)**
32:16;56:2
**toughest (1)**
214:16
**toward (2)**
7:5;127:17
**towards (12)**
106:2,18;115:11;
120:19;124:18;
125:18;126:7,7;
142:2,4;199:23;
211:19
**trackable (1)**
46:3
**trade (11)**
56:22,25;57:1,3;
66:6,8,10;135:5;
136:10,14;141:24
**traditional (4)**

52:9;106:3;107:2,4
**traditionally (1)**
137:10
**trained (1)**
21:3
**trainees (1)**
24:5
**training (24)**
20:18,20,25;21:11,
11,14;23:14,19,20,
21,23;24:1,7,15,18,
23,24;25:2,3,10;
26:25;28:9;33:1;
163:19
**trainings (3)**
24:3,9;26:18
**trajectory (3)**
135:2;185:2,13
**transcript (13)**
10:20;12:2,12,18,
20;13:13;19:17;45:3;
61:8;68:12;70:2;
84:24;199:3
**transcription (1)**
18:7
**transcripts (1)**
59:7
**transferred (1)**
34:8
**transgender (51)**
50:5;67:4;81:10;
82:2,10;119:7;
133:12,20,22;134:25;
135:19,19,23;137:9;
155:8,23;164:16,21,
23;165:18,22;166:3,
7;172:11,16;174:1;
177:6;178:7;182:25;
183:6,9,10,22,23;
184:6,9,15;188:12;
189:25;191:5;200:6,
18;201:3;212:25;
213:11;214:9;
215:14,17;216:12,22;
217:17
**transition (12)**
82:23;83:5,10,24;
133:7,24;134:11,17;
135:11,24;155:24;
190:10
**transitioned (1)**
83:17
**transitioning (3)**
54:25;136:8,10
**transitions (3)**
63:6;192:14;
208:13
**translate (1)**
130:17
**transphobic (1)**
55:2
**trauma (8)**
182:20,23;183:15;

202:14,17,23;203:5,6
**traumas (1)**
106:21
**Traumatic (3)**
88:11;183:23;
210:18
**traumatized (1)**
170:20
**travel (1)**
87:8
**treat (18)**
11:11,11;21:23,23;
22:13,19;41:13;
109:23;138:1;
142:24;157:9;
158:14;159:4;
161:17;162:13,20;
165:15;196:11
**treated (13)**
11:9;35:7,12;39:3;
56:9;60:25;68:3;
69:8,20;100:23;
132:14;133:6;158:1
**treater (1)**
160:16
**treating (9)**
21:21;39:25;46:5;
129:18;149:4;158:3,
24;159:15;197:11
**treatment (89)**
11:6;22:24;24:14,
19;26:22;27:1;29:3,
7,13;30:1,20;32:5,17;
37:20;38:8;39:17,21;
40:2;43:13,17;47:9,
10;48:16;50:4;57:1;
58:2;61:20;67:10,15,
20;68:16;69:4,7,9,12,
14;71:2,16;98:11;
105:9,15,16,17;
107:8;110:10;
115:25;116:1,14,15,
24,24;117:2,5,8,10,
16,25;118:3,6;
123:16;125:23;
131:15;132:18,19;
145:4,24;146:2,3;
148:8;150:5,12,14;
157:17;158:6;159:7,
13;160:1,2,13;163:8;
166:12;188:4,5;
192:18;196:5,7;
197:16;198:4,5
**treatments (18)**
27:19;58:11;62:11;
80:12;96:12;144:3;
145:9,23;156:21;
157:22;158:8;170:5;
186:13,17,19;191:22;
197:7;198:14
**treats (1)**
196:10
**trial (10)**

