UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CASE NO. 1:23-cv-00595-JPH-KMB


K.C., et al.,                    )
                                 )
                 Plaintiffs,     )
                                 )
        -vs-                     )
                                 )
THE INDIVIDUAL MEMBERS OF THE    )
MEDICAL LICENSING BOARD OF       )
INDIANA, in their official       )
capacities, et al.,              )
                                 )
                 Defendants.     )



        The videoconference deposition upon oral

examination of JAMES M. CANTOR, PH.D., a witness

produced and sworn before me, Dana S. Miller, RPR,

CRR, a Notary Public in and for the County of Boone,

State of Indiana, taken on behalf of the Plaintiffs,

appearing remotely from Ontario, Canada, on the 7th

day of June, 2023, commencing at 9:35 a.m. pursuant

to the Federal Rules of Civil Procedure.




                CIRCLE CITY REPORTING
                135 North Pennsylvania
                      Suite 1720
                Indianapolis, IN  46204
                   (317) 635-7857

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 2 of 165 PageID #: 3624

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 2

```
1              A P P E A R A N C E S
2   FOR THE PLAINTIFFS:   Chase Strangio, Esq.
                          AMERICAN CIVIL LIBERTIES UNION
3                         125 Broad Street
                          19th Floor
4                         New York, NY  10004
                          cstrangio@aclu.org
5                            -and-
                          Gavin M. Rose, Esq.
6                         Stevie J. Pactor, Esq.
                          ACLU OF INDIANA
7                         1031 East Washington Street
                          Indianapolis, IN  46202
8                         grose@aclu-in.org
                          spactor@aclu-in.org
9
10  FOR THE DEFENDANTS:   John D. Ramer, Esq.
                          COOPER & KIRK PLLC
11                        1523 New Hampshire Ave., N.W.
                          Washington, D.C.  20036
12                        jramer@cooperkirk.com
13
    ALSO PRESENT:         Chad Blackwelder
14                        Charlie Ferguson
                          Brandon Splitter
15                        Bailey Steinhauer
                          Andrew Shaw
16                        Shay Storz
                          Mylene Laughlin
17
    MODERATOR:            Joel Scherer
18                        Circle City Reporting
19
20      I N D E X   O F   E X A M I N A T I O N
                                              PAGES
21
```

```
22  DIRECT EXAMINATION ..................................4
       QUESTIONS BY CHASE STRANGIO
```

```
23
24
25
```

Page 3

```
1         I N D E X   O F   E X H I B I T S
2                                              PAGES
    Plaintiff(s) Deposition Exhibit No(s).:
3
```

```
    1 - Expert Report of James M. Cantor, Ph.D.  ......18
4   2 - Curriculum Vitae ...............................21
    3 - James Cantor Testimony .........................22
5   4-5 (Not used)
    6 - The Cass Review ................................98
6   7 - Finnish Guidelines 2020 .......................90
    8 - Correction to 2018 Littman ...................145
7   9-10 - (Not used)
    11 - James Cantor Tweet ...........................185
```

```
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1   Pursuant to the Indiana Supreme Court Case 20S-MS-236
2   signed March 31, 2020,
3   J A M E S  M. C A N T O R, PH.D., having been first
4   duly sworn or affirmed to tell the truth, the whole truth
5   and nothing but the truth relating to said
6   matter, was examined and testified as follows:
7   DIRECT EXAMINATION
8     QUESTIONS BY CHASE STRANGIO:
9   Q  Good morning, Dr. Cantor.  How are you today?
10  A  I'm good.  Thank you.
11  Q  My name is Chase Strangio.  I am a lawyer with the
12     ACLU representing the plaintiffs in this case.  And
13     I'll be asking you some questions today.
14        As I mentioned, there are also some law
15     student interns sitting in, as well as my
16     colleagues, Gavin Rose and Stevie Pactor, from the
17     ACLU of Indiana.
18        Can you start by just stating your full name
19     for the record, please.
20  A  I'm Dr. James Michael Cantor, C-A-N-T-O-R.
21  Q  And you've had your deposition taken before; yes?
22  A  Yes, I have.
23  Q  So you, generally speaking, know how this process
24     goes?
25  A  Yes, I do.
```

Page 5

```
1   Q  Okay.  Still going to run through a few of the
2      ground rules just to make sure we're on the same
3      page.
4         So as you know, there's a court reporter here.
5      When answering my question, I ask that you respond
6      verbally out loud so that Dana can hear you.  And
7      to please wait for me to finish asking my question
8      before you begin your response.  Does that sound
9      okay?
10  A  Yep.
11  Q  And if you don't understand my question, which is
12     very possible, please let me know and I can try to
13     word it differently.  Is that okay?
14  A  Yep.
15  Q  And if you do answer my question, I will assume
16     that you understood it.  Does that make sense?
17  A  I understand, yep.
18  Q  And are you feeling okay today?
19  A  Yes, I am.  Thank you.
20  Q  Okay.  And are you on any medication that would
21     impair your ability to truthfully and accurately
22     answer my questions?
23  A  No, I am not.
24  Q  And is there any reason you don't feel able to give
25     complete and truthful testimony today?
```

Page 6

1  A  Nope.
2  Q  Okay.  Great.  I think we can get started.  And, as
3     you know, at any point if you need to take a break,
4     please let me know.  I imagine we'll also break for
5     lunch at some point.  But if -- the only thing I
6     ask is to just answer the question we're discussing
7     before we break.
8  A  I understand.
9  Q  All right.  So just starting with a little
10    background.  You have been retained by the
11    defendants as an expert in this case; is that
12    right?
13 A  Yes, I have.
14 Q  And how did you come to be retained as an expert in
15    this case?
16 A  Oh, goodness.  I'm involved in several very similar
17    cases.  And it's difficult for me to remember
18    exactly which one -- which way I got what e-mail
19    from who for which case.
20       So I could speak in general, I don't -- as I
21    say, I don't remember exactly how the first e-mail
22    started, "Hi, Dr. Cantor, I was referred to you
23    from," but it was essentially along those lines.
24 Q  So someone in the State of -- someone at the State
25    of Indiana Attorney General's Office contacted you

Page 7

1     and you didn't contact them; is that right?
2  A  Yes, that's correct.
3  Q  And do you remember who that was?
4  A  As I say, because several of these offices often
5     involve, you know, several different people, I
6     can't remember exactly which e-mail came from which
7     without going through my own e-mails to see who
8     said -- who came in at what point in the
9     conversation.
10 Q  And do you remember approximately when that was?
11 A  Within the past four or five months, I think.
12    Again, as I say, there's a cluster of them.  I'm
13    not good on people's names to begin with.
14       So I hesitate to, again, without checking
15    through my own e-mails, but it was roughly in
16    that -- within the past couple of months.  But
17    without checking my e-mails, I can't be --
18 Q  Understood.
19 A  I know better than to depend on my memory when
20    there are several very similar things all standing
21    next to each other.
22 Q  Understood.  You said you were an expert in similar
23    cases currently.  What cases are those?
24 A  On my CV, I listed all of the current cases.  The
25    states themselves would be Kentucky, Indiana,

Page 8

1     Montana, Arizona, Florida, Texas, Tennessee.  And,
2     again, without checking my list, I'm very probably
3     leaving one or two out.
4  Q  And Oklahoma?
5  A  Yes.  Thank you.
6  Q  So that's in addition -- including -- excuse me.
7        Including Indiana, that's one, two, three,
8     four -- at least eight states currently in cases
9     involving similar issues to the one here?
10 A  Yes, that sounds about right.
11 Q  And just so we're grounded in this case, are you
12    aware that this case concerns an Indiana law called
13    Senate Enrolled Act 480?
14 A  Yes, I am.
15 Q  And when this law was pending in the Indiana
16    legislature, did you take a public position on the
17    bill?
18 A  No.  The only testimony I had, and the only
19    interest I've ever had, really, is in the content
20    of the science.
21       So whenever I'm asked by the media, you know,
22    representatives in any state or any country,
23    members of the public, random e-mails I get, I'm
24    always happy to share whatever I can about the
25    science, but -- oh, and if somebody asks me a

Page 9

1     particular opinion about it, I'm perfectly happy to
2     show, you know, whatever points -- where the
3     science seems to contradict or match up with any
4     given proposal.
5        But I haven't in this state, and I don't think
6     in any state, given any particular support or
7     detraction from any particular proposal.  The only
8     one I can think of where I did, I was specifically
9     invited to come and appear in Ontario, none in the
10    U.S.
11 Q  So did you testify in support of Senate Enrolled
12    Act 480?
13 A  No, I did not.
14 Q  Have you ever spoken with a member of the Indiana
15    legislature about Senate Enrolled Act 480?
16 A  No, I haven't.
17 Q  Did you speak with anyone about Senate Enrolled Act
18    480 while it was pending?
19 A  Not in any kind of professional capacity.  But with
20    so many states and so many conversations just
21    amongst my colleagues and friends, I can't say that
22    I've never had a comment about it in general.  But
23    I've never taken any public stance or given any,
24    you know, public commentary on any of the -- on any
25    specific proposal.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 10

1    I tend very specifically -- I do my best very
2  specifically to speak, again, just to the science
3  and to the general ideas and what ideas in general
4  match what -- or fail to match up with whatever
5  point in the science.
6  Q  Understood.  So have you -- other than the Ontario
7    example, have you ever testified in any state
8    legislature in the United States over pending
9    legislation concerning transgender people or the
10   treatment of gender dysphoria?
11 A  No, I have not.
12 Q  What did you do to prepare for your deposition
13   today?
14 A  Lots and lots of re-reading.  I re-read, of course,
15   the case files that I had, my comments, my
16   responses to the other experts who submitted
17   declarations.  Re-read my own CV in case those
18   relevant questions are asked.  And I'm always
19   keeping up with the literature, so there's always
20   something I need to read, re-read.
21 Q  You mentioned your case files.  What are those?
22 A  Oh, no, I meant because I'm involved in several
23   different of the legal cases, in order to help me,
24   you know, as much as possible keep straight which
25   one is which, pardon the pun, just keeping track of

Page 11

1  which ones are involving which subset of issues and
2  in what order things are happening, just to, again,
3  keep my -- help me, as best as my aging memory can,
4  which one is which.
5  Q  So when you say your case files, you mean your
6    files for this particular case?
7  A  Yes.
8  Q  And did you meet --
9  A  Well, I shouldn't say this particular case, but
10   they're in clusters.  And so, it helps me, you
11   know, keep a cognitive map of what's going in which
12   direction.
13    But by case files, I don't mean patient cases.
14   I mean the various set of legal cases and the
15   various, you know, documentation that's available
16   for each one.  And some of the cases pertain to
17   events that happened years ago and what was -- what
18   the state of the science was at the particular time
19   before.
20    So, again, keeping track of a rough timeline
21   of what was available to whom and when.
22 Q  So what is the cluster that this case would fall
23   in?
24 A  Oh, bans to medicalized transition of minors.  The
25   other clusters are the athletics-related bills and

Page 12

1  a set of bills that I would describe more generally
2  as free speech bills, under what circumstances, you
3  know, what person has a -- that somebody's comments
4  which others are offended by, you know, to what
5  extent the actual content of their comments
6  actually line up with what the science and what the
7  evidence itself has.  I would say roughly those
8  three main clusters.
9  Q  So you --
10 A  Oh, and I should add -- I'm sorry --
11   detransitioners.  Now there are groups of
12   detransitioners who are taking actions against
13   their clinics and care providers.
14 Q  So you're currently serving as an expert in cases
15   involving medical care, athletics, what you explain
16   as free speech and detransition.  Is that a fair
17   summary?
18 A  Yes.  My hesitation really is that my involvement
19   in all of them is the same regardless of the
20   application to which it's being put, the question
21   is to me or I'm a scientist --
22 Q  Understood.
23 A  -- and, as I say I, I will tell anybody of any
24   political angle or view whatever I can about the
25   existing science.  What we know, what we don't know

Page 13

1  and how to interpret science and the scientific
2  method.
3    So those are the clusters, the topics to which
4  that information is being put.  But the information
5  from me is the same regardless of who and how it's
6  being put.
7  Q  So just to simplify, you are offering your
8    scientific opinion in cases involving medical care,
9    athletics, free speech and detransition; is that
10   right?
11 A  Yes.  I'd say that's a fair way to put it, sure.
12 Q  And did you meet with counsel in preparation for
13   today's deposition?
14 A  Yes, I did.
15 Q  How many times?
16 A  Once.
17 Q  And for how long?
18 A  A full day, a long day.
19 Q  So you met with counsel for one long day?
20 A  Yes.  Everything else has been mostly
21   organizational e-mails, a few short Zoom calls.
22   But specifically aimed at preparation for today was
23   one full day.
24 Q  What were the few short Zoom calls?
25 A  Oh, again, reviewing the documents that have been

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

---

Page 14

1  submitted, you know, the basic process, the
2  context.
3  Q  Yes, I would only -- so I didn't know if you
4  meant -- is that part of your meeting with counsel,
5  or is that a separate part of your preparation?  I
6  don't need to know what you did with counsel.
7  A  Oh, yeah, the e-mails and Zoom calls were
8  background kinds of organization.  The only
9  preparation specifically for today was the one full
10  day pre-prep -- or prep.
11  Q  And who was present for that prep meeting?
12  A  John Ramer and Roger Brooks.
13  Q  Roger Brooks from ADF?
14  A  Correct.
15  Q  Is ADF involved in this case?
16  A  I don't know the details of the arrangements, but
17  the sequence of events was the first substantive
18  case that I was involved in for which I was
19  preparing a sizeable review of the scientific
20  literature was a case in Alabama.
21      After that preliminary hearing -- preliminary
22  injunction hearing, Alabama, the state, then again
23  I want to use the word retained, but I don't know
24  if that's actually the proper arrangement, but they
25  then began to -- they took on Roger Brooks in order

---

Page 15

1  to help them coordinate the subsequent features --
2  not features, events, processing of that case --
3  Q  Does Roger --
4  A  -- and --
5  Q  Sorry.  Go ahead.  You can continue.
6  A  Then several other states, as I say, with very,
7  very similar cases going on, same questions, same
8  needs, also wanted to retain me.
9      They similarly began to coordinate with
10  Alabama in order to, you know, minimize, overlap,
11  you know, maximize the efficiency between each of
12  the cases.  They signed common interest agreements
13  with each other.
14      So Roger then, in turn, became involved in
15  helping to coordinate, you know, these -- they're
16  not coordinated cases in any way that I'm aware of,
17  but in order to help, you know, streamline
18  everything, there is an amount of, you know, trying
19  to use the best resources available across each of
20  these various states and each of the people
21  available to them.
22      MR. RAMER:  Yeah, and --
23  A  All of that to say I'm not aware of a direct
24  relationship between Roger Brooks and Indiana, but
25  through this set of coordinations, he is therefore,

---

Page 16

1  you know, at least indirectly involved because of
2  his experience through all of it.  You know, many
3  people take his input and advice, you know, very
4  seriously.
5      MR. RAMER:  Yeah, sorry, I'll just -- I'm
6  going to object and instruct the witness not to
7  answer about the substance of conversations,
8  obviously, with me as counsel in Indiana and Roger
9  Brooks who is counsel in Alabama, subject to the
10  protections there and also the common interest
11  privilege and protections here, so --
12      MR. STRANGIO:  Yes, understood.  Not trying in
13  any way to get at the substance of what was talked
14  about, just who was there.
15      MR. RAMER:  Right.
16  BY MR. STRANGIO:
17  Q  Is Roger Brooks often present for your deposition
18  preps subsequent to your involvement in Alabama?
19  A  This was the only one.  And he wasn't involved in
20  the prep for Alabama.  He became involved after the
21  preliminary injunction hearing.
22  Q  Got it.  Do you have a relationship with ADF?
23  A  No.
24  Q  Did you speak with anyone other than your counsel
25  and Roger Brooks about your testimony today?

---

Page 17

1  A  Not other than in any logistical sense.
2  Q  What do you mean by logistical sense?
3  A  Making sure that I had a quiet place in order to
4  be, clearing out my calendar for the day.  You
5  know, just old-fashioned logistical kind of, oh,
6  this is happening.
7  Q  Understood.  And you talked about reviewing case
8  documents and your report and the other expert
9  reports in this case.
10      Any other documents that you recall reviewing
11  in anticipation of today's deposition?
12  A  Not specific documents, no.
13  Q  Okay.  And is there anything with you on your desk
14  in front of you at the moment?
15  A  I cleared my desk.  I gave myself a blank pad of
16  paper in case I need it, a clean copy of my report
17  itself.  But I didn't have time to print out a copy
18  of my CV in case there was something I needed in
19  reference to that.  Other than that, it's coffee
20  and water.
21  Q  Understood.  Okay.  So the only printed document is
22  your clean copy of your report in this case.  So
23  when we talk about that, you will have it in front
24  of you; is that correct?
25  A  Exactly, yes.

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 18

1  Q  Great.  Thank you for doing that, spare us some of
2     the difficulties of the electronics.
3  A  I don't know even if Lieutenant Uhura could have
4     handled this much paper.
5  Q  All right.  Well, we will just jump right in, then.
6     So I want to start by just marking a few exhibits,
7     just for ease as we go along, starting with your
8     declaration in this case.
9        MR. STRANGIO:  So, Joel, if you can go ahead
10     and pull up what's premarked as Exhibit 1, that
11     would be great.
12  BY MR. STRANGIO:
13  Q  And that's what, Dr. Cantor, you have in front of
14     you, I gather.
15        Doctor, do you -- oh, wow, maybe I can
16     actually move this -- do you recognize this
17     document, Doctor?
18  A  Yes, I do.  It looks like the declaration submitted
19     for this case.
20  Q  And you understand this to be a true and accurate
21     copy of the declaration that you submitted in this
22     case?
23  A  As best I can see, yes.
24  Q  I can go down to the list of appendices, the
25     bibliography.  So, yes, it does appear to be that?

Page 19

1  A  As best as I can tell, yes.
2  Q  And who wrote this declaration?
3  A  I did.
4  Q  Anyone help you?
5  A  No.  Again, the legal team, you know, did some
6     proofreading, gave me heads-up with some formatting
7     issues.  The American Foreign Law Association uses
8     a different bibliography method than I'm accustomed
9     to.  In my profession, we use the APA standards.
10        So, as I said, you know, technical details
11     like that.
12  Q  And did you discuss this declaration with anyone?
13  A  Again, with the legal team to help ensure the
14     topics that needed coverage would be included.
15  Q  Anyone else?
16  A  Not specifically that I can recall.  As I say,
17     because I'm involved in several cases, and the
18     science that they need input on is the same
19     science, using the same basic report updated, you
20     know, as necessary, and, again, with feedback from
21     the various groups in order -- various parties to
22     make sure -- sometimes just a clarification of a
23     sentence or to ensure that it includes the
24     information that they need it to include.
25        So I don't want to say blanketly that nobody

Page 20

1     else has, you know, had any input to it, but
2     everybody who has had input, it's been on that same
3     kind of basic back-and-forth, make sure it's clear.
4     And what I can only describe as formatting things
5     in the opposite way than we do in science.
6        In science, I'm accustomed to here's what we
7     know.  Here's the project I did, and here are our
8     conclusions.  Where legal documents tend to be
9     organized in the opposite order.  Here is my
10     conclusion, then I'll get to subsequently the
11     backup for how I got there.
12  Q  Other than the various legal teams involved in all
13     of the cases where you're currently serving as an
14     expert, did you discuss the contents of this with
15     anyone else?
16  A  Outside of that, no, not that I recall.
17  Q  And did you discuss the contents of your
18     declaration with the other experts retained by the
19     defendants in this case?
20  A  No, I did not.
21  Q  Does this declaration represent a complete
22     statement of the opinions you intend to provide in
23     this matter?
24  A  Yes, it does, which isn't to say, you know, if
25     asked a question about something else in the

Page 21

1     research that I happened not to have covered in my
2     report, or if somebody presents an argument making
3     an error in scientific thinking, you know, other
4     information can become relevant.  But this is -- it
5     summarizes my intention of everything I plan to be
6     able -- I plan to be expressing.
7  Q  So up until -- up to the point of today, this
8     represents a complete statement of the opinions you
9     intend to provide?
10  A  Yes, that is correct.
11  Q  Are you aware of any inaccuracies in the
12     declaration that you submitted in this case?
13  A  No, other than, as I say, I found missing half of a
14     pair of parentheses, because the editor in me.
15     Again, as soon as I submit something, that's
16     exactly when I find a typo.
17  Q  Yes, I understand this.  Anything you would --
18     other than the parentheses, anything you would like
19     to amend or correct in the declaration you
20     submitted in this case?
21  A  No.  I found no factual or content error.
22        MR. STRANGIO:  And let's go ahead, Joel, and
23     pull up what's premarked as Exhibit 2.
24  BY MR. STRANGIO:
25  Q  And just for your awareness, Doctor, this is going

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

**Page 22**

1  to be your CV. Do you recognize this document?
2  A  Yes, I do. It looks like my CV.
3  Q  And is this a current and complete version of your
4     CV, 32 pages?
5  A  The only -- and there's -- yes, it's complete, with
6     the caveat that I would have updated it with any
7     additional cases that I've become involved with.
8  Q  So the only thing that might be missing from this
9     would be the addition of cases in which you've
10    become involved as an expert witness; is that
11    right?
12 A  Yes, to the best of my recollection. I don't think
13    there's been anything else that's changed since I
14    submitted it.
15 Q  So in 2022, you testified at a hearing in Alabama
16    in a case concerning a law similar to SEA 480; is
17    that right?
18 A  Yes, that is correct.
19       MR. STRANGIO: And let's, Joel, go ahead and
20    pull up what's premarked as Exhibit 3.
21 BY MR. STRANGIO:
22 Q  And, Dr. Cantor, at the time this was the case
23    called Eknes-Tucker; is that correct?
24 A  Yes, that's my memory of it.
25 Q  Doctor, does this appear to be a copy of your

**Page 23**

1  testimony from that hearing? You can take a close
2     look.
3  A  As best as I can tell, that's what it looks like.
4     The sentences that jump out at me match the --
5     match what I recall.
6  Q  And did you testify truthfully in that hearing?
7  A  Yes, I did.
8  Q  Great. So that's all I have to premark for now.
9     So let's go back to your CV, which is Exhibit 2.
10       MR. STRANGIO: If you could, Joel. Thanks.
11 BY MR. STRANGIO:
12 Q  And before we have that in front of us, in
13    paragraph 1 of your declaration in this case, you
14    describe yourself as a sexual behavior scientist.
15    What is that?
16 A  That's a good question. It is a relatively small
17    field in numbers of people. Because of the import
18    of the issues to so many people in so many
19    circumstances, it is like a very, very highly
20    followed field.
21       I say that only because there isn't a very
22    simple universally-agreed-upon term, like if I said
23    I were an epidemiologist or endocrinologist or
24    something, very many of us would simply refer to
25    ourselves as sex researchers. But because sex

**Page 24**

1  research is itself such a highly interdisciplinary
2     field, saying one is a sex researcher describes the
3     questions that we're pursuing and the kind of
4     issues we're investigating, but within that one
5     could be anything from a psychologist to a
6     neuroscientist, an epidemiologist. It doesn't
7     refer to the academic field referring to the tools
8     that we use in order to address those questions.
9        So I usually would use a phrase like sex
10    researcher or sexual behavior scientist in order to
11    indicate the kind of questions in which I've spent
12    my career investigating.
13 Q  And when you say sex researcher, what are you
14    referring to with respect to sex?
15 A  Well, over the course of my career, I've handled,
16    you know, many, many different kinds of questions.
17       In general, because I have a more technical
18    background than most other sex researchers do, I've
19    been able to apply, you know, much more
20    sophisticated tools for doing those investigations.
21       For example, a lot of studies including, you
22    know, many of the studies that the public are most
23    aware of, really involve interviewing people or
24    surveys or questionnaires or other relatively
25    simple, relatively straightforward methods, but

**Page 25**

1  they don't answer questions in the kind of way that
2     have a great deal of weight.
3        For example, you know, is somebody born gay,
4     or does somebody, you know, become gay is a
5     question that very often comes down to, you know,
6     some very technical, very biological studies. But
7     because so many people who themselves call
8     themselves sex researchers are just interviewing
9     people, they just get a pile of what everybody
10    thinks the answer should be.
11       So as I say, when I use the term, I'm refer --
12    when I use the term to describe myself, I'm
13    refer -- using sexual behavior scientist because
14    I'm investigating, you know, the motivations and
15    the basis behind or supporting people's sexual
16    behaviors, but I don't want to limit it technically
17    to behaviors either.
18       For example, if there's somebody who's
19    uncomfortable or trying to deal with being gay
20    living in a straight world, you know, some of the
21    questions are, "Doc, why am I different from other
22    people?" Well, we're not talking about his
23    behavior. We're not talking about some -- yeah,
24    doing therapy with somebody in order to help them,
25    you know, gain the self-confidence that they need

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 26

1 in order to live a happy gay life.
2        But for the research itself, again, now we're
3 talking more, you know, fundamental -- I don't know
4 if I want to say traditional kinds of science, but
5 we're applying the tools to sexual behaviors or
6 sexual desires, sexual experiences, sexual intents,
7 sexual fantasies, masturbatory fantasies.
8        Some of these, you know, are not visible
9 behaviors, although they, you know -- some of these
10 don't reflect external behaviors. They reflect,
11 you know, what we infer to be internal states. And
12 there is no one-to-one correspondence between
13 external observable, objective characteristics and
14 what people report being their internal
15 experiences. That's especially true for people
16 whose sexual interests are, you know, something
17 that's stigmatized. They hide it, feel like they
18 need to hide it. They hide it in different ways
19 from different people in different circumstances,
20 including to the themselves.
21 Q  And what is your current job?
22 A  I'm in private practice.
23 Q  What kind of private practice?
24 A  It's in clinical psychology as a clinical
25    psychologist. My hesitation is, of course, as

Page 27

1 these cases became, you know, more and more
2 frequent, it's now a larger and larger proportion
3 of my time.
4        The majority of my career, as my CV says, is
5 as a full-time scientist and member of the medical
6 faculty. When I left CAMH, it was to go into
7 private practice. And then as these various cases,
8 again, came to -- started coming up, I was devoting
9 more and more time to the cases.
10        So I'm in private practice and continue to see
11 patients, but a larger portion of my time, again,
12 is in consultation, expert witness testimony, and
13 in summarizing the existing science for the needs
14 of the various cases.
15 Q  So let's take each piece separately. What
16    percentage of your time currently would you say is
17    occupied by your private practice?
18 A  I guess my question is a little bit different if
19    we're talking about corporate structure versus
20    hours per week.
21        So far as the accountants are concerned, you
22    know, everything I do is part of my private
23    practice. If one means by private practice, you
24    know, one-to-one therapy and seeing patients in a
25    traditional clinical psychology kind of role --

Page 28

1 Q  Yeah, that's --
2 A  -- or used in a therapy kind of role --
3 Q  What percentage of your week is spent seeing
4    patients as a clinical psychologist?
5 A  Roughly 20 percent of my time.
6 Q  And what percentage of your time is spent serving
7    as an expert witness?
8 A  Roughly 80 percent, two-thirds of my time.
9 Q  And are you regularly compensated $400 an hour for
10    your expert witness time?
11 A  I am now, yes.
12 Q  And approximately how many hours per week do you
13    spend serving as an expert witness?
14 A  Oh, goodness. It's really hard to nail that down.
15    Although I'm now doing it, I'll say,
16    professionally, I'm still a scientist at heart. My
17    thinking is still what my thinking always is, I
18    want to know the right answer. I'm just genuinely
19    curious, and I want to know how all of this stuff
20    works.
21        So I will, for example, be posed a question
22    which, you know, whatever lawyer has about whatever
23    particular person's situation or case. I'll spend
24    whatever, half an hour answering an e-mail or
25    supplying whatever materials back up whatever the

Page 29

1 answer to their question is, but that then leads
2 to, oh, wait a -- that leads me to start thinking
3 about if that's true, wouldn't that mean. And now
4 I'm reorganizing my own notes, and I'm, you know,
5 reading and catching up on, you know, some obscure
6 statistic that was used in whatever set of
7 analyses.
8        And I'm, you know, now spending several
9 hours -- I don't know if self-educating is exactly
10 the right term, but scratching the itch of my own
11 curiosity for which, you know, I became a scientist
12 in the first place. And then later in the week I
13 will get another e-mail from another person in an
14 unrelated case asking a similar question, and I can
15 now give them a more fulsome answer.
16        So I still only, you know, spent a limited
17 amount of time working with either particular case,
18 but I will have spent several hours, you know,
19 investigating, thinking about and forming my own
20 thoughts about whatever a given issue is.
21 Q  So understanding that it's combined somewhat across
22    cases, how many hours, approximately, per week
23    would you say you spend serving as an expert
24    witness?
25 A  Typically, over the past few months, perhaps the

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

---

Page 30

1    past year, actually, might be a better guideline,
2    over the past year anywhere from just two or three
3    hours in bookkeeping and miscellaneous, you know,
4    admin tasks up through full-time, up through 40ish
5    hours, as an average, 10 to 15.
6         But, again, with the caveat that it runs
7    anywhere from practically zero for a long period of
8    time to, you know, almost obsessive because the --
9    some deadline is approaching with very little
10   notice, or I got caught up with, you know, my own
11   curiosity just leading me to that much more reading
12   and thinking.
13 Q  Understood.  And so, you said for the past year it
14   could range from anywhere between zero, two to
15   three hours, up to full-time.  Did I get that
16   right?
17 A  Yes, that would be about right.
18 Q  And over the past year, about how much of your
19   income would you say derived from serving as an
20   expert witness?
21       MR. RAMER: Objection to the form.
22 A  So if I'm remembering today's process correctly, I
23   do still answer a question even though there's an
24   objection in a deposition, even though --
25 Q  Yes, sorry.  Yes.

---

Page 31

1  A  Got it.  I'm just checking.  Roughly 80 percent.
2  Q  And on your CV, you're listed as the Director of
3    the Toronto Sexuality Centre from 2017 through the
4    present.
5         What is that position?
6  A  When I left my hospital appointment, as I say it
7    was to go into private practice.  My intent was to
8    begin a sex therapy clinic, which I did with
9    several staff people, you know, also clinical
10   psychologists, when I incorporated that group and I
11   began that clinic, I named it the Toronto Sexuality
12   Centre.  And the legal designations appear just
13   automatically titled me, therefore, as Director.
14        As time went on and it became apparent -- a
15   bit clearer that a more substantial amount of my
16   own time was going to be involved with legal cases
17   rather than with clinical situations, I rebalanced
18   what was going on in the clinic so that I am
19   essentially just a solo private practitioner, but I
20   still have the name of the clinic as the corporate
21   entity.
22 Q  So the Toronto Sexuality Centre signifies your
23   private practice; is that right?
24 A  Yes.  That's an accurate summary, yes.
25 Q  And when you say you left your hospital appointment

---

Page 32

1    to begin your private practice, when was that?
2  A  In 2017.
3  Q  And before 2017, what was your job?
4  A  I was a senior scientist at one of the large
5    psychiatric teaching hospitals -- well, the largest
6    psychiatric teaching hospital up here in Canada, in
7    Toronto, called the Centre for -- now called The
8    Centre for Addiction and Mental Health.
9  Q  And when you were at the -- when you were a senior
10   scientist at that centre prior to 2017, did you
11   have a clinical practice?
12 A  No, other than in the last year of it, as I was
13   preparing to leave it, I was, you know, building
14   my -- I was sewing together my parachute before I
15   jumped.
16 Q  And in that role as a senior scientist at The
17   Centre for Addiction and Mental Health, what were
18   your responsibilities?
19 A  They changed over the course of time.  And as my
20   career advanced with them -- again, also as my CV
21   indicates, I began there as an intern the final
22   year of my doctoral studies, then a postdoctoral
23   fellow and so on progressing up the pretty
24   traditional ladder for academic researchers.
25        My duties as a senior scientist then were I

---

Page 33

1    was in charge of my specific research projects.  I
2    was in charge of -- including obtaining the funding
3    in order to, you know, pursue those projects
4    itself.
5         I was then training and supervising the next
6    line of junior scientists, plus my own students
7    engaged in academic publications for the various
8    studies that I was running.  And, also, in its
9    eccentric way as an ambassador to the field itself,
10   I was one of the higher profiled scientists in that
11   institution, largely due to my own, you know,
12   success and standing within my own field.
13        And because the issues that I was studying are
14   not just attention grabbing, but of the size of
15   legal weight or size of social import where the
16   results were not mere scientific curiosities, they
17   had very, very obvious and very, very important
18   potential implications for public health and public
19   safety.
20        So my media -- social media, and as I say
21   almost ambassadorial role itself became a large --
22   I don't know if I should call it official or
23   unofficial portion of my career, of my work --
24 Q  When -- sorry.  Continue.
25 A  Of my career there.

---

Page 34

1 Q  And when you say ambassador to the field, what
2     field is that that you're describing?
3 A  Sex research, several different fields.  Again,
4     that's the nature of being part of an interdis--
5     such an interdisciplinary field.
6         Part of it was to sex research itself.  Part
7     of it was to the field of psychiatry.  Even though
8     I was not myself a psychiatrist, I was, you know, a
9     member of the faculty of the Department of
10    Psychiatry in the University of Toronto Medical
11    School.
12        So helping the public appreciate the role of
13    mental health, mental health research, psychiatry
14    within the public health system, and to help people
15    appreciate the potential benefits of scientifically
16    oriented, evidence-based mental health treatment.
17        So a chunk, as I say, was to psychiatry.  A
18    chunk was to sex research.  And a large chunk, as I
19    say, to public welfare and public safety.  I was
20    specifically within the law and mental health
21    program of the -- the abbreviation to the
22    hospital -- again, it was the Center for Addiction
23    and Mental Health, or C-A-M-H, it's pronounceable
24    nickname is CAMH.
25 Q  CAMH.  Understood.

Page 35

1 A  So --
2 Q  How -- sorry.  Continue, you can.
3 A  Lost the train -- oh, so because my specific role
4     was within their law and mental health program, a
5     lot of -- a large chunk of the group for which I
6     was -- you know, had an ambassadorial role was the
7     integration of psychiatry and the law or mental
8     health and the law.
9         What are the appropriate ways, what are the
10    most effective ways, what are the most
11    evidenced-based ways to ensure that people who were
12    engaged in the legal system in various capacities,
13    how does mental health interact with that.
14        So mental health issues not just in consent --
15    capacity to consent, but also people who break the
16    law.  People who break the law, you know, during a
17    psychotic episode or people who break the law, you
18    know, as motivated by some mental illness.  And
19    what's the correct way to get the right resources
20    to the right person, not only to help the patient,
21    but to also protect the health and safety of the
22    people around the patient.
23 Q  Understood.  I think that's probably a good
24    description of the field and your ambassadorial
25    role.

Page 36

1         Going back to your clinical practice, your
2     current clinical practice.  What is the average age
3     of the patients that you see?
4 A  I don't think -- as we would say in statistics,
5     nothing can mislead as much as the mean group,
6     because you really need to know how dispersed they
7     are.  If I calculated a number, it would be --
8 Q  Do you primarily see adults in your clinical
9     practice?
10 A  Yes.
11 Q  Do you see any adolescents in your clinical
12    practice?
13 A  Yes.
14 Q  How many?
15 A  Oh, goodness.  Today I think it's just down to two.
16    As I say, I see very few people of any age, you
17    know, currently.
18 Q  Got it.  And so you see about two adolescents.  And
19    how many adults?
20 A  Roughly eight currently.
21 Q  And any prepubertal children?
22 A  No.
23 Q  Has the -- oh, sorry, no.  Just one more thing on
24    your CV here.  You have psychologist 2004 --
25    May 2004 to December 2011.

Page 37

1         Were you a clinical psychologist during that
2     period?
3 A  Yes, that's correct.  But the term clinical
4     psychologist isn't part of the formal title that
5     the institution gave.
6 Q  Did you see patients during that period?
7 A  Yes, I did.
8 Q  And were the majority of your patients during that
9     period adults?
10 A  Yes, they were.
11 Q  Any adolescents?
12 A  Yes.
13 Q  What percentage of your patients during that period
14    were adolescent, would you say?
15 A  Roughly 5 percent, perhaps.
16 Q  And has the entirety of your professional career as
17    a psychologist been in Canada?
18 A  Predominantly in Canada.  I would hesitate to say
19    all.  The gray part of the line would be I was
20    still in the U.S. while doing my master's degree.
21    And I was employed as a research assistant
22    specifically in neuroscience and in neuropsychology
23    for several years.
24        The topics were -- had no direct relationship
25    with the topics I study now, but it, of course,

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 38

1 involved the same kinds of tools that are how to
2 assess somebody's brain health, neuropsychological
3 functioning, right down to the brain anatomy
4 itself.
5        So the tools include several of the tools I
6 still use today, but the topics and the behavioral
7 syndromes that the people were exhibiting are
8 different from the ones I study now.  So I --
9 Q  Have you had -- sorry.  Go ahead, you can finish.
10 A  So I was employed especially in a research context
11 within psychology for a few years in the U.S.
12 before I became Canadian.
13 Q  Any clinical practice in the United States?
14 A  Again, these overlap.  The functions I was doing
15 then was to help analyze on the research end
16 information we were gathering from psychological
17 and neuropsychological assessment and clinical
18 assessment.
19        So it was clinical research, whether one
20 counts that as research or clinical reasonably and
21 appropriately checks both boxes.  You can't do
22 research -- the kind of research we were doing was
23 based on the clinical work that we were doing.  So
24 the same task is legitimately described as both.
25 Q  And was that between 1990 and 1992?

Page 39

1 A  Yes, that is correct.
2 Q  And going back to your clinical psychology practice
3 or work from May of 2004 to December of 2011, you
4 said about 5 percent of your practice was
5 adolescent patients.  Any prepubertal children?
6 A  No.
7 Q  You're not a medical doctor; correct?
8 A  That is correct.
9 Q  Not a psychiatrist?
10 A  That is correct.
11 Q  Not an endocrinologist?
12 A  That is correct.
13 Q  Have you ever prescribed puberty blockers to any
14 individual?
15 A  No, I have not.
16 Q  Hormone therapy?
17 A  No, I have not.  I'm wondering -- I guess I have a
18 question about your question.
19        How are you using hormone therapy to be
20 different from a specific hormone?  To me those
21 are -- one is the subset of the other.
22 Q  Well, do you prescribe medications?
23 A  No, I do not.
24 Q  So you've never prescribed puberty blockers to any
25 individual?

Page 40

1 A  That is correct.
2 Q  And you have never provided gender-affirming
3 hormone therapy to any individuals?
4 A  That is correct.
5 Q  Do you have any formal education or training
6 related to the treatment of gender dysphoria?
7 A  Yes.  The Canadian training model is different from
8 the American training model, however.  So it's
9 difficult to compare them one to one.
10        Also, it's not -- clear is not the right
11 word -- to the extent that people who say that
12 they're offering training models, it's not clear,
13 and I don't want to take for granted that they are
14 legitimate training models.
15        They are usually a list of information, people
16 give it a title every -- and people in different
17 circumstances or context will accept it as that,
18 but these are not the kind of established,
19 validated testing programs where anybody's, you
20 know, tried to see what kind of outcomes and what
21 the appropriate content of such programs are.
22        But to get to your question more specifically,
23 the training model used up here in Canada is much
24 more similar to the European models than to the
25 American models.  Where the American models, as I

Page 41

1 say, are, you know, here's a folder with a correct,
2 you know, title and description to it, and here's
3 the test at the end, that's that, we now call you
4 qualified, Canadian and European models apply a
5 much more apprenticeship-oriented model where here
6 are the readings, here are the patients.  Let's go
7 over it all and start talking about it all and
8 develop a more comprehensive way of integrating all
9 of the information, acknowledging all of the
10 unknowns that we have.
11        So, as I say, in Canada we don't have the kind
12 of -- I don't know if credential-oriented is the
13 right description, but, you know, on-paper method
14 which is much more of the American model.
15 Q  Well, when --
16 A  I think there's also --
17 Q  When did you have the Canadian model of formal
18 training related to gender dysphoria?
19 A  I would divide that into two pieces, a clinical
20 portion and the research portion.
21 Q  And when was the clinical portion?
22 A  It was during my internship here.  The final year
23 of my training as a clinical psychologist.
24 Q  And what year was that?
25 A  Oh goodness.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

---

Page 42

1 Q  I can look on your --

2 A  '98/'99, I think it was.

3 Q  And when was your research module of training?

4 A  Again, it's hard to nail it down within those

5     terms, because it doesn't fit that kind of a model

6     quite -- it doesn't fit that way of thinking about

7     how the training works.

8        It's not like a plumbing or Calculus 1 where,

9     you know, it's a pretty set, known, widely used set

10    of material where people know what you get in

11    Calculus 1.

12       A great deal of the relevant research,

13    research methods would have been over the course of

14    my postdoctoral study -- over the course of my

15    postdoctoral studies, which would have been, you

16    know, in the first few years of 2000.

17       But, again, these -- because of the nature of

18    the model up here, because of the particular places

19    and people that I was training with, there's much

20    more of a blend across clinical and research.

21       I was in a research science facility in a

22    clinical research program where the difference

23    between clinical work and research is just how good

24    your documentation is.  If you see a bunch of

25    people and have a rough memory, and you're only

---

Page 43

1     reflecting on your own recollections of it, you

2     know, calling it clinical experience or anecdotal

3     evidence, people would accept that as clinical

4     work.

5        But if you then write down exactly how many

6     people you saw, exactly how many people ended up

7     with exactly what kind of situation, and you do it

8     in a systematic way, now it's research, even though

9     the functions themselves are the same.

10 Q  So taking aside the how, this blended process,

11    let's say, occurred between 1998 and the early

12    2000s; is that right?

13 A  It's correct for timeline.  But, again, I don't

14    mean to be evasive, but to leave enough, you know,

15    blurriness around the boundaries that there was no

16    end of -- as of June, you are now qualified or you

17    are no longer going to be doing any of this after

18    this semester, none of it was that kind of a

19    program.

20       Most training, as I say, is much more an

21    apprentice kind of model where, "Oh, you're good at

22    math.  Could you give us a hand with" whoever it is

23    doing whatever kind of a study.  And so, now we're

24    studying this kind of sexual or gender behavior

25    instead of that kind of sexual or gender behavior.

---

Page 44

1        MR. STRANGIO: I'm about to sort of move into

2     a slightly different section of the CV.  Do you

3     want to take a break, John, for five or --

4        MR. RAMER: I'd welcome a break, but it's up

5     to Dr. Cantor, if he would welcome one.

6        THE WITNESS: Oh, more specifically, my

7     coffee's empty.  So yes.

8        MR. STRANGIO: Okay.  Let's do five minutes

9     and we'll come back in five.  Thanks.

10       (A recess was taken.)

11 BY MR. STRANGIO:

12 Q  On your website, Doctor, you describe the main

13    focus of your research as being on the role of the

14    brain and human sexual interests, especially

15    atypical sexualities; is that right?

16 A  Yes, that sounds right.

17 Q  So the majority of your work, as you describe it,

18    has been focused on what you describe as atypical

19    sexualities?

20 A  That's the best all-encompassing phrase I can think

21    of to capture it quickly, but, yes.

22 Q  What are atypical sexualities?

23 A  As I say, I use the term specifically to be broad,

24    but it's not an official term.  To break it down

25    into pieces, I would say it breaks down into sexual

---

Page 45

1     orientations other than, you know, predominant

2     heterosexuality.

3        So it would include, you know, the various

4     homosexualities, bisexualities, more recently

5     people referring to themselves as asexual, some

6     people adopt terms like hypersexual and so on.

7        For gender identity, you know, of course, it

8     includes identifying originally as male or female.

9     But now people, of course, identifying with, you

10    know -- again, adopting very many different terms,

11    describing it in very many different ways.  And, of

12    course, in the group of atypical sexualities that

13    are called the paraphilias.

14       And, again, there's no concrete objective,

15    clear demarcation for what counts as a paraphilia

16    or not.  In general, the phrase is used for people

17    with a sexual interest pattern or sexual

18    interest -- a sexual interest pattern either in

19    people, kinds of people, or in activities that are

20    not merely atypical, not merely statistically

21    unusual, but that they experience that interest

22    pattern as profoundly and as deeply as sexual

23    orientation.

24       To them, you know, if the thing that they're

25    attracted to is not involved in the situation, it

---

Circle City Reporting
317-635-7857

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 46

1 to them is not a sexual situation at all.
2 Q Is being transgender an atypical sexuality as you
3   describe it?
4 A As I describe it, I would include it among -- I
5   would include gender identities and gender
6   dysphoria within the term as I use these terms, but
7   I also have to acknowledge that, again, these are
8   not official terms with very specific lines.  There
9   are other people who would use, you know, these
10  terms in different ways.  And as long as we clarify
11  who we're talking about, you know, we can have a
12  perfectly productive conversation.
13      But I don't want to say, you know, I use the
14  term one way; and, therefore, you know, if somebody
15  else says it counts or it doesn't count that there
16  even is a right or wrong to it.  But I use the term
17  because of its breadth in order to include things
18  like gender identity.
19      Oh, and also in the atypical sexualities, I
20  would also include the various kinks.  And, again,
21  what's a kink versus what's a paraphilia is not
22  very clear.  One blends into the others.  There are
23  kinksters for whom, you know, if the thing that
24  they're into, yeah, some sexual encounters will
25  include it, others not.  But for others if it

Page 47

1 doesn't include whatever thing it is that they're
2   into, it doesn't count at sex.
3      So it's tough to come up with a -- there's no
4   good objective, definite, uniformly accepted
5   boundary between them.
6 Q And have you done any research relating to
7   transgender people and/or gender dysphoria?
8      MR. RAMER: Objection to the form.
9 A I have.
10 Q What was that research?
11 A I've done research on various relatively technical
12  aspects, including, you know, how to develop, you
13  know, formal questionnaires and the psychometric
14  properties of those questionnaires.
15      I guess by psychometric I mean the statistical
16  properties of how to form a test in order to make
17  sure that the test is testing what you want it to
18  be testing and not merely just asking the same
19  question over and over and over again 10 different
20  ways, but not providing 10 different pieces of
21  information.
22      I've also done research on the role of the
23  brain and age of puberty and how going through
24  puberty at different ages affects, you know, the
25  course of brain development.

Page 48

1 Q Any research on the mental health outcomes of
2   people with gender dysphoria?
3 A No.  I don't think I've done any direct work on
4   clinical outcomes.
5 Q On page 10 of your CV, which is up here, I just
6   want to ask you about a few things.  You have here
7   listed under your "Funding History" a five-year
8   grant September 2015 entitled "Effects of sex
9   hormone treatment on brain development: A magnetic
10  resonance imaging" -- oh, no, sorry, is someone
11  moving this?  Okay.  Sorry.
12      MODERATOR: It said you didn't have access to
13  move it.  So I was trying to give you control
14  again.  I think it's Zoom messing up.  Sorry about
15  that.
16      MR. STRANGIO: Oh, no, it's okay.
17      THE WITNESS: Oh, we need Lieutenant Uhura
18  again.
19      MR. STRANGIO: I thought it was me.
20 BY MR. STRANGIO:
21 Q I'm going to start that over.  So we have here
22  under "Funding History" on your CV a five-year
23  grant from September of 2015, "Effects of sex
24  hormone treatment on brain development: A magnetic
25  resonance imaging study of adolescents with gender

Page 49

1 dysphoria."
2      Do you see where I'm looking?
3 A Yes, I do.
4 Q And what is this grant?
5 A It was essentially as it sounds.  It was an attempt
6   to investigate what happens -- you know, what
7   happens in the brain, doesn't happen in the brain.
8   You know, in what patterns does the brain develop
9   amongst people who are being treated and receiving
10  different kinds of treatment, whether medical or
11  nonmedical, over the course of puberty.
12 Q And you were not the principal investigator in
13  this -- was it a study?
14 A It was a -- well, is a research grant.  And so, it
15  was the request for the government funding in order
16  to conduct the study --
17 Q Did the government --
18 A -- studies, I should say.
19 Q Did the government provide the funding for this
20  particular research question?
21 A Yes, it did.
22 Q And you were not the principal investigator for
23  this grant?
24 A That is correct.  That one was done by
25  Dr. VanderLaan.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 50

1  Q  What was your role?
2  A  Again, I handled the technical parts.  I was the --
3     I don't want to say the expert on brain anatomy,
4     but I was the connective tissue between the, you
5     know, neuroanatomists and the other sex researchers
6     involved in the project.
7         Especially then, I was one of the very few
8     people in the world at that time that had a foot in
9     each of those camps and was able to help everybody,
10    you know, coordinate and cross these various fields
11    helping the sex researchers, you know, asking these
12    questions, helping them understand how MRI research
13    works.  How, you know, brain analysis works.  How
14    the statistics are done.  Why things are done the
15    way that they're done.  The strengths and
16    shortcomings and different methodological
17    principles available -- procedures available to
18    them.
19        As I say, it's a highly, highly
20    interdisciplinary field.  And in order to use
21    really these, you know, very, very high-end
22    research techniques, you know, there are only a few
23    people who can at the same time talk to both the
24    sex researchers and the statisticians and the
25    neuroanatomists.

Page 51

1  Q  And this was a grant for a five-year period; is
2     that right?
3  A  Yes, that's correct.
4  Q  Were your findings published?
5  A  I hesitate to say mine, because those, of course --
6     that was before I actually left the academic world.
7     But, yes, it's been published.
8  Q  And where is it published?
9  A  Oh, goodness.  I don't remember.  I'd have to look
10    it up.
11 Q  Is it in your CV?
12 A  No, I didn't participate.  As I say, once I left
13    the academic world, then -- I was going to say left
14    the project, but that makes it sound a bit more
15    dramatic than true.
16        I'm, you know, in regular e-mail contact with
17    several of these people and answer questions where
18    I can here and there, but I wasn't dedicating --
19 Q  But you didn't stay on as a co-investigator on this
20    particular grant?
21 A  Yes, in the sense that I didn't have the kind of
22    active, ongoing, you know, regular input attending,
23    you know, the weekly meetings and so on.  But I --
24    at the same time, it wouldn't be fair to say that
25    there was some kind of formal resignation process.

Page 52

1     It was just we all moved on, and that's that --
2     well, I moved on, I guess I should say.
3  Q  And you're not listed in any of the papers that
4     were published as a result of this grant?
5  A  That's correct.
6  Q  And there's a second grant listed at the top.  That
7     is from July of 2018 for five years.  And this was
8     "Brain function and connectomics" --
9  A  Connectomics.
10 Q  -- "connectomics following sex hormone treatment in
11    adolescents experience gender dysphoria."
12        Was this a grant that was also received by
13    your -- by this research team?
14 A  Yes.
15 Q  And you were not the principal investigator on this
16    grant?
17 A  That's correct.
18 Q  Do you remain a co-investigator on this one?
19 A  The situation is the same.  This one, you know,
20    was -- it was awarded in 2018, but, of course, the
21    design and the submission was ahead of that.
22        My involvement was the same.  I was
23    essentially the consultant, you know, helping
24    everybody communicate to each other, helping them
25    figure out, you know, what are the kinds of brain

Page 53

1     features they should be looking at as the next
2     logical steps.
3  Q  And in what year did you leave -- or let's just --
4     I'll rephrase that.
5         In what year did you move on from this
6     particular academic position and, therefore, this
7     grant?
8  A  I'd have to look through my e-mails to find the
9     actual date of my formal letter of resignation from
10    CAMH, but all of this was happening roughly around
11    2017, 2018.
12 Q  And so you will not be an author on any of the
13    published findings out of this grant?
14 A  I've learned never to say never.  It's not my plan
15    and intent, but that isn't to say that if they come
16    to me with, "James, we found, you know, this
17    strange thing that we thought you'd find
18    interesting, or we need your input on, or we ran
19    into some piece of the mathematics we can't figure
20    out," again, I have no -- I'm still a scientist at
21    heart.  I still enjoy the material.  And I would do
22    my best to try to fit it in.
23 Q  For the two pieces of grant funding listed in your
24    CV under "Funding History," you don't anticipate
25    being involved in the published findings of either

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 54

1 of them?
2 A That's correct.
3 Q How were the study participants recruited for these
4 two grants?
5 A Through the clinics that see kids with gender
6 dysphoria.
7 Q And do you know approximately how many individuals
8 were enrolled in each?
9 A No.
10 Q More than 50?
11 A Again, I don't know. There are oftentimes changes
12 in design that would have happened, you know, once
13 the project itself got going.
14     As I say, I'm not involved in the day-to-day
15 running of the project. So I wouldn't be apprised
16 of progress or changes.
17 Q And how would you describe the study design of
18 these two grant projects?
19 A Case control.
20 Q And what does that mean?
21 A A group of people who are undergoing one set of
22 circumstances and series of brain scans, and we
23 come up with what's essentially an average brain,
24 if it could be called -- average brain image, if
25 one could be called that. And then compared to

Page 55

1 people as matched on as many variables as we can,
2 you know -- or they can, I should say, match them
3 on similarly developed and equivalent average brain
4 of the control group. And then through an
5 exquisitely bizarre set of statistics use what's
6 more like image analysis than, you know,
7 traditional statistics in order to identify
8 patterns in the averages of the images and connect
9 that back to what are those differences in the
10 images and the patterns, you know, tell us about
11 the structure of the brain itself.
12     And then in turn, what do those changes in the
13 structure of the brain tell us about the
14 developmental processes that led to those
15 differences.
16 Q And the control groups, were those study-enrolled
17 participants, or was that a control developed from
18 data of the general population?
19 A I'm sorry, could you ask that again? I'm not sure
20 those are different groups.
21 Q Was the -- were there particular individuals
22 enrolled in the study who were not receiving
23 treatment that represented a control group?
24 A The control group would be people not receiving any
25 kind of gender-related treatment, yes.

Page 56

1 Q And they also had a diagnosis of gender dysphoria?
2 A No, these would be -- depending on the question,
3 each of these, again, were grants, you know, that
4 were enabling the funding of several different
5 research projects all boiling down to neuroimaging,
6 but it wasn't like the final research paper which
7 reported a single set of analyses, you know, to
8 answer a specific question.
9     Different parts of the grant were aimed at
10 answering different questions, each using different
11 kinds of methods. Some would compare the gender
12 dysphoric kids to non-dysphoric kids. Some would
13 compare the gender dysphoric kids to their
14 non-dysphoric siblings.
15 Q Got it.
16 A And in early pilot studies, we would even do it
17 versus what I can only call stock brains, you know,
18 there exist large databases, you know, of images
19 that have been accumulated over many years, you
20 know, and are just available as gen -- I hesitate
21 to use the word generic, but generic-controlled
22 samples because -- especially because getting MRIs
23 on someone is so expensive that if we can get just
24 a group of healthy controls that anybody can use,
25 you know, with socioeconomic status already

Page 57

1 reported and controlled and age already reported
2 and controlled that they, you know, can be used as
3 a generic set of -- a generic control sample for
4 just about any study. Typically that would be done
5 early in development -- early in the development of
6 a study.
7 Q But for these particular studies, you had at least
8 two variables, one of which was experiencing gender
9 dysphoria and one of which was receiving sex
10 hormone treatment?
11 A My hesitation is a quibble in that, you know, those
12 are not necessarily separate variables, you know,
13 so they wouldn't get chopped apart so easily. But
14 the issues, the features, you know, being
15 investigated sometimes were the gender dysphoria
16 itself and sometimes were the effects of the
17 medications and treatments that they were receiving
18 or potentially receiving.
19 Q But your controls neither had gender dysphoria, nor
20 were receiving sex hormone treatment?
21 A That's my recollection of the plan, yes.
22 Q Okay.
23 A As I say, my involvement was in the design of --
24 was in the grant application which proposed the
25 design of the studies. And it's not unusual for,

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 16 of 165 PageID #: 3638

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 58

1  you know, studies to need to be adjusted according
2  to whatever's going on, you know, once the feet hit
3  the laboratory ground.
4       So I couldn't say that, you know, as the
5  studies were conducted and after my involvement was
6  completed, I'll say, I can't speak to the current
7  status of the programs and whether any changes were
8  made, but the original plan was to do it as we
9  described.
10 Q  So going back to your clinical practice, you're an
11    adult clinical psychologist; is that right?
12 A  Yes, that's correct.
13 Q  And as we discussed, you currently are treating
14    approximately 10 patients in your private practice?
15 A  Yes.
16 Q  Are any of those patients transgender?
17 A  They're not.  No one is transgender in the way that
18    most of the public uses the term currently.  But,
19    as I say, especially the public use the term in
20    relatively vague ways that don't always match up
21    with the science.
22       But I do have one at the moment for whom
23    identity issues in general are a topic of their
24    concern but -- a topic of their concern.  So it
25    really would depend on to whom I'm talking and in

Page 59

1  what context would this person's situation count is
2  a legitimate question.  And it depends on how
3  people are using whatever terms and whatever ideas.
4       So if somebody, you know, gave me a
5  description or said, you know, is this a person
6  concerned with this, you know, we could say yes or
7  no.  But whether the person, you know, counts as
8  gender dysphoric, counts as transsexual and so on
9  depends on how the person is using those terms.
10 Q  Is that person an adult?
11 A  Yes.
12 Q  And you have never treated a prepubertal
13    transgender child; is that right?
14 A  Yes, that is correct.
15       MR. RAMER: Objection to the form.
16 Q  And you've never treated a transgender adolescent
17    under the age of 16; is that correct?
18 A  Yes, that's correct.
19 Q  Have you treated anyone under the age of 16?
20 A  No, I have not.
21 Q  And as I understand from previous testimony, the
22    extent of your clinical experience with transgender
23    adolescents has been providing counseling to eight
24    transgender patients between the ages of 16 and 18
25    in your career; is that right?

Page 60

1  A  For being a formal clinician for cases, that number
2     sounds about right, yes.
3  Q  And that was the number you gave in your testimony
4     in Alabama in May of 2022.  So has that changed
5     since then?
6        MR. RAMER: Objection to the form.
7  A  No, I don't think there's been anybody else in that
8     age range since that time.
9  Q  Have you ever diagnosed a child with gender
10    dysphoria?
11 A  No.  Diagnosis, of course, is a subset of clinical
12    activities.  So it's the same -- it's within the
13    same boundaries.
14 Q  Since you've never treated a child, you've never
15    diagnosed a child with gender dysphoria it would be
16    fair to say?
17 A  That is exactly.  Lovely when logic lines up.
18 Q  It's rare.
19 A  A rare pleasure we can call it.
20 Q  Have you ever diagnosed an adolescent with gender
21    dysphoria?
22 A  Not that I recall.
23 Q  Have you ever monitored an adolescent patient with
24    gender dysphoria who was being treated with hormone
25    therapy?

Page 61

1  A  That would depend on what one means by monitored.
2     I wouldn't have followed such a person or monitored
3     their medical treatment, for example.  You know,
4     looking out for or interviewing regarding, you
5     know, physical side effects, that would have been
6     done by one of the physicians on the person's
7     clinical care team.
8        But I would have been involved in, you know,
9     progress and effects and so on on the person's
10    mental health status and development while they
11    were undergoing physical transition.
12 Q  Well, you would have.  Were you ever involved?
13 A  I was involved in such cases, yes.  I meant
14    hypothetically to be the different hypothetical --
15    to be the different ways to interpret the question,
16    not my role in the case.
17 Q  So that would have been with the eight patients
18    that you have seen between the ages of 16 and 18,
19    some of those patients were on hormone therapy?
20 A  Yes, that's correct.
21 Q  And how were you monitoring their well-being on
22    hormone therapy?
23 A  Oh, regular mental health assessment.  As people
24    were going through, you know, transition, you know,
25    part of that, you know, during the clinical

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 17 of 165 PageID #: 3639

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 62

1 standards, especially of that time, you know,
2 checking in regularly with their -- with
3 psychologists and mental health professionals, you
4 know, was part of the process.
5      So it was a combination of reviewing the
6 various documents such as from schools and
7 employers where relevant.  And a lot of it, of
8 course, face-to-face interviews and with the
9 clients themselves.
10 Q  And when was this?
11 A  This would have been over the course of my -- while
12 I was at CAMH for my internship and a few years
13 after -- several years after.
14 Q  Can you give me those particular range of years?
15 A  Oh, 1998 through probably roughly 2005.
16 Q  So you have -- since 2005, have you provided
17 clinical treatment to any transgender adolescent?
18      MR. RAMER:  Objection to the form.
19 A  Of the eightish, a small -- twoish, perhaps, were
20 between 2005 and today.
21 Q  And when was the most recent adolescent patient
22 with gender dysphoria that you saw as a clinical
23 psychologist?
24 A  Three years ago, four years ago.  Again, depending
25 on, you know, who counts which way, there are

Page 63

1 people who come in periodically for -- to check in
2 or catch up or somebody is now later experiencing,
3 you know, an unrelated issue, but because they know
4 who I am and we have a developed relationship, you
5 know, we can continue consultation or therapy or
6 whatever's appropriate, or there will be somebody,
7 again, not currently concerned with a
8 gender-related issue, but had gender-related issues
9 earlier in their lives.
10      So it's integrated as part of a comprehensive
11 assessment in getting to know the person, but not
12 necessarily the topic that brings them into therapy
13 to begin with or brings them into therapy to see me
14 specifically.
15 Q  So just to summarize, in your career you have seen
16 approximately eight transgender adolescents as a
17 clinical psychiat -- excuse me.
18      In the course of your career, you've seen
19 approximately eight transgender adolescents between
20 the ages of 16 and 18, six of those were between
21 1998 and 2005?
22      MR. RAMER:  Objection to the form.
23 A  That sounds basically correct, yes.  My, you know,
24 knowledge and expertise and the material, of
25 course, is about the science itself, not in the --

Page 64

1 when I see these people, this is what I do, as I
2 say.  I'm relying on the evidence itself, not my,
3 you know, personal anecdotal experience with them.
4 Q  And for the eight patients that you saw as a
5 clinical psychologist, what was the nature of the
6 counseling that you provided?
7 A  The nature of the therapy and counseling with them
8 really depended on whatever it was that was going
9 on in their lives.
10      The research demonstrates that the people who
11 do best are the ones who have -- who are able to
12 navigate and who have the support in order to
13 navigate typical, I'll say, life stretches and
14 developmental courses.
15      So for many of these people, it was dealing
16 with usual, you know, what do I do with my life, or
17 I'm upset about or I'm having difficulty finding
18 educational experiences or friendship groups or,
19 you know, significant others.
20      So they were often -- I don't want to use the
21 word generic, but they were, you know, very similar
22 issues to what, you know, other people attending
23 therapy would be experiencing.  But the potential
24 role that these other indicators had was greater
25 for most of these people because they had

Page 65

1 additional stressors to be going through; and,
2 therefore, needed that much more strength in order
3 to be able to handle the stresses that accompany
4 transition.
5      So the content of the therapy with them
6 usually would be the same content as with anyone
7 else, but there were -- there was for many of these
8 people more on the line, for a lot of people a
9 decision, for example, about what -- in the U.S.
10 you say college, in Canada we say university -- in
11 decisions about what university to attend would be
12 attached to social engagements, social
13 opportunities.  The pressure on somebody who, of
14 course, is not just gender dysphoria, sexual
15 orientation often can have a similar impact, being
16 in urban versus rural environments, conservative
17 versus liberal environments.  There's more on the
18 line for somebody -- for youth experiencing gender
19 dysphoria in planning or undergoing transition.
20      So the particular issues are the same.  I'm
21 sorry, I'm repeating myself, but the circumstance
22 and context in which they're doing it is more
23 complicated or there's more involved in it.
24      So it's often very useful for them to
25 double-check their thinking or to receive, you

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 18 of 165 PageID #: 3640

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 66

1  know, feedback from somebody who's, you know,
2  familiar with and experienced with, you know, other
3  people going through similar issues.
4  Q  So in some sense, you are providing to these eight
5  adolescent patients counseling comparable to what
6  you would provide to other patients?
7  A  Predominantly.  For some people it was specific
8  questions or curiosities or questions or their own
9  concerns about transitions, possibilities of
10  transitions, possible futures for them.  But they
11  were not defined by their gender dysphoria or trans
12  status.  They had all the regular issues that, you
13  know, very many youth have.
14  Q  I want to talk for a minute about your appearance
15  in other cases as an expert.  So I'm going to just
16  go right down to this last page here.
17      I'm trying to think, you mentioned a few
18  states that aren't listed here at the beginning.
19  So I guess my first question is: To the best of
20  your recollection, is this a complete list of the
21  cases in which you have been retained as an expert
22  witness?
23  A  No.  I think there have been some new ones since
24  then.
25  Q  Can you tell me what those ones are?

Page 67

1  A  I'm looking over, because on my bookshelf I have a
2  three-ring binder for each one, because that's my
3  list.
4  Q  Why don't we do this, because you said -- is one
5  additional case Kentucky?
6  A  Yes.
7  Q  Is one additional case Montana?
8  A  Yes.  My hesitation is that it's going to
9  happen.  They sent me the contract, but I haven't
10  signed it and returned it yet.  But by the end of
11  business tomorrow, the answer will be yes.
12  Q  Okay.  So let's just say there's two or three
13  others that are in the works in which you have not
14  yet necessarily submitted any form of testimony.
15  Is that accurate?
16  A  Again, perhaps I'm quibbling on the phrasing, but
17  for submitting testimony for Kentucky, I submitted
18  my declaration 48 hours ago, I think.
19  Q  Okay.  Understood.  And for Montana, you have not
20  submitted anything yet?
21  A  Correct.  As I say, that -- you know, we're all
22  anticipating it about to happen.  And I would not
23  be at all surprised if you're even more familiar
24  with my deadlines on this one than I am.  But it
25  hasn't -- I'm waiting for the -- there's a funny

Page 68

1  old expression, dot and tittle.  People used to dot
2  the "I" and cross the "T."  Turns out that there
3  are words for those.  The dot over the "I" is
4  called the jot, and the cross on the "T" is called
5  a tittle.
6  Q  So that is where we are with respect to that.
7  Understood.
8      Among these cases listed, can you tell me
9  which ones you were deposed in?
10  A  The Indiana case, A.M. versus.  I would have to
11  check my notes for BPJ.
12  Q  Anything else you recall?
13  A  No, not that I recall, because several of the
14  cases -- well, a little less than half now were
15  Frye hearings, they don't involve depositions.
16  Q  Those are the criminal cases -- or, sorry, civil
17  commitment cases?
18  A  Yes.  Again, I wasn't involved in the civil
19  commitment itself.  I was involved in the Frye
20  hearing which, you know, was going to then get used
21  in the -- the questions to those were whether the
22  person was subject to civil commitment in the first
23  place, hence the Frye hearing in order to
24  investigate the scientific issues to decide whether
25  the civil commitment regulations pertained at all.

Page 69

1  Q  So let's -- we'll say -- we will continue to update
2  as your testimony changes in these various cases
3  and call it an ongoing process.  Does that sound
4  fair?
5  A  That, yes, indeed sounds fair.  As I say, the
6  nature of these particular set of cases, it's, you
7  know, me versus various combinations of, you know,
8  people from the AR office versus various subsets
9  of, you know, the same group of experts.
10      So it's, as I say, a rather bizarre, I don't
11  know if I can say unusual, but eccentric, novel
12  situation.
13  Q  Well, going back to the cases involving transgender
14  people, did you ever reach out and offer yourself
15  as an expert in any of those cases?
16  A  No, they all came to me.
17  Q  And one of the cases you have listed here on your
18  CV, No. 5, is Dekker, et al. v. Florida Agency for
19  Health Care Administration.  Do you see that?
20  A  Yeah.
21  Q  What was the nature of your involvement in that
22  case?
23  A  They needed a -- well, my basic involvement was the
24  same as with the other cases.  They needed, you
25  know, to know what the science said and, you know,

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 70

1  what the -- and feedback on the experts -- what the
2  other experts have written and then, you know,
3  comparing their claims against the content of the
4  scientific literature again.
5      So the basic content of my involvement in that
6  case was exactly the same as my involvement in
7  each of the cases, is here are a bunch of claims,
8  which ones match up with the science.
9  Q  And you wrote a declaration in that case?
10 A  Yes.
11 Q  But you were not called to testify at trial in
12    Dekker; is that right?
13 A  That's my recollection, yes.  I don't think it's
14    gone to trial yet.
15 Q  I can represent to you that it has gone to trial.
16    So --
17 A  Oh, okay.
18 Q  -- if you haven't -- if you didn't testify there, I
19    gather you didn't testify at that particular trial.
20 A  That would make sense.  My amnesia gets me, but not
21    that bad.
22 Q  So, yes, you did not unknowingly testify at the
23    Dekker trial we're going to say.
24 A  I almost want to say, can I testify in my sleep?
25    Does that happen?

Page 71

1  Q  I mean, you're the psychologist.
2  A  Perfect answer.
3  Q  And, yeah, so that was my only question on Dekker.
4     So in your declaration in this case, you write
5     about the practices of a selection of your European
6     countries with respect to treatment of adolescents
7     with gender dysphoria; is that right?
8  A  Yes.
9        MR. STRANGIO:  And, Joel, could we pull up
10    Exhibit 1, which is Dr. Cantor's declaration in
11    this case.  I think I am -- am I in control?
12    That's a great question, but --
13       THE WITNESS:  Is this another you're the
14    psychologist?
15       MR. STRANGIO:  Yeah, I'm about to start asking
16    for advice over here, but for now I think I can
17    actually use this Zoom mechanism.
18 BY MR. STRANGIO:
19 Q  Okay.  So you do not provide a comprehensive
20    summary of all the practices of country -- excuse
21    me, you do not provide a comprehensive summary of
22    the practices of all of the countries in Europe; is
23    that correct?
24 A  Correct.  Again, my content was not about the, you
25    know, political situation, policy situation.  My,

Page 72

1  you know, comments are about the science itself.
2  So I included -- what I included were the
3  systematic reviews that were available, all of the,
4  you know, comprehensive systematic reviews that
5  were available.
6      And so, the countries that I mentioned are the
7  countries that have used them, that have engaged in
8  them, but I haven't -- didn't attempt to make a
9  review of the political policy orientations of any
10  countries -- well, set of countries.
11 Q  So England, Finland, Sweden, France and Norway are
12    the only countries that have done systematic
13    reviews of the evidence with respect to the
14    treatment of adolescents with gender dysphoria?
15 A  That I am aware of.  France didn't conduct its own.
16    They conducted a review, but not the -- but not a
17    systematic review of the original research.
18 Q  Then why did you include France?
19 A  They conducted a non -- a review, but not a formal
20    systematic review of the evidence as they were, you
21    know, evaluating their own set -- oh, actually,
22    that would be a better way of phrasing it.
23      That I included the countries that have, you
24    know, engaged in reviews of their policies, but, of
25    course, the ones that I deal with, you know, in its

Page 73

1  own section emphasizing are, of course, the
2  systematic -- the ones that conducted systematic
3  reviews.
4  Q  So there are no other countries in Europe that have
5     engaged in reviews of their own policies other than
6     these five countries?
7  A  I don't think I can claim negative in that I
8     haven't looked at every single country that did.
9     Essentially these are the ones who have done it,
10    who have conducted the kinds of reviews and then,
11    you know, made conclusions and asserted policies on
12    the basis of those reviews.
13      But I couldn't say that no other country has
14    done it more than feasible -- it's theoretically
15    possible, especially because they don't all publish
16    everything in English, it's certainly possible that
17    others have that I haven't become aware of.
18 Q  But these were the ones that did reviews and came
19    to conclusions with respect to the evidence similar
20    to your own?
21 A  Well, the ones that I reviewed, the ones that I
22    included would -- included their conclusions,
23    period.  They happened to have come to the same
24    conclusions about the science that I've come to
25    about the science, but there was no -- I wouldn't,

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 74

1  in fact I would work very hard to avoid, you know,
2  the kind of cherrypicking where I would only cite,
3  you know, or pick the ones who come to a particular
4  conclusion in any direction.
5  Q  But you're just not sure whether there are other
6  countries in Europe that have done different
7  reviews?
8      MR. RAMER: Objection to the form.
9  A  Again, I haven't attempted a country-by-country
10  search, you know, each in their various languages
11  to see if there's something that's been less
12  publicized or less internationally released.
13     So I can't say with any kind of certainty that
14  none exist, but these are the -- so I can't say
15  that none exist. I can only say that I'm not aware
16  of any.
17  Q  So you didn't do a systematic review of all of the
18  countries' policies?
19  A  Of countries' policies, correct.
20  Q  On page 7, paragraph 16, you write here at the
21  bottom -- towards the bottom of paragraph 16
22  speaking about the European policies, "These range
23  from medical advisories to outright bans on the
24  transition of minors." Did I read that correctly?
25  A  Those sounds like my words. I'm just squinting to

Page 75

1  take the --
2  Q  Yeah, here we go.
3      MR. RAMER: And, Doctor, you have your -- am I
4  correct you have your blank printout as well?
5      Chase, is it okay if he consults that?
6      MR. STRANGIO: Yes, absolutely. I was about
7  to get my reading glasses, but I also made it
8  larger if that's helpful.
9  A  Both are good, as I say. And here's my three-ring
10  binder for this one.
11  Q  So, again, we're in paragraph 16, page 7. "These
12  range from medical advisories to outright bans on
13  the medical transition of minors."
14  A  Yes.
15  Q  Which of the countries that you identified in your
16  declaration have outright bans on the medical
17  transition of minors?
18  A  The UK, Sweden, Finland. Am I forgetting somebody?
19  Q  So is it your opinion --
20  A  Yes, those three.
21  Q  It's your opinion that the UK, Finland and Sweden
22  have outright bans on the medical transition of
23  minors?
24  A  People can certainly quibble over the definition of
25  ban, but they have essentially, you know, reversed

Page 76

1  course from the wide availability that they had
2  restricting it only to specific formal approved,
3  you know, research studies.
4  Q  So you consider accessing treatment in a formal
5  approved research study to be an outright ban on
6  medical transition?
7      MR. RAMER: Objection to the form.
8  A  There's something funny embedded in that question.
9  That one is that they are restricted to research
10  studies which in turn select only particular people
11  under particular circumstances -- in particular
12  circumstances when they fit the -- whatever the
13  inclusion criteria are for the study. I don't
14  think it would be accurate to refer to that as
15  access.
16     It's not access. You know, what they would be
17  participating in, what they would be volunteering
18  for is participation in a research study as a
19  research subject, which is in turn medically
20  supervised and so on, which is -- again, especially
21  in countries -- this is one of the main
22  distinctions between the U.S. and the rest of the
23  world is that, you know, it's a public healthcare
24  system. Access means access.
25     And, you know, so participating in or

Page 77

1  volunteering for studies that involve, you know,
2  physical transition is not part of the you go to a
3  doctor and you show your health card and you get
4  access. That's -- as I said, that term does not
5  accurately depict their situation.
6  Q  We're not talking about access. We're talking
7  about --
8  A  I'm sorry, I thought you used the word.
9  Q  -- outright bans on the medical transition of
10  minors.
11     So my question was: Do you consider
12  enrolling -- limiting treatment to a research study
13  to be an outright ban on the medical transition of
14  minors?
15     MR. RAMER: Objection to the form.
16  A  Again, the use of the word treatment has some
17  assumptions built into it that don't very
18  accurately fit.
19     What the results of the systematic reviews of
20  the science and, you know, to the best of my
21  reading the science itself, says is that these are
22  not ready to be called treatments. These are
23  experiments. We're not sure when, for whom, under
24  what circumstances and in which way, you know,
25  these kind -- these interventions are helpful

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 78

1 versus harmful and how to weigh the potential risks
2 with the potential benefits.
3         It's not yet ready for prime time.  To refer
4 to it as a treatment would insinuate at least that,
5 you know, it has already, you know, been subject to
6 the kinds of analyses that we apply in providing
7 evidence-based medicine.
8 Q  Okay.  Well, let's ask more specifically.  None of
9 the European countries that you mention in your
10 report have restrictions comparable to the one that
11 was passed in Indiana; right?
12         MR. RAMER: Objection to the form.
13 A  Again, it's -- I can tell anybody, to the extent of
14 my knowledge, what the content of the science is.
15 And when I -- and to the extent that, you know, any
16 given, you know, legal proceeding or law is written
17 in lay language that a non-politician, non-lawyer
18 can read, I can, you know, compare it against the
19 content of the science.
20         The only distinction -- but I can't say that I
21 know the details of all the European various
22 regulations or those particular states within the
23 U.S.  The only distinction I'm aware of is whether
24 research purposes are permitted exemption within
25 the ban.  But I don't think it would be legitimate

Page 79

1 to say that if there's an exception to it then it's
2 not a ban.
3 Q  So you would call it an outright ban even if it had
4 an exemption?
5         MR. RAMER: Objection to the form.
6 A  It would depend on the nature of the exception.
7 Q  So if there was an exception for research, for
8 example, would you call it an outright ban on
9 treatment?  Sorry, excuse me.
10         If there was an exception for research, you
11 would call it an outright ban on the medical
12 transition of minors?
13         MR. RAMER: Objection to the form.
14 A  I would hesitate to make a blanket statement in
15 case -- you know, I can imagine other at least
16 theoretical, you know, reasons that I would or
17 wouldn't call it.  But I don't think that having an
18 exception -- for this particular situation, you
19 know, permitting -- again, we're not even talking a
20 particular research study that's ongoing in any of
21 these.
22         Such laws were -- regulations in Europe were
23 going on despite that there was no research going
24 on.  That was one of the, you know, almost
25 ubiquitous criticisms, was the lack of research.

Page 80

1 And research programs have not been initiated in
2 these places yet.
3         So if a law, you know, permits -- in theory,
4 in the future if somebody else comes up with this
5 thing that doesn't yet exist, the current situation
6 is still such that it's not available, but we're
7 leaving room in the law just in case for the
8 future?
9         It's difficult -- in that circumstance, yes, I
10 think the word ban is including outright ban as a
11 perfectly legitimate descriptor.
12 Q  So in the UK currently, can an adolescent with
13 gender dysphoria access puberty blockers as part of
14 an approved research protocol?
15 A  That's my -- as I say, I don't study closely the
16 public policies of it.  I can testify only to the
17 content -- really only to the content of the
18 science.  But the way you describe it is roughly
19 what I recall of their current policy.  But I don't
20 think that they have yet designed any such research
21 studies.
22         So even though it, you know, maintains and
23 reserves the potential, and as best as I can tell
24 the intent in the future to do that, the process
25 today, still for kids today, is that it's going to

Page 81

1 be a ban for the moment.
2         Things may -- as I say, exceptions, you know,
3 they're leaving room for potential exceptions in
4 the future, but they haven't happened yet.
5 Q  So in paragraph 16 you talk about the various
6 policies and details about the policies.
7         Is it now your position that you're not
8 qualified to talk about the various policies in
9 these different European countries?
10         MR. RAMER: Objection to the form.
11 A  I refer to the content of their reviews of the
12 science.  And I, you know, share, re-review their
13 conclusions of the science.  And I demonstrate not
14 their policies, but their changes to their policies
15 in response to their evaluations of the science.
16 Q  But you might not be that familiar with how those
17 reviews are implementing the practice with respect
18 to the delivery of healthcare in these countries.
19 Is that fair?
20         MR. RAMER: Objection to the form.
21 A  That's a bit overstated, I think.  I haven't taken,
22 and I have no current plans to take thorough -- and
23 I speak as a scientist when I say thorough, I mean
24 almost obsessive -- investigation of the ins and
25 outs of the details.  But on a relatively high

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 82

1 level, I'm generally aware of their application or
2 of applications of science and how it's getting
3 used or misused in public policy.
4 But, as I say, I'm not a public policy expert.
5 I haven't, you know, gone into the details of, you
6 know, countries that are changing. I'm only
7 investigating, you know, the individual groups as
8 they are trying to gather the science for the
9 application of their policies.
10 I think it would be fairer to say that I've
11 spent some time and attention on the use of science
12 in policy -- or the uses of this present body of
13 science in policy, but I haven't studied, you know,
14 policy in and of itself.
15 Q So is it your position that no adolescents with
16 gender dysphoria are currently receiving puberty
17 blockers to treat their gender dysphoria in the UK?
18 A No, that doesn't sound correct to me. Exactly
19 because they're aware -- pardon the pun -- but
20 because their policies are in a transitional
21 status, there were, of course, you know, youth who
22 were already receiving medical transition services.
23 And that, as best as I recall, has been
24 grandfathered in. I don't think that they, you
25 know, stopped, you know, anybody who was already

Page 83

1 receiving treatment. So it wouldn't be fair to say
2 that nobody is currently receiving treatment.
3 What they say they're aiming to put
4 limitations on are the unnecessary or excessive or
5 over availability where medicalized transition
6 looks like is being used to displace other
7 interventions that very, very feasibly could be
8 better matched to these kids' needs and without the
9 sacrifices and risks that are associated with
10 physical transition.
11 Q So there are youth in the UK currently receiving
12 puberty blockers for gender dysphoria?
13 MR. RAMER: Objection to the form.
14 A Again, I hesitate to say that, you know, flat out
15 as a matter of fact, because that's not the --
16 they've already -- that's no longer a piece of --
17 you know, they've already completed their review of
18 the science. And so, that kind of completes how --
19 you know, that level of how closely I'm
20 following -- or that section of what I'm following
21 of what they're doing.
22 They're now -- the implementation or what --
23 the policies to which they're applying the science
24 is, you know, less a focus of what I follow than
25 the application of the science itself. Their

Page 84

1 review of the science is largely complete.
2 Q So at least as to individuals who had been
3 previously receiving puberty blockers for gender
4 dysphoria, that treatment -- or, excuse me, that
5 care is ongoing?
6 MR. RAMER: Objection to the form.
7 A My basic recollection is that they didn't cut off
8 from treatment people who were -- medical treatment
9 people who were already receiving medicalized
10 transition services or at least while a minor.
11 Q That would be true for hormone therapy as well?
12 A I'm including hormone therapy or what most people
13 call hormone therapy under medicalized transition,
14 yes.
15 Q And in your report you also reference Finland. And
16 just right now you referenced Finland as well; is
17 that right?
18 A Yes, that sounds right.
19 Q And do you read and write in Finnish?
20 A No, I do not.
21 Q Do you have a certified translation of the COHERE
22 2020 document regarding their review?
23 A Not of the full document, no, I don't think.
24 Q So you're basing your understanding of the Finnish
25 review on an uncertified translation?

Page 85

1 A No, that's not exactly true either. As a matter of
2 fact, I was due to go to Finland in the next couple
3 of weeks, but had -- you know, for a conference
4 that they're holding, you know, bringing together
5 the experts on exactly these topics.
6 And, of course, I'm in regular communication,
7 you know, with people all over the world within my
8 field and more and more commonly with this one.
9 You know, they've also been, you know, discussing
10 the issues themselves regularly in the media in
11 English and Finnish.
12 And, you know, to the extent that they have
13 also been, you know, releasing statements and
14 conversations with other people within the program
15 have been, again, in English. And all of it is
16 exactly consistent with each other. Nobody's
17 identified and nobody's, you know, claimed that
18 there have been any contradictions in any of the
19 available translations in any of the statements
20 that the scientists involved with it -- you know,
21 what they have said in English versus what they
22 have said in Finnish.
23 There have been no contradictions between the
24 conclusions that they came to versus the
25 conclusions that have been produced by scientists

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 86

1    in other countries.

2 Q  But typically are the only systematic review an

3    outline of the medical practices in Finland -- the

4    only official versions of the systematic review for

5    the Finnish medical authorities are in Finnish?

6        MR. RAMER: Objection to the form.

7 A  I would have to check through my files to see if

8    that's still true. Another publication -- by

9    coincidence, not soon after I submitted this

10    declaration -- again, I would have to look through

11    and check to see if those were Sweden or Finland,

12    recently published in English a peer-reviewed

13    document, you know, summarizing the content of what

14    was originally in their native language.

15        And, again, I keep mixing up several of the

16    Scandinavian states, Finland and Sweden, and which

17    one contained within itself, you know, English

18    language summaries.

19        English is -- of course, you know, despite the

20    original languages that many reports are published

21    in, you know, throughout all of science, English is

22    still the lingua franca. The circulation of the

23    materials, the abstracts of the materials and so on

24    are still circulated in English.

25        And my conversations with the scientists

Page 87

1    themselves, including the ones who publish the

2    relevant studies, you know, we're in regular

3    contact with each other who, you know, certainly

4    have confirmed our whole conversations were based

5    on, you know, the idea of what the studies said --

6    of what the studies resulted. Also --

7 Q  And by studies, you don't mean studies, you mean

8    systematic reviews; right?

9 A  I'm kind of blending -- your mind is going exactly

10    where mine was headed. These two are blended. The

11    content of these systematic reviews -- of

12    systematic -- the content of systematic reviews is

13    largely the list of the papers getting reviewed.

14        So even though -- you know, and it is not at

15    all difficult to determine in any language Appendix

16    A is the list of studies included, you know, the

17    list of studies in Appendix B are the studies that

18    were not included. And those list of studies, you

19    know, have English titles published in English

20    journals and so on. And I'm very, very familiar

21    with every one of those studies.

22        So they have produced, you know, what are

23    entirely transparent lists of what was included and

24    what was not included. This was not a dense text

25    in which one needs a translation in order to

Page 88

1    identify subtle potential differences between how

2    something was originally written versus described.

3    The differences between what is included and what

4    is not, what was determined to be useful versus

5    not. And the result is very, very easy to

6    determine.

7        And, as I say, the studies themselves are

8    exactly the same studies that I'm very, very

9    familiar with to begin with.

10        MR. RAMER: Chase, if you have a good breaking

11    point, we've been going a little over an hour,

12    but --

13        MR. STRANGIO: I think if it's okay with you

14    both, I'd like to just finish up this section, and

15    then we could even break for lunch around noon, or

16    what are you thinking?

17        MR. RAMER: Over to Dr. Cantor, how he --

18        MR. STRANGIO: Yeah, are you --

19        THE WITNESS: That's fine with me.

20        MR. STRANGIO: Okay.

21 BY MR. STRANGIO:

22 Q  So let's just take a step back. Finland has not

23    cut off puberty blockers and hormone therapy for

24    patients who had previously been receiving those

25    interventions, have they?

Page 89

1 A  To the best of my knowledge, Finland has grand-

2    fathered people already receiving medical

3    treatments, and that the ban is for additional

4    cases.

5        They're attempting to stave off the -- or halt

6    the flood of new cases for which it is not at all

7    clear that the exist -- that the prior research

8    applies to the new demographic and to the new

9    phenomena that we're observing.

10 Q  And for people prospectively seeking puberty

11    blockers and hormone therapy for gender dysphoria,

12    those interventions are available through clinical

13    trials?

14 A  Again, I don't think it's accurate to refer to --

15    the word access and the word treatment, you know,

16    assumes that -- come with several assumptions that

17    I don't think are valid. For example --

18 Q  Well, I think I said interventions and available.

19    Do you disagree with those formulations?

20 A  Yes, for next-door neighbor kinds of reasons. That

21    is it assumes a current situation that is allowed

22    for, but is not assumed in the procedure itself --

23    policy itself. If, for example --

24 Q  Let's pull up the Finnish policy, just so we are

25    talking about the same thing.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

---

Page 90

1    MR. STRANGIO: So that's Exhibit 7. Joel, you
2    do that part; right? Thanks. Exhibit 7.
3  A  Again, this looks ouija boardish from over here.
4    You talk and magic happens.
5  Q  Well, let's not go that far.
6    Is this the document that you're referring to
7    from Finland?
8  A  Yes, that looks like it.
9  Q  Okay. And I just want to go first to -- so this is
10   under the current care in Finland, "In clear cases
11   of prepubertal onset of gender dysphoria that
12   intensified during puberty, a referral can be made
13   for an assessment by the research group at TAYS or
14   HUS regarding the appropriateness for puberty
15   suppression." Did I read that correctly?
16     MR. RAMER: Chase, can you zoom in a little
17   bit?
18     MR. STRANGIO: Yeah, sorry about that.
19  A  What you read was the content of that sentence, but
20   interpreting what that sentence means requires a
21   little more information -- well, chunks of
22   significant information.
23    That text indicates that that would be the
24   process and that they are leaving permission for
25   that to happen, except they leave permission for

---

Page 91

1    that to happen. Missing from that sentence is that
2    neither -- I'm saying this in a backwards kind of
3    way -- they are limiting the permission to do that
4    to those two hospitals. But when that sentence is
5    isolated, it seems to suggest that, you know, these
6    two hospitals are engaged in such research
7    programs, and I don't believe they are.
8      It's, as I say, in the text of the policy it
9    leaves permission for them to do that, but they
10   have not set up the infrastructure to do it.
11   Also --
12  Q  And you know that definitively?
13  A  No, I don't know that --
14     MR. RAMER: Objection to form.
15  A  -- definitively.
16  Q  So they may have set up research program --
17   proto -- excuse me, they may have set up research
18   groups at the two hospitals listed?
19     MR. RAMER: Objection to the form.
20  A  Again, some things are getting left out there. You
21   know, when this first came through, you know, the
22   best of my understanding in conversations with
23   these people was that there was no -- that there
24   did not then exist such a situation. But as, you
25   know, we've tripped over several times, these

---

Page 92

1    things are changing quickly. People are making
2    plans, and I -- you know, the exact details of
3    every policy are not what I follow.
4      So I necessarily need to leave room for the
5    possibility that they have come up with one since
6    the last time I happened to have heard from anybody
7    there, but I -- they haven't received any kind -- I
8    don't want to say they've received no publicity,
9    they at least have not crossed my desk.
10     Also, in the establishment of their policy,
11   you know, the intention of the policy is put it in
12   place and then the government structure is move on.
13     If they conduct a study, find that, oh, it
14   doesn't actually help these kids so we shouldn't do
15   it anymore, the study wraps up and the rest of the
16   ban remains in place. It leaves, again, in theory
17   the opportunity for there being research, but it
18   would not be fair to say that the situation is more
19   limiting than it was meant to be.
20     They leave a loophole such that it can be used
21   if it can lead to potential changes in the future,
22   but none of those -- there's nothing in it that it
23   assumes that it will be this everliving alternative
24   way to receive medicalized transition services. It
25   just gives permission as just in case, but there's

---

Page 93

1    no indication that -- no reason to interpret it
2    either as permanent or as current.
3  Q  So based on your understanding, those who had
4    previously been receiving medicalized transition as
5    adolescents can continue to receive it; is that
6    right?
7  A  So far as I know, they haven't cut off people
8    already in a medicalized pipeline.
9  Q  And that there is -- they have left open the
10   possibility of future treatment through research.
11   Is that fair?
12     MR. RAMER: Objection to the form.
13  A  Again, for the same reasons as before, I hesitate
14   to say treatment. They've left the door open
15   through research, and then it will be open to the
16   researchers, you know, whether to investigate
17   whatever kind of interventions, changes, whether
18   that counts as treatment, whether that cancels the
19   type of treatment we're envisioning now is unknown.
20  Q  And that's the same as in Sweden; correct? They
21   have not -- in Sweden they have not cut off
22   treatment for those who had previously been
23   receiving medicalized transition, as you call it?
24  A  That -- to the best of my knowledge, that's true,
25   yes.

---

Page 94

1  Q  And in Sweden they have left open the possibility
2      that these interventions may be provided through
3      research?
4          MR. RAMER: Objection to the form.
5  A  Again, I would phrase it a different way, that they
6      have -- that the regulation enables research. And
7      then it's up to the researcher to know exactly what
8      it entails, including the researchers not doing it
9      at all.
10 Q  Is it your view that there is no research in this
11     area happening at all in Sweden at this moment?
12         MR. RAMER: Objection to the form.
13 A  I don't recall there currently being such a study,
14     no.
15 Q  But you don't know?
16 A  Again, I just reflexively leave myself some wiggle
17     room in that these things are changing quickly, you
18     know, they are of enormous interest. And I do not
19     take for granted that, you know, in the very recent
20     past that things have changed.
21 Q  And you mentioned in our conversation Sweden,
22     Finland and the UK, and then you also discuss
23     France and Norway.
24         But France and Norway would not be examples of
25     places that have, quote, outright bans on

Page 95

1      treatment; is that right?
2  A  They have instead, you know, issued policy
3      statements and advisories, you know, indicating
4      their conclusion that medicalized transition is
5      being overused too quickly, too often without
6      sufficient consideration of less-risky
7      alternatives, but they have not implemented -- they
8      have not used the same policies strategies, I guess
9      is the best term I can come up with, that the other
10     countries have.
11         Again, I'm not a medical policy expert. And
12     each of these countries, you know, is run different
13     ways, and they have different tools available to
14     them -- each of these governments has different
15     tools available to them in the way that they
16     regulate medicine, all of which are, you know,
17     entirely unlike the American lack of government
18     control over -- in the U.S. I hesitate to call it a
19     medical system, it's more like a medical industry.
20 Q  So these are all countries with medical systems
21     that fundamentally different from the U.S., you
22     would say?
23         MR. RAMER: Objection.
24 A  They have --
25 Q  What was that?

Page 96

1  A  Yes, each of these countries has an entirely public
2      healthcare system, you know, very -- relative to
3      which the U.S. remains a big international outlier.
4  Q  Medicalized transition, as you call it, is
5      available in France for adolescents?
6  A  It has not reached the level of -- it has -- the
7      documents they've released have not suggested the
8      level of restriction that other countries have.
9      But I don't know, and I don't recall any reports
10     discussing what portions of that, you know,
11     reflect, you know, local political interests or, as
12     I say, the methods by which each of these countries
13     controls -- manage is a better word, manage their
14     healthcare system.
15         I don't know what the alternative strategies
16     or controls the government had, how they get
17     implemented or the extent to which they're issuing
18     policy guidelines or advisories. You know, does
19     that reflect a difference in their conclusion
20     result of the science or just the political
21     facility and speed with which they can produce such
22     changes.
23 Q  So based on your knowledge, neither France nor
24     Norway have outright bans on either puberty
25     blockers or hormone therapy for adolescents with

Page 97

1      gender dysphoria?
2  A  It would be fair to say that current -- that
3      although they have, you know, reversed course, you
4      know, and they have scaled way back from the easy
5      facilitation of medicalized transition, they
6      haven't issued any language that suggests a yank as
7      far back as strongly as the other countries have.
8  Q  Well, I'm not asking for such a descriptive answer,
9      just simply yes or no -- well, I'll say it this
10     way, just is medicalized transition, as you call
11     it, banned in either France or Norway?
12 A  I'm not sure the question can be answered very
13     accurately in just a yes or no, but I think it
14     would be fair to say that the statements available
15     are not as definitive as the ones in Scandinavia,
16     for example.
17 Q  Going back to the --
18         MR. RAMER: Hey, Chase --
19         MR. STRANGIO: Yes.
20         MR. RAMER: -- do you --
21         MR. STRANGIO: This will be my last question
22     on this topic, and then I was thinking we could
23     break for lunch.
24         MR. RAMER: Okay.
25         MR. STRANGIO: Yeah, sorry. I'm not going to

Case 1:23-cv-00595-JPH-KMB     Document 58-8     Filed 06/12/23     Page 26 of 165 PageID
#: 3648
K.C., et al. VS                                                          JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board                           June 7, 2023

Page 98

1 take us down -- I'm not going through every
2 country, I promise, John. I was going to pull up a
3 map, actually, of the whole world, and we're
4 just --
5     THE WITNESS: I was just going to say and now
6 for Latvia.
7     MR. STRANGIO: Yeah. If we could just pull up
8 what I have premarked as Exhibit 6.
9 BY MR. STRANGIO:
10 Q And before it comes up, Dr. Cantor, you reference
11 in your discussion of the UK something called the
12 interim report from Dr. Cass; is that right?
13 A Yes.
14 Q And this is a document that Dr. Cass put together
15 that informed -- is this the document?
16 A Yes, it looks like it.
17 Q And what is this document?
18 A This was -- there were several documents that were
19 released as a bulk. And I can't remember just from
20 the particular date of this one exactly which one
21 was which.
22     This was part of the series of reports and
23 documents where she was indicating the basic
24 results of the systematic review and the
25 comparisons against -- comparisons of its

Page 99

1 conclusions of what the science said with their
2 what was then current policy and why those policies
3 needed substantial revision.
4 Q And then I just want to turn to page 9 here. And
5 this is "A letter to children and young people"
6 from presumably Dr. Cass. Is that a fair
7 assessment?
8 A So far as I can -- so far as I know, yes. Oh, I
9 should also add that I don't think it's fair to say
10 that this is a document that she put together.
11 Q Fair enough.
12 A This was a very -- she was a leader of a very
13 large, very substantial, very talented team. You
14 know, she provided the leadership, and she was
15 selected specifically because she was close enough
16 to the material in order to understand the science,
17 what was going on in the basic field, but not so
18 close as to being a part of it and receiving money.
19 You know, she wasn't making her living from it
20 either.
21 Q Who is the -- who made up the team that she was
22 leading?
23 A Oh, goodness, I couldn't name the particular
24 people. I couldn't name the particular people.
25 Q You said it was a substantial team. How many

Page 100

1 people?
2 A Oh, that's a good question. I remember running
3 across, you know, lists in which they were
4 provided, but I -- these were not -- as I say,
5 these aren't people who are regularly part of the
6 sex research community where I would have run into
7 them over the course of my career.
8 Q So you don't know exactly sitting here today the
9 nature of the team that Dr. Cass led?
10 A No, that's not fair either. The nature of the team
11 were people, you know, with expertise and
12 background in assessment and public healthcare
13 policy. They were, you know, people with the
14 appropriate backgrounds in order to conduct the
15 review. But I don't recall their names, and
16 they're not -- I would have to go through the names
17 to double-check. I don't think any of them was a
18 sex researcher.
19     These are, you know, experts in medical
20 outcomes and medical outcomes research and in its
21 application to public healthcare policy.
22 Q And so, on this page here in this interim report
23 authored by Dr. Cass, the second paragraph she
24 writes, "I have heard that young service users are
25 particularly worried that I will suggest that

Page 101

1 services should be reduced or stopped. I want to
2 assure you that this is absolutely not the case -
3 the reverse is true. I think that more services
4 are needed for you, closer to where you live."
5     Is that correct? Did I read that correctly?
6 A That's the sentence that she wrote. But, again, in
7 its context -- when removed from the context
8 surrounding it, it would seem to be saying
9 something other than what it seems to say when put
10 back into that context.
11     I mean, you know, when isolated like that, you
12 know, it almost sounds like she's saying that she
13 wants to create more gender clinics so that people
14 didn't all have to go to the same clinic in London.
15 That's not what she was saying.
16     In the context of the fuller report and all
17 the other changes, she was putting as
18 diplomatically as a person can in such a polarized
19 cultural situation that the services -- that they
20 need more services, but not necessarily the exact
21 kind of services that they were requesting. I'm
22 even being ambiguous about this myself.
23     She wasn't saying that these people need more
24 gender clinics, and we're going to put more gender
25 clinics in more cities in order to facilitate your

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 102

1 access to medicalized transition. She was
2 recognizing that these people are, and they are,
3 suffering from very substantial mental health
4 issues that are getting unaddressed. Those are the
5 services that she wanted to distribute, make more
6 available. And she was recognizing that these
7 people had great unmet needs, but that the --
8 Q So is it your -- finish. I'm sorry.
9 A But that medicalized transition was not necessarily
10 the best, most-appropriate balance of the potential
11 risks and potential benefits of the alternatives
12 that were available to them.
13     So she wanted better access to services that
14 would help the kids, but one can't isolate that
15 sentence in order to say that she was taking for
16 granted that the service that they needed was
17 medicalized transition.
18 Q So is it your understanding that in England --
19 excuse me, is it your understanding that in England
20 they are not expanding access to services including
21 medical services outside of the central gender
22 clinic?
23     MR. RAMER: Objection to the form.
24 A I'm not sure I'm following your question. When she
25 says -- in general where she says services, she is

Page 103

1 referring broadly to mental health services and
2 social services and help because these kids are in
3 distress.
4 Q And excluding gender transition -- including
5 medicalized transition services?
6     MR. RAMER: Objection to the form.
7 A Again, she's saying what she can say and leaving
8 open possibilities acknowledging the large number
9 of remaining unknowns. And that there are
10 possibilities that things may change in the future
11 as we get better evidence or if research produces
12 something that we're not currently predicting.
13     So she's using carefully crafted language, in
14 my judgment, to leave open the possibilities, but
15 to not make particular promises or to lead anybody
16 down a -- to mislead people down a particular path.
17     It is conceivable that, you know, future
18 research may demonstrate that, okay, this is --
19 that this may indeed, at least for some number of
20 these cases, perhaps that it would be possible that
21 medicalized transition might be the best option,
22 but we can't take that for granted.
23     What is very, very clear is that these kids
24 are in genuine distress, and they're not receiving
25 the supports they need for that distress. And

Page 104

1 although she didn't say it, the research is
2 indicating that -- does suggest very, very strongly
3 that these people are -- that very many of these
4 youth are expecting that a physical gender
5 transition would help them meet their psychological
6 needs when it's not the best balance of potential
7 risks and potential benefits -- risks and benefits
8 for what they're aiming. So she --
9 Q She didn't say that, you're saying that?
10 A Correct. That would be -- that last part is my own
11 assumption -- are my own words, you know. It is --
12 you know, what she said is consistent with it, but
13 I can't say that that is exactly what she's saying.
14     I point out only that when take -- removed
15 from the rest of the context around it, you know,
16 it sounds like she's offering to expand medicalized
17 transition, but that's not at all the full story.
18     MR. STRANGIO: I think we can go ahead and
19 stop there. How long, John, and Dr. Cantor, do you
20 want for lunch?
21     MR. RAMER: Over to Dr. Cantor.
22     THE WITNESS: Oh, I'm from New York. I can
23 eat while talking.
24     MR. STRANGIO: I mean, same, but let's not do
25 that for the sake of the court reporter, at least.

Page 105

1 So 40 minutes? Do you want to come back at ten of
2 one Eastern Time?
3     MR. RAMER: 12:50 Eastern sounds good.
4     MR. STRANGIO: Okay. All right. See you
5 then.
6     (The deposition was recessed for lunch.)
7 BY MR. STRANGIO:
8 Q So coming back to a conversation we started a while
9 back, Doctor, just for the sake of this line of
10 questioning, so you're not a pediatrician; is that
11 right?
12 A Correct.
13 Q And you don't have any clinical expertise in the
14 treatment of children?
15 A I don't know if it's fair to phrase it that way. I
16 have no clinical experience in that I don't do the
17 activity itself. But, of course, the effects on
18 children and how it affects their development and
19 their sexualities and so on I have a great deal of
20 expertise in.
21 Q So you don't have any clinical experience in the
22 treatment of children?
23 A Correct.
24 Q And limited clinical experience in the treatment of
25 adolescents?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 106

1      MR. RAMER: Objection to form.
2   A  Again, I don't know what limited means in the sense
3      that, you know, it's -- most people have absolutely
4      zero, and even a lot of the people who have
5      experience with it have no experience in any other
6      aspect of human sexuality and aren't able to
7      perform a proper differential diagnosis.
8   Q  But, generally speaking, in your clinical practice
9      I think you said lasted -- or, excuse me, generally
10     speaking in your clinical practice, approximately
11     5 percent of your patients were adolescents?
12  A  Those numbers are correct, yes.
13  Q  And do you have experience in pediatric research?
14  A  Yes, in the same sense that I published papers
15     regarding children -- the assessment of children,
16     the effects of development over the course of
17     childhood, or for that matter, you know, prenatal.
18        You know, I'm not a neonatologist, but by the
19     same token brain development and what happens in
20     the brain and during brain development even before
21     birth is the very center of my background and
22     expertise.
23  Q  And that's -- you've published original research in
24     that regard?
25  A  I'm sorry, in which regard -- which of the --

Page 107

1   Q  Excuse me, so you -- let me rephrase that.
2        Have you done any research trials in the area
3      of pediatrics?
4   A  What do you mean a research trial?
5   Q  What does that mean to you?
6   A  It doesn't mean anything to me.
7   Q  So I don't know what a --
8   A  Usually when somebody says trial they mean a
9      clinical trial.
10  Q  Have you done any clinical trials in pediatric
11     research?
12  A  No, I don't think so.  Again, my hesitation is
13     that -- just without scanning through my CV, just
14     to make sure that there isn't one that I forget, as
15     I say, you know, very often my involvement in
16     projects is for the statistics or, you know,
17     whatever technical piece that's relevant to the
18     project that somebody on the team doesn't have.
19        My favorite analogy is with accounting.  It
20     doesn't matter if you're doing the books for one
21     kind of an industry or the other kind of an
22     industry.  You know the accountant, and you know
23     when the accountant is wrong.  And it doesn't
24     matter if they're selling cars or beef.
25  Q  Got it.  Have you reviewed the evidence base

Page 108

1      supporting clinical guidelines for pediatric
2      conditions other than gender dysphoria?
3         MR. RAMER: Objection to the form.
4   A  No, not that I recall.
5   Q  So are you aware of whether other treatment
6      protocols for pediatric conditions are supported by
7      randomized controlled trials?
8   A  Some are, some aren't.  The question's a bit over-
9      restricted in the sense that each of these
10     questions requires several different aspects to be
11     investigated at the same time and compared against
12     each other.
13        Of course, the most relevant of those are the
14     risk-to-benefit ratio, and in the large majority of
15     investigations that are pertinent to children, you
16     know, there are relatively few instances that
17     are -- that make good comparisons to gender
18     dysphoria when they have to be applied to children
19     or when we're talking medical interventions
20     specifically to adolescents, not prepubescence.
21  Q  And are you aware as a general matter as to whether
22     research is more limited in the area of pediatrics
23     as compared with adult medicine?
24        MR. RAMER: Objection to the form.
25  A  I've never undertaken such a comparison myself, but

Page 109

1      as a matter of, you know, how research -- how
2      medical research is done, of course, I'm often
3      involved in investigating or reviewing grants and a
4      wide range of different topics.
5         It would be an error to isolate research on
6      adolescents and interpret it in -- it would be an
7      error to interpret the number of studies conducted
8      with adolescents as opposed to, you know, age 18
9      and up or, you know, age of majority in whatever
10     given state and jurisdiction, because very, very
11     many illnesses are age linked.  Young people have
12     fewer diseases than older people.
13        So the priority is often, on average, lower
14     for children than adults, because on average
15     they're healthier, you know, they haven't had the
16     long-term effects of whatever situation they're in,
17     whether it's smoking, obesity and so on.
18        That isn't to say zero, and that isn't to say
19     if you're young you're healthy, it's just that the
20     difference of the people who suffer ill health, the
21     young people are necessarily un -- less is a better
22     word, less represented.  So one has to be careful
23     in not accidentally asserting a pattern that isn't
24     associated with -- we can't take anything for
25     granted.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 110

1  Q  And are you aware of whether there are randomized
2     controlled trials supporting medical treatment for
3     precocious puberty?
4  A  I don't think that there have been randomized
5     trials for it, but it's not a fair comparison.  But
6     it wouldn't be fair to compare precocious puberty
7     and puberty blockers for precocious puberty with
8     the use of those same drugs for gender dysphoria.
9  Q  Well, I'm not asking about gender dysphoria.  I'm
10    just saying just as to precocious puberty.  There
11    are -- you're not aware of any randomized
12    controlled trials preventing medical treatments for
13    precocious puberty?
14 A  I haven't conducted a search for them.
15 Q  So you're not aware of any?
16 A  Not offhand, no.
17 Q  What about randomized controlled trials supporting
18    medical treatment for congenital adrenal
19    hyperplasia?
20       MR. RAMER: Objection to the form.
21 A  No, I can't think of randomized -- I can't think of
22    a placebo-controlled randomized study.  I would
23    have to search to see if there have been randomized
24    studies comparing different kinds of medicalized
25    treatments with each other.

Page 111

1  Q  But you're not aware of any offhand?
2  A  No, not offhand.
3  Q  Do you have any reason to know -- actually, let me
4     rephrase that.
5        Do you know if pediatric conditions frequently
6     have the type of evidence supporting treatment as
7     available evidence for treatment of gender
8     dysphoria?
9        MR. RAMER: Objection to the form.
10 A  Again, that's not really a meaningful comparison,
11    because there are very few issues that have the
12    same risk-to-benefit ratio.  And the great majority
13    of disorders, especially with youth, we're talking
14    about, you know, objectively diagnosed.
15       You can take a blood test and you either have
16    it or you don't.  It isn't a matter of, well, we'll
17    talk about it and kind of decide and the child is
18    telling you what their diagnosis is.  So there are
19    really very few like apples-versus-apples
20    comparisons that can be made.
21       So if you just kind of add up how many are
22    there, again, the result is misleading, because the
23    population of related disorders are so small to
24    begin with.
25 Q  Well, let's take CAH, congenital adrenal

Page 112

1     hyperplasia, and just the medical intervention
2     of -- surgical interventions on the genitals to
3     make them conform to a more typical female genital
4     presentation.
5        Are you aware of any data supporting the use
6     of that surgical technique on infants with
7     congenital adrenal hyperplasia?
8        MR. RAMER: Objection to the form.
9  A  I'm sorry, am I aware of any --
10 Q  Data on the efficacy of that surgical technique on
11    treatment of infants with congenital adrenal
12    hyperplasia?
13       MR. RAMER: Same objection.
14 A  Not on mental health effects.  There have been some
15    case studies on, you know, the physiological
16    outcomes, for whatever they're worth.
17       You know, does the cosmetic end point match up
18    with generic surgical success, I'm not aware of
19    such studies for mental health effects.
20 Q  But it's possible, then, that that intervention
21    causes harmful mental health effects on individuals
22    with congenital adrenal hyperplasia.  Is that true?
23       MR. RAMER: Objection to the form.
24 A  It's certainly a fair hypothesis.  In fact, there
25    have been case studies, I don't remember if it's

Page 113

1     the name of the patient or the name of the author
2     of the book, John Colapinto, who examined, you know
3     a series of, you know, interventions that were done
4     with children in order to make their physiology,
5     you know, better match whatever -- oh, that was it.
6     I'm thinking of the Reimer case.  It wasn't a CAH.
7     Never mind.
8  Q  So you don't know of any data studying the mental
9     health outcomes of surgical interventions on
10    intersex -- sorry, excuse me, on infants with CAH?
11 A  No quantitative studies, no.  There have been, you
12    know, single case studies of people, you know,
13    describing individual people, but not on -- not
14    anything to which one would apply any statistics.
15 Q  Do you have concerns about the impact of that
16    surgical intervention on infants with congenital
17    adrenal hyperplasia --
18       MR. RAMER: Objection to the form.  Sorry.
19       MR. STRANGIO: No, no.  Sorry, that was not a
20    good question.  I'll rephrase.
21 BY MR. STRANGIO:
22 Q  Do you have any scientific objections to the nature
23    of the evidence base supporting the surgical
24    interventions on infants with congenital adrenal
25    hyperplasia?

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 30 of 165 PageID
#: 3652
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

Page 114

1    MR. RAMER: Objection to the form. Beyond the
2    scope.
3 A  The question's kind of -- has a foot in science,
4    and a foot in, you know, the related research
5    ethics. And where it's properly science versus not
6    is a legitimate conversation.
7        I have concerns in the usual medical and
8    clinical research concern that intervening puts us
9    in a position of responsibility, especially when
10   we're talking about, you know, surgical
11   interventions.
12       In all of medicine and medical researches -- I
13   don't want to say it in Latin, because I'll
14   mispronounce it -- but we're not going to -- we are
15   bound not to do anything until we have very good
16   evidence of its outcome.
17       So intervening surgically or medically at all
18   should be withheld until we have, you know, solid
19   objective evidence to demonstrate benefit.
20       So, again, I'm kind of -- you know, that's
21   kind of scientific and kind of not. But I have
22   concerns in that, you know, people were intervening
23   medically and surgically without having a
24   sufficient scientific research basis for dramatic
25   intervention at all.

Page 115

1 Q  But the law in this case explicitly exempts from
2    prohibition those kinds of surgical interventions
3    on infants with CAH. Are you aware of that?
4 A  Yes. But, of course, you know, my purpose and
5    testimony isn't about the law. It's about the
6    nature of science, what the science says. And how
7    any organization wants to implement it is up to
8    them. I don't mean either to attack or defend any
9    statute.
10 Q  But you didn't weigh in as to the scientific base
11   supporting those exempted interventions in this
12   case?
13 A  I didn't intervene at all. I --
14 Q  I said weigh in.
15 A  -- do have -- not exactly sure what the difference
16   is. But, again, for a specific statute, I haven't
17   said anything.
18       The only caveat I need to add is that it's
19   very possible, although I don't have a specific
20   recollection, it's very, very plausible that I
21   would have spoken publicly about the application,
22   again, of medical interventions in situations like
23   the John Colapinto book about John Reimer -- Dan
24   Reimer, John Reimer -- David Reimer, that was it --
25   about medically intervene -- about engaging in

Page 116

1    medical interventions without first having
2    objective evidence about its risk-to-benefit ratio.
3 Q  So I'm going to pull us to, just if you want to
4    pull it up on your paper copy, page 46, paragraph
5    106 of your declaration, which is Exhibit 1.
6 A  Got it.
7 Q  Maybe I should have had that. Okay. And this is
8    at the bottom of the page, from 46 to 47. You
9    write, "Biologically, the sex of an individual (for
10   humans and almost all animal species) as male or
11   female is irrevocably determined at the moment it
12   is conceived. Terms such as 'assign' obfuscate
13   rather than clarify the objective evidence."
14       Did I read that correctly?
15 A  That's the content of the sentence, yes.
16 Q  What about infants with intersex traits?
17 A  What about it?
18 Q  Would this sentence apply to them?
19 A  Yes. However, there's subtle and profound -- or
20   there's a distinction that can be both subtle and
21   profound, you know, in how people are using the
22   word sex, especially in this context and in today's
23   context, about what it means as a definition of sex
24   and in what ways, you know, exceptions can and
25   should be made.

Page 117

1        There are relatively few characteristics for
2    which there don't exist, again, details,
3    atypicalities for which not everything can be taken
4    for granted, but they do not -- but these are often
5    examples that prove rather than disprove the rule.
6 Q  So what is the definition of sex that you're using
7    here?
8 A  That is exactly one of those profound and subtle --
9    distinctions that are both profound and subtle. In
10   the context of gender dysphoria, it's a mistake to
11   be saying that there is a definition of and that's
12   that.
13       And then with people picking either
14   chromosomes or hormones or, you know, subjective
15   experiences, sex itself in science would be -- let
16   me say this a different way. People are confusing
17   definitions with construct validity.
18       In mathematics, we have a definition, and it
19   will apply to the definition of the real numbers is
20   the definition of the real numbers and there are no
21   exceptions.
22       In science, we have what's called construct
23   validity. There's -- although we will use the word
24   fact, there is no such thing as a fact. We only
25   have the best explanation we have for the

Case 1:23-cv-00595-JPH-KMB     Document 58-8     Filed 06/12/23     Page 31 of 165 PageID #: 3653

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 118

1  observations we've made. And it remains eternally
2  possible for some future exception to be made, and
3  we just haven't seen it yet. There is no such
4  thing as settled science as popular as the phrase
5  has become.
6      Sex is not like defining a real number versus
7  irrational number versus an imaginary number for
8  which there exists no exceptions. Sex is, again,
9  in science or in statistics what we would -- what
10  is the overlap amongst each of the pieces,
11  including all of chromosomes and genetics and so
12  on, all of which overlap and match the great,
13  great, great majority of the time.
14      Sex is that overlap, not the individual
15  ingredients that are put into the very -- the
16  overlap. So the identification of exceptions do
17  not break the rule.
18      In most situations, you know, at birth visual
19  inspection of the genitals is, you know, a
20  perfectly convenient, if I can use that term, way
21  to go about, you know, identifying the sex of the
22  kid, because it matches up with all of the other
23  features in the great, great, great majority of
24  instances.
25      But phrases such as the one that I was talking

Page 119

1  about here assigned at birth, well, if the mother
2  got a sonogram when she was six months pregnant,
3  she knew what the sex of the kid was going to be in
4  the great, great, great majority of cases months
5  before the birth happened.
6      So, as I say, but that -- so the presence of
7  exceptions in a long complicated chain of events
8  going from conception, and in some cases even
9  before conception for some, you know, chemical
10  interactions with the mother's body, you know,
11  through life experiences, you know, some of them
12  chemical, some of them biological, some of them
13  social, again, these are a large, large complicated
14  set of interrelated factors which are irrelevant in
15  the great majority of the time, but we only have an
16  issue when there is some exception.
17      So then we need to look more deeply into the
18  situation in order to decide what, if anything,
19  would be the most helpful to the person in
20  question. But as I say, these are all questions
21  about construct validity. And, you know, if I ask
22  a person what a house is, they can give me, you
23  know, a rough idea that will fit in the great,
24  great majority of the time. But then we can ask,
25  you know, "Well, is this an exception? Does this

Page 120

1  cave count as a house? Does this hut count as a
2  house? Does a hotel that you're living in" -- I'm
3  just making these up. And one can come up with,
4  well, there can be certain exceptions to certain
5  pieces of it, but what makes the house the house is
6  the consistent overlap of each of these
7  characteristics. But that there can be an
8  exception to one of the useful rules of thumb that
9  we use does not mean the overall concept -- that
10  the entire structure itself is wrong.
11 Q  Well, I'm not asking if it was right or wrong. And
12  I think in some sense maybe you're trying to
13  respond to why I'm asking, not what I asked,
14  because I am just focused on these words in your
15  declaration, "The sex of an individual as male or
16  female."
17      What did you mean by "The sex of an individual
18  as male or female"?
19 A  The overlapping set of -- again, because of the
20  context in which I wrote the sentence, it isn't so
21  easy to just lift the sentence out from the others.
22      By the sex of the individual, I mean the
23  overall set of characteristics, you know, ranging
24  from and including, you know, the multiple
25  biological features which are mostly -- again, it's

Page 121

1  the exceptions that are hitting my head -- that are
2  mostly determined at the point of conception and
3  the chromosomal combination.
4 Q  Mostly, but not always determined at the point of
5  conception?
6      MR. RAMER: Objection to form.
7 A  I wouldn't say always. Again, I'm leaving room for
8  there are certain, you know, chemical interactions
9  between the chromosomes, the mother's body, the
10  potential zygote and so on which can influence
11  what's going on biologically. They're rarely of
12  interest to very many circumstances, situations,
13  but they exist.
14 Q  And so, coming back to your previous discussion,
15  you would say that overall sex is a set of --
16  sorry, the overlapping set of characteristics,
17  including multiple biological factors?
18      MR. RAMER: Objection to the form.
19 A  Close. I would say it is the overlap --
20 Q  Okay.
21 A  -- amongst those biological features.
22 Q  And what are those biological features?
23 A  I don't know if they can be enumerated in full, but
24  the primary ones are, of course, chromosomes,
25  hormones. And biology, I'll say, from the neck

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 32 of 165 PageID #: 3654

K.C., et al. VS                                    JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board              June 7, 2023

Page 122

1  down, you know, morphological form. And then
2  neuroanatomy, anatomy from the neck up.
3  Q  And all of those biological features are part of
4  sex?
5  A  Again, to say part of is to insinuate or the word
6  kind of involves a way by which they go together.
7  The best way I have -- I'm avoiding a mathematical
8  term, factor analysis, but it is the overlap itself
9  that forms the construct.
10      Science and biology don't work like
11  mathematics or law where you can write a definition
12  and then make all of your decisions based on that
13  definition and expect the result to be correct.
14  That's not how science works.
15      We give a best guess, and then we have to
16  check to see if we were correct by making -- you
17  know, designing a clever experiment to see if
18  something might be an exception. And we remain
19  tentative, because there remains always, at least
20  in theory, the possibility of something being
21  different.
22  Q  Then in paragraph 107 regarding gender identity,
23  you write, "In science, a valid construct must be
24  both objectively measurable and falsifiable with
25  objective testing."

Page 123

1      Did I read that right, correctly?
2  A  Yes.
3  Q  What did you mean by that?
4  A  Well, again, I was pitting it specifically against
5  trying to define or describe a concept according to
6  something that is none of, that doesn't fit --
7  well, specifically against claims of an inner
8  sense.
9      In science, there is no such thing as an inner
10  sense. The purpose of science was to replace
11  concepts based merely upon one's -- it's even more
12  ephemeral than inner sense, it's what one says is
13  their inner sense.
14  Q  In medicine, though, there are phenomena that are
15  not objectively measurable beyond patient report;
16  right?
17      MR. RAMER: Objection to the form.
18  A  Yes and no. There exists situations where when
19  it's low cost, consistent with other measures which
20  are objective and for which there are no major
21  risks, a convenient way to identify it could be
22  through something relatively subjective.
23      For example, you know, pain receptors in the
24  brain, fine and important and very relevant for
25  certain kind of research, but at the same time if

Page 124

1  there aren't enormous social pressures and enormous
2  risks, we don't need to send to a brain scan
3  everybody who comes in saying, "Doctor, my hand
4  hurts."
5      If, however, there are other situations where,
6  you know -- there also exists situations like
7  phantom limb pain. Now all of a sudden we're
8  looking at an exceptional circumstance and we can't
9  take for granted what the person says their
10  individual experience is.
11      So just saying that there exists exceptions,
12  again, we can't from that say -- those exceptions
13  don't disprove any such rule. There is a balance
14  of risks and benefits.
15      If it's low cost and pretty low risk, then we
16  can afford, we have the luxury of just going along
17  with the subjective self-report. If, however,
18  we're talking about something -- if that subjective
19  self-report is now in contradiction with the
20  objective available data, now we have a question.
21  We can't so easily take for granted the accuracy of
22  that subjective self-report.
23  Q  But subjective self-report is often the basis for
24  some medical interventions; is that correct?
25      MR. RAMER: Objection to the form.

Page 125

1  A  They exist in certain circumstances, which as I say
2  are when they're low risk and not in conflict with
3  objective information we do have.
4  Q  Do you think gender identity is real?
5      MR. RAMER: Objection to the form.
6  A  That's a pretty philosophical question, if not
7  outright Cartesian. Different people, of course,
8  use that phrase, you know, to mean many different
9  things in many different circumstances.
10      So there are different senses in which that,
11  you know, can be a useful descriptor, but only
12  partially accurate. And there are situations in
13  which, you know, people completely either misuse
14  the term or misidentify their own experiences by
15  application of the term because they don't have a
16  better term. They haven't been exposed to a better
17  term, or they're under some kind of social or other
18  pressure to use that term or use another term, for
19  that matter.
20      So whether it exists really depends on what a
21  person means and in what context.
22  Q  Do you mean -- excuse me, do you use the term
23  gender identity?
24  A  The words will come out of my mouth in -- if we're
25  in a context where what I'm trying to say is --

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 126

1 will be well understood.  If one is asking, you
2 know, very detailed questions or very specific
3 questions, then I'll use terms that, you know, more
4 precisely and more accurately capture what a person
5 is trying to say in using the phrase gender
6 identity.  It's even more --
7 Q  What are some of those terms that people might --
8 that you think would be -- that would more
9 accurately capture what people are trying to say?
10 A  Oh, it depends on whatever it is I can infer about
11 what they're trying to say, again, by the context
12 of it.  Very many people use the word, for example,
13 to mean -- to assert their belief that they would
14 be happier in a different social role if people
15 treated them in a different way.
16        And the only -- and so they use the word
17 gender identity, because it's now such a ubiquitous
18 term.  And in many parts of society, a lot of
19 people feel pressure to just nod their heads and
20 say uh-huh, even though they're not sure what it is
21 exactly that they mean.  And both of them are
22 working from a series of assumptions, and each one
23 is completely miscommunicating.
24        Again, with my scientific hat on, that's not
25 an acceptable situation.  That's not how

Page 127

1 information can, you know, be assessed or
2 self-corrected, and we can't help each -- we can't
3 help people that way.  In fact --
4 Q  How would -- excuse me.  Go ahead, you can finish.
5 A  In doing -- probably one of the most common
6 questions in doing any kind of therapy with
7 anything is, "What do you mean by that?"  A person
8 says whatever emotion it is, or they feel whatever
9 emotion they're feeling about, you know, their
10 mother, their brother, their significant other,
11 whoever it is, "What do you mean you hate love?"
12 Like/dislike are confused by, and it's the what are
13 the criteria that led you to use whatever word or
14 concept is the important part.
15        There are so many social, political and
16 emotional pressures influencing gender issues now
17 that, again, the term itself -- so many people are
18 using the term in so many different ways, the term
19 itself is not useful.  People are using it for its
20 cachet as much sometimes, if not more, for its
21 accuracy.
22 Q  So let's say -- how would you describe someone who
23 40 years ago, as a natal boy, let's say, said, "I
24 am certain that I am a girl."
25        What is that -- what would you describe that

Page 128

1 certainty of being a girl?
2        MR. RAMER: Objection to the form.
3 A  Again, there are a couple of things embedded in
4 that.  It's that, you know, if a child says it, you
5 know, a child being certain is not reflective of a
6 child being certain, you know.  Very often children
7 phrase things, you know, in dichotomous or
8 simplified ways, you know, just as part of their
9 not yet having developed more subtle understandings
10 of them.
11        They will often assert things strongly because
12 they feel emotionally strongly about them, so they
13 use terms that are strong, even though that doesn't
14 reflect actual certainty or evidence.
15        It's an almost ubiquitous experience for gay
16 men to say that they -- or including myself even in
17 this particular one -- to have memories or feelings
18 of not being a boy or I'm a girl on the inside.
19 But even though they will have used those terms,
20 it's not an accurate perception.  It's a use of the
21 only vocabulary that they have available to them
22 with a child's perception and experience of it.
23 Q  What about an adult, 30 years ago none of the same
24 social political context of now, who is a natal
25 male asserts understanding or certainty of one's

Page 129

1 self as female?
2        MR. RAMER: Objection to the form.
3 A  I'm almost self-conscious about I don't have to
4 project I was there and listening to these people
5 and in a -- you know, working in a clinic helping
6 adults, you know, with gender dysphoria exactly to
7 transition.  And we had exactly this conversation,
8 but not quite 30 years, closer to 25.  And that's
9 not how they described it.  That's one of the flags
10 that's -- you know, that increases my, you know,
11 critical thinking ear, if I can mix my metaphors.
12        25 years ago, people felt -- at least the ones
13 that I was encountering, people felt comfortable
14 admitting to their doubt and uncertainty and "I'm
15 not so sure, and I want to try this out and see how
16 it goes."
17        Where the people coming into clinics now
18 are -- the expression -- I'm losing the expression,
19 are reporting to the test.  They're -- you know,
20 they think they know the right answer.  And if they
21 express doubt, then they won't be permitted to
22 transition, so they don't express doubt.  Or flip
23 side that, you know, they're afraid that whatever
24 services will be changed if they start describing,
25 you know, I feel depressed or whatever negative

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 130

1 emotions, so they don't tell the clinician.
2      So people today are describing in much more
3 dichotomous, black-and-white terms things that to
4 those of us who have been in this field for a while
5 recognize as different. People were willing to
6 express their doubt a generation ago, and they're
7 not now.
8 Q What are you basing that on, your assertion about
9   what's happening when people present themselves to
10   clinics today?
11      MR. RAMER: Objection to the form.
12 A It's a combination of my own experiences, the
13   reports of clinicians on both sides of the issues,
14   those who, you know, basically see things, you
15   know, with a critical eye that I apply, as well as
16   clinicians who do not, you know, they also
17   describe, you know, very, very dichotomous reports
18   from their patients.
19      But there's a huge generational divide. The
20   clinicians I should -- the large, large majority of
21   clinicians, even calling themselves advocates and
22   activists, are all very young. They didn't
23   experience these clinics, these patients, these
24   populations, these problems, these difficulties
25   before the social media age.

Page 131

1      This is all they know. They didn't notice a
2   difference. So far as they're concerned, things
3   have always been like this, and this is a permanent
4   situation. It's only the people who have been
5   working in this field over a longer period of time
6   who are able to look back at it and say, this
7   doesn't match the evidence. These are not the
8   people on whom we gathered that evidence.
9      The situations that suggest that, again, for
10   the adults for whom this was a good idea, this is a
11   different profile of what we were seeing before.
12   And the research we gathered on that prior group
13   does not automatically translate to the group that
14   we're seeing now.
15 Q You said your experience with patients presenting
16   to clinics, but you aren't currently seeing
17   patients in clinics, are you?
18 A I'm not seeing the patients directly, no. Usually
19   these would be either individual people coming to
20   me, other clinicians coming to me to consult on
21   whatever cases that they're seeing, the public
22   discussions amongst, you know, groups fall along
23   the spectrum. I should use a better term than
24   spectrum, it's getting overused.
25 Q What clinicians have been coming to you to express

Page 132

1   this?
2 A I'm not sure what you mean by what clinicians. Are
3   you asking for names?
4 Q Yeah.
5 A I don't know if I'm comfortable giving particular
6   names. Usually these would be clinicians, again,
7   from all over the world, you know, the U.S.,
8   Canada, Europe, asking for input or a contrast or
9   observations that they have known -- that they have
10   noticed with subsets of their patients whose
11   stories are different, or they don't know how to
12   interpret the story because the models they used to
13   use don't seem to be fitting. They're not getting
14   feedback from their clients in the same way the
15   clients they used to see.
16      And, of course, you know, the clinicians and
17   other sex researchers, you know, at a sex research
18   and sex therapy clinic -- sex therapy conference
19   that I'm a regular member of -- again, these are,
20   you know, to me -- I've been going to these, I'll
21   say it again, 25 years, you know, and these are
22   common conversations among them. I feel like I
23   need to add a caveat to that, too.
24      Conversations have also become -- I don't know
25   if quieter is the right term. People now are

Page 133

1   almost ironically less comfortable now talking
2   about it than it used to be. When gender identity
3   and sexual orientation were more stigmatized, you
4   know, height of the HIV era, clinicians and
5   scientists would pride themselves on resisting the
6   social stigma in order to talk about the issues.
7   The mantra of those days was silence equals death.
8      It's reversed today. People now are often --
9   I shouldn't say moderates, the middle 80 percent
10   are less comfortable discussing the issue, because
11   people want to ask questions where they feel there
12   is a vagary or uncertainty. But they've seen so
13   many examples, and there exists -- again, since the
14   onset of social media especially -- so many
15   examples of where people are getting pilloried not
16   merely -- not because they said what somebody
17   thinks is the wrong thing, but for saying,
18   basically, that they agree, but not strongly enough
19   that they're leaving out another opportunity to be
20   still more extreme.
21 Q What's an example of that?
22 A I can really only talk about them in a family of
23   examples where somebody will talk about a point
24   about a particular study. Actually, Twitter
25   probably is the best example, because --

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 134

1 Q  So you're referring to things that happened on
2    Twitter, not in medical communities?
3 A  They --
4         MR. RAMER: Objection to the form.
5 A  The situations don't divide quite so easily.  It's
6    because I'm, you know, a well-known member of that
7    professional community that many of my Twitter
8    conversations or Twitter threads are with other
9    people that I know, again, from conferences,
10   experts and the same background.
11        So it's not the same kind of a conversation
12   that, you know, a member of the lay public would
13   have --
14 Q  Let me ask you this --
15 A  -- with another, you know, stranger member of the
16   lay public.  These would be two professionals and
17   experts in a topic having a conversation mediated
18   by Twitter, but it's not the same as just two
19   random nonexperts having a conversation.
20 Q  Well, when you say -- when you referenced the
21   examples of being pilloried, is that on Twitter?
22 A  It includes Twitter.  And because the nature of the
23   medium allows for it, you know, happens like --
24   they happen louder and more often.  But, no, these
25   kinds of examples happen in every venue in which

Page 135

1    sex researchers have conversations.
2 Q  Do you have examples from outside Twitter of this
3    happening?
4 A  Yes.  Again, just about any conversation -- any
5    social gathering -- social gatherings, for example,
6    the social hours at conferences where usually, you
7    know, it's at the end of the day, you know,
8    whatever cocktail somebody is holding as people are
9    just chatting and catching up since, you know,
10   we're all old friends to each other -- most of us
11   are old friends, you know, and then new batches of
12   students and so on.  But the conversations are now
13   followed by who's listening.  People are looking
14   over their shoulders.  People are adding phrases
15   and caveats to their conversations that didn't used
16   to be there.
17        Two specific examples come to mind.  Again,
18   I'm running through my head, because I don't want
19   to, you know, be inappropriately naming other
20   people in the context where they wouldn't have me
21   do.  Both of these happen to involve Ken Zucker by
22   coincidence.
23        One would be a talk that he was giving at the
24   Society for Sex Therapy and Research, SSTAR.  And
25   it was, you know, very much like other talks that

Page 136

1    Ken Zucker gives describing -- you know, sometimes
2    he's giving talks about specific research that he
3    was doing at the time on gender-dysphoric kids and
4    their development.
5         And then, you know, when he was involved in
6    the DSM, you know, many of his talks were about the
7    ongoing negotiations in the formation of the
8    clinical criteria for the DSM-5 this was.  But
9    rather than just raise their hand or disagree and
10   have a conversation, the conversation was how dare
11   you say whatever it is that the person disagreed
12   with.  Unlike not very many years before, you know,
13   it wasn't agree to disagree, it wasn't even just
14   disagree.  It was if all I have to do is declare
15   myself offended and now you're not allowed to say
16   it, which was anathema to sex research, sex
17   research is what it is exactly because of sex
18   researchers who were willing to say things that
19   were unpopular amongst whatever other groups.
20 Q  But Dr. Zucker was the one giving the presentation
21   in this example?
22 A  Yes.
23 Q  So he was speaking?
24 A  Yes.
25 Q  And you're describing the reaction of someone in

Page 137

1    the audience?
2 A  Yes, interrupting it, and essentially the word
3    cancellation hadn't yet existed, but were so upset
4    that they didn't think that he should be allowed to
5    complete his thought discussion, or said another
6    way, other people didn't have the right to hear it.
7 Q  When was this?
8 A  Early 2010s.
9 Q  And your other examples that you can think of are
10   in social hours and conferences and on Twitter?
11 A  Those are, of course, much more common, because
12   those, you know, kinds of conversations are, you
13   know, so very much more common than an annual
14   conference.
15        And the other one -- specific one involving
16   him, again, was at a conference -- that I was at a
17   conference.  I'm trying to remember the name of the
18   researcher who did it.  Again, Ken Zucker was
19   giving a presentation.  She had just finished hers
20   and happened to have been sitting right behind me.
21   And she was at full voice, you know, continuing to
22   talk to herself, essentially, saying what she'd
23   like -- well, didn't like about his conversation,
24   until I finally turned around, you know, "Do you
25   mind, you know, he's talking?"

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 36 of 165 PageID #: 3658

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 138

```
 1        To which her response was, "Oh, I don't need
 2   to hear that."
 3   Q  So coming back to your --
 4   A  I couldn't --
 5   Q  -- declaration, just to ground us there.  You write
 6   in some sections about social transition in
 7   prepubertal children.
 8        What is your understanding of what social
 9   transition is?
10   A  I hesitate to say my understanding is -- I hesitate
11   to say my understanding in that my understanding is
12   that, you know, many people use that phrase to say
13   many different things.
14        So step number one is find out, you know, what
15   it is the person I'm communicating with is trying
16   to say even before we know if we're agreeing or
17   disagreeing over any particular point.
18        So my understanding is the range of different
19   definitions and applications people use.  And then
20   if we're actually going to do any kind of research
21   or assert any kind of meaningful fact, we start
22   with, well, in this circumstance what do me and
23   whoever it is that I'm talking to or I and whatever
24   author of the paper I'm reading, how is it being
25   used in this instance so we can be talking about
```

Page 139

```
 1   the concept -- the relevant concept.
 2   Q  So you don't have a singular definition of social
 3   transition that you use?
 4   A  I don't think it's -- I don't think anyone could
 5   say that there exists a singular definition.
 6   Q  And if you use it at various points in your
 7   declaration, is that based on how it's used in
 8   other places that you're referencing?
 9   A  Again, I would have to look through each time I
10   mentioned it, but I, as a matter of habit, try to
11   either make it explicit how I'm using it or make
12   explicit -- if I'm addressing somebody else's
13   comment, then I do my best to make sure that it's
14   clear that, you know, I'm using that person's
15   definition or I'm addressing whatever that person's
16   conceptualization is.
17   Q  And in your table of contents here pulled up on the
18   screen, which I think it's IX.B.1, you have a
19   section on what in the table of contents is,
20   "Eleven cohort studies followed children not
21   permitted social transition, all showing the
22   majority to desist feeling gender dysphoric upon
23   follow-up after puberty."
24   A  Yep.
25   Q  What does social transition refer to there?
```

Page 140

```
 1   A  There I was referring to Olson's study, recently
 2   out of California, which was the one exception
 3   among -- well, I shouldn't say exception among,
 4   exception in addition to that 11.  Hers was the one
 5   study that followed kids who had already begun
 6   living as the other gender when they came into her
 7   clinic.
 8        So when she reported her results of relatively
 9   few of these kids having desisted by puberty,
10   exactly the opposite as the first -- as the prior
11   11, then, of course, I needed to cleave that, you
12   know, there was an important difference between her
13   one study and the other 11.  That difference was,
14   again using her words, I'm pretty sure, that they
15   had socially transitioned.
16        So in that context, the meaning was, you know,
17   that the relevant definition was the one that made
18   the sample she was reporting on so distinct from
19   the others, from the other studies.
20   Q  Well, you describe all the others as following
21   children who were not permitted social transition.
22   So presumably there has to be a definition that
23   applies to those 11 to know that children were not
24   permitted to social transition.
25        MR. RAMER: Objection to the form.
```

Page 141

```
 1   A  Again, that's not a definition.  These were
 2   studies, you know, that predated the existence of
 3   the term.  So the studies themselves didn't say
 4   these kids were not permitted to transition
 5   socially.  These were studies that did what the
 6   studies did.
 7        And so, here we are, you know, sometimes
 8   decades later trying to summarize in an
 9   understandable, accurate, but still pithy --
10   pithy's not the right word -- succinct or concise
11   way to capture what is it that made, you know,
12   these 11 different from that one.
13        And the, you know, most applicable, shortest,
14   easily -- hardest to misunderstand phrase would be
15   social transition.  But those papers didn't use
16   that term at all, but they're meaningfully
17   described with that term.
18   Q  So what does it mean that they're meaningfully
19   described with that term, since you're the one who
20   applied that term to these 11 cohort studies?
21   A  Oh, I think anybody reading the studies, the
22   methods, the contents of them would very
23   immediately come to the same conclusion that I did.
24        As I say, I'm not asserting that there was a
25   specific definition with a set of criteria that
```

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 37 of 165 PageID #: 3659

K.C., et al. VS                                                        JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board                              June 7, 2023

Page 142

1 says fit or not fit. There really is no overlap
2 between what the set of 11 did and what Olson's
3 recent one did.
4     It was an active part or it was an explicit
5 part of the original 11 studies where the kids were
6 not permitted to crossdress and adopt new names.
7 They were, you know, encouraged to be as
8 comfortable as possible in their biological selves,
9 which is in -- which is exactly opposite to what
10 Olson did, which was to let the kids -- I don't
11 think it would be fair to say encourage, but --
12 indulge probably isn't the right word either, but
13 the way she, basically, described it is that, you
14 know, the kids came in very often already living
15 socially as the other sex.
16    So because this was, you know, such a large,
17 large difference between the original 11, we're not
18 in a situation where subtle differences in wording
19 or definition would change. You know, maybe one of
20 these two 11 really were more like Olson -- the
21 Olson study, the people -- the treatments, the
22 therapies that kids who were coming into Olson's
23 study were night and day different from the
24 treatments being received by the first 11.
25 Q So the first 11 you have on this page 51; is that

Page 143

1 correct? This table?
2 A That sounds right. Just seeing what you have up
3 there, that looks right, yes.
4 Q And seven of those were from the 1970s and '80s?
5 A Yes. As I say, this was ubiquitous, I would say
6 since the '70s. It would be an error to say that
7 all studies are old and, therefore, wrong.
8 Q I'm just not asking you to say whether they're old
9 or not. I'm just asking a factual matter whether
10 seven of them were published in the 1970s and the
11 1980s?
12 A That looks right, yes.
13    MR. STRANGIO: I'm happy -- I can keep going.
14 It is an hour now if you want to take five.
15    MR. RAMER: Yeah, why don't we take five.
16    MR. STRANGIO: Okay.
17    (A recess was taken.)
18 BY MR. STRANGIO:
19 Q So I'm going to fill in this exhibit, which is
20 one -- I'm going to take us to another section. So
21 we're in -- here on paragraph 135, page 59 of your
22 declaration, Doctor. It's at the bottom of the
23 page discussing what you're referring to as
24 adolescent childhood -- sorry, "Adolescent-Onset --
25 A Yep.

Page 144

1 Q -- Gender Dysphoria." And so, you write, "This
2 group typically presents in adolescence, but lacks
3 the history of cross-gender behavior in childhood
4 like the childhood-onset cases have. It is that
5 feature which led to the term Rapid Onset Gender
6 Dysphoria (ROGD)," citing to Littman 2018.
7    Did I read that correctly?
8 A Yes, that sounds correct.
9 Q And rapid-onset gender dysphoria is not a
10 recognized diagnosis; is that right?
11 A Not in a diagnostic manual itself, but that
12 shouldn't be interpreted to mean that the
13 phenomenon doesn't exist.
14 Q And the paper that you cite, Littman 2018, was
15 corrected as you note; right?
16 A There was a change to it, but nothing that
17 meaningfully altered any of its actual conclusions.
18 Q On footnote 5 you reference, "After initial
19 criticism, the publishing journal conducted a
20 reassessment of the article. The article was
21 expanded with additional detail and republished.
22 The relevant results were unchanged."
23    Is that a correct reading of the footnote
24 there?
25 A Yes.

Page 145

1    MR. STRANGIO: If we could, Joel, pull up
2 Exhibit 8.
3 Q Does this appear to be the notice of republication
4 of the Littman 2018 article?
5 A It appears to be, yes.
6 Q And at the top it says -- and I can zoom in so we
7 can look more closely -- "After publication of this
8 article" -- sorry, do you see where it begins that?
9 A Yes.
10 Q And then going down to the next paragraph -- oh,
11 sorry. Under the second part of this corrected
12 republication, there's a heading that reads,
13 "Emphasis that this is a study of parental
14 observations which serves to develop hypotheses."
15 Do you see that?
16 A Yes.
17 Q And then here at the top, about four lines down,
18 "Rapid-onset gender dysphoria, (ROGD) is not a
19 formal mental health diagnosis at this time. This
20 report did not collect data from the adolescents
21 and young adults (AYAs) or clinicians and therefore
22 does not validate the phenomenon."
23    Did I read that correctly?
24 A That's what that text says, but it's very difficult
25 for a person to know what that means and what it

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 146

1  doesn't mean without having a better idea of how,
2  you know, science publishing works.
3  Q  Well, so you noted that there was correction to the
4  article, but did not reference that ROGD is not a
5  formal mental health diagnosis.
6      Why didn't you mention that?
7      MR. RAMER: Objection to the form.
8  A  It's not pertinent to the decision or question --
9  to the decision -- to the clinical question and the
10  pertinent decisions that followed from it.
11      In the situation, the whole point of the
12  current difficulty is that the profiles of the
13  people coming to clinics and expressing profound
14  often discontent that they do not match what is in
15  the existing manuals and on which our existing
16  knowledge base sits, that's the point.
17      Whether this new profile of person is better
18  helped and better served by ROGD as a diagnosis
19  unto itself, or if they actually are suffering
20  other kinds of problems but we're just noticing the
21  ROGD part of it because it's what they're saying on
22  its face value, or if, you know, the previously --
23  you know, the well-characterized distinction
24  between the adult-onset gender dysphoria -- and
25  adult-onset gender dysphoria, if this is now just a

Page 147

1  new way of expressing one of those, well, we need
2  to know that in order to know what to do with these
3  kids.  That this new presentation is not in the, in
4  this case DSM is usually what people are referring
5  to, that's the whole point.
6      This is new and we don't know what to do with
7  it.  Therefore, the medically and clinically
8  appropriate thing to do is nothing until we have a
9  better idea of what the potentials are, the risks
10  and benefits are.
11      When we're talking the removal of healthy
12  functioning tissue, that's a method of last resort
13  until we've exhausted the other alternatives which
14  don't involve as much potential harm.
15      If, you know, after we've exhausted the other
16  possibilities and realize, yeah, this really is the
17  best balance of the potential risks and benefits,
18  okay, let's go ahead.  But that entire set of
19  questions was skipped.
20      We don't know if this is an independent
21  phenomenon, a new subset of an old phenomenon, and
22  if it is which phenomenon.  These are people coming
23  in, you know, in great emotional distress.  Okay,
24  but that doesn't mean that it's automatically what
25  it is that they're saying out loud.  We can't take

Page 148

1  for granted that they're like one of the other
2  forms of gender dysphoria.
3  Q  But in this paper, you're not saying it out loud;
4  right?  It's their parents?
5  A  Oh, in studies of youth that is -- that's very
6  common.  That is -- as I say, it's difficult to
7  interpret that sentence once lifted out of, you
8  know, the rest of how this research is done.
9  Interviewing parents and caregivers and so on is a
10  very, very routine method of studying minors.
11  Q  Exclusively interviewing parents and not the minors
12  themselves is routine?
13      MR. RAMER: Objection to the form.
14  A  For one particular study, absolutely.  It's when
15  asking a question, you know, it is exquisitely,
16  exquisitely rare for any one study to be -- to
17  answer -- you know, to answer any question.
18      Usually what we need, and the only way we know
19  that we're on the correct path that we have the
20  correct answer is when several different
21  researchers working independently using different
22  kinds of methods keep coming to the same result
23  over and over.  That's when we can be confident.
24      So in any research investigating or that's the
25  pursuit of any question including this one, we need

Page 149

1  studies that talk to the kids, that talk to the
2  parents, that talk to their psychologists, that
3  talk to the physicians and other studies that don't
4  talk to a person at all and stick to objective
5  measures, you know, of whatever is appropriate to
6  the question.
7      So this one particular study was the one that
8  interviewed parents.  It is neither the beginning
9  nor the end.  Is it one piece of the puzzle and an
10  important piece when we need, you know, and it goes
11  in the pattern of all the others.
12      So it's that, you know, contribution one piece
13  at a time, yes, that is absolutely a routine method
14  for investigations studying minors.
15      MR. STRANGIO: If we could go back, Joel, to
16  Exhibit 1.  Sorry, Joel, did you hear that, Exhibit
17  1?  Thanks.
18  BY MR. STRANGIO:
19  Q  Okay.  Still on paragraph 135, you write after
20  reference to the Littman article, "The patterns" --
21  and this, let me -- I can zoom in for you, although
22  I think you have this in front of you, Doctor.
23      "The patterns reported by Littman have now
24  been independently replicated by another study
25  which also found it to be a predominantly female

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 150

1  phenomenon, associated with very high rates of
2  social media use, among youth with other mental
3  health issues, and in association with peers
4  expressing gender dysphoria issues." Citation to
5  Diaz 2023.
6  A  Yes.
7  Q  Is that right?
8  A  That reading of the text is correct, yes.
9  Q  And if we can pull up -- well, let's see if we can
10  do this without pulling up the exhibit for the sake
11  of our limited technological skills.
12      Are you aware of changes to the Diaz article
13  subsequent to publication?
14  A  Yes, I am.
15  Q  And you're aware that the second author of the
16  publication, Michael Bailey, has since made public
17  that the paper has been retracted?
18  A  Yes.  Of course, I need to add the caveat that arm
19  of the drama happened after I submitted this.  So
20  it wasn't -- you know, I didn't have that knowledge
21  when I wrote and submitted it.  But, yes, I know
22  that that's happened in the interim.
23  Q  So the article that you cite further the prop --
24  the article that you cite for the proposition that
25  the patterns reported by Littman have now been

Page 151

1  independently replicated was retracted?
2  A  Again, there are some nuances in that.  There are
3  some nuances in that.  The paper wasn't -- the
4  basis of the retraction of the paper, which is
5  itself now a means of enormous controversy, was not
6  actually about whether the contents were accurate.
7  No one has, you know, presented any demonstration
8  that the results that they reported were incorrect.
9      So to the extent that one is actually seeking
10  the truth in that if one wants to know what's going
11  on, as best as we could tell with these kids, you
12  know, the conclusions they came to are perfectly
13  valid and, again, exactly the same.  They, you
14  know, completely independently come to the same
15  conclusion as the Littman paper.
16      To the best of my knowledge, the nature of the
17  controversy, I guess I can call it, which led to
18  the formal retraction was -- oh, goodness -- was
19  the database was pre-existing.  The nature of the
20  data were already collected by the time -- I guess
21  it was Bailey became involved.
22      And in research ethics, there are different
23  criteria that they use for pre-existing databases
24  versus, you know, actively going and recruiting
25  people in order to participate in a study or

Page 152

1  whatever.
2      The way that these data came, it was
3  ambiguous.  There are, you know, different groups
4  that have different policies and different
5  principles for, you know, under what circumstances
6  should people have undergone how thorough of an
7  informed-consent process.
8      In this particular one, the relevant
9  guidelines would be those of the publisher itself,
10  Springer who publishes the journal that this was
11  printed in.
12      The policy of Springer is that it was up to
13  the discretion of the editor in chief.  And the
14  editor in chief which said that, yep, nope, fine
15  with him.
16      However, after the publication of the article,
17  you know, the nature of it and that people didn't
18  like the conclusions that it came to started a --
19  what I can only call a campaign to have it declared
20  unethical, because they don't think that the
21  editor's discretion was what they wanted it to be.
22      So, again, that became, you know, whatever
23  pressures.  And then it goes, you know, behind
24  closed doors, and I don't know what's going on.
25  And then the publisher ultimately decided to --

Page 153

1  that the paper should be officially retracted.  But
2  there were never any allegations, and there were
3  never any conclusions that the content or the
4  conclusions themselves were in error.
5      So whether that should be -- so does that
6  count or does that not count?  It's hard for me to
7  come to any conclusion that people are going to
8  accept or reject the contents of that paper
9  according to whether they accept or reject its
10  implications.  The content of the paper, however,
11  has not been in question.
12  Q  But just as a factual matter, in this paragraph one
13  of the papers was corrected and one was retracted?
14  A  I don't think -- such a characterization, again,
15  just kind of insinuates a situation that is the
16  opposite of the truth.
17      The correction -- again, in general publishing
18  a correction is the formal name of a post-
19  publication change.  It is -- you know, but in the
20  context where people are, you know, liking or
21  disliking a finding, the word correction is getting
22  used to imply that one of the conclusions was wrong
23  or something in it was incorrect, which is not the
24  case.
25      The content that was changed to Littman was

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 154

1 adding detail. None of the conclusions changed, no
2 errors in it were found. It's the decision was,
3 well, add the necessary detail in order to
4 demonstrate that nothing was skipped because this
5 particular audience isn't going to take anything
6 for granted.
7     So they added the detail, but the nature of
8 editorial publishing is that such changes are
9 called correction. So, again, to just take that
10 sentence out is to -- is easily mistaken as an
11 assertion that something was incorrect.
12     Same with the Diaz paper. To call it a
13 retraction without the, you know, details of what
14 led to the retraction is to insinuate or to kind
15 of, you know, leave a reader or listener the
16 impression that there was something wrong, that
17 there was an error in the conclusions of the paper,
18 and so its conclusions ought not to be given any
19 weight.
20     That's not the case. The conclusions were
21 never in question, and nobody's changed any of the
22 conclusion -- nobody's asked for any changes to the
23 conclusions or demonstrated that there was an
24 error.
25     People have been -- there were people who were

Page 155

1 upset and protesting about -- well, again, their
2 motivations are, you know, pretty -- are relatively
3 clear, but the content -- the rule that was being
4 contested was the method and amount of disclosure,
5 you know, of the people who participated in the
6 study. But there was never any question in the
7 accuracy of the study itself.
8 Q Is your view that it was only retracted because of
9 external pressures?
10     MR. RAMER: Objection to the form.
11 A I haven't seen any evidence, and I haven't -- I
12 don't think I've heard any accusations otherwise.
13 Q So you think that the journal just retracted it
14 because of external pressures, not concerns about
15 the informed consent as --
16 A The journal didn't retract it. The publisher did.
17 Q Excuse me, the publisher retracted it out of
18 concerns about a lack of informed consent, that was
19 not a true reason?
20     MR. RAMER: Objection to the form.
21 A I don't think the situation breaks down quite that
22 way. And it's essentially what the publisher
23 themselves said. They indicated that they were
24 receiving those kinds of communications. There
25 was -- I'd have to go back and read the original

Page 156

1 letter they sent. The policy that they have, you
2 know, it was entirely explicit that it was left up
3 to editor's discretion. So essentially they as
4 publisher overturned the editor's use of that
5 discretion.
6     Again, I don't think any of that is ambiguous.
7 And I'm not aware of anyone anywhere in that
8 pipeline -- at least the parts, you know, to which
9 I'm privy, I've not seen any communications or
10 evidence or discussion otherwise.
11 Q Going to page 62 -- uh-oh, what have I done? So
12 beginning on page 62 of your declaration, you
13 distinguish between suicide and suicidality; is
14 that right?
15 A Yeah, again, I hesitate to say that, you know, I
16 distinguish. I'm just, you know, orienting people
17 to the proper uses of the vocabulary. So people
18 who are, you know, not psychologists, you know,
19 reading this don't accidentally mistake one to mean
20 the other, which, again, especially in this context
21 very many groups are actively doing.
22 Q So, I mean, in essence you note that they're
23 distinct clinical phenomena; is that right?
24 A I know that these are distinct phenomena, yes.
25 Q You note, sorry. I know that you know that. You

Page 157

1 note?
2 A Oh, I note that, yes.
3 Q I don't actually know, so --
4 A And perfectly legitimately, the public doesn't.
5 That's not their job. You know, this isn't the
6 kind of stuff that people discuss. And that's what
7 leads so many people to misunderstand the content
8 of these studies, especially when things are being
9 lifted out of context.
10     So in order to understand the context of these
11 studies, you know, I have to start out with, as I
12 say I do, here are the definitions. Here's how I'm
13 going to use them. If you read these other, here's
14 how they use them. Which one we use, I don't care,
15 but as long as we're all using the same one, we can
16 have a productive conversation.
17 Q And so, understanding they're distinct clinical
18 phenomena, you would agree that both should be
19 clinically addressed?
20     MR. RAMER: Objection.
21 A Oh, yes, absolutely.
22 Q And that reducing suicide and reducing suicidality
23 are both positive outcomes?
24 A Yes, absolutely. The difficulty that society comes
25 to is that it is exactly because it is part of

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 158

1  these being such different phenomena that the way
2  to deal with them effectively is very different.
3  So --
4  Q  Understood.
5  A  -- not merely a matter of -- you know, using
6    suicide when we mean suicidality, that's not
7    merely, you know, exaggerating. It's failing to
8    help get the right kind of help to the right group
9    of people. And so, you're disadvantaging them
10   both. And everybody's harmed or failed to be
11   helped.
12 Q  In paragraph 142, and this is on page 63, you
13   write, "Social media voices today loudly advocate
14   'hormones-on-demand' while issuing hyperbolic
15   warnings that teens will commit suicide unless this
16   is not granted."
17      Did I read that correctly?
18 A  Yes, that's the content of my sentence.
19 Q  What are hormones-on-demand?
20 A  With minimal assessment consideration of
21   alternatives, it's removing whatever safeguard one
22   can find an excuse to remove.
23      This is another one of the differences that
24   have changed over time, which is relatively
25   apparent to those of us who have been in this field

Page 159

1  for long periods of time and have watched the
2  removal of safeguards as opposed to people who have
3  recently come into the field and are only aware of
4  the current status and don't realize that this is a
5  change.
6      So people are often referring to, you know,
7  history's long-standing criteria. No, the current
8  criteria are not long-standing at all. These are
9  brand-new and untested.
10     The subset of studies which suggest success
11  use the relatively high standards that used to be
12  in place at that time. Today people have removed
13  the real-life testing requiring months, years in
14  some cases, of psychotherapy and expect still to
15  get the same results.
16 Q  There's no citation on this sentence about
17   hormones-on-demand; right?
18 A  Correct. And that's also why I put it in quotes.
19   I'm using it as a general description to capture
20   the basic idea of what's going on.
21 Q  So that's not based on any specific practice?
22      MR. RAMER: Objection to the form.
23 A  No, that's not true either. It's the -- you know,
24   the term itself is, you know, my own expression in
25   order to describe the situation. But the situation

Page 160

1  that I'm describing is, you know, quite concretely
2  real.
3      As I say, it's the -- I'm referring very
4  specifically to the removal of the safeguards that
5  were in place when the available data were first
6  gathered. And the reason why, that just because
7  we're -- that after removing those safeguards and
8  after removing the assessment procedures and so on,
9  that expecting different -- expecting the same
10 result after changing the -- after removing those
11 safeguards is what makes the current situation an
12 experiment, you know, without the knowledge of the
13 experimentees.
14     And I use the word hormones-on-demand to refer
15 to situations where -- and to clinicians who
16 believe that asking for hormones or medicalized
17 transition services is sufficient, and from that
18 point forward, the clinician's predominant duty,
19 now with only very rare exceptions, to find ways to
20 provide them. Rather than to accept it as one of
21 the possibilities, let's try the less potentially
22 risky ones first.
23 Q  And what -- who are the social media voices?
24 A  Oh, again, the ones whom I happen to run into
25   regularly. There's certainly no shortage of them,

Page 161

1  only because his name is forefront of my mind for
2  the moment, would be, for example, Jack Turban.
3 Q  So you would consider Jack Turban to be a social
4   media voice?
5 A  Yes, I think it would be fair to describe him that
6   way. I don't want to be unfair to him either. I
7   wouldn't say he's limited to being a social media
8   voice.
9 Q  So you mean clinicians on social media?
10 A  I would include clinicians on social media.
11 Q  And you think that non-clinicians on social media
12   are relevant to your assessment of current clinical
13   practice?
14      MR. RAMER: Objection to the form.
15 A  No, I wouldn't say that either. How I use that
16   phrase, and how I would still use that phrase,
17   really, is that that is the medium through which
18   one would run into, you know, such voices. I mean,
19   if one is looking to find, you know, how these
20   ideas are getting communicated, they're largely
21   getting communicated through social media.
22      It is hard to avoid the observation that it
23   was the onset of social media that changed, you
24   know, the public perception and treatment,
25   including professional treatment, of gender

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 42 of 165 PageID
#: 3664
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

Page 162

1  dysphoria is one of very many, very profound
2  changes that all started with identical timelines.
3  Among them is this sudden and exquisitely rapid,
4  literally exponential increase in rates of mostly
5  adolescents, mostly biological female reporting
6  gender dysphoria.
7       It's unfortunate, it is not helping that
8  generation at all.  Gender dysphoria -- or that
9  enormous exponential increase in gender dysphoria
10  is only one of several dysphorias, all of which
11  have exponentially been increasing since the onset
12  of social media.
13  Q  What are the other dysphorias?
14  A  The other major ones are reports of depressions,
15  anxieties and, again, suicidality.
16  Q  On page 91, paragraph 204 -- Joel never should have
17  given me control of this.
18  A  Would it be inappropriate for me to say, oh, this
19  sounds like a significant other kind of a comment?
20  Q  Okay.  204.  Here, Doctor, you are talking about
21  sterilization without proven fertility preservation
22  options.  You write, "Clinical guidelines for the
23  medical transition of gender among children include
24  the need to caution and counsel patients and
25  parents about what are euphemistically called

Page 163

1  'options for fertility preservation.'"  And then
2  you cite the Endocrine Society Guidelines.
3       Is that -- did I read that correctly?
4  A  That's that one sentence, yes.
5  Q  Shouldn't clinicians counsel patients about options
6  for fertility preservation?
7       MR. RAMER: Objection to the form.
8  A  Again, that's why I'm pointing it was trying to
9  emphasize that what I'm pointing out is that
10  they're doing that euphemistically, where the term
11  they're using is sterilization, which is
12  essentially guaranteed for somebody who goes from
13  puberty -- or halted puberty with puberty blockers
14  to cross-sex hormones.
15       The very phrase "fertility preservation" works
16  under the assumption that you were fertile in the
17  first place.  And the sequence of blocking puberty
18  and taking prepubertal gonads and putting them on
19  cross-sex hormones is the prevention of
20  ever-developing fertility.  It's not preservation.
21       That's an adopting of the term -- adoption of
22  a term if, for example, a man with testicular
23  cancer is going to undergo chemotherapy, which,
24  again, would, you know, interfere with, if not
25  outright destroy, his ability to produce viable

Page 164

1  sperm.  That would be a person who is fertile, and
2  we are trying to maintain, we're trying to preserve
3  his fertility.  To say that --
4  Q  So I understand that.  This is a reference to the
5  clinical guidelines for medical transition
6  generally.
7       So taking aside puberty blockers, there are
8  fertility preservation options for persons who
9  undergo hormone therapy, are there not?
10       MR. RAMER: Objection to the form.
11  A  Again, that to me is why I referred to this as
12  you've -- as a euphemism.  There exists a range of
13  interventions and a range of their harms.
14       To pick the mildest phrase which describes the
15  mildest harm, and then generalize that to apply to
16  the entire range where the controversy is at the
17  other extreme where there is again sterilizing
18  these children, you know, we end up with a
19  situation where the terminology is being used in
20  accordance with the person's political or other
21  views rather than my automatic preference as a
22  scientist make the word -- make the phrase precise
23  and accurate.
24       And fertility preservation is amongst the
25  terms that is, again, being a euphemism and not

Page 165

1  accurately describing the risks and potential harms
2  in a way that would allow for a legitimate and
3  meaningful calculation of the risk-to-benefit
4  ratio.
5  Q  But you don't think that counseling a patient that
6  there are no options for fertility preservation in
7  some instances, and then counseling a different
8  patient that there are some options for fertility
9  preservation in other instances is an appropriate
10  way to describe a range of medical intervention?
11       MR. RAMER: Objection to the form.
12  A  I haven't seen a document that does that.  I don't
13  believe the Henbury policy did that.  It consisted
14  only of the use of the mildest terms.
15       I also think it's an error to use, again, an
16  all-encompassing term like patient.  We are talking
17  a prepubescent child and having an adult
18  conversation about whether they want to have
19  children.  That conversation is not comparable in
20  any meaningful way to a 30-year-old adult male,
21  with in this example testicular cancer, who is able
22  to come to an adult brain decision over children,
23  not children, the potential for his own future
24  fertility.
25       Asking a prepubescent that is using a global

Case 1:23-cv-00595-JPH-KMB     Document 58-8     Filed 06/12/23     Page 43 of 165 PageID
#: 3665
K.C., et al. VS                                                    JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board              June 7, 2023

Page 166

1  all-encompassing term like patient is another
2  example of obscuring the most, you know, severe and
3  dramatic of these situations using exactly the same
4  term that we should use, you know, in describing
5  the most mild of the range of issues and the
6  risk-to-benefit ratio.
7  Q  In that paragraph you write, "The decision to
8  undergo medicalized transition also represents the
9  decision never to have biological children of one's
10 own."
11     Do you think that might be the most extreme
12 interpretation of a range of potential outcomes?
13     MR. RAMER: Objection to the form.
14 A  Oh, again, the same.  When somebody is giving one
15 extreme, I'm pointing that out to -- you know, I'm
16 red flagging it by pointing out the missing part of
17 the extreme, which requires me to name the missing
18 part of the extreme.  The whole point is that this
19 is a wide range.
20 Q  But someone who, say, undergoes a double mastectomy
21 can still have biological children of one's own?
22     MR. RAMER: Objection to form.
23 A  The situation, at least in theory, can exist.  But
24 there are no reliable numbers, I think either in
25 the U.S. or Europe, about the proportions and

Page 167

1  overlap of, in your example biological women,
2  undergoing mastectomy versus cross-sex hormones
3  versus puberty suppression.
4     Of course, you know, sterility and decisions
5  about the sterility being made by a prepubescent
6  brain comes from people who are on puberty blockers
7  pretty much as puberty starts and then going on to
8  cross-sex hormones.
9  Q  So you're describing a subset of the people who
10 undergo medicalized transition in this sentence?
11     MR. RAMER: Objection to the form.
12 A  Hang on, I was still stuck on the prior part.
13 Again, the sterility is for people who are on
14 puberty blockers followed by cross-sex hormones.
15     A biological female put on puberty blockers
16 and then put on cross-sex hormones doesn't develop
17 the breasts for which a double mastectomy would be
18 required in the first place.
19 Q  So, I'm sorry, your phrase undergoing a medicalized
20 transition only refers to people who go from
21 puberty blockers to gender-affirming hormones?
22     MR. RAMER: Objection to the form.
23 A  I didn't mean my sentence to be a complete review
24 of, you know, several different potential
25 combinations of the several different variables.

Page 168

1     Again, my purpose was to demonstrate that it
2  is inappropriate to the point of misleading for a
3  professional medical society of all groups to use
4  only the mildest and most euphemistic of language
5  ignoring -- again, in a document meant for
6  physicians, not meant for the patients themselves,
7  describing, you know, only the most optimistic
8  balance of risk-to-benefit ratio as opposed to
9  recognizing the full range of varying situations.
10     And, again, in the case specifically of the
11 Endocrine Society statement, in complete absence of
12 the consideration -- I shouldn't say complete
13 absence, but at the same time as failing to
14 integrate the large number of complete unknowns and
15 still unexplored alternatives before we get to the
16 most dramatic of the options.
17 Q  I'm just trying to understand this sentence that
18 you wrote --
19 A  I'm sorry.
20 Q  -- which is, "The decision to undergo medicalized
21 transition also represents the decision never to
22 have biological children of one's own."
23     In that sentence, medicalized transition only
24 refers to patients who go from puberty blockers to
25 hormone therapy; is that right?

Page 169

1     MR. RAMER: Objection to form.
2  A  No, my one sentence cannot be considered on its own
3  without the other sentences that I purposefully put
4  it together with.
5  Q  So you're not willing to say -- you're not willing
6  to accept that someone who only undergoes a
7  mastectomy, for example, could still have
8  biological children of their own?
9     MR. RAMER: Objection to the form.
10 A  In its context, my sentence doesn't contest that.
11 I'm filling in the missing pieces.  So the one
12 sentence taking out just, you know, ends up leaving
13 different pieces missing.  It takes the whole set
14 of them where I'm pointing out, you know, the
15 pieces of the puzzle are missing.  So I'm alerting
16 the reader to the missing pieces.
17     Well, it's true that I am not alerting people
18 to the not missing pieces.  I only need to alert
19 people to the missing pieces.
20     So the one sentence on its own is what, in my
21 view, is one of the missing pieces.  There's no
22 purpose to that sentence to point out the pieces
23 that were already there to begin with.
24 Q  Do you think that testosterone impairs fertility
25 for every natal female who takes it?

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 44 of 165 PageID #: 3666

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 170

1  A  For everyone?  No.  The most -- the powerful
2     effect, the essentially sterilizing issue happens
3     with the combination -- that happens from the
4     combination essentially applying cross-sex hormones
5     to gonads that still have prepubertal cells.
6  Q  Got it.
7  A  So the automatic sterilization goes from the --
8     goes to people who essentially were going from
9     puberty blockers to cross-sex hormones without time
10    in between to develop adult quality viable gonad
11    tissue, that I don't remember if it was in this
12    report, but it was exactly that error for which I
13    was faulting several of the other experts, as they
14    report, you know, some of the relatively mild side
15    effects of one or the relatively mild side effects
16    of the other where the actual danger is in the
17    combination, and nobody mentions the combination.
18 Q  Understood.  Earlier you were talking about
19    prepubertal children making these decisions about
20    fertility, but in the United States in their
21    parents consenting to treatment; right?
22       MR. RAMER:  Objection to form.
23 A  I don't think -- that doesn't really describe the
24    full sentence.  It's not like the parents are
25    deciding -- the parents aren't talking with each

Page 171

1     other should we have grandchildren.  The parents
2     are trying to figure out, you know, what would
3     help, you know, increase the mood or discomfort of
4     the profound unhappiness of their child.
5        And so, from their point of view, they're
6     doing their best to do what they think their kid
7     wants or what they imagine their kid would want or
8     will have wanted when the kid is later an adult and
9     looking back on the whole thing.
10       So the parents generally are trying to guess
11    what the kid would want is -- what the kids would
12    want.  It's also, I think, unfair to describe the
13    parents' decision-making process as consent as if
14    it's a cognitive process, when the consent is in
15    the legal meaning they are providing on paper what
16    we deem to be consent.  But it's a misleading use
17    of the term to equate legal consent with making the
18    kid's decision for the kid, when the basis of what
19    the parent's legal decision is going to be is their
20    best guess for what they think the kid would want
21    if the kid were an adult, which the kid isn't.
22 Q  And that's the nature of pediatric medicine as a
23    general matter?
24       MR. RAMER:  Objection to form.
25 A  This isn't like pediatric medicine as a general

Page 172

1     matter.  That's the whole problem.  In pediatric
2     medicine in general, we have objective evidence of
3     an objective process for which we can give -- I'm
4     making this part up -- a blood test to verify that
5     the kid has -- you know, to use a usual example,
6     whatever intersex condition.
7        This is exactly the opposite condition.  We
8     have zero objective evidence, only subjective
9     self-report from a prepubescent kid which conflicts
10    entirely with all of the available objective
11    evidence.  That is entirely unlike the rest of the
12    pediatric medicine -- or that is entirely unlike,
13    if I can talk in italics, the process of general
14    pediatric medicine.
15 Q  On page 109 --
16 A  I'm there.  Speak of the devil.
17 Q  Okay.  So this is in paragraph 259.  You write of
18    Dr. Turban, "Dr. Turban's employment as director of
19    a gender program in child and adolescent psychiatry
20    represents a significant conflict of interest:  The
21    income he derives from his medical treatment of
22    these children would be directly affected by the
23    outcome of this case."
24       Did I read that correctly?
25 A  Those are the sentence -- that's the sentence I

Page 173

1     wrote, yes.
2  Q  And Dr. Turban is a psychiatrist; correct?
3  A  Yes, so far as I know.
4  Q  And he is employed in a child and adolescent
5     psychiatry program?
6  A  Yes.  Is it up to a year yet?  Recently, but, yes.
7  Q  But you maintain that his income is derived from
8     endocrine treatments?
9  A  Did I say endocrine?
10 Q  You said his medical treatment.  I don't know what
11    you're referring to there.
12 A  I meant it relatively broadly.  It's -- again, I
13    don't know details about how the specific hospital
14    works.  But the usual procedure, and I don't recall
15    him ever pointing out an exception, is to engage in
16    these procedures as a multidisciplinary team.
17       As a psychiatrist, he would ultimately be
18    responsible for the mental health assessment or
19    lack of mental health assessments used in deciding
20    who would go on to endocrinological treatments.
21    And the endocrinologist would be responsible then
22    for ensuring the physical ability of the child to
23    respond to the medications as desired, but not the
24    decision whether to.
25 Q  Do you think that everyone who works in a

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 174

1  multidisciplinary gender clinic has a conflict of
2  interest in these cases?
3       MR. RAMER: Objection to the form.
4  A  I don't see any way around the idea that when the
5  legality of providing a service is in question that
6  there is a conflict of interest for the people
7  providing that service.
8  Q  Well, Dr. Turban doesn't provide any of the
9  services directly that are the subject of the
10  Indiana law; right?
11       MR. RAMER: Objection to the form.
12  A  I don't know what director would -- I don't know
13  what you mean by direct. If one is in charge of --
14  I don't mean to equate the situations, but if one
15  is the manager of a McDonald's, just because you're
16  not serving the hamburgers doesn't mean that you
17  are not affected if they shut down the whole
18  restaurant.
19  Q  So if they ban puberty blockers and hormones and
20  surgery, it's your view that not only are the
21  endocrinologists and the surgeons conflicted --
22  possessing a conflict of interest, but the
23  psychiatrists are as well?
24       MR. RAMER: Objection to the form.
25  A  Yes, everybody involved in the provision of the

Page 175

1  service. And if the -- to the extent that the
2  provision of the service is multidisciplinary, and
3  he is the doctor -- he is the director directing
4  the entire process, he is ultimately responsible
5  for it.
6       And it would be that entire -- it would be the
7  entire service he is directing that would be
8  switching to the other use of the term directly
9  influenced by regulations and findings that limit
10  or ban or restrict the provision of that very
11  service.
12  Q  So is it just the directors of the program or every
13  physician who works at a gender program?
14       MR. RAMER: Objection to the form.
15  A  I don't think I necessarily need to allow for the
16  possibility that there could be an exceptional
17  situation that doesn't immediately come to mind,
18  but to -- it's I can't think of a situation in
19  which one can be a specialist in providing a
20  specialized service that -- for which one would not
21  be in a conflict of interest if that service is
22  prevented.
23       The only exceptions, and I'm not even sure
24  they count as exceptions, depending on -- again, in
25  different hospitals in the U.S. is the

Page 176

1  international outlier in this again, there can be,
2  or I can imagine there existing a situation in
3  which, for example, a nurse is simply assigned a
4  department. And if one department is restructured
5  or canceled, then he, she, or they are reassigned
6  to another clinic so that it's, you know,
7  relatively invisible to them, I can imagine the
8  possibility for certain circumstances like that.
9       I cannot imagine such a situation from the
10  person -- from a person legitimately holding the
11  title director.
12  Q  Do you believe that the physicians who treat
13  patients at gender clinics would not have jobs if
14  puberty blockers and gender-affirming hormones were
15  banned?
16  A  I would be surprised certainly if they became
17  unemployed. But, again -- but they would be, you
18  know, in any meaningful way highly impacted.
19  Q  They couldn't practice other aspects of their
20  specialties?
21       MR. RAMER: Objection to the form.
22  A  They would be forced to. As I say, they would be
23  impacted, but I would be surprised if they ended up
24  unemployed.
25  Q  So their income wouldn't necessarily be impacted?

Page 177

1       MR. RAMER: Objection to the form.
2  A  I don't think that fairly describes the situation.
3  It's -- I don't think that fairly describes the
4  situation, no.
5       Having one's means of income being required,
6  you know, against one's will to have to change what
7  one does for a living in order to maintain one's
8  income represents a significant conflict of
9  interest.
10  Q  So based on that, are the only legitimate experts
11  those who do not treat adolescents with gender
12  dysphoria?
13  A  That's --
14       MR. RAMER: Objection to form.
15  A  That's a different question. And as I enumerated
16  within my report, it is a standard procedure in
17  producing a systematic review in order to get
18  people who do not have a direct interest in the
19  outcome of it.
20       And that's exactly how Vivienne Cass in the UK
21  was chosen. And that's how all of the other groups
22  in all of the other countries were selected. To
23  pick an odd example, if one wanted to know if
24  reading fortune tea leaves were scientifically
25  valid, you could not do it by asking only the

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 178

1  fortune tea leaf readers.
2       One needs to be able to -- in order to be
3  without a conflict of interest, one needs to be one
4  step further away than receiving income from the
5  provision of the service in question.
6  Q  So you believe Dr. Turban is biased because you
7     think his compensation is tied to a certain
8     clinical outcome?
9       MR. RAMER: Objection to the form.
10 A  I don't think I said biased.  I'm, you know,
11    acknowledging he's in a conflict of interest.  The
12    nature --
13 Q  So you -- okay.  Go ahead.  Sorry.
14 A  The nature of his writings suggest that, you know,
15    he has very, very strong beliefs about the
16    situation.  But, again, the term bias is for me to
17    engage in some mind reading that I'd hesitate to.
18    It is perfectly legitimate, and it's a matter of,
19    you know, objective evidence to indicate that this
20    is a legitimate conflict of interest.
21       Bias is more cognitive -- is a more cognitive
22    situation, which is, I think, a legitimate
23    accusation, but I couldn't say that I have an
24    objective means of demonstrating it unlike conflict
25    of interest.

Page 179

1  Q  So you think that compensation can have an improper
2     influence on a clinician's perspective?
3       MR. RAMER: Objection to the form.
4  A  That's not a reference to the proper audience.  The
5     people who are in need of protection, and the
6     people who are meant to be protected by
7     conflict-of-interest principles are not the
8     providers of the service, but the recipients of the
9     service.
10 Q  What are conflict-of-interest principles?
11 A  Oh, I don't mean them -- as I said, I mean them
12    generically.  If I were going to receive, you know,
13    any medical service, I expect of the institutions,
14    whether it's government or medical boards depending
15    on one's jurisdiction, that if I'm going to be
16    receiving what I expect to be evidence-based
17    medicine, I expect that evidence to be evaluated by
18    people other than the person actually providing me
19    the service.
20       If I knew that the only person reviewing my
21    provider was my provider, I would be in a very
22    different situation of confidence in making my own
23    healthcare decisions than if a person at arm's
24    length were in charge of reviewing the procedures
25    my provider provides.

Page 180

1  Q  Do you think being paid by an advocacy organization
2     might have an improper influence on a clinician's
3     opinion?
4       MR. RAMER: Objection to the form.
5  A  I can imagine situations where it would, and I can
6     imagine situations where it wouldn't.  So I
7     wouldn't automatically -- it would be a legitimate
8     conclusion, but it doesn't have the automatic
9     people provided -- the quality of service provision
10    or the -- tenability's not the word.  The safety
11    and effectiveness of providing a service has to be
12    conducted by people at arm's length from it.
13       If one is at a -- is in a position where one
14    is advocating a particular view, then it's
15    completely transparent that one is, you know, of
16    that view or advocating for whatever that situation
17    is.
18       That's entirely unlike healthcare where one is
19    expected to be -- expected and depended upon to be
20    entirely objective, but it's not -- the
21    expectations and the people who were meant to be
22    protected by it are of a different kind.
23 Q  Were you aware that Indiana's expert, Daniel Weiss,
24    testified before multiple state legislatures in
25    favor of laws like SEA 480?

Page 181

1       MR. RAMER: Objection to the form.
2  A  I'm not even sure who that is.
3  Q  And that he was compensated by Do No Harm for that
4     testimony?
5       MR. RAMER: Objection to the form.
6  A  Same, I don't think I know who that is.
7  Q  Is that a conflict of interest to testify before a
8     state legislature regarding a law and be
9     compensated by an advocacy organization?
10      MR. RAMER: Objection to the form.
11 A  I'm still missing a piece.  I don't know who or
12    what it is that we're talking about.
13 Q  Well, I don't think you even have to know who he
14    is.  He's one of Indiana's experts in this case, an
15    endocrinologist.  But he testified regarding a law
16    like SEA 480, and for that testimony was
17    compensated by Do No Harm, an advocacy
18    organization.
19       I'm just trying to understand under your
20    framework for conflict of interest, would that be
21    one?
22      MR. RAMER: Objection to the form.
23 A  No, I don't think so.  Acting in a political
24    capacity advocating for a political view doesn't
25    have the same expectations of neutrality as would a

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 47 of 165 PageID #: 3669

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 182

1 physician -- as a patient coming to a physician
2 expecting to receive objective feedback and advice
3 from the physician.
4         In a governmental situation, there will --
5 there would generally be people advocating on one
6 side, people advocating on the other side.  And the
7 influence of whatever money for whatever decision
8 it is, is almost, I don't know how cynical -- one
9 could be -- it would be perfectly fair to be
10 cynical.  But that is not the same decision-making
11 process or position of vulnerability that a patient
12 has in expecting the advice they get from their own
13 doctors to be.
14 Q  So is the conflict of interest you describe with
15 respect to Dr. Turban about a conflict of interest
16 with his patients, not as an expert in this case?
17         MR. RAMER: Objection to the form.
18 A  The conflict I'm referring to is the combination of
19 them.
20 Q  Page 124 --
21         MR. RAMER: Hey, Chase, we've been going
22 for --
23         MR. STRANGIO: So the question I have is, I'm
24 close to the end.  Do you want to sort of go 20
25 more and try to wrap it up, or do you want to take

Page 183

1 a break and then finish?  We can take a break, I
2 can check in with my side, and then we'll just
3 finish up after the break?
4         MR. RAMER: I'd appreciate the break.
5         MR. STRANGIO: Yeah, yeah, yeah, let's do it.
6 Let's do it.  I was trying to get us done, but
7 understood.
8         MR. RAMER: No, I appreciate that, too.
9         MR. STRANGIO: Yeah, it's fine.  It's fine.
10 Five minutes?
11         MR. RAMER: Works for me.
12         Doctor?
13         THE WITNESS: Okay.  See you in five.
14         (A recess was taken.)
15 BY MR. STRANGIO:
16 Q  Okay.  I'm on page 124, paragraph 299 regarding
17 Dr. Shumer, you write, "Despite his use of dramatic
18 terms, Dr. Shumer is not a mental health expert
19 qualified to assess mental health outcomes, and he
20 cites no evidence to justify any predictions of
21 suicidality or other predictions of outcomes."
22         Did I read that correctly?
23 A  Yes.
24 Q  Do medical doctors not typically assess their
25 patient's mental health?

Page 184

1 A  Not in the manner -- not in that manner, no.
2 Again, not -- they're generally, unless they have
3 specific training, again, specifically for
4 assessment of such mental health concerns, it tends
5 to be limited to what a brief screening and
6 standardized questions of, in general, things to be
7 on the lookout for.  But that's not the context or
8 situation that he's describing or -- that he's
9 describing period -- semicolon.  Nor is it the
10 basis for predicting what future situations that do
11 not currently exist will bring, you know, on the
12 basis of no evidence whatsoever.
13 Q  And in the previous paragraph you write,
14 "Dr. Shumer's report provides a highly misleading
15 discussion of the risks of GnRH agonists and
16 cross-sex hormones."
17         Did I read that correctly?
18 A  Yes.
19 Q  And are you an endocrinologist qualified to make
20 assessments of the risks of GnRH agonists and
21 cross-sex hormones?
22         MR. RAMER: Objection to the form.
23 A  That statement doesn't require an endocrinological
24 background.
25 Q  Do you use social media?

Page 185

1 A  A little bit.
2 Q  Twitter as we've been discussing?
3 A  Yeah, I try to keep it to roughly, you know, a
4 tweet or two a day.  Usually I'm working on
5 something else and it occurs to me, oh, people
6 would be interested to hear that and I'll post it,
7 or there's a precious pithy thing that, ooh, that
8 kind of crystallizes it, so I'll release that.
9 Q  And is your handle @JamesCantorPhD?
10 A  Yes, that's correct.
11         MR. STRANGIO: Can we pull up what's marked as
12 Exhibit 11.
13 BY MR. STRANGIO:
14 Q  On February 23 of this year, do you recall
15 tweeting, "The only ones who crave affirmation more
16 than trans teens are their doctors"?
17 A  I recall that tweet, yes.
18 Q  What did you mean by that?
19 A  The interactions that I've had with them, with the
20 ones who in turn discuss or refuse to discuss the
21 relevant issues on social media are unlike the
22 healthcare providers I interact with in any other
23 aspect of human sexuality and unlike the scientists
24 I interact with on any other issue.  There's much,
25 much less discussion of the content and much, much

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 186

1    more discussion of how it's going to look.
2 Q  And when you're talking about the interactions,
3    you're talking about interactions on social media?
4 A  Not just.  Of course, you know, it is exactly
5    because the bar for entry into social media is so
6    low that, you know, the proportion of the publicly
7    available statements, it takes up so much more than
8    it.  But, no, it's not limited to social media.
9 Q  Do you think that doctors who treat transgender
10    adolescents are doing so for reasons other than
11    concern for their patients?
12        MR. RAMER: Objection to the form.
13 A  As happy as I am to call out what I think is an
14    unhealthy influence of one's personal
15    characteristics in one's professional practice, I
16    wouldn't dichotomize it either.
17        I would not say as a general rule that -- I do
18    believe, or I have every reason to believe, that
19    they genuinely believe that they are helping, but
20    the set of cases, situations, willingness to take
21    on risks, willingness to disagree with a popular
22    idea in the face of evidence suggests that there
23    is, as I say, an unhealthy or disproportionate
24    balance of the several inputs and motivations to
25    behavior.

Page 187

1        And, again, I don't mean to isolate people
2    involved with this issue versus rest of world so
3    much as I've been involved with very many, you
4    know, controversial issues.  That's not only the
5    nature of sex research, but it's the nature above
6    all the other branches, even of sex research, it's
7    much more a part of the study and of atypical
8    sexualities.
9        So relative to other care providers and other
10    scientists involved with providing professional
11    care to people with other atypical sexualities, the
12    cluster of personalities, the type of conversations
13    that are had and not had, the unwillingness to
14    respond to the most legitimate, even published
15    criticisms, this group of people are unlike those
16    working in any other area of atypical sexuality.
17 Q  And what is -- who is this group of people?
18        MR. RAMER: Objection to the form.
19 A  People publicly advocating.  I really want to say
20    extremists, I think I want -- I have a hard time
21    finding a different word than extremists, but
22    people with an un -- with a disproportionate
23    conviction of what they're doing is correct without
24    having balanced it against the enormous number of
25    unknown potential alternatives -- or potential

Page 188

1    alternatives.
2 Q  And is that description one that you would apply to
3    all doctors that treat trans teens?
4        MR. RAMER: Objection to the form.
5 A  No, I would automatically hesitate to -- I would
6    automatically -- I would reflexively refuse to --
7 Q  What about would you apply that description to most
8    doctors that treat trans teens?
9        MR. RAMER: Objection to the form.
10 A  I don't think there's a meaningful way -- no, I
11    would have to couch it more than that.  Again, I'm
12    speaking, you know, on social media referring to
13    the other people involved in the discussion on
14    social media.  And today, more than ever, the
15    number of people that -- I think I was making this
16    point earlier, that people with relatively moderate
17    or relatively balanced or nuanced perspectives are
18    silencing themselves for fear of being attacked by
19    either extremists on one side or extremists on the
20    other side for not being far enough to that given
21    extreme.
22        So it's because they've self-silenced.  Again,
23    outside of the people who were speaking publicly,
24    and I mean to be speaking of the people who are
25    speaking publicly, I would not reflexively

Page 189

1    generalize that to people who are keeping quiet --
2    publicly quiet.
3 Q  Including those people who are keeping quiet
4    publicly and continuing to treat adolescents with
5    gender dysphoria with medical interventions?
6        MR. RAMER: Objection to the form.
7 A  Well, again, the continuing to treat is to assume
8    that there was a baseline against which to compare
9    them that doesn't exist.  This really wasn't
10    getting done in the way and by the numbers of
11    people and without the supervision or tracking or
12    external review that --
13 Q  I wasn't referring to the temporal in the way
14    you're responding.  I just meant someone who's
15    currently prescribing, let's say, gender-affirming
16    hormone therapy to adolescents but isn't speaking
17    publicly on the matter.
18        Would this tweet apply to them?
19        MR. RAMER: Objection to the form.
20 A  No.  Again, I pretty much mean it to be people who
21    were speaking -- other people who were
22    participating in the same forum.
23 Q  And so, when you refer to extremists, are
24    extremists those who support the provision of
25    hormone therapy to adolescents with gender

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 49 of 165 PageID #: 3671

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

Page 190

1  dysphoria?
2      MR. RAMER: Objection to the form.
3  A  Not necessarily.  There are -- what's missing are
4      the people who merely support.  There are very --
5      there are few speakers who merely support.
6          The people I would call extremists would be
7      those for whom there exists no alternative.  There
8      is that -- the person asked for it has sufficient
9      basis to do everything you can to make sure that
10     they get it.  Rather than cover bases, let's try
11     other things first.  Let's not start with the most
12     dramatic of alternatives.  Let's skip all of the
13     many unknowns and we're not so sure and use it as
14     a method of first resort.  And any resistance is
15     immediately dismissed as politically anathema
16     rather than we're not so sure, let's be more
17     careful until we can be more sure.
18  Q  Is the Endocrine Society Clinical Practice
19     Guideline on treatment of gender dysphoria with
20     respect to adolescents an extremist's position?
21      MR. RAMER: Objection to the form.
22  A  I don't have an objective way to differentiate
23     extremists from going farther than it should
24     relative to the quality of evidence available.
25  Q  Have you treated any of the individual plaintiffs

Page 191

1  in this case?
2  A  No, I have not.
3  Q  Have you ever practiced as a clinical psychologist
4     in Indiana?
5  A  No, I have not.
6  Q  And do you have any personal knowledge of how
7     treatment for gender dysphoria is provided to
8     adolescents in Indiana?
9  A  Not in any direct way.  Again, the nature of my
10     expertise is not the specifics of the policy or the
11     patients involved, but on the science according to
12     which the legal system and legislatures are
13     attempting to establish policy.
14      MR. STRANGIO: Just one sec.  I'm going to --I
15     don't have anything else on my end.
16      THE WITNESS: That was a fast 20 minutes.
17      MR. STRANGIO: So I'll pass -- it was slightly
18     less.  I'll pass the witness.
19      MR. RAMER: And I have no questions for the
20     witness.  And we'd just like to review and sign.
21          AND FURTHER THE DEPONENT SAITH NOT.
22
23     _____
       JAMES M. CANTOR, PH.D.
24
25

Page 192

1  STATE OF INDIANA        )
                           ) SS:
2  COUNTY OF BOONE         )
3      I, Dana S. Miller, RPR, CRR, a Notary Public in
4  and for the County of Boone, State of Indiana at
5  large, do hereby certify that JAMES M.
6  CANTOR, PH.D., the deponent herein, was by me first
7  duly sworn to tell the truth, the whole truth, and
8  nothing but the truth in above-captioned cause.
9      That the foregoing deposition was taken on
10  behalf of the Plaintiffs, appearing remotely from
11  Toronto, Canada, on the 7th day of June, 2023,
12  pursuant to the Applicable Rules.
13      That said deposition was taken down in
14  stenograph notes and afterwards reduced to
15  typewriting under my direction, and that the
16  typewritten transcript is a true record of the
17  testimony given by said deponent; and thereafter
18  presented to said deponent for his/her signature;
19      That the parties were represented by their
20  aforementioned counsel;
21      I do further certify that I am a disinterested
22  person in this cause of action; that I am not a
23  relative or attorney of either party, or otherwise
24  interested in the event of this action, and am not
25  in the employ of the attorneys for either party.

Page 193

1      IN WITNESS WHEREOF, I have hereunto set my hand
2  and affixed my notarial seal this _____ day of
3  _____, 2023.
4
5                    _____
                     Dana S. Miller
6
7  Commission Number 0675790
8  My Commission Expires:
   January 17, 2024
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**K.C., et al. VS**
**The Individual Members of the Medical Licensing Board**

**JAMES M. CANTOR, PH.D.**
**June 7, 2023**

Page 194

1  (Originating Party)
Chase Strangio, Esq.
2  AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
3  19th Floor
New York, NY  10004
4
NOTICE OF DEPOSITION FILING
5
UNITED STATES DISTRICT COURT
6  SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
7  CASE NO. 1:23-cv-00595-JPH-KMB
8
K.C., et al.,              )
9                           )
            Plaintiff(s, )
10                          )
      -vs-                  )
11                          )
THE INDIVIDUAL MEMBERS OF THE )
12  MEDICAL LICENSING BOARD OF    )
INDIANA, in their official   )
13  capacities, et al.,          )
14                          )
            Defendants. )
15
16      In compliance with the Indiana Rules of
Procedure, Federal Rules of Civil Procedure and/or
17  the Rules of the Industrial Board, you are notified
that the signed original deposition of JAMES M.
18  CANTOR, PH.D., taken on the 7th day of June, 2023,
has been sealed and submitted to the originating
19  party, along with the attached Errata Sheet(s), if
applicable:
20
21
22  (Date received by Circle City Reporting)
23            CIRCLE CITY REPORTING
135 North Pennsylvania
24            Suite 1720
Indianapolis, IN  46204
25            (317) 635-7857

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 51 of 165 PageID #: 3673

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.,
June 7, 2023

**$**

**$400 (1)**
28:9

**@**

**@JamesCantorPhD (1)**
185:9

**A**

**abbreviation (1)**
34:21
**ability (3)**
5:21;163:25;
173:22
**able (10)**
5:24;21:6;24:19;
50:9;64:11;65:3;
106:6;131:6;165:21;
178:2
**above (1)**
187:5
**above-captioned (1)**
192:8
**absence (2)**
168:11,13
**absolutely (7)**
75:6;101:2;106:3;
148:14;149:13;
157:21,24
**abstracts (1)**
86:23
**academic (6)**
24:7;32:24;33:7;
51:6,13;53:6
**accept (6)**
40:17;43:3;153:8,
9;160:20;169:6
**acceptable (1)**
126:25
**accepted (1)**
47:4
**access (12)**
48:12;76:15,16,24,
24;77:4,6;80:13;
89:15;102:1,13,20
**accessing (1)**
76:4
**accidentally (2)**
109:23;156:19
**accompany (1)**
65:3
**accordance (1)**
164:20
**according (4)**
58:1;123:5;153:9;
191:11
**accountant (2)**
107:22,23
**accountants (1)**

27:21
**accounting (1)**
107:19
**accumulated (1)**
56:19
**accuracy (3)**
124:21;127:21;
155:7
**accurate (10)**
18:20;31:24;67:15;
76:14;89:14;125:12;
128:20;141:9;151:6;
164:23
**accurately (7)**
5:21;77:5,18;
97:13;126:4,9;165:1
**accusation (1)**
178:23
**accusations (1)**
155:12
**accustomed (2)**
19:8;20:6
**acknowledge (1)**
46:7
**acknowledging (3)**
41:9;103:8;178:11
**ACLU (2)**
4:12,17
**across (4)**
15:19;29:21;42:20;
100:3
**Act (4)**
8:13;9:12,15,17
**Acting (1)**
181:23
**action (2)**
192:22,24
**actions (1)**
12:12
**active (2)**
51:22;142:4
**actively (2)**
151:24;156:21
**activists (1)**
130:22
**activities (2)**
45:19;60:12
**activity (1)**
105:17
**actual (5)**
12:5;53:9;128:14;
144:17;170:16
**actually (17)**
12:6;14:24;18:16;
30:1;51:6;71:17;
72:21;92:14;98:3;
111:3;133:24;
138:20;146:19;
151:6,9;157:3;
179:18
**add (2)**
12:10;99:9;111:21;
115:18;132:23;

150:18;154:3
**added (1)**
154:7
**Addiction (3)**
32:8,17;34:22
**adding (2)**
135:14;154:1
**addition (3)**
8:6;22:9;140:4
**additional (6)**
22:7;65:1;67:5,7;
89:3;144:21
**address (1)**
24:8
**addressed (1)**
157:19
**addressing (2)**
139:12,15
**ADF (3)**
14:13,15;16:22
**adjusted (1)**
58:1
**admin (1)**
30:4
**Administration (1)**
69:19
**admitting (1)**
129:14
**adolescence (1)**
144:2
**adolescent (12)**
37:14;39:5;59:16;
60:20,23;62:17,21;
66:5;80:12;143:24;
172:19;173:4
**Adolescent-Onset (1)**
143:24
**adolescents (28)**
36:11,18;37:11;
48:25;52:11;59:23;
63:16,19;71:6;72:14;
82:15;93:5;96:5,25;
105:25;106:11;
108:20;109:6,8;
145:20;162:5;
177:11;186:10;
189:4,16,25;190:20;
191:8
**adopt (2)**
45:6;142:6
**adopting (2)**
45:10;163:21
**adoption (1)**
163:21
**adrenal (7)**
110:18;111:25;
112:7,11,22;113:17,
24
**adult (10)**
58:11;59:10;
108:23;128:23;
165:17,20,22;170:10;
171:8,21

**adult-onset (2)**
146:24,25
**adults (7)**
36:8,19;37:9;
109:14;129:6;
131:10;145:21
**advanced (1)**
32:20
**advice (4)**
16:3;71:16;182:2,
12
**advisories (4)**
74:23;75:12;95:3;
96:18
**advocacy (3)**
180:1;181:9,17
**advocate (1)**
158:13
**advocates (1)**
130:21
**advocating (6)**
180:14,16;181:24;
182:5,6;187:19
**affected (2)**
172:22;174:17
**affects (2)**
47:24;105:18
**affirmation (1)**
185:15
**affirmed (1)**
4:4
**affixed (1)**
193:2
**afford (1)**
124:16
**aforementioned (1)**
192:20
**afraid (1)**
129:23
**afterwards (1)**
192:14
**Again (130)**
7:12,14;8:2;10:2;
11:2,20;13:25;14:22;
19:5,13,20;21:15;
26:2;27:8,11;30:6;
32:20;34:3,22;38:14;
42:4,17;43:13;45:10,
14;46:7,20;47:19;
48:14,18;50:2;53:20;
54:11;55:19;56:3;
62:24;63:7;67:16;
68:18;70:4;71:24;
74:9;75:11;76:20;
77:16;78:13;79:19;
83:14;85:15;86:10,
15;89:14;90:3;91:20;
92:16;93:13;94:5,16;
95:11;101:6;103:7;
106:2;107:12;
111:10,22;114:20;
115:16,22;117:2;
118:8;119:13;

120:19,25;121:7;
122:5;123:4;124:12;
126:11,24;127:17;
128:3;131:9;132:6,
19,21;133:13;134:9;
135:4,17;137:16,18;
139:9;140:14;141:1;
151:2,13;152:22;
153:14,17;154:9;
155:1;156:6,15,20;
160:24;162:15;
163:8,24;164:11,17,
25;165:15;166:14;
167:13;168:1,5,10;
173:12;175:24;
176:1,17;178:16;
184:2,3;187:1;
188:11,22;189:7,20;
191:9
**against (10)**
12:12;70:3;78:18;
98:25;108:11;123:4,
7;177:6;187:24;
189:8
**age (11)**
36:2,16;47:23;
57:1;59:17,19;60:8;
109:8,9,11;130:25
**Agency (1)**
69:18
**ages (4)**
47:24;59:24;61:18;
63:20
**aging (1)**
11:3
**ago (8)**
11:17;62:24,24;
67:18;127:23;
128:23;129:12;130:6
**agonists (2)**
184:15,20
**agree (3)**
133:18;136:13;
157:18
**agreeing (1)**
138:16
**agreements (1)**
15:12
**ahead (10)**
15:5;18:9;21:22;
22:19;38:9;52:21;
104:18;127:4;
147:18;178:13
**aimed (1)**
13:22;56:9
**aiming (2)**
83:3;104:8
**al (3)**
69:18;194:8.5,13
**Alabama (8)**
14:20,22;15:10;
16:9,18,20;22:15;
60:4

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 52 of 165 PageID #: 3674
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

**alert (1)**
169:18

**alerting (2)**
169:15,17

**allegations (1)**
153:2

**all-encompassing (3)**
44:20;165:16;
166:1

**allow (2)**
165:2;175:15

**allowed (3)**
89:21;136:15;
137:4

**allows (1)**
134:23

**almost (11)**
30:8;33:21;70:24;
79:24;81:24;101:12;
116:10;128:15;
129:3;133:1;182:8

**along (5)**
6:23;18:7;124:16;
131:22;194:18.5

**altered (1)**
144:17

**alternative (3)**
92:23;96:15;190:7

**alternatives (8)**
95:7;102:11;
147:13;158:21;
168:15;187:25;
188:1;190:12

**although (7)**
26:9;28:15;97:3;
104:1;115:19;
117:23;149:21

**always (9)**
8:24;10:18,19;
28:17;58:20;121:4,7;
122:19;131:3

**ambassador (2)**
33:9;34:1

**ambassadorial (3)**
33:21;35:6,24

**ambiguous (3)**
101:22;152:3;
156:6

**amend (1)**
21:19

**American (7)**
19:7;40:8,25,25;
41:14;95:17;194:2

**amnesia (1)**
70:20

**among (8)**
46:4;68:8;132:22;
140:3,3;150:2;162:3,
23

**amongst (7)**
9:21;49:9;118:10;
121:21;131:22;
136:19;164:24

**amount (4)**
15:18;29:17;31:15;
155:4

**analogy (1)**
107:19

**analyses (3)**
29:7;56:7;78:6

**analysis (3)**
50:13;55:6;122:8

**analyze (1)**
38:15

**anathema (2)**
136:16;190:15

**anatomy (3)**
38:3;50:3;122:2

**and/or (2)**
47:7;194:16

**anecdotal (2)**
43:2;64:3

**angle (1)**
12:24

**animal (1)**
116:10

**annual (1)**
137:13

**answered (1)**
97:12

**anticipate (1)**
53:24

**anticipating (1)**
67:22

**anticipation (1)**
17:11

**anxieties (1)**
162:15

**anymore (1)**
92:15

**APA (1)**
19:9

**apart (1)**
57:13

**apparent (2)**
31:14;158:25

**appear (5)**
9:9;18:25;22:25;
31:12;145:3

**appearance (1)**
66:14

**appearing (1)**
192:10

**appears (1)**
145:5

**appendices (1)**
18:24

**Appendix (2)**
87:15,17

**apples-versus-apples (1)**
111:19

**applicable (3)**
141:13;192:12;
194:19

**application (8)**
12:20;57:24;82:1,

9;83:25;100:21;
115:21;125:15

**applications (2)**
82:2;138:19

**applied (2)**
108:18;141:20

**applies (2)**
89:8;140:23

**apply (11)**
24:19;41:4;78:6;
113:14;116:18;
117:19;130:15;
164:15;188:2,7;
189:18

**applying (3)**
26:5;83:23;170:4

**appointment (2)**
31:6,25

**appreciate (4)**
34:12,15;183:4,8

**apprentice (1)**
43:21

**apprenticeship-oriented (1)**
41:5

**apprised (1)**
54:15

**approaching (1)**
30:9

**appropriate (7)**
35:9;40:21;63:6;
100:14;147:8;149:5;
165:9

**appropriately (1)**
38:21

**appropriateness (1)**
90:14

**approved (3)**
76:2,5;80:14

**approximately (8)**
7:10;28:12;29:22;
54:7;58:14;63:16,19;
106:10

**AR (1)**
69:8

**area (4)**
94:11;107:2;
108:22;187:16

**argument (1)**
21:2

**Arizona (1)**
8:1

**arm (1)**
150:18

**arm's (2)**
179:23;180:12

**around (7)**
35:22;43:15;53:10;
88:15;104:15;
137:24;174:4

**arrangement (1)**
14:24

**arrangements (1)**
14:16

**article (10)**
144:20,20;145:4,8;
146:4;149:20;
150:12,23,24;152:16

**asexual (1)**
45:5

**aside (2)**
43:10;164:7

**aspect (2)**
106:6;185:23

**aspects (3)**
47:12;108:10;
176:19

**assert (3)**
126:13;128:11;
138:21

**asserted (1)**
73:11

**asserting (2)**
109:23;141:24

**assertion (2)**
130:8;154:11

**asserts (1)**
128:25

**assess (3)**
38:2;183:19,24

**assessed (1)**
127:1

**assessment (13)**
38:17,18;61:23;
63:11;90:13;99:7;
100:12;106:15;
158:20;160:8;
161:12;173:18;184:4

**assessments (2)**
173:19;184:20

**assign' (1)**
116:12

**assigned (2)**
119:1;176:3

**assistant (1)**
37:21

**associated (3)**
83:9;109:24;150:1

**Association (2)**
19:7;150:3

**assume (2)**
5:15;189:7

**assumed (1)**
89:22

**assumes (3)**
89:16,21;92:23

**assumption (2)**
104:11;163:16

**assumptions (3)**
77:17;89:16;
126:22

**assure (1)**
101:2

**athletics (2)**
12:15;13:9

**athletics-related (1)**
11:25

**attached (2)**
65:12;194:18.5

**attack (1)**
115:8

**attacked (1)**
188:18

**attempt (2)**
49:5;72:8

**attempted (1)**
74:9

**attempting (2)**
89:5;191:13

**attend (1)**
65:11

**attending (2)**
51:22;64:22

**attention (2)**
33:14;82:11

**Attorney (2)**
6:25;192:23

**attorneys (1)**
192:25

**attracted (1)**
45:25

**atypical (10)**
44:15,18,22;45:12,
20;46:2,19;187:7,11,
16

**atypicalities (1)**
117:3

**audience (3)**
137:1;154:5;179:4

**author (4)**
53:12;113:1;
138:24;150:15

**authored (1)**
100:23

**authorities (1)**
86:5

**automatic (3)**
164:21;170:7;
180:8

**automatically (6)**
31:13;131:13;
147:24;180:7;188:5,
6

**availability (2)**
76:1;83:5

**available (26)**
11:15,21;15:19,21;
50:17,17;56:20;72:3,
5;80:6;85:19;89:12,
18;95:13,15;96:5;
97:14;102:6,12;
111:7;124:20;
128:21;160:5;
172:10;186:7;190:24

**average (7)**
30:5;36:2;54:23,
24;55:3;109:13,14

**averages (1)**
55:8

**avoid (2)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 53 of 165 PageID
#: 3675
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

74:1;161:22
**avoiding (1)**
122:7
**awarded (1)**
52:20
**aware (26)**
8:12;15:16,23;
21:11;24:23;72:15;
73:17;74:15;78:23;
82:1,19;108:5,21;
110:1,11,15;111:1;
112:5,9,18;115:3;
150:12,15;156:7;
159:3;180:23
**awareness (1)**
21:25
**away (1)**
178:4
**AYAs (1)**
145:21

**B**

**back (22)**
23:9;28:25;36:1;
39:2;44:9;55:9;
58:10;69:13;88:22;
97:4,7,17;101:10;
105:1,8,9;121:14;
131:6;138:3;149:15;
155:25;171:9
**back-and-forth (1)**
20:3
**background (7)**
6:10;14:8;24:18;
100:12;106:21;
134:10;184:24
**backgrounds (1)**
100:14
**backup (1)**
20:11
**backwards (1)**
91:2
**bad (1)**
70:21
**Bailey (2)**
150:16;151:21
**balance (6)**
102:10;104:6;
124:13;147:17;
168:8;186:24
**balanced (2)**
187:24;188:17
**ban (15)**
75:25;76:5;77:13;
78:25;79:2,3,8,11;
80:10,10;81:1;89:3;
92:16;174:19;175:10
**banned (2)**
97:11;176:15
**bans (8)**
11:24;74:23;75:12,
16,22;77:9;94:25;

96:24
**bar (1)**
186:5
**base (4)**
107:25;113:23;
115:10;146:16
**based (9)**
38:23;87:4;93:3;
96:23;122:12;
123:11;139:7;
159:21;177:10
**baseline (1)**
189:8
**bases (1)**
190:10
**basic (9)**
14:1;19:19;20:3;
69:23;70:5;84:7;
98:23;99:17;159:20
**basically (4)**
63:23;130:14;
133:18;142:13
**basing (2)**
84:24;130:8
**basis (9)**
25:15;73:12;
114:24;124:23;
151:4;171:18;
184:10,12;190:9
**batches (1)**
135:11
**became (10)**
15:14;16:20;27:1;
29:11;31:14;33:21;
38:12;151:21;
152:22;176:16
**become (7)**
21:4;22:7,10;25:4;
73:17;118:5;132:24
**beef (1)**
107:24
**began (4)**
14:25;15:9;31:11;
32:21
**begin (8)**
5:8;7:13;31:8;
32:1;63:13;88:9;
111:24;169:23
**beginning (3)**
66:18;149:8;
156:12
**begins (1)**
145:8
**begun (1)**
140:5
**behalf (1)**
192:10
**behavior (8)**
23:14;24:10;25:13,
23;43:24,25;144:3;
186:25
**behavioral (1)**
38:6

**behaviors (5)**
25:16,17;26:5,9,10
**behind (3)**
25:15;137:20;
152:23
**belief (1)**
126:13
**beliefs (1)**
178:15
**benefit (1)**
114:19
**benefits (8)**
34:15;78:2;102:11;
104:7,7;124:14;
147:10,17
**best (31)**
10:1;11:3;15:19;
18:23;19:1;22:12;
23:3;44:20;53:22;
64:11;66:19;77:20;
80:23;82:23;89:1;
91:22;93:24;95:9;
102:10;103:21;
104:6;117:25;122:7,
15;133:25;139:13;
147:17;151:11,16;
171:6,20
**better (16)**
7:19;30:1;72:22;
83:8;96:13;102:13;
103:11;109:21;
113:5;125:16,16;
131:23;146:1,17,18;
147:9
**Beyond (2)**
114:1;123:15
**bias (2)**
178:16,21
**biased (2)**
178:6,10
**bibliography (2)**
18:25;19:8
**big (1)**
96:3
**bill (1)**
8:17
**bills (3)**
11:25;12:1,2
**binder (2)**
67:2;75:10
**biological (15)**
25:6;119:12;
120:25;121:17,21,22;
122:3;142:8;162:5;
166:9,21;167:1,15;
168:22;169:8
**Biologically (2)**
116:9;121:11
**biology (2)**
121:25;122:10
**birth (4)**
106:21;118:18;
119:1,5

**bisexualities (1)**
45:4
**bit (7)**
27:18;31:15;51:14;
81:21;90:17;108:8;
185:1
**bizarre (2)**
55:5;69:10
**black-and-white (1)**
130:3
**blank (2)**
17:15;75:4
**blanket (1)**
79:14
**blanketly (1)**
19:25
**blend (1)**
42:20
**blended (2)**
43:10;87:10
**blending (1)**
87:9
**blends (1)**
46:22
**blockers (20)**
39:13,24;80:13;
82:17;83:12;84:3;
88:23;89:11;96:25;
110:7;163:13;164:7;
167:6,14,15,21;
168:24;170:9;
174:19;176:14
**blocking (1)**
163:17
**blood (2)**
111:15;172:4
**blurriness (1)**
43:15
**BOARD (2)**
194:12,16.5
**boardish (1)**
90:3
**boards (1)**
179:14
**body (3)**
82:12;119:10;
121:9
**boiling (1)**
56:5
**book (2)**
113:2;115:23
**bookkeeping (1)**
30:3
**books (1)**
107:20
**bookshelf (1)**
67:1
**BOONE (2)**
192:2,4
**born (1)**
25:3
**both (14)**
38:21,24;50:23;

75:9;88:14;116:20;
117:9;122:24;
126:21;130:13;
135:21;157:18,23;
158:10
**bottom (4)**
74:21,21;116:8;
143:22
**bound (1)**
114:15
**boundaries (2)**
43:15;60:13
**boundary (1)**
47:5
**boxes (1)**
38:21
**boy (2)**
127:23;128:18
**BPJ (1)**
68:11
**brain (2)**
38:2,3;44:14;
47:23,25;48:9,24;
49:7,7,8;50:3,13;
52:8,25;54:22,23,24;
55:3,11,13;106:19,
20,20;123:24;124:2;
165:22;167:6
**brains (1)**
56:17
**branches (1)**
187:6
**brand-new (1)**
159:9
**breadth (1)**
46:17
**break (16)**
6:3,4,7;35:15,16,
17;44:3,4,24;88:15;
97:23;118:17;183:1,
1,3,4
**breaking (1)**
88:10
**breaks (2)**
44:25;155:21
**breasts (1)**
167:17
**brief (1)**
184:5
**bring (1)**
184:11
**bringing (1)**
85:4
**brings (2)**
63:12,13
**broad (2)**
44:23;194:2.5
**broadly (2)**
103:1;173:12
**Brooks (7)**
14:12,13,25;15:24;
16:9,17,25
**brother (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 54 of 165 PageID #: 3676

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

127:10
**building (1)**
32:13
**built (1)**
77:17
**bulk (1)**
98:19
**bunch (2)**
42:24;70:7
**business (1)**
67:11

### C

**cachet (1)**
127:20
**CAH (4)**
111:25;113:6,10;
115:3
**calculated (1)**
36:7
**calculation (1)**
165:3
**Calculus (2)**
42:8,11
**calendar (1)**
17:4
**California (1)**
140:2
**call (20)**
25:7;33:22;41:3;
56:17;60:19;69:3;
79:3,8,11,17;84:13;
93:23;95:18;96:4;
97:10;151:17;
152:19;154:12;
186:13;190:6
**called (15)**
8:12;22:23;32:7,7;
45:13;54:24,25;68:4,
4;70:11;77:22;98:11;
117:22;154:9;162:25
**calling (2)**
43:2;130:21
**calls (3)**
13:21,24;14:7
**came (12)**
7:6,8;27:8;69:16;
73:18;85:24;91:21;
140:6;142:14;
151:12;152:2,18
**CAMH (5)**
27:6;34:24,25;
53:10;62:12
**C-A-M-H (1)**
34:23
**campaign (1)**
152:19
**camps (1)**
50:9
**Can (117)**
4:18;5:6,12;6:2;
8:24;9:8;11:3;12:24;

15:5;18:9,15,23,24;
19:1,16;20:4;21:4;
23:1,3;29:14;35:2;
36:5;38:9;42:1;
44:20;46:11;50:23;
51:18;55:1,2;56:17,
23,24;57:2;60:19;
62:14;63:5;65:15;
66:25;68:8;69:11;
70:15,24;71:16;73:7;
74:15;75:24;78:13,
18,18;79:15;80:12,
16,23;90:12,16;
92:20,21;93:5;95:9;
96:21;97:12;99:8;
101:18;103:7;
104:18,22;111:15,20;
116:20,24;117:3;
118:20;119:22,24;
120:3,4,7;121:10,23;
122:11;124:16;
125:11;126:10;
127:1,4;129:11;
133:22;137:9;
138:25;143:13;
145:6,7;148:23;
149:21;150:9,9;
151:17;152:19;
157:15;158:22;
166:21,23;172:3,13;
175:19;176:1,2,7;
179:1;180:5,5;183:1,
2;185:11;190:9,17
**Canada (8)**
32:6;37:17,18;
40:23;41:11;65:10;
132:8;192:11
**Canadian (4)**
38:12;40:7;41:4,17
**canceled (1)**
176:5
**cancellation (1)**
137:3
**cancels (1)**
93:18
**cancer (2)**
163:23;165:21
**Cantor (13)**
4:9,20;6:22;18:13;
22:22;44:5;88:17;
98:10;104:19,21;
191:23;192:6;
194:17.5
**C-A-N-T-O-R (1)**
4:20
**Cantor's (1)**
71:10
**capacities (2)**
35:12;194:13
**capacity (3)**
9:19;35:15;181:24
**capture (5)**
44:21;126:4,9;

141:11;159:19
**card (1)**
77:3
**care (10)**
12:13,15;13:8;
61:7;69:19;84:5;
90:10;157:14;187:9,
11
**career (11)**
24:12,15;27:4;
32:20;33:23,25;
37:16;59:25;63:15,
18;100:7
**careful (2)**
109:22;190:17
**carefully (1)**
103:13
**caregivers (1)**
148:9
**cars (1)**
107:24
**Cartesian (1)**
125:7
**Case (65)**
4:1,12;6:11,15,19;
8:11,12;10:15,17,21;
11:5,6,9,13,22;14:15,
18,20;15:2;17:7,9,16,
18,22;18:8,19,22;
20:19;21:12,20;
22:16,22;23:13;
28:23;29:14,17;
54:19;61:16;67:5,7;
68:10;69:22;70:6,9;
71:4,11;79:15;80:7;
92:25;101:2;112:15,
25;113:6,12;115:1,
12;147:4;153:24;
154:20;168:10;
172:23;181:14;
182:16;191:1;
194:7.5
**cases (50)**
6:17;7:23,23,24;
8:8;10:23;11:13,14,
16;12:14;13:8;15:7,
12,16;19:17;20:13;
22:7,9;27:1,7,9,14;
29:22;31:16;60:1;
61:13;66:15,21;68:8,
14,16,17;69:2,6,13,
15,17,24;70:7;89:4,6;
90:10;103:20;119:4,
8;131:21;144:4;
159:14;174:2;186:20
**Cass (6)**
98:12,14;99:6;
100:9,23;177:20
**catch (1)**
63:2
**catching (2)**
29:5;135:9
**caught (1)**

30:10
**cause (2)**
192:8,22
**causes (1)**
112:21
**caution (1)**
162:24
**cave (1)**
120:1
**caveat (5)**
22:6;30:6;115:18;
132:23;150:18
**caveats (1)**
135:15
**cells (1)**
170:5
**Center (2)**
34:22;106:21
**central (1)**
102:21
**Centre (7)**
31:3,12,22;32:7,8,
10,17
**certain (10)**
120:4,4;121:8;
123:25;125:1;
127:24;128:5,6;
176:8;178:7
**certainly (6)**
73:16;75:24;87:3;
112:24;160:25;
176:16
**certainty (4)**
74:13;128:1,14,25
**certified (1)**
84:21
**certify (2)**
192:5,21
**chain (1)**
119:7
**change (6)**
103:10;142:19;
144:16;153:19;
159:5;177:6
**changed (10)**
22:13;32:19;60:4;
94:20;129:24;
153:25;154:1,21;
158:24;161:23
**changes (14)**
54:11,16;55:12;
58:7;69:2;81:14;
92:21;93:17;96:22;
101:17;150:12;
154:8,22;162:2
**changing (4)**
82:6;92:1;94:17;
160:10
**characteristics (6)**
26:13;117:1;120:7,
23;121:16;186:15
**characterization (1)**
153:14

**charge (4)**
33:1,2;174:13;
179:24
**CHASE (8)**
4:8,11;75:5;88:10;
90:16;97:18;182:21;
194:1.5
**chatting (1)**
135:9
**check (6)**
63:1;68:11;86:7,
11;122:16;183:2
**checking (5)**
7:14,17;8:2;31:1;
62:2
**checks (1)**
38:21
**chemical (3)**
119:9,12;121:8
**chemotherapy (1)**
163:23
**cherrypicking (1)**
74:2
**chief (2)**
152:13,14
**child (13)**
59:13;60:9,14,15;
111:17;128:4,5,6;
165:17;171:4;
172:19;173:4,22
**childhood (3)**
106:17;143:24;
144:3
**childhood-onset (1)**
144:4
**children (28)**
36:21;39:5;99:5;
105:14,18,22;106:15,
15;108:15,18;
109:14;113:4;128:6;
138:7;139:20;
140:21,23;162:23;
166:9,21;168:22;
169:8;170:19;172:22
**child's (1)**
128:22
**chopped (1)**
57:13
**chosen (1)**
177:21
**chromosomal (1)**
121:3
**chromosomes (4)**
117:14;118:11;
121:9,24
**chunk (4)**
34:17,18,18;35:5
**chunks (1)**
90:21
**Circle (2)**
194:22,23
**circulated (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 55 of 165 PageID #: 3677
K.C., et al. VS                                                                    JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board                               June 7, 2023

86:24
circulation (1)
86:22
circumstance (4)
65:21;80:9;124:8;
138:22
circumstances (13)
12:2;23:19;26:19;
40:17;54:22;76:11,
12;77:24;121:12;
125:1,9;152:5;176:8
Citation (2)
150:4;159:16
cite (5)
74:2;144:14;
150:23,24;163:2
cites (1)
183:20
cities (1)
101:25
citing (1)
144:6
City (2)
194:22,23
civil (6)
68:16,18,22,25;
194:2,16
claim (1)
73:7
claimed (1)
85:17
claims (3)
70:3,7;123:7
clarification (1)
19:22
clarify (2)
46:10;116:13
clean (2)
17:16,22
clear (10)
20:3;40:10,12;
45:15;46:22;89:7;
90:10;103:23;
139:14;155:3
cleared (1)
17:15
clearer (1)
31:15
clearing (1)
17:4
cleave (1)
140:11
clever (1)
122:17
clients (3)
62:9;132:14,15
clinic (11)
31:8,11,18,20;
101:14;102:22;
129:5;132:18;140:7;
174:1;176:6
clinical (59)
26:24,24;27:25;

28:4;31:9,17;32:11;
36:1,2,8,11;37:1,3;
38:13,17,19,20,23;
39:2;41:19,21,23;
42:20,22,23;43:2,3;
48:4;58:10,11;59:22;
60:11;61:7,25;62:17,
22;63:17;64:5;89:12;
105:13,16,21,24;
106:8,10;107:9,10;
108:1;114:8;136:8;
146:9;156:23;
157:17;161:12;
162:22;164:5;178:8;
190:18;191:3
clinically (2)
147:7;157:19
clinician (2)
60:1;130:1
clinicians (15)
130:13,16,20,21;
131:20,25;132:2,6,
16;133:4;145:21;
160:15;161:9,10;
163:5
clinician's (3)
160:18;179:2;
180:2
clinics (12)
12:13;54:5;101:13,
24,25;129:17;130:10,
23;131:16,17;
146:13;176:13
close (5)
23:1;99:15,18;
121:19;182:24
closed (1)
152:24
closely (3)
80:15;83:19;145:7
closer (2)
101:4;129:8
cluster (3)
7:12;11:22;187:12
clusters (4)
11:10,25;12:8;13:3
cocktail (1)
135:8
coffee (1)
17:19
coffee's (1)
44:7
cognitive (4)
11:11;171:14;
178:21,21
COHERE (1)
84:21
cohort (2)
139:20;141:20
coincidence (2)
86:9;135:22
co-investigator (2)
51:19;52:18

Colapinto (2)
113:2;115:23
colleagues (2)
4:16;9:21
collect (1)
145:20
collected (1)
151:20
college (1)
65:10
combination (8)
62:5;121:3;130:12;
170:3,4,17,17;182:18
combinations (2)
69:7;167:25
combined (1)
29:21
comfortable (5)
129:13;132:5;
133:1,10;142:8
coming (13)
27:8;105:8;121:14;
129:17;131:19,20,25;
138:3;142:22;
146:13;147:22;
148:22;182:1
comment (3)
9:22;139:13;
162:19
commentary (1)
9:24
comments (4)
10:15;12:3,5;72:1
Commission (2)
193:7,8
commit (1)
158:15
commitment (4)
68:17,19,22,25
common (7)
15:12;16:10;127:5;
132:22;137:11,13;
148:6
commonly (1)
85:8
communicate (1)
52:24
communicated (2)
161:20,21
communicating (1)
138:15
communication (1)
85:6
communications (2)
155:24;156:9
communities (1)
134:2
community (2)
100:6;134:7
comparable (3)
66:5;78:10;165:19
compare (6)
40:9;56:11,13;

78:18;110:6;189:8
compared (3)
54:25;108:11,23
comparing (2)
70:3;110:24
comparison (3)
108:25;110:5;
111:10
comparisons (4)
98:25,25;108:17;
111:20
compensated (4)
28:9;181:3,9,17
compensation (2)
178:7;179:1
complete (12)
5:25;20:21;21:8;
22:3,5;66:20;84:1;
137:5;167:23;
168:11,12,14
completed (2)
58:6;83:17
completely (4)
125:13;126:23;
151:14;180:15
completes (1)
83:18
compliance (1)
194:15.5
complicated (3)
65:23;119:7,13
comprehensive (5)
41:8;63:10;71:19,
21;72:4
conceivable (1)
103:17
conceived (1)
116:12
concept (5)
120:9;123:5;
127:14;139:1,1
conception (4)
119:8,9;121:2,5
concepts (1)
123:11
conceptualization (1)
139:16
concern (4)
58:24,24;114:8;
186:11
concerned (4)
27:21;59:6;63:7;
131:2
concerning (2)
10:9;22:16
concerns (8)
8:12;66:9;113:15;
114:7,22;155:14,18;
184:4
concise (1)
141:10
conclusion (9)
20:10;74:4;95:4;

96:19;141:23;
151:15;153:7;
154:22;180:8
conclusions (20)
20:8;73:11,19,22,
24;81:13;85:24,25;
99:1;144:17;151:12;
152:18;153:3,4,22;
154:1,17,18,20,23
concrete (1)
45:14
concretely (1)
160:1
condition (2)
172:6,7
conditions (3)
108:2,6;111:5
conduct (4)
49:16;72:15;92:13;
100:14
conducted (9)
58:5;72:16,19;
73:2,10;109:7;
110:14;144:19;
180:12
conference (5)
85:3;132:18;
137:14,16,17
conferences (3)
134:9;135:6;
137:10
confidence (1)
179:22
confident (1)
148:23
confirmed (1)
87:4
conflict (16)
125:2;172:20;
174:1,6,22;175:21;
177:8;178:3,11,20,
24;181:7,20;182:14,
15,18
conflicted (1)
174:21
conflict-of-interest (2)
179:7,10
conflicts (1)
172:9
conform (1)
112:3
confused (1)
127:12
confusing (1)
117:16
congenital (7)
110:18;111:25;
112:7,11,22;113:16,
24
connect (1)
55:8
connective (1)
50:4

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 56 of 165 PageID #: 3678

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

**connectomics (3)**
52:8,9,10
**consent (8)**
35:14,15;155:15,
18;171:13,14,16,17
**consenting (1)**
170:21
**conservative (1)**
65:16
**consider (3)**
76:4;77:11;161:3
**consideration (3)**
95:6;158:20;
168:12
**considered (1)**
169:2
**consisted (1)**
165:13
**consistent (4)**
85:16;104:12;
120:6;123:19
**construct (5)**
117:17,22;119:21;
122:9,23
**consult (1)**
131:20
**consultant (1)**
52:23
**consultation (2)**
27:12;63:5
**consults (1)**
75:5
**contact (3)**
7:1;51:16;87:3
**contacted (1)**
6:25
**contained (1)**
86:17
**content (26)**
8:19;12:5;21:21;
40:21;65:5,6;70:3,5;
71:24;78:14,19;
80:17,17;81:11;
86:13;87:11,12;
90:19;116:15;153:3,
10,25;155:3;157:7;
158:18;185:25
**contents (7)**
20:14,17;139:17,
19;141:22;151:6;
153:8
**contest (1)**
169:10
**contested (1)**
155:4
**context (26)**
14:2;38:10;40:17;
59:1;65:22;101:7,7,
10,16;104:15;116:22,
23;117:10;120:20;
125:21,25;126:11;
128:24;135:20;
140:16;153:20;

**156:20;157:9,10;**
169:10;184:7
**continue (7)**
15:5;27:10;33:24;
35:2;63:5;69:1;93:5
**continuing (3)**
137:21;189:4,7
**contract (1)**
67:9
**contradict (1)**
9:3
**contradiction (1)**
124:19
**contradictions (2)**
85:18,23
**contrast (1)**
132:8
**contribution (1)**
149:12
**control (11)**
48:13;54:19;55:4,
16,17,23,24;57:3;
71:11;95:18;162:17
**controlled (6)**
57:1,2;108:7;
110:2,12,17
**controls (4)**
56:24;57:19;96:13,
16
**controversial (1)**
187:4
**controversy (3)**
151:5,17;164:16
**convenient (2)**
118:20;123:21
**conversation (16)**
7:9;46:12;94:21;
105:8;114:6;129:7;
134:11,17,19;135:4;
136:10,10;137:23;
157:16;165:18,19
**conversations (14)**
9:20;16:7;85:14;
86:25;87:4;91:22;
132:22,24;134:8;
135:1,12,15;137:12;
187:12
**conviction (1)**
187:23
**coordinate (4)**
15:1,9,15;50:10
**coordinated (1)**
15:16
**coordinations (1)**
15:25
**copy (6)**
17:16,17,22;18:21;
22:25;116:4
**corporate (1)**
27:19;31:20
**corrected (3)**
144:15;145:11;
153:13

**correction (5)**
146:3;153:17,18,
21;154:9
**correctly (13)**
30:22;74:24;90:15;
101:5;116:14;123:1;
144:7;145:23;
158:17;163:3;
172:24;183:22;
184:17
**correspondence (1)**
26:12
**cosmetic (1)**
112:17
**cost (2)**
123:19;124:15
**couch (1)**
188:11
**counsel (10)**
13:12,19;14:4,6;
16:8,9,24;162:24;
163:5;192:20
**counseling (6)**
59:23;64:6,7;66:5;
165:5,7
**count (8)**
46:15;47:2;59:1;
120:1,1;153:6,6;
175:24
**countries (26)**
71:6,22;72:6,7,10,
10,12,23;73:4,6;74:6;
75:15;76:21;78:9;
81:9,18;82:6;86:1;
95:10,12,20;96:1,8,
12;97:7;177:22
**countries' (2)**
74:18,19
**country (5)**
8:22;71:20;73:8,
13;98:2
**country-by-country (1)**
74:9
**counts (7)**
38:20;45:15;46:15;
59:7,8;62:25;93:18
**COUNTY (2)**
192:2,4
**couple (3)**
7:16;85:2;128:3
**course (41)**
10:14;24:15;26:25;
32:19;37:25;42:13,
14;45:7,9,12;47:25;
49:11;51:5;52:20;
60:11;62:8,11;63:18,
25;65:14;72:25;73:1;
76:1;82:21;85:6;
86:19;97:3;100:7;
105:17;106:16;
108:13;109:2;115:4;
121:24;125:7;
132:16;137:11;

**140:11;150:18;**
167:4;186:4
**courses (1)**
64:14
**Court (4)**
4:1;5:4;104:25;
194:6
**cover (1)**
190:10
**coverage (1)**
19:14
**covered (1)**
21:1
**crafted (1)**
103:13
**crave (1)**
185:15
**create (1)**
101:13
**credential-oriented (1)**
41:12
**criminal (1)**
68:16
**criteria (7)**
76:13;127:13;
136:8;141:25;
151:23;159:7,8
**critical (2)**
129:11;130:15
**criticism (1)**
144:19
**criticisms (2)**
79:25;187:15
**cross (3)**
50:10;68:2,4
**crossdress (1)**
142:6
**crossed (1)**
92:9
**cross-gender (1)**
144:3
**cross-sex (10)**
163:14,19;167:2,8,
14,16;170:4,9;
184:16,21
**CRR (1)**
192:3
**crystallizes (1)**
185:8
**cultural (1)**
101:19
**curiosities (2)**
33:16;66:8
**curiosity (2)**
29:11;30:11
**curious (1)**
28:19
**current (18)**
7:24;22:3;26:21;
36:2;58:6;80:5,19;
81:22;89:21;90:10;
93:2;97:2;99:2;
146:12;159:4,7;

**160:11;161:12**
**currently (19)**
7:23;8:8;12:14;
20:13;27:16;36:17,
20;58:13,18;63:7;
80:12;82:16;83:2,11;
94:13;103:12;
131:16;184:11;
189:15
**cut (1)**
84:7;88:23;93:7,21
**CV (18)**
7:24;10:17;17:18;
22:1,2,4;23:9;27:4;
31:2;32:20;36:24;
44:2;48:5,22;51:11;
53:24;69:18;107:13
**cynical (2)**
182:8,10

**D**

**Dan (1)**
115:23
**Dana (3)**
5:6;192:3;193:5.5
**danger (1)**
170:16
**Daniel (1)**
180:23
**dare (1)**
136:10
**data (9)**
55:18;112:5,10;
113:8;124:20;
145:20;151:20;
152:2;160:5
**database (1)**
151:19
**databases (2)**
56:18;151:23
**date (3)**
53:9;98:20;194:22
**David (1)**
115:24
**day (12)**
13:18,18,19,23;
14:10;17:4;135:7;
142:23;185:4;
192:11;193:2;
194:17.5
**days (1)**
133:7
**day-to-day (1)**
54:14
**deadline (1)**
30:9
**deadlines (1)**
67:24
**deal (6)**
25:2,19;42:12;
72:25;105:19;158:2
**dealing (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 57 of 165 PageID
#: 3679
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

64:15
**death (1)**
133:7
**decades (1)**
141:8
**December (2)**
36:25;39:3
**decide (3)**
68:24;111:17;
119:18
**decided (1)**
152:25
**deciding (2)**
170:25;173:19
**decision (13)**
65:9;146:8,9;
154:2;165:22;166:7,
9;168:20,21;171:18,
19;173:24;182:7
**decision-making (2)**
171:13;182:10
**decisions (6)**
65:11;122:12;
146:10;167:4;
170:19;179:23
**declaration (22)**
18:8,18,21;19:2,
12;20:18,21;21:12,
19;23:13;67:18;70:9;
71:4,10;75:16;86:10;
116:5;120:15;138:5;
139:7;143:22;156:12
**declarations (1)**
10:17
**declare (1)**
136:14
**declared (1)**
152:19
**dedicating (1)**
51:18
**deem (1)**
171:16
**deeply (2)**
45:22;119:17
**defend (1)**
115:8
**defendants (3)**
6:11;20:19;194:14
**define (1)**
123:5
**defined (1)**
66:11
**defining (1)**
118:6
**definite (1)**
47:4
**definition (17)**
75:24;116:23;
117:6,11,18,19,20;
122:11,13;139:2,5,
15;140:17,22;141:1,
25;142:19
**definitions (3)**

117:17;138:19;
157:12
**definitive (1)**
97:15
**definitively (2)**
91:12,15
**degree (1)**
37:20
**Dekker (4)**
69:18;70:12,23;
71:3
**delivery (1)**
81:18
**demarcation (1)**
45:15
**demographic (1)**
89:8
**demonstrate (5)**
81:13;103:18;
114:19;154:4;168:1
**demonstrated (1)**
154:23
**demonstrates (1)**
64:10
**demonstrating (1)**
178:24
**demonstration (1)**
151:7
**dense (1)**
87:24
**Department (3)**
34:9;176:4,4
**depend (4)**
7:19;58:25;61:1;
79:6
**depended (2)**
64:8;180:19
**depending (4)**
56:2;62:24;175:24;
179:14
**depends (4)**
59:2,9;125:20;
126:10
**depict (1)**
77:5
**DEPONENT (4)**
191:21;192:6,17,
18
**deposed (1)**
68:9
**deposition (11)**
4:21;10:12;13:13;
16:17;17:11;30:24;
105:6;192:9,13;
194:5,17
**depositions (1)**
68:15
**depressed (1)**
129:25
**depressions (1)**
162:14
**derived (2)**
30:19;173:7

derives (1)
172:21
**describe (22)**
12:1;20:4;23:14;
25:12;44:12,17,18;
46:3,4;54:17;80:18;
123:5;127:22,25;
130:17;140:20;
159:25;161:5;
165:10;170:23;
171:12;182:14
**described (7)**
38:24;58:9;88:2;
129:9;141:17,19;
142:13
**describes (4)**
24:2;164:14;177:2,
3
**describing (14)**
34:2;45:11;113:13;
129:24;130:2;136:1,
25;160:1;165:1;
166:4;167:9;168:7;
184:8,9
**description (7)**
35:24;41:2,13;
59:5;159:19;188:2,7
**descriptive (1)**
97:8
**descriptor (2)**
80:11;125:11
**design (5)**
52:21;54:12,17;
57:23,25
**designations (1)**
31:12
**designed (1)**
80:20
**designing (1)**
122:17
**desired (1)**
173:23
**desires (1)**
26:6
**desist (1)**
139:22
**desisted (1)**
140:9
**desk (3)**
17:13,15;92:9
**despite (3)**
79:23;86:19;
183:17
**destroy (1)**
163:25
**detail (4)**
144:21;154:1,3,7
**detailed (1)**
126:2
**details (10)**
14:16;19:10;78:21;
81:6,25;82:5;92:2;
117:2;154:13;173:13

**determine (2)**
87:15;88:6
**determined (4)**
88:4;116:11;121:2,
4
**detraction (1)**
9:7
**detransition (2)**
12:16;13:9
**detransitioners (2)**
12:11,12
**develop (6)**
41:8;47:12;49:8;
145:14;167:16;
170:10
**developed (4)**
55:3,17;63:4;128:9
**development (11)**
47:25;48:9,24;
57:5,5;61:10;105:18;
106:16,19,20;136:4
**developmental (2)**
55:14;64:14
**devil (1)**
172:16
**devoting (1)**
27:8
**diagnosed (4)**
60:9,15,20;111:14
**diagnosis (8)**
56:1;60:11;106:7;
111:18;144:10;
145:19;146:5,18
**diagnostic (1)**
144:11
**Diaz (3)**
150:5,12;154:12
**dichotomize (1)**
186:16
**dichotomous (3)**
128:7;130:3,17
**difference (8)**
42:22;96:19;
109:20;115:15;
131:2;140:12,13;
142:17
**differences (6)**
55:9,15;88:1,3;
142:18;158:23
**different (74)**
7:5;10:23;19:8;
24:16;25:21;26:18,
19,19;27:18;34:3;
38:8;39:20;40:7,16;
44:2;45:10,11;46:10;
47:19,20,24;49:10;
50:16;55:20;56:4,9,
10,10;61:14,15;74:6;
81:9;94:5;95:12,13,
14,21;108:10;109:4;
110:24;117:16;
122:21;125:7,8,9,10;
126:14,15;127:18;

130:5;131:11;
132:11;138:13,18;
141:12;142:23;
148:20,21;151:22;
152:3,4,4;158:1,2;
160:9;165:7;167:24,
25;169:13;175:25;
177:15;179:22;
180:22;187:21
**differential (1)**
106:7
**differentiate (1)**
190:22
**differently (1)**
5:13
**difficult (6)**
6:17;40:9;80:9;
87:15;145:24;148:6
**difficulties (1)**
18:2;130:24
**difficulty (3)**
64:17;146:12;
157:24
**diplomatically (1)**
101:18
**DIRECT (7)**
4:7;15:23;37:24;
48:3;174:13;177:18;
191:9
**directing (2)**
175:3,7
**direction (3)**
11:12;74:4;192:15
**directly (4)**
131:18;172:22;
174:9;175:8
**Director (6)**
31:2,13;172:18;
174:12;175:3;176:11
**directors (1)**
175:12
**disadvantaging (1)**
158:9
**disagree (5)**
89:19;136:9,13,14;
186:21
**disagreed (1)**
136:11
**disagreeing (1)**
138:17
**disclosure (1)**
155:4
**discomfort (1)**
171:3
**discontent (1)**
146:14
**discretion (4)**
152:13,21;156:3,5
**discuss (7)**
19:12;20:14,17;
94:22;157:6;185:20,
20
**discussed (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 58 of 165 PageID #: 3680

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

58:13
**discussing (6)**
6:6;85:9;96:10;
133:10;143:23;185:2
**discussion (8)**
98:11;121:14;
137:5;156:10;
184:15;185:25;
186:1;188:13
**discussions (1)**
131:22
**diseases (1)**
109:12
**disinterested (1)**
192:21
**disliking (1)**
153:21
**dismissed (1)**
190:15
**disorders (2)**
111:13,23
**dispersed (1)**
36:6
**displace (1)**
83:6
**disproportionate (2)**
186:23;187:22
**disprove (2)**
117:5;124:13
**distinct (4)**
140:18;156:23,24;
157:17
**distinction (4)**
78:20,23;116:20;
146:23
**distinctions (2)**
76:22;117:9
**distinguish (2)**
156:13,16
**distress (4)**
103:3,24,25;
147:23
**distribute (1)**
102:5
**DISTRICT (2)**
194:6,6,5
**divide (3)**
41:19;130:19;
134:5
**DIVISION (1)**
194:7
**Doc (1)**
25:21
**Doctor (15)**
18:15,17;21:25;
22:25;39:7;44:12;
75:3;77:3;105:9;
124:3;143:22;
149:22;162:20;
175:3;183:12
**doctoral (1)**
32:22
**doctors (6)**

182:13;183:24;
185:16;186:9;188:3,
8
**document (13)**
17:21;18:17;22:1;
84:22,23;86:13;90:6;
98:14,15,17;99:10;
165:12;168:5
**documentation (2)**
11:15;42:24
**documents (9)**
13:25;17:8,10,12;
20:8;62:6;96:7;
98:18,23
**done (22)**
47:6,11,22;48:3;
49:24;50:14,14,15;
57:4;61:6;72:12;
73:9,14;74:6;107:2,
10;109:2;113:3;
148:8;156:11;183:6;
189:10
**door (1)**
93:14
**doors (1)**
152:24
**dot (3)**
68:1,1,3
**double (2)**
166:20;167:17
**double-check (2)**
65:25;100:17
**doubt (4)**
129:14,21,22;
130:6
**down (20)**
18:24;25:5;28:14;
36:15;38:3;42:4;
43:5;44:24,25;56:5;
66:16;98:1;103:16,
16;122:1;145:10,17;
155:21;174:17;
192:13
**Dr (27)**
4:9,20;6:22;18:13;
22:22;44:5;49:25;
71:10;88:17;98:10,
12,14;99:6;100:9,23;
104:19,21;136:20;
172:18,18;173:2;
174:8;178:6;182:15;
183:17,18;184:14
**drama (1)**
150:19
**dramatic (6)**
51:15;114:24;
166:3;168:16;
183:17;190:12
**drugs (1)**
110:8
**DSM (2)**
136:6;147:4
**DSM-5 (1)**

136:8
**due (2)**
33:11;85:2
**duly (2)**
4:4;192:7
**during (9)**
35:16;37:1,6,8,13;
41:22;61:25;90:12;
106:20
**duties (1)**
32:25
**duty (1)**
160:18
**dysphoria (55)**
10:10;40:6;41:18;
46:6;47:7;48:2;49:1;
52:11;54:6;56:1;
57:9,15,19;60:10,15,
21,24;62:22;65:14,
19,66:11;71:7;72:14;
80:13;82:16,17;
83:12;84:4;89:11;
90:1;97:1;108:2,18;
110:8,9;111:8;
117:10;129:6;144:1,
6,9;145:18;146:24,
25;148:2;150:4;
162:1,6,8,9;177:12;
189:5;190:1,19;
191:7
**dysphorias (2)**
162:10,13
**dysphoric (4)**
56:12,13;59:8;
139:22

## E

**ear (1)**
129:11
**earlier (3)**
63:9;170:18;
188:16
**early (5)**
43:11;56:16;57:5,
5;137:8
**ease (1)**
18:7
**easily (5)**
57:13;124:21;
134:5;141:14;154:10
**Eastern (2)**
105:2,3
**easy (3)**
88:5;97:4;120:21
**eat (1)**
104:23
**eccentric (2)**
33:9;69:11
**editor (3)**
21:14;152:13,14
**editorial (1)**
154:8

**editor's (3)**
152:21;156:3,4
**education (1)**
40:5
**educational (1)**
64:18
**effect (1)**
170:2
**effective (1)**
35:10
**effectively (1)**
158:2
**effectiveness (1)**
180:11
**Effects (13)**
48:8,23;57:16;
61:5,9;105:17;
106:16;109:16;
112:14,19,21;170:15,
15
**efficacy (1)**
112:10
**efficiency (1)**
15:11
**eight (8)**
8:8;36:20;59:23;
61:17;63:16,19;64:4;
66:4
**eightish (1)**
62:19
**either (25)**
25:17;29:17;45:18;
53:25;85:1;93:2;
96:24;97:11;99:20;
100:10;111:15;
115:8;117:13;
125:13;131:19;
139:11;142:12;
159:23;161:6,15;
166:24;186:16;
188:19;192:23,25
**Eknes-Tucker (1)**
22:23
**electronics (1)**
18:2
**Eleven (1)**
139:20
**else (13)**
13:20;19:15;20:1,
15,25;22:13;46:15;
60:7;65:7;68:12;
80:4;185:5;191:15
**else's (1)**
139:12
**e-mail (6)**
6:18,21;7:6;28:24;
29:13;51:16
**e-mails (7)**
7:7,15,17;8:23;
13:21;14:7;53:8
**embedded (2)**
76:8;128:3
**emotion (2)**

127:8,9
**emotional (2)**
127:16;147:23
**emotionally (1)**
128:12
**emotions (1)**
130:1
**Emphasis (1)**
145:13
**emphasize (1)**
163:9
**emphasizing (1)**
73:1
**employ (1)**
192:25
**employed (3)**
37:21;38:10;173:4
**employers (1)**
62:7
**employment (1)**
172:18
**empty (1)**
44:7
**enables (1)**
94:6
**enabling (1)**
56:4
**encountering (1)**
129:13
**encounters (1)**
46:24
**encourage (1)**
142:11
**encouraged (1)**
142:7
**end (10)**
38:15;41:3;43:16;
67:10;112:17;135:7;
149:9;164:18;
182:24;191:15
**ended (2)**
43:6;176:23
**Endocrine (5)**
163:2;168:11;
173:8,9;190:18
**endocrinological (2)**
173:20;184:23
**endocrinologist (5)**
23:23;39:11;
173:21;181:15;
184:19
**endocrinologists (1)**
174:21
**ends (1)**
169:12
**engage (2)**
173:15;178:17
**engaged (6)**
33:7;35:12;72:7,
24;73:5;91:6
**engagements (1)**
65:12
**engaging (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 59 of 165 PageID #: 3681

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

115:25
**England (3)**
72:11;102:18,19
**English (11)**
73:16;85:11,15,21;
86:12,17,19,21,24;
87:19,19
**enjoy (1)**
53:21
**enormous (6)**
94:18;124:1,1;
151:5;162:9;187:24
**enough (5)**
43:14;99:11,15;
133:18;188:20
**Enrolled (6)**
8:13;9:11,15,17;
54:8;55:22
**enrolling (1)**
77:12
**ensure (3)**
19:13,23;35:11
**ensuring (1)**
173:22
**entails (1)**
94:8
**entire (6)**
120:10;147:18;
164:16;175:4,6,7
**entirely (9)**
87:23;95:17;96:1;
156:2;172:10,11,12;
180:18,20
**entirety (1)**
37:16
**entitled (1)**
48:8
**entity (1)**
31:21
**entry (1)**
186:5
**enumerated (2)**
121:23;177:15
**environments (2)**
65:16,17
**envisioning (1)**
93:19
**ephemeral (1)**
123:12
**epidemiologist (2)**
23:23;24:6
**episode (1)**
35:17
**equals (1)**
133:7
**equate (2)**
171:17;174:14
**equivalent (1)**
55:3
**era (1)**
133:4
**Errata (1)**
194:18.5

**error (10)**
21:3,21;109:5,7;
143:6;153:4;154:17,
24;165:15;170:12
**errors (1)**
154:2
**especially (15)**
26:15;38:10;44:14;
50:7;56:22;58:19;
62:1;73:15;76:20;
111:13;114:9;
116:22;133:14;
156:20;157:8
**Esq (1)**
194:1.5
**essence (1)**
156:22
**essentially (15)**
6:23;31:19;49:5;
52:23;54:23;73:9;
75:25;137:2,22;
155:22;156:3;
163:12;170:2,4,8
**establish (1)**
191:13
**established (1)**
40:18
**establishment (1)**
92:10
**et (3)**
69:18;194:8.5,13
**eternally (1)**
118:1
**ethics (2)**
114:5;151:22
**euphemism (2)**
164:12,25
**euphemistic (1)**
168:4
**euphemistically (2)**
162:25;163:10
**Europe (6)**
71:22;73:4;74:6;
79:22;132:8;166:25
**European (7)**
40:24;41:4;71:5;
74:22;78:9,21;81:9
**evaluated (1)**
179:17
**evaluating (1)**
72:21
**evaluations (1)**
81:15
**evasive (1)**
43:14
**even (31)**
18:3;30:23,24;
34:7;43:8;46:16;
56:16;67:23;79:3,19;
80:22;87:14;88:15;
101:22;106:4,20;
119:8;123:11;126:6,
20;128:13,16,19;

130:21;136:13;
138:16;175:23;
181:2,13;187:6,14
**event (1)**
192:24
**events (4)**
11:17;14:17;15:2;
119:7
**ever-developing (1)**
163:20
**everliving (1)**
92:23
**everybody (6)**
20:2;25:9;50:9;
52:24;124:3;174:25
**everybody's (1)**
158:10
**everyone (2)**
170:1;173:25
**evidence (29)**
12:7;43:3;64:2;
72:13,20;73:19;
103:11;107:25;
111:6,7;113:23;
114:16,19;116:2,13;
128:14;131:7,8;
155:11;156:10;
172:2,8,11;178:19;
179:17;183:20;
184:12;186:22;
190:24
**evidence-based (3)**
34:16;78:7;179:16
**evidenced-based (1)**
35:11
**exact (2)**
92:2;101:20
**exactly (36)**
6:18,21;7:6;17:25;
21:16;29:9;43:5,6,7;
60:17;70:6;82:18;
85:1,5,16;87:9;88:8;
94:7;98:20;100:8;
104:13;115:15;
117:8;126:21;129:6,
7;136:17;140:10;
142:9;151:13;
157:25;166:3;
170:12;172:7;
177:20;186:4
**exaggerating (1)**
158:7
**EXAMINATION (1)**
4:7
**examined (2)**
4:6;113:2
**example (26)**
10:7;24:21;25:3,
18;28:21;61:3;65:9;
79:8;89:17,23;97:16;
123:23;126:12;
133:21,25;135:5;
136:21;161:2;

163:22;165:21;
166:2;167:1;169:7;
172:5;176:3;177:23
**examples (10)**
94:24;117:5;
133:13,15,23;134:21,
25;135:2,17;137:9
**except (1)**
90:25
**exception (14)**
79:1,6,7,10,18;
118:2;119:16,25;
120:8;122:18;140:2,
3,4;173:15
**exceptional (2)**
124:8;175:16
**exceptions (14)**
81:2,3;116:24;
117:21;118:8,16;
119:7;120:4;121:1;
124:11,12;160:19;
175:23,24
**excessive (1)**
83:4
**excluding (1)**
103:4
**Exclusively (1)**
148:11
**excuse (14)**
8:6;63:17;71:20;
79:9;84:4;91:17;
102:19;106:9;107:1;
113:10;125:22;
127:4;155:17;158:22
**exempted (1)**
115:11
**exemption (2)**
78:24;79:4
**exempts (1)**
115:1
**exhausted (2)**
147:13,15
**Exhibit (15)**
18:10;21:23;22:20;
23:9;71:10;90:1,2;
98:8;116:5;143:19;
145:2;149:16,16;
150:10;185:12
**exhibiting (1)**
38:7
**exhibits (1)**
18:6
**exist (13)**
56:18;74:14,15;
80:5;89:7;91:24;
117:2;121:13;125:1;
144:13;166:23;
184:11;189:9
**existed (1)**
137:3
**existence (1)**
141:2
**existing (5)**

12:25;27:13;
146:15,15;176:2
**exists (9)**
118:8;123:18;
124:6,11;125:20;
133:13;139:5;
164:12;190:7
**expand (1)**
104:16
**expanded (1)**
144:21
**expanding (1)**
102:20
**expect (5)**
122:13;159:14;
179:13,16,17
**expectations (2)**
180:21;181:25
**expected (2)**
180:19,19
**expecting (5)**
104:4;160:9,9;
182:2,12
**expensive (1)**
56:23
**experience (17)**
16:2;43:2;45:21;
52:11;59:22;64:3;
105:16,21,24;106:5,
5,13;124:10;128:15,
22;130:23;131:15
**experienced (1)**
66:2
**experiences (7)**
26:6,15;64:18;
117:15;119:11;
125:14;130:12
**experiencing (4)**
57:8;63:2;64:23;
65:18
**experiment (2)**
122:17;160:12
**experimentees (1)**
160:13
**experiments (1)**
77:23
**expert (22)**
6:11,14;7:22;
12:14;17:8;20:14;
22:10;27:12;28:7,10,
13;29:23;30:20;50:3;
66:15,21;69:15;82:4;
95:11;180:23;
182:16;183:18
**expertise (6)**
63:24;100:11;
105:13,20;106:22;
191:10
**experts (12)**
10:16;20:18;69:9;
70:1,2;85:5;100:19;
134:10,17;170:13;
177:10;181:14

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 60 of 165 PageID #: 3682
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

**Expires (1)**
193:8
**explain (1)**
12:15
**explanation (1)**
117:25
**explicit (4)**
139:11,12;142:4;
156:2
**explicitly (1)**
115:1
**exponential (2)**
162:4,9
**exponentially (1)**
162:11
**exposed (1)**
125:16
**express (4)**
129:21,22;130:6;
131:25
**expressing (4)**
21:6;146:13;147:1;
150:4
**expression (4)**
68:1;129:18,18;
159:24
**exquisitely (4)**
55:5;148:15,16;
162:3
**extent (9)**
12:5;40:11;59:22;
78:13,15;85:12;
96:17;151:9;175:1
**external (5)**
26:10,13;155:9,14;
189:12
**extreme (7)**
133:20;164:17;
166:11,15,17,18;
188:21
**extremists (8)**
187:20,21;188:19,
19;189:23,24;190:6,
23
**extremist's (1)**
190:20
**eye (1)**
130:15

**F**

**face (2)**
146:22;186:22
**face-to-face (1)**
62:8
**facilitate (1)**
101:25
**facilitation (1)**
97:5
**facility (2)**
42:21;96:21
**fact (8)**
74:1;83:15;85:2;

**112:24;117:24,24;**
127:3;138:21
**factor (1)**
122:8
**factors (2)**
119:14;121:17
**factual (3)**
21:21;143:9;
153:12
**faculty (2)**
27:6;34:9
**fail (1)**
10:4
**failed (1)**
158:10
**failing (2)**
158:7;168:13
**fair (23)**
12:16;13:11;51:24;
60:16;69:4,5;81:19;
83:1;92:18;93:11;
97:2,14;99:6,9,11;
100:10;105:15;
110:5,6;112:24;
142:11;161:5;182:9
**fairer (1)**
82:10
**fairly (2)**
177:2,3
**fall (2)**
11:22;131:22
**falsifiable (1)**
122:24
**familiar (5)**
66:2;67:23;81:16;
87:20;88:9
**family (1)**
133:22
**fantasies (2)**
26:7,7
**far (9)**
27:21;90:5;93:7;
97:7;99:8,8;131:2;
173:3;188:20
**farther (1)**
190:23
**fast (1)**
191:16
**fathered (1)**
89:2
**faulting (1)**
170:13
**favor (1)**
180:25
**favorite (1)**
107:19
**fear (1)**
188:18
**feasible (1)**
73:14
**feasibly (1)**
83:7
**feature (1)**

**144:5**
**features (9)**
15:1,2;53:1;57:14;
118:23;120:25;
121:21,22;122:3
**February (1)**
185:14
**Federal (1)**
194:16
**feedback (5)**
19:20;66:1;70:1;
132:14;182:2
**feel (8)**
5:24;26:17;126:19;
127:8;128:12;
129:25;132:22;
133:11
**feeling (3)**
5:18;127:9;139:22
**feelings (1)**
128:17
**feet (1)**
58:2
**fellow (1)**
32:23
**felt (2)**
129:12,13
**female (10)**
45:8;112:3;116:11;
120:16,18;129:1;
149:25;162:5;
167:15;169:25
**fertile (2)**
163:16;164:1
**fertility (13)**
162:21;163:1,6,15,
20;164:3,8,24;165:6,
8,24;169:24;170:20
**few (19)**
5:1;13:21,24;18:6;
29:25;36:16;38:11;
42:16;48:6;50:7,22;
62:12;66:17;108:16;
111:11,19;117:1;
140:9;190:5
**fewer (1)**
109:12
**field (18)**
23:17,20;24:2,7;
33:9,12;34:1,2,5,7;
35:24;50:20;85:8;
99:17;130:4;131:5;
158:25;159:3
**fields (2)**
34:3;50:10
**figure (3)**
52:25;53:19;171:2
**files (6)**
10:15,21;11:5,6,
13;86:7
**FILING (1)**
194:5
**fill (1)**

**143:19**
**filling (1)**
169:11
**final (3)**
32:21;41:22;56:6
**finally (1)**
137:24
**find (8)**
21:16;53:8,17;
92:13;138:14;
158:22;160:19;
161:19
**finding (3)**
64:17;153:21;
187:21
**findings (4)**
51:4;53:13,25;
175:9
**fine (5)**
88:19;123:24;
152:14;183:9,9
**finish (7)**
5:7;38:9;88:14;
102:8;127:4;183:1,3
**finished (1)**
137:19
**Finland (14)**
72:11;75:18,21;
84:15,16;85:2;86:3,
11,16;88:22;89:1;
90:7,10;94:22
**Finnish (7)**
84:19,24;85:11,22;
86:5,5;89:24
**first (20)**
4:3;6:21;14:17;
29:12;42:16;66:19;
68:22;90:9;91:21;
116:1;140:10;
142:24,25;160:5,22;
163:17;167:18;
190:11,14;192:6
**fit (9)**
42:5,6;53:22;
76:12;77:18;119:23;
123:6;142:1,1
**fitting (1)**
132:13
**five (10)**
7:11;44:3,8,9;52:7;
73:6;143:14,15;
183:10,13
**five-year (3)**
48:7,22;51:1
**flagging (1)**
166:16
**flags (1)**
129:9
**flat (1)**
83:14
**flip (1)**
129:22
**flood (1)**

**89:6**
**Floor (1)**
194:3
**Florida (2)**
8:1;69:18
**focus (2)**
44:13;83:24
**focused (2)**
44:18;120:14
**folder (1)**
41:1
**follow (2)**
83:24;92:3
**followed (7)**
23:20;61:2;135:13;
139:20;140:5;
146:10;167:14
**following (5)**
52:10;83:20,20;
102:24;140:20
**follows (1)**
4:6
**follow-up (1)**
139:23
**foot (3)**
50:8;114:3,4
**footnote (2)**
144:18,23
**forced (1)**
176:22
**forefront (1)**
161:1
**foregoing (1)**
192:9
**Foreign (1)**
19:7
**forget (1)**
107:14
**forgetting (1)**
75:18
**form (87)**
30:21;47:8,16;
59:15;60:6;62:18;
63:22;67:14;74:8;
76:7;77:15;78:12;
79:5,13;81:10,20;
83:13;84:6;86:6;
91:14,19;93:12;94:4,
12;102:23;103:6;
106:1;108:3,24;
110:20;111:9;112:8,
23;113:18;114:1;
121:6,18;122:1;
123:17;124:25;
125:5;128:2;129:2;
130:11;134:4;
140:25;146:7;
148:13;155:10,20;
159:22;161:14;
163:7;164:10;
165:11;166:13,22;
167:11,22;169:1,9;
170:22;171:24;

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 61 of 165 PageID
#: 3683
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

174:3,11,24;175:14;
176:21;177:1,14;
178:9;179:3;180:4;
181:1,5,10,22;
182:17;184:22;
186:12;187:18;
188:4,9;189:6,19;
190:2,21
**formal (14)**
37:4;40:5;41:17;
47:13;51:25;53:9;
60:1;72:19;76:2,4;
145:19;146:5;
151:18;153:18
**formation (1)**
136:7
**formatting (2)**
19:6;20:4
**forming (1)**
29:19
**forms (2)**
122:9;148:2
**formulations (1)**
89:19
**fortune (2)**
177:24;178:1
**forum (1)**
189:22
**forward (1)**
160:18
**found (5)**
21:13,21;53:16;
149:25;154:2
**four (4)**
7:11;8:8;62:24;
145:17
**framework (1)**
181:20
**franca (1)**
86:22
**France (8)**
72:11,15,18;94:23,
24;96:5,23;97:11
**free (3)**
12:2,16;13:9
**frequent (1)**
27:2
**frequently (1)**
111:5
**friends (3)**
9:21;135:10,11
**friendship (1)**
64:18
**front (5)**
17:14,23;18:13;
23:12;149:22
**Frye (3)**
68:15,19,23
**full (10)**
4:18;13:18,23;
14:9;84:23;104:17;
121:23;137:21;
168:9;170:24

**fuller (1)**
101:16
**full-time (3)**
27:5;30:4,15
**fulsome (1)**
29:15
**function (1)**
52:8
**functioning (2)**
38:3;147:12
**functions (2)**
38:14;43:9
**fundamental (1)**
26:3
**fundamentally (1)**
95:21
**funding (8)**
33:2;48:7,22;
49:15,19;53:23,24;
56:4
**funny (2)**
67:25;76:8
**further (4)**
150:23;178:4;
191:21;192:21
**future (11)**
80:4,8,24;81:4;
92:21;93:10;103:10,
17;118:2;165:23;
184:10
**futures (1)**
66:10

## G

**gain (1)**
25:25
**gather (3)**
18:14;70:19;82:8
**gathered (3)**
131:8,12;160:6
**gathering (2)**
38:16;135:5
**gatherings (1)**
135:5
**gave (5)**
17:15;19:6;37:5;
59:4;60:3
**Gavin (1)**
4:16
**gay (5)**
25:3,4,19;26:1;
128:15
**gen (1)**
56:20
**gender (83)**
10:10;40:6;41:18;
43:24,25;45:7;46:5,5,
18;47:7;48:2,25;
52:11;54:5;56:1,11,
13;57:8,15,19;59:8;
60:9,15,20,24;62:22;
65:14,18;66:11;71:7;

72:14;80:13;82:16,
17;83:12;84:3;89:11;
90:11;97:1;101:13,
24,24;102:21;103:4;
104:4;108:2,17;
110:8,9;111:7;
117:10;122:22;
125:4,23;126:5,17;
127:16;129:6;133:2;
139:22;140:6;144:1,
5,9;145:18;146:24,
25;148:2;150:4;
161:25;162:6,8,9,23;
172:19;174:1;
175:13;176:13;
177:11;189:5,25;
190:19;191:7
**gender-affirming (4)**
40:2;167:21;
176:14;189:15
**gender-dysphoric (1)**
136:3
**gender-related (3)**
55:25;63:8,8
**general (18)**
6:20;9:22;10:3,3;
24:17;45:16;55:18;
58:23;102:25;
108:21;153:17;
159:19;171:23,25;
172:2,13;184:6;
186:17
**generalize (2)**
164:15;189:1
**generally (9)**
4:23;12:1;82:1;
106:8,9;164:6;
171:10;182:5;184:2
**General's (1)**
6:25
**generation (2)**
130:6;162:8
**generational (1)**
130:19
**generic (5)**
56:21;57:3,3;
64:21;112:18
**generically (1)**
179:12
**generic-controlled (1)**
56:21
**genetics (1)**
118:11
**genital (1)**
112:3
**genitals (2)**
112:2;118:19
**genuine (1)**
103:24
**genuinely (2)**
28:18;186:19
**gets (1)**
70:20

**girl (3)**
127:24;128:1,18
**given (10)**
9:4,6,23;29:20;
78:16;109:10;
154:18;162:17;
188:20;192:17
**gives (2)**
92:25;136:1
**giving (6)**
132:5;135:23;
136:2,20;137:19;
166:14
**glasses (1)**
75:7
**global (1)**
165:25
**GnRH (2)**
184:15,20
**goes (7)**
4:24;129:16;
149:10;152:23;
163:12;170:7,8
**gonad (1)**
170:10
**gonads (2)**
163:18;170:5
**Good (16)**
4:9,10;7:13;23:16;
35:23;42:23;43:21;
47:4;75:9;88:10;
100:2;105:3;108:17;
113:20;114:15;
131:10
**goodness (7)**
6:16;28:14;36:15;
41:25;51:9;99:23;
151:18
**government (7)**
49:15,17,19;92:12;
95:17;96:16;179:14
**governmental (1)**
182:4
**governments (1)**
95:14
**grabbing (1)**
33:14
**grand- (1)**
89:1
**grandchildren (1)**
171:1
**grandfathered (1)**
82:24
**grant (17)**
48:8,23;49:4,14,
23;51:1,20;52:4,6,12,
16;53:7,13,23;54:18;
56:9;57:24
**granted (11)**
40:13;94:19;
102:16;103:22;
109:25;117:4;124:9,
21;148:1;154:6;

158:16
**grants (3)**
54:4;56:3;109:3
**gray (1)**
37:19
**Great (23)**
6:2;18:1,11;23:8;
25:2;42:12;71:12;
102:7;105:19;
111:12;118:12,13,13,
23,23,23;119:4,4,4,
15,23,24;147:23
**greater (1)**
64:24
**ground (3)**
5:2;58:3;138:5
**grounded (1)**
8:11
**group (17)**
31:10;35:5;36:5;
45:12;54:21;55:4,23,
24;56:24;69:9;90:13;
131:12,13;144:2;
158:8;187:15,17
**groups (13)**
12:11;19:21;55:16,
20;64:18;82:7;91:18;
131:22;136:19;
152:3;156:21;168:3;
177:21
**guaranteed (1)**
163:12
**guess (11)**
27:18;39:17;47:15;
52:2;66:19;95:8;
122:15;151:17,20;
171:10,20
**guideline (2)**
30:1;190:19
**guidelines (6)**
96:18;108:1;152:9;
162:22;163:2;164:5

## H

**habit (1)**
139:10
**half (3)**
21:13;28:24;68:14
**halt (1)**
89:5
**halted (1)**
163:13
**hamburgers (1)**
174:16
**hand (4)**
43:22;124:3;136:9;
193:1
**handle (2)**
65:3;185:9
**handled (3)**
18:4;24:15;50:2
**Hang (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 62 of 165 PageID #: 3684

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

**167**:12
**happen (10)**
49:7;67:9,22;
70:25;90:25;91:1;
134:24,25;135:21;
160:24
**happened (11)**
11:17;21:1;54:12;
73:23;81:4;92:6;
119:5;134:1;137:20;
150:19,22
**happening (6)**
11:2;17:6;53:10;
94:11;130:9;135:3
**happens (7)**
49:6,7;90:4;
106:19;134:23;
170:2,3
**happier (1)**
126:14
**happy (5)**
8:24;9:1;26:1;
143:13;186:13
**hard (6)**
28:14;42:4;74:1;
153:6;161:22;187:20
**hardest (1)**
141:14
**harm (4)**
147:14;164:15;
181:3,17
**harmed (1)**
158:10
**harmful (2)**
78:1;112:21
**harms (2)**
164:13;165:1
**hat (1)**
126:24
**hate (1)**
127:11
**head (2)**
121:1;135:18
**headed (1)**
87:10
**heading (1)**
145:12
**heads (1)**
126:19
**heads-up (1)**
19:6
**Health (37)**
32:8,17;33:18;
34:13,13,14,16,20,
23;35:4,8,13,14,21;
38:2;48:1;61:10,23;
62:3;69:19;77:3;
102:3;103:1;109:20;
112:14,19,21;113:9;
145:19;146:5;150:3;
173:18,19;183:18,19,
25;184:4
**healthcare (9)**

**76**:23;81:18;96:2,
14;100:12,21;
179:23;180:18;
185:22
**healthier (1)**
109:15
**healthy (3)**
56:24;109:19;
147:11
**hear (5)**
5:6;137:6;138:2;
149:16;185:6
**heard (3)**
92:6;100:24;
155:12
**hearing (8)**
14:21,22;16:21;
22:15;23:1,6;68:20,
23
**hearings (1)**
68:15
**heart (2)**
28:16;53:21
**height (1)**
133:4
**help (20)**
10:23;11:3;15:1,
17;19:4,13;25:24;
34:14;35:20;38:15;
50:9;92:14;102:14;
103:2;104:5;127:2,3;
158:8,8;171:3
**helped (2)**
146:18;158:11
**helpful (3)**
75:8;77:25;119:19
**helping (9)**
15:15;34:12;50:11,
12;52:23,24;129:5;
162:7;186:19
**helps (1)**
11:10
**Henbury (1)**
165:13
**hence (1)**
68:23
**hereby (1)**
192:5
**herein (1)**
192:6
**here's (7)**
20:6,7;41:1,2;75:9;
157:12,13
**hereunto (1)**
193:1
**herself (1)**
137:22
**hesitate (13)**
7:14;37:18;51:5;
56:20;79:14;83:14;
93:13;95:18;138:10,
10;156:15;178:17;
188:5

**hesitation (5)**
12:18;26:25;57:11;
67:8;107:12
**heterosexuality (1)**
45:2
**Hey (2)**
97:18;182:21
**Hi (1)**
6:22
**hide (3)**
26:17,18,18
**high (3)**
81:25;150:1;
159:11
**high-end (1)**
50:21
**higher (1)**
33:10
**highly (6)**
23:19;24:1;50:19,
19;176:18;184:14
**his/her (1)**
192:18
**History (4)**
48:7,22;53:24;
144:3
**history's (1)**
159:7
**hit (1)**
58:2
**hitting (1)**
121:1
**HIV (1)**
133:4
**holding (3)**
85:4;135:8;176:10
**homosexualities (1)**
45:4
**Hormone (22)**
39:16,19,20;40:3;
48:9,24;52:10;57:10,
20;60:24;61:19,22;
84:11,12,13;88:23;
89:11;96:25;164:9;
168:25;189:16,25
**hormones (16)**
117:14;121:25;
160:16;163:14,19;
167:2,8,14,16,21;
170:4,9;174:19;
176:14;184:16,21
**hormones-on-demand (3)**
158:19;159:17;
160:14
**hormones-on-demand' (1)**
158:14
**hospital (5)**
31:6,25;32:6;
34:22;173:13
**hospitals (5)**
32:5;91:4,6,18;
175:25
**hotel (1)**

**120**:2
**hour (4)**
28:9,24;88:11;
143:14
**hours (11)**
27:20;28:12;29:9,
18,22;30:3,5,15;
67:18;135:6;137:10
**house (5)**
119:22;120:1,2,5,5
**huge (1)**
130:19
**human (3)**
44:14;106:6;
185:23
**humans (1)**
116:10
**hurts (1)**
124:4
**HUS (1)**
90:14
**hut (1)**
120:1
**hyperbolic (1)**
158:14
**hyperplasia (7)**
110:19;112:1,7,12,
22;113:17,25
**hypersexual (1)**
45:6
**hypotheses (1)**
145:14
**hypothesis (1)**
112:24
**hypothetical (1)**
61:14
**hypothetically (1)**
61:14

**I**

**idea (8)**
87:5;119:23;
131:10;146:1;147:9;
159:20;174:4;186:22
**ideas (4)**
10:3,3;59:3;161:20
**identical (1)**
162:2
**identification (1)**
118:16
**identified (2)**
75:15;85:17
**identify (3)**
55:7;88:1;123:21
**identifying (3)**
45:8,9;118:21
**identities (1)**
46:5
**identity (9)**
45:7;46:18;58:23;
122:22;125:4,23;
126:6,17;133:2

**ignoring (1)**
168:5
**ill (1)**
109:20
**illness (1)**
35:18
**illnesses (1)**
109:11
**image (2)**
54:24;55:6
**images (3)**
55:8,10;56:18
**imaginary (1)**
118:7
**imagine (8)**
6:4;79:15;171:7;
176:2,7,9;180:5,6
**imaging (2)**
48:10,25
**immediately (3)**
141:23;175:17;
190:15
**impact (2)**
65:15;113:15
**impacted (3)**
176:18,23,25
**impair (1)**
5:21
**impairs (1)**
169:24
**implement (1)**
115:7
**implementation (1)**
83:22
**implemented (2)**
95:7;96:17
**implementing (1)**
81:17
**implications (2)**
33:18;153:10
**imply (1)**
153:22
**import (2)**
23:17;33:15
**important (5)**
33:17;123:24;
127:14;140:12;
149:10
**impression (1)**
154:16
**improper (2)**
179:1;180:2
**inaccuracies (1)**
21:11
**inappropriate (2)**
162:18;168:2
**inappropriately (1)**
135:19
**include (12)**
19:24;38:5;45:3;
46:4,5,17,20,25;47:1;
72:18;161:10;162:23
**included (11)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 63 of 165 PageID #: 3685

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

19:14;72:2,2,23;
73:22,22;87:16,18,
23,24;88:3
**includes (3)**
19:23;45:8;134:22
**including (19)**
8:6,7;24:21;26:20;
33:2;47:12;80:10;
84:12;87:1;94:8;
102:20;103:4;
118:11;120:24;
121:17;128:16;
148:25;161:25;189:3
**inclusion (1)**
76:13
**income (5)**
30:19;172:21;
173:7;176:25;177:5,
8;178:4
**incorporated (1)**
31:10
**incorrect (3)**
151:8;153:23;
154:11
**increase (3)**
162:4,9;171:3
**increases (1)**
129:10
**increasing (1)**
162:11
**indeed (2)**
69:5;103:19
**independent (1)**
147:20
**independently (4)**
148:21;149:24;
151:1,14
**Indiana (20)**
4:1,17;6:25;7:25;
8:7,12,15;9:14;
15:24;16:8;68:10;
78:11;174:10;191:4,
8;192:1,4;194:6.5,
12.5,15.5
**INDIANAPOLIS (2)**
194:7,24.5
**Indiana's (2)**
180:23;181:14
**indicate (2)**
24:11;178:19
**indicated (1)**
155:23
**indicates (2)**
32:21;90:23
**indicating (3)**
95:3;98:23;104:2
**indication (1)**
93:1
**indicators (1)**
64:24
**indirectly (1)**
16:1
**individual (13)**

39:14,25;82:7;
113:13;116:9;
118:14;120:15,17,22;
124:10;131:19;
190:25;194:11.5
**individuals (5)**
40:3;54:7;55:21;
84:2;112:21
**indulge (1)**
142:12
**Industrial (1)**
194:16.5
**industry (3)**
95:19;107:21,22
**infants (7)**
112:6,11;113:10,
16,24;115:3;116:16
**infer (2)**
26:11;126:10
**influence (5)**
121:10;179:2;
180:2;182:7;186:14
**influenced (1)**
175:9
**influencing (1)**
127:16
**information (12)**
13:4,4;19:24;21:4;
38:16;40:15;41:9;
47:21;90:21,22;
125:3;127:1
**informed (3)**
98:15;155:15,18
**informed-consent (1)**
152:7
**infrastructure (1)**
91:10
**ingredients (1)**
118:15
**initial (1)**
144:18
**initiated (1)**
80:1
**injunction (2)**
14:22;16:21
**inner (4)**
123:7,9,12,13
**input (7)**
16:3;19:18;20:1,2;
51:22;53:18;132:8
**inputs (1)**
186:24
**ins (1)**
81:24
**inside (1)**
128:18
**insinuate (3)**
78:4;122:5;154:14
**insinuates (1)**
153:15
**inspection (1)**
118:19
**instance (1)**

138:25
**instances (4)**
108:16;118:24;
165:7,9
**instead (2)**
43:25;95:2
**institution (2)**
33:11;37:5
**institutions (1)**
179:13
**instruct (1)**
16:6
**integrate (1)**
168:14
**integrated (1)**
63:10
**integrating (1)**
41:8
**integration (1)**
35:7
**intend (2)**
20:22;21:9
**intensified (1)**
90:12
**intent (3)**
31:7;53:15;80:24
**intention (2)**
21:5;92:11
**intents (1)**
26:6
**interact (3)**
35:13;185:22,24
**interactions (5)**
119:10;121:8;
185:19;186:2,3
**interdis- (1)**
34:4
**interdisciplinary (3)**
24:1;34:5;50:20
**interest (24)**
8:19;15:12;16:10;
45:17,18,18,21;
94:18;121:12;
172:20;174:2,6,22;
175:21;177:9,18;
178:3,11,20,25;
181:7,20;182:14,15
**interested (2)**
185:6;192:24
**interesting (1)**
53:18
**interests (3)**
26:16;44:14;96:11
**interfere (1)**
163:24
**interim (3)**
98:12;100:22;
150:22
**intern (1)**
32:21
**internal (2)**
26:11,14
**international (2)**

96:3;176:1
**internationally (1)**
74:12
**interns (1)**
4:15
**internship (2)**
41:22;62:12
**interpret (7)**
13:1;61:15;93:1;
109:6,7;132:12;
148:7
**interpretation (1)**
166:12
**interpreted (1)**
144:12
**interpreting (1)**
90:20
**interrelated (1)**
119:14
**interrupting (1)**
137:2
**intersex (3)**
113:10;116:16;
172:6
**intervene (2)**
115:13,25
**intervening (3)**
114:8,17,22
**intervention (5)**
112:1,20;113:16;
114:25;165:10
**interventions (20)**
77:25;83:7;88:25;
89:12,18;93:17;94:2;
108:19;112:2;113:3,
9,24;114:11;115:2,
11,22;116:1;124:24;
164:13;189:5
**interviewed (1)**
149:8
**interviewing (5)**
24:23;25:8;61:4;
148:9,11
**interviews (1)**
62:8
**into (25)**
27:6;31:7;41:19;
44:1,25,25;46:22,24;
47:2;53:19;63:12,13;
77:17;82:5;100:6;
101:10;118:15;
119:17;129:17;
140:6;142:22;159:3;
160:24;161:18;186:5
**investigate (3)**
49:6;68:24;93:16
**investigated (2)**
57:15;108:11
**investigating (7)**
24:4,12;25:14;
29:19;82:7;109:3;
148:24
**investigation (1)**

81:24
**investigations (3)**
24:20;108:15;
149:14
**investigator (3)**
49:12,22;52:15
**invisible (1)**
176:7
**invited (1)**
9:9
**involve (6)**
7:5;24:23;68:15;
77:1;135:21;147:14
**involved (34)**
6:16;10:22;14:15,
18;15:14;16:1,19,20;
19:17;20:12;22:7,10;
31:16;38:1;45:25;
50:6;53:25;54:14;
61:8,12,13;65:23;
68:18,19;85:20;
109:3;136:5;151:21;
174:25;187:2,3,10;
188:13;191:11
**involvement (10)**
12:18;16:18;52:22;
57:23;58:5;69:21,23;
70:5,6;107:15
**involves (1)**
122:6
**involving (6)**
8:9;11:1;12:15;
13:8;69:13;137:15
**ironically (1)**
133:1
**irrational (1)**
118:7
**irrelevant (1)**
119:14
**irrevocably (1)**
116:11
**isolate (3)**
102:14;109:5;
187:1
**isolated (2)**
91:5;101:11
**issue (8)**
29:20;63:3,8;
119:16;133:10;
170:2;185:24;187:2
**issued (2)**
95:2;97:6
**issues (26)**
8:9;11:1;19:7;
23:18;24:4;33:13;
35:14;57:14;58:23;
63:8;64:22;65:20;
66:3,12;68:24;85:10;
102:4;111:11;
127:16;130:13;
133:6;150:3,4;166:5;
185:21;187:4
**issuing (2)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 64 of 165 PageID #: 3686
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

96:17;158:14
**italics (1)**
172:13
**itch (1)**
29:10
**IXB1 (1)**
139:18

## J

**Jack (2)**
161:2,3
**James (5)**
4:20;53:16;191:23;
192:5;194:17
**January (1)**
193:8.5
**job (3)**
26:21;32:3;157:5
**jobs (1)**
176:13
**Joel (10)**
18:9;21:22;22:19;
23:10;71:9;90:1;
145:1;149:15,16;
162:16
**John (8)**
14:12;44:3;98:2;
104:19;113:2;
115:23,23,24
**jot (1)**
68:4
**journal (4)**
144:19;152:10;
155:13,16
**journals (1)**
87:20
**judgment (1)**
103:14
**July (1)**
52:7
**jump (2)**
18:5;23:4
**jumped (1)**
32:15
**June (3)**
43:16;192:11;
194:17.5
**junior (1)**
33:6
**jurisdiction (2)**
109:10;179:15
**justify (1)**
183:20

## K

**KC (1)**
194:8.5
**keep (7)**
10:24;11:3,11;
86:15;143:13;
148:22;185:3

**keeping (5)**
10:19,25;11:20;
189:1,3
**Ken (3)**
135:21;136:1;
137:18
**Kentucky (3)**
7:25;67:5,17
**kid (12)**
118:22;119:3;
171:6,7,8,11,18,20,
21,21;172:5,9
**kids (21)**
54:5;56:12,12,13;
80:25;92:14;102:14;
103:2,23;136:3;
140:5,9;141:4;142:5,
10,14,22;147:3;
149:1;151:11;171:11
**kids' (1)**
83:8
**kid's (1)**
171:18
**kind (54)**
9:19;17:5;20:3;
24:3,11;25:1;26:23;
27:25;28:2;38:22;
40:18,20;41:11;42:5;
43:7,18,21,23,24,25;
51:21,25;55:25;74:2,
13;77:25;83:18;87:9;
91:2;92:7;93:17;
101:21;107:21,21;
111:17,21;114:3,20,
21,21;122:6;123:25;
125:17;127:6;
134:11;138:20,21;
153:15;154:14;
157:6;158:8;162:19;
180:22;185:8
**kinds (18)**
14:8;24:16;26:4;
38:1;45:19;49:10;
52:25;56:11;73:10;
78:6;89:20;110:24;
115:2;134:25;
137:12;146:20;
148:22;155:24
**kink (1)**
46:21
**kinks (1)**
46:20
**kinksters (1)**
46:23
**knew (2)**
119:3;179:20
**knowledge (10)**
63:24;78:14;89:1;
93:24;96:23;146:16;
150:20;151:16;
160:12;191:6
**known (2)**
42:9;132:9

## L

**laboratory (1)**
58:3
**lack (4)**
79:25;95:17;
155:18;173:19
**lacks (1)**
144:2
**ladder (1)**
32:24
**language (7)**
78:17;86:14,18;
87:15;97:6;103:13;
168:4
**languages (2)**
74:10;86:20
**large (16)**
32:4;33:21;34:18;
35:5;56:18;99:13;
103:8;108:14;
119:13,13;130:20,20;
142:16,17;168:14;
192:5
**largely (4)**
33:11;84:1;87:13;
161:20
**larger (4)**
27:2,2,11;75:8
**largest (1)**
32:5
**last (6)**
32:12;66:16;92:6;
97:21;104:10;147:12
**lasted (1)**
106:9
**later (4)**
29:12;63:2;141:8;
171:8
**Latin (1)**
114:13
**Latvia (1)**
98:6
**law (21)**
4:14;8:12,15;19:7;
22:16;34:20;35:4,7,8,
16,16,17;78:16;80:3,
7;115:1,5;122:11;
174:10;181:8,15
**laws (2)**
79:22;180:25
**lawyer (2)**
4:11;28:22
**lay (3)**
78:17;134:12,16
**lead (2)**
92:21;103:15
**leader (1)**
99:12
**leadership (1)**
99:14
**leading (2)**

30:11;99:22
**leads (3)**
29:1,2;157:7
**leaf (1)**
178:1
**learned (1)**
53:14
**least (14)**
8:8;16:1;57:7;
78:4;79:15;84:2,10;
92:9;103:19;104:25;
122:19;129:12;
156:8;166:23
**leave (9)**
32:13;43:14;53:3;
90:25;92:4,20;94:16;
103:14;154:15
**leaves (3)**
91:9;92:16;177:24
**leaving (8)**
8:3;80:7;81:3;
90:24;103:7;121:7;
133:19;169:12
**led (6)**
55:14;100:9;
127:13;144:5;
151:17;154:14
**left (11)**
27:6;31:6,25;51:6,
12,13;91:20;93:9,14;
94:1;156:2
**legal (15)**
10:23;11:14;19:5,
13;20:8,12;31:12,16;
33:15;35:12;78:16;
171:15,17,19;191:12
**legality (1)**
174:5
**legislation (1)**
10:9
**legislature (4)**
8:16;9:15;10:8;
181:8
**legislatures (2)**
180:24;191:12
**legitimate (12)**
40:14;59:2;78:25;
80:11;114:6;165:2;
177:10;178:18,20,22;
180:7;187:14
**legitimately (3)**
38:24;157:4;
176:10
**length (2)**
179:24;180:12
**less (11)**
68:14;74:11,12;
83:24;109:21,22;
133:1,10;160:21;
185:25;191:18
**less-risky (1)**
95:6
**letter (3)**

53:9;99:5;156:1
**level (4)**
82:1;83:19;96:6,8
**liberal (1)**
65:17
**LIBERTIES (1)**
194:2
**LICENSING (1)**
194:12
**Lieutenant (2)**
18:3;48:17
**life (4)**
26:1;64:13,16;
119:11
**lift (1)**
120:21
**lifted (2)**
148:7;157:9
**Like/dislike (1)**
127:12
**liking (1)**
153:20
**limb (1)**
124:7
**limit (2)**
25:16;175:9
**limitations (1)**
83:4
**limited (8)**
29:16;105:24;
106:2;108:22;
150:11;161:7;184:5;
186:8
**limiting (3)**
77:12;91:3;92:19
**line (6)**
12:6;33:6;37:19;
65:8,18;105:9
**lines (6)**
6:23;46:8;60:17;
145:17
**lingua (1)**
86:22
**linked (1)**
109:11
**list (9)**
8:2;18:24;40:15;
66:20;67:3;87:13,16,
17,18
**listed (10)**
7:24;31:2;48:7;
52:3,6;53:23;66:18;
68:8;69:17;91:18
**listener (1)**
154:15
**listening (2)**
129:4;135:13
**lists (2)**
87:23;100:3
**literally (1)**
162:4
**literature (3)**
10:19;14:20;70:4

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 65 of 165 PageID #: 3687
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

little (8)
6:9;27:18;30:9;
68:14;88:11;90:16,
21;185:1
Littman (8)
144:6,14;145:4;
149:10,23;150:25;
151:15;153:25
live (2)
26:1;101:4
lives (2)
63:9;64:9
living (6)
25:20;99:19;120:2;
140:6;142:14;177:7
local (1)
96:11
logic (1)
60:17
logical (1)
53:2
logistical (3)
17:1,2,5
London (1)
101:14
long (9)
13:17,18,19;30:7;
46:10;104:19;119:7;
157:15;159:1
longer (3)
43:17;83:16;131:5
long-standing (2)
159:7,8
long-term (1)
109:16
look (10)
23:2;42:1;51:9;
53:8;86:10;119:17;
131:6;139:9;145:7;
186:1
looked (1)
73:8
looking (8)
49:2;53:1;61:4;
67:1;124:8;135:13;
161:19;171:9
lookout (1)
184:7
looks (9)
18:18;22:2;23:3;
83:6;90:3,8;98:16;
143:3,12
loophole (1)
92:20
losing (1)
129:18
Lost (1)
35:3
lot (6)
24:21;35:5;62:7;
65:8;106:4;126:18
Lots (2)
10:14,14

loud (3)
5:6;147:25;148:3
louder (1)
134:24
loudly (1)
158:13
love (1)
127:11
Lovely (1)
60:17
low (5)
123:19;124:15,15;
125:2;186:6
lower (1)
109:13
lunch (5)
6:5;88:15;97:23;
104:20;105:6
luxury (1)
124:16

# M

magic (1)
90:4
magnetic (2)
48:9,24
main (3)
12:8;44:12;76:21
maintain (3)
164:2;173:7;177:7
maintains (1)
80:22
major (2)
123:20;162:14
majority (13)
27:4;37:8;44:17;
108:14;109:9;
111:12;118:13,23;
119:4,15,24;130:20;
139:22
makes (3)
51:14;120:5;
160:11
Making (11)
17:3;21:2;92:1;
99:19;120:3;122:16;
170:19;171:17;
172:4;179:22;188:15
male (6)
45:8;116:10;
120:15,18;128:25;
165:20
man (1)
163:22
manage (2)
96:13,13
manager (1)
174:15
manner (2)
184:1,1
mantra (1)
133:7

manual (1)
144:11
manuals (1)
146:15
many (50)
9:20,20;13:15;
16:2;23:18,18,24;
24:16,16,22;25:7;
28:12;29:22;36:14,
19;43:5,6;45:10,11;
54:7;55:1;56:19;
64:15;65:7;66:13;
86:20;99:25;104:3;
109:11;111:21;
121:12;125:8,9;
126:12,18;127:15,17,
18;133:13,14;134:7;
136:6,12;138:12,13;
156:21;157:7;162:1;
187:3;190:13
map (2)
11:11;98:3
March (1)
4:2
marked (1)
185:11
marking (1)
18:6
mastectomy (4)
166:20;167:2,17;
169:7
master's (1)
37:20
masturbatory (1)
26:7
match (13)
9:3;10:4,4;23:4,5;
55:2;58:20;70:8;
112:17;113:5;
118:12;131:7;146:14
matched (2)
55:1;83:8
matches (1)
118:22
material (4)
42:10;53:21;63:24;
99:16
materials (3)
28:25;86:23,23
math (1)
43:22
mathematical (1)
122:7
mathematics (3)
53:19;117:18;
122:11
matter (19)
4:6;20:23;83:15;
85:1;106:17;107:20,
24;108:21;109:1;
111:16;125:19;
139:10;143:9;
153:12;158:5;

171:23;172:1;
178:18;189:17
maximize (1)
15:11
May (10)
36:25;39:3;60:4;
81:2;91:16,17;94:2;
103:10,18,19
maybe (4)
18:15;116:7;
120:12;142:19
McDonald's (1)
174:15
mean (50)
11:5,13,14;17:2;
29:3;36:5;43:14;
47:15;54:20;71:1;
81:23;87:7,7;101:11;
104:24;107:4,5,6,8;
115:8;120:9,17,22;
123:3;125:8,22;
126:13,21;127:7,11;
132:2;141:18;
144:12;146:1;
147:24;156:19,22;
158:6;161:9,18;
167:23;174:13,14,16;
179:11,11;185:18;
187:1;188:24;189:20
meaning (2)
140:16;171:15
meaningful (6)
111:10;138:21;
165:3,20;176:18;
188:10
meaningfully (1)
141:16,18;144:17
means (11)
27:23;61:1;76:24;
90:20;106:2;116:23;
125:21;145:25;
151:5;177:5;178:24
meant (10)
10:22;14:4;61:13;
92:19;168:5,6;
173:12;179:6;
180:21;189:14
measurable (2)
122:24;123:15
measures (2)
123:19;149:5
mechanism (1)
71:17
media (24)
8:21;33:20,20;
85:10;130:25;
133:14;150:2;
158:13;160:23;
161:4,7,9,10,11,21,
23;162:12;184:25;
185:21;186:3,5,8;
188:12,14
mediated (1)

134:17
medical (51)
12:15;13:8;27:5;
34:10;39:7;49:10;
61:3;74:23;75:12,13,
16,22;76:6;77:9,13;
79:11;82:22;84:8;
86:3,5;89:2;95:11,19,
19,20;100:19,20;
102:21;108:19;
109:2;110:2,12,18;
112:1;114:7,12;
115:22;116:1;
124:24;134:2;
162:23;164:5;
165:10;168:3;
172:21;173:10;
179:13,14;183:24;
189:5;194:12
medicalized (25)
11:24;83:5;84:9,
13;92:24;93:4,8,23;
95:4;96:4;97:5,10;
102:1,9,17;103:5,21;
104:16;110:24;
160:16;166:8;
167:10,19;168:20,23
medically (5)
76:19;114:17,23;
115:25;147:7
medication (1)
5:20
medications (3)
39:22;57:17;
173:23
medicine (11)
78:7;95:16;108:23;
114:12;123:14;
171:22,25;172:2,12,
14;179:17
medium (2)
134:23;161:17
meet (3)
11:8;13:12;104:5
meeting (2)
14:4,11
meetings (1)
51:23
member (7)
9:14;27:5;34:9;
132:19;134:6,12,15
members (2)
8:23;194:11.5
memories (1)
128:17
memory (4)
7:19;11:3;22:24;
42:25
men (1)
128:16
Mental (31)
32:8,17;34:13,13,
16,20,23;35:4,7,13,

Case 1:23-cv-00595-JPH-KMB   Document 58-8   Filed 06/12/23   Page 66 of 165 PageID #: 3688

K.C., et al. VS                                                    JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board                      June 7, 2023

14,18;48:1;61:10,23;
62:3;102:3;103:1;
112:14,19,21;113:8;
145:19;146:5;150:2;
173:18,19;183:18,19,
25;184:4
**mention (2)**
78:9;146:6
**mentioned (6)**
4:14;10:21;66:17;
72:6;94:21;139:10
**mentions (1)**
170:17
**mere (1)**
33:16
**merely (9)**
45:20,20;47:18;
123:11;133:16;
158:5,7;190:4,5
**messing (1)**
48:14
**met (1)**
13:19
**metaphors (1)**
129:11
**method (8)**
13:2;19:8;41:13;
147:12;148:10;
149:13;155:4;190:14
**methodological (1)**
50:16
**methods (6)**
24:25;42:13;56:11;
96:12;141:22;148:22
**Michael (2)**
4:20;150:16
**middle (1)**
133:9
**might (8)**
22:8;30:1;81:16;
103:21;122:18;
126:7;166:11;180:2
**mild (3)**
166:5;170:14,15
**mildest (4)**
164:14,15;165:14;
168:4
**Miller (2)**
192:3;193:5.5
**mind (7)**
87:9;113:7;135:17;
137:25;161:1;
175:17;178:17
**mine (2)**
51:5;87:10
**minimal (1)**
158:20
**minimize (1)**
15:10
**minor (1)**
84:10
**minors (11)**
11:24;74:24;75:13,

17,23;77:10,14;
79:12;148:10,11;
149:14
**minute (1)**
66:14
**minutes (4)**
44:8;105:1;183:10;
191:16
**miscellaneous (1)**
30:3
**miscommunicating (1)**
126:23
**misidentify (1)**
125:14
**mislead (2)**
36:5;103:16
**misleading (4)**
111:22;168:2;
171:16;184:14
**mispronounce (1)**
114:14
**missing (14)**
21:13;22:8;91:1;
166:16,17;169:11,13,
15,16,18,19,21;
181:11;190:3
**mistake (2)**
117:10;156:19
**mistaken (1)**
154:10
**misunderstand (2)**
141:14;157:7
**misuse (1)**
125:13
**misused (1)**
82:3
**mix (1)**
129:11
**mixing (1)**
86:15
**model (9)**
40:7,8,23;41:5,14,
17;42:5,18;43:21
**models (7)**
40:12,14,24,25,25;
41:4;132:12
**moderate (1)**
188:16
**moderates (1)**
133:9
**MODERATOR (1)**
48:12
**module (1)**
42:3
**moment (6)**
17:14;58:22;81:1;
94:11;116:11;161:2
**money (2)**
99:18;182:7
**monitored (3)**
60:23;61:1,2
**monitoring (1)**
61:21

**Montana (3)**
8:1;67:7,19
**months (6)**
7:11,16;29:25;
119:2,4;159:13
**mood (1)**
171:3
**more (73)**
12:1;24:17,19;
26:3;27:1,1,9,9;
29:15;30:11;31:15;
36:23;40:22,24;41:5,
8,14;42:20;43:20;
44:6;45:4;51:14;
54:10;55:6;65:2,8,17,
22,23;67:23;73:14;
78:8;85:8,8;90:21;
92:18;95:19;101:3,
13,20,23,24,25;
102:5;108:22;112:3;
119:17;123:11;
126:3,4,6,8;127:20;
128:9;130:2;133:3,
20;134:24;137:11,
13;142:20;145:7;
178:21,21;182:25;
185:15;186:1,7;
187:7;188:11,14;
190:16,17
**morning (1)**
4:9
**morphological (1)**
122:1
**most (26)**
24:18,22;35:10,10;
43:20;58:18;62:21;
64:25;84:12;106:3;
108:13;118:18;
119:19;127:5;
135:10;141:13;
166:2,5,11;168:4,7,
16;170:1;187:14;
188:7;190:11
**most-appropriate (1)**
102:10
**mostly (6)**
13:20;120:25;
121:2,4;162:4,5
**mother (2)**
119:1;127:10
**mother's (2)**
119:10;121:9
**motivated (1)**
35:18
**motivations (3)**
25:14;155:2;
186:24
**mouth (1)**
125:24
**move (5)**
18:16;44:1;48:13;
53:5;92:12
**moved (2)**

52:1,2
**moving (1)**
48:11
**MRI (1)**
50:12
**MRIs (1)**
56:22
**much (27)**
10:24;18:4;24:19;
30:11,18;36:5;40:23;
65:2;127:20;130:2;
135:25;137:11,13;
147:14;167:7;
185:24,25,25,25;
186:7;187:3,7;
189:20
**multidisciplinary (3)**
173:16;174:1;
175:2
**multiple (3)**
120:24;121:17;
180:24
**must (1)**
122:23
**myself (9)**
17:15;25:12;34:8;
65:21;94:16;101:22;
108:25;128:16;
136:15

### N

**nail (2)**
28:14;42:4
**name (11)**
4:11,18;31:20;
99:23,24;113:1,1;
137:17;153:18;
161:1;166:17
**named (1)**
31:11
**names (6)**
7:13;100:15,16;
132:3,6;142:6
**naming (1)**
135:19
**natal (3)**
127:23;128:24;
169:25
**native (1)**
86:14
**nature (22)**
34:4;42:17;64:5,7;
69:6,21;79:6;100:9,
10;113:22;115:6;
134:22;151:16,19;
152:17;154:7;
171:22;178:12,14;
187:5,5;191:9
**navigate (2)**
64:12,13
**necessarily (10)**

57:12;63:12;67:14;
92:4;101:20;102:9;
109:21;175:15;
176:25;190:3
**necessary (2)**
19:20;154:3
**neck (2)**
121:25;122:2
**need (30)**
6:3;10:20;14:6;
17:16;19:18,24;
25:25;26:18;36:6;
48:17;53:18;58:1;
92:4;101:20,23;
103:25;115:18;
119:17;124:2;
132:23;138:1;147:1;
148:18,25;149:10;
150:18;162:24;
169:18;175:15;179:5
**needed (9)**
17:18;19:14;65:2;
69:23,24;99:3;101:4;
102:16;140:11
**needs (8)**
15:8;27:13;83:8;
87:25;102:7;104:6;
178:2,3
**negative (2)**
73:7;129:25
**negotiations (1)**
136:7
**neighbor (1)**
89:20
**neither (4)**
57:19;91:2;96:23;
149:8
**neonatologist (1)**
106:18
**neuroanatomists (2)**
50:5,25
**neuroanatomy (1)**
122:2
**neuroimaging (1)**
56:5
**neuropsychological (2)**
38:2,17
**neuropsychology (1)**
37:22
**neuroscience (1)**
37:22
**neuroscientist (1)**
24:6
**neutrality (1)**
181:25
**new (13)**
66:23;89:6,8,8;
104:22;135:11;
142:6;146:17;147:1,
3,6,21;194:3.5
**next (5)**
7:21;33:5;53:1;
85:2;145:10

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 67 of 165 PageID #: 3689

K.C., et al. VS                                                                                                    JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board                                                                          June 7, 2023

next-door (1)
  89:20
nickname (1)
  34:24
night (1)
  142:23
nobody (3)
  19:25;83:2;170:17
Nobody's (4)
  85:16,17;154:21,
  22
nod (1)
  126:19
non (1)
  72:19
non-clinicians (1)
  161:11
non-dysphoric (2)
  56:12,14
none (9)
  9:9;43:18;74:14,
  15;78:8;92:22;123:6;
  128:23;154:1
nonexperts (1)
  134:19
non-lawyer (1)
  78:14
nonmedical (1)
  49:11
non-politician (1)
  78:17
noon (1)
  88:15
Nope (2)
  6:1;152:14
nor (4)
  57:19;96:23;149:9;
  184:9
North (1)
  194:23.5
Norway (5)
  72:11;94:23,24;
  96:24;97:11
notarial (1)
  193:2
Notary (1)
  192:3
note (5)
  144:15;156:22,25;
  157:1,2
noted (1)
  146:3
notes (3)
  29:4;68:11;192:14
notice (4)
  30:10;131:1;145:3;
  194:5
noticed (1)
  132:10
noticing (1)
  146:20
notified (1)
  194:16.5

novel (1)
  69:11
nuanced (1)
  188:17
nuances (2)
  151:2,3
number (14)
  36:7;60:1,3;103:8,
  19;109:7;118:6,7,7;
  138:14;168:14;
  187:24;188:15;193:7
numbers (6)
  23:17;106:12;
  117:19,20;166:24;
  189:10
nurse (1)
  176:3
NY (1)
  194:3.5

# O

obesity (1)
  109:17
obfuscate (1)
  116:12
object (1)
  16:6
Objection (88)
  30:21,24;47:8;
  59:15;60:6;62:18;
  63:22;74:8;76:7;
  77:15;78:12;79:5,13;
  81:10,20;83:13;84:6;
  86:6;91:14,19;93:12;
  94:4,12;95:23;
  102:23;103:6;106:1;
  108:3,24;110:20;
  111:9;112:8,13,23;
  113:18;114:1;121:6,
  18;123:17;124:25;
  125:5;128:2;129:2;
  130:11;134:4;
  140:25;146:7;
  148:13;155:10,20;
  157:20;159:22;
  161:14;163:7;
  164:10;165:11;
  166:13,22;167:11,22;
  169:1,9;170:22;
  171:24;174:3,11,24;
  175:14;176:21;
  177:1,14;178:9;
  179:3;180:4;181:1,5,
  10,22;182:17;
  184:22;186:12;
  187:18;188:4,9;
  189:6,19;190:2,21
objections (1)
  113:22
objective (20)
  26:13;45:14;47:4;
  114:19;116:2,13;

122:25;123:20;
  124:20;125:3;149:4;
  172:2,3,8,10;178:19,
  24;180:20;182:2;
  190:22
objectively (3)
  111:14;122:24;
  123:15
obscure (1)
  29:5
obscuring (1)
  166:2
observable (1)
  26:13
observation (1)
  161:22
observations (3)
  118:1;132:9;
  145:14
observing (1)
  89:9
obsessive (2)
  30:8;81:24
obtaining (1)
  33:2
obvious (1)
  33:17
obviously (1)
  16:8
occupied (1)
  27:17
occurred (1)
  43:11
occurs (1)
  185:5
odd (1)
  177:23
off (5)
  84:7;88:23;89:5;
  93:7,21
offended (2)
  12:4;136:15
offer (1)
  69:14
offering (3)
  13:7;40:12;104:16
offhand (3)
  110:16;111:1,2
Office (2)
  6:25;69:8
offices (1)
  7:4
official (5)
  33:22;44:24;46:8;
  86:4;194:12.5
officially (1)
  153:1
often (19)
  7:4;16:17;25:5;
  64:20;65:15,24;95:5;
  107:15;109:2,13;
  117:4;124:23;128:6,
  11;133:8;134:24;

142:14;146:14;159:6
oftentimes (1)
  54:11
Oklahoma (1)
  8:4
old (6)
  68:1;135:10,11;
  143:7,8;147:21
older (1)
  109:12
old-fashioned (1)
  17:5
Olson (3)
  142:10,20,21
Olson's (3)
  140:1;142:2,22
Once (5)
  13:16;51:12;54:12;
  58:2;148:7
one (138)
  6:18;8:3,7,9,9;8;
  10:25;11:4,16;13:19,
  23;14:9;16:19;24:2,
  4;27:23;32:4;33:10;
  36:23;38:19;39:21;
  40:9,9;44:5;46:14,
  22;49:24;50:7;52:18,
  19;54:21,25;57:8,9;
  58:17,22;61:1,6;67:2,
  4,7,24;69:17;75:10;
  76:9,21;78:10;79:24;
  85:8;86:17;87:21,25;
  92:5;98:20,20;
  102:14;105:2;
  107:14,20;109:22;
  113:14;117:8;
  118:25;120:3,8;
  123:12;126:1,22;
  127:5;128:17;129:9;
  135:23;136:20;
  137:15,15;138:14;
  140:2,4,13,17;
  141:12,19;142:3,19;
  143:20;147:1;148:1,
  14,16,25;149:7,7,9,
  12;151:7,9,10;152:8;
  153:12,13,22;156:19;
  157:14,15;158:21,23;
  160:20;161:18,19;
  162:1,10;163:4;
  166:14;169:2,11,20,
  21;170:15;174:13,
  14;175:19,20;176:4;
  177:7,23;178:2,3,3;
  180:13,13,15,18;
  181:14,21;182:5,8;
  188:2,19;191:14
ones (23)
  11:1;38:8;64:11;
  66:23,25;68:9;70:8;
  72:25;73:2,9,18,21,
  21;74:3;87:1;97:15;
  121:24;129:12;

160:22,24;162:14;
  185:15,20
one's (1)
  123:11;128:25;
  166:9,21;168:22;
  177:5,6,7;179:15;
  186:14,15
one-to-one (2)
  26:12;27:24
ongoing (5)
  51:22;69:3;79:20;
  84:5;136:7
only (61)
  6:5;8:18,18;9:7;
  14:3,8;16:19;17:21;
  20:4;22:5,8;23:21;
  29:16;35:20;42:25;
  50:22;56:17;71:3;
  72:12;74:2,15;76:2,
  10;78:20,23;80:16,
  17;82:6;86:2,4;
  104:14;115:18;
  117:24;119:15;
  125:11;126:16;
  128:21;131:4;
  133:22;148:18;
  152:19;155:8;159:3;
  160:19;161:1;
  162:10;165:14;
  167:20;168:4,7,23;
  169:6,18;172:8;
  174:20;175:23;
  177:10,25;179:20;
  185:15;187:4
on-paper (1)
  41:13
onset (5)
  90:11;133:14;
  144:5;161:23;162:11
Ontario (2)
  9:9;10:6
ooh (1)
  185:7
open (6)
  93:9,14,15;94:1;
  103:8,14
opinion (5)
  9:1;13:8;75:19,21;
  180:3
opinions (2)
  20:22;21:8
opportunities (1)
  65:13
opportunity (2)
  92:17;133:19
opposed (3)
  109:8;159:2;168:8
opposite (6)
  20:5,9;140:10;
  142:9;153:16;172:7
optimistic (1)
  168:7
option (1)

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 68 of 165 PageID #: 3690

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

103:21
**options (7)**
162:22;163:1,5;
164:8;165:6,8;
168:16
**order (37)**
10:23;11:2;14:25;
15:10,17;17:3;19:21;
20:9;24:8,10;25:24;
26:1;33:3;46:17;
47:16;49:15;50:20;
55:7;64:12;65:2;
68:23;87:25;99:16;
100:14;101:25;
102:15;113:4;
119:18;133:6;147:2;
151:25;154:3;
157:10;159:25;
177:7,17;178:2
**organization (5)**
14:8;115:7;180:1;
181:9,18
**organizational (1)**
13:21
**organized (1)**
20:9
**orientation (3)**
45:23;65:15;133:3
**orientations (2)**
45:1;72:9
**oriented (1)**
34:16
**orienting (1)**
156:16
**original (8)**
58:8;72:17;86:20;
106:23;142:5,17;
155:25;194:17
**originally (3)**
45:8;86:14;88:2
**Originating (2)**
194:1,18
**others (11)**
12:4;46:22,25,25;
64:19;67:13;73:17;
120:21;140:19,20;
149:11
**otherwise (3)**
155:12;156:10;
192:23
**ought (1)**
154:18
**ouija (1)**
90:3
**ourselves (1)**
23:25
**out (36)**
5:6;8:3;17:4,17;
23:4;52:25;53:13,20;
61:4;68:2;69:14;
83:14;91:20;104:14;
120:21;125:24;
129:15;133:19;

138:14;140:2;
147:25;148:3,7;
154:10;155:17;
157:9,11;163:9;
166:15,16;169:12,14,
22;171:2;173:15;
186:13
**outcome (4)**
114:16;172:23;
177:19;178:8
**outcomes (11)**
40:20;48:1,4;
100:20,20;112:16;
113:9;157:23;
166:12;183:19,21
**outlier (2)**
96:3;176:1
**outline (1)**
86:3
**outright (15)**
74:23;75:12,16,22;
76:5;77:9,13;79:3,8,
11;80:10;94:25;
96:24;125:7;163:25
**outs (1)**
81:25
**Outside (4)**
20:16;102:21;
135:2;188:23
**over (38)**
10:8;24:15;29:25;
30:2,18;32:19;41:7;
42:13,14;47:19,19,
19;48:21;49:11;
56:19;62:11;67:1;
68:3;71:16;75:24;
83:5;85:7;88:11,17;
90:3;91:25;95:18;
100:7;104:21;
106:16;131:5;132:7;
135:14;138:17;
148:23,23;158:24;
165:22
**over- (1)**
108:8
**overall (1)**
120:9,23;121:15
**overlap (11)**
15:10;38:14;
118:10,12,14,16;
120:6;121:19;122:8;
142:1;167:1
**overlapping (2)**
120:19;121:16
**overstated (1)**
81:21
**overturned (1)**
156:4
**overused (2)**
95:5;131:24
**own (32)**
7:7,15;10:17;29:4,
10,19;30:10;31:16;

33:6,11,12;43:1;
66:8;72:15,21;73:1,5,
20;104:10,11;
125:14;130:12;
159:24;165:23;
166:10,21;168:22;
169:2,8,20;179:22;
182:12

## P

**Factor (1)**
4:16
**pad (1)**
17:15
**page (19)**
5:3;48:5;66:16;
74:20;75:11;99:4;
100:22;116:4,8;
142:25;143:21,23;
156:11,12;158:12;
162:16;172:15;
182:20;183:16
**pages (1)**
22:4
**paid (1)**
180:1
**pain (2)**
123:23;124:7
**pair (1)**
21:14
**paper (17)**
17:16;18:4;56:6;
116:4;138:24;
144:14;148:3;
150:17;151:3,4,15;
153:1,8,10;154:12,
17;171:15
**papers (5)**
52:3;87:13;106:14;
141:15;153:13
**parachute (1)**
32:14
**paragraph (18)**
23:13;74:20,21;
75:11;81:5;100:23;
116:4;122:22;
143:21;145:10;
149:19;153:12;
158:12;162:16;
166:7;172:17;
183:16;184:13
**paraphilia (2)**
45:15;46:21
**paraphilias (1)**
45:13
**pardon (2)**
10:25;82:19
**parental (1)**
145:13
**parentheses (2)**
21:14,18
**parents (11)**

148:4,9,11;149:2,
8;162:25;170:21,24,
25;171:1,10
**parents' (1)**
171:13
**parent's (1)**
171:19
**part (32)**
14:4,5;27:22;34:4,
6,6;37:4,19;61:25;
62:4;63:10;77:2;
80:13;90:2;98:22;
99:18;100:5;104:10;
122:3,5;127:14;
128:8;142:4,5;
145:11;146:21;
157:25;166:16,18;
167:12;172:4;187:7
**partially (1)**
125:12
**participants (2)**
54:3;55:17
**participate (2)**
51:12;151:25
**participated (1)**
155:5
**participating (3)**
76:17,25;189:22
**participation (1)**
76:18
**particular (39)**
9:1,6,7;11:6,9,18;
28:23;29:17;42:18;
49:20;51:20;53:6;
55:21;57:7;62:14;
65:20;69:6;70:19;
74:3;76:10,11,11;
78:22;79:18,20;
98:20;99:23,24;
103:15,16;128:17;
132:5;133:24;
138:17;148:14;
149:7;152:8;154:5;
180:14
**particularly (1)**
100:25
**parties (2)**
19:21;192:19
**parts (4)**
50:2;56:9;126:18;
156:8
**party (4)**
192:23,25;194:1,
18.5
**pass (2)**
191:17,18
**passed (1)**
78:11
**past (8)**
7:11,16;29:25;
30:1,2,13,18;94:20
**path (2)**
103:16;148:19

**patient (13)**
11:13;35:20,22;
60:23;62:21;113:1;
123:15;165:5,8,16;
166:1;182:1,11
**patients (33)**
27:11,24;28:4;
36:3;37:6,8,13;39:5;
41:6;58:14,16;59:24;
61:17,19;64:4;66:5,
6;88:24;106:11;
130:18,23;131:15,17,
18;132:10;162:24;
163:5;168:6,24;
176:13;182:16;
186:11;191:11
**patient's (1)**
183:25
**pattern (5)**
45:17,18,22;
109:23;149:11
**patterns (6)**
49:8;55:8,10;
149:20,23;150:25
**pediatric (10)**
106:13;107:10;
108:1,6;111:5;
171:22,25;172:1,12,
14
**pediatrician (1)**
105:10
**pediatrics (2)**
107:3;108:22
**peer-reviewed (1)**
86:12
**peers (1)**
150:3
**pending (3)**
8:15;9:18;10:8
**Pennsylvania (1)**
194:23.5
**people (187)**
7:5;10:9;15:20;
16:3;23:17,18;24:23;
25:7,9,22;26:14,15,
19;31:9;34:14;35:11,
15,16,17,22;36:16;
38:7;40:11,15,16;
42:10,19,25;43:3,6,6;
45:5,6,9,16,19,19;
46:9;47:7;48:2;49:9;
50:8,23;51:17;54:21;
55:1,24;59:3;61:23;
63:1;64:1,10,15,22,
25;65:8,8;66:3,7;
68:1;69:8,14;75:24;
76:10;84:8,9,12;85:7,
14;89:2,10;91:23;
92:1;93:7;99:5,24,
24;100:1,5,11,13;
101:13,23;102:2,7;
103:16;104:3;106:3,
4;109:11,12,20,21;

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 69 of 165 PageID #: 3691

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

113:12,13;114:22;
116:21;117:13,16;
125:7,13;126:7,9,12,
14,19;127:3,17,19;
129:4,12,13,17;
130:2,5,9;131:4,8,19;
132:25;133:8,11,15;
134:9;135:8,13,14,
20;137:6;138:12,19;
142:21;146:13;
147:4,22;151:25;
152:6,17;153:7,20;
154:25,25;155:5;
156:16,17;157:6,7;
158:9;159:2,6,12;
167:6,9,13,20;
169:17,19;170:8;
174:6;177:18;179:5,
6,18;180:9,12,21;
182:5,6;185:5;187:1,
11,15,17,19,22;
188:13,15,16,23,24;
189:1,3,11,20,21;
190:4,6
**people's (2)**
    7:13;25:15
**per (3)**
    27:20;28:12;29:22
**percent (7)**
    28:5,8;31:1;37:15;
    39:4;106:11;133:9
**percentage (4)**
    27:16;28:3,6;37:13
**perception (3)**
    128:20,22;161:24
**Perfect (1)**
    71:2
**perfectly (8)**
    9:1;46:12;80:11;
    118:20;151:12;
    157:4;178:18;182:9
**perform (1)**
    106:7
**perhaps (5)**
    29:25;37:15;62:19;
    67:16;103:20
**period (9)**
    30:7;37:2,6,9,13;
    51:1;73:23;131:5;
    184:9
**periodically (1)**
    63:1
**periods (1)**
    159:1
**permanent (2)**
    93:2;131:3
**permission (5)**
    90:24,25;91:3,9;
    92:25
**permits (1)**
    80:3
**permitted (7)**
    78:24;129:21;

139:21;140:21,24;
141:4;142:6
**permitting (1)**
    79:19
**person (30)**
    12:3;29:13;35:20;
    59:5,7,9,10;61:2;
    63:11;68:22;101:18;
    119:19,22;124:9;
    125:21;126:4;127:7;
    136:11;138:15;
    145:25;146:17;
    149:4;164:1;176:10,
    10;179:18,20,23;
    190:8;192:22
**personal (3)**
    64:3;186:14;191:6
**personalities (1)**
    187:12
**persons (1)**
    164:8
**person's (7)**
    28:23;59:1;61:6,9;
    139:14,15;164:20
**perspective (1)**
    179:2
**perspectives (1)**
    188:17
**pertain (1)**
    11:16
**pertained (1)**
    68:25
**pertinent (3)**
    108:15;146:8,10
**phantom (1)**
    124:7
**PHD (4)**
    4:3;191:23;192:6;
    194:17.5
**phenomena (6)**
    89:9;123:14;
    156:23,24;157:18;
    158:1
**phenomenon (6)**
    144:13;145:22;
    147:21,22,22;150:1
**philosophical (1)**
    125:6
**phrase (17)**
    24:9;44:20;45:16;
    94:5;105:15;118:4;
    125:8;126:5;128:7;
    138:12;141:14;
    161:16,16;163:15;
    164:14,22;167:19
**phrases (2)**
    118:25;135:14
**phrasing (2)**
    67:16;72:22
**physical (6)**
    61:5,11;77:2;
    83:10;104:4;173:22
**physician (4)**

175:13;182:1,1,3
**physicians (4)**
    61:6;149:3;168:6;
    176:12
**physiological (1)**
    112:15
**physiology (1)**
    113:4
**pick (3)**
    74:3;164:14;
    177:23
**picking (1)**
    117:13
**piece (8)**
    27:15;53:19;83:16;
    107:17;149:9,10,12;
    181:11
**pieces (14)**
    41:19;44:25;47:20;
    53:23;118:10;120:5;
    169:11,13,15,16,18,
    19,21,22
**pile (1)**
    25:9
**pilloried (2)**
    133:15;134:21
**pilot (1)**
    56:16
**pipeline (2)**
    93:8;156:8
**pithy (2)**
    141:9;185:7
**pithy's (1)**
    141:10
**pitting (1)**
    123:4
**place (9)**
    17:3;29:12;68:23;
    92:12,16;159:12;
    160:5;163:17;167:18
**placebo-controlled (1)**
    110:22
**places (4)**
    42:18;80:2;94:25;
    139:8
**plaintiffs (4)**
    4:12;190:25;
    192:10;194:9.5
**plan (3)**
    21:5,6;53:14;
    57:21;58:8
**planning (1)**
    65:19
**plans (2)**
    81:22;92:2
**plausible (1)**
    115:20
**please (4)**
    4:19;5:7,12;6:4
**pleasure (1)**
    60:19
**plumbing (1)**
    42:8

**plus (1)**
    33:6
**point (21)**
    6:3,5;7:8;10:5;
    21:7;88:11;104:14;
    112:17;121:2,4;
    133:23;138:17;
    146:11,16;147:5;
    160:18;166:18;
    168:2;169:22;171:5;
    188:16
**pointing (6)**
    163:8,9;166:15,16;
    169:14;173:15
**points (2)**
    9:2;139:6
**polarized (1)**
    101:18
**policies (18)**
    72:24;73:5,11;
    74:18,19,22;80:16;
    81:6,6,8,14,14;82:9,
    20;83:23;95:8;99:2;
    152:4
**policy (25)**
    71:25;72:9;80:19;
    82:3,4,12,13,14;
    89:23,24;91:8;92:3,
    10,11;95:2,11;96:18;
    99:2;100:13,21;
    152:12;156:1;
    165:13;191:10,13
**political (10)**
    12:24;71:25;72:9;
    96:11,20;127:15;
    128:24;164:20;
    181:23,24
**politically (1)**
    190:15
**popular (2)**
    184:4;186:21
**population (2)**
    55:18;111:23
**populations (1)**
    130:24
**portion (5)**
    27:11;33:23;41:20,
    20,21
**portions (1)**
    96:10
**posed (1)**
    28:21
**position (9)**
    8:16;31:5;53:6;
    81:7;82:15;114:9;
    180:13;182:11;
    190:20
**positive (1)**
    157:23
**possessing (1)**
    174:22
**possibilities (6)**
    66:9;103:8,10,14;

147:16;160:21
**possibility (6)**
    92:5;93:10;94:1;
    122:20;175:16;176:8
**possible (10)**
    5:12;10:24;66:10;
    73:15,16;103:20;
    112:20;115:19;
    118:2;142:8
**post (1)**
    185:6
**post- (1)**
    153:18
**postdoctoral (3)**
    32:22;42:14,15
**potential (22)**
    33:18;34:15;64:23;
    78:1,2;80:23;81:3;
    88:1;92:21;102:10,
    11;104:6,7;121:10;
    147:14,17;165:1,23;
    166:12;167:24;
    187:25,25
**potentially (2)**
    57:18;160:21
**potentials (1)**
    147:9
**powerful (1)**
    170:1
**practically (1)**
    30:7
**practice (28)**
    26:22,23;27:7,10,
    17,23,23;31:7,23;
    32:1,11;36:1,2,9,12;
    38:13;39:2,4;58:10,
    14;81:17;106:8,10;
    159:21;161:13;
    176:19;186:15;
    190:18
**practiced (1)**
    191:3
**practices (4)**
    71:5,20,22;86:3
**practitioner (1)**
    31:19
**precious (1)**
    185:7
**precise (1)**
    164:22
**precisely (1)**
    126:4
**precocious (5)**
    110:3,6,7,10,13
**predated (1)**
    141:2
**predicting (2)**
    103:12;184:10
**predictions (2)**
    183:20,21
**predominant (2)**
    45:1;160:18
**Predominantly (3)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 70 of 165 PageID #: 3692

K.C., et al. VS                                                    JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board                        June 7, 2023

37:18;66:7;149:25
**pre-existing (2)**
  151:19,23
**preference (1)**
  164:21
**pregnant (1)**
  119:2
**preliminary (3)**
  14:21,21;16:21
**premark (1)**
  23:8
**premarked (4)**
  18:10;21:23;22:20;
  98:8
**prenatal (1)**
  106:17
**prep (3)**
  14:10,11;16:20
**preparation (4)**
  13:12,22;14:5,9
**prepare (1)**
  10:12
**preparing (2)**
  14:19;32:13
**pre-prep (1)**
  14:10
**preps (1)**
  16:18
**prepubertal (8)**
  36:21;39:5;59:12;
  90:11;138:7;163:18;
  170:5,19
**prepubescence (1)**
  108:20
**prepubescent (4)**
  165:17,25;167:5;
  172:9
**prescribe (1)**
  39:22
**prescribed (2)**
  39:13,24
**prescribing (1)**
  189:15
**presence (1)**
  119:6
**present (5)**
  14:11;16:17;31:4;
  82:12;130:9
**presentation (4)**
  112:4;136:20;
  137:19;147:3
**presented (2)**
  151:7;192:18
**presenting (1)**
  131:15
**presents (2)**
  21:2;144:2
**preservation (8)**
  162:21;163:6,15,
  20;164:8,24;165:6,9
**preservation' (1)**
  163:1
**preserve (1)**

164:2
**pressure (3)**
  65:13;125:18;
  126:19
**pressures (5)**
  124:1;127:16;
  152:23;155:9,14
**presumably (2)**
  99:6;140:22
**pretty (8)**
  32:23;42:9;124:15;
  125:6;140:14;155:2;
  167:7;189:20
**prevented (1)**
  175:22
**preventing (1)**
  110:12
**prevention (1)**
  163:19
**previous (3)**
  59:21;121:14;
  184:13
**previously (5)**
  84:3;88:24;93:4,
  22;146:22
**pride (1)**
  133:5
**primarily (1)**
  36:8
**primary (1)**
  121:24
**prime (1)**
  78:3
**principal (3)**
  49:12,22;52:15
**principles (4)**
  50:17;152:5;179:7,
  10
**print (1)**
  17:17
**printed (2)**
  17:21;152:11
**printout (1)**
  75:4
**prior (5)**
  32:10;89:7;131:12;
  140:10;167:12
**priority (1)**
  109:13
**private (12)**
  26:22,23;27:7,10,
  17,22,23;31:7,19,23;
  32:1;58:14
**privilege (1)**
  16:11
**privy (1)**
  156:9
**probably (6)**
  8:2;35:23;62:15;
  127:5;133:25;142:12
**problem (1)**
  172:1
**problems (2)**

130:24;146:20
**procedure (5)**
  89:22;173:14;
  177:16;194:16,16
**procedures (4)**
  50:17;160:8;
  173:16;179:24
**proceeding (1)**
  78:16
**process (16)**
  4:23;14:1;30:22;
  43:10;51:25;62:4;
  69:3;80:24;90:24;
  152:7;171:13,14;
  172:3,13;175:4;
  182:11
**processes (1)**
  55:14
**processing (1)**
  15:2
**produce (2)**
  96:21;163:25
**produced (2)**
  85:25;87:22
**produces (1)**
  103:11
**producing (1)**
  177:17
**productive (2)**
  46:12;157:16
**profession (1)**
  19:9
**professional (7)**
  9:19;37:16;134:7;
  161:25;168:3;
  186:15;187:10
**professionally (1)**
  28:16
**professionals (2)**
  62:3;134:16
**profile (2)**
  131:11;146:17
**profiled (1)**
  33:10
**profiles (1)**
  146:12
**profound (7)**
  116:19,21;117:8,9;
  146:13;162:1;171:4
**profoundly (1)**
  45:22
**program (10)**
  34:21;35:4;42:22;
  43:19;85:14;91:16;
  172:19;173:5;
  175:12,13
**programs (5)**
  40:19,21;58:7;
  80:1;91:7
**progress (2)**
  54:16;61:9
**progressing (1)**
  32:23

**prohibition (1)**
  115:2
**project (7)**
  20:7;50:6;51:14;
  54:13,15;107:18;
  129:4
**projects (5)**
  33:1,3;54:18;56:5;
  107:16
**promise (1)**
  98:2
**promises (1)**
  103:15
**pronounceable (1)**
  34:23
**proofreading (1)**
  19:6
**prop (1)**
  150:23
**proper (4)**
  14:24;106:7;
  156:17;179:4
**properly (1)**
  114:5
**properties (2)**
  47:14,16
**proportion (2)**
  27:2;186:6
**proportions (1)**
  166:25
**proposal (3)**
  9:4,7,25
**proposed (1)**
  57:24
**proposition (1)**
  150:24
**prospectively (1)**
  89:10
**protect (1)**
  35:21
**protected (2)**
  179:6;180:22
**protection (1)**
  179:5
**protections (2)**
  16:10,11
**protesting (1)**
  155:1
**proto (1)**
  91:17
**protocol (1)**
  80:14
**protocols (1)**
  108:6
**prove (1)**
  117:5
**proven (1)**
  162:21
**provide (8)**
  20:22;21:9;49:19;
  66:6;71:19,21;
  160:20;174:8
**provided (8)**

40:2;62:16;64:6;
  94:2;99:14;100:4;
  180:9;191:7
**provider (3)**
  179:21,21,25
**providers (4)**
  12:13;179:8;
  185:22;187:9
**provides (2)**
  179:25;184:14
**providing (11)**
  47:20;59:23;66:4;
  78:6;171:15;174:5,7;
  175:19;179:18;
  180:11;187:10
**provision (6)**
  174:25;175:2,10;
  178:5;180:9;189:24
**psychiat (1)**
  63:17
**psychiatric (2)**
  32:5,6
**psychiatrist (4)**
  34:8;39:9;173:2,17
**psychiatrists (1)**
  174:23
**psychiatry (7)**
  34:7,10,13,17;
  35:7;172:19;173:5
**psychological (2)**
  38:16;104:5
**psychologist (14)**
  24:5;26:25;28:4;
  36:24;37:1,4,17;
  41:23;58:11;62:23;
  64:5;71:1,14;191:3
**psychologists (4)**
  31:10;62:3;149:2;
  156:18
**psychology (4)**
  26:24;27:25;38:11;
  39:2
**psychometric (2)**
  47:13,15
**psychotherapy (1)**
  159:14
**psychotic (1)**
  35:17
**puberty (37)**
  39:13,24;47:23,24;
  49:11;80:13;82:16;
  83:12;84:3;88:23;
  89:10;90:12,14;
  96:24;110:3,6,7,7,10,
  13;139:23;140:9;
  163:13,13,13,17;
  164:7;167:3,6,7,14,
  15,21;168:24;170:9;
  174:19;176:14
**public (27)**
  8:16,23;9:23,24;
  24:22;33:18,18;
  34:12,14,19,19;

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 71 of 165 PageID #: 3693

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

58:18,19;76:23;
80:16;82:3,4;96:1;
100:12,21;131:21;
134:12,16;150:16;
157:4;161:24;192:3
**publication (6)**
86:8;145:7;150:13,
16;152:16;153:19
**publications (1)**
33:7
**publicity (1)**
92:8
**publicized (1)**
74:12
**publicly (8)**
115:21;186:6;
187:19;188:23,25;
189:2,4,17
**publish (2)**
73:15;87:1
**published (13)**
51:4,7,8;52:4;
53:13,25;86:12,20;
87:19;106:14,23;
143:10;187:14
**publisher (6)**
152:9,25;155:16,
17,22;156:4
**publishes (1)**
152:10
**publishing (4)**
144:19;146:2;
153:17;154:8
**pull (12)**
18:10;21:23;22:20;
71:9;89:24;98:2,7;
116:3,4;145:1;150:9;
185:11
**pulled (1)**
139:17
**pulling (1)**
150:10
**pun (2)**
10:25;82:19
**purpose (4)**
115:4;123:10;
168:1;169:22
**purposefully (1)**
169:3
**purposes (1)**
78:24
**Pursuant (2)**
4:1;192:12
**pursue (1)**
33:3
**pursuing (1)**
24:3
**pursuit (1)**
148:25
**put (15)**
12:20;13:4,6,11;
83:3;92:11;98:14;
99:10;101:9,24;

118:15;159:18;
167:15,16;169:3
**puts (1)**
114:8
**putting (2)**
101:17;163:18
**puzzle (2)**
149:9;169:15

# Q

**qualified (5)**
41:4;43:16;81:8;
183:19;184:19
**quality (3)**
170:10;180:9;
190:24
**quantitative (1)**
113:11
**questionnaires (3)**
24:24;47:13,14
**question's (2)**
108:8;114:3
**quibble (2)**
57:11;75:24
**quibbling (1)**
67:16
**quickly (4)**
44:21;92:1;94:17;
95:5
**quiet (4)**
17:3;189:1,2,3
**quieter (1)**
132:25
**quite (5)**
42:6;129:8;134:5;
155:21;160:1
**quote (1)**
94:25
**quotes (1)**
159:18

# R

**raise (1)**
136:9
**Ramer (107)**
14:12;15:22;16:5,
15;30:21;44:4;47:8;
59:15;60:6;62:18;
63:22;74:8;75:3;
76:7;77:15;78:12;
79:5,13;81:10,20;
83:13;84:6;86:6;
88:10,17;90:16;
91:14,19;93:12;94:4,
12;95:23;97:18,20,
24;102:23;103:6;
104:21;105:3;106:1;
108:3,24;110:20;
111:9;112:8,13,23;
113:18;114:1;121:6,
18;123:17;124:25;

125:5;128:2;129:2;
130:11;134:4;
140:25;143:15;
146:7;148:13;
155:10,20;157:20;
159:22;161:14;
163:7;164:10;
165:11;166:13,22;
167:11,22;169:1,9;
170:22;171:24;
174:3,11,24;175:14;
176:21;177:1,14;
178:9;179:3;180:4;
181:1,5,10,22;
182:17,21;183:4,8,
11;184:22;186:12;
187:18;188:4,9;
189:6,19;190:2,21;
191:19
**ran (1)**
53:18
**random (2)**
8:23;134:19
**randomized (8)**
108:7;110:1,4,11,
17,21,22,23
**range (15)**
30:14;60:8;62:14;
74:22;75:12;109:4;
138:18;164:12,13,16;
165:10;166:5,12,19;
168:9
**ranging (1)**
120:23
**Rapid (2)**
144:5;162:3
**rapid-onset (2)**
144:9;145:18
**rare (4)**
60:18,19;148:16;
160:19
**rarely (1)**
121:11
**rates (2)**
150:1;162:4
**rather (9)**
31:17;69:10;
116:13;117:5;136:9;
160:20;164:21;
190:10,16
**ratio (6)**
108:14;111:12;
116:2;165:4;166:6;
168:8
**reach (1)**
69:14
**reached (1)**
96:6
**reaction (1)**
136:25
**read (18)**
10:20;74:24;78:18;
84:19;90:15,19;

101:5;116:14;123:1;
144:7;145:23;
155:25;157:13;
158:17;163:3;
172:24;183:22;
184:17
**reader (2)**
154:15;169:16
**readers (1)**
178:1
**reading (11)**
29:5;30:11;75:7;
77:21;138:24;
141:21;144:23;
150:8;156:19;
177:24;178:17
**readings (1)**
41:6
**reads (1)**
145:12
**ready (2)**
77:22;78:3
**real (5)**
117:19,20;118:6;
125:4;160:2
**realize (2)**
147:16;159:4
**real-life (1)**
159:13
**really (20)**
8:19;12:18;24:23;
28:14;36:6;50:21;
58:25;64:8;80:17;
111:10,19;125:20;
133:22;142:1,20;
147:16;161:17;
170:23;187:19;189:9
**reason (6)**
5:24;93:1;111:3;
155:19;160:6;186:18
**reasonably (1)**
38:20
**reasons (4)**
79:16;89:20;93:13;
186:10
**reassessment (1)**
144:20
**reassigned (1)**
176:5
**rebalanced (1)**
31:17
**recall (16)**
17:10;19:16;20:16;
23:5;60:22;68:12,13;
80:19;82:23;94:13;
96:9;100:15;108:4;
173:14;185:14,17
**receive (5)**
65:25;92:24;93:5;
179:12;182:2
**received (5)**
52:12;92:7,8;
142:24;194:22

**receiving (23)**
49:9;55:22,24;
57:9,17,18,20;82:16,
22;83:1,2,11;84:3,9;
88:24;89:2;93:4,23;
99:18;103:24;
155:24;178:4;179:16
**recent (3)**
62:21;94:19;142:3
**recently (5)**
45:4;86:12;140:1;
159:3;173:6
**receptors (1)**
123:23
**recess (3)**
44:10;143:17;
183:14
**recessed (1)**
105:6
**recipients (1)**
179:8
**recognize (3)**
18:16;22:1;130:5
**recognized (1)**
144:10
**recognizing (3)**
102:2,6;168:9
**recollection (6)**
22:12;57:21;66:20;
70:13;84:7;115:20
**recollections (1)**
43:1
**record (2)**
4:19;192:16
**recruited (1)**
54:3
**recruiting (1)**
151:24
**red (1)**
166:16
**reduced (2)**
101:1;192:14
**reducing (2)**
157:22,22
**refer (11)**
23:24;24:7;25:11,
13;76:14;78:3;81:11;
89:14;139:25;
160:14;189:23
**reference (8)**
17:19;84:15;98:10;
144:18;146:4;
149:20;164:4;179:4
**referenced (2)**
84:16;134:20
**referencing (1)**
139:8
**referral (1)**
90:12
**referred (2)**
6:22;164:11
**referring (15)**
24:7,14;45:5;90:6;

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 72 of 165 PageID
#: 3694
K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

103:1;134:1;140:1;
143:23;147:4;159:6;
160:3;173:11;
182:18;188:12;
189:13
**refers (2)**
167:20;168:24
**reflect (5)**
26:10,10;96:11,19;
128:14
**reflecting (1)**
43:1
**reflective (1)**
128:5
**reflexively (3)**
94:16;188:6,25
**refuse (2)**
185:20;188:6
**regard (2)**
106:24,25
**regarding (8)**
61:4;84:22;90:14;
106:15;122:22;
181:8,15;183:16
**regardless (2)**
12:19;13:5
**regular (7)**
51:16,22;61:23;
66:12;85:6;87:2;
132:19
**regularly (5)**
28:9;62:2;85:10;
100:5;160:25
**regulate (1)**
95:16
**regulation (1)**
94:6
**regulations (4)**
68:25;78:22;79:22;
175:9
**Reimer (5)**
113:6;115:23,24,
24,24
**reject (2)**
153:8,9
**related (4)**
40:6;41:18;111:23;
114:4
**relating (2)**
4:5;47:6
**relationship (4)**
15:24;16:22;37:24;
63:4
**relative (4)**
96:2;187:9;190:24;
192:23
**relatively (19)**
23:16;24:24,25;
47:11;58:20;81:25;
108:16;117:1;
123:22;140:8;155:2;
158:24;159:11;
170:14,15;173:12;

176:7;188:16,17
**release (1)**
185:8
**released (3)**
74:12;96:7;98:19
**releasing (1)**
85:13
**relevant (14)**
10:18;21:4;42:12;
62:7;87:2;107:17;
108:13;123:24;
139:1;140:17;
144:22;152:8;
161:12;185:21
**reliable (1)**
166:24
**relying (1)**
64:2
**remain (2)**
52:18;122:18
**remaining (1)**
103:9
**remains (4)**
92:16;96:3;118:1;
122:19
**remember (11)**
6:17,21;7:3,6,10;
51:9;98:19;100:2;
112:25;137:17;
170:11
**remembering (1)**
30:22
**remotely (1)**
192:10
**removal (3)**
147:11;159:2;
160:4
**remove (1)**
158:22
**removed (3)**
101:7;104:14;
159:12
**removing (4)**
158:21;160:7,8,10
**reorganizing (1)**
29:4
**repeating (1)**
65:21
**rephrase (4)**
53:4;107:1;111:4;
113:20
**replace (1)**
123:10
**replicated (2)**
149:24;151:1
**report (17)**
17:8,16,22;19:19;
21:2;26:14;78:10;
84:15;98:12;100:22;
101:16;123:15;
145:20;170:12,14;
177:16;184:14
**reported (7)**

56:7;57:1,1;140:8;
149:23;150:25;151:8
**reporter (2)**
5:4;104:25
**reporting (5)**
129:19;140:18;
162:5;194:22,23
**reports (7)**
17:9;86:20;96:9;
98:22;130:13,17;
162:14
**represent (2)**
20:21;70:15
**representatives (1)**
8:22
**represented (3)**
55:23;109:22;
192:19
**representing (1)**
4:12
**represents (5)**
21:8;166:8;168:21;
172:20;177:8
**republication (2)**
145:3,12
**republished (1)**
144:21
**request (1)**
49:15
**requesting (1)**
101:21
**require (1)**
184:23
**required (2)**
167:18;177:5
**requires (3)**
90:20;108:10;
166:17
**requiring (1)**
159:13
**re-read (3)**
10:14,17,20
**re-reading (1)**
10:14
**re-review (1)**
81:12
**research (95)**
21:1;24:1;26:2;
33:1;34:3,6,13,18;
37:21;38:10,15,19,
20,22,22;41:20;42:3,
12,13,20,21,22,23;
43:8;44:13;47:6,10,
11,22;48:1;49:14,20;
50:12,22;52:13;56:5,
6;64:10;72:17;76:3,
5,9,18,19;77:12;
78:24;79:7,10,20,23,
25;80:1,14,20;89:7;
90:13;91:6,16,17;
92:17;93:10,15;94:3,
6,10;100:6,20;
103:11,18;104:1;

106:13,23;107:2,4,
11;108:22;109:1,2,5;
114:4,8,24;123:25;
131:12;132:17;
135:24;136:2,16,17;
138:20;148:8,24;
151:22;187:5,6
**researcher (6)**
24:2,10,13;94:7;
100:18;137:18
**researchers (13)**
23:25;24:18;25:8;
32:24;50:5,11,24;
93:16;94:8;132:17;
135:1;136:18;148:21
**researches (1)**
114:12
**reserves (1)**
80:23
**resignation (2)**
51:25;53:9
**resistance (1)**
190:14
**resisting (1)**
133:5
**resonance (2)**
48:10,25
**resort (2)**
147:12;190:14
**resources (2)**
15:19;35:19
**respect (8)**
24:14;68:6;71:6;
72:13;73:19;81:17;
182:15;190:20
**respond (4)**
5:5;120:13;173:23;
187:14
**responding (1)**
189:14
**response (3)**
5:8;81:15;138:1
**responses (1)**
10:16
**responsibilities (1)**
32:18
**responsibility (1)**
114:9
**responsible (3)**
173:18,21;175:4
**rest (6)**
76:22;92:15;
104:15;148:8;
172:11;187:2
**restaurant (1)**
174:18
**restrict (1)**
175:10
**restricted (2)**
76:9;108:9
**restricting (1)**
76:2
**restriction (1)**

96:8
**restrictions (1)**
78:10
**restructured (1)**
176:4
**result (7)**
52:4;88:5;96:20;
111:22;122:13;
148:22;160:10
**resulted (1)**
87:6
**results (7)**
33:16;77:19;98:24;
140:8;144:22;151:8;
159:15
**retain (1)**
15:8
**retained (5)**
6:10,14;14:23;
20:18;66:21
**retract (1)**
155:16
**retracted (5)**
150:17;151:1;
153:1,13;155:8,13,17
**retraction (4)**
151:4,18;154:13,
14
**returned (1)**
67:10
**reverse (1)**
101:3
**reversed (3)**
75:25;97:3;133:8
**review (19)**
14:19;72:9,16,17,
19,20;74:17;83:17;
84:1,22,25;86:2,4;
98:24;100:15;
167:23;177:17;
189:12;191:20
**reviewed (3)**
73:21;87:13;
107:25
**reviewing (7)**
13:25;17:7,10;
62:5;109:3;179:20,
24
**reviews (16)**
72:3,4,13,24;73:3,
5,10,12,18;74:7;
77:19;81:11,17;87:8,
11,12
**revision (1)**
99:3
**right (67)**
6:9,12;7:1;8:10;
13:10;16:15;18:5,5;
22:11,17;28:18;
29:10;30:16,17;
31:2;35:19;20;38:3;
40:10;41:13;43:12;
44:15,16;46:16;51:2;

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 73 of 165 PageID #: 3695

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

58:11;59:13,25;60:2;
66:16;70:12;71:7;
78:11;84:16,17,18;
87:8;90:2;93:6;95:1;
98:12;105:4,11;
120:11;123:1,16;
129:20;132:25;
137:6,20;141:10;
142:12;143:2,3,12;
144:10,15;148:4;
150:7;156:14,23;
158:8,8;159:17;
168:25;170:21;
174:10
**risk (2)**
124:15;125:2
**risks (14)**
78:1;83:9;102:11;
104:7,7;123:21;
124:2,14;147:9,17;
165:1;184:15,20;
186:21
**risk-to-benefit (6)**
108:14;111:12;
116:2;165:3;166:6;
168:8
**risky (1)**
160:22
**ROGD (5)**
144:6;145:18;
146:4,18,21
**Roger (9)**
14:12,13,25;15:3,
14,24;16:8,17,25
**role (14)**
27:25;28:2;32:16;
33:21;34:12;35:3,6,
25;44:13;47:22;50:1;
61:16;64:24;126:14
**room (5)**
80:7;81:3;92:4;
94:17;121:7
**Rose (1)**
4:16
**rough (3)**
11:20;42:25;
119:23
**roughly (11)**
7:15;12:7;28:5,8;
31:1;36:20;37:15;
53:10;62:15;80:18;
185:3
**routine (3)**
148:10,12;149:13
**RPR (1)**
192:3
**rule (5)**
117:5;118:17;
124:13;155:3;186:17
**rules (6)**
5:2;120:8;192:12;
194:15.5,16,16.5
**run (5)**

5:1;95:12;100:6;
160:24;161:18
**running (4)**
33:8;54:15;100:2;
135:18
**runs (1)**
30:6
**rural (1)**
65:16

## S

**sacrifices (1)**
83:9
**safeguard (1)**
158:21
**safeguards (4)**
159:2;160:4,7,11
**safety (4)**
33:19;34:19;35:21;
180:10
**SAITH (1)**
191:21
**sake (3)**
104:25;105:9;
150:10
**same (58)**
5:2;12:19;13:5;
15:7,7;19:18,19;
20:2;38:1,24;43:9;
47:18;50:23;51:24;
52:19,22;60:12,13;
65:6,20;69:9,24;
70:6;73:23;88:8;
89:25;93:13,20;95:8;
101:14;104:24;
106:14,19;108:11;
110:8;111:12;
112:13;123:25;
128:23;132:14;
134:10,11,18;141:23;
148:22;151:13,14;
154:12;157:15;
159:15;160:9;166:3,
14;168:13;181:6,25;
182:10;189:22
**sample (2)**
57:3;140:18
**samples (1)**
56:22
**saw (3)**
43:6;62:22;64:4
**saying (18)**
24:2;91:2;101:8,
12,15,23;103:7;
104:9,13;110:10;
117:11;124:3,11;
133:17;137:22;
146:21;147:25;148:3
**scaled (1)**
97:4
**scan (1)**
124:2

**Scandinavia (1)**
97:15
**Scandinavian (1)**
86:16
**scanning (1)**
107:13
**scans (1)**
54:22
**School (1)**
34:11
**schools (1)**
62:6
**science (58)**
8:20,25;9:3;10:2,5;
11:18;12:6,25;13:1;
19:18,19;20:5,6;
26:4;27:13;42:21;
58:21;63:25;69:25;
70:8;72:1;73:24,25;
77:20,21;78:14,19;
80:18;81:12,13,15;
82:2,8,11,13;83:18,
23,25;84:1;86:21;
96:20;99:1,16;114:3,
5;115:6,6;117:15,22;
118:4,9;122:10,14,
23;123:9,10;146:2;
191:11
**scientific (12)**
13:1,8;14:19;21:3;
33:16;68:24;70:4;
113:22;114:21,24;
115:10;126:24
**scientifically (2)**
34:15;177:24
**scientist (14)**
12:21;23:14;24:10;
25:13;27:5;28:16;
29:11;32:4,10,16,25;
53:20;81:23;164:22
**scientists (8)**
33:6,10;85:20,25;
86:25;133:5;185:23;
187:10
**scope (1)**
114:2
**scratching (1)**
29:10
**screen (1)**
139:18
**screening (1)**
184:5
**SEA (3)**
22:16;180:25;
181:16
**seal (1)**
193:2
**sealed (1)**
194:18
**search (3)**
74:10;110:14,23
**sec (1)**
191:14

**second (4)**
52:6;100:23;
145:11;150:15
**section (6)**
44:2;73:1;83:20;
88:14;139:19;143:20
**sections (1)**
138:6
**seeing (8)**
27:24;28:3;131:11,
14,16,18,21;143:2
**seeking (2)**
89:10;151:9
**seem (2)**
101:8;132:13
**seems (3)**
9:3;91:5;101:9
**select (1)**
76:10
**selected (2)**
99:15;177:22
**selection (1)**
71:5
**self (1)**
129:1
**self-confidence (1)**
25:25
**self-conscious (1)**
129:3
**self-corrected (1)**
127:2
**self-educating (1)**
29:9
**self-report (5)**
124:17,19,22,23;
172:9
**self-silenced (1)**
188:22
**selling (1)**
107:24
**selves (1)**
142:8
**semester (1)**
43:18
**semicolon (1)**
184:9
**Senate (4)**
8:13;9:11,15,17
**send (1)**
124:2
**senior (4)**
32:4,9,16,25
**sense (14)**
5:16;17:1,2;51:21;
66:4;70:20;106:2,14;
108:9;120:12;123:8,
10,12,13
**senses (1)**
125:10
**sent (2)**
67:9;156:1
**sentence (28)**
19:23;90:19,20;

91:1,4;101:6;102:15;
116:15,18;120:20,21;
148:7;154:10;
158:18;159:16;
163:4;167:10,23;
168:17,23;169:2,10,
12,20,22;170:24;
172:25,25
**sentences (2)**
23:4;169:3
**separate (2)**
14:5;57:12
**separately (1)**
27:15
**September (2)**
48:8,23
**sequence (2)**
14:17;163:17
**series (4)**
54:22;98:22;113:3;
126:22
**seriously (1)**
16:4
**served (1)**
146:18
**serves (1)**
145:14
**service (17)**
100:24;102:16;
174:5,7;175:1,2,7,11,
20,21;178:5;179:8,9,
13,19;180:9,11
**services (19)**
82:22;84:10;92:24;
101:1,3,19,20,21;
102:5,13,20,21,25;
103:1,2,5;129:24;
160:17;174:9
**serving (7)**
12:14;20:13;28:6,
13;29:23;30:19;
174:16
**set (27)**
11:14;12:1;15:25;
29:6;42:9,9;54:21;
55:5;56:7;57:3;69:6;
72:10,21;91:10,16,
17;119:14;120:19,
23;121:15,16;
141:25;142:2;
147:18;169:13;
186:20;193:1
**settled (1)**
118:4
**seven (2)**
143:4,10
**several (28)**
6:16;7:4,5,20;
10:22;15:6;19:17;
29:8,18;31:9;34:3;
37:23;38:5;51:17;
56:4;62:13;68:13;
86:15;89:16;91:25;

Case 1:23-cv-00595-JPH-KMB     Document 58-8     Filed 06/12/23     Page 74 of 165 PageID #: 3696

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

98:18;108:10;
148:20;162:10;
167:24,25;170:13;
186:24
**severe (1)**
166:2
**sewing (1)**
32:14
**sex (50)**
23:25,25;24:2,9,13,
14,18;25:8;31:8;
34:3,6,18;47:2;48:8,
23;50:5,11,24;52:10;
57:9,20;100:6,18;
116:9,22,23;117:6,
15;118:6,8,14,21;
119:3;120:15,17,22;
121:15;122:4;
132:17,17,18,18;
135:1,24;136:16,16,
17;142:15;187:5,6
**sexual (22)**
23:14;24:10;25:13,
15;26:5,6,6,6,7,16;
43:24,25;44:14,25;
45:17,17,18,22;46:1,
24;65:14;133:3
**sexualities (8)**
44:15,19,22;45:12;
46:19;105:19;187:8,
11
**Sexuality (7)**
31:3,11,22;46:2;
106:6;185:23;187:16
**share (2)**
8:24;81:12
**Sheets (1)**
194:18.5
**short (2)**
13:21,24
**shortage (1)**
160:25
**shortcomings (1)**
50:16
**shortest (1)**
141:13
**shoulders (1)**
135:14
**show (2)**
9:2;77:3
**showing (1)**
139:21
**Shumer (2)**
183:17,18
**Shumer's (1)**
184:14
**shut (1)**
174:17
**siblings (1)**
56:14
**side (9)**
61:5;129:23;
170:14,15;182:6,6;

183:2;188:19,20
**sides (1)**
130:13
**sign (1)**
191:20
**signature (1)**
192:18
**signed (4)**
4:2;15:12;67:10;
194:17
**significant (6)**
64:19;90:22;
127:10;162:19;
172:20;177:8
**signifies (1)**
31:22
**silence (1)**
133:7
**silencing (1)**
188:18
**similar (12)**
6:16;7:20,22;8:9;
15:7;22:16;29:14;
40:24;64:21;65:15;
66:3;73:19
**similarly (2)**
15:9;55:3
**simple (2)**
23:22;24:25
**simplified (1)**
128:8
**simplify (1)**
13:7
**simply (3)**
23:24;97:9;176:3
**single (3)**
56:7;73:8;113:12
**singular (2)**
139:2,5
**sits (1)**
146:16
**sitting (3)**
4:15;100:8;137:20
**situation (41)**
28:23;43:7;45:25;
46:1;52:19;59:1;
69:12;71:25,25;77:5;
79:18;80:5;89:21;
91:24;92:18;101:19;
109:16;119:18;
126:25;131:4;
142:18;146:11;
153:15;155:21;
159:25,25;160:11;
164:19;166:23;
175:17,18;176:2,9;
177:2,4;178:16,22;
179:22;180:16;
182:4;184:8
**situations (18)**
31:17;115:22;
118:18;121:12;
123:18;124:5,6;

125:12;131:9;134:5;
160:15;166:3;168:9;
174:14;180:5,6;
184:10;186:20
**six (2)**
63:20;119:2
**size (2)**
33:14,15
**sizeable (1)**
14:19
**skills (1)**
150:11
**skip (1)**
190:12
**skipped (2)**
147:19;154:4
**sleep (1)**
70:24
**slightly (2)**
44:2;191:17
**small (3)**
23:16;62:19;
111:23
**smoking (1)**
109:17
**social (44)**
33:15,20;65:12,12;
103:2;119:13;124:1;
125:17;126:14;
127:15;128:24;
130:25;133:6,14;
135:5,5,6;137:10;
138:6,8;139:2,21,25;
140:21,24;141:15;
150:2;158:13;
160:23;161:3,7,9,10,
11,21,23;162:12;
184:25;185:21;
186:3,5,8;188:12,14
**socially (3)**
140:15;141:5;
142:15
**society (7)**
126:18;135:24;
157:24;163:2;168:3,
11;190:18
**socioeconomic (1)**
56:25
**solid (1)**
114:18
**solo (1)**
31:19
**somebody (23)**
8:25;21:2;25:3,4,
18,24;46:14;59:4;
63:2,6;65:13,18;
66:1;75:18;80:4;
107:8,18;133:16,23;
135:8;139:12;
163:12;166:14
**somebody's (2)**
12:3;38:2
**someone (9)**

6:24,24;48:10;
56:23;127:22;
136:25;166:20;
169:6;189:14
**sometimes (6)**
19:22;57:15,16;
127:20;136:1;141:7
**somewhat (1)**
29:21
**sonogram (1)**
119:2
**soon (2)**
21:15;86:9
**sophisticated (1)**
24:20
**sorry (33)**
12:10;15:5;16:5;
30:25;33:24;35:2;
36:23;38:9;48:10,11,
14;55:19;65:21;
68:16;77:8;79:9;
90:18;97:25;102:8;
106:25;112:9;
113:10,18,19;121:16;
143:24;145:8,11;
149:16;156:25;
167:19;168:19;
178:13
**sort (2)**
44:1;182:24
**sound (4)**
5:8;51:14;69:3;
82:18
**sounds (14)**
8:10;44:16;49:5;
60:2;63:23;69:5;
74:25;84:18;101:12;
104:16;105:3;143:2;
144:8;162:19
**SOUTHERN (1)**
194:6.5
**spare (1)**
18:1
**speak (7)**
6:20;9:17;10:2;
16:24;58:6;81:23;
172:16
**speakers (1)**
190:5
**speaking (11)**
4:23;74:22;106:8,
10;136:23;188:12,23,
24,25;189:16,21
**specialist (1)**
175:19
**specialized (1)**
175:20
**specialties (1)**
176:20
**species (1)**
116:10
**specific (19)**
9:25;17:12;33:1;

35:3;39:20;46:8;
56:8;66:7;76:2;
115:16,19;126:2;
135:17;136:2;
137:15;141:25;
159:21;173:13;184:3
**specifically (20)**
9:8;10:1,2;13:22;
14:9;19:16;34:20;
37:22;40:22;44:6,23;
63:14;78:8;99:15;
108:20;123:4,7;
160:4;168:10;184:3
**specifics (1)**
191:10
**spectrum (2)**
131:23,24
**speech (3)**
12:2,16;13:9
**speed (1)**
96:21
**spend (3)**
28:13,23;29:23
**spending (1)**
29:8
**spent (6)**
24:11;28:3,6;
29:16,18;82:11
**sperm (1)**
164:1
**spoken (2)**
9:14;115:21
**Springer (2)**
152:10,12
**squinting (1)**
74:25
**SS (1)**
192:1.5
**SSTAR (1)**
135:24
**staff (1)**
31:9
**stance (1)**
9:23
**standard (1)**
177:16
**standardized (1)**
184:6
**standards (3)**
19:9;62:1;159:11
**standing (2)**
7:20;33:12
**start (10)**
4:18;18:6;29:2;
41:7;48:21;71:15;
129:24;138:21;
157:11;190:11
**started (6)**
6:2,22;27:8;105:8;
152:18;162:2
**starting (2)**
6:9;18:7
**starts (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 75 of 165 PageID
#: 3697
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

167:7
**State (13)**
6:24,24;8:22;9:5,6;
10:7;11:18;14:22;
109:10;180:24;
181:8;192:1,4
**statement (5)**
20:22;21:8;79:14;
168:11;184:23
**statements (5)**
85:13,19;95:3;
97:14;186:7
**states (13)**
7:25;8:8;9:20;
10:8;15:6,20;26:11;
38:13;66:18;78:22;
86:16;170:20;194:6
**stating (1)**
4:18
**statistic (1)**
29:6
**statistical (1)**
47:15
**statistically (1)**
45:20
**statisticians (1)**
50:24
**statistics (7)**
36:4;50:14;55:5,7;
107:16;113:14;118:9
**status (6)**
56:25;58:7;61:10;
66:12;82:21;159:4
**statute (2)**
115:9,16
**stave (1)**
89:5
**stay (1)**
51:19
**stenograph (1)**
192:14
**step (3)**
88:22;138:14;
178:4
**steps (1)**
53:2
**sterility (3)**
167:4,5,13
**sterilization (3)**
162:21;163:11;
170:7
**sterilizing (2)**
164:17;170:2
**Stevie (1)**
4:16
**stick (1)**
149:4
**stigma (1)**
133:6
**stigmatized (2)**
26:17;133:3
**Still (26)**
5:1;28:16,17;

29:16;30:23;31:20;
37:20;38:6;53:20,21;
80:6,25;86:8,22,24;
133:20;141:9;
149:19;159:14;
161:16;166:21;
167:12;168:15;
169:7;170:5;181:11
**stock (1)**
56:17
**stop (1)**
104:19
**stopped (2)**
82:25;101:1
**stories (1)**
132:11
**story (2)**
104:17;132:12
**straight (2)**
10:24;25:20
**straightforward (1)**
24:25
**strange (1)**
53:17
**stranger (1)**
134:15
**STRANGIO (54)**
4:8,11;16:12,16;
18:9,12;21:22,24;
22:19,21;23:10,11;
44:1,8,11;48:16,19,
20;71:9,15,18;75:6;
88:13,18,20,21;90:1,
18;97:19,21,25;98:7,
9;104:18,24;105:4,7;
113:19,21;143:13,16,
18;145:1;149:15,18;
182:23;183:5,9,15;
185:11,13;191:14,17;
194:1.5
**strategies (2)**
95:8;96:15
**streamline (1)**
15:17
**Street (1)**
194:2.5
**strength (1)**
65:2
**strengths (1)**
50:15
**stresses (1)**
65:3
**stressors (1)**
65:1
**stretches (1)**
64:13
**strong (2)**
128:13;178:15
**strongly (5)**
97:7;104:2;128:11,
12;133:18
**structure (5)**
27:19;55:11,13;

92:12;120:10
**stuck (1)**
167:12
**student (1)**
4:15
**students (2)**
33:6;135:12
**studied (1)**
82:13
**studies (51)**
24:21,22;25:6;
32:22;33:8;42:15;
49:18;56:16;57:7,25;
58:1,5;76:3,10;77:1;
80:21;87:2,5,6,7,7,
16,17,17,18,21;88:7,
8;109:7;110:24;
112:15,19,25;113:11,
12;139:20;140:19;
141:2,3,5,6,20,21;
142:5;143:7;148:5;
149:1,3;157:8,11;
159:10
**study (37)**
37:25;38:8;42:14;
43:23;48:25;49:13,
16;54:3,17;55:22;
57:4,6;76:5,13,18;
77:12;79:20;80:15;
92:13,15;94:13;
110:22;133:24;
140:1,5,13;142:21,
23;145:13;148:14,
16;149:7,24;151:25;
155:6,7;187:7
**study-enrolled (1)**
55:16
**studying (5)**
33:13;43:24;113:8;
148:10;149:14
**stuff (2)**
28:19;157:6
**subject (5)**
16:9;68:22;76:19;
78:5;174:9
**subjective (7)**
117:14;123:22;
124:17,18,22,23;
172:8
**submission (1)**
52:21
**submit (1)**
21:15
**submitted (14)**
10:16;14:1;18:18,
21;21:12,20;22:14;
67:14,17,20;86:9;
150:19,21;194:18
**submitting (1)**
67:17
**subsequent (3)**
15:1;16:18;150:13
**subsequently (1)**

20:10
**subset (6)**
11:1;39:21;60:11;
147:21;159:10;167:9
**subsets (2)**
69:8;132:10
**substance (2)**
16:7,13
**substantial (5)**
31:15;99:3,13,25;
102:3
**substantive (1)**
14:17
**subtle (7)**
88:1;116:19,20;
117:8,9;128:9;
142:18
**success (3)**
33:12;112:18;
159:10
**succinct (1)**
141:10
**sudden (2)**
124:7;162:3
**suffer (1)**
109:20
**suffering (2)**
102:3;146:19
**sufficient (4)**
95:6;114:24;
160:17;190:8
**suggest (6)**
91:5;100:25;104:2;
131:9;159:10;178:14
**suggested (1)**
96:7
**suggests (2)**
97:6;186:22
**suicidality (5)**
156:13;157:22;
158:6;162:15;183:21
**suicide (4)**
156:13;157:22;
158:6,15
**Suite (1)**
194:24
**summaries (1)**
86:18
**summarize (2)**
63:15;141:8
**summarizes (1)**
21:5
**summarizing (2)**
27:13;86:13
**summary (4)**
12:17;31:24;71:20,
21
**supervised (1)**
76:20
**supervising (1)**
33:5
**supervision (1)**
189:11

**supplying (1)**
28:25
**support (6)**
9:6,11;64:12;
189:24;190:4,5
**supported (1)**
108:6
**supporting (8)**
25:15;108:1;110:2,
17;111:6;112:5;
113:23;115:11
**supports (1)**
103:25
**suppression (2)**
90:15;167:3
**Supreme (1)**
4:1
**sure (23)**
5:2;13:11;17:3;
19:22;20:3;47:17;
55:19;74:5;77:23;
97:12;102:24;
107:14;115:15;
126:20;129:15;
132:2;139:13;
140:14;175:23;
181:2;190:9,16,17
**sures (1)**
190:13
**surgeons (1)**
174:21
**surgery (1)**
174:20
**surgical (9)**
112:2,6,10,18;
113:9,16,23;114:10;
115:2
**surgically (2)**
114:17,23
**surprised (3)**
67:23;176:16,23
**surrounding (1)**
101:8
**surveys (1)**
24:24
**Sweden (10)**
72:11;75:18,21;
86:11,16,19;93:20,21;
94:1,11,21
**switching (1)**
175:8
**sworn (1)**
4:4;192:7
**syndromes (1)**
38:7
**system (7)**
34:14;35:12;76:24;
95:19;96:2,14;
191:12
**systematic (18)**
43:8;72:3,4,12,17,
20;73:2,2;74:17;
77:19;86:2,4;87:8,11,

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 76 of 165 PageID #: 3698

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

12,12;98:24;177:17
**systems (1)**
    95:20

## T

**table (3)**
    139:17,19;143:1
**talented (1)**
    99:13
**talk (18)**
    17:23;50:23;66:14;
    81:5,8;90:4;111:17;
    133:6,22,23;135:23;
    137:22;149:1,1,2,3,4;
    172:13
**talked (2)**
    16:13;17:7
**talking (29)**
    25:22,23;26:3;
    27:19;41:7;46:11;
    58:25;77:6,6;79:19;
    89:25;104:23;
    108:19;111:13;
    114:10;118:25;
    124:18;133:1;
    137:25;138:23,25;
    147:11;162:20;
    165:16;170:18,25;
    181:12;186:2,3
**talks (3)**
    135:25;136:2,6
**task (1)**
    38:24
**tasks (1)**
    30:4
**TAYS (1)**
    90:13
**tea (2)**
    177:24;178:1
**teaching (2)**
    32:5,6
**team (11)**
    19:5,13;52:13;
    61:7;99:13,21,25;
    100:9,10;107:18;
    173:16
**teams (1)**
    20:12
**technical (6)**
    19:10;24:17;25:6;
    47:11;50:2;107:17
**technically (1)**
    25:16
**technique (2)**
    112:6,10
**techniques (1)**
    50:22
**technological (1)**
    150:11
**teens (4)**
    158:15;185:16;
    188:3,8

**telling (1)**
    111:18
**temporal (1)**
    189:13
**ten (1)**
    105:1
**tenability's (1)**
    180:10
**tend (2)**
    10:1;20:8
**tends (1)**
    184:4
**Tennessee (1)**
    8:1
**tentative (1)**
    122:19
**term (45)**
    23:22;25:11,12;
    29:10;37:3;44:23,24;
    46:6,14,16;58:18,19;
    77:4;95:9;118:20;
    122:8;125:14,15,16,
    17,18,18,22;126:18;
    127:17,18,18;131:23;
    132:25;141:3,16,17,
    19,20;144:5;159:24;
    163:10,21,22;165:16;
    166:1,4;171:17;
    175:8;178:16
**terminology (1)**
    164:19
**terms (17)**
    42:5;45:6,10;46:6,
    8,10;59:3,9;116:12;
    126:3,7;128:13,19;
    130:3;164:25;
    165:14;183:18
**test (6)**
    41:3;47:16,17;
    111:15;129:19;172:4
**testicular (2)**
    163:22;165:21
**testified (5)**
    4:6;10:7;22:15;
    180:24;181:15
**testify (9)**
    9:11;23:6;70:11,
    18,19,22,24;80:16;
    181:7
**testimony (14)**
    5:25;8:18;16:25;
    23:1;27:12;59:21;
    60:3;67:14,17;69:2;
    115:5;181:4,16;
    192:17
**testing (5)**
    40:19;47:17,18;
    122:25;159:13
**testosterone (1)**
    169:24
**Texas (1)**
    8:1
**Thanks (4)**

    23:10;44:9;90:2;
    149:17
**theoretical (1)**
    79:16
**theoretically (1)**
    73:14
**theory (4)**
    80:3;92:16;122:20;
    166:23
**therapies (1)**
    142:22
**therapy (30)**
    25:24;27:24;28:2;
    31:8;39:16,19;40:3;
    60:25;61:19,22;63:5,
    12,13;64:7,23;65:5;
    84:11,12,13;88:23;
    89:11;96:25;127:6;
    132:18,18;135:24;
    164:9;168:25;
    189:16,25
**thereafter (1)**
    192:17
**therefore (8)**
    15:25;31:13;46:14;
    53:6;65:2;143:7;
    145:21;147:7
**thinking (12)**
    21:3;28:17,17;
    29:2,19;30:12;42:6;
    65:25;88:16;97:22;
    113:6;129:11
**thorough (3)**
    81:22,23;152:6
**though (10)**
    30:23,24;34:7;
    43:8;80:22;87:14;
    123:14;126:20;
    128:13,19
**thought (4)**
    48:19;53:17;77:8;
    137:5
**thoughts (1)**
    29:20
**threads (1)**
    134:8
**three (7)**
    8:7;12:8;30:2,15;
    62:24;67:12;75:20
**three-ring (2)**
    67:2;75:9
**throughout (1)**
    86:21
**thumb (1)**
    120:8
**tied (1)**
    178:7
**timeline (2)**
    11:20;43:13
**timelines (1)**
    162:2
**times (2)**
    13:15;91:25

**tissue (3)**
    50:4;147:12;
    170:11
**title (4)**
    37:4;40:16;41:2;
    176:11
**titled (1)**
    31:13
**titles (1)**
    87:19
**tittle (2)**
    68:1,5
**today (21)**
    4:9,13;5:18,25;
    10:13;13:22;14:9;
    16:25;21:7;36:15;
    38:6;62:20;80:25,25;
    100:8;130:2,10;
    133:8;158:13;
    159:12;188:14
**today's (4)**
    13:13;17:11;30:22;
    116:22
**together (6)**
    32:14;85:4;98:14;
    99:10;122:6;169:4
**token (1)**
    106:19
**tomorrow (1)**
    67:11
**took (1)**
    14:25
**tools (8)**
    24:7,20;26:5;38:1,
    5,5;95:13,15
**top (3)**
    52:6;145:6,17
**topic (5)**
    58:23,24;63:12;
    97:22;134:17
**topics (7)**
    13:3;19:14;37:24,
    25;38:6;85:5;109:4
**Toronto (6)**
    31:3,11,22;32:7;
    34:10;192:11
**tough (1)**
    47:3
**towards (1)**
    74:21
**track (2)**
    10:25;11:20
**tracking (1)**
    189:11
**traditional (4)**
    26:4;27:25;32:24;
    55:7
**train (1)**
    35:3
**training (14)**
    33:5;40:5,7,8,12,
    14,23;41:18,23;42:3,
    7,19;43:20;184:3

**traits (1)**
    116:16
**trans (4)**
    66:11;185:16;
    188:3,8
**transcript (1)**
    192:16
**transgender (14)**
    10:9;46:2;47:7;
    58:16,17;59:13,16,
    22,24;62:17;63:16,
    19;69:13;186:9
**transition (53)**
    11:24;61:11,24;
    65:4,19;74:24;75:13,
    17,22;76:6;77:2,9,13;
    79:12;82:22;83:5,10;
    84:10,13;92:24;93:4,
    23;95:4;96:4;97:5,
    10;102:1,9,17;103:4,
    5,21;104:5,17;129:7,
    22;138:6,9;139:3,21,
    25;140:21,24;141:4,
    15;160:17;162:23;
    164:5;166:8;167:10,
    20;168:21,23
**transitional (1)**
    82:20
**transitioned (1)**
    140:15
**transitions (2)**
    66:9,10
**translate (1)**
    131:13
**translation (3)**
    84:21,25;87:25
**translations (1)**
    85:19
**transparent (2)**
    87:23;180:15
**transsexual (1)**
    59:8
**treat (8)**
    82:17;176:12;
    177:11;186:9;188:3,
    8;189:4,7
**treated (8)**
    49:9;59:12,16,19;
    60:14,24;126:15;
    190:25
**treating (1)**
    58:13
**treatment (48)**
    10:10;34:16;40:6;
    48:9,24;49:10;52:10;
    55:23,25;57:10,20;
    61:3;62:17;71:6;
    72:14;76:4;77:12,16;
    78:4;79:9;83:1,2;
    84:4,8,8;89:15;93:10,
    14,18,19,22;95:1;
    105:14,22,24;108:5;
    110:2,18;111:6,7;

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 77 of 165 PageID
#: 3699
K.C., et al. VS                                                          JAMES M. CANTOR, PH.D.
The Individual Members of the Medical Licensing Board                              June 7, 2023

112:11;161:24,25;
170:21;172:21;
173:10;190:19;191:7
**treatments (9)**
57:17;77:22;89:3;
110:12,25;142:21,24;
173:8,20
**trial (8)**
70:11,14,15,19,23;
107:4,8,9
**trials (8)**
89:13;107:2,10;
108:7;110:2,5,12,17
**tried (1)**
40:20
**tripped (1)**
91:25
**true (14)**
18:20;26:15;29:3;
51:15;84:11;85:1;
86:8;93:24;101:3;
112:22;155:19;
159:23;169:17;
192:16
**truth (8)**
4:4,4,5;151:10;
153:16;192:7,7,8
**truthful (1)**
5:25
**truthfully (2)**
5:21;23:6
**try (8)**
5:12;53:22;129:15;
139:10;160:21;
182:25;185:3;190:10
**trying (23)**
15:18;16:12;25:19;
48:13;66:17;82:8;
120:12;123:5;
125:25;126:5,9,11;
137:17;138:15;
141:8;163:8;164:2,2;
168:17;171:2,10;
181:19;183:6
**Turban (7)**
161:2,3;172:18;
173:2;174:8;178:6;
182:15
**Turban's (1)**
172:18
**turn (6)**
15:14;55:12;76:10,
19;99:4;185:20
**turned (1)**
137:24
**Turns (1)**
68:2
**tweet (3)**
185:4,17;189:18
**tweeting (1)**
185:15
**Twitter (10)**
133:24;134:2,7,8,

18,21,22;135:2;
137:10;185:2
**two (21)**
8:3,7;30:2,14;
36:15,18;41:19;
53:23;54:4,18;57:8;
67:12;87:10;91:4,6,
18;134:16,18;
135:17;142:20;185:4
**twoish (1)**
62:19
**two-thirds (1)**
28:8
**type (3)**
93:19;111:6;
187:12
**typewriting (1)**
192:15
**typewritten (1)**
192:16
**typical (2)**
64:13;112:3
**Typically (5)**
29:25;57:4;86:2;
144:2;183:24
**typo (1)**
21:16

## U

**ubiquitous (4)**
79:25;126:17;
128:15;143:5
**uh-oh (1)**
156:11
**Uhura (2)**
18:3;48:17
**UK (8)**
75:18,21;80:12;
82:17;83:11;94:22;
98:11;177:20
**ultimately (3)**
152:25;173:17;
175:4
**un (2)**
109:21;187:22
**unaddressed (1)**
102:4
**uncertainty (2)**
129:14;133:12
**uncertified (1)**
84:25
**unchanged (1)**
144:22
**uncomfortable (1)**
25:19
**under (16)**
12:2;48:7,22;
53:24;59:17,19;
76:11;77:23;84:13;
90:10;125:17;
145:11;152:5;
163:16;181:19;

192:15
**undergo (5)**
163:23;164:9;
166:8;167:10;168:20
**undergoes (2)**
166:20;169:6
**undergoing (5)**
54:21;61:11;65:19;
167:2,19
**undergone (1)**
152:6
**understandable (1)**
141:9
**understandings (1)**
128:9
**understood (17)**
5:16;7:18,22;10:6;
12:22;16:12;17:7,21;
30:13;34:25;35:23;
67:19;68:7;126:1;
158:4;170:18;183:7
**undertaken (1)**
108:25
**unemployed (2)**
176:17,24
**unethical (1)**
152:20
**unexplored (1)**
168:15
**unfair (2)**
161:6;171:12
**unfortunate (1)**
162:7
**unhappiness (1)**
171:4
**unhealthy (2)**
186:14,23
**uniformly (1)**
47:4
**UNION (1)**
194:2
**United (4)**
10:8;38:13;170:20;
194:6
**universally-agreed-upon (1)**
23:22
**University (3)**
34:10;65:10,11
**unknowingly (1)**
70:22
**unknown (2)**
93:19;187:25
**unknowns (4)**
41:10;103:9;
168:14;190:13
**unless (2)**
158:15;184:2
**unlike (9)**
95:17;136:12;
172:11,12;178:24;
180:18;185:21,23;
187:15
**unmet (1)**

102:7
**unnecessary (1)**
83:4
**unofficial (1)**
33:23
**unpopular (1)**
136:19
**unrelated (2)**
29:14;63:3
**untested (1)**
159:9
**unto (1)**
146:19
**unusual (3)**
45:21;57:25;69:11
**unwillingness (1)**
187:13
**up (73)**
9:3;10:4,19;12:6;
18:10;21:7,7,23;
22:20;27:8;28:25;
29:5;30:4,4,10,15;
32:6,23;40:23;42:18;
43:6;44:4;47:3;48:5,
14;51:10;54:23;
58:20;60:17;63:2;
70:8;71:9;80:4;
86:15;88:14;89:24;
91:10,16,17;92:5,15;
94:7;95:9;98:2,7,10;
99:21;109:9;111:21;
112:17;115:7;116:4;
118:22;120:3,3;
122:2;135:9;139:17;
143:2;145:1;150:9,
10;152:12;156:2;
164:18;169:12;
172:4;173:6;176:23;
182:25;183:3;
185:11;186:7
**update (1)**
69:1
**updated (2)**
19:19;22:6
**upon (3)**
123:11;139:22;
180:19
**upset (3)**
64:17;137:3;155:1
**urban (1)**
65:16
**use (64)**
14:23;15:19;19:9;
24:8,9;25:11,12;
38:6;44:23;46:6,9,13,
16;50:20;55:5;56:21,
24;58:19;64:20;
71:17;77:16;82:11;
110:8;112:5;117:23;
118:20;120:9;125:8,
18,18,22;126:3,12,
16;127:13;128:13,
20;131:23;132:13;

138:12,19;139:3,6;
141:15;150:2;
151:23;156:4;
157:13,14,14;159:11;
160:14;161:15,16;
165:14,15;166:4;
168:3;171:16;172:5;
175:8;183:17;
184:25;190:13
**used (25)**
28:2;29:6;40:23;
42:9;45:16;57:2;
68:1,20;72:7;77:8;
82:3;83:6;92:20;
95:8;128:19;132:12,
15;133:2;135:15;
138:25;139:7;
153:22;159:11;
164:19;173:19
**useful (5)**
65:24;88:4;120:8;
125:11;127:19
**users (1)**
100:24
**uses (4)**
19:7;58:18;82:12;
156:17
**using (22)**
19:19;25:13;39:19;
56:10;59:3,9;103:13;
116:21;117:6;126:5;
127:18,19;139:11,14;
140:14;148:21;
157:15;158:5;
159:19;163:11;
165:25;166:3
**usual (4)**
64:16;114:7;172:5;
173:14
**usually (10)**
24:9;40:15;65:6;
107:8;131:18;132:6;
135:6;147:4;148:18;
185:4

## V

**vagary (1)**
133:12
**vague (1)**
58:20
**valid (4)**
89:17;122:23;
151:13;177:25
**validate (1)**
145:22
**validated (1)**
40:19
**validity (3)**
117:17,23;119:21
**value (1)**
146:22
**VanderLaan (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 78 of 165 PageID #: 3700
K.C., et al. VS
The Individual Members of the Medical Licensing Board
JAMES M. CANTOR, PH.D.
June 7, 2023

49:25
variables (4)
55:1;57:8,12;
167:25
various (23)
11:14,15;15:20;
19:21,21;20:12;27:7,
14;33:7;35:12;45:3;
46:20;47:11;50:10;
62:6;69:2,7,8;74:10;
78:21;81:5,8;139:6
varying (1)
168:9
venue (1)
134:25
verbally (1)
5:6
verify (1)
172:4
version (1)
22:3
versions (1)
86:4
versus (20)
27:19;46:21;56:17;
65:16,17;68:10;69:7,
8;78:1;85:21,24;
88:2,4;114:5;118:6,
7;151:24;167:2,3;
187:2
viable (2)
163:25;170:10
view (9)
12:24;94:10;155:8;
169:21;171:5;
174:20;180:14,16;
181:24
views (1)
164:21
visible (1)
26:8
visual (1)
118:18
Vivienne (1)
177:20
vocabulary (2)
128:21;156:17
voice (3)
137:21;161:4,8
voices (3)
158:13;160:23;
161:18
volunteering (2)
76:17;77:1
vs- (1)
194:10.5
vulnerability (1)
182:11

**W**

wait (2)
5:7;29:2

waiting (1)
67:25
wants (4)
101:13;115:7;
151:10;171:7
warnings (1)
158:15
watched (1)
159:1
water (1)
17:20
way (52)
6:18;13:11;15:16;
16:13;20:5;25:1;
33:9;35:19;41:8;
42:6;43:8;46:14;
50:15;58:17;62:25;
72:22;77:24;80:18;
91:3;92:24;94:5;
95:15;97:4,10;
105:15;117:16;
118:20;122:6,7;
123:21;126:15;
127:3;132:14;137:6;
141:11;142:13;
147:1;148:18;152:2;
155:22;158:1;161:6;
165:2,10,20;174:4;
176:18;188:10;
189:10,13;190:22;
191:9
ways (14)
26:18;35:9,10,11;
45:11;46:10;47:20;
58:20;61:15;95:13;
116:24;127:18;
128:8;160:19
website (1)
44:12
week (5)
27:20;28:3,12;
29:12,22
weekly (1)
51:23
weeks (1)
85:3
weigh (3)
78:1;115:10,14
weight (3)
25:2;33:15;154:19
Weiss (1)
180:23
welcome (2)
44:4,5
welfare (1)
34:19
well-being (1)
61:21
well-characterized (1)
146:23
well-known (1)
134:6
whatever's (2)

58:2;63:6
what's (18)
11:11;18:10;21:23;
22:20;35:19;46:21,
21;54:23;55:5;
117:22;121:11;
130:9;133:21;
151:10;152:24;
159:20;185:11;190:3
whatsoever (1)
184:12
whenever (1)
8:21
WHEREOF (1)
193:1
whole (11)
4:4;87:4;98:3;
146:11;147:5;
166:18;169:13;
171:9;172:1;174:17;
192:7
who's (4)
25:18;66:1;135:13;
189:14
whose (2)
26:16;132:10
wide (3)
76:1;109:4;166:19
widely (1)
42:9
wiggle (1)
94:16
willing (4)
130:5;136:18;
169:5,5
willingness (2)
186:20,21
withheld (1)
114:18
Within (17)
7:11,16;24:4;
33:12;34:14,20;35:4;
38:11;42:4;46:6;
60:12;78:22,24;85:7,
14;86:17;177:16
without (19)
7:7,14,17;8:2;83:8;
95:5;107:13;114:23;
116:1;146:1;150:10;
154:13;160:12;
162:21;169:3;170:9;
178:3;187:23;189:11
witness (20)
16:6;22:10;27:12;
28:7,10,13;29:24;
30:20;44:6;48:17;
66:22;71:13;88:19;
98:5;104:22;183:13;
191:16,18,20;193:1
women (1)
167:1
wondering (1)
39:17

word (26)
5:13;14:23;40:11;
56:21;64:21;77:8,16;
80:10;89:15,15;
96:13;109:22;
116:22;117:23;
122:5;126:12,16;
127:13;137:2;
141:10;142:12;
153:21;160:14;
164:22;180:10;
187:21
wording (1)
142:18
words (6)
68:3;74:25;104:11;
120:14;125:24;
140:14
work (9)
33:23;38:23;39:3;
42:23;43:4;44:17;
48:3;74:1;122:10
working (7)
29:17;126:22;
129:5;131:5;148:21;
185:4;187:16
works (12)
28:20;42:7;50:13,
13;67:13;122:14;
146:2;163:15;
173:14,25;175:13;
183:11
world (9)
25:20;50:8;51:6,
13;76:23;85:7;98:3;
132:7;187:2
worried (1)
100:25
worth (1)
112:16
wow (1)
18:15
wrap (1)
182:25
wraps (1)
92:15
write (16)
43:5;71:4;74:20;
84:19;116:9;122:11,
23;138:5;144:1;
149:19;158:13;
162:22;166:7;
172:17;183:17;
184:13
writes (1)
100:24
writings (1)
178:14
written (3)
70:2;78:16;88:2
wrong (8)
46:16;107:23;
120:10,11;133:17;

143:7;153:22;154:16
wrote (7)
19:2;70:9;101:6;
120:20;150:21;
168:18;173:1

**Y**

yank (1)
97:6
year (12)
30:1,2,13,18;32:12,
22;41:22,24;53:3,5;
173:6;185:14
years (18)
11:17;37:23;38:11;
42:16;52:7;56:19;
62:12,13,14,24,24;
127:23;128:23;
129:8,12;132:21;
136:12;159:13
Yep (6)
5:10,14,17;139:24;
143:25;152:14
York (2)
104:22;194:3.5
young (7)
99:5;100:24;
109:11,19,21;130:22;
145:21
youth (8)
65:18;66:13;82:21;
83:11;104:4;111:13;
148:5;150:2

**Z**

zero (5)
30:7,14;106:4;
109:18;172:8
Zoom (8)
13:21,24;14:7;
48:14;71:17;90:16;
145:6;149:21
Zucker (4)
135:21;136:1,20;
137:18
zygote (1)
121:10

**0**

0675790 (1)
193:7

**1**

1 (8)
18:10;23:13;42:8,
11;71:10;116:5;
149:16,17
1:23-cv-00595-JPH-KMB (1)
194:7.5

Case 1:23-cv-00595-JPH-KMB   Document 58-8   Filed 06/12/23   Page 79 of 165 PageID #: 3701

K.C., et al. VS
The Individual Members of the Medical Licensing Board

JAMES M. CANTOR, PH.D.
June 7, 2023

**10 (5)**
30:5;47:19,20;
48:5;58:14
**10004 (1)**
194:3.5
**106 (1)**
116:5
**107 (1)**
122:22
**109 (1)**
172:15
**11 (13)**
140:4,11,13,23;
141:12,20;142:2,5,
17,20,24,25;185:12
**12:50 (1)**
105:3
**124 (2)**
182:20;183:16
**125 (1)**
194:2.5
**135 (3)**
143:21;149:19;
194:23.5
**142 (1)**
158:12
**15 (1)**
30:5
**16 (9)**
59:17,19,24;61:18;
63:20;74:20,21;
75:11;81:5
**17 (1)**
193:8.5
**1720 (1)**
194:24
**18 (4)**
59:24;61:18;63:20;
109:8
**1970s (2)**
143:4,10
**1980s (1)**
143:11
**1990 (1)**
38:25
**1992 (1)**
38:25
**1998 (3)**
43:11;62:15;63:21
**19th (1)**
194:3

---

**2**

**2 (2)**
21:23;23:9
**20 (3)**
28:5;182:24;
191:16
**2000 (1)**
42:16
**2000s (1)**
43:12

**2004 (3)**
36:24,25;39:3
**2005 (4)**
62:15,16,20;63:21
**2010s (1)**
137:8
**2011 (2)**
36:25;39:3
**2015 (2)**
48:8,23
**2017 (5)**
31:3;32:2,3,10;
53:11
**2018 (6)**
52:7,20;53:11;
144:6,14;145:4
**2020 (2)**
4:2;84:22
**2022 (2)**
22:15;60:4
**2023 (4)**
150:5;192:11;
193:3;194:17.5
**2024 (1)**
193:8.5
**204 (2)**
162:16,20
**20S-MS-236 (1)**
4:1
**23 (1)**
185:14
**25 (3)**
129:8,12;132:21
**259 (1)**
172:17
**299 (1)**
183:16

---

**3**

**3 (1)**
22:20
**30 (2)**
128:23;129:8
**30-year-old (1)**
165:20
**31 (1)**
4:2
**317 (1)**
194:25
**32 (1)**
22:4

---

**4**

**40 (2)**
105:1;127:23
**40ish (1)**
30:4
**46 (2)**
116:4,8
**46204 (1)**
194:24.5

**47 (1)**
116:8
**48 (1)**
67:18
**480 (7)**
8:13;9:12,15,18;
22:16;180:25;181:16

---

**5**

**5 (5)**
37:15;39:4;69:18;
106:11;144:18
**50 (1)**
54:10
**51 (1)**
142:25
**59 (1)**
143:21

---

**6**

**6 (1)**
98:8
**62 (2)**
156:11,12
**63 (1)**
158:12
**635-7857 (1)**
194:25

---

**7**

**7 (4)**
74:20;75:11;90:1,2
**70s (1)**
143:6
**7th (2)**
192:11;194:17.5

---

**8**

**8 (1)**
145:2
**80 (3)**
28:8;31:1;133:9
**80s (1)**
143:4

---

**9**

**9 (1)**
99:4
**91 (1)**
162:16
**98/'99 (1)**
42:2

---

```
 1              MS. EAGAN:  No, Your Honor.

 2              THE COURT:  All right.  State's case.

 3              MR. DAVIS:  Your Honor, the State calls Dr. James

 4    Cantor when you are ready.

 5              THE COURT:  I'm ready.

 6                        JAMES CANTOR, MD,

 7    having been first duly sworn by the courtroom deputy clerk, was

 8    examined and testified as follows:

 9                        DIRECT EXAMINATION

10    BY MR. DAVIS:

11    Q    Good morning, Dr. Cantor.

12    A    Good morning.

13    Q    Would you state your full name?

14    A    James Michael Cantor.

15    Q    What is your profession, Dr. Cantor?

16    A    I am a clinical psychologist and neuroscientist.

17    Q    What degrees do you have?  Academic degrees.

18    A    Bachelor's degree in computer science and mathematics, a

19    master's degree in applied psychology, and a Ph.D in clinical

20    psychology.

21    Q    Where do you work?

22    A    I am currently in private practice in Toronto, Canada.

23    Q    And what is the nature -- are there any particular focuses

24    of the counseling you provide or the research that you have

25    performed?
```

10:39:28 — line 5
10:39:46 — line 10
10:40:02 — line 15
10:40:17 — line 20
10:40:32 — line 25

```
 1  A     Human sexuality and atypical sexualities.
 2  Q     Would that include studies of gender identity?
 3  A     Yes, it is.  Yes, it does.
 4  Q     Are you knowledgeable about the research surrounding
 5  gender dysphoria?
 6  A     Yes, I am.
 7  Q     Have you analyzed research concerning the benefits and
 8  harms of different ways of treating gender dysphoria?
 9  A     Yes, I have.
10  Q     Do you have skills and expertise assessing the strengths
11  and weaknesses of scientific studies?
12  A     Yes, I do.
13  Q     And do these skills and expertise include judging what
14  those studies do and do not prove as a matter of science?
15  A     Yes.
16  Q     Have you treated people who presented with gender
17  dysphoria?
18  A     Yes.
19        MR. DAVIS:  Your Honor, we proffer Dr. Cantor as an
20  expert on psychology, human sexuality, research methodology,
21  and the state of the research literature on gender dysphoria
22  and its treatment.
23        THE COURT:  Any objection?
24        MS. EAGAN:  No, Your Honor.
25        THE COURT:  All right.  He will be accepted for that
```

```
 1   purpose.
 2   BY MR. DAVIS:
 3   Q    Dr. Cantor, there is a notebook in front of you with a
 4   blue cover.  Would you please turn to the second tab?
 5   A    I'm sorry.  It just occurs to me I didn't bring my reading
 6   glasses.  They're in my brief case.
 7          MR. DAVIS:  Your Honor, can the witness get his
 8   glasses?
 9          THE COURT:  Absolutely.
10          THE WITNESS:  Part 2, you said?
11   BY MR. DAVIS:
12   Q    Yes.  Tab 2, which is Defendants' Exhibit 2.
13        Can you identify that document, Dr. Cantor?
14   A    Yes.  That is my report, which I submitted for these
15   proceedings.
16   Q    Thank you.
17        I think actually, since we just heard Dr. Antommaria, I
18   would like to begin with addressing some things that we heard
19   this morning.
20        Did you have the opportunity hear this morning's testimony
21   by Dr. Antommaria?
22   A    Yes, I did.
23   Q    Did you understand Dr. Antommaria to testify that randomly
24   controlled studies are not available in this area of medicine?
25   A    Yes.
```

Timestamps in left margin:
10:41:51 (line 5)
10:42:43 (line 10)
10:42:54 (line 15)
10:43:02 (line 20)
10:43:16 (line 25)

1    Q    Did he then say, if you understand -- as you understand,

2    that because the randomly controlled trials are not available,

3    we can rely on observational trials?

4    A    That is roughly what I understood him to say, yes.

10:43:33  5    Q    Do you have any response to that?

6    A    Yes.  That's not -- it is true that none of the existing

7    studies are randomized, but it is entirely untrue that we

8    therefore can rely -- can make decisions based on the least

9    reliable kinds of studies.

10:43:48  10    There is a wide, wide range of studies in between, and

11    there's a wide, wide, range of different scientific

12    methodologies that we can employ in order to minimize the laws

13    that we get from completely randomized studies.

14    It's also actually possible if we wanted to conduct such

10:44:09  15    studies such as by allowing people to undergo different parts

16    of a treatment at different times, so we can compare the

17    differences between them when one group has started on that

18    type of treatment and the other hadn't yet.

19    Q    Okay.  So the randomized trials would be considered like

10:44:29  20    the gold standard, the top-tier level of scientific research?

21    A    Randomization is one factor in determining how high

22    quality a study is.  It is not a -- it's neither an all or

23    nothing.

24    Q    I understand.  But did I understand you to say that if you

10:44:47  25    assume that's not available, that's no reason to drop down to

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 84 of 165 PageID
#: 8706
USCA11 Case: 22-11707    Date Filed: 07/05/2022    Page: 73 of 232

257

1    the lowest quality of evidence?

2    A    That is correct.

3    Q    I understood Dr. Antommaria to testify that the level of

4    evidence supporting the WPATH and Endocrine Society guidelines

10:45:05  5    is comparable to the level of evidence supporting other

6    treatments in pediatrics.  Can you respond to that?

7    A    I am not aware, of course, of all the other treatments in

8    pediatrics.  However, there are no studies yielding positive

9    effects of either the Endocrine Society standards or the WPATH

10:45:24 10    standards.

11        The studies which have shown effects have used the Dutch

12    model, which uses a higher set of standards than either the

13    Endocrine Society or the WPATH group.

14    Q    Speaking of the Dutch study, I also understood

10:45:42 15    Dr. Antommaria to say there is no high quality evidence

16    supporting the use of psychotherapy alone for gender dysphoria.

17    Do you agree with that?

18    A    No, I do not.

19    Q    What would you say in response?  What's the countervailing

10:45:56 20    evidence?

21    A    There exists roughly 15'ish studies following up these

22    kids at all.  All of the studies, which without exception that

23    used medical interventions also used psychological --

24    psychotherapy at the same time.  So all of the studies which

10:46:17 25    could seem to show a benefit for medical interventions are

1    unable to distinguish that it was the medical intervention

2    causing the benefit, versus the psychotherapy causing the

3    benefit.

4        Of those studies, two were designed in a way that it was

10:46:33  5    possible to peel apart the effects of psychotherapy versus

6    medicine -- the Costa study and the Achille study.  The full

7    references are in my report.

8        In the Costa study, there was a -- there were two phases.

9    There was a phase that people went through when they received

10:46:52 10    psychotherapy alone.  And then in the subsequent phase, they

11    received both psychotherapy and medical interventions.

12        There were no significant differences between the group.

13    Both groups improved, and there were no significant differences

14    between the group that received psychotherapy alone and the

10:47:08 15    group that received psychotherapy plus medical interventions.

16        The other study, the Achille study, used a statistical

17    method to control for the effects of psychotherapy.  That group

18    also improved after medical intervention, but when the effects

19    of psychotherapy were statistically controlled, there was no

10:47:28 20    additional benefit of the medical interventions after that.

21    Q    I want to break some of that down.  You mentioned studies

22    where all the participants were receiving both psychotherapy

23    and medical-affirming care at the same time, right?

24    A    Correct.

10:47:48 25    Q    Is that the Dutch -- oh, is the Dutch protocol, the Dutch

```
  1   study an example of such a study?
  2   A    Both Dutch studies, the 2011 and the 2014, yes.
  3   Q    If, at the end of that trial, you look and see the people
  4   that were receiving both psychotherapy and medical-affirming
10:48:06  5   care at the same time, improved in mental health at the end of
  6   the trial, can you as a scientist tell whether the improvement
  7   is the result of the pharmaceuticals or the psychotherapy?
  8   A    Not in the design of those studies, no.  That's what in
  9   science is called a confound.
10:48:27 10   Q    Confound?
 11   A    Correct.
 12   Q    What does that mean, confound?
 13   A    It describes exactly that situation.  When two things are
 14   done at once, when you see the result, you can't peel apart
10:48:37 15   which -- which of those two interventions was responsible or
 16   the interaction between those two interventions was
 17   responsible.
 18   Q    Okay.  But the Costa and Achille study, on the other hand,
 19   they do provide scientific evidence that psychotherapy alone is
10:48:53 20   helpful, did --
 21   A    That's correct.
 22   Q    Okay.
 23   A    That psychotherapy is helpful and not the medical
 24   interventions.
10:49:01 25   Q    I also understood Dr. Antommaria to say that he had not
```

1  read studies about detransitioning.  But if it ever became

2  relevant, he would make an effort to review such studies.

3      You are familiar with the body of the literature

4  concerning gender dysphoria, correct?

10:49:21 5  A    Yes.

6  Q    In your opinion, are the studies of detransitioning

7  relevant to someone trying to assess the benefits and harms of

8  these treatments?

9  A    Yes, of course.  It's very difficult -- detransition would

10:49:35 10  be the situation that one is trying to avoid.  The best way to

11  avoid a situation is to understand that situation.

12  Q    Dr. Antommaria said that there are prospective

13  observational trials that demonstrate the efficacy of puberty

14  blockers in gender-affirming care, and then later said the

10:49:59 15  trials he is referring to were primarily the Dutch group

16  studies.

17      Are those the studies you just mentioned, the 2011, 2014

18  studies?

19  A    Those are the Dutch studies that usually we use.  I can't

10:50:12 20  know if he is referring to some other study that I didn't make

21  a specific reference to.

22  Q    That's fair.

23      In this area of medicine, when someone's talking about the

24  Dutch studies, the Dutch group studies, is it your

10:50:25 25  understanding they're generally referring to these 2011 and

        1    2014 studies from the Dutch project?

        2    A    Almost always, yes.

        3    Q    Okay.  And those are the studies you just mentioned that

        4    have the confound problem, right?

10:50:36 5    A    Correct.

        6    Q    You can't unpack whether it's the psychotherapy or -- not

        7    from that study, you can't unpack whether it is the

        8    psychotherapy or the pharmaceuticals that are making the

        9    difference?

10:50:47 10   A    That's correct.

        11   Q    Okay.  More generally, I'd like to read for you a

        12   statement from the plaintiffs' brief in support of their

        13   preliminary injunction motion.

        14        For the record, it's Doc 8 at page 18.

10:51:07 15        Dr. Cantor, the plaintiffs wrote in that brief, For more

        16   than four decades, medical organizations have studied and

        17   created an evidence-based standard for the medical treatment of

        18   transgender patients.  This standard confirms that transition,

        19   including puberty blockers and hormone therapy where

10:51:26 20   appropriate, is the only safe and effective treatment for

        21   gender dysphoria?

        22        Dr. Cantor, does the research literature support that

        23   statement?

        24   A    No, it does not.

10:51:37 25   Q    Do you understand the plaintiffs primarily to be pointing

1    to the guidelines of medical organizations such at WPATH and

2    the Endocrine Society and the American Academy of Pediatrics to

3    support their positions that wish to continue giving these

4    treatments to children?

10:51:52 5    A    Yes.  They cited those repeatedly.

6    Q    Okay.  What observations have you had about the WPATH

7    guidelines and whether they have support in evidence?

8    A    The WPATH guidelines and the Endocrine Society guidelines

9    have been tested among the set of -- as I say, roughly 15

10:52:13 10    outcome studies, some of them have used the WPATH guidelines or

11    Endocrine Society guidelines instead of the Dutch protocol.

12    And those studies demonstrated that there was no improvement at

13    all.

14        I shouldn't say none at all.  One of them used several

10:52:36 15    kinds of measures of improvement, and I think it was all but

16    one demonstrated no differences at all.  And one small one gave

17    an indication that suggested the possibility.

18    Q    Have these organizations acknowledged anything about

19    desistance rates -- these organizations, I'm referring

10:52:57 20    specifically to WPATH and the Endocrine Society?

21    A    I can't say that they've never addressed it, but to the

22    extent if it was ever addressed, they are grossly, grossly

23    minimized.

24    Q    Can I refer you to paragraph 12 of your report on page 4?

10:53:33 25    A    I got it.

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 90 of 165 PageID
#: 5712
USCA11 Case: 22-11707    Date Filed: 07/05/2022    Page: 79 of 232

263

1   Q    You say in that paragraph that the plaintiffs'

2   documentation -- and I assume by documentation, you mean

3   their -- the pleadings in this case and the briefs that you had

4   seen?

10:53:50  5   A    That's correct.

6   Q    You said the plaintiffs' documentation misrepresents the

7   contents of the associations' policies themselves.

8        Which associations were you speaking of there?

9   A    They mentioned several other societies which made short

10:54:04 10   statements in general support of sexual diversity, but without

11   actually issuing specific standards about how to treat people

12   in that community with what or at what ages.

13   Q    And what inconsistencies did you see between what those

14   organizations have said and the arguments you saw in

10:54:23 15   plaintiffs' briefing?

16   A    The plaintiffs referred to the societies as if they were

17   providing very specific support for very specific policies

18   rather than general recommendations to provide, for example,

19   respect and values for diversity, but no specific guidelines.

10:54:48 20   Q    Okay.  Well, looking at paragraph 12, is one of your

21   points here looking at the bullet points that even WPATH and

22   Endocrine Society acknowledge as you write, that desistance of

23   gender dysphoria occurs in the majority of prepubescent

24   children?

10:55:04 25   A    That is correct.

```
            1  Q    And then turning the page, were there other issues you saw
            2  that the statements -- that these organizations believed and
            3  plaintiffs' briefing was inconsistent with what the
            4  organizations had stated?
10:55:16    5  A    That the issue of mental health and that mental illnesses
            6  and similar concerns need to be resolved before considering
            7  transition rather than depending on transition to be the
            8  resolution of, for example, depression and anxiety.
            9  Q    And have any of these organizations acknowledged that
10:55:42   10  puberty-blocking medication is an experimental not a routine
           11  treatment?
           12  A    Yes, they have used that phrase.
           13  Q    Which organization?
           14  A    Again, I would have to look up to see exactly who used
10:55:52   15  which word.  I believe it was WPATH, but I again have to go
           16  back and check to make sure that it was they.
           17  Q    And let's turn to the American Academy of Pediatrics.  And
           18  I will refer you to your appendix.
           19       And, Dr. Cantor, if you look at the top of the page, you
10:56:12   20  will see a line of blue figures.  And it's page X out of 106.
           21  The appendix I am referring to is page 100 out of 106.
           22  A    Got it.
           23  Q    What does the American Academy of Pediatrics or AAP, what
           24  do they recommend in this area of care?
10:56:42   25  A    They recommend what I can best describe as affirmation on
```

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 92 of 165 PageID
                                   #: 5714
       USCA11 Case: 22-11707    Date Filed: 07/05/2022    Page: 81 of 232

                                                                              265

```
          1   demand.

          2   Q     Okay.  Did you review their recommendation when it came

          3   out?

          4   A     Specifically I reviewed the sources on which they based

10:56:58  5   their recommendations.

          6   Q     Okay.  Did you write about that?

          7   A     Yes, I did.

          8   Q     And does that appear as an appendix to your report

          9   beginning at page 100 of that pdf?

10:57:09 10   A     That is correct.  I summarized all of my comments.  I

         11   submitted them to a journal where they underwent peer review.

         12   And it's an official published peer-reviewed paper.

         13   Q     This is not a letter to the editor?

         14   A     That is correct.  This is part of a scientific -- now part

10:57:22 15   of the scientific literature.

         16   Q     What did you comment upon?

         17   A     I really just checked what the authors of the AAP policy,

         18   Dr. Rafferty, what their claims were, what they said was in

         19   their references versus what was actually in their references.

10:57:43 20         And not only did their sources not contain what they were

         21   alleged to have obtained, they often contained the very

         22   opposite of what the AAP policy said they contained.

         23   Q     Did you have an agenda to disprove -- to prove or disprove

         24   anybody when you undertook that review of the evidence?

10:58:01 25   A     I wouldn't say an agenda other than to set the record --
```

```
 1   pardon the pun -- straight.

 2        This was a situation where these sources I had known for

 3   many years.  I had read them when they had first came out.

 4        And when AAP came out with its policy, I was stunned by

 5   its content.  And as I read what they were basing it on, my

 6   recollection was immediately this is not what those sources

 7   said.

 8        So immediately I just started double checking myself.  Did

 9   I misread something?  Am I misremembering something?

10        And as I just checked in my own files with copies of these

11   papers -- most of these papers already in it, my memory was

12   correct.  They said as -- the kinds of things I recalled them

13   to be saying.

14        Because we were now talking a major medical association

15   rather than an individual other scientist.  This was different

16   from just one scientist like me disagreeing with another

17   scientist.  This was now -- now had the potential to cause a

18   great deal of damage to a great number of people.

19        So because I had the ability to do it, I simply summarized

20   the contents of the original paper and contrasted point by

21   point the claims being made by AAP and simply quoting verbatim

22   what was in the original studies.

23        That entire thing was published, and the AAP has never

24   responded.  They were approached by the media, and they just

25   would refuse to talk even to the media.  They have yet to have
```

10:58:21
10:58:36
10:58:51
10:59:11
10:59:33

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 94 of 165 PageID
#: 3716
USCA11 Case: 22-11707    Date Filed: 07/05/2022    Page: 83 of 232

267

```
          1  any response.
          2  Q    So to date, the AAP has not responded to the criticisms
          3  that you raised?
          4  A    That is correct.
10:59:42  5  Q    I will refer you now to page 6 of your report.  Going by
          6  the numbers at the bottom of the pages.
          7  A    Yep.
          8  Q    As you noted in your review of the plaintiffs' expert
          9  report -- well, first off, did you review the expert reports
11:00:08 10  submitted by the plaintiffs by Dr. Hawkins and Dr. Ladinsky?
         11  A    Yes, I did.
         12  Q    And did you note that they studied a 2016 Olsen study
         13  claiming that it proves that transition reduces the risk of
         14  mental illness?  That that was their claim?
11:00:23 15  A    Correct.
         16  Q    Does the Olsen study show that?
         17  A    Just referring to my own report.  Ultimately, no, it did
         18  not.  There was several statistical errors in the Olsen study.
         19  The data were obtained then by the -- they -- upon request, and
11:00:45 20  Olsen provided their data to another author who reanalyzed -- I
         21  should say, correctly analyzed the Olsen data, who demonstrated
         22  that Olsen's data did not contain evidence of improvement.  In
         23  fact, it contained evidence of deterioration.
         24  Q    So in your opinion, does the 2016 Olsen study support
11:01:04 25  plaintiffs' position that children need these affirming --
```

```
        1  these medicalized affirming treatments in order to improve
        2  their mental health?
        3  A    No, it does not.  Making such a claim is a half truth.  It
        4  would ignore the subsequent entries in the scientific
11:01:20 5  literature.
        6  Q    And what about the de Vries study that plaintiffs cited in
        7  which you address on page 9 of your report?  And does it show
        8  that medical transition of minors improves mental health?
        9  A    No.  It contains part of the confound.  The de Vries study
11:01:43 10  as part of a Dutch group also included psychotherapy during
       11  transition.  So it is not possible to differentiate which type
       12  of therapy, medical or psychotherapy, is responsible for the
       13  benefits reported in that study.
       14  Q    I see.  So participants in that study did have improved
11:02:00 15  mental health, correct?
       16  A    Yes.
       17  Q    But it's just not possible scientifically to tell what
       18  caused the improvement?
       19  A    Correct.
11:02:06 20  Q    And what about the Greene and Turbin studies plaintiffs'
       21  experts cited which you discuss in paragraph 24 of your report?
       22  A    Yep.
       23  Q    Do those studies show that medical transition improves
       24  mental health?
11:02:25 25  A    No, they do not.  These are retrospective correlational
```

1  studies.  They are not able of describing any causal effect

2  coming to any causal conclusion.

3  Q    Okay.  Now, you mentioned there that -- you say this very

4  pattern is what one would predict from clinical gatekeeping.

11:02:43 5  What do you mean by clinical gatekeeping?

6  A    One of -- across the various clinical standards are to

7  prevent somebody with mental illness from undergoing

8  transition.  So such people are being held back.  They're being

9  filtered out of groups who do undergo transition.

11:03:03 10      So when a clinic then compares the people who underwent

11  transition to the people in their files who did not undergo

12  transition, they are necessarily comparing a group of people

13  from whom the mental illness was removed and comparing them to

14  a group of people from whom the mental illnesses were not

11:03:22 15  removed.

16      So when you see better mental health amongst the people

17  who had transitioned, the improvement is not because of the

18  transition, the improvement is because you have removed the

19  people with the worst mental health from the group in the first

11:03:40 20  place.

21  Q    Okay.  So is it correct, then, that one thing you might

22  see in these studies is by picking out the people with the best

23  mental health, and giving them the treatment, then comparing

24  them to the people with lower mental health, then, of course,

11:03:57 25  the people who went through the study would do better?

```
 1   A    That is correct.

 2   Q    Did you review any of the other studies that plaintiffs

 3   have submitted into evidence such as the Allen study, the

 4   Turban articles, the Biggs (phonetic) study, the Lopez de Lara

 5   study, Tordoff?

 6   A    Yes, I have.

 7   Q    Do you have any comments on those studies and whether they

 8   support plaintiffs' position?

 9   A    They suffered from the same methodological problems as the

10   other studies.

11   Q    Did any of those studies support the position that medical

12   transition improves mental health?

13   A    No, they did not.

14   Q    In minors with gender dysphoria?

15   A    Correct.  No, they do not.

16   Q    Oh.  What has been called the Yale study by Brouware,

17   B-R-O-U-W-A-R-E, was the first named author.  Did you review

18   that one?

19   A    Yes, I did, but it wasn't a study.

20   Q    What was --

21   A    Apparently, that was a report submitted by those authors

22   for another -- or for a combined set of court cases.

23   Q    Okay.  But you would not refer to that document as a

24   scientific study?

25   A    From the Yale group with -- again, the name I don't -- I
```

1    hesitate to try to pronounce, but, no, it was not a study at

2    all.  It was those authors' report reviewing the literature and

3    providing their opinions.

4    Q    Okay.  As a matter of fact, Dr. Ladinsky was asked about

11:05:39    5    that study yesterday.  And for the record, that testimony

6    appears on page 116 of the rough transcript.

7        The question was:  In this document, do the authors also

8    cite a number of peer-reviewed studies that contradict some of

9    the supports or the principles that the State articulated as

11:06:00    10    the reasons for SB 184?  And Dr. Ladinsky responded, They do, a

11    considerable compendium of them.

12        Is she right?  Did those authors show that there are

13    studies that contradict the State's position in this case?

14    A    There was such a statement.  There was no meaningful way

11:06:21    15    to try to put together what claim went together with what

16    source.  Rather than -- what's done more typically either in

17    science or in pause, best as I understand, is here the claim

18    and here is the source justifying it.  Here is next claim, here

19    the source justifying it.

11:06:38    20        Instead, that document made a long series of unsourced

21    claims and then provided a long series -- a series of very

22    large footnotes with 20 and 30 references.  And there was just

23    no way to see what fact was alleged to have come from what

24    source.

11:06:56    25    Q    So we've talked about whether the literature the

```
 1  plaintiffs' -- the studies that plaintiffs cite to support
 2  their position.  Let's talk about whether the literature
 3  supports the State's position.  But a little background first.
 4       Could you describe from your review of the literature just
 5  what's the difference between adult onset gender dysphoria,
 6  child onset, and adolescent onset?  And I know this is a broad
 7  question, but I just mean like age groups.
 8  A    Usually we would be referring to these as a prepubescent
 9  onset.  Then the literature is very, very long, but reported on
10  adult onset.  And by adult, on average, these were people in
11  their 20s and in their 30s and 40s.  It was very, very
12  distinct.  It was not, you know, a bell-shaped curve with some
13  midpoint around 18 or 19 years old.
14       It's only within the past --
15            THE COURT:  Hold on one second.
16       Go ahead.  Sorry.
17            THE WITNESS:  It's only within the past ten years or
18  so that a different profile has begun to emerge and was noticed
19  by clinicians.  And that now is being called either adolescent
20  onset or rapid onset.
21       Now, all three of these groups have in common that they're
22  complaining about the same thing.  Doc, I feel like I am in the
23  wrong body.  Doc, I am the brain of one, but in the body of the
24  other.
25       So the way that they describe it is similar.  But every
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
11:08:50
```

 1    objective way we have of measuring these people shows that

 2    these are independent phenomena.  They are not related except

 3    in the way that people describe the situation, describe what

 4    they're experiencing.

 5         The best analogy I have would be if somebody came to a

 6    doctor saying I have a headache.  Okay.  I got it.  Got that's

 7    a symptom.  I have some more questions.  But we cannot from

 8    that say that a migraine headache is the same thing as a

 9    tension headache is the same thing as having just suffered a

10    head injury.

11         The causes are different.  How we respond to them is

12    different.  And the other characteristics about each of these

13    are different.  They only resemble each other in the most

14    superficial ways.

15         Childhood onset or prepubescent onset gender dysphoria

16    appears to be entirely unrelated to adult onset gender

17    dysphoria.  And the two of those appear to be entirely

18    unrelated to the rapid onset or adolescent onset gender

19    dysphoria.

20    BY MR. DAVIS:

21    Q    Well, let's break that down.  Adult onset, typically

22    people who present with what you're referring to adult onset

23    gender dysphoria, what age are they when they come into the

24    doctors' office and say, something's wrong?

25    A    On average, in their 30s and 40s.

1    Q    Okay.  Has there been research considering whether

2    those -- that universe, the adult onset universe does well

3    after transitioning?

4    A    Those who are mentally healthy by and large do, do well

11:10:08  5    after transition.

6    Q    Can you apply those studies to consider whether someone

7    with child onset gender dysphoria is going to do well after

8    transitioning?

9    A    No.  Because these are independent phenomena.  The

11:10:23 10    information from one does not -- from one group does not

11    generalize to the other.

12    Q    Comparing the adult and the child onset, what is the

13    difference that makes the studies of one, you know, it's not

14    apples to apples?

11:10:35 15    A    Correct.

16    Q    Okay.  What is the difference between those patients?

17    A    The -- they -- as I say, differed in just about every

18    objective measure we've been able to apply to them.

19        There are, of course, the ages themselves.  Something --

11:10:53 20    the sex ratios in them are different.  The adults are almost

21    100 percent biological male.  There's more of a mix amongst the

22    childhood onset.

23        The adults are almost always attracted to females.  That

24    is to say, relative to being biological male, they are almost

11:11:13 25    always heterosexual.

```
 1          The childhood onset almost always are attracted to the
 2    same biological sex.  They are almost always homosexual.
 3    Q    Talking about the child onset, is that a new phenomenon,
 4    child onset gender dysphoria?
 5    A    I wouldn't say new.  It's been systematically studied for
 6    20 to 30 years'ish.
 7    Q    From the literature that you reviewed, do most of these
 8    kids, if not socially transitioned and given hormones, will
 9    they want to transition after reaching puberty?
10    A    Generally not.
11    Q    And page 36 -- excuse me -- paragraph 36 of your report,
12    Dr. Cantor, what statistics do you provide about the rates of
13    desistance among those presenting with childhood onset gender
14    dysphoria?
15    A    The exact numbers are between 61 to 88 percent of them
16    desist.  In the appendix in my report, I list all of the
17    studies that have ever been conducted with that group, all the
18    outcome studies that have been conducted with that group.
19    Q    We probably both need to slow down just a little bit
20    for...
21    A    I'm from New York.  It just happens.
22    Q    We'll do our best.
23          Dr. Hawkins was asked about your paragraph 36 yesterday.
24    And I will represent that on page 30 of the rough transcript,
25    she said that when the study such as the ones you're citing
```

```
 1    offers this elevated rate of desisters, quote, what we tend to
 2    find is that the initial cohort that was given the diagnosis of
 3    gender dysphoria is actually false.
 4         My question, Dr. Cantor, is:  Does the research literature
 5    support Dr. Hawkins's statement?
 6    A    No.  As I say, I listed every single such study.
 7    Q    Do we have any tools today that reliably tell us which
 8    kids will desist and which kids will persist?
 9    A    No, we do not.  There have been some attempts to develop
10    such a test, but they have never been able to find a good
11    characteristic, a feature, a pattern, a test result in which
12    the majority continued to want to persist.
13         The best that they have ever been able to do was find a
14    tool which distinguished unlikely to want to persist versus
15    even less likely to want to persist.
16    Q    There's been testimony about something called the DSM-5.
17    Do you know what that is?
18    A    Yes, I do.
19    Q    What is it?
20    A    The full name is the Diagnostic and Statistical Manual of
21    Mental Illnesses, published by the American Psychiatric
22    Association.
23    Q    If someone were to claim that now that we have the DSM-5
24    we may be able to do a lot better with identifying who's the
25    desister and who is the persister, is there any research on
```

```
 1   that?
 2   A    No.  Nobody's ever tried to differentiating any of the
 3   DSMs from DSM-I through its various versions to the current
 4   one.
```
11:14:38
```
 5   Q    So there have been at least five?
 6   A    There was a I, a II, a III, III-R, IV, IV then had a text
 7   revision.  They switched some of the commentary around the
 8   diagnoses, but they didn't change any of the diagnostic
 9   criteria themselves.  There was then the 5.  And there is as of
```
11:15:01
```
10   last month a 5 again with a text revision, but no changes to
11   any of the actual diagnostic criteria.
12            THE COURT:  Mr. Davis, how much longer do you think we
13   will be?
14            MR. DAVIS:  Your Honor, direct will take us up to
```
11:15:14
```
15   about noon, I would predict.  There's just a lot to cover with
16   Dr. Cantor.
17            THE COURT:  I am not rushing you.  I am just trying to
18   get a road map of that.
19        So how long do we think cross might be?
```
11:15:25
```
20            MS. EAGAN:  It's difficult to predict because I am not
21   sure what else he may say, but maybe an hour, hour or less, I
22   would think.
23            THE COURT:  All right.  I am leaning toward an earlier
24   lunch than we did yesterday.  So maybe -- if it's okay with
```
11:15:45
```
25   you, let's just go ahead and find a stopping point at your
```

```
 1  leisure, and we will just pick back up after lunch.

 2          MR. DAVIS:  Thank you, Your Honor.  This is as good as

 3  any.

 4          THE COURT:  Is it?

 5          MR. DAVIS:  Yes.  We have just talked about DSM-5.

 6  Going to watchful waiting next.  This is as good a place as

 7  any.

 8          THE COURT:  Okay.  Good.  Good.  With that said, then

 9  are we still on target with your last witness?

10          MR. DAVIS:  Yes, Your Honor.  Ms. Wright is here.  I

11  don't know if she is in the courtroom yet or not, but she is in

12  Montgomery, and she will be ready to go when we finish with

13  Dr. Cantor.

14          THE COURT:  We think the length of that witness would

15  be what?

16          MR. DAVIS:  Oh, I would say direct would be well under

17  30 minutes, but I don't know about cross.

18          THE COURT:  Okay.  All right.  Okay.  Well, I think

19  we're on target.

20      Let's take a good long lunch today.  Let's see here.

21  Let's come back at 12:45.

22          MR. DAVIS:  Thank you, Judge.

23          THE COURT:  Thank you.

24          MR. DOSS:  Judge?

25          THE COURT:  Yes?
```

```
 1              MR. DOSS:  Closing, how long would you like?

 2              THE COURT:  You know, I mean, this is important.  I'm

 3    not going to, you know, jack everybody up on this, but to the

 4    extent you can hold it to around 25, I think would probably be

 5    a good thing.

 6         And in your openings, I think you really road mapped it

 7    very well, both sides did.

 8         So, you know, again, I know the arguments.  I'm really

 9    interested in, you know, some analysis with case law.  And I am

10    going to be directly asking about a few cases.  I'm very

11    interested to know parallels between the Arkansas decision and

12    that law.  And then I may give you some hypotheticals that you

13    won't like.

14         See you after lunch.

15              (Recess.)

16              THE COURT:  All yours, Mr. Davis.

17              MR. DAVIS:  Thank you, Judge.

18    BY MR. DAVIS:

19    Q    Welcome back, Dr. Cantor.

20         We spoke earlier about the Dutch protocol.  Did the

21    participants in those Dutch studies have psychotherapy before

22    beginning treatment?  Before that study?

23    A    They were receiving treatment as part of their

24    participation in the study.  I don't think they reported

25    whether anybody happened to have attempted psychotherapy before
```

 1  approaching the clinic at all.

 2  Q    Okay.  Forgive me if I'm mistaking which study is which.

 3  I was reading about a study that described the psychotherapy

 4  that was available to the participants as extensive.  And that

12:51:40  5  that extensive psychotherapy was at least two years.  Which

 6  study am I thinking of?

 7  A    That wouldn't have been a particular study so much as what

 8  they use in their process in general.

 9        And then the Dutch group was reporting the results, you

12:51:56 10  know, of -- periodically over the course of the study.

11  Q    I see.

12  A    But by the time the first set of results, their earlier

13  study, the 2011 study, the participants in it will have already

14  been through a substantial amount of therapy.

12:52:13 15  Q    Okay.

16  A    They also emphasize that in assessing the children that

17  it's a very extensive assessment, and the assessment itself was

18  also ongoing over the course of the study.

19        So even before deciding who might be eligible for

12:52:30 20  hormones, they have now many, many months to years' experience

21  with the particular case even with a particular child even

22  before making a decision.  That's very, very different from

23  just having an appointment, taking a test, and then having a

24  diagnostic decision an hour later.

12:52:46 25  Q    That is exactly what I was meaning to ask you about.  I

1    was using sloppy language.

2         So this extensive assessment that happened before some of

3    these children began treatments, they were assessed, you said,

4    over a course of a couple of years?

12:52:59 5    A    Correct.

6    Q    Okay.  So does literature support having such an extensive

7    assessment period before subjecting someone to these

8    treatments?

9    A    I don't know if I would say support it, but all of the

12:53:16 10   conclusions that come from the literature depend on it.

11   Q    Thank you.

12        Is there a way of treating gender dysphoria that some

13   practitioners refer to as a watchful waiting approach?

14   A    Yes.  Watchful waiting usually refers specifically to

12:53:40 15   withholding any decision about medical interventions until they

16   have a better idea or feel more confident for a particular case

17   about whether that kid is going to be a persister or desister.

18   It is given the knowledge that that's available that the

19   majority of these kids do desist.  Nobody wants to make a

12:54:00 20   decision upon first appointment.

21        And so -- so they tend to provide psychotherapy, whatever

22   kind of care, whatever is appropriate to the individual kid

23   until enough time has gone by to give -- to suggest is this a

24   kid whose feelings like they're feelings are slowing down and

12:54:19 25   they just need more time, are they building up, or are they

```
 1  staying steady?
 2        So the watchful waiting period would be postponing any
 3  decision about medical interventions until the clinicians had
 4  some confidence.
 5  Q    While you are watching and while you are waiting, are you
 6  just leaving him alone, or her?
 7  A    No.  That would be the time during which one would be
 8  supplying a therapy for whatever else is going on in the kid's
 9  life.
10  Q    Okay.
11  A    Usually they're associated with -- there's a great deal of
12  what we call comorbidity.  They're also suffering from other
13  problems at the same time, either depressions, anxieties, early
14  evidence of personality disorders, for example.  And it's never
15  clear whether their gender dysphoria is a result of those other
16  psychological problems.
17        So by helping them develop the tools to deal with those
18  other problems, if they remain dysphoric afterwards, we know
19  that the dysphoria wasn't the result of those other problems.
20  So rather than just leaving them alone, they're still receiving
21  support, and the family is still receiving support over that
22  period.
23  Q    So I believe you pointed out in your report that clinical
24  guidelines suggest that mental health issues such as the
25  comorbidities you mentioned should be resolved before
```

12:54:31 (line 5)
12:54:42 (line 10)
12:55:00 (line 15)
12:55:17 (line 20)
12:55:33 (line 25)

1  transition; is that correct?

2  A    Yes.

3  Q    Okay.  Why?

4  A    Because it's never clear what's causing what.  We cannot

12:55:44  5  from a correlation conclude anything about a causation.  It's

6  very possible, and it's been frequently observed that a lot of

7  these kids are using gender issues as an explanation for the

8  unhappiness that they're experiencing elsewhere in their life.

9        So rather than developing the skills to -- for example --

12:56:04 10  better social skills.  If a person feels awkward and they're

11  withdrawing from kids their own age, we are not sure if they

12  want to transition because they're blaming gender dysphoria for

13  why they feel unpopular or uncomfortable, and we're not --

14  versus we can't tell if anxiety or depression is a result of

12:56:27 15  how they're being treated by the rest of society.

16        So it's only by helping them deal with and by giving them

17  the skills to overcome those other disorders that we can see if

18  the gender dysphoria itself resolves just as a result of that.

19  Q    So if a person is suffering from depression, or is

12:56:48 20  struggling with their own sexual identity, or some type of

21  abuse, or any of these other comorbidities, explain how this

22  psychotherapy process would work, how a psychotherapist such as

23  yourself would try to dig down into the issue and see if that

24  is something that's generating these feelings that are being

12:57:08 25  mistaken as gender dysphoria, or whether the gender dysphoria

1   is its own thing.

2   A    Just to be specific, I'm specifically an adult clinical

3   psychologist.  I see clients ages 16 and up.  So it wouldn't be

4   me personally.

12:57:23 5       What the literature shows about these kids is that they

6   can be very, very diverse.  It certainly is feasible that they

7   are experiencing, for example, depression or anxiety as a

8   result of social transphobia, but that doesn't explain the

9   other things that we're observing.

12:57:41 10       For example, a transphobia doesn't cause autism, which is

11  another very, very common disorder in that group.  Transphobia

12  wouldn't cause the development of borderline personality

13  disorder, which we're seeing in very, very, large proportions

14  among the teenagers.

12:57:58 15       So although certain symptoms like anxiety and depression

16  can feasibly be the result of social reactions to being trans,

17  but that does not explain the overall phenomenon.  What does

18  better explain the overall phenomenon is that there is some

19  thing troubling this kid, and it is resulting in both the

12:58:20 20  psychological symptoms, depression, anxiety in someone, and

21  also producing the gender dysphoria, that discomfort with being

22  their natural sex.

23  Q    I would expect this could vary wildly from patient to

24  patient, but if you -- and I recognize and thank you for

12:58:37 25  clarifying that you deal with a more adult-age group.

```
 1              But if you're helping someone, an adolescent, work through
 2     some of these issues, how often do you think a psychotherapist
 3     would want to see the patient and over what period of time?
 4     A    It does vary widely.  And the kind of disorders that
12:58:57  5  they're reporting do tend to be the kinds that require very
 6     long-term interventions.
 7              As I say, autism, and related Asperger's syndrome, and
 8     also very, very high rates of borderline personality disorders,
 9     which, again, is a very, very long-term disorder to help
12:59:14 10  somebody deal with.
11     Q    Fair to say this would not be two or three sessions?
12     A    Correct.  This would be over the course of months or
13     years.
14     Q    Does the research literature show that there are risks
12:59:30 15  associated with medical transitioning?
16     A    Yes, quite substantial, including both loss of --
17     primarily loss of function, and depending on the person's point
18     of view, whatever the cosmetic effects are.
19     Q    What are the risks of the watchful waiting approach in
12:59:48 20  providing psychotherapy in helping the child deal with any
21     underlying emotional issues?
22     A    There don't appear to be any, at least any concrete.
23     Q    I will refer you to paragraph 68 of your report,
24     Dr. Cantor.
13:00:06 25          Tell me what the advantages there are to a patient, what
```

1    opportunities it opens up to him or her if any emotional issues

2    are dealt with before the decision to transition.

3    A    If a person fails to deal with whatever emotional issues

4    before it transition, and then transitions and discovers that

13:00:30  5    they continue with whatever psychological issues are pervading

6    them, they have gone through the entire transition process

7    entirely unnecessarily.  They haven't been helped.  They have

8    now lost whatever -- they have now been sterilized, lost

9    whatever sexual -- or other functions, but it hasn't actually

13:00:49 10    resulted in any improvement in their psychological function.

11        If you go the other way around and you help the person

12    deal with psychologically whatever it is that's going on, they

13    still retain the option for transition after that.  And it's

14    that situation that the professional societies have

13:01:05 15    repeatedly -- that the standards of care have repeatedly

16    pointed out.

17    Q    So watchful waiting approach does not eliminate a person's

18    ability to transition to the opposite sex later in life if they

19    so choose?

13:01:19 20    A    Correct.

21    Q    Does the research literature show there's any relationship

22    between children who present with gender dysphoria and those

23    who later in life turn out to identify as gay?

24    A    Yes.  The large majority of the ones who believe that they

13:01:42 25    were born the wrong sex turn out to be gay or lesbian.

```
 1          To a prepubescent child who doesn't yet have a sex drive,
 2     they have no way to interpret why they feel different from
 3     other boys or other girls their age.  It's only with the onset
 4     of sex drive that they start -- and start developing crushes
13:01:58 5  and physical attractions that they now have the information
 6     they need to realize why they're different.  But to an eight
 7     year old or to prepubescent children, the only explanation they
 8     have for why they're not like other boys or not like other
 9     girls is they must be the wrong sex.  They're misinterpreting
13:02:18 10 their feelings.
11          THE COURT:  Let's take a quick time out.
12          So, you know, I guess I'm wondering how both sides are
13     wanting me to use all this expert testimony.  I mean, the
14     Eleventh Circuit has said more than one time that, you know,
13:02:31 15 medical psychiatric professionals are in a far better position
16     to make decisions about medical and psychiatric issues than
17     judges are.
18          So I guess I want to know from each side real quickly, how
19     do y'all envision that I use these experts?  I mean, are you
13:02:48 20 asking me to say, well, this guy's science is junk and this
21     guy's science is perfect; or something in between?  What am
22     I -- tell me how you envision me using this.
23          MR. LACOUR:  May I?
24          THE COURT:  Perfect.  Absolutely.
13:03:05 25 MR. LACOUR:  Your Honor, as we began the opening
```

```
 1  statements, when there's an area of medical uncertainty, the
 2  State has wide discretion to regulate.  So if it's not so clear
 3  to you as to which side's experts have it right, if you see
 4  that uncertainty, then under Supreme Court precedent, the State
 5  is allowed to regulate.
 6      The State has to think about all 5 million Alabamians.  We
 7  have to take all that into account when regulating in these
 8  areas where it is not certain.
 9      The judge has an important but a limited role in our
10  federal system to see whether those judgments the State has
11  reached in those areas of uncertainty somehow conflict with the
12  Constitution.
13      And we submit we have come forward with evidence to at
14  least put into question whether there is this consensus that
15  has been proclaimed by the plaintiffs here.
16      Again, I think the bar on the plaintiffs is quite high, to
17  show an absence of uncertainty, or to show some great
18  certainty.
19      And when you look at the international studies and the
20  literature reviews, when you hear from very qualified experts
21  like Dr. Cantor, who have applied great rigor to these studies
22  that are being relied upon by the plaintiffs, by their experts,
23  by the AAP, for example, then I think that is enough to create
24  that doubt to create that space for uncertainty.  And when that
25  is there, the State can step in.
```

13:03:29 (line 5)
13:03:45 (line 10)
13:04:03 (line 15)
13:04:19 (line 20)
13:04:45 (line 25)

  1          So that's how we see it.  We don't think that you sit here

  2     as an independent medical board to assess whether a particular

  3     treatment is going to be the best for any particular

  4     individual.  The role of the federal courts in our federal

13:05:01  5     system, the laboratories of democracy is to see if we have done

  6     something that is somewhat inexplicable.

  7          I think there is ample evidence to explain why the State

  8     has done what it's done in addition to the lengthy legislative

  9     findings in SB 184.

13:05:22 10          We have come forward with multiple experts from fields of

 11     endocrinology, psychology, and pediatrics, and have brought

 12     forward substantial amount of other peer-reviewed research and

 13     literature reviews to show that this very novel area of the

 14     law -- keep in mind the UAB clinic didn't open until

13:05:44 15     seven years ago.  This is a novel area of medicine, rather --

 16     is just, in the State's judgment, too risky.  And if that's a

 17     reasonable judgment for the State to make, then that's the end

 18     of the case.

 19               THE COURT:  All right.  Mr. Doss.

13:06:03 20               MR. DOSS:  Your Honor, I'm unaware of a case that

 21     establishes that principle that's so long as there's

 22     uncertainty and a reasonable judgment, then that alone is

 23     sufficient for the State to violate constitutional protections.

 24          The standard of review is what I think helps frame some of

13:06:23 25     this testimony.  So, for example, if strict scrutiny applies,

1    it is the State's burden to establish a compelling state

2    interest.  And that its infringement on the constitutional

3    protection has been narrowly tailored.

4         And I guess to preview Your Honor for closing, that is a

13:06:40 5    key focus that I plan to spend some time with in closing on why

6    this testimony we've heard yesterday and today, number one,

7    does not establish a compelling State interest.  But number

8    two, even if you assume that it does establish some interest by

9    the State, the interest that the State has identified and the

13:06:58 10   regulation that it has imposed are mismatched.  It's not

11   narrowly tailored for the very reasons offered by the State

12   through its witnesses.

13        And based on the standard of review, it is not a reasoned

14   judgment.  That's not the test for when a constitutional

13:07:13 15   violation has occurred.  The test is whether there is

16   satisfaction of this demanding standard for the law's

17   viability.

18        And so as I mentioned in opening, I don't think that Your

19   Honor's job for the purpose of this hearing is deciding

13:07:31 20   ultimately maybe even who is right.  It's to show that there is

21   scientific -- there are standards of care that exist, there are

22   approved approaches to dealing with these issues.  These are

23   real medical diagnoses.  These are real medical treatments.

24        And though the State may disagree them, that's not enough

13:07:50 25   to establish the violation of the constitutional rights, Your

```
 1   Honor.
 2           THE COURT:  And on that note, at least from what I can
 3   tell from both sides, State and government, and original
 4   plaintiffs, am I correct to say that everybody agrees that
 5   these are real diagnoses?  Or no?
 6           MR. LACOUR:  Your Honor, could you --
 7           THE COURT:  And I am going to say this one more time.
 8   I don't need head nods.  It is out of hand.  This is not
 9   entertainment.  This is the real world and the law.  So we're
10   not in a movie theater.  I don't need head nods.  I don't need
11   approval or disapproval.  If you want to do that, take it
12   outside.
13       Go ahead.
14           MR. LACOUR:  Your Honor, I think -- Your Honor, we
15   agree that gender dysphoria is a psychological diagnosis, but
16   as we have shown in both our written evidence and through
17   witness testimony from both defense witnesses and plaintiffs'
18   witnesses, we don't know whose gender dysphoria is likely to
19   persist.  And that's very important.
20       Even Dr. Antommaria this morning said that if you -- the
21   level of certainty you have --
22           THE COURT:  You are giving me more detail than I want.
23   I just need you to answer my question.
24           MR. LACOUR:  Okay.  Can I respond to something
25   Mr. Doss said before?
```

1              THE COURT:  Very quickly.

2              MR. LACOUR:  He is unaware of the standard.  We cited

3    it multiple times in our P.I. response.  It's Gonzales vs.

4    Carhart, a 2007 decision from the Supreme Court where the

13:09:32 5    federal government had regulated partial birth abortion.  That

6    was an area of medical uncertainty.

7         There were -- I will go back and I will look at the

8    filings in that case, but I would be shocked if the AMA did not

9    chime in, in favor of the plaintiffs who were challenging the

13:09:46 10    ban on partial birth abortion there saying that it was a safe

11    or necessary -- medically necessary treatment for some people.

12         It was enough that Congress found medical uncertainty

13    there.  And there were values, as well, in unborn life that

14    Congress was able to promote even though there were medical

13:10:04 15    organizations.

16         I will confirm this before closing, but I am fairly

17    certain there were medical organizations who were not fans of

18    Congress's action there.

19         Even so, and even in an area like abortion where there is

13:10:16 20    more law at least for the last 49 years in that space,

21    addressing some right to abortion, even then, that ban was

22    upheld by the Supreme Court.

23              THE COURT:  And I'm sure you can get into that on

24    closing.

13:10:31 25         Let's go back to my original question.  Just answer it

 1  succinctly for me.

 2          MR. LACOUR:  And that would be are these real

 3  diagnoses?

 4          THE COURT:  Yes.  Just answer my question in two

 5  sentences.

 6          MR. LACOUR:  Gender dysphoria is a diagnosis.  I think

 7  the debate is how should it be treated.  And SB 184 is

 8  expressed in Section 6.

 9      There's no ban on psychotherapy whatsoever.  The ban only

10  applies to these novel risky potentially long-term

11  harm-inducing or causing medications.

12          THE COURT:  So no argument from the State on status,

13  diagnosis, any of that?  You are only -- your only issue is

14  treatment; is that correct?

15          MR. LACOUR:  Correct, Your Honor.

16          THE COURT:  Got it.  Thank you.

17      Anything else, Mr. Doss?  And I will give the government a

18  shot --

19          MR. DOSS:  No, Your Honor.

20          THE COURT:  -- if they want to be heard.

21          MR. CHEEK:  Nothing else to add that hasn't already

22  been said, Your Honor.  Thank you.

23          THE COURT:  Okay.  All right.

24      Mr. Davis, I have gotten right in the middle of your

25  witness again.  Sorry.  Pick it back up.

1           MR. DAVIS:  I certainly understand, Judge.

2   BY MR. DAVIS:

3   Q    Okay.  Dr. Cantor, we to try to pick up where we were.

4        Let's take two young boys, eight years old, say.  So

13:11:52 5   puberty hasn't started yet.  They both have gender dysphoria,

6   even though they may not really understand it yet.

7        And I know I'm asking you to assume some things that an

8   outside observer may not be able to confirm just by looking at

9   that child.

13:12:06 10       And let's assume that both those young boys would, if not

11  intervened with transitioning care, would both grow up to

12  identify as gay.

13       So the boy who is left alone to go through natural

14  puberty, what does he come to understand once puberty kicks in?

13:12:24 15  A    Once he -- as puberty kicks in, of course, sex drive comes

16  in as a part of that, and he starts experiencing sexual

17  attractions and sexual arousal.

18       That, then, because he is experiencing it towards other

19  men, teachers, peers, whoever it is, he can now -- he now has

13:12:41 20  the opportunity to understand the nature of his experiences and

21  why he doesn't feel quite like other boys, why he doesn't feel

22  as masculine, and why he doesn't feel as masculine.

23       Now, in otherwise healthy circumstances, he will grow up

24  to be a healthy gay man.

13:12:57 25  Q    Now, the other boy is given puberty blockers.  What

1  happens in his case?

2  A    Such a person who does not develop sexual -- the capacity

3  for sexual arousal and sexual attractions because the very

4  biological features which produce that have been held from him,

13:13:14  5  he never experiences an orgasm.  He never experiences sexual

6  arousal, and doesn't have the opportunity to understand the

7  other potential explanations for why he feels the way he does,

8  and go from a child's understanding of why he doesn't feel like

9  other boys, to an adult's understanding of why he doesn't feel

13:13:36 10  like other boys.

11      By blocking puberty, you are blocking the very information

12  that he needs to understand his own situation.

13  Q    And you are not claiming to describe every person who is

14  experiencing gender dysphoria, I take it?

13:13:49 15  A    Correct.

16  Q    Does the evidence show that sexual orientation changes

17  after a person identifies as gay or lesbian?

18  A    No.  There is no evidence to suggest that sexual

19  orientation is unstable or changes.

13:14:05 20  Q    What does the evidence show about whether a person's

21  gender identity can change?

22  A    That shows the very opposite.  Among the children, it

23  changes in the majority of them.

24      They're even people who identify and describe themselves,

13:14:19 25  for example, as being fluid, the very definition of which is

1  that their gender identity changes on a constant basis.

2  Q    Are you familiar with the argument that if we do not allow

3  minors to transition medically, the result will be increased

4  suicides within these group of young people?

13:14:38  5  A    I've heard that said, yes.

6  Q    Does the research literature support the argument that

7  denying these treatments will lead to an increase in

8  suicidality?

9  A    No, it does not.

13:14:50  10  Q    Are you familiar with what other countries are doing, with

11  respect to treatment of gender dysphoria?

12  A    Yes, I am.

13  Q    Are there any changes going on in recent years?

14  A    Very much.  In fact, things -- it's almost as if the

13:15:10  15  pendulum has reached its far point, and it's now coming back to

16  a much more moderate evidence-based tone.

17       There was really -- sparking off of the social media age

18  more than anything else, we're able to identify a greatly,

19  greatly accelerated, great and greatly expanded number and type

13:15:31  20  of person who was potentially going to go through transition

21  entirely, unlike the groups which we had previously studied.

22       Several countries, especially in Europe, permitted them

23  with lower and lower standards.  And then once the reports

24  started coming out that that was failing greatly, they're now

13:15:53  25  restricting very, very quickly and very, very greatly.

1       The two most substantial bans have been in Sweden and in

2   Finland.  And there are also now very, very strong statements

3   urging the medical field to pull things back in the UK and in

4   France.

13:16:08  5   Q    Dr. Ladinsky testified yesterday that -- I don't have her

6   exact words in front of me -- but she said that what's going on

7   in the UK and Sweden and Finland isn't as relevant here because

8   those countries have a centralized health-care system, whereas

9   we have a less centralized health-care system, and all these

13:16:35 10   experts unrelated can see the same child.

11       That's a poor paraphrase.  The record will speak for

12   itself.  But assume she made that type of testimony.  Would you

13   agree with her?

14   A    No.  I can't see the logic of it.  It's certainly

13:16:53 15   feasible, in fact, more than likely that decisions are made

16   differently when there are centralized boards and a centralized

17   authority charged specifically with reviewing the evidence that

18   will be the basis of the medical procedures of that country,

19   and the U.S. lacks that.

13:17:11 20       But there's no reason to think that that situation would

21   change the actual outcomes of the actual children getting the

22   actual interventions.

23   Q    So is it possible, then, that a more centralized

24   health-care system may provide the ability -- an even greater

13:17:24 25   ability to study and evaluate the risks and benefits of

1  gender-affirming care?

2  A    That's demonstrably true.  That is exactly the process

3  they have gone through.  They have published the results of

4  exactly their reviews, and that is how their health-care

13:17:40 5  systems -- that is what their health-care systems are

6  responding to.

7        The American professional associations have not gone

8  through such a comprehensive process.  They're merely coming up

9  with policies and citing only individual pieces of studies that

13:17:54 10  appear to support it, rather than a comprehensive review.

11  Q    I want to close a loop on adolescent onset gender

12  dysphoria.  We talked about ways different groups are

13  different.

14        What's unique about this group of adolescent onset, or you

13:18:11 15  referred to it also as rapid onset gender dysphoria?

16  A    Yeah.  It's been called both.

17        Where both the childhood onset and the adult onset are

18  primarily male, the adolescent -- the adult onset and childhood

19  onset are primarily male.  The adolescent onset is primarily is

13:18:28 20  female.  They present with a different set -- it's a different

21  epidemiological set of characteristics, and the evidence that

22  we have about both adults and children don't seem to apply to

23  that middle group.

24  Q    Does this group of people presenting with gender dysphoria

13:18:45 25  in their adolescence -- you said primarily female?

1    A    Yes.

2    Q    Do they tend to have any issues or comorbidities in common

3    with each other?

4    A    The most common one of those would be borderline

13:18:57    5    personality disorders and other difficulties with integrating

6    socially into their environments.  As I say, such as autism and

7    Asperger's syndrome.

8    Q    You are not saying that's true for everyone presenting

9    with gender dysphoria for the first time in their adolescence?

13:19:13    10    A    Correct.

11    Q    But many?

12    A    Correct.

13    Q    What does the research literature show about the

14    desistance or detransition rates of people who transition after

13:19:25    15    first presenting with gender dysphoria in their adolescence?

16    A    There has never been any such study.

17    Q    Did you review the plaintiffs' reply brief, Dr. Cantor?

18    A    Yes, I did.

19    Q    Did you see any response to your report in plaintiffs'

13:19:41    20    reply?

21    A    Not a single comment.  My name was never mentioned.  None

22    of the studies that I cited were referred to.  None of the

23    arguments were addressed.  I don't believe I was quoted

24    anywhere in it, unlike the other experts.

13:19:56    25    Q    I did note a line that the plaintiffs criticized the

```
 1  defendants' experts in general for relying on older studies.
 2  A    Yes.  I saw that claim.  I was a bit confused by it.
 3       In my report, I provided a comprehensive list of every
 4  single study.  There were 11 in total.  So the old studies were
 5  listed, the new studies were listed.  It was comprehensive.
 6       It was also a tangential argument.  As I said, the 11
 7  studies which have been conducted were unanimous in their
 8  findings.  They all found the same thing.  The majority
 9  desists.
10       So it doesn't matter even if one did rely only on the
11  older studies, the newer studies showed exactly the same thing
12  as the older studies.
13  Q    We spoke a little bit about some of the things we heard
14  from Dr. Antommaria this morning.  I want to turn to some of
15  the things in his report.
16       You reviewed his written expert report, did you not?
17  A    Yes, I did.
18  Q    He -- Dr. Antommaria wrote on -- in paragraph 17 of his
19  report -- and I will find a copy if you need it, but this is
20  one sentence.
21       Quote, gender-affirming medical care is supported by
22  clinical studies.  Is he right?
23  A    That's true for adults, but that's not true for the other
24  groups.
25  Q    And Dr. Antommaria spoke about how if a drug is FDA
```

13:20:18  5
13:20:33 10
13:20:55 15
13:21:07 20
13:21:21 25

1    approved in one area, it's okay to use it off label in another

2    area?

3    A    That's what he said, yes.

4    Q    What does the research literature say, or what opinion do

13:21:44 5    you have about using the same drug, a puberty-blocker in the

6    case of a person who's six, seven, eight, the purpose is to --

7    precocious puberty, what about the cases of precocious puberty

8    and using puberty-blockers to help someone medically transition

9    at the beginning of normal puberty?

13:22:03 10    A    Well, the ability to use a medication off label is not a

11    blanket permission to give any drug you want for any reasons

12    you want or for any conditions you want.

13        Ultimately, it's going to depend on what the scientific

14    literature itself says, which in turn is what the various

13:22:22 15    regulatory bodies use to make their decisions to decide what's

16    off label or on label to begin with.

17        So because a medication would be useful for some people in

18    some situations and some circumstances, does not mean it's

19    automatically going to be useful for other people in other

13:22:37 20    circumstances.  Indeed it could be deleterious.

21        If you use a puberty-blocker in somebody with precocious

22    puberty, you are pushing somebody who is far below the average

23    age of puberty, and you are bringing them closer to the

24    species-typical range of puberty.

13:22:55 25        If you give that same drug to somebody who is already

```
 1   having a typical age of puberty, you are now pushing them

 2   outside of the species-typical age.

 3   Q     Thank you, Dr. Cantor.

 4         I am going to sum up.  Does the research literature

13:23:21 5   support plaintiffs' claims that we need to treat children and

 6   adolescents with gender dysphoria with social transition

 7   puberty-blockers and cross-sex hormones?

 8   A     I'm sorry.  Could you say that -- I missed the first half

 9   of that sentence.

13:23:33 10  Q     My apologies.

11         Does the research literature support plaintiffs' claims

12   that we need to treat children and adolescents with gender

13   dysphoria with social transition, puberty-blockers, and

14   cross-sex hormones?

13:23:46 15  A     No.  That's terrible overstatement.

16   Q     Does the research literature support Alabama's description

17   of these treatments as experimental?

18   A     Yes.  They're fairly called experimental.

19   Q     When does a drug or a course of treatment stop being

13:24:02 20  experimental?

21   A     That's an excellent question.  There is no real test for

22   it.  There is no objective way to decide something is one

23   versus the other.

24         Science is never finished.  It's always possible for there

13:24:14 25  always to be some future piece of information that changes what
```

```
 1  we know.

 2        There are, of course, you know, different situations --

 3  drugs, issues under active investigation, where it's very clear

 4  that it's still experimental, and others where, you know, there

 5  is only very little question left.

 6        For this particular situation, we have a very small number

 7  of studies that in certain situations might look like they

 8  might be helping, but a much larger body of better performed

 9  studies showing that the improvement is not actually coming

10  from the transition itself.

11        Indeed, there were other areas of the report that were

12  referred to already ongoing studies testing exactly these

13  interventions.  Well, that there exists ongoing tests of these

14  interventions is pretty much the definition of calling

15  something experimental.

16  Q    If scientists are eventually able to replicate the same

17  results under the same conditions over and over again, can you

18  then pretty much say something is established?

19  A    Yes.

20  Q    Has anybody been able to replicate the results of, say,

21  the Dutch study that showed at least some positive results with

22  a combination of treatments?

23  A    No.  Most of the studies have demonstrated no improvement

24  in these children from medical transition.

25  Q    Do you understand plaintiffs to argue that Alabama is out
```

 1  of step with groups like the American Academy of Pediatrics?

 2  A    Yes, I've heard them say that.

 3  Q    What's your response?

 4  A    Well, it's actually the American Academy of Pediatrics

13:25:54 5  which is out of step with the international standards.

 6  Q    Is there a consensus, a medical consensus internationally

 7  in support of these treatments?

 8  A    There is now a very quickly developing one.  It is still

 9  ongoing debate, so I would hesitate to describe it -- describe

13:26:12 10  that there is a solid consensus.

11       As I say, really what we have seen is a pendulum swing

12  which is overswung and now is substantially and very quickly

13  correcting itself.

14  Q    Is the pendulum swinging in favor of medical transition

13:26:27 15  use of puberty-blockers and cross-sex hormones for children and

16  adolescents?

17  A    No.  It's swinging now against that.

18  Q    Is there a medical consensus in the United States for the

19  best way to treat gender dysphoria?

13:26:39 20  A    No, there is not.

21            MR. DAVIS:  Thank you, Dr. Cantor.

22            THE COURT:  So I do have a question myself.

23       Dr. Cantor, you said that an adult should be affirmed in

24  their transgender status.

13:26:58 25            THE WITNESS:  An otherwise mentally healthy adult,

```
 1   yes.
 2            THE COURT:  All right.  So make it clear to me, then,
 3   when should an adolescent or a child be affirmed in that
 4   status?
 5            THE WITNESS:  That, to me, is an empirical question.
 6     We are not sure actually when the best time do that is.
 7   Every time we check, we keep finding that, no, that's not
 8   exactly the right way.  No, that's not exactly quite working.
 9     And when we do think we have run into a clue that gives us
10   an idea of when, we are not able to recreate that situation.
11            THE COURT:  Is that case by case, then?
12            THE WITNESS:  I would hesitate to say case by case
13   exactly because --
14            THE COURT:  Let me rephrase it.  Under what
15   circumstances would you affirm a child or an adolescent?
16            THE WITNESS:  I can't say that there's a situation --
17   all of the situations will be gray.  I can't think of any
18   evidence that would give us the kind of certainty in any case
19   that would outweigh the potential risks.
20            THE COURT:  So you would never affirm a child or an
21   adolescent?
22            THE WITNESS:  Not with the current evidence available,
23   no.
24            THE COURT:  Okay.  All right.  Cross?
25                          CROSS-EXAMINATION
```

13:27:10 (line 5)
13:27:26 (line 10)
13:27:44 (line 15)
13:28:19 (line 20)
13:28:28 (line 25)

```
  1  BY MS. EAGAN:
  2  Q     Good afternoon, Dr. Cantor.
  3  A     Good afternoon.
  4  Q     Dr. Cantor, you are an adult clinical psychologist,
13:29:15  5  correct?
  6  A     Yes.
  7  Q     You are not a medical doctor?
  8  A     Correct.
  9  Q     Your private practice -- in your private practice in
13:29:22 10  Toronto, the average age of your patients is 30 to 35 years
 11  old?
 12  A     Average, that would be about right, yes.
 13  Q     You've not ever provided clinical care to transgender
 14  prepubertal children?
13:29:39 15  A     Correct.
 16  Q     You have not provided care to a transgender adolescent
 17  under the age of 16?
 18  A     Correct.
 19  Q     The extent of your experience, Dr. Cantor, working with
13:29:52 20  transgender adolescents consists of counseling six to eight
 21  transgender patients between the ages of 16 and 18; isn't that
 22  correct?
 23  A     Yes.
 24  Q     So your clinical experience with gender dysphoria really
13:30:09 25  lies in the counseling of adult patients?
```

```
 1  A    Correct.
 2  Q    And you acknowledge that gender dysphoria in children does
 3  not represent the same phenomenon as adult gender dysphoria,
 4  correct?
 5  A    Correct.
 6  Q    And, in fact, to use your words, they differ in every
 7  known regard, from sexual interest patterns to responses to
 8  treatments?
 9  A    Correct.
10  Q    Dr. Cantor, you have never diagnosed a child or an
11  adolescent with gender dysphoria?
12  A    Correct.
13  Q    Never treated a child or an adolescent for gender
14  dysphoria?
15  A    Correct.
16  Q    You have no experience personally with monitoring patients
17  who are undergoing puberty-blocking treatment?
18  A    Correct.
19  Q    You don't know what type of monitoring is typically done
20  or not done on those types of patients; isn't that fair?
21  A    No.
22  Q    No, that's not fair?
23  A    Well, you -- I personally didn't do it, but I am aware of
24  the procedures that are done.
25  Q    Okay.  But you have no experience with that?
```

 1   A     That's correct.

 2   Q     Similarly, you have never monitored -- or you have not

 3   monitored an adolescent or teenage patient on hormone therapy?

 4   A     Correct.  Until -- well, I wouldn't be monitoring the

13:31:34  5   status in any case, so, yes, that's correct.

 6   Q     I am going to switch to UAB Children's, the gender clinic

 7   here in Alabama.

 8         Have you ever spoken to a child or adolescent who was

 9   treated at the gender clinic here in Alabama?

13:32:00 10   A     No.

11   Q     Have you ever spoken to any former patients of the clinic?

12   A     No.

13   Q     You weren't here yesterday to hear Dr. Ladinsky talk about

14   the treatment protocols they have at children's UAB, were you?

13:32:12 15   A     Correct.

16   Q     You weren't here to listen to the results of treatments

17   provided to adolescent patients at UAB's Children's in the

18   gender clinic; fair?

19   A     Yes.  They have never published them.

13:32:27 20   Q     And you weren't here to hear them?

21   A     Correct.

22   Q     Dr. Cantor, you have no personal knowledge of the

23   assessment or the treatment methodologies that are used here in

24   Alabama at UAB Children's Hospital, correct?

13:32:42 25   A     Correct.  Correct.

1  Q    You do not know the disciplines of the medical providers

2  who are part of the treatment team involved in that assessment

3  at UAB Hospital?

4  A    Correct.

13:32:56  5  Q    Now, I heard your opinion that it's important to assess

6  the mental health issues of an adolescent patient to see

7  whether that is a potentially contributing factor to gender

8  dysphoria and whether there's a need to address.  That's a fair

9  statement of your opinion?

13:33:17 10  A    I'm sorry.  Would you repeat that, please?

11  Q    Sure.  It's your belief that mental health issues need to

12  be assessed and addressed before a transition occurs?

13  A    Correct.

14  Q    Do you know what assessment protocols at UAB Children's

13:33:31 15  are to address mental health issues before a child is put on

16  any transitioning medication?

17  A    No, I do not.

18  Q    Do you have any idea or do you know what the doctors at

19  UAB Children's discuss with their adolescent patients about the

13:33:48 20  risks and the benefits of medical treatments at UAB?

21  A    No.

22  Q    Wouldn't you agree -- well, never mind.  I am going to

23  move on.

24       Dr. Cantor, I want to talk with you a minute about -- or a

13:34:18 25  little bit about your criticisms of the various studies

1  regarding the efficacy of puberty blockers and hormone

2  treatments, okay?

3  A    Yep.

4  Q    As I understand your report and your testimony today, one

13:34:36 5  of the criticisms you have of some of those studies is that it

6  relies on participant's self-assessment I believe is the

7  language that you used.

8       Essentially, it is based upon what socially transitioned

9  youth and their family is reporting about their mental health

13:34:53 10  in these studies?

11  A    I would say that's incomplete.  My criticisms would be

12  relying on such subjective accounts entirely for all the

13  decision making rather than using it as one part of the

14  decision making.

13:35:08 15  Q    In other words, basing your study based upon what the

16  participants in the study tell you how they're feeling at

17  different points in the study?

18  A    Being limited to that is a problem, yes.

19  Q    And I believe the way that you phrased it, you said,

13:35:22 20  subjective self-reports about how one is doing may not be

21  reflecting reality objectively.

22  A    Correct.

23  Q    But, Dr. Cantor, self-reports about how one is doing may

24  reflect reality, fair?

13:35:38 25  A    That's correct.

1  Q    So when somebody says, I am doing well, my mental state is

2  better, that very well may be the case?

3  A    May be the case, yes.

4  Q    Another complaint that you have, I believe, is what you

13:35:58  5  call confounded data.  And I believe you referred to the de

6  Vries study for that?

7  A    The two de Vries's studies, yes.  As a matter of fact,

8  it's all but two of all papers in that set of literature.

9  Q    And by confounded data, the way that I am understanding

13:36:13 10  it, what you're saying is that you are not able to tell because

11  the data is, quote, confounded, whether one's improved mental

12  health for a minor who has socially transitioned, whether that

13  came from the actual medical services, whether it came from the

14  psychotherapy, or whether it came from the combination of both?

13:36:34 15  A    Correct.

16  Q    But one thing, Doctor, that you do have to admit is when

17  adolescents with gender dysphoria have transitioned through a

18  combination of medical services and psychotherapy, you have to

19  admit that based upon the studies, their mental health

13:36:55 20  improved, correct?

21  A    No.  There were several studies that showed no improvement

22  even though -- even though they were receiving both.  I've

23  listed them in my report.

24  Q    Can you direct me to where in your report those are,

13:37:11 25  please, sir?

1  A      Sure.

2              THE COURT:  While he is looking, did you say your

3  target is an hour; is that right?

4              MS. EAGAN:  Yes, sir.  I believe I should be able to

13:37:33  5  be done in an hour.

6              THE WITNESS:  Page 20, footnote 40.

7  BY MS. EAGAN:

8  Q    I'm sorry, sir?

9  A    Page 20, footnote 40.  The Carmichael study, the

13:37:48 10  Hisle-Gorman, et al, study, and Kaltiala.

11      My full sentence was, New studies continue to appear at an

12  accelerating rate, repeatedly reporting deteriorations or lacks

13  of improvement in mental health, footnote 40 -- or again, those

14  were the specific studies -- and then or lack of improvement

13:38:23 15  beyond psychotherapy alone, footnote 41.

16  Q    Certainly, Dr. Cantor, though, there are many study -- or

17  there are studies that indicate when adolescents with the

18  combination of medical service and psychotherapy transition,

19  their mental health has improved.  You agree with that

13:38:40 20  statement?

21  A    I would have to check to see if the number is zero or a

22  handful.  There have been reports of there having been such

23  improvement, such as the Branstom study, which once it was

24  reanalyzed, discovered to have problems, and the finding was

13:39:00 25  withdrawn.

```
            1      So there -- again, I would have to go through and check to
            2   be sure that it's not zero.  It would be fair to say that there
            3   might have been a study which found such a thing.  But the
            4   majority of studies are finding either no improvements or
13:39:17    5   deteriorations, or it's a situation that we call a failure to
            6   replicate.
            7   Q    Sir, I am a little bit confused, because I want to go to
            8   two of your studies that you have actually talked about today,
            9   the Costa study and the Achille study.
13:39:33   10      Now, as I understand your testimony today, in those
           11   studies, there was -- the studies reported that there was an
           12   improvement in mental state for adolescents who were treated
           13   with medication and psychological treatment in transition that
           14   there was an improvement, but in those, you said you can't tell
13:39:58   15   whether it's from the medication or from the psychological
           16   treatment?
           17   A    No.  The Costa study and the Achille study associated the
           18   improvement specifically with the psychotherapy and ruled out
           19   that the effects were due to the medical interventions.
13:40:13   20   Q    Okay.  Well, let's pull those studies, Doctor, and let's
           21   look at those.
           22      If you could, there should be a notebook up there that has
           23   plaintiffs' exhibits in it.  Is that one plaintiff, sir?
           24      If you could please, sir, turn to Plaintiffs' Exhibit 34.
13:40:55   25   A    Yes.
```

1    Q    All right.  Plaintiffs' Exhibit 34, is this the -- do you

2    say Costa or Costa?

3    A    I'm sorry?

4    Q    Do you say Costa?

13:41:05 5    A    My guess is Costa.  I have never met the person.

6    Q    All right.  Exhibit 34 that you have in front of you, is

7    that the Costa study?

8    A    Yes, it is.

9    Q    All right.  So, Doctor, I first want to focus in on --

13:41:18 10    well, let me ask this:  This study was aimed at assessing

11    gender dysphoric adolescents' global functioning after

12    psychological support and after puberty suppression, correct?

13    A    Yes.

14    Q    Bear with me.  I am going to take this out so I can put it

13:41:42 15    up on the Elmo, sir.

16         All right, sir.  I am going to direct your attention to

17    results that I have highlighted on my copy.  Okay?  According

18    to the abstract here, the results?

19    A    Yes.

13:42:18 20    Q    At baseline, gender dysphoric adolescents showed poor

21    functioning with -- it defines the mean scores.  So baseline

22    means at the start of the study, correct?

23    A    Usually it does.  I would have to check that that's

24    exactly how they used the term.

13:42:35 25    Q    All right.  We will get to the details of that in a

```
 1    minute.

 2         Okay.  Gender dysphoric adolescents' global functioning

 3    improved significantly after six months after psychological

 4    support.  And then it goes on to say, Moreover, gender

13:42:49  5    dysphoric adolescents receiving also puberty suppression had

 6    significantly better psychosocial functioning after 12 months

 7    of puberty suppression compared to when they had received only

 8    psychological support.

 9         Did I read that right, sir?

13:43:07 10    A    Yes.

11    Q    Do you remember the methodology that was used for this

12    study, sir?

13    A    Roughly.

14    Q    Pardon?

13:43:14 15    A    Yes.  Roughly.

16    Q    Sorry.  I meant to -- all right.  And do you recall that

17    the methodology was everybody started at baseline.  For the

18    first six months all of the adolescents received psychological

19    counseling.  And then for the next 12 months beyond that, one

13:43:36 20    group received puberty blockers, and one group just continued

21    to receive psychological counseling.  Do you recall that?

22    A    Yes.

23    Q    All right.  And then I am going to direct you, sir, to

24    page 2211 of the -- if you look at the blue writing on the top,

13:44:12 25    it's page 6 of 9.
```

```
 1   A    Yes.
 2   Q    All right.  And I am going to direct you, sir, to on the
 3   CGAS on follow-up?
 4   A    Yes.
```
13:44:32
```
 5   Q    All right.  And I am going to start at the second
 6   paragraph where it says delayed eligible.  Do you see where I
 7   am talking about?
 8   A    Yes.
 9   Q    This is talking about there were three follow-ups, right,
```
13:44:43
```
10   at 6 months, at 12 months, and at 18 months for this study; is
11   that correct?
12   A    That sounds familiar to me, yes.
13   Q    And let's read through that together.
14        Delayed eligible gender dysphoric adolescents, who
```
13:44:55
```
15   received only -- and gender delayed, GD adolescents, is your
16   recollection that those were adolescents who were eligible to
17   receive puberty blockers, but they delayed them for six months
18   so that they had everybody at a -- doing psychological study?
19   Do you remember this is the group that gets the puberty
```
13:45:17
```
20   blockers?
21   A    Yes, that sounds correct.
22   Q    Okay.  The delayed eligible gender dysphoric adolescents
23   who received only psychological support for the entire duration
24   of the study -- excuse me -- I take that back.
```
13:45:29
```
25        This was actually the group that just got the
```

    1  psychological -- had significantly better psychosocial

    2  functioning after six months of psychological support, okay?

    3       However, despite scoring better at the following

    4  evaluations, they did not show any further significant

13:45:47 5  improvement in their psychosocial functioning.

    6       Did I read that right?

    7  A    Yes.

    8  Q    Also, the delayed eligible group continued to score lower

    9  than a sample of children adolescents without observed

13:46:04 10 psychological psychiatric symptoms even after 18 months of

    11 being in psychological support.

    12      So what that's saying is after 18 months, they were still

    13 below a group that did not have psychological therapy or

    14 issues, correct?

13:46:20 15 A    Yes.

    16 Q    On the contrary, the immediately eligible group, who at

    17 baseline had a higher, but not significantly different

    18 psychosocial functioning than the delayed eligible group, did

    19 not show any significant improvement after six months of

13:46:40 20 psychological support.  However -- and this is the key --

    21 immediately eligible adolescents had a significantly higher

    22 psychosocial functioning after 12 months of puberty suppression

    23 compared to when they had received only psychological support.

    24      Did I read that correctly?

13:47:03 25 A    Yes.

1  Q    Then you see at the top of this, there is a chart.  And

2  when you look at this chart, the bottom is actually the three

3  different check-ins.  Time zero is baseline, when the study

4  started, right?

13:47:18  5  A    Yes.

6  Q    Time one is the six-month check-in, correct?

7  A    Yes.

8  Q    And during that six months, both groups are getting just

9  psychotherapy, correct?

13:47:31 10  A    Yes, I believe so.

11  Q    The rest -- and just to orient us.

12        The red group, the red line is the group of adolescents

13  who only got psychotherapy or psychotherapy through the entire

14  18-month study, right?

13:47:46 15  A    Yes.

16  Q    The green line that you see that goes up -- goes up and

17  keeps going up, that is the line of adolescents who receive

18  puberty blockers; fair?

19  A    Yes.

13:47:59 20  Q    And so, Doctor, to get to the ultimate conclusion of this

21  study that you say shows that puberty blockers don't work or

22  don't give any improvement in mental condition over

23  psychotherapy, the conclusion, this study confirms the

24  effectiveness of puberty suppression for gender dysphoric

13:48:37 25  adolescents.  Recently, a long-term follow-up evaluation of

Case 1:23-cv-00595-JPH-KMB    Document 58-8    Filed 06/12/23    Page 146 of 165
USCA11 Case: 22-11707    Date Filed: 07/05/2022    Page: 135 of 232

319

```
 1   puberty suppression among gender dysphoric adolescents after

 2   that CSHT, which is hormone therapy and GRS, which is puberty

 3   blockers, has demonstrated that gender dysphoric adolescents

 4   are able to maintain a good functioning into their adult years.

 5   This present study, together with this previous research,

 6   indicate that both psychological support and puberty

 7   suppression enable young gender dysphoric individuals to reach

 8   a psychosocial functioning comparable with their peers.

 9         Did I read that conclusion correctly?

10   A    Yes.

11              THE COURT:  Ms. Eagan, when you reach a comfortable

12   spot, let's take a post-lunch break.

13              MS. EAGAN:  Perfect.  We're good, Judge.  We can go

14   ahead and break now.

15              THE COURT:  Okay.  I will see you in 15 minutes.

16              (Recess.)

17              THE COURT:  Go ahead, Ms. Eagan.

18              MS. EAGAN:  Thank you, Your Honor.

19   BY MS. EAGAN:

20   Q    Dr. Cantor, my understanding from paragraph 63 of your

21   declaration is that the other study that you point to in

22   support of your assertion that testing revealed that puberty

23   blockers did not improve mental health any more than mental

24   health does on its own is the Achille study you mentioned

25   earlier today; is that right?
```

```
          1  A    Yes.
          2  Q    If you, please, sir, could turn to Plaintiffs' Exhibit 42
          3  in that binder in front of you, and this would be the
          4  plaintiffs' exhibits that we were looking at earlier.
14:09:42  5  A    Yep.  Got it.
          6  Q    All right.  Is Plaintiffs' Exhibit 42 the Achille study
          7  that we just mentioned?
          8  A    Yes.
          9  Q    All right.
14:09:59 10          MS. EAGAN:  Your Honor, do you mind if I take this off
         11  of this?
         12          THE COURT:  That's fine.
         13  BY MS. EAGAN:
         14  Q    All right.  I am going to -- so this is Plaintiffs'
14:10:15 15  Exhibit 42.
         16       And the Achille study, again, was -- in this case if we
         17  look at the abstract, the background of the study or the
         18  purpose of the study was to examine the associations of
         19  endocrine intervention puberty suppression and/or cross-sex
14:10:35 20  hormones therapy with depression and quality of life scores
         21  over time in transgender youths.
         22       That was the purpose of the study, correct?
         23  A    Yes.
         24  Q    And looking down to the results section, between 2013 and
14:10:56 25  2018 -- so this went over a five-year period, right?
```

```
         1  A     Yes.

         2  Q     And there were 50 participants in the study, correct?

         3  A     That sounds right, yes.

         4  Q     All right.  And that they received endocrine intervention

14:11:17 5  both -- some were in the form of puberty blockers, and some

         6  were in the form of cross-sex hormones, but endocrine -- and

         7  over that time period and completed three waves of

         8  questionnaires.

         9        Is that your recollection of this study?

14:11:30 10 A     Yes, roughly.

        11  Q     Okay.  And when that was -- with those treatments, mean

        12  depression scores and suicidal ideation decreased over time,

        13  which means their depression was -- went down, or they got

        14  better.  Suicidal ideation went down, which is improvement,

14:11:50 15 correct?

        16  A     Yes.

        17  Q     While mean quality of life scores improved over time.

        18        And then it goes on to say, When controlling for

        19  psychiatric medications and engagement in counseling,

14:12:03 20 regression analysis suggested improvement with endocrine

        21  intervention.  And then it goes on to say that this reached

        22  significance in male to female participants.  And the male to

        23  female participants, those are ones that were receiving hormone

        24  therapy, correct?

14:12:23 25 A     I believe they were both receiving hormone therapy.  It
```

1    was not significant in one group, and so they're just reporting

2    the successful in the other and not reporting the nonsuccessful

3    group.

4    Q    Well, let's talk about that.  Let me pull up paragraph 63

14:12:39 5    of your declaration.

6        When you're discussing this study, here is what you said.

7    You said that upon follow-up, some incremental improvements

8    were noted; however, after -- so, in other words, upon

9    follow-up, they saw improvements.

14:13:07 10        But after statistically adjusting for psychiatric

11    medication and engagement and counseling, quote, most

12    predictors did not reach statistical significance.

13        And that's your basis -- that statement is your basis to

14    say there was not a statistical significance of difference

14:13:26 15    between just counseling versus with meds; is that right?

16    A    I'm sorry.  Could you say that part again?

17    Q    The language that you seize onto, to say that puberty

18    blockers did not improve mental health more than mental

19    healthcare did on its own --

14:13:43 20    A    Right.

21    Q    -- was the statement in the study that most predictors did

22    not reach statistical significance.

23    A    Well, I wouldn't say that I derived that just from that

24    sentence.  It's just easier to convey that idea to readers by

14:13:56 25    using the sentence.  My evaluation of the study is by those

1  statistics directly.

2  Q    All right.  Let's go to the language in the study that

3  they talk about, the regression analysis that you were just

4  referencing there.

14:14:11 5        Okay.  And this is here in the regression analysis.

6        Let me first say this:  The mean changes over time.  And

7  it does say, Mean depression scores decreased.  Quality of life

8  improved, but did not reach statistical significance.

9        But then when you go on to the regression analysis, here

14:14:39 10 is what it says.  It says, Given our modest sample size --

11 which in this case was 50 people, right?

12 A    Yes.

13 Q    Given our modest sample size, particularly when stratified

14 by gender, most predictors did not reach statistical

14:14:57 15 significance.

16       So one of the contributing factors to that, of course, was

17 the size of the number of participants, correct?

18 A    Yes.  In statistics, that's a truism.  The precision of

19 the statistics is the direct -- direct result of the sample

14:15:20 20 size.

21 Q    Okay.  And then it goes on to say, That being said, effect

22 sizes values were notably large in many models.  In the male to

23 female participants, only puberty suppression reached a

24 significance level.  And it gives the number in one of the

14:15:43 25 sample -- one of the tests, and associations with the two other

1    scores approached significance.

2         And then it goes on to say, For female to male

3    participants, only cross-sex hormone therapy approached

4    statistical significance.

14:15:57  5         All right.  Statistical significance are not -- on all

6    planes, the numbers improved, correct?

7    A    No.  That's -- the very meaning of determining --

8    factoring in whether something is statistically significant or

9    not.

14:16:15 10  Q    Ultimately, the writers of this study stated, if you look

11   at the next paragraph -- or look on the discussion part if you

12   want -- can you see the screen up here?

13   A    Oh, I have the same thing on this screen.

14   Q    Oh.  You have got one.  Okay, good.

14:16:31 15        Our results suggest that endocrine intervention is

16   associated with improved mental health among transgender youth.

17        Did I read that right?

18   A    Yes.  Those are their words.

19   Q    Doctor, to be clear, you agree that the U.S.-based medical

14:17:15 20  association guidelines and position statements are in support

21   for the use of medical treatment combined with mental health

22   treatment for adolescents with gender dysphoria, correct?

23   A    I don't think I would phrase it quite that strongly.  Most

24   of the associations are using relatively vague terms.  And it's

14:17:35 25  not clear when they're talking about adults or children, when

1    they're talking about transition, medical services versus

2    psychotherapy, or a relatively blanket statement of

3    demonstrating respect.  I can only accept that they're

4    endorsing a particular treatment when they're endorsing a

14:17:54  5    particular treatment.

6         So is there a specific association or specific statement

7    you have in mind?

8    Q    The major medical associations that were involved in this

9    space endorse the use of medications to treat gender dysphoria

14:18:08 10   in children -- excuse me -- gender dysphoric adolescents once

11   they reach puberty when appropriate?

12   A    I can think of two medical associations, one

13   interdisciplinary association, and the other -- and all of the

14   others are, as I say relatively, vague words of support, and

14:18:44 15   it's not clear exactly what it is that they're recommending.

16   Q    Well, my understanding is what you like to look at is the

17   international standards.  That's what you're talking about

18   today in support of your opinions?

19   A    Oh, I looked at each of them, and I think I described each

14:18:59 20   of them.  I did my best not to leave any out.

21   Q    So, and according to you, the Dutch approach is

22   internationally the most widely-respected and utilized method

23   for the treatment of children who present with gender

24   dysphoria?

14:19:13 25   A    Yes.

 1    Q    And the Dutch approach is also, I believe, what you call
 2    that watchful waiting approach?
 3    A    No.
 4    Q    Okay.  The Dutch approach is what is accepted -- I have
14:19:24 5    already said what you said.
 6        The Dutch approach says social transition can happen at
 7    age 12, puberty blockers may be prescribed at age 12, hormones
 8    at age 16, and then resolve other mental health issues before
 9    transition.  That's the Dutch method?
14:19:43 10    A    Yes.
 11    Q    Do you know how that approach aligns with protocols that
 12    are utilized at UAB Children's in Alabama?
 13    A    I don't know.
 14    Q    In any event, what you say is internationally the most
14:20:03 15    widely-respected and utilized method for treatment of children
 16    who present with gender dysphoria, you would agree that that
 17    approach would be a felony in Alabama with this new law,
 18    correct?
 19    A    Yes.  It's true that the Alabama law didn't leave an
14:20:26 20    exception for research purposes.
 21    Q    Okay.  So let's talk about the European countries that you
 22    mentioned very briefly, the UK, Finland, Sweden and France.
 23        When you look at those four European countries, Doctor,
 24    not one of them has enacted a ban to puberty blockers and
14:20:46 25    hormone treatments as Alabama has done here, correct?

```
 1  A      No.

 2  Q      That's not correct?

 3  A      Correct.  That is not correct.

 4  Q      UK has not fully banned puberty blockers and hormone

14:21:00  5  treatments in youth 18 and younger?

 6  A      That's correct.

 7  Q      Finland has not banned -- let me ask it this way:  Has

 8  Finland banned blockers and hormone treatments in youth ages 18

 9  and under for gender dysphoria?

14:21:16 10  A      Yes, I believe it has.

11  Q      It has?

12  A      I believe so.

13  Q      A blanket ban?  Should I refer you to paragraph 131 of

14  your declaration, sir?

14:21:47 15  A      Hang on.  That's just where I am now.

16  Q      Okay.

17  A      Oh, yes, they did leave an exception for hormones.  The

18  total ban was on surgery.

19  Q      Thank you, sir.

14:22:05 20         Sweden, has Sweden put an absolute ban on puberty

21  blockers?

22  A      Yes.

23  Q      And bear with me.  Have they put a ban on puberty blockers

24  and hormone treatments in youth ages 18 and under for gender

14:22:23 25  dysphoria in Sweden?
```

```
 1  A    18 and under?

 2  Q    Yes, sir.

 3  A    No.  They allowed exceptions for 16 year olds -- 16 year

 4  olds within research circumstances.

 5  Q    Has France banned the use of puberty blockers and hormone

 6  treatments for adolescents ages 18 and under?

 7  A    No.

 8  Q    Can you point me to a single country, Doctor, in Europe

 9  that has put a blanket ban on the use of puberty blockers or

10  hormone treatments for youth ages 18 and under for gender

11  dysphoria?

12  A    Blanket ban in the way you're describing it, no.

13          THE COURT:  How about any country?

14          THE WITNESS:  No, not that I know of.

15  BY MS. EAGAN:

16  Q    I want to turn very briefly to the subject of -- I will

17  use your word desistance.

18       If you turn to paragraph 36 of your declaration.

19  A    Yes.

20  Q    In that -- you state, Among prepubescent children who feel

21  gender dysphoric, the majority cease to want to be the other

22  gender over the course of puberty ranging from 61 to 80 percent

23  desistance across the large prospective studies.

24       I know that's a point that you also raised earlier today.

25       So I want to ask this question:  Of those that number, do
```

The timestamps in the left margin: 14:22:32 (line 5), 14:22:50 (line 10), 14:23:04 (line 15), 14:23:36 (line 20), 14:23:59 (line 25).

```
        1    you know, Doctor, what percentage of those kids cease to want
        2    to be the other gender -- that's using your words -- before or
        3    as they enter puberty, in other words, before they actually get
        4    into puberty?  Do you know how many of those desisters are in
14:24:27 5   that window?
        6    A    I must not be understanding your question, because it
        7    makes me want to say the same number that's in the report, 61
        8    to 88 percent.  What's different from what I said and what
        9    you're asking?
14:24:39 10  Q    The 61 to 88 percent, is that children that realign with
        11   their birth sex before -- or as they're entering into puberty,
        12   that's that number?
        13   A    Yes.
        14   Q    Okay.  All right.  So I want to focus on a different
14:25:01 15  category of youth.  Let me ask you this:  The medications in
        16   the United States, puberty blockers and hormone treatments
        17   cannot be given to kids for gender dysphoria until after
        18   they've actually entered into puberty, correct?
        19   A    Very many clinics are doing it as close to the beginning
14:25:23 20  as soon as puberty starts as they are able.
        21   Q    But it's once they have entered puberty?
        22   A    Yes.
        23   Q    So let me ask you about that category of youth.
        24        And that is adolescents who have entered into puberty,
14:25:38 25  okay, and who have been -- have suffered from gender dysphoria
```

```
 1  persistently, consistently, and insistently in childhood

 2  leading up to puberty, okay?

 3  A    Okay.

 4  Q    Do you have any data regarding what percentage of those

 5  individuals desist after they enter into puberty?

 6  A    No.  I don't think that level of follow-up has yet been

 7  conducted.

 8  Q    And, Doctor, in fact, it's your belief that the

 9  majority -- that while the majority of prepubescent kids cease

10  to feel trans, you know, to puberty or during puberty, in other

11  words, as they enter into puberty, the majority of kids who

12  continue to feel trans after puberty rarely cease?

13  A    That does seem to be the case, yes.

14  Q    Okay.  Doctor, are you being paid to be here to testify

15  today?

16  A    Yes.

17  Q    What's your rate?

18  A    400 an hour.

19  Q    Who is paying your fees?

20  A    The Alabama state -- State of Alabama.

21  Q    Okay.  Dr. Cantor, have you attempted to recruit parents

22  in Alabama whose children have gender dysphoria and were

23  prescribed or referred to gender-affirmative treatments, have

24  you tried to recruit them to give a witness statement in this

25  case that they believe the treatments are harmful?
```

14:25:58  (line 5)
14:26:35  (line 10)
14:27:10  (line 15)
14:27:14  (line 20)
14:27:38  (line 25)

```
          1   A     No.

          2   Q     Do you tweet?

          3   A     Yes.

          4          MS. EAGAN:  Your Honor, may I approach?

14:27:49  5          THE COURT:  Yes.

          6   BY MS. EAGAN:

          7   Q     Doctor, I've marked as Plaintiffs' Exhibit 45 a tweet

          8   Dr. James Cantor retweeted.  And it's -- let me say this:  Is

          9   this a tweet that you actually did?

14:28:40 10   A     No.  I --

         11   Q     You retweeted?

         12   A     Retweeted, exactly.

         13   Q     From a group called Genspect, or what's -- I don't tweet.

         14   Would you call that a group?  I guess it's a group called

14:28:56 15   Genspect?

         16   A     It's there is a group called Genspect, and this is their

         17   Twitter account.

         18   Q     All right.  And then you retweeted it?

         19   A     Yes.

14:29:03 20   Q     And it says, Urgent.  Attention.  Alabama parents, if your

         21   child experienced gender dysphoria and was prescribed or

         22   referred to gender-affirmative treatments and you believe these

         23   treatments are harmful, please direct message, e-mail us at

         24   once.  We are looking for witness statements.  Can be anon.

14:29:26 25          By anon, I guess that means anonymous, correct?
```

1    A    That would be my reading, yes.

2    Q    All right.  Doctor, have you seen a sworn statement under

3    penalty of perjury for any Alabama parent whose kid received

4    puberty blockers or hormones and the parent said the

14:29:50  5    medications hurt their kid more than they helped them?

6    A    I'm sorry.  Did you ask have I seen such a statement?

7    Q    Yes, sir.

8    A    Not that I recall.

9         MS. EAGAN:  Nothing further.

14:30:05 10         THE COURT:  Any redirect?

11         MR. DAVIS:  Short.

12         THE COURT:  Ms. Eagan, did you intend to offer that

13    into evidence or no?

14         MS. EAGAN:  Oh, yes.  Thank you, Judge.  I offer

14:30:37 15    Plaintiffs' Exhibit 45.

16         THE COURT:  It will be admitted.

17              REDIRECT EXAMINATION

18    BY MR. DAVIS:

19    Q    Dr. Cantor?

14:30:51 20    A    Hi.

21    Q    Is it true as a clinician you are not treating anyone who

22    has presented with gender dysphoria as an adult or as a child?

23    A    I treat adults with gender dysphoria, not children.

24    Q    You are not treating them while they are adolescents or

14:31:09 25    children, you are not currently treating someone who is like

```
           1   under age 16?

           2   A    Correct.

           3   Q    Okay.  But you are familiar with the research literature

           4   on these issues, correct?

14:31:19   5   A    Yes, quite.

           6   Q    And even those that are studying -- or children in

           7   adolescents?

           8   A    Of course.

           9   Q    You're knowledgeable about the treatment they're

14:31:29  10   receiving?

          11   A    Yes, very.

          12   Q    And are you knowledgeable about what the research shows

          13   about the efficacy of these treatments?

          14   A    Yes.

14:31:35  15   Q    You had an exchange with Ms. Eagan where you admitted that

          16   a fact that is self-reported by a participant may be true?

          17   A    Correct.

          18   Q    What's the rest of that sentence?

          19   A    It is certainly not necessarily true.  We need something

14:31:53  20   objective before we can make any decisions upon it.

          21   Q    Let's turn to the Costa study.  That's at Tab 38 of the

          22   book of plaintiffs' exhibits.

          23        MR. DAVIS:  Your Honor, I'm sorry.  I left a notebook.

          24   May I step over?

14:32:40  25        THE COURT:  Certainly.
```

```
      1              THE WITNESS:  I'm sorry.  You said Tab 38?
      2    BY MR. DAVIS:
      3    Q    I was mistaken, Dr. Cantor.  It was 34.
      4    A    34 of the defendants'?
14:33:02  5    Q    No.  Of the plaintiffs' book.
      6    A    Yes.  Now I'm back there.
      7    Q    Okay.  Now, you have a line in your report in paragraph 57
      8    of your report that I will just read to you.
      9         It says, Both groups improved in psychological functioning
14:33:25 10    over the course of the study, but no statistically significant
     11    differences between the groups was detected at any point?
     12    A    Correct.
     13    Q    Okay.  Are the three groups represented by the three
     14    colored lines -- the three groups you're talking about, the
14:33:41 15    three groups on the three colored lines on this chart I'm
     16    showing you?
     17    A    Part of the information is contained in that graph, yes.
     18    Q    Okay.  Does this table tell us more about the statistical
     19    significance or lack thereof shown in the Costa study?
14:34:02 20    A    Yes, it does.  The results of this table, although much
     21    harder to read, indicate that there was no statistical
     22    significance between the groups.
     23    Q    Okay.
     24    A    What was changing in the groups was change over time
14:34:13 25    within the group relative to the same group previously.  But
```

 1  there were no changes -- no significant differences between the

 2  groups themselves.

 3  Q    Okay.  What does it mean in a study if a finding lacks

 4  statistical significance?

14:34:29 5  A    That there was a substantial probability of getting a

 6  pattern like that just by random chance.

 7  Q    And are there any reasons other than puberty suppression

 8  that the delayed group did not have the same change over time

 9  as the immediately eligible group?

14:34:45 10  A    It's not exactly clear if they didn't change just as much.

11  That's one of the ambiguities that, again, comes from

12  statistics.  When you look at it in different ways, you can see

13  different aspects, different aspects of it.

14  Q    And the authors actually noted statistical significance or

14:35:11 15  lack thereof, did they not, in the language that are bracketed

16  there?  It says, this difference failed to reach significance

17  possibly because of sample size?

18  A    That is correct.

19  Q    Have you said anything about the Costa study in your

14:35:24 20  report that you need to withdraw after your exchange with

21  Ms. Eagan?

22  A    No.  Everything I said is accurate.

23  Q    Okay.  Is the same true for everything that you have said

24  about the Achille study?

14:35:39 25  A    Yes.  Everything I said was accurate.  Nothing in the

1   prior discussion changed it.

2   Q    The UK is still reviewing these treatments, are they not?

3   A    They are in the middle of deciding what to do with what

4   they have now discovered from their comprehensive review of the

14:35:57 5   literature, which showed what they were doing was wrong.

6   Q    What did they discover?

7   A    They discovered that they said exactly what I said, that

8   there is no evidence to support the medical transition of these

9   children.

14:36:09 10   Q    And they have not yet decided how to respond to that

11   revelation, correct?

12   A    Correct.  They have now taken that report, and they're now

13   reorganizing and deciding exactly what it is that they're going

14   to do.

14:36:21 15   Q    And in France, is it not correct that they've said about

16   hormones that the greatest reserve is required for their use?

17   A    That is correct.

18   Q    And is it true that, quote, they have said that speaking

19   of hormones, they're irreversible nature must be emphasized?

14:36:38 20   A    That is correct.

21   Q    And in Sweden, is anyone under 16 getting puberty blockers

22   or hormone treatments?

23   A    No.  That is banned.

24   Q    And what about over 16?  Youth -- like --

14:36:51 25   A    Between 16 and 18, they're permitted to do it, but only

```
 1   within recognized research programs.  A regular physician
 2   can't.
 3   Q    And how many such research programs are going on at
 4   present?
 5   A    Oh, in Sweden?
 6   Q    Are you aware of any?
 7   A    I am aware of one lab that has two locations.  I don't
 8   know what its current status is with its current research
 9   program.
10   Q    Okay.  Can you say whether a single child under 18 is
11   currently receiving hormones for the purpose of transitioning
12   in Sweden?
13   A    I don't know.
14              MR. DAVIS:  Thank you, Dr. Cantor.
15              THE COURT:  Any recross?
16              MS. EAGAN:  No, Your Honor.
17              THE COURT:  May this witness be excused?
18              MR. DAVIS:  Yes, of course, Your Honor.
19              THE COURT:  All right.  You can step down, sir.
20              THE WITNESS:  Thank you.
21              THE COURT:  All right.  Call your next witness.
22              MR. DAVIS:  Your Honor, the State calls Ms. Sydney
23   Wright.
24              THE COURT:  All right.
25                        SYDNEY WRIGHT,
```

14:37:04 — 5
14:37:20 — 10
14:37:39 — 15
14:37:48 — 20
14:37:54 — 25



Tweet

James Cantor
@JamesCantorPhD

The only ones who crave affirmation more than trans teens are their doctors.

8:02 AM · Feb 15, 2023 · 4,734 Views

EXHIBIT 11
Witness: James Cantor
Date: 6/7/23
Dana Miller, RPR, CRR