1

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
                       INDIANAPOLIS DIVISION
                     NO. 1:23-cv-00595-JPH-KMB


K.C., et al.,                         )
                                      )
            Plaintiff(s),             )
                                      )
        -vs-                          )
                                      )
THE INDIVIDUAL MEMBERS OF THE         )
MEDICAL LICENSING BOARD OF            )
INDIANA, in their official            )
capacities, et al.,                   )
                                      )
            Defendant(s).             )


          The videoconference deposition upon oral

examination of PROFESSOR DIANNA T. KENNY, a witness

produced and sworn before me, Brandy L. Bradley, RPR,

a Notary Public in and for the County of Hamilton,

State of Indiana, taken on behalf of the Plaintiffs

at the remote location of the witness, Sydney, New

South Whales, Australia, on the 30th day of May,

2023, pursuant to the Indiana Rules of Trial

Procedure.




                    CIRCLE CITY REPORTING
                  135 N. Pennsylvania Street
                          Suite 1720
                  Indianapolis, IN  46204
                       (317) 635-7857

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

Page 2

```
1              A P P E A R A N C E S
2
3  FOR PLAINTIFFS:    Gavin M. Rose
                      Kenneth J. Falk
4                     ACLU of Indiana
                      1031 W. Washington Street
5                     Indianapolis, IN  46202
                      grose@aclu-in.org
6                     kfalk@aclu-in.org
7                     Harper Seldin
                      AMERICAN CIVIL LIBERTIES UNION
8                     125 Broad Street
                      New York, NY  10004
9                     hseldin@aclu.org
10
11 FOR DEFENDANTS:    Thomas M. Fisher
                      Razi Lane
12                    OFFICE OF THE INDIANA ATTORNEY
                      GENERAL
13                    IGCS, 5th Floor
                      302 W. Washington Street
14                    Indianapolis, IN  46204
                      tom.fisher@atg.in.gov
15                    razi.lane@atg.in.gov
16
17     I N D E X   O F   E X A M I N A T I O N
18
19                                          PAGES
20 DIRECT EXAMINATION                         4
      QUESTIONS BY GAVIN M. ROSE
21 CROSS-EXAMINATION                        166
      QUESTIONS BY THOMAS M. FISHER
22
23
24
25
```

---

Page 3

```
1      I N D E X   O F   E X H I B I T S
2                                          PAGES
3  Plaintiff(s) Exhibit No(s).
4  1 - CV                                     11
   2 - Expert Declaration                     59
5  3 - Expert Declaration Exhibit Citations   60
6  4 - Victoria Act                           63
   5 - Littman                                82
7  6 - Littman Correction                     88
8  7 - Turban - 2022                          89
   8 - CAAPS Position Statement on ROGD       92
9  9 - Indremo                                99
10 10 - Pang                                 103
   11 - WA Website                           115
11 12 - Queensland Website                   116
12 13 - Turban - 2021                        119
   14 - Social Contagion                     123
13 15 - Australian Perspectives             125
14 16 - APS Information Sheet               137
   17 - APS Information Sheet Summary       138
15 18 - AusPATH Standards of Care          139
16 19 - AusPATH Informed Consent           147
   20 - M.W. Riley record                   154
17 21 - M.W. Riley intake packet            156
18 22 - Kenny presentation to SEGM          163
19
20
21
22
23
24
25
```

---

Page 4

```
1      Pursuant to the Indiana Supreme Court Case
2  20S-MS-236 signed March 31, 2020, PROFESSOR
3  DIANNA T. KENNY, having been first duly sworn to
4  tell the truth, the whole truth and nothing but
5  the truth relating to said matter, was examined
6  and testified as follows:
7  DIRECT EXAMINATION,
8      QUESTIONS BY GAVIN M. ROSE:
9  Q   Good morning, Doctor.  How are you today?
10 A   I'm fine.  Thanks.
11 Q   Can you state your name for the record, please.
12 A   It's Dianna Theadora Kenny.
13 Q   That's Dianna with two Ns; correct?
14 A   Yes, and Theadora with an O, not an A, so
15     T-h-e-a-d-o-r-a, and Kenny there's no E,
16     K-e-n-n-y.
17 Q   And I heard you before we went on the record say
18     that you would prefer to be addressed as Dianna;
19     is that correct?
20 A   That's fine, yeah.
21 Q   If I fall into old habits, do you prefer doctor
22     or professor?
23 A   Professor.
24 Q   Dianna, have you ever had your deposition taken
25     before?
```

---

Page 5

```
1  A   Not in America, no.
2  Q   Have you in Australia?
3  A   Yes.  Well, I mean, you don't call them -- it's
4      not exactly the same process, but yes.
5  Q   You've been asked questions under oath for
6      purposes of a court case?
7  A   That's right, yes.
8  Q   I, obviously, know nothing about the rules of
9      depositions or their equivalent in Australia, so
10     I will go over the rules real quick with you.
11     You understand that this is a formal asking and
12     answering of questions under oath; correct?
13 A   Yes.
14 Q   Okay.  The court reporter has asked me to remind
15     you, which I would have done anyway, that
16     because she is writing down everything that we
17     say it is very important that you wait until I
18     finish my question before providing your answer.
19 A   Okay.
20 Q   And I will try to give you the exact same
21     courtesy; is that fair?
22 A   Yes, it is.  Could I get you to sit back a
23     fraction because I can only see that much of
24     your face?
25 Q   I'm sorry.  Is this better?
```

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

**Page 6**

1 A   That's better, yes.

2 Q   Can you still hear me okay?

3 A   Yes, I can.

4 Q   Okay. We had an issue with Zoom not long ago
5     where I had it set to the wrong microphone so
6     I'm used to leaning over something and I don't
7     have to now that it's set correctly, so I
8     apologize.

9 A   Thank you.

10 Q   The court reporter has also asked me to remind
11     you that because of the distance between you and
12     us there very well may be a lag time in the
13     video or in our communication, so, for that
14     reason, too, it's important for you to wait
15     until I finish to begin your answer, okay?

16 A   Okay.

17 Q   In other depositions in this case we have been
18     taking a short break every hour or so. My plan,
19     if everybody is tolerating it, is to go a little
20     longer than that, at least for the beginning,
21     simply because we're already in the evening
22     hours right now, but if at any time you feel
23     like you need a break to stretch your legs, get
24     a drink of water, use the restroom, please,
25     speak up and we can certainly make that happen.

**Page 7**

1     Is that okay?

2 A   I'm perfectly happy to go for -- I'm used to
3     doing long stretches. I have a long attention
4     span. I know it's going to get very late over
5     there, it's fine with me to just, yeah,
6     extend those breaks.

7 Q   Well, I have a short attention span and horrible
8     knees so, please, forgive me if I'm the one that
9     needs a break.

10 A   Okay.

11 Q   Do you have any questions about the process?

12 A   No.

13 Q   Okay. What did you do to prepare for today's
14     deposition?

15     MR. FISHER: I'm going to object to the
16     extent it calls for communication with counsel.

17 Q   Without telling me the content of anything you
18     spoke with your attorneys about today's
19     happenings, did you speak with your attorneys in
20     advance of today's deposition?

21 A   Yes.

22 Q   And when did you speak with them?

23 A   Over the course of the last month. Well,
24     speaking means communicating, documents, you
25     know, going through what was required in my

**Page 8**

1     report, things like that.

2 Q   Did you have a meeting or conversations
3     specifically for the purpose of preparing you
4     for today's deposition?

5 A   A brief meeting.

6 Q   When did that take place?

7 A   I think that was last Thursday morning, my time.

8 Q   Of course. Did you speak with anyone other than
9     the attorneys for Indiana to prepare for today's
10     deposition?

11 A   No.

12 Q   Did you review any documents in advance of
13     today's deposition?

14 A   Yes.

15 Q   Which documents did you review?

16 A   The primary documents that I reviewed are listed
17     on the front of my declaration. Do you want me
18     to go through them? You'll have them in front
19     of you, but I have them here if you need them.

20 Q   That was going to be my next question. Do you
21     have any documents in front of you that you plan
22     on referencing during the deposition?

23 A   I have my declaration.

24 Q   Okay. Is that the only document you have in
25     front of you?

**Page 9**

1 A   I was advised that that was the only document I
2     was permitted.

3 Q   That's perfectly fine with me. I just want to
4     make sure.

5     The declaration that you have in front of
6     you, does it have the attached exhibits, I think
7     A through E?

8 A   Yes, A through E. The ones you just sent like
9     10 minutes ago?

10 Q   The declaration that your attorneys provided to
11     us have, I think, five attachments. The first
12     was your CV and then the other four were medical
13     records pertaining to each of the plaintiffs.
14     Do you have those attachments in front of you?

15 A   No, I don't, no.

16 Q   And it sounds like you have received copies of
17     several exhibits that I e-mailed to your
18     attorneys a short while ago?

19 A   Yes, I received them about three minutes before
20     this call.

21 Q   Okay. And is anyone else in the room with you?

22 A   No.

23 Q   And are you physically located in your home?

24 A   Yes, in my office, yes.

25 Q   Your home office?

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

Page 10

1 A    My home office, yes.
2 Q    And you said this while we were off the record,
3      but that's in Sydney, New South Whales,
4      Australia?
5 A    That's right.
6 Q    While we're talking today, Doctor, I have
7      several exhibits that I am going to show you.
8      Unlike the other attorneys in this case, I have
9      decided to go out on a limb and explain to the
10     court reporter that I will try to use the
11     share-screen function to show them myself.
12     Because of how that works, you will only be able
13     to see one page or part of one page on your
14     computer.  I promise I'm not trying to trick
15     you.  If you need me to scroll down or anything
16     like that, please, just let me know and I'm more
17     than happy to do so.  Is that fair?
18 A    Yes, that's fine.
19 Q    You will also notice as we go through some of
20     them that I have highlighted portions of the
21     exhibits.  The only reason for doing so -- and I
22     freely admit that that was me that did so -- is
23     to try to direct my eyesight so that I don't
24     waste your time as I try to find what I'm
25     looking for, but that's why some portions will

Page 11

1      be highlighted.
2           MR. FISHER:  Gavin, can I interject for a
3      second?
4           MR. ROSE:  Of course.
5           MR. FISHER:  To the extent that she needs
6      full context for any of those documents, do you
7      have an objection if she opens the full document
8      that she received by e-mail?
9           MR. ROSE:  Of course not.
10 Q    Okay, Doctor, I'm going to pull up using the
11     share-screen function what I have marked as
12     Exhibit 1.  And do you see that in front of you
13     right now?
14 A    Yes.
15 Q    And I can scroll down if you need for me to;
16     although, I can tell you that it's 14 pages
17     long.  I assume you recognize this as your
18     curriculum vitae?
19 A    Yes.
20 Q    And this is the version that your attorneys
21     provided to us just over the weekend.  I assume
22     that it's still current; is that correct?
23 A    Yes, that's correct.
24 Q    Okay.  And you're currently employed, I
25     understand?

Page 12

1 A    Yes.
2 Q    And it looks from your CV like you're employed
3      as a consultant presently?
4 A    That's right.
5 Q    And that's for a business called DK Consulting?
6 A    Yes.
7 Q    And I assume the DK is you?
8 A    Yes.
9 Q    Are you the -- I'm sorry, I talked over you.
10 A    That's okay.  I just said it's not very
11     original.  No symbolism in that at all, yeah.
12 Q    Are you the only employee of DK Consulting?
13 A    I have an assistant, like an administrative
14     assistant.
15 Q    Okay.  Is that the only other employee?
16 A    Yes.
17 Q    And has this been your only employment since
18     2019?
19 A    Yes.
20 Q    And by "since 2019," I mean since you retired
21     from being a professor.
22 A    That's right, yes.
23 Q    Do you currently have any patient care
24     responsibility?
25 A    I'm in full-time private practice, so yeah.

Page 13

1 Q    Is that through DK Consulting or just separate?
2 A    No, no, that's through DK Consulting.
3 Q    Okay.  And I assume that you provide
4      psychotherapy to your patients?
5 A    Yes, I provide psychotherapy; I provide marriage
6      and family therapy; I do child and adolescent
7      assessments; and I do mediation and family
8      dispute resolution.
9 Q    When you do child and adolescent assessments, is
10     that for anyone in particular?
11 A    Well, in recent times, it's children being
12     brought for gender dysphoria, so a large part of
13     my practice currently are children and families
14     with a young person who is declaring themselves
15     transgender.
16 Q    And when you say that you work full time in
17     private practice, is that more or less 40 hours
18     a week that you see patients?
19 A    It's more like 60 hours a week.
20 Q    And approximately what percentage of that would
21     you say are for patients who have identified
22     themselves as transgender?
23 A    I'd say two-thirds, but they're not all patient
24     contacts, the 60 hours, because I include
25     preparing depositions for Indiana among the

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

**Page 14**

1    hours that I spend working.  So, in my clinical
2    hours, I would say at the moment two-thirds.
3  Q    And, I'm sorry, that was just a bad question
4    then.  About how many hours each week are you
5    working as a clinician?
6  A    About 30.
7  Q    Okay.  So about 20 hours or so each week you're
8    treating or assessing patients for gender
9    dysphoria?
10  A    Yes.
11  Q    And are all the patients with gender dysphoria
12    that you see minors?
13  A    Yes, I specialize in minors.
14  Q    I'll come back to your clinical practice in just
15    a little bit.  It looks from your CV like you
16    served as a professor at the University of
17    Sydney in various capacities from 1988 through
18    2019.  Is that accurate?
19  A    That is.
20  Q    Your last position was as an honorary professor
21    of psychology and a professor of music?
22  A    Yes.
23  Q    I'm just curious, but why music?
24  A    Sorry?
25  Q    I said I'm just curious, but why music?

**Page 15**

1  A    Why music?  It's a very long story and it's
2    probably for another time, but I, you know --
3  Q    Let me ask you this because I couldn't tell from
4    your CV.  Is it teaching music or is it teaching
5    the psychology of music or performance anxiety
6    or what have you?
7  A    I established a research center at the Sydney
8    Conservatorium of Music which is a faculty of
9    the University of Sydney.  So, when the Sydney
10    Conservatorium of Music amalgamated with the
11    university, it was a freestanding tertiary
12    institution, and then there was a lot of
13    legislative changes to reduce the number of
14    tertiary institutions and the Sydney
15    Conservatorium amalgamated with Sydney
16    University and became a faculty, but we were a
17    research-led university and it didn't have any
18    research as a tertiary institution.  It was
19    primarily concerned with training young
20    musicians.
21    And they were looking for somebody who had
22    research expertise and who knew about music and
23    how the university structures ran, applying for
24    research grants, setting up a research
25    laboratory, so the magic finger was pointed at

**Page 16**

1    me.  And, for those years, I had two
2    professorships that I had to juggle and get this
3    search established.  So I didn't do any
4    undergraduate lecturing in that position.  It
5    was all as a director of research center and I
6    was primarily supervising Ph.D. students but
7    also doing a lot of research, applying for
8    grants, writing papers, and so forth, yeah.
9  Q    Thank you.  In your role as a professor of
10    psychology or I guess before that a lecturer in
11    psychology, were there specific subjects that
12    you taught?
13  A    Yes, I was specifically hired for my expertise
14    in developmental psychology and so I was
15    primarily responsible for both the undergraduate
16    and the postgraduate teaching in subjects like
17    infant and child psychology, developmental
18    psychology, developmental psychopathology.  What
19    else?  Current issues in adolescent psychology,
20    all those kinds of subjects, child and
21    adolescent assessment.
22  Q    Of the psychology courses that you taught, did
23    any of them concern treating gender dysphoria or
24    providing gender-affirmative care?
25  A    There was no such thing when I started at the

**Page 17**

1    university and there were no courses anywhere in
2    Australia because the incidence and prevalence
3    of that condition was estimated to be minutely
4    small and we, therefore, focused on the much
5    more prevalent conditions that children present
6    with in childhood.  So it wasn't on the radar.
7    Let me put it that way.
8  Q    Did you teach any courses about that subject
9    toward the end of your career with the
10    University of Sydney?
11  A    No.  Towards the end of my career as a
12    professor, I was primarily supervising Ph.D.
13    students and executing research grants,
14    conducting research, and generally organizing
15    the research program that I've described before.
16  Q    Have you taken any courses pertaining to gender
17    dysphoria?
18  A    Well, there aren't any formal courses even now
19    that I'm aware of in Australia and I would have
20    to vet them very carefully before I book any of
21    those courses because Australia has
22    unquestioningly, and without due thought and
23    consideration, adopted what we call here as
24    gender ideology and as soon as I see the
25    contents of the description of gender ideology,

K.C., et al. VS

Dianna T. Kenny

The Individual Members of the Medical Licensing Board

May 30, 2023

Page 18

1  I become, you know, quite twitchy and disturbed
2  by the scientifically fallacious information
3  that's being propagated, particularly in our
4  entrance primary and secondary schools.
5      So I have engaged in a very detailed
6  undertaking to educate myself based on my
7  thorough training and many, many years of
8  clinical experience developing my own model and
9  my own clinical practice approach to these young
10  people.
11 Q  In the middle of your answer there you used the
12  phrase "what we call here as gender ideology,"
13  and I'm just curious who "we" is in that
14  sentence.
15 A  Well, it's generally referred to in that way in
16  the media and media who are somewhat less than
17  supportive of things like gender-affirming care,
18  for example, and all the new lexicon, the new
19  terminology, you know, that's being propagated
20  by the machinery of the trans advocates.
21 Q  Okay.  And I asked if you had taken any courses
22  pertaining to gender dysphoria and maybe I
23  didn't ask the question in the right way.  Other
24  than your personal investigation and review of
25  the literature and certain materials, do you

Page 19

1  have any professional training specific to
2  gender dysphoria or its treatment?
3 A  As I explained, there are no such courses.
4  People have just adopted practices from
5  overseas.  And, I mean, there are courses within
6  courses, so, for example, in cultural studies
7  there's a subcourse called gender and sexuality
8  and within that course they would cover the
9  discourses, the current discourses, but it's
10  more in the area of sociology or critical
11  studies.  And my field is psychology so there's
12  not really any intersection unless I choose to
13  read some literature in that field, but there's
14  no such discrete course as gender-affirming
15  care.
16 Q  Okay.  During your time as a professor for, if
17  I'm doing the math right, 30, 31 years, did you
18  have patient care responsibilities at the same
19  time?
20 A  Yes, I had rights to private practice throughout
21  my academic career.
22 Q  And about how many hours each week were you
23  seeing patients?  And I'm sure --
24 A  About 10.
25 Q  Okay.  And was that more or less consistent

Page 20

1  throughout your time teaching?
2 A  Yeah.  I mean, it varied according to, you know,
3  circumstances, but, on average, I would say that
4  would be about right.
5 Q  So, prior to your time in private practice
6  following your tenure with the University of
7  Sydney, were any of the patients that you saw
8  diagnosed with gender dysphoria?
9 A  Do you mean when I was at the university?
10 Q  Yes.  I'm sorry.
11 A  No.  I only kind of became involved in about
12  2019 when a colleague of mine, who is an
13  adolescent psychiatrist, called me and said a
14  few psychiatrists are getting referrals of these
15  young children who are gender dysphoric and
16  wanting to transgender and none of them had very
17  much experience with child and adolescent
18  psychology or psychiatry.  And he asked me if I
19  would review a couple of cases that he had been
20  referred and have a case conference.  And it was
21  consultation.  And it was from that point that I
22  started to take on cases myself and to really
23  intensively educate myself about what was going
24  on and what was happening in this field, so it's
25  really been for the last coming into five years.

Page 21

1 Q  And do you remember what time of the year in
2  2019 you left the University of Sydney?
3 A  July.
4 Q  So would it be after that time that you began
5  looking into gender dysphoria?
6 A  Yes.
7 Q  Okay.  And then it looks from your CV like from
8  '86 through '87 you were a psychologist in
9  private practice?
10 A  Yes, I was.
11 Q  During this time did you see or treat any
12  patients with gender dysphoria?
13 A  No.  I might say that they didn't exist in
14  Australia in 1986/'87.
15 Q  Okay.  Then I want to, if it's okay, just
16  briefly focus on your clinical experience after
17  you left the University of Sydney where you've
18  been seeing patients and looking into gender
19  dysphoria.  Is that okay?
20 A  Yeah.
21 Q  Approximately how many patients with gender
22  dysphoria or gender identity issues did you see
23  over this period or have you seen over this
24  period?
25      MR. FISHER: I'm going to object to the

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 22

1 form of that question. It's unclear whether
2 those are two separate categories or you're
3 conflating them together?
4     MR. ROSE: That's a perfectly fair
5 objection and if Tom had not called me, I would
6 have rephrased it myself.
7 Q  How many patients diagnosed with gender
8 dysphoria have you seen since you left the
9 University of Sydney, more or less?
10 A  Well, it depends on whether you're talking about
11 seeing them for assessment or seeing them for
12 therapy. If I just counted the young people
13 that I had seen for assessment, it would be in
14 the vicinity of 150 to 180, and, of those, I
15 would have taken probably 50 to 60 into
16 long-term therapy.
17 Q  And pretend I know almost nothing about the
18 practice of psychology, but what is, I guess,
19 the assessment? A patient gets referred to you
20 from some source and what happens then when
21 you're assessing them?
22 A  Well, I always meet with the parents first and I
23 get a full developmental history because there's
24 a great deal of dispute about onset and I want
25 to get a very clear picture from the parents

Page 23

1 about when their child first expressed ideas
2 about being transgender and so forth. So I do a
3 very careful historical overview of their
4 developmental milestones. I also want to
5 understand how they're performing at school. I
6 also want to review any of the previous
7 assessments that they've had for intellectual
8 ability, any intellectual disabilities, learning
9 disabilities, have they had an assessment for
10 autism spectrum disorder, ADHD, have they ever
11 been diagnosed with depression and anxiety, are
12 they on any medications. So that is quite an
13 extended interview with the parents.
14     And during that time I'm also assessing the
15 marital and parental dynamic so I'm looking for
16 power imbalances in the marital diet, I'm
17 looking for whether there's a lack of respectful
18 interactions between the parents, and I'm also
19 looking for whether there's any disagreement
20 about how they should proceed with their child.
21 And quite often you'll see one parent who is
22 more supportive of allowing the transition and
23 another parent who is not approving. So all of
24 these things are extremely important.
25     And then I will see the child on his or her

Page 24

1 own and that might go from one to three sessions
2 depending on what I'm exploring with the child
3 and what I think is happening in terms of this
4 child's life.
5     After that assessment of the child, I meet
6 again with the parents and I give them an
7 overview of my opinion and how we should proceed
8 or how I recommend that the family proceed.
9 Q  Just a couple of questions about that.
10     MR. FISHER: Gavin, I'm sorry to interrupt
11 you. I just want to alert you. Because you're
12 sharing your screen, when people are sending you
13 text messages they're popping up on my screen.
14 I'm doing my best to ignore them and not look at
15 them, but I noticed at least one of them was
16 from Chase so I thought I'd better alert you
17 because probably you don't want me to see those.
18     MR. ROSE: I appreciate that. Thank you.
19 Can we go off the record for just a second?
20     (A discussion was held off the record.)
21 QUESTIONS BY GAVIN M. ROSE:
22 Q  Okay. Doctor, you just explained the assessment
23 process when you see a patient for the first
24 time for gender dysphoria, and my question to
25 you is going to be whether there is an age range

Page 25

1 of the children that you assess.
2 A  I've seen children as young as three to four and
3 I usually -- I have seen some young adults in
4 their 20s, but the majority are under 18 years
5 of age or around. You know, I've seen quite a
6 few like 17, 18-year-olds.
7 Q  Would you say the majority are in their
8 adolescence?
9 A  Yes, I would.
10 Q  Approximately how many children preadolescence
11 have you assessed for gender dysphoria?
12 A  I think it would be less than a quarter of the
13 presentations.
14 Q  So, if I'm doing the math, maybe 30-ish?
15 A  Yeah. I mean, it depends on whether you count
16 the peripubertal children, you know, the 11
17 12-year-olds because some children are reaching
18 puberty at younger than average ages. So a
19 child might be pubertal at 10 and so it would be
20 a question of whether you would count that child
21 as a child or as an emerging adolescent, so it
22 gets a little bit gray if you wanted to strictly
23 categorize them. The majority, I would say,
24 would be between 10 and 18.
25 Q  Okay. And of the 150 to 180 patients you've

Circle City Reporting
317-635-7857

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 26

1 assessed, how do you decide which ones will
2 become the 50 or 60 that you accept for
3 longer-term treatment?
4 A   I make an assessment about whether the young
5 person is capable of entering into a
6 psychotherapeutic process.  That's one
7 criterion.
8       Another is whether it is more (inaudible)
9 to work directly with the parents and, quite
10 often, I will choose to do that in the first
11 instance.  So I will meet with the parents more
12 regularly than the child and I will -- I suppose
13 the word is coach, you know, coach them about
14 parenting and how to manage, you know, the
15 child's behavior generally and how to manage the
16 statements or, you know, gender sort of related
17 issues, so that's another way that I work.
18       And, in some cases, I'll work with the
19 family, usually the young person and the parents
20 together.  In most cases I don't include
21 siblings.  If I do do family therapy, it's just
22 with the identified child.
23       So I have a very broad perspective on the
24 kinds of interventions that I undertake and
25 they're based on very careful assessment of the

Page 27

1 dynamics of the family, the capacity to engage
2 in particular psychotherapeutic processes, and
3 that involves a capacity for insight and
4 reflective function.  And, you know, if not, I
5 step it down to psychoeducation, behavioral
6 management.  But I do find that an open
7 exploratory psychodynamic/psychotherapy approach
8 is more effective if it's suitable for that
9 young person and the family.
10 Q   And you began that answering by saying that one
11 of the things you look at in determining whether
12 to accept a patient for longer-term treatment is
13 whether they're capable of entering into the
14 psychotherapeutic relationship or possibly the
15 process.  What type of patient is not capable of
16 doing that?
17 A   Well, you have to be very careful about young
18 people with autism spectrum disorder.  In the
19 early days and even now, I did take some of
20 those into individual therapy because they were
21 extremely distressed young people.  And, because
22 of their cognitive rigidity, cognitive
23 immaturity, their literal interpretation of the
24 world, and some of them display quite
25 obsessional features in both their behavior and

Page 28

1 their thinking, you come to a point where it
2 does not seem to be the best intervention for
3 that type of young person and so I seek other
4 methods, usually primarily working intensively
5 with the parents.
6 Q   And when you assess a patient are you attempting
7 to -- are they coming to you with a diagnosis or
8 are you attempting to diagnose them?
9 A   I'm not primarily focused -- I presume you're
10 meaning a diagnosis of gender dysphoria?
11 Q   Sure.
12 A   Yeah.  The parent will usually tell me in the
13 first assessment interview what their child is
14 saying and doing with respect to gender and what
15 their demands are and expectations.  When I see
16 the child, I'll ask them why they've come to see
17 me, what is their understanding of why they've
18 visited with me today, and I usually take the
19 assessment from that point.  And you would be
20 amazed at how many of them don't start with
21 gender.
22 Q   How many minor patients have you diagnosed with
23 gender dysphoria, if any?
24 A   I think one.
25 Q   And how old was that patient?

Page 29

1 A   Four.
2 Q   And when you diagnosed that patient with gender
3 dysphoria, what diagnostic criteria did you use?
4 A   Well, I mean, the only acceptable one in current
5 situation is DSM-5 that you will see from my
6 declaration that I have great concerns about the
7 DSM-5 as do a large number of my colleagues.
8 Q   Are those the criteria that you used in
9 diagnosing that one patient, though?
10 A   I look at those criteria, but I primarily am
11 concerned with the behavior of the child.
12 Q   What, if any, criteria other than the DSM-5 did
13 you consult in diagnosing that patient?
14 A   I look at their general adaptation, whether
15 they're meeting developmental milestones,
16 whether they're capable of expressing an
17 independent idea about themselves because quite
18 often there are subtle communication dynamics
19 happening between parents and children, and, you
20 know, I mean, of course, the simplest one is
21 that mother speaks for the child and that's why
22 it's important to spend some time with the child
23 alone.  And, often, because I do a lot of work
24 for the family court in Australia and for the
25 Office of the Department of Public Prosecutions

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 30

1  where there are allegations of child sexual
2  abuse, they're really, really, you know, very
3  damaging custody disputes and so on.
4  Q    I'm sorry for interrupting, but I was going to
5  ask:  Did the tools or criteria that you used in
6  addition to the DSM-5, do they come from any
7  publication?  Are they written down anywhere?
8  A    Well, they come from the development psychology
9  literature and also the literature on dynamic
10  psychotherapy.
11  Q    But there's no specific one page, two-page list
12  of criteria that you can point me to for these?
13  A    Well, I have been a coauthor of two clinical
14  guides for the management of children with
15  gender dysphoria.  One of them was an
16  international consortium that I contributed a
17  very significant portion of that document.  I've
18  also contributed in a major way to the clinical
19  guide published by the National Association of
20  Practicing Psychiatrists, and I've also written
21  some therapeutic treatment guides for clinicians
22  that I've presented at meetings and conferences
23  for consideration.
24  Q    You described this one patient that you
25  diagnosed with gender dysphoria.  Were any of

Page 31

1  the other patients that you saw for gender
2  dysphoria diagnosed with gender dysphoria by
3  another professional?
4  A    By and large, my practice involves what's called
5  tertiary referral, so a lot of these young
6  people come to me when the parents have been
7  horrified by what's been going on in the gender
8  clinics.
9        So one of the typical ways that it happens
10  is that the child declares him or herself
11  transgender.  The mother takes the child to the
12  general practitioner.  That's the family
13  treating doctor.  The doctors will then refer
14  these children to either gender-affirming
15  (inaudible) pediatricians or to the gender
16  clinics.  And once you're on that, as the
17  Swedish call it, the "trans train," there's
18  almost only one stop and that's transition.
19        And, so, when the parents go to these
20  establishments, they're actually excluded from
21  the process.  They're being made to wait
22  outside.  If the parent wants to contribute
23  their perceptions of their child and their
24  worries about their child and maybe transition
25  isn't the right thing for them, they're taken

Page 32

1  off and told that they're the problem and to get
2  out of the child's way.  And, you know, as soon
3  as this child starts the transition process, all
4  of these serious psychological problems up to
5  and including self harm and school refusal and,
6  you know, the old standards of depression and
7  anxiety, they're all going to magically
8  disappear if you start pumping the child with
9  puberty blockers and cross-sex hormones.
10  Q    I'm sorry, Doctor.
11  A    I'll finish my answer.
12  Q    I'm sorry, Doctor.  You've actually gone well
13  beyond the question that I've asked so I'd like
14  to turn back to the question that I asked which
15  is:  Other than the one patient that you
16  diagnosed with gender dysphoria, had any of the
17  other patients that you've seen for gender
18  dysphoria been diagnosed with that condition by
19  some other professional?
20  A    Well, I was about to finish my answer when you
21  cut me off.  So the answer is yes and I'm
22  telling you the root by which they've been
23  diagnosed after maybe one half-hour session by
24  the gender clinic.
25  Q    And the reason I ask that question is I'm trying

Page 33

1  to hone down on, I guess, whether you believe
2  that you have only had one patient with an
3  accurate diagnosis of gender dysphoria or
4  whether you believe you've had a number of
5  patients with an accurate diagnosis of gender
6  dysphoria.
7  A    Well, I was attempting to answer that question
8  in your previous question which is I am a
9  tertiary referral source.  So the parents who
10  become horrified at what's going on at the
11  gender clinics are the people who are most
12  likely to come to see me so they're already
13  convinced that the diagnosis of gender dysphoria
14  is inaccurate and inappropriate for their child,
15  and, so, that would be the patient group that I
16  see.  I'm not seeing the captured parents.
17  They're staying at the gender clinics.
18  Q    Okay.  And, other than that one patient that you
19  diagnosed with gender dysphoria, did you agree
20  with the assessment of the parents that every
21  other patient you saw for gender dysphoria had
22  been inaccurately or inappropriately diagnosed
23  with that condition?
24  A    I don't make definitive statements of that kind
25  until I've worked with the parents and with the

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

**Page 34**

1 child. It's an open question that has to be
2 explored very carefully as well as all of the
3 other comorbid presentations that the child
4 usually presents with. I can tell you one thing
5 for sure and that is I haven't seen a child
6 without a comorbid presentation who comes
7 telling me that they're gender dysphoric, so
8 there's usually serious pathology in the child
9 and the family.
10 Q  Have any patients come to you with a diagnosis
11 of gender dysphoria where your assessment and
12 prolonged treatment, if it goes that way,
13 confirms the diagnosis?
14 A  I don't confirm the diagnosis.
15 Q  Okay. You keep medical records for each of your
16 patients; is that correct?
17 A  Of course.
18 Q  And on the medical records that you keep, do you
19 have a list of diagnoses for which the patients
20 have presented or been confirmed? Do you have a
21 list of diagnoses for each patient?
22 A  Yes.
23 Q  And how many patients of the 50 or 60 that
24 you've accepted into long-term treatment do your
25 records reflect a diagnosis of gender dysphoria?

**Page 35**

1 A  Zero.
2 Q  And what about the one person that you diagnosed
3 with gender dysphoria?
4 A  I didn't make a definitive statement. I said it
5 was likely a diagnosis that needed to be
6 considered seriously, but because of the child's
7 age and, you know, cognitive immaturity, I
8 suggested that the parents engage in active
9 watchful waiting for a significant period of
10 time before taking any action.
11 Q  And do you continue to see that patient?
12 A  I see the parents. I don't see the patient at
13 this point.
14 Q  Have you ever seen a patient who was taking
15 either puberty blockers or gender-affirming
16 hormones?
17 A  Yes.
18 Q  And were those subsequently discontinued?
19 A  No. Oh, well, I mean, one has to look at each
20 case individually, but there's only a small
21 number that I'm seeing who had already started
22 that process and, to date, they have not
23 discontinued and I'm not pressuring them to
24 discontinue. You know, these young people on
25 cross-sex hormones around 16, 17, 18, so I

**Page 36**

1 engage in an exploratory process with them, but,
2 once they do start taking the cross-sex
3 hormones, the landscape changes because these
4 medications, of course, affect the total body
5 and the way they think about themselves and
6 their neurological as well as physical
7 functioning.
8 Q  And, please, correct me if I'm wrong because I
9 might have just misheard a word. Did you say
10 that you've only seen one patient taking
11 hormones?
12 A  No, I've seen three or four.
13 Q  Okay. And were those three or four patients
14 patients that you simply assessed or were they
15 accepted into longer-term treatment?
16 A  I have one in long-term treatment. I've been
17 seeing him for two years, and when I started to
18 see him he wasn't taking hormones. The others
19 have turned 18 during their therapy and decided
20 that they were going to proceed to cross-sex
21 hormones. And, yeah, I don't know if that
22 answers your question.
23 Q  It does. Thank you. And I didn't ask it right
24 the first time and I apologize for that, but
25 same questions about puberty blockers. How many

**Page 37**

1 patients have you seen who are taking puberty
2 blockers?
3 A  Probably not many, two or three.
4 Q  And, again, same question. Were those patients
5 that you accepted into longer-term treatment?
6 A  Well, I did attempt to, yes.
7 Q  Attempt but did not ultimately?
8 A  Well, when the decision was made, you know, that
9 puberty blockers were the magic bullet, that
10 kind of foreclosed any further discussion.
11 Q  Why did it foreclose any further discussion?
12 A  Well, they found the magic solution.
13 Q  A short while ago in talking about the one
14 patient who you diagnosed with at least likely
15 gender dysphoria, you said that you told the
16 parents to wait and evaluate for I think you
17 said a considerable amount of time. Does that
18 sound right?
19 A  Yes.
20 Q  How long do you consider to be a considerable
21 amount of time?
22 A  It varies with different patients, but I was
23 very mindful if I communicated this to the
24 parents that one of the only robust studies that
25 looked at childhood onset of gender dysphoria

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 38

1 and followed them for 20 years, 88% of them
2 desisted by like adulthood and I think it was
3 60% identified as gay young men. And I
4 communicated that developmental trajectory to
5 the parents and said that they needed to
6 exercise extreme caution in allowing the child
7 to follow his natural developmental trajectory
8 and that any social transition or prescription
9 of puberty blockade would derail that
10 developmental trajectory.
11 Q  And, I'm sorry, how are you defining social
12 transition?
13 A  Where the child changes his or her names or
14 pronouns. They start to dress in the
15 stereotypically style of the opposite sex where
16 they grow their hair long or cut their hair
17 short, that kind of thing.
18 Q  When you have a patient that presents to you as
19 transgender, do you use particular pronouns in
20 referring to that person?
21 A  I avoid pronouns altogether because I'm having
22 first person conversation with a young person
23 and I do not use --
24 Q  Well, you talk about the patient with their
25 parents, though; right?

Page 39

1 A  Not often, no. I usually separate the
2 consultations with parents and children.
3 Q  I'm so sorry for the misunderstanding, Doctor.
4 I did not mean you talk about the patient with
5 the parents in the same room. I meant you have
6 a separate conversation with the parents about
7 the patient; correct?
8 A  Yes.
9 Q  And when you're speaking to the parent do you
10 use pronouns to refer to the child?
11 A  I follow the parent and, in the majority of the
12 cases that I see, the parent is insisting on the
13 child's birth name and natal pronouns.
14 Q  Are there cases where the parent has referred to
15 their child using their non-natal pronouns?
16 A  Yes, I had one last night and, I mean, it wasn't
17 her first session. I've seen her before and she
18 is now using her daughter's preferred name and
19 masculine pronouns. And I have discussed that
20 with her, you know, why is she doing that and
21 how does she think it's helping her child, and I
22 then seek permission from the parent to call the
23 child by his or her given name and pronouns.
24 Q  And I assume your medical records use the sex
25 the child was assigned at birth when they have

Page 40

1 to?
2 A  Yes. I need to do that for clinical purposes
3 because I need to get a picture in my own mind,
4 a template of this child, and quite often I have
5 to do file reviews and case reviews and you will
6 notice in my declaration that I have referred to
7 these four young people using pronouns of their
8 natal sex and their given name except in one
9 case where the given name has been expunged
10 completely, but that is my clinical practice.
11 Q  Okay. Doctor, in your CV, which should still be
12 in front of you, Page 2 lists your membership in
13 various professional organizations; is that
14 correct?
15 A  Yeah.
16 Q  And I assume you remain a member of each of the
17 organizations you list here?
18 A  No, I said that I -- well, in my CV, obviously,
19 it doesn't say that, but somewhere I said, I
20 think it was in the bio, you know, preceding
21 this, I was a member or eligible for membership
22 if I let the membership lapse and in some cases
23 I have let the membership lapse because the fees
24 are ridiculous and you have to be very
25 selective.

Page 41

1 Q  Okay. Of the professional societies you list on
2 your CV, which of these societies or
3 organizations do you remain a member?
4 A  Only the Australian Psychological Society, but I
5 have at one time or another been members -- oh,
6 and the International Association of Relational
7 Psychoanalytic Psychotherapy. Oh, and I'm a
8 member of the Australian Dispute Resolution
9 Association, yeah.
10 Q  And when was the last time you were a member of
11 the American -- or an international affiliate,
12 it looks like, of the American Psychological
13 Association?
14 A  I let those go after I left the university.
15 Q  So 2019 or so?
16 A  Yeah.
17 Q  Is that because the university was paying your
18 membership dues?
19 A  Oh, no. No, we have to pay our own membership
20 dues.
21 Q  Why did you let your membership lapse then?
22 A  There's just so much available on the Internet
23 now. It just wasn't value for money. I mean,
24 the Australian Psychological Society, the fees
25 are $1,000 a year and you just have to be

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 12 of 145 PageID #: 3799

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 42

1  selective.
2  Q   And what does it mean to be an international
3      affiliate of the American Psychological
4      Association?  I just don't know what that means.
5  A   That means that if you're not American, you
6      can't be a full member.
7  Q   Gotcha.  Other than the organizations that you
8      list here on Page 2 of your CV, are you
9      currently a member of any other professional
10     organizations?
11 A   Yes, I'm a council member of the University of
12     Sydney Association of Professors and I'm a
13     council member of the Australian Association of
14     University Professors.  I'm a member of the
15     Society for Evidence-Based Gender Medicine.
16 Q   And if I refer to that organization just as
17     SEGM, S-E-G-M, you'll know what I mean?
18 A   I will.
19 Q   How did you become a member of SEGM?
20 A   I was invited.
21 Q   By whom?
22 A   There were two founding directors and I think
23     one of them is Australian and he put my name up
24     to the American cofounder and they invited me
25     together.

Page 43

1  Q   And when did you first become a member?
2  A   I'd say maybe three to four years ago.
3  Q   Have you ever held a leadership position with
4      the organization?
5  A   No, I avoid administration and hierarchies and,
6      you know, political positions like the plague.
7      I'm a clinician, I'm a researcher, I'm a writer,
8      and I don't have time for that and I'm not
9      interested in that, yeah.
10 Q   Have you ever been compensated by SEGM for any
11     reason?
12 A   Yes, I have been on one occasion.
13 Q   I assume this was for giving a talk or
14     presentation to a meeting?
15 A   I wrote some extensive material for their
16     clinical guide.
17 Q   I'm sorry, I missed a word there.  Wrote some
18     what material?
19 A   Extensively.  I wrote some very long documents
20     for them when we were putting together the
21     clinical guide and it was an honorarium.  I
22     didn't ask for payment, but they appreciated the
23     amount of time and effort that I devoted to
24     that.  And I was perfectly prepared to do it
25     voluntarily so it was just a gesture rather than

Page 44

1      -- it wasn't a contract.  It was an honorarium.
2  Q   Does SEGM hold meetings or conferences?
3  A   Yes.
4  Q   How often?
5  A   I believe about once a month there's a Zoom
6      meeting and from time to time, you know, people
7      get together in person but it's very difficult
8      when you're in Australia.  You have to be very
9      selective where you travel.
10 Q   Do you have to be invited to become a member?
11 A   I believe so.
12 Q   Are you aware that statements by SEGM have been
13     cited in support of a formal opinion in Texas
14     that took the position that the provision of
15     certain gender-affirming care to a minor
16     constitutes child abuse?
17 A   Yes.
18     MR. FISHER:  I was just gonna object.  I
19     wasn't sure what formal opinion.  Could you
20     maybe --
21     MR. ROSE:  I can state for the record, Tom,
22     but when Attorney General Paxton issued his
23     formal opinion declaring the provision of
24     certain care to be child abuse under Texas law
25     he cited SEGM, I think, a couple times.

Page 45

1      MR. FISHER:  Paxton did, okay.  Thank you.
2      MR. ROSE:  And I didn't see a point to
3      bring that up and I apologize, bringing the
4      actual document up.
5  Q   And I guess my question to you, Doctor, is
6      whether you believe that providing
7      gender-affirming care to minors in the form of
8      puberty blockers or hormones constitutes child
9      abuse.
10 A   I would prefer to avoid a motive language.  I do
11     believe it's very poor medicine to derail a
12     child's natural developmental trajectory
13     precipitously when the drugs that have been
14     prescribed have known demonstrated (inaudible)
15     to the human body.
16     Now, child abuse in this country, and I'm
17     sure in yours, carries with it a legal
18     definition and so I don't think it's helpful to
19     use a motive language when trying to discuss the
20     best treatment and management of young people
21     who are declaring themselves gender dysphoric.
22 Q   And, I'm sorry, Doctor, I would know the answer
23     to this question if you were a psychologist in
24     America.  As a psychologist in Australia, are
25     you authorized to prescribe medications?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

Page 46

1  A    No.
2  Q    Are you a member of any advocacy or political
3       organizations?
4  A    No.
5  Q    Have you been in the past?
6  A    You mean advocacy for gender-affirming care?
7  Q    I meant in general and we can narrow it down
8       from there.
9  A    No, I'm not a member of any political party.
10      I'm not a member of any religious organization.
11      I'm not a member of any gender or
12      sexuality-based organization.  I am a completely
13      free agent.
14 Q    Okay.  My understanding is that you have
15      testified before several legislatures and other
16      decision-making bodies concerning transgender
17      persons or the provision of gender-affirming
18      care; correct?
19 A    Well, only one formally in America and that was
20      in Alabama.
21 Q    And I'll do that one first.  Do you mean that
22      you played a role in the Alabama bill similar to
23      Indiana's before that bill was passed?
24 A    Yes.
25 Q    You, I assume, submitted written comments

---

Page 47

1       advocating for it to be passed?
2  A    The original bill, yes.
3  Q    And have you testified before legislatures or
4       other decision-making bodies in Australia about
5       the issue?
6  A    I have provided written and oral submission to
7       the New South Whales Parliament and the
8       Queensland Parliament and written submission to
9       the National Parliament in Canberra on various
10      bills associated with gender.
11 Q    Let me take those one at a time, I'm sorry,
12      because I just don't understand how broad your
13      answer was.  For the parliament in New South
14      Whales, was there more than one bill that you
15      submitted comments on?
16 A    Just scroll down so I can see and just remind
17      myself.
18 Q    I apologize.
19 A    Just keep going.  Keep going down to the
20      submissions.  Okay.  Stop.  The submission to
21      the New South Whales Parliamentary Inquiry for
22      the Education Legislation Amendment of Parental
23      Rights, I had a written submission and appeared.
24      I was invited to appear to the parliamentary
25      inquiry.  Then there was the submission and

---

Page 48

1       invited presentation to the Queensland
2       government inquiry into the Health Legislation
3       Bill in 2019 to outlaw conversion therapy.  And
4       the submission to the ACT -- that stands for
5       Australian Capital Territory -- government into
6       the proposed amendments to outlaw conversion
7       therapy.  And I believe I submitted a similar
8       submission to the Victorian Parliament on
9       conversion therapy as well and I've just
10      neglected to put that in.
11 Q    Okay.  And other than -- maybe this would have
12      been a better way to do this.  Other than the
13      possible submission to the Victorian Parliament,
14      is every time you have testified or submitted
15      written testimony to a decision-making body in
16      Australia about gender-affirming care, is that
17      contained on Page 6 of your CV here?
18 A    Yes.
19 Q    And the one to the Victorian Parliament was also
20      on conversion therapy?
21 A    Yeah.
22 Q    Have you been compensated for your testimony to
23      any of these bodies?
24 A    Only Alabama and Indiana.  The other have been
25      all pro bono.

---

Page 49

1  Q    And, by your compensation in Alabama and
2       Indiana, you mean after a lawsuit was filed?
3  A    I don't understand.
4  Q    I'm sorry, Doctor.  I'm trying to figure out
5       whether you were paid for submitting testimony
6       to the legislatures while a bill was being
7       contemplated or whether you're just talking
8       about being paid to serve as a witness after a
9       bill was passed and challenged in court.
10 A    I think they -- the Alabama and Indiana
11      situations are similar, you know, a bill was
12      passed, now there's an appeal, and I have
13      written a report.  Tom will be able to explain
14      that a lot better than me.  I don't want to say
15      the wrong thing.
16          MR. FISHER: I'm of no use to Gavin in any
17      of this.
18 Q    I understand.  Thank you.  Page 3 of your CV
19      describes some of your activities for
20      court-referred clients.  Do you see that?
21 A    Yeah.
22 Q    And when did you assume these responsibilities?
23 A    Oh, I've been doing that kind of work 10 to 15
24      years.
25 Q    You mean you have over the past 15 years?

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

Page 50

1 A   Yeah.

2 Q   And I assume these are cases where a court in
3     Australia, for one reason or another, wants a
4     child to be evaluated; is that fair?

5 A   Yes, and they can also be referred for
6     court-mandated therapy.

7 Q   In your responsibilities for court-referred
8     clients, did any of the issues arising from that
9     concern gender dysphoria?

10 A   No, because the work that I've done for courts
11     related to gender dysphoria have been written
12     review and literature review and clinical
13     practice documents, so these court-referred
14     clients are usually to do with parental
15     capacity, custody, time with, and, you know, any
16     assessment that would make it necessary for the
17     child or the family to enter into a therapeutic
18     process.

19 Q   Okay.

20 A   I'll say no to that in terms of gender
21     dysphoria.  This work, more or less, preceded my
22     work on gender issues.

23 Q   Okay.  And then Page 4 of your CV indicates that
24     you also consult for the Tribunal of the
25     Catholic Church; correct?

---

Page 51

1 A   I have, yeah.

2 Q   Is that something you currently do?

3 A   The last case I did was probably about a year
4     ago, maybe more, but I have been doing it for a
5     very long time but I've kinda pulled back
6     because I've just got too much work in other
7     areas.

8 Q   And, just very briefly, what did your
9     consultancy for the church or does it entail
10     when they refer something to you?

11 A   Usually cases of marriage where one party is --
12     one or both parties is seeking an annulment of
13     the marriage, and it's a very arcane system and
14     it actually behaves very much like a court of
15     law.  There's a defender of the faith and a
16     defender of the couple so it's quite
17     adversarial, it can be, and, extraordinarily,
18     the Catholic Church will sometimes find that
19     there are no grounds for annulment.  And usually
20     people who go and seek annulments, they're
21     devout Catholics and they wanted to remarry in
22     the Catholic Church, but they can't remarry in
23     the Catholic Church.  They can only have a civil
24     marriage unless their previous marriage has been
25     annulled, and so they're the people who seek

---

Page 52

1     annulments.

2     So I do a marriage assessment and I see the
3     couple and, you know, I do all the normal things
4     that I would normally do as a psychological
5     assessment of these couples to assist them and
6     support them in -- you know, it's usually a very
7     fraught and stressful time for these couples.

8 Q   Okay.  And then I'm going to scroll through this
9     real quick.  And, I'm sorry, Doctor, did you say
10     that you have a copy of your CV in front of you?

11 A   No, I don't, no.

12 Q   Okay.  Then I will scroll through real quick.
13     I'm going to scroll through Pages 5 through 8 of
14     your CV real quick, and my question to you is
15     going to be whether this, as it purports to, the
16     articles, reports, presentations that you have
17     given specifically concerning gender
18     dysphoria-related issues is going to be my
19     question.  Spoiler alert.

20     Look through to the bottom there.  Is that
21     an accurate description of what you identify in
22     Pages 5 through 8?

23 A   Yeah, pretty much.

24 Q   Okay.  The very last entry under that subheading
25     related to gender dysphoria appears to be a

---

Page 53

1     radio interview that you gave in 2015.  Do you
2     see that?

3 A   Yes.

4 Q   I've read the transcript to this interview.
5     It's my assumption it was mistakenly placed
6     here, but I will just ask you.  Did this
7     interview specifically concern gender dysphoria
8     or any issues related to it?

9 A   I'm sorry about that.  Let me just turn my phone
10     off.  It is misplaced, I'm afraid to say,
11     because the date of 2015 is prior to my work in
12     the gender dysphoria area, so I apologize for
13     that error.

14 Q   That was my assumption.  I just wanted to make
15     sure the record reflected that.  And if that's
16     the only error you make in a 14-page CV, you
17     have done quite well for yourself.

18     Okay.  The date you've given for when you
19     started focusing on gender-related issues of
20     2019 you've indicated, more or less, coincides
21     with when you left the University of Sydney.
22     I'm wondering, first and foremost, why you left
23     the University of Sydney.

24 A   Well, after 31 years, I'd had enough and I was
25     wanting to get back into clinical work and the

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 54

1    tertiary system in this country is somewhat less
2    than conducive to genuine academic work. It's
3    just turned into a corporate bazaar and I no
4    longer felt the affinity that I've always felt
5    for academic life and my academic institution in
6    particular, but it was time for a change.
7        I wanted to work clinically and I wanted to
8    be free to express my firmly-held positions on
9    certain topics. And you, no doubt, are very
10    aware that there have been several academics
11    around the world who have been sacked from the
12    universities for expressing a contrary view, but
13    that didn't motivate me. I have to be very
14    clear about that because I hadn't really written
15    or published anything or even formed my opinions
16    firmly in 2019, but I did note with interest how
17    other academics were being treated around the
18    world if they dared to express a contrary view
19    and I wouldn't find that acceptable.
20  Q   Was there anything specific at the University of
21    Sydney that indicated to you you would not be
22    allowed to express your opinions related to
23    gender dysphoria?
24  A   Oh, absolutely. You just had to look at the new
25    policies and, you know, colleagues using -- you

Page 55

1    know, you can see our names up here on the Zoom
2    and suddenly putting in preferred pronouns and
3    there were all sorts of indications that, you
4    know, the opinions were only going one way and
5    there was no room for academic debate, but I do
6    stress that that was not a motivator for me
7    personally.
8  Q   Okay. I'm going to scroll back up to Page 5 of
9    your CV. Toward the bottom of the page is an
10    article with the lead author R. D'Angelo that
11    you coauthored titled One Size Does Not Fit All.
12    Do you see that?
13  A   Yeah.
14  Q   Other than this publication, have any of your
15    writings concerning gender dysphoria or its
16    treatment been published in any peer-reviewed
17    journals?
18  A   No, not at this point.
19  Q   But this D'Angelo article was published in a
20    peer-reviewed journal?
21  A   Yes, it was.
22  Q   And it's my understanding from looking at the
23    article that it's a direct response to an
24    article that had been published by Jack Turban
25    and others?

Page 56

1  A   Correct.
2  Q   Pages 7 through 8 of your CV identify keynote
3    and invited presentations and podcasts that you
4    have given pertaining to gender dysphoria. Do
5    you see that?
6  A   Yes.
7  Q   Is this a complete list of the presentations
8    that you have given concerning gender dysphoria?
9  A   Look, it might not be complete. I, you know,
10    was under extreme time pressure to get all the
11    materials prepared for this deposition and I did
12    focus very much on the content, you know,
13    reviewing the literature, writing, and then I
14    had to focus an enormous amount of attention on
15    doing the case file reviews of the four
16    plaintiffs so it may not be an exhaustive list.
17  Q   Is it fair to say that you intended it as an
18    exhaustive list but there might have been some
19    presentations that simply slipped your mind as
20    you were preparing this?
21  A   Quite possibly, yes.
22  Q   Are there any presentations that you
23    intentionally left off?
24  A   No.
25  Q   Okay. First of all, we've been going for about

Page 57

1    an hour and a half. Are you still good to go
2    for a while?
3  A   Yes, I'm fine.
4        MR. ROSE: Please, if anyone needs a break,
5    feel free to speak up, but, as I say, I'm more
6    than happy to keep talking as long as anyone
7    will let me.
8        THE WITNESS: I just wonder if I could have
9    a one-minute adjournment. I'll be back in one
10    minute.
11        MR. ROSE: That's perfectly fine.
12        (A recess was taken.)
13  DIRECT EXAMINATION CONTINUING,
14    QUESTIONS BY GAVIN M. ROSE:
15  Q   My understanding is that you have been retained
16    by the State of Indiana to offer expert
17    testimony in this case. Is that your
18    understanding as well?
19  A   Yes.
20  Q   And you understand that this litigation
21    generally challenges a complete ban on providing
22    certain gender-affirming care to minors
23    diagnosed with gender dysphoria?
24  A   Yes.
25  Q   In order to become involved in this case, did

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 58

1  you reach out to Indiana or did Indiana or its
2  attorneys contact you?
3  A   The latter.
4  Q   And you're being compensated at an hourly rate
5      of $400 U.S.?
6  A   Yes.
7  Q   Do you know approximately how many hours you've
8      devoted to this case so far?
9  A   I've kept a running total, but it's well over
10     100.  Well over, yeah.
11 Q   How does the hourly rate of $400 compare with
12     the rate that you charge to clients for
13     psychotherapy?
14 A   It's extremely generous.
15 Q   What is your hourly rate to provide
16     psychotherapy?
17 A   I work on a sliding scale so people who are in
18     financial hardship I work for what's called the
19     Medicare rebate, which is the amount that is
20     covered by the nationalized healthcare cover in
21     Australia, and for people who own planes, boats,
22     and tennis courts I charge about, depending,
23     250.
24 Q   I'm sorry, did you say 350?  250?
25 A   250.  And that's a lot less in American dollars

Page 59

1  because our Australian dollar is only worth
2  about $.68 to your dollar at the moment.
3  Q   And that's what I was going to ask.  That's in
4      Australian dollars?
5  A   Yeah.  Yeah.
6  Q   Okay.  At the outset of this deposition you
7      indicated that you had your expert declaration
8      in front of you?
9  A   Yes.
10 Q   Is that still the case?
11 A   Yes, it is.
12 Q   Okay.  I'm going to share my screen just very
13     quickly right now and pull up what I marked as
14     Exhibit 2.  And I assume that you recognize this
15     as the expert declaration you have submitted?
16 A   Yes.
17 Q   And I will tell you at the outset that I did not
18     include any of the attachments that your
19     attorneys provided to us.  If it's okay with
20     you, I am going to stop the share of this and
21     both you and I can reference our hard copies and
22     I assume that will be much quicker than me
23     scrolling up and down through this.  Is that
24     okay?
25 A   That's okay.

Page 60

1  Q   Okay.  Did you draft your declaration yourself?
2  A   Yes.
3  Q   Did anyone other than you draft any portion of
4      it?
5  A   No.
6  Q   Did anyone other than Indiana's attorneys review
7      or comment on it before you finalized it?
8  A   No.
9  Q   Have you conferred with any other professionals
10     about this litigation?
11 A   No.
12 Q   Are you familiar with -- and by familiar, I just
13     mean do you know who they are.  Are you familiar
14     with the other individuals that Indiana has
15     designated as expert witnesses in this case?
16 A   No, I don't think I am.  I haven't been
17     specifically advised, no.
18 Q   And my only question to you is whether you have
19     conferred with any of them about this case.
20 A   No.
21 Q   Okay.  I'm pulling up just very quickly what I
22     have marked as Exhibit 3.  Do you see that?
23 A   Yes.
24 Q   Have you seen this document before?
25 A   Yes.

Page 61

1  Q   It's my understanding that this is a summary
2      prepared either by Indiana's attorneys or by you
3      in conjunction with Indiana's attorneys
4      indicating which medical records you have
5      attached to your declarations as Exhibits B, C,
6      D, and E.  Is that correct?
7  A   Yes.
8  Q   Since leaving the University of Sydney, are
9      there any conditions or diagnoses other than
10     gender dysphoria that you consider yourself
11     specialized and emphasize your practice in?
12 A   I'm best known for developmental and educational
13     psychology type diagnoses, but I also have an
14     international reputation in the treatment of
15     music performance anxiety and I have many
16     peer-reviewed international publications and
17     have developed a completely new theory about
18     music performance anxiety so that would be an
19     expertise I'm well known for.
20         The other well-known area is the area of
21     sexual offending and I've written extensively on
22     child sexual abuse and juvenile sex offending.
23         So they would be kind of super specialties
24     that I have, but, in general, in the field of
25     developmental and educational psychology.

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 62

1 Q   Okay.  You indicate in your expert report -- and
2     I don't think you have to look at it, but I
3     think it's Paragraph 9 -- that you have become a
4     tertiary referral source and you mentioned that
5     here as well.
6 A   Yeah.
7 Q   What does that mean, becoming a tertiary
8     referral source?
9 A   Well, it means people have gone through other
10    steps before they get to me.
11 Q  Okay.  And are there particular persons or
12    entities from whom you receive a significant
13    number of referrals?
14 A  I get most of my referrals directly from parents
15    who have spoken with each other.  There are some
16    parent support organizations who will recommend
17    parents to me and so they'll come through that
18    route as well.
19 Q  Okay.  In your declaration you indicate that you
20    are one of only a few clinicians practicing
21    exploratory psychotherapy with persons with
22    gender dysphoria because of so-called conversion
23    therapy bans that have been passed in some
24    Australian states.  I assume you're familiar
25    with that.

Page 63

1 A   Yes.
2 Q   What Australian states have passed a ban on
3     conversion therapy?
4 A   Queensland, Victoria, the ACT, and I think one
5     in Tasmania is about to go through.  And, yeah,
6     I think that they're the four, yeah.
7 Q   And I assume you've reviewed the laws that were
8     being proposed and then passed in these states?
9 A   Yes.
10 Q  Are they all, I guess, functionally identical,
11    for lack of a better word?
12 A  Yeah.  Yeah, I would say.
13 Q  I'm going to pull up what I have marked as
14    Exhibit 4.  Do you see that document in front of
15    you?
16 A  Yes, but I can't read it.
17 Q  That's perfectly fair.  I will represent to you
18    that the, I guess, fifth page of the PDF, which
19    has an internal pagination No. 1, says "The
20    Parliament of Victoria enacts:"  And I'm just
21    wondering if you recognize this as Victoria's
22    ban on conversion therapy.
23 A  Yes, I recognize it, yes.
24 Q  And my assumption is that you, yourself,
25    practice in New South Whales?

Page 64

1 A   That's right, yes.
2 Q   Is there a conversion therapy ban that has been
3     enacted in New South Whales?
4 A   Not a legal ban, but there's a huge amount of
5     pressure against therapists who are not
6     practicing gender-affirming care.
7 Q   And, I'm sorry, I just didn't understand from
8     your declaration.  Are you saying that the
9     psychotherapy that you perform to patients with
10    gender dysphoria would be illegal if you did the
11    same thing in Queensland, Victoria, or the ACT?
12 A  Yes.
13 Q  My understanding is that Australia is at least
14    considering a nationwide ban.  Is that your
15    understanding?
16 A  Yes, that's my understanding.
17 Q  Has it been passed yet?
18 A  No.
19 Q  Okay.  In Paragraph 10 of your declaration you
20    indicate that you're unable to list the
21    Australian cases in which you've testified as an
22    expert because of laws protecting the identity
23    of minors; correct?
24 A  Yeah.
25 Q  But there have been approximately 100 of those

Page 65

1     cases?
2 A   That includes my child sexual abuse cases.
3     They're not all related to gender dysphoria.
4     And it also includes the family court cases and
5     the children's court cases.  They involve
6     custody disputes but not related to gender
7     dysphoria.
8 Q   And that was going to be my question is we
9     looked at the court-referred clients portion of
10    your CV.  Is that what those 100 cases refer to?
11 A  No, no, no.  That's post the court process, the
12    court referred.  These are assessments for or
13    expert witness regarding the actual call of
14    matter.
15 Q  Of those 100 cases, approximately how many
16    concern gender dysphoria or related issues?
17 A  Oh, I think only about three.
18 Q  And I assume those were in the last few years?
19 A  Yeah.
20 Q  And then the one American case you identify is
21    the case challenging a ban similar to ours in
22    Alabama?
23 A  Yes.
24 Q  And you identify the case as Bowman, but I
25    assume, if you know, it's the same case that I

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 66

1     know as Eknes-Tucker?
2 A  I'll take your word for that.
3 Q  Okay. Doctor, I am ready to move into slightly
4     more substantive matters. Thank you for your
5     patience as I went through that.
6        I want to be perfectly clear from the
7     outset. Do you consider gender dysphoria to be
8     a valid medical diagnosis?
9 A  No.
10 Q  Are there any circumstances under which you
11     believe a patient may accurately be diagnosed
12     with gender dysphoria?
13 A  Let me put it this way. I think there is a
14     phenomenon that one could describe as gender
15     dysphoria, but the diagnostic process is what
16     I'm referring to as lacking validity. So, in
17     answer to your first question -- could you just
18     repeat your first question about gender
19     dysphoria?
20 Q  My first question was whether you consider
21     gender dysphoria to be a valid diagnosis.
22 A  Diagnosis, no. I have major diagnostic concerns
23     with the way in which gender dysphoria is being
24     diagnosed, but I'm not challenging the existence
25     of a phenomenon, a clinical phenomenon, that can

Page 67

1     be described as gender dysphoria.
2 Q  What does that mean, a clinical phenomenon?
3 A  Well, you know, if a patient comes to you and
4     says, "Look, I've got very low mood, I'm not
5     sleeping, I've lost my appetite, I've got no
6     motivation," you'll say, "Well, you know, that
7     sounds like a depressive process," and I need to
8     explore that further with the patient.
9        Similarly, with gender dysphoria, you know,
10     children will come with their narrative about
11     I've always wanted to be a boy and I've always
12     wanted to play with boy things and, in the
13     extreme cases, they want to cut off their sexual
14     organs and so forth. So, of course, one has to
15     be alert to the possibility that there is a
16     clinical process in which the child is
17     uncomfortable in his or her own body and that
18     needs to be explored.
19 Q  Do you believe that there are any circumstances
20     under which a child who presents with that
21     clinical phenomenon should be allowed to receive
22     puberty blockers or gender-affirming hormones?
23 A  Under almost no circumstances would I think that
24     is a valid approach to take.
25 Q  You qualify that with "almost no." What are the

Page 68

1     circumstances where you think that might be a
2     valid approach?
3 A  Well, if you look at the historical literature
4     and, you know, the amount of writing that
5     occurred, you know, pre sort of 2005 to '10,
6     this was a vanishingly rare diagnosis,
7     vanishingly rare. For example, some of the
8     population figures given for the prevalence of
9     gender dysphoria pre the common era of gender
10     dysphoria, let's put it that way, Sweden was
11     reporting one in one million. The DSM-5
12     reported 1 in 27,000 females and one in 10,000
13     males. So, you know, these figures are
14     extremely low so I'm not going to be absolutist
15     and say there is no circumstance under which
16     it's not an appropriate diagnosis, but the
17     degree to which it's being diagnosed today is of
18     great clinical concern.
19 Q  And, Doctor, my question was: How would a child
20     have to present to you for you to believe it to
21     be appropriate for that child to receive puberty
22     blockers or gender-affirming hormones or is that
23     just off the table entirely?
24 A  It's very close to being off the table.
25 Q  How about for adults? Do you think adults

Page 69

1     should have the ability to receive
2     gender-affirming hormones or even
3     gender-affirming surgery?
4 A  Under very special circumstances. Under the
5     original treatment protocol for an adult seeking
6     transgender surgery was that they had to live in
7     their chosen sex for two years and undergo
8     intensive psychotherapy before they would be
9     cleared for surgery. None of those safeguards
10     are in place for young people.
11 Q  If they were in place, would you believe it
12     would be appropriate for them to receive this
13     sort of gender-affirming care?
14 A  In vanishingly rare cases.
15 Q  And can you imagine a child who presents who has
16     consistently over a number of years presented as
17     a sex different than the birth sex who has been
18     in therapy for years and who is presenting with
19     no comorbidities and a certain level of
20     distress, can you imagine yourself thinking it
21     appropriate for that person to receive
22     gender-affirming medications?
23 A  I don't think such a person exists.
24 Q  Okay. I want to turn, at long last, to social
25     contagion and your description of social

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 19 of 145 PageID #: 3806

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 70

1    contagion.  My understanding is that you
2    separate your declaration into two chapters;
3    correct?
4  A    Yes.
5  Q    And will you flip to Paragraph 21 of your
6    declaration on Page 11?
7  A    Okay.  So I'm going to have to change glasses
8    frequently when I'm looking at my declaration.
9    So you said 21?
10  Q    21.
11  A    Alright.
12  Q    Are you there?
13  A    Yes.
14  Q    You don't have to do so out loud, but will you
15    read Paragraph 21 to yourself real quick?
16  A    Yeah, I've read it.
17  Q    Okay.  We'll get to the specifics momentarily,
18    but my first question is if this paragraph
19    provides a fair summary of the conclusion that
20    you offer in the first chapter of your
21    declaration.
22  A    Yes.
23  Q    You use the language "social contagion may have
24    a major role" to play, and I'm curious about
25    your use of the word "may" in that sentence.

Page 71

1  A    Well, I'm not absolutist or prescriptionist
2    because I am not omnipotent and my paper is
3    based on very careful analysis and inference.
4    And the reason that it is based on analysis and
5    inference is that there has been no
6    empirically-driven epidemiological study to test
7    my hypotheses and that's why I say "may."
8  Q    And you're familiar, I assume, with an article
9    and ultimately a correction to that article that
10    was published by Dr. Lisa Littman who was then
11    with Brown University?
12  A    Uh-huh.
13  Q    I'm sorry.  Yes?
14  A    Yes.
15  Q    And you're aware, I assume, that she describes
16    her work as "generating hypotheses, not
17    conclusions"?
18  A    Yes.
19  Q    And you just used that word, too.  Is it fair to
20    say that you are describing to us a hypothesis?
21  A    Yes, it is fair to say that, but some hypotheses
22    are more robust than others and I believe this
23    to be a very robust hypothesis.
24  Q    Will you turn to Paragraph 108 of your
25    declaration?

Page 72

1  A    Did you say 108?
2  Q    108 on Page 55.
3  A    Yes.
4  Q    Are you there?
5  A    Yes, I am.
6  Q    And in that paragraph you describe a "core group
7    of 'actual' cases," I assume of gender
8    dysphoria.  Do you see that?
9  A    Yes.
10  Q    And by "core group of 'actual' cases," you meant
11    actual cases of gender dysphoria?
12  A    Yes.
13  Q    And it appears to me that you're indicating in
14    this paragraph that social contagion may affect
15    some "actual cases" of gender dysphoria but may
16    also affect some other, I assume, nonactual
17    cases.  Is that a fair statement?
18  A    Yes, that's a fair statement.
19  Q    And how does the social contagion affect the
20    actual cases?
21  A    Well, it's the disinhibition effect that if --
22    you see, I'm trying to cover all my bases here
23    because all of the literature that I've read,
24    all the epidemiological literature available on
25    gender dysphoria, will identify a case.  It

Page 73

1    might be 1 in 84,000.  It might be 1 in 1
2    million.  It might be 1 in "twenty-two hundred
3    and fourteen thousand."  There's data predating
4    2010 that shows, you know, very consistently
5    that there are cases but they're vanishingly
6    rare.  It wouldn't even qualify for -- well, an
7    orphan diagnosis qualifies because --
8  Q    Let me stop you there because I think you've
9    gone well beyond the --
10        MR. FISHER: Gavin, let her finish the
11    answer, please.  You keep doing this.  You gotta
12    let her answer.  She's trying to provide you an
13    answer.
14        MR. ROSE: I think she keeps stepping well
15    beyond my questions, Tom.
16  A    I'm sorry.  I'll be very specific.  It's okay.
17    It's okay.  The answer is:  Yes, there are some
18    actual cases.  We don't know how many.  And of
19    those actual cases, the current (inaudible) of
20    transgender affirming everything would help that
21    vanishingly rare case who had not yet enacted or
22    done anything about their genuine gender
23    dysphoria to come forward for treatment.
24  Q    And I think you referred to that at the outset
25    as a disinhibition effect.  Is that fair?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 74

1 A   Yeah.  Yeah.
2 Q   It might make some people just feel more
3     comfortable coming forward?
4 A   Yes.
5 Q   Okay.  I want to make sure I understand
6     generally now what types of things might serve
7     as the social contagion you described as capable
8     of causing persons to mistakenly identify as
9     transgender.  You describe, first and foremost,
10    influences from peers, celebrities, social
11    media.  Is that a fair statement?
12 A  Yeah.  It obviously goes way beyond that, but,
13    yes, they are factors that are included.
14 Q  And I guess my question is:  If a celebrity or
15    other influential person does nothing more than
16    openly identify themselves as being transgender,
17    is that something that you think can have this
18    social contagion effect?
19 A  Yes.
20 Q  There does not need to be any attempt at overt
21    coercion of any sort?
22 A  No.
23 Q  What if a public library or a school library
24    chooses to either carry or display books
25    pertaining to gender-related issues, is that

Page 75

1     something that can have a social contagion
2     effect?
3 A   Absolutely.  Particularly as they're universally
4     full of misinformation.
5 Q   What if a person is simply subjected to a book
6     with a transgender protagonist, can that have a
7     social contagion effect?
8 A   Yes, it can.  The Internet site Anime was
9     recently boasting that it now had 279 characters
10    that were known cisgender.
11 Q  Do you know how many cisgender characters it
12    has?
13 A  Half a dozen.
14 Q  And the Internet site Anime, is that anime.com?
15 A  I presume.
16 Q  You know throughout your declaration that in
17    recent years there have been significant
18    increases in persons identifying as transgender
19    or in seeking care from gender clinics.  I
20    assume you agree that's a fair summary?
21 A  Yeah.
22 Q  I assume you agree that there are other factors
23    in addition to social contagion that might also
24    cause an increase in persons identifying as
25    transgender?

Page 76

1 A   Well, you have to go back to my paragraph that
2     tries to explain the statistical complexity.  I
3     would argue that what explains the exponential
4     increase in young people presenting as
5     transgender is primarily accounted for by the
6     phenomena of social contagion.
7 Q   And I understand that and you used the word
8     "primarily."  I'm just wondering what other
9     factors might also account for that.
10 A  Well, the other factors I see as secondary
11    factors.  So gender dysphoria has become a
12    vehicle for young people who are very distressed
13    about themselves in some way that something has
14    gone wrong with their development, so they're
15    unhappy, they're discontent, they don't have a
16    peer group, they're lonely, they may be in
17    conflict with their parents, they may have and
18    they will have significant comorbid conditions.
19    So gender dysphoria has become, you know, the
20    overarching umbrella on which disturbed young
21    people are hanging their hats, so to speak,
22    because they get such a receptive response to
23    declaring themselves transgender, whereas if
24    they said, oh, I'm depressed or I'm anxious,
25    well, that's very garden variety and it doesn't

Page 77

1     get above the threshold of concern, whereas
2     young people presenting with gender dysphoria
3     have this whole machine around them now.  It
4     really gets their parents' attention.  It really
5     gets them noticed and, you know, managed and so
6     forth.  So these are secondary things.
7         But, I mean, I have parents coming to me
8     who show me thousands of text messages that
9     their child had received from groomers and
10    predators on the Internet trying to convince
11    young people to transition.  You're really
12    trans.  If you say this about yourself, it means
13    that you're really trans.  And some of them have
14    gone to the point of actually sending minors
15    cross-sex hormones through the Internet as a
16    gift to the young person.
17 Q  Do you believe that better understanding of
18    gender dysphoria has played any role in the
19    increase in the number of persons identifying as
20    transgender?
21 A  I don't think there's any better understanding
22    that I've noticed in the last 10 years.
23 Q  Do you think increases in the availability of
24    treatment have led more persons to come forward
25    as transgender?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 78

1 A    Absolutely, but in a socially contagious way.
2 Q    Are you aware of studies indicating that more
3    persons will seek care for a condition when that
4    condition becomes destigmatized?
5 A    You know, the destigmatized argument has a small
6    amount of merit, but it can't possibly account
7    for the numbers and the trajectories on graphs
8    that we're seeing with gender dysphoria.
9 Q    Are you familiar with a body of professional
10    literature specifically concerning increased
11    numbers in patients seeking treatment for HIV as
12    the condition became destigmatized?
13 A    Sure.
14 Q    And you agree that there were significant
15    increases in persons seeking treatment for that
16    condition?
17 A    Yes, because they had a diagnosable medical
18    condition that could be treated with
19    scientifically evidence-based medications.
20 Q    In your opinion, can social contagion work the
21    other way around if someone is subjected to
22    messages that being transgender is wrong or
23    simply does not have access to any books with a
24    transgender protagonist?  Can that cause a
25    transgender person to remain in the closet, so

Page 79

1    to speak?
2 A    There is absolutely no evidence for that
3    assertion one way or the other, but if you want
4    me to give an educated guess, it's possible but
5    it would be extremely unusual.
6 Q    In the report that you submitted in the Alabama
7    case -- and I didn't print it out or pull it up
8    for you -- you noted that the "ominous trend"
9    whereby more persons are identifying as
10    transgender has "rarely been systematically
11    studied" either theoretically or empirically.  I
12    understand you might not recall the precise
13    verbiage, but do you recall expressing
14    sentiments similar to that?
15 A    Yes.
16 Q    And I assume that's still an accurate statement
17    of your beliefs?
18 A    Well, it's not my beliefs.  It's an empirical
19    fact.
20 Q    Are you aware of any peer-reviewed studies at
21    all that attempted to systematically study
22    whether social contagion has led to increases in
23    transgender identification?
24 A    Did you use the word "peer-reviewed" or -- what
25    was the wording exactly?

Page 80

1 Q    Sorry, I will repeat the question.  Are you
2    aware of any peer-reviewed studies at all that
3    attempted to systematically study whether social
4    contagion has led to increases in transgender
5    identification?
6 A    Well, Jack Turban actually claims that he's
7    systematically and emphatically disconfirmed
8    social contagion, but, given that I only deal
9    with robust scientific literature that uses a
10    scientific method, I will say no because his
11    study does not fall into that category.
12 Q    Are you aware of any peer-reviewed studies at
13    all that attempted to determine what proportion
14    of the increase in transgender identification
15    over recent years can be attributed to social
16    contagion?
17 A    I have stated at the outlet that my conclusions
18    are inferential and deductional.  I looked at
19    social contagions in a range of other adolescent
20    psychopathologies and the same mechanisms and
21    the same dynamics and the same upward swings in
22    prevalence have occurred in at least six
23    adolescent psychopathologies that have been
24    systematically studied.  Now, there's no will to
25    systematically study social contagion and gender

Page 81

1    dysphoria and the reason for that is that it
2    will disprove the basic tenant of gender
3    ideology.
4 Q    Doctor, I'm sorry to cut you off.  I don't mind
5    that you're trying to explain your answer, but
6    the question I asked you first was a yes or no
7    question.  We do need to make sure the record is
8    complete and clear so I do want to make sure I
9    get a yes or no to the question about whether
10    you're aware of any peer-review studies that
11    attempted to determine what proportion of the
12    increase in transgender identification can be
13    attributed to social contagion.
14 A    I've already answered that question and then I
15    tried to qualify it and was unable to finish my
16    answer.
17 Q    Is it fair to say that there are no
18    peer-reviewed studies that attempt to determine
19    what proportion of the increase in transgender
20    identification over recent years can be
21    attributed to social contagion?
22 A    Yep.
23 Q    I'm sorry.  Did you say yes or no?
24 A    I said yep.
25 Q    Is that a yes?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 82

1 A    Yes, it's a yes.

2 Q    Okay. I'm going to pull up for you real quick

3    what I have marked as Exhibit 5. And do you see

4    that in front of you?

5 A    Yes.

6 Q    Beginning in -- and you can go there if you

7    want, but in Paragraph 81 of your declaration

8    you describe an article that was written by

9    Dr. Littman who we mentioned.

10 A    Yes.

11 Q    And I understand that there was ultimately a

12    correction to that article, but you recognize

13    what I have in front of you as the original

14    article that Dr. Littman authored?

15 A    Yes.

16 Q    And both you and Dr. Littman discuss

17    "rapid-onset gender dysphoria"; correct?

18 A    Yes.

19 Q    Prior to Dr. Littman's article in 2018, are you

20    aware of any professional literature that used

21    that term?

22 A    No.

23 Q    Is rapid-onset gender dysphoria a diagnosis

24    listed in the DSM-5 or its text revision?

25 A    No.

Page 83

1 Q    Is it identified in the International

2    Classification of Diseases, ICD-9?

3 A    No.

4 Q    Is there an objective measure that you or

5    Dr. Littman are using to determine when or

6    weather the onset of gender dysphoria is

7    "rapid"?

8 A    It's adolescent onset as opposed to early

9    childhood onset.

10 Q    And that was going to be my question. Is the

11    term saying anything other than that a person

12    first identified themselves as transgender

13    during their adolescency rather than earlier?

14 A    Well, it's the timing but also the rapidity of

15    the onset so it becomes manifest in a very short

16    period of time during adolescence.

17 Q    Do you have a way of distinguishing between

18    someone with "rapid-onset gender dysphoria" and

19    someone who had dysphoria for a longer period of

20    time but simply delayed in coming out through

21    pressures or family dynamics or what have you?

22 A    That would be very unusual, but the way that I

23    assess it is through very detailed clinical

24    interview.

25 Q    Do you have any patients that you've diagnosed

Page 84

1    with rapid-onset gender dysphoria?

2 A    Well, I don't tend to be beholden to diagnoses,

3    but the majority of my caseload would, if you

4    wanted to use that term, would fit into that

5    categorization.

6 Q    Okay. It's my understanding that for her study

7    Dr. Littman posted a survey on three different

8    websites where parents had reported sudden or

9    rapid onsets of gender dysphoria in their

10    children; is that correct?

11 A    That's my understanding, yes.

12 Q    And then I understand they were subsequently

13    reposted to a fourth website, a Facebook group?

14 A    Uh-huh.

15 Q    Sorry. Yes?

16 A    Yes.

17 Q    And of the three websites that Dr. Littman

18    originally posted the survey, are you aware that

19    they have all taken a position on the provision

20    of gender-affirming care to transgender youth?

21 A    The parents?

22 Q    The websites.

23 A    Oh. No, I don't think I was completely clear

24    about that.

25 Q    Do you have an understanding that all three of

Page 85

1    those sites have taken a position that is

2    "unsupportive" of gender transition?

3        MR. FISHER: I'm going to object. I'm not

4    sure that the meaning of that is clear or where

5    it's coming from.

6        MR. ROSE: Why don't I get an answer first

7    and then I can explain, if that's okay.

8 Q    Do you need me to repeat the question, Doctor?

9 A    Yes.

10 Q    Do you agree that all three of the sites on

11    which Dr. Littman posted the survey have taken a

12    position that is "unsupportive of [gender]

13    transition"?

14        MR. FISHER: Same objection. You may

15    answer.

16 A    Okay. Concerned and questioning.

17 Q    Would it surprise you to know that in her notice

18    of correction to this article Dr. Littman

19    characterized all three of these websites as

20    being "unsupportive of [gender] transition"?

21 A    Look, I probably read it, but I've been reading

22    hundreds of papers since then and details will

23    sometimes escape one's attention.

24        MR. ROSE: And, just for the record since

25    I'm speaking instead of writing, the "gender"

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 86

1     there is in brackets. The quote is
2     "unsupportive of transition" and the "gender" is
3     taken from context.
4 Q  One of the websites that Dr. Littman indicates
5     the survey was posted to is called Youth Trans
6     Critical Professionals. Are you familiar with
7     that website?
8 A  Yes.
9 Q  Have you ever visited it?
10 A  I tend not to spend a lot of time visiting
11     websites.
12 Q  Have you ever visited it?
13 A  I've clicked to it.
14 Q  The reason I ask is that if you go right now,
15     you pick up a language saying that the website
16     is now private and it cannot be accessed, and
17     I'm wondering if you were aware of that.
18 A  No.
19 Q  Okay. And you understand that Dr. Littman
20     directed her survey toward the parents of
21     transgender youth, not the youth themselves;
22     right?
23 A  Yes.
24 Q  When you provide psychotherapy to one of your
25     patients, are there any circumstances at all

Page 87

1     where you would rely exclusively on a parent's
2     report about what was going on with their child?
3 A  No, I do what's called triangulation and I
4     include in my case formulation information from
5     every possible source that is available to me.
6 Q  And one of those sources is obviously speaking
7     with the child themselves; correct?
8 A  Of course.
9 Q  And I assume in speaking with the child you
10     would want to know not just what they're going
11     through but also if there were any reasons that
12     their parents would not be aware of what they're
13     going through; is that fair?
14     MR. FISHER: I'm going to object. I'm not
15     sure what is meant by "what they're not going
16     through."
17     THE WITNESS: Yeah, I know. Thank you.
18 Q  Do you understand the question, Doctor?
19 A  I think you'll have to reword it.
20 Q  Let me just ask this more generally. In your
21     field of psychotherapy, I assume that
22     self-reporting provides a useful and sometimes
23     vital source of information; is that fair?
24 A  Yes.
25 Q  Okay. And you're aware, I assume, that the year

Page 88

1     after Dr. Littman first published her article
2     she published a corrected version of the same
3     article along with a notice of correction?
4 A  There was a (inaudible) after the publication of
5     her article and it was taken down after it had
6     already gone through a rigorous peer-review
7     process, so, to please the naysayers, a couple
8     of sentences were added and so I wouldn't call
9     it a substantive correction. The data remained
10     unchanged and the conclusions remained
11     unchanged.
12 Q  Okay. But there was a corrected version
13     published; correct?
14 A  Well, there was a slightly altered version
15     published.
16 Q  And at the same time of that publication there
17     was also a separate notice of correction
18     explaining the reasons for the revision that was
19     published in the same journal?
20 A  Yes.
21 Q  I'm going to click over to Exhibit 6. Do you
22     see that in front of you?
23 A  Yes.
24 Q  And you recognize this, I assume, as the notice
25     of correction?

Page 89

1 A  Yes.
2 Q  In this notice, Dr. Littman says that "This
3     report ... does not validate the phenomenon,"
4     and it appears from context that the phenomenon
5     is rapid-onset gender dysphoria. Do you see
6     that in the middle of the --
7 A  Yeah. Yeah.
8 Q  Do you agree that Dr. Littman's study does not
9     validate of phenomenon of rapid-onset gender
10     dysphoria?
11 A  Absolutely. It was a very preliminary early
12     notice of something interesting, and all new
13     discoveries are made through noticing changes in
14     patterns in the environment and that can lead to
15     all sorts of astounding new discoveries. So it
16     would be foolish, and nor did she do so,
17     claiming that this study proved anything other
18     than the report of this group of parents.
19 Q  Okay. Do you know Dr. Littman personally?
20 A  No.
21 Q  Okay. And I'm going to click over to Exhibit 7.
22     And do you see that in front of you?
23 A  I do.
24 Q  A short while ago, you mentioned a study by
25     Dr. Turban and others that sounded like you took

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 90

1 issues with, and am I correct that this is that
2 study?
3 A  Yes, it is.
4 Q  This was published in a journal called
5 Pediatrics?
6 A  Yeah.
7 Q  And that's a peer-reviewed journal; correct?
8 A  Let's just say they have a peer-review process
9 that has been degraded in recent times.
10 Q  Has the process itself changed to your
11 knowledge?
12 A  No, the process is still the same.
13 Q  If it had not been for the article's publication
14 of Dr. Turban's article or others like it, would
15 you believe that the peer-review process of
16 Pediatrics had been degraded in recent years?
17 A  I would have to judge that article by article,
18 but it's astounding to me that some of the
19 papers that I see published on the subject have
20 actually got through a peer-review process if it
21 was truly anonymized and objective.
22 Q  I understand that you might take issue with some
23 of the data or the source of the data, but you
24 understand that Dr. Turban and others analyzed
25 data from several states that was collected by

Page 91

1 the Centers for Disease Control and Prevention;
2 correct?
3 A  That one, I believe from memory, is from the
4 Youth Risk Behavior Survey.
5     MR. ROSE:  Okay.  Doctor, if you don't
6 mind, my bladder is desperately requesting that
7 I call a break.  I'm okay with just five
8 minutes.  If anyone needs a longer break, I'm
9 more than happy with that, too.
10     THE WITNESS: Five minutes is fine with me.
11     (A recess was taken.)
12 DIRECT EXAMINATION CONTINUING,
13     QUESTIONS BY GAVIN M. ROSE:
14 Q  Doctor, do you still have your declaration in
15 front of you?
16 A  Yes, I do.
17 Q  I will have you turn to Paragraph 85 on Page 41
18 if you don't mind.
19 A  Yeah.
20 Q  In this paragraph, you mention an August 2021
21 statement by the Coalition for Advancement &
22 Application of Psychological Services or CAAPS
23 calling for the elimination of the use of
24 rapid-onset gender dysphoria; correct?
25 A  Yes.

Page 92

1 Q  It's my understanding that CAAPS, with two As to
2 our court reporter, is a nonprofit coalition of
3 various professional organizations involved in
4 the science of mental health.  Is that a fair
5 summary?
6 A  I guess so, yes.
7 Q  Well, I took it directly from their website, so
8 I hope it is.  Okay.  I am going to show you
9 what I've marked as Exhibit 8.  Do you see that
10 in front of you?
11 A  Yes.
12 Q  And you, I assume, recognize this as the
13 statement to which you were referring in
14 Paragraph 85 of your declaration?
15 A  That's right, yes.
16 Q  And you understand, I assume, that numerous
17 other -- I won't count them, but numerous other
18 organizations also signed on to the statement?
19 A  Yes.
20 Q  Including both the American Psychological
21 Association and the American Psychiatric
22 Association, I think?
23 A  Yes.
24 Q  I'm looking, I guess, generally at Paragraph 87
25 of your declaration.  I don't know, Doctor, if

Page 93

1 you will need to look at it for this series of
2 questions, but I certainly invite you to if it
3 would be useful to you.  In this paragraph --
4 A  Sorry for interrupting.  It's very hard.  I've
5 got a visual impairment and it's very hard for
6 me to go from screen to page, back and forward,
7 and I'm just wondering if you would be able to
8 quickly put that up on the screen for me.
9 Q  I can certainly do that.  I can't promise it
10 will be quickly, but I can certainly do that.
11 A  Okay.
12 Q  Do you see that in front of you?
13 A  Yeah.
14 Q  It's Paragraph 87 of your declaration; correct?
15 A  Yes.
16 Q  And I'm not going to get into precise numbers,
17 but it sounds here like you're describing, I
18 guess, differences in the share of persons
19 identifying as transgender between adolescents
20 and younger children over several decades; is
21 that fair?
22 A  Yes.
23 Q  I think you say that prior to 2000, children age
24 3 to 12 years identifying as transgender greatly
25 outnumbered adolescents?

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 94

1  A   Yes.

2  Q   And my understanding of your report is that you
3      believe the increase in the percentage of
4      adolescents identifying as transgender is
5      because that group, and particularly persons
6      assigned female at birth in that group, are
7      particularly susceptible to social contagion; is
8      that fair?

9  A   Yes.

10 Q   Is it fair to say that you think that social
11     contagion played a minimal role before the year
12     2000 in causing persons to identify as
13     transgender?

14 A   Yes.

15 Q   Is there an age at which you think persons
16     assigned female at birth have matured enough
17     that they're less likely to be susceptible to
18     social contagion?

19 A   Could I register my disagreement with the phrase
20     "assigned female at birth"?  Could you, please,
21     just say "a natal female" because sex is not
22     assigned at birth.  Sex is determined at
23     conception by the presence of X and Y
24     chromosomes.  It is not assigned at birth, so I
25     would appreciate if you could just use the

Page 95

1      phrase "a natal female" or "a natal male."

2  Q   Why don't I just state for the record that when
3      I use the phrase "assigned female at birth," I
4      am referring to what you would refer to as a
5      "natal female," okay?

6  A   But I don't want any more documents than
7      necessary to reflect flawed and fallacious
8      scientifically-lacking gender ideology of which
9      the phrase "assigned female at birth" is a major
10     contributor.

11 Q   Do you understand what I mean when I say
12     "assigned female at birth"?

13 A   I understand what you mean, but you're
14     expressing it incorrectly.

15     MR. FISHER: I'm concerning along these
16     lines that it's gonna end up putting words in
17     her mouth that she doesn't want, and I think
18     that that's probably part of her concern, too.

19     MR. ROSE: Well, she can certainly answer
20     however she feels comfortable, but I am going to
21     use the verbiage with which I feel comfortable.

22 Q   And, as I stated for the record, when I use the
23     phrase "assigned female at birth," I'm referring
24     to what you would refer to as "a natal female."
25     Is that fair?

Page 96

1  A   Yes.

2  Q   Okay.  The question that precipitated this was
3      whether there is an age at which you believe
4      that persons assigned female at birth have
5      matured enough that they are less susceptible to
6      social contagion?

7  A   There's a clear set of studies that shows that
8      susceptibility decreases with increasing age and
9      cognitive maturity, so children are more
10     susceptible, in general -- we're talking in
11     population figures here but there's a lot of,
12     you know, variation at an individual basis, but,
13     statistically, in general, at a population
14     level, children tend to be more susceptible than
15     young adolescents; young adolescents tend to be
16     more susceptible than older adolescents; and
17     older adolescents tend to be more susceptible
18     than young adults, onwards.

19     So there's not a cut-off.  There's not, you
20     know, 15 is the cut-off at which you're
21     susceptible and then after 15 you're not
22     susceptible.  It's a gradient rather than
23     categorical, but that, from a statistical
24     perspective, is what the findings have been.

25 Q   And I apologize for repeating you.  I really

Page 97

1      just think I missed a word.  It sounded like you
2      were saying that children are the most
3      susceptible, young adolescents next, older
4      adolescents next, and adults are the less
5      susceptible; is that fair?

6  A   From a population statistically, a generalized
7      perspective, yes.

8  Q   I understand there may be variants with
9      particular individuals; correct?

10 A   Well, one variation that has been noted is that
11     children who are securely attached to their
12     parents are less susceptible compared with
13     children who were not securely attached and that
14     could occur anywhere from early childhood to
15     late adolescence, so there's very important
16     modifiers of that statement.

17 Q   I had asked the initial question about whether
18     there was an age at which persons assigned
19     female at birth are mature enough, and you gave
20     me that hierarchy and that's perfectly fine.  I
21     assume the same hierarchy exists for persons
22     assigned male at birth?

23 A   The natal males, yes, the same hierarchy exists.

24 Q   And we were talking in general, but as it
25     relates to the social contagion effect of

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

**Page 98**

1  transgender identification, it's the same
2  hierarchy, right, children most susceptible,
3  then young adolescents, then older adolescents,
4  then adults?
5  A  Well, when you look at the literature on uptake
6  of behavioral phenomenon in different age
7  groups, you find this effect across the board
8  whether it's substance abuse, self harm,
9  suicidality, and so forth, so it's a fairly
10  robust finding.
11  Q  Okay.  I'm going to scroll up on your
12  declaration again to Paragraph 84.  Do you see
13  that?
14  A  Yes.
15  Q  And in this paragraph you're describing, at
16  least for most of it until the last sentence, a
17  study published by Indremo and others?
18  A  Yes.
19  Q  And this was a study that tracked a number of
20  referrals to clinics providing gender-affirming
21  care after positive or negative media coverage?
22  A  Yes.
23  Q  And it sounds to me from your language like
24  you're describing in this paragraph increases in
25  referrals following positive media coverage and

**Page 99**

1  decreases following negative media coverage; is
2  that fair?
3  A  That's fair.
4  Q  And the study you cite concerning the negative
5  media coverage is the Indremo, the Swedish study
6  from 2020?
7  A  Yes.
8  Q  I'm flipping over to Exhibit 9 now.  And do you
9  see that in front of you?
10  A  Yes, I do.
11  Q  And I assume that you recognize this as the
12  Indremo and others study?
13  A  I know where you're going with this and it's a
14  question of emphasis, but the results are the
15  results.  Indremo is trying to present it as,
16  you know, let's get all the media coverage
17  positive, but his study is, in fact, a perfect
18  example of social contagion.  Negative coverages
19  reduces clinic numbers and positive coverage
20  increases them and so it's really quite a robust
21  demonstration of social contagion.
22  Q  I'm sorry, Doctor, my question was literally
23  just do you recognize Exhibit 9, the Indremo
24  study that you cite?
25  A  Yes, I do.  I do recognize it, but I was

**Page 100**

1  anticipating where you were going with it.
2  MR. FISHER: Doctor, let me just suggest
3  let's not anticipate.  We'll get through it
4  faster.
5  THE WITNESS: Thank you.  Okay.  I'm sorry.
6  Q  You're perfectly fine.  I don't mind at all.  I
7  just wanted to make sure the record was clear on
8  that front.
9  A  Okay.
10  Q  And my understanding is that the Indremo study
11  actually studied the relationship between three
12  different media events and referrals to gender
13  clinics; correct?
14  A  Yes.
15  Q  One positive media event and two negative media
16  events?
17  A  Well, the two negative were connected.  They
18  were Part 1 and Part 2 of the same series.
19  Q  And then there was also one positive media
20  event?
21  A  Yes.
22  Q  And do you understand that for the positive
23  event and for the first of the positive events
24  the Indremo study actually found no relationship
25  between media coverage and transgender clinic

**Page 101**

1  referrals?
2  A  Say that again.  Sorry.
3  Q  You understand, don't you, that for both the
4  positive media event and the first of the
5  negative media events the study actually found
6  virtually no change in the number of referrals
7  to gender clinics following the media coverage;
8  correct?
9  A  It's been some time since I've read the details
10  of the article.  It's just not my memory of it.
11  I thought -- let me just see that conclusion.
12  Q  I've moved you down to the results section.  Do
13  you see that on the --
14  A  Yeah.
15  Q  And you agree that the majority of this section
16  describes the changes in referrals following the
17  second negative media event; correct?
18  A  Okay.  So we're looking at time-specific
19  changes.  So in the three months following the
20  event, referrals decreased by 25% overall, by
21  32% for individuals being natal females, and by
22  25% for those aged 13 to 18.
23  Q  And you understand that those statistics that
24  you just recounted relate to the changes in
25  referrals following the second negative media

1  event; correct?
2  A  Yeah.  Yeah.
3  Q  Do you see the last line of the results section
4     that says for the other two media events no
5     changes in referral counts or time trends were
6     observed?
7  A  Yes, I do see that and I actually forgotten that
8     part of it.
9  Q  Is it fair to say that in your expert report you
10    only described one of the three events studied
11    in the Indremo study?
12 A  I was reporting the three-month follow-up data,
13    so I'd have to go back and just revisit that.
14 Q  Okay.  Then flipping back to your expert report
15    still on Paragraph 84, the last sentence of that
16    paragraph after you talk about the Indremo study
17    says, "On the contrary, increased positive media
18    coverage of trans issues resulted in an increase
19    in referrals to gender clinics."  Do you see
20    that?
21 A  Yeah.
22 Q  The study you cite for that is Pang and others?
23 A  Yes.
24 Q  And, just for the record, I think you cite the
25    same study earlier in your report for a similar

1  proposition.
2  A  Yes.
3  Q  Just proving to you that I read the entire
4     thing.
5  A  I'm very impressed.
6  Q  I was gonna say I could write my memoirs three
7     times over and end the night with your report
8     here.
9        Okay.  I'm flipping over to Exhibit 10.
10    And, again, my first question to you is whether
11    you recognize this as the Pang report that you
12    cite.
13 A  Yes.
14 Q  And I will just tell you the page numbers on
15    this exhibit do not line up with page numbers
16    that you cited elsewhere in your report simply
17    because of where I got it from, I assume.
18       Okay.  My understanding is that Dr. Pang
19    and others studied referral rates to gender
20    clinics in Australia and the UK following media
21    coverage related to transgender issues.  Is that
22    your understanding?
23 A  Yes.
24 Q  Okay.  I'm going to flip over to the PDF Page 5
25    where I have highlighted a portion beginning

1  with "The search strategy."  You don't need to
2  do so out loud, but can you read the highlighted
3  portion to yourself?
4  A  Yes, I'm familiar with it, yes.
5  Q  And this describes the search criteria or terms
6     that Pang and others used to find media items to
7     study in their report?
8  A  Yes.
9  Q  And you agree that these criteria included any
10    media coverage that contained the words gender,
11    transgender, or gender dysphoria as well as
12    child or adolescent; correct?
13 A  Yes.
14 Q  If there had been stories in the UK or Australia
15    during the relevant time period similar to the
16    negative media events that were covered in the
17    Indremo study, do you agree that they would
18    almost certainly have fallen within the search
19    criteria?
20 A  It would only be a surmise, but it's likely.
21 Q  It would have been very difficult to write about
22    that without using the words transgender and
23    either child or adolescent; right?
24 A  Sure.
25 Q  Okay.  I'm going to scroll down to Page 9.  And

1  at the bottom of that carry-over paragraph at
2  the top, Pang and others write, "Testing whether
3  negative media coverage is associated with
4  reduced referral rates (and conversely whether
5  positive coverage is associated with increased
6  referral rates) would thus be a useful next
7  step."  Did I read this correctly?
8  A  Yes.
9  Q  Would it surprise you to learn that this is the
10    only sentence in the entire study where media
11    coverage is referred to as either negative or
12    positive?
13 A  Could you go back up to the top of the article?
14 Q  Tell me where to stop.
15 A  I just want to see the abstract.  Okay.  Keep
16    going.  Okay.  Just stop there.  Come back down
17    actually.  No, go up.
18 Q  Sorry.
19 A  There.  Stop there.  Okay.  And you're saying
20    that he's talked about media coverage generally
21    as opposed to positive or negative media
22    coverage.
23 Q  And do you agree with that?
24 A  What in particular?
25 Q  Do you agree that the study authors are talking

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 106

1  about media coverage in general and not media
2  coverage as either positive toward transgender
3  issues or negative toward transgender issues?
4  A   Well, saying it's positive or negative is kind
5  of drilling down, but the fact that he showed a
6  strong association between media coverage and
7  increased referrals is a demonstration of social
8  contagion.
9  Q   I'm going to flip back over to Exhibit 2 where
10  you say, "On the contrary, increased positive
11  media coverage of trans issues resulted in an
12  increase in referrals to gender clinics," and I
13  want you to explain to me where you got that
14  "increased positive media coverage" language.
15  A   I'd probably have to read the whole paper again
16  to tell you where I got it. I hope it wasn't an
17  overstep inference on my part, so I presume,
18  obviously, that I inferred from the paper, but I
19  would have to review the paper again to identify
20  how I drew the conclusion that it was positive
21  media coverage as opposed to any media coverage.
22  Q   Prior to today, when was the last time you
23  looked at that study?
24  A   Oh, it was some time ago.
25  Q   Okay. I'm going to scroll down still on your

Page 107

1  declaration to, I think, Paragraph 129. Do you
2  see that in front of you?
3  A   Yes, I do.
4  Q   And do you see at the bottom of that paragraph
5  you state, "The authors, however, did concede
6  that ... increased media content (specifically
7  via social media) might act as a ... means of
8  social contagion"?
9  A   Uh-huh.
10  Q   I'm sorry. Yes?
11  A   Yes.
12  Q   And you underlined "might act as a ... means of
13  social contagion"; correct?
14  A   Yes.
15  Q   And that was still in reference to the Pang
16  study; correct?
17  A   Yes.
18  Q   I'm going to flip back over to Exhibit 10 and
19  scroll down to Page 9. And you will see at the
20  top of the paragraph immediately above the
21  Limitations heading, Pang and others begin their
22  statement with, "However, we are also mindful
23  that others have speculated that increased media
24  content (specifically via social media) might
25  act as a double-edged sword or a means of social

Page 108

1  contagion." Did I read that correctly?
2  A   Yes.
3  Q   And that is the language from which you are
4  quoting?
5  A   Yeah.
6  Q   The declaration?
7  A   Yeah.
8  Q   And what I want to know is how the authors
9  saying "we are mindful that others have
10  speculated" in their article translated to "the
11  authors, however, did concede that" in your
12  expert declaration.
13  A   The very fact that he mentioned it, you know,
14  implies that it has to be considered as a
15  serious hypothesis.
16  Q   You think that him mentioning that others have
17  speculated about the effect of increased media
18  content means that he's conceding that it might
19  act as a means of social contagion?
20  A   Yes, I think his disarming that possible
21  conclusion.
22  Q   Okay. In Paragraphs 94 and 95 of your
23  declaration -- and, I'm sorry, it won't all fit
24  in on one page, but you understand that these
25  paragraphs generally concern various data from

Page 109

1  the United Kingdom and from Australia; correct?
2  A   Yeah.
3  Q   And, for much of this data, the citation is
4  provide is to either Kenny, DT 2021 or Kenny, DT
5  2022. Do you see that?
6  A   Yep.
7  Q   And these citations are obviously you; correct?
8  A   They're obviously me, yes.
9  Q   And are they referencing something that has been
10  published or simply data that you've collected?
11  A   Well, it's been published on my website, but the
12  figures were provided by the gender clinics and
13  I converted them from either text or tabular
14  form into a graph.
15  Q   Has this data been published in any
16  peer-reviewed journal?
17  A   I think similar data has been used in
18  peer-reviewed publications. (Inaudible) had to
19  have used similar data to have done his study.
20  Q   Your chart wherein you reference both referrals
21  to gender clinics in the UK and Australia
22  provides under it that Australian data was
23  provided by "gender clinics under freedom of
24  information applications." Do you see that?
25  A   Yeah.

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 29 of 145 PageID #: 3816

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

Page 110

1 Q   Did the UK data come from similar requests?
2 A   No, the UK data was published on the NIH
3     website.
4 Q   And I understand that -- and I'm looking at
5     Figure 3 here.  Do you see the entirety of
6     Figure 3 on this screen?
7 A   Yeah.
8 Q   I understand that the figure is in thousands so
9     you can't garner precise numbers from this, but,
10    from looking at the chart, it appears to me that
11    the Australian data shows either zero or roughly
12    zero referrals to gender clinics all the way
13    through 2013; is that correct?
14 A  Yeah.
15 Q  And the UK data shows roughly zero through 2006
16    or 2007 at which point it starts increasing
17    slowly?
18 A  Yes.
19 Q  Is this because there were simply no gender
20    clinics prior to these dates?
21 A  My understanding is that the UK only had the
22    Tavistock gender service.  Right up until it's
23    closure, I think it was the only service
24    offering so-called gender-affirming care, so it
25    was a sole referral agency.

---

Page 111

1 Q   I'm sorry, I didn't mean to cut you off.  Just
2     while it was fresh on my mind, I was going to do
3     it for the court reporter, but
4     T-a-v-i-s-t-o-c-k.  Do I have that correct,
5     Doctor?
6 A   Yeah.  Yeah.
7 Q   So my question was whether it's your
8     understanding that there were no gender clinics
9     in these countries during the periods of time
10    where the chart indicates that there were zero
11    or roughly zero referrals to clinics.
12 A  Well, as I've just answered for the UK, that
13    there was a clinic, but it did receive a very
14    low number of referrals.  In Australia there
15    would have been a couple of clinics but nowhere
16    near as many as there are now.
17 Q  A couple of gender clinics even before 2013?
18 A  Look, I can't give you the precise numbers and
19    dates of clinics.  I believe that they were
20    incorporated into the pediatric departments of
21    the major children's hospital, so there would have
22    been people consulting about children who were
23    presenting with gender dysphoria, but they were
24    probably not called gender clinics and there
25    wasn't a specific service for that purpose until

---

Page 112

1     more recently.
2 Q   So, when these charts indicate zero or near
3     zero, you agree it's likely because people were
4     receiving care through something other than
5     formal gender clinics; is that fair?
6 A   Yes, it's probably fair, yeah.
7 Q   And do you know when Tavistock opened?
8 A   I know there's data before like 2000, I mean
9     back as far as 2000, but beyond that I don't
10    know.
11 Q  Do you know when it closed?
12 A  I think it's formally closing September 2023.
13 Q  Okay.  In Paragraphs 97 and 98 of your
14    declaration, we'll start here, but do you
15    generally see what these paragraphs are talking
16    about?
17 A  Yes.
18 Q  It looks to me like you're describing data
19    showing increased referrals to gender clinics in
20    certain Australian states.  Do I understand that
21    right?
22 A  Yeah.
23 Q  And Figure 4 separates it out by each state?
24 A  Yes.
25 Q  And I think you describe in text that the

---

Page 113

1     increased referrals were primarily in three
2     states, Western Australia, Queensland, and
3     Victoria.  Do I have that right?
4 A   Yes.
5 Q   I assume on your chart WA is Western Australia?
6 A   That's right.
7 Q   And VIC is Victoria?
8 A   Yes.
9 Q   And QLD is Queensland?
10 A  Yes.
11 Q  My understanding is that Melbourne is the
12    largest city in Victoria.  Do I have that right?
13 A  Sydney is the largest.
14 Q  I'm sorry.  Is Sydney not in New South Whales?
15 A  Sydney is in New South Whales.
16 Q  Sorry.  I said Victoria.  Is Melbourne the
17    largest city in Victoria?
18 A  Oh, I see what you mean.  , it is, yes.
19 Q  Okay.  I'm sorry.  I have to admit my knowledge
20    of Australian geography is less than yours so I
21    would've been happy to be told I was wrong
22    there.
23 A  Well, my knowledge of your 51 states is very
24    sparse in my mind as well, so we're even.
25 Q  We're somewhere between Los Angeles and New

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 114

1    York.  That's all you need to know.
2  A   Okay.
3  Q   Certainly that's all people in either Los
4      Angeles or New York care about.
5          Okay.  My understanding, and please tell me
6      if I'm wrong, is that the first health clinic
7      catering solely to the needs of transgender
8      persons or gender diverse persons in Melbourne
9      was opened in 2016.  Is that your understanding
10     as well?
11         MR. FISHER: I'm gonna object just because
12     there's lack of definition behind those
13     descriptions you just provided.
14 Q   And you can answer the question, Doctor.
15 A   I was just going to say a plane was flying
16     overhead and I missed the substantive issue in
17     your question.
18 Q   Sure.  My understanding is that the first health
19     clinic in Melbourne catering solely to
20     transgender and gender diverse persons opened in
21     2016.  Is that your understanding as well?
22         MR. FISHER: Same objection.  You can
23     answer.
24 A   I couldn't give you the precise year, so, if you
25     have researched the question and found that it

Page 115

1      was 2016, I will accept that answer.
2  Q   You understand that it opened sometime in the
3      last 5 or 10 years; right?
4  A   Yeah.  Yeah.
5  Q   And what's the name of that clinic in Melbourne?
6  A   It's called the -- it's in the Royal Children's
7      Hospital -- the Adolescent Gender Service, I
8      think it's called, or something of that nature.
9  Q   Okay.  And then in Western Australia, the
10     capital and the largest city is Perth; right?
11 A   Yeah.
12 Q   I don't know why I didn't have an exhibit for
13     you for Victoria and I made you guess at that.
14     I'm sorry for making you do that, but I'm going
15     to pull up Exhibit 11 and see if there's a
16     rotate button.
17         MR. FISHER: You have to subscribe.
18 Q   Okay.  Why don't I flip to my own Exhibit 11 and
19     read you the highlighted portion that I have
20     taken there.  And I will tell you that this is a
21     printout that I took from the web page of the
22     Government of Western Australia's Mental Health
23     Commission, and the portion I have highlighted
24     says that the gender identity service "was
25     created in 2015 to address the gap in services

Page 116

1      available to young people in WA experiencing
2      problems with their gender identity."
3          Is it your understanding that the gender
4      identity service opened in Western Australia in
5      2015?
6  A   Yes.
7  Q   And I assume that that's the largest gender
8      clinic in Western Australia?
9  A   Yes.
10 Q   And then Exhibit 12 is another printout that
11     I've taken from the website of the Government of
12     Queensland wherein the article they published
13     has someone saying that there was no
14     multidisciplinary gender service in Queensland
15     before the establishment of the gender clinic at
16     Children's Health Queensland in 2017.  And my
17     question to you is:  Is it your understanding
18     that the gender clinic at Children's Health
19     Queensland first opened in 2017?
20 A   Yes.
21 Q   Okay.  In Paragraph 105 of your declaration,
22     which spans two pages, but do you see the top of
23     Paragraph 105 there?
24 A   Yes.  Yep.
25 Q   And you provide a citation here to Tegg, 2022,

Page 117

1      personal communication?
2  A   Yep.
3  Q   And I assume that the citation is to something
4      that was just relayed to you by whoever Tegg is?
5  A   Yes.
6  Q   And Tegg, I assume, is Simon Tegg?
7  A   Yes.
8  Q   And are you aware that Mr. Tegg is part of a
9      group called Fully Informed?
10 A   Yes.
11 Q   Are you aware that that group has played an
12     active role in advocating in favor of policies
13     in New Zealand that would prevent children from
14     accessing gender-affirming medications?
15 A   Of course.
16 Q   To your knowledge, has the data you received
17     from Mr. Tegg been published in any peer-review
18     journal?
19 A   Not to my knowledge.
20 Q   Okay.  I'm going to scroll down just as an
21     example to Paragraph 107.  Do you see that
22     there?
23 A   Yeah.
24 Q   The citation that you provide at the end of that
25     paragraph is to a -- your guess is as good as

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 118

1  mine on the pronunciation -- Respaut & Terhune,
2  2022; correct?
3  A  Yep.
4  Q  This article here, Respaut & Terhune, is it
5  published in a peer-review journal?
6  A  I'd have to look at the reference.
7  Q  I will just tell you that I found it and your
8  references are at the end of your declaration,
9  but Respaut & Terhune are actually reporters for
10  Reuters.  Does that refresh your recollection?
11  A  Well, I have quoted some journalistic pieces
12  from reputable journals, yes, because they have
13  access to information that's very difficult for
14  people, you know, to obtain by any other means,
15  so I have done that on a couple of occasions.
16  Q  And when you have relied on media stories for
17  the information you provide in your expert
18  report, you provide the citation in roughly that
19  format, right, just the author and the year?
20  A  Yeah.  Yeah.  That is the accepted APA
21  referencing convention.
22  Q  Is it fair to say that there are several other
23  citations that you provide in your expert report
24  that are just media stories?
25  A  There's a small handful out of 200 plus

Page 119

1  references and it's because I wasn't able to
2  source the information from anywhere else.
3  Q  And every media story that you relied on, is
4  that cited in the references portion at the end
5  of your declaration?
6  A  Yes.
7  Q  I'm going to scroll down to Paragraph 131 real
8  quick.  And I don't know how every single
9  paragraph I've chosen actually spans two pages,
10  so I apologize for that, but do you see the
11  beginning of Paragraph 131?
12  A  I do.
13  Q  And in this you are describing an article
14  published by Dr. Turban and others in 2021?
15  A  Yes.
16  Q  I'm going to bring up Exhibit 13 and ask you,
17  first and foremost, if Exhibit 13 is that
18  article that you're citing.
19  A  Yep.
20  Q  And, generally speaking, in your expert
21  declaration you're relying on Dr. Turban's
22  article to describe the detransition rates
23  amongst persons who had previously been
24  diagnosed with gender dysphoria.  Is that a fair
25  summary?

Page 120

1  A  No, because in this study Turban conflates
2  transgender with gender diverse and that's a
3  fatal flaw for any study to do that.
4  Q  Okay.  And I apologize, that wasn't the portion
5  that I was trying to focus on and that's just my
6  verbiage, but you're relying on Dr. Turban's
7  study to discuss the detransition rates.  Is
8  that a fair summary?
9  A  Not detransition rates generally but the
10  detransition rates that he reports in that
11  study.
12  Q  Okay.  Do you understand that Dr. Turban's
13  article did not just seek to collect data on the
14  rate of so-called detransition but also sought
15  to analyze why persons detransitioned?
16  A  I don't think he's capable of psychoanalyzing
17  anything and I don't necessarily think he
18  claimed to do so.
19  Q  Do you understand that the report itself
20  purports to provide data on why persons
21  detransitioned?
22  A  Yes.
23  Q  Do you understand that the data set that he
24  relied on was of people who currently identify
25  or identified at the time of the article as

Page 121

1  transgender?
2  A  Or gender diverse.
3  Q  Or gender diverse.  I'm sorry.  You understand
4  that; correct?
5  A  Yes.
6  Q  So every person in the article who had
7  "detransitioned" subsequently retransitioned.
8  Is that your understanding of what the article
9  purports to report?
10  A  It's very difficult to work out exactly what it
11  purports to report.
12  Q  Okay.  Well, you're relying on the article to
13  talk about detransition rate and my question to
14  you was whether you were aware that everyone in
15  the article subsequently retransitioned;
16  correct?
17  A  I'm not sure I'm aware of that now only because
18  it's been some time since I read the paper.
19  Q  The article speaks for itself so if you're not
20  aware of it, that's perfectly fine and I don't
21  have to prolong the issue.
22  Are you aware that the article also
23  classified the reasons for "detransition" --
24  A  Yes.
25  Q  -- as either -- I'm sorry, I wasn't done with

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 32 of 145 PageID #: 3819

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 122

1   the question. Why don't we start there, though.
2   You're aware that the article also classified
3   the reasons for detransition; correct?
4 A   Yes. Yes.
5 Q   And it classified them, while having specific
6   categories as well, into external and internal
7   reasons. Is that your understanding?
8 A   Yes.
9 Q   And you're aware that the article found that the
10   overwhelming majority of persons with a history
11   of detransition cited at least one external
12   reason for that; correct?
13 A   Yes.
14 Q   Do you agree that that finding is consistent
15   with your social contagion hypothesis?
16 A   Look, I'm afraid that I don't base any of my
17   inferences or conclusions on the work of Jack
18   Turban because it's almost all universally
19   flawed research, methodologically suspect, and
20   one cannot draw conclusions or make
21   generalizations from the purported conclusions
22   that he draws from his own research.
23 Q   Well, imagine some professional other than
24   Dr. Turban who you respected. If they published
25   a scholarly article finding that of 100 persons

Page 123

1   who "detransitioned," 82.5% of them cited at
2   least one external factor as a reason for their
3   detransition, would you believe that that is
4   consistent with your social contagion
5   hypothesis?
6 A   Well, that eventuality has never occurred. It's
7   never been reported before or since, so it would
8   be merely an assumption to say that a reputable
9   scientist had found those results. So, to take
10   the next leap and say whether it was consistent
11   or not consistent with social contagion, my
12   hypothesis, is really not appropriate.
13 Q   Okay. I'm going to click over to Exhibit 14.
14       MR. FISHER: Gavin, can I interrupt for
15   just one second?
16       MR. ROSE: Of course.
17       MR. FISHER: I just want to point something
18   out. Please go off the record for just one
19   second.
20       (A discussion was held off the record.)
21 Q   Doctor, I have in front of you right now what
22   I've marked as Exhibit 14, and I assume that you
23   are familiar with this?
24 A   Yes.
25 Q   This is an article that you authored and was

Page 124

1   published in 2021. Do I have that correct?
2 A   Yeah.
3 Q   I understand that there is significant, I guess,
4   elaboration in your expert declaration, but is
5   it fair to say that many of the opinions you
6   express in your expert declaration are also
7   expressed in this article Exhibit 14?
8 A   Yes.
9 Q   And my understanding is that this article was
10   published in a collection of articles by various
11   Australian professionals. Do I have that right?
12 A   Yes.
13 Q   And the collection was devoted to the
14   "transgendering" of children and adolescents; is
15   that right?
16 A   Yeah.
17 Q   Was your article published anywhere else?
18 A   Not at this point, no.
19 Q   Has it been published -- I'm sorry, I was
20   confused by your response. By "not at this
21   point," do you mean not currently or do you mean
22   not at the time that it was published in the
23   collection of articles?
24 A   No to both questions.
25 Q   Okay. My understanding is that the article

Page 125

1   collection was edited and published by a
2   sociologist in Australia named Geoffrey
3   Holloway. Do I have that right?
4 A   Yes.
5 Q   Were you compensated for writing or submitting
6   your article?
7 A   No.
8 Q   Okay. I'm pulling up Exhibit 15 and I will just
9   tell you before we get into this that I have not
10   taken the entire publication. What I have here,
11   I think, is the cover page, the table of
12   contents, and the editorial that appears as
13   Section 1 to the publication. Do you recognize
14   this as those portions of that collection in
15   which your article appear?
16 A   Yes.
17 Q   The editorial that appears indicates that one of
18   the key objectives of the publication was "to
19   promote the campaign for a national, public
20   inquiry into the transgendering of children and
21   adolescents." Do you see that?
22 A   Yes.
23 Q   Is that your understanding as one of the key
24   objectives of the publication?
25 A   Yes.

Page 126

1 Q    Is that one of the reasons that you submitted
2      your article for inclusion?
3 A    Yes.
4 Q    What is the transgendering of children and
5      adolescents?
6 A    The transgendering refers to a process of
7      persuasion that children are "born in the wrong
8      body," that their gender identity, however
9      defined, does not align with their natal sex,
10     and the transgendering is the process whereby
11     medical professionals assist the child to bring
12     their sexed body into line with their reported
13     gender identity using means such as puberty
14     blockade, cross-sex hormones, and sex
15     reassignment surgery.
16 Q   In your declaration you refer on several
17     occasions to the "trans activist lobby." You're
18     familiar with that, I assume?
19 A   Yes.
20 Q   Is the transgendering of children and
21     adolescents being accomplished or attempted by
22     the trans activist lobby?
23 A   Absolutely.
24 Q   Is there anyone other than the trans activist
25     lobby that is performing the transgendering of

Page 127

1      children and adolescents?
2 A    Well, the lobby is an open social network that
3      has a number of means of propagation, one of
4      which is the Internet, social media, the
5      misteaching of children, schools using
6      curricular that is scientifically incorrect, so
7      they're being coquetted at very young ages, five
8      and six.
9          If you have a look at some of the
10     educational materials and curricula, children as
11     young as five and six are being told that girls
12     can have penises and boys can have vulvas and
13     there are crude drawings, anatomical drawings,
14     for which children are not really ready and
15     should not be exposed. They're also being told
16     that they can have whatever gender identity they
17     like.
18         And, furthermore, you know, there are other
19     means of propagation including this whole
20     movement of drag queen story time where drag
21     queens go into schools and libraries, community
22     libraries, and other public places where very
23     young children assemble and play and they're
24     read transgender story books about transgender
25     theories and transgender (inaudible) and a

Page 128

1      gender unicorn where further incorrect
2      information is disseminated and propagated.
3      That's what we call the transgendering of
4      children.
5 Q    Your article, Exhibit 14, were you solicited to
6      submit an article to that publication?
7 A    Well, the word "solicited" is slightly loaded.
8      I was invited to contribute an article.
9 Q    And I wasn't trying to load anything. I was
10     asking whether they invited you or whether they
11     had an open call for articles and you just
12     happened to submit one. But they invited you to
13     submit an article?
14 A   I believe so, yes.
15 Q   Okay. Did you submit your article for
16     publication anywhere else?
17 A   Not that particular article. I did attempt to
18     get it published in a peer-reviewed journal and,
19     unsurprisingly, it was not considered
20     politically correct enough and so I was unable
21     to get it published.
22 Q   What journal was that?
23 A   The Archives of Sexual Behavior.
24 Q   And when did you submit it to that journal?
25 A   A version of it was submitted about a year ago,

Page 129

1      maybe about that.
2 Q    So after it appeared in this collection?
3 A    Probably.
4 Q    Other than that journal, did you submit it for
5      publication anywhere else?
6 A    I've done versions of it under invitation to
7      other sources and publications and so forth.
8      It's never the same version. It's always
9      tailored and very much shorter than the
10     declaration. The declaration is probably the
11     longest and most detailed version of my work on
12     this topic.
13 Q   Other than the one peer-reviewed journal from
14     which it was rejected, did you submit it to any
15     other peer-reviewed journals?
16 A   I think I already answered that question and I
17     said no.
18 Q   Oh, I'm sorry. I thought you had two. I'm not
19     trying to trick you up. I just don't have a
20     realtime transcript, so I apologize.
21 A   The chapter that I submitted to the
22     Brunskell-Evans edited volume was peer-reviewed
23     and I just haven't really been focused on
24     peer-reviewed publications. (Inaudible) at the
25     moment having left the university to publish and

Page 130

1  most of my colleagues have had the experience of
2  putting a huge amount of work into a paper and
3  not even get past the first round of reviews, so
4  I haven't pursued that avenue of dissemination,
5  but I do have over 200 international
6  peer-reviewed journal articles.  So I'm not
7  incapable of reaching a bar for peer review, but
8  it's almost impossible to get articles critical
9  of the current transgender position past a peer
10  review.
11  Q    Okay.  I'm back in your declaration right now
12  and I am going to bring up, I guess, the end of
13  Paragraph 140 and the beginning of Paragraph
14  141.  Do you see that in front of you?
15  A    Yep, I do.
16  Q    It appears to me that Paragraph 140 ends with a
17  quote from a British neurosurgeon about
18  lobotomy; correct?
19  A    Yep.
20  Q    And then in Paragraph 141 you apply this quote
21  to the practice of transgendering children and
22  young people.  Is that a fair summary?
23  A    That's a fair summary.
24  Q    And you have in that paragraph a statement that
25  "These young people are also 'totally ruined as

Page 131

1  social human beings.'"  I assume that by "These
2  young people" there, you're referring to
3  transgender persons?
4  A    I'm referring to young people who have had their
5  bodies medically and surgically altered in a
6  vain attempt to change their sex.
7  Q    What does it mean to be totally ruined as a
8  social human being?
9  A    It means that one suffers, as I say later on in
10  that paragraph, pervasive mistreatment and
11  violence, severe economic hardship and
12  instability, discrimination, significant
13  negative physical and mental health impacts, and
14  so forth.
15  Q    Do you believe that the plaintiff children in
16  this case have been totaled ruined as social
17  human beings?
18  A    I think they have suffered enormously.  They're
19  very vulnerable young people and, I mean,
20  obviously, I wouldn't apply that phraseology to
21  very young children, you know, who still have
22  the opportunity to be rehabilitated if they
23  received the right care rather than the
24  one-size-fits-all care of gender affirmation for
25  which, you know, they are, in all likelihood,

Page 132

1  not appropriate.
2  Q    Sorry.  One second, please.  I'm sorry, Doctor,
3  my co-counsel heard something that I didn't hear
4  and we're probably both wrong on one front or
5  another.
6      What role does whether or not a person has
7  had gender-affirming surgery play in your
8  determination as to whether they are totally
9  ruined as social human beings?
10  A    What role does surgery play in ruining them?  Is
11  that what you're asking?
12  Q    Sure, let's start there.
13  A    Okay.  It's a significant traumatic insult on
14  the body to remove perfectly healthy organs, the
15  result of which will impair their sexual
16  function.  Many of them suffer ongoing and
17  significant medical complications including
18  chronic pain, infection, fistulas, bleeding,
19  and, you know, in the case of male to female,
20  they have to constantly dilate which I'm told
21  causes significant pain.  Many of them are
22  sexually dysfunctional or are not able to feel
23  comfortable enough to expose their naked bodies
24  to other people.  So, to the extent that those
25  situations have eventuated from sex reassignment

Page 133

1  surgery, the answer to your question would be
2  yes.
3  Q    Do you believe that children who have been given
4  access to gender-affirming medications, either
5  puberty blockers or hormones, but have not had
6  surgery, do you believe that they are totally
7  ruined as social human beings?
8  A    I don't think it's fair that you characterize my
9  view as everybody who's had gender-affirming
10  care of some kind or another are totally ruined
11  human beings because it depends on the age of
12  the child, it depends on the nature of the
13  treatment, what age it was commenced at, and,
14  you know, the kind of support they got and what
15  was the final outcome, but if your question was
16  about puberty blockade -- is that correct?  Were
17  they totally ruined human beings?
18  Q    I said puberty blockers or gender-affirming
19  hormones, but if you have different --
20  A    Okay.
21  Q    -- for the two, please --
22  A    Well, some of the adverse effects of puberty
23  blockade are -- I mean, I'm sure I'm not going
24  to be able to include everything right at this
25  moment, but the ones that come to mind are

Page 134

1  questions of future fertility, bone density and
2  bone grown and their final height.  It carries
3  significant risks of weight gain and there are a
4  significant number of children who report
5  headaches and hot flashes and, more recently, a
6  phenomenon called pseudotumor cerebri which, if
7  not treated promptly, may cause blindness.
8      So this drug is not safe and, in some
9  respects, it's not reversible because what it,
10  in fact, does is delay puberty including the
11  growth of the sexual organs, and if the child
12  remains on puberty blockers for longer than two
13  years, the growth of their sexual organs may not
14  return to what they would have been had they
15  been allowed to mature without puberty blockade.
16      The other thing that happens with puberty
17  blockade is, of course, their peers are going
18  through puberty and so all of the factors that
19  made them feel different and gender dysphoric in
20  the first place are often exacerbated because
21  they remain in a prepubertal state while what
22  used to be their best friends and peers are all
23  moving into the next stage of development which
24  is sexual maturation.  So there are the possible
25  problems caused by puberty blockade.

Page 135

1      So, if we move on to the cross-sex
2  hormones, some of the problems with prescribing
3  testosterone to women are, of course, well,
4  first of all, the suppression of menses, the
5  permanent infertility, and ovarian uterine
6  atrophy that occurs with longer-term use often
7  necessitating the removal of a young woman's
8  uterus and ovaries because they atrophy and
9  cause enormous pain.  Then we have clitoral
10  discomfort, vaginal atrophy which, of course,
11  makes sexual intercourse very difficult.  They
12  often have cyst formation on the ovaries, pelvic
13  pain, a condition called polycythemia which
14  means that they develop too many red blood cells
15  which carry medical risks.  There's increased
16  dyslipidemia, acne, oily skin.  Some of them
17  develop hypertension, some of them develop Type
18  2 diabetes, mood swings, increased frustration
19  and anger and aggression, a risk for deep vein
20  thrombosis.
21      That's what I can think of at the moment.
22  I'm sure there are more, but, you know, these
23  drugs are touted as being, you know, oh, wow,
24  this is really going to get you what you want,
25  but these issues are skated over, at best.

Page 136

1      So, if we move to the adverse effects of
2  estrogen on males, we see things like, again,
3  deep vein thrombosis, high triglycerides.  Some
4  of them will get hyperprolactinemia which means
5  they will start to have discharge from their
6  nipples.  They can develop a condition called
7  hyperkalemia which is excessive potassium which
8  can really upset the metabolic balance in the
9  body which can affect the heart.  Again, Type 2
10  diabetes, hypertension, weight gain.
11      Yeah, these drugs are dangerous drugs.
12  They're synthetic dangerous drugs to be pumping
13  into young children and adolescents.
14 Q   And, just to be clear, Doctor --
15 A   I beg your pardon.
16 Q   I'm sorry, I didn't mean to cut you off there.
17     I thought you were done.
18 A   Well, I'm sure I've missed something, but that
19     will have to do for now.
20 Q   And, just to be clear, Doctor, you're not a
21     medical doctor, are you?
22 A   I'm not.
23 Q   In your CV you make reference to what appears to
24     me to be a two-part podcast called The Medical
25     Scam of the Century.  Do you know what I'm

Page 137

1  talking about?
2 A   I do know what you're talking about.
3 Q   Is it fair to say that you consider the
4     "transgendering of children and adolescents" to
5     be the medical scam of the century?
6 A   Yes.
7 Q   You're familiar, I assume, with the Australian
8     Psychological Society; correct?
9 A   Of course.
10 Q   And, I'm sorry, I just forget.  Is this one of
11     the organizations you're still a member of or is
12     it something --
13 A   Yes, it is.  Yes, I'm still a member.
14 Q   And you're aware that this organization has
15     published an information sheet recommending
16     mental health practices that affirm transgender
17     people's experiences?
18 A   Yes.
19 Q   And I'm pulling up Exhibit 16 for you.  Do you
20     see that in front of you?
21 A   Yes.
22 Q   You recognize this as that information sheet?
23 A   Yes, I do.
24 Q   And you understand that, along with this, the
25     same organization published a one-page summary

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 36 of 145 PageID #: 3823

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 138

1　　of its information sheet; correct?
2　A　I do.
3　Q　And I'm pulling up Exhibit 17.  And you
4　　recognize this as that summary; correct?
5　A　Correct.
6　Q　You previously mentioned the Royal Children's
7　　Hospital in Melbourne; correct?
8　A　Yes.
9　Q　And my understanding is this is the largest
10　　children's hospital in Melbourne?
11　A　Yes, it is.
12　Q　Is it the largest one in Australia?  I just
13　　don't know.
14　A　No, there's the Westmead Children's Hospital and
15　　the Prince of Whales Children's Hospital in New
16　　South Whales.
17　Q　But you're aware that it has published treatment
18　　guidelines for the treatment of transgender and
19　　gender diverse children and adolescents;
20　　correct?
21　A　Yes.
22　Q　And what's the relationship, if you know,
23　　between The Royal Children's Hospital and
24　　AusPATH?
25　A　Well, the director of the gender service at The

Page 139

1　　Royal Children's Hospital is one of the
2　　coauthors of AusPATH.
3　Q　I'm pulling up for you what I have marked as
4　　Exhibit 18.  Do you see that in front of you?
5　A　Yes, I do.
6　Q　You recognize these as the treatment guidelines
7　　that have been published by AusPATH for the
8　　treatment of transgender and gender diverse
9　　children and adolescents?
10　A　Yes.
11　Q　And these are the treatment guidelines that you
12　　reference in your declaration occasionally as
13　　the AusPATH guidelines?
14　A　Yes.
15　Q　And my understanding is that this is the
16　　Australian body similar to WPATH?
17　A　Yes.
18　Q　We just briefly touched on this, but in your
19　　declaration you repeatedly describe the
20　　influence of the trans activist lobby and I'm
21　　wondering -- and maybe I asked you this or
22　　something close to this, but I'm wondering who,
23　　in your estimation, comprises the trans activist
24　　lobby.
25　A　Look, I think in a footnote I said I'm using it

Page 140

1　　as a summary term for the vast network of
2　　individuals and organizations who are
3　　propagating gender-affirming care.
4　Q　Do you believe that the trans activist lobby has
5　　a leader or a leadership structure?
6　A　The trans activist lobby, which is my summary
7　　term so that I don't have to list multiple
8　　individuals and organizations, is an open system
9　　network so it's got many, many influencers and
10　　many networks and subnetworks that have, you
11　　know, been -- it's been a very, very effective
12　　marketing machine.
13　　So it's got very great many modes, you
14　　know, that can attract children, so we've got
15　　TikTok, we've got Insta -- Instagram not so
16　　much.  What are the others?  I'm having a mental
17　　block about these websites, but there's many of
18　　them that spend a great deal of time, you know,
19　　attracting young people to these sites and, you
20　　know, talking to them in very positive terms
21　　about transgendering and they can be whatever
22　　gender they like.  And it often attracts young
23　　children who are marginalized and who are
24　　looking for a group, looking to belong, looking
25　　to be important and special.

Page 141

1　　And, yeah, so it's not any one individual,
2　　but I did do a social network diagram for what's
3　　going on in Australia and the network consists
4　　of politicians, sadly the Australian Human
5　　Rights Commission, the Commissioner for Children
6　　and Young People, the eSafety Commissioner.
7　　They're all singing the same song and there's no
8　　capacity to (inaudible) the unanimous kind of
9　　voice about gender-affirming care.
10　　So, you know, I'm not being extremist or,
11　　you know, it's not a conspiracy theory to call
12　　it a trans lobby.  It's a summary term for
13　　what's happening in society currently and it's
14　　very, very concerning.
15　Q　And the deep dive that you said you took -- and
16　　I'm sorry if I'm putting words into your mouth
17　　-- into persons in power in Australia, it's my
18　　understanding that that is available on your
19　　website?
20　A　What particularly?
21　Q　I'm sorry, I will pull that up at the next break
22　　and make sure we're talking about the same
23　　thing.
24　　I assume you believe that the trans
25　　activist lobby is global and not limited to

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 142

1    Australia; right?
2  A   Oh, absolutely.
3  Q   And The Royal Children's Hospital in Melbourne
4    is a member of the lobby?
5  A   Look, I don't want you to put that kind of
6    notion into my mouth.  I'm not kind of reifying
7    the transgender lobby as some, you know, star
8    chamber organization that's infiltrating the
9    world, but The Royal Children's Hospital acts as
10    a major harbor of this open social network
11    disseminating misinformation and advocating for
12    gender-affirming care very strongly, both
13    politically and in the courts.  These are facts.
14    They're not part of a conspiracy theory.
15        The Australian standards of care have been
16    strongly influenced by the WPATH guidelines and
17    the WPATH guidelines have been strongly
18    influenced, so there's this mutual kind of
19    network of social influence to the point that
20    you would call it brute think because if you
21    have a look at the early documents like the
22    standards of care, you'll see the same authors
23    across different guidelines and standards of
24    care.  So we've got Henriette van de Waal and
25    Peggy Cohen-Kettenis from the Amsterdam Clinic

Page 143

1    who were authors of the 2006 Dutch protocol and
2    we see their names appear repeatedly on these
3    standards of care compilations over the last few
4    years as well as the Endocrine Society.  And
5    there are other names as well that keep coming
6    up like Louie Myer (phonetic) and so forth.
7        So there is this group think that has
8    developed around the guidelines including the
9    Australian Psychological Society.  It's one
10    voice speaking and there's no room for doubt.
11    And, so, there is this collective
12    rationalization of thinking where there's a lot
13    of -- you know, there's no admission of any
14    other alternative point of view.  They don't
15    survey the alternatives and every time an
16    alternative is offered like social contagion or
17    like the fact that many of these gender diverse
18    children will grow up to be gay adults if left
19    alone.  They don't admit any other possible way
20    of helping and managing these young people, so
21    they do not appraise properly the risks of their
22    own preferred solution which is gender-affirming
23    care.  They scoff at the idea of the
24    reversibility of some of their treatments.  They
25    selectively choose information and they have

Page 144

1    this err of invulnerability that if you belong
2    to this group of gender-affirming care,
3    clinicians, politicians, teachers, et cetera,
4    then we have the truth.  We have the absolute
5    truth.  And all I'm saying, people outside of
6    that network are saying:  Please think about
7    alternatives, please think about possible harm,
8    please think about irreversibility.  And it's
9    not happening.
10  Q   Is it fair to say that you believe that the
11    American Medical Association has been improperly
12    influenced by the trans activist lobby?
13  A   Yes.
14  Q   Is it fair to say that you believe the American
15    Psychiatric Association has been improperly
16    influenced?
17  A   Yes.
18  Q   How about the American Psychological
19    Association?
20  A   Look, I've put a big list in my declaration and
21    if you have a look at all of their position
22    statements, there's very little variation, you
23    know, between them and it's --
24  Q   I'm sorry, Doctor.  We're gonna be here all
25    night if you don't just answer the question.

Page 145

1  A   Okay.
2  Q   The question was whether you believe the
3    American Psychological Association has been
4    improperly influenced by the trans activist --
5  A   Yes.
6  Q   And the same for the Endocrine Society?
7  A   Yes.
8  Q   Earlier in your deposition I showed you what was
9    Exhibit 8, the statement by the CAAPS
10    organization that had been signed by a couple
11    dozen other organizations.  Do you remember that
12    document?
13  A   Yes, I do.
14  Q   Is it fair to say that you believe that each of
15    those organizations has been improperly
16    influenced by the trans activist lobby?
17  A   Well, they're part of it so they influence each
18    other.  It's a bidirectional influence.
19  Q   And the various Australian state governments
20    that have passed bans on conversion therapy,
21    have they been improperly influenced by the
22    trans activist lobby?
23  A   Well, I mean, I'm afraid I have to seriously
24    question their intellectual capacity to put a
25    bill like the banning of conversion therapy into

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 146

1    parliament.  It's an extremely poorly-worded
2    document and it's unlikely to catch anyone in
3    its net, but what it has done is scare off
4    therapists from treating these children in any
5    way whatsoever.  So now there is an extreme
6    shortage of skilled child and adolescent
7    therapists to help these young people because
8    almost no one wants to touch this patient group
9    because of that legislation.
10 Q    You understand, I assume, that a federal judge
11    in the Alabama case where you submitted an
12    expert report issued an injunction against the
13    statute banning certain types of
14    gender-affirming care for minors; correct?
15 A    Issued an injunction against gender-affirming
16    care?
17 Q    I'm sorry, that's lawyer talk.  Issued an order
18    for preventing the statute from taking effect.
19 A    Yes.
20 Q    Is it your position that that judge was
21    improperly influenced by the trans activist
22    lobby?
23 A    I don't have an opinion on that.
24 Q    I'm pulling up for you what I have marked as
25    Exhibit 19.  Do you see that document in front

Page 147

1    of you?
2 A    Yes.
3 Q    I assume you're familiar with this?
4 A    Yes.
5 Q    These are the informed consent standards that
6    AusPATH has promulgated for gender-affirming
7    hormone therapy?
8 A    Yeah.
9 Q    I'm popping Exhibit 18 back up for you and my
10    question to you is whether you use any portion
11    of this document, the AusPATH treatment
12    guidelines, when you provide therapy to
13    transgender persons or persons who identify as
14    transgender.
15 A    Was your question:  Is there any part of the
16    document that says children should have therapy?
17 Q    My question was whether there's any portion of
18    this document that you rely on when treating a
19    patient who walks through your door.
20 A    No.
21 Q    And is the same true for Exhibit 19, the
22    informed consent standards?
23 A    There are more general informed consent
24    standards that every practicing clinician must
25    adhere to, but the gender-affirming therapists

Page 148

1    don't even adhere to their own standards of
2    informed consent and most of them don't even
3    understand what constitutes informed consent.
4        MR. ROSE:  Off the record for a sec.
5        (A discussion was held off the record.)
6 Q    Doctor, you ready to power forward?
7 A    Sure.
8 Q    Chapter 2 of your declaration -- excuse me.  You
9    have a separate what you call chapter of your
10    declaration that specifically concerns the named
11    plaintiffs in this case; is that fair?
12 A    Yeah.
13        MR. ROSE:  And, Tom, before we plow
14    forward, just a matter of housekeeping.  We want
15    to make sure that Exhibits B, C, D, and E of the
16    doctor's declaration as well as I think they
17    will be Exhibits 20 and 21 of this deposition
18    and any testimony about those are maintained as
19    confidential.  I assume that's not an issue and
20    we can obviously figure out how that needs to
21    work for the Court?
22        MR. FISHER:  Right.  Agreed.  No objection
23    to that.
24 Q    Okay, Doctor.  Just very generally, have you
25    personally evaluated any of the plaintiffs?

Page 149

1 A    As stated in my report, no, I haven't.
2 Q    Have you interviewed them at any time?
3 A    No.
4 Q    Have you interviewed any of their parents?
5 A    No.
6 Q    Have you ever communicated in any fashion with
7    either them or their parents?
8 A    No.
9 Q    Have you ever communicated about the plaintiffs
10    with any professional who has evaluated or
11    treated any of them?
12 A    No.
13 Q    It's fair to say that your opinions about them
14    come exclusively from a review of the medical
15    records that you were provided; is that correct?
16 A    As stated in my report.
17 Q    Sorry.  That's a yes?
18 A    Yes.
19 Q    Do you have an understanding as to whether each
20    of the plaintiffs received mental health therapy
21    before seeking or being prescribed either
22    puberty blockers or gender-affirming hormones?
23 A    Did you say do I have an understanding?
24 Q    Do you understand whether the plaintiffs
25    received mental health therapy before seeking or

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 39 of 145 PageID #: 3826

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 150

1  being prescribed gender-affirming medications
2  including puberty blockers?
3  A  It wasn't entirely clear exactly what they
4  received by way of psychotherapeutic support
5  because, as I say, in the documents before me
6  only vague references were made.  So I didn't
7  see any process notes, I didn't see any case
8  formulation, I didn't see any progress, goals,
9  or anything that one would normally see
10 documented in a clinical process.
11 Q  Okay.  I am bringing back up your expert report,
12 Exhibit 2.  Do you see that in front of you?
13 A  Yeah.
14 Q  I am going to scroll down to Paragraph 198.
15 Okay.  Do you see Paragraph 198 and the
16 associated footnote 34?
17 A  Yes.
18 Q  In this portion of your declaration you're
19 describing a visit that Plaintiff K.C. had with
20 the doctor managing her Type 1 diabetes.  Do you
21 see that?
22 A  Yeah.
23 Q  And you underscore in your report that K.C. was
24 reported to have "no dysmorphic features."  Do
25 you see that language?

Page 151

1  A  Yes.
2  Q  And you speculate in the footnote that it's
3  unclear whether the doctor meant dysphoric or
4  dysmorphic or was --
5  A  Yes.
6  Q  -- using the terms interchangeably; is that
7  correct?
8  A  Yes.
9  Q  I assume you understand that gender dysphoria
10 and body dysmorphic disorder are two entirely
11 separate diagnoses; right?
12 A  They're not two entirely separate diagnoses, but
13 they have different emphases.
14 Q  And they're listed separately in the DSM;
15 correct?
16 A  Yes.
17 Q  Do you have an understanding that persons with
18 diabetes are more likely to develop an eating
19 disorder that might lead to body dysmorphia?
20 A  Yes.
21 Q  So do you agree that for a doctor managing a
22 patient's diabetes whether a patient displays
23 dysmorphic features might be particularly
24 noteworthy?
25 A  Yes.

Page 152

1  Q  But you still think the diabetes doctor, despite
2  using the phrase "dysmorphic features," might
3  have been intending to reference K.C.'s gender
4  dysphoria?
5  A  Well, he then goes on to say "sweet transgender
6  girl," so it's ambiguous.
7  Q  Okay.  I'm going to scroll down to Paragraph
8  229.  Do you see that in front of you?
9  A  Yes.  Yes.
10 Q  You're describing here an assessment of M.W.
11 that you indicate took place on January 4th,
12 2022.  Is that a fair statement?
13 A  Yes.
14 Q  My review of the medical records, I'll just tell
15 you, does not reveal anything from January 4th
16 but does indicate that M.W. had an initial
17 evaluation at Riley Gender Health Connect on
18 April 14th, 4/14/22.  Is it possible that you
19 simply got the dates wrong?
20 A  Well, given that I had to scroll through
21 literally thousands of pages on Notepad
22 formatting, it is possible I got the date wrong.
23 And, also, Americans reverse the date and month
24 and it may have occurred for one of those two
25 reasons.

Page 153

1  Q  I understand that and I'm not blaming you.  And,
2  for the record, I did go through other portions
3  of your declaration to see whether you were
4  adopting the American style of month/day or
5  whether you were not.  I'm certainly not blaming
6  you.
7      In your report of this encounter you
8  indicate that M.W. was neutral about certain
9  secondary sexual characteristics, satisfied with
10 other things, and also neutral about
11 characteristics such as hair, voice, and general
12 appearance.  I understand that I'm not quoting
13 everything, but you see the language I'm
14 referencing; right?
15 A  Yes.  Yes.
16 Q  And you underlined "voice"; right?
17 A  Uh-huh.
18 Q  Sorry.  Yes?
19 A  Yes.
20 Q  Why did you underline "voice"?
21 A  Because voice is one of the characteristics
22 around which young people claim extreme
23 dysphoria.
24 Q  So is it fair to say that you underlined "voice"
25 because you thought M.W. being neutral about

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

Page 154

1  that was more noteworthy than some of the other
2  items reported?
3  A   Yes.
4  Q   I'm going to flip over to what I've marked as
5  Exhibit 20 which, as you will see, is the
6  encounter on April 14th, 2022.  And I will
7  scroll down to, I guess, Page 3 of the document
8  using the PDF page numbers.  I have highlighted
9  a couple aspects of the report there.  Do you
10 see the portions I have highlighted?
11 A   Yes.
12 Q   And I will just tell you that this -- and I'm
13 not trying to trick you.  I can scroll back and
14 forth if you want me to.  The language I
15 highlighted matches almost verbatim the language
16 that you report in Paragraph 229 of your
17 declaration.  Is it fair to say that this is the
18 document that you were looking at?
19 A   Well, I didn't get it in that form.  In that
20 form it's actually interpretable, but I got it
21 in incredibly narrow paragraphs and the average
22 scores were kind of above the text
23 interpretation so it was quite difficult for me
24 to make sense of it.  I mean, presented like
25 that, it looks much more interpretable than the

---

Page 155

1  form that I got it in which was a Notepad
2  document.
3  Q   So is it possible that you misinterpreted M.W.'s
4  medical records as you were going through them?
5  A   I hope I didn't.  I took great care not to, but
6  it looks as if I did not misinterpret anything
7  on this occasion.
8  Q   Okay.  And all of the medical records that you
9  reviewed, did you receive them all in the same
10 format that was difficult to read?
11 A   Most of them were in Notepad format.  I got a
12 couple that were scanned Word or PDF documents,
13 but they weren't like -- the text was fuzzy, and
14 they were the two primary forms in which I got
15 the records.
16 Q   And the Notepad format was the one that you were
17 indicating was difficult to read?
18 A   Yeah, and I had hundreds of those files to go
19 through.
20 Q   Okay.  I will scroll up just a little bit on
21 Exhibit 20 now to the top of that Page 3.  It
22 looks to me like what Page 3 is doing here is
23 providing a summary of the intake paperwork that
24 M.W. and, under the caregiver's portion, M.W.'s
25 parents completed.  Is that fair?

---

Page 156

1  A   Yeah.
2  Q   I assume you were provided a copy of that
3  pre-intake paperwork itself as well?
4  A   As I said, but not in this form.
5  Q   Okay.  I understand the formatting might have
6  changed, but I'm flipping over to Exhibit 21 and
7  I will ask you whether this appears to you to be
8  the pre-intake paperwork for M.W. that is
9  summarized in Exhibit 20.
10 A   I don't believe I've seen that document.
11 Q   Okay.  Is there a reason you would not have seen
12 it?
13 A   I don't know.  I would remember that if I had
14 seen it and I haven't seen it.
15 Q   I'm going to scroll down just a little and I
16 will represent to you this is the self-report
17 portion and I'm on Page 6 right now.  Do you see
18 the highlighted portion about how M.W. feels
19 about his breasts?
20 A   Yes.
21 Q   And you acknowledge that he indicates that he
22 was very dissatisfied with them?
23 A   Yep.
24 Q   I'm scrolling down just a little bit farther.
25 You see the same thing about voice and chest?

---

Page 157

1  A   Yes.
2  Q   And I'm looking at Page 7 now, but you see that
3  M.W. actually reported that he was very
4  dissatisfied with his voice?
5  A   Yes.
6  Q   So is it fair to say that the statement in your
7  declaration that M.W. was neutral about his
8  voice is inaccurate?
9  A   According to the document that I reviewed, no,
10 it's not inaccurate because that was the
11 information in front of me, but, as I said in
12 the beginning of my Chapter 2, that had I been
13 presented with any information subsequent to my
14 report, it might cause me to change my opinion.
15         And just because a child says they're
16 dissatisfied with their breasts and voice, it
17 doesn't mean that you automatically jump into a
18 diagnosis of gender dysphoria and send them off
19 for gender-affirming care.
20 Q   Okay.  Well, we've established that Exhibit 20
21 which indicates "Tended to report feeling
22 neutral about characteristics such as hair,
23 voice, and general appearance" is what you were
24 looking at for that portion of your declaration;
25 correct?

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

---

Page 158

1 A   Correct.

2 Q   I'm going to scroll up on the same document then
3     to the top of Page 2 where it says that M.W.
4     "Reports feeling significant dysphoria related
5     to chest, voice, and menstrual periods." Do you
6     see that?

7 A   Yep.

8 Q   And do you still think it was accurate for you
9     to report that M.W. is neutral about his voice?

10 A  From the documents that were in front of me, I
11    reported that accurately.

12 Q  This is part of the same document, Doctor.

13 A  Look, I would like you to have a look at the
14    Notepad files that I was sent. They were
15    disjointed. They didn't necessarily even follow
16    one sentence continuing on the next line.
17    Sometimes I had to scroll down several lines to
18    get the end of a sentence. I was under extreme
19    time pressure. I was given some medical records
20    two days before I had to file my report. I was
21    up all night for three nights in a row trying to
22    complete the work.

23    But, even under all of those circumstances,
24    even if a young child reports dysphoria in
25    relation to chest, voice, and menstrual periods,

---

Page 159

1     I do not jump to the conclusion that this child
2     is suitable for gender-affirmation care.

3 Q   And the circumstances you described about your
4     difficulties reviewing the medical records, I
5     assume that applies to the medical records of
6     all four plaintiffs?

7 A   Well, most of them were given to me in that
8     format, in Notepad format.

9 Q   Is that a yes?

10 A  Yes.

11 Q  Okay.

12 A  But I didn't just rely on those medical records.
13    I also was given the declarations of the parents
14    and I had the parent reports from their lawyers
15    as well, so it was multiple sources of
16    information.

17 Q  I'm back in Paragraph 229 of your declaration.
18    In the middle of this paragraph you say "there
19    is no evidence of a marked incongruence between
20    M.W.'s experienced/expressed gender and (all)
21    primary and/or secondary sex characteristics."
22    Do you see the language that I have just quoted?

23 A  Yeah.

24 Q  Why is "all" in parentheses?

25 A  Because, generally speaking, the child would

---

Page 160

1     need to express a global dissatisfaction with
2     their body overall. I mean, you know, quite
3     often children will not like something about
4     themselves. I don't like my hips or I don't
5     like my shoulders. That doesn't make them
6     either body dysmorphic or gender dysphoric.

7     So, perhaps, it would've been better to put
8     "most" rather than "all," but I was just drawing
9     that point so that people wouldn't misconstrue
10    that one dissatisfaction or a few
11    dissatisfactions would meet criteria.

12 Q  Let me put it this way, Doctor. Is "all" in
13    parentheses because the rest of that sentence is
14    a direct quote from the DSM-5 criteria for
15    gender dysphoria?

16 A  Yes, it is. I am quoting from the criteria from
17    DSM.

18 Q  So you added the word "all" to the criteria?

19 A  Well, I probably did add it, yes, for emphasis.

20 Q  Okay. Doctor, I was reading an interview that's
21    linked from your website to a website called
22    xxxkidernet.com. Are you familiar with the
23    interview that I'm referencing?

24 A  Yep.

25 Q  And I don't have it up in front of me, but I did

---

Page 161

1     copy this quote. And I'm going to read this
2     quote to you and then the questions I'm going to
3     ask is going to be whether you recall making
4     this statement and whether it is an accurate
5     statement of your beliefs.

6     You were quoted as saying, "Transgender
7     advocates state that in transgenderism -- the
8     belief/assumption that one has been born in the
9     wrong body -- the body must be aligned to one's
10    gender belief, not one's belief to one's
11    biological body. They assume that the mind is
12    correct in its perceptions and beliefs and the
13    body is diseased and must be treated."

14    Do you recall making that statement or
15    something similar to it?

16 A  Yes.

17 Q  And is what I quoted an accurate statement of
18    your beliefs?

19 A  Yes.

20 Q  When you provide psychotherapy to a transgender
21    patient or a patient identifying as transgender,
22    is one of your methods to attempt to align their
23    belief to their biological body?

24 A  This is a grave misunderstanding of the process
25    of exploratory psychodynamic psychotherapy. I

---

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 162

1    don't try to do anything except provide a safe
2    space for the young person to know their true
3    feelings and to express them, and whatever
4    conclusion they draw at the end of the
5    psychotherapeutic process is not any attempt on
6    the part of the therapist to engineer a
7    particular outcome.
8       And what I find in the majority of cases is
9    that after the first few sessions the child just
10   stops talking about gender dysphoria and wanting
11   to transition and we start talking about their
12   emotional distress and pain in relationship to
13   what is happening in their primary attachment
14   relationships and also other issues that are of
15   great concern to them such as bullying and
16   discrimination, isolation, lonliness, a fear of
17   not meeting expectations. Many of them have
18   very deeply entrenched self-punity, internalized
19   self-punity xxthat need to be dealt with and
20   often we have to deal with how they manage their
21   emotional distress through self harm.
22      So every time a child or anybody comes into
23   an exploratory psychodynamic psychotherapy it's
24   what's on the mind of the patient, what the
25   patient brings to that session that the

Page 163

1    therapist focuses on. So, no, I do not have a
2    goal of aligning anything with anything else.
3 Q   Okay.
4 A   It's to support the young person to understand
5    themselves better.
6 Q   Okay, Doctor. I'm going to pull up what I have
7    marked as Exhibit 22. Do you see that in front
8    of you?
9 A   Uh-huh.
10 Q  Sorry. ?
11 A  Yes.
12 Q  That's for the court reporter, not for me.
13 A  I understand. I understand.
14 Q  You recognize this as a presentation that you
15   gave in November 2021 to the organization that
16   we previously called SEGM?
17 A  Yes.
18 Q  And this presentation is not listed on your CV.
19   Does this refresh your recollection as to
20   whether there are presentations that you
21   omitted?
22 A  Right. Okay. I'll be sure to add it next time.
23 Q  Was this presentation given at a conference of
24   some sort?
25      MR. ROSE: You're on mute, Tom, if you're

Page 164

1    trying to talk.
2       MR. FISHER: Is there any reason you can
3    just make it bigger for the doctor?
4       MR. ROSE: Oh, I had no idea, Tom.
5 Q   I'm sorry, Doctor, I didn't realize you were
6    leaning forward to try to read it.
7 A   Right.
8 Q   Is this better for you?
9 A   Yes. Thank you. Yes.
10 Q  Okay. I'm sorry, Doctor, let me repeat the
11   question. The question was whether this
12   presentation was given at a conference of some
13   sort.
14 A  Yes, it was, yes.
15 Q  Did you give it in person, online?
16 A  Given that it's November '21, it was probably
17   online.
18 Q  It would have been a conference of the Society
19   for Evidence-based Gender Medicine?
20 A  No, not necessarily. I'm just characterizing --
21   I'm just situating myself as a member of that
22   organization.
23 Q  Gotcha. And I don't know where I got this from,
24   but it's in my notes so I'll just ask you. Was
25   this given at a conference of the National

Page 165

1    Association of Practicing Psychiatrists?
2 A   Oh, that's highly likely, yes.
3 Q   I'm positive I saw it somewhere, but I don't
4    know where I got that from. Is that an
5    Australian organization?
6 A   Yeah, it's a national organization, yes.
7 Q   But the nation of Australia?
8 A   The nation of Australia.
9 Q   I assumed by how practicing was spelled.
10      Okay. And what we have here is the
11   PowerPoint, I assume, that accompanied this
12   presentation?
13 A  Yes.
14 Q  Did you create the PowerPoint yourself?
15 A  Yes, I did. This is a presentation of a
16   distillation of my theory development of what is
17   required in assessment and therapy of young
18   people presenting with gender dysphoria, so,
19   yeah, it is a model that I've developed.
20 Q  Okay. And on the very last page of your
21   presentation you included an image of what
22   appears to be a rose with the verbage "TRANS IS
23   NOT BEAUTIFUL," correct?
24 A  Yes.
25 Q  Do you consider this image to be a hateful one?

Page 166

1 A    The image with or without the "NOT"?

2 Q    As you presented it at the conference.

3 A    Hate was not in my heart.  Why didn't you show
4      more interest in the slides in between?

5      MR. ROSE:  Doctor, I have no further
6      questions.  Thank you very much for your time
7      this morning for you/this evening for us.

8      MR. FISHER: Can we take maybe 20 minutes?
9      (A recess was taken.)

10 CROSS-EXAMINATION,

11     QUESTIONS BY THOMAS M. FISHER:

12 Q    Dianna, you were asked earlier by Mr. Rose about
13     -- and this was a while ago so I'm certainly
14     paraphrasing here, but I think the discussion
15     was treatment of children who had started
16     puberty blockers.  Do you remember that
17     discussion?

18 A    Yes.

19 Q    And I think the question from Mr. Rose was
20     something along the lines of:  Well, did you
21     continue treating them, that child?  And you
22     said no.  And then the follow-up, of course,
23     was:  Well, why not?  And your response was
24     something like:  Well, they had found the magic
25     solution.  And that was the end of the

Page 167

1      discussion.  Do you remember that?

2 A    Yes.

3 Q    Okay.  So I was hoping you could explain to us a
4      little bit more about what you meant when you
5      said that.

6 A    What I meant was that families go through a lot
7      of heartache when a child declares themselves
8      transgender, not all but most, and parents have
9      difficulty tolerating their children's distress
10     and most parents want to do what's going to make
11     their children happy.  And by "magic solution,"
12     I'm referring to a treatment that they've been
13     convinced is going to improve their child's not
14     only gender dysphoria but all the comorbid
15     presentations that the child has as well.

16     And there is, not always but very, very
17     often, a honeymoon period where everything seems
18     to settle down.  It's like, you know, the child
19     is getting this almost magic treatment that's
20     going to take away all the gender dysphoria and
21     everybody then breathes a sigh of relief, but
22     they're really breathing a sigh of relief over
23     this very short-term period and all the
24     complications that may come in the future are
25     brushed aside because peace is being restored

Page 168

1      and the child appears happier in the short term.

2      But most studies show that pubic blockade
3      has no positive effect on mental health
4      presentations.  It's just a placebo effect, but
5      it feels like magic at the time.

6 Q    So, in that circumstance then, because there was
7      that honeymoon period, the family would
8      discontinue seeing you at that point?

9 A    Yes.  Yes, they would discontinue other forms of
10     therapy.

11 Q    Okay.  Alright.  Later in Mr. Rose's questioning
12     he asked about so-called conversion therapy bans
13     in some of the Australian states.  Do you recall
14     that discussion?

15 A    Yes, I do.

16 Q    And I think that the sum and substance was
17     pretty much all of those so-called conversion
18     therapy bans were materially identical.  Is that
19     your recollection?

20 A    Yes.

21 Q    Tell us about what that means, the conversion
22     therapy bans that those Australian states have
23     enacted.  What, in particular, are they trying
24     to ban?

25 A    Well, they're actually based on a completely and

Page 169

1      utter red herring.  I don't know if you know
2      that expression in America, but it means that
3      it's a (inaudible).  It's just based on
4      shimmering sand because what they're claiming --
5      like conversion therapy is defined as trying to
6      change the sexual orientation of homosexual
7      individuals to heterosexual, and there was some
8      conversion therapy practiced many, many years
9      ago, decades ago, and maybe there are tiny
10     little pockets in religious groups and so forth
11     that is still trying to practice that but it's
12     certainly not accepted in mainstream medicine,
13     and it has never been practiced in its form,
14     which was created for homosexuality, on
15     transgender individuals.  So there is no such
16     thing as conversion therapy for transgender
17     individuals.

18     And the definition of conversion therapy is
19     a question that Mr. Rose put to me about my
20     psychotherapy and that is:  Do you aim to change
21     the child's perception of the gender identity to
22     align with their body?  Now, that's conversion
23     therapy, but psychotherapy doesn't try to do
24     that.

25     So the only conversion therapy is

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 170

1  gender-affirming care.  It doesn't exist in any
2  other form and it's a defunct treatment.  It's
3  proven to be inhumane, unethical, and medically
4  ineffective.  So it's all part, I'm sorry to
5  say, you know, the transgender machinery,
6  building up straw men to attack and pull down,
7  and then there was so much dancing in the street
8  when these conversion therapy laws got through
9  parliament.
10 Q  What can you do in your practice that
11  psychologists in those states with conversion
12  therapy bans cannot do when it comes to treating
13  gender dysphoria?
14 A  Well, there's two ways of looking at it.  One is
15  that anything that isn't gender-affirming care
16  may be interpreted as conversion therapy, but
17  you can only be prosecuted under that act if an
18  actual patient makes a complaint about you.  So
19  a trans group or an advocacy group making a
20  complaint that they know you're practicing
21  something other than gender-affirming care
22  cannot bring a complaint, so the patient or the
23  patient's parent needs to directly complain
24  about you.
25        But, in reality, it carries 18 months jail

Page 171

1  and a $30,000 fine if you're convicted under
2  this act, but I doubt very much whether anybody
3  could be convicted under that act because
4  conversion therapy is not even defined properly
5  in these new laws and it's never been practiced
6  to anybody's knowledge in the transgender space.
7 Q  But, just to be clear, your understanding of
8  those laws is that they mean to say that
9  anything other than gender-affirming care is
10  conversion therapy?
11 A  Yes.
12 Q  Okay.  Then at the end of Mr. Rose's
13  questioning, he brought up a slide at the end of
14  a long presentation that you gave, I think, and
15  -- well, first of all, do you recall what that
16  presentation was?
17 A  Yes, I do.  Yes, I was presenting my new model
18  of exploratory psychodynamic psychotherapy
19  starting with what I thought were essential
20  assessment examinations that need to be done at
21  the beginning, and then I outlined some of what
22  I believe underlies the genesis of gender
23  dysphoria and then how I work with the family to
24  resolve some of those issues.
25 Q  Well, and when Mr. Rose was asking you about the

Page 172

1  last slide, you, I think, made a comment about
2  how you wished he would be more interested in
3  what came before that.  Do you remember making
4  that comment?
5 A  Yes, I do.  Yes.
6 Q  I was wondering what sparked that.  What was it
7  that you had hoped Mr. Rose would have been more
8  interested in?
9 A  Well, it was a very serious presentation
10  presenting a new model of therapy that has not
11  been presented before or outlined, you know,
12  actually put into a coherent form so that
13  clinicians can meet and discuss, compare notes,
14  and, you know, talk about the process of
15  psychotherapy.  So it was the result of, you
16  know, four to five years of very intense study
17  on the subject and, you know, working constantly
18  with young gender dysphoric people, and to go to
19  the last slide, I mean, all we saw was the first
20  slide and the last slide, which I think is a
21  little bit cheap.
22 Q  And what about that last slide that said, as I
23  reall, it had said "TRANS IS BEAUTIFUL" and you
24  put the word "NOT" in, "TRANS IS NOT BEAUTIFUL."
25  Do you remember that?

Page 173

1 A  Yes, I do, yes.
2 Q  What did you mean by that?
3 A  Well, if you look at the foregoing slides, you
4  would see that the life of young people after
5  they transition is actually worse in so many
6  ways compared to before they transition.  Yes,
7  they're already having difficulties, there are a
8  lot of problems, a lot of comorbidities, but
9  when you look at studies that show what happens
10  to these young people after they transition,
11  that's when the suicide rate increases.
12     A long-term Swedish study that followed up
13  people who'd had transgender surgery for 30
14  years showed that their suicide rate was 19
15  times higher than in the general population
16  matched for age and sex.  So transgender
17  cross-sex hormones and sex reassignment surgery
18  does not cure suicidality.  It actually
19  exacerbates it.
20     And the same goes for the other common
21  comorbidities that you see with young people
22  premorbid and that is vastly increased rates of
23  depression, suicide, self harm, acting out,
24  unemployment, homelessness.
25     And that was my summary way of saying

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 45 of 145 PageID #: 3832

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

Page 174

1  becoming transgender is not beautiful.  In other
2  words, it's not la dolce vita, the beautiful
3  life that people envisage/fantasize about
4  because their previous life was so difficult and
5  in some cases traumatic.  So it was part of a
6  whole kind of complex constellation of factors
7  that I had been talking about previously.
8      MR. FISHER: I don't have any further
9  questions.
10     MR. ROSE: Just another hour, hour and a
11  half maybe, Doctor.  Doctor, it's 11 o'clock at
12  night here.  My boss is in my office and I have
13  been told that if I ask you a single question, I
14  will be fired on the spot, so I have no further
15  questions.
16     MR. FISHER: We'll take signature.
17  AND FURTHER THE DEPONENT SAITH NOT.
18
19     _____
        PROFESSOR DIANNA T. KENNY
20
21
22
23
24
25

Page 175

1  STATE OF INDIANA        )
                           ) SS:
2  COUNTY OF HAMILTON      )
3      I, Brandy L. Bradley, RPR, a Notary Public in
4  and for the County of Hamilton, State of Indiana at
5  large, do hereby certify that PROFESSOR DIANNA
6  T. KENNY, the deponent herein, was by me first duly
7  sworn to tell the truth, the whole truth, and nothing
8  but the truth in the above-captioned cause;
9      That the foregoing deposition was taken on
10 behalf of the Plaintiffs at the remote location of
11 the witness, Sydney, New South Whales, Australia, on
12 the 30th day of May, 2023, pursuant to the Applicable
13 Rules;
14     That said deposition was taken down in
15 stenograph notes and afterwards reduced to
16 typewriting under my direction, and that the
17 typewritten transcript is a true record of the
18 testimony given by said deponent, and thereafter
19 presented to said deponent for his/her signature;
20     That the parties were represented by their
21 aforementioned counsel.
22     I do further certify that I am a disinterested
23 person in this cause of action; that I am not a
24 relative or attorney of either party, or otherwise
25 interested in the event of this action, and am not in

Page 176

1  the employ of the attorneys for either party.
2      IN WITNESS WHEREOF, I have hereunto set my hand
3  and affixed my notarial seal this _____ day of
4  _____, 2023.
5
6
7      _____
        Brandy L. Bradley, RPR
8
9  Commission No. NP0682101
10 My Commission Expires:
   April 13, 2024
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 177

1  (Originating Party)
   Gavin M. Rose
2  ACLU of Indiana
   1031 W. Washington Street
3  Indianapolis, IN 46202
4      NOTICE OF DEPOSITION FILING
5
6      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF INDIANA
7      INDIANAPOLIS DIVISION
       NO. 1:23-cv-00595-JPH-KMB
8
9  K.C., et al.,              )
10     Plaintiff(s),      )   )
11     -vs-                   )
12 THE INDIVIDUAL MEMBERS OF THE   )
   MEDICAL LICENSING BOARD OF      )   )
13 INDIANA, in their official      )
   capacities, et al.,             )
14     Defendant(s).      )   )
15
16     In compliance with the Indiana Rules of
17 Procedure, Federal Rules of Civil Procedure and/or
   the Rules of the Industrial Board, you are notified
   that the signed original deposition of PROFESSOR
18 DIANNA T. KENNY, taken on the 30th day of May, 2023,
   has been sealed and submitted to the originating
19 party, along with the attached Errata Sheet(s), if
   applicable.
20
21     _____
       (Date received by Circle City Reporting)
22
23     CIRCLE CITY REPORTING
       135 N. Pennsylvania Street
24     Suite 1720
       Indianapolis, IN 46204
25     (317) 635-7857

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 46 of 145 PageID #: 3833

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

**$**

**$1,000 (1)**
41:25
**$30,000 (1)**
171:1
**$400 (2)**
58:5,11
**$68 (1)**
59:2

**[**

**[gender] (2)**
85:12,20

**A**

**ability (2)**
23:8;69:1
**able (6)**
10:12;49:13;93:7;
119:1;132:22;133:24
**above (3)**
77:1;107:20;
154:22
**above-captioned (1)**
175:8
**absolute (1)**
144:4
**absolutely (7)**
54:24;75:3;78:1;
79:2;89:11;126:23;
142:2
**absolutist (2)**
68:14;71:1
**abstract (1)**
105:15
**abuse (8)**
30:2;44:16,24;
45:9,16;61:22;65:2;
98:8
**academic (5)**
19:21;54:2,5,5;
55:5
**academics (2)**
54:10,17
**accept (3)**
26:2;27:12;115:1
**acceptable (2)**
29:4;54:19
**accepted (5)**
34:24;36:15;37:5;
118:20;169:12
**access (3)**
78:23;118:13;
133:4
**accessed (1)**
86:16
**accessing (1)**
117:14
**accompanied (1)**

165:11
**accomplished (1)**
126:21
**according (2)**
20:2;157:9
**account (2)**
76:9;78:6
**accounted (1)**
76:5
**accurate (8)**
14:18;33:3,5;
52:21;79:16;158:8;
161:4,17
**accurately (2)**
66:11;158:11
**acknowledge (1)**
156:21
**ACLU (1)**
177:2
**acne (1)**
135:16
**across (2)**
98:7;142:23
**ACT (10)**
48:4;63:4;64:11;
107:7,12,25;108:19;
170:17;171:2,3
**acting (1)**
173:23
**action (3)**
35:10;175:23,25
**active (2)**
35:8;117:12
**activist (13)**
126:17,22,24;
139:20,23;140:4,6;
141:25;144:12;
145:4,16,22;146:21
**activities (1)**
49:19
**acts (1)**
142:9
**actual (8)**
45:4;65:13;72:11,
15,20;73:18,19;
170:18
**actual' (2)**
72:7,10
**actually (19)**
31:20;32:12;51:14;
77:14;80:6;90:20;
100:11,24;101:5;
102:7;105:17;118:9;
119:9;154:20;157:3;
168:25;172:12;
173:5,18
**adaptation (1)**
29:14
**add (2)**
160:19;163:22
**added (2)**
88:8;160:18
**addition (2)**

30:6;75:23
**address (1)**
115:25
**addressed (1)**
4:18
**ADHD (1)**
23:10
**adhere (2)**
147:25;148:1
**adjournment (1)**
57:9
**administration (1)**
43:5
**administrative (1)**
12:13
**admission (1)**
143:13
**admit (3)**
10:22;113:19;
143:19
**adolescence (3)**
25:8;83:16;97:15
**adolescency (1)**
83:13
**adolescent (14)**
13:6,9;16:19,21;
20:13,17;25:21;
80:19,23;83:8;
104:12,23;115:7;
146:6
**adolescents (20)**
93:19,25;94:4;
96:15,15,16,17;97:3,
4;98:3,3;124:14;
125:21;126:5,21;
127:1;136:13;137:4;
138:19;139:9
**adopted (2)**
17:23;19:4
**adopting (1)**
153:4
**adult (1)**
69:5
**adulthood (1)**
38:2
**adults (7)**
25:3;68:25,25;
96:18;97:4;98:4;
143:18
**advance (2)**
7:20;8:12
**Advancement (1)**
91:21
**adversarial (1)**
51:17
**adverse (2)**
133:22;136:1
**advised (2)**
9:1;60:17
**advocacy (3)**
46:2,6;170:19
**advocates (2)**
18:20;161:7

advocating (3)
47:1;117:12;
142:11
**affect (5)**
36:4;72:14,16,19;
136:9
**affiliate (2)**
41:11;42:3
**affinity (1)**
54:4
**affirm (1)**
137:16
**affirmation (1)**
131:24
**affirming (1)**
73:20
**affixed (1)**
176:3
**aforementioned (1)**
175:21
**afraid (3)**
53:10;122:16;
145:23
**afterwards (1)**
175:15
**again (9)**
24:6;37:4;98:12;
101:2;103:10;
106:15,19;136:2,9
**against (3)**
64:5;146:12,15
**age (12)**
24:25;25:5;35:7;
93:23;94:15;96:3,8;
97:18;98:6;133:11,
13;173:16
**aged (1)**
101:22
**agency (1)**
110:25
**agent (1)**
46:13
**ages (2)**
25:18;127:7
**aggression (1)**
135:19
**ago (12)**
6:4;9:9,18;37:13;
43:2;51:4;89:24;
106:24;128:25;
166:13;169:9,9
**agree (14)**
33:19;75:20,22;
78:14;85:10;89:8;
101:15;104:9,17;
105:23,25;112:3;
122:14;151:21
**Agreed (1)**
148:22
**aim (1)**
169:20
**al (2)**
177:9,13.5

**Alabama (5)**
46:20,22;48:24;
49:1,10;65:22;79:6;
146:11
**alert (4)**
24:11,16;52:19;
67:15
**align (3)**
126:9;161:22;
169:22
**aligned (1)**
161:9
**aligning (1)**
163:2
**allegations (1)**
30:1
**allowed (3)**
54:22;67:21;
134:15
**allowing (2)**
23:22;38:6
**almost (10)**
22:17;31:18;67:23,
25;104:18;122:18;
130:8;146:8;154:15;
167:19
**alone (2)**
29:23;143:19
**along (5)**
88:3;95:15;137:24;
166:20;177:19
**Alright (2)**
70:11;168:11
**altered (2)**
88:14;131:5
**alternative (1)**
143:14,16
**alternatives (2)**
143:15;144:7
**although (1)**
11:16
**altogether (1)**
38:21
**always (6)**
22:22;54:4;67:11,
11;129:8;167:16
**amalgamated (2)**
15:10,15
**amazed (1)**
28:20
**ambiguous (1)**
152:6
**Amendment (1)**
47:22
**amendments (1)**
48:6
**America (4)**
5:1;45:24;46:19;
169:2
**American (14)**
41:11,12;42:3,5,
24;58:25;65:20;
92:20,21;144:11,14,

Case 1:23-cv-00595-JPH-KMB   Document 58-9   Filed 06/12/23   Page 47 of 145 PageID #: 3834

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

18;145:3;153:4
**Americans (1)**
152:23
**among (1)**
13:25
**amongst (1)**
119:23
**amount (9)**
37:17,21;43:23;
56:14;58:19;64:4;
68:4;78:6;130:2
**Amsterdam (1)**
142:25
**analysis (2)**
71:3,4
**analyze (1)**
120:15
**analyzed (1)**
90:24
**anatomical (1)**
127:13
**and/or (2)**
159:21;177:16.5
**Angeles (2)**
113:25;114:4
**anger (1)**
135:19
**Anime (2)**
75:8,14
**animecom (1)**
75:14
**annulled (1)**
51:25
**annulment (2)**
51:12,19
**annulments (2)**
51:20;52:1
**anonymized (1)**
90:21
**answered (3)**
81:14;111:12;
129:16
**anticipate (1)**
100:3
**anticipating (1)**
100:1
**anxiety (5)**
15:5;23:11;32:7;
61:15,18
**anxious (1)**
76:24
**APA (1)**
118:20
**apologize (9)**
6:8;36:24;45:3;
47:18;53:12;96:25;
119:10;120:4;129:20
**appeal (1)**
49:12
**appear (3)**
47:24;125:15;
143:2
**appearance (2)**

153:12;157:23
**appeared (2)**
47:23;129:2
**appears (11)**
52:25;72:13;89:4;
110:10;125:12,17;
130:16;136:23;
156:7;165:22;168:1
**appetite (1)**
67:5
**Applicable (2)**
175:12;177:19.5
**Application (1)**
91:22
**applications (1)**
109:24
**applies (1)**
159:5
**apply (2)**
130:20;131:20
**applying (2)**
15:23;16:7
**appraise (1)**
143:21
**appreciate (2)**
24:18;94:25
**appreciated (1)**
43:22
**approach (4)**
18:9;27:7;67:24;
68:2
**appropriate (6)**
68:16,21;69:12,21;
123:12;132:1
**approving (1)**
23:23
**approximately (6)**
13:20;21:21;25:10;
58:7;64:25;65:15
**April (3)**
152:18;154:6;
176:10.5
**arcane (1)**
51:13
**Archives (1)**
128:23
**area (4)**
19:10;53:12;61:20,
20
**areas (1)**
51:7
**argue (1)**
76:3
**argument (1)**
78:5
**arising (1)**
50:8
**around (8)**
25:5;35:25;54:11,
17;77:3;78:21;143:8;
153:22
**article (50)**
55:10,19,23,24;

71:8,9;82:8,12,14,19;
85:18;88:1,3,5;90:14,
17,17;101:10;
105:13;108:10;
116:12;118:4;
119:13,18,22;120:13,
25;121:6,8,12,15,19,
22;122:2,9,25;
123:25;124:7,9,17,
25;125:6,15;126:2;
128:5,6,8,13,15,17
**articles (6)**
52:16;124:10,23;
128:11;130:6,8
**article's (1)**
90:13
**aside (1)**
167:25
**aspects (1)**
154:9
**assemble (1)**
127:23
**assertion (1)**
79:3
**assess (3)**
25:1;28:6;83:23
**assessed (3)**
25:11;26:1;36:14
**assessing (3)**
14:8;22:21;23:14
**assessment (19)**
16:21;22:11,13,19;
23:9;24:5,22;26:4,
25;28:13,19;33:20;
34:11;50:16;52:2,5;
152:10;165:17;
171:20
**assessments (4)**
13:7,9;23:7;65:12
**assigned (13)**
39:25;94:6,16,20,
22,24;95:3,9,12,23;
96:4;97:18,22
**assist (2)**
52:5;126:11
**assistant (2)**
12:13,14
**associated (4)**
47:10;105:3,5;
150:16
**Association (15)**
30:19;41:6,9,13;
42:4,12,13;92:21,22;
106:6;144:11,15,19;
145:3;165:1
**assume (49)**
11:17,21;12:7;
13:3;39:24;40:16;
43:13;46:25;49:22;
50:2;59:14,22;62:24;
63:7;65:18,25;71:8,
15;72:7,16;75:20,22;
79:16;87:9,21,25;

88:24;92:12,16;
97:21;99:11;103:17;
113:5;116:7;117:3,6;
123:22;126:18;
131:1;137:7;141:24;
146:10;147:3;
148:19;151:9;156:2;
159:5;161:11;165:11
**assumed (1)**
165:9
**assumption (4)**
53:5,14;63:24;
123:8
**astounding (2)**
89:15;90:18
**atrophy (3)**
135:6,8,10
**attached (5)**
9:6;61:5;97:11,13;
177:19
**attachment (1)**
162:13
**attachments (3)**
9:11,14;59:18
**attack (1)**
170:6
**attempt (8)**
37:6,7;74:20;
81:18;128:17;131:6;
161:22;162:5
**attempted (5)**
79:21;80:3,13;
81:11;126:21
**attempting (3)**
28:6,8;33:7
**attention (5)**
7:3,7;56:14;77:4;
85:23
**Attorney (2)**
44:22;175:24
**attorneys (13)**
7:18,19;8:9;9:10,
18;10:8;11:20;58:2;
59:19;60:6;61:2,3;
176:1
**attract (1)**
140:14
**attracting (1)**
140:19
**attracts (1)**
140:22
**attributed (3)**
80:15;81:13,21
**August (1)**
91:20
**AusPATH (6)**
138:24;139:2,7,13;
147:6,11
**Australia (33)**
5:2,9;10:4;17:2,19,
21;21:14;29:24;44:8;
45:24;47:4;48:16;
50:3;58:21;64:13;

103:20;104:14;
109:1,21;111:14;
113:2,5;115:9;116:4,
8;125:2;138:12;
141:3,17;142:1;
165:7,8;175:11
**Australian (25)**
41:4,8,24;42:13,
23;48:5;59:1,4;
62:24;63:2;64:21;
109:22;110:11;
112:20;113:20;
124:11;137:7;
139:16;141:4;
142:15;143:9;
145:19;165:5;
168:13,22
**Australia's (1)**
115:22
**author (2)**
55:10;118:19
**authored (2)**
82:14;123:25
**authorized (1)**
45:25
**authors (6)**
105:25;107:5;
108:8,11;142:22;
143:1
**autism (2)**
23:10;27:18
**automatically (1)**
157:17
**availability (1)**
77:23
**available (5)**
41:22;72:24;87:5;
116:1;141:18
**avenue (1)**
130:4
**average (3)**
20:3;25:18;154:21
**avoid (3)**
38:21;43:5;45:10
**aware (24)**
17:19;44:12;54:10;
71:15;78:2;79:20;
80:2,12;81:10;82:20;
84:18;86:17;87:12,
25;117:8,11;121:14,
17,20,22;122:2,9;
137:14;138:17
**away (1)**
167:20

**B**

**back (21)**
5:22;14:14;32:14;
51:5;53:25;55:8;
57:9;76:1;93:6;
102:13,14;105:13,16;
106:9;107:18;112:9;

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 48 of 145 PageID #: 3835

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

130:11;147:9;
150:11;154:13;
159:17
**bad (1)**
14:3
**balance (1)**
136:8
**ban (8)**
57:21;63:2,22;
64:2,4,14;65:21;
168:24
**banning (2)**
145:25;146:13
**bans (6)**
62:23;145:20;
168:12,18,22;170:12
**bar (1)**
130:7
**base (1)**
122:16
**based (6)**
18:6;26:25;71:3,4;
168:25;169:3
**bases (1)**
72:22
**basic (1)**
81:2
**basis (1)**
96:12
**bazaar (1)**
54:3
**BEAUTIFUL (5)**
165:23;172:23,24;
174:1,2
**became (3)**
15:16;20:11;78:12
**become (10)**
18:1;26:2;33:10;
42:19;43:1;44:10;
57:25;62:3;76:11,19
**becomes (2)**
78:4;83:15
**becoming (2)**
62:7;174:1
**beg (1)**
136:15
**began (2)**
21:4;27:10
**begin (2)**
6:15;107:21
**beginning (7)**
6:20;82:6;103:25;
119:11;130:13;
157:12;171:21
**behalf (1)**
175:10
**behaves (1)**
51:14
**behavior (5)**
26:15;27:25;29:11;
91:4;128:23
**behavioral (2)**
27:5;98:6

**behind (1)**
114:12
**beholden (1)**
84:2
**beings (5)**
131:17;132:9;
133:7,11,17
**beings' (1)**
131:1
**belief (3)**
161:10,10,23
**belief/assumption (1)**
161:8
**beliefs (5)**
79:17,18;161:5,12,
18
**belong (2)**
140:24;144:1
**best (6)**
24:14;28:2;45:20;
61:12;134:22;135:25
**better (11)**
5:25;6:1;24:16;
48:12;49:14;63:11;
77:17,21;160:7;
163:5;164:8
**beyond (5)**
32:13;73:9,15;
74:12;112:9
**bidirectional (1)**
145:18
**big (1)**
144:20
**bigger (1)**
164:3
**bill (9)**
46:22,23;47:2,14;
48:3;49:6,9,11;
145:25
**bills (1)**
47:10
**bio (1)**
40:20
**biological (2)**
161:11,23
**birth (15)**
39:13,25;69:17;
94:6,16,20,22,24;
95:3,9,12,23;96:4;
97:19,22
**bit (6)**
14:15;25:22;
155:20;156:24;
167:4;172:21
**bladder (1)**
91:6
**blaming (2)**
153:1,5
**bleeding (1)**
132:18
**blindness (1)**
134:7
**block (1)**

140:17
**blockade (8)**
38:9;126:14;
133:16,23;134:15,17,
25;168:2
**blockers (14)**
32:9;35:15;36:25;
37:2,9;45:8;67:22;
68:22;133:5,18;
134:12;149:22;
150:2;166:16
**blood (1)**
135:14
**board (3)**
98:7;177:12.5,17
**boasting (1)**
75:9
**boats (1)**
58:21
**bodies (5)**
46:16;47:4;48:23;
131:5;132:23
**body (20)**
36:4;45:15;48:15;
67:17;78:9;126:8,12;
132:14;136:9;
139:16;151:10,19;
160:2,6;161:9,9,11,
13,23;169:22
**bone (2)**
134:1,2
**bono (1)**
48:25
**book (2)**
17:20;75:5
**books (3)**
74:24;78:23;
127:24
**born (2)**
126:7;161:8
**boss (1)**
174:12
**both (11)**
16:15;27:25;51:12;
59:21;82:16;92:20;
101:3;109:20;
124:24;132:4;142:12
**bottom (4)**
52:20;55:9;105:1;
107:4
**Bowman (1)**
65:24
**boy (2)**
67:11,12
**boys (1)**
127:12
**brackets (1)**
86:1
**Bradley (2)**
175:3;176:7.5
**Brandy (2)**
175:3;176:7.5
**break (7)**

6:18,23;7:9;57:4;
91:7;8;141:21
**breaks (1)**
7:6
**breasts (2)**
156:19;157:16
**breathes (1)**
167:21
**breathing (1)**
167:22
**brief (1)**
8:5
**briefly (3)**
21:16;51:8;139:18
**bring (5)**
45:3;119:16;
126:11;130:12;
170:22
**bringing (2)**
45:3;150:11
**brings (1)**
162:25
**British (1)**
130:17
**broad (2)**
26:23;47:12
**brought (2)**
13:12;171:13
**Brown (1)**
71:11
**Brunskell-Evans (1)**
129:22
**brushed (1)**
167:25
**brute (1)**
142:20
**building (1)**
170:6
**bullet (1)**
37:9
**bullying (1)**
162:15
**business (1)**
12:5
**button (1)**
115:16

**C**

**CAAPS (3)**
91:22;92:1;145:9
**call (14)**
5:3;9:20;17:23;
18:12;31:17;39:22;
65:13;88:8;91:7;
128:3,11;141:11;
142:20;148:9
**called (19)**
12:5;19:7;20:13;
22:5;31:4;58:18;
86:5;87:3;90:4;
111:24;115:6,8;
117:9;134:6;135:13;

136:6,24;160:21;
163:16
**calling (1)**
91:23
**calls (1)**
7:16
**came (1)**
172:3
**campaign (1)**
125:19
**Can (57)**
4:11;5:23;6:2,3,25;
11:2,15,16;24:19;
30:12;34:4;44:21;
46:7;47:16;50:5;
51:17,23;55:1;59:21;
66:25;69:15,20;
74:17;75:1,6,8;78:20,
24;80:15;81:12,20;
82:6;85:7;89:14;
93:9,10;95:19;104:2;
114:14,22;123:14;
127:12,12,16;135:21;
136:6,8,9;140:14,21;
148:20;154:13;
164:2;166:8;170:10,
17;172:13
**Canberra (1)**
47:9
**capable (6)**
26:5;27:13,15;
29:16;74:7;120:16
**capacities (2)**
14:17;177:13.5
**capacity (5)**
27:1,3;50:15;
141:8;145:24
**Capital (2)**
48:5;115:10
**captured (1)**
33:16
**care (42)**
12:23;16:24;18:17;
19:15,18;44:15,24;
45:7;46:6,18;48:16;
57:22;64:6;69:13;
75:19;78:3;84:20;
98:21;110:24;112:4;
114:4;131:23,24;
133:10;140:3;141:9;
142:12,15,22,24;
143:3,23;144:2;
146:14,16;155:5;
157:19;159:2;170:1,
15,21;171:9
**career (3)**
17:9,11;19:21
**careful (4)**
23:3;26:25;27:17;
71:3
**carefully (2)**
17:20;34:2
**caregiver's (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 49 of 145 PageID #: 3836

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

155:24
**carries (3)**
45:17;134:2;
170:25
**carry (2)**
74:24;135:15
**carry-over (1)**
105:1
**Case (29)**
4:1;5:6;6:17;10:8;
20:20;35:20;40:5,9;
51:3;56:15;57:17,25;
58:8;59:10;60:15,19;
65:20,21,24,25;
72:25;73:21;79:7;
87:4;131:16;132:19;
146:11;148:11;150:7
**caseload (1)**
84:3
**cases (29)**
20:19,22;26:18,20;
39:12,14;40:22;50:2;
51:11;64:21;65:1,2,4,
5,10,15;67:13;69:14;
72:7,10,11,15,17,20;
73:5,18,19;162:8;
174:5
**catch (1)**
146:2
**categorical (1)**
96:23
**categories (2)**
22:2;122:6
**categorization (1)**
84:5
**categorize (1)**
25:23
**category (1)**
80:11
**catering (2)**
114:7,19
**Catholic (4)**
50:25;51:18,22,23
**Catholics (1)**
51:21
**cause (7)**
75:24;78:24;134:7;
135:9;157:14;175:8,
23
**caused (1)**
134:25
**causes (1)**
132:21
**causing (2)**
74:8;94:12
**caution (1)**
38:6
**celebrities (1)**
74:10
**celebrity (1)**
74:14
**cells (1)**
135:14

**center (2)**
15:7;16:5
**Centers (1)**
91:1
**Century (2)**
136:25;137:5
**cerebri (1)**
134:6
**certain (9)**
18:25;44:15,24;
54:9;57:22;69:19;
112:20;146:13;153:8
**certainly (10)**
6:25;93:2,9,10;
95:19;104:18;114:3;
153:5;166:13;169:12
**certify (2)**
175:5,22
**cetera (1)**
144:3
**challenged (1)**
49:9
**challenges (1)**
57:21
**challenging (2)**
65:21;66:24
**chamber (1)**
142:8
**change (7)**
54:6;70:7;101:6;
131:6;157:14;169:6,
20
**changed (2)**
90:10;156:6
**changes (8)**
15:13;36:3;38:13;
89:13;101:16,19,24;
102:5
**chapter (5)**
70:20;129:21;
148:8,9;157:12
**chapters (1)**
70:2
**characteristics (5)**
153:9,11,21;
157:22;159:21
**characterize (1)**
133:8
**characterized (1)**
85:19
**characterizing (1)**
164:20
**characters (2)**
75:9,11
**charge (2)**
58:12,22
**chart (4)**
109:20;110:10;
111:10;113:5
**charts (1)**
112:2
**Chase (1)**
24:16

**cheap (1)**
172:21
**chest (3)**
156:25;158:5,25
**child (74)**
13:6,9;16:17,20;
20:17;23:1,20,25;
24:2,5;25:19,20,21;
26:12,22;28:13,16;
29:11,21,22;30:1;
31:10,11,23,24;32:3,
8;33:14;34:1,3,5,8;
38:6,13;39:10,15,21,
23,25;40:4;44:16,24;
45:8,16;50:4,17;
61:22;65:2;67:16,20;
68:19,21;69:15;77:9;
87:2,7,9;104:12,23;
126:11;133:12;
134:11;146:6;
157:15;158:24;
159:1,25;162:9,22;
166:21;167:7,15,18;
168:1
**childhood (4)**
17:6;37:25;83:9;
97:14
**children (54)**
13:11,13;17:5;
20:15;25:1,2,10,16,
17;29:19;30:14;
31:14;39:2;67:10;
84:10;93:20,23;96:9,
14;97:2,11,13;98:2;
111:22;117:13;
124:14;125:20;
126:4,7,20;127:1,5,
10,14,23;128:4;
130:21;131:15,21;
133:3;134:4;136:13;
137:4;138:19;139:9;
140:14,23;141:5;
143:18;146:4;
147:16;160:3;
166:15;167:11
**children's (14)**
65:5;111:21;115:6;
116:16,18;138:6,10,
14,15,23;139:1;
142:3,9;167:9
**child's (8)**
24:4;26:15;32:2;
35:6;39:13;45:12;
167:13;169:21
**choose (3)**
19:12;26:10;
143:25
**chooses (1)**
74:24
**chosen (2)**
69:7;119:9
**chromosomes (1)**
94:24

**chronic (1)**
132:18
**Church (1)**
50:25;51:9,18,22,
23
**Circle (2)**
177:21.5,23
**circumstance (2)**
68:15;168:6
**circumstances (9)**
20:3;66:10;67:19,
23;68:1;69:4;86:25;
158:23;159:3
**cisgender (2)**
75:10,11
**citation (5)**
109:3;116:25;
117:3,24;118:18
**citations (2)**
109:7;118:23
**cite (5)**
99:4,24;102:22,24;
103:12
**cited (6)**
44:13,25;103:16;
119:4;122:11;123:1
**citing (1)**
119:18
**city (5)**
113:12,17;115:10;
177:21.5,23
**civil (2)**
51:23;177:16.5
**claim (1)**
153:22
**claimed (1)**
120:18
**claiming (2)**
89:17;169:4
**claims (1)**
80:6
**Classification (1)**
83:2
**classified (3)**
121:23;122:2,5
**clear (6)**
22:25;54:14;66:6;
81:8;84:23;85:4;
96:7;100:7;136:14,
20;150:3;171:7
**cleared (1)**
69:9
**click (3)**
88:21;89:21;
123:13
**clicked (1)**
86:13
**clients (5)**
49:20;50:8,14;
58:12;65:9
**clinic (11)**
32:24;99:19;
100:25;111:13;

114:6,19;115:5;
116:8,15,18;142:25
**clinical (20)**
14:1,14;18:8,9;
21:16;30:13,18;40:2,
10;43:16,21;50:12;
53:25;66:25;67:2,16,
21;68:13;83:23;
150:10
**clinically (1)**
54:7
**clinician (3)**
14:5;43:7;147:24
**clinicians (4)**
30:21;62:20;144:3;
172:13
**clinics (24)**
31:8,16;33:11,17;
75:19;98:20;100:13;
101:7;102:19;
103:20;106:12;
109:12,21,23;110:12,
20;111:8,11,15,17,
19,24;112:5,19
**clitoral (1)**
135:9
**close (2)**
68:24;139:22
**closed (1)**
112:11
**closet (1)**
78:25
**closing (1)**
112:12
**closure (1)**
110:23
**coach (2)**
26:13,13
**Coalition (2)**
91:21;92:2
**coauthor (1)**
30:13
**coauthored (1)**
55:11
**coauthors (1)**
139:2
**co-counsel (1)**
132:3
**coercion (1)**
74:21
**cofounder (1)**
42:24
**cognitive (3)**
27:22,22;35:7;96:9
**Cohen-Kettenis (1)**
142:25
**coherent (1)**
172:12
**coincides (1)**
53:20
**colleague (1)**
20:12
**colleagues (3)**

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 50 of 145 PageID #: 3837

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

29:7;54:25;130:1
**collect (1)**
120:13
**collected (2)**
90:25;109:10
**collection (6)**
124:10,13,23;
125:1,14;129:2
**collective (1)**
143:11
**comfortable (4)**
74:3;95:20,21;
132:23
**coming (7)**
20:25;28:7;74:3;
77:7;83:20;85:5;
143:5
**commenced (1)**
133:13
**comment (3)**
60:7;172:1,4
**comments (2)**
46:25;47:15
**Commission (4)**
115:23;141:5;
176:9,10
**Commissioner (2)**
141:5,6
**common (2)**
68:9;173:20
**communicated (4)**
37:23;38:4;149:6,9
**communicating (1)**
7:24
**communication (4)**
6:13;7:16;29:18;
117:1
**community (1)**
127:21
**comorbid (4)**
34:3,6;76:18;
167:14
**comorbidities (3)**
69:19;173:8,21
**compare (2)**
58:11;172:13
**compared (2)**
97:12;173:6
**compensated (4)**
43:10;48:22;58:4;
125:5
**compensation (1)**
49:1
**compilations (1)**
143:3
**complain (1)**
170:23
**complaint (3)**
170:18,20,22
**complete (5)**
56:7;9;57:21;81:8;
158:22
**completed (1)**

155:25
**completely (5)**
40:10;46:12;61:17;
84:23;168:25
**complex (1)**
174:6
**complexity (1)**
76:2
**compliance (1)**
177:16
**complications (2)**
132:17;167:24
**comprises (1)**
139:23
**computer (1)**
10:14
**concede (2)**
107:5;108:11
**conceding (1)**
108:18
**conception (1)**
94:23
**concern (9)**
16:23;50:9;53:7;
65:16;68:18;77:1;
95:18;108:25;162:15
**concerned (3)**
15:19;29:11;85:16
**concerning (8)**
46:16;52:17;55:15;
56:8;78:10;95:15;
99:4;141:14
**concerns (3)**
29:6;66:22;148:10
**conclusion (6)**
70:19;101:11;
106:20;108:21;
159:1;162:4
**conclusions (6)**
71:17;80:17;88:10;
122:17,20,21
**condition (10)**
17:3;32:18;33:23;
78:3,4,12,16,18;
135:13;136:6
**conditions (3)**
17:5;61:9;76:18
**conducive (1)**
54:2
**conducting (1)**
17:14
**conference (6)**
20:20;163:23;
164:12,18,25;166:2
**conferences (2)**
30:22;44:2
**conferred (2)**
60:9,19
**confidential (1)**
148:19
**confirm (1)**
34:14
**confirmed (1)**

34:20
**confirms (1)**
34:13
**conflates (1)**
120:1
**conflating (1)**
22:3
**conflict (1)**
76:17
**confused (1)**
124:20
**conjunction (1)**
61:3
**Connect (1)**
152:17
**connected (1)**
100:17
**consent (5)**
147:5,22,23;148:2,
3
**Conservatorium (3)**
15:8;10,15
**consider (5)**
37:20;61:10;66:7,
20;137:3;165:25
**considerable (2)**
37:17,20
**consideration (2)**
17:23;30:23
**considered (3)**
35:6;108:14;
128:19
**considering (1)**
64:14
**consistent (5)**
19:25;122:14;
123:4,10,11
**consistently (2)**
69:16;73:4
**consists (1)**
141:3
**consortium (1)**
30:16
**conspiracy (2)**
141:11;142:14
**constantly (2)**
132:20;172:17
**constellation (1)**
174:6
**constitutes (3)**
44:16;45:8;148:3
**consult (2)**
29:13;50:24
**consultancy (1)**
51:9
**consultant (1)**
12:3
**consultation (1)**
20:21
**consultations (1)**
39:2
**Consulting (5)**
12:5,12;13:1,2;

111:22
**contact (1)**
58:2
**contacts (1)**
13:24
**contagion (35)**
69:25;70:1,23;
72:14,19;74:7,18;
75:1,7,23;76:6;
78:20;79:22;80:4,8,
16,25;81:13,21;94:7,
11,18;96:6;97:25;
99:18,21;106:8;
107:8,13;108:1,19;
122:15;123:4,11;
143:16
**contagions (1)**
80:19
**contagious (1)**
78:1
**contained (2)**
48:17;104:10
**contemplated (1)**
49:7
**content (5)**
7:17;56:12;107:6,
24;108:18
**contents (2)**
17:25;125:12
**context (3)**
11:6;86:3;89:4
**continue (2)**
35:11;166:21
**CONTINUING (3)**
57:13;91:12;
158:16
**contract (1)**
44:1
**contrary (4)**
54:12,18;102:17;
106:10
**contribute (2)**
31:22;128:8
**contributed (2)**
30:16,18
**contributor (1)**
95:10
**Control (1)**
91:1
**convention (1)**
118:21
**conversation (2)**
38:22;39:6
**conversations (1)**
8:2
**conversely (1)**
105:4
**conversion (24)**
48:3,6,9,20;62:22;
63:3,22;64:2;145:20,
25;168:12,17,21;
169:5,8,16,18,22,25;
170:8,11,16;171:4,10

**converted (1)**
109:13
**convicted (2)**
171:1,3
**convince (1)**
77:10
**convinced (2)**
33:13;167:13
**copies (2)**
9:16;59:21
**copy (3)**
52:10;156:2;161:1
**coquetted (1)**
127:7
**core (2)**
72:6,10
**corporate (1)**
54:3
**corrected (2)**
88:2,12
**correction (7)**
71:9;82:12;85:18;
88:3,9,17,25
**correctly (3)**
6:7;105:7;108:1
**council (2)**
42:11,13
**counsel (2)**
7:16;175:21
**count (3)**
25:15,20;92:17
**counted (1)**
22:12
**countries (1)**
111:9
**country (2)**
45:16;54:1
**counts (1)**
102:5
**COUNTY (2)**
175:2,4
**couple (12)**
20:19;24:9;44:25;
51:16;52:3;88:7;
111:15,17;118:15;
145:10;154:9;155:12
**couples (2)**
52:5,7
**course (18)**
7:23;8:8;11:4,9;
19:8,14;29:20;34:17;
36:4;67:14;87:8;
117:15;123:16;
134:17;135:3,10;
137:9;166:22
**courses (10)**
16:22;17:1,8,16,18,
21;18:21;19:3,5,6
**Court (18)**
4:1;5:6,14;6:10;
10:10;29:24;49:9;
50:2;51:14;65:4,5,11,
12;92:2;111:3;

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 51 of 145 PageID #: 3838

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

148:21;163:12;177:6
**courtesy (1)**
    5:21
**court-mandated (1)**
    50:6
**court-referred (4)**
    49:20;50:7,13;65:9
**courts (3)**
    50:10;58:22;
    142:13
**cover (4)**
    19:8;58:20;72:22;
    125:11
**coverage (23)**
    98:21,25;99:1,5,16,
    19;100:25;101:7;
    102:18;103:21;
    104:10;105:3,5,11,
    20,22;106:1,2,6,11,
    14,21,21
**coverages (1)**
    99:18
**covered (2)**
    58:20;104:16
**create (1)**
    165:14
**created (2)**
    115:25;169:14
**criteria (13)**
    29:3,8,10,12;30:5,
    12;104:5,9,19;
    160:11,14,16,18
**criterion (1)**
    26:7
**critical (3)**
    19:10;86:6;130:8
**CROSS-EXAMINATION (1)**
    166:10
**cross-sex (8)**
    32:9;35:25;36:2,
    20;77:15;126:14;
    135:1;173:17
**crude (1)**
    127:13
**cultural (1)**
    19:6
**cure (1)**
    173:18
**curious (4)**
    14:23,25;18:13;
    70:24
**current (6)**
    11:22;16:19;19:9;
    29:4;73:19;130:9
**currently (8)**
    11:24;12:23;13:13;
    42:9;51:2;120:24;
    124:21;141:13
**curricula (1)**
    127:10
**curricular (1)**
    127:6
**curriculum (1)**

11:18
**custody (3)**
    30:3;50:15;65:6
**cut (6)**
    32:21;38:16;67:13;
    81:4;111:1;136:16
**cut-off (2)**
    96:19,20
**CV (20)**
    9:12;12:2;14:15;
    15:4;21:7;40:11,18;
    41:2;42:8;48:17;
    49:18;50:23;52:10,
    14;53:16;55:9;56:2;
    65:10;136:23;163:18
**cyst (1)**
    135:12

## D

**damaging (1)**
    30:3
**dancing (1)**
    170:7
**D'Angelo (2)**
    55:10,19
**dangerous (1)**
    136:11,12
**dared (1)**
    54:18
**data (23)**
    73:3;88:9;90:23,
    25;102:12;
    108:25;109:3,10,15,
    17,19,22;110:1,2,11,
    15;112:8,18;117:16;
    120:13,20,23
**date (6)**
    35:22;53:11,18;
    152:22,23;177:21.5
**dates (3)**
    110:20;111:19;
    152:19
**daughter's (1)**
    39:18
**day (3)**
    175:12;176:3;
    177:18
**days (2)**
    27:19;158:20
**de (1)**
    142:24
**deal (4)**
    22:24;80:8;140:18;
    162:20
**dealt (1)**
    162:19
**debate (1)**
    55:5
**decades (2)**
    93:20;169:9
**decide (1)**
    26:1

**decided (2)**
    10:9;36:19
**decision (1)**
    37:8
**decision-making (3)**
    46:16;47:4;48:15
**declaration (51)**
    8:17,23;9:5,10;
    29:6;40:6;59:7,15;
    60:1;62:19;64:8,19;
    70:2,6,8,21;71:25;
    75:16;82:7;91:14;
    92:14,25;93:14;
    98:12;107:1;108:6,
    12,23;112:14;
    116:21;118:8;119:5,
    21;124:4,6;126:16;
    129:10,10;130:11;
    139:12,19;144:20;
    148:8,10,16;150:18;
    153:3;154:17;157:7,
    24;159:17
**declarations (2)**
    61:5;159:13
**declares (2)**
    31:10;167:7
**declaring (4)**
    13:14;44:23;45:21;
    76:23
**decreased (1)**
    101:20
**decreases (2)**
    96:8;99:1
**deductional (1)**
    80:18
**deep (3)**
    135:19;136:3;
    141:15
**deeply (1)**
    162:18
**Defendants (1)**
    177:14.5
**defender (2)**
    51:15,16
**defined (3)**
    126:9;169:5;171:4
**defining (1)**
    38:11
**definition (3)**
    45:18;114:12;
    169:18
**definitive (2)**
    33:24;35:4
**defunct (1)**
    170:2
**degraded (2)**
    90:9,16
**degree (1)**
    68:17
**delay (1)**
    134:10
**delayed (2)**
    83:20

**demands (1)**
    28:15
**demonstrated (1)**
    45:14
**demonstration (2)**
    99:21;106:7
**density (1)**
    134:1
**Department (1)**
    29:25
**departments (1)**
    111:20
**depending (2)**
    24:2;58:22
**depends (4)**
    22:10;25:15;
    133:11,12
**DEPONENT (4)**
    174:17;175:6,18,
    19
**deposition (15)**
    4:24;7:14,20;8:4,
    10,13,22;56:11;59:6;
    145:8;148:17;175:9,
    14;177:4.5,17.5
**depositions (3)**
    5:9;6:17;13:25
**depressed (1)**
    76:24
**depression (3)**
    23:11;32:6;173:23
**depressive (1)**
    67:7
**derail (2)**
    38:9;45:11
**describe (7)**
    66:14;72:6;74:9;
    82:8;112:25;119:22;
    139:19
**described (6)**
    17:15;30:24;67:1;
    74:7;102:10;159:3
**describes (4)**
    49:19;71:15;
    101:16;104:5
**describing (8)**
    71:20;93:17;98:15,
    24;112:18;119:13;
    150:19;152:10
**description (3)**
    17:25;52:21;69:25
**descriptions (1)**
    114:13
**designated (1)**
    60:15
**desisted (1)**
    38:2
**desperately (1)**
    91:6
**despite (1)**
    152:1
**destigmatized (3)**
    78:4,5,12

**detailed (3)**
    18:5;83:23;129:11
**details (2)**
    85:22;101:9
**determination (1)**
    132:8
**determine (4)**
    80:13;81:11,18;
    83:5
**determined (1)**
    94:22
**determining (1)**
    27:11
**detransition (10)**
    119:22;120:7,9,10,
    14;121:13,23;122:3,
    11;123:3
**detransitioned (4)**
    120:15,21;121:7;
    123:1
**develop (5)**
    135:14,17,17;
    136:6;151:18
**developed (3)**
    61:17;143:8;
    165:19
**developing (1)**
    18:8
**development (4)**
    30:8;76:14;134:23;
    165:16
**developmental (12)**
    16:14,17,18;22:23;
    23:4;29:15;38:4,7,
    10;45:12;61:12,25
**devoted (3)**
    43:23;58:8;124:13
**devout (1)**
    51:21
**diabetes (6)**
    135:18;136:10;
    150:20;151:18,22;
    152:1
**diagnosable (1)**
    78:17
**diagnose (1)**
    28:8
**diagnosed (20)**
    20:8;22:7;23:11;
    28:22;29:2;30:25;
    31:2;32:16,18,23;
    33:19,22;35:2;37:14;
    57:23;66:11,24;
    68:17;83:25;119:24
**diagnoses (7)**
    34:19,21;61:9,13;
    84:2;151:11,12
**diagnosing (2)**
    29:9,13
**diagnosis (18)**
    28:7,10;33:3,5,13;
    34:10,13,14,25;35:5;
    66:8,21,22;68:6,16;

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 52 of 145 PageID #: 3839

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

73:7;82:23;157:18
**diagnostic (3)**
29:3;66:15,22
**diagram (1)**
141:2
**DIANNA (9)**
4:3,12,13,18,24;
166:12;174:19,5;
175:5;177:18
**diet (1)**
23:16
**differences (1)**
93:18
**different (9)**
37:22;69:17;84:7;
98:6;100:12;133:19;
134:19;142:23;
151:13
**difficult (9)**
44:7;104:21;
118:13;121:10;
135:11;154:23;
155:10,17;174:4
**difficulties (2)**
159:4;173:7
**difficulty (1)**
167:9
**dilate (1)**
132:20
**DIRECT (6)**
4:7;10:23;55:23;
57:13;91:12;160:14
**directed (1)**
86:20
**direction (1)**
175:16
**directly (4)**
26:9;62:14;92:7;
170:23
**director (2)**
16:5;138:25
**directors (1)**
42:22
**disabilities (2)**
23:8,9
**disagreement (2)**
23:19;94:19
**disappear (1)**
32:8
**disarming (1)**
108:20
**discharge (1)**
136:5
**discomfort (1)**
135:10
**disconfirmed (1)**
80:7
**discontent (1)**
76:15
**discontinue (3)**
35:24;168:8,9
**discontinued (2)**
35:18,23

**discourses (2)**
19:9,9
**discoveries (2)**
89:13,15
**discrete (1)**
19:14
**discrimination (2)**
131:12;162:16
**discuss (4)**
45:19;82:16;120:7;
172:13
**discussed (1)**
39:19
**discussion (9)**
24:20;37:10,11;
123:20;148:5;
166:14,17;167:1;
168:14
**Disease (1)**
91:1
**diseased (1)**
161:13
**Diseases (1)**
83:2
**disinhibition (2)**
72:21;73:25
**disinterested (1)**
175:22
**disjointed (1)**
158:15
**disorder (4)**
23:10;27:18;
151:10,19
**display (2)**
27:24;74:24
**displays (1)**
151:22
**disprove (1)**
81:2
**dispute (3)**
13:8;22:24;41:8
**disputes (2)**
30:3;65:6
**dissatisfaction (2)**
160:1,10
**dissatisfactions (1)**
160:11
**dissatisfied (3)**
156:22;157:4,16
**disseminated (1)**
128:2
**disseminating (1)**
142:11
**dissemination (1)**
130:4
**distance (1)**
6:11
**distillation (1)**
165:16
**distinguishing (1)**
83:17
**distress (4)**
69:20;162:12,21;

167:9
**distressed (2)**
27:21;76:12
**DISTRICT (1)**
177:6,6,5
**disturbed (2)**
18:1;76:20
**dive (1)**
141:15
**diverse (8)**
114:8,20;120:2;
121:2,3;138:19;
139:8;143:17
**DIVISION (1)**
177:7
**DK (5)**
12:5,7,12;13:1,2
**Doctor (48)**
4:9,21;10:6;11:10;
24:22;31:13;32:10,
12;39:3;40:11;45:5,
22;49:4;52:9;66:3;
68:19;81:4;85:8;
87:18;91:5,14;92:25;
99:22;100:2;111:5;
114:14;123:21;
132:2;136:14,20,21;
144:24;148:6,24;
150:20;151:3,21;
152:1;158:12;
160:12,20;163:6;
164:3,5,10;166:5;
174:11,11
**doctors (1)**
31:13
**doctor's (1)**
148:16
**document (20)**
8:24;9:1;11:7;
30:17;45:4;60:24;
63:14;145:12;146:2,
25;147:11,16,18;
154:7,18;155:2;
156:10;157:9;158:2,
12
**documented (1)**
150:10
**documents (13)**
7:24;8:12,15,16,
21;11:6;43:19;50:13;
95:6;142:21;150:5;
155:12;158:10
**dolce (1)**
174:2
**dollar (2)**
59:1,2
**dollars (2)**
58:25;59:4
**done (11)**
5:15;50:10;53:17;
73:22;109:19;
118:15;121:25;
129:6;136:17;146:3;

171:20
**door (1)**
147:19
**double-edged (1)**
107:25
**doubt (3)**
54:9;143:10;171:2
**down (28)**
5:16;10:15;11:15;
27:5;30:7;33:1;46:7;
47:16,19;59:23;88:5;
101:12;104:25;
105:16;106:5,25;
107:19;117:20;
119:7;150:14;152:7;
154:7;156:15,24;
158:17;167:18;
170:6;175:14
**dozen (2)**
75:13;145:11
**Dr (25)**
71:10;82:9,14,16,
19;83:5;84:7,17;
85:11,18;86:4,19;
88:1;89:2,8,19,25;
90:14,24;103:18;
119:14,21;120:6,12;
122:24
**draft (2)**
60:1,3
**drag (2)**
127:20,20
**draw (2)**
122:20;162:4
**drawing (1)**
160:8
**drawings (2)**
127:13,13
**draws (1)**
122:22
**dress (1)**
38:14
**drew (1)**
106:20
**drilling (1)**
106:5
**drink (1)**
6:24
**drug (1)**
134:8
**drugs (5)**
45:13;135:23;
136:11,11,12
**DSM (2)**
151:14;160:17
**DSM-5 (7)**
29:5,7,12;30:6;
68:11;82:24;160:14
**DT (2)**
109:4,4
**due (1)**
17:22
**dues (2)**

41:18,20
**duly (2)**
4:3;175:6
**during (9)**
8:22;19:16;21:11;
23:14;36:19;83:13,
16;104:15;111:9
**Dutch (1)**
143:1
**dynamic (2)**
23:15;30:9
**dynamics (4)**
27:1;29:18;80:21;
83:21
**dysfunctional (1)**
132:22
**dyslipidemia (1)**
135:16
**dysmorphia (1)**
151:19
**dysmorphic (6)**
150:24;151:4,10,
23;152:2;160:6
**dysphoria (98)**
13:12;14:9,11;
16:23;17:17;18:22;
19:2;20:8;21:5,12,19,
22;22:8;24:24;25:11;
28:10,23;29:3;30:15,
25;31:2,2;32:16,18;
33:3,6,13,19,21;
34:11,25;35:3;37:15,
25;50:9,11,21;52:25;
53:7,12;54:23;55:15;
56:4,8;57:23;61:10;
62:22;64:10;65:3,7,
16;66:7,12,15,19,21,
23;67:1,9;68:9,10;
72:8,11,15,25;73:23;
76:11,19;77:2,18;
78:8;81:1;82:17,23;
83:6,18,19;84:1,9;
89:5,10;91:24;
104:11;111:23;
119:24;151:9;152:4;
153:23;157:18;
158:4,24;160:15;
162:10;165:18;
167:14,20;170:13;
171:23
**dysphoria-related (1)**
52:18
**dysphoric (7)**
20:15;34:7;45:21;
134:19;151:3;160:6;
172:18

**E**

**earlier (4)**
83:13;102:25;
145:8;166:12
**early (5)**

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 53 of 145 PageID #: 3840

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

27:19;83:8;89:11;
97:14;142:21
**eating (1)**
151:18
**economic (1)**
131:11
**edited (2)**
125:1;129:22
**editorial (2)**
125:12,17
**educate (2)**
18:6;20:23
**educated (1)**
79:4
**Education (1)**
47:22
**educational (3)**
61:12,25;127:10
**effect (11)**
72:21;73:25;74:18;
75:2,7;97:25;98:7;
108:17;146:18;
168:3,4
**effective (2)**
27:8;140:11
**effects (2)**
133:22;136:1
**effort (1)**
43:23
**either (19)**
31:14;35:15;61:2;
74:24;79:11;104:23;
105:11;106:2;109:4,
13;110:11;114:3;
121:25;133:4;149:7,
21;160:6;175:24;
176:1
**Eknes-Tucker (1)**
66:1
**elaboration (1)**
124:4
**eligible (1)**
40:21
**elimination (1)**
91:23
**else (7)**
9:21;16:19;119:2;
124:17;128:16;
129:5;163:2
**elsewhere (1)**
103:16
**e-mail (1)**
11:8
**e-mailed (1)**
9:17
**emerging (1)**
25:21
**emotional (2)**
162:12,21
**emphases (1)**
151:13
**emphasis (2)**
99:14;160:19

**emphasize (1)**
61:11
**emphatically (1)**
80:7
**empirical (1)**
79:18
**empirically (1)**
79:11
**empirically-driven (1)**
71:6
**employ (1)**
176:1
**employed (2)**
11:24;12:2
**employee (2)**
12:12,15
**employment (1)**
12:17
**enacted (3)**
64:3;73:21;168:23
**enacts (1)**
63:20
**encounter (2)**
153:7;154:6
**end (13)**
17:9,11;95:16;
103:7;117:24;118:8;
119:4;130:12;
158:18;162:4;
166:25;171:12,13
**Endocrine (2)**
143:4;145:6
**ends (1)**
130:16
**engage (3)**
27:1;35:8;36:1
**engaged (1)**
18:5
**engineer (1)**
162:6
**enormous (2)**
56:14;135:9
**enormously (1)**
131:18
**enough (6)**
53:24;94:16;96:5;
97:19;128:20;132:23
**entail (1)**
51:9
**enter (1)**
50:17
**entering (2)**
26:5;27:13
**entire (3)**
103:3;105:10;
125:10
**entirely (4)**
68:23;150:3;
151:10,12
**entirety (1)**
110:5
**entities (1)**
62:12

**entrance (1)**
18:4
**entrenched (1)**
162:18
**entry (1)**
52:24
**environment (1)**
89:14
**envisage/fantasize (1)**
174:3
**epidemiological (2)**
71:6;72:24
**equivalent (1)**
5:9
**era (1)**
68:9
**err (1)**
144:1
**Errata (1)**
177:19
**error (2)**
53:13,16
**eSafety (1)**
141:6
**escape (1)**
85:23
**essential (1)**
171:19
**established (3)**
15:7;16:3;157:20
**establishment (1)**
116:15
**establishments (1)**
31:20
**estimated (1)**
17:3
**estimation (1)**
139:23
**estrogen (1)**
136:2
**et (3)**
144:3;177:9,13.5
**evaluate (1)**
37:16
**evaluated (3)**
50:4;148:25;
149:10
**evaluation (1)**
152:17
**even (14)**
17:18;27:19;54:15;
69:2;73:6;111:17;
113:24;130:3;148:1,
2;158:15,23,24;171:4
**evening (2)**
6:21;166:7
**event (8)**
100:15,20,23;
101:4,17,20;102:1;
175:25
**events (7)**
100:12,16,23;
101:5;102:4,10;

104:16
**eventuality (1)**
123:6
**eventuated (1)**
132:25
**everybody (3)**
6:19;133:9;167:21
**everyone (1)**
121:14
**evidence (2)**
79:2;159:19
**Evidence-Based (3)**
42:15;78:19;
164:19
**exacerbated (1)**
134:20
**exacerbates (1)**
173:19
**exact (1)**
5:20
**exactly (4)**
5:4;79:25;121:10;
150:3
**EXAMINATION (3)**
4:7;57:13;91:12
**examinations (1)**
171:20
**examined (1)**
4:5
**example (5)**
18:18;19:6;68:7;
99:18;117:21
**except (2)**
40:8;162:1
**excessive (1)**
136:7
**excluded (1)**
31:20
**exclusively (2)**
87:1;149:14
**excuse (1)**
148:8
**executing (1)**
17:13
**exercise (1)**
38:6
**exhaustive (2)**
56:16,18
**Exhibit (39)**
11:12;59:14;60:22;
63:14;82:3;88:21;
89:21;92:9;99:8,23;
103:9,15;106:9;
107:18;115:12,15,18;
116:10;119:16,17;
123:13,22;124:7;
125:8;128:5;137:19;
138:3;139:4;145:9;
146:25;147:9,21;
150:12;154:5;
155:21;156:6,9;
157:20;163:7
**exhibits (7)**

9:6,17;10:7,21;
61:5;148:15,17
**exist (2)**
21:13;170:1
**existence (1)**
66:24
**exists (3)**
69:23;97:21,23
**expectations (2)**
28:15;162:17
**experience (4)**
18:8;20:17;21:16;
130:1
**experienced/expressed (1)**
159:20
**experiences (1)**
137:17
**experiencing (1)**
116:1
**expert (17)**
57:16;59:7,15;
60:15;62:1;64:22;
65:13;102:9,14;
108:12;118:17,23;
119:20;124:4,6;
146:12;150:11
**expertise (3)**
15:22;16:13;61:19
**Expires (1)**
176:10
**explain (7)**
10:9;49:13;76:2;
81:5;85:7;106:13;
167:3
**explained (2)**
19:3;24:22
**explaining (1)**
88:18
**explains (1)**
76:3
**exploratory (6)**
27:7;36:1;62:21;
161:25;162:23;
171:18
**explore (1)**
67:8
**explored (2)**
34:2;67:18
**exploring (1)**
24:2
**exponential (1)**
76:3
**expose (1)**
132:23
**exposed (1)**
127:15
**express (6)**
54:8,18,22;124:6;
160:1;162:3
**expressed (2)**
23:1;124:7
**expressing (4)**
29:16;54:12;79:13;

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 54 of 145 PageID #: 3841

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

95:14
**expression (1)**
169:2
**expunged (1)**
40:9
**extend (1)**
7:6
**extended (1)**
23:13
**extensive (1)**
43:15
**Extensively (2)**
43:19;61:21
**extent (3)**
7:16;11:5;132:24
**external (3)**
122:6,11;123:2
**extraordinarily (1)**
51:17
**extreme (6)**
38:6;56:10;67:13;
146:5;153:22;158:18
**extremely (6)**
23:24;27:21;58:14;
68:14;79:5;146:1
**extremist (1)**
141:10
**eyesight (1)**
10:23

**F**

**face (1)**
5:24
**Facebook (1)**
84:13
**fact (6)**
79:19;99:17;106:5;
108:13;134:10;
143:17
**factor (1)**
123:2
**factors (7)**
74:13;75:22;76:9,
10,11;134:18;174:6
**facts (1)**
142:13
**faculty (2)**
15:8,16
**fair (46)**
5:21;10:17;22:4;
50:4;56:17;63:17;
70:19;71:19,21;
72:17,18;73:25;
74:11;75:20;81:17;
87:13,23;92:4;93:21;
94:8,10;95:25;97:5;
99:2,3;102:9;112:5,
6;118:22;119:24;
120:8;124:5;130:22,
23;133:8;137:3;
144:10,14;145:14;
148:11;149:13;

152:12;153:24;
154:17;155:25;157:6
**fairly (1)**
98:9
**faith (1)**
51:15
**fall (2)**
4:21;80:11
**fallacious (2)**
18:2;95:7
**fallen (1)**
104:18
**familiar (13)**
60:12,12,13;62:24;
71:8;78:9;86:6;
104:4;123:23;
126:18;137:7;147:3;
160:22
**families (2)**
13:13;167:6
**family (15)**
13:6,7;24:8;26:19,
21;27:1,9;29:24;
31:12;34:9;50:17;
65:4;83:21;168:7;
171:23
**far (2)**
58:8;112:9
**farther (1)**
156:24
**fashion (1)**
149:6
**faster (1)**
100:4
**fatal (1)**
120:3
**favor (1)**
117:12
**fear (1)**
162:16
**features (4)**
27:25;150:24;
151:23;152:2
**federal (2)**
146:10;177:16.5
**feel (6)**
6:22;57:5;74:2;
95:21;132:22;134:19
**feeling (2)**
157:21;158:4
**feelings (1)**
162:3
**feels (3)**
95:20;156:18;
168:5
**fees (2)**
40:23;41:24
**felt (2)**
54:4,4
**female (14)**
94:6,16,20,21;95:1,
3,5,9,12,23,24;96:4;
97:19;132:19

**females (2)**
68:12;101:21
**fertility (1)**
134:1
**few (7)**
20:14;25:6;62:20;
65:18;143:3;160:10;
162:9
**field (5)**
19:11,13;20:24;
61:24;87:21
**fifth (1)**
63:18
**figure (6)**
49:4;110:5,6,8;
112:23;148:20
**figures (4)**
68:8,13;96:11;
109:12
**file (3)**
40:5;56:15;158:20
**filed (1)**
49:2
**files (2)**
155:18;158:14
**FILING (1)**
177:4.5
**final (2)**
133:15;134:2
**finalized (1)**
60:7
**financial (1)**
58:18
**find (7)**
10:24;27:6;51:18;
54:19;98:7;104:6;
162:8
**finding (3)**
98:10;122:14,25
**findings (1)**
96:24
**fine (12)**
4:10,20;7:5;9:3;
10:18;57:3,11;91:10;
97:20;100:6;121:20;
171:1
**finger (1)**
15:25
**finish (6)**
5:18;6:15;32:11,
20;73:10;81:15
**fired (1)**
174:14
**firmly (1)**
54:16
**firmly-held (1)**
54:8
**first (38)**
4:3;9:11;22:22;
23:1;24:23;26:10;
28:13;36:24;38:22;
39:17;43:1;46:21;
53:22;56:25;66:17,

18,20;70:18,20;74:9;
81:6;83:12;85:6;
88:1;100:23;101:4;
103:10;114:6,18;
116:19;119:17;
130:3;134:20;135:4;
162:9;171:15;
172:19;175:6
**FISHER (25)**
7:15;11:2,5;21:25;
24:10;44:18;45:1;
49:16;73:10;85:3,14;
87:14;95:15;100:2;
114:11,22;115:17;
123:14,17;148:22;
164:2;166:8,11;
174:8,16
**fistulas (1)**
132:18
**Fit (3)**
55:11;84:4;108:23
**five (7)**
9:11;20:25;91:7,
10;127:7,11;172:16
**flashes (1)**
134:5
**flaw (1)**
120:3
**flawed (2)**
95:7;122:19
**flip (6)**
70:5;103:24;106:9;
107:18;115:18;154:4
**flipping (4)**
99:8;102:14;103:9;
156:6
**flying (1)**
114:15
**focus (4)**
21:16;56:12,14;
120:5
**focused (3)**
17:4;28:9;129:23
**focuses (1)**
163:1
**focusing (1)**
53:19
**follow (3)**
38:7;39:11;158:15
**followed (2)**
38:1;173:12
**following (8)**
20:6;98:25;99:1;
101:7,16,19,25;
103:20
**follows (1)**
4:6
**follow-up (2)**
102:12;166:22
**foolish (1)**
89:16
**footnote (3)**
139:25;150:16;

151:2
**foreclose (1)**
37:11
**foreclosed (1)**
37:10
**foregoing (2)**
173:3;175:9
**foremost (3)**
53:22;74:9;119:17
**forget (1)**
137:10
**forgive (1)**
7:8
**forgotten (1)**
102:7
**form (10)**
22:1;45:7;109:14;
154:19,20;155:1;
156:4;169:13;170:2;
172:12
**formal (6)**
5:11;17:18;44:13,
19,23;112:5
**formally (2)**
46:19;112:12
**format (6)**
118:19;155:10,11,
16;159:8,8
**formation (1)**
135:12
**formatting (2)**
152:22;156:5
**formed (1)**
54:15
**forms (2)**
155:14;168:9
**formulation (2)**
87:4;150:8
**forth (10)**
16:8;23:2;67:14;
77:6;98:9;129:7;
131:14;143:6;
154:14;169:10
**forward (7)**
73:23;74:3;77:24;
93:6;148:6,14;164:6
**found (8)**
37:12;100:24;
101:5;114:25;118:7;
122:9;123:9;166:24
**founding (1)**
42:22
**four (11)**
9:12;25:2;29:1;
36:12,13;40:7;43:2;
56:15;63:6;159:6;
172:16
**fourteen (1)**
73:3
**fourth (1)**
84:13
**fraction (1)**
5:23

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 55 of 145 PageID #: 3842

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

**fraught (1)**
52:7
**free (3)**
46:13;54:8;57:5
**freedom (1)**
109:23
**freely (1)**
10:22
**freestanding (1)**
15:11
**frequently (1)**
70:8
**fresh (1)**
111:2
**friends (1)**
134:22
**front (33)**
8:17,18,21,25;9:5,
14;11:12;40:12;
52:10;59:8;63:14;
82:4,13;88:22;89:22;
91:15;92:10;93:12;
99:9;100:8;107:2;
123:21;130:14;
132:4;137:20;139:4;
146:25;150:12;
152:8;157:11;
158:10;160:25;163:7
**frustration (1)**
135:18
**full (6)**
11:6,7;13:16;
22:23;42:6;75:4
**full-time (1)**
12:25
**Fully (1)**
117:9
**function (4)**
10:11;11:11;27:4;
132:16
**functionally (1)**
63:10
**functioning (1)**
36:7
**further (9)**
37:10,11;67:8;
128:1;166:5;174:8,
14,17;175:22
**furthermore (1)**
127:18
**future (2)**
134:1;167:24
**fuzzy (1)**
155:13

**G**

**gain (2)**
134:3;136:10
**gap (1)**
115:25
**garden (1)**
76:25

**garner (1)**
110:9
**gave (4)**
53:1;97:19;163:15;
171:14
**GAVIN (10)**
4:8;11:2;24:10,21;
49:16;57:14;73:10;
91:13;123:14;
177:1.5
**gay (2)**
38:3;143:18
**gender (169)**
13:12;14:8,11;
16:23;17:16,24,25;
18:12,22;19:2,7;20:8,
15;21:5,12,18,21,22;
22:7;24:24;25:11;
26:16;28:10,14,21,
23;29:2;30:15,25;
31:1,2,7,15;32:16,17,
24;33:3,5,11,13,17,
19,21;34:7,11,25;
35:3;37:15,25;42:15;
45:21;46:11;47:10;
50:9,11,20,22;52:17,
25;53:7,12;54:23;
55:15;56:4,8;57:23;
61:10;62:22;64:10;
65:3,6,16;66:7,12,14,
18,21,23;67:1,9;68:9,
9;72:7,11,15,25;
73:22;75:19;76:11,
19;77:2,18;78:8;
80:25;81:2;82:17,23;
83:6,18;84:1,9;85:2,
25;86:2;89:5,9;
91:24;95:8;100:12;
101:7;102:19;
103:19;104:10,11;
106:12;109:12,21,23;
110:12,19,22;111:8,
17,23,24;112:5,19;
114:8,20;115:7,24;
116:2,3,7,14,15,18;
119:24;120:2;121:2,
3;126:8,13;127:16;
128:1;131:24;
134:19;138:19,25;
139:8;140:22;
143:17;151:9;152:3,
17;157:18;159:20;
160:6,15;161:10;
162:10;164:19;
165:18;167:14,20;
169:21;170:13;
171:22;172:18
**gender-affirmation (1)**
159:2
**gender-affirmative (1)**
16:24
**gender-affirming (41)**
18:17;19:14;31:14;

35:15;44:15;45:7;
46:6,17;48:16;57:22;
64:6;67:22;68:22;
69:2,3,13,22;84:20;
98:20;110:24;
117:14;132:7;133:4,
9,18;140:3;141:9;
142:12;143:22;
144:2;146:14,15;
147:6,25;149:22;
150:1;157:19;170:1,
15,21;171:9
**gender-related (2)**
53:19;74:25
**general (13)**
29:14;31:12;44:22;
46:7;61:24;96:10,13;
97:24;106:1;147:23;
153:11;157:23;
173:15
**generalizations (1)**
122:21
**generalized (1)**
97:6
**generally (14)**
17:14;18:15;26:15;
57:21;74:6;87:20;
92:24;105:20;
108:25;112:15;
119:20;120:9;
148:24;159:25
**generating (1)**
71:16
**generous (1)**
58:14
**genesis (1)**
171:22
**genuine (2)**
54:2;73:22
**Geoffrey (1)**
125:2
**geography (1)**
113:20
**gesture (1)**
43:25
**gets (4)**
22:19;25:22;77:4,5
**gift (1)**
77:16
**girl (1)**
152:6
**girls (1)**
127:11
**given (19)**
39:23;40:8,9;
52:17;53:18;56:4,8;
68:8;80:8;133:3;
152:20;158:19;
159:7,13;163:23;
164:12,16,25;175:18
**giving (1)**
43:13
**glasses (1)**

70:7
**global (2)**
141:25;160:1
**goal (1)**
163:2
**goals (1)**
150:8
**goes (4)**
34:12;74:12;152:5;
173:20
**gonna (5)**
44:18;95:16;103:6;
114:11;144:24
**Good (3)**
4:9;57:1;117:25
**Gotcha (2)**
42:7;164:23
**gotta (1)**
73:11
**government (4)**
48:2,5;115:22;
116:11
**governments (1)**
145:19
**gradient (1)**
96:22
**grants (3)**
15:24;16:8;17:13
**graph (1)**
109:14
**graphs (1)**
78:7
**grave (1)**
161:24
**gray (1)**
25:22
**great (7)**
22:24;29:6;68:18;
140:13,18;155:5;
162:15
**greatly (1)**
93:24
**groomers (1)**
77:9
**grounds (1)**
51:19
**group (16)**
33:15;72:6,10;
76:16;84:13;89:18;
94:5,6;117:9,11;
140:24;143:7;144:2;
146:8;170:19,19
**groups (2)**
98:7;169:10
**grow (2)**
38:16;143:18
**grown (1)**
134:2
**growth (2)**
134:11,13
**guess (16)**
16:10;22:18;33:1;
45:5;63:10,18;74:14;

79:4;92:6,24;93:18;
115:13;117:25;
124:3;130:12;154:7
**guide (3)**
30:19;43:16,21
**guidelines (9)**
138:18;139:6,11,
13;142:16,17,23;
143:8;147:12
**guides (2)**
30:14,21

**H**

**habits (1)**
4:21
**hair (4)**
38:16,16;153:11;
157:22
**half (3)**
57:1;75:13;174:11
**half-hour (1)**
32:23
**HAMILTON (2)**
175:2,4
**hand (1)**
176:2
**handful (1)**
118:25
**hanging (1)**
76:21
**happen (1)**
6:25
**happened (1)**
128:12
**happening (6)**
20:24;24:3;29:19;
141:13;144:9;162:13
**happenings (1)**
7:19
**happens (4)**
22:20;31:9;134:16;
173:9
**happier (1)**
168:1
**happy (6)**
7:2;10:17;57:6;
91:9;113:21;167:11
**harbor (1)**
142:10
**hard (3)**
59:21;93:4,5
**hardship (2)**
58:18;131:11
**harm (5)**
32:5;98:8;144:7;
162:21;173:23
**Hate (1)**
166:3
**hateful (1)**
165:25
**hats (1)**
76:21

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 56 of 145 PageID #: 3843

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

**headaches (1)**
134:5
**heading (1)**
107:21
**Health (13)**
48:2;92:4;114:6,
18;115:22;116:16,
18;131:13;137:16;
149:20,25;152:17;
168:3
**healthcare (1)**
58:20
**healthy (1)**
132:14
**hear (2)**
6:2;132:3
**heard (2)**
4:17;132:3
**heart (2)**
136:9;166:3
**heartache (1)**
167:7
**height (1)**
134:2
**held (4)**
24:20;43:3;123:20;
148:5
**help (2)**
73:20;146:7
**helpful (1)**
45:18
**helping (2)**
39:21;143:20
**Henriette (1)**
142:24
**hereby (1)**
175:5
**herein (1)**
175:6
**hereunto (1)**
176:2
**herring (1)**
169:1
**herself (1)**
31:10
**heterosexual (1)**
169:7
**hierarchies (1)**
43:5
**hierarchy (4)**
97:20,21,23;98:2
**high (1)**
136:3
**higher (1)**
173:15
**highlighted (10)**
10:20;11:1;103:25;
104:2;115:19,23;
154:8,10,15;156:18
**highly (1)**
165:2
**hips (1)**
160:4

**hired (1)**
16:13
**his/her (1)**
175:19
**historical (2)**
23:3;68:3
**history (2)**
22:23;122:10
**HIV (1)**
78:11
**hold (1)**
44:2
**Holloway (1)**
125:3
**home (3)**
9:23,25;10:1
**homelessness (1)**
173:24
**homosexual (1)**
169:6
**homosexuality (1)**
169:14
**hone (1)**
33:1
**honeymoon (2)**
167:17;168:7
**honorarium (2)**
43:21;44:1
**honorary (1)**
14:20
**hope (3)**
92:8;106:16;155:5
**hoped (1)**
172:7
**hoping (1)**
167:3
**hormone (1)**
147:7
**hormones (18)**
32:9;35:16,25;
36:3,11,18,21;45:8;
67:22;68:22;69:2;
77:15;126:14;133:5,
19;135:2;149:22;
173:17
**horrible (1)**
7:7
**horrified (2)**
31:7;33:10
**hospital (10)**
111:21;115:7;
138:7,10,14,15,23;
139:1;142:3,9
**hot (1)**
134:5
**hour (4)**
6:18;57:1;174:10,
10
**hourly (3)**
58:4,11,15
**hours (10)**
6:22;13:17,19,24;
14:1,2,4,7;19:22;58:7

**housekeeping (1)**
148:14
**huge (1)**
64:4;130:2
**human (9)**
45:15;131:1,8,17;
132:9;133:7,11,17;
141:4
**hundred (1)**
73:2
**hundreds (2)**
85:22;155:18
**hyperkalemia (1)**
136:7
**hyperprolactinemia (1)**
136:4
**hypertension (2)**
135:17;136:10
**hypotheses (3)**
71:7,16,21
**hypothesis (6)**
71:20,23;108:15;
122:15;123:5,12

**I**

**ICD-9 (1)**
83:2
**idea (3)**
29:17;143:23;
164:4
**ideas (1)**
23:1
**identical (2)**
63:10;168:18
**identification (6)**
79:23;80:5,14;
81:12,20;98:1
**identified (6)**
13:21;26:22;38:3;
83:1,12;120:25
**identify (11)**
52:21;56:2;65:20,
24;72:25;74:8,16;
94:12;106:19;
120:24;147:13
**identifying (8)**
75:18,24;77:19;
79:9;93:19,24;94:4;
161:21
**identity (9)**
21:22;64:22;
115:24;116:2,4;
126:8,13;127:16;
169:21
**ideology (5)**
17:24,25;18:12;
81:3;95:8
**ignore (1)**
24:14
**illegal (1)**
64:10
**image (3)**

165:21,25;166:1
**imagine (3)**
69:15,20;122:23
**imbalances (1)**
23:16
**immaturity (2)**
27:23;35:7
**immediately (1)**
107:20
**impacts (1)**
131:13
**impair (1)**
132:15
**impairment (1)**
93:5
**implies (1)**
108:14
**important (6)**
5:17;6:14;23:24;
29:22;97:15;140:25
**impossible (1)**
130:8
**impressed (1)**
103:5
**improperly (6)**
144:11,15;145:4,
15,21;146:21
**improve (1)**
167:13
**inaccurate (3)**
33:14;157:8,10
**inaccurately (1)**
33:22
**inappropriate (1)**
33:14
**inappropriately (1)**
33:22
**inaudible (10)**
26:8;31:15;45:14;
73:19;88:4;109:18;
127:25;129:24;
141:8;169:3
**incapable (1)**
130:7
**incidence (1)**
17:2
**include (5)**
13:24;26:20;59:18;
87:4;133:24
**included (3)**
74:13;104:9;
165:21
**includes (2)**
65:2,4
**including (7)**
32:5;92:20;127:19;
132:17;134:10;
143:8;150:2
**inclusion (1)**
126:2
**incongruence (1)**
159:19
**incorporated (1)**

111:20
**incorrect (2)**
127:6;128:1
**incorrectly (1)**
95:14
**increase (9)**
75:24;76:4;77:19;
80:14;81:12,19;94:3;
102:18;106:12
**increased (14)**
78:10;102:17;
105:5;106:7,10,14;
107:6,23;108:17;
112:19;113:1;
135:15,18;173:22
**increases (8)**
75:18;77:23;78:15;
79:22;80:4;98:24;
99:20;173:11
**increasing (2)**
96:8;110:16
**incredibly (1)**
154:21
**independent (1)**
29:17
**Indiana (16)**
4:1;8:9;13:25;
48:24;49:2,10;57:16;
58:1,1;60:14;175:1,
4;177:2,6,5,13,16
**Indianapolis (3)**
177:3,7,24.5
**Indiana's (4)**
46:23;60:6;61:2,3
**indicate (7)**
62:1,19;64:20;
112:2;152:11,16;
153:8
**indicated (3)**
53:20;54:21;59:7
**indicates (6)**
50:23;86:4;111:10;
125:17;156:21;
157:21
**indicating (4)**
61:4;72:13;78:2;
155:17
**indications (1)**
55:3
**individual (4)**
27:20;96:12;141:1;
177:12
**individually (1)**
35:20
**individuals (8)**
60:14;97:9;101:21;
140:2,8;169:7,15,17
**Indremo (10)**
98:17;99:5,12,15,
23;100:10,24;102:11,
16;104:17
**Industrial (1)**
177:17

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 57 of 145 PageID #: 3844

K.C., et al. VS                                                                Dianna T. Kenny
The Individual Members of the Medical Licensing Board                          May 30, 2023

**ineffective (1)**
170:4
**infant (1)**
16:17
**infection (1)**
132:18
**inference (3)**
71:3,5;106:17
**inferences (1)**
122:17
**inferential (1)**
80:18
**inferred (1)**
106:18
**infertility (1)**
135:5
**infiltrating (1)**
142:8
**influence (4)**
139:20;142:19;
145:17,18
**influenced (8)**
142:16,18;144:12,
16;145:4,16,21;
146:21
**influencers (1)**
140:9
**influences (1)**
74:10
**influential (1)**
74:15
**information (15)**
18:2;87:4,23;
109:24;118:13,17;
119:2;128:2;137:15,
22;138:1;143:25;
157:11,13;159:16
**Informed (6)**
117:9;147:5,22,23;
148:2,3
**inhumane (1)**
170:3
**initial (2)**
97:17;152:16
**injunction (2)**
146:12,15
**Inquiry (4)**
47:21,25;48:2;
125:20
**insight (1)**
27:3
**insisting (1)**
39:12
**Insta (1)**
140:15
**instability (1)**
131:12
**Instagram (1)**
140:15
**instance (1)**
26:11
**instead (1)**
85:25

**institution (3)**
15:12,18;54:5
**institutions (1)**
15:14
**insult (1)**
132:13
**intake (1)**
155:23
**intellectual (3)**
23:7,8;145:24
**intended (1)**
56:17
**intending (1)**
152:3
**intense (1)**
172:16
**intensive (1)**
69:8
**intensively (2)**
20:23;28:4
**intentionally (1)**
56:23
**interactions (1)**
23:18
**interchangeably (1)**
151:6
**intercourse (1)**
135:11
**interest (2)**
54:16;166:4
**interested (5)**
43:9;172:2,8;
175:25
**interesting (1)**
89:12
**interject (1)**
11:2
**internal (2)**
63:19;122:6
**internalized (1)**
162:18
**international (8)**
30:16;41:6,11;
42:2;61:14,16;83:1;
130:5
**Internet (6)**
41:22;75:8,14;
77:10,15;127:4
**interpretable (2)**
154:20,25
**interpretation (2)**
27:23;154:23
**interpreted (1)**
170:16
**interrupt (2)**
24:10;123:14
**interrupting (2)**
30:4;93:4
**intersection (1)**
19:12
**intervention (1)**
28:2
**interventions (1)**

26:24
**interview (8)**
23:13;28:13;53:1,
4,7;83:24;160:20,23
**interviewed (2)**
149:2,4
**into (38)**
4:21;20:25;21:5,
18;22:15;26:5;27:13,
20;34:24;36:15;37:5;
48:2,5;50:17;53:25;
54:3;66:3;70:2;
80:11;84:4;93:16;
109:14;111:20;
122:6;125:9,20;
126:12;127:21;
130:2;134:23;
136:13;141:16,17;
142:6;145:25;
157:17;162:22;
172:12
**investigation (1)**
18:24
**invitation (1)**
129:6
**invite (1)**
93:2
**invited (9)**
42:20,24;44:10;
47:24;48:1;56:3;
128:8,10,12
**involve (1)**
65:5
**involved (3)**
20:11;57:25;92:3
**involves (2)**
27:3;31:4
**invulnerability (1)**
144:1
**irreversibility (1)**
144:8
**isolation (1)**
162:16
**issue (6)**
6:4;47:5;90:22;
114:16;121:21;
148:19
**issued (4)**
44:22;146:12,15,
17
**issues (19)**
16:19;21:22;26:17;
50:8,22;52:18;53:8,
19;65:16;74:25;90:1;
102:18;103:21;
106:3,3,11;135:25;
162:14;171:24
**items (2)**
104:6;154:2

**J**

**Jack (3)**

55:24;80:6;122:17
**jail (1)**
170:25
**January (2)**
152:11,15
**journal (13)**
55:20;88:19;90:4,
7;109:16;117:18;
118:5;128:18,22,24;
129:4,13;130:6
**journalistic (1)**
118:11
**journals (3)**
55:17;118:12;
129:15
**judge (3)**
90:17;146:10,20
**juggle (1)**
16:2
**July (1)**
21:3
**jump (2)**
157:17;159:1
**juvenile (1)**
61:22

**K**

**KC (3)**
150:19,23;177:9
**KC's (1)**
152:3
**keep (8)**
34:15,18;47:19,19;
57:6;73:11;105:15;
143:5
**keeps (1)**
73:14
**KENNY (8)**
4:3,12,15;109:4,4;
174:19.5;175:6;
177:18
**K-e-n-n-y (1)**
4:16
**kept (1)**
58:9
**key (2)**
125:18,23
**keynote (1)**
56:2
**kind (15)**
20:11;33:24;37:10;
38:17;49:23;61:23;
106:4;133:10,14;
141:8;142:5,6,18;
154:22;174:6
**kinda (1)**
51:5
**kinds (2)**
16:20;26:24
**Kingdom (1)**
109:1
**knees (1)**

7:8
**knew (1)**
15:22
**knowledge (6)**
90:11;113:19,23;
117:16,19;171:6
**known (4)**
45:14;61:12,19;
75:10

**L**

**la (1)**
174:2
**laboratory (1)**
15:25
**lack (3)**
23:17;63:11;
114:12
**lacking (1)**
66:16
**lag (1)**
6:12
**landscape (1)**
36:3
**language (12)**
45:10,19;70:23;
86:15;98:23;106:14;
108:3;150:25;
153:13;154:14,15;
159:22
**lapse (3)**
40:22,23;41:21
**large (4)**
13:12;29:7;31:4;
175:5
**largest (7)**
113:12,13,17;
115:10;116:7;138:9,
12
**last (22)**
7:23;8:7;14:20;
20:25;39:16;41:10;
51:3;52:24;65:18;
69:24;77:22;98:16;
102:3,15;106:22;
115:3;143:3;165:20;
172:1,19,20,22
**late (2)**
7:4;97:15
**later (2)**
131:9;168:11
**latter (1)**
58:3
**law (2)**
44:24;51:15
**laws (5)**
63:7;64:22;170:8;
171:5,8
**lawsuit (1)**
49:2
**lawyer (1)**
146:17

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 58 of 145 PageID #: 3845

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

**lawyers (1)**
159:14
**lead (3)**
55:10;89:14;
151:19
**leader (1)**
140:5
**leadership (2)**
43:3;140:5
**leaning (2)**
6:6;164:6
**leap (1)**
123:10
**learn (1)**
105:9
**learning (1)**
23:8
**least (8)**
6:20;24:15;37:14;
64:13;80:22;98:16;
122:11;123:2
**leaving (1)**
61:8
**lecturer (1)**
16:10
**lecturing (1)**
16:4
**led (3)**
77:24;79:22;80:4
**left (9)**
21:2,17;22:8;
41:14;53:21,22;
56:23;129:25;143:18
**legal (2)**
45:17;64:4
**Legislation (3)**
47:22;48:2;146:9
**legislative (1)**
15:13
**legislatures (3)**
46:15;47:3;49:6
**legs (1)**
6:23
**less (14)**
13:17;18:16;19:25;
22:9;25:12;50:21;
53:20;54:1;58:25;
94:17;96:5;97:4,12;
113:20
**level (2)**
69:19;96:14
**lexicon (1)**
18:18
**libraries (2)**
127:21,22
**library (2)**
74:23,23
**LICENSING (1)**
177:12.5
**life (5)**
24:4;54:5;173:4;
174:3,4
**likelihood (1)**

**131:25**
**likely (8)**
33:12;35:5;37:14;
94:17;104:20;112:3;
151:18;165:2
**limb (1)**
10:9
**Limitations (1)**
107:21
**limited (1)**
141:25
**line (4)**
102:3;103:15;
126:12;158:16
**lines (3)**
95:16;158:17;
166:20
**linked (1)**
160:21
**Lisa (1)**
71:10
**list (12)**
30:11;34:19,21;
40:17;41:1;42:8;
56:7,16,18;64:20;
140:7;144:20
**listed (4)**
8:16;82:24;151:14;
163:18
**lists (1)**
40:12
**literal (1)**
27:23
**literally (2)**
99:22;152:21
**literature (13)**
18:25;19:13;30:9,
9;50:12;56:13;68:3;
72:23,24;78:10;80:9;
82:20;98:5
**litigation (2)**
57:20;60:10
**little (10)**
6:19;14:15;25:22;
144:22;155:20;
156:15,24;167:4;
169:10;172:21
**Littman (14)**
71:10;82:9,14,16;
83:5;84:7,17;85:11,
18;86:4,19;88:1;
89:2,19
**Littman's (2)**
82:19;89:8
**live (1)**
69:6
**load (1)**
128:9
**loaded (1)**
128:7
**lobby (16)**
126:17,22,25;
127:2;139:20,24;

**140:4,6;141:12,25;**
142:4,7;144:12;
145:16,22;146:22
**lobotomy (1)**
130:18
**located (1)**
9:23
**location (1)**
175:10
**lonely (1)**
76:16
**long (12)**
6:4;7:3,3;11:17;
15:1;37:20;38:16;
43:19;51:5;57:6;
69:24;171:14
**longer (5)**
6:20;54:4;83:19;
91:8;134:12
**longer-term (5)**
26:3;27:12;36:15;
37:5;135:6
**longest (1)**
129:11
**long-term (4)**
22:16;34:24;36:16;
173:12
**lonliness (1)**
162:16
**look (27)**
24:14;27:11;29:10,
14;35:19;52:20;
54:24;56:9;62:2;
67:4;68:3;85:21;
93:1;98:5;111:18;
118:6;122:16;127:9;
139:25;142:5,21;
144:20,21;158:13,13;
173:3,9
**looked (4)**
37:25;65:9;80:18;
106:23
**looking (20)**
10:25;15:21;21:5,
18;23:15,17,19;
55:22;70:8;92:24;
101:18;110:4,10;
140:24,24,24;154:18;
157:2,24;170:14
**looks (8)**
12:2;14:15;21:7;
41:12;112:18;
154:25;155:6,22
**Los (2)**
113:25;114:3
**lost (1)**
67:5
**lot (12)**
15:12;16:7;29:23;
31:5;49:14;58:25;
86:10;96:11;143:12;
167:6;173:8,8
**loud (2)**

**70:14;104:2**
**Louie (1)**
143:6
**low (3)**
67:4;68:14;111:14

## M

**machine (2)**
77:3;140:12
**machinery (2)**
18:20;170:5
**magic (7)**
15:25;37:9,12;
166:24;167:11,19;
168:5
**magically (1)**
32:7
**mainstream (1)**
169:12
**maintained (1)**
148:18
**major (6)**
30:18;66:22;70:24;
95:9;111:21;142:10
**majority (8)**
25:4,7,23;39:11;
84:3;101:15;122:10;
162:8
**makes (2)**
135:11;170:18
**making (5)**
115:14;161:3,14;
170:19;172:3
**male (3)**
95:1;97:22;132:19
**males (3)**
68:13;97:23;136:2
**manage (3)**
26:14,15;162:20
**managed (1)**
77:5
**management (3)**
27:6;30:14;45:20
**managing (3)**
143:20;150:20;
151:21
**manifest (1)**
83:15
**many (32)**
14:4;18:7,7;19:22;
21:21;22:7;25:10;
28:20,22;34:23;
36:25;37:3;58:7;
61:15;65:15;73:18;
75:11;111:16;124:5;
132:16,21;135:14;
140:9,9,10,13,17;
143:17;162:17;
169:8,8;173:5
**March (1)**
4:2
**marginalized (1)**

**140:23**
**marital (2)**
23:15,16
**marked (12)**
11:11;59:13;60:22;
63:13;82:3;92:9;
123:22;139:3;
146:24;154:4;
159:19;163:7
**marketing (1)**
140:12
**marriage (6)**
13:5;51:11,13,24,
24;52:2
**masculine (1)**
39:19
**matched (1)**
173:16
**matches (1)**
154:15
**material (2)**
43:15,18
**materially (1)**
168:18
**materials (3)**
18:25;56:11;
127:10
**math (2)**
19:17;25:14
**matter (3)**
4:5;65:14;148:14
**matters (1)**
66:4
**maturation (1)**
134:24
**mature (2)**
97:19;134:15
**matured (2)**
94:16;96:5
**maturity (1)**
96:9
**may (19)**
6:12;56:16;66:11;
70:23,25;71:7;72:14,
15;76:16,17;85:14;
97:8;134:7,13;
152:24;167:24;
170:16;175:12;
177:18
**maybe (13)**
18:22;25:14;31:24;
32:23;43:2;44:20;
48:11;51:4;129:1;
139:21;166:8;169:9;
174:11
**mean (40)**
5:3;12:20;19:5;
20:2,9;25:15;29:4,
20;35:19;39:4,16;
41:23;42:2,17;46:6,
21;49:2,25;60:13;
62:7;67:2;77:7;
95:11,13;111:1;

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 59 of 145 PageID #: 3846

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

112:8;113:18;
124:21,21;131:7,19;
133:23;136:16;
145:23;154:24;
157:17;160:2;171:8;
172:19;173:2
**meaning (2)**
28:10;85:4
**means (19)**
7:24;42:4,5;62:9;
77:12;107:7,12,25;
108:18,19;118:14;
126:13;127:3,19;
131:9;135:14;136:4;
168:21;169:2
**meant (7)**
39:5;46:7;72:10;
87:15;151:3;167:4,6
**measure (1)**
83:4
**mechanisms (1)**
80:20
**media (44)**
18:16,16;74:11;
98:21,25;99:1,5,16;
100:12,15,15,19,25;
101:4,5,7,17,25;
102:4,17;103:20;
104:6,10,16;105:3,
10,20,21;106:1,1,6,
11,14,21,21;107:6,7,
23,24;108:17;118:16,
24;119:3;127:4
**mediation (1)**
13:7
**medical (23)**
9:12;34:15,18;
39:24;61:4;66:8;
78:17;126:11;
132:17;135:15;
136:21,24;137:5;
144:11;149:14;
152:14;155:4,8;
158:19;159:4,5,12;
177:12.5
**medically (2)**
131:5;170:3
**Medicare (1)**
58:19
**medications (8)**
23:12;36:4;45:25;
69:22;78:19;117:14;
133:4;150:1
**Medicine (4)**
42:15;45:11;
164:19;169:12
**meet (5)**
22:22;24:5;26:11;
160:11;172:13
**meeting (6)**
8:2,5;29:15;43:14;
44:6;162:17
**meetings (2)**

30:22;44:2
**Melbourne (8)**
113:11,16;114:8,
19;115:5;138:7,10;
142:3
**member (21)**
40:16,21;41:3,8,
10;42:6,9,11,13,14,
19;43:1;44:10;46:2,
9,10,11;137:11,13;
142:4;164:21
**members (2)**
41:5;177:12
**membership (7)**
40:12,21,22,23;
41:18,19,21
**memoirs (1)**
103:6
**memory (2)**
91:3;101:10
**men (2)**
38:3;170:6
**menses (1)**
135:4
**menstrual (2)**
158:5,25
**mental (8)**
92:4;115:22;
131:13;137:16;
140:16;149:20,25;
168:3
**mention (1)**
91:20
**mentioned (5)**
62:4;82:9;89:24;
108:13;138:6
**mentioning (1)**
108:16
**merely (1)**
123:8
**merit (1)**
78:6
**messages (3)**
24:13;77:8;78:22
**metabolic (1)**
136:8
**method (1)**
80:10
**methodologically (1)**
122:19
**methods (2)**
28:4;161:22
**microphone (1)**
6:5
**middle (3)**
18:11;89:6;159:18
**might (25)**
21:13;24:1;25:19;
36:9;56:9,18;68:1;
73:1,1,2;74:2,6;
75:23;76:9;79:12;
90:22;107:7,12,24;
108:18;151:19,23;

152:2;156:5;157:14
**milestones (2)**
23:4;29:15
**million (2)**
68:11;73:2
**mind (11)**
40:3;56:19;81:4;
91:6,18;100:6;111:2;
113:24;133:25;
161:11;162:24
**mindful (3)**
37:23;107:22;
108:9
**mine (2)**
20:12;118:1
**minimal (1)**
94:11
**minor (2)**
28:22;44:15
**minors (7)**
14:12,13;45:7;
57:22;64:23;77:14;
146:14
**minute (1)**
57:10
**minutely (1)**
17:3
**minutes (5)**
9:9,19;91:8,10;
166:8
**misconstrue (1)**
160:9
**misheard (1)**
36:9
**misinformation (2)**
75:4;142:11
**misinterpret (1)**
155:6
**misinterpreted (1)**
155:3
**misplaced (1)**
53:10
**missed (4)**
43:17;97:1;114:16;
136:18
**mistakenly (2)**
53:5;74:8
**misteaching (1)**
127:5
**mistreatment (1)**
131:10
**misunderstanding (2)**
39:3;161:24
**model (4)**
18:8;165:19;
171:17;172:10
**modes (1)**
140:13
**modifiers (1)**
97:16
**moment (5)**
14:2;59:2;129:25;
133:25;135:21

**momentarily (1)**
70:17
**money (1)**
41:23
**month (3)**
7:23;44:5;152:23
**month/day (1)**
153:4
**months (2)**
101:19;170:25
**mood (2)**
67:4;135:18
**more (41)**
10:16;13:17,19;
17:5;19:10,25;22:9;
23:22;26:8,11;27:8;
47:14;50:21;51:4;
53:20;57:5;66:4;
71:22;74:2,15;77:24;
78:2;79:9;87:20;
91:9;95:6;96:9,14,16,
17;112:1;134:5;
135:22;147:23;
151:18;154:1,25;
166:4;167:4;172:2,7
**morning (3)**
4:9;8:7;166:7
**most (15)**
26:20;33:11;62:14;
97:2;98:2,16;129:11;
130:1;148:2;155:11;
159:7;160:8;167:8,
10;168:2
**mother (2)**
29:21;31:11
**motivate (1)**
54:13
**motivation (1)**
67:6
**motivator (1)**
55:6
**motive (2)**
45:10,19
**mouth (3)**
95:17;141:16;
142:6
**move (3)**
66:3;135:1;136:1
**moved (1)**
101:12
**movement (1)**
127:20
**moving (1)**
134:23
**much (17)**
5:23;17:4;20:17;
41:22;51:6,14;52:23;
56:12;59:22;109:3;
129:9;140:16;
154:25;166:6;
168:17;170:7;171:2
**multidisciplinary (1)**
116:14

**multiple (2)**
140:7;159:15
**music (11)**
14:21,23,25;15:1,4,
5,8,10,22;61:15,18
**musicians (1)**
15:20
**must (3)**
147:24;161:9,13
**mute (1)**
163:25
**mutual (1)**
142:18
**MW (11)**
152:10,16;153:8,
25;155:24;156:8,18;
157:3,7;158:3,9
**MW's (3)**
155:3,24;159:20
**Myer (1)**
143:6
**myself (7)**
10:11;18:6;20:22,
23;22:6;47:17;
164:21

## N

**naked (1)**
132:23
**name (8)**
4:11;39:13,18,23;
40:8,9;42:23;115:5
**named (2)**
125:2;148:10
**names (2)**
38:13;55:1;143:2,5
**narrative (1)**
67:10
**narrow (2)**
46:7;154:21
**natal (10)**
39:13;40:8;94:21;
95:1,1,5,24;97:23;
101:21;126:9
**nation (2)**
165:7,8
**National (5)**
30:19;47:9;125:19;
164:25;165:6
**nationalized (1)**
58:20
**nationwide (1)**
64:14
**natural (2)**
38:7;45:12
**nature (2)**
115:8;133:12
**naysayers (1)**
88:7
**near (2)**
111:16;112:2
**necessarily (3)**

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 60 of 145 PageID
#: 3847
K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

120:17;158:15;
164:20
**necessary (2)**
50:16;95:7
**necessitating (1)**
135:7
**need (16)**
6:23;8:19;10:15;
11:15;40:2,3;67:7;
74:20;81:7;85:8;
93:1;104:1;114:1;
160:1;162:19;171:20
**needed (2)**
35:5;38:5
**needs (8)**
7:9;11:5;57:4;
67:18;91:8;114:7;
148:20;170:23
**negative (17)**
98:21;99:1,4,18;
100:15,17,23;101:5,
17,25;104:16;105:3,
11,21;106:3,4;131:13
**neglected (1)**
48:10
**net (1)**
146:3
**network (8)**
127:2;140:1,9;
141:2,3;142:10,19;
144:6
**networks (1)**
140:10
**neurological (1)**
36:6
**neurosurgeon (1)**
130:17
**neutral (6)**
153:8,10,25;157:7,
22;158:9
**New (22)**
10:3;18:18,18;
47:7,13,21;54:24;
61:17;63:25;64:3;
89:12,15;113:14,15,
25;114:4;117:13;
138:15;171:5,17;
172:10;175:11
**next (9)**
8:20;97:3,4;105:6;
123:10;134:23;
141:21;158:16;
163:22
**night (5)**
39:16;103:7;
144:25;158:21;
174:12
**nights (1)**
158:21
**NIH (1)**
110:2
**nipples (1)**
136:6

**nonactual (1)**
72:16
**none (2)**
20:16;69:9
**non-natal (1)**
39:15
**nonprofit (1)**
92:2
**nor (1)**
89:16
**normal (1)**
52:3
**normally (2)**
52:4;150:9
**notarial (1)**
176:3
**Notary (1)**
175:3
**note (1)**
54:16
**noted (2)**
79:8;97:10
**Notepad (6)**
152:21;155:1,11,
16;158:14;159:8
**notes (4)**
150:7;164:24;
172:13;175:15
**noteworthy (2)**
151:24;154:1
**notice (9)**
10:19;40:6;85:17;
88:3,17,24;89:2,12;
177:4,5
**noticed (3)**
24:15;77:5,22
**noticing (1)**
89:13
**notified (1)**
177:17
**notion (1)**
142:6
**November (2)**
163:15;164:16
**nowhere (1)**
111:15
**NP0682101 (1)**
176:9
**Ns (1)**
4:13
**number (12)**
15:13;29:7;33:4;
35:21;62:13;69:16;
77:19;98:19;101:6;
111:14;127:3;134:4
**numbers (9)**
78:7,11;93:16;
99:19;103:14,15;
110:9;111:18;154:8
**numerous (2)**
92:16,17

**O**

**oath (2)**
5:5,12
**object (6)**
7:15;21:25;44:18;
85:3;87:14;114:11
**objection (5)**
11:7;22:5;85:14;
114:22;148:22
**objective (2)**
83:4;90:21
**objectives (2)**
125:18,24
**observed (1)**
102:6
**obsessional (1)**
27:25
**obtain (1)**
118:14
**obviously (9)**
5:8;40:18;74:12;
87:6;106:18;109:7,8;
131:20;148:20
**occasion (2)**
43:12;155:7
**occasionally (1)**
139:12
**occasions (2)**
118:15;126:17
**occur (1)**
97:14
**occurred (4)**
68:5;80:22;123:6;
152:24
**occurs (1)**
135:6
**o'clock (1)**
174:11
**off (19)**
10:2;24:19,20;
32:1,21;53:10;56:23;
67:13;68:23,24;81:4;
111:1;123:18,20;
136:16;146:3;148:4,
5;157:18
**offending (2)**
61:21,22
**offer (2)**
57:16;70:20
**offered (1)**
143:16
**offering (1)**
110:24
**office (5)**
9:24,25;10:1;
29:25;174:12
**official (1)**
177:13
**often (14)**
23:21;26:10;29:18,
23;39:1;40:4;44:4;

134:20;135:6,12;
140:22;160:3;
162:20;167:17
**oily (1)**
135:16
**old (3)**
4:21;28:25;32:6
**older (4)**
96:16,17;97:3;98:3
**ominous (1)**
79:8
**omitted (1)**
163:21
**omnipotent (1)**
71:2
**once (3)**
31:16;36:2;44:5
**one (92)**
7:8;10:13,13;
23:21;24:1,15;26:6;
27:10;28:24;29:4,9,
20;30:11,15,24;31:9,
18;32:15,23;33:2,18;
34:4;35:2,19;36:10,
16;37:13,24;39:16;
40:8;41:5;42:23;
43:12;46:19,21;
47:11,14;48:19;50:3;
51:11,12;55:4,11;
57:9;62:20;63:4;
65:20;66:14;67:14;
68:11,11,12;79:3;
86:4,24;87:6;91:3;
97:10;100:15,19;
102:10;108:24;
122:11,20;123:2,15,
18;125:17,23;126:1;
127:3;128:12;
129:13;131:9;132:2,
4;137:10;138:12;
139:1;141:1;143:9;
146:8;150:9;152:24;
153:21;155:16;
158:16;160:10;
161:8,22;165:25;
170:14
**one-minute (1)**
57:9
**one-page (1)**
137:25
**ones (3)**
9:8;26:1;133:25
**one's (4)**
85:23;161:9,10,10
**one-size-fits-all (1)**
131:24
**ongoing (1)**
132:16
**online (2)**
164:15,17
**only (36)**
5:23;8:24;9:1;
10:12,21;12:12,15,

17;20:11;29:4;31:18;
33:2;35:20;36:10;
37:24;41:4;46:19;
48:24;51:23;53:16;
55:4;59:1;60:18;
62:20;65:17;80:8;
102:10;104:20;
105:10;110:21,23;
121:17;150:6;
167:14;169:25;
170:17
**onset (6)**
22:24;37:25;83:6,
8,9,15
**onsets (1)**
84:9
**onwards (1)**
96:18
**open (6)**
27:6;34:1;127:2;
128:11;140:8;142:10
**opened (6)**
112:7;114:9,20;
115:2;116:4,19
**openly (1)**
74:16
**opens (1)**
11:7
**opinion (7)**
24:7;44:13,19,23;
78:20;146:23;157:14
**opinions (5)**
54:15,22;55:4;
124:5;149:13
**opportunity (1)**
131:22
**opposed (3)**
83:8;105:21;
106:21
**opposite (1)**
38:15
**oral (1)**
47:6
**order (2)**
57:25;146:17
**organization (12)**
42:16;43:4;46:10,
12;137:14,25;142:8;
145:10;163:15;
164:22;165:5,6
**organizations (14)**
40:13,17;41:3;
42:7,10;46:3;62:16;
92:3,18;137:11;
140:2,8;145:11,15
**organizing (1)**
17:14
**organs (4)**
67:14;132:14;
134:11,13
**orientation (1)**
169:6
**original (5)**

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 61 of 145 PageID #: 3848
K.C., et al. VS
The Individual Members of the Medical Licensing Board
Dianna T. Kenny
May 30, 2023

12:11;47:2;69:5;
82:13;177:17.5
**originally (1)**
84:18
**Originating (2)**
177:1,18.5
**orphan (1)**
73:7
**others (18)**
36:18;55:25;71:22;
89:25;90:14,24;
98:17;99:12;102:22;
103:19;104:6;105:2;
107:21,23;108:9,16;
119:14;140:16
**otherwise (1)**
175:24
**ours (1)**
65:21
**out (14)**
10:9;32:2;49:4;
58:1;70:14;79:7;
83:20;104:2;112:23;
118:25;121:10;
123:18;148:20;
173:23
**outcome (2)**
133:15;162:7
**outlaw (2)**
48:3,6
**outlet (1)**
80:17
**outlined (2)**
171:21;172:11
**outnumbered (1)**
93:25
**outset (4)**
59:6,17;66:7;73:24
**outside (2)**
31:22;144:5
**ovarian (1)**
135:5
**ovaries (2)**
135:8,12
**over (30)**
5:10;6:6;7:4,23;
11:21;12:9;21:23,23;
49:25;58:9,10;69:16;
80:15;81:20;88:21;
89:21;93:20;99:8;
103:7,9,24;106:9;
107:18;123:13;
130:5;135:25;143:3;
154:4;156:6;167:22
**overall (2)**
101:20;160:2
**overarching (1)**
76:20
**overhead (1)**
114:16
**overseas (1)**
19:5
**overstep (1)**

106:17
**overt (1)**
74:20
**overview (2)**
23:3;24:7
**overwhelming (1)**
122:10
**own (11)**
18:8,9;24:1;40:3;
41:19;58:21;67:17;
115:18;122:22;
143:22;148:1

**P**

**page (31)**
10:13,13;30:11;
40:12;42:8;48:17;
49:18;50:23;55:8,9;
63:18;70:6;72:2;
91:17;93:6;103:14,
15,24;104:25;
107:19;108:24;
115:21;125:11;
154:7,8;155:21,22;
156:17;157:2;158:3;
165:20
**pages (7)**
11:16;52:13,22;
56:2;116:22;119:9;
152:21
**pagination (1)**
63:19
**paid (2)**
49:5,8
**pain (5)**
132:18,21;135:9,
13;162:12
**Pang (7)**
102:22;103:11,18;
104:6;105:2;107:15,
21
**paper (6)**
71:2;106:15,18,19;
121:18;130:2
**papers (3)**
16:8;85:22;90:19
**paperwork (3)**
155:23;156:3,8
**Paragraph (44)**
62:3;64:19;70:5,
15,18;71:24;72:6,14;
76:1;82:7;91:17,20;
92:14,24;93:3,14;
98:12,15,24;102:15,
16;105:1;107:1,4,20;
116:21,23;117:21,25;
119:7,9,11;130:13,
13,16,20,24;131:10;
150:14,15;152:7;
154:16;159:17,18
**Paragraphs (5)**
108:22,25;112:13,

15;154:21
**paraphrasing (1)**
166:14
**pardon (1)**
136:15
**parent (12)**
23:21,23;28:12;
31:22;39:9,11,12,14,
22;62:16;159:14;
170:23
**parental (3)**
23:15;47:22;50:14
**parentheses (2)**
159:24;160:13
**parenting (1)**
26:14
**parents (41)**
22:22,25;23:13,18;
24:6;26:9,11,19;
28:5;29:19;31:6,19;
33:9,16,20,25;35:8,
12;37:16,24;38:5,25;
39:2,5,6;62:14,17;
76:17;77:7;84:8,21;
86:20;87:12;89:18;
97:12;149:4,7;
155:25;159:13;
167:8,10
**parents' (1)**
77:4
**parent's (1)**
87:1
**Parliament (10)**
47:7,8,9,13;48:8,
13,19;63:20;146:1;
170:9
**Parliamentary (2)**
47:21,24
**part (15)**
10:13;13:12;95:18;
100:18,18;102:8;
106:17;117:8;
142:14;145:17;
147:15;158:12;
162:6;170:4;174:5
**particular (10)**
13:10;27:2;38:19;
54:6;62:11;97:9;
105:24;128:17;
162:7;168:23
**particularly (6)**
18:3;75:3;94:5,7;
141:20;151:23
**parties (2)**
51:12;175:20
**party (6)**
46:9;51:11;175:24;
176:1;177:1,19
**passed (9)**
46:23;47:1;49:9,
12;62:23;63:2,8;
64:17;145:20
**past (4)**

15;154:21
46:5;49:25;130:3,9
**pathology (1)**
34:8
**patience (1)**
66:5
**patient (40)**
12:23;13:23;19:18;
22:19;24:23;27:12,
15;28:6,25;29:2,9,13;
30:24;32:15;33:2,15,
18,21;34:21;35:11,
12,14;36:10;37:14;
38:18,24;39:4,7;
66:11;67:3,8;146:8;
147:19;151:22;
161:21,21;162:24,25;
170:18,22
**patients (29)**
13:4,18,21;14:8,
11;19:23;20:7;21:12,
18,21;22:7;25:25;
28:22;31:1;32:17;
33:5;34:10,16,19,23;
36:13,14;37:1,4,22;
64:9;78:11;83:25;
86:25
**patient's (2)**
151:22;170:23
**patterns (1)**
89:14
**Paxton (2)**
44:22;45:1
**pay (1)**
41:19
**paying (1)**
41:17
**payment (1)**
43:22
**PDF (4)**
63:18;103:24;
154:8;155:12
**peace (1)**
167:25
**pediatric (1)**
111:20
**pediatricians (1)**
31:15
**Pediatrics (2)**
90:5,16
**peer (4)**
20:20;76:16;130:7,
9
**peer-review (7)**
81:10;88:6;90:8,
15,20;117:17;118:5
**peer-reviewed (17)**
55:16,20;61:16;
79:20,24;80:2,12;
81:18;90:7;109:16,
18;128:18;129:13,15,
22,24;130:6
**peers (3)**
74:10;134:17,22

**Peggy (1)**
142:25
**pelvic (1)**
135:12
**penises (1)**
127:12
**Pennsylvania (1)**
177:23.5
**people (50)**
18:10;19:4;22:12;
24:12;27:18,21;31:6;
33:11;35:24;40:7;
44:6;45:20;51:20,25;
58:17,21;62:9;69:10;
74:2;76:4,12,21;77:2,
11;111:22;112:3;
114:3;116:1;118:14;
120:24;130:22,25;
131:2,4,19;132:24;
140:19;141:6;
143:20;144:5;146:7;
153:22;160:9;
165:18;172:18;
173:4,10,13,21;174:3
**people's (1)**
137:17
**percentage (1)**
13:20;94:3
**perception (1)**
169:21
**perceptions (2)**
31:23;161:12
**perfect (1)**
99:17
**perfectly (11)**
7:2;9:3;22:4;
43:24;57:11;63:17;
66:6;97:20;100:6;
121:20;132:14
**perform (1)**
64:9
**performance (3)**
15:5;61:15,18
**performing (2)**
23:5;126:25
**perhaps (1)**
160:7
**period (9)**
21:23,24;35:9;
83:16,19;104:15;
167:17,23;168:7
**periods (3)**
111:9;158:5,25
**peripubertal (1)**
25:16
**permanent (1)**
135:5
**permission (1)**
39:22
**permitted (1)**
9:2
**person (23)**
13:14;26:5,19;

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 62 of 145 PageID
#: 3849
K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

27:9;28:3;35:2;
38:20,22,22;44:7;
69:21,23;74:15;75:5;
77:16;78:25;83:11;
121:6;132:6;162:2;
163:4;164:15;175:23
**personal (2)**
18:24;117:1
**personally (3)**
55:7;89:19;148:25
**persons (31)**
46:17;62:11,21;
74:8;75:18,24;77:19,
24;78:3,15;79:9;
93:18;94:5,12,15;
96:4;97:18,21;114:8,
8,20;119:23;120:15,
20;122:10,25;131:3;
141:17;147:13,13;
151:17
**perspective (3)**
26:23;96:24;97:7
**persuasion (1)**
126:7
**pertaining (5)**
9:13;17:16;18:22;
56:4;74:25
**Perth (1)**
115:10
**pervasive (1)**
131:10
**PhD (2)**
16:6;17:12
**phenomena (1)**
76:6
**phenomenon (10)**
66:14,25,25;67:2,
21;89:3,4,9;98:6;
134:6
**phone (1)**
53:9
**phonetic (1)**
143:6
**phrase (7)**
18:12;94:19;95:1,
3,9,23;152:2
**phraseology (1)**
131:20
**physical (2)**
36:6;131:13
**physically (1)**
9:23
**pick (1)**
86:15
**picture (2)**
22:25;40:3
**pieces (1)**
118:11
**place (5)**
8:6;69:10,11;
134:20;152:11
**placebo (1)**
168:4

**placed (1)**
53:5
**places (1)**
127:22
**plague (1)**
43:6
**plaintiff (2)**
131:15;150:19
**plaintiffs (10)**
9:13;56:16;148:11,
25;149:9,20,24;
159:6;175:10;177:10
**plan (2)**
6:18;8:21
**plane (1)**
114:15
**planes (1)**
58:21
**play (5)**
67:12;70:24;
127:23;132:7,10
**played (4)**
46:22;77:18;94:11;
117:11
**please (16)**
4:11;6:24;7:8;
10:16;36:8;57:4;
73:11;88:7;94:20;
114:5;123:18;132:2;
133:21;144:6,7,8
**plow (1)**
148:13
**plus (1)**
118:25
**pockets (1)**
169:10
**podcast (1)**
136:24
**podcasts (1)**
56:3
**point (16)**
20:21;28:1,19;
30:12;35:13;45:2;
55:18;77:14;110:16;
123:17;124:18,21;
142:19;143:14;
160:9;168:8
**pointed (1)**
15:25
**policies (2)**
54:25;117:12
**political (3)**
43:6;46:2,9
**politically (2)**
128:20;142:13
**politicians (2)**
141:4;144:3
**polycythemia (1)**
135:13
**poor (1)**
45:11
**poorly-worded (1)**
146:1

**popping (2)**
24:13;147:9
**population (5)**
68:8;96:11,13;
97:6;173:15
**portion (5)**
30:17;60:3;65:9;
103:25;104:3;
115:19,23;119:4;
120:4;147:10,17;
150:18;155:24;
156:17,18;157:24
**portions (5)**
10:20,25;125:14;
153:2;154:10
**position (10)**
14:20;16:4;43:3;
44:14;84:19;85:1,12;
130:9;144:21;146:20
**positions (2)**
43:6;54:8
**positive (20)**
98:21,25;99:17,19;
100:15,19,22;101:4;
102:17;105:5,12,21;
106:2,4,10,14,20;
140:20;165:3;168:3
**possibility (1)**
67:15
**possible (10)**
48:13;79:4;87:5;
108:20;134:24;
143:19;144:7;
152:18,22;155:3
**possibly (3)**
27:14;56:21;78:6
**post (1)**
65:11
**posted (4)**
84:7,18;85:11;86:5
**postgraduate (1)**
16:16
**potassium (1)**
136:7
**power (3)**
23:16;141:17;
148:6
**PowerPoint (2)**
165:11,14
**practice (17)**
12:25;13:13,17;
14:14;18:9;19:20;
20:5;21:9;22:18;
31:4;40:10;50:13;
61:11;63:25;130:21;
169:11;170:10
**practiced (3)**
169:8,13;171:5
**practices (2)**
19:4;137:16
**Practicing (7)**
30:20;62:20;64:6;
147:24;165:1,9;

170:20
**practitioner (1)**
31:12
**pre (2)**
68:5,9
**preadolescence (1)**
25:10
**preceded (1)**
50:21
**preceding (1)**
40:20
**precipitated (1)**
96:2
**precipitously (1)**
45:13
**precise (5)**
79:12;93:16;110:9;
111:18;114:24
**predating (1)**
73:3
**predators (1)**
77:10
**prefer (3)**
4:18,21;45:10
**preferred (3)**
39:18;55:2;143:22
**pre-intake (2)**
156:3,8
**preliminary (1)**
89:11
**premorbid (1)**
173:22
**prepare (2)**
7:13;8:9
**prepared (3)**
43:24;56:11;61:2
**preparing (3)**
8:3;13:25;56:20
**prepubertal (1)**
134:21
**prescribe (1)**
45:25
**prescribed (3)**
45:14;149:21;
150:1
**prescribing (1)**
135:2
**prescription (1)**
38:8
**prescriptionist (1)**
71:1
**presence (1)**
94:23
**present (3)**
17:5;68:20;99:15
**presentation (13)**
34:6;43:14;48:1;
163:14,18,23;164:12;
165:12,15,21;171:14,
16;172:9
**presentations (10)**
25:13;34:3;52:16;
56:3,7,19,22;163:20;

167:15;168:4
**presented (8)**
30:22;34:20;69:16;
154:24;157:13;
166:2;172:11;175:19
**presenting (7)**
69:18;76:4;77:2;
111:23;165:18;
171:17;172:10
**presently (1)**
12:3
**presents (4)**
34:4;38:18;67:20;
69:15
**pressure (3)**
56:10;64:5;158:19
**pressures (1)**
83:21
**pressuring (1)**
35:23
**presume (3)**
28:9;75:15;106:17
**pretend (1)**
22:17
**pretty (2)**
52:23;168:17
**prevalence (3)**
17:2;68:8;80:22
**prevalent (1)**
17:5
**prevent (1)**
117:13
**preventing (1)**
146:18
**Prevention (1)**
91:1
**previous (4)**
23:6;33:8;51:24;
174:4
**previously (4)**
119:23;138:6;
163:16;174:7
**primarily (10)**
15:19;16:6,15;
17:12;28:4,9;29:10;
76:5,8;113:1
**primary (5)**
8:16;18:4;155:14;
159:21;162:13
**Prince (1)**
138:15
**print (1)**
79:7
**printout (2)**
115:21;116:10
**prior (6)**
20:5;53:11;82:19;
93:23;106:22;110:20
**private (6)**
12:25;13:17;19:20;
20:5;21:9;86:16
**pro (1)**
48:25

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 63 of 145 PageID #: 3850

K.C., et al. VS                                                                                        Dianna T. Kenny
The Individual Members of the Medical Licensing Board                                                   May 30, 2023

**probably (15)**
15:2;22:15;24:17;
37:3;51:3;85:21;
95:18;106:15;
111:24;112:6;129:3,
10;132:4;160:19;
164:16
**problem (1)**
32:1
**problems (5)**
32:4;116:2;134:25;
135:2;173:8
**Procedure (2)**
177:16.5,16.5
**proceed (4)**
23:20;24:7,8;36:20
**process (27)**
5:4;7:11;24:23;
26:6;27:15;31:21;
32:3;35:22;36:1;
50:18;65:11;66:15;
67:7,16;88:7;90:8,10,
12,15,20;126:6,10;
150:7,10;161:24;
162:5;172:14
**processes (1)**
27:2
**professional (11)**
19:1;31:3;32:19;
40:13;41:1;42:9;
78:9;82:20;92:3;
122:23;149:10
**professionals (4)**
60:9;86:6;124:11;
126:11
**PROFESSOR (13)**
4:2,22,23;12:21;
14:16,20,21;16:9;
17:12;19:16;
174:19.5;175:5;
177:17.5
**Professors (2)**
42:12,14
**professorships (1)**
16:2
**program (1)**
17:15
**progress (1)**
150:8
**prolong (1)**
121:21
**prolonged (1)**
34:12
**promise (2)**
10:14;93:9
**promote (1)**
125:19
**promptly (1)**
134:7
**promulgated (1)**
147:6
**pronouns (10)**
38:14,19,21;39:10,

13,15,19,23;40:7;
55:2
**pronunciation (1)**
118:1
**propagated (3)**
18:3,19;128:2
**propagating (1)**
140:3
**propagation (2)**
127:3,19
**properly (2)**
143:21;171:4
**proportion (3)**
80:13;81:11,19
**proposed (2)**
48:6;63:8
**proposition (1)**
103:1
**prosecuted (1)**
170:17
**Prosecutions (1)**
29:25
**protagonist (2)**
75:6;78:24
**protecting (1)**
64:22
**protocol (2)**
69:5;143:1
**proved (1)**
89:17
**proven (1)**
170:3
**provide (16)**
13:3,5,5;58:15;
73:12;86:24;109:4;
116:25;117:24;
118:17,18,23;120:20;
147:12;161:20;162:1
**provided (9)**
9:10;11:21;47:6;
59:19;109:12,23;
114:13;149:15;156:2
**provides (3)**
70:19;87:22;
109:22
**providing (6)**
5:18;16:24;45:6;
57:21;98:20;155:23
**proving (1)**
103:3
**provision (4)**
44:14,23;46:17;
84:19
**pseudotumor (1)**
134:6
**Psychiatric (2)**
92:21;144:15
**psychiatrist (1)**
20:13
**psychiatrists (3)**
20:14;30:20;165:1
**psychiatry (1)**
20:18

**Psychoanalytic (1)**
41:7
**psychoanalyzing (1)**
120:16
**psychodynamic (3)**
161:25;162:23;
171:18
**psychodynamic/psychotherapy (1)**
27:7
**psychoeducation (1)**
27:5
**psychological (12)**
32:4;41:4,12,24;
42:3;52:4;91:22;
92:20;137:8;143:9;
144:18;145:3
**psychologist (3)**
21:8;45:23,24
**psychologists (1)**
170:11
**psychology (15)**
14:21;15:5;16:10,
11,14,17,18,19,22;
19:11;20:18;22:18;
30:8;61:13,25
**psychopathologies (2)**
80:20,23
**psychopathology (1)**
16:18
**psychotherapeutic (5)**
26:6;27:2,14;
150:4;162:5
**psychotherapy (18)**
13:4,5;30:10;41:7;
58:13,16;62:21;64:9;
69:8;86:24;87:21;
161:20,25;162:23;
169:20,23;171:18;
172:15
**pubertal (1)**
25:19
**puberty (24)**
25:18;32:9;35:15;
36:25;37:1,9;38:9;
45:8;67:22;68:21;
126:13;133:5,16,18,
22;134:10,12,15,16,
18,25;149:22;150:2;
166:16
**pubic (1)**
168:2
**Public (5)**
29:25;74:23;
125:19;127:22;175:3
**publication (12)**
30:7;55:14;88:4,
16;90:13;125:10,13,
18,24;128:6,16;129:5
**publications (4)**
61:16;109:18;
129:7,24
**publish (1)**
129:25

**published (35)**
30:19;54:15;55:16,
19,24;71:10;88:1,2,
13,15,19;90:4,19;
98:17;109:10,11,15;
110:2;116:12;
117:17;118:5;
119:14;122:24;
124:1,10,17,19,22;
125:1;128:18,21;
137:15,25;138:17;
139:7
**pull (9)**
11:10;59:13;63:13;
79:7;82:2;115:15;
141:21;163:6;170:6
**pulled (1)**
51:5
**pulling (6)**
60:21;125:8;
137:19;138:3;139:3;
146:24
**pumping (2)**
32:8;136:12
**purported (1)**
122:21
**purports (4)**
52:15;120:20;
121:9,11
**purpose (2)**
8:3;111:25
**purposes (2)**
5:6;40:2
**Pursuant (2)**
4:1;175:12
**pursued (1)**
130:4
**put (14)**
17:7;42:23;48:10;
66:13;68:10;93:8;
142:5;144:20;
145:24;160:7,12;
169:19;172:12,24
**putting (5)**
43:20;55:2;95:16;
130:2;141:16

## Q

**QLD (1)**
113:9
**qualifies (1)**
73:7
**qualify (3)**
67:25;73:6;81:15
**quarter (1)**
25:12
**queen (1)**
127:20
**queens (1)**
127:21
**Queensland (10)**
47:8;48:1;63:4;

64:11;113:2,9;
116:12,14,16,19
**quick (7)**
5:10;52:9,12,14;
70:15;82:2;119:8
**quicker (1)**
59:22
**quickly (4)**
59:13;60:21;93:8,
10
**quite (14)**
18:1;23:12,21;
25:5;26:9;27:24;
29:17;40:4;51:16;
53:17;56:21;99:20;
154:23;160:2
**quote (6)**
86:1;130:17,20;
160:14;161:1,2
**quoted (4)**
118:11;159:22;
161:6,17
**quoting (3)**
108:4;153:12;
160:16

## R

**radar (1)**
17:6
**radio (1)**
53:1
**ran (1)**
15:23
**range (2)**
24:25;80:19
**rapid (2)**
83:7;84:9
**rapidity (1)**
83:14
**rapid-onset (7)**
82:17,23;83:18;
84:1;89:5,9;91:24
**rare (5)**
68:6;7;69:14;73:6,
21
**rarely (1)**
79:10
**rate (8)**
58:4,11,12,15;
120:14;121:13;
173:11,14
**rates (8)**
103:19;105:4,6;
119:22;120:7,9,10;
173:22
**rather (5)**
43:25;83:13;96:22;
131:23;160:8
**rationalization (1)**
143:12
**reach (1)**
58:1

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

**reaching (2)**
25:17;130:7
**read (20)**
19:13;53:4;63:16;
70:15,16;72:23;
85:21;101:9;103:3;
104:2;105:7;106:15;
108:1;115:19;
121:18;127:24;
155:10,17;161:1;
164:6
**reading (2)**
85:21;160:20
**ready (3)**
66:3;127:14;148:6
**real (7)**
5:10;52:9,12,14;
70:15;82:2;119:7
**reality (1)**
170:25
**realize (1)**
164:5
**reall (1)**
172:23
**really (18)**
19:12;20:22,25;
30:2,2;54:14;77:4,4,
11,13;96:25;99:20;
123:12;127:14;
129:23;135:24;
136:8;167:22
**realtime (1)**
129:20
**reason (12)**
6:14;10:21;32:25;
43:11;50:3;71:4;
81:1;86:14;122:12;
123:2;156:11;164:2
**reasons (7)**
87:11;88:18;
121:23;122:3,7;
126:1;152:25
**reassignment (3)**
126:15;132:25;
173:17
**rebate (1)**
58:19
**recall (6)**
79:12,13;161:3,14;
168:13;171:15
**receive (8)**
62:12;67:21;68:21;
69:1,12,21;111:13;
155:9
**received (10)**
9:16,19;11:8;77:9;
117:16;131:23;
149:20,25;150:4;
177:21.5
**receiving (1)**
112:4
**recent (6)**
13:11;75:17;80:15;

81:20;90:9,16
**recently (3)**
75:9;112:1;134:5
**receptive (1)**
76:22
**recess (3)**
57:12;91:11;166:9
**recognize (16)**
11:17;59:14;63:21,
23;82:12;88:24;
92:12;99:11,23,25;
103:11;125:13;
137:22;138:4;139:6;
163:14
**recollection (3)**
118:10;163:19;
168:19
**recommend (2)**
24:8;62:16
**recommending (1)**
137:15
**record (19)**
4:11,17;10:2;
24:19,20;44:21;
53:15;81:7;85:24;
95:2,22;100:7;
102:24;123:18,20;
148:4,5;153:2;
175:17
**records (15)**
9:13;34:15,18,25;
39:24;61:4;149:15;
152:14;155:4,8,15;
158:19;159:4,5,12
**recounted (1)**
101:24
**red (2)**
135:14;169:1
**reduce (1)**
15:13
**reduced (2)**
105:4;175:15
**reduces (1)**
99:19
**refer (8)**
31:13;39:10;42:16;
51:10;65:10;95:4,24;
126:16
**reference (7)**
59:21;107:15;
109:20;118:6;
136:23;139:12;152:3
**references (4)**
118:8;119:1,4;
150:6
**referencing (5)**
8:22;109:9;118:21;
153:14;160:23
**referral (9)**
31:5;33:9;62:4,8;
102:5;103:19;105:4,
6;110:25
**referrals (20)**

20:14;62:13,14;
98:20,25;100:12;
101:1,6,16,20,25;
102:19;106:7,12;
109:20;110:12;
111:11,14;112:19;
113:1
**referred (9)**
18:15;20:20;22:19;
39:14;40:6;50:5;
65:12;73:24;105:11
**referring (8)**
38:20;66:16;92:13;
95:4,23;131:2,4;
167:12
**refers (1)**
126:6
**reflect (2)**
34:25;95:7
**reflected (1)**
53:15
**reflective (1)**
27:4
**refresh (2)**
118:10;163:19
**refusal (1)**
32:5
**regarding (1)**
65:13
**register (1)**
94:19
**regularly (1)**
26:12
**rehabilitated (1)**
131:22
**reifying (1)**
142:6
**rejected (1)**
129:14
**relate (1)**
101:24
**related (10)**
26:16;50:11;52:25;
53:8;54:22;65:3,6,
16;103:21;158:4
**relates (1)**
97:25
**relating (1)**
4:5
**relation (1)**
158:25
**Relational (1)**
41:6
**relationship (5)**
27:14;100:11,24;
138:22;162:12
**relationships (1)**
162:14
**relative (1)**
175:24
**relayed (1)**
117:4
**relevant (1)**

104:15
**relied (3)**
118:16;119:3;
120:24
**relief (2)**
167:21,22
**religious (2)**
46:10;169:10
**rely (3)**
87:1;147:18;
159:12
**relying (3)**
119:21;120:6;
121:12
**remain (4)**
40:16;41:3;78:25;
134:21
**remained (2)**
88:9,10
**remains (1)**
134:12
**remarry (2)**
51:21,22
**remember (7)**
21:1;145:11;
156:13;166:16;
167:1;172:3,25
**remind (3)**
5:14;6:10;47:16
**remote (1)**
175:10
**removal (1)**
135:7
**remove (1)**
132:14
**repeat (4)**
66:18;80:1;85:8;
164:10
**repeatedly (2)**
139:19;143:2
**repeating (1)**
96:25
**rephrased (1)**
22:6
**report (33)**
8:1;49:13;62:1;
79:6;87:2;89:3,18;
94:2;102:9,14,25;
103:7,11,16;104:7;
118:18,23;120:19;
121:9,11;134:4;
146:12;149:1,16;
150:11,23;153:7;
154:9,16;157:14,21;
158:9,20
**reported (8)**
68:12;84:8;123:7;
126:12;150:24;
154:2;157:3;158:11
**reporter (6)**
5:14;6:10;10:10;
92:2;111:3;163:12
**reporters (1)**

118:9
**reporting (4)**
68:11;102:12;
177:21.5,23
**reports (5)**
52:16;120:10;
158:4,24;159:14
**reposted (1)**
84:13
**represent (2)**
63:17;156:16
**represented (1)**
175:20
**reputable (2)**
118:12;123:8
**reputation (1)**
61:14
**requesting (1)**
91:6
**requests (1)**
110:1
**required (2)**
7:25;165:17
**research (12)**
15:7,18,22,24,24;
16:5,7;17:13,14,15;
122:19,22
**researched (1)**
114:25
**researcher (1)**
43:7
**research-led (1)**
15:17
**resolution (2)**
13:8;41:8
**resolve (1)**
171:24
**Respaut (3)**
118:1,4,9
**respect (1)**
28:14
**respected (1)**
122:24
**respectful (1)**
23:17
**respects (1)**
134:9
**response (4)**
55:23;76:22;
124:20;166:23
**responsibilities (1)**
19:18;49:22;50:7
**responsibility (1)**
12:24
**responsible (1)**
16:15
**rest (1)**
160:13
**restored (1)**
167:25
**restroom (1)**
6:24
**result (2)**

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 65 of 145 PageID #: 3852

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

132:15;172:15
**resulted (2)**
102:18;106:11
**results (5)**
99:14,15;101:12;
102:3;123:9
**retained (1)**
57:15
**retired (1)**
12:20
**retransitioned (2)**
121:7,15
**return (1)**
134:14
**Reuters (1)**
118:10
**reveal (1)**
152:15
**reverse (1)**
152:23
**reversibility (1)**
143:24
**reversible (1)**
134:9
**review (13)**
8:12,15;18:24;
20:19;23:6;50:12,12;
60:6;106:19;130:7,
10;149:14;152:14
**reviewed (4)**
8:16;63:7;155:9;
157:9
**reviewing (2)**
56:13;159:4
**reviews (4)**
40:5,5;56:15;130:3
**revision (2)**
82:24;88:18
**revisit (1)**
102:13
**reword (1)**
87:19
**ridiculous (1)**
40:24
**right (43)**
5:7;6:22;10:5;
11:13;12:4,22;18:23;
19:17;20:4;31:25;
36:23;37:18;38:25;
59:13;64:1;86:14,22;
92:15;98:2;104:23;
110:22;112:21;
113:3,6,12;115:3,10;
118:19;123:21;
124:11,15;125:3;
130:11;131:23;
133:24;142:1;
148:22;151:11;
153:14,16;156:17;
163:22;164:7
**rights (3)**
19:20;47:23;141:5
**rigidity (1)**

27:22
**rigorous (1)**
88:6
**Riley (1)**
152:17
**Risk (2)**
91:4;135:19
**risks (3)**
134:3;135:15;
143:21
**robust (6)**
37:24;71:22,23;
80:9;98:10;99:20
**role (8)**
16:9;46:22;70:24;
77:18;94:11;117:12;
132:6,10
**room (4)**
9:21;39:5;55:5;
143:10
**root (1)**
32:22
**ROSE (31)**
4:8;11:4,9;22:4;
24:18,21;44:21;45:2;
57:4,11,14;73:14;
85:6,24;91:5,13;
95:19;123:16;148:4,
13;163:25;164:4;
165:22;166:5,12,19;
169:19;171:25;
172:7;174:10;
177:1.5
**Rose's (2)**
168:11;171:12
**rotate (1)**
115:16
**roughly (4)**
110:11,15;111:11;
118:18
**round (1)**
130:3
**route (1)**
62:18
**row (1)**
158:21
**Royal (6)**
115:6;138:6,23;
139:1;142:3,9
**RPR (2)**
175:3;176:7.5
**ruined (7)**
130:25;131:7,16;
132:9;133:7,10,17
**ruining (1)**
132:10
**rules (6)**
5:8,10;175:13;
177:16,16.5,17
**running (1)**
58:9

**S**

**sacked (1)**
54:11
**sadly (1)**
141:4
**safe (2)**
134:8;162:1
**safeguards (1)**
69:9
**SAITH (1)**
174:17
**same (34)**
5:4,20;19:18;
36:25;37:4;39:5;
64:11;65:25;80:20,
21,21;85:14;88:2,16,
19;90:12;97:21,23;
98:1;100:18;102:25;
114:22;129:8;
137:25;141:7,22;
142:22;145:6;
147:21;155:9;
156:25;158:2,12;
173:20
**sand (1)**
169:4
**satisfied (1)**
153:9
**saw (5)**
20:7;31:1;33:21;
165:3;172:19
**saying (14)**
27:10;28:14;64:8;
83:11;86:15;97:2;
105:19;106:4;108:9;
116:13;144:5,6;
161:6;173:25
**scale (1)**
58:17
**Scam (2)**
136:25;137:5
**scanned (1)**
155:12
**scare (1)**
146:3
**scholarly (1)**
122:25
**school (3)**
23:5;32:5;74:23
**schools (3)**
18:4;127:5,21
**science (1)**
92:4
**scientific (2)**
80:9,10
**scientifically (3)**
18:2;78:19;127:6
**scientifically-lacking (1)**
95:8
**scientist (1)**
123:9

**scoff (1)**
143:23
**scores (1)**
154:22
**screen (6)**
24:12,13;59:12;
93:6,8;110:6
**scroll (22)**
10:15;11:15;47:16;
52:8,12,13;55:8;
98:11;104:25;
106:25;107:19;
117:20;119:7;
150:14;152:7,20;
154:7,13;155:20;
156:15;158:2,17
**scrolling (2)**
59:23;156:24
**seal (1)**
176:3
**sealed (1)**
177:18.5
**search (4)**
16:3;104:1,5,18
**sec (1)**
148:4
**second (7)**
11:3;24:19;101:17,
25;123:15,19;132:2
**secondary (5)**
18:4;76:10;77:6;
153:9;159:21
**section (4)**
101:12,15;102:3;
125:13
**securely (2)**
97:11,13
**seeing (9)**
19:23;21:18;22:11,
11;33:16;35:21;
36:17;78:8;168:8
**seek (6)**
28:3;39:22;51:20,
25;78:3;120:13
**seeking (7)**
51:12;69:5;75:19;
78:11,15;149:21,25
**seem (1)**
28:2
**seems (1)**
167:17
**SEGM (7)**
42:17,19;43:10;
44:2,12,25;163:16
**S-E-G-M (1)**
42:17
**selective (3)**
40:25;42:1;44:9
**selectively (1)**
143:25
**self (4)**
32:5;98:8;162:21;
173:23

**self-punity (2)**
162:18,19
**self-report (1)**
156:16
**self-reporting (1)**
87:22
**send (1)**
157:18
**sending (2)**
24:12;77:14
**sense (1)**
154:24
**sent (2)**
9:8;158:14
**sentence (8)**
18:14;70:25;98:16;
102:15;105:10;
158:16,18;160:13
**sentences (1)**
88:8
**sentiments (1)**
79:14
**separate (9)**
13:1;22:2;39:1,6;
70:2;88:17;148:9;
151:11,12
**separately (1)**
151:14
**separates (1)**
112:23
**September (1)**
112:12
**series (2)**
93:1;100:18
**serious (4)**
32:4;34:8;108:15;
172:9
**seriously (2)**
35:6;145:23
**serve (2)**
49:8;74:6
**served (1)**
14:16
**service (8)**
110:22,23;111:25;
115:7,24;116:4,14;
138:25
**Services (2)**
91:22;115:25
**session (3)**
32:23;39:17;
162:25
**sessions (2)**
24:1;162:9
**set (5)**
6:5,7;96:7;120:23;
176:2
**setting (1)**
15:24
**settle (1)**
167:18
**several (9)**
9:17;10:7;46:15;

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

54:10;90:25;93:20;
118:22;126:16;
158:17
**severe (1)**
131:11
**sex (16)**
38:15;39:24;40:8;
61:22;69:7,17,17;
94:21,22;126:9,14;
131:6;132:25;
159:21;173:16,17
**sexed (1)**
126:12
**sexual (13)**
30:1;61:21,22;
65:2;67:13;128:23;
132:15;134:11,13,24;
135:11;153:9;169:6
**sexuality (1)**
19:7
**sexuality-based (1)**
46:12
**sexually (1)**
132:22
**share (3)**
59:12,20;93:18
**share-screen (2)**
10:11;11:11
**sharing (1)**
24:12
**sheet (3)**
137:15,22;138:1
**Sheets (1)**
177:19
**shimmering (1)**
169:4
**short (8)**
6:18;7:7;9:18;
37:13;38:17;83:15;
89:24;168:1
**shortage (1)**
146:6
**shorter (1)**
129:9
**short-term (1)**
167:23
**shoulders (1)**
160:5
**show (7)**
10:7,11;77:8;92:8;
166:3;168:2;173:9
**showed (3)**
106:5;145:8;
173:14
**showing (1)**
112:19
**shows (4)**
73:4;96:7;110:11,
15
**siblings (1)**
26:21
**sigh (2)**
167:21,22

**signature (2)**
174:16;175:19
**signed (4)**
4:2;92:18;145:10;
177:17.5
**significant (14)**
30:17;35:9;62:12;
75:17;76:18;78:14;
124:3;131:12;
132:13,17,21;134:3,
4;158:4
**similar (12)**
46:22;48:7;49:11;
65:21;79:14;102:25;
104:15;109:17,19;
110:1;139:16;161:15
**Similarly (1)**
67:9
**Simon (1)**
117:6
**simplest (1)**
29:20
**simply (10)**
6:21;36:14;56:19;
75:5;78:23;83:20;
103:16;109:10;
110:19;152:19
**singing (1)**
141:7
**single (2)**
119:8;174:13
**sit (1)**
5:22
**site (2)**
75:8,14
**sites (3)**
85:1,10;140:19
**situating (1)**
164:21
**situation (1)**
29:5
**situations (2)**
49:11;132:25
**six (3)**
80:22;127:8,11
**Size (1)**
55:11
**skated (1)**
135:25
**skilled (1)**
146:6
**skin (1)**
135:16
**sleeping (1)**
67:5
**slide (6)**
171:13;172:1,19,
20,20,22
**slides (2)**
166:4;173:3
**sliding (1)**
58:17
**slightly (3)**

66:3;88:14;128:7
**slipped (1)**
56:19
**slowly (1)**
110:17
**small (4)**
17:4;35:20;78:5;
118:25
**so-called (5)**
62:22;110:24;
120:14;168:12,17
**social (51)**
38:8,11;69:24,25;
70:23;72:14,19;74:7,
10,18;75:1,7,23;76:6;
78:20;79:22;80:3,8,
15,19,25;81:13,21;
94:7,10,18;96:6;
97:25;99:18,21;
106:7;107:7,8,13,24,
25;108:19;122:15;
123:4,11;127:2,4;
131:1,8,16;132:9;
133:7;141:2;142:10,
19;143:16
**socially (1)**
78:1
**societies (2)**
41:1,2
**Society (9)**
41:4,24;42:15;
137:8;141:13;143:4,
9;145:6;164:18
**sociologist (1)**
125:2
**sociology (1)**
19:10
**sole (1)**
110:25
**solely (2)**
114:7,19
**solicited (2)**
128:5,7
**solution (4)**
37:12;143:22;
166:25;167:11
**somebody (1)**
15:21
**someone (4)**
78:21;83:18,19;
116:13
**sometime (1)**
115:2
**sometimes (4)**
51:18;85:23;87:22;
158:17
**somewhat (2)**
18:16;54:1
**somewhere (3)**
40:19;113:25;
165:3
**song (1)**
141:7

**soon (2)**
17:24;32:2
**sorry (55)**
5:25;12:9;14:3,24;
20:10;24:10;30:4;
32:10,12;38:11;39:3;
43:17;45:22;47:11;
49:4;52:9;53:9;
58:24;64:7;71:13;
73:16;80:1;81:4,23;
84:15;93:4;99:22;
100:5;101:2;105:18;
107:10;108:23;
111:1;113:14,16,19;
115:14;121:3,25;
124:19;129:18;
132:2,2;136:16;
137:10;141:16,21;
144:24;146:17;
149:17;153:18;
163:10;164:5,10;
170:4
**sort (6)**
26:16;68:5;69:13;
74:21;163:24;164:13
**sorts (2)**
55:3;89:15
**sought (1)**
120:14
**sound (1)**
37:18
**sounded (2)**
89:25;97:1
**sounds (4)**
9:16;67:7;93:17;
98:23
**source (8)**
22:20;33:9;62:4,8;
87:5,23;90:23;119:2
**sources (3)**
87:6;129:7;159:15
**South (10)**
10:3;47:7,13,21;
63:25;64:3;113:14,
15;138:16;175:11
**SOUTHERN (1)**
177:6.5
**space (2)**
162:2;171:6
**span (2)**
7:4,7
**spans (2)**
116:22;119:9
**sparked (1)**
172:6
**sparse (1)**
113:24
**speak (7)**
6:25;7:19,22;8:8;
57:5;76:21;79:1
**speaking (8)**
7:24;39:9;85:25;
87:6,9;119:20;

143:10;159:25
**speaks (2)**
29:21;121:19
**special (2)**
69:4;140:25
**specialize (1)**
14:13
**specialized (1)**
61:11
**specialties (1)**
61:23
**specific (7)**
16:11;19:1;30:11;
54:20;73:16;111:25;
122:5
**specifically (9)**
8:3;16:13;52:17;
53:7;60:17;78:10;
107:6,24;148:10
**specifics (1)**
50:17
**spectrum (2)**
23:10;27:18
**speculate (1)**
151:2
**speculated (3)**
107:23;108:10,17
**spelled (1)**
165:9
**spend (4)**
14:1;29:22;86:10;
140:18
**Spoiler (1)**
52:19
**spoke (1)**
7:18
**spoken (1)**
62:15
**spot (1)**
174:14
**SS (1)**
175:1.5
**stage (1)**
134:23
**standards (9)**
32:6;142:15,22,23;
143:3;147:5,22,24;
148:1
**stands (1)**
48:4
**star (1)**
142:7
**start (9)**
28:20;32:8;36:2;
38:14;112:14;122:1;
132:12;136:5;162:11
**started (6)**
16:25;20:22;35:21;
36:17;53:19;166:15
**starting (1)**
171:19
**starts (2)**
32:3;110:16

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 67 of 145 PageID
#: 3854
K.C., et al. VS                                                                Dianna T. Kenny
The Individual Members of the Medical Licensing Board                          May 30, 2023

**state (11)**
4:11;44:21;57:16;
95:2;107:5;112:23;
134:21;145:19;
161:7;175:1,4
**stated (4)**
80:17;95:22;149:1,
16
**statement (18)**
35:4;72:17,18;
74:11;79:16;91:21;
92:13,18;97:16;
107:22;130:24;
145:9;152:12;157:6;
161:4,5,14,17
**statements (4)**
26:16;33:24;44:12;
144:22
**states (11)**
62:24;63:2,8;
90:25;112:20;113:2,
23;168:13,22;
170:11;177:6
**statistical (2)**
76:2;96:23
**statistically (2)**
96:13;97:6
**statistics (1)**
101:23
**statute (2)**
146:13,18
**staying (1)**
33:17
**stenograph (1)**
175:15
**step (2)**
27:5;105:7
**stepping (1)**
73:14
**steps (1)**
62:10
**stereotypically (1)**
38:15
**still (17)**
6:2;11:22;40:11;
57:1;59:10;79:16;
90:12;91:14;102:15;
106:25;107:15;
131:21;137:11,13;
152:1;158:8;169:11
**stop (7)**
31:18;47:20;59:20;
73:8;105:14,16,19
**stops (1)**
162:10
**stories (3)**
104:14;118:16,24
**story (4)**
15:1;119:3;127:20,
24
**strategy (1)**
104:1
**straw (1)**

170:6
**street (3)**
170:7;177:2.5,23.5
**stress (1)**
55:6
**stressful (1)**
52:7
**stretch (1)**
6:23
**stretches (1)**
7:3
**strictly (1)**
25:22
**strong (1)**
106:6
**strongly (3)**
142:12,16,17
**structure (1)**
140:5
**structures (1)**
15:23
**students (2)**
16:6;17:13
**studied (5)**
79:11;80:24;
100:11;102:10;
103:19
**studies (12)**
19:6,11;37:24;
78:2;79:20;80:2,12;
81:10,18;96:7;168:2;
173:9
**study (37)**
71:6;79:21;80:3,
11,25;84:6;89:8,17,
24;90:2;98:17,19;
99:4,5,12,17,24;
100:10,24;101:5;
102:11,16,22,25;
104:7,17;105:10,25;
106:23;107:16;
109:19;120:1,3,7,11;
172:16;173:12
**style (2)**
38:15;153:4
**subcourse (1)**
19:7
**subheading (1)**
52:24
**subject (3)**
17:8;90:19;172:17
**subjected (2)**
75:5;78:21
**subjects (3)**
16:11,16,20
**submission (7)**
47:6,20,23,25;48:4,
8,13
**submissions (2)**
47:8,20
**submit (7)**
128:6,12,13,15,24;
129:4,14

**submitted (11)**
46:25;47:15;48:7,
14;59:15;79:6;126:1;
128:25;129:21;
146:11;177:18.5
**submitting (2)**
49:5;125:5
**subnetworks (1)**
140:10
**subscribe (1)**
115:17
**subsequent (1)**
157:13
**subsequently (4)**
35:18;84:12;121:7,
15
**substance (2)**
98:8;168:16
**substantive (3)**
66:4;88:9;114:16
**subtle (1)**
29:18
**sudden (1)**
84:8
**suddenly (1)**
55:2
**suffer (1)**
132:16
**suffered (1)**
131:18
**suffers (1)**
131:9
**suggest (1)**
100:2
**suggested (1)**
35:8
**suicidality (2)**
98:9;173:18
**suicide (3)**
173:11,14,23
**suitable (2)**
27:8;159:2
**Suite (1)**
177:24
**sum (1)**
168:16
**summarized (1)**
156:9
**summary (15)**
61:1;70:19;75:20;
92:5;119:25;120:8;
130:22,23;137:25;
138:4;140:1,6;
141:12;155:23;
173:25
**super (1)**
61:23
**supervising (2)**
16:6;17:12
**support (6)**
44:13;52:6;62:16;
133:14;150:4;163:4
**supportive (2)**

18:17;23:22
**suppose (1)**
26:12
**suppression (1)**
135:4
**Supreme (1)**
4:1
**sure (25)**
9:4;19:23;28:11;
34:5;44:19;45:17;
53:15;74:5;78:13;
81:7,8;85:4;87:15;
100:7;104:24;
114:18;121:17;
132:12;133:23;
135:22;136:18;
141:22;148:7,15;
163:22
**surgery (10)**
69:3,6,9;126:15;
132:7,10;133:1,6;
173:13,17
**surgically (1)**
131:5
**surmise (1)**
104:20
**surprise (2)**
85:17;105:9
**survey (7)**
84:7,18;85:11;
86:5,20;91:4;143:15
**susceptibility (1)**
96:8
**susceptible (13)**
94:7,17;96:5,10,14,
16,17,21,22;97:3,5,
12;98:2
**suspect (1)**
122:19
**Sweden (1)**
68:10
**Swedish (3)**
31:17;99:5;173:12
**sweet (1)**
152:5
**swings (2)**
80:21;135:18
**sword (1)**
107:25
**sworn (2)**
4:3;175:7
**Sydney (21)**
10:3;14:17;15:7,9,
9,14,15;17:10;20:7;
21:2,17;22:9;42:12;
53:21,23;54:21;61:8;
113:13,14,15;175:11
**symbolism (1)**
12:11
**synthetic (1)**
136:12
**system (3)**
51:13;54:1;140:8

**systematically (6)**
79:10,21;80:3,7,24,
25

**T**

**table (3)**
68:23,24;125:11
**tabular (1)**
109:13
**tailored (1)**
129:9
**talk (8)**
38:24;39:4;43:13;
102:16;121:13;
146:17;164:1;172:14
**talked (2)**
12:9;105:20
**talking (16)**
10:6;22:10;37:13;
49:7;57:6;96:10;
97:24;105:25;
112:15;137:1,2;
140:20;141:22;
162:10,11;174:7
**Tasmania (1)**
63:5
**taught (2)**
16:12,22
**Tavistock (2)**
110:22;112:7
**T-a-v-i-s-t-o-c-k (1)**
111:4
**teach (1)**
17:8
**teachers (1)**
144:3
**teaching (4)**
15:4,4;16:16;20:1
**Tegg (6)**
116:25;117:4,6,6,8,
17
**telling (3)**
7:17;32:22;34:7
**template (1)**
40:4
**tenant (1)**
81:2
**tend (5)**
84:2;86:10;96:14,
15,17
**Tended (1)**
157:21
**tennis (1)**
58:22
**tenure (1)**
20:6
**Terhune (3)**
118:1,4,9
**term (7)**
82:21;83:11;84:4;
140:1,7;141:12;
168:1

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 68 of 145 PageID
#: 3855
K.C., et al. VS                                                                    Dianna T. Kenny
The Individual Members of the Medical Licensing Board                              May 30, 2023

terminology (1)
18:19
terms (5)
24:3;50:20;104:5;
140:20;151:6
Territory (1)
48:5
tertiary (8)
15:11,14,18;31:5;
33:9;54:1;62:4,7
test (1)
71:6
testified (5)
4:6;46:15;47:3;
48:14;64:21
testimony (6)
48:15,22;49:5;
57:17;148:18;175:18
Testing (1)
105:2
testosterone (1)
135:3
Texas (2)
44:13,24
Thanks (1)
4:10
Theadora (2)
4:12,14
T-h-e-a-d-o-r-a (1)
4:15
theoretically (1)
79:11
theories (1)
127:25
theory (4)
61:17;141:11;
142:14;165:16
therapeutic (2)
30:21;50:17
therapist (2)
162:6;163:1
therapists (4)
64:5;146:4,7;
147:25
therapy (40)
13:6;22:12,16;
26:21;27:20;36:19;
48:3,7,9,20;50:6;
62:23;63:3,22;64:2;
69:18;145:20,25;
147:7,12,16;149:20,
25;165:17;168:10,12,
18,22;169:5,8,16,18,
23,25;170:8,12,16;
171:4,10;172:10
thereafter (1)
175:18
therefore (1)
17:4
thinking (3)
28:1;69:20;143:12
THOMAS (1)
166:11

thorough (1)
18:7
though (3)
29:9;38:25;122:1
thought (7)
17:22;24:16;
101:11;129:18;
136:17;153:25;
171:19
thousand (1)
73:3
thousands (3)
77:8;110:8;152:21
three (19)
9:19;24:1;25:2;
36:12,13;37:3;43:2;
65:17;84:7,17,25;
85:10,19;100:11;
101:19;102:10;
103:6;113:1;158:21
three-month (1)
102:12
threshold (1)
77:1
thrombosis (2)
135:20;136:3
throughout (3)
19:20;20:1;75:16
Thursday (1)
8:7
thus (1)
105:6
TikTok (1)
140:15
times (5)
13:11;44:25;90:9;
103:7;173:15
time-specific (1)
101:18
timing (1)
83:14
tiny (1)
169:9
titled (1)
55:11
today (5)
4:9;10:6;28:18;
68:17;106:22
today's (6)
7:13,18,20;8:4,9,13
together (5)
22:3;26:20;42:25;
43:20;44:7
told (7)
32:1;37:15;113:21;
127:11,15;132:20;
174:13
tolerating (2)
6:19;167:9
Tom (7)
22:5;44:21;49:13;
73:15;148:13;
163:25;164:4

took (7)
44:14;89:25;92:7;
115:21;141:15;
152:11;155:5
tools (1)
30:5
top (6)
105:2,13;107:20;
116:22;155:21;158:3
topic (1)
129:12
topics (1)
54:9
total (2)
36:4;58:9
totaled (1)
131:16
totally (6)
130:25;131:7;
132:8;133:6,10,17
touch (1)
146:8
touched (1)
139:18
touted (1)
135:23
toward (5)
17:9;55:9;86:20;
106:2,3
Towards (1)
17:11
tracked (1)
98:19
train (1)
31:17
training (3)
15:19;18:7;19:1
trajectories (1)
78:7
trajectory (4)
38:4,7,10;45:12
trans (25)
18:20;31:17;77:12,
13;86:5;102:18;
106:11;126:17,22,24;
139:20,23;140:4,6;
141:12,24;144:12;
145:4,16,22;146:21;
165:22;170:19;
172:23,24
transcript (3)
53:4;129:20;
175:17
transgender (68)
13:15,22;20:16;
23:2;31:11,38:19;
46:16;69:6;73:20;
74:9,16;75:6,18,25;
76:5,23;77:20,25;
78:22,24,25;79:10,
23;80:4,14;81:12,19;
83:12;84:20;86:21;
93:19,24;94:4,13;

98:1;100:25;103:21;
104:11,22;106:2,3;
114:7,20;120:2;
121:1;127:24,24,25;
130:9;131:3;137:16;
138:18;139:8;142:7;
147:13,14;152:5;
161:6,20,21;167:8;
169:15,16;170:5;
171:6;173:13,16;
174:1
transgendering (11)
124:14;125:20;
126:4,6,10,20,25;
128:3;130:21;137:4;
140:21
transgenderism (1)
161:7
transition (15)
23:22;31:18,24;
32:3;38:8,12;77:11;
85:2,13,20;86:2;
162:11;173:5,6,10
translated (1)
108:10
traumatic (2)
132:13;174:5
travel (1)
44:9
treat (1)
21:11
treated (5)
54:17;78:18;134:7;
149:11;161:13
treating (7)
14:8;16:23;31:13;
146:4;147:18;
166:21;170:12
treatment (28)
19:2;26:3;27:12;
30:21;34:12,24;
36:15,16;37:5;45:20;
55:16;61:14;69:5;
73:23;77:24;78:11,
15;133:13;138:17,
18;139:6,8,11;
147:11;166:15;
167:12,19;170:2
treatments (1)
143:24
trend (1)
79:8
trends (1)
102:5
triangulation (1)
87:3
Tribunal (1)
50:24
trick (3)
10:14;129:19;
154:13
tried (1)
81:15

tries (1)
76:2
triglycerides (1)
136:3
true (3)
147:21;162:2;
175:17
truly (1)
90:21
truth (8)
4:4,4,5;144:4,5;
175:7,7,8
try (7)
5:20;10:10,23,24;
162:1;164:6;169:23
trying (18)
10:14;32:25;45:19;
49:4;72:22;73:12;
77:10;81:5;99:15;
120:5;128:9;129:19;
154:13;158:21;
164:1;168:23;169:5,
11
Turban (8)
55:24;80:6;89:25;
90:24;119:14;120:1;
122:18,24
Turban's (4)
90:14;119:21;
120:6,12
turn (5)
32:14;53:9;69:24;
71:24;91:17
turned (2)
36:19;54:3
twenty-two (1)
73:2
twitchy (1)
18:1
two (24)
4:13;16:1;22:2;
30:13;36:17;37:3;
42:22;69:7;70:2;
92:1;100:15,17;
102:4;116:22;119:9;
129:18;133:21;
134:12;151:10,12;
152:24;155:14;
158:20;170:14
two-page (1)
30:11
two-part (1)
136:24
two-thirds (2)
13:23;14:2
type (6)
27:15;28:3;61:13;
135:17;136:9;150:20
types (2)
74:6;146:13
typewriting (1)
175:16
typewritten (1)

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 69 of 145 PageID #: 3856

K.C., et al. VS                                                                                    Dianna T. Kenny
The Individual Members of the Medical Licensing Board                                             May 30, 2023

175:17
**typical (1)**
31:9

## U

**UK (8)**
103:20;104:14;
109:21;110:1,2,15,
21;111:12
**ultimately (3)**
37:7;71:9;82:11
**umbrella (1)**
76:20
**unable (3)**
64:20;81:15;
128:20
**unanimous (1)**
141:8
**unchanged (2)**
88:10,11
**unclear (2)**
22:1;151:3
**uncomfortable (1)**
67:17
**under (22)**
5:5,12;25:4;44:24;
52:24;56:10;66:10;
67:20,23;68:15;69:4,
4;109:22,23;129:6;
155:24;158:18,23;
170:17;171:1,3;
175:16
**undergo (1)**
69:7
**undergraduate (2)**
16:4,15
**underlies (1)**
171:22
**underline (1)**
153:20
**underlined (3)**
107:12;153:16,24
**underscore (1)**
150:23
**undertake (1)**
26:24
**undertaking (1)**
18:6
**unemployment (1)**
173:24
**unethical (1)**
170:3
**unhappy (1)**
76:15
**unicorn (1)**
128:1
**United (2)**
109:1;177:6
**universally (2)**
75:3;122:18
**universities (1)**
54:12

**University (23)**
14:16;15:9,11,16,
17,23;17:1,10;20:6,9;
21:2,17;22:9;41:14,
17;42:11,14;53:21,
23;54:20;61:8;71:11;
129:25
**unless (2)**
19:12;51:24
**Unlike (1)**
10:8
**unlikely (1)**
146:2
**unquestioningly (1)**
17:22
**unsupportive (4)**
85:2,12,20;86:2
**unsurprisingly (1)**
128:19
**unusual (2)**
79:5;83:22
**up (47)**
6:25;11:10;15:24;
24:13;32:4;42:23;
45:3,4;55:1,8;57:5;
59:13,23;60:21;
63:13;79:7;82:2;
86:15;93:8;95:16;
98:11;103:15;
105:13,17;110:22;
115:15;119:16;
125:8;129:19;
130:12;137:19;
138:3;139:3;141:21;
143:6,18;146:24;
147:9;150:11;
155:20;158:2,21;
160:25;163:6;170:6;
171:13;173:12
**upset (1)**
136:8
**uptake (1)**
98:5
**upward (1)**
80:21
**use (20)**
6:24;10:10;29:3;
38:19,23;39:10,24;
45:19;49:16;70:23,
25;79:24;84:4;91:23;
94:25;95:3,21,22;
135:6;147:10
**used (12)**
6:6;7:2;18:11;
29:8;30:5;71:19;
76:7;82:20;104:6;
109:17,19;134:22
**useful (3)**
87:22;93:3;105:6
**uses (1)**
80:9
**using (13)**
11:10;39:15,18;

40:7;54:25;83:5;
104:22;126:13;
127:5;139:25;151:6;
152:2;154:8
**usually (12)**
25:3;26:19;28:4,
12,18;34:4,8;39:1;
50:14;51:11,19;52:6
**uterine (1)**
135:5
**uterus (1)**
135:8
**utter (1)**
169:1

## V

**vaginal (1)**
135:10
**vague (1)**
150:6
**vain (1)**
131:6
**valid (4)**
66:8,21;67:24;68:2
**validate (2)**
89:3,9
**validity (1)**
66:16
**value (1)**
41:23
**van (1)**
142:24
**vanishingly (5)**
68:6,7;69:14;73:5,
21
**variants (1)**
97:8
**variation (3)**
96:12;97:10;
144:22
**varied (1)**
20:2
**varies (1)**
37:22
**variety (1)**
76:25
**various (7)**
14:17;40:13;47:9;
92:3;108:25;124:10;
145:19
**vast (1)**
140:1
**vastly (1)**
173:22
**vehicle (1)**
76:12
**vein (2)**
135:19;136:3
**verbage (1)**
165:22
**verbatim (1)**
154:15

**verbiage (3)**
79:13;95:21;120:6
**version (7)**
11:20;88:2,12,14;
128:25;129:8,11
**versions (1)**
129:6
**vet (1)**
17:20
**via (2)**
107:7,24
**VIC (1)**
113:7
**vicinity (1)**
22:14
**Victoria (9)**
63:4,20;64:11;
113:3,7,12,16,17;
115:13
**Victorian (3)**
48:8,13,19
**Victoria's (1)**
63:21
**video (1)**
6:13
**view (4)**
54:12,18;133:9;
143:14
**violence (1)**
131:11
**virtually (1)**
101:6
**visit (1)**
150:19
**visited (3)**
28:18;86:9,12
**visiting (1)**
86:10
**visual (1)**
93:5
**vita (1)**
174:2
**vitae (1)**
11:18
**vital (1)**
87:23
**voice (15)**
141:9;143:10;
153:11,16,20,21,24;
156:25;157:4,8,16,
23;158:5,9,25
**volume (1)**
129:22
**voluntarily (1)**
43:25
**vs- (1)**
177:11
**vulnerable (1)**
131:19
**vulvas (1)**
127:12

## W

**WA (2)**
113:5;116:1
**Waal (1)**
142:24
**wait (4)**
5:17;6:14;31:21;
37:16
**waiting (1)**
35:9
**walks (1)**
147:19
**wants (3)**
31:22;50:3;146:8
**Washington (1)**
177:2.5
**waste (1)**
10:24
**watchful (1)**
35:9
**water (1)**
6:24
**way (26)**
17:7;18:15,23;
26:17;30:18;32:2;
34:12;36:5;48:12;
55:4;66:13,23;68:10;
74:12;76:13;78:1,21;
79:3;83:17,22;
110:12;143:19;
146:5;150:4;160:12;
173:25
**ways (3)**
31:9;170:14;173:6
**weather (1)**
83:6
**web (1)**
115:21
**website (10)**
84:13;86:7,15;
92:7;109:11;110:3;
116:11;141:19;
160:21,21
**websites (7)**
84:8,17,22;85:19;
86:4,11;140:17
**week (5)**
13:18,19;14:4,7;
19:22
**weekend (1)**
11:21
**weight (2)**
134:3;136:10
**well-known (1)**
61:20
**weren't (1)**
155:13
**Western (6)**
113:2,5;115:9,22;
116:4,8
**Westmead (1)**

Case 1:23-cv-00595-JPH-KMB    Document 58-9    Filed 06/12/23    Page 70 of 145 PageID
#: 3857

K.C., et al. VS                                                                    Dianna T. Kenny
The Individual Members of the Medical Licensing Board                              May 30, 2023

138:14
**Whales (11)**
10:3;47:7,14,21;
63:25;64:3;113:14,
15;138:15,16;175:11
**what's (11)**
31:4,7;33:10;
58:18;87:3;115:5;
138:22;141:2,13;
162:24;167:10
**whatsoever (1)**
146:5
**whereas (2)**
76:23;77:1
**whereby (2)**
79:9;126:10
**wherein (2)**
109:20;116:12
**WHEREOF (1)**
176:2
**who'd (1)**
173:13
**whole (6)**
4:4;77:3;106:15;
127:19;174:6;175:7
**who's (1)**
133:9
**wished (1)**
172:2
**within (3)**
19:5,8;104:18
**Without (6)**
7:17;17:22;34:6;
104:22;134:15;166:1
**witness (8)**
49:8;57:8;65:13;
87:17;91:10;100:5;
175:11;176:2
**witnesses (1)**
60:15
**woman's (1)**
135:7
**women (1)**
135:3
**wonder (1)**
57:8
**wondering (8)**
53:22;63:21;76:8;
86:17;93:7;139:21,
22;172:6
**word (14)**
26:13;36:9;43:17;
63:11;66:2;70:25;
71:19;76:7;79:24;
97:1;128:7;155:12;
160:18;172:24
**wording (1)**
79:25
**words (5)**
95:16;104:10,22;
141:16;174:2
**work (25)**
13:16;26:9,17,18;

29:23;49:23;50:10,
21,22;51:6;53:11,25;
54:2,7;58:17,18;
71:16;78:20;121:10;
122:17;129:11;
130:2;148:21;
158:22;171:23
**worked (1)**
33:25
**working (4)**
14:1,5;28:4;172:17
**works (1)**
10:12
**world (4)**
27:24;54:11,18;
142:9
**worries (1)**
31:24
**worse (1)**
173:5
**worth (1)**
59:1
**wow (1)**
135:23
**WPATH (3)**
139:16;142:16,17
**write (3)**
103:6;104:21;
105:2
**writer (1)**
43:7
**writing (6)**
5:16;16:8;56:13;
68:4;85:25;125:5
**writings (1)**
55:15
**written (12)**
30:7,20;46:25;
47:6,8,23;48:15;
49:13;50:11;54:14;
61:21;82:8
**wrong (12)**
6:5;36:8;49:15;
76:14;78:22;113:21;
114:6;126:7;132:4;
152:19,22;161:9
**wrote (3)**
43:15,17,19

---

**X**

**xxthat (1)**
162:19
**xxxkidernetcom (1)**
160:22

---

**Y**

**year (8)**
21:1;41:25;51:3;
87:25;94:11;114:24;
118:19;128:25
**years (27)**

16:1;18:7;19:17;
20:25;25:4;36:17;
38:1;43:2;49:24,25;
53:24;65:18;69:7,16,
18;75:17;77:22;
80:15;81:20;90:16;
93:24;115:3;134:13;
143:4;169:8;172:16;
173:14
**Yep (12)**
81:22,24;109:6;
116:24;117:2;118:3;
119:19;130:15,19;
156:23;158:7;160:24
**York (2)**
114:1,4
**you/this (1)**
166:7
**young (57)**
13:14;15:19;18:9;
20:15;22:12;25:2,3;
26:4,19;27:9,17,21;
28:3;31:5;35:24;
38:3,22;40:7;45:20;
69:10;76:4,12,20;
77:2,11,16;96:15,15,
18;97:3;98:3;116:1;
127:7,11,23;130:22,
25;131:2,4,19,21;
135:7;136:13;
140:19,22;141:6;
143:20;146:7;
153:22;158:24;
162:2;163:4;165:17;
172:18;173:4,10,21
**younger (2)**
25:18;93:20
**youth (5)**
84:20;86:5,21,21;
91:4

---

**Z**

**Zealand (1)**
117:13
**Zero (8)**
35:1;110:11,12,15;
111:10,11;112:2,3
**Zoom (3)**
6:4;44:5;55:1

---

**1**

**1 (10)**
11:12;63:19;68:12;
73:1,1,1,2;100:18;
125:13;150:20
**1:23-cv-00595-JPH-KMB (1)**
177:7.5
**10 (11)**
9:9;19:24;25:19,
24;49:23;64:19;68:5;
77:22;103:9;107:18;

115:3
**10,000 (1)**
68:12
**100 (5)**
58:10;64:25;65:10,
15;122:25
**1031 (1)**
177:2.5
**105 (2)**
116:21,23
**107 (1)**
117:21
**108 (3)**
71:24;72:1,2
**11 (5)**
25:16;70:6;115:15,
18;174:11
**12 (2)**
93:24;116:10
**129 (1)**
107:1
**12-year-olds (1)**
25:17
**13 (4)**
101:22;119:16,17;
176:10.5
**131 (2)**
119:7,11
**135 (1)**
177:23.5
**14 (5)**
11:16;123:13,22;
124:7;128:5
**140 (2)**
130:13,16
**141 (2)**
130:14,20
**14-page (1)**
53:16
**14th (2)**
152:18;154:6
**15 (5)**
49:23,25;96:20,21;
125:8
**150 (2)**
22:14;25:25
**16 (2)**
35:25;137:19
**17 (3)**
25:6;35:25;138:3
**1720 (1)**
177:24
**18 (8)**
25:4,24;35:25;
36:19;101:22;139:4;
147:9;170:25
**180 (2)**
22:14;25:25
**18-year-olds (1)**
25:6
**19 (3)**
146:25;147:21;
173:14

**198 (2)**
150:14,15
**1986/'87 (1)**
21:14
**1988 (1)**
14:17

---

**2**

**2 (11)**
40:12;42:8;59:14;
100:18;106:9;
135:18;136:9;148:8;
150:12;157:12;158:3
**20 (8)**
14:7;38:1;148:17;
154:5;155:21;156:9;
157:20;166:8
**200 (2)**
118:25;130:5
**2000 (4)**
93:23;94:12;112:8,
9
**2005 (1)**
68:5
**2006 (2)**
110:15;143:1
**2007 (1)**
110:16
**2010 (1)**
73:4
**2013 (2)**
110:13;111:17
**2015 (4)**
53:1,11;115:25;
116:5
**2016 (3)**
114:9,21;115:1
**2017 (2)**
116:16,19
**2018 (1)**
82:19
**2019 (9)**
12:18,20;14:18;
20:12;21:2;41:15;
48:3;53:20;54:16
**2020 (2)**
4:2;99:6
**2021 (5)**
91:20;109:4;
119:14;124:1;163:15
**2022 (5)**
109:5;116:25;
118:2;152:12;154:6
**2023 (4)**
112:12;175:12;
176:4;177:18
**2024 (1)**
176:10.5
**20s (1)**
25:4
**20S-MS-236 (1)**
4:2

K.C., et al. VS
The Individual Members of the Medical Licensing Board

Dianna T. Kenny
May 30, 2023

**21 (7)**
70:5,9,10,15;
148:17;156:6;164:16
**22 (1)**
163:7
**229 (3)**
152:8;154:16;
159:17
**25% (2)**
101:20,22
**250 (3)**
58:23,24,25
**27,000 (1)**
68:12
**279 (1)**
75:9

## 3

**3 (8)**
49:18;60:22;93:24;
110:5,6;154:7;
155:21,22
**30 (3)**
14:6;19:17;173:13
**30-ish (1)**
25:14
**30th (2)**
175:12;177:18
**31 (3)**
4:2;19:17;53:24
**317 (1)**
177:25
**32% (1)**
101:21
**34 (1)**
150:16
**350 (1)**
58:24

## 4

**4 (3)**
50:23;63:14;
112:23
**4/14/22 (1)**
152:18
**40 (1)**
13:17
**41 (1)**
91:17
**46202 (1)**
177:3
**46204 (1)**
177:24.5
**4th (2)**
152:11,15

## 5

**5 (6)**
52:13,22;55:8;
82:3;103:24;115:3

**50 (3)**
22:15;26:2;34:23
**51 (1)**
113:23
**55 (1)**
72:2

## 6

**6 (3)**
48:17;88:21;
156:17
**60 (5)**
13:19,24;22:15;
26:2;34:23
**60% (1)**
38:3
**635-7857 (1)**
177:25

## 7

**7 (3)**
56:2;89:21;157:2

## 8

**8 (5)**
52:13,22;56:2;
92:9;145:9
**81 (1)**
82:7
**82.5% (1)**
123:1
**84 (2)**
98:12;102:15
**84,000 (1)**
73:1
**85 (2)**
91:17;92:14
**86 (1)**
21:8
**87 (3)**
21:8;92:24;93:14
**88% (1)**
38:1

## 9

**9 (5)**
62:3;99:8,23;
104:25;107:19
**94 (1)**
108:22
**95 (1)**
108:22
**97 (1)**
112:13
**98 (1)**
112:13



EXHIBIT    4
Witness:  Kenny
Date:  5/30/23
Stenographer:  Brandy Bradley, RPR

# Change or Suppression (Conversion) Practices Prohibition Act 2021

## No.        of 2021

## TABLE OF PROVISIONS

| Clause | | Page |
|---|---|---|
| **Part 1—Preliminary** | | **1** |
| **Division 1—General** | | **1** |
| 1 | Purposes | 1 |
| 2 | Commencement | 2 |
| 3 | Objects of this Act | 3 |
| 4 | Definitions | 4 |
| 5 | Meaning of *change or suppression practice* | 7 |
| 6 | Act binds the Crown | 8 |
| 7 | Contravention does not create civil or criminal liability | 8 |
| 8 | Extra-territorial application | 9 |
| **Division 2—Change or suppression practices are prohibited** | | **9** |
| 9 | General prohibition on change or suppression practices | 9 |
| **Part 2—Offences relating to change or suppression practices** | | **10** |
| **Division 1—Offences** | | **10** |
| 10 | Offence of engaging in one or more change or suppression practices that cause serious injury | 10 |
| 11 | Offence of engaging in one or more change or suppression practices that cause injury | 11 |
| 12 | Offence of taking a person from Victoria for a change or suppression practice | 12 |
| 13 | Offence of advertising a change or suppression practice | 13 |
| 14 | Production of documents relating to advertising offence | 14 |
| **Division 2—General matters relating to offences against this Part** | | **14** |
| 15 | Corporate criminal responsibility for offence against this Part | 14 |
| 16 | Who may bring proceedings for an offence under section 13 | 15 |
| **Part 3—Civil response scheme** | | **16** |
| **Division 1—Functions and powers of Commission** | | **16** |
| 17 | Functions and powers of Commission | 16 |
| 18 | Functions of Commission—educative function | 17 |

i

| Clause | | Page |
|---|---|---|
| 19 | Functions of Commission—research function | 17 |
| 20 | Commission may report on educative or research functions | 17 |
| 21 | Functions of Commission—receiving reports and facilitating outcomes | 18 |
| 22 | Staff of Commission | 18 |
| 23 | Delegation | 18 |

**Division 2—Reporting change or suppression practices to Commission** | | **19**

| 24 | Reporting change or suppression practices | 19 |
|---|---|---|
| 25 | Principles for responding to reports | 19 |
| 26 | Commission may request more information | 19 |
| 27 | Consideration of reports | 19 |
| 28 | Responding to reports | 20 |
| 29 | Referral of reports | 21 |
| 30 | Discretion to decline to respond to report | 21 |
| 31 | Withdrawal from facilitation of an outcome | 22 |
| 32 | Agreements resulting from facilitation | 22 |
| 33 | Registration of agreements | 23 |

**Division 3—Investigations** | | **24**

| 34 | When investigation may be conducted | 24 |
|---|---|---|
| 35 | Commission to conduct investigation as it considers fit | 24 |
| 36 | Power to compel provision of information and production of documents | 24 |
| 37 | Power to compel attendance | 26 |
| 38 | Compliance with notice requiring attendance or production of documents | 26 |
| 39 | Protection against self-incrimination | 26 |
| 40 | Disclosure of identity of persons who give information or documents | 27 |
| 41 | Publication of evidence, information or documents | 27 |
| 42 | Outcome of an investigation | 28 |

**Division 4—Remedies** | | **29**

| 43 | Enforceable undertakings | 29 |
|---|---|---|
| 44 | Register of enforceable undertakings | 29 |
| 45 | Compliance notices | 29 |
| 46 | Failure to comply with enforceable undertaking or compliance notice | 30 |
| 47 | Vicarious liability | 30 |
| 48 | Who may bring proceedings for an offence under this Part | 31 |
| 49 | Reports etc. that relate to organisations | 31 |

*Clause*    *Page*

**Part 4—General matters**    **33**

**Division 1—Secrecy**    **33**

50    Definition    33
51    Secrecy    33
52    Disclosure to courts    34

**Division 2—Provisions relating to certain proceedings**    **35**

53    Commission not to prejudice certain proceedings or
       investigations    35
54    Person bringing proceedings presumed to be authorised to do so    35
55    Commission may assist in proceedings as amicus curiae    36

**Division 3—Annual report and review of Act**    **36**

56    Annual report    36
57    Review of this Act    36

**Division 4—Regulations**    **37**

58    Regulations    37

**Part 5—Amendment of definitions in the Equal Opportunity Act
2010**    **39**

**Division 1—Amendment of definitions**    **39**

59    Definitions    39
60    Attributes    40

**Division 2—Transitional provisions**    **40**

61    New Division inserted    40

**Part 6—Consequential amendment of Acts**    **42**

**Division 1—Amendment of the Equal Opportunity Act 2010**    **42**

62    Obstructing Commission    42
63    False or misleading information    42

**Division 2—Amendment of the Family Violence Protection Act
2008**    **42**

64    Meaning of *emotional or psychological abuse*    42

**Division 3—Amendment of the Personal Safety Intervention
Orders Act 2010**    **43**

65    Meaning of *harassment*    43

**Part 7—Repeal of amending Parts**    **44**

66    Repeal of amending Parts    44

iii

| *Clause* | *Page* |
| --- | --- |
| **Endnotes** | **45** |
| 1    General information | 45 |

# Change or Suppression (Conversion) Practices Prohibition Act 2021[†]

## No.        of 2021

[Assented to                    ]

**The Parliament of Victoria enacts:**

# Part 1—Preliminary

## Division 1—General

### 1  Purposes

The main purposes of this Act are—

(a) to denounce and prohibit change or suppression practices; and

(b) to establish a civil response scheme within the Victorian Equal Opportunity and Human Rights Commission that will—

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 1—Preliminary

_____

(i)  promote understanding of the prohibition on change or suppression practices under this Act and matters relating generally to change or suppression practices; and

(ii)  consider and resolve reports of change or suppression practices; and

(iii)  investigate serious or systemic change or suppression practices; and

(c)  to prohibit engaging in change or suppression practices, including through creating offences in relation to engaging in change or suppression practices and certain related activities; and

(d)  to amend the definitions of ***sexual orientation*** and ***gender identity*** in the **Equal Opportunity Act 2010**; and

(e)  to include sex characteristics as a protected attribute under the **Equal Opportunity Act 2010**; and

(f)  to make consequential amendments to certain Acts.

**2  Commencement**

(1)  Subject to subsection (2), this Act comes into operation on a day or days to be proclaimed.

(2)  If a provision of this Act does not come into operation within the period of 12 months beginning on the day on which this Act receives the Royal Assent, it comes into operation on the day after the end of that period.

_____

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 1—Preliminary

### 3  Objects of this Act

(1)  The objects of this Act are—

    (a)  to eliminate so far as possible the occurrence of change or suppression practices in Victoria; and

    (b)  to further promote and protect the rights set out in the Charter of Human Rights and Responsibilities; and

    (c)  to ensure that all people, regardless of sexual orientation or gender identity, feel welcome and valued in Victoria and are able to live authentically and with pride.

(2)  In enacting this Act, it is the intention of the Parliament—

    (a)  to denounce and give statutory recognition to the serious harm caused by change or suppression practices; and

    (b)  to affirm that a person's sexual orientation or gender identity is not broken and in need of fixing; and

    (c)  to affirm that no sexual orientation or gender identity constitutes a disorder, disease, illness, deficiency or shortcoming; and

    (d)  to affirm that change or suppression practices are deceptive and harmful both to the person subject to the change or suppression practices and to the community as a whole.

### 4 Definitions

In this Act—

*associate*, in relation to a body corporate, means the following—

    (a) an employee or agent of the body corporate to the extent that the employee or agent is acting within the actual or apparent scope of their employment or within their actual or apparent authority;

    (b) an officer of the body corporate;

*Australian Health Practitioner Regulation Agency* means the Australian Health Practitioner Regulation Agency established by section 23 of the Health Practitioner Regulation National Law;

*board of directors* means the body (by whatever name called) exercising the executive authority of a body corporate;

*change or suppression practice* has the meaning given by section 5;

*Chief Commissioner of Police* means the **Chief Commissioner** within the meaning of the **Victoria Police Act 2013**;

*Commission* has the same meaning as it has in the **Equal Opportunity Act 2010**;

*Commissioner* has the same meaning as it has in the **Equal Opportunity Act 2010**;

*compliance notice* means a compliance notice issued under section 45(1);

*corporate culture* of a body corporate means an attitude, policy, rule, course of conduct or practice existing within the body corporate

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 1—Preliminary

_____

or within a part of the body corporate, as the case requires;

***Director of Public Prosecutions*** means the Director of Public Prosecutions appointed under section 87AB of the **Constitution Act 1975**;

***enforceable undertaking*** means an undertaking accepted under section 43;

***gender identity*** has the same meaning as it has in the **Equal Opportunity Act 2010**;

***Health Complaints Commissioner*** means the ***Commissioner*** within the meaning of the **Health Complaints Act 2016**;

***health service*** has the same meaning as it has in the Health Practitioner Regulation National Law;

***health service provider*** has the same meaning as it has in the Health Practitioner Regulation National Law;

***IBAC*** means the Independent Broad-based Anti-corruption Commission established by the **Independent Broad-based Anti-corruption Commission Act 2011**;

***injury*** has the same meaning as it has in section 15 of the **Crimes Act 1958**;

***investigation*** means an investigation under section 34;

***officer***, in relation to a body corporate, means an officer (as defined by section 9 of the Corporations Act) of the body corporate to the extent that the officer is acting within the actual or apparent scope of their employment or within their actual or apparent authority;

_____

5

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 1—Preliminary

***Ombudsman*** means the person appointed as the Ombudsman under section 3 of the **Ombudsman Act 1973**;

***organisation*** means an unincorporated body or association, whether the body or association—

    (a) is based in or outside Australia; or

    (b) is part of a larger organisation;

***person affected by a change or suppression practice*** means a person towards whom a change or suppression practice is being, or has been, directed;

***police officer*** has the same meaning as it has in the **Victoria Police Act 2013**;

***produce*** includes permit access to;

***protected information*** has the meaning given by section 50;

***serious injury*** has the same meaning as it has in section 15 of the **Crimes Act 1958**;

***sexual orientation*** has the same meaning as it has in the **Equal Opportunity Act 2010**;

***Tribunal*** means the Victorian Civil and Administrative Tribunal established by the **Victorian Civil and Administrative Tribunal Act 1998**;

***Victoria Police*** has the same meaning as in the **Victoria Police Act 2013**;

***Victorian Inspectorate*** means the Victorian Inspectorate established by the **Victorian Inspectorate Act 2011**.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021
Part 1—Preliminary

## 5  Meaning of *change or suppression practice*

(1) In this Act, a ***change or suppression practice*** means a practice or conduct directed towards a person, whether with or without the person's consent—

  (a) on the basis of the person's sexual orientation or gender identity; and

  (b) for the purpose of—

    (i) changing or suppressing the sexual orientation or gender identity of the person; or

    (ii) inducing the person to change or suppress their sexual orientation or gender identity.

(2) For the purposes of subsection (1), a practice or conduct is not a change or suppression practice if it—

  (a) is supportive of or affirms a person's gender identity or sexual orientation including, but not limited to, a practice or conduct for the purposes of—

    (i) assisting a person who is undergoing a gender transition; or

    (ii) assisting a person who is considering undergoing a gender transition; or

    (iii) assisting a person to express their gender identity; or

    (iv) providing acceptance, support or understanding of a person; or

    (v) facilitating a person's coping skills, social support or identity exploration and development; or

    (b)  is a practice or conduct of a health service provider that is, in the health service provider's reasonable professional judgement, necessary—

        (i)  to provide a health service; or

        (ii)  to comply with the legal or professional obligations of the health service provider.

  (3)  For the purposes of subsection (1), a practice includes, but is not limited to the following—

    (a)  providing a psychiatry or psychotherapy consultation, treatment or therapy, or any other similar consultation, treatment or therapy;

    (b)  carrying out a religious practice, including but not limited to, a prayer based practice, a deliverance practice or an exorcism;

    (c)  giving a person a referral for the purposes of a change or suppression practice being directed towards the person.

  (4)  For the purposes of subsection (1), a practice or conduct may be directed towards a person remotely (including online) or in person.

## 6  Act binds the Crown

This Act binds the Crown in right of Victoria and, so far as the legislative power of the Parliament permits, the Crown in all its other capacities.

## 7  Contravention does not create civil or criminal liability

A contravention of this Act does not create any civil or criminal liability except to the extent expressly provided by this Act.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021
Part 1—Preliminary

### 8  Extra-territorial application

(1) This section applies if—

   (a) a person engages in conduct outside, or partly outside, Victoria; and

   (b) there is a real and substantial link between the conduct and Victoria.

(2) This Act has effect in relation to the conduct as if it had been engaged in wholly within Victoria.

(3) For the purposes of subsection (1), there is a real and substantial link with Victoria if—

   (a) a significant part of the conduct occurs in Victoria; or

   (b) the conduct occurred wholly outside Victoria, but the effects of the conduct occurred wholly or partly in Victoria.

## Division 2—Change or suppression practices are prohibited

### 9  General prohibition on change or suppression practices

A person or organisation contravenes this Act if the person or organisation engages in a change or suppression practice.

**Note**

A contravention of this Act by a person or organisation may result in a report being made under Part 3, which sets out the civil response scheme.

# Part 2—Offences relating to change or suppression practices

## Division 1—Offences

### 10  Offence of engaging in one or more change or suppression practices that cause serious injury

(1)  A person (**A**) commits an offence if—

    (a)  A intentionally engages in a change or suppression practice directed towards another person (**B**); and

    (b)  the change or suppression practice causes serious injury to B; and

    (c)  A is negligent as to whether engaging in the change or suppression practice will cause serious injury to B.

Penalty:    In the case of a natural person, level 5 imprisonment (10 years maximum) or a level 5 fine (1200 penalty units maximum) or both;

In the case of a body corporate, 6000 penalty units maximum.

(2)  A person (**A**) commits an offence if—

    (a)  A intentionally engages in change or suppression practices directed towards another person (**B**); and

    (b)  any or all of the change or suppression practices, considered as a group, cause serious injury to B; and

(c) A is negligent as to whether engaging in any or all of the change or suppression practices will cause serious injury to B.

Penalty:    In the case of a natural person, level 5 imprisonment (10 years maximum) or a level 5 fine (1200 penalty units maximum) or both;

In the case of a body corporate, 6000 penalty units maximum.

## 11  Offence of engaging in one or more change or suppression practices that cause injury

(1) A person (**A**) commits an offence if—

(a) A intentionally engages in a change or suppression practice directed towards another person (**B**); and

(b) the change or suppression practice causes injury to B; and

(c) A is negligent as to whether engaging in the change or suppression practice will cause injury to B.

Penalty:    In the case of a natural person, level 6 imprisonment (5 years maximum) or a level 6 fine (600 penalty units maximum) or both;

In the case of a body corporate, 3000 penalty units maximum.

(2) A person (**A**) commits an offence if—

(a) A intentionally engages in change or suppression practices directed towards another person (**B**); and

(b) any or all of the change or suppression practices, considered as a group, cause injury to B; and

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

(c) A is negligent as to whether engaging in any or all of the change or suppression practices will cause injury to B.

Penalty:    In the case of a natural person, level 6 imprisonment (5 years maximum) or a level 6 fine (600 penalty units maximum) or both;

In the case of a body corporate, 3000 penalty units maximum.

## 12  Offence of taking a person from Victoria for a change or suppression practice

(1) A person (**A**) commits an offence if—

(a) A takes another person (**B**) from Victoria, or arranges for B to be taken from Victoria; and

(b) A intends that a change or suppression practice directed towards B will be engaged in outside Victoria (whether by A or another person); and

(c) a change or suppression practice directed towards B is engaged in outside Victoria; and

(d) the change or suppression practice causes injury to B; and

(e) A is negligent as to whether the change or suppression practice will cause injury to B.

Penalty:    In the case of a natural person, level 7 imprisonment (2 years maximum) or a level 7 fine (240 penalty units maximum) or both;

In the case of a body corporate, 1200 penalty units maximum.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 2—Offences relating to change or suppression practices

(2) A person (**A**) commits an offence if—

   (a) A takes another person (**B**) from Victoria, or arranges for B to be taken from Victoria; and

   (b) A intends that change or suppression practices directed towards B will be engaged in outside Victoria (whether by A or another person); and

   (c) change or suppression practices directed towards B are engaged in outside Victoria; and

   (d) any or all of the change or suppression practices, considered as a group, cause injury to B; and

   (e) A is negligent as to whether any or all of the change or suppression practices, considered as a group, will cause injury to B.

Penalty:    In the case of a natural person, level 7 imprisonment (2 years maximum) or a level 7 fine (240 penalty units maximum) or both;

In the case of a body corporate, 1200 penalty units maximum.

## 13  Offence of advertising a change or suppression practice

(1) A person commits an offence if—

   (a) the person publishes or displays, or authorises the publication or display of, an advertisement or other notice; and

   (b) the advertisement or other notice indicates, or could reasonably be understood as indicating, that the person or any other person intends to engage in one or more change or suppression practices, other than

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 2—Offences relating to change or suppression practices

for the purposes of warning of the harm caused by such practices.

Penalty:    In the case of a natural person, level 9 fine (60 penalty units maximum);

In the case of a body corporate, 300 penalty units maximum.

(2) It is a defence to a charge under subsection (1) if the accused proves that the accused took reasonable precautions and exercised due diligence to prevent the publication or display.

## 14  Production of documents relating to advertising offence

(1) For the purpose of proceedings under section 13, the Commission may, by written notice, require any person to produce any documents specified in the notice to the Commission.

(2) A person must not refuse, without reasonable excuse, to produce a document referred to in subsection (1) to the Commission.

Penalty:    In the case of a natural person, level 9 fine (60 penalty units maximum);

In the case of a body corporate, 300 penalty units maximum.

## Division 2—General matters relating to offences against this Part

## 15  Corporate criminal responsibility for offence against this Part

(1) For the purposes of a proceeding against a body corporate for an offence against this Part, the following must also be attributed to the body corporate—

(a) relevant conduct engaged in by an associate of the body corporate;

14

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 2—Offences relating to change or suppression practices

(b) knowledge of an associate of the body corporate;

(c) intention—

   (i) of the body corporate's board of directors; or

   (ii) of an officer of the body corporate; or

   (iii) of any other associate of the body corporate if a corporate culture existed within the body corporate that directed, encouraged, tolerated or led to the formation of that intention.

(2) If an officer of a body corporate engages in conduct that constitutes an offence against this Part, the body corporate must be taken to have also engaged in conduct constituting the offence, and may be proceeded against and found guilty of the offence whether or not the officer has been proceeded against or found guilty of that offence.

(3) In a proceeding against a body corporate for an offence against this Part brought in reliance on subsection (2), it is a defence to the charge for the body corporate to prove that it exercised due diligence to prevent the conduct engaged in by the officer.

## 16  Who may bring proceedings for an offence under section 13

Proceedings for an offence under section 13 may be brought by—

(a) the Commission; or

(b) a police officer; or

(c) a person who is authorised to do so, either generally or in a particular case, by the Commission.

# Part 3—Civil response scheme

## Division 1—Functions and powers of Commission

### 17  Functions and powers of Commission

(1)  The Commission has the following functions—

    (a)  to develop and provide education in relation to change or suppression practices;

    (b)  to receive reports about change or suppression practices from any person;

    (c)  to request further information regarding reports of change or suppression practices from persons who make a report and persons or organisations alleged to be engaging in change or suppression practices;

    (d)  to determine appropriate responses to reports on the basis of information provided and the wishes of persons affected where those persons are involved in making reports;

    (e)  to offer education to persons and organisations engaged in change or suppression practices;

    (f)  to establish processes for facilitating an outcome in relation to matters in certain reports that meet the needs of persons affected by change or suppression practices;

    (g)  to focus on ensuring that persons affected by change or suppression practices receive support by directing them to appropriate support services;

    (h)  to support persons who are or may be victims of criminal offences under this Act to voluntarily report these to police.

(2)  The Commission has all the powers necessary to enable it to perform its functions.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

**18  Functions of Commission—educative function**

(1)  The Commission must—

    (a)  establish and undertake information and education programs in relation to change or suppression practices; and

    (b)  promote and advance the objects of this Act and be an advocate for this Act.

(2)  The Commission must undertake programs to disseminate information and educate the public with respect to—

    (a)  the objects of this Act; and

    (b)  any other matters relevant to the provisions of this Act.

**19  Functions of Commission—research function**

(1)  The Commission may undertake research into any matter arising from, or incidental to, the operation of this Act that it considers would advance the objects of this Act.

(2)  The Commission may collect and analyse information and data relevant to the operation and objects of this Act.

**20  Commission may report on educative or research functions**

The Commission may, at any time, submit a report to the Attorney-General on any matter arising from the performance of the Commission's functions under section 18 or 19.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

### 21  Functions of Commission—receiving reports and facilitating outcomes

The Commission must—

(a) receive reports under section 24 from persons affected by change or suppression practices (or persons acting on their behalf), or other persons; and

(b) establish policies and issue procedures and directions on the manner in which such reports should be dealt with; and

(c) in the case of a reports made by persons affected by change or suppression practices (or persons acting on their behalf), establish policies and procedures for the facilitation of an outcome in relation to the matters in the report.

### 22  Staff of Commission

Any staff that are necessary for the purposes of administering this Act are to be employed under Part 3 of the **Public Administration Act 2004**.

### 23  Delegation

The Commission, by instrument, may delegate to the Commissioner or a member of staff of the Commission referred to in section 22 any of the Commission's functions, duties or powers under this Act other than this power of delegation.

**Note**

Under an Order made by the Governor in Council under section 16 of the **Public Administration Act 2004**, the Commissioner has all the functions of a public service body Head in relation to employees of the Commission.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

─────────────────────────────────────────────

## Division 2—Reporting change or suppression practices to Commission

### 24  Reporting change or suppression practices

(1) A person affected by a change or suppression practice, or any other person, may make a report to the Commission in relation to an alleged change or suppression practice.

(2) A report must be in the prescribed form (if any).

### 25  Principles for responding to reports

The principles for the Commission responding to reports are—

(a) a response should be provided to the person who made the report; and

(b) a response should be informed by the needs and wishes of persons affected by change or suppression practices; and

(c) a response should be appropriate to the report; and

(d) a response should be fair to all persons; and

(e) a response should be consistent with the objects of this Act.

### 26  Commission may request more information

The Commission may request a person who makes a report or a person or organisation who is alleged to be engaging in a change or suppression practice to provide any further information that the Commission considers necessary to assist in determining its response to a report.

### 27  Consideration of reports

(1) This section applies if, in considering a report, the Commission is satisfied that a person or organisation is engaging in, or has engaged in, a change or suppression practice.

─────────────────────────────────────────────

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

(2) In responding to the report, the Commission must as far as practicable have regard to the following matters, to the extent that information about the matters is reasonably available to the Commission—

   (a) the wishes of the person or persons affected by the change or suppression practice;

   (b) whether the change or suppression practice was a one-off event or a pattern of behaviour;

   (c) the number of people affected by the change or suppression practice;

   (d) the nature and extent of the harm caused by the change or suppression practice;

   (e) any steps taken by a person or organisation to stop engaging in the change or suppression practice or to address the harms caused by the change or suppression practice.

**28  Responding to reports**

(1) The Commission, after considering a report, may do one or more of the following—

   (a) offer targeted education to persons or organisations reported to have engaged in change or suppression practices;

   (b) in the case of reports made by persons affected by a change or suppression practice, offer facilitation of an outcome in relation to the matters in the report;

   (c) refer the report to another person or body under section 29;

   (d) decline to respond to the report in accordance with section 30.

(2) Participation in facilitation of an outcome in relation to matters in a report is voluntary.

## 29  Referral of reports

(1) Subject to subsection (3), if the Commission considers that a report relates to conduct that would be more adequately dealt with by another person or body, the Commission may refer the report to the other person or body.

(2) The persons or bodies to which the Commission may refer a report include, but are not limited to, the following—

　(a)  the Health Complaints Commissioner;

　(b)  the Australian Health Practitioner Regulation Agency;

　(c)  the Ombudsman;

　(d)  Victoria Police.

(3) The Commission must not refer a report under subsection (1) without the consent of the person affected by the change or suppression practice to which the report relates, unless required to do so by a law dealing with mandatory reporting.

## 30  Discretion to decline to respond to report

The Commission may decline to respond to a report if—

　(a)  the report refers to persons or organisations who can no longer be located; or

　(b)  the report relates to conduct in respect of which sufficient information is no longer available; or

　(c)  the report relates to conduct that has been adequately dealt with in another forum or would be more appropriately dealt with in another forum; or

(d) having regard to all the circumstances, the Commission considers it is not appropriate to respond to the report.

### 31  Withdrawal from facilitation of an outcome

If the Commission is facilitating an outcome in relation to a matter in a report, any person involved in the facilitation may withdraw at any time by informing the Commission that the person no longer wishes to participate.

### 32  Agreements resulting from facilitation

(1) This section applies if, after the Commission facilitates an outcome in relation to a matter in a report, the persons engaged in the facilitation (the *parties*) reach agreement with respect to any of the matters.

(2) Any party may request that a written record of agreement be prepared by the parties or the Commission.

(3) A request must be made within 30 days after the agreement is reached.

(4) If a record of agreement is prepared by the Commission following a request under subsection (2)—

    (a) the record of agreement must be signed by or on behalf of each party; and

    (b) the Commission must certify the record of agreement.

(5) If a record of agreement is prepared by the parties following a request under subsection (2)—

    (a) the record of agreement must be signed by or on behalf of each party; and

    (b) on the request of a party, the Commission may certify the record of agreement.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

(6) If the Commission certifies a record of agreement under subsection (4)(b) or (5)(b), the Commission must give each party a copy of the signed and certified record of agreement.

(7) The refusal of the Commission to certify a record of agreement does not affect the validity of the agreement.

## 33  Registration of agreements

(1) Any party to an agreement reached under section 32 may, after notifying each other party in writing, lodge a copy of the signed and certified record of agreement with the Tribunal for registration.

(2) Subject to subsection (3), the Tribunal must register the record of agreement and give a certified copy of the registered record of agreement to each party.

(3) If the Tribunal, constituted by a presidential member, considers that it may not be practicable to enforce, or to supervise compliance with, a record of agreement or part of a record of agreement, the Tribunal—

(a) in the case of a record of agreement, may refuse to register the record of agreement; or

(b) in the case of a part of a record of agreement, may refuse to register the part of the record of agreement that it considers may not be practicable to enforce, or to supervise compliance with.

(4) On registration, a registered record of agreement or a registered part of a record of agreement—

(a) is taken to be an order of the Tribunal in accordance with its terms; and

(b) may be enforced accordingly.

23

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

(5) The refusal of the Tribunal to register a record of agreement or any part of a record of agreement does not affect the validity of the agreement.

## Division 3—Investigations

### 34  When investigation may be conducted

The Commission may conduct an investigation under this section into any matter relating to this Act—

(a) that raises an issue that is serious in nature or indicates change or suppression practices that are systemic or persisting; and

(b) that indicates a possible contravention of this Act; and

(c) that relates to a class or group of persons; and

(d) that would advance the objects of this Act.

### 35  Commission to conduct investigation as it considers fit

(1) Subject to this Division, the Commission may conduct an investigation in the manner it considers fit.

(2) In conducting an investigation, the Commission is bound by the principles of natural justice, unless otherwise expressly provided in this Division.

### 36  Power to compel provision of information and production of documents

(1) If the Commission reasonably believes that—

(a) a person is in possession of information or a document that is relevant to an investigation; and

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

    (b)  the information or document is necessary for the conduct of the investigation—

the Commission may by written notice require the person to provide the information or document or both.

(2)  A notice referred to in subsection (1) must specify that the person must do either or both of the following within a reasonable period specified in the notice, or on a reasonable date and at a reasonable time specified in the notice—

    (a)  give the Commission a document containing information required by the notice;

    (b)  produce to the Commission the documents specified in the notice.

(3)  A document referred to in subsection (2)(a) must be signed by the person or, in the case of a notice served on a body corporate, an officer of the body corporate.

(4)  If a document is produced to the Commission in accordance with a notice under this section, the Commission may—

    (a)  take possession of the document; and

    (b)  make copies of the document or take extracts from the document; and

    (c)  retain possession of the document for as long as is necessary for the purposes of the investigation to which the document relates.

(5)  The Commission must allow a document retained under this section to be inspected, at all reasonable times, by any person who would be entitled to inspect the document if it were not in the possession of the Commission.

25

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

### 37 Power to compel attendance

(1) The Commission by written notice may require a person to attend before the Commission, at a reasonable time and place, to answer questions if the Commission reasonably believes that—

    (a) the person has information that is relevant to an investigation; and

    (b) the information is necessary for the conduct of the investigation.

(2) A person who is required under this section to attend before the Commission—

    (a) is entitled to be paid a reasonable sum for the person's attendance; and

    (b) is entitled to have a legal or personal representative present.

### 38 Compliance with notice requiring attendance or production of documents

A person must not, without reasonable excuse, fail to comply with a notice of the Commission under section 36 or 37.

Penalty:    In the case of a natural person, level 9 fine (60 penalty units maximum);

            In the case of a body corporate, 300 penalty units maximum.

### 39 Protection against self-incrimination

It is a reasonable excuse for a natural person to refuse to give information, answer a question or produce a document under this Act if the giving of the information, the answering of the question or the production of the document would tend to incriminate the person.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

### 40  Disclosure of identity of persons who give information or documents

(1) This section applies to a person who has given or who will give evidence, information or documents to the Commission as part of an investigation, whether or not the person is compelled to do so under section 36 or 37.

(2) The Commission may give directions prohibiting the disclosure of the identity of the person, or prohibiting the disclosure of information that would be reasonably likely to identify the person, if the Commission considers that preservation of the person's anonymity is necessary—

    (a) to protect the person's security of employment, privacy or any right protected by the **Charter of Human Rights and Responsibilities Act 2006**; or

    (b) to protect the person from victimisation.

### 41  Publication of evidence, information or documents

(1) The Commission may give directions prohibiting or limiting the publication of—

    (a) any evidence given before the Commission or any information given to the Commission as part of an investigation; or

    (b) the contents of any document produced to the Commission as part of an investigation.

(2) Subsection (1) applies whether or not a person was compelled to give the evidence or produce the information or document under section 36 or 37.

(3) In deciding whether or not to give a direction under subsection (1), the Commission must have regard to the need to prevent such of the following as are relevant to the circumstances—

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

---

(a) prejudice to the relations between the Government and the Commonwealth Government or between the Government and the Government of another State or a Territory;

(b) the disclosure of deliberations or decisions of the Cabinet, or of a Committee of the Cabinet;

(c) prejudice to the proper functioning of the Government;

(d) the disclosure, or the ascertaining by a person, of the existence or identity of a confidential source of information in relation to the enforcement of the criminal law;

(e) the endangering of the life or physical or psychological safety of any person;

(f) prejudice to the proper enforcement of the law or the protection of public safety;

(g) the disclosure of information the disclosure of which is prohibited, absolutely or subject to qualifications, by or under another Act;

(h) the unreasonable disclosure of the personal affairs of any person or organisation;

(i) the unreasonable disclosure of confidential commercial information.

**42  Outcome of an investigation**

(1) After conducting an investigation, the Commission may take any action it considers fit.

(2) Without limiting subsection (1), the Commission may do any of the following—

(a) take no further action;

(b) enter into an agreement with a person about action required to comply with this Act;

---

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

———————————————————————————

    (c)  accept an enforceable undertaking;

    (d)  issue a compliance notice to a person.

## Division 4—Remedies

**43  Enforceable undertakings**

If, following an investigation, the Commission believes that a change or suppression practice has occurred, is occurring or is likely to occur, the Commission may accept a written undertaking from a person under which the person undertakes to take certain actions or refrain from taking certain actions to comply with this Act.

**44  Register of enforceable undertakings**

The Commission may keep a register of enforceable undertakings that is available to the public.

**45  Compliance notices**

(1)  If, following an investigation, the Commission believes that a change or suppression practice has occurred or is occurring, the Commission may issue a compliance notice to a person who is wholly or partly responsible for the change or suppression practice.

(2)  A compliance notice must set out the following—

    (a)  the basis for the Commission's belief that a change or suppression practice has occurred or is occurring;

    (b)  the provisions of this Act (if any) that the Commission believes the person has contravened;

    (c)  the date by which the person must take or refrain from taking specified actions in relation to the change or suppression practice;

———————————————————————————

29

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

(d) the further action that the Commission may take if the person does not take or refrain from taking specified actions;

(e) that the person may apply to the Tribunal for review of the issuing of the notice or any term of the notice.

(3) A person may, within 28 days of receiving the compliance notice, apply to the Tribunal for a review of the issuing of the compliance notice or of any term of the compliance notice.

## 46  Failure to comply with enforceable undertaking or compliance notice

(1) This section applies if—

(a) the Commission has accepted an enforceable undertaking from a person; or

(b) the Commission has issued a compliance notice to a person.

(2) If the person fails to comply with the enforceable undertaking or the compliance notice—

(a) the Commission may apply to the Tribunal to enforce the undertaking or the notice; and

(b) the Tribunal may make an order requiring the person to comply with the undertaking or notice.

**Note**

Under section 133 of the **Victorian Civil and Administrative Tribunal Act 1998**, non-compliance with an order of the Tribunal is an offence.

## 47  Vicarious liability

(1) For the purposes of this Part, if a natural person engages in a change or suppression practice in the course of employment (including as a volunteer) or while acting as an agent—

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

(a) subject to subsection (2), both the natural person, and the employer or principal, as the case requires, are taken to have engaged in the change or suppression practice; and

(b) the person towards whom the change or suppression practice was directed or another person may make a report under section 24 in respect of—

(i) the natural person; or

(ii) the employer or principal; or

(iii) both the natural person and the employer or principal.

(2) The employer or principal is not taken to have engaged in the change or suppression practice if the employer or principal proves, on the balance of probabilities, that the employer or principal took reasonable precautions to prevent the natural person engaging in a change or suppression practice.

## 48  Who may bring proceedings for an offence under this Part

Proceedings for an offence under this Part may be brought by—

(a) the Commission; or

(b) a police officer; or

(c) a person who is authorised to do so, either generally or in a particular case, by the Commission.

## 49  Reports etc. that relate to organisations

If a report under this Act relates to change or suppression practices alleged to have been engaged in by an organisation—

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 3—Civil response scheme

_____

    (a)  the Commission may request information under section 26 from the president, secretary or other similar officer of the organisation; and

    (b)  the Commission may offer targeted education to the president, secretary or other similar officer of the organisation; and

    (c)  the president, secretary or other similar officer of the organisation may be a party to facilitation of an outcome for the purposes of Division 2 of this Part.

_____

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 4—General matters

---

# Part 4—General matters

## Division 1—Secrecy

### 50  Definition

In this Division—

***protected information*** means information concerning the affairs of a person or organisation, being information obtained by a person to whom section 51 applies—

   (a)  in the course of performing functions or duties or exercising powers under this Act; or

   (b)  as a result of another person performing functions or duties or exercising powers under this Act.

### 51  Secrecy

(1)  This section applies to a person who is or has been—

   (a)  the Commissioner; or

   (b)  a member of the staff of the Commission referred to in section 22;

   (c)  a person (other than a person referred to in paragraph (b)) acting under the authority of the Commission or the Commissioner.

(2)  A person to whom this section applies must not, either directly or indirectly, make a record of, disclose or communicate protected information to any person unless —

   (a)  it is necessary to do so for the purposes of, or in connection with, the performance of a function or duty or the exercise of a power under this Act; or

---

33

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 4—General matters

(b) it is necessary to do so to prevent a credible
and imminent threat of harm to one or more
persons; or

(c) it is necessary to do so to comply with a
mandatory reporting obligation; or

(d) the disclosure, communication or production
is to a court in accordance with section 52; or

(e) the information is already in the public
domain; or

(f) the information does not identify any person
or organisation; or

(g) all persons or organisations identified by the
information have consented to the disclosure
of the information.

Penalty:  Level 9 fine (60 penalty units
maximum).

## 52  Disclosure to courts

(1) Subject to this section, a person to whom
section 51 applies must not be required—

(a) to produce in a court any document
containing protected information; or

(b) to disclose or communicate protected
information to a court.

(2) Subsection (1) does not prevent a person to whom
section 51 applies disclosing or communicating
protected information or producing in a court any
document containing protected information if the
disclosure, communication or production —

(a) is necessary for the purposes of, or for a
prosecution under or arising out of, this Part;
or

(b) is required by an order of a court for the
purposes of a criminal proceeding; or

34

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 4—General matters

    (c) is with the consent of the person or
organisation to whose affairs the information
relates.

## Division 2—Provisions relating to certain proceedings

### 53  Commission not to prejudice certain proceedings or investigations

(1) The Commission must not perform the functions
or duties or exercise the powers of the
Commission under this Act in a manner that
would prejudice any—

    (a) criminal proceedings or criminal
investigations; or

    (b) investigations by the IBAC or the Victorian
Inspectorate.

(2) For the purposes of ensuring compliance with
subsection (1), the Commission may consult any
of the following—

    (a) the Director of Public Prosecutions;

    (b) the Chief Commissioner of Police;

    (c) the IBAC;

    (d) the Victorian Inspectorate.

### 54  Person bringing proceedings presumed to be authorised to do so

In a proceeding for an offence against this Act it
must be presumed, in the absence of evidence to
the contrary, that the person bringing the
proceeding was authorised to bring it.

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 4—General matters

---

**55  Commission may assist in proceedings as amicus curiae**

(1) The Commission may assist a court or tribunal as amicus curiae in the following proceedings, with the leave of the court or tribunal—

(a) proceedings in which the Commission considers that the orders sought, or likely to be sought, may significantly affect the rights relating to change or suppression practices in relation to persons who are not parties to the proceedings;

(b) proceedings that, in the opinion of the Commission, have significant implications for the administration of this Act;

(c) proceedings where the Commission is satisfied that it would be in the public interest for the Commission to assist the court or tribunal as amicus curiae.

## Division 3—Annual report and review of Act

**56  Annual report**

In its report of operations for a financial year under Part 7 of the **Financial Management Act 1994**, the Commission must include a description of the performance of its functions in relation to change or suppression practices during the financial year.

**57  Review of this Act**

(1) The Attorney-General must ensure that an independent review of the operation and effectiveness of this Act commences 2 years after the commencement of this Act and is completed within 6 months.

---

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 4—General matters
_____

(2) The Attorney-General must ensure that the review is conducted by a person who, in the opinion of the Attorney-General, possesses appropriate qualifications and expertise related to change or suppression practices.

(3) The person conducting the review must consider the following—

    (a) whether the criminal offences contained in this Act are effective;

    (b) whether the civil response scheme is effective, including whether broader investigation and enforcement powers are required;

    (c) whether a redress scheme should be developed.

(4) A person who undertakes the review must give the Attorney-General a written report of the review as soon as practicable after completing the review.

(5) The Attorney-General must cause a copy of the review to be laid before each House of the Parliament within 15 sitting days of that House after receiving the written report.

## Division 4—Regulations

**58  Regulations**

(1) The Governor in Council may make regulations for or with respect to the following matters—

    (a) forms to be used for the purposes of this Act;

    (b) any other matter or thing required or permitted by this Act to be prescribed or necessary to be prescribed to give effect to this Act.

(2) Regulations made under this Act—

    (a) may be of limited or general application; and

_____

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 4—General matters

_____

(b) may differ according to differences in time, place or circumstance; and

(c) may confer powers or impose duties in connection with the regulations on any specified person or specified class of persons; and

(d) may apply, adopt or incorporate, with or without modification, any matter contained in any document, code, standard, rule, specification or method formulated, issued, prescribed or published by any person—

(i) wholly or partially or as amended by the regulations; or

(ii) as formulated, issued, prescribed or published at the time the regulations are made or at any time before then; or

(iii) as formulated, issued, prescribed or published from time to time.

_____

# Part 5—Amendment of definitions in the Equal Opportunity Act 2010

## Division 1—Amendment of definitions

### 59  Definitions

(1) In section 4(1) of the **Equal Opportunity Act 2010**, for the definition of *gender identity* substitute—

"*gender identity* means a person's gender-related identity, which may or may not correspond with their designated sex at birth, and includes the personal sense of the body (whether this involves medical intervention or not) and other expressions of gender, including dress, speech, mannerisms, names and personal references;".

(2) In section 4(1) of the **Equal Opportunity Act 2010 insert** the following definition—

"*sex characteristics* means a person's physical features relating to sex, including—

   (a) genitalia and other sexual and reproductive parts of the person's anatomy; and

   (b) the person's chromosomes, genes, hormones, and secondary physical features that emerge as a result of puberty;".

(3) In section 4(1) of the **Equal Opportunity Act 2010**, for the definition of *sexual orientation* substitute—

"*sexual orientation* means a person's emotional, affectional and sexual attraction to, or intimate or sexual relations with, persons of

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 5—Amendment of definitions in the Equal Opportunity Act 2010

a different gender or the same gender or more than one gender;".

## 60   Attributes

After section 6(o) of the **Equal Opportunity Act 2010 insert**—

"(oa)  sex characteristics;".

## Division 2—Transitional provisions

## 61   New Division inserted

After Division 2 of Part 14 of the **Equal Opportunity Act 2010, insert**—

## "Division 3—Transitional provisions relating to the Change or Suppression (Conversion) Practices Prohibition Act 2021

### 197   Definitions

In this Division—

*commencement day* means the day on which Part 5 of the **Change or Suppression (Conversion) Practices Prohibition Act 2021** comes into operation;

*old Act* means the **Equal Opportunity Act 2010**, as in force immediately before the commencement day.

### 198   Conduct, disputes and investigations before commencement day

(1)  This section applies to—

(a)  conduct engaged in before the commencement day; and

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Part 5—Amendment of definitions in the Equal Opportunity Act 2010

<blockquote>

(b) a dispute brought to the Commission before the commencement day that had not ended before the commencement day; and

(c) an investigation of the Commission that had not been finally determined before the commencement day.

(2) The old Act continues to apply in relation to the conduct, dispute or investigation, as the case requires, as if the amendments made by Part 5 of the **Change or Suppression (Conversion) Practices Prohibition Act 2021** had not been made.".

</blockquote>

41

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.      of 2021

Part 6—Consequential amendment of Acts

# Part 6—Consequential amendment of Acts

## Division 1—Amendment of the Equal Opportunity Act 2010

### 62   Obstructing Commission

In section 185(1) of the **Equal Opportunity Act 2010**, after "Act" **insert** "or the **Change or Suppression (Conversion) Practices Prohibition Act 2021**".

### 63   False or misleading information

In section 186 of the **Equal Opportunity Act 2010**, after "Act" **insert** "or the **Change or Suppression (Conversion) Practices Prohibition Act 2021**".

## Division 2—Amendment of the Family Violence Protection Act 2008

### 64   Meaning of *emotional or psychological abuse*

In section 7 of the **Family Violence Protection Act 2008**, after the second dot point under the heading "**Examples**—" **insert**—

"• an adult child repeatedly denigrating an elderly parent's sexual orientation, including by telling them it is wrong to be same-sex attracted and that they must change or the adult child will no longer support them;".

42

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.      of 2021

Part 6—Consequential amendment of Acts

_____

## Division 3—Amendment of the Personal Safety Intervention Orders Act 2010

### 65  Meaning of *harassment*

In section 7 of the **Personal Safety Intervention Orders Act 2010**, at the end of the paragraphs under the heading "**Examples**" **insert**—

"A repeatedly leaves pamphlets in B's mailbox that state that it is wrong to gender transition and that everyone's gender expression should match the sex they were assigned at birth.".

_____

# Part 7—Repeal of amending Parts

## 66  Repeal of amending Parts

Parts 5 and 6 and this Part are **repealed** on the first anniversary of the first day on which all of the provisions in those Parts are in operation.

**Note**

The repeal of these Parts does not affect the continuing operation of the amendments made by these Parts (see section 15(1) of the **Interpretation of Legislation Act 1984**).

Change or Suppression (Conversion) Practices Prohibition Act 2021
No.        of 2021

Endnotes

# Endnotes

## 1  General information

See www.legislation.vic.gov.au for Victorian Bills, Acts and current authorised versions of legislation and up-to-date legislative information.

[†]   *Minister's second reading speech—*

*Legislative Assembly:*

*Legislative Council:*

The long title for the Bill for this Act was "A Bill for an Act to prohibit change or suppression practices, to amend certain definitions in the **Equal Opportunity Act 2010** and for other purposes."

By Authority. Government Printer for the State of Victoria.


**PLOS | ONE**

> **EXHIBIT  6**
> Witness:  Kenny
> Date:  5/30/23
> Stenographer:  Brandy Bradley, RPR

CORRECTION

# Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria

**Lisa Littman**

## Notice of republication

After publication of this article [1], questions were raised that prompted the journal to conduct a post-publication reassessment of the article, involving senior members of the journal's editorial team, two Academic Editors, a statistics reviewer, and an external expert reviewer. The post-publication review identified issues that needed to be addressed to ensure the article meets *PLOS ONE*'s publication criteria. Given the nature of the issues in this case, the *PLOS ONE* Editors decided to republish the article, replacing the original version of record with a revised version in which the author has updated the Title, Abstract, Introduction, Discussion, and Conclusion sections, to address the concerns raised in the editorial reassessment. The Materials and methods section was updated to include new information and more detailed descriptions about recruitment sites and to remove two figures due to copyright restrictions. Other than the addition of a few missing values in Table 13, the Results section is unchanged in the updated version of the article. The Competing Interests statement and the Data Availability statement have also been updated in the revised version. The original version of the published article is appended to this Correction as S1 File.

This Correction Notice serves to provide additional clarifications and context for the article in response to questions raised during the post-publication review of this work.

## Emphasis that this is a study of parental observations which serves to develop hypotheses

This study of parent observations and interpretations serves to develop the hypotheses that rapid-onset gender dysphoria is a phenomenon and that social influences, parent-child conflict, and maladaptive coping mechanisms may be contributing factors for some individuals. Rapid-onset gender dysphoria (ROGD) is not a formal mental health diagnosis at this time. This report did not collect data from the adolescents and young adults (AYAs) or clinicians and therefore does not validate the phenomenon. Additional research that includes AYAs, along with consensus among experts in the field, will be needed to determine if what is described here as rapid-onset gender dysphoria (ROGD) will become a formal diagnosis. Furthermore, the use of the term, rapid-onset gender dysphoria should be used cautiously by clinicians and parents to describe youth who appear to fall into this category. The term should not be used in a way to imply that it explains the experiences of all gender dysphoric youth nor should it be used to stigmatize vulnerable individuals. This article has been revised to better reflect that these parent reports provide information that can be used to develop hypotheses about factors that may contribute to the onset and/or expression of gender dysphoria among this demographic group.

Because this is a study of parent reports, there is some information about the AYAs that the parents would not have access to and the answers might reflect parent perspectives. Examples


Check for updates


OPEN ACCESS

**Citation:** Littman L (2019) Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS ONE 14(3): e0214157. https://doi.org/10.1371/journal.pone.0214157

**Published:** March 19, 2019

**Copyright:** © 2019 Lisa Littman. This is an open access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

PLOS ONE

where parent answers reflect their perspective of the AYA include answers concerning the child's mental well-being, the parent-child relationship, and whether the child has high expectations about transitioning. However, it is also important to note that there are other survey items where the parent would have direct access to information about their child and that those answers reflect items that can be directly observed. Examples of this type include age, natal sex, diagnoses given by medical providers in the presence of the parent, directly observed behaviors of the child and the child's friend group, school performance, whether the child has dropped out or required a leave of absence from school, has been unable to hold a job, whether the child went to a clinic, or received treatment. Readers are reminded to keep in mind that this is a study of parent report and consideration of what information parents may or may not have access to is an important element of the findings.

## Questions on whether the article describes adolescent-onset gender dysphoria or if it describes something new

There is some controversy over whether what is described as rapid onset of gender dysphoria, particularly in natal females, falls under the existing definition of late-onset or adolescent-onset gender dysphoria or whether it represents a new kind of development or presentation. This controversy might be a false dichotomy because both might be true. Although recent observations of adolescents and young adults who are predominantly natal female having a sudden onset of gender dysphoria symptoms beginning during or after puberty might technically fall under the existing definitions and criteria for adolescent and adult gender dysphoria [2], the substantial change in the demographics of patients presenting for care, the inversion of the sex ratio with disproportionate increase in adolescent natal females [3–5], and the new phenomenon of natal females exhibiting adolescent-onset and late-onset gender dysphoria [6–8] signal that something new may be happening as well. These changes may indicate that there are new etiologies leading to gender dysphoria and it is unclear, particularly without research about these new populations, whether gender dysphoria in this context has the same outcomes, desistence and persistence rates, and response to treatment as the gender dysphorias that have been previously studied.

## Expanded discussion of qualitative analyses

Because this is a descriptive, exploratory study into a new topic with very little existing data, the addition of the qualitative analysis of two questions in addition to the quantitative analysis allowed for a greater depth of information to be used in the development of hypotheses. A grounded theory approach was selected as the strategy of choice for handling the qualitative data. There were two reviewers consisting of a professor with a PhD degree and expertise in qualitative methods (MM) [9] and the author (LL) who holds an MD and MPH degree, and has published both qualitative and quantitative research papers [10–11]. Each reviewer independently read and re-read the open-text responses in an iterative process to identify major themes arising from the data. Once each reviewer independently listed major themes and coded the open-text responses according to those themes, both reviewers compared notes to collaboratively revise and refine the major themes identified. Once an agreed-upon final list of themes was developed, attention was turned back to the data to code the open-text response with the final list of themes. After this task was completed, LL selected salient quotes to reflect each major theme, shared the quotes with MM, and both discussed collaboratively until agreement for the final list of major themes and associated quotes was reached. The incorporation of both the qualitative and quantitative analysis allowed for a more vivid picture of parent

PLOS | ONE

perspectives about the friendship group dynamics and behaviors and clinician interactions than could have been obtained from just one type of analysis.

## Clarification of study design, methods, and related limitations

As mentioned in the article, the study design of this research falls under descriptive research: as such, it did not assign an exposure, there were no comparison groups, and the study's output was hypothesis-generating rather than hypothesis-testing [12]. Descriptive studies often represent a first inquiry into an area of research and the findings of descriptive studies are used to generate new hypotheses that can be tested in subsequent research [12–13]. Because of the known limitations of descriptive studies, claims about causal associations cannot be made [12], and there were none made in the article. The conclusions of the current study are that the findings raise certain hypotheses and that more research is needed. Simple descriptive metrics to describe the quantitative characteristics of a sample in a descriptive study are the appropriate measures to use in this study. Additionally, because the data were collected at one point in time, no claims of cause and effect can be made.

All research methods have advantages and limitations. Obtaining information from parents (and guardians) about the health and well-being of children and adolescents is an established method of research [14]. Parental report, used elsewhere and in this study, offers the advantages of collecting data from adults who are knowledgeable about the child, who are able and willing to complete research activities such as detailed surveys, and who can provide details that are not available by other methods. Limitations of parental report include information that parents may not be aware of and parental biases. Anonymous surveys, used elsewhere and in this study, are advantageous for topics that might be stigmatized and can allow participants to be more honest in their responses but introduce the limitation that the researcher cannot verify the identity and experiences of the participants. The use of targeted recruitment and convenience samples, used elsewhere and in this study, offers the benefit of connecting with hard-to-reach populations but introduces limitations associated with selection bias that can subsequently be addressed by further studies. For the current study, selection bias may have resulted in findings that are more positive or more negative than would be found in a larger and less self-selected population. Subsequent studies should address these issues.

## Updated Information about recruitment

Concerns were raised that this study only posted links to the recruitment information on selected sites that are viewed as being unsupportive of transition. However, announcements about the study included requests to distribute the recruitment information and link, and because information about where the participants encountered the announcement was not collected, it is not known which populations were ultimately reached. It has come to light that a link to the recruitment information and research survey was posted on a private Facebook group perceived to have a pro-gender-affirming perspective during the first week of the recruitment period (via snowball sampling). This private Facebook group is called "Parents of Transgender Children" and has more than 8,000 members. This means that parents participating in this research may have viewed the recruitment information from one of at least four sites with varied perspectives. Specifically, three of the sites that posted recruitment information expressed cautious or negative views about medical and surgical interventions for gender dysphoric adolescents and young adults and cautious or negative views about categorizing gender dysphoric youth as transgender. And, one of the sites that posted recruitment information is perceived to be pro-gender-affirming. The rest of the Correction notice will refer to recruitment from the four sites that are known to have posted the survey in the first week of

PLOS ONE

recruitment: 4thwavenow, transgendertrend, Youth Trans Critical Professionals, and Parents of Transgender Children.

## Parental approaches to gender dysphoria and views on medical interventions

To oversimplify parental approaches as simply "accepting" or "rejecting" misrepresents the range of responses and complexity of approaches that parents take when addressing the needs of their gender dysphoric children. Parental approaches are complex and cover many variables. For example, one parental approach might be to affirm the child as a person, support gender nonconformity, support gender exploration, support mental health evaluation and treatment as needed, support the exploration of potential underlying causes for the dysphoria while expressing caution about medical interventions. Another approach might be to affirm the child's newly declared gender identity, support gender nonconformity, support a liberal approach to medical intervention while expressing caution about mental health evaluation and caution about the exploration of potential underlying causes for the dysphoria. To categorize the former as "rejecting" and the latter as "accepting" would be inaccurate.

This study recruited participants based on whether participants thought their child exhibited a sudden or rapid onset of gender dysphoria beginning during or after puberty and did not recruit based on parental beliefs about what types of approaches toward gender dysphoric AYAs are best. Although one of the sites posting recruitment information might be considered to hold a pro-gender affirming perspective and three sites might be considered to hold a cautious or even negative perspective about medical or surgical interventions, the site where a participant first heard about the study may not be an accurate reflection of their beliefs and whether they endorse or disagree with the content of the websites. Data about where participants first heard about this study were not collected. Future studies should seek a wider array of websites to post recruitment information, recruit from clinicians with varied approaches to gender dysphoria, and ask specific questions about parental beliefs regarding their approach to their child's gender dysphoria, including: whether parents support or don't support gender exploration, gender nonconformity, mental health evaluation and treatment, exploration of potential underlying causes for dysphoria, non-heterosexual sexual identity, and whether they hold a liberal, cautious or negative view about the use of medical and surgical interventions for gender dysphoric youth. Exploration about what types of affirmation are endorsed by parents including affirmation of the child as a person and affirmation of the child's gender identity would also be valuable.

## Expanded discussion about limitations and biases

Regarding the reporting of gender dysphoria, an absence of childhood gender dysphoria and whether the AYA was gender dysphoric at the time of survey completion were based on parent report of whether certain indicators of gender dysphoria were observed prior to puberty or at the time of the survey. These determinations were not diagnoses made by clinicians. Three of the indicators listed in the DSM-5 include information that a parent might not have access to (unless the child told them directly) [2], and therefore answers based on parent perceptions may not accurately reflect the experiences or traits of the AYAs themselves. However, the other five indicators include readily observable behaviors and preferences that would seem difficult for a parent not to notice such as: strong preference or strong resistance to wearing certain kinds of clothing; strong preference or strong rejection of specific toys, games and activities; and strong preference for playmates of the other gender [2]. It is possible that a parent could have ignored some of these indicators, though other people in the child's life may



have observed them. To improve the reliability of this measure, future studies should include evaluation from clinicians with input from parents, AYAs and from third party informants such as teachers, pediatricians, mental health professionals, babysitters, and other family members who knew the youth during childhood to verify the whether the readily observable behaviors and preferences were present or absent during childhood.

For a clinician to make a diagnosis of gender dysphoria in childhood, a child would need to exhibit at least six of the eight indicators. Given that 97.6% of the participants reported 2 or fewer readily observable indicators, even if hypothetically all participants incorrectly under-reported all three of the subtler indicators, 97.6% would still have fewer than six indicators. So, although no clinical evaluation was performed and a clear presence or absence of a diagnosis cannot be verified, given the reports of the easily observed behaviors and preferences, it can be said that it would be very unlikely for these AYAs to have met criteria for childhood gender dysphoria if they had seen a clinician for an evaluation.

There is expected variation in how objective parents can be about their own children. Some individual biases may limit the objectivity of parents. This descriptive study was not designed to explore or measure the objectivity of participants. Participants may have first learned about this study from one of four (or more) sites described previously where recruitment information was posted. It is possible that exposure to websites that take a cautious or negative approach to transition during adolescence and young adulthood and exposure to websites that take a pro-gender-affirming approach might influence how parents report about their children's experiences. There have not been any studies to determine if parents who seek information from online sites in general, don't seek information from online sites, or seek information from specific online sites, including the four sites noted for this study, differ in their ability to provide objective assessments of their children. However, if there were an excess of participants who, compared to other parents who take surveys reporting on their children, were less able to be objective about their children, it could limit some of the findings of the study, particularly for findings that are more interpretive rather than the findings that are more concrete.

The research survey did not specifically ask whether parents supported their AYAs' exploration of gender identity, so whether and what numbers of participants supported their child's exploration of gender identity is unknown. However, if there were an excess of parents who did not support the exploration of gender identity, it could potentially result in higher reports of declining mental health. The parents' perception that their child's mental health and the parent-child relationship were worse after the child announced a transgender-identification could be due to several variables such as conflict between parent and child, maladaptive coping mechanisms, or worsening psychiatric issues unrelated to gender. The trajectories for adolescent-onset gender dysphoria are not well understood and additional research is desperately needed.

There are many ways that parents can provide support for their child which include: affirming them as a unique and valuable person and as a loved member of the family; supporting their emotional and financial needs; supporting them in pursuing their interests; supporting them to develop the skills needed for self-sufficiency; supporting their choices of gender non-conforming clothing and interests; supporting their exploration of their identity; and supporting them in their critical thinking skills. Parental support is multifaceted and should not be oversimplified into a binary of whether a parent agrees or disagrees with a specific medical course. This study was not designed to measure different types of support provided by parents or levels of support. If there were an excess of parents who were unsupportive of their children, it might affect some of these initial findings. The nature and extent of parental support—including the many different ways that parents can support their children in becoming healthy, self-sufficient adults—is well worth further study.

PLOS ONE

## Clarification of Fig 1

The purpose of Fig 1 was to provide the reader with a quick sense of what kinds of advice can be found and shared on Reddit and Tumblr. One example includes an excerpt from a publicly available Tumblr blog that posted a list of purported indirect signs of gender dysphoria. This excerpt is indeed an example of advice that can be found on Tumblr. Note, however, that the excerpted Tumblr post itself does not reflect the full content of the original blog it refers to, nor does the excerpt in Fig 1. The original blog is titled, "'That was dysphoria?' 8 signs and symptoms of indirect gender dysphoria" [15].

## Discussion of the ICD-11 change from "gender dysphoria" to "gender incongruence"

The ICD-11 will go into effect in January 2022, and, with this change, the new diagnosis of "gender incongruence" will replace "gender dysphoria." Because the current descriptive, exploratory study raises hypotheses about factors that may contribute to the onset and/or expression of gender dysphoria and concludes that more research is needed, it is unlikely that the change in diagnostic criteria will appreciably change the conclusion of the study, although the terminology may become outdated.

## Supporting information

**S1 File. PDF of the original article version that was published on August 16, 2018 (two figures removed due to copyright restrictions).**
(PDF)

## References

1. Littman L. Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS ONE. 2018; 13(8): e0202330. https://doi.org/10.1371/journal.pone.0202330 PMID: 30114286

2. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders (Fifth ed.). Arlington, VA: American Psychiatric Publishing; 2013.

3. Zucker KJ. Epidemiology of gender dysphoria and transgender identity. Sex Health. 2017 Oct; 14 (5):404–411. https://doi.org/10.1071/SH17067 PMID: 28838353

4. Aitken MA, Steensma TD, Blanchard R, VanderLaan DP, Wood H, Fuentes A, et al. Evidence for an altered sex ratio in clinic-referred adolescents with gender dysphoria. J Sex Med. 2015; 12:756–763. https://doi.org/10.1111/jsm.12817 PMID: 25612159

5. de graaf NM, Giovanardi G, Zitz C, Carmichael P. Sex Ratio in Children and Adolescents Referred to the Gender Identity Development Service in the UK (2009–2016). Archives of Sexual Behavior. 2018; 47:1301–1304 https://doi.org/10.1007/s10508-018-1204-9 PMID: 29696550

6. Zucker KJ, Bradley SJ, Owen-Anderson A, Kibblewhite SJ, Wood H, Singh D, Choi K. Demographics, Behavior Problems, and Psychosexual Characteristics of Adolescents with Gender Identity Disorder or Transvestic Fetishism, Journal of Sex & Marital Therapy. 2012; 38:2, 151–189.

7. Steensma TD, Kreukels BPC, de Vries ALC, Cohen-Kettenis PT. Gender identity development in adolescence. Hormones and Behavior. 2013; 64: 288–297. https://doi.org/10.1016/j.yhbeh.2013.02.020 PMID: 23998673

8. Bonfatto M, Crasnow E. Gender/ed identities: an overview of our current work as child psychotherapists in the Gender Identity Development Service, Journal of Child Psychotherapy. 2018; 44:1, 29–46.

9. Moore M. Grounded Theory. In: Goodley D, Lawthom R, Clough P, and Moore MResearching Life Stories: Method, Theory and Analyses in a Biographical Age. London: RoutledgeFalmer; 2004. pp 118–121.

10. Littman LL, Zarcadoolas C and Jacobs AR, Introducing abortion patients to a culture of support: a pilot study, Archives of Women's Mental Health. 2009; 12(6):419–431 https://doi.org/10.1007/s00737-009-0095-0 PMID: 19672677

**PLOS | ONE**

11. Littman LL, Jacobs A, Negron R, Shochet T, Gold M, Cremer M. Beliefs about abortion risks in women returning to the clinic after their abortions: a pilot study. Contraception. 2014; 90(1):19–22. https://doi.org/10.1016/j.contraception.2014.03.005 PMID: 24792143

12. Grimes D A., Schulz K. F. An overview of clinical research: the lay of the land. *The Lancet*. 2002; 359 (9300):57–61.

13. Grimes DA, Schulz KF. Descriptive studies: what they can and cannot do. Lancet. 2002; 359:145–9. PMID: 11809274

14. Child and Adolescent Health Measurement Initiative. Fast Facts: 2017 National Survey of Children's Health. Data Resource Center for Child and Adolescent Health, supported by Cooperative Agreement U59MC27866 from the U.S. Department of Health and Human Services, Health Resources and Services Administration's Maternal and Child Health Bureau (HRSA MCHB). 2018. Available from: https://www.childhealthdata.org/docs/default-source/default-document-library/2017-nsch-fast-facts_final60ba3af3c0266255aab2ff00001023b1.pdf?sfvrsn=659c5817_0 Revised 26 Sept 2018.

15. Jones Z. "That was dysphoria?" 8 signs and symptoms of indirect gender dysphoria. Sept 10 2013. Available at: https://genderanalysis.net/articles/that-was-dysphoria-8-signs-and-symptoms-of-indirect-gender-dysphoria/

**EXHIBIT     8**
Witness:  Kenny
Date:  5/30/23
Stenographer:  Brandy Bradley, RPR

About CAAPS

CAAPS Summits

CAAPS Podcast

Media Experts

CAAPS Discussion Forum

# Coalition for the Advancement & Application of Psychological Science

## CAAPS Position Statement on Rapid Onset Gender Dysphoria (ROGD)

As an organization committed to the generation and application of clinical science for the public good, the Coalition for the Advancement and Application of Psychological Science (CAAPS) supports eliminating the use of Rapid-Onset Gender Dysphoria (ROGD) and similar concepts for clinical and diagnostic application given the lack of rigorous empirical support for its existence.

There are no sound empirical studies of ROGD and it has not been subjected to rigorous peer-review processes that are standard for clinical science. Further, there is no evidence that ROGD aligns with the lived experiences of transgender children and adolescents.

Despite the lack of evidence for ROGD and its significant potential for creating harm, it has garnered increased attention in the general public and is being misused within and beyond the field of psychology. For example, recent medical articles have started including ROGD in their overview of adolescents with gender incongruence, and there has been an increase in books, videos, podcasts, and training directed to parents and clinicians offering strategies for diagnosing and treating ROGD. The proliferation of misinformation regarding ROGD is also infiltrating policy decisions. Currently, there are over 100 bills under consideration in legislative bodies across the country that seek to limit the rights of transgender adolescents, many of which are predicated on the unsupported claims advanced by ROGD. Thus, even though ROGD is not a diagnostic classification or subtype in either the Diagnostic and Statistical Manual of Mental Disorders (DSM) or the International Classification of Diseases (ICD), nor is it under consideration for inclusion in future editions, it is critical to address the misinformation regarding ROGD now.

Research on gender identity development in children and adolescents continues to evolve and these advances will likely influence diagnosis and empirically-based standards of care, as well as the legislative landscape impacting trans people's access to care and legal protections. The available research is clear that transgender people are subjected to marginalization, stigmatization, and minority stress, which have significant detrimental effects on health and well-being. Terms, such as ROGD, that further stigmatize and limit access to gender-affirming and evidence-based care violate the principles upon which CAAPS was founded and public trust in clinical science.

CAAPS supports eliminating the use of ROGD and similar concepts for clinical and diagnostic application given the lack of empirical support for its existence and its likelihood of contributing to harm and mental health burden. CAAPS also encourages further research that leads to evidence-based clinical guidelines for gender-affirming care that support child and adolescent gender identity development. CAAPS opposes trainings that encourage others to utilize this concept in their clinical practice given the lack of reputable scientific evidence to support its clinical utility. Finally, CAAPS recommends expanding community education about these topics to reduce the stigma and marginalization that contribute to mental health burden.

**Signatories:**

American Psychological Association (APA)

Society for the Psychology of Sexual Orientation and Gender Identity, American Psychological Association, Division 44

Society for a Science of Clinical Psychology (SSCP)

Society of Clinical Child and Adolescent Psychology (SCCAP), American Psychological Association, Division 53

Society of Behavioral Medicine (SBM)

Society for the Psychological Study of Social Issues (SPSSI)

Association for Behavioral & Cognitive Therapies (ABCT)

National Association of School Psychologists

Council of University Directors of Clinical Psychology (CUDCP) Board

Asian American Psychological Association (AAPA)

Society for the Psychological Study of Culture, Ethnicity, and Race

MSU Research Consortium on Gender-based Violence

State, Provincial and Territorial Psychological Association Affairs (Division 31, APA)

American Psychological Association, Division 22 Rehabilitation Psychology

New York Association of School Psychologists (NYASP)

Society for Community Research and Action (SCRA)

Society for the Study of School Psychology (SSSP)

Society for Child and Family Policy and Practice (Division 37 of the American Psychological Association)

Society of Personality and Social Psychology

Association for University and College Counseling Center Directors (AUCCCD)

Psychologists' Association of Alberta

Saint Louis University, Clinical Psychology Program

American Psychology-Law Society; Division 41 of APA

Michigan State University, Department of Psychology, Clinical Science Area

Psychologists in Public Service, American Psychological Association, Division 18

American Psychiatric Association

Society of Pediatric Psychology (SPP), Division 54 of the American Psychological Association

Society for Research in Child Development

National Association of Psychological Research and Graduation Programs

Council on Social Work Education

Stony Brook University, Clinical Psychology Program

Michigan State University Twin Registry (MSUTR)

Society of Counseling Psychology, Division 17, American Psychological Association

National Latinx Psychological Association (NLPA)

Anxiety and Depression Association of America

The Society of Clinical Psychology, APA Division 12

American Group Psychotherapy Association

University of Miami Department of Psychology

Portuguese Psychologists Association

Diverse Sexualities Research and Education institute

National Association of Social Workers

Puerto Rico Psychology Association

Association for Psychological Science

Connecticut Psychological Association

Howard Brown Health

American Association for Marriage and Family Therapy

British Columbia Psychological Association

World Professional Association for Transgender Health (WPATH)

Associations for Psychologists in Academic Health Centers

Nebraska Psychological Association

GLMA: Health Professionals Advancing LGBTQ Equality

Michigan Psychological Association

Arizona Psychological Association

New Hampshire Mental Health Counselors Association

Florida Psychological Association

Minnesota Association for Marriage and Family Therapy (MAMFT)

AIP— Italian Association of Psychology

Manitoba Psychological Society

Georgia Psychological Association

Vermont Psychological Association

Illinois Psychological Association

Delaware Psychological Association

# CAAPS

About    Contact    Follow



EXHIBIT    22
Witness:  Kenny
Date:  5/30/23
Stenographer:  Brandy Bradley, RPR



# PSYCHOTHERAPY FOR TRANSGENDER DECLARING ADOLESCENTS

**Dianna Kenny PhD MAPsS MAPA**
Professor of psychology (rtd), The University of Sydney
Society for Evidence-based Gender Medicine

15 November 2021

# Four distinct groups

- ***Early onset during preschool.*** I have not been referred a case of early onset GD. They are very rare.

- ***Adolescent onset (ROGD).*** By far, most referrals to my practice are for young people aged 12-17, predominantly girls. This presentation will focus on this group.

- ***Over 18s and young adults.*** Unlike the bias towards females in ROGD referrals, the over 18s referred to my practice are more equally distributed between males and females. The majority are referred by parents. Their management is complicated by the fact that they are legally adults and able to make their own decisions independently of parents.

- ***Mature aged adults.*** Many present after the breakdown of their marriages with a history of long term cross-dressing and fantasies about being the other sex. Others present as single adults who have been socially transitioned for many years, having first identified as butch lesbians, and decide to finalize their transition surgically.

# Intake assessment



- **Family constellation**, family conflict /dysfunction, marital and sibling dynamics

- **Psychological evaluation** – ADHD, ASD, self-harm, suicidality, suicide attempts, anxiety, depression, incipient BPD, and psychosis

- History of **body dysmorphia**, eating disorders

- **School life experiences** e.g., attitude towards school, peer rejection, bullying, truanting, academic performance, post school aspirations

- **Cognitive immaturity, concrete thinking, cognitive rigidity, and cognitive distortions**, lack of understanding or misunderstanding of gender ideology and capacity to critically review it (given the illogical and scientifically unsound basis of the ideology)

- **Understanding of the gravity and irreversibility of medical/surgical transition**; what GA treatment entails, and the consequences of treatment (e.g., infertility, sexual dysfunction, complications of cross-sex hormones and surgery, lifelong patienthood).

- **Sexual experience** history – sexual relationships, sexual abuse experiences, sexual knowledge, sexual anxiety

- Emerging awareness of **ego dystonic sexual orientation** - > internalized homophobia

- **Social contagion** (influence of social milieu e.g., schools, gender clinics, internet, online transgender communities)

- Perceptions and misperceptions of **gender roles**

- **Systemic function of ROGD** e.g., defiance of parents, finding an "in group," being "seen", denying the development of their sexed bodies, fear of adulthood, fear of sexual relationships.



# TRANSITION, SELF HARM AND SUICIDALITY

The vulnerable (traumatized) part of the self is hated so it is subsumed into the omnipotent self which is the part that suppresses doubts and anxiety and presses for transition.

If the traumatized self pushes for recognition of psychic pain, the young person may resort to self-harm and suicidal ideation which is a form of acting out of their self-hatred against their bodies.

Affirming clinicians collude with the patient's own attacks on the traumatized self by "traumatizing" their bodies with cross-sex hormones and mutilating surgery.

Hope that transition will restore young person to an ideal state – medics become omnipotent creators of this ideal state. When this fails, the patient sinks into further self-hatred which is enacted through self-harming and suicidal states.

# Mechanisms of social contagion

○ Peer contagion

- has a powerful socializing effect on children beginning in the preschool years.
- By middle childhood, gender is the most important factor in the formation of peer associations, highlighting the significance of gender as an organizing principle of the norms and values associated with gender identity.
- ROGD have often experienced peer rejection, bullying, hostility and/or social isolation and hence feel marginalized from peer groups. They will gravitate to the Rainbow clubs in schools where everyone is accepted without question, especially if they declare an alternative gender, whereupon they are lauded and validated, even when they had no previous intentions to do so.



## Social contagion

A very powerful phenomenon underlying the staggering increases in primarily adolescent girls declaring themselves transgender.

Social contagion identified as a mechanism in eating disorders, self harm and suicide, substance abuse, emotion, and now gender dysphoria.

# Mechanisms of social contagion

- ◦ Deviancy training
  - ◦ deviant attitudes and behaviours rewarded by the peer group
- ◦ Co-rumination
  - ◦ a process of repetitive discussion, rehearsal and speculation about a problematic issue within the peer dyad.
  - ◦ Results in increases in internalizing disorders and gender confusion.
  - ◦ Girls more affected



## Social contagion

A very powerful phenomenon underlying the staggering increases in primarily adolescent girls declaring themselves transgender.

Social contagion identified as a mechanism in eating disorders, self harm and suicide, substance abuse, emotion, and now gender dysphoria.

A boy has a special needs younger sister who gets all the attention. Watching his mother tend to his sister one day, he said "Mummy, you will only love me if I am a girl."

A loved father appears to love her brother more than his daughter and spends much more time engaged in male pursuits with his son. She says, "I want to be close to Dad but he spends all his time with my brother and never with me." She concluded it was better to be a boy and declared herself transgender. Now she is in a perpetual rage that her father does not accept her transgender identity because she feels she has nothing more to offer him.

A mother tells her pre-adolescent daughter who is described as a "tomboy" about the sexual abuse she experienced as a child by her stepfather and the sexual assaults she endured as a teenager. Her daughter formed the view that girls are unsafe in the company of men and are constantly at risk of harm particularly as they approach puberty. She decided that being a female "sucked" and that she would prefer to be a male in order to keep herself safe and strong.

A 15-y old girl has a mother who has been diagnosed with BPD. She has lived with her mother's emotional storms and capriciousness all her life. When she has an outburst, her father says, "You have your mother's BPD, and I don't want to have to deal with that again." He would then leave the house. Her father told her, "It is because you were the firstborn - the firstborn girl in Mum's family always got the worst mental illness." This girl formed the view that men and boys are saner than women and girls and that it would be preferable to change gender rather than turn out like her mother.



# Family Constellation

Identity is not hard-wired – it develops in a social world where the young person experiences attachments, trauma, abuse, or misperceives the meaning of experiences because of cognitive immaturity or concrete thinking.

Need to explore identifications (I want to be like…) and dis-identifications (I do not want to be like…)

A 14-year-old natal boy first came out to his parents as **GAY**.

He soon changed that declaration to **BISEXUAL** when he experienced a powerful crush on a female classmate. After she rejected him, he came out as **TRANS** and demanded puberty blockade and cross sex hormones.

In therapy, his demands for transition were strident and incessant. He constantly asked me when I was going to tell his parents that he could go ahead with his transition.

He shaved his legs, arms and body hair, grew his hair long, and started to wear eye makeup and nail polish. He ordered female clothing from the internet and wore it secretly in his room. When his parents confiscated these clothing items, his female friends lent him their clothes to wear until I advised his parents to put a stop to this. Teachers at his school started calling him by his preferred name and pronouns until I advised his parents not to allow this.

Several months after therapy commenced, while still vehemently protesting his trans-female identity, he wrote a letter to his parents apologising for misleading them. He said he now realised that he was not a trans-female but a **DEMIGIRL** (denoting partial non-binary, partial female gender identity).

He changed this orientation shortly thereafter to **DEMIBOY**, before again writing to his parents, telling them that he was only joking about the whole thing and that they were the only people who had taken it seriously.

I advised his parents to eat humble pie to give their son the opportunity to exit the gender maze without losing face.

The next day he asked his parents to take him for a haircut. **STRAIGHT**

# Sexual orientation

Many young people are confused about their sexual orientation and often conflate sexual orientation with gender identity.



# ROMANTIC AND SEXUAL RELATIONSHIPS

**Majority of young GD adolescents**

**(i)  have had no sexual experience  (crushes from a distance, hand holding and kissing)**

**(ii)  disdain genital sex  as "gross"**

**(iii)  are indifferent to loss of sexual function, fertility**

**(iv) are confused about the nature of "trans" relationships e.g.,**

A self-declared non-binary male (natal sex = male) in a relationship with a transgender declaring natal female (i.e., a trans man) told their parents they were in a gay male relationship. Similarly, two natal females, both transmen, rejected the suggestion that they were a lesbian couple and stated that they were a gay male couple.



Anime character against a pansexual flag

## Case example: Artem, aged 15

Artem, aged 15, from a Middle Eastern country that is homophobic, was referred by his mother for a range of issues but specifically because he had declared himself **transgender**. He was post pubertal, facially and bodily hirsute with a deep male voice. Artem was insistent that he was transgender and was impatient to commence his social transition and to obtain prescriptions for cross sex hormones.

### Of himself:

I see myself as **bisexual**. I have feelings for guys and girls, more like a **pan**-thing. I have had a boyfriend who identifies as male and pan since last year. We get together just the two of us - we visit each other's houses. I guess I would be OK with being **GAY**. For me, it fluctuates.

### Of his mother, Artem said:

Mum knows I have this friend. She doesn't know that he is **my boyfriend**. I don't think Mum will take it well because she asked me if I still liked girls. She wouldn't take kindly to knowing I am gay and have a boyfriend.

### Of his father, Artem said:

Dad is trying to suppress his **queer phobia**, but he says bad things about LGBTQ. He is anti it all; he got angry with me for refuting what he was saying. Dad said **gay is about anal sex and that is gross**. Then Mum told him to shut up and I went to my room and cried. Dad is anti queer for sure, he tries to suppress it because he still loves me. I felt very disappointed in Dad when he expressed these sentiments. He will be very freaked out if he thinks I am **queer, gay, or trans**.

# Internalized homophobia

An adolescent realises that s/he is same-sex attracted. Finding this unacceptable, due to parental and/or internalized homophobia, the adolescent reasons as follows:

Being same-sex attracted is bad and shameful. My parents will reject me if I am gay. If I am a boy attracted to other boys, I must be a girl and therefore need to transition so that my attraction to boys becomes heterosexual.



## Conclusions



- Imperative to keep the **developmental path** open into adulthood (need **frontal lobe maturation** that occurs in early 20s)

- **Psychological trauma** from the past forms part of their psychic structure in the present. The expression of these **traumas are socio-culturally embedded** (i.e., social contagion permits particular forms of "acting out" these traumas).

- Envy and rivalry part of human condition -> **unconscious envy** is a factor in trans identification

- GD adolescents need assistance to explore their **defences and internal psychic conflicts and managing their psychic pain** before irreparably altering their bodies. "The body is used to act out something that cannot be accepted or processed by the mind." (Evans & Evans, 2021, Ch 2, p. 28).

- **Clinicians should not collude with the phantasy that the "embodied" self can be altered or removed.**



# CURRENT CONCEPTS
# IN GENDER AFFIRMING SURGERY
# FOR WOMEN IN TRANSITION

**ONLINE EVENT**   March 11th & 12th, 2021

## FACIAL SURGERY

Moderated by Drs. Shane Morrison & Devin Coon


**FGCS – state of the art**
**Dr. Daniel Simon**


**Forehead and hairline**
**Dr. Luis Capitán**

## TRANSGENDER HEALTH

Moderated by Prof. Loren S. Schechter


**Transgender rights**
**Dr. Jamison Green**

## GENITAL SURGERY

Moderated by Dr. Marci L. Bowers


**Vaginoplasty: what is new?**
**Prof. Stan Monstrey**


**Upper face feminization**
**Dr. Christopher Inglefield**


**Gender incongruence**
**Prof. Christina Richards**


**20 years of surgery**
**Dr. Iván Mañero**


**Rhinoplasty and lip lift**
**Dr. Raúl J. Bellinga**


**Social acceptance**
**Prof. Joz Motmans**


**Montreal vaginoplasty**
**Dr. Pierre Brassard**


**Lower jaw contouring**
**Dr. Javier G. Santamaría**


**Hormonal treatment**
**Prof. Guy T'Sjoen**


**Failed vaginoplasty**
**Prof. Miroslav Djordjevic**


**Expectations in FGCS**
**Dr. Jens U. Berli**



# Conclusions

○ **Sexual development poses a threat** to young people as it signifies approaching adulthood, the demands of which they feel ill equipped to manage.

○ **ROGD** as a "trauma" or **a response to the reality of puberty** that one now has a **sexed body**.

○ Rigid **adherence to peer norms** temporarily assuages vulnerabilities because the young person has found others like him/her who are acting out in the same way.



TRANSITION could be

i. related to a grievance against the parents and a struggle for autonomy/individuation

ii. related to an idea that one can create an ideal self

iii. protective against feelings of inadequacy, anxiety, jealousy, and disappointment

iv. a triumph over feelings of vulnerability

v. a repudiation of the sexed body and adulthood

