UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| K.C., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00595-JPH-KMB |
| | ) | |
| THE INDIVIDUAL MEMBERS OF THE | ) | |
| MEDICAL LICENSING BOARD OF | ) | |
| INDIANA, in their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiffs' Reply Memorandum in Support of Motion for Preliminary Injunction**

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org


Chase Strangio
*Pro Hac Vice*
Harper Seldin
*Pro Hac Vice*
ACLU
125 Broad St.
New York, N.Y.
212/549-2500
cstrangio@aclu.org
hseldin@aclu.org

Attorneys for Plaintiffs and the
Putative Classes and Subclasses

## Table of Contents

Table of Authorities.................................................................................................... iii

Introduction................................................................................................................ 1

Response to the State's Proffered Evidence.............................................................. 2

    I.     It is undisputed that the care prohibited by S.E.A. 480 conforms to the
          applicable standards of care ..................................................................... 2

    II.    The State's defense of the law is supported by witnesses whose statements are
          entitled to little, if any, weight, and ignores the science supporting gender-
          affirming care ........................................................................................... 4

          A.    The State's "expert" witnesses are unqualified and not credible .......... 4

          B.    The State's concerns about the accepted medical treatments for
               gender-dysphoric minors are ill-founded ................................................ 7

    III.   The plaintiff parents provided informed consent to their children's gender-
          affirming medical treatment consistent with existing medical protocols, and the
          plaintiff youth have all benefitted enormously from this treatment ................... 10

          A.    It is undisputed that the plaintiff parents all provided consent to
               gender-affirming care for their children only after being fully informed
               of the risks and benefits of that care ...................................................... 11

          B.    It is undisputed that the plaintiff youth have greatly benefited from their
               gender-affirming care ............................................................................. 12

Argument ................................................................................................................... 15

    I.     The plaintiffs are likely to prevail on the merits of their claims ......................... 15

          A.    The plaintiffs have standing to challenge S.E.A. 480's prohibition on
               surgery.................................................................................................... 15

          B.    S.E.A. 480 violates the equal-protection rights of the plaintiff youth... 16

               1.    S.E.A. 480 discriminates on the basis of sex and transgender
                    status...................................................................................... 16

               2.    S.E.A. 480 fails any level of scrutiny ............................................ 19

          C.    S.E.A. 480 infringes upon the fundamental rights of parents to the care,
               custody, and control of their children, and is not narrowly tailored to serve

any compelling governmental interests........................................................ 19

D.   S.E.A 480's ban on the provision of gender-affirming care violates federal Medicaid law ............................................................................ 22

1.   Medicaid requires the provision of services, not merely payment for services.................................................................................. 22

2.   S.E.A. 480 violates the Availability Provision of federal Medicaid law............................................................................................. 24

3.   S.E.A. 480 violates the Comparability Provision of federal Medicaid law............................................................................................. 25

E.   S.E.A. 480 violates the Affordable Care Act .............................................. 26

F.   S.E.A. 480's aid-or-abet provision violates the First Amendment ........ 27

II.   Absent an injunction, the plaintiffs will suffer irreparable harm.......................... 29

III.   S.E.A. 480 should be preliminarily enjoined on its face ......................................... 30

Conclusion ...................................................................................................................................... 30

## Table of Authorities

**Cases**

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) ................................................27

*Bigelow v. Virginia*, 421 U.S. 809 (1975) ...........................................................................................28

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018) .............................................................17

*Brandt v. Rutledge,* 47 F.4th 661 (8th Cir. 2022).............................................................................15

*Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022)..........*passim*

*Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003) .........................................................................25

*Collins v. Hamilton*, 349 F.3d 371 (7th Cir. 2003) ..........................................................................24

*Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc.*, 800 F.2d 177 (7th Cir. 1986) ..................................................................................................................................27

*Department of Homeland Security v. New York*, 140 S. Ct. 599 (2020) .........................................30

*Doe v. City of Lafayette, Ind.*, 377 F.3d 757 (7th Cir. 2004) ..........................................................20

*Doe v. Ladapo*, 2023 WL 3833848 (N.D. Fla. June 6, 2023) ........................................................*passim*

*Doe v. Rokita*, 54 F.4th 518 (7th Cir. 2022 ......................................................................................30

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002) ......................................6

*Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022).............................................*passim*

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ...........................................................................................17

*Health & Hospital Corporation of Marion County v. Talevski*, 2023 WL 3872515 (June 8, 2023)...............22

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................................................28

*Illinois Republican Party v. Pritzker,* 973 F.3d 760 (7th Cir. 2020)..............................................16

*Kadel v. Folwell*, 446 F. Supp. 3d 1 M.D. N.C. 2020), *aff'd*, 12 F.4th 422 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022)..................................................................................................................18

*Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022), *appeal pending*, No. 22-1721 (4th Cir.) .... 7, 8, 17

*Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396 (6th Cir. 2019)................................20

*McConnie-Navarro v. Centro de Fertilidad del Caribe, Inc.*, 2007 WL 7652299 (D.P.R. May 31, 2007) .........6

*Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494 (1977) .....................................................................21

*O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016) ........................................................................... 23, 25

*Parham v. J.R.,* 442 U.S. 584 (1979) ..............................................................................20, 21, 22

*Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981)...............................................25

*Planned Parenthood of Ind. & Ky., Inc. v. Commissioner*, 258 F. Supp. 3d 929 (S.D. Ind. 2017), *vacated in part*, 142 S. Ct. 2228 (2022)................................................................................................................29

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)................................................................................28

*Reno v. Flores*, 507 U.S. 292 (1993).......................................................................................... 21, 22

*Romer v. Evans*, 517 U.S. 620 (1996)..............................................................................................19

*Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980) .............................................................................26

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) ...............................................................8

*Troupe v. Barbour*, 2013 WL 12303126 (S.D. Miss. Aug. 23, 2013) ..............................................24

*Troxel v. Granville*, 530 U.S. 57 (2000) ........................................................................................20

*United States v. Virginia*, 518 U.S. 515 (1996) ....................................................................... 18, 19

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000).........................................................................20

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) ..................................................................................................................................16, 18, 27

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) ...........................................................30

*Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013)............................18

**Statutes**

*United States*

P.L. 111-148 (H.R. 3590), § 2304 (Mar. 23, 2010) ..................................................................23

42 U.S.C § 1396a(a)(10)............................................................................................................24

42 U.S.C. § 1396a(a)(10)(A) .....................................................................................................24

42 U.S.C. § 1396a(a)(10)(B) .....................................................................................................25

42 U.S.C. § 1396a(a)(43)…………………………………………………………………...24

42 U.S.C. § 18116(a) .................................................................................................................26

*Indiana*

Ind. Code § 25-2-22-3 (eff. July 1, 2023)................................................................................16

Ind. Code § 25-2-22-5 (eff. July 1, 2023) …………………………………………………16

Ind. Code § 25-1-22-5(b) (eff. July 1, 2023) ..........................................................................18

Ind. Code § 25-2-22-12 (eff. July 1, 2023).............................................................................17

Ind. Code § 25-1-22-13(b) (eff. July 1, 2023).................................................................. 23, 27

Ind. Code § 25-1-22-13(c) (eff. July 1, 2023). ......................................................................25

**Regulations**

*United States*

42 C.F.R. § 440.230(c) ..............................................................................................................25

*Indiana*

Ind. Admin. Code tit. 405, r. 5-29-1(1) ....................................................................................24

**Other Authorities**

H.R. Rep. No. 299, 111th Cong., 1st Sess. 2009 (Oct. 14, 2009) ..............................................................23

Annelise Hanshaw, *Families dispute whistleblower's allegations against St. Louis transgender center*, Missouri Indep., Mar. 1, 2023, *at* https://missouriindependent.com/2023/03/01/transgender-st-louis-whistleblower (last visited June 6, 2023 ...................................................................................................12

**Introduction**

Every district court that has so far considered whether to preliminarily enjoin a law banning gender-affirming medical care for minors has done so, allowing care to continue during the pendency of the proceedings. *See Doe v. Ladapo*, 2023 WL 3833848 (N.D. Fla. June 6, 2023); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022); *Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022). Those courts rejected arguments, like the ones made by the State of Indiana in defense of S.E.A. 480, trying to cast doubt on the well-established, evidence-based standards of care and treatment protocols for gender dysphoria in adolescents, which are followed by the Riley Gender Health Program ("Riley") and Mosaic Health and Healing Arts, Inc. ("Mosaic") to successfully treat the minor plaintiffs. Absent a preliminary injunction, the plaintiff youth and hundreds if not thousands of other minors will be denied this care and their gender dysphoria, a condition that causes extreme distress, will be profoundly, detrimentally exacerbated.

