UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | | |
|---|---|---|
| K.C., *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:23-cv-00595-JPH-KMB |
| | ) | Indianapolis, Indiana |
| THE INDIVIDUAL MEMBERS OF | ) | |
| THE MEDICAL LICENSING BOARD | ) | June 14, 2023 |
| OF INDIANA, *et al*, | ) | 1:30 p.m. |
| | ) | |
| Defendants. | ) | |


Before the

HONORABLE JAMES PATRICK HANLON


PRELIMINARY INJUNCTION



FOR THE PLAINTIFFS:     Kenneth J. Falk
                        Gavin Minor Rose
                        Stevie J. Pactor
                        ACLU OF INDIANA
                        1031 East Washington Street
                        Indianapolis, Indiana 46202
                        kfalk@aclu-in.org

                        Chase Strangio
                        Harper Samuel Seldin
                        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                        125 Broad Street
                        18th Floor
                        New York, New York 10004

```
 1   FOR THE DEFENDANTS:      Thomas M. Fisher
                              James A. Barta
 2                            Melinda Rebecca Holmes
                              Razi Lane
 3                            INDIANA ATTORNEY GENERAL
                              SOLICITOR GENERAL DIVISION
 4                            Indiana Government Center South
                              302 West Washington Street
 5                            5th Floor
                              Indianapolis, Indiana 46204
 6                            tom.fisher@atg.in.gov

 7

 8   COURT REPORTER:          jodie_franzen@insd.uscourts.gov

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        (*In open court*)

2           THE COURT:  Good afternoon, everyone.  We are on the

3    record in Case No. 1:23-cv-595, K.C., et.al. vs. The Individual

4    Members of the Medical Licensing Board of the State of Indiana

5    in Their Official Capacities, et. al.  We are here for a

6    hearing on the plaintiffs' motion for a hearing on preliminary

7    injunction.

8           I would ask for lead counsel, beginning with the

9    plaintiffs, to please introduce themselves for the record, as

10   well as their co-counsel.  And you are free to, but don't have

11   to, introduce any party representatives who happen to be in the

12   courtroom as well.

13          Mr. Falk.

14          MR. FALK:  Thank you, Your Honor.  Ken Falk from the

15   ACLU of Indiana representing the plaintiffs.  With me from the

16   ACLU of Indiana are my co-counsel Gavin Rose and Stevie Pactor.

17   And with me from the ACLU offices in New York are Chase

18   Strangio and Harper Seldin.  Thank you.

19          THE COURT:  Okay.  Thank you.

20          MR. FISHER:  Good afternoon, Your Honor.  Tom Fisher,

21   solicitor general of Indiana on behalf of defendants.  With me

22   at counsel table, James Barta, deputy solicitor general;

23   Melinda Holmes, deputy attorney general; Razi Lane, deputy

24   attorney general.

25          THE COURT:  Okay.  Thank you.  The parties had

1   originally requested that the hearing be limited to argument

2   with no evidence presented, and that was affirmed at the

3   June 5th, 2023 status conference.  In preparation for the

4   hearing I have reviewed the parties' stipulated facts that were

5   filed at Docket 51; the briefing; as well as voluminous

6   exhibits filed by both sides in support of the briefing; and

7   there also was a recently filed defense motion to exclude the

8   opinions of plaintiffs' experts that was filed on June 12th,

9   2023.

10        The parties had requested 45 minutes per side for

11   their presentations, so that is how we will proceed.  I have

12   built in some extra time to account for questions that I may

13   have.

14        So since the plaintiffs, of course, carry the burden,

15   they will go first.  Mr. Falk, I assume you are going to

16   reserve some time for rebuttal?

17        MR. FALK:  Yes, Your Honor.  Hopefully I will be able

18   to reserve 15 minutes or so for rebuttal.

19        THE COURT:  Okay.

20        MR. FALK:  But before I start my presentation, I

21   would like to make a motion.  We would like to move to strike

22   the motion to exclude that you just referred to, Docket 63,

23   that was filed after business hours on Monday.  Under the local

24   rules, of course, we have 14 days to respond.  We did not want

25   to generate any more paper in this case, and therefore I'm

1    making this oral motion for a number of reasons.

2            First, during our on-the-record conference that the

3    Court alluded to on June 5th, the parties agreed that all of

4    the evidence that was being submitted to this court would be

5    admitted, with the Court assigning it the weight that it deems

6    appropriate.  The State is now contradicting that explicit

7    understanding by filing this motion, and it simply cannot go

8    back on its stipulation this way.

9            Second, Your Honor, we filed our preliminary

10   injunction memorandum, as you know, on April 21st, with the

11   declaration of our three experts attached.  Defendants filed

12   their memorandum -- opposed it -- on June 2nd, 43 days later.

13   Defendants conducted the depositions of the three experts, our

14   three experts, ending on May 18th -- May 19th, excuse me.  They

15   had ample time, two weeks, prior to June 2nd to file any

16   motions directed towards the experts that we have, and there is

17   no excuse for waiting until the eve of this hearing to file to

18   strike, especially given the fact that the law is scheduled to

19   go into effect in two weeks.

20           Third, Your Honor, the case law is clear, of course,

21   that a preliminary injunction motion, or any matter that is

22   being heard by the Court, as opposed to a jury, *Daubert* motions

23   are not favored.  The judge is the gatekeeper and can assess

24   the evidence and determine what weight should be given.  The

25   case law on this is voluminous.  I actually have a case of

1  yours, the *Hitachi Astemo* case at 2022 Westlaw, 3369263 from

2  last year that says that, along with many citations.

3      That is precisely why we spend time in our reply

4  memorandum addressing the weakness of the defendants' experts.

5  The defendants could have done so in their response memorandum,

6  but instead they have filed a new 35-page memoranda in

7  opposition to our preliminary injunction request and have

8  labeled it a motion to exclude.  In the memorandum they end up

9  saying that if the experts are not excluded, that they should

10 be given no weight.  Well, that's an argument that should have

11 been made when they filed their response.  Moreover, the State

12 is using this motion to introduce new evidence in the form of

13 exhibits, all of which existed prior to June 2nd.

14     Briefly put, Your Honor, they had their chance to

15 argue against the plaintiffs' experts that was in their

16 response that was due long after they deposed those experts,

17 and they should not be given another bite of the apple at this

18 point.  We are happy to reply to the substance of the motion

19 because we do not think it is well taken.  If the Court wishes

20 a substantive response, we would like a week to file that.  But

21 at this point, given where we are, we think that the motion to

22 exclude should be struck.

23     Thank you.

24     THE COURT:  Okay.  All right.  Thank you.  So I'm

25 going to take that under advisement, and Mr. Fisher, of course,

1    will have an opportunity to respond when he speaks.  I will say

2    that the parties had worked very hard with the Court in coming

3    up with what was an agreed-upon expedited schedule for briefing

4    and discovery and other matters so that we would be full ready

5    to give presentations at this hearing, which was scheduled a

6    long time ago, so the filing of the motion on June 12th did

7    come as a surprise to me as well.  It also does address many

8    issues that could have been addressed in the response brief.

9    But that being said, there are many important issues.  That is

10   an important issue, but there are many other important issues

11   that I know both the parties have put a lot of work into, so I

12   will hear what Mr. Fisher has to say when he gets up to give

13   his presentation, but I will plan to take the motion to strike

14   under advisement.  I don't want us to get overly sidetracked

15   with that at this hearing this afternoon.  Thank you.

16           MR. FALK:  Thank you, Your Honor.  And with having

17   said that, pursuant to the agreement that we reached in our

18   conference with the Court, my understanding is, is that both

19   parties have agreed that all of the evidence that has been

20   tendered to the Court to this point, with the exception of the

21   evidence attached to the motion to exclude our experts, is

22   before the Court, and I would move all of that evidence in,

23   with the Court to decide the weight to be given, again with the

24   exception of the motion, so at least tendered evidence attached

25   to the motion to exclude.

1          THE COURT:  Subject to that limitation, I will go

2    ahead and admit that evidence at this time.

3          MR. FALK:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. FALK:  As far as my presentation is concerned --

6    thank you -- we are two weeks away from the effective date of

7    Senate Enrolled Act 480, a statute that not only will stop the

8    care that the minor plaintiffs and other transgender youth in

9    Indiana are receiving, and might otherwise receive in the

10   future, but will force them to experience irreversible

11   physiological changes that are inconsistent with their gender

12   identities.  This going backwards, developing characteristics

13   of the wrong gender, will be disastrous.  S.E.A. 480, Senate

14   Enrolled Act 480, is an odd law.  It bans the care that the

15   minor plaintiffs are receiving and that hundreds of other

16   transgender Hoosier adolescents are receiving, despite the fact

17   that the care they are receiving is the standard of care

18   endorsed by every major medical and mental health organization

19   in the United States: the American Medical Association, the

20   American Psychiatric Association, the American Psychological

21   Association, the American Academy of Pediatrics, the Endocrine

22   Society, the Pediatric Endocrine Society, and the American

23   Academy of Family Physicians, among others.  It bans this care

24   despite the fact that the gender-affirming medical care is

25   vitally necessary to stem the serious side effects of gender

1    dysphoria, a well-recognized mental disorder that causes

2    depression, anxiety, self-harming behavior, suicidal ideations,

3    and hospitalization, all symptoms manifested by the minor

4    plaintiffs in this case.

