UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| K.C., *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 1:23-cv-00595-JPH-KMB |
| | ) |
| THE INDIVIDUAL MEMBERS | ) |
| OF THE MEDICAL LICENSING | ) |
| BOARD OF INDIANA, in their | ) |
| official capacities, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

JAMES A. BARTA
Solicitor General

CORRINE YOUNGS
Policy Director and Legislative Counsel

MELINDA R. HOLMES
KATELYN E. DOERING
Deputy Attorneys General

Office of the Attorney General
302 West Washington Street
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

*Counsel for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................1

ARGUMENT .........................................................................................................................3

I.      Rule 23(a)(1)'s Numerosity Requirement Is Not Satisfied for the Provider Class and Medicaid Provider Subclass....................................................................................3

II.     Material Differences Among Procedures, Providers, and Proposed Class Members Preclude Certification of Rule 23(b)(2) Classes for Puberty Blockers and Hormones ...................................................................................................................5

        A.    Class certification is appropriate here only if the claims asserted and relief sought do not require consideration of individual circumstances ...................................................................................................6

        B.    Differences between puberty blockers and hormones make class-wide treatment inappropriate ..........................................................................................7

        C.    Differences among providers' approaches make class-wide treatment inappropriate ..........................................................................................9

        D.    Differences among minors make class-wide treatment inappropriate...................12

        E.    Unique defenses exist with respect to some proposed class members .................13

III.    Each Class Improperly Includes Surgical Interventions....................................................13

CONCLUSION....................................................................................................................16

# INTRODUCTION

Plaintiffs propose several broad classes under Federal Rule of Civil Procedure 23(b)(2) that encompass any minor seeking gender-transition procedures prohibited by S.E.A. 480 and any provider offering those procedures to minors. Within those classes, however, there is more variety than plaintiffs care to admit. The classes encompass persons seeking (or providing) different procedures—puberty blockers, hormones, surgeries; minors with diverse medical histories; and providers following different guidelines for the diagnosis and treatment of gender dysphoria in minors. These differences mean that S.E.A. 480 does not affect all members of the proposed classes in the same way, and that a court could conclude that only some members are entitled to injunctive relief, even under heightened scrutiny. Plaintiffs' failure to establish that class claims can be resolved without reference to members' individual circumstances precludes certification.

# BACKGROUND

This case is a putative class action in which the plaintiffs allege that Indiana's Senate Enrolled Act 480, Ind. Code § 25-1-22-1 *et seq.*—which regulates the provision of gender-transition procedures to minors—violates the Fourteenth Amendment's Equal Protection and Due Process Clauses; the First Amendment; Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116; and Medicaid requirements, 42 U.S.C. § 1396d(a)(10)(A) and (a)(10)(B)(i). Dkt. 1. The "gender transition procedures" restricted by S.E.A. 480 include the use of GnRH analogues (puberty blockers) to delay normal puberty, the use of cross-sex hormones to induce features of the opposite sex, and surgeries intended to instill physical features that resemble those of the opposite sex. Ind. Code § 25-1-22-5(a); *see* Dkt. 54 at 7–9. The named plaintiffs in this lawsuit, all of whom oppose the ban on these procedures, are four minors (K.C., M.W., A.M., and M.R.); parents of the minor

plaintiffs (Nathaniel and Beth Clawson, Ryan and Lisa Welch, Emily Morris, and Maria Rivera); and providers Dr. Catherine Bast and Mosaic Health and Healing Arts, Inc. ("Mosaic"). *Id.*

