UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| K.C., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, *et al.*, <br><br> Defendants. | No. 1:23-cv-00595-JPH-KMB |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

**INTRODUCTION**

This action challenges, on a number of constitutional and statutory bases, Senate Enrolled Act 480 ("S.E.A. 480"), which prohibits physicians and other medical practitioners in Indiana from providing certain gender-affirming care to minors, or aiding or abetting the provision of such care. *See* Ind. Code § 25-1-22-13. Given that S.E.A. 480 applies uniformly to hundreds if not thousands of transgender children and their parents, and to dozens if not hundreds of practitioners providing gender-affirming care, the plaintiffs have sought certification of three classes (a Minor Patient Class, a Parent Class, and a Provider Class) and two subclasses (a Medicaid Patient Subclass and a Medicaid Provider Subclass). Each class and subclass is defined to include persons who may raise the various legal claims advanced by the plaintiffs and to exclude persons who may not. This is clearly appropriate: Federal Rule 23(b)(2) was designed specifically to facilitate relief in cases just like this one, and the requirements for class certification are readily met. Indeed, Indiana does not challenge numerosity (*see* Fed. R. Civ. P. 23(a)(1)) as it relates to the Minor Patient Class, the Parent Class, or the Medicaid Patient Subclass, nor does it challenge adequacy (*see* Fed. R. Civ. P. 23(a)(4)) as it relates to any class or subclass. Instead, it raises three arguments against certification, none of which have merit.

1

First, it argues that the Provider Class and the Medicaid Provider Subclass are not sufficiently numerous to render the joinder of all members impracticable. *See* Fed. R. Civ. P. 23(a)(1). In advancing this argument, however, it does not dispute that both the class and the subclass consist of more than the forty persons required to raise a presumption that numerosity is met. Instead, it argues that two institutional providers—Riley Hospital's Gender Health Program ("Riley") and Eskenazi Hospital ("Eskenazi")—could, if they chose, initiate legal action on behalf of their employees. But there is absolutely no authority for the proposition that a class may be deemed insufficiently numerous merely because its claims might be aggregated in some other fashion, and Indiana cites none.

Second, Indiana argues that the claims of each class member will depend on a variety of individual circumstances, such that the commonality and typicality requirements of Rule 23(a) and the requirement of Rule 23(b)(2) are not met. This argument, however, runs headfirst into dozens of cases certifying classes where the plaintiffs' claims arise from their medical needs, which will, of course, always depend on "individual circumstances." The bottom line is that these class-certification factors are readily met when a putative class challenges a generally applicable statute or policy that applies uniformly to all of its members. Indeed, Indiana's tacit contention that this Court should resolve dozens or hundreds of individual challenges to S.E.A. 480 each year, instead of resolving a single class-action lawsuit, is simply untenable.

And third, Indiana raises two reasons that it believes that the proposed class definitions are overbroad. Even if meritorious, those arguments are, at most, a reason to redefine some of the classes, but not a basis for denying class certification. In light of this Court's holding on preliminary injunction that the plaintiffs lacked standing to challenge S.E.A. 480's ban on gender-affirming surgical care, this Court may wish to redefine all classes other than the Provider Class to exclude persons (or the parents of persons) who will receive or provide surgical care. This redefinition has no practical effect given the undisputed fact that no entities in Indiana provide this care to minors. In all other respects,

however, the class definitions are proper.

All requirements of Rule 23(a) and (b)(2) are met in this case, and the putative classes and subclasses should be certified.

**ARGUMENT**

**I.     The Provider Class and Medicaid Provider Subclass are sufficiently numerous to render joinder impracticable**

Indiana does not dispute that a class consisting of at least forty members is generally "regarded as sufficient to meet the numerosity requirement" of Federal Rule 23(a)(1). (Dkt. 105 at 4 [quoting *Orr v. Shickler*, 953 F.3d 490, 498 (7th Cir. 2020)]). Nor, as noted, does it dispute that numerosity is met with respect to the Minor Patient Class, the Medicaid Patient Subclass, and the Parent Class. Indeed, it does not even dispute that the forty-member threshold is met for the Provider Class and the Medicaid Provider Subclass. (*See* Dkt. 106 at 6 [observing that the plaintiffs have identified "approximately 50 physicians and licensed practitioners affected by S.E.A. 480"]). Instead, it argues that the Provider Class and the Medicaid Provider Class fail the numerosity requirement, notwithstanding the fact that the numerical threshold is met, because the largest providers of gender-affirming care in Indiana—Riley and Eskenazi—could have joined in this suit. There are two primary problems with this argument.