13:9,14;14:9;
16:17,22,23;17:22;
68:8,20;198:19
**trials (1)**
43:16
**tribal (2)**
110:8;141:18
**tribalism (1)**
55:12
**trick (1)**
31:8
**tried (2)**
15:13;172:8
**trouble (1)**
16:4
**true (9)**
14:15,18;41:8;
70:10;95:6;119:18;
129:13;192:16;
219:15
**truly (1)**
192:13
**truth (12)**
4:3,3,4;97:17,17,
22;99:24;100:11;
102:15;104:24;
206:1;219:7
**truthful (6)**
5:11;10:18,25;
14:11,25;68:21
**truthfully (2)**
5:14;73:14
**try (8)**
6:3;14:5;16:9;
54:20,24;71:18;
172:22;215:8
**trying (24)**
31:8;37:12;46:6;
49:15;53:23;55:5;
61:7;85:12;86:2,10,
14;104:11;106:5;
121:4;124:16,24;
125:12;127:23;
141:13;143:13;
191:25;199:15,17;
211:23
**tuning (2)**
94:24;194:8
**Turban (2)**
18:5;167:19
**turn (1)**
106:1
**turned (1)**
112:3
**turning (3)**
41:22;75:16;
106:16
**TV (2)**
81:25;91:25
**tweet (9)**
205:6,25;206:5,12,
19;207:23,24;208:6;
209:1

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 82 of 84 PageID #: 3620
K.C., et al. VS                                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                                          June 1, 2023

tweeted (2)
207:18,19

twelve (4)
35:25;36:1,8;48:13

twenty (2)
35:8;49:23

twenty-five (1)
64:18

twenty-one (2)
64:19;66:4

twenty-two (1)
35:4

twice (1)
89:14

twist (1)
71:24

Twitter (8)
51:18,19,20,23,24,
24;205:2,23

two (18)
10:3;33:24;49:15;
64:2;77:15;81:15;
85:1;88:10;94:18;
116:16;151:6;
197:24;204:15,16,22;
209:20;210:11;217:2

two-thirds (2)
74:14;143:21

type (10)
64:23;82:6;110:19;
122:13;127:10;
165:8,9;170:11,24;
185:16

types (4)
130:4;164:18;
187:15;191:4

typewriting (1)
219:14

typical (4)
106:16;149:9;
174:21;175:4

Typically (7)
22:1,15,18;137:12;
160:18;176:4;201:25

## U

umbrella (1)
87:19

uncertainty (1)
146:12

unclear (1)
111:10

uncomfortable (2)
153:5,13

under (15)
35:24;36:1,6;
44:21;45:16;65:16;
76:7;87:19;89:5;
108:17;148:20;
168:14;201:10;
212:21;219:14

underemphasized (1)

156:7

undergoing (1)
110:25

underlie (5)
93:22;94:6,12,16;
95:4

underlying (1)
175:24

underpin (1)
97:9

underpinning (1)
97:12

underserved (2)
121:18;128:21

understood (4)
5:22;10:23;12:16;
78:17

undertaken (1)
102:17

undue (1)
99:8

unedited (1)
172:22

unethical (2)
105:14,18

unexplained (1)
67:5

unfair (1)
208:19

Unfortunately (3)
120:21;121:24;
174:2

unhealthy (6)
182:13,16,18;
183:2,7,19

uniform (1)
197:15

unit (3)
172:12,16,18

United (3)
74:2,16;167:10

units (1)
172:21

universities (3)
24:3;84:11;173:24

University (2)
31:22;32:4

unknown (3)
63:1,5,5

unknowns (2)
146:2;190:16

Unless (2)
6:25;218:7

unlikely (1)
48:4

unrealistic (1)
129:1

unrelated (1)
202:22

unstable (1)
175:24

unusual (3)
104:15;160:21;

175:16

unusually (1)
90:12

up (74)
6:15;7:13;8:21;
10:8;13:6;15:3;
21:12;25:24;31:5;
37:15;38:2,19;39:5;
40:7;62:10;66:22;
68:5;72:23;74:9;
85:20,25;86:15;
93:12;94:3;100:12,
17;110:13;113:11;
115:16;126:21;
127:13;129:23;
133:20,21;135:18,22;
136:6;137:1,4,8,11;
141:12,21;142:1;
149:19,21;152:5;
153:21,23;155:4;
166:25;176:22;
179:14;180:5,11;
183:3;184:7,15;
188:12;189:25;
190:5;198:15;
203:22;204:25;
206:20;209:7;210:8,
10;211:1;212:5;
213:2;215:1;217:21;
218:8

upfront (4)
214:20;216:16;
217:16,17

upon (1)
70:4

upset (1)
189:13

URL (1)
193:6

use (39)
24:21;36:7;51:10,
11,12;91:11;95:20;
98:21;99:19;108:14;
126:13;131:18,19;
132:6;141:15;
157:21,21;158:9,22,
22;159:6;160:12,20,
20;161:16,21;162:4,
10,14;166:18,19;
169:15;174:15;
178:7,15;179:4,16;
180:16;192:5

used (10)
52:4;71:24;106:17;
132:7,12;134:19;
136:16;190:21;
205:23;209:5

uses (3)
112:23;132:10;
209:1

USF (2)
33:11;47:20

using (14)