S.E.A. 480 is extraordinary in its overreach. The care that it bans is not untested or experimental treatment. It is the consensus medical treatment endorsed by major medical professional associations across the globe. Yet, Indiana presumes to intrude into the relationship between parents, their children, and their physicians to absolutely prohibit this essential treatment. To justify that overreach, the State relies on five purported experts who disagree with the well-accepted protocols for treatment of gender dysphoria, a recognized condition the existence of which some of them only grudgingly accept, despite its inclusion in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5-TR"). Their sharp break with mainstream medical practice is unsurprising, given that they have no claim to expertise in adolescent gender dysphoria or its treatment. Two have no experience treating transgender adolescents. The others have minimal experience, treating maybe twenty or twenty-five patients over decades of practice. And none have conducted any peer-reviewed research in the field. On multiple occasions, the limits to their expertise,

1

the outlier opinions they offer, and serious questions about their credibility have caused federal courts to significantly limit their testimony or to afford their testimony little weight.

The State and its experts attack the quality of existing studies showing the documented effects of the banned treatment, ignore the decades of clinical experience of clinicians across the country, and claim more research is needed to understand the effects of gender-affirming hormone therapy, but then defend a law that would block such research. They do this while offering no evidence-based alternate course of care for the minors who everyone admits are suffering. As the court in *Ladapo* explained, "[t]he choice these plaintiffs face is binary: to use GnRH agonists and cross-sex hormones, or not. It is no answer to say the evidence on the yes side is weak when the evidence on the no side is weaker or nonexistent." 2023 WL 3833848, at *11. There are real people suffering real harms and for them, "[a] decision … cannot wait for further or better research; [it] must be made now." *Id.*

Whether analyzed under equal protection or due process, the State's interference cannot be justified. S.E.A. 480 violates both the Constitution and federal law and is causing irreparable harm.

## Response to the State's Proffered Evidence

**I.     It is undisputed that the care prohibited by S.E.A. 480 conforms to the applicable medical standards of care**

At no point does the State dispute the fact that the clinical guidelines set out by the World Professional Association for Transgender Health ("WPATH") and the similar standards established by the Endocrine Society—which include pubertal suppression and gender-affirming hormones—are the standards of care utilized by practitioners to treat adolescents with gender dysphoria. (*See, e.g.*, Dkt. 26-1 at 9-10; Dkt. 26-2 at 9-11; Dkt. 26-3).[1] As noted in information provided to patients at Riley, which also summarizes some of the research findings described in greater detail by the plaintiffs'

---

[1]      *See also, e.g.*, *Ladapo*, 2023 WL 3833848, at *3 (crediting "the abundant testimony in this record that these standards [that is, those established by WPATH and the Endocrine Society] are widely followed by well-trained clinicians").

experts, these are the "[e]xpert medical standards of care on the provision of gender-affirming care [that] have been continuously maintained and updated for more than 40 years. These standards require providers to carefully evaluate each patient and make decisions in [their] best interest." (Dkt. 58-1 at 16-17).[2] The prevailing practice in the United States is to adhere to these protocols, including by providing careful mental-health assessments, addressing comorbid psychiatric conditions, and following rigorous informed-consent processes before initiating any medical interventions for gender-dysphoric adolescents. (*See* Dkt. 58-2 at 3-5; Dkt. 58-3 at 3). As explained by Drs. Dan Karasic, Daniel Shumer, and Jack Turban—who, collectively, have treated thousands of patients with gender dysphoria over several decades, published extensively on this topic, and conducted leading research in this field—these practices not only are well-established, but are thoroughly supported by research and clinical experience. (*See, e.g.*, Dkt. 26-1 at 9-10, 12, 16-17; Dkt. 26-2 at 19-21; Dkt. 26-3 at 5-8, 10-11).

It is therefore not surprising that the WPATH and Endocrine Society treatment protocols are supported by the major professional medical and mental-health associations in the United States, including the American Academy of Pediatrics, the American Medical Association, the Pediatric Endocrine Society, the American Psychiatric Association, and the American Psychological Association, among many others. (Dkt. 26-1 at 16). Several of these organizations have issued explicit statements opposing bans on gender-affirming care for adolescents with gender dysphoria. (Dkt. 26-3 at 4).  The reason for this, of course, is that puberty blockers and hormones are safe and effective treatments for adolescents with gender dysphoria. (*See* Dkt. 58-3 at 2, 5-6, 8-9). Receiving gender-affirming medical care during adolescence can lead to substantial mental-health improvements, and

---

[2]        In addition to providing gender-affirming care to plaintiffs K.C., A.M., and M.W. (Dkt. 26-4 at 2; Dkt. 26-5 at 1-2; Dkt. 26-6 at 9), Riley has provided care to more than 900 patients between 2018 and 2022, "[a] good percentage of whom" have received or are receiving either pubertal suppressants or gender-affirming hormones (Dkt. 48-6 at 16 [Riley Dep. 55:8-20]). Dr. Bast, who provides services to plaintiff M.R. at Mosaic, also follows the WPATH Standards of Care. (Dkt. 26-9 at 3). So does the Gender Health Clinic at Eskenazi Hospital, which provides hormones to post-pubertal adolescents. (Dkt. 48-7 at 8-10 [Eskenazi Dep. 24:19-21, 29:19-24, 31:19-23]).

forcing adolescents to wait until they turn 18 to receive care can have a severe negative impact on mental health while exacerbating lifelong dysphoria. (*See* Dkt. 58-2 at 9-10; Dkt. 58-3 at 4). This care is particularly important because there are no alternative treatments to manage the serious effects of gender dysphoria in adolescence: although the State's experts have some hypotheses about what *might* work, like yoga or just waiting, there is no evidence for that. (*See* Dkt. 58-2 at 6-9). Nor is there any evidence that psychotherapy alone addresses gender dysphoria, although it may be part of the treatment to support the person's general mental health. (*See* Dkt. 58-2 at 6-8; Dkt. 58-4 at 5, 27). While the State's experts critique the data supporting existing treatment protocols, the alternative treatment modalities they recommend are supported by *no* evidence of safety or efficacy.

## II.   The State's defense of the law is supported by witnesses whose statements are entitled to little, if any, weight, and ignores the science supporting gender-affirming care

In defense of the law, the State proffers a series of mischaracterizations and distortions about the treatment of gender dysphoria and its evidence base, presented by persons claiming expertise who lack relevant experience. Given that it is clear that S.E.A. 480 prohibits the care that is endorsed as the standard of care throughout the United States, there really is no need to go any further. But it is worth noting that, contrary to the State's arguments,  (a) gender dysphoria is diagnosed just like other psychiatric conditions; (b) destigmatization and greater awareness of treatment options, not "social contagion" among adolescents, have resulted in more youth presenting at gender clinics for treatment; (c) patient regret is not unique to the provision of gender-affirming care and, when compared to other conditions, rates of regret in this area are low; (d) other clinical practice guidelines, particularly in pediatrics, are based on evidence comparable to that supporting the WPATH and Endocrine Society standards; and (e) prohibiting this care is not the model followed throughout the world.

### A.     The State's "expert" witnesses are unqualified and not credible

It is clear that the State's experts lack any meaningful clinical experience treating adolescents with gender dysphoria. Their opinions, based almost entirely on a selective review of the literature, are

speculative at best and often infected with bias.

Neither of the State's endocrinology experts (Drs. Paul Hruz and Daniel Weiss) have ever treated a minor patient for gender dysphoria. (Dkt. 58-5 at 8 [Hruz. Dep. 27:20 through 29:16]; Dkt. 58-6 at 8-9, 11-13, 33 [Weiss Dep. 28:10 through 29:15, 32:6-13, 41:19 through 47:9, 126:16 through 127:8]). Indeed, Dr. Hruz has never treated *any* patient for gender dysphoria nor has he even been present for conversations with physicians and gender-dysphoric patients concerning their treatment options. (Dkt. 58-5 at 9 [Hruz Dep. 32:12 through 33:10]). The expert psychiatrist the State offers (Dr. Kristopher Kaliebe) has only treated approximately 13 minors with gender dysphoria.  (Dkt. 58-7 at 10 [Kaliebe Dep. 35:7 through 36:11]).  And its expert psychologists have résumés just as thin: in 25 years of seeing patients, Dr. James Cantor has treated only 8 minors with gender dysphoria and has not treated a single person, *for any condition*, younger than 16 (Dkt. 58-8 at 16 [Cantor Dep. 59:12 through 60:8]); and Dr. Dianna Kenny—who, in general, receives referrals of parents "convinced that the diagnosis of gender dysphoria is inaccurate and inappropriate for their child"—contends that only a single minor patient of hers may have been properly diagnosed with the condition.  (Dkt. 58-9 at 8-9 [Kenny Dep. 28:22-24, 30:24 through 33:17]).

And none of the credentials of these experts are meaningfully bolstered by their research or academic experiences. Both Dr. Weiss and Dr. Kaliebe admit to not having conducted or supervised any research, or published any articles, pertaining to gender dysphoria. (Dkt. 58-6 at 9-10 [Weiss Dep. 33:7 through 34:6]; Dkt. 58-7 at 13-14 [Kaliebe Dep. 49:24 through 50:11]). Dr. Kenny's sole peer-reviewed publication pertaining to gender dysphoria (on which she was the fifth-listed author) did not consist of original research but merely responded to an article published by Dr. Turban, one of the plaintiff's experts. (Dkt. 58-9 at 15 [Kenny Dep. 55:8 through 56:1]). Dr. Cantor, who specializes in atypical sexual attractions such as pedophilia, has not performed or published any original research on the mental-health outcomes of persons with gender dysphoria. (Dkt. 58-8 at 12-13 [Cantor Dep.