5            S.E.A. 480 bans this gender-affirming care, despite

6    the fact that every court that has faced similar statutes to

7    this one has preliminarily enjoined them, finding the

8    plaintiffs are likely to prevail in their claims, both

9    constitutionally and statutorily, and that the plaintiffs are

10    threatened with obvious irreparable harm.

11            S.E.A. 480 bans this gender-affirming care despite

12    the fact that the law is explicit that the exact same care that

13    will be denied to the plaintiffs, what we call generically

14    puberty blockers and gender-affirming hormones, remains

15    available to treat conditions that will afflict adolescents who

16    are not transgender.  The treatment is just not available to

17    transgender youth for their gender-affirming care.

18            And most of all, S.E.A. 480 is an odd law because it

19    bans gender-affirming care despite the fact that it works.  We

20    know that from the research, the extensive clinical experience

21    of our experts, and probably most importantly we know it

22    because it has clearly lessened the debilitating symptoms of

23    gender dysphoria for the plaintiffs, K.C., M.W., A.M., and

24    M.R., and many other transgender youth in Indiana.

25            THE COURT:  Let me ask you one question there --

1        MR. FALK:  Of course.

2        THE COURT:  -- on your statement that we know it

3   works.  Obviously the evidence that the Court should take into

4   account is very hotly contested in this case.  The defendants

5   point out, of course, that the results of randomized controlled

6   trials would be the best evidence to have to most accurately

7   consider safety and efficacy of these treatments.  Given the

8   lack of that research-based data, would you agree that the

9   safety and the efficacy is largely uncertain and unknown?

10       MR. FALK:  No, Your Honor.  Random controlled trials

11  cannot be done here.  You cannot tell a parent we're going to

12  give treatment to Child A, but we're not going to give your

13  child treatment.  And I think all of their experts, when asked

14  in depositions, conceded that this is not an area where random

15  controlled trials would be ethical.  What we have, however, is

16  many, many studies and we have experts who have talked -- who

17  have treated thousands of adolescents and the studies all point

18  that this is in fact the best care available.  The WPATH

19  standards and the Endocrine Society standards are based on

20  research and they're based on studies and they're clinically

21  backed, so I think what we're dealing with here are standards

22  that definitely have been proven and have been established

23  through clinical practice.

24       Conversely, the State offers nothing on the other

25  side.  There is no other treatment for gender dysphoria other

1  than this -- the standards of care that all of these medical

2  organizations have endorsed.  We're not in a situation where we

3  have to choose between two different types of care.  The only

4  research-backed, science-backed care that is available are

5  these standards of care and that is exactly what is being

6  delivered through Riley to three of the plaintiffs and through

7  Mosaic to one of the plaintiffs and it's what's being delivered

8  throughout the United States to thousands and thousands of

9  adolescents.

10         Now, what the State argues is that this standard of

11  care treatment is dangerous and unsupported by adequate

12  science, but that's been repeatedly rejected in *Ladapo*, in

13  *Brandt*, and *Eknes-Tucker*, dealing with very similar statutes,

14  as well as in *Fain*, *Kadel*, and *Flack* dealing with state health

15  or Medicaid plans excluding gender-affirming care.  And arguing

16  against this standard of care treatment seems to be a difficult

17  task, if not impossible, given that every major mental health

18  and medical organization supports the protocols.  Moreover, as

19  I noted, we have submitted declarations from three experts in

20  the field, Drs. Turban, Karasic, and Shumer, who not only have

21  done extensive research in this area that supports

22  gender-affirming care and are aware of a vast majority of

23  studies supporting the care, but have the clinical experience

24  with thousands of patients to demonstrate that this actually

25  works.

 1          And given the motion that was just filed, I would

 2     like to focus for a second on our experts.  Dr. Karasic, who

 3     was credited as an expert in *Ladapo*, is a psychiatrist, he is a

 4     professor emeritus at the University of California San

 5     Francisco medical school, he has been working with gender

 6     dysphoric patients for 30 years.  For 17 years he was a

 7     psychiatrist at the Dimensions Clinic for transgender youth in

 8     San Francisco.  He has seen thousands of patients.  He is the

 9     co-author of the WPATH standards of care, Edition 8.  He has

10     developed a special certification in transgender health that

11     has helped train over 2,000 health providers to make this care.

12     He is the consultant for transgender care for both the

13     California Department of State Hospitals and the California

14     Department of Corrections Rehabilitation.  He has also served

15     as an expert consultant for the United Nations Development

16     Programme on international issues concerning transgender care.

17          Dr. Shumer, who has also been credited as an expert

18     in *Ladapo*, is a pediatric endocrinologist.  He has been

19     treating adolescents with gender dysphoria since 2015 when he

20     created the child and adolescent center -- gender clinic,

21     excuse me, at the Mott Children's Hospital, which is part of

22     Michigan Medicine at the University of Michigan where he still

23     serves as a clinical director.  He is an assistant professor of

24     pediatrics at the university.  He has published extensively on

25     gender dysphoria in peer review journals, and that is the focus

1    of his work.  He has personally treated over 400 patients at

2    the clinic, and he has co-authored textbooks on medical

3    management of transgender persons.

4            Dr. Turban, our last expert, is a psychiatrist and

5    assistant professor of child and adolescent psychiatry, again,

6    at the University of California, San Francisco medical school.

7    He is the director of the gender psychiatry program there.  He

8    also has conducted an enormous amount of research on mental

9    health of transgender youth and youth experiencing gender

10   dysphoria, and he is published extensively on the subject in

11   peer-reviewed journals.

12           Even without their obvious scholarship, these persons

13   are experts based on their clinical experience.  This contrasts

14   greatly with the defendants' so-called experts who venture

15   opinions that are far outside the mainstream and based on

16   virtually no scholarship or expertise and as we have argued are

17   entitled to little weight.

18           We have two endocrinologists, Dr. Hruz and Weiss, who

19   have never treated a patient for gender dysphoria.  Dr. Hruz

20   has never done any research in the area, and his opinions have

21   specifically not been credited in *Ladapo* and *Kadel*.  With the

22   exception of a letter to the editor, Dr. Weiss's limited

23   writings -- I believe six -- on gender dysphoria have appeared

24   only in religiously-affiliated publications, and Dr. Weiss

25   holds the opinion, expressed in his deposition, that the

1    American Medical Association is a politically-motivated

2    organization, and that all of the groups endorsing

3    gender-affirming care, all of the medical and mental health

4    groups in the United States, have been taken over by group

5    think and social contagion.

6         The State proffers Dr. Kaliebe, a psychiatrist who

7    also has not done any research or published any articles

8    concerning gender dysphoria and has treated only about 13

9    minors with gender dysphoria in a career that stretches over

10   20 years.

11        We have an Australian psychologist proffered,

12   Dr. Kenny, who also has done no original research.  He sees

13   only patients whose parents are convinced their children have

14   been misdiagnosed with gender dysphoria, which he doesn't

15   necessarily believe exists, but he believes to the extent that

16   people claim gender dysphoria, it's caused by social contagion

17   and he explains the fact that every major medical and mental

18   health group of the United States approves the standards of

19   care as the result of the transactivist lobby and the

20   transactivist medical industry pushing gender-affirming care.

21             THE COURT:  I have a question for you at this point.

22             MR. FALK:  Of course.

23             THE COURT:  So even if these experts -- and of course

24   in the briefs there is a lot of mutual accusations going to the

25   qualifications of the experts, but it strikes me that the

1    experts on both sides are reasonably well credentialed, and

2    even if the defense experts, one or more of them, don't have

3    experience directly tied to treating the procedures that are

4    prohibited by S.E.A. 480, wouldn't you agree they at least have

5    experience that is relevant of a nature that would qualify them

6    as experts so that I would consider their opinions?

7         MR. FALK:  Not when it comes to treating gender

8    dysphoria in adolescents, Your Honor.  Dr. -- as I said,

9    Dr. Hruz was specifically not credited in *Ladapo* and *Kadel*

10   because he has no experience.  Dr. Kaliebe has seen 13 persons

11   in 20 years.  Dr. Kenny doesn't even believe that gender

12   dysphoria exists, and she is treating persons with a form of

13   therapy that she admits is actually band in three Australian

14   states because it is deemed to be conversion therapy.  We have

15   Dr. Cantor who receives 80 percent of his income serving as an

16   expert, but he doesn't specialize in gender dysphoria.  He

17   specializes in atypical sexual attractions, like pedophilia.

18   He has not performed any research on gender dysphoria.  He has

19   treated only eight minors with gender dysphoria and has not

20   treated anyone under the age of 16.  He -- in *Eknes-Tucker*,

21   after seeing these qualifications, the Court said he was

22   entitled to very little weight.

23        What the experts have done is they have cherry-picked

24   through articles and regurgitated what they think those

25   articles say.  But as we noted in our brief, that simply is not

1    the role of an expert.  Someone cannot go into an area where

2    they have no expertise and find literature and claim they have

3    the expertise because they repeat the findings or what they

4    believe to be the findings of literature.  This is not the

5    function of an expert.

6              THE COURT:  So I have a question for you here.  I

7    think that the case you referred to was the case that was in

8    either Arkansas or Alabama, the case that --

9              MR. FALK:  Yes, both are -- one in Arkansas and one

10   in Alabama, yes.

11             THE COURT:  And wasn't that a bench trial?

12             MR. FALK:  That was a preliminary injunction on a

13   bench trial, yes.