Each of these groups of named plaintiffs seeks to represent a proposed class. Class 1 (the "Minor Patient Class"), represented by K.C., M.W., A.M., and M.R., is defined as "all minors in the State of Indiana who are, or will be, diagnosed with gender dysphoria, and are receiving, or would receive but for Senate Enrolled Act 480, care that falls within the statute's definition of 'gender transition procedures.'" Dkt. 105 at 2. Class 2 (the "Parent Class"), represented by Nathaniel and Beth Clawson, Ryan and Lisa Welch, Emily Morris, and Maria Rivera, is defined as "all parents of minors in the State of Indiana who are, or will be, diagnosed with gender dysphoria, and are receiving, or would receive but for Senate Enrolled Act 480, care that falls within the statute's definition of 'gender transition procedures.'" *Id.* Class 3 (the "Provider Class"), represented by Dr. Catherine Bast and Mosaic, is defined as "all current physicians and practitioners in Indiana, as those terms are defined in Senate Enrolled Act 480, who are providing care that falls within the statute's definition of 'gender transition procedures' or who, but for the Act, would provide that care." *Id.* at 3. Plaintiffs also propose a subclass of the Minor Patient Class that includes Medicaid recipients (represented by A.M.), and a subclass of the Provider Class that includes Medicaid providers (represented by Dr. Bast and Mosaic). *Id.* at 2–3.

Plaintiffs sought class certification and a preliminary injunction enjoining the State from enforcing S.E.A. 480. Dkt. 1 at 46; Dkt. 9 (motion for preliminary injunction); Dkt. 10 (motion for class certification). The Court later granted plaintiffs' motion for preliminary injunction in part "to the extent that, while this case is pending, Defendants may not enforce S.E.A. 480's prohibitions on (1) providing gender transition procedures for minors except gender reassignment surgery and (2) speech that would aid or abet gender transition procedures for minors," and denied in part "as

2

to the ban on gender reassignment surgeries." Dkt. 67 at 2. The Court also "use[d] its equitable power" to prohibit the State "from enforcing the enjoined portions of S.E.A. 480 against any provider, as to any minor." Dkt. 67 at 33. The motion for class certification remains pending.

## ARGUMENT

"The party seeking [class] certification bears the burden of demonstrating that certification is proper." *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021) (quoting *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015)). A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). The proposed class must also satisfy "at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Rule 23's requirements are not "a mere pleading standard." *Id.* at 350. Rather, "[a] party seeking class certification must affirmatively demonstrate . . . compliance with the Rule." *Id.* Plaintiffs fall short of meeting their burden.

### I. Rule 23(a)(1)'s Numerosity Requirement Is Not Satisfied for the Provider Class and Medicaid Provider Subclass

A class action is designed for situations in which class members are so numerous that joinder is impracticable. *See* Fed. R. Civ. P. 23(a)(1); *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). The "key numerosity inquiry" is "not the number of class members alone but the practicability of joinder." *Anderson*, 986 F.3d at 777. To prove numerosity, a class representative must show that it is "extremely difficult or inconvenient" to join all class members. *Id.* (quoting 7A Wright & Miller, *Federal Practice & Procedure* § 1762 (3d ed.)). Class size is "relevant" but "not dispositive." *Young v. Magnequench Int'l, Inc.*, 188 F.R.D. 504, 506 (S.D. Ind. 1999). A class of several "easily identifiable" parties does not meet the numerosity requirement. *Id.* at 507.

A court may refuse to certify a proposed class if its membership is "limited" and members' identities are "readily discoverable." *Swain v. Brinegar*, 517 F.2d 766, 780 (7th Cir. 1975).

Here, joinder of the providers is practicable. Plaintiffs offer a list of three providers that is both limited and easily identifiable: Mosaic, Riley Gender Health Program, and Eskenazi Gender Health Clinic. Dkt. 105-1 at 3 (Marquis Suppl. Decl. ¶ 10). Mosaic is already a party to this lawsuit, and if Riley and Eskenazi wished to challenge S.E.A. 480, they could readily be joined as parties. Plaintiffs observe that these three practices together represent approximately 50 physicians and licensed practitioners affected by S.E.A. 480. *See* Dkt. 105 at 7. But it is not clear why the headcount of Mosaic, Riley, and Eskenazi should matter. If these practices obtained an injunction preventing enforcement of S.E.A. 480 against them, the injunction would cover their employees too; a corporation must "act through agents." *Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 417 (7th Cir. 1995). The employees would need to sue individually only if they intend to provide gender-transition procedures apart from their employment at Mosaic, Riley, and Eskenazi—and plaintiffs provide no evidence any practitioners at these practices intend to do so. Regardless, it would not be difficult to contact the providers' employees and join any who wished to participate. That plaintiffs have been able to count how many employees each practice has demonstrates that the pool of potential class members is limited and that their identities are readily discoverable.