First, the Provider Class and Medicaid Provider Subclass are defined as all "physicians and practitioners" who provide, or will provide, care prohibited by S.E.A. 480. This is obviously appropriate, for the statute prohibits "a physician or other practitioner" from providing gender-affirming care, Ind. Code § 25-1-22-13(a), or from aiding or abetting another practitioner in doing so, Ind. Code §§ 25-1-22-13(b), 15. Indiana does not argue, however, that the joinder of all of these persons is practicable. Rather, its argument is that *if* the largest providers of gender-affirming care in Indiana *chose* to file suit, a favorable judgment might inure to the benefit of their employees, who are members of the putative class. That is the functional equivalent of saying that a class of voters cannot

3

be certified to challenge election regulations because suit could have been initiated by the major political parties representing the voters, *but see McDaniel v. Sanchez*, 452 U.S. 103, 133 n.4 (1981), or that a class of Black employees cannot be certified to challenge discriminatory employment practices because suit could have been initiated by their union or by the NAACP, *but see Lewis v. City of Chicago*, 560 U.S. 205, 209 (2010). Obviously no support for Indiana's contention exists. There are any number of reasons that large hospitals such as Riley and Eskenazi might decline to pursue legal action against state officials, but their willingness or unwillingness to do so has nothing to do with the numerosity calculus. *Cf. Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 605 (E.D. Wis. 2000) ("The presence of large claimants in a proposed . . . class and the possibility that some of them might proceed on their own does not militate against class certification."). This is because numerosity asks whether it is impracticable to join all class members in a single action, not whether there is some other mechanism through which claims might conceivably be aggregated.

And second, Indiana's argument does not do justice to the jurisprudence establishing that a class consisting of at least forty members raises a presumption that joinder is impracticable. Although Indiana is correct that the size of any class is "relevant" but "not dispositive" in the numerosity calculus (Dkt. 106 at 5 [quoting *Young v. Magnequench Int'l, Inc.*, 188 F.R.D. 504, 506 (S.D. Ind. 1999)]), with virtual uniformity this principle is employed to *relax* the numerical threshold under appropriate circumstances. *See, e.g.*, *Glynn v. Martin Sports & Entm't, LLC*, 2023 WL 2601609, at *4 (D. Mass. Mar. 22, 2023) ("Where the potential class number is less than forty, federal courts have taken a more flexible approach to the numerosity analysis.") (quotation and citation omitted) (cleaned up); *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002) ("Courts have . . . found the numerosity requirement satisfied where the putative class would number less than forty individuals."). This is particularly so when certification is sought pursuant to Rule 23(b)(2), for "[t]he general rule encouraging liberal construction of civil rights class actions applies with equal force to the numerosity

4

requirement of Rule 23(a)(1)." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975). Indiana does not cite a single case concluding that numerosity was not met notwithstanding the fact that the class size was *greater* than forty, and undersigned counsel has been unable to unearth any such cases. If any exist, they are clearly few and far between.

Indiana does not dispute that both the Provider Class and the Medicaid Provider Subclass consist of more than forty persons. This is enough to render the class sufficiently numerous for joinder to be impracticable. Indiana's argument to the contrary has no basis in the law.[1]

## II. Indiana's attempts to cast doubt on the commonality and typicality requirements of Federal Rule 23(a) as well as the requirement of Federal Rule 23(b)(2) are without merit

The named plaintiffs and the members of the putative classes and subclasses are all adversely affected by S.E.A. 480's complete prohibition on the provision of gender-affirming care to minors. Referencing the commonality and typicality requirements of Rule 23(a), as well as the requirement of Rule 23(b)(2), the lion's share of Indiana's opposition to class certification is devoted to its lengthy contention that the claims of some class members might actually differ from the claims of other class members based on individual medical needs. (Dkt. 106 at 7-15). But Indiana has not enacted a statute that differentiates between the provision of puberty blockers and the provision of gender-affirming hormones. (*See id.* at 9-11). It has not enacted a statute that mandates that physicians providing gender-affirming care follow a specific protocol. (*See id.* at 11-13). And it has not enacted a statute

---

[1] In their previous brief, the plaintiffs identified four additional factors that render joinder particularly impracticable here. (*See* Dkt. 105 at 8-10). Given that Indiana does not dispute that the Provider Class and the Medicaid Provider Subclass each consist of more than forty persons, it is not necessary for this Court to address any of these factors. However, Indiana's argument that institutional providers will not fear retaliation because they already publicly identify their provision of gender-affirming medical care (Dkt. 106 at 7) warrants response. This argument, of course, has nothing to do with whether individual physicians or other practitioners—the actual class members here—might be reluctant to, or lack the resources to, initiate individual suits. It also ignores the obvious distinction between notifying prospective patients about the availability of gender-affirming care and challenging a state statute in a hotly contested and highly publicized legal proceeding with all the attendant risks, including potential forced disclosure of personal patient information in the course of discovery.