38:24;45:8;55:13;
127:17;134:23;
158:5,13;159:3,21;
163:10;167:18;
178:9;180:22;193:18

USPATH (4)
157:6;158:5;159:3;
162:15

usual (4)
25:25;110:9,20;
160:15

usually (9)
67:24;108:9,10;
139:7;159:13;
160:19;176:8;
178:25;191:7

utilize (1)
155:20

## V

valiance (1)
145:16

valid (1)
11:10

values (1)
214:24

variations (2)
182:8,13

various (1)
31:7

vehicles (1)
124:22

verbal (1)
5:24

verbalize (1)
6:1

verify (1)
219:19

version (2)
88:12;155:8

versus (5)
32:18;103:8;
154:21;160:23;
190:20

Victorian (1)
80:15

view (5)
90:10;104:22;
118:20;125:22;
153:10

viewing (1)
80:4

viewpoint (10)
101:10,12,20;
103:24;104:4;
138:18,21;141:18;
168:19;216:5

viewpoints (5)
80:20;104:2,5;
148:14;155:21

views (5)
72:2,7;82:22;

108:20;151:4

vignette (2)
180:2,11

virtuosity (1)
109:18

virtuous (1)
164:6

vision (1)
122:21

voluntary (1)
78:6

## W

wait (1)
198:9

waiting (9)
129:16,17;130:13,
15,18;132:3,6,22,25

walks (1)
41:4

wants (1)
109:6

warranted (2)
180:22;181:1

watch (3)
26:1,12,13

watched (1)
26:3

watchful (9)
129:16,17;130:12,
15,18;132:3,6,22,25

way (42)
11:24;19:25;23:1;
34:20,21;55:22;59:5;
66:1;74:15;80:16;
83:1;91:12;101:3,13;
106:4,19,25;110:17,
18;117:20;123:6;
124:3;127:2,19;
129:3;132:1;134:9;
139:11;140:9;
143:21;147:11;
153:24;157:18;
178:24;179:2;183:4,
24;184:1;205:8;
213:13;214:24;
215:22

ways (11)
36:19;69:3,5;
70:12;80:24;94:18;
117:18;124:21;
125:8;141:16;215:23

wealth (1)
157:13

website (3)
117:19;167:2;
212:9

week (1)
90:23

weekend (1)
204:13

weeks (2)

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 83 of 84 PageID #: 3621

K.C., et al. VS                                                    KRISTOPHER KALIEBE, M.D.
The Individual Members of the Medical Licensing Board                            June 1, 2023

70:7;85:25
**Weida (1)**
  9:2
**Weigle (1)**
  85:14
**Weigle's (1)**
  93:10
**Weiss (5)**
  19:9;90:20,22;
  168:2,6
**welcome (4)**
  66:21;109:15;
  152:3;214:23
**welcoming (1)**
  83:25
**well-being (1)**
  212:24
**well-intentioned (1)**
  127:5
**well-known (1)**
  82:2
**wellness (3)**
  40:19,21,22
**well-regarding (1)**
  130:12
**well-rounded (1)**
  130:5
**well-trained (1)**
  113:19
**Wendi (2)**
  219:4;220:7.5
**What's (3)**
  178:24;179:18,20
**whenever (5)**
  44:13;66:3;111:22;
  140:22;159:17
**Whereas (2)**
  103:12;142:14
**WHEREOF (1)**
  220:2
**wherever (1)**
  87:8
**whistleblower (1)**
  177:8
**whole (7)**
  4:3;26:6;80:10;
  103:10;115:14;
  156:3;172:13
**whose (1)**
  146:24
**WIC (1)**
  121:16
**wide (2)**
  122:15;215:12
**widely (1)**
  81:8
**wife (3)**
  11:14;19:18,22
**willing (3)**
  138:16,22;180:16
**willingness (1)**
  191:23
**wing (1)**