5

44:12-21, 48:1-4]).  Other than a single "letter to the editor," Dr. Hruz's limited writings on the subject have all appeared in religiously affiliated publications. (Dkt. 58-5 at 13-15 [Hruz. Dep. 46:6 through 55:5]).

In other words, the primary expertise that the State's witnesses bring to bear on this case is their ability to read (selected) scientific literature authored by others. This is not enough. *See, e.g., Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."); *see also McConnie-Navarro v. Centro de Fertilidad del Caribe, Inc.*, 2007 WL 7652299, at *13 (D.P.R. May 31, 2007) ("Courts are suspicious of purported expertise premised solely or primarily on a literature review.") (collecting cases).

While it should not be necessary to proceed further, there is also substantial reason to believe that the testimony of the State's "experts" is infected by improper bias. Dr. Weiss, for instance, is a senior fellow at Do No Harm, an organization focused on "Protecting Minors from Gender Ideology," which pays him to provide legislative testimony in favor of laws like S.E.A. 480 across the country. (Dkt. 58-6 at 15, 26, 37, 40 [Weiss Dep. 56:10 through 57:8, 98:24 through 99:8, 143:19 through 144:6, 155:11 through 156:19]). On May 18, 2023, Dr. Kaliebe testified in federal court that gender dysphoria is a real condition that requires treatment before testifying in his deposition two weeks later that it does not require treatment. (Dkt. 58-7 at 18-19 [Kaliebe Dep. 67:9 through 72:12]). Dr. Kenny practices a form of psychotherapy that has been banned as "conversion therapy" in three Australian states (though not the one where she works) (Dkt. 58-9 at 17 [Kenny Dep. 62:19 through 63:12]), and once appended to a presentation to a group of professionals the offensive image reproduced immediately to the right



(*id.* at 145). And Dr. Cantor, who despite his lackluster credentials derives roughly 80% of his income from serving as an expert witness in cases like this one (Dkt. 58-8 at 9 [Cantor Dep. 30:18 through

31:1]), complained in a recent Twitter post that "[t]he only ones who crave affirmation more than trans teens are their doctors" (*id.* at 165).

Indeed, in light of their criticisms of the treatments supported by the universe of qualified professionals, it is worth noting that one of the State's experts works for a facility that provides the precise care banned by S.E.A. 480 (Dkt. 58-5 at 9-10 [Hruz Dep. 33:11 through 34:21]), and another works for a medical group with a transgender program that advertises the WPATH and Endocrine Society standards (Dkt. 58-6 at 34-35 [Weiss Dep. 130:15 through 135:14]).

Given all this, federal courts have explicitly rejected testimony offered by two of the State's experts that they recycle for this case. *See Ladapo*, 2023 WL 3833848, at *2 n.8 (describing Dr. Hruz as "a deeply biased advocate, not as an expert sharing relevant evidence-based information and opinions," and refusing to credit his testimony); *Kadel v. Folwell*, 620 F. Supp. 3d 339, 364 (M.D.N.C. 2022) (sharply criticizing Dr. Hruz's motivations and finding him unqualified to render opinions "on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential causes, the likelihood that a patient will 'desist,' or the efficacy of mental health treatments"), *appeal pending*, No. 22-1721 (4th Cir.); *Eknes-Tucker*, 603 F. Supp. 3d at 1142-43 (assigning Dr. Cantor's testimony "very little weight" in light of his lack of experience treating transgender minors). The testimony offered by the State's other witnesses is subject to the same criticisms. And, as noted previously and below, courts have also soundly rejected many of the unscientific opinions that the State's witnesses offer.

### B.    The State's concerns about the accepted medical treatments for gender-dysphoric minors are ill-founded

It is thus not necessary to address every opinion voiced by the State's experts.  Given the length of their declarations, this would be impossible.  But a few overarching points deserve mention.

First, the State and its witnesses attempt to depict the diagnosis of gender dysphoria as an outlier in medicine, dependent on entirely subjective factors. Gender dysphoria, however, is

7

diagnosed, like other psychiatric conditions in the DSM-5-TR, based on clinical interviews, a widely used assessment tool not unique to gender dysphoria. (*See* Dkt. 58-2 at 12; Dkt. 58-4 at 2-3). Under the WPATH and Endocrine Society guidelines—as they are actually written and implemented, not as the State's experts speculate they might be misused or ignored—adolescents must undergo careful mental-health assessments prior to receiving a gender dysphoria diagnosis and to determine the appropriateness of any course of treatment, and that assessment may be extended for youth with more complex histories and comorbidities. (*See* Dkt. 58-2 at 3-4; Dkt. 58-3 at 3-4; Dkt. 58-4 at 2-3).

Second, based on the (incorrect) belief that gender dysphoria is somehow diagnosed with less rigor than other psychiatric conditions, the State claims that the condition is "sweeping" developed countries (Dkt. 54 at 12), driven by both "social contagion" (among adolescents) and institutional capture by a "transactivist" lobby that is filtering down to individual clinical decisions. These claims have been resoundingly rejected as unsupported and unscientific when advanced in cases addressing statutes similar to S.E.A. 480.  *See Kadel*, 620 F. Supp. 3d at 365-67 (rejecting evidence about "social contagion" as nothing more than a "hypothesis" and concluding that Dr. Hruz's "conspiratorial intimations and outright accusations" about a lobby of activists that has improperly infected the whole of the medical community "sound[s] in political hyperbole"); *see also Ladapo*, 2023 WL 3833848, at *14 ("[I]t is fanciful to believe that all the many medical associations who have endorsed gender-affirming care . . . have so readily sold their patients down the river."). Dr. Kenny confirms that "social contagion" remains a "hypothesis" (Dkt. 58-9 at 19 [Kenny Dep. 71:19-23]), *cf. Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (a hypothesis is not "knowledge" or "the product of reliable principles and methods applied reliably to the facts" and thus inadmissible), and there is certainly no evidence that all of the major professional groups are sacrificing adolescents' health to promote an ideology, or that clinicians are failing to rigorously evaluate adolescents with gender dysphoria because of political pressure. (*See* Dkt. 58-2 at 16-18; Dkt. 58-3 at 4; Dkt. 58-4 at 24-25).

It is not surprising, given the greater awareness among youth and parents about what treatments are available for gender dysphoria and the decreasing (albeit still significant) stigma associated with being transgender, that more adolescents would present at multidisciplinary gender clinics for treatment, which is not the same as an increase in the overall number of people who are transgender or have gender dysphoria. (*See* Dkt. 58-2 at 10-11; Dkt. 58-4 at 15-16). The diagnostic criteria remain stringent: an individual claiming a transgender identity to fit into a peer group would not meet the criteria for gender dysphoria, and it appears that, even with increasing numbers of children and adolescents being referred to clinics for evaluation, a smaller percentage of patients overall are actually being diagnosed with gender dysphoria and referred for potential medical treatment. (*See* Dkt. 58-2 at 12; Dkt. 58-4 at 15-16).[3]

Third, and perhaps most to the point, there is no evidence that adolescent Hoosiers with gender dysphoria are receiving puberty blockers or hormone therapy where not medically indicated, or that they are being inappropriately diagnosed.  So instead, the State claims repeatedly that gender-affirming medical care is experimental and harmful. It is neither. As detailed both previously and above, using puberty blockers and hormone therapy to treat adolescent gender dysphoria where medically indicated is best practice, and thoroughly supported by research. (*See, e.g.*, Dkt. 26-1 at 9-10, 12, 16-17; Dkt. 26-2 at 19-21; Dkt. 26-3 at 5-8, 10-11). These treatments are safe and effective. (*See*

---

[3]    The hypothesis that gender dysphoria, a diagnosable mental health condition, is being spread through "social contagion" has its roots in a 2018 article that purported to identify the phenomenon of so-called "rapid-onset gender dysphoria" among adolescents.  (*See, e.g.*, Dkt. 58-9 at 22 [Kenny Dep. 82:6 through 83:16]; *see also* Dkt. 58-4 at 12-13). This article was subsequently corrected to make clear that the data on which it relied was collected from parents of transgender youth (rather than youth themselves) who completed a survey that had originally been posted only to three websites that, in the author's words, "expressed cautious or negative views about medical and surgical interventions for gender dysphoric adolescents and young adults and cautious or negative views about categorizing gender dysphoric youth as transgender." (Dkt. 58-9 at 121, 123). Since the publication of this article, dozens of organizations, including the American Psychological Association and the American Psychiatric Association, have called for "eliminating the use of [rapid-onset gender dysphoria] and similar concepts for clinical and diagnostic application given the lack of empirical support for its existence and its likelihood of contributing to harm and mental health burden." (*Id.* at 129-31). Dr. Turban details at length the evidentiary flaws in the "social contagion" hypothesis. (*See* Dkt. 58-4 at 12-19).