14             THE COURT:  Okay.  On a bench trial, though?

15             MR. FALK:  Yes.

16             THE COURT:  So here the parties didn't want an

17   evidentiary hearing, so I'm left with a paper record of, as I

18   said, experts on both sides that each arguably appear to be

19   reasonably well qualified, even if they don't have experience

20   directly in this area, which I don't think is a requirement for

21   the qualification, but my question would be, given the

22   allegations on both sides, without the opportunity to observe

23   the experts as they testify, to observe their demeanor and hear

24   them under cross examination, how should I go about weighing

25   their comparative qualifications --

1          MR. FALK:  Sure.

2          THE COURT:  -- without the benefit of that?

3          MR. FALK:  Well, I guess I have two responses.  One

4     is to the extent that we have experts who have had years and

5     years of actually treating adolescents with gender dysphoria,

6     who have the clinical experience, that is entitled to an

7     enormous amount of weight, as opposed to defendants' experts

8     who have virtually no experience.  Some have no experience at

9     all.  If you find, for instance, that we have Dr. Cantor who

10    has nothing to do with gender dysphoria in terms of training,

11    in terms of research, there is no reason to credit what he

12    says.  There is no reason to credit what Dr. Kenny says who

13    doesn't even believe in gender dysphoria and thinks it's all a

14    big conspiracy.  There is no reason to credit Dr. Hruz or

15    Dr. Weiss who have never treated a patient with gender

16    dysphoria and have no research experience.  However -- I'm

17    sorry.

18         THE COURT:  When you talk about their views about the

19    underlying subject, the defense, of course, has made similar

20    allegations that your experts shouldn't be taken into account

21    because they are infected with bias.  That is the allegation

22    that the defense has made about your experts.  So I'm not sure

23    that it's very helpful for me to hear both counsel mutually

24    saying how the other side's experts are not credible because of

25    a view that they supposedly hold, which hasn't been, again,

1    borne out and really tested in the crucible of cross

2    examination.

3            MR. FALK:  And I guess my second response, Your

4    Honor, is that even if you credit all of the witnesses, you are

5    still left with a procedure or a standard of care which is

6    adopted by every major medical organization in the United

7    States and you are still dealing with parents who bring a child

8    to a doctor and the doctor says here is the standard of care by

9    all of these organizations and you are now telling the doctor

10   and the parent, and most importantly the child, you can't get

11   this care and there is nothing that allows a state to do that.

12   Even if there is a legitimate disagreement, which I don't think

13   there is, but even if there is a legitimate disagreement as to

14   this care, we have to recognize it is the standard of care, and

15   the State has no constitutional ability to intervene in that.

16   So I would say that regardless of the strength of the

17   experts -- and I think our experts are measurably stronger with

18   much more experience and have been credited by other courts

19   because of that experience and that knowledge, but even without

20   that, we're still having the State of Indiana saying we don't

21   care that every major medical organization and mental health

22   organization in the country says this is okay, you can't do it,

23   and I think that's where we are.

24            THE COURT:  And when you say that the State has no

25   constitutional ability to intervene, in your view, is the

1  problem that the State is regulating the procedures at all, or

2  is it the extent of the regulation?  So, for example, if the

3  State had codified WPATH's guidelines or the guidelines that

4  Riley follows, would that be constitutional?

5          MR. FALK:  I think so, Your Honor.  I mean I think we

6  are not concerned here with the precise nature of the

7  regulation because what we're dealing with here is a total

8  prohibition.  A state certainly has the right to regulate

9  doctors and procedures, but I think we're kind of far afield

10  here.  What we're dealing with here is the standard of care,

11  the gold standard in this particular type of treatment, and the

12  State saying you can't get it.  And I think what the evidence

13  shows here is contrary to what the State is alleging.

14  Obviously gender dysphoria is a condition within the Diagnostic

15  and Statistical Manual.  It's not caused by the internet, it's

16  not caused by social contagion, or the result of the

17  transactivist lobby.  It's a diagnosis like any other mental

18  health condition.

19          Number two, the standards, the PATH standards and the

20  Endocrine Society standards, despite the State's unwillingness

21  to accept them, are evidence based, and they are based on

22  rigorous review of experts.

23          Number three, I think the evidence is clear that

24  parents and their children are not being pushed into getting

25  gender-affirming care without knowledge of risks and benefits.

1    The diagnosis for gender dysphoria requires six months of

2    incongruous and distress, and no one rushes into this.  The

3    youth and the parents are being given detailed information as

4    to the benefits and risks of this procedure, and we have

5    included that in our materials with our response reply

6    memorandum, the ones from Mosaic and Riley and Eskenazi, and

7    these medications, puberty blockers and hormones, are only

8    provided after evaluation of mental health and take into

9    account co-morbidities.

10           The evidence also shows, Your Honor, that the puberty

11   blockers have been widely used for decades -- no one disagrees

12   with that -- to treat adolescents for precocious puberty, and

13   also for other things, and there is extensive data supporting

14   the safety of their use.  They are prescribed, of course, in

15   this case to prevent the distress that accompanies body changes

16   with puberty for someone who is gender dysphoric.  For

17   instance, as K.C. approached puberty and noticed her body odor,

18   her dysphoria increased.  She took multiple baths and showers

19   daily.  She stopped looking at herself in the mirror.  She

20   obsessed that her voice was getting lower, and she demonstrated

21   general discomfort with her body.  Gender dysphoria.  After

22   less than a month on a puberty blocker, she has shown great

23   improvement because she does not have that fear of going into

24   the wrong puberty.

25           The evidence also shows, Your Honor -- and again,

1    this is not contested -- that the hormones that are

2    prescribed -- testosterone, estrogen -- are widely prescribed

3    to persons with conditions other than gender dysphoria, things

4    like delayed puberty, hypogonadism, Turner syndrome,

5    Klinefelter syndrome, disorders of sexual development.  The

6    side effects are rare.  One of them is it may affect fertility,

7    and you will see in the informed consent information that is

8    discussed and options are offered.  The other thing the

9    evidence shows, that treatment works both for short-term and

10   long-term functioning and mental health, and regret and

11   desistance is extremely rare.  We have cited numerous

12   peer-reviewed articles and studies that show exactly that.  And

13   of course the efficacy of the treatment is confirmed by our

14   experts who have done this thousands of times.  The evidence is

15   also clear that terminating this ongoing care and denying

16   future care will cause severe harm -- onset of the wrong

17   puberty, development of secondary sex characteristics for the

18   wrong gender -- and we have cited peer-reviewed studies that

19   demonstrate this directly contributes to poor mental health

20   outcomes.

21            And lastly, Your Honor, as I alluded to, most

22   importantly, there is no evidence-based alternatives for

23   treating gender dysphoria.  The State suggests psychotherapy --

24   and as I noted, Dr. Kenny in Australia practices what appears

25   to be conversion therapy, which not only has been prohibited in

1    three Australian states, but it's been deemed unethical by the

2    American Medical Association, the American Psychiatric

3    Association, the American Psychological Association because it

4    does harm and increases the risk of psychological distress and

5    suicidality.  And traditional therapy -- going to talk this

6    out -- doesn't cure gender dysphoria.  A.M. was in therapy

7    through Eskenazi for almost three years before receiving her

8    puberty blocker.  Therapy by itself does not work.  It can be

9    obviously presented in conjunction with gender-affirming care

10   but not as a substitute.

11          The only other alternative, of course, is to do

12   nothing and wait until the minor turns 18.  Well, this is akin

13   to having a child who has bipolar disorder or cancer and

14   saying, well, let's wait until you're 18.  It's not a viable

15   alternative.

16          So what is the law here?  As we said, I think this is

17   clearly unlawful, and courts have so found as violating equal

18   protection, due process, the Medicaid Act, the Affordable Care

19   Act, and the First Amendment.  Let's talk about equal

20   protection.

21          THE COURT:  And before we get there, I just had one

22   question.

23          MR. FALK:  Sure.

24          THE COURT:  You had mentioned, a minute ago,

25   desistance.

1              MR. FALK:  Yeah.

2              THE COURT:  And I believe that your experts

3    essentially say that that is virtually non-existent for

4    individuals who are diagnosed when they are adolescents --

5              MR. FALK:  Exactly.

6              THE COURT:  -- as opposed to being prepubescent.

7    There was a 2022 study in the Journal of Clinical Endocrinology

8    and Metabolism entitled the Continuation of Gender-Affirming

9    Hormones Among Transgender Adolescents and Adults that, among

10   other findings, found that among the patients who began taking

11   cross-sex hormones as minors, that there was a 74.4

12   continuation rate after four years, leaving obviously over

13   25 percent who would have stopped.  So it appears as though

14   there is perhaps an inconsistency between your experts'

15   opinions and the findings of that journal, or a factual dispute

16   there.

17             MR. FALK:  I don't think so, Your Honor.  I think our

18   experts noted -- and I apologize, I don't remember which one, I

19   think more than one -- that it's not uncommon for persons when

20   they hit adulthood to be satisfied as where they are.  They

21   don't go back.  They're not regretting their journey.  They

22   just don't feel the need to continue with hormonal care because

23   they feel they have come as far as they need to go.  That is

24   not -- I guess it's technically desistance, but that is not

25   regret.  That is deciding that it all worked.  And I think that

1   is what I believe Dr. Karasic testified that his experience is

2   with his patients.  Some of them are satisfied where they are.

3   Others want to continue receiving hormones.

4         THE COURT:  So any number of the cases could be

5   desistance without regret?