Perhaps plaintiffs believe there will be more providers in the "future." Dkt. 105 at 8. But the class is defined as "all *current* physicians and practitioners in Indiana, as those terms are defined in Senate Enrolled Act 480, who are providing care that falls within the statute's definition of 'gender transition procedures' or who, but for the Act, would provide that care." Dkt. 105 at 3 (emphasis added). Plaintiffs, moreover, provide no evidence that Indiana "would" have more providers "but for" S.E.A. 480. That plaintiffs can identify only three providers despite a preliminary

4

injunction preventing S.E.A. 480's enforcement as to any minor and "any provider," Dkt. 67 at 33, undermines their position further. "Mere speculation as to the number of parties involved" does not prove numerosity. *Roe v. Town of Highland*, 909 F.2d 1097, 1100 n.4 (7th Cir. 1990) (quoting Wright & Miller § 1762, at 164 (2d ed. 1986)).

There are no "other factors" that suggest joinder is "impracticab[le]." Dkt. 105 at 7. Plaintiffs speculate that the "Provider Class (and the Medicaid Provider Subclass)" may be "reluctan[t] to initiate individual actions." *Id.* at 9. But that makes no sense: Mosaic, Riley, and Eskenazi all advertise their provision of gender-transition procedures to the public, even identifying some of their physicians by name or specialty. *See Mosaic Health & Healing Arts*, https://mosaichha.org/; Riley Children's Health, *Gender Health Program*, https://www.rileychildrens.org/departments/gender-health-program; Eskenazi Health, *Gender Health Program*, https://www.eskenazi-health.edu/health-services/gender-health. These providers would not do so if they feared public exposure. Plaintiffs' "'speculation'" that there may be other providers reluctant to be identified is insufficient to support class certification, *Roe*, 909 F.2d at 1100 n.4, especially considering that plaintiffs have the ability to sue anonymously in the event of a genuine concern over publicity. The Provider Class and Medicaid Provider Subclass do not satisfy the numerosity requirement.

**II.     Material Differences Among Procedures, Providers, and Proposed Class Members Preclude Certification of Rule 23(b)(2) Classes for Puberty Blockers and Hormones**

Plaintiffs define each of their proposed classes to include persons pursuing or providing "care that falls within the statute's definition of 'gender transition procedures.'" Dkt. 105 at 2–3. The class definitions do not differentiate between minors seeking access to GnRH analogues and hormones. The class definitions do not differentiate among minors with no comorbidities and minors with significant comorbidities. And the class definitions do not differentiate among medical

5

providers that follow more rigorous standards and providers that follow less rigorous standards. Those capacious definitions make class certification inappropriate.

### A. Class certification is appropriate here only if the claims asserted and relief sought do not require consideration of individual circumstances

To certify a Rule 23(b)(2) class, a court must assure itself that neither the claims asserted nor relief sought requires "reference to [each plaintiff's] individual circumstances." *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1038 (8th Cir. 2020) (citations omitted); *see Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). Class cohesiveness under typicality and commonality must be so high that "success by the plaintiff translates into success for all class members" and the requested relief would be "applicable across the class." 1 McLaughlin on Class Actions § 5:15 (19th ed.); *see Washington v. Marion Cnty. Prosecutor*, 264 F. Supp. 3d 957, 965 (7th Cir. 2017) ("commonality and typicality . . . tend to merge") (citing *Falcon*, 457 U.S. at 158 n.13).