that even allows for, let alone requires, the consideration of transgender minors' individual circumstances. (*See id.* at 13-15). In other words, Indiana's argument is simply that, if the General Assembly passed a *different* statute that only applied to some class members, that hypothetical statute might pass muster. Suffice it to say that this is not the issue confronting the Court at the class-certification stage. Notwithstanding the fact that determining an individual's precise medical needs will always be patient-specific, case law is clear that certification is appropriate when a generally applicable statute or policy is enforced against all putative class members. Because Indiana simply misconstrues the requirements of Rule 23, it is unnecessary for this Court to address the other errors in its arguments, which depend to a significant extent on the testimony of its own biased and unqualified experts.[2]

### A. There are questions of law or fact common to the class

Indiana argues that potential differences in the risks or benefits of gender-affirming care for some class members, or in the precise protocol that providers follow, means that this proceeding cannot "generate common answers" for the classes and the subclasses. *Wal-Mart Stores, Inc. v. Dukes*,

---

[2] Two of Indiana's errors, however, deserve mention at the outset. Aside from its misunderstanding of Rule 23's requirements, Indiana's focus on the risks it believes gender-affirming care poses under certain circumstances (Dkt. 106 at 13-14), or that certain forms of gender-affirming care pose (*id.* at 9-11), does not, as it suggests, mean that S.E.A. 480's complete ban on the provision of this care to minors might be constitutional as to some persons but not others. Rather, these arguments simply concern whether the statute is appropriately tailored and thus either constitutional or unconstitutional *as to everyone*. *See, e.g., Hawkins v. NCAA*, 652 F. Supp. 602, 612 (C.D. Ill. 1987) ("Equal protection is a test of whether the classification 'lines' were properly drawn.").

And Indiana's contentions regarding the precise treatment protocols employed by providers (Dkt. 106 at 11-13) are particularly off-base. Even if there were some distinction in the treatment offered by various providers, that clearly has nothing to do with class certification: no matter the precise protocol employed, S.E.A. 480 prohibits the provision of gender-affirming care, thereby presenting an obvious identity of interests among all class members. In any event, Indiana's argument is entirely an academic exercise. It attempts to find a difference in the protocol employed by Eskenazi because that facility only treats older adolescents with gender dysphoria. (*Id.* at 12). But in offering this treatment, that facility relies on the WPATH Standards of Care, the Endocrine Society Guidelines, and guidelines developed by "a number of well-regarded gender health programs around the country." (Dkt. 48-7 at 8 [24:15 through 25:23]). The fact that it has chosen to provide care only to older adolescents, in part because "there are other programs that do a great job providing services to younger adolescents and children" (*id.* at 10 [32:5-13]), obviously is not evidence of a difference in treatment protocol.

6

564 U.S. 338, 350 (2011) (emphasis omitted). This argument, however, evidences a fundamental misapprehension about commonality itself. In determining whether this requirement is met, "[t]he critical point is the need for *conduct* common to members of the class." *Lacy v. Cook Cnty.*, 897 F.3d 847, 865 (7th Cir. 2018) (internal quotation and citation omitted) (emphasis in original). Indiana, of course, does not and could not contend that it fails to act uniformly with respect to each and every class member, for S.E.A. 480 completely prohibits the provision of gender-affirming care to transgender adolescents, in all circumstances. The "conduct" common to the class is obvious.

Of course, this Court is not alone in confronting a statute or policy that allegedly denies necessary care to persons diagnosed with gender dysphoria or that otherwise singles out transgender individuals for differential treatment. "Numerous courts have found commonality satisfied where a proposed class challenges government policies that discriminate against transgender individuals." *Roe ex rel. Roe v. Herrington*, 2023 WL 5759590, at *3 (D. Ariz. Aug. 10, 2023) (citing *Toomey v. Arizona*, 2020 WL 3197647, at *1 (D. Ariz. June 15, 2020), *Monroe v. Meeks*, 335 F.R.D. 201, 206 (S.D. Ill. 2020), and *Flack v. Wisc. Dep't of Health Servs.*, 331 F.R.D. 361, 370 (W.D. Wis. 2019)); *see also Doe v. Ladapo*, 2023 WL 8271764, at *2-3 (N.D. Fla. Oct. 18, 2023); *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 16835839, at *4-5 (W.D. Wash. Nov. 9, 2022); *Fain v. Crouch*, 342 F.R.D. 109, 114-15 (S.D.W. Va. 2022), *appeal pending*, No. 22-1927 (4th Cir.); *Cruz v. Zucker*, 195 F. Supp. 3d 554, 565-66 (S.D.N.Y.), *on reconsideration*, 218 F. Supp. 3d 246 (S.D.N.Y. 2016). In many of these cases, the plaintiffs advanced similar or identical legal claims to those advanced here, and the courts rejected the precise arguments that Indiana advances.