55:1
**winning (1)**
  208:1
**wise (7)**
  133:11,16;134:13;
  136:11;166:2;
  176:21;181:21
**wish (4)**
  139:13;155:17;
  171:7;186:10
**within (24)**
  20:22;21:24;44:11;
  46:19,20;47:20;
  54:11;55:17;96:20;
  98:9;100:1;104:13;
  110:12;113:7;
  120:13;121:5;
  124:22;133:16;
  174:21;177:10;
  202:1,10;207:15;
  215:21
**without (8)**
  69:13;104:23;
  110:25;115:20;
  127:12;147:19;
  184:21;198:4
**witness (5)**
  4:2;14:2;199:5,14;
  220:2
**women (2)**
  208:1;209:8
**women's (4)**
  46:22;207:1,6;
  209:9
**won (2)**
  111:19;113:6
**wonder (2)**
  98:12;151:16
**wondering (1)**
  210:5
**word (10)**
  40:21;51:11;69:18;
  70:12,17;72:8,9;
  82:4;95:17,20
**worded (1)**
  69:2
**wording (2)**
  48:7;68:24
**words (5)**
  71:23;131:18,19;
  160:12;169:15
**work (33)**
  22:17,21,22,23;
  23:2,15;24:4,6,9;
  32:3,23;33:18,21;
  44:10;49:7,21;54:24;
  55:22;59:15;67:19;
  76:3;85:1;114:4,12;
  147:11;151:18;
  152:23;160:17;
  162:6;178:20;
  193:23;194:14,19
**worked (3)**

62:10;76:21;135:6
**working (9)**
  23:4;33:4;44:18;
  76:7;107:13;121:9;
  143:18;162:5;176:5
**works (4)**
  113:9;127:4;
  194:20;196:12
**workup (1)**
  107:11
**world (7)**
  42:16;102:21;
  108:21;114:9;
  128:17;214:21;
  216:17
**worldview (1)**
  213:14
**worried (1)**
  189:9
**worse (3)**
  136:4;189:2,14
**worst (5)**
  187:18,20,22;
  188:22;189:4
**worth (2)**
  144:8;181:6
**WPATH (7)**
  117:11;157:5;
  158:5;159:3;162:14;
  163:20;177:22
**WPATH's (1)**
  152:12
**wrap (1)**
  217:21
**wrapped (1)**
  144:19
**write (4)**
  104:14;110:18;
  205:16,18
**writing (5)**
  104:9,11;122:24;
  164:3;174:9
**written (5)**
  53:10;55:19;97:3;
  104:16;179:13
**wrong (5)**
  14:1;169:20;
  210:16,16;214:8
**wrote (26)**
  53:15;55:11;67:7;
  75:22;77:3;79:20;
  84:5;105:12;115:4,
  24;121:7;122:22;
  124:12;125:25;
  126:1;144:4;150:8,
  15;151:1;155:2;
  164:10;169:14;
  173:4;180:18;
  190:25;196:21
**wrought (1)**
  96:24

**Y**

**year (11)**
  26:15,19;31:25;
  34:16,18;35:2,8;
  75:18;181:10,15,19
**years (11)**
  25:20,20;26:24;
  27:3;34:25;35:1,4;
  122:19;123:2;
  208:12;211:17
**yoga (4)**
  41:3;42:24;43:4,17
**young (8)**
  48:23;49:2;133:25;
  170:5;211:13,19;
  213:22,24
**youth (5)**
  51:25;52:3;83:18;
  188:15;192:15

**Z**

**Zero (6)**
  211:8,12,13,22;
  212:9;213:21
**Zoom (1)**
  5:17
**zooming (1)**
  39:11
**Zucker (2)**
  132:4,11
**Zucker's (3)**
  132:13,17;133:5

**1**

**1 (14)**
  6:14,17;31:5;35:6;
  66:23;75:16;96:7;
  152:5;157:1;169:10,
  18,19;201:17;220:11
**1:31 (1)**
  151:22
**10:00 (1)**
  22:7
**10:01 (1)**
  22:11
**100,000 (1)**
  77:16
**102 (2)**
  74:11,14
**1058 (2)**
  13:16,22
**107 (1)**
  211:6
**1095 (1)**
  14:4
**11 (3)**
  68:12;167:1;199:3
**11:09 (1)**
  66:15