Dkt. 58-3 at 2, 5-6, 8-9). As with any medical interventions, potential risks are weighed against benefits, as well as the risks of doing nothing. (*See* Dkt. 58-2 at 9-10; Dkt. 58-3 at 4-6). Risks of any medical treatment include regret, but in this regard, gender-affirming care is a positive outlier: regret is extremely rare. (Dkt. 26-1 at 14; Dkt. 26-3 at 14-18).[4] There is no evidence from the State's experts that casts doubt on the safety or efficacy of the medical interventions at issue.[5]

Finally, the State seeks to undermine the propriety of the standard of care for treatment of gender dysphoria by pointing to the reaction of a number of European countries. (Dkt. 54 at 25-27). These European countries, however, have not banned gender-affirming care for adolescents as does S.E.A. 480; they have only changed the way and where the care is delivered (for instance, by moving the care to settings where more data can be collected or utilizing regional clinics instead of one clinic). (*See* Dkt. 58-4 at 1-2). There is no evidence that *any* country has done what Indiana has done: ban gender-affirming care for minors entirely.

## III.   The plaintiff parents provided informed consent to their children's gender-affirming

---

[4]   The State submitted declarations from four persons, apparently not from Indiana, who express regret with their decisions to transition and the medical, including in some cases surgical, support that they received. (Dkts. 49-12 through 49-14, 49-16). One other declaration is from a father who blames the drug and alcohol-induced death of his adult transgender son on his transition. (Dkt. 49-15). It is unclear from the declarations whether the care described by the witnesses followed WPATH standards. Even if it did, this would not counter the fact, as detailed in the citations above, that multiple studies demonstrate that regret is extremely rare. This is to contrast, for example, with the 47% regret rate for women concerning their reconstructive surgery after a mastectomy for breast cancer. (Dkt. 26-1 at 14).

[5]   The absence of randomized controlled trials does not undermine the clinical guidelines for the treatment of gender dysphoria in adolescents. It is not ethical to run such a trial in this field, and the existing body of research reinforces extensive clinical observations that gender-affirming medical care, like puberty blockers and hormone therapy, is necessary to treat gender dysphoria, that is, the distress caused by the feeling of physical incongruence with one's gender identity. (*See* Dkt. 58-4 at 3-5). It is also not unusual in pediatric medicine to utilize treatment interventions not proven by randomized controlled trials. Indeed, use of puberty blockers to treat precocious puberty is not proven effective through such trials. The State's experts admitted as much. (*See* Dkt. 58-5 at 30 [Hruz Dep. 114:10 through 115:1]; Dkt. 58-8 at 29 [Cantor Dep. 110:1-16]). In general, the quality of the research for gender-affirming medical care is consistent with that for other complex conditions: the State's experts' impossible standards, which their own proposed alternative treatments fail to meet, would require the State to ban most medical interventions and all complex interventions. (*See* Dkt. 58-2 at 21-22). Even two of the State's experts, Dr. Hruz and Dr. Weiss, agreed that more research would be helpful, although if S.E.A. 480 goes into effect this research will be impossible as care will be banned. (Dkt. 58-5 at 40, 45 [Hruz Dep. 154:10-24, 175:18-22]; Dkt. 58-6 at 56-57 [Weiss Dep. 220:25 through 222:2]).

**medical treatment consistent with existing medical protocols, and the plaintiff youth have all benefitted enormously from this treatment**

**A.      It is undisputed that the plaintiff parents all provided consent to gender-affirming care for their children only after being fully informed of the risks and benefits of that care**

There is nothing uniquely risky about gender-affirming care for adolescents that prevents parents from consenting and minors from assenting to this treatment. In this case—as in many other cases involving treatment for minors—parents, patients, and clinicians carefully weigh the risk and benefits of any given intervention. The State's portrayal of gender-affirming medical treatment as fraught with risk and danger is erroneous. Nevertheless, every medical intervention or decision not to intervene has potential benefits and risks. For this reason, gender-affirming care is not offered unless the clinician believes it is appropriate and only after risks and benefits are considered and "discussed with the minor's parents, who must consent to treatment, and to the youth, who must assent. This process is no different than the informed consent process for other treatments." (Dkt. 26-1 at 13; *see also* Dkt. 26-2 at 14, 16). The care is constantly reevaluated and "should a patient desire to discontinue a medical intervention, the intervention is discontinued." (Dkt. 26-2 at 16).

Before providing gender-affirming care, both Riley and Mosaic provide their patients with detailed information, orally and in writing, concerning the safety and effectiveness as well as the potential effects and risks of treatment. (Dkt. 48-6 at 6 [Riley Dep. 13:14-18]; Dkt. 48-8 at 18, 37-38 [Mosaic Dep. 63:14 through 64:21; 140:16 through 142:15]). The plaintiffs had all this information at their disposal, and they were able to make informed decisions regarding care. (Dkt. 26-4 at 4; Dkt. 26-5 at 2; Dkt. 26-6 at 3; Dkt. 26-7 at 2).  Copies of the detailed informed-consent documents used by both Riley (Dkt. 58-1 at 7-8, 16-21, 24-43, 48-64) and Mosaic (Dkt. 58-10 at 6-17) appear in the record. And the Gender Health Clinic at Eskenazi Hospital provides comparable informed consent

information to patients. (Dkt. 48-7 at 7-8 [Eskenazi Dep. 21:19 through 23:22]; Dkt. 58-11 at 12-21).[6]

**B.     It is undisputed that the plaintiff youth have greatly benefited from their gender-affirming care**

Evidence-based research supports the provision of gender-affirming care to gender-dysphoric adolescents. But the wealth of evidence supporting the provision of this care generally should not obscure the more obvious point—the care has greatly benefitted the plaintiffs.

Prior to receiving gender-affirming hormones, counseling had not resolved M.W.'s continuing anxiety and depression. (Dkt. 48-15 at 9 [R. Welch Dep. 29:16-25]). M.W. received his first testosterone injection in July of 2022, resulting in the deepening of his voice and the growth of facial and body hair. (Dkt. 51 at 7-8). With this, his dysphoric symptoms—depression, anxiety, and isolation—have greatly decreased. (Dkt. 48-15 at 19 [R. Welch Dep. 65:3 through 66:13]). His father describes him now as "being his more authentic self." (*Id.* at 23 [84:8]). Specifically, M.W. has become more talkative, his sense of humor has returned, he started producing more art, and he is willing to leave the house more often. (*Id.* at 23-24 [84:23-85:6]). And his dad highlighted that, whether overhearing M.W.'s conversations with his friends or talking to him in everyday situations such as riding in the car, "there's just a sound in his voice that is—you can—it's the same sound that he had as a child before, you know, a lot of this started coming to light. He's one of my favorite people." (*Id.* at 24 [85:7-15]). This is all because "he feels more aligned with the gender he identifies with." (*Id.* at 19 [68:12-13]). Removing hormones would be "devastating" to his mental health. (*Id.* at 21 [73:2-5]).

---

[6]     In an apparent attempt to cast doubt on the parents' informed decisionmaking, the State relies on a declaration from a former employee of a transgender care center in St. Louis that claims that informed-consent standards and established protocols have not always been followed at that center. (Dkt. 49-17). Suffice it to say, there is no evidence of that in Indiana. It is worth noting, however, that the declarant's statements have been challenged elsewhere. *See, e.g.,* Annelise Hanshaw, *Families dispute whistleblower's allegations against St. Louis transgender center,* Missouri Indep., Mar. 1, 2023, *at* https://missouriindependent.com/2023/03/01/transgender-st-louis-whistleblower (last visited June 6, 2023).  Ironically, while the State and its experts hold decades of research and clinical experience to impossible-to-meet standards, they are willing to rely on a single, unverified report from a *different* state to attempt to refute clinical practices by well-respected institutions in Indiana and the documented, positive outcomes of adolescent Hoosiers.

M.R. has been receiving testosterone since February, shortly after he was released from a 10-day inpatient stay due to symptoms of major depressive disorder and gender dysphoria. (Dkt. 51 at 11). He had previously received counseling after disclosing to his parents his gender dysphoria. (Dkt. 48-17 at 9 [Rivera Dep. 25:3 through 27:3]). Although he has not yet noticed any physical changes, his mother notes positive emotional changes: "He had more energy, more smiling, more bubbly. He was more outgoing. He was more motivated to go to school." (*Id.* at 20 [70:24 through 71:1]).[7]

K.C., who is now 10, socially transitioned before she was 4, and started receiving pubertal suppression at the end of April. (Dkt. 51 at 5). She has been in therapy intermittently since she was very young. (Dkt. 26-4 at 2). She has already gained significant benefit from pubertal suppression, as her gender dysphoria had been intensifying prior to treatment. (Dkt. 48-12 at 18 [B. Clawson Dep. 61:16 through 62:9]). She had begun to worry about body odor and was taking multiple baths or showers a day; she had stopped looking at herself in the mirror; she worried that her voice was sounding lower; and she evinced a general discomfort with her body. (*Id.*; Dkt. 48-13 at 13 [N. Clawson Dep. 41:24 through 42:2]). However, with the puberty blocker she is extremely relieved that she does not have to worry about experiencing endogenous puberty. (Dkt. 48-12 at 19 [B. Clawson Dep. 66:2-4]). Her mother notes that she has "see[n] the improvement to [her] child's quality of life already after not even a month." (*Id.* at 20 [72:17-19]). K.C.'s father fears that K.C. "wouldn't be here" if she were unable to access puberty blockers and were forced to go through the incorrect puberty. (Dkt. 48-13 at 16 [N. Clawson Dep. 55:20-25]).