6         MR. FALK:  Exactly.

7         THE COURT:  Thank you.  Go ahead.

8         MR. FALK:  In *Whitaker*, of course, the Seventh

9   Circuit established that discrimination against transgender

10  persons is sex discrimination for purposes of equal protection

11  because the discrimination there, not allowing a transgender

12  male to use -- a male student to use a high school male

13  restroom, was discrimination based on sex.  The Supreme Court

14  in *Bostock*, of course, reached the same conclusion in the

15  context of Title VII.  In both cases the Court concluded that

16  challenge actions could not be stated without reference to sex.

17  Now, the State argues that the discrimination here is not based

18  on transgender status but on age, procedure, or medical

19  condition, but this just isn't the case.  Let's assume the law

20  goes into effect and it's July 2nd and a doctor is in her

21  office and she has on her calendar that she has an initial

22  appointment for a 16-year-old who requires an office procedure

23  to receive testosterone and that's all she knows.  Well, she

24  won't be able to do it unless she knows the sex assigned at

25  birth of the patient.  She can do it if the 16-year-old is a

1    cisgender male.  She cannot do it if he is a transgender male.

2           What the law allows and doesn't allow cannot be

3    stated without reference to sex.  And as the Eighth Circuit

4    indicated in *Brandt*, and also *in Ladapo* and *Eknes-Tucker*, this

5    is discrimination based on sex because the minor's sex at birth

6    determines whether or not the minor can receive the care.  Now,

7    the State seeks support from the Supreme Court's 1974 *Geduldig*

8    case where the Court held that denying pregnancy benefits for

9    job loss due to normal pregnancy did not violate equal

10   production because in the estimation of the Court this was a

11   neutral condition that treated men and women equally, it did

12   not discriminate based on sex.  Well, the *Geduldig* argument has

13   been raised and rejected repeatedly in other cases concerning

14   discrimination against transgender persons like we hear

15   today -- *Ladapo*, *Kadel* and *Boyden* -- because excluding this

16   care does not treat transgender and non-transgender persons the

17   same and directly targets transgender persons.  It is not a

18   neutral condition.  It's a facial classification based on sex,

19   as the -- as I argued, after all, cisgender persons can receive

20   puberty blockers and hormones.  And to know whether you can

21   receive treatment, you have to know the person's sex at birth.

22   This is differential treatment based on sex, or at least sexual

23   stereotype.

24          *U.S. versus Virginia* tells us that this type of

25   discrimination, gender-based discrimination, is subject to

1   demanding scrutiny requiring the State to demonstrate an

2   exceedingly persuasive justification.  It must be substantially

3   related to an important government interest.  And the State

4   argues that this serves the important government interest in

5   the well-being of minors.  It's not enough to claim it.  What

6   does the evidence show?  And this is where I think parsing the

7   experts, although we think they certainly go our way, isn't

8   really necessary because in looking at the State's interests,

9   the medical interventions that the plaintiffs are receiving

10  represent the standard of care.  It's backed by research and

11  clinical experience.  It was initiated -- they were initiated

12  only after confirmation of their need and only after the

13  benefits and potential risks were explained.  This is all

14  uncontested.  They work.  They work.

15          The State took depositions of all of the parents in

16  this case, and they have all talked about how their children

17  have benefited from this treatment.  And there are no

18  alternatives, Your Honor.  There is no alternative to the safe

19  and effective treatment that is being provided now.

20          Banning this medically-necessary care is not

21  substantially related to the articulated interests.  It's

22  contrary to the interests.  It's not minimally rational, let

23  alone meeting the elevated standard required.  It also violates

24  due process.

25          *Ladapo*, *Eknes-Tucker*, and *Brandt* all found a

1    violation of both equal protection and due process, finding

2    that this statute, or a statute like this, likely violated the

3    fundamental rights that parents have in the care, custody, and

4    control of their children.

5            As the Supreme Court noted in *Troxell*, this is a

6    right that is perhaps the oldest of the fundamental rights

7    protected by due process.  And as the court also stressed in

8    *Troxell*, if the parent is fit, there is normally no reason for

9    the State to interfere or question the choices that parents

10   make.

11           Obviously S.E.A. 480 is an attempt by the State to

12   radically interfere with fit parents, in consultation with

13   their doctors, making choices for their children that are the

14   standard of care.

15           THE COURT:  In the two cases you just cited there,

16   you said that the Court had found both that the plaintiffs had

17   proven their case with respect to due process and equal

18   protection; is that right?

19           MR. FALK:  That's correct.

20           THE COURT:  But if I were, for example, to find that

21   the plaintiffs had established a reasonable likelihood of

22   prevailing on their equal protection claim, I wouldn't have to

23   go on and address due process, right?

24           MR. FALK:  That's correct.  And that's exactly what

25   the Eighth Circuit did in *Brandt*.  The district court in *Brandt*

 1   found that this was a violation of parental rights, equal

 2   protection, and also the First Amendment.  And without

 3   mentioning those other claims, the Eighth Circuit said that

 4   this was an equal protection problem.

 5            THE COURT:  And let me ask you one question on the

 6   First Amendment claim, since you mentioned that there was just

 7   kind of a natural follow-on.  If I were to agree with your

 8   position on the merits there, it would be too vague, I think,

 9   for the injunction to just say it's enjoined as to speech.  So

10   is there specific language that you have thought of or that you

11   would propose that the injunction would actually have that

12   would address that topic that would be specific examples of

13   speech that would be covered?

14            MR. FALK:  Well, the problem, the First Amendment

15   problem is because we have this aiding and abetting provision,

16   and the aiding and abetting provision prohibits Mosaic and

17   Dr. Bast, for example, from, after July 1st, if the law was in

18   effect, to refer their patients out of the state or to answer

19   questions from out-of-state providers, so to the extent that

20   that is banning pure speech, which it clearly is, then we would

21   ask that the law be found to violate the First Amendment to the

22   extent that it would prohibit communications by, in this case,

23   the physicians or by the clinics.  It obviously would not

24   prohibit, perhaps, actions being taken, but at this point all

25   we're talking about is pure speech, so I'm not sure -- we would

1 certainly be happy to propose language, but that is what we're

2 talking about, and that is what -- you know, this is, as we

3 noted for the First Amendment, this is the *Bigelow* case where

4 the State of Virginia said not only can you not do abortions

5 here, but you can't even advertise legal abortions in New York,

6 and the court struck that statute down.  We think the statute

7 here is indistinguishable in that regard.

8          THE COURT:  So I think we're probably at about a good

9 place where I would like to hear from Mr. Fisher soon, so if

10 you could wrap up where you were going in this front end of

11 your presentation, that would be great.

12          MR. FALK:  I would be happy to do so.  We think this

13 is a clear violation of parental rights.  This is, as we noted,

14 a fundamental right that has been long recognized as a

15 violation -- or as an impingement on a fundamental right.

16 There must be a compelling governmental interest narrowly

17 tailored.  Again, for the same reasons I alluded to, there is

18 no justification for this law.

19          And just very briefly, the Medicaid Act claim, which

20 has been recognized in other cases, is quite clear.  Medicaid

21 requires not just that the State pay but that the State provide

22 services.  This denies that.  And because Medicaid is

23 implicated, which is federal funding, the Affordable Care Act

24 is implicated as well, and therefore denying Mosaic, Dr. Bast,

25 and other practitioners the ability to provide these services

1   when they are Medicaid recipients is discrimination on the

2   grounds of sex, as found in other courts, and it violates the

3   Affordable Care Act.

4           THE COURT:  Okay.

5           MR. FALK:  Thank you.

6           THE COURT:  Thank you.

7           Okay, Mr. Fisher.

8           MR. FISHER:  Thank you, Your Honor.  May it please

9   the Court.  So I'll start, of course, with the oral motion to

10  strike our motion to exclude.  A couple of responses I think

11  are warranted there.  First, with respect to our stipulation

12  about the receipt of evidence in this case, I had not

13  understood that to cover things like Rule 702 motions based on

14  reliability.  I had understood it to cover the idea that we

15  don't need to bring the witnesses into court to have them

16  testify.  And we had flagged in our motion to push off the

17  class certification briefing that we were considering a *Daubert*

18  motion, and that was one of the reasons that we needed

19  additional time.  Now, once we filed our brief, we scrambled as

20  quickly as we could to get the motion to exclude on file given

21  the, you know, the complexities of the witness testimony, the

22  need to corral our own experts to get their reactions to it.

23  And, indeed, even the supplemental expert reports that the

24  plaintiffs filed that brought in new evidence, brought in new

25  testimony, all of this contributed to the timing, so I think --

1    you know, I think what we have done is reasonable, and I think

2    the plaintiffs are incorrect that at a preliminary injunction

3    hearing reliability doesn't matter.  I think, you know,

4    notwithstanding the form in which it comes in, I think the

5    reliability of opinion testimony always matters, even in a

6    bench trial.  So that's -- in summary, those are our responses

7    on the motion to exclude.  You know, I think there is a lot

8    there to take in.

9             And candidly, I completely understand the Court's

10   concern about the back-and-the-forth over the experts, and I

11   really don't plan to spend time on our experts today.  I want

12   to talk about the European systematic reviews, which really are

13   not in any way contested by the plaintiffs.  They don't --

14   their experts, when given a chance at depositions, refused to

15   say that those reviews were unreasonable.  In their reply

16   brief, knowing how much we were relying on those systematic

17   reviews, they didn't address them, and I think that that is

18   really, in many respects, kinda the safe area for the Court if

19   you don't want to have to get into the questions about

20   reliability of the experts, the questions about their biases,

21   the questions about their affiliations, and I think that

22   provides a lot.  Those are, you know, government-commissioned

23   reviews that are specifically designed to factor out things

24   like bias and cherry-picking and the, you know, overlooking of

25   confounding variables.  They are meant to assess the quality

1    and not just the quantity of evidence.