To satisfy commonality under Rule 23(a)(2), plaintiffs must "demonstrate that class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality requires a "common contention" that is "capable of classwide resolution," and that "generate[s] common answers apt to drive the resolution of the litigation." *Id.* Similarly, to satisfy typicality under Rule 23(a)(3), plaintiffs must show that their claims "have the same essential characteristics as the claims of the class at large." *McFields v. Dart*, 982 F.3d 511, 518 (7th Cir. 2020). Typicality is not met when "each class member" presents "fundamentally unique circumstances" or "overwhelming factual distinctions that defeat any 'essential characteristics' across the claims." *Id.*; *see Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) ("A person whose claim is idiosyncratic or possibly unique is an unsuitable class representative."). "[A] plaintiff against whom the defendants have a defense not applicable to other members of the class is

6

not a proper class representative" under Rule 23(a)(3). *Hardy v. City Optical Inc.*, 39 F.3d 765, 770 (7th Cir. 1994) (citing *Koos v. First Nat'l Bank*, 496 F.2d 1162 (7th Cir. 1974)).

Also, to certify as a Rule 23(b)(2) class, plaintiffs must show that "a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. Redress must be for "group, as opposed to individual, injuries." 1 McLaughlin on Class Actions § 5:15. Rule 23(b)(2) is only satisfied when "a single injunction or declaratory judgment would provide relief to each member of the class" and not when "each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360. Relief under Rule 23(b)(2) is only appropriate when "the interests of the class members are *cohesive* and *homogeneous* such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000) (emphasis added). Effectively, the commonality, typicality, and single-injunction requirements are three ways of putting the same question: Can the Court conduct the case and fashion relief without regard to class members' individual circumstances?

**B. Differences between puberty blockers and hormones make class-wide treatment inappropriate**

The Court cannot do so here. To the contrary, plaintiffs' theories require consideration of individualized circumstances. Plaintiffs ask this Court to apply heightened scrutiny to their Fourteenth Amendment claims and issue a permanent injunction against enforcement of S.E.A. 480. Dkt. 27 at 27–30. Under heightened scrutiny, a court must determine whether the challenged classification "serves important governmental objectives" and whether "the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up). Similarly, in evaluating an injunction, a court must

7

"weigh[] the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party and the public—including third parties—if it is granted." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023). Here, no one denies that gender-transition procedures carry risks. *See* Dkt. 67 at 22–23. The question that remains is whether the benefits of allowing gender-transition procedures for minor patients outweigh those risks.

In answering that question, a court could reach different conclusions about the risk-benefit profile of GnRH analogues and hormones. First, hormones cause more irreversible effects than puberty blockers. Dkt. 48-2 at 35–38 (Hruz Decl. ¶¶ 61–62, 65, 67). Cross-sex hormones, for example, can have "irreversible effects on fertility." *Id.* at 39 (Hruz Decl. ¶ 67). As even plaintiffs' expert admits, a patient taking cross-sex hormones "for a certain period of time" will "start to develop characteristics that are more permanent," and these effects are "more irreversible . . . than [for] the puberty blocker." Dkt. 48-11 at 18 (Turban Dep. 61:6–15). Second, while both hormones and puberty blockers carry significant risks, "there are more uncertainties associated with [puberty blockers'] use." Dkt. 49-7 at 38 (Cass Report ¶ 3.24). These uncertainties include whether the blockers contribute to an "increased risk of testicular cancer" in natal males or cause "significant effects on final stature and bone density" and "alteration of normal adolescent brain maturation" in all adolescents. Dkt. 48-2 at 35–37 (Hruz Decl. ¶¶ 61, 62, 64). Third, although there is ample reason to conclude that both puberty blockers and hormones lack sufficient supporting evidence, Dkt. 49-10 at 5 (Ludvigsson at 4), plaintiffs have relied on different studies for puberty blockers and hormones, introducing a variation in the reliability of evidence into the analysis. *See* Dkt. 26-3 at 5–6 (Turban Decl. ¶¶ 14–15); Dkt. 63 at 9–15 (describing problems with Turban's studies).