In *Ladapo*, for instance—which concerned a statute nearly identical to S.E.A. 480—the state asserted "that providing class relief will require individual determinations of the circumstances and appropriate care of each individual." 2023 WL 8271764, at *3. "Not so," said the court:

> Commonality requires common questions with common answers and is not defeated just because a case also presents individual issues. Indeed, nearly all class actions

7

> potentially present individual questions about whether individuals qualify for whatever classwide relief may ultimately be granted. Thus, for example, class actions in the decade following enactment of the Civil Rights Act of 1964 resulted in injunctions desegregating large public and private employers, despite individual questions about whether any individual class member would qualify for the jobs or pay at issue . . . .
>
> If this action results in a ruling that the challenged statute and rules are unconstitutional, the individual class members will be able to seek individualized medical care, just as they could do before the statute [was adopted]. The class members—and for minors, the parents—will decide, in consultation with their healthcare professionals, what medical care to obtain. Except to the extent necessary to prevent state officials from acting in violation of the United States Constitution, the court will not address individualized treatment issues.

*Id.* The court in *Cruz* (which concerned restrictions on Medicaid coverage for gender-affirming care) similarly rejected the argument that "each class member's individual medical circumstances w[ould] determine whether specific treatments are medically necessary" such that commonality did not exist. 195 F. Supp. 3d at 565. It was the overarching "ban" on coverage that represented "the 'glue' holding together plaintiffs' claims as required by *Dukes*: if the ban violates the federal law, each of the claims brought by [the class] will be resolved 'in one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350); *see also Fain*, 342 F.R.D. at 114-15 (rejecting an identical argument in certifying a class of Medicaid recipients seeking coverage of gender-affirming surgical care).

So too here. "This is not a situation where the defendant's allegedly injurious conduct differs from plaintiff to plaintiff; rather, they all complain about the same failure." *Lacy*, 897 F.3d at 865 (internal quotation and citation omitted). That is all that commonality requires.

### B. The claims of the named plaintiffs are typical of those of the members of the putative classes and subclasses

Indiana's "challenge to the typicality requirement fails for largely the same reasons." *Lacy*, 897 F.3d at 866 (reiterating the observation in *Wal-Mart*, 564 U.S. at 349 n.4, that the "commonality and typicality requirements . . . tend to merge") (alteration in original). Similar to commonality, typicality requires only that the named plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members" and that these claims "are based on the

8

y

same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (internal quotation and citation omitted); *see also Lacy*, 897 F.3d at 866 (quoting *Rosario*, 963 F.2d at 1018).

The district court in *Fain*, which concerned a prohibition on Medicaid coverage for gender-affirming surgeries, rejected the precise typicality argument that Indiana advances here:

> Plaintiffs argue that the proposed class representatives have claims identical to those of the class they seek to represent as, like all transgender Medicaid participants, they are denied without exception access to surgical care for gender dysphoria on the basis of sex and transgender status. The Court agrees. The exclusion invidiously discriminates against Plaintiffs as much as it would other members of the class. The relief sought is identical to other class members—the declaration of the exclusion's unlawfulness and an injunction precluding the enforcement of it.

342 F.R.D. at 115 (cleaned up). It simply did not matter that "[t]he determination of whether surgical care is appropriate" for each class member is "individualized," for the plaintiffs in that case merely sought an injunction "preclud[ing] Defendants from asserting the [system-wide] exclusion as a reason to deny coverage." *Id.* The *Ladapo* court reached the same conclusion. *See* 2023 WL 8271764, at *3 ("[E]ach named plaintiff has the same interest and has suffered the same injury as the class the named plaintiff will represent. The interest is to obtain appropriate medical care related to transgender identity and, for the parents, to direct their children's medical care. The injury is the state's prohibition of that care."). And, again, cases challenging governmental policies discriminating against transgender persons, including by denying medical care, appear to be uniform in this regard. *See, e.g., Roe*, 2023 WL 5759590, at *3; *C.P.*, 2022 WL 16835839, at *6-7; *Monroe*, 335 F.R.D. at 206; *Flack*, 331 F.R.D. at 369.

"Here, the named plaintiffs allege[] the same injurious conduct . . . as the class at large," and there is thus "no reason to question the typicality of their claims." *Lacy*, 897 F.3d at 866. Indiana's arguments to the contrary notwithstanding, typicality is met.

### C. Indiana has acted on grounds generally applicable to the classes and subclasses, and requirements of Federal Rule 23(b)(2) are therefore met

Indiana also interposes several objections based on the requirement of Rule 23(b)(2) that "the

9

party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." In so doing, however, Indiana does not dispute (nor could it) that it has acted "on grounds that apply generally to the class." Instead, its argument appears to be that class-wide relief is inappropriate *notwithstanding* the fact that it has acted uniformly against all class members.