**11:15 (1)**
  66:19
**1119 (1)**
  68:11
**1130 (2)**
  198:16;199:2
**12:21 (1)**
  109:9
**12:27 (2)**
  109:8,13
**121 (3)**
  152:9,10;154:24
**122 (2)**
  157:2,2
**129 (3)**
  163:25;164:1;
  166:17
**130 (4)**
  169:11,12,15,17
**131 (1)**
  181:25
**133 (1)**
  14:5
**14 (2)**
  72:16;155:5
**142 (2)**
  171:24,25
**144 (1)**
  172:25
**145 (4)**
  174:6,7,15;180:14
**15 (2)**
  203:23;212:10
**151 (1)**
  187:3
**154 (2)**
  190:18;196:17
**157 (1)**
  68:6
**16 (2)**
  73:11;205:1
**168 (3)**
  193:1,2;198:17
**17 (2)**
  209:12,15
**18 (2)**
  13:12;72:3
**1984 (1)**
  206:17
**1999 (2)**
  34:17;35:6

**2**

**2 (3)**
  87:2;88:15,18
**2:15 (1)**
  152:1
**2001 (2)**
  34:13,15
**2002 (1)**
  34:13
**2004 (1)**

Case 1:23-cv-00595-JPH-KMB   Document 58-7   Filed 06/12/23   Page 84 of 84 PageID #: 3622

K.C., et al. VS
The Individual Members of the Medical Licensing Board

KRISTOPHER KALIEBE, M.D.
June 1, 2023

34:9
**2005 (7)**
  27:23;28:10;34:23;
  35:2;73:23;75:18;
  76:15
**2007 (2)**
  74:2,17
**2015 (1)**
  27:23
**2016 (4)**
  31:12;73:23;75:18;
  76:15
**2017 (1)**
  211:8
**2021 (3)**
  211:9,25;212:10
**2022 (2)**
  206:12;207:24
**2023 (1)**
  220:4
**2030 (1)**
  220:11
**21 (1)**
  211:7
**25 (1)**
  67:2
**26 (2)**
  75:16,17
**260 (1)**
  156:6
**27 (1)**
  114:25
**28 (3)**
  78:24;206:12;
  207:24

**3**

**3 (5)**
  7:14;87:2;88:15,
  18;211:1
**3:31 (1)**
  203:15
**3:37 (2)**
  203:13,19
**30 (1)**
  77:2
**33 (2)**
  79:14,15

**4**

**4 (8)**
  8:22;74:10;94:4;
  149:20,20;150:2,3,11
**4:02 (1)**
  218:1
**4:09 (1)**
  218:5
**4:13 (1)**
  217:24
**43 (1)**
  155:12

**44 (1)**
  94:4
**480 (9)**
  30:14,17;56:19;
  57:19;63:13,17;
  141:3;186:5;208:23

**5**

**5 (3)**
  10:9,11;122:19
**5.7 (1)**
  155:14
**52 (1)**
  84:4
**53 (6)**
  90:20;93:9,13;
  181:23,24;182:1
**54 (2)**
  93:6,17
**55 (3)**
  93:18,20;187:2
**56 (1)**
  196:16
**57 (3)**
  96:5,7,9
**58 (1)**
  99:22
**59 (1)**
  202:12

**6**

**6 (2)**
  15:4;167:25
**62 (1)**
  105:7
**65 (1)**
  109:16
**66 (1)**
  112:12

**7**

**7 (6)**
  10:1;13:7;68:6,7;
  74:13;198:16
**79 (1)**
  114:22

**8**

**8 (3)**
  152:12;155:8;
  212:8
**83 (2)**
  116:13;117:7
**84 (1)**
  122:17
**85 (2)**
  124:1,9
**86 (2)**
  124:1,6

**87 (2)**
  7:25;127:3
**89 (1)**
  129:15

**9**

**9 (1)**
  199:4
**91 (2)**
  137:18;142:5
**92 (2)**
  143:20,22
**93 (1)**
  148:22
**95 (1)**
  13:18