A.M. is 11 and socially transitioned before she was 4. (Dkt. 51 at 8). She received counseling for almost four years, starting shortly before her first visit to Riley. (*Id.* at 9). She has been taking a puberty blocker since 2021. (*Id.*). "[W]hen she was getting closer to puberty, before she started the

---

[7]     Prior to his hospitalization and receipt of testosterone, M.R. did not want to perform chores or participate in activities, and experienced distress about his teachers misgendering him and not using his preferred name. (Dkt. 51 at 10-11). He repeatedly missed school. (*Id.* at 11).

blockers, she vocalized that if she was unable to get them, she did not want to live because she could not stand living presenting male." (Dkt. 48-14 at 13 [Morris Dep. 44:20-25]). During lapses in receiving the medication, due to insurance and pharmacy issues, "her depression and suicidal ideations increased because she was anxious that she would not receive [it]." (*Id.* [45:1-6]). While on the puberty blockers she does not have anxiety or thoughts of self-harm. (*Id.* at 14 [46:24 through 47:13]).

Against all this, two of the State's experts—Drs. Kenny and Weiss—purport to render opinions regarding the plaintiff youth based on a review of their medical records. These individuals, with virtually nonexistent experience treating gender dysphoric minors in the first place, obviously reviewed the records from their own perspectives, which include a categorical skepticism of puberty blockers or hormone therapy to treat gender dysphoria based on the existence of other comorbid conditions, an assumption that the age of onset of gender dysphoria undermines a gender dysphoria diagnosis, and a belief that transgender identity or the experience of gender dysphoria arises from trauma. None of that is true, as demonstrated by the testimony of experienced clinicians who actually treat significant numbers of adolescents with gender dysphoria. (*See* Dkt. 58-3 at 13-14). As the plaintiffs' profoundly qualified experts reiterate, co-occurring conditions do not preclude a proper gender dysphoria diagnosis: the mental health assessments prerequisite to gender-affirming medical care exist to distinguish other mental health conditions from gender dysphoria and to determine whether medical interventions would be appropriate or not. (*See id.* at 13; Dkt. 58-4 at 2-3). In any event, in describing the plaintiffs and their families both Dr. Kenny and Dr. Weiss made inexcusable factual errors that make clear that their reviews were conducted in a cursory, haphazard fashion—a fact that Dr. Kenny event admitted in her deposition.[8]  The testimony offered by these witnesses is

---

[8]      During her deposition Dr. Kenny was questioned about her statement in her declaration that M.W. was "neutral" about certain characteristics including his chest and voice—she even underlined "voice" because it "is one of the characteristics around which young people claim extreme dysphoria." (Dkt. 58-9 at 39 [Kenny Dep. 153:7-23]). Then, when shown that the very medical records on which she relied for these statements demonstrated exactly the opposite (*id.* at 40-41 [154:4 through 158:12]), Dr. Kenny acknowledged that her

not based on reliable science and should not be credited.[9]

Argument

**I.      The plaintiffs are likely to prevail on the merits of their claims**

**A.      The plaintiffs have standing to challenge S.E.A. 480's prohibition on surgery**

The State contends that because the parents of the plaintiff youth are not currently considering surgical interventions, the plaintiffs lack standing to challenge S.E.A. 480 to the extent that it bans surgeries. But the law prohibits the performance of "gender transition procedures" generally, Ind. Code § 25-1-22-5(a) (eff. July 1, 2023), and it is this prohibition that the plaintiffs seek to enjoin. In *Brandt v. Rutledge,* 47 F.4th 661 (8th Cir. 2022), the court rejected the identical argument: "[T]his court declines the State's invitation to modify well-established constitutional standing principles to require that a plaintiff demonstrate an injury traceable to every possible application of the challenged statute in order to satisfy the constitutional standing requirement." *Id.* at 668-69 (footnote omitted). The State cites no authority for the proposition that a court must parse the statutory definition of "gender transition procedures" to determine if each plaintiff is burdened by every portion of the definition.

In any event, as plaintiffs have noted previously and below, prohibiting Mosaic and Dr. Bast from referring their patients to and from communicating with out-of-state practitioners to assist their patients in obtaining "gender transition procedures" violates the First Amendment. They certainly have standing to challenge the general prohibition on "gender transition procedures."

---

review of the plaintiffs' medical records was hampered by the format in which they were received (in Notepad and "disjointed") as well as by the "extreme time pressure" she felt (*id.* at 41 [158:13-22]). And Dr. Weiss's review was apparently so perfunctory that he reported that K.C.'s parents are both "biologic males and one of whom identifies as transgender" (Dkt. 48-4 at 8)—a fact that, inexplicably, he simply got wrong, as K.C.'s parents are both cisgender (one a "biologic" female and the other a "biologic" male) (Dkt. 48-12 at 6 [B. Clawson Dep. 15:2-8]; Dkt. 48-13 at 7 [N. Clawson Dep. 18:2-10]).

[9]      In addition to the experiences of the plaintiff youth, other parents of transgender children have also noted that the provision of puberty blockers or gender-affirming hormones has resulted in the lessening of depression and the increase in their children being more comfortable with themselves. (*See, e.g.,* Dkt. 26-10 at 2; Dkt. 26-11 at 2; Dkt. 26-12 at 2; Dkt. 26-13 at 2; Dkt, 26-14 at 2).

15

**B.    S.E.A. 480 violates the equal-protection rights of the plaintiff youth**

**1.    S.E.A. 480 discriminates on the basis of sex and transgender status**

S.E.A 480 only singles out one form of treatment for prohibition: gender-affirming care for transgender adolescents. Both the Seventh Circuit and the Supreme Court have recognized that discrimination based on transgender status is discrimination based on sex. *See Bostock v. Clayton Cnty*, 140 S. Ct. 1731, 1741 (2020); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *abrogation on other grounds recognized by Ill. Republican Party v. Pritzker,* 973 F.3d 760 (7th Cir. 2020). The State argues that S.E.A. 480 discriminates based not on sex or transgender status but on "age, procedure, and medical condition." (Dkt. 54 at 40). Not so.

S.E.A. 480 is not facially neutral: it explicitly classifies based on sex and transgender status by drawing lines based on whether a medical or surgical intervention is designed to cause "gender transition," "the process in which an individual shifts from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex." Ind. Code §§ 25-2-22-3, 5 (eff. July 1, 2023). As the court explained in *Ladapo*, "[t]o know whether treatment with any of these medications is legal, one must know whether the patient is transgender . . . one must know the patient's natal sex." 2023 WL 3833848, at *10. The same is true here.

It is therefore not the case, as the State claims, that the law provides equal treatment because no minor, whether cisgender or transgender, can receive gender-affirming medical care under S.E.A. 480: the law singles out transgender minors. Just like the school argued unsuccessfully in *Whitaker* that a bathroom policy denying a transgender males access to male restrooms was not violative of equal protection "since it treats all boys and girls the same," 858 F.3d at 1051, so too is the State wrong that S.E.A. 480 treats all minors alike. As the court explained in *Eknes-Tucker*, when a statute "categorically prohibits transgender minors from taking transitioning medications due to their gender nonconformity," it "places a special burden on transgender minors because their gender identity does

not match their birth sex" and thus "amounts to a sex-based classification for purposes of the Equal Protection Clause." 603 F. Supp. 3d at 1147. The Eighth Circuit in *Brandt* similarly concluded that a ban on gender-affirming care "discriminates on the basis of sex" insofar as "the minor's sex at birth determines whether or not the minor can receive certain types of medical care." 47 F.4th at 669.

Advancing an argument that was recently rejected in *Ladapo*, 2023 WL 3833848, at *10, the State argues that the discrimination is justified under *Geduldig v. Aiello*, 417 U.S. 484 (1974), where the Court held that a state disability insurance program that denied benefits for work loss due to normal pregnancy—described as "merely . . . one physical condition," *id.* at 496 n.20—did not violate equal protection. The Court in *Geduldig* stressed that equal protection problems would arise if the classifications based on pregnancy "were mere pretexts designed to effect an invidious discrimination." *Id.* at 496 n.20. Of course, as explained above, S.E.A. 480 is not a neutral listing of excluded conditions, and it directly targets only those who do not conform to the statute's definition of sex, "the biological state of being male or female." Ind. Code § 25-2-22-12 (eff. July 1, 2023). Other courts have, just like the court in *Ladapo*, rejected arguments to the contrary. *See Kadel*, 620 F. Supp. 3d at 379 (treatment exclusion for "sex change or modification" violated equal protection because the state health plan did not merely exclude one physical condition from coverage but "exclude[d] *treatments* that lead or are connected to sex changes or modifications") (emphasis in original); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999 (W.D. Wis. 2018) (*Geduldig* inapplicable and a state insurance plan's exclusion of gender transition treatment violated equal protection as it treated individuals differently based on sex).