2            And so I think, you know, let's take a look at what a

3    couple of them say on this subject.  In Britain, where

4    blockers, by the way, blockers and hormones had been available

5    to youths since 1989, they commissioned -- the UK National

6    Health Service commissioned a report by Hilary Cass, and she

7    said that using the -- what we have described and what others

8    agree as sort of the standard to be applied here, the GRADE

9    standard for quality, G-R-A-D-E is the acronym.  Using GRADE,

10   that report concluded that those interventions, the evidence

11   supporting those interventions, was very low quality, which

12   means any estimate of effect is certain or that the true effect

13   of an intervention is probably markedly different from what the

14   study purports to find.

15           The NICE assessment by Dr. Cass also observed that

16   children taking puberty blockers lack normal bone density.

17   Dr. Cass reported that the review could not provide definitive

18   advice on puberty blockers and hormones due to gaps in the

19   evidence, and the evidence was not strong enough to recommend a

20   policy.  Dr. Cass, interestingly enough, also highlighted that

21   the literature provided the least information for the largest

22   group of patients, namely females present -- first presenting

23   in the early teen years.  And this is a theme that I think

24   comes up again and again in the European reviews and with the

25   literature that our -- certainly our experts have cited about

1  this growing number of a different age and sex cohort than what

2  had traditionally presented for gender dysphoria in the past.

3         Now, what has been the UK's response to the Cass

4  report?  Well, they --

5         THE COURT:  Well, wait, wait.  I have a question on

6  the contagion since you brought it up.

7         MR. FISHER:  Uh-huh, sure.

8         THE COURT:  Isn't it equally possible or even

9  probable that the increase in social acceptance, and things

10  along those lines that are argued by the plaintiffs, is what is

11  responsible for the increased number of patients who are in

12  that category, as opposed to the theory of social contagion?

13         MR. FISHER:  Yes, certainly.  I think the critical

14  issue here is we don't know.  And in that regard, let me just

15  point you very quickly to what the Norwegian systematic review

16  said, and this is reported -- and I don't take plaintiffs to

17  contest this, but Dr. Cantor reported this in his declaration,

18  and in the Norway report we have the Ukom medical director

19  Stine Marit Moen saying that we have seen a marked increase in

20  referrals to specialized health care services in Norway for

21  teenagers, as seen in many other western countries, and nobody

22  knows the reason.  And that is really important, that we don't

23  know the reason.  Is it something that is going to be a

24  permanent sense of gender dysphoria if it's not treated with

25  hormones and blockers?  Is it something else?  We don't know.

1    And in particular that's relevant because the studies that have

2    been done -- which by the way do not show any causation, any

3    causative benefit from hormones and blockers -- were done on

4    different cohorts, typically young men presenting for a long

5    period before they hit their teenage years, and that has been I

6    think one of the alarm bells for a lot of people who look at

7    this now.  This is a very different phenomenon that is coming

8    across, and we just don't know the answer why.

9            Now, Britain's response to the Cass report has been

10   to say that -- and this is just as of last Friday, even after

11   we filed our brief, unfortunately.  The UK National Health

12   Service announced two new protocols.  It said that the primary

13   intervention for minors with gender dysphoria would now be

14   psychosocial and psychological support and intervention.

15   That's the alternative.  That's not what the plaintiffs have

16   described as conversion therapy.  Not everything that doesn't

17   support gender-affirming care is conversion therapy.  That's

18   been the complaint lodged against our experts is that, well, if

19   you don't support blockers and hormones, if you support

20   psychosocial support, you must be a conspiracy therapist and a

21   conversion therapist.  And that is not fair, and that is not

22   accurate.  That is Britain's policy change.  They have done a

23   180.  Before, routinely hormones and blockers were recommended.

24   Now it is not to be routinely recommended.

25           I mentioned Norway also --

1          THE COURT:  Wait, so as far as the psychotherapy

2     goes, of course your argument with respect to the plaintiffs is

3     that there is no reliable evidence that blockers and

4     cross-hormone therapy are efficacious.

5          MR. FISHER:  Right.

6          THE COURT:  Is there data supporting your view that

7     psychotherapy is efficacious and has a certain outcome?

8          MR. FISHER:  I think -- first of all, let me just

9     take it in general, which is to say with respect to any number

10    of psychological disorders, depression, PTSD, many other, you

11    know, types of disorders, I think cognitive behavioral therapy,

12    other psychological therapies, are highly regarded, well

13    understood to be very effective.  Now, in this context, do we

14    have a study?  No.  You know what, the studies that the

15    plaintiffs rely on typically were combining psychological

16    support with hormones and other -- and medical therapy, so they

17    were together.  They have never been disentangled.  The

18    difference is that psychosocial support, cognitive behavioral

19    therapy, does not pose the same risks, long-term risks, as

20    intervention with blockers, with hormones, and with surgeries,

21    you know, risks to bone density, risks of any number of

22    diseases, risks to fertility, those things are not at stake

23    with psychosocial intervention, so I think there is a very big

24    difference when we compare those two.

25          THE COURT:  And on the topic of risks associated with

1    those treatments, I know that your experts, of course, cite the

2    possibility of risks, and it seems like there are risks

3    attendant to virtually any medical procedure you could have.

4              MR. FISHER:  Uh-huh.

5              THE COURT:  The plaintiffs, I think, argue that those

6    are mitigated by individual treatment, as well as informed

7    consent.  But my question for you would be is there any

8    evidence that the defendants have that quantifies the risk, or

9    is just a very general there is a risk, so that means it could

10   be a .1 percent risk or anywhere between there and up, or is it

11   completely unknown?

12             MR. FISHER:  Well, I'm sorry, I can't bring up an

13   index of those specific risks and what they are, but I think

14   that our experts pretty clearly do point out studies showing

15   quantifiable risks of various types, so I think they are

16   quantifiable.  And there are various types of risks, including

17   fertility, which is very high, in fact is something that is

18   almost unavoidable when you go from blockers where your

19   reproductive organs don't develop, straight into hormones, and

20   the idea that you are then at some point going to come off of

21   hormones and be able to have reproductive capacity, it's hard

22   to see how that could happen.  And certainly there is no

23   evidence about that, and that is a very important risk that,

24   you know, given the trajectory that we see where once you are

25   on blockers there is this sort of conveyor belt where you then

1    get onto hormones and eventually you go to surgery, that's a

2    very serious problem.  But the other risks, yes, are quantified

3    and quantifiable.  I don't even think at some level that they

4    are denied.  I mean they are disclosed as part of the informed

5    consent process.  And the question really then is, well, how do

6    we make an assessment as to how much risk is too much for a

7    minor to undertake?  That is a classic government regulatory

8    question, and I think it's really interesting that Mr. Falk has

9    said, well, gosh, if we would merely codify the WPATH standards

10   or the way that IU Health and Riley do things, that would be

11   acceptable regulation.  Well, why are those the entities that

12   get to determine what is acceptable regulation in our society?

13         THE COURT:  Let me ask you one question on the prior

14   topic before you continue down this path, which I am eager to

15   hear more about.  But when you cited the defense experts'

16   studies relating to harm that -- or the likelihood of harm

17   resulting from the use of blockers and/or hormones, are those

18   based on randomized controlled trials?

19         MR. FISHER:  Offhand I don't know the answer to that,

20   but the expert reports themselves set forth -- and again, I

21   don't think that the risks and those quantified risks are

22   disputed.  I think that everybody understands that they are

23   there.  It's just a question of what you do with that, and I

24   think that from the plaintiffs' point of view we can make

25   decisions individually knowing that those risks exist, as long

1    as they are disclosed, and our position is, well, when you are

2    talking about minors and when you are talking about long-term

3    effects and the ability -- you know, the inability to know the

4    benefits of this intervention, those risks are very important,

5    and they justify government intervention.

6           So, again, why isn't it, you know, the State of

7    Indiana and our legislature that can look at these European

8    systematic reviews, they can come -- see those conclusions and

9    make a regulatory decision.  And in fact, the plaintiffs

10   criticize us for citing those studies only because those

11   countries have not enacted an outright ban the way that we

12   have.  Well, they have made very substantial policy changes.

13   And again, this is a matter of regulatory judgment.  What do

14   you do with the information?  The information is not, as far as

15   I can tell, disputed from the -- in terms of what has come out

16   of these systematic reviews.  What the Indiana General Assembly

17   has decided to do is to say we don't want our children to be

18   part of this grand experiment.  If they want to have

19   availability as part of research programs in the UK or in these

20   other European countries, they can do that.  We don't have to

21   do that.  That is certainly not something we think is

22   appropriate for children here.

23          So again, that all comes down to

24   politically-accountable legislative judgment, what do you do

25   with the information, and the WPATH and others who have come

1    forward with guidelines do not get to determine what is the

2    constitutional limit of the regulatory response.

3        Now, you know, I invite the Court to look at the

4    other reviews, including especially Sweden, which has a very

5    compelling report, and even there the Karolinska Institute,

6    which was one of the world leaders in interventions for minors

7    for gender dysphoria, has reversed its policies, and it no

8    longer provides puberty blockers or hormones to anyone under

9    the age of 16, so there we have a very respected institute

10   taking this information, seeing that there is an absence of

11   long-term studies and there is a presence of risk and there is

12   no evidence of causation and coming to a decision that, you

13   know what, we're going to put the cutoff at 16, and I think --

14   you know, we choose 18 in Indiana.  That's, you know, hardly a

15   constitutionally-significant difference.