As a result of these differences, it is possible that a court could analyze GnRH analogues and hormones differently under heightened scrutiny. That means that minors seeking puberty

8

blockers and minors seeking hormones may not have suffered the "'same injury,'" *Dukes*, 564 U.S. at 350, and may not have claims with the "'same essential characteristics,'" *McFields*, 982 F.3d at 518, making it improper to certify classes covering both puberty blockers and hormones. The possibility that a court could reach different conclusions for puberty blockers and hormones creates a problem under Rule 23(b)(2) as well. If a court were to reach different conclusions, it could not enter a single injunction providing relief to the proposed class "as a whole." Fed. R. Civ. P. 23(b)(2). Any injunction would provide relief only to a portion of the proposed classes, either the portions seeking access to puberty blockers or the portions seeking access to hormones.

      **C.    Differences among providers' approaches make class-wide treatment inappropriate**

Differences among providers' approaches to gender-transition procedures could affect the cost-benefit analysis as well and hence the propriety of class-wide relief. Among providers of gender-transition procedures, different providers follow different protocols of different rigor. Some providers follow the so-called "Dutch protocol" that involves "extensive mental health assessment," requires ongoing mental health support, and imposes age limits on access to gender-transition procedures. Dkt. 48-1 at 110–11 (Cantor Decl. ¶¶ 240, 243–44); Dkt. 48-2 at 34 (Hruz Decl. ¶ 59). By contrast, plaintiffs' preferred approach—which they say is reflected in guidelines issued by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, Dkt. 1 at 21—does not require psychotherapy before medical interventions are begun or impose age limits. Dkt. 48-1 at 112–13, 124–25 (Cantor Decl. ¶¶ 248, 278, 280–81); *see* Dkt. 48-9 at 21 (Karasic Dep. 76:9–17) (admitting no therapy is required). And some providers are even less bound, operating "well outside of any standard of care." Dkt. 49-17 at 6–7, 10–11 (Reed Decl. ¶¶ 10, 21). As a result, even if one credits the results of studies conducted under the

more conservative protocols, one could conclude that those studies do not support barring S.E.A. 480's enforcement against providers that follow laxer standards.

Plaintiffs themselves acknowledge that standards matter for their claims. Plaintiffs admitted that Indiana may require medical providers to follow "WPATH's guidelines or the guidelines that Riley [Gender Health Program] follows." Dkt. 73 (Hr'g Tr. at 19:2–9). But there is nothing in the class definitions excluding minors who seek procedures from providers that depart from these guidelines. As defined, the proposed class definitions are broad enough to encompass minors who go to practitioners following the Dutch protocol and practitioners following no guidelines whatsoever. That means there is no way to conclude that every person within the proposed classes will be affected in the same way by S.E.A. 480 and is entitled to the same relief. Commonality, typicality, and Rule 23(b)(2) are not satisfied.

Plaintiffs may argue that all current providers in Indiana follow essentially the same approach to gender-transition procedures. But Eskenazi's approach appears more similar to the Dutch protocol than WPATH's. It will not provide medical gender-transition procedures (puberty blockers, hormone therapy) for minors younger than 16. Dkt. 48-7 at 10 (Fogel Dep. 31:19–33:17). Mosaic, by contrast, is much more aggressive, diagnosing minor patients of "all ages"—as young as 3—with gender dysphoria and providing GnRH analogues to minors at the start of puberty. Dkt. 48-8 at 11, 15, 17–18 (Mosaic Dep. 35:4–12, 49:5–8, 57:4–9, 62:11–21). Thus, even if a court thought it appropriate to provide gender-transition procedures to minors under some circumstances, it would not follow that all members of the proposed classes are entitled to relief.