The first problem with this argument is that the second prong of Rule 23(b)(2)—everything following "so that"—merely identifies what happens when the first prong is met; it is not a requirement distinct from the requirement that Indiana have acted on generally applicable grounds. *Cf. Baum Research & Dev. Co., Inc. v. Univ. of Mass. at Lowell*, 587 F. Supp. 2d 840, 846 (W.D. Mich. 2008) ("The portion of each claim that follows the phrase 'so that,' is not part of the function, but is instead a description of what occurs."); *Metso Paper, Inc. v. Enerquin Air Inc.*, 2008 WL 5068712, at *75 (E.D. Wis. July 23, 2008) ("The use of the phrase 'so that,' rather than a word such as 'and,' clearly indicates . . . that the language following the phrase 'so that' recites a functional capability of the claimed apparatus, rather than a separate method step."). Indiana cites no authority concluding that the requirements of Rule 23(b)(2) may not be met even when a defendant has acted "on grounds that apply generally to the class." Its recognition that it *does* act on grounds generally applicable to the class is enough for the Rule 23(b)(2) requirement to be met.

Just as importantly, by preliminarily enjoining S.E.A. 480 "against any provider, as to any minor" (Dkt. 67 at 33), this Court has already implicitly concluded that class-wide injunctive relief is appropriate should the plaintiffs prevail. And this conclusion stands on solid footing. Where a generally applicable statute is challenged, the fact that individual "medical decisions cannot be made through a generic remedy" does not preclude certification under Rule 23(b)(2). *Monroe*, 335 F.R.D. at 207. It suffices that "[t]he parties opposing the class—the defendants—will, unless enjoined, enforce the challenged statute . . . . They will do this because the statute . . . require[s] it—a ground that applies

generally to the classes." *Ladapo*, 2023 WL 8271764, at *4; *see also, e.g.*, *Fain*, 342 F.R.D. at 116; *Flack*, 331 F.R.D. at 470. As underscored previously, "Rule 23(b)(2) was drafted specifically to facilitate relief in civil right suits" such that "[m]ost class actions in the constitutional and civil rights areas . . . readily satisfy Rule 23(b)(2)" if they seek primarily prospective relief. (Dkt. 26 at 12 [quoting *Tyson v. Grant Cnty. Sheriff*, 2007 WL 1395563, at *5 (N.D. Ind. May 9, 2007)]).

The requirements of Rule 23(b)(2) are easily met with respect to each class and subclass.

### D. If meritorious, Indiana's arguments would preclude class certification in a wide array of cases concerning generally applicable restrictions on medical care where classes are routinely certified

While the plaintiffs have focused above most prominently on cases in which class certification was sought to challenge restrictions applicable to transgender persons, Indiana's arguments are not so limited. After all, in a wide variety of circumstances class certification is sought to pursue claims that governmental or insurance restrictions have resulted in the denial of necessary care. Were Indiana's arguments meritorious, a class seeking to raise such claims could seldom if ever be certified, for the determination of whether an individual actually needs such care will *always* depend on their precise medical circumstances and on the risks and benefits of providing that care to them as an individual.

But courts routinely conclude that classes raising these claims satisfy the commonality and typicality requirements of Rule 23(a) as well as the additional requirement of Rule 23(b)(2). *See, e.g.*, *Fitzmorris v. Weaver*, 2023 WL 8188770, at *14-27 (D.N.H. Nov. 27, 2023) (class of Medicaid waiver recipients at risk of "unjustified institutionalization"); *Meza ex rel. Hernandez v. Marstiller*, 2023 WL 2648180, at *9-12 (M.D. Fla. Mar. 27, 2023) (class of Medicaid recipients denied coverage for prescribed incontinence supplies); *A.A. ex rel. P.A. v. Phillips*, 339 F.R.D. 232, 245-49 (M.D. La. 2021), *vacated on other grounds*, 2023 WL 334010 (5th Cir. Jan. 20, 2023) (class of Medicaid recipients seeking home- and community-based services); *D.T. ex rel. K.T. v. NECA/IBEW Family Med. Care Plan*, 2019 WL 1354091, at *6-9 (W.D. Wash. Mar. 26, 2019) (class of insurance beneficiaries seeking coverage