The State's contention that S.E.A. 480's distinctions are based not on sex or transgender status but on "basic, immutable biological differences between males and females" (Dkt. 54 at 42) is similarly unavailing. S.E.A. 480 allows medical interventions to conform to sex stereotypes, but "tethers plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject." *Kadel v. Folwell*,

446 F. Supp. 3d 1, 14 (M.D. N.C. 2020), *aff'd*, 12 F.4th 422 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022). That is sex discrimination. This is made even clearer by the fact that the statute allows medical or surgical services to persons with "disorder[s] of sex development," for the purpose of bringing a patient's body into alignment with sex stereotypes, Ind. Code § 25-1-22-5(b) (eff. July 1, 2023), while denying the exact same services to transgender persons because as "transgender individual[s they do] not conform to the sex-based stereotypes of the sex . . . assigned at birth," *Whitaker*, 858 F.3d at 1048; *see also Ladapo*, 2023 WL 3833848, at *10 ("Cisgender individuals can be and routinely are treated with [blockers and hormones], when they and their doctors deem it appropriate. Not so for transgender individuals—the challenged statute and rules prohibit it.").

Finally, the State argues that *Bostock*, despite holding that discrimination based on transgender status represents sex discrimination, is inapposite insofar as it did not address discrimination based on transgender status where that status is relevant. (Dkt. 54 at 43). The "relevancy" of transgender status pertains not to whether the discrimination is based on sex but to whether the State can meet its "demanding" evidentiary burden to justify the discrimination, *United States v. Virginia*, 518 U.S. 515, 533 (1996), which it cannot. And, while it is true that *Bostock* arose under Title VII, the Court held that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 140 S. Ct. at 1741. The State responds by arguing that *Bostock* only finds discrimination to exist where individuals are treated worse than those similarly situated. (Dkt. 54 at 43). But the plaintiff youth *are* treated worse than their similarly situated cisgender counterparts. S.E.A. 480 allows cisgender individuals to affirm their gender identities through medical interventions, while transgender individuals cannot. This is discrimination based on sex.[10]

---

[10]     As underscored previously, numerous courts have held that discrimination based on transgender status triggers heightened scrutiny. (Dkt. 27 at 30-32). The State argues that transgender status is not a protected or quasi-suspect class. The plaintiffs reiterate only that statutes like S.E.A. 480 certainly continue the history of transgender persons being subject to discrimination and demonstrate that they lack political power to stop it. *See, e.g., Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013).

### 2.   S.E.A. 480 fails any level of scrutiny

Because S.E.A. 480 discriminates on the basis of transgender status and sex, it is the State's responsibility to demonstrate that the law "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of these objectives." *Virginia*, 518 U.S. at 533. It does not and cannot show how S.E.A. 480's categorical ban does so.

Although the State argues that S.E.A. 480 serves the "compelling interest in the wellbeing of minors and the medical profession" (Dkt. 54 at 46), this is simply untrue. Ultimately, the State's proffered concerns are based on mischaracterizations and distortions about the diagnosis and treatment of gender dysphoria and, rather than advancing an interest in protecting children, it undermines such interest. There is no evidence that any Hoosier adolescents are receiving puberty blockers or hormones without proper assessment, nor is there evidence that "social contagion" is increasing the number of adolescents with gender dysphoria receiving treatment.  Though the State urges this Court to accept its experts' conspiratorial view that established medical associations are recommending harmful care, there is no evidence that is true.

Ultimately, denying necessary medical care that represents the standard of care for the treatment of gender dysphoria, and interfering with the relationship between physicians and their patients, does not substantially relate to *any* government objective, let alone an important one. *See Romer v. Evans*, 517 U.S. 620, 635 (1996) (even under low-level scrutiny, a law that "further[s no] proper legislative end but to make a group 'unequal to everyone else' does not bear a rational relationship to a legitimate governmental purpose"). S.E.A. 480 violates equal protection.[11]

### C.   S.E.A. 480 infringes upon the fundamental rights of parents to the care, custody, and control of their children, and is not narrowly tailored to serve any compelling governmental interests

---

[11]     Dr. Bast and Mosaic have argued that they have standing to raise the claims of their patients under recognized third-party standing principles. (Dkt. 27 at 17 n.11). The State argues that they do not have third-party standing. (Dkt. 54 at 46). Dr. Bast and Mosaic reassert the standing arguments they have previously made.

The State cannot deny that "the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court was clear that "so long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of the parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69. But the State argues that parents lack "a historical right" to obtain gender-affirming care for minors. (Dkt. 54 at 31).

While it is true that a substantive due process right must be defined in a manner "that is specific and concrete [and] avoids sweeping abstractions and generalities," *Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 769 (7th Cir. 2004) (en banc), the microscopic specificity suggested by the State makes little sense. In *Parham v. J.R.,* 442 U.S. 584 (1979), the Court recognized that the right of a parent, as opposed to the state, to make decisions for a child includes deciding upon "a tonsillectomy, appendectomy, or other medical procedure." *Id.* at 604. The question is not whether due process protects a right to a specific medical procedure, but simply whether it protects the fundamental right of parents to make medical decisions for their children. Of course, it does. *See, e.g.,* *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (describing "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state"); *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (referring to the "fundamental right" of parents "to direct their children's medical care"). Parents' right "to direct the medical care of their children . . . includes the more specific right to treat their children with transitioning medication subject to medically accepted standards." *Eknes-Tucker*, 603 F. Supp. 3d at 1146.

But parents do not make medical decisions on their own: they are made in consultation with physicians. As the district court noted in *Brandt*, parents "have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's

20

recommendation, make a judgment that medical care is necessary." 551 F. Supp. 3d at 892. Parents "retain plenary authority to seek such care, subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604. Indeed, the Court stressed that parents have a "'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.* at 602.[12]

The question, therefore, is whether S.E.A. 480's abrogation of parents' fundamental rights is justified. Any impingement on a fundamental constitutional right must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). The State argues that it has met this standard by demonstrating the risk of gender-transition procedures and "[t]he need to protect minors from risky procedures with irreversible effects." (Dkt. 54 at 35). But the State's attempt to demonstrate that gender-affirming care is dangerous is contrary to medical science and the evidence in this case. The State acknowledges that major medical and mental-health associations endorse the precise care that S.E.A. 480 prohibits but tersely dismisses this by noting that medical associations do not determine a statute's constitutionality. (Dkt. 54 at 38). That is true. But the endorsement of gender-affirming care by these organizations reflects the care's widespread acceptance by the medical establishment and serves as a strong indication that the opinions of the State's witnesses are outliers and cannot be credited without disregarding the studied view of trusted medical associations. The State's contention that these studied views are merely the product of "interest group culture," or the result of organizations being infiltrated by advocates for gender-affirming care, plainly has no basis.

Since the filing of its brief, the district court in *Ladapo*—similar to *Brandt* and *Eknes-Tucker*—soundly rejected every argument the State advances. *See* 2023 WL 3833848, at *11-16. The State is

---

[12]     The State argues at length that a minor's right to receive certain medical care can be no greater than the right of an adult to access the care, and that there is no right of adults to receive gender-affirming care. (Dkt. 54 at 32-33). The relevance of this argument is unclear. The plaintiffs are not arguing a free-standing right to gender-affirming care, any more than the Court in *Parham* was describing a free-standing right to a tonsillectomy. The plaintiffs simply argue that within the established right to the care and control of their children, parents have a right to consent to well-accepted medical treatment. This right "is deeply rooted in this Nation's history and tradition." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503 (1977) (plurality).

denying parents the right to consent to the care that is widely accepted as the appropriate and necessary treatment for gender dysphoria. It is true that the care has potential risks for parents to balance against the benefits afforded—all medical care involves risks (*see, e.g.*, Dkt. 26-3 at 17)—but it is also undisputed that families consent to gender-affirming care only after they have been informed of the care's risks and benefits. The existence of "risk does not automatically transfer the power to make [the healthcare] decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603.