16       So I invite the Court, again, to look at those

17   studies.  I'm happy to talk about them more, but I also want to

18   make sure that I address some other points that the plaintiffs

19   raise.

20       So the plaintiffs talk about WPATH and the Endocrine

21   Society and all of these other societies that have endorsed

22   what they describe as the standard of care and this is the

23   standard of care.  There is nothing talismanic about the

24   standard of care.  The State is permitted to regulate the

25   standard of care, so that doesn't really tell us much when we

1    arrive at some conclusion as to what the standard of care is.

2    But what is interesting is that WPATH's guidelines, the latest

3    guidelines, the SOC-8, do not purport to be based on a

4    systematic review the way that those European studies are.

5    SOC-8 thinks that you can't do a systematic review precisely

6    because the studies don't exist.  Well, that's supposed to tell

7    you something when you go to do a systematic review.  If you

8    can't find the studies, maybe you have got something to be

9    concerned about, maybe you need to start back a few steps

10   before you assume that, you know, there is something worth

11   trying out here, so -- and SOC-8 instead relies on literature

12   that it selects -- again, there is this cherry-picking problem

13   that systematic reviews are designed to address -- and

14   professional consensus, which is really the weakest type of

15   evidence that lies at the bottom of the evidence pyramid.

16   SOC-8 does not even disclose how the literature it cites scored

17   under GRADE or under any other scoring system for reviews or

18   where it is allowing consensus to override the evidence.

19           In fact, the lack of quality evidence supporting the

20   guidelines is apparent by the process that they used.  As part

21   of the process, WPATH commissioned a review by Baker in 2021,

22   but that review asked only limited questions about the

23   effectiveness of puberty blockers and hormones.  It did not

24   consider safety, which is a critical question.  And despite

25   that limited scope, the Baker review was unable to identify a

sufficient number of studies focusing on adolescents to support
results for minors specifically.  And when combining adolescent
studies and adult studies, the review reported that it was
impossible to draw conclusions about the effects of hormone
therapy on death by suicide.  That is one of the very important
risks that the plaintiffs are relying on when saying that an
injunction is necessary, here is this prospect of suicidality.
Well, even WPATH was unable to come to a conclusion about the
effect of hormones and blockers on suicidality.

        Well, what about the Endocrine Society, does it do
any more to support the idea that the WPATH guidelines or this
general standard of care is supported by evidence and can be
considered evidence-based care?  And they do not.  They were
drafted by a committee largely staffed by WPATH leaders and
authors, and they are not supported by a comprehensive
systematic review either.  The society never claims to have
reviewed any evidence regarding whether medical interventions
are effective in reducing gender dysphoria or improving mental
health, nor does the society claim to have undertaken a
systematic review regarding the risks of medical interventions
for fertility, brain development, and reversibility, even
though it admitted that those were risks.  Rather, the society
commissioned reviews on just two narrow questions, lipids and
cardiovascular outcomes and also bone health, but their failure
to look at the critical risks is a serious problem with the

1    guidelines.  Why wouldn't a comprehensive assessment of the

2    science go into the known risks, those that even the Endocrine

3    Society itself recognized exist?

4         So there is other vary -- various problems.  The

5    guidelines themselves, in fact, look at the evidence that is

6    out there on these matters, on the quality of evidence for

7    recommending hormones and blockers, and they rate it as low or

8    very low under the GRADE standards.

9         THE COURT:  When you -- when you were talking about

10   the legislative judgment made, based on European studies and

11   essentially said that there is a very, very wide range of

12   options that the State could take in response to this

13   information, that sounds like we're talking about rational

14   basis review, as opposed to heightened scrutiny.

15        MR. FISHER:  Uh-huh.

16        THE COURT:  Is that correct?  And if so, what about

17   heightened scrutiny, and specifically the language of the fit,

18   because that is something that I have spent a lot of time

19   thinking about, both what is the standard that would apply, how

20   *Whitaker* would not be a controlling case, which it seems to me

21   that it is, and if it is, how does the complete ban on the

22   procedures have a tight fit that would pass heightened

23   scrutiny?

24        MR. FISHER:  Right, well, so, *Whitaker*, *Whitaker* is,

25   I think, first of all, nowhere near this type of regulation.

1    There we were talking about a school bathroom policy that drew

2    distinctions based entirely on sex.   This is a distinction here

3    that is geared towards procedure.

4         And let's take Mr. Falk's example in that regard.

5    That doctor who has a 16-year-old coming in for some sort of

6    hormone therapy better know the sex of that child before

7    prescribing those hormones, I don't care about S.E.A. 480 or

8    anything else.   Hormones are going to have different effects on

9    males versus females and you have got to know as a doctor what

10   you are treating and how much to give and how frequently to

11   give it.   That's not sex discrimination.   That is taking into

12   account immutable, physical, objectively verifiable

13   characteristics that are biological, that is all this law is

14   doing, the exact same thing, whereas in *Whitaker*, the bathroom

15   policy was based entirely on sex and not on inherent biological

16   differences.

17        So I think, you know, looking at the Supreme Court

18   precedence, whether it's *Glenn* or *Geduldig* or *Dobbs*, all of

19   these cases tell us where you have got inherent biological

20   differences, those are not to be taken as discriminatory based

21   on sex if you have a regulation that is relevant to those

22   characteristics.   Indeed, that's not stereotyping, which is the

23   other problem with the *Whitaker* -- or the problem the *Whitaker*

24   court found with the bathroom policy.   It determined that what

25   was going on there was an assessment of stereotypical attitudes

1  towards privacy, and it was discriminatory to make that kind of

2  assessment based only on sex.  This is not a statute that turns

3  on stereotypes.  Again, it turns on the procedures, the age,

4  and the conditions for which they are prescribed, which are

5  different from the conditions for which blockers and hormones

6  can be used for a central precocious puberty or for problems

7  with, you know, pubertal development, et cetera.  Again, you

8  are treating different conditions with different types of

9  hormones for different periods of time with different results

10 and you are knowing in those circumstances something about

11 causation, which we don't know here.

12          So, again, we have, I think, a very different

13 scenario.  We don't have immutable characteristics in those

14 other cases, and we have, I think from *Whitaker*, merely an

15 assessment of a bathroom policy that has really very little to

16 do with the type of risks and the type of biologically-based,

17 you know, medical interventions that are at issue here.

18          Now, I think with respect to that heightened

19 scrutiny, we do have the evidence to meet that.  I don't think

20 the plaintiffs disclaim that the State has a compelling

21 interest in protecting children and safeguarding their health

22 and safety, and here the evidence amply supports advancing that

23 interest by prohibiting gender-transition procedures for

24 minors.  We don't have evidence that those procedures work.

25 That's one of the problems.  We do know that there are

1    significant risks.  The risks are substantial, and they are

2    various.  We detail them in our brief at pages 22 through 25,

3    so there is probably a little more precise numbers there, but

4    the point is that we have all of these reputable studies that I

5    think are not -- they are not really contested from -- at least

6    the ones from Europe and the risks themselves aren't contested

7    and the question is, that the plaintiffs raise, well, this is

8    not sufficiently narrowly tailored, and I think this goes to

9    Your Honor's question about fit.  Well, what are we supposed to

10   do?  We don't know -- and I don't think the plaintiffs dispute

11   this -- which children are accurately diagnosed with gender

12   dysphoria and which are not.  There is no objectively

13   verifiable way to say who has really got it and who doesn't.

14   The plaintiffs' expert witnesses admit that.  There is no

15   objective test you can do.  It all depends on the child's inner

16   sense, in a way, and how it relates to the world around them.

17   That's not something that we can have a test for and a statute,

18   so we are left with nothing that is more finely tuned.

19        I think the plaintiffs' next objection is, well, you

20   could permit it for research, but I don't understand how that

21   that's a narrower, you know, rule that would somehow still

22   advance the purposes of the statute.  The children that

23   participate in research trials are also at risk, the same way

24   that all other children are, so our interests are still at

25   stake, and we're not, as a state, required to permit the

1   children of Indiana to be subjected to this grand experiment,

2   particularly when we know from the European studies that they

3   are already happening elsewhere in the world.  So I think that

4   the narrowness of fit matches the scope of the risks, it

5   matches the lack of proof that these are effective

6   interventions.

7            THE COURT:  And when you say the lack of the proof

8   and the evidence and I think in your brief that you say that

9   there is -- something to the effect of that there is no

10  evidence whatsoever that the use of blockers and/or hormones

11  has any benefit to any person whatsoever, so essentially you

12  are saying that the evidence of plaintiffs' experts -- and I

13  know it goes to your motion, but, again, at least one of the

14  experts, I think it's Dr. Karasic, has been practicing in this

15  field many, many years, seen hundreds and hundreds of patients,

16  and is your argument that that evidence should be given limited

17  value or that it has zero value whatsoever?  Same question as

18  to the evidence of the named plaintiffs in this case and the

19  affidavit of Dr. Bast having spoken to her patients and saying

20  that here is my observation, so is your argument that all of

21  those different types of evidence are entitled to zero weight

22  whatsoever?

23            MR. FISHER:  Well, I will start with Dr. Bast and

24  Mosaic because I think the important part there is that, you

25  know, a clinical setting, a personal physician's observation

1    about a handful of patients, is not how we do science, it's not

2    how we do assessment of risk and cause and effect in medicine.