There is, moreover, evidence suggesting that not all Indiana providers adhere to the medical guidelines that plaintiffs say should be followed. Plaintiffs' expert Jack Turban testified that, to make a proper diagnosis of gender dysphoria, a "simple case" would require "five or six sessions

10

over a few months" and that "very complicated cases," such as cases in which a patient has conditions like "schizophrenia and PTSD," could require "a year or longer." Dkt. 48-11 at 12–13 (Turban Dep. 40:13–41:22). But Mosaic's Bast has indicated that she believes she can get "enough" information "to make a diagnosis" over the course of a single appointment. Dkt. 48-8 at 17 (Mosaic Dep. 60:7–14); *see* Dkt. 48-17 at 16 (M. Rivera Dep. 53:21–56:7). At least two of the named plaintiffs in the lawsuit were diagnosed more quickly than Turban's testimony suggests is appropriate. M.R. was diagnosed with gender dysphoria at Michiana Behavioral Health during a single stay, Dkt. 48-17 at 12 (M. Rivera Dep. 38:1–6), and Mosaic agreed with this diagnosis "in the first appointment," Dkt. 48-8 at 31 (Mosaic Dep. 114:10–115:1), which lasted only "30 minutes to an hour," Dkt. 48-17 at 14–16 (M. Rivera Dep. 55:4–56:19). M.W., who receives treatment at Riley, was similarly diagnosed with gender dysphoria "at the first appointment," which was virtual. Dkt. 48-15 at 12–13 (R. Welch Dep. 38:13–23, 40:7–18, 43:6–13). The lack of rigor with which providers approach gender dysphoria in minors affects the analysis.

### D.     Differences among minors make class-wide treatment inappropriate

Differences among minors themselves preclude class certification as well. Some minors experience significant psychological comorbidities that make the use of GnRH analogues and cross-sex hormones riskier and more harmful for them than for minors without any comorbidities. *See* Dkt. 48-1 at 75–79 (Cantor Decl. ¶¶ 153–161); Dkt. 48-2 at 31 (Hruz Decl. ¶ 55); Dkt. 48-3 at 101–02, 106, 111–114 (Kenny Decl. ¶¶ 193, 204, 220, 223, 225). Other conditions can affect the risk-benefit calculus as well. As plaintiffs' expert admitted, a "high risk of blood clots," an "acute psychiatric crisis," or the failure to complete "a comprehensive biopsychosocial evaluation" could make it too risky to provide GnRH analogues or hormones. Dkt. 48-11 at 12 (Turban Dep. 38:3–39:10). Plaintiffs' own experts thus emphasize the "need to be weighing the risks and benefits" on

11

a "case-by-case basis." *Id.*; *see* Dkt. 26-2 at 15 (Shumer Decl. ¶ 58) (the "individual needs of the patient . . . direct conversations regarding care options"); Dkt. 26-1 at 10 (Karasic Decl. ¶ 38) ("medical interventions . . . depend[] on the age and medical needs of each individual").

The variation in individual circumstances precludes class certification. To obtain an injunction under Rule 23(b)(2), plaintiffs must show that relief can be awarded "without reference to [each plaintiff's] individual circumstances." *Harris*, 953 F.3d at 1038; *see Lemon*, 216 F.3d at 580. On the account of plaintiffs' own experts, however, medical interventions are not appropriate for some minors within the class. Those minors, their parents, and any providers proposing to provide puberty blockers or hormones to them thus are not entitled to injunctive relief against S.E.A. 480. That makes it infeasible to craft relief on a class-wide basis. Plaintiffs cannot demonstrate that it is an inappropriate use of the police power to ban gender-transition procedures with respect to every member of the proposed classes, as they must to succeed under Rule 23.