11

for certain neurodevelopmental therapies); *M.H. v. Berry*, 2017 WL 2570262, at *4-8 (N.D. Ga. June 14, 2017) (class of Medicaid recipients seeking certain care under the EPSDT provision of federal Medicaid law), *reconsideration denied*, 2017 WL 4224089 (N.D. Ga. Aug. 28, 2017), *appeal pending*, No. 22-12071 (11th Cir.); *M.A. ex rel. Avila v. Norwood*, 2016 WL 11818203, at *4-7 (N.D. Ill. May 4, 2016) (class of Medicaid recipients seeking coverage for in-home nursing services); *K.M. v. Regence Blue Shield*, 2015 WL 519932, at *3-4 (W.D. Wash. Feb. 9, 2015) (class of insurance beneficiaries seeking coverage for certain therapies); *R.H. v. Premera Blue Cross*, 2014 WL 3056797, at *3-4 (W.D. Wash. July 7, 2014) (classes of insurance beneficiaries seeking coverage for certain therapies and behavioral interventions); *K.M. v. Regence Blueshield*, 2014 WL 801204, at *12-15 (W.D. Wash. Feb. 27, 2014) (class of insurance beneficiaries seeking coverage for certain neurodevelopmental therapies); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 771-75 (N.D. Ill. 2014) (class of Medicaid recipients challenging "system-wide failure to provide services that have already been prescribed"); *Oster v. Lightbourne*, 2012 WL 685808, at *4-5 (N.D. Cal. Mar. 2, 2012) (class of Medicaid recipients seeking coverage for certain in-home services); *A.M.T. v. Gargano*, 2010 WL 4860119, at *4-6 (S.D. Ind. Nov. 22, 2010) (class of Medicaid recipients denied coverage for certain therapies); *Cota v. Maxwell-Jolly*, 2010 WL 11485115, at *4-5 (N.D. Cal. Aug. 10, 2010) (class of Medicaid recipients in need of adult day care services); *Fields v. Maram*, 2004 WL 1879997, at *6-12 (N.D. Ill. Aug. 17, 2004) (class of nursing home residents seeking Medicaid coverage for motorized wheelchairs); *Nemnich v. Stangler*, 1992 WL 178963, at *5 (W.D. Mo. Jan. 7, 1992) (class of Medicaid recipients seeking coverage for dental services); *Weaver v. Reagen*, 701 F. Supp. 717, 721-23 (W.D. Mo. 1988) (class of Medicaid recipients infected with HIV seeking coverage for a specific medication); *White v. Beal*, 413 F. Supp. 1141, 1150-51 (E.D. Pa. 1976) (class of Medicaid recipients seeking coverage for eyeglasses).[3]

---

[3] In other instances, courts have certified similar classes as a result either of the parties' stipulation or a separate decision not available on Westlaw. *See, e.g., Collins v. Hamilton*, 349 F.3d 371, 372 n.1 (7th Cir. 2003) (class of Medicaid recipients who required mental health services and their parents); *Bontrager v. Ind. Family &*

The district court's decision in *A.A.* is emblematic of this jurisprudence. The state in that case objected to the certification of a class seeking to challenge the failure to provide certain home- and community-based services because "each proposed class member is factually distinctive and each . . . service criteria differs based on medical necessity" such that "each potential class member's claim w[ould] depend on an individualized inquiry regarding the alleged missing services." 339 F.R.D. at 245. This objection to commonality failed, however, "because it [wa]s founded on the misplaced notion that class relief will require individualized, judicially monitored, mental health assessments to determine class members' eligibility for . . . services, when, in fact, such assessments have already been performed by the class members' physicians." *Id.*; *see also, e.g.*, *D.T.*, 2019 WL 1354091, at *6 ("Defendants argue that individual differences in whether participants submitted a claim, were denied, had the medical necessity for the requested treatments, or had different treatment protocols mean that Plaintiff's claims lack commonality. . . . The Court disagrees."). And the objection met the same fate when it was recycled under the rubric of typicality and the requirements of Rule 23(b)(2). *A.A.*, 339 F.R.D. at 246-49.

Were Indiana's arguments meritorious, every one of these cases stands on dubious footing. Not surprisingly, as demonstrated above, this is not the case.

### E. Indiana's arguments, if accepted, would hopelessly burden this Court, Indiana's own attorneys, and plaintiffs' attorneys throughout the state

---

*Soc. Servs. Admin.*, 829 F. Supp. 2d 688, 692 (N.D. Ind. 2011), *aff'd*, 697 F.3d 604 (7th Cir. 2012) (class of Medicaid recipients seeking dental services); *Skubel v. Sullivan*, 925 F. Supp. 930, 935 (D. Conn. 1996) (class of Medicaid recipients seeking home health nursing services outside the physical confines of their home); *Sobky v. Smoley*, 855 F. Supp. 1123, 1126 n.2 (E.D. Cal. 1994) (class of Medicaid recipients seeking coverage for methadone maintenance treatment); *Doe v. Busbee*, 481 F. Supp. 46, 48 n.2 (N.D. Ga. 1979) (classes of Medicaid recipients and providers seeking coverage for medically necessary abortion care), *abrogated on other grounds as recognized in State v. Heckler*, 768 F.2d 1293, 1294-95 (11th Cir. 1985); *Zbaraz v. Quern*, 469 F. Supp. 1212, 1213 n.1 (N.D. Ill. 1979) (classes of Medicaid recipients and providers seeking coverage for medically necessary abortion care), *vacated on other grounds sub nom. Williams v. Zbaraz*, 448 U.S. 358 (1980); *Smith v. Vowell*, 379 F. Supp. 139, 145-46 (W.D. Tex. 1974) (class of Medicaid recipients seeking transportation to and from the providers of medically necessary services).