There is no interest that justifies S.E.A. 480's interference with parental decisionmaking. Nevertheless, the State argues that it is better for the gender-dysphoric youth to be categorically denied access to the only evidence-based medical care available for their condition because there *might* be other treatments with fewer side effects. But there are no such other treatments, and there is no other medical condition for which the State has arrogated to itself the sole authority to make treatment decisions, in lieu of fit parents, nor any other treatment protocol that the State holds to the impossible standard of being proven more effective than potential, untested treatments. S.E.A. 480 is unconstitutional for this reason as well.[13]

### D. S.E.A. 480's ban on the provision of gender-affirming care violates federal Medicaid law[14]

#### 1. Medicaid requires the provision of services, not merely payment for services

Relying on a definition of "medical assistance" that has since been amended, the State argues

---

[13]     All of this aside, the law must be "narrowly tailored" to achieve the State's asserted interests. *See, e.g.*, *Flores*, 507 U.S. at 302. Here, even the State's experts have pointed to less restrictive means: the policies of the various European countries they tout, which do not include any categorical bans, but rather employ additional safeguards or research protocols, include moving care to research settings where more data can be collected. (*See* Dkt. 58-4 at 1-2; Dkt. 58-6 at 60-61 [Weiss Dep. 235:23 through 238:16]). "Because Defendants themselves offer several less restrictive ways to achieve their proffered purposes, the Act is not narrowly tailored at this stage of litigation." *Eknes-Tucker*, 603. F. Supp. 3d at 1146.

[14]     The Supreme Court in *Health & Hospital Corporation of Marion County v. Talevski*, 2023 WL 3872515, at *5-8 (June 8, 2023), recently reaffirmed its longstanding holding that Spending Clause legislation may be enforced through 42 U.S.C. § 1983.  The State's right-of-action argument does not survive that decision.

that its only obligation under federal Medicaid law is to *fund* services once those services have been provided, and that a *ban* on covered services is entirely legal. (Dkt. 54 at 47). While the State excerpts only a portion of the statute's relevant language, as currently drafted, 42 U.S.C. § 1396d(a) defines "medical assistance" to mean "payment of part or all of the cost of [covered] care and services *or the care and services themselves, or both*." There are three fundamental flaws in the State's argument.

First, the argument is premised on the assertion that, if a physician illegally provided gender-affirming care to a minor, S.E.A. 480 would allow Indiana to pay for that care. This is simply not correct: the law prohibits a physician or other practitioner from "aid[ing] or abet[ting]" another professional in the provision of gender-affirming care. *See* Ind. Code § 25-1-22-13(b) (eff. July 1, 2023). The Secretary of the Indiana Family and Social Services Administration is a physician—other officials within or contractors of the agency surely also qualify as "physician[s] or other practitioner[s]"—and it is difficult to see how *paying* for care does not qualify as "aid[ing] or abet[ting]" its provision.

Second, while the language in § 1396d(a) defining "medical assistance" was *previously* limited to "payment for services," in direct response to case law accepting the State's argument, the term's definition was amended to its current form by the Patient Protection and Affordable Care Act. *See* P.L. 111-148 (H.R. 3590), § 2304 (Mar. 23, 2010). The Seventh Circuit has explicitly held that this amendment served to overrule case law adopting the State's reading of the statute: "Congress amended [the definition of 'medical assistance'] in response to *Bruggeman* [*ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906 (7th Cir. 2003),] and the decisions that followed it" precisely "to clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them." *O.B. v. Norwood*, 838 F.3d 837, 843 (7th Cir. 2016) (internal quotation omitted); *see also* H.R. Rep. No. 299, 111th Cong., 1st Sess. 2009, at 645-50 (Oct. 14, 2009), *available at* 2009 WL 3321420, at *649-50 (legislative history specifically explaining that the purpose of the amendment was "[t]o correct any misunderstandings as to the meaning of ['medical

23

assistance']" in cases such as *Bruggeman*). The only citation offered by the State is to *Collins v. Hamilton*, 349 F.3d 371 (7th Cir. 2003), decided before the statute was amended. It is not relying on good law.

And third, the statutory change aside, the State's duty to provide early and periodic screening, diagnostic, and treatment ("EPSDT") services to minors arises not only from 42 U.S.C § 1396a(a)(10) but also from § 1396a(a)(43)—which does not even use the term "medical assistance." Rather, this statute plainly requires the provision of a *service*, not merely *payment*: participating states must "arrang[e] for . . . corrective treatment the need for which is disclosed by . . . screening services." The State does not even attempt to address its duties under this statute, which "is not dependent upon the definition of 'medical assistance,' and . . . allows no room for the claim that Medicaid is a payment-only scheme in this context." *Troupe v. Barbour*, 2013 WL 12303126, at *3 (S.D. Miss. Aug. 23, 2013).

### 2.   S.E.A. 480 violates the Availability Provision of federal Medicaid law

As detailed previously, 42 U.S.C. § 1396a(a)(10)(A)—the so-called Availability Provision—requires states to provide Medicaid coverage for medically necessary services within specified service categories. The State does not deny that the gender-affirming care banned by S.E.A. 480 falls within several covered service categories, but instead argues that it is not medically necessary. As an initial matter, where EPSDT services are concerned, this does not appear to be the State's decision to make: "a state's discretion to exclude services deemed 'medically necessary' *by an EPSDT provider* has been circumscribed by the express mandate of the statute." *Collins*, 349 F.3d at 376 n.8 (emphasis added).

More to the point, as detailed at great length above, the State is simply wrong. Indeed, its argument is contradicted by its acknowledgment (borne out by the facts of this case, *see* Dkt. 26-8 at 2-3 [¶¶ 13-15]; Dkt. 48-6 at 16-17 [Riley Dep. 56:17 through 57:8]) that it has consistently provided Medicaid reimbursement for gender-affirming care in the past and that it would do so in the future were this care provided in contravention of S.E.A. 480. In Indiana, Medicaid coverage has *always* been limited to medically necessary services. *See* Ind. Admin. Code tit. 405, r. 5-29-1(1) ("The following

24

services are not covered by Medicaid: Services that are not medically necessary."). The State does not appear to recognize that its years-long coverage of the care banned by S.E.A. 480, and its admission that it would provide reimbursement in the future to any provider who violates S.E.A. 480, represents a concession that the care is medically necessary. S.E.A. 480 violates the Availability Provision.[15]

### 3.  S.E.A. 480 violates the Comparability Provision of federal Medicaid law

If anything, the State's defense to the plaintiffs' claim under 42 U.S.C. § 1396a(a)(10)(B)—the Comparability Provision—is even further afield. Among other things, this statute prohibits a state Medicaid agency from denying Medicaid coverage for a required service (including both EPSDT services and physicians' services) "to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). On its face, S.E.A. 480 does precisely that: it prohibits treatment for persons diagnosed with gender dysphoria but allows the exact same treatment for persons diagnosed with other conditions. *See* Ind. Code § 25-1-22-13(c) (eff. July 1, 2023).

The State's initial response to this is to reiterate its erroneous argument that § 1396a(a)(10) only concerns itself with *payment* for services and not with the *provision* of services. Again, this is simply wrong. *See O.B.*, 838 F.3d at 843. The State then pivots to assert that there is no violation because S.E.A. 480 discriminates not only on the basis of diagnosis but *also* on the basis of age. But the

---

[15]     As a final matter, the State insists that any uncertainty over the necessity of the care prohibited by S.E.A. 480 must be resolved in its favor. (Dkt. 54 at 48). This is so, the argument goes, because *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), requires that conditions imposed on states by Spending Clause legislation be "unambiguous." There is no uncertainty over the necessity of gender-affirming care for young Hoosiers. But, that issue aside, the State misconstrues *Pennhurst*'s requirements. While the condition imposed upon states by Spending Clause legislation must be unambiguous, "Congress is not required to list every factual instance in which a state will fail to comply with a condition. Such specificity would prove too onerous, and perhaps, impossible. Congress must, however, make the existence of the condition itself . . . explicitly obvious." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted). Thus, "the exact nature of the conditions may be 'largely indeterminate,' provided that the existence of the condition is clear, such that States have notice that compliance with the conditions is required." *Id.* (citation omitted).

Here, the unambiguous condition imposed by federal Medicaid law is the duty to cover medically necessary care. The precise factual circumstances in which courts may be called on to *apply* that unambiguous condition (that is, "the exact nature of the conditions") need not separately be unambiguous.

discrimination that forms the basis for the plaintiffs' claim is the discrimination based solely on diagnosis: presented with two Medicaid recipients both under the age of eighteen, Indiana will not allow the gender-dysphoric recipient to receive hormones but will allow the recipient diagnosed with some other condition to do so. That is discrimination "solely" on the basis of diagnosis. The fact that Indiana will *also* allow an adult with gender dysphoria to receive hormones is of no moment.

Finally, the State asserts in cursory fashion that the Comparability Provision only concerns itself with "arbitrary" denials. The unsupportable factual error in the State's contention aside, this is not a case where Indiana has prohibited the use of puberty blockers or hormones across the board: it has prohibited them only for patients with one condition. Indeed, the State's citation to *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980), proves too much. While the court in that case upheld a Medicaid agency's denial of "transsexual surgery" under a provision banning coverage of experimental procedures, it made clear that if coverage had been denied not because the procedure was experimental but "because it was transsexual surgery," the state would "be required to pay for the operation." *Id.* at 1156 n.12. Here, Indiana is attempting to ban care precisely because of a patient's diagnosis.