3    We don't say, well, it seemed to work okay for these patients

4    right now, so therefore it must work.  Well, we don't know

5    anything about other patients and other circumstances, we don't

6    know long term how it's going to work out for these plaintiffs,

7    all we know is sort of a snapshot in time about an observation

8    of very limited use, really, from which generalizations cannot

9    be drawn.  And I really don't think that even the plaintiffs

10   would say that that is enough to say, well, therefore this

11   should, you know, be deemed as successful for everybody.  I

12   think they really try to turn to something more -- something

13   broader, and I think this is where Dr. Karasic and Dr. Turban

14   come in.  To the extent that those experts are saying that

15   there is evidence that puberty blockers and hormones and

16   surgeries cause gender dysphoria to dissipate, cause gender

17   dysphoria to dissipate, they are entitled to no weight because

18   there is no evidence that that is true.  The only studies that

19   exist, at most, show correlation, which is not causation, they

20   don't disentangle the medical intervention from the

21   psychological intervention and support, and they don't show

22   what happens, you know, for a long enough period of time.  And

23   indeed, I don't think that those experts say otherwise.  I

24   think what they are trying to do is to say, well, we have these

25   correlational studies and we have enough of them that, boy,

1    that sure seems to add up to causation, plus in our clinical

2    experience this all seems to work out okay.  But that, again is

3    not how we do science.  That is not demonstrative proof of

4    causation.  That is only, you know, no better than the studies

5    that they rely on one by one by one.  Dr. Turban admitted no

6    single study shows causation, and I think that that's the

7    critical feature of all of this.

8          THE COURT:  Right, and I agree and I understand the

9    point that we don't have what you refer to as the gold

10   standard, but we have what we have, and we have to look at that

11   evidence, recognizing that we don't have the results of

12   randomized controlled trials on either side, so we're having to

13   do imperfect comparisons, I guess I would say.  But having to

14   look at what evidence we do have in this record in this case,

15   even if it's not the best, I don't think I would say, well,

16   because it's not the best evidence that one could possibly

17   want, it's worth nothing.

18         MR. FISHER:  Well, no, I think the statements are

19   worth nothing.  When the statements are that intervention by

20   hormones and blockers cause gender dysphoria to be relieved,

21   there is no support for that statement.  And the question is

22   can the State therefore prohibit their use in light of the

23   known risks, and the answer is yes.  That's the difference.

24   Now, as to the ability to do a randomized controlled trial,

25   again, I think here the European studies come into play.  I

1    think it was the Swedish study that -- you know, there can be a

2    way to do a valid randomized controlled trial that is ethical.

3    It has to do not with giving people placebos but with sorting

4    them as between people who take -- medical intervention and

5    psychological support, versus a group that only does

6    psychological support.  So I think that there is a way to do

7    it, it hasn't been done, I'm not sure why, but that's where we

8    are.  And given the risks, and given that these are minors and

9    that the risks are not short term but long term and that the

10   risks, even in a successful scenario, we're talking about a

11   lifetime of medicalization, potentially surgery that is going

12   to irreversibly damage, you know, one's reproductive organs or

13   other -- you know, perhaps breasts, I mean this is really

14   serious stuff, and I don't think it's like more minor medical

15   interventions that can rest on less rigorous scientific

16   scrutiny.

17          Again, where is that line going to be drawn between

18   what the legislature can regulate and what it can't regulate

19   based on the science of efficacy and the science of risks?

20   Classic legislative question.  There is no constitutional or

21   statutory line to be drawn here.

22          THE COURT:  If this were rational basis.

23          MR. FISHER:  Well, I think, yes.  But I think that

24   even if we are in heightened scrutiny, we have no proof of

25   benefit at all.  There is no proof of causation, and that's, I

1   think, critical on that inquiry.

2          THE COURT:  I believe it is undisputed in the record

3   that adolescent gender dysphoria is a serious medical condition

4   recognized by the DSM-5, right?

5          MR. FISHER:  Right.

6          THE COURT:  Okay.  So we agree with that.

7          And a focus of that, as I understand it, is on the

8   distress that individuals diagnosed with that condition may

9   experience.  So my point is that we're talking about the real,

10  live individuals who have been diagnosed with what is a real

11  condition validated in the DSM-5.  And would you agree that if

12  left untreated, that an adolescent can experience serious harm

13  from having gender dysphoria that is untreated?

14         MR. FISHER:  Perhaps.  But of course no one is

15  talking about leaving this untreated.  The question is not

16  hormones, blockers, or nothing.  It's what is the, you know,

17  the ability to get other treatment, psychological support,

18  psychosocial support.  Which, by the way, Dr. Karasic

19  acknowledges is valuable, at least in cases of suicidality.

20  Well, if it's valuable there, why isn't it valuable in other

21  places?

22         Let's take one of the concrete examples to illustrate

23  this point.  One of the plaintiffs, M.R., there was a mental

24  health hospital visit.  Mental health hospital treated M.R. who

25  suffers from anxiety, depression, and ADHD.  The treatment that

1   was prescribed by the hospital was anti-depressants and

2   teaching M.R. coping skills.  M.R. reported good results.

3   M.R.'s doctor suggested that providing continued mental health

4   support would be a treatment option, but M.R.'s mother already

5   decided, before seeing the physician, that M.R. would start

6   hormones as well.  After starting hormones, M.R. stopped taking

7   anti-depressants.  So the rush to hormone therapy there

8   interceded, got in the way of, the alternative, which is the

9   anti-depressants and the psychotherapy that was prescribed by

10  the hospital and that M.R.'s doctor had recommended to be

11  continued.  So it's not a case of all or nothing.  There is an

12  alternative, and that alternative is the psychological care

13  that accompanied the inventions with hormones and blockers in

14  all of the studies the plaintiffs cite, which cannot be

15  discounted as the causation that's behind whatever recovery

16  those plaintiffs found.

17          THE COURT:  So let me shift gears just one second and

18  ask you about on the issue of ultimately granting injunctive

19  relief, assuming that I were to find that plaintiffs had

20  established some likelihood of succeeding on one or more of the

21  claims and had passed the initial phase of preliminary

22  injunctive relief, my question would be is it would seem like

23  you have a group of adolescents who are going to have to

24  abruptly stop a course of treatment that they have been

25  undergoing for some amount of time and there is evidence from

1    the parents, the minors, and the doctors, that that would cause

2    those specific individuals harm.  And I also note somewhere in

3    the plaintiffs' materials they gave the data that I think Riley

4    Children's Hospital has been providing this type of treatment

5    since about 2018 to over 900 patients and that a good number of

6    them have received or are receiving blockers and/or hormones.

7    Long way of leading up to ask that wouldn't the harm that is

8    going to occur to those individuals who began undergoing this

9    treatment, without any idea that it would be abruptly stopped,

10   would outweigh any comparable harm?

11             MR. FISHER:  So a couple of points I want to make in

12   response.  The first is with respect to hormones, it's not that

13   immediate.  It doesn't -- there is a taper period to the end of

14   the year.  With the blockers, it does go into effect

15   immediately.  With the hormones, it's until the end of the

16   year, so it's not as immediate and as abrupt, so I just want to

17   make sure that that is clear.

18             THE COURT:  No, right, I understand that, but they

19   will have a finite amount of time where they will be faced

20   with, I suppose, if the law were to go into effect, where they

21   would have to say either they immediately cease doing treatment

22   that their parents and they and their doctor have all agreed

23   that was medically necessary under their individual

24   circumstances, or I suppose leave the state.  So if my ultimate

25   goal is to get it right, wouldn't I want to leave the status

1     quo as it's been while this case is pending until we can

2     actually have a full trial on the merits, which will be a bench

3     trial, obviously, because they are only seeking injunctive

4     relief, and get that done soon?

5             MR. FISHER:  Well, I think a couple of points.

6     Number one is the types of comparisons that I think the Court

7     is making between these particular plaintiffs and other

8     plaintiffs perhaps that are being seen at Riley or other

9     places, I think all of that has to be assessed in the context

10     of the motion for class certification.  I don't think that that

11     is something that the Court can skip over and craft an

12     injunction that is so broad that it covers every conceivable

13     patient that maybe Riley or these other facilities have, and I

14     think the Court and the Seventh Circuit has been quite clear

15     about that, that you have to tailor the relief to the

16     particular plaintiffs.

17             Now, in a circumstance where there is a final

18     judgment and a broad declaration of invalidity, that is a very

19     different scenario, and it's not really that there is an

20     injunction as against the whole world absent class

21     certification, but it's just that the declaration of invalidity

22     does the work of sort of the universal application.

23             In the preliminary injunction scenario, we don't have

24     that.  We have to focus on these plaintiffs.  Now, if we go

25     through the class certification scenario and the Court is

1   satisfied that all of the requirements for class certification

2   have been met, that is, again, different.  But the Seventh

3   Circuit tells us, with respect to this preliminary injunction

4   right now, the Court can only really address the harms that are

5   attendant to these plaintiffs.

6          Now, again, I think what I want to point to, of

7   course, is the lack of evidence that these interventions are

8   causing any relief from gender dysphoria.  The Court, I think,

9   you know, and other courts have said, well, gosh, there is

10  evidence that these interventions work for things like blocking

11  puberty, for prompting secondary sex characteristics or

12  preventing other secondary sex characteristics.  And of course

13  all of that is true, but that's not the question.  The question

14  is what's the effect on the dysphoria.  And there is no

15  evidence that these interventions cause a relief from

16  dysphoria, as opposed to other interventions, namely

17  psychological interventions, and all of what has accompanied, I

18  think, so many of the treatments of patients having gender

19  dysphoria for so many years.  So I think that that is part of

20  what the Court has to think about and has to look at.