### E. Unique defenses exist with respect to some proposed class members

Unique defenses affect the class-certification analysis as well. Under S.E.A. 480, provider clinics owned by the state, counties, and municipalities, and the physicians and licensed practitioners these providers employ, are subject to double restrictions. First, they are subject to S.E.A. 480's general prohibition against providing gender-transition procedures to minors. *See* Ind. Code § 25-1-22-13. Second, they are subject to S.E.A. 480's more specific prohibition against providing gender-transition procedures as a "health care facility owned by the state, a county, or a municipality," or as a "practitioner employed by state, county, or local government." Ind. Code § 25-1-22-14.

That second restriction affects the injuries, claims, and defenses available as to proposed class members subject to that restriction. As an initial matter, none of the plaintiffs have standing

12

to challenge the restriction. To challenge § 25-1-22-14, plaintiffs would have to "demonstrate standing" as to that "claim." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207–08 (2021); *see Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) ("*Before* a class is certified . . . the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit."). But no plaintiff provider is owned or employed by the State, a county, or a municipality, and no plaintiff minor receives gender-transition procedures at those facilities. Plaintiffs thus do not have standing to challenge that aspect of S.E.A. 480.

Given plaintiffs' lack of standing to challenge § 25-1-22-14, defendants would have unique defenses as to any claims involving state, county, and municipal providers. For example, defendants would be able to argue that any minor seeking gender-transition procedures at a county or municipal hospital cannot demonstrate an injury traceable to § 25-1-22-13 because § 25-1-22-14 would "independently" bar the hospital from providing those procedures. *Satanic Temple, Inc. v. Rokita*, No. 1:22-CV-01859-JMS-MG, 2023 WL 7016211, at *10 (S.D. Ind. Oct. 25, 2023). Defendants, moreover, would have unique arguments to raise as to constitutional claims asserted by any class members seeking or providing treatment at a state, county, or municipal hospital. For example, plaintiffs have argued that the Fourteenth Amendment provides a right to access gender-transition procedures for minors. *See* Dkt. 1 at 44 (Compl. ¶ 215). As the Supreme Court has explained, however, a right of access to a procedure does not create a right to state "subsidization." *Harris v. McRae*, 448 U.S. 297, 318 (1980). So situations in which minors are seeking gender-transition procedures from state, county, and municipal providers must be treated differently, which in turn creates problems for commonality, typicality, and Rule 23(b)(2).

### III. Each Class Improperly Includes Surgical Interventions

Plaintiffs' proposed classes are too broad because they encompass gender-transition surgeries. Plaintiffs' proposed class definitions each include persons seeking or providing any "care

that falls within the statute's definition of 'gender transition procedures.'" Dkt. 105 at 2–3. Under S.E.A. 480, "gender transition procedures" include any "surgical service" to "alter or remove physical or anatomical characteristics or features that are typical for the individual's sex," as well as "genital gender reassignment surgery" and "nongenital gender reassignment surgery." Ind. Code § 25-1-22-5(a); *see id.* §§ 25-1-22-6, 25-1-22-8. There are several reasons why it is improper to include surgical interventions within the proposed class definitions.

First, as this Court previously explained, plaintiffs "lack standing" to challenge "S.E.A. 480's prohibition on gender-transition surgery for minors." Dkt. 67 at 15. No minor patient plaintiff has concrete plans for surgery before age 18. *See* Dkt. 48-13 at 19 (N. Clawson Dep. 66:20–24); Dkt. 48-14 at 14 (Morris Dep. 47:23–48:8); Dkt. 48-17 at 21 (M. Rivera Dep. 75:23–76:7); Dkt. 48-15 at 22 (R. Welch Dep. 80:4–10); Dkt. 48-16 at 26 (L. Welch Dep. 95:19–96:2). And no one in Indiana provides, or plans to provide, surgeries to minors. Dkt. 51 at 4 (Stip. of Facts ¶ 14); Dkt. 48-8 at 26 (Mosaic Dep. 93:8–10, 94:6–8); Dkt. 48-7 at 10, 13 (Eskenazi Dep. 32:2–4, 42:21–43:6); Dkt. 48-6 at 12 (Riley Dep. 38:23–24). Given that *none* of the named plaintiffs possesses standing to challenge S.E.A. 480's restrictions on surgical interventions, it would be improper to certify a class defined to encompass surgical interventions. If the named plaintiffs "lacked standing when they filed the suit," classwide resolution is "doom[ed]." *Walters v. Edgar*, 163 F.3d 430, 437 (7th Cir. 1998); *see Kohen*, 571 F.3d at 676 ("*Before* a class is certified . . . the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit.").

Second, plaintiffs cannot demonstrate to the Court that Rule 23(a)'s requirements are met. Under Rule 23(a)(2) and (3), plaintiffs must show that they have suffered a common injury with class members, *see Dukes*, 564 U.S. at 350, and that "the claims or defenses of the representative

14

parties are typical of the claims or defenses of the class," *McFields*, 982 F.3d at 517. Additionally, under Rule 23(a)(4), plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." This adequacy requirement is not met when the named plaintiff's "interest in prospective relief is too tenuous" to support "a right to an injunction on his part." *Arreola v. Godinez*, 546 F.3d 788, 799 (7th Cir. 2008). Here, however, plaintiffs do not have a concrete interest in challenging S.E.A. 480's restrictions on surgical interventions; indeed, they do not have standing to do so. That deprives the named plaintiffs of the ability to satisfy Rule 23(a)'s requirements as to surgical interventions.

Third, as witnesses on both sides recognize, the risk-benefit calculus for surgeries is different compared to other medical interventions. Surgeries carry even greater risks and cause irreversible effects. Operations in which surgeons castrate young boys and cut out ovaries in girls cause permanent loss of fertility and the ability to orgasm, among other risks. Dkt. 48-1 at 99, 101 (Cantor Decl. ¶¶ 207, 214). Similar risks accompany breast removal, which permanently prevents breastfeeding. Dkt. 48-1 at 98–99 (Cantor Decl. ¶ 206). Additionally, "[b]etween 15–38% of children who undergo mastectomies require additional surgeries." Dkt. 48-4 at 25 (Weiss Decl. ¶ 128). Among adults who have had sex reassignment surgery, the "overall mortality" rate is "three times higher" than the general population and the suicide rate is "19 times higher." Dkt. 48-3 at 72 (Kenny Decl. ¶ 137). Moreover, there is far less evidence about the purported benefits of surgery. As plaintiffs' own expert admits, no papers examine genital surgery for adolescents. Dkt. 48-11 at 50 (Turban Dep. 189:10–24). And the literature on chest surgeries is "at the level of more case series qualitative data," *e.g.*, interviews with select patients. *Id.* at 49 (188:14–22).

Whatever one thinks of other medical interventions, there is good reason to prohibit surgeries for minors. Indeed, both Riley and plaintiffs' expert Dr. Karasic reject gender-transition

15

surgery for those under 18 given (1) the lack of capacity of children and adolescents to consent and (2) the permanence of surgery. Dkt. 48-6 at 9 (Riley Dep. 28:14–21); Dkt. 48-9 at 26 (Karasic Dep. 95:2–10). That even proponents of some gender-transition procedures reject surgeries for minors makes it inappropriate to treat minors seeking surgeries the same as minors seeking other interventions, which in turn creates problems for commonality, typicality, and relief.

## CONCLUSION

Plaintiffs' motion for class certification should be denied.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

By: /s/ James A. Barta
James A. Barta
Solicitor General

Corrine Youngs
Policy Director & Legislative Counsel

Melinda R. Holmes
Katelyn E. Doering
Deputy Attorneys General

Office of the Attorney General
302 West Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204
Phone: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

*Counsel for Defendants*