13

One final point deserves mention. Indiana's position appears to be that each time a minor is diagnosed with gender dysphoria and is prescribed puberty blockers or hormones—or perhaps even consults with their physician about the appropriateness of these interventions, *see* Ind. Code § 25-1-22-5(a)—they must initiate their own federal lawsuit challenging the constitutionality and legality of S.E.A. 480. While some minors might be disincentivized from pursuing relief due to a fear of retaliation or limited resources, or might simply be unaware that they have the ability to do so, federal courts in Indiana could easily expect to see dozens if not hundreds of such lawsuits each year. (*See* Dkt. 105 at 5-6). Imagine if eight expert witnesses submitted lengthy reports in each of those cases. Indiana's attorneys clearly do not wish to defend S.E.A. 480 *ad nauseum*, and this possibility is simply untenable for everyone involved.

This practical consequence of Indiana's arguments, of course, is "precisely the multiplicity of activity which Rule 23 was designed to avoid." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551 (1974). Although unnecessary to reject its arguments in opposition to class certification, the real-world implications of these arguments nonetheless deserve to be underscored.

### III. Indiana's argument that the classes and subclasses are overbroad in certain respects may require minor changes to class definitions but does not defeat certification

Finally, Indiana argues that the class definitions are overbroad in two respects. First, although it does not characterize this as an overbreadth argument, it contends that the classes and subclasses improperly include persons receiving care at a government-owned health care facility governed by Indiana Code § 25-1-22-14. (*See* Dkt. 106 at 14-15). And second, it contends that the classes and subclasses are inappropriately defined to include persons who will receive surgical care. (*See id.* at 15-18). Although this Court may choose to redefine the classes to exclude persons who will receive gender-affirming surgical care—a meaningless redefinition given that everyone agrees that this care is not provided in the state—Indiana's arguments are otherwise without merit.

14

### A. Indiana's statutory bar on the provision of gender-affirming care at government-owned facilities does not affect the propriety of class certification

Indiana argues that it has a "unique defense[]" to the claims of any plaintiff seeking gender-affirming care at a government-owned health care facility insofar as this "subsidized" care is separately banned by Indiana Code § 25-1-22-14.  (Dkt. 106 at 14-15).  Although it raises this argument in the context of its commonality, typicality, and Rule 23(b)(2) arguments, in actuality it appears to be contending that the classes and subclasses are overbroad to the extent that they include patients receiving care at government-owned facilities as well as practitioners providing care at these facilities.  There are three problems with this argument.

First, it appears a largely if not entirely hypothetical one.  As Indiana stresses, the parties have identified only three entities providing gender-affirming care to minors in the state.  Quite plainly, neither Mosaic Health and Healing Arts, Inc. nor Riley is "owned by the state, a county, or a municipality."  Ind. Code § 25-1-22-14(a).  But it appears that this exception does not even apply to Eskenazi, which provides hormones to a limited number of sixteen- and seventeen-year-olds (Dkt. 48-7 at 10 [31:19 through 33:17]) and which is operated by the Health and Hospital Corporation of Marion County ("HHC"), *see* Eskenazi Health, *About*, *at* https://www.eskenazihealth.edu/about (last visited Dec. 6, 2023).  After all, HHC is a "distinct municipal corporation," with its own governing board and capacity to sue and be sued, not a "county" or a "municipality."  *See* Ind. Code §§ 16-22-8-6, 7; *see also Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 688 (7th Cir. 2013); *Ekanem v. Health & Hosp. Corp. of Marion Cnty.*, 1980 WL 273, at *4 (S.D. Ind. Nov. 28, 1980).  Indiana does not explain why its argument matters.

Second, even if some entity in Indiana that would otherwise provide gender-affirming care to minors may not do so as a result of Indiana Code § 25-1-22-14, that fact would at most affect the Provider Class and the Medicaid Provider Subclass.  The Minor Patient Class, the Medicaid Patient Subclass, and the Parent Class are all defined in terms of persons who "are receiving[] or would

15

receive" gender-affirming care prohibited by S.E.A. 480. A patient who visits an entity that cannot provide gender-affirming care because it is covered by Indiana Code § 25-1-22-14 either will not receive care (in which case they are not a class member) or will receive care from a different provider (in which case their claims are unaffected by the statute). And even the Provider Class would still require certification as to the plaintiffs' First Amendment claim, *see* Fed. R. Civ. P. 23(c)(4) (allowing certification "with respect to particular issues"), for this claim is likewise unaffected by Indiana Code § 25-1-22-14.

And third, as Indiana appears to acknowledge, its argument relies on the contention that it truly does have a "unique defense" to the equal-protection claim of the Provider Class and the claim under the Affordable Care Act ("ACA") of the Medicaid Provider Subclass when gender-affirming care is provided at a government-owned facility. After all, "[w]here an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." *Baby Neal ex rel. Kanger v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (citation omitted). This is because "[i]t is the legal theories supporting those injuries that must be typical of plaintiffs' claims." *Eagle v. Vee Pak, Inc.*, 343 F.R.D. 552, 575 (N.D. Ill. 2023); *see also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ("[S]imilarity of legal theory may control even in the face of differences of fact.").

But Indiana has no greater right to mandate sex discrimination, whether viewed through the lens of equal protection or through the ACA's statutory prohibition, at government-owned facilities than it does at private facilities. Indeed, the Seventh Circuit's leading precedents holding that discrimination against transgender persons constitutes impermissible sex discrimination both arose in cases where the discrimination was committed *by* a public institution. *See A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772-74 (7th Cir. 2023), *cert. pending*, No. 23-392 (U.S.); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047-54 (7th Cir. 2017),

16

*abrogated on other grounds by* N*ken v. Holder*, 556 U.S. 418 (2009). The Supreme Court's holding in *Harris v. McRae*, 448 U.S. 297 (1980), that a due-process right to obtain an abortion does not require that the government pay for the procedure, which Indiana relies on (Dkt. 106 at 15), has absolutely nothing to do with this case: if the government paid for the abortions of one subclass of patients but not another, clearly the discrimination would be subject to equal-protection scrutiny.

Given all this, the focus on Indiana Code § 25-1-22-14 is a complete red herring. That statute does not render any of the classes or subclasses overbroad.

### B. The classes and subclasses do not inappropriately include persons who might receive or provide gender-affirming surgical care but, if this Court believes it appropriate, they may be redefined to make this explicit

Finally, Indiana argues at length that each class and subclass "improperly includes surgical interventions." (Dkt. 106 at 15-18). As a matter of semantics, this is true: the classes are all defined in terms of the receipt or provision of "gender transition procedures" as defined by S.E.A. 480, which include surgery. (*See* Dkt. 105 at 2-3). As this Court recognized on preliminary injunction, however, "[n]o Indiana provider performs gender-transition surgery on persons under the age of 18." (Dkt. 67 at 14 [quoting the parties' stipulation]). Indiana's argument therefore has no practical effect, for it is complaining that the classes are defined to include persons that do not exist.

Indiana's semantic argument should not be elevated over the practicalities of this litigation and, given the undisputed facts, there is no need to redefine the classes to excise (non-existent) class members who might receive or provide gender-affirming surgical care. Nonetheless, while the plaintiffs previously took the position that S.E.A. 480's ban on gender-affirming care should be enjoined in its entirety (*see* Dkt. 59 at 22), they recognize this Court's holding that they lack standing to challenge the statute's ban on surgical procedures (*see* Dkt. 67 at 13-15). Therefore, if the Court believes it appropriate, they have no objection to the redefinition of each class and subclass—with the exception of the Provider Class—to exclude persons who might receive or provide "gender

17

reassignment surgery" as that term is defined by Indiana Code § 25-1-22-2.  *See, e.g.*, *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001) ("Where appropriate, the district court may redefine the class."), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005); *In re: Libor-Based Fin. Instruments Antitrust Litigation*, 2016 WL 2851333, at *1 (S.D.N.Y. May 13, 2016) ("[T]he typical relief for an overbroad class is, if possible, redefinition, not the termination of class allegations.") (citation omitted).  The Provider Class should not be redefined insofar as its First Amendment claim—which challenges S.E.A. 480's aid-or-abet provision, Ind. Code § 25-1-22-13(b), "as applied to its regulation of speech" (Dkt. 67 at 28)—is not affected by the precise care provided by the members of the class.

Given that surgical procedures are not performed in Indiana, this redefinition does not affect the size of any putative class or subclass, and therefore does not cast numerosity into doubt.

## CONCLUSION

Indiana's opposition to the plaintiffs' request for class certification is without merit.  The three classes and two subclasses proposed by the plaintiffs should be certified, although this Court may wish to exclude persons who might receive or provide "gender reassignment surgery" from all classes other than the Provider Class.

Gavin M. Rose
Kenneth J. Falk
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 4602
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Chase Strangio, *Pro Hac Vice*
Harper Seldin, *Pro Hac Vice*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
212/549-2500
cstrangio@aclu.org
hseldin@aclu.org

*Attorneys for Plaintiffs and the Putative Classes and Subclasses*