### E.    S.E.A. 480 violates the Affordable Care Act

The Patient Protection and Affordable Care Act ("ACA") prohibits "any health program or activity" receiving federal monies from engaging in sex-based discrimination. *See* 42 U.S.C. § 18116(a). The State does not dispute that the Medicaid program constitutes a "health program or activity" receiving federal monies. Two of its arguments may be easily rejected. First, Medicaid requires more than mere payment, so there is no merit to the State's argument that it does not engage in any discrimination because it will pay for services if those services are provided, albeit illegally. And second, the State's preemption argument hinges on its contention that there is no "actual conflict" between state and federal law, but this is also wrong: Dr. Bast and Mosaic are under a federal duty not to engage in sex-based discrimination and under a state duty to do just that. The State's argument

appears to be coextensive with its argument that S.E.A. 480 does not constitute sex discrimination.[16]

For the reasons described above, this argument does not survive *Whitaker*. And, to the extent that it relies on its assertion that "*Whitaker* should not be extended to medicine," that is *precisely* what the ACA does: by its terms, it extends the protections of Title IX to "any health program or activity."

### F.   S.E.A. 480's aid-or-abet provision violates the First Amendment

Finally, the State does not deny that the aid-or-abet provision, to be codified at Indiana Code § 25-1-22-13(b) (eff. July 1, 2023), prohibits Mosaic and other medical providers from providing their patients with truthful, non-misleading information about their ability to obtain gender-affirming care in other jurisdictions. Nor does it deny that this provision prohibits providers from ensuring continuity of care for their patients by, for instance, providing medical records or other information. And the State does not deny that all of this constitutes "speech" that implicates the First Amendment.

Rather, the State's only argument is that the First Amendment does not protect speech that aids or abets criminal activity. (Dkt. 54 at 52-53). There are multiple flaws with this argument, the first of which is that S.E.A. 480 is simply not a criminal statute. But even if it did criminalize the provision of gender-affirming care in Indiana, a family who travelled to Illinois or Michigan to ensure that their child can receive gender-affirming care would be committing no crime; they would not be committing *any* act *vis-à-vis* Indiana. In other words, someone who engages in the expressive activity prohibited by S.E.A. 480 is not aiding or abetting a crime. *See, e.g.*, *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc.*, 800 F.2d 177, 183 (7th Cir. 1986) ("[T]here can be no aiding and abetting violation" where the aided party did not violate the law.). The State ignores this obvious point.

---

[16]   The State's argument that Mosaic and Dr. Bast should simply withdraw from the Medicaid program cannot be reconciled with *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), in which the Court rejected a conflict preemption claim premised on a violation of federal Medicaid law because (a) Congress created a separate remedy through which Medicaid law can be enforced and (b) the text of the federal statute giving rise to supposed preemption was sufficiently vague to be "judicially unadministrable." *Id.* at 328-29.  If preemption did not exist in *Armstrong* because the Medicaid provider who brought suit could have simply withdrawn from the program, surely the Supreme Court would have said so.

The State's only attempt to distinguish this case from *Bigelow v. Virginia*, 421 U.S. 809, 811 (1975), in which the Court invalidated a Virginia law prohibiting the advertisement of abortion services that were legally provided in New York, is that the aid-or-assist provision here criminalizes both speech and conduct. (*See* Dkt. 54 at 52-53). But so what? This argument ignores the as-applied nature of the plaintiffs' challenge to the aid-or-abet provision and runs headfirst into the Supreme Court's holding in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). In that case, where the plaintiff sought to engage in expressive activity prohibited by a statute regulating both speech and conduct, the Court nonetheless held traditional First Amendment principles applicable to the free-speech challenge: "The law here may be described as directed at conduct . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 27-28. So too here. Indeed, it would be shocking if a state could ban speech activity simply by also banning non-speech activity.

Given that the aid-or-abet provision constitutes a content-based regulation of pure speech, it is subject to strict scrutiny. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). The State argues that its statute is justified by its interest "in protecting the physical and psychological well-being of minors" (Dkt. 54 at 53), but, as underscored repeatedly, the evidence demonstrates clearly that minors' well-being is advanced by the *provision*, not the *prohibition*, of gender-affirming care. Indeed, that the aid-or-abet provision actually serves to endanger minors' well-being is obvious from the fact that it prohibits providers from sharing patients' medical histories with out-of-state providers to whom minors have turned for their care: how is Indiana possibly served by allowing young Hoosiers to seek care from providers that do not have access to a complete medical history? It is not.

These issues aside, when Indiana sought to prohibit the dissemination of information about out-of-state abortion options for minors, this Court rejected the precise argument it advances here:

> [T]he State has failed to show how its interests are advanced by prohibiting private individuals, including medical providers, from disseminating information about lawful abortion practices in other states . . . that . . . is widely available to the public. . . . "In the context of a First Amendment challenge under the narrowly tailored test, the

28

government has the burden of showing that there is evidence supporting its proffered justification." The State has failed to satisfy its burden . . . .

*Planned Parenthood of Ind. & Ky., Inc. v. Commissioner*, 258 F. Supp. 3d 929, 954 (S.D. Ind. 2017) (internal citation omitted), *vacated in part on other grounds following Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). Substitute "gender-affirming care" for "abortion," and you have this case.

## II.    Absent an injunction, the plaintiffs will suffer irreparable harm

The State's argument concerning irreparable harm is simply a rehash of its declarants' criticisms of the standards of care used by medical professionals for the treatment of gender dysphoria. For the reasons articulated above, this argument fails. The State fails to respond to the fact that the clear unconstitutionality of its action means that there is *per se* irreparable harm. (Dkt. 27 at 43). And the State entirely ignores the ample evidence regarding the plaintiffs' experience of gender dysphoria, their treatment, and the harm they will suffer if that treatment is banned, that is, the "imminent threat of. . . physical and/or psychological harm." *Eknes-Tucker*, 603 F. Supp. 3d at 1148.

This harm to the minor plaintiffs is not speculative. When A.M. experienced occasional lapses in care, she had increased depression and suicidal ideation, which she does not have while on puberty blockers. (Dkt. 48-14 at 13 [Morris Dep. 45:1-6, 46:24 through 47:13]). K.C.'s gender dysphoria had been intensifying prior to receiving puberty blockers: even after just a month on blockers, her quality of life improved. (Dkt. 48-12 at 18 [B. Clawson Dep. 61:16 through 62:9, 72:17-19]). M.R. and M.W., who are both receiving testosterone, experienced enormous improvements in mental health and decreasing dysphoric symptoms when they started treatment, and losing access to that treatment would mean returning to the dysphoric symptoms—including depression, anxiety, and isolation. (Dkt. 48-15 at 19 [R. Welch Dep. 65:3 through 66:13]; Dkt. 48-17 at 20 [Rivera Dep. 70:24 through 71:1]).[17]

---

[17]    The State raises only a cursory argument as to the remaining preliminary-injunction factors—the balance of harms and public policy. (Dkt. 54 at 55). These factors were addressed previously.

### III.    S.E.A. 480 should be preliminarily enjoined on its face

Finally, the State contends that any preliminary injunction should apply only to the named plaintiffs and not to the hundreds or thousands of other transgender Hoosiers negatively impacted by S.E.A. 480. As this Court noted previously, however, "a district court's equitable powers can extend beyond the named parties, in an appropriate case. . . . 'A court may issue a classwide preliminary injunction in a putative class action suit prior to a ruling on the class certification motion.'" (Dkt. 41 at 3 [quoting Newburg on Class Actions § 4:30] [alteration omitted]). This is clearly such a case: Indiana has enacted a statute that applies identically to all minors with gender dysphoria, and the failure to issue a classwide injunction would surely cause this Court to become inundated with similar suits.

The authority on which the State relies to suggest that an injunction should inure only to the named plaintiffs' benefit is entirely inapposite. *Doe v. Rokita*, 54 F.4th 518, 519 (7th Cir. 2022), arose in the context of an as-applied challenge to a statute that had already been upheld by the Supreme Court. The observation in *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021), that "no court may . . . purport to enjoin challenged laws themselves," came in the context of holding that the Texas attorney general was not a proper defendant in a suit challenging an abortion statute insofar as he had no "enforcement authority" under the statute. And, while Justice Gorsuch and Justice Thomas, concurring in *Department of Homeland Security v. New York*, 140 S. Ct. 599, 600-01 (2020), expressed concerns about the issuance of "nationwide injunctions," not only are these concerns inapplicable here but they acknowledged that such injunctions represented "widespread practice."

### Conclusion

Consistent with the decisions of every other court to have addressed the issue, a preliminary injunction should issue to prevent the grievous harm occasioned by the denial of necessary care.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 4602
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Chase Strangio
*Pro Hac Vice*
Harper Seldin
*Pro Hac Vice*
ACLU
125 Broad Street
New York, NY 10004
212/549-2500
cstrangio@aclu.org
hseldin@aclu.org

Attorneys for Plaintiffs and the
Putative Classes and Subclasses

31