21         Now, I would submit we're presumably, if the Court

22  grants an injunction, which I hope it won't, but if it does,

23  then we're going to proceed to, I would assume, the class

24  certification motion, and at that point I think, you know, the

25  Court will be able to take into account the broader impact and

1   review whether, indeed, these plaintiffs are representative in

2   a way that is significant and meaningful enough to expand that

3   injunction.

4           THE COURT:  Okay.  So based on our timing here, I

5   think I'm going to momentarily go back to hearing from

6   Mr. Falk, so if you could wrap up your presentation.

7           MR. FISHER:  And really I think at this point I'm

8   only interested in answering the Court's questions.  I think

9   Mr. Falk briefly touched on Medicaid, and so I shouldn't let

10  that go unaddressed.  This is not a Medicaid statute.  This is

11  a statute that has to do with regulating the practice of

12  medicine.  If Indiana targeted treatment of Medicaid patients,

13  that would be a different thing, but that's not what this

14  statute is doing, and that gets us outside of Medicaid.  There

15  are no cases that I'm aware of, aside, perhaps, from the other

16  gender dysphoria cases that Mr. Falk is relying on, no other

17  cases that say, well, Medicaid prevents the State from

18  regulating broadly with respect to the practice of medicine,

19  and so I think that that is really a non-starter in terms of a

20  way to preempt Indiana from doing what it's doing here.

21          THE COURT:  All right.  Thank you.

22          Mr. Falk.

23          MR. FALK:  Thank you.  In one sense the argument the

24  State is making is shocking.  They're saying there is no

25  evidence, even though we have submitted countless studies and

1    even though we have experts who have seen thousands of persons,

2    they are saying there is no proof that there is causation.  And

3    what our experts have said is that what there is is proof that

4    this is efficacious, that this works, that without this

5    treatment, people get worse.  I think we're asking a lot of

6    science here.  Listening to clinical judgment as medicine is

7    exactly how we do medicine and the fact that something has

8    worked thousands of times means something and the fact that we

9    are dealing with a standard of care that has been endorsed by

10   everyone means something.  It would be shocking to a doctor

11   practicing to find out that, hey, you know, forget about

12   listening to the AMA or the American Psychiatric Association,

13   the American Academy of Pediatrics, because the State of

14   Indiana is going to tell you what to do.  There has to be a

15   significant reason for that, and there isn't there.

16           Mr. Fisher talks about what is going on in Europe.

17   What is going on in Europe is that you are having countries say

18   that perhaps it will be harder to get gender-affirming care

19   through the National Health Service, but in Sweden today you

20   can get gender-affirming care from a private doctor, in England

21   you can get gender-affirming care.  No one, no one, no country

22   has banned this care.  Indiana is going where Europe has not

23   gone/done.  And for Indiana to say, well, we need more

24   research, well how do you do research, Your Honor, if you ban

25   it?  Our experts are scientists.  They are more than happy to

1    do studies, they are more than happy to do research, but you

2    can't do research if you can't do the gender-affirming care.

3            Now, Dr. Karasic has noted that most pediatric

4    treatment is given a very low GRADE in systematic reviews

5    because generally low quality means no random controlled

6    trials, so I don't want to play doctor, I don't want to play

7    social scientist, but I don't think we can draw conclusions by

8    talking about GRADE and low GRADE.  I think we can draw

9    conclusions from clinical experience.  And obviously, that's

10   what our experts have, and their credibility depends not on

11   their demeanor, which you can see, but on their obvious

12   experience they bring to bear, and our experts have brought a

13   lot of experience to bear.

14           But this is not a case about dueling experts.  This

15   is a case about whether the State can show that this

16   discrimination, which is clearly based on sex, survives

17   heightened scrutiny, and it simply doesn't.  The State

18   hypothesizes potential harms, but there is no proof of the

19   grave harms they talk about.  Yes, there is a bone density

20   potential issue with puberty blockers and that's why you see in

21   the material that we presented from Riley and Mosaic and

22   Eskenazi that's dealt with and there are ways to deal with it

23   through monitoring, through providing a medication, through

24   making sure someone is not on puberty blockers for too long.

25   This is the exact same risks that you have if you are getting

1    puberty blockers for something else.  Yes, there is a potential

2    risk concerning fertility with regard to hormones, although our

3    experts note that people who are on -- transgender persons who

4    are receiving hormones are informed to use birth control

5    because you can still get pregnant or can still be fertile, but

6    there are ways to dealing with that too.  Every medicine has a

7    potential downside.  And what medicine does, and what we trust

8    our doctors to do, is to sit down with us and say, look, here

9    is the problem, you have gender dysphoria.  Yes, there is no

10   objective test for gender dysphoria.  There is no objective

11   test for depression, for bipolar.  The Diagnostic & Statistical

12   Manual of Mental Disorders is full of mental disorders that

13   there is no objective test for, but there certainly is an

14   objective listing about gender dysphoria so that practitioners

15   can diagnose you, not based on this is just what we think, but

16   based on meeting standards that have been vetted and have been

17   approved and are used every day.

18           So they sit down, and they say here it is, you have

19   gender dysphoria, here are your options, here are the

20   downsides, here are the plus sides.  I think what our experts

21   have testified from their clinical experience, experience that

22   defendants' experts don't have, is that in weighing those

23   downsides against the upside of getting rid of or minimizing

24   dysphoria, again the upside of aligning yourself -- you know,

25   let's not miss -- let's not forget about how horrible gender

 1    dysphoria is, how horrible it is to be trapped in the wrong

 2    body, and how that permeates every minute of your life and

 3    every minute of parents' lives, so you are able through this

 4    discussion with your doctor to assess the plusses and minuses

 5    and then most people say, yeah, let's try it because we need to

 6    feel better, and we do feel better.  People feel better.  This

 7    isn't a case where four people are getting treatment.  This is

 8    a case where thousands of people in the United States are

 9    getting this treatment, and there is a long history of

10    providing this treatment.

11          We could always use more research, sure.  And we are

12    willing -- our experts are willing to do it if they can provide

13    this sort of procedure.

14          Mr. Fisher mentioned M.R.  M.R. was hospitalized for

15    suicidal thoughts and behavior -- I think he had been cutting,

16    suicide ideation -- after being repeatedly misgendered for

17    quite some time in his school and trying to cope with that.

18    His hospitalization was directly related to gender dysphoria.

19    In the hospital, he is diagnosed with gender dysphoria.  And

20    coming out of the hospital, he seeks treatment for gender

21    dysphoria, continues his medication, I think Dr. Bast

22    prescribed him a different medication for depression, but

23    that's how it works.  That's how it works.  You have gender

24    dysphoria, and it's hard to reconcile yourself with your

25    day-to-day life.  And with his hormones, he has improved.

1      There are enormous stakes here, Your Honor, for these

2  children and their families, and I think that a parent can tell

3  you those enormous stakes better than I can.  When M.W.'s

4  mother was asked what her worries were, she was asked in her

5  deposition about this statute, she said, quote:  That he will

6  be denied the care that has breathed life into him, and it

7  could all get taken away from him.  That would send him back to

8  the darkest period and worse because he has had a taste of what

9  life could be like when he has that alignment within himself,

10  and to rob him of that would be devastating.

11      We think that this Court should maintain the status

12  quo and grant the injunction.  We are happy to have a quick

13  trial to resolve this, but it would be truly, truly dangerous

14  and devastating to end this treatment for the many hundreds, if

15  not thousands, of persons in Indiana who are receiving it now.

16  Thank you.

17      THE COURT:  Okay.  Thank you.  So I do want to thank

18  both sides for very thorough and professional presentations,

19  both on paper and here today in court, that very thoroughly

20  address issues that, of course, as Mr. Falk and Mr. Fisher

21  indicated, are of great importance to both sides in this case.

22  I will take the motion under advisement.  I'm aware, obviously,

23  of the time sensitivity with the effective date of the new

24  statute rapidly approaching, and we'll get a ruling out as soon

25  as possible.

1          Is there anything else, Mr. Falk, at this time?

2          MR. FALK:  Your Honor, their motion to exclude is

3    sitting out there.  We have 14 days to respond under the local

4    rules.  We have moved to strike.  Obviously we would prefer not

5    to respond to it because we don't think it should exist, but

6    what is the Court's pleasure in that regard?

7          THE COURT:  I will issue a written order following up

8    before the end of this week, so I have both under advisement at

9    this time.

10          MR. FALK:  Great.  Thank you.

11          THE COURT:  Anything further?

12          MR. FALK:  Nothing.  Thank you very much, Your Honor.

13          THE COURT:  Mr. Fisher, anything further?

14          MR. FISHER:  Nothing, Your Honor.  Thank you.

15          THE COURT:  Okay.  So thank you all again.  And with

16    that, we are adjourned.

17          COURTROOM DEPUTY:  All rise.

18               (Adjourned at 2:59 p.m.)

19     ****************************************

20          CERTIFICATE OF COURT REPORTER

21          I, Jodie Franzen, hereby certify that the foregoing

22    is a true and correct transcript from reported proceedings in

23    the above-entitled matter.

24

25    S/s Jodie